**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

Thurgood Marshall U.S. Courthouse    40 Foley Square, New York, NY 10007 Telephone: 212-857-8500

## MOTION INFORMATION STATEMENT

Docket Number(s): 16-1914 _____    Caption [use short title] _____

Motion for: Stay Pending Appeal

In re Petrobras Securities Litigation

Set forth below precise, complete statement of relief sought:

Appellants request that this Court stay all
proceedings in the district court, pending this
Court's resolution of this expedited interlocutory
appeal.

MOVING PARTY: Defendants-Appellants          OPPOSING PARTY: Plaintiffs-Appellees

☐ Plaintiff          ☑ Defendant
☑ Appellant/Petitioner    ☐ Appellee/Respondent

MOVING ATTORNEY: See Addendum A          OPPOSING ATTORNEY: See Addendum A

[name of attorney, with firm, address, phone number and e-mail]

Court-Judge/Agency appealed from: Hon. Jed S. Rakoff, U.S. District Court, S.D.N.Y.

**Please check appropriate boxes:**

Has movant notified opposing counsel (required by Local Rule 27.1):
☑ Yes ☐ No (explain): _____

Opposing counsel's position on motion:
☐ Unopposed ☑ Opposed ☐ Don't Know
Does opposing counsel intend to file a response:
☑ Yes ☐ No ☐ Don't Know

**FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUNCTIONS PENDING APPEAL:**
Has request for relief been made below? ☑ Yes ☐ No
Has this relief been previously sought in this Court? ☐ Yes ☑ No
Requested return date and explanation of emergency: _____

July 25, 2016, in order to allow this Court
to review the Certification Order in the interlocutory
appeal and to prevent the in terrorem pressure to settle
before this Court rules on the appeal.

Is oral argument on motion requested? ☑ Yes ☐ No (requests for oral argument will not necessarily be granted)

Has argument date of appeal been set? ☐ Yes ☑ No  If yes, enter date: _____

Signature of Moving Attorney:
/s/ Lewis J. Liman _____ Date: 6/28/16    Service by: ☑ CM/ECF ☑ Other [Attach proof of service]

## ADDENDUM A

| MOVING ATTORNEYS | |
|---|---|
| Lewis J. Liman<br>CLEARY GOTTLIEB STEEN &<br>HAMILTON LLP<br>One Liberty Plaza<br>New York, New York 10006<br>(212)-225-2000<br><br>lliman@cgsh.com<br><br>*Attorneys for the Petrobras<br>Defendants-Appellants* | Jay B. Kasner<br>SKADDEN, ARPS, SLATE,<br>MEAGHER & FLOM LLP<br>Four Times Square<br>New York, NY 10036<br>(212) 735-3000<br><br>jay.kasner@skadden.com<br><br>*Attorneys for the Underwriter<br>Defendants-Appellants* |
| James J. Capra, Jr.<br>KING & SPALDING LLP<br>1185 Avenue of the Americas<br>New York, NY 10036<br>(212) 556-2100<br><br>jcapra@kslaw.com<br><br>*Attorneys for Defendant-Appellant<br>PricewaterhouseCoopers Auditores<br>Independentes* | |

| OPPOSING ATTORNEYS | |
|---|---|
| Jeremy A. Lieberman<br>POMERANTZ LLP<br>600 Third Avenue, Floor 20<br>New York, NY 10016<br>(212) 616-1100<br><br>jalieberman@pomlaw.com<br><br>*Attorneys for Lead Plaintiff and Named<br>Plaintiffs North Carolina Department of<br>State Treasurer and Employees'<br>Retirement System of the State of Hawaii* | |

## CERTIFICATION PURSUANT TO F.R.A.P. 26.1

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Defendants-Appellants Petróleo Brasileiro S.A. – Petrobras, Petrobras Global Finance B.V. ("PGF"), Petrobras America Inc. ("PAI") (collectively, with Theodore Helms, the "Petrobras Defendants"), BB Securities Ltd., Citigroup Global Markets Inc., J.P. Morgan Securities LLC, Itau BBA USA Securities, Inc., Morgan Stanley & Co. LLC, HSBC Securities (USA) Inc., Mitsubishi UFJ Securities (USA), Inc., Merrill Lynch, Pierce, Fenner & Smith Inc., Standard Chartered Bank, Bank of China (Hong Kong) Limited, Banco Bradesco BBI S.A., Banca IMI S.p.A. and Scotia Capital (USA) Inc. (collectively, the "Underwriter Defendants"), and PricewaterhouseCoopers Auditores Independentes ("PwC Brazil") state that:

1) Petrobras is a publicly traded company organized under the laws of Brazil. Petrobras has no parent company and no publicly-held corporation owns 10% or more of its shares. The Brazilian Federal Government owns 50.26% of the ordinary shares of Petrobras.

2) PGF is an indirectly controlled subsidiary of Petrobras. Petrobras has no parent company and no publicly held corporation owns 10% or more of its shares. The Brazilian Federal Government owns 50.26% of the ordinary shares of Petrobras.

3) PAI is an indirectly controlled subsidiary of Petróleo Brasileiro S.A. – Petrobras ("Petrobras"). Petrobras has no parent company and no publicly held corporation owns 10% or more of its shares. The Brazilian Federal Government owns 50.26% of the ordinary shares of Petrobras.

4) BB Securities Ltd. is wholly owned by Brasilian American Merchant Bank – BAMB, which is wholly owned by Banco do Brasil S.A., a publicly held company. Banco do Brasil S.A. has no parent company and no publicly held company owns 10% or more of its stock.

5) Citigroup Global Markets Inc. is a wholly owned subsidiary of Citigroup Financial Products, Inc., which, in turn, is a wholly owned subsidiary of Citigroup Global Markets Holdings Inc., which, in turn, is a wholly owned subsidiary of Citigroup Inc., a publicly held company. Citigroup Inc. has no parent company and no publicly held corporation owns 10% or more of its stock.

6) J.P. Morgan Securities LLC is wholly owned by JPMorgan Broker-Dealer Holdings Inc., which is a wholly owned subsidiary of JPMorgan Chase & Co., a publicly held company. JPMorgan Chase & Co. has no parent company and no publicly held corporation owns 10% or more of its stock.

7)   Itau BBA USA Securities, Inc. is wholly owned by Itau USA Inc. Itau

USA Inc. is 99.9% owned by Itaú Corretora de Valores S.A., which is

wholly owned by Itaú Unibanco S.A., which, in turn, is a wholly owned

subsidiary of Itaú Unibanco Holding S.A., a publicly held company.  Itaú

Unibanco Holding S.A. is controlled by Itaú Unibanco Participações

S.A., which is controlled, in part, by Itaúsa - Investimentos Itau S.A., a

publicly held company.  Itaúsa- Investimentos Itau S.A. has no parent

company and no publicly held company owns 10% or more of its stock

8)   Morgan Stanley & Co. LLC is a limited liability company whose sole

member is Morgan Stanley Domestic Holdings, Inc., a corporation

wholly owned by Morgan Stanley Capital Management, LLC, a limited

liability company whose sole member is Morgan Stanley.  Morgan

Stanley is a publicly held corporation that has no parent corporation.

Based on Securities and Exchange Commission Rules regarding

beneficial ownership, Mitsubishi UFJ Financial Group, Inc., 7-1

Marunouchi 2-chome, Chiyoda-ku, Tokyo 100-8330, beneficially owns

greater than 10% of Morgan Stanley's outstanding common stock.

9)   HSBC Securities (USA) Inc. is a wholly owned subsidiary of HSBC

Markets (USA) Inc.  HSBC Markets (USA) Inc. is a wholly owned

subsidiary of HSBC Investments (North America) Inc., which is an

indirect subsidiary of HSBC Holdings PLC, a publicly held company. HSBC Holdings PLC has no parent company and no publicly held corporation owns 10% or more of its stock.

10) Mitsubishi UFJ Securities (USA), Inc. is a wholly owned subsidiary of Mitsubishi UFJ Securities Holdings Co., Ltd., which, in turn, is a wholly owned subsidiary of Mitsubishi UFJ Financial Group, Inc., a publicly held company. Mitsubishi UFJ Financial Group, Inc. has no parent company and no publicly held corporation owns 10% or more of its stock.

11) Merrill Lynch, Pierce, Fenner & Smith Incorporated is a wholly owned subsidiary of NB Holdings Corporation. NB Holdings Corporation is a direct subsidiary of Bank of America Corporation, which owns all of the common stock of NB Holdings Corporation. Bank of America Corporation is a publicly held company whose shares are traded on the New York Stock Exchange. Bank of America Corporation has no parent company and no publicly held corporation owns more than 10% of Bank of America Corporation's shares.

12) Standard Chartered Bank is a subsidiary of Standard Chartered Holdings Limited, which, in turn, operates as a subsidiary of Standard Chartered PLC, a publicly held company. Temasek Holdings, an investment

4

company organized under the laws of Singapore, holds an ownership interest of 10% or more in Standard Chartered PLC.

13) Bank of China (Hong Kong) Limited is a wholly owned subsidiary of BOC Hong Kong Holdings Ltd., a publicly held company. Bank of China Limited, a publicly held company, owns 66.06% of the stock of BOC Hong Kong Holdings Ltd. Bank of China Limited has no parent company and no publicly held corporation owns 10% or more of its stock.

14) Banco Bradesco BBI S.A. is a subsidiary of Banco Bradesco S.A., a publicly held company. Banco Bradesco S.A. has no parent company and no publicly held corporation owns 10% or more of its stock.

15) Banca IMI S.p.A. is a wholly owned subsidiary of Intesa Sanpaolo S.p.A., a publicly held company. No publicly held corporation owns 10% or more of Intesa Sanpaolo S.p.A.'s stock.

16) Scotia Capital (USA) Inc. is a U.S. registered broker-dealer owned by Scotia Capital Inc. Scotia Capital Inc. is a wholly owned subsidiary of The Bank of Nova Scotia, a publicly held company. The Bank of Nova Scotia has no parent company and no publicly held corporation owns 10% or more of its stock.

17)     PwC Brazil has no parent corporation, and, as PwC Brazil is a

partnership, no publicly-held company owns stock in PwC Brazil.

# 16-1914-cv

## 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰

### *for the*

## 𝔖𝔢𝔠𝔬𝔫𝔡 𝔆𝔦𝔯𝔠𝔲𝔦𝔱

►◄◄

IN RE PETROBRAS SECURITIES LITIGATION

UNIVERSITIES SUPERANNUATION SCHEME LIMITED, *et al.*,

*Plaintiffs-Appellees*,

PETER KALTMAN, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, *et al.*,

*Plaintiffs*,

– v. –

PETRÓLEO BRASILEIRO S.A. – PETROBRAS, *et al.*,

*Defendants-Appellants*,

JOSE SERGIO GABRIELLI, *et al.*,

*Defendants*.

_____

**ON APPEAL FROM AN ORDER OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK (RAKOFF, J.) DATED FEBRUARY 2, 2016, CERTIFYING A CLASS ACTION, NO. 14 CIV. 9662 (JSR)**

## BRIEF IN SUPPORT OF APPELLANTS' EMERGENCY MOTION FOR A STAY PENDING APPEAL

| | |
|---|---|
| Lewis J. Liman | Jay B. Kasner |
| Roger A. Cooper | Boris Bershteyn |
| Elizabeth Vicens | Scott D. Musoff |
| Mitchell A. Lowenthal, Of Counsel | Jeremy A. Berman |
| CLEARY GOTTLIEB STEEN & HAMILTON LLP | SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP |
| One Liberty Plaza | Four Times Square |
| New York, New York 10006 | New York, NY 10036 |
| (212)-225-2000 | (212) 735-3000 |
| *Attorneys for the Petrobras Defendants-Appellants* | *Attorneys for the Underwriter Defendants-Appellants* |

James J. Capra, Jr.
Israel Dahan
KING & SPALDING LLP
1185 Avenue of the Americas
New York, NY 10036
(212) 556-2100


Michael R. Pauze (admission pending)
Kenneth Y. Turnbull
KING & SPALDING LLP
1700 Pennsylvania Avenue, NW
Washington, D.C. 20006
(202) 626-3737
*Attorneys for Defendant-Appellant*
*PricewaterhouseCoopers Auditores*
*Independentes*

# **<u>TABLE OF CONTENTS</u>**

<u>Page</u>

TABLE OF AUTHORITIES ....................................................................... ii

PRELIMINARY STATEMENT ............................................................... 1

PROCEDURAL BACKGROUND ........................................................... 3

ARGUMENT ........................................................................................... 7

I.     Defendants Are Likely to Succeed on the Merits of Their Appeal and Have Raised "Serious Questions" Regarding the Order's Merits ................... 7

II.    Defendants Will Suffer Irreparable Harm Absent a Stay ............................. 11

III.   Plaintiffs Will Not Be Injured by a Stay ........................................ 17

IV.   The Balance of Hardships Decisively Favors a Stay ..................................... 18

V.    The Public Interest Favors a Stay ................................................ 19

CONCLUSION ......................................................................................... 19

## <u>TABLE OF AUTHORITIES</u>

## CASES

Page

*In re A2P SMS Antitrust Litigation*,
No. 12-CV-2656, 2014 WL 4247744 (S.D.N.Y. Aug. 27, 2014) .................8

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
677 F.3d 60 (2d Cir. 2012) ..............................................................9

*Actelion Pharmaceuticals Ltd. v. Lee*,
No. 1:15-cv-1266, 2016 WL 205377 (E.D. Va. Jan. 13, 2016) ...................18

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988)......................................................................6

*Bradberry v. T-Mobile USA, Inc.*,
No. C 06-6567 CW, 2007 WL 2221076 (N.D. Cal. Aug. 2, 2007) ..............12

*Brecher v. Republic of Argentina*,
806 F.3d 22 (2d Cir. 2015) ............................................................10

*Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund,
Ltd.*, 598 F.3d 30 (2d Cir. 2010)......................................................8

*In re Easysaver Rewards Litigation*,
No. 09cv2094 AJB (WVG), 2011 WL 3360007 (S.D. Cal. Aug. 3,
2011) ......................................................................................18

*Estate of Heiser v. Deutsche Bank Trust Co. Americas*,
No. 11 Civ. 1608 AJN MHD, 2012 WL 2865485 (S.D. N. Y. July 10,
2012) ......................................................................................19

*Gray v. Golden Gate National Recreational Area*,
No. C 08-00722 EDL, 2011 WL 6934433 (N.D. Cal. Dec. 29, 2011)..........19

*Guifu Li v. A Perfect Franchise, Inc.*,
No. 5:10-CV-01189-LHK, 2011 WL 2293221 (N.D. Cal. June 8,
2011) ......................................................................................12

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    134 S. Ct. 2398 (2014)...................................................................................6

*Hevesi v. Citigroup Inc.*,
    366 F.3d 70 (2d Cir. 2004) ...............................................................2, 9, 11

*IBEW Local 98 Pension Fund v. Best Buy Co.*,
    No. 11-429 (DWF/FLN), 2014 WL 4540228 (D. Minn. Sept. 11,
    2014) ..........................................................................................................9

*In re Lorazepam & Clorazepate Antitrust Litigation*,
    208 F.R.D. 1 (D.D.C. 2002) ........................................................................19

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*,
    547 U.S. 71 (2006)......................................................................................11

*Mohammed v. Reno*,
    309 F.3d 95 (2d Cir. 2002) ..........................................................................8

*Morrison v. National Australia Bank Ltd.*,
    561 U.S. 247 (2010)................................................................................6, 10

*National Asbestos Workers Medical Fund v. Philip Morris, Inc.*,
    No. 98 CV 1492, 2000 WL 1424931 (E.D.N.Y. Sept. 26, 2000) .................13

*Nieberding v. Barrette Outdoor Living, Inc.*,
    No. 12-2353-DDC-TJJ, 2014 WL 5817323 (D. Kan. Nov. 10, 2014)..........19

*Nken v. Holder*,
    556 U.S. 418 (2009).....................................................................................7

*Parkcentral Global Hub Ltd. v. Porsche Automobile Holdings SE*,
    763 F.3d 198 (2d Cir. 2014) .......................................................................10

*Pena v. Taylor Farms Pacific, Inc.*,
    No. 2:13-cv-01282-KJM-AC, 2015 WL 5103157 (E.D. Cal. Aug. 31,
    2015) ..........................................................................................................9

*In re Petrobras Securities Litigation*,
    312 F.R.D. 354 (S.D.N.Y. 2016)...................................................................4

*In re Rhone-Poulenc Rorer, Inc.*,
    51 F.3d 1293 (7th Cir. 1995) .....................................................................13

*RJR Nabisco, Inc. v. European Community*,
    __ S. Ct. __, No. 15-138, 2016 WL 3369423 (June 20, 2016) ....................10

*SEC v. Citigroup Global Markets Inc.*,
    673 F.3d 158 (2d Cir. 2012) ...................................................................2, 13

*Sumitomo Copper Litigation v. Credit Lyonnais Rouse, Ltd.*,
    262 F.3d 134 (2d Cir. 2001) .....................................................................8, 9

*Teamsters Local 445 Freight Division Pensions Fund v. Bombardier Inc.*,
    546 F.3d 196 (2d Cir. 2008) .........................................................................10

*Weber v. United States Trustee*,
    484 F.3d 154 (2d Cir. 2007) ................................................................12, 13

## STATUTES

28 U.S.C. § 1291 .............................................................................................12

## RULES

Fed. R. Civ. P. 23(f) ..................................................................................*passim*

## OTHER AUTHORITIES

2 Joseph M. McLaughlin, *McLaughlin on Class Actions: Law and Practice*
    § 7:1 (12th ed. 2015)...................................................................................9

Manual for Complex Litigation (4th ed. 2004) § 21.28 ........................................17

Defendants move on an emergency basis to temporarily stay all district court proceedings—including argument on summary judgment motions scheduled for August 5, 2016 and trial scheduled for September 19, 2016—pending this Court's resolution of defendants' expedited interlocutory appeal of the district court's order granting class certification ("Certification Order"). Without immediate action from this Court, trial will certainly begin, and will likely conclude, before this Court is able to review the Certification Order in this interlocutory appeal. The well-recognized *in terrorem* pressure to settle a massive securities class action before trial could also moot this Court's interlocutory review.

## PRELIMINARY STATEMENT

This appeal arises from the district court's erroneous certification of a multi-year worldwide investor class seeking billions of dollars in connection with purchases of, among other things, a foreign issuer's non-exchange traded globally offered notes, in violation of the principles of ascertainability, predominance, and superiority, and in the absence of adequate proof of classwide reliance. On June 15, 2016, this Court granted defendants' petition under Federal Rule of Civil Procedure 23(f) for interlocutory review of the district court's Certification Order. This Court then expedited briefing and could hear argument as early as the week of September 26, 2016.

1

But even this Court's accelerated review faces a grave risk of being thwarted. The district court has refused to stay the impending trial scheduled for September 19, 2016, which will very likely be concluded before a decision on this interlocutory appeal. Therefore, absent a stay, defendants will suffer the very injury that Rule 23(f) and this Court's June 15 order intended to prevent: a risk of unbounded liability to an unascertainable and improper class. As this Court has recognized, under these circumstances—whatever the merits of the defendants' defenses—"the class certification 'places inordinate or hydraulic pressure on defendants to settle, avoiding the risk, however small, of potentially ruinous liability.'" *Hevesi v. Citigroup Inc.*, 366 F.3d 70, 80 (2d Cir. 2004) (quoting *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 164 (3d Cir. 2001)).

Rule 23(f) should not be so easily eluded—and this Court should therefore stay district court proceedings. None of the reasons for the district court's refusal to stay the case—principally, the presence of related non-class actions and the imminence of the trial—can insulate it from interlocutory appellate review. The history of this litigation leaves no doubt that the class action has dominated any non-class tag-alongs. The presence of these tag-alongs also offers no compelling reason to bypass this Court's interlocutory review under Rule 23(f). And the imminence of the trial date is not a reason to deny a stay—but a reason to grant it.

2

*See SEC v. Citigroup Glob. Mkts. Inc.*, 673 F.3d 158, 166 (2d Cir. 2012) (granting stay pending appeal after district court (Rakoff, J.) denied stay and parties were "ordered to prompt trial").

## PROCEDURAL BACKGROUND

Plaintiffs seek billions of dollars in damages on behalf of a multi-year investor class based on allegedly false or misleading statements related to a corruption scheme perpetrated against Petrobras. Petrobras is a majority state-owned Brazilian oil-and-gas company that relies on the international capital markets for much of its financing, including American Depository Receipts ("ADRs") and notes that Petrobras issued. Late in 2014, after the last of the relevant issuances, Brazilian prosecutors conducting an unrelated investigation revealed that they had found evidence that Petrobras was the victim of an illegal bid-rigging and kickback scheme perpetrated by a cartel of construction companies, that as part of their scheme, also bribed former Petrobras executives. Plaintiffs in the United States responded by filing federal securities class actions seeking damages for the alleged drops in the ADRs and Notes after disclosure of the investigation and alleging that, under U.S. law, Petrobras should have disclosed the scheme's existence and expensed (not capitalized) the bribes paid pursuant to the scheme. *See generally* Liman Decl. ¶¶ 7-11.

The class complaint alleges claims under Section 10(b) of the Securities Exchange Act of 1934 and Sections 11 and 12(a)(2) of the Securities Act of 1933. Petrobras and certain of its officers and directors are defendants in both the Exchange Act and the Securities Act claims. Petrobras's independent auditor and the underwriters of the U.S. Dollar-denominated note offerings in 2013 and 2014 are defendants in only the Securities Act claims. *Id.* ¶ 7.

On February 2, 2016, the district court certified two classes: (1) under Section 10(b) of the Exchange Act, a class including all persons who, from January 22, 2010 through July 28, 2015, purchased any Petrobras ADRs or any of Petrobras's 39 outstanding debt securities "pursuant to other domestic transactions"; and (2) under Sections 11 and 12(a)(2) of the Securities Act, a class including all persons who purchased or otherwise acquired "in domestic transactions" Petrobras debt securities "in, pursuant and/or traceable to" two offerings of Petrobras notes (including persons who purchased in the aftermarket rather than the offerings themselves). *In re: Petrobras Sec. Litig.*, 312 F.R.D. 354, 372-73 (S.D.N.Y. 2016).

The class action has played the dominant role throughout the litigation. Class action counsel conducted almost all the fact and expert discovery. In almost all critical junctures of the litigation—motions to dismiss, document production, depositions and summary judgment—the district court began with the class action.

4

Indeed, it was only after the district court appointed a lead plaintiff and lead counsel that numerous tag-along actions were filed. Liman Decl. ¶ 23.

Because district court proceedings have moved so quickly—numerous depositions since February 1, 2016, including over 20 expert depositions between June 8 and 27—the district court left little time between class certification and trial. Briefing on summary judgment motions began on June 27, 2016, and is scheduled to be completed by July 29, 2016. Argument on summary judgment motions is scheduled for August 5, 2016.[1] A single, consolidated eight-week trial of the class and individual actions is scheduled to begin on September 19, 2016. Dkt. Nos. 282, 391; Liman Decl. ¶ 14.

On June 15, 2016, this Court granted defendants' petition for leave to appeal from the Certification Order pursuant to Federal Rule of Civil Procedure 23(f) and, on June 16, 2016, ordered that the appeal be expedited. *Id.* ¶ 11. The petition raises two separate significant and recurring issues: (1) whether the certification of a class including globally offered notes violates principles of ascertainability, predominance, and superiority after *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247 (2010); and (2) whether plaintiffs satisfied their evidentiary burden under

---

[1] Although defendants are seeking a stay of all proceedings in the district court, they are amenable to this Court staying all proceedings except for briefing on summary judgment motions.

5

*Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398 (2014) ("*Halliburton II*") to invoke the presumption of reliance established in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988). Liman Decl. ¶ 11.

The latter issue is also present in two other appeals in which this Court has recently granted leave to appeal. *See In re Goldman Sachs Grp., Inc. Sec. Litig.*, No. 16-250 (2d Cir.), Dkt. Nos. 1, 80; *Strougo v. Barclays PLC*, No. 16-450 (2d Cir.), Dkt. Nos. 1, 55. In one case, the district court has stayed the entire action pending resolution of the Rule 23(f) appeal. *See In re Goldman Sachs Grp., Inc. Sec. Litig.*, No. 10-cv-03461-PAC (S.D.N.Y.), Dkt. No. 177. In the other, the district court has pending before it briefing on defendants' stay application. *See Strougo v. Barclays PLC*, No. 14-cv-05797-VM, Dkt. Nos. 88, 89 (S.D.N.Y.).

Defendants moved in the district court to stay argument and decision on summary judgment and trial in the consolidated class action and individual actions. The district court accepted letter briefs from both sides—limited to two pages—addressing the stay request. Liman Decl. ¶ 15. On June 24, 2016, the district court denied the stay request. It concluded that this Court's decision to grant defendants leave to immediately appeal under Rule 23(f) does not weigh in favor of a stay, that this Court's resolution of the appeal could not affect the nature or scope of trial, and that the pendency of this appeal does not undermine defendants' ability to

make an informed decision regarding settlement. *In re Petrobras Sec. Litig.,* 2016 U.S. Dist. LEXIS 82426 (S.D.N.Y. June 24, 2016).

## ARGUMENT

In determining whether to grant a stay pending interlocutory appeal, courts consider: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009); *see also SEC v. Galleon Mgmt.*, LP No. 10 civ. 0462 (2d Cir. Mar. 24, 2010), Dkt. No. 77 (granting stay pending interlocutory appeal after district court (Rakoff, J.) denied stay). Here, each factor strongly supports a stay.

## I. Defendants Are Likely to Succeed on the Merits of Their Appeal and Have Raised "Serious Questions" Regarding the Order's Merits.

In evaluating a stay applicant's likelihood of success on the merits, "[t]he necessary 'level' or 'degree' of possibility of success will vary according to the court's assessment of the other [stay] factors." *Mohammed v. Reno*, 309 F.3d 95, 101 (2d Cir. 2002). Courts have "long recognized that the 'likelihood of success on the merits' required for . . . a stay can be satisfied if there are 'serious questions' going to the merits of the dispute and the applicant is able to establish that the balance of hardships tips decidedly in its favor." *In re A2P SMS Antitrust Litig.*,

7

No. 12-CV-2656, 2014 WL 4247744, at *2 (S.D.N.Y. Aug. 27, 2014) (emphasis omitted) (citing *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund, Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010)).

By granting defendants' Rule 23(f) petition, this Court has already determined that the Certification Order is either "questionable" or implicates a novel and "compelling" legal question in need of immediate review. *See Sumitomo Copper Litig. v. Credit Lyonnais Rouse, Ltd.*, 262 F.3d 134, 139 (2d Cir. 2001); Ex. C[2] (order granting Rule 23(f) petition) (citing *Sumitomo*, 262 F.3d at 139-40). "[A] novel legal question will not compel immediate review unless it is of fundamental importance to the development of the law of class actions and it is likely to escape effective review after entry of final judgment." *Sumitomo*, 262 F.3d at 140. In order to make that showing, defendants must have made a "substantial legal argument." *Hevesi*, 366 F.3d at 83. Thus, this Court's decision to grant defendants' Rule 23(f) petition weighs heavily in favor of a stay.[3]

---

[2] All citations to exhibits refer to the exhibits attached to the declaration of Lewis J. Liman, filed herewith.

[3] *See Pena v. Taylor Farms Pac., Inc.*, No. 2:13-cv-01282-KJM-AC, 2015 WL 5103157, at *3 (E.D. Cal. Aug. 31, 2015) (staying action pending Rule 23(f) appeal because the Court of Appeals had "already weighed in on the substantiality of [the defendants'] case for relief" by granting Rule 23(f) petition); *accord IBEW Local 98 Pension Fund v. Best Buy Co.*, No. 11-429 (DWF/FLN), 2014 WL 4540228, at *2 (D. Minn. Sept. 11, 2014); 2 Joseph M. McLaughlin, *McLaughlin on Class Actions Law and Practice* § 7:1 (12th ed. 2015) ("Even if a stay is denied

*(cont'd)*

In any event, defendants are likely to succeed on the merits of their appeal. As defendants' Rule 23(f) petition explains, the district court erred in certifying classes of purchasers of a foreign issuer's non-exchange traded globally offered notes in light of the myriad fact-intensive individualized issues involved in determining whether each purchaser participated in a "domestic transaction" under *Morrison*, *Parkcentral Glob. Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 215 (2d Cir. 2014), and *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60 (2d Cir. 2012). The class certification record establishes that the population of such "domestic transactions" could not be ascertained, even by purchasers, without extensive investigation.[4] Accordingly, plaintiffs failed to meet their burden of establishing either that a putative class member could determine whether he was a class member sufficient to exercise an opt-out right or that the proposed classes are "sufficiently definite so that it is administratively feasible for

_____

*(cont'd from previous page)*

when the application is based solely on the filing of a Rule 23(f) petition, courts have been more willing to re-evaluate whether a stay should issue once the petition is granted.").

[4] The Supreme Court recently highlighted the complex and individualized nature of the "domesticity" inquiry in a different context. *See RJR Nabisco, Inc. v. European Cmty.*, ---S. Ct.---, No. 15-138, 2016 WL 3369423, at *19 (June 20, 2016) (holding that a civil RICO plaintiff is required to prove a "domestic" injury to business or property, and that "[t]he application of this rule in any given case will not always be self-evident, as disputes may arise as to whether a particular alleged injury is 'foreign' or 'domestic'").

the court to determine whether a particular individual is a member . . . [without] a mini-hearing on the merits of each case." *Brecher v. Republic of Argentina*, 806 F.3d 22, 24-25 (2d Cir. 2015) (citations omitted).

In addition, the district court erred in holding that plaintiffs demonstrated market efficiency consistent with the Supreme Court's guidance in *Halliburton II*. As this Court has observed, direct evidence of cause and effect is "the most important" factor to consider in judging efficiency because, without that evidence, "it is difficult to presume that the market will integrate the release of material information about a security into its price." *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 207 (2d Cir. 2008). But instead the district court held that no empirical evidence was necessary because it was "common sense" that the securities of large companies like Petrobras trade in efficient markets. Further, the district court alternatively embraced an approach—not endorsed by finance, much less peer-reviewed, literature—that compares the movements of groups of subjectively selected days (rather than price movements of individual days, as done in virtually all scientific event studies). Because aggregate movements in certain groups exceeded that in others, class plaintiffs' expert, Steven Feinstein, concluded that cause and effect had been shown, and the district court agreed. But Feinstein's test did not even consider the hallmark of *Basic*; to wit, whether there was price impact because prices moved in the

10

appropriate direction (*e.g.*, <u>rose</u> on the release of good news (whether true or false) and <u>fell</u> on the release of bad news(again, whether true or false)).  Without such evidence, there is no basis in economics or law to say that the market impounded into prices material news, causing a price impact.

## II.     Defendants Will Suffer Irreparable Harm Absent a Stay.

Defendants will suffer irreparable harm absent a stay.  The "*in terrorem*" effect of class certification, coercing settlement even of groundless claims, is well established.[5]  Rule 23(f) was adopted to blunt this effect "by establishing in the court of appeals a discretionary power to grant interlocutory review in cases that show appeal-worthy certification issues."   Fed. R. Civ. P. 23(f) advisory committee's note to 1998 amendment; *see also Weber v. U.S. Tr.*, 484 F.3d 154, 159 (2d Cir. 2007) (Rule 23(f) "ensures that courts of appeals may review district court decisions that, although not 'final' within the meaning of 28 U.S.C. § 1291, . . . sound a 'death-knell'" (citations omitted)).[6]

---

[5] *See Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 81 (2006); *Hevesi*, 366 F.3d at 83

[6] While a stay is not automatic, even those courts that have denied stays have done so without prejudice to renewal in the event trial approached without a decision from the Court of Appeals.  *See, e.g.*, *Bradberry v. T-Mobile USA, Inc.*, No. C 06-6567 CW, 2007 WL 2221076, at *4 (N.D. Cal. Aug. 2, 2007) (denying stay request without prejudice to renewal but stating that "a stay would be appropriate when the trial date approaches"); *Guifu Li v. A Perfect Franchise, Inc.*, No. 5:10-CV-01189-LHK, at *5 (N.D. Cal. June 8, 2011) ("If the case proceeds to the point of final

*(cont'd)*

11

The *in terrorem* effect of class certification is particularly acute in this case, which involves "vast" classes with members numbering at least "in the thousands." Ex. B at 7. Were the Certification Order to stand, defendants face the prospect of astronomical classwide damages, potentially reaching many billions of dollars. But if the Certification Order does not survive this Court's review—as it should not—defendants would have an opportunity to vindicate the merits of their defenses as trial without the inordinate pressure of a ruinous verdict.

Rule 23(f) was designed to avoid trapping defendants on the horns of this dilemma. But absent a stay, the district court intends to try the case before this Court can complete its interlocutory review of class certification. That would thwart the design of Rule 23(f), severely and unduly prejudicing defendants.[7] As in *Citigroup*, 673 F.3d at 166—which found that the SEC and Citigroup would be irreparably harmed "if they are prevented from settling their dispute and are

_____

*(cont'd from previous page)*

pretrial preparations without a ruling from the Ninth Circuit on Defendants' [interlocutory] appeal . . . , Defendants may renew their motion to stay the case at that time.").

[7] *See Weber*, 484 F.3d at 159; *see also In re Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293, 1298 (7th Cir. 1995) ("intense pressure to settle" wrought by class certification may constitute irreparable harm); *Nat'l Asbestos Workers Med. Fund v. Philip Morris, Inc.*, No. 98 CV 1492, 2000 WL 1424931, at *2 (E.D.N.Y. Sept. 26, 2000) (granting stay pending resolution of Rule 23(f) appeal and noting that "the [R]ule was designed to accommodate the need for quick appellate review of class certification decisions").

ordered to prompt trial, as the district court has directed"— forcing parties here to a prompt trial that could be obviated or altered by this Court would also constitute irreparable harm.

The *in terrorem* effect of the class action is exacerbated by the pendency of the tag-along actions. Many of those actions present the same issues on which this Court granted Rule 23(f) review. For example, like the named class representatives, many of the tag-along plaintiffs rely on *Basic* to establish reliance necessary to invoke Section 10(b). In addition, if the consolidated trial were split apart and the tag-along cases re-ordered to start first, then concerns that defendants would face collateral estoppel, without the corresponding benefit of global resolution in the event of a defense verdict, could force defendants to settle without the benefit of this Court's ruling—and in a manner unrelated to the merits. A stay should thus include the consolidated trial of all actions.

In declining to stay the litigation, the district court ignored these compelling arguments, reasoning instead that the case "has evolved into one that is primarily a non-class action." Ex. G at 7.[8] Defendants respectfully submit that the record

---

[8] The District Court also reasoned that, because "defendants are represented by excellent legal counsel and have offered the opinions of fourteen experts," "[i]t is highly unlikely that they are unable to make an informed decision regarding settlement." Ex. G at 7. But nothing in this Court's decisions or in the history of Rule 23(f) suggests that sophisticated legal teams—commonplace in high-stakes
*(cont'd)*

belies the district court's new assessment. The class action has always been the centerpiece of these consolidated proceedings, seeking the most damages by far. Indeed, from the beginning, the district court's case management centered around the class action, while the tag-along individual actions followed behind. *See* Liman Decl. ¶ 23. Class plaintiffs' counsel took virtually all the depositions of defendants and their experts. By contrast, non-class discovery focused almost entirely on issues unique to the tag-along cases, such as the individual plaintiffs' purchases and the circumstances of their transactions. And under the district court's own trial scheduling order, individual plaintiffs' issues are to be tried *after* common issues. Dkt. No. 282.

Similarly, the district court's case management plan (Dkt No. 391) is replete with indications that the class action would lead pre-trial proceedings:

- The motions to dismiss in the class action were heard first, and argument on the motion to dismiss the individual actions was not scheduled until after the motion to dismiss the class action was decided.

- Documents were produced in the class action before production in the tag-along individual actions.

- Depositions were completed in the class action before the tag-along individual actions.

- Summary judgment papers in the class action were filed before the individual actions, which have yet to file.

---

*(cont'd from previous page)*

class litigation—should be stripped of that Rule's protections or can overcome the *in terrorem* impact of a wrongly certified class.

- The district court allowed oral argument only for the class summary judgment motions, not for issues relating solely to the individual actions.

- The summary judgment papers in the individual cases will not be filed until after the final pre-trial conference in the consolidated case.

- The court stayed proceedings in all individual cases filed after December 2015, precisely so that the class case could go forward first.

Liman Decl. ¶ 23. Defendants are not aware of any case in which the parties were forced to hold an entire classwide trial during the pendency of a Rule 23(f) appeal. And for good reason: in addition to the risk of mooting this Court's review of the Certification Order, this Court's decision could dramatically affect the trial's structure. The finality of any judgment, the identities of the plaintiffs, the scope of alleged damages, and even the proof required to establish liability are all inextricably linked to the Certification Order.[9] For instance, if, after trial, this Court were to agree with defendants that plaintiffs failed to satisfy their burden to invoke the *Basic* presumption of reliance, then the liability phase of the trial will require re-litigation. Rather than relying on a fraud-on-the-market presumption of reliance, each individual plaintiff would be required to prove on an individual basis that it actually relied on the alleged misstatements at issue in purchasing a security.

---

[9] In addition, knowing which of the claims will proceed as a class action will better enable class members to determine whether to opt out. If, for example, this Court were to affirm certification for Section 10(b) claims but not for Section 11 claim, or the converse, class members would be positioned to make a determination whether to remain in the class—and risk preclusive effect on their individual claims of an adverse determination on the class wide claim—or opt out.

And, because many of the individual plaintiffs did not actually rely on many of the alleged misstatements, the very statements at issue in the case would change.

In rejecting this contention, the district court stated that "questions of how defendants' alleged misstatements affected the markets for Petrobras securities will almost certainly still be contested on summary judgment and at trial, in connection with issues of reliance and damages, even if class plaintiffs ultimately proceed as individual plaintiffs." Ex. G at 6. Plaintiffs, however, did not offer any empirical evidence of an efficient market other than Dr. Feinstein's novel, litigation-inspired and invalid "test." Thus, if this Court holds that empirical evidence is necessary, and Dr. Feinstein's evidence is rejected, plaintiffs will need to demonstrate reliance on a plaintiff-by-plaintiff basis.

Additionally, regarding both the Exchange Act class and the Securities Act class, this Court may find that whether securities were acquired in a "domestic transaction" requires a searching individualized inquiry, and thus, contrary to the Certification Order, cannot be determined through straightforward post-judgment "bureaucratic processes." Ex. B at 23. If the Court reaches that conclusion, any "domesticity" issues litigated at trial will need to be re-litigated before a jury, requiring a new, second trial. Moreover, because these issues implicate threshold questions of ascertainability and notice, a reversal even in part could require an entirely new trial with new class notice or a plan of notice. *Cf.* Manual for

16

Complex Litigation § 21.28 (4th ed. 2004) ("If the appeal is from a grant of certification, the district court should ordinarily stay the dissemination of class notice to avoid the confusion and the substantial expense of renotification that may result from appellate reversal or modification after notice dissemination.").

Indeed, even courts that found no irreparable harm have considered the imminence of trial a factor that could change the analysis. *See* n.6, *supra*. Accordingly, denying a stay in this case effectively leaves defendants in the same position they would have been in had they waited to challenge the Certification Order in an appeal from a final judgment, negating the benefits of Rule 23(f). Defendants are irreparably harmed as a result.

## III. Plaintiffs Will Not Be Substantially Injured by a Stay.

By contrast, plaintiffs will not be injured if the Court stays trial pending resolution of defendants' interlocutory appeal. Because the appeal is proceeding on an expedited schedule, the stay would be brief. And because all discovery has now been completed, the parties could proceed to trial promptly if the Certification Order were affirmed.[10] Moreover, the tag-along plaintiffs would not be harmed by

---

[10] *Cf. Actelion Pharm. Ltd. v. Lee*, No. 1:15-cv-1266, 2016 WL 205377, at *5 (E.D. Va. Jan. 13, 2016) (granting stay pending resolution of a related appeal in part because plaintiff was not harmed by "short" delay between appellate argument and decision); *In re Easysaver Rewards Litig.*, No. 09cv2094 AJB (WVG), 2011 WL 3360007, at *1 (S.D. Cal. Aug. 3, 2011) (granting stay pending resolution of
*(cont'd)*

17

a stay of their actions. The market efficiency question at issue in the 23(f) petition is at the heart of their cases as well. They themselves recognized that there would be a benefit from trying their case at the same time as the class case is tried, when they agreed to that process in the trial court. Indeed, the district court's expedited discovery schedule would provide for a trial even after this Court's decision on a pace that is far sooner than most cases of this type.

## IV. The Balance of Hardships Decisively Favors a Stay

The irreparable harm to defendants would decisively outweigh any such claimed injury to plaintiffs. As described above, denying a stay will potentially waste substantial amounts of time and resources unnecessarily litigating an eight-week trial, will render defendants unable to make an informed decision about settlement prior to trial and potentially final judgment, and may effectively deprive defendants of any benefits of this Court's grant of an interlocutory appeal under Rule 23(f). Weighed against any minimal harm to plaintiffs caused by a brief trial delay, this balance of hardships tips decidedly in defendants' favor.[11]

_____

*(cont'd from previous page)*

related appeal where "the only effect on plaintiffs is a brief delay, which does not equate to harm or prejudice").

[11] *See In re Lorazepam & Clorazepate Antitrust Litig.*, 208 F.R.D. 1, 6 (D.D.C. 2002) ("[A]ny inherent harm stemming from an approximately two-month stay, when juxtaposed to the potential magnitude of a decision by the Court of Appeals on the issues before it, is simply *de minimis* . . . ."); *Nieberding v. Barrette Outdoor Living, Inc.*, No. 12-2353-DDC-TJJ, 2014 WL 5817323, at *4 (D. Kan.

*(cont'd)*

It is worth underscoring the modest relief defendants seek by this motion. Defendants did not seek a stay when they filed their Rule 23(f) petition, allowing the parties to complete all discovery, fact and expert; they waited, instead, until this Court granted their petition.

## V. The Public Interest Favors a Stay.

Finally, the public interest favors granting a stay of trial pending resolution of the Rule 23(f) appeal granted by this Court. "[C]onsiderations of judicial economy are frequently viewed as relevant to the public interest, and, . . . weigh against the investment of court resources that may prove to have been unnecessary." *Estate of Heiser v. Deutsche Bank Trust Co. Ams.*, No. 11 Civ. 1608 AJN MHD, 2012 WL 2865485, at *5 (S.D.N.Y. July 10, 2012).[12]

### CONCLUSION

_____
*(cont'd from previous page)*

Nov. 10, 2014) ("While staying this case in its entirety will cause delay, the Court finds this harm to Plaintiffs is outweighed by the greater harm to Defendants in requiring them to proceed . . . during the interlocutory appeal of the order granting class certification.").

[12] *Accord Gray v. Golden Gate Nat'l Recreational Area*, No. C 08-00722 EDL, 2011 WL 6934433, at *3 (N.D. Cal. Dec. 29, 2011) ("The public interest lies in proper resolution of the important issues raised in this case, and issuance of a stay would avoid wasting resources on a class action litigation which might be changed in scope on appeal.").

For the foregoing reasons, defendants respectfully request that this Court stay all proceedings in the district court, pending this Court's resolution of this expedited interlocutory appeal.

Respectfully submitted,

CLEARY GOTTLIEB STEEN &
HAMILTON LLP

By: __/s/ Lewis J. Liman_____
    Lewis J. Liman
    Roger A. Cooper
    One Liberty Plaza
    New York, New York 10006
    (212) 225-2000
*Attorneys for the Petrobras*
*Defendants-Appellants*

SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP

By: __/s/ Jay B. Kasner_____
    Jay B. Kasner
    Boris Bershteyn
    Scott D. Musoff
    Jeremy A. Berman
    Four Times Square
    New York, NY 10036
    (212) 735-3000
*Attorneys for the Underwriter*
*Defendants-Appellants*

KING & SPALDING LLP

By: __/s/ James J. Capra, Jr._____
    James J. Capra, Jr.
    Israel Dahan
    1185 Avenue of the Americas
    New York, NY 10036
    (212) 556-2100

    Kenneth Y. Turnbull
    Michael R. Pauze (admission pending)
    1700 Pennsylvania Avenue, NW
    Washington, D.C. 20006
    (202) 626-3737
*Attorneys for Defendant-Appellant*
*PricewaterhouseCoopers*
*Auditores Independentes*

# 16-1914-cv

# United States Court of Appeals
*for the*
# Second Circuit

▶◀◀

IN RE PETROBRAS SECURITIES LITIGATION

UNIVERSITIES SUPERANNUATION SCHEME LIMITED, *et al.,*

*Plaintiffs-Appellees*,

PETER KALTMAN, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, *et al.,*

*Plaintiffs*,

– v. –

PETRÓLEO BRASILEIRO S.A. – PETROBRAS, *et al.*,

*Defendants-Appellants*,

JOSE SERGIO GABRIELLI, *et al.*,

*Defendants*.

**ON APPEAL FROM AN ORDER OF THE UNITED STATES
DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK
(RAKOFF, J.) DATED FEBRUARY 2, 2016, CERTIFYING A CLASS ACTION,
NO. 14 CIV. 9662 (JSR)**

**DECLARATION OF LEWIS J. LIMAN IN SUPPORT OF APPELLANTS'
EMERGENCY MOTION FOR A STAY PENDING APPEAL**

LEWIS J. LIMAN declares under 28 U.S.C. §1746 as follows:

1.    I am a member of the Bar of this Court and the firm Cleary Gottlieb Steen & Hamilton LLP, attorneys for Defendants Petróleo Brasileiro S.A. - Petrobras ("Petrobras"), Petrobras Global Finance B.V., Petrobras America Inc., Theodore M. Helms, Almir Guilherme Barbassa, Jose Carlos Cosenza, Guillherme de Oliveira Estrella and Jose Miranda Formigli Filho (collectively, the "Petrobras Defendants").

2.    On June 15, 2016, this Court granted defendants' petition for permission to bring an interlocutory appeal from the district court's order granting class certification, as authorized by Federal Rule of Civil Procedure 23(f).

3.    I respectfully submit this Declaration in support of the Defendants' Emergency Motion for a Stay Pending Appeal, dated June 28, 2016 (the "Motion").[1]    The Motion seeks to stay all proceedings, including

---

[1] In addition to being submitted on behalf of the Petrobras Defendants, this Motion is also being submitted on behalf of the Underwriter Defendants: (1) Banca IMI S.p.A.; (2) Banco Bradesco BBI S.A.; (3) Bank of China (Hong Kong) Limited; (4) BB Securities Ltd.; (5) Citigroup Global Markets Inc.; (6) HSBC Securities (USA) Inc.; (7) Itau BBA USA Securities, Inc.; (8) JP Morgan Securities LLC; (9) Merrill Lynch, Pierce, Fenner & Smith Incorporated; (10) Mitsubishi UFJ Securities (USA), Inc.; (11) Morgan Stanley & Co. LLC; (12) Scotia Capital (USA) Inc.; and (13) Standard Chartered Bank (collectively, the "Underwriter Defendants") and

*(cont'd)*

summary judgment scheduled for argument on August 5, a final pre-trial conference scheduled for August 5, and an eight-week trial scheduled to start on September 19, 2016. This Declaration is based on my personal knowledge, including my knowledge of the pleadings and papers relevant to the actions pending below in the District Court (*In Re Petrobras Securities Litigation*, No. 14-cv-9662 (JSR) (the "Petrobras Action")).

4. On June 27, 2016, I informed counsel for plaintiffs that defendants would be filing this motion and of the emergency nature of the motion. I requested that plaintiffs agree to a stay. Plaintiffs declined to consent to a stay.

**Introduction**

5. This Court has authorized this expedited interlocutory appeal from the district court's February 2, 2015 order granting class certification of a multi-year worldwide investor class seeking billions of dollars in connection with purchases of, among other things, a foreign issuer's non-exchange traded globally offered notes (hereafter "Certification Order"). defendants sought—and received—this Court's permission to challenge the

_____
*(cont'd from previous page)*
PricewaterhouseCoopers Auditores Independentes, Petrobras's independent auditor.

2

certification for violating the principles of ascertainability, predominance, and superiority, and for inadequate proof of classwide reliance.

6. This Motion seeks on an emergency basis to stay all district court proceedings—including trial scheduled to begin September 19, 2016—pending this Court's resolution of the expedited interlocutory appeal. Without immediate action from this Court, trial will certainly begin, and will likely conclude, before this Court is able to review the Certification Order in this interlocutory appeal. The well-recognized *in terrorem* pressure to settle a massive securities class action before trial could also moot this Court's interlocutory review.

## Procedural Background

7. On December 8, 2014, Peter Kaltman brought a putative class action against Petrobras. Dkt. No. 1. Following appointment as lead plaintiff, on March 27, 2015, Universities Superannuation Scheme Limited ("USS") filed a First Amended Complaint. Dkt. No. 109. On November 30, 2015, USS filed a Fourth Amended Complaint ("FAC"). Dkt. No. 342.

8. The FAC alleges purported claims under Section 10(b) of the Exchange Act of 1934 and Sections 11 and 12(a)(2) of the Securities Act of 1933. The Exchange Act claims—which are based on trades in Petrobras American Depository Receipts ("ADRs") and Notes—are brought by USS.

3

Two note purchasers—Employees' Retirement System of the State of Hawaii and North Carolina Department of State Treasurer—assert claims under Section 11 of the Securities Act based on the 2013 and 2014 note offerings. Plaintiffs claim that Petrobras's public disclosures, including disclosures within the 2013 and 2014 offering documents, were false and misleading. Specifically, the FAC alleges that the purported misrepresentations and omissions concerned (1) corruption; (2) asset valuations on Petrobras's balance sheet; (3) Petrobras's net income; and (4) the effectiveness of Petrobras's internal controls over financial reporting.

9. A list of all other individual actions relating to Petrobras securities and consolidated before Judge Rakoff is set out in Exhibit A.

10. The February 2, 2016 Certification Order, attached as Exhibit B, certified a class under Section 10(b) of the Securities Exchange Act of 1934, which includes all persons or entities who, during the five-year period from January 22, 2010 through July 28, 2015, purchased or otherwise acquired the securities of Petrobras in domestic transactions and were damaged thereby. *In re Petrobras Sec. Litig.*, 312 F.R.D. 354, 357 (S.D.N.Y. Feb. 2, 2016). The Certification Order also certified a class under Sections 11 and 12(a)(2) of the Securities Act of 1933.

11.    On February 16, 2016, Petrobras and Underwriter Defendants jointly filed a petition for leave to appeal the Certification Order to this Court under Rule 23(f).  The petition presented two questions: (1) whether the certification of a class including globally offered notes violates principles of ascertainability, predominance, and superiority after *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247 (2010); and (2) whether plaintiffs satisfied their evidentiary burden under *Halliburton, Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398 (2014) ("*Halliburton II*") to invoke the presumption of reliance established in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988).

12.    On June 15, 2016, this Court granted defendants' petition.  A copy of this Court's Order is attached as Exhibit C.  On June 16, 2016, this Court entered a separate scheduling order expediting the appeal.  All briefing in the appeal must be completed by September 8, 2016, and oral argument is scheduled for as early as the week of September 26, 2016. A copy of this Court's Scheduling Order is attached as Exhibit D.

13.    This Court has also recently granted leave to appeal on the question of *Halliburton II*'s application in two other cases.  *See In re Goldman Sachs Grp., Inc. Sec. Litig.*, No. 16-250 (2d Cir.), Dkt. Nos. 1, 80; *Strougo v. Barclays PLC*, No. 16-450(2d Cir.), Dkt. Nos. 1, 55.  In one case,

the district court has stayed the entire action pending resolution of the Rule 23(f) appeal. *See In re Goldman Sachs Grp., Inc. Sec. Litig.*, No. 10-cv-03461-PAC (S.D.N.Y.), Dkt. No. 177. In the other, the district court has pending before it briefing on defendants' stay application. *See Strougo v. Barclays PLC*, No. 14-cv-05797-VM, Dkt. Nos. 88, 89 (S.D.N.Y.).

14. All discovery—expert and fact—is complete in the class and individual actions; summary judgment motions in the class action have been filed; and the eight-week combined class and individual actions trial is scheduled to commence on September 19, 2016. The schedule for briefing on the summary judgment motions in the class action is as follows: Opening papers were filed on June 27, 2016; opposition papers are due July 18, 2016; and reply papers are due July 29, 2016. Plaintiffs have filed a motion for summary judgment on liability issues including falsity, materiality, and scienter. Argument on summary judgment and a final pre-trial conference are scheduled for August 5, 2016. In the non-class, individual actions, briefing is later. Notice is due July 29, 2016; opening papers by August 5, 2016; response papers by August 22, 2016; and reply papers by August 31, 2016. There is no argument on the summary judgment motions in the individual actions.

15.    Following this Court's issuance of its Scheduling Order, defendants promptly moved for a stay of proceedings before the District Court.  On June 21, 2016, per the District Court's individual practices, the parties called the District Court so that defendants could seek a stay pending appeal of the Certification Order.  The District Court requested letter briefing from each side of no more than two pages.  As required by the District Court, defendants submitted their letter brief on June 22, 2016, and Plaintiffs responded on June 23, 2016.  Copies of both letters are attached hereto as Exhibits E and F, respectively.

16.    On June 24, 2016, the District Court issued an order denying defendants' motion for a stay pending appeal.  A copy of that order is attached as Exhibit G.  *In re Petrobras Sec. Litig.*, 2016 U.S. Dist. LEXIS 82426 (S.D.N.Y. June 24, 2016).

**Defendants Will Suffer Irreparable Harm Absent a Temporary Stay**

17.    Absent a stay, this Court's accelerated review faces a grave risk of being thwarted.  The summary judgment scheduled to be argued on August 5, 2016 will very likely be decided, and the impending trial scheduled for September 19, 2016 will very likely be concluded, before a decision on this interlocutory appeal.  Therefore, absent a stay, defendants will suffer the very injury that Rule 23(f) and this Court's June 15 order

7

were intended to prevent: a risk of unbounded liability to an unascertainable and improper class. As this Court has recognized, under these circumstances—whatever the merits of the defendants' defenses—"the class certification 'places inordinate or hydraulic pressure on defendants to settle, avoiding the risk, however small, of potentially ruinous liability.'" *Hevesi v. Citigroup Inc.*, 366 F.3d 70, 80 (2d Cir. 2004) (quoting *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 164 (3d Cir. 2001)).

18. The strain class certification puts on defendants to settle is exacerbated by the pendency of the non-class tag-along actions. Were they to be tried first, concerns about collateral estoppel, without the corresponding benefit of global resolution in the event of a defense verdict, could also pressure defendants to settle without the benefit of this Court's ruling, and in a manner unrelated to the merits of the case.

19. A stay pending appeal will clarify which claims (and in what amounts) defendants face—facts very significant not only for defendants but also for current members of the classes. Once this Court has ruled on the parameters of the classes at issue, class members may make an informed decision about proceeding to trial as a class or as individuals.

20. In order to be fully effective, a stay must take effect not only before trial but also before a decision on summary judgment and the final

pre-trial conference in the class action on August 5, 2016. If defendants' stay motion were not decided before that date and this Court later determined that one or both of the classes had to be renoticed, then putative class members would the unwarranted benefit of a one-way ratchet—they could opt into a favorable plaintiff judgment but opt out of a defense judgment.

## Plaintiffs Will Not Be Substantially Injured by a Stay

21.    Plaintiffs will not be prejudiced by a stay. In light of the complexity of this litigation, the number of documents produced and depositions taken, size of the classes and potential damages, this case has moved at an extremely accelerated pace, from lead plaintiff appointment on March 4, 2015, to trial scheduled to commence September 19, 2016. Because district court proceedings have moved so quickly—numerous depositions since February 1, 2016, including over 20 expert depositions between June 8 and 27—the district court left little time between class certification and trial. Because all fact and expert discovery has ended, and because trial would be able to begin very soon after this Court issues its determination of defendants' appeal, plaintiffs will not be harmed by this Court granting a short stay pending the outcome of the expedited appeal.

22.     Furthermore, the tag-along individual plaintiffs agreed to a single trial with class plaintiffs in order to jointly present common issues to the jury.  The same considerations support a brief stay of both the class and individual trials pending an expedited appeal.

23.     As noted above, defendants have been centrally constrained by the prospect of enormous liability to the class—a prospect not present in the individual actions, even when considered altogether.  Furthermore, from the beginning, the class was intended to lead (and has led) the pre-trial proceedings:

(a)     The complaints in the individual actions largely mirror the complaint in the class action.

(b)     Individual actions were not filed until after lead plaintiffs and lead counsel were chosen on March 4, 2015. *See* the District Court's Order dated March 4, 2015, at 2, a copy of which is attached as Exhibit H;

(c)     While defendants' motion to dismiss in the class action was due April 17, 2005, defendants' time to move or answer was "stayed until 28 days following a decision on any pending motions to dismiss in the Consolidated Securities Litigation."  *See* the District

10

Court's Scheduling and Consolidation Order at *2, a copy of which is attached as Exhibit I;

(d)     Individual actions filed after December 31, 2015 were automatically stayed in all respects until after the completion of the trial in the class case.  *See* the Amended Case Management Plan at *1, a copy of which is attached as Exhibit J;

(e)     Depositions were scheduled to be completed in the class action a month prior to the close of discovery in the individual actions.  *See Id.* at.  Class plaintiffs' counsel took virtually all the depositions of defendants and their experts;

(f)     Document production in the class action had a substantial completion deadline of January 1, 2016, whereas the deadline for document production in the individual actions was January 31, 2016. *Id.* at *2;

(g)     Class action summary judgment papers are due approximately one month before those in the individual actions.  *Id.*;

(h)     the District Court has only allowed oral argument for the class summary judgment motions and not on issues relating solely to the individual actions;  *Id.; and*

11

(i)    Summary judgment motions in the individual actions will not be fully briefed until several weeks after the final pre-trial conference.  *Id.*

### The Balance of Hardships Decisively Favors a Stay

24.    A stay would allow class members, individual plaintiffs and defendants to make informed decisions as to settlement and appropriately focus issues at trial.  It would also prevent duplicative efforts, wasting the parties' and the District Court's resources, in retrying the class action should the classes be modified on appeal.

### The Public Interest Favors a Stay

25.    It is in the public interest to grant a stay pending appeal.  This Court has granted defendants' leave to appeal under Fed. R. Civ. P. 23(f), a interlocutory procedure that recognizes the primacy of class certification in shaping the parties' decisions.  Allowing the district court to proceed to trial, and render a decision on summary judgment, would undercut the effectiveness of this mechanism.  In addition, there is a real possibility of having a new trial (or trials) following a decision or new class notification. The extraordinary pressures facing defendants to settle, the expedited schedule of the district court since inception of this case, the expedited

appeal at issue, and the primary importance of the two issues on appeal to the consolidated case all favor a brief stay pending appeal.

### Relevant Documents

26.     In connection with this Declaration and accompanying Motion and Memorandum of Law, I attached true and correct copies of the following documents:

| A | List of all individual actions pending before the Honorable Jed S. Rakoff consolidated with the Petrobras Action. |
|---|---|
| B | Order in *In re Petrobras Securities Litigation*, No. 14 Civ. 9662 (JSR), (S.D.N.Y. Feb. 2, 2016), Dkt. No. 428. |
| C | Order in *In re Petrobras Securities Litigation*, No. 16-0463cv (2d Cir. June 15, 2016), granting Defendants leave to appeal under 23(f). |
| D | Scheduling Order in *In re Petrobras Securities Litigation*, No. 16-1914-cv (2d Cir. June 16, 2016). |
| E | Letter from Defendants to the Honorable Jed S. Rakoff dated June 22, 2016, requesting a stay of proceedings in the District Court. |
| F | Letter from Plaintiffs to the Honorable Jed S. Rakoff dated June |

| | |
|---|---|
| | 23, 2016, opposing a stay of proceedings in the District Court. |
| G | Order of the Honorable Jed S. Rakoff dated June 24, 2016, denying Defendants' request for a stay. |
| H | Order of the Honorable Jed S. Rakoff appointing Lead Plaintiff and approving Lead Counsel, *In re Petrobras Securities Litigation*, No. 14 Civ. 9662 (JSR) (S.D.N.Y. March 4, 2015), Dkt. No. 99. |
| I | Scheduling and Consolidation Order of the Honorable Jed S. Rakoff dated March 24, 2015, Dkt. No. 105. |
| J | Order of the Honorable Jed S. Rakoff amending the District Court's Case Management Plan, *In re Petrobras Securities Litigation*, No. 14 Civ. 9662 (JSR) (S.D.N.Y. January 11, 2016), Dkt. No. 391. |

I declare under penalty of perjury that the foregoing is true and correct. Executed on June 28, 2016.

*/s/* Lewis J. Liman

Lewis J. Liman

14

## **EXHIBIT A**

1. *Dimensional Emerging Markets Value Fund, et al. v. Petróleo Brasileiro S.A –Petrobras*, No. 15-cv-2165 (JSR);

2. *New York City Employees Retirement System, et al. v. Petróleo Brasileiro S.A. – Petrobras, et al.*, No. 15-cv-02192 (JSR);

3. *Skagen, et al. v. Petróleo Brasileiro S.A. – Petrobras, et al.*, No. 15-cv-2214 (JSR);

4. *Transamerica Income Shares, Inc., et al. v. Petróleo Brasileiro S.A. – Petrobras, et al.*, No. 15-cv-03733 (JSR);

5. *Aberdeen Emerging Markets Fund, et al. v. Petróleo Brasileiro S.A. – Petrobras*, No. 15-cv-03860 (JSR);

6. *Ohio Public Employees Retirement System v. Petróleo Brasileiro S.A. – Petrobras et al.*, No. 15-cv-03887 (JSR);

7. *Central States Southeast and Southwest Areas Pension Fund v. Petróleo Brasileiro S.A. – Petrobras, et al.*, No. 15-cv-3911 (JSR);

8. *Washington State Investment Board v. Petróleo Brasileiro S.A. – Petrobras, et al.*, No. 15-cv-03923 (JSR);

9. *Aberdeen Latin American Income Fund Limited, et al. v. Petróleo Brasileiro S.A. – Petrobras*, No.15-cv-4043 (JSR);

10. *NN Investment Partners B.V., et al. v. Petróleo Brasileiro S.A. – Petrobras, et al.*, No. 15-cv-4226 (JSR);

11. *Aura Capital Ltd. v. Petróleo Brasileiro S.A. – Petrobras, et al.*, No. 15-cv-4951 (JSR);

12. *Al Shams Investment Ltd., et al. v. Petroleo Brasileiro S.A. – Petrobras, et al.*, No. 15-cv-6243 (JSR);

13. *INKA Internationale Kapitalanlagegesellschaft mbH v. Petróleo Brasileiro S.A. – Petrobras, et al.*, No. 15-cv-6575 (JSR);

14. *Delaware Enhanced Global Dividend and Income Fund, et al. v. Petroleo Brasileiro S.A. – Petrobras*, No. 15-cv-6643 (JSR);

15. *Abbey Life Assurance Co. v. Petroleo Brasileiro S.A. –Petrobras*, No. 15-cv-6661 (JSR);

16. *WGI Emerging Markets Fund, LLC, et al. v. Petroleo Brasileiro S.A. – Petrobras, et al.*, No. 15-cv-7568 (JSR).

17. *Russell Investment Co., et al. v.Petroleo Brasileiro S.A. – Petrobras*, No. 15-cv-7605 (JSR);

18. *Lord Abbett Global Fund, Inc. – Lord Abbett Emerging Markets Currency Fund: Lord Abbett Global Fund Inc., et al. v. Petróleo Brasileiro S.A. – Petrobras, et al.*, No. 15-cv-7615 (JSR);

19. *PIMCO Funds: PIMCO Total Return Fund, et al. v. Petróleo Brasileiro S.A. – Petrobras, et al.*, No. 15-cv-8192 (JSR);

20. *State of Alaska Department of Revenue, Treasury Division, et al. v. Petróleo Brasileiro S.A. – Petrobras*, 15-cv-8995 (JSR);

21. *Discovery Global Citizens Master Fund, Ltd., et al. v. Petróleo Brasileiro S.A. – Petrobras et al.*, No. 15-cv-09126 (JSR);

22. *The Hartford Mutual Funds, Inc., et al. v. Petróleo Brasileiro S.A. – Petrobras, et al.*, 15-cv-9182 (JSR);

23. *Massachusetts Mutual Life Insurance Company, et al. v. Petróleo Brasileiro S.A. – Petrobras, et al.*, 15-cv-9243 (JSR);

24. *Janus Overseas Fund, et al. v. Petróleo Brasileiro S.A. – Petrobras, et al.*, 15-cv-10086 (JSR);

25. *Dodge & Cox International Stock Fund, et al. v. Petróleo Brasileiro S.A. – Petrobras, et al.*, 15-cv-10111 (JSR);

26. *State Street Cayman Trust Company, Ltd., solely in its capacity as Trustee of Russell Emerging Markets Equity Fund v. Petróleo Brasileiro S.A. – Petrobras*, 15-cv-10158 (JSR);

27. *Manning & Napier Advisors, LLC v. Petróleo Brasileiro S.A. – Petrobras*, 15-cv-10159 (JSR);

U.S. ... NY

... ALLY FILED

D... #:

DAT... ...  2/2/16

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------x
                                :        14-cv-9662 (JSR)

In re: PETROBRAS SECURITIES    :
LITIGATION                         :        <u>OPINION AND ORDER</u>
                                :
------------------------------------x

JED S. RAKOFF, U.S.D.J.

    Lead Plaintiff Universities Superannuation Scheme Ltd.

("USS") brings this putative class action against Brazilian oil

company Petróleo Brasileiro S.A. – Petrobras ("Petrobras"); two

of Petrobras' wholly-owned subsidiaries, Petrobras Global

Finance, B.V. ("PGF")[1] and Petrobras America, Inc. ("PAI");

various former officers and directors of Petrobras and its

subsidiaries (the "Individual Defendants");[2] Petrobras'

---

[1] On February 12, 2014, PGF acquired the outstanding shares of
another wholly-owned subsidiary of Petrobras, Petrobras
International Finance Company S.A. ("PifCo").

[2] Specifically, the Individual Defendants include former
Petrobras Chief Executive Officer ("CEO") Maria das Gracas Silva
Foster, another former Petrobras CEO José Sergio Gabrielli, and
various other current or former executives of Petrobras or
associated companies, namely, Petrobras Chief Financial Officer
("CFO") Almir Guilherme Barbassa, Petrobras director Paulo
Roberto Costa, Petrobras director Jose Carlos Cosenza, Petrobras
director Renato de Souza Duque, Petrobras director Guillherme de
Oliveira Estrella, Petrobras director Jose Miranda Formigli
Filho, Petrobras director Silvio Sinedino Pinheiro, PifCo
Chairman and CEO Daniel Lima de Oliveira, PifCo director José
Raimundo Brandão Pereira, PifCo CFO Sérvio Túlio da Rosa Tinoco,
PifCo Chief Accounting Officer Paulo Jose Alves, PGF CEO and
"Managing Director A" Gustavo Tardin Barbosa, PGF CFO and
"Managing Director B" Alexandre Quintão Fernandes, PGF "Managing
Director A" Marcos Antonio Zacarias, PGF "Managing Director B"

1

independent auditor, PricewaterhouseCoopers Auditores

Independentes ("PwC"); and the various underwriters of

Petrobras's debt offerings (the "Underwriter Defendants").[3]

Plaintiffs allege that Petrobras was at the center of a multi-

year, multi-billion dollar bribery and kickback scheme, in

connection with which defendants made false and misleading

statements in violation of the Securities Act of 1933 (the

"Securities Act") and the Securities Exchange Act of 1934 (the

"Exchange Act").

The general details of this case are set forth in the

Court's Opinion dated July 30, 2015, familiarity with which is

here presumed. See Opinion dated July 30, 2015, at 2-14, ECF No.

194. Plaintiffs now move to certify two classes, one for their

Securities Act claims and one for their Exchange Act claims.

Plaintiffs propose the following Class for their Securities Act

claims (the "Securities Act Class"):

> As to claims under Sections 11, 12(a)(2), and 15 of
> the Securities Act of 1933, all purchasers who
> purchased or otherwise acquired debt securities issued

---

Cornelis Franciscus Jozef Looman, and authorized Petrobras
United States Representative Theodore Marshall Helms.

[3] Specifically, the Underwriter Defendants are: BB Securities
Ltd., Citigroup Global Markets Inc., J.P. Morgan Securities LLC,
Itau BBA USA Securities, Inc., Morgan Stanley & Co. LLC, HSBC
Securities (USA) Inc., Mitsubishi UFJ Securities (USA), Inc.,
Merrill Lynch, Pierce, Fenner & Smith Incorporated, Standard
Chartered Bank, Bank of China (Hong Kong) Limited, Banco
Bradesco BBI S.A., Banca IMI S.p.A., and Scotia Capital (USA)
Inc.

by Petrobras, Petrobras International Finance Company
S.A. ("PifCo"), and/or Petrobras Global Finance B.V.
("PGF") directly in, pursuant and/or traceable to a
May 15, 2013 public offering registered in the United
States and/or a March 11, 2014 public offering
registered in the United States. Excluded from the
Class are Defendants, current or former officers and
directors of Petrobras, members of their immediate
families and their legal representatives, heirs,
successors or assigns, and any entity in which
Defendants have or had a controlling interest.

Plaintiffs' Memorandum of Law in Support of Motion for Class

Certification at 1, ECF No. 256. Plaintiffs propose the

following Class for their Exchange Act claims (the "Exchange Act

Class"):

As to claims under Sections 10(b) and 20(a) of the
Exchange Act of 1934, all purchasers who, between
January 22, 2010 and July 28, 2015, inclusive (the "Class
Period") purchased or otherwise acquired the securities
of Petroleo Brasileiro S.A. ("Petrobras"), including
debt securities issued by Petrobras International
Finance Company S.A. ("PifCo") and/or Petrobras Global
Finance B.V. ("PGF") on the New York Stock Exchange (the
"NYSE") or pursuant to other domestic transactions, and
were damaged thereby. Excluded from the Class are
Defendants, current or former officers and directors of
Petrobras, members of their immediate families and their
legal representatives, heirs, successors or assigns, and
any entity in which Defendants have or had a controlling
interest.

Id. Plaintiffs move to appoint four plaintiffs -- namely USS,

North Carolina Department of State Treasurer ("North Carolina"),

Employees' Retirement System of the State of Hawaii

("Hawaii"),and Union Asset Management Holding AG ("Union") -- as

class representatives for the Securities Act Class, and one

3

plaintiff, USS, as class representative for the Exchange Act Class. Plaintiffs also move to appoint Pomerantz LLP ("Pomerantz") as Class Counsel for both Classes.

Defendants oppose plaintiffs' class certification motion, arguing that plaintiffs have failed to satisfy the requirements of Rules 23(a) and 23(b)(3). The Court received briefing from the parties and held an evidentiary hearing on December 21, 2015. At the hearing, the Court heard the testimony of competing expert witnesses: Dr. Steven Feinstein ("Feinstein") for plaintiffs and Dr. Paul Gompers ("Gompers") for defendants. See Transcript dated Dec. 21, 2015, ECF No. 414. Each of these experts also submitted two written reports apiece, all four of which the Court received in evidence. See Declaration of Emma Gilmore dated Oct. 23, 2015, Ex. A ("Feinstein Report"), ECF No. 264-1; Declaration of Emma Gilmore dated Nov. 23, 2015, Ex. H ("Feinstein Rebuttal Report"), ECF No. 338-8; Declaration of Jared Gerber dated Nov. 6, 2015, Ex. 27 ("Gompers Report"), ECF No. 294-5; Declaration of Jared Gerber dated Dec. 8, 2015, Ex. A ("Gompers Rebuttal Report"), ECF No. 355.

Having now fully reviewed the parties' submissions and evidence, the Court grants plaintiffs' motion for class certification, certifies a Securities Act Class and an Exchange Act Class, appoints North Carolina and Hawaii as class representatives for the Securities Act Class and USS as class

4

representative for the Exchange Act Class, and appoints
Pomerantz as Class Counsel for both Classes.

To prevail on their motion for class certification,
plaintiffs must first satisfy the four requirements of Rule
23(a), commonly referred to as numerosity, commonality,
typicality, and adequacy. See Fed. R. Civ. P. 23(a). The Court
considers each in turn.

Rule 23(a)(1) provides that class may be certified only if
"the class is so numerous that joinder of all members is
impracticable." In the Second Circuit, numerosity is usually
presumed for classes larger than forty members. See Pennsylvania
Public School Employee's Retirement System v. Morgan Stanley &
Co., Inc., 772 F.3d 111, 120 (2d Cir. 2014). However, "the
numerosity inquiry is not strictly mathematical but must take
into account the context of the particular case." Id. Relevant
factors include "(i) judicial economy, (ii) geographic
dispersion, (iii) the financial resources of class members, (iv)
their ability to sue separately, and (v) requests for injunctive
relief that would involve future class members." Id.

Defendants do not dispute the statements in Feinstein's
report that, on average during the Class Period, there were
756.1 million Petrobras common ADS outstanding and 741.8 million
Petrobras preferred ADS outstanding and that the total face
value of Petrobras bonds was $41.1 billion. Feinstein Report ¶¶

33, 93, 193. On the basis of these figures, plaintiffs estimate
that there are thousands of class members, dispersed across the
globe. Defendants do not object to this assessment per se, but
argue instead that the volume of "opt-out" individual actions
filed against Petrobras demonstrates that the class includes
sophisticated members with the resources to sue separately. See,
e.g., New York City Employees Retirement System et al v.
Petroleo Brasileirio S.A. -Petrobras et al, No. 15-cv-2192.
Defendants also point to the fact that the Court has scheduled a
joint trial of the instant action and the individual actions as
evidence that a class action is not necessary in this instance.
See Order dated Nov. 18, 2015, ECF No. 311 (setting common trial
date for all cases related to the present action).

Defendants are correct that a significant volume of
sophisticated plaintiffs have opted out of the present action,
but they miss the point of these opt-outs. The Second Circuit
has made clear that "the numerosity inquiry . . . must take into
account the context of the particular case." Pennsylvania Public
School Employee's Retirement System v. Morgan Stanley & Co.,
Inc., 772 F.3d 111, 120 (2d Cir. 2014). The context of this
particular case is that Petrobras was among the world's largest
companies during the Class Period. Defendants do not dispute
that the billions of Petrobras securities traded vigorously
around the world throughout the Class Period. In light of this,

6

the volume of sophisticated opt-outs does not indicate that a class action is inappropriate or that the Classes are insufficiently numerous. Instead, the volume of opt-outs underscores just how vast the Classes are. Hundreds of opt-outs is a large number, but a conservative estimate would place the size of the proposed Classes in the thousands. Judicial economy will be served by a joint trial because of the similarities between the individual actions and the present action, but, contrary to defendants' suggestion, this would not extend to a joint trial for thousands upon thousands of individual actions. Accordingly, the Court concludes that the Classes satisfy the numerosity requirement of Rule 23(a)(1).

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." In the context of a securities class action, "[c]ommon questions of law and fact include whether certain statements were false and misleading, whether those statements violated the federal securities laws, whether those statements were knowingly and recklessly issued, and ensuing causation issues." Pennsylvania Ave. Funds v. Inyx Inc., 2011 WL 2732544 at *4 (S.D.N.Y. July 5, 2011). Common questions of law and fact in this case include the truth of the bribery and kickback allegations against Petrobras, the accuracy of Petrobras's statements in connection with the allegations, the knowledge of individual defendants regarding these matters, and

7

related causation issues. Defendants do not seriously challenge
that common questions of law and fact exist here. Accordingly,
the Court concludes that the commonality requirement is
satisfied.

Rule 23(a)(3) requires that "the claims or defenses of the
representative parties [be] typical of the claims or defenses of
the class." Defendants do not materially attack the typicality
of North Carolina's or Hawaii's Securities Act claims, but they
argue that, because the Court dismissed Union's and USS's Notes
claims, Rule 23(a)(3) bars them from serving as class
representatives for the Securities Act Class. Plaintiffs respond
that Union's and USS's Exchange Act claims arise from the "same
set of concerns" as the Securities Act claims, and so Union's
and USS's claims are still typical of the Securities Act Class.
NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co., 693 F.3d
145, 149 (2d Cir. 2012). However, the "same set of concerns"
standard pertains to class standing, a distinct inquiry from
typicality under Rule 23(a)(3). Id. at 158 n.9.

While the underlying thrust of plaintiffs' argument might
still have some relevance to a Rule 23(a)(3) analysis in general
-- because "a class representative can establish the requisite
typicality under Rule 23 if the defendants 'committed the same
wrongful acts in the same manner against all members of the
class.'" Hevesi v. Citigroup, Inc., 366 F.3d 70, 82 (2d Cir.

8

2004) (citation omitted) -- here, Union and USS fail to clear
even this relatively modest hurdle with respect to the
Securities Act Class because they no longer have Securities Act
claims. Indeed, although plaintiffs' proposed definition of the
Securities Act Class does not explicitly require that class
members have purchased Notes in domestic transactions, such a
requirement must be part of any certified class definition. See
Morrison v. National Australia Bank Ltd., 561 U.S. 247 (2010).
Because neither Union nor USS adequately pleaded that they
purchased Notes in domestic transactions, see Opinion and Order
dated Dec. 21, 2015, at 12, ECF No. 374, they cannot be members
of the Securities Act Class. And, while typicality does not
require identity amongst class members' claims, it does demand
that a class representative be a member of the Class.
Accordingly, USS and Union cannot serve as class representatives
for the Securities Act Class.

Turning to the Exchange Act Class, defendants argue that
typicality also bars USS from serving as a class representative
for the Exchange Act Class because USS's Notes claims were
dismissed. But there is no dispute that USS is a member of the
Exchange Act Class, although its claims are based only on its
purchases of Petrobras equities. Defendants object that there
are significant differences, including differences in price
movements, between Petrobras's debt and equity securities. But

such variations are not relevant when the same alleged
misconduct drives the claims based on debt and equity alike. The
defendants allegedly "'committed the same wrongful acts in the
same manner against all members of the class'" by participating
in a bribery and kickback scheme and making false and misleading
statements that impacted all members of the Exchange Act Class.
Hevesi v. Citigroup, Inc., 366 F.3d 70, 82 (2d Cir. 2004)
(citation omitted), see In re Enron Sec. Litig., 206 F.R.D. 427,
445-46 (S.D. Tex. 2002) ("[C]ourts have repeatedly concluded
that stock purchasers can represent purchasers of debt
instruments and vice versa in the same action.") (collecting
cases). Accordingly, the Court concludes that the typicality
requirement does not bar USS from serving as class
representative for the Exchange Act Class solely because of its
lack of Notes claims.

Defendants also argue that USS fails the typicality
requirement because it faces unique defenses in four respects.
First, defendants argue that USS is atypical because USS made
some additional purchases of Petrobras securities in June 2015,
after Petrobras had made corrective disclosures and plaintiffs
had filed the Consolidated Amended Complaint in this case. But
aside from the irrelevance of post-disclosure purchases to
earlier reliance, see In re Monster Worldwide, Inc. Sec. Litig.,
251 F.R.D. 132, 135 (S.D.N.Y. 2008), the Class Period for the

10

Exchange Act Class runs through July 28, 2015, based on plaintiffs' allegations that Petrobras's earlier corrective disclosures were a "whitewash." See Opinion and Order dated Dec. 21, 2015, at 12-14, ECF No. 374.[4] Accordingly, USS's purchases of securities in June 2015 do not mean it will face atypical defenses.

Second, defendants argue that USS is atypical in that it alternated between purchases and sales throughout the class period. But such "in-and-out" trading is not atypical in a class that contains, by defendants' own admission, numerous sophisticated institutional investors. See Defendants' Joint Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification ("Def. Opp.") at 3, ECF No. 295. Moreover, plaintiffs claim that USS lost approximately $80 million, its in-and-out trading notwithstanding. See Class Plaintiffs' Reply Memorandum of Law in Further Support of Motion for Class Certification at 3, ECF No. 337.

Third, defendants claim that USS's trading decisions were based on atypical considerations. In particular, defendants claim that USS had special contact with Petrobras during the

---

[4] In their opposition to plaintiffs' motion for class certification, defendants reiterate their earlier request to shorten the periods for the claims in this case. The Court again denies this request for the reasons stated in its decision on defendants' motion to dismiss the Fourth Amended Complaint. See Opinion and Order dated Dec. 21, 2015, at 12-14, ECF No. 374.

Class Period that affected its decisions, and also that USS
followed a special investment strategy that "look[s] at extra
financial factors" that "the market does not accurately
reflect." Declaration of Jared Gerber dated Nov. 6, 2015, Ex. 4,
ECF No. 294. Such general statements do not seriously call the
typicality of USS's claims into question: it is common practice
for money managers to claim they have some special strategy that
will deliver insights -- and returns -- superior to the wider
market. Likewise, the interactions with Petrobras that
defendants point to -- communications with the company's
investment relations team and operating personnel and a brief
meeting with the Petrobras CEO. See Declaration of Emma Gilmore
dated Nov. 23, 2015, Ex. A (Deposition of Christopher Shale) at
84:3-23, 108:10-14, ECF No. 338-1 -- are typical of the
relationships between large institutional investors and
companies like Petrobras. In a class so heavily populated by
institutional investors, these sorts of interactions do not mean
that USS is subject to atypical defenses.

Fourth, defendants claim that USS will face unique reliance
defenses based on its May 25, 2015, vote against approving
Petrobras's management reports and financial statements for
2014. These documents were part of Petrobras's alleged
"whitewash" of the bribery and kickback scandal, which valued
the total overcharges from the bribery scheme at $2.5 billion.

12

See Fourth Amended Complaint ¶¶ 169, 176 ECF No. 342; Def. Opp.
at 7. USS objected to the documents because it had "concerns
regarding the reliability of the reported numbers." Declaration
of Jared Gerber dated Nov. 6, 2015, Ex. 3, ECF No. 294. Such
statements by plaintiffs may form part of a reliance defense,
but any such defense will be typical of the Exchange Act Class
because the Consolidated Amended Complaint in this case was
filed on March 27, 2015, and alleged that the bribery scheme
cost an estimated $28 billion. Consolidated Amended Complaint ¶
5, ECF No. 109. Indeed, defendants have already argued that
plaintiffs cannot prove reliance on Petrobras's May 25, 2015,
statements because of the filings in this case. See Defendants'
Memorandum of Law in Support of their Motion to Dismiss the
Third Consolidated Amended Complaint at 10-14, ECF No. 226. The
Court takes no position on the merits of this issue at this
stage, but it does conclude that disputes over class members'
reliance on the alleged "whitewash" are typical of the Exchange
Act class a whole. Accordingly, USS's claims and defenses
against them are typical, and plaintiffs have satisfied the
requirements of Rule 23(a)(3).

Rule 23(a)(4) requires that "the representative parties
will fairly and adequately protect the interests of the class."
"Adequacy 'entails inquiry as to whether: 1) plaintiff's
interests are antagonistic to the interest of other members of

the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation.'" In re Flag Telecom Holdings, Ltd. Sec. Litig., 574 F.3d 29, 35 (2d Cir. 2009). Defendants argue that USS's interests are antagonistic to members of the Exchange Act Class whose claims are based on purchases of Notes or preferred ADS because USS no longer has Notes claims and sold its preferred ADS in October 2013. See Declaration of Jared Gerber dated Nov. 6, 2015, Ex. 16 at 1-2, ECF No. 294-2. However, even assuming that the date USS sold its preferred ADS would significantly alter its interests with respect to those securities, defendants have not sufficiently explained why the interests of holders of common ADS like USS would be antagonistic to the interests of holder of Notes or preferred ADSs. The only theory of antagonism of which the Court is aware was presented during consideration of appointment of Lead Plaintiff and concerned the differing priority of securities in the event of bankruptcy. See Memorandum dated May 18, 2015, at 10 n.3, ECF No. 166. There is no evidence that the bankruptcy scenario is remotely likely or relevant. Because the same alleged misconduct drives plaintiffs' claims, regardless of whether they arise from purchases of Notes, common ADS, or preferred ADS, the interests of all members of the Exchange Act Class are aligned. See In re Enron Sec. Litig., 206 F.R.D. 427, 445-46 (S.D. Tex. 2002) ("[C]ourts have repeatedly concluded

14

that stock purchasers can represent purchasers of debt

instruments and vice versa in the same action.") (collecting

cases). Moreover, the solution to USS's putative adequacy

problem would not be to deny certification of the Exchange Act

Class but rather to appoint another class representative

alongside USS. For now, this course remains a solution in search

of a problem. However, if, as the litigation proceeds, an

Exchange Act Class member with claims based on Notes or

preferred ADS purchases wishes to appoint a class representative

dedicated to their interests, the Court will entertain her

motion.

Defendants also argue that North Carolina, Hawaii, and USS

are collectively inadequate class representatives because they

suffer from a lack of cohesion. In particular, they rely on this

Court's decision appointing USS Lead Plaintiff to criticize the

appointment of three class representatives who, defendants

claim, are an "artificial grouping" and will not be able to

cooperate effectively. See Memorandum dated May 18, 2015, at 4

ECF No. 166. Although the Court recognizes that there are costs

associated with the appointment of multiple class

representatives, the dangers are not the same as those presented

by lawyers bundling unrelated clients together to win a lead

plaintiff appointment under 15 U.S.C. § 78u-

4(a)(3)(B)(iii)(I)(bb) (directing court to adopt presumption

15

that lead plaintiff is person or group of persons with "the largest financial interest in the relief sought by the class"). There is now a valid reason to appoint multiple class representatives because Lead Plaintiff USS is no longer a member of one of the Classes to be certified. Moreover, the proposed class representatives have already demonstrated that they can work together effectively: they managed the addition of three named plaintiffs, Hawaii, North Carolina, and Union, and produced a Joint Prosecution Agreement. See Order dated March 30, 2015, ECF No. 112. In light of this, the number of class representatives is not a barrier to their collective adequacy.

Defendants make other attacks on the competence and qualifications of the proposed class representatives and their counsel, but none has merit. First, defendants argue that USS has never led a U.S. securities class action before. However, experience is not a prerequisite to adequacy under Rule 23(a)(4).

Second, defendants claim that the volume of opt-outs should be seen as a vote of no confidence in USS's leadership of the class. Defendants do not provide any support for this interpretation of class members exercising their opt-out rights. Indeed, it is not uncommon for large institutions to opt out of class actions simply so that they can improve their bargaining position if, as usually occurs, settlement discussions begin. If

16

anything, as explained above, the Court views the volume of opt-out plaintiffs as indirect evidence that a class action is appropriate in this case and that a sophisticated institutional investor like USS is needed as a class representative for the thousands of remaining class members.

Third, defendants claim that the proposed class representatives have exhibited "stark discovery failures." Def. Opp. at 9. But this Court almost never refers discovery disputes to Magistrate Judges, precisely so that the Court can remain apprised of any discovery defalcations, and to this end, the Court provides a mechanism for swift joint telephone conferences to resolve any such problems. If defendants felt that plaintiffs and their counsel were behaving so badly, they should have notified the Court sooner than their opposition to plaintiffs' motion for class certification. The argument thus smacks more of strategy than substance.

In any event, on the basis not only of USS's counsel's prior experience but also the Court's observation of its advocacy over the many months since it was appointed lead counsel, the Court concludes that Pomerantz, the proposed class counsel, is "qualified, experienced and able to conduct the litigation." In re Flag Telecom Holdings, Ltd. Sec. Litig., 574 F.3d 29, 35 (2d Cir. 2009). There is no real dispute that Pomerantz is an established firm with considerable class action

17

experience, and the Court has now had multiple opportunities to observe Pomerantz's performance. The Court finds that the Pomerantz firm has both the skill and resources to represent the Classes adequately.

On the basis of the foregoing discussion, the Court concludes that the requirements of Rule 23(a)(4) are satisfied. With that, the Court concludes that plaintiffs have satisfied all four prongs of Rule 23(a).

In addition, of course, for plaintiffs to prevail on their motion for class certification, the action must meet one of the three alternative conditions of Rule 23(b). Plaintiffs argue that the requirements of Rule 23(b)(3) are satisfied. Rule 23(b)(3) requires that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy" and that "the questions of law or fact common to class members predominate over any questions affecting only individual members."

The foregoing analysis under Rule 23(a) supports a finding that a class action is superior to other methods of adjudication. Petrobras was a massive company with investors around the globe. Notwithstanding Petrobras's size and its numerous and far-flung investors, the interests of the class members are aligned and the same alleged misconduct underlies their claims. Moreover, the thousands of individual class

18

members who have not opted-out have a minimal interest in controlling the course of the litigation; there are significant efficiency gains to be reaped from concentrating the litigation in a single forum; and the likely difficulties in managing the class action are readily surmountable. See Fed. R. Civ. P. 23(b)(3)(A), (C), (D). Defendants again point to the volume of actions brought by individual plaintiffs as evidence against the superiority of the class action form in this case. See Fed. R. Civ. P. 23(b)(3)(B). But the Court again disagrees: instead, the volume of opt-outs demonstrates the need for a class action in these circumstances. Otherwise, the Court risks the present stream of individual actions growing into an unmanageable flood.

Defendants raise two more specific arguments against the superiority of a class action in this case. First, defendants argue that plaintiffs must demonstrate "a probability that a foreign court will recognize the res judicata effect of a U.S. class action judgment" to satisfy superiority. In re Vivendi Universal, S.A., 242 F.R.D. 76, 95 (S.D.N.Y. 2007). The Court is not aware of any binding precedent that sets out such a requirement. In re Vivendi Universal, S.A., the case on which defendants rely for their position, was decided before Morrison v. National Australia Bank Ltd., 561 U.S. 247 (2010), which limited the reach of U.S. securities laws to securities traded on a U.S. exchange or purchased in domestic transactions.

19

Morrison, 561 U.S. at 267. Morrison materially lessens the
foreign res judicata concerns animating In re Vivendi Universal,
S.A.. Moreover, In re Vivendi Universal, S.A. only concluded
that res judicata concerns could be one consideration that could
lead to the exclusion of foreign members from a class. In re
Vivendi Universal, S.A., 242 F.R.D. 76, 95 (S.D.N.Y. 2007).
While defendants also propose including in the Class definitions
lists of countries whose residents would be excluded from the
Classes, see Defendants' Joint Supplemental Memorandum of Law in
Further Opposition to Plaintiffs' Motion for Class
Certification, App. A, ECF No. 389, defendants have not
explained in any detail why these particular countries would not
recognize a U.S. class action judgment in this case.
Accordingly, the Court concludes that foreign res judicata
concerns are not a bar to the superiority of a class action and
declines to list any specific countries in the Class
definitions.

Defendants also argue against superiority on so-called
"ascertainability" grounds. The Second Circuit has framed
ascertainability as a stand-alone "implied requirement" of Rule
23, and, to the extent defendants' arguments are addressed to
ascertainability as distinct from superiority, the Court also
considers them here. See Brecher v. Republic of Argentina, 806
F.3d 22, 24 (2d Cir. 2015). "[T]he touchstone of

20

ascertainability is whether the class is 'sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member.'" Id. However, "failure to certify an action under Rule 23(b)(3) on the sole ground that it would be unmanageable is disfavored and 'should be the exception rather than the rule.'" In re Visa Check/MasterMoney Antitrust Litigation, 280 F.3d 124, 140 (2d Cir. 2001).

Defendants point out that any putative class member must be able to show that they purchased Petrobras securities on an American exchange or in a domestic transaction under Morrison v. National Australia Bank Ltd., 561 U.S. 247 (2010). Defendants argue that, because of the nuances of the "domestic transaction" standard, determining who is a class member and damages will be an administratively unfeasible task for this Court, for putative class members who receive notice of the action, and for future courts facing claims from class members who have not properly opted out.[5] To cut this supposed Gordian knot, defendants propose that the Exchange Act Class definition be amended to exclude off-exchange purchasers and that the Securities Act Class

---

[5] Defendants also argue that the Classes are unmanageable because plaintiffs will need to provide notice to investors across four continents. In today's modern world, this is not an unfeasible task, as demonstrated by the fact that Petrobras successfully marketed its securities across four continents.

21

definition be rejected outright or amended to exclude
aftermarket purchasers and purchasers from non-U.S.
underwriters.

Amending the Class definitions in this way would cut off
purchasers who have valid claims under Morrison's second prong,
which holds that the securities laws apply to securities
purchased in "domestic transactions." Morrison, 561 U.S. at 267.
This would not be a faithful application of Morrison. Moreover,
having recently evaluated whether the four proposed class
representatives adequately pleaded that they purchased Petrobras
securities in domestic transactions, see Opinion and Order at 5-
6, ECF No. 374, the Court is confident that the Morrison
determination is "administratively feasible." Brecher v.
Republic of Argentina, 806 F.3d 22, 24 (2d Cir. 2015). Indeed,
defendants themselves have elsewhere represented as much to the
Court. See Defendants' Supplemental Memorandum of Law in Support
of their Motion to Dismiss the Fourth Consolidated Amended
Complaint and in Further Support of their Motion to Dismiss the
Third Consolidated Amended Complaint at 6, ECF No. 351 ("Each of
[Absolute Activist's tests] establishes, as the site of the
transaction that is of congressional concern, a single location
that—although subject to proof—can be easily determined based on
recognized and readily understood standards."). The criteria
identified by Absolute Activist Value Master Fund Ltd. v.

Ficeto, 677 F.3d 60 (2d Cir. 2012), as relevant to the
determination of whether a transaction was domestic, are highly
likely to be documented in a form susceptible to the
bureaucratic processes of determining who belongs to a Class.
For example, documentation of "the placement of purchase orders"
is the sort of discrete, objective record routinely produced by
the modern financial system that a court, a putative class
member, or a claims administrator can use to determine whether a
claim satisfies Morrison. Accordingly, the Court concludes that
the proposed Classes are ascertainable and administratively
manageable and that a class action is the superior method of
adjudication under Rule 23(b)(3).

Rule 23(b)(3) also requires that "the questions of law or
fact common to class members predominate over any questions
affecting only individual members." "Class-wide issues
predominate if resolution of some of the legal or factual
questions that qualify each class member's case as a genuine
controversy can be achieved through generalized proof, and if
these particular issues are more substantial than the issues
subject only to individualized proof." UFCW Local 1776 v. Eli
Lilly and Co., 620 F.3d 121, 131 (2d Cir. 2010). Here,
plaintiffs submit, and defendants do not meaningfully contest,
that, with the exception of reliance and damages, all elements
of plaintiffs' claims are susceptible to generalized proof. The

23

Court agrees: with the exception of reliance and damages, plaintiffs' claims rest almost exclusively on class-wide questions of law and fact centered around the alleged bribery and kickback scheme, Petrobras's alleged misstatements in connection with the scheme, the conduct of Petrobras's officers and employees, and the effects of these actions and events on the market.

It is true that, with respect to the Exchange Act Class, reliance is an element of plaintiffs' claims. But while reliance may be an individual phenomenon, here plaintiffs argue that reliance will be established on a common basis under a "fraud-on-the-market" theory. See Basic, Inc. v. Levinson, 485 U.S. 224, 241-42 (1988). "[T]o invoke the Basic presumption, a plaintiff must prove that . . . (3) the [security] traded in an efficient market." Halliburton Co. v. Erica P. John Fund, Inc., 134 S. Ct. 2398, 2413 (2014). The Second Circuit has not adopted a test for the market efficiency of stocks or bonds. See Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc., 546 F.3d 196, 204 n.11 (2d Cir. 2008). However, it has recognized that courts generally apply a set of eight factors, known as the "Cammer factors." Id.; see Cammer v. Bloom, 711 F. Supp. 1264, 1286 (D.N.J. 1989) (setting out five factors); Krogman v. Sterritt, 202 F.R.D. 467, 478 (N.D. Tex. 2001) (considering three additional "Cammer" factors). To address

24

these factors, plaintiffs submitted two expert reports from

their witness Feinstein. Feinstein also testified at an

evidentiary hearing on December 21, 2015. Defendants and their

expert do not meaningfully dispute Feinstein's conclusions with

respect to all but one of the Cammer factors (discussed below).

The Court accepts Feinstein's testimony with respect to these

other factors and concludes that they weigh in favor of finding

that Petrobras equity and debt securities traded in efficient

markets.

The Court first considers the application of the Cammer

factors to the Petrobras equity markets. The Cammer factors are

designed for equity markets and can be applied directly to the

markets for Petrobras common and preferred ADS. The first Cammer

factor considers the average weekly trading volume during the

Class Period. Specifically, "average weekly trading of two

percent or more of the outstanding shares would justify a strong

presumption that the market for the security is an efficient

one; one percent would justify a substantial presumption."

Cammer, 711 F. Supp. at 1286 (citing Bromberg & Lowenfels, 4

Securities Fraud and Commodities Fraud, § 8.6 (Aug. 1988)).

Feinstein reported that 14.1% of all common ADS and 6.61% of all

preferred ADS outstanding traded on average in a given week

during the Class Period. Feinstein Report ¶¶ 61, 171. This is

well above the 2% threshold for a "strong presumption" of
efficiency discussed in Cammer.

The second Cammer factor considers analyst coverage.
Feinstein reported that over 50 analysts covered Petrobras's
securities, inarguably a significant number. Id. ¶¶ 66, 173.
There was also extensive news coverage of Petrobras during the
Class Period. Id. ¶¶ 71, 176.

The third Cammer factor considers whether market makers
existed for the securities at issue. Feinstein reported that
there were at least 574 market makers for Petrobras common ADS
and 147 market makers for Petrobras preferred ADS; these market
makers included Goldman Sachs, JP Morgan, Citigroup, and Morgan
Stanley. Id. ¶¶ 78, 181.

The fourth Cammer factor considers whether an issuer was
eligible to file a Form S-3, a simplified security registration
form that can be filed by companies that have met prior
reporting requirements. A Form F-3 is the equivalent of a Form
S-3 for foreign companies; companies are eligible to file an F-3
or an S-3 form when, among other things, they have filed
Exchange Act reports for a certain time and have a float over a
certain level. Id. ¶¶ 81.[6] Petrobras satisfied the F-3
requirements for the duration of the Class Period, except for

---

[6] "Float" refers to outstanding shares minus closely-held and
restricted shares.

26

when it delayed release of its financials because of the allegations that underlie this case. Id. ¶¶ 90, 187. Petrobras filed an F-3 form during the Class Period on August 29, 2012. Id.

Defendants dispute the fifth Cammer factor, which looks to "empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price." Cammer, 711 F. Supp. at 1287. Because this factor is disputed, the Court considers it separately below.

The sixth Cammer factor[7] considers market capitalization. The average aggregate market value of the Petrobras common ADS during the Class Period was $16.9 billion, greater than 90% of publicly traded U.S. companies. Feinstein Report ¶ 93. The average aggregate market value of Petrobras preferred ADS during the Period was $15.9 billion, an amount that, on its own, would mean Petrobras was larger than 90% of publicly traded U.S. companies. Id. ¶ 190.

The seventh Cammer factor considers the bid-ask spread for the securities at issue. The average bid-ask spread for Petrobras common ADS over the Class Period was 0.09%, and the

---

[7] Really the first "Krogman" factor. As noted above, in Krogman v. Sterritt, 202 F.R.D. 467 (N.D. Tex. 2001), the court supplemented and elaborated on the Cammer factors.

average bid-ask spread for Petrobras preferred ADRs was 0.08%.
Id. ¶¶ 99, 196. By comparison, the average bid-ask spread for
all stocks in the Center for Research in Security Prices
("CRSP") database was 0.59%. Id.

The eighth Cammer factor considers the issuer's float.
Feinstein reported that none of the Petrobras common ADS were
held by insiders or affiliated corporate entities. Id. ¶ 95.
Accordingly, the entire $16.9 billion average aggregate value of
Petrobras common ADS was floated during the Class Period, again
placing Petrobas in the top decile of U.S. companies. The float
for the preferred ADS varied during the Class Period, but
averaged $15.9 billion, always exceeding the minimum requirement
for F-3 eligibility. Id. ¶ 185.

The Court now considers the application of the Cammer
factors to the market for Petrobras debt securities. Although
the Cammer factors were not designed for debt securities,
plaintiffs argue that they are still useful in evaluating the
efficiency of a debt securities market, particularly in
conjunction with an analysis of the equities market for the same
company. See In re Enron Corp. Sec., 529 F. Supp. 2d 644, 747-48
(S.D. Tex. 2006). To analyze the Petrobras debt markets,
Feinstein omitted some Cammer factors, modified others, and
considered additional debt-specific factors. The Court agrees

28

that the modified Cammer factors provide a useful rubric to
evaluate debt markets.

The first modified Cammer factor considers the par value
and float of the debt securities. Feinstein reported that the
aggregate par value of Petrobras Notes totaled $41.4 billion and
was larger than 90% of all market capitalizations on the NYSE,
Amex, and NASDAQ during the Class Period. Feinstein Report ¶
246. Feinstein reported that no substantial portion of Petrobras
Notes was held by insiders, so that the float was equivalent to
the aggregate par value. Id. ¶ 248.

The second modified Cammer factor considers analyst and
credit rating agency coverage of the debt securities. As noted
above, Feinstein reported that over 50 analysts cover
Petrobras's securities, inarguably a significant number. Id. ¶¶
66, 173. There was also extensive news coverage of Petrobras.
Id. ¶¶ 71, 176. During the Class Period, Petrobras was covered
by the major credit rating agencies, Fitch, Moody's, and
Standard & Poor's. Id. ¶¶ 231-35.

The third modified Cammer factor considers the market
makers and underwriters for the debt securities. Feinstein
reported that there were at least 20 underwriters of the
Petrobras Bonds, including large and prominent investment banks.
Id. ¶ 241. Feinstein also opined that underwriters generally
serve as market makers for securities and that many investment

banks that published analyst reports covering the bonds also served as market makers. Id. ¶ 242-43.

The fourth modified Cammer factor considers institutional ownership of the debt securities. Feinstein reported that 214 different mutual funds held one or more Petrobras bonds during the Class Period. Id. ¶¶ 236-38. Feinstein opined that wide institutional ownership indicates market efficiency because institutional investors often conduct their own research on securities and make investment decisions based on that research. Id.

The fifth modified Cammer factor again considers the ability of the issuer to file a Form S-3. As discussed above, Petrobras satisfied the F-3 requirements for the duration of the Class Period, except for when it delayed release of its financials because of the allegations that underlie this case. Id. ¶ 90, 187. Petrobras filed an F-3 form during the Class Period on August 29, 2012. Id.

The sixth modified Cammer factor considers trading volume and frequency. Feinstein reported a table of weekly average trading volumes for the Petrobras Notes during the Class Period. See id. at 64 tbl.5. The volumes ranged from 1.13% to 10.95%, with most over 2%. Id. Accordingly, all the bonds were over Cammer's 1% threshold for a substantial presumption of efficiency, even though the Cammer thresholds are designed for

30

common stock, which trades more frequently than bonds. Id. ¶ 253. In addition, the average number of days between successive trades in the Notes ranged from 0.020 and 0.418 over the Class Period. Id. ¶ 257. By comparison, relatively few corporate bonds trade more frequently than 200 days in a year. Id. § 255. Feinstein concluded that the trading volumes and frequencies of the Notes were significantly high.

The final modified Cammer factor is the fifth unmodified Cammer factor: empirical evidence of a cause and effect relationship between events and an immediate response in the price of the debt securities. Because this factor is also disputed with respect to the Notes, the Court considers it separately below.

Defendants and their expert Gompers do not directly dispute Feinstein's application of the foregoing Cammer factors, unmodified or modified. Instead, Gompers testified that the foregoing factors are "structural factors that are necessary for efficient markets," but not, on their own, sufficient. Gompers Report ¶ 27. According to Gompers, the fifth Cammer factor, "empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price," is the only factor sufficient to show market efficiency.

31

Although the Second Circuit has recognized that evidence of causality has been considered the most important Cammer factor, it has not held that direct evidence is always necessary. See Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc., 546 F.3d 196, 204 n.11, 207-08 (2d Cir. 2008). While some language in Cammer supports Gompers' view that direct evidence is essential, see Cammer, 711 F. Supp. at 1287, this Court, which is not bound by Cammer, does not agree that only direct evidence is sufficient to demonstrate market efficiency in translating material disclosures into effect on market price. As the Supreme Court recently opined, "market efficiency is not a yes-or-no proposition," and particularly strong indications of market efficiency from the indirect Cammer factors can lessen the burden to be carried by the fifth, "direct evidence" Cammer factor. Halliburton Co. v. Erica P. John Fund, Inc., 134 S. Ct. 2398, 2414 (2014). Causality is notoriously difficult to prove with certainty, even in physics or chemistry, let alone in market analyses, because of the large number of factors involved and the difficulty of measuring them with precision, separating out their interactions, etc. Where, as here, the indirect factors overwhelmingly describe a large and well-functioning market for Petrobras securities, common sense suggests that the market would materially react to material disclosures. Put simply, Petrobras was one of the largest and most-analyzed firms

32

in the world throughout the Class Period, and such size and
sophistication raise the likelihood of an efficient market.

In any event, though it is a somewhat involved analysis,
the Court ultimately concludes that plaintiffs have satisfied
the fifth Cammer factor. To be sure, almost every aspect was
disputed. The experts even sparred over whether any direct
evidence of the fifth factor existed. Feinstein testified that
he found direct evidence of a link between events and prices
movements in Petrobras securities. Specifically, Feinstein ran
four event studies on the Petrobras equities and two on the debt
securities. Feinstein identified three categories of event
dates: (1) dates when Petrobras filed 6-K Forms containing the
term "corrupt*",[8] excluding dates when the terms was used only in
boilerplate language; (2) dates when Petrobras filed any 6-K
Form; and (3) dates when Petrobras released earnings statements.
He then looked at the price movements of Petrobras securities
for a given set (or combined multiple sets) of event dates,
using a regression analysis to strip out any price movement that
was caused by external forces, such as moves in the wider
market. Next, he compared the proportion of event dates with
statistically significant price movements to the proportion of
non-event dates with statistically significant price movements,

---

[8] Meaning the letters "corrupt" followed by any letters or no
letters.

concluding that there was a statistically significant difference
in proportions for common ADS and preferred ADS and across the
Petrobras Notes. See Feinstein Report ¶¶ 148-61, 205-21, 279-86.
In other words, there were more likely to be big price movements
on days when important Petrobras events occurred, demonstrating
the markets in Petrobras securities were responsive to new
information.

Gompers challenged both the execution and the sufficiency
of Feinstein's tests. First, Gompers objected to Feinstein's
selection of event dates. Gompers objected that by selecting
dates uses the term "corrupt*," Feinstein ignored dates on which
allegation-related information was released to the market that
did not include the specific term "corrupt*." Gompers also
identified three additional dates with 6-Ks that included the
term corruption that he argued should not have been excluded as
boilerplate dates. Finally, Gompers claimed that Feinstein
failed to produce evidence that the information released on
various dates across all three date sets was new. In particular,
he contended that, because Petrobras is a Brazilian company,
some information had already been released in Brazil.

Feinstein offers some specific ripostes to these points,
but the Court does not deem it necessary to discuss them at
length here. The dispute over the inclusion of event dates is
essentially about the role of subjectivity in such analysis.

34

Gompers objects that Feinstein's choice of event dates injects subjectivity into his analysis. However, Gompers' suggested improvements -- including other dates with allegation-related information, more 6-K corruption dates, analysis of whether information was new enough -- could also be criticized as subjective. There is always some subjectivity in analyses of this nature, and courts would be unable to rely on expert testimony if they could not tolerate a modest level of subjectivity. The Court concludes that Feinstein's selection of event dates displays only that -- a modest level of subjectivity -- and that this is not fatal to his conclusions.

Gompers next objected that Feinstein should have used the BOVESPA index, an index of stocks on the Brazilian stock market, instead of the CRSP Market Index in his regression analysis. Gompers contended that the BOVESPA does a better job than the CRSP Market Index of stripping out exogenous returns. Feinstein responded that the BOVESPA returns are not exogenous to the Petrobras returns because, as a result of Petrobras's size and prominence in Brazil, the BOVESPA's movements were driven in part by Petrobras. Moreover, Feinstein re-ran his tests using the BOVEPSA index and concluded that using the BOVESPA in his regression analysis would not change his overall conclusions. See Feinstein Rebuttal Report ¶ 83, Exhibit-7a-7w. The Court

35

credits Feinstein's testimony and concludes that his regression analysis is sound.

Gompers further objected that the sample sizes used in Feinstein's tests were too small and could result in "large standard errors, broad confidence intervals, and tests having low power." Gompers Report ¶ 84 (quoting Reference Manual on Scientific Evidence, 3rd ed. (Washington: The National Academies Press, 2011), 255). But Feinstein pointed out that these properties would bias his tests against finding statistical significance -- the danger would be false negatives not false positives. Feinstein Rebuttal Report ¶ 68. Moreover, Feinstein performed an additional bootstrap analysis and the Fisher's Exact Test to demonstrate that his results were robust. See Feinstein Rebuttal Report ¶¶ 69-70, Exhibit 8a-8b. The Court credits Feinstein's testimony and concludes that his sample sizes do not seriously undermine his results.

Gompers still further objected that Feinstein did not conduct tests on the Petrobras Notes using the earnings statement date set alone, although Feinstein did use the earnings statement date set by itself for his analysis of the common and preferred ADS. Gompers Report ¶ 72. Feinstein responded that unless bonds are close to default they are insensitive to earnings announcements and so the earning statements date set by itself was not an appropriate event date

set for the Petrobras Notes. Feinstein Rebuttal Report ¶ 89. Moreover, the results of Feinstein's regression analysis on the Petrobras Notes showed that the fixed-rate Petrobras bonds moved in response to market interest rates, indicating the market for Petrobras Notes was efficient. Feinstein Report ¶ 288-91, Ex. 7c. Accordingly, the Court concludes that the fact that Feinstein did not use the earnings statement date set alone in his analysis of the Petrobras Notes does not damage his conclusions regarding the market for Petrobras debt securities.

Gompers raised some other technical objections to Feinstein's report. For example, he pointed out computational errors that Feinstein made in his initial analysis. See Gompers Report ¶ 76-80. Feinstein corrected these errors in his rebuttal report, and they did not change his conclusions. Feinstein Rebuttal Report ¶¶ 48-49. Upon considering the magnitude of these errors and Gompers' other critiques of Feinstein's execution of his methodology, the Court does not deem them substantial enough to seriously undermine Feinstein's credibility or his conclusions regarding the efficiency of the markets for Petrobras securities.

Concerns about execution aside, Gompers also raised objections to the sufficiency of Feinstein's approach. First, Gompers objected to Feinstein's conclusions because no peer-reviewed academic article has used Feinstein's methodology to

37

evaluate the efficiency of a market. Feinstein's method of comparing the proportions of statistically significant observations in two samples is a "z-test," essentially a version of the more famous Student's "t-test." See Reference Manual on Scientific Evidence, 3rd ed. (2011), 300.[9] There is no dispute that z-tests are commonly used and widely accepted statistical tools. See id.; Feinstein Rebuttal Report ¶ 37; Gompers Rebuttal Report ¶ 9; see also, Reference Manual on Scientific Evidence, 3rd ed. (2011), 591-97 (discussing epidemiological cohort study that compares incidence of emphysema in different populations). Both sides refer to Feinstein's methodology as an "FDT" test because use of z-test to evaluate market efficiency was first proposed in a law review article by three well-known securities econometric experts, whose combined initials were "FDT." See Paul A. Ferrillo, Frederick C. Dunbar, and David Tabak, The "Less Than" Efficient Capital Markets Hypothesis: Requiring More Proof from Plaintiffs in Fraud-on-the-Market Cases, 78 St. John's L. Rev. 81, 119-22 (2004). Gompers contends that, because the article was not peer-reviewed, a z-test cannot be used to show market efficiency. Were Feinstein using a novel or

---

[9] The Reference Manual on Scientific Evidence is jointly prepared by the Federal Judicial Center and by the National Research Council of the National Academy of Sciences. The undersigned was one of the four federal judges who served on the committee that oversaw the preparation of the 3rd Edition.

questionable statistical technique, the Court would place more weight on the absence of peer review. But it is not necessary for every application of a commonly used statistical technique to be peer-reviewed. Indeed, the elegance of statistical methods is that they can be applied to data sets of varying substantive significance, from rates of emphysema to transactions on modern securities markets.[10] Because the Court is convinced that the z-test is a well-established and sound statistical technique, the lack of peer review does not seriously undermine Feinstein's application of the z-test.

Next, Gompers objected to Feinstein's conclusions on the grounds that Feinstein's z-tests failed to consider the directionality of movements in the Petrobras market. By simply comparing the proportions of dates with statistically significant returns, Feinstein's z-tests did not examine whether

---

[10] The Court is also mystified by Gompers' claim that one of the authors of the FDT article subsequently disavowed Feinstein's methods. Gompers states, "[i]n fact, David Tabak (one of the authors of the St. John's Law Review article) specifically noted that the collective evaluation required by the FDT test rendered the methodology 'not . . . able to fully distinguish an efficient market from an inefficient one.'" Gompers Rebuttal Report ¶ 13 (quoting Tabak, David, "Use and Misuse of Event Studies to Examine Market Efficiency," NERA Working Paper, April 30, 2010, 7). But Tabak's sentence is, in fact, "[t]here are several ways that versions of the FDT methodology may not be able to fully distinguish an efficient market from an inefficient one." Tabak, David, "Use and Misuse of Event Studies to Examine Market Efficiency," NERA Working Paper, April 30, 2010, 7. This manner of selective quotation does not redound to Gompers' credit.

a statistically significant return on a given day was positive or negative and, in particular, whether the price of a security moved up or down as expected based on the precipitating market event. Feinstein did not dispute that his z-test methodology alone could not test directionality. Instead, he reported the results of a supplementary analysis examining how the prices of common and preferred Petrobras ADS moved on earning announcement dates. See Feinstein Rebuttal Report ¶ 53, Appendix-2. To conduct this analysis, Feinstein examined analyst reports on earnings event dates and coded their tenor as "Positive," "Negative," "Mixed/Neutral," or "In Line." On dates with statistically significant returns, he found that the price movements in common and preferred ADS were consistent with his assessments of the tenor of analyst coverage. Id.

Gompers and defendants objected to this analysis as subjective and flawed. Overall, they objected to Feinstein's categorization of the tenor of analyst coverage as dependent on his subjective interpretation. More specifically, they claimed that the tenor of coverage on two of the dates Feinstein labeled "Positive," May 16, 2011, and October 28, 2013, should have been labeled "Mixed/Neutral." The Court agrees that these dates were mischaracterized. See Transcript dated Dec. 21, 2015 at 44-50, ECF No. 413; Gompers Rebuttal Report ¶¶ 52-55. Moreover, Feinstein did not provide the analyst reports he relied on in

40

making his coverage assessments and, other than the excerpts listed in Appendix-2 to his rebuttal report, did not explain how he arrived at specific tenor determinations. Therefore, it is difficult to assess whether the two dates identified by defendants are anomalous or indicative of wider deficiencies in Feinstein's directionality testing. Accordingly, the Court places only limited weight on Feinstein's directionality testing of the Petrobras ADS.

The Court also places only limited weight on the evidence of the directionality of the movements in the Petrobras Notes market. Feinstein reported that his regression analysis of the Notes showed that they moved with his Benchmark Bond return variable, which serves as basic confirmation of the directionality of Notes price movements. Feinstein Report ¶¶ 288-91; Ex. 7c. However, Gompers identified three dates when some Notes had statistically significant price declines while other Notes had statistically significant price increases. Feinstein did not address these movements. Accordingly, the Court concludes that there is only limited evidence of directionality in the Petrobras Notes market.

However, evidence of directionality or the degree of fit between expected and observed moves in a market need not be substantial to allow a finding of market efficiency. Such evidence goes to the accuracy of the price of a security, and

41

the Supreme Court has explained that it is not the accuracy of a price as a reflection of underlying value but instead the sensitivity of the price to false statements that underlies the Basic presumption. See Halliburton Co. v. Erica P. John Fund, Inc., 134 S. Ct. 2398, 2410 (2014) ("'That the ... price [of a stock] may be inaccurate does not detract from the fact that false statements affect it, and cause loss,'" which is 'all that Basic requires.'") (quoting Schleicher v. Wendt, 618 F.3d 679, 685 (7th Cir. 2010) (alteration in original)). Defendants' own arguments that Feinstein's tenor assessments were subjective demonstrate the wisdom of the Supreme Court's position. Any assessment of the tenor of analyst coverage and the expected impact of an event on the market will be subjective. Indeed, the analyst reports released on May 15, 2011, and May 16, 2011, varied in their assessments of the same earnings event. See Feinstein Rebuttal Report, Appendix-2; Transcript dated Dec. 21, 2015 at 44-50, ECF No. 413. Whether the market, upon receiving new information, moved in the precise way analysts or experts would expect it to move is not the key to unlocking Basic's presumption of reliance. What is essential is evidence that, when the market received new information, it "generally affect[ed]" the price. Halliburton, 134 S. Ct. at 2410. In this case, the z-tests provide such evidence. Accordingly, the Court

concludes that the limited evidence of directionality is not fatal to plaintiffs' showing of market efficiency.

Finally, Gompers objected to the sufficiency of Feinstein's results on the grounds that "in an efficient market, the price of a security should <u>always</u> move in response to the release of new value-relevant information that is materially different from expectations." Gompers Rebuttal Report ¶ 31. Gompers allowed that, because of potential shortcomings in a regression analysis, "there may be instances where [an] event study does not <u>always</u> show directionally consistent price movements to new information." <u>Id.</u> But, he "would expect the vast majority of days with new value-relevant information that is materially different from expectations to have statistically significant price movements that are directionally consistent with the information." <u>Id.</u> Gompers pointed out that Feinstein's event studies failed to show that the Petrobras markets moved in response to events the vast majority of the time.

Feinstein responded that not every event will move a market and that the impact of an event depends on various factors, including, among other things, the nature of the event, whether the information involved is truly new,[11] whether a confounding

---

[11] This factor is why the Court gives little weight to Gompers' application of Feinstein's methodology to the eighty-five alleged corrective disclosure dates in Plaintiffs' Complaint. Gompers Report ¶¶ 88-89, 92, Ex. 3. Gompers found that the

event occurs simultaneously, the magnitude of background volatility, and how the event unfolded. Feinstein Rebuttal Report ¶ 33. In light of these complex forces, one should not expect to see a price movement on every news day.

The Court sides with Feinstein. The Supreme Court has rejected Gompers' absolutist view of market efficiency by making clear that "market efficiency is a matter of degree" and that "Basic's presumption of reliance . . . does not rest on a 'binary' view of market efficiency." Halliburton Co. v. Erica P. John Fund, Inc., 134 S. Ct. 2398, 2410 (2014). In assessing market efficiency, courts should not let the perfect become the enemy of the good. In this case, where the indirect Cammer factors lay a strong foundation for a finding of efficiency, a statistically significant showing that statistically significant price returns are more likely to occur on event dates is sufficient as direct evidence of market efficiency and thereby to invoke Basic's presumption of reliance at the class certification stage. Accordingly, plaintiffs have adequately

---

proportion of alleged corrective disclosure dates with statistically significant price moves was not statistically significantly larger than other dates during the period. Id. In contrast to Feinstein's selection of event dates, which involved a tolerable level of subjectivity, see supra, the alleged corrective disclosure dates were compiled by plaintiffs as dates when news of the alleged bribery and kickback scheme trickled out. By design, they did not all involve new information being presented to the market and are therefore not an appropriate sample for a z-test. Feinstein Rebuttal Report ¶ 64.

demonstrated that common issues of law and fact will predominate over individual issues with respect to the reliance element of their Exchange Act claims.

Defendants also argue that plaintiffs have failed to satisfy Rule 23(b)(3) because they have not presented an adequate model of classwide damages. It is "'well-established' in [the Second Circuit] that 'the fact that damages may have to be ascertained on an individual basis is not sufficient to defeat class certification' under Rule 23(b)(3)." Roach v. T.L. Cannon Corp., 778 F.3d 401, 405 (2d Cir. 2015). However, the Supreme Court has held that if a court does rely on a classwide model of damages when certifying a class, the "model . . . must actually measure damages that result from the class's asserted theory of injury." Id. at 407; see Comcast Corp. v. Behrend, 133 S. Ct. 1426 (2013).

Feinstein proposed a three-step damages methodology: (1) an event study could determine the amount of price inflation in a given security, as well as how much of this dissipated upon disclosures; (2) an "inflation ribbon" could be constructed, measuring the difference between the inflated price of the security and what it would have traded at without the alleged misrepresentations; and (3) per shares damages could be calculated as the difference between the inflation on the date

shares were purchased and the inflation on the date those same shares were sold. Feinstein Report ¶ 296.

In response, Gompers divided the alleged corrective disclosures into "numeric" and "non-numeric" disclosures. Gompers Report ¶ 107-08. Numeric disclosures involved quantitative information, such as the amount of a write-down, while non-numeric disclosures involved qualitative information, such as acknowledgment of ethical breaches. Id. Gompers claimed that numeric disclosures would categorically have no impact on the price of Petrobras securities because prices were based on the economic value of Petrobras's assets, specifically their future cash flows. Id. ¶¶ 109-17. Gompers further claimed that the impact of non-numeric disclosures on the prices of Petrobras securities would be too difficult to measure because, among other reasons, different investors would have had different appetites for risk when investing in Petrobras and price declines following non-numeric disclosures could have been caused by collateral factors.

It is not necessary, however, to resolve the detailed disputes over plaintiffs' damages model at the class certification stage. Indeed, plaintiffs do not even have a burden to produce a classwide damages model at this time. "'[T]he fact that damages may have to be ascertained on an individual basis' [is] simply one 'factor that [courts must]

46

consider in deciding whether issues susceptible to generalized proof 'outweigh' individual issues' when certifying the case as a whole." Roach v. T.L. Cannon Corp., 778 F.3d 401, 405 (2d Cir. 2015). Nonetheless, the Court concludes that plaintiffs' proposed damages model weighs modestly, although not dispositively, in favor of granting class certification. Plaintiffs' proposed damages model is not unusual for a securities fraud class action. The Court credits Gompers' point that there may be serious difficulties in determining the impact of non-numeric disclosures. But it is not clear that these difficulties will be fatal, and they do not mean that plaintiffs' proposed model does not match their theory of liability. The Court does not credit Gompers' claim that numeric disclosures have no effect on the prices of Petrobras securities. The Court understands Gompers' point about economic value as a theoretical matter, but, in practical terms, it is difficult for the Court to accept that, in a reasonably efficient market, a company's stock price would not decline upon reports that it faces billions of dollars in losses. Gompers Report ¶ 108, 117. Accordingly, the Court concludes that plaintiffs' model of classwide damages provides a modest indication that common issues of law and fact will predominate over individual issues under Rule 23(b)(3).

Based on the foregoing analysis, the Court concludes that plaintiffs have satisfied the requirements of Rule 23(b)(3). Because plaintiffs have satisfied the requirements of Rule 23, the Court hereby certifies two classes. The Exchange Act Class is defined as follows:

> As to claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, all purchasers who, between January 22, 2010 and July 28, 2015, inclusive (the "Class Period") purchased or otherwise acquired the securities of Petroleo Brasileiro S.A. ("Petrobras"), including debt securities issued by Petrobras International Finance Company S.A. ("PifCo") and/or Petrobras Global Finance B.V. ("PGF") on the New York Stock Exchange (the "NYSE") or pursuant to other domestic transactions, and were damaged thereby. Excluded from the Class are Defendants, current or former officers and directors of Petrobras, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

The Securities Act Class is defined as follows:

> As to claims under Sections 11 and 15 of the Securities Act of 1933, all purchasers who purchased or otherwise acquired debt securities issued by Petroleo Brasileiro S.A. ("Petrobras"), Petrobras International Finance Company S.A. ("PifCo"), and/or Petrobras Global Finance B.V. ("PGF"), in domestic transactions, directly in, pursuant and/or traceable to a May 15, 2013 public offering registered in the United States and/or a March 11, 2014 public offering registered in the United States before Petrobras made generally available to its security holders an earnings statement covering a period of at least twelve months beginning after the effective date of the offerings, and were damaged thereby. As to claims under Sections 12(a)(2) of the Securities Act of 1933, all purchasers who purchased or otherwise acquired debt securities issued by Petroleo Brasileiro S.A.

("Petrobras"), Petrobras International Finance Company
S.A. ("PifCo"), and/or Petrobras Global Finance B.V.
("PGF"), in domestic transactions, directly in a May 15,
2013 public offering registered in the United States
and/or a March 11, 2014 public offering registered in
the United States before Petrobras made generally
available to its security holders an earnings statement
covering a period of at least twelve months beginning
after the effective date of the offerings, and were
damaged thereby. Excluded from the Class are Defendants,
current or former officers and directors of Petrobras,
members of their immediate families and their legal
representatives, heirs, successors or assigns, and any
entity in which Defendants have or had a controlling
interest.

The Court appoints USS class representative for the Exchange Act

Class and North Carolina and Hawaii class representatives for

the Securities Act Class. The Court appoints Pomerantz LLP as

class counsel for both Classes.

The Clerk of Court is directed to close documents numbered

255 on the docket of this case.


SO ORDERED.

Dated:     New York, NY
           February _1_, 2016          _____
                                       JED S. RAKOFF, U.S.D.J.

S.D.N.Y. – N.Y.C.
14-cv-9662
Rakoff, J.

# United States Court of Appeals
### FOR THE
### SECOND CIRCUIT

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 15th day of June, two thousand sixteen.

Present:

> Jon O. Newman,
> José A. Cabranes,
> Susan L. Carney,
> *Circuit Judges*.

---

Petroleo Brasileiro S.A. Petrobras, et al.,

> *Petitioners*,

v.                                          16-463

Universities Superannuation Scheme Limited, et al.,

> *Respondents*.

---

Petitioners move, pursuant to Federal Rule of Civil Procedure 23(f), for leave to appeal the district court's order granting Respondents' motion for class certification. Petitioners also move for leave to file a reply in further support of their motion, Respondents move to strike a letter filed by Petitioners, and the Securities Industry and Financial Markets Association moves to file an amicus curiae brief. Upon due consideration, it is hereby ORDERED that the motion for leave to file a reply is GRANTED; the Rule 23(f) petition for leave to appeal is GRANTED. *See Sumitomo Copper Litig. v. Credit Lyonnais Rouse, Ltd.*, 262 F.3d 134, 139-40 (2d Cir. 2001). The motions to strike and to file an amicus curiae brief are also GRANTED. The appeal in this matter shall be EXPEDITED.

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk

CERTIFIED COPY ISSUED ON 06/15/2016

# UNITED STATES COURT OF APPEALS
# FOR THE
# SECOND CIRCUIT

At a Stated Term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 16th day of June, two thousand and sixteen.

_____

Petroleo Brasileiro S.A. Petrobras, *et al*.,

         Plaintiffs - Appellants,

  v.

Universities Superannuation Scheme Limited, Union Asset Management Holding AG, Employees Retirement System of the State of Hawaii, North Carolina Department of State Treasurer,

         Defendants – Appellees.

_____

**ORDER**

Docket No. 16-1914

By order dated June 15, 2016, a panel of this Court granted Plaintiffs' petition for leave to appeal pursuant to Fed. R. Civ. P. 23(f) and ordered that the appeal be expedited.  IT IS HEREBY ORDERED that the parties must comply with the following briefing schedule: Plaintiffs-Appellants' principal brief and the joint appendix must be filed on or before July 21, 2016; Defendants-Appellees' opposition brief must be filed on or before August 25, 2016; and Plaintiffs-Appellants' reply brief, if any, must be filed on or before September 8, 2016.  The appeal shall be heard as early as the week of September 26, 2016, subject to the approval of the presiding judge.  IT IS FURTHER ORDERED that counsel for Plaintiffs-Appellants must file Forms C and D within five (5) business days of the date of this order.

        For the Court**:**

        Catherine O'Hagan Wolfe,
        Clerk of Court

# CLEARY GOTTLIEB STEEN & HAMILTON LLP



NEW YORK

June 22, 2016

**VIA EMAIL**
Hon. Jed S. Rakoff, U.S.D.J.
Southern District of New York
Daniel Patrick Moynihan Courthouse
500 Pearl Street, Courtroom 14B
New York, New York 10007

Re:     *In re Petrobras Sec. Litig.*, No. 14-cv-9662 (JSR) (the "Class Action"),
         This Document Relates to: All Actions

Dear Judge Rakoff:

    All Defendants write to request an order staying the consolidated trial and certain other pretrial proceedings in the Class Action and individual actions, pending the Second Circuit's decision on Defendants' interlocutory appeal of this Court's February 2, 2016 order granting class certification (the "Order"). On June 15, 2016, the Second Circuit granted Defendants' petition, and directed that the appeal be heard on an expedited basis, with argument as early as the week of September 26, 2016. *In re Petrobras Sec. Litig.*, No. 16-1914, Dkt. No. 15 (citing *Sumitomo Copper Litig. v. Credit Lyonnais Rouse, Ltd.*, 262 F.3d 134, 139 (2d Cir. 2001)). The petition raises two separate issues: (1) whether Plaintiffs satisfied their evidentiary burden to invoke the *Basic Inc.* v. *Levinson* presumption of reliance;[1] and (2) whether the certification of a class including globally offered notes violates principles of ascertainability, predominance, and superiority after *Morrison v. NAB.* Defendants request the Court stay argument and decisions on the motions for summary judgment and all pretrial proceedings and trial pending issuance of the mandate.[2] The case could then proceed (to the extent necessary) with argument on summary judgment and the filing of pre-trial submissions within weeks of the mandate. Alternatively, Defendants propose that the Court hear argument on motions for summary judgment but stay trial and all other proceedings.

    The Second Circuit already implicitly determined that defendants' questions are serious, and that the Order was either "questionable" or implicates a novel and compelling legal question in need of immediate review. *See In re Petrobras Sec. Litig.*, No. 16-463, Dkt. 119 (granting Defendants' Rule 23(f) petition) (citing *Sumitomo*, 262 F.3d at 139-40); *see also Sutherland v.*

---

[1] The Second Circuit recently granted two other Rule 23(f) petitions to appeal from class certification orders involving a challenge to the application of the fraud-on-the-market theory that, as here, concern the proof necessary to utilize the presumption of reliance in *Basic Inc. v. Levinson*. *See In re Goldman Sachs Group, Inc. Sec. Litig.*, No. 16-250, Dkt. 1, 80; *Strougo v. Barclays PLC*, No. 16-450, Dkt. 1, 55. In *In re Goldman Sachs Group*, Judge Crotty stayed the entire action pending appeal. *See* No. 10-cv-03461-PAC, Dkt. 177. In *Strougo*, Judge Marrero has pending before him briefing on defendants' stay application. *See* No. 14-cv-05797-VM, Dkt. 88, 89.

[2] Class members should not be permitted to take advantage of these proceedings in deciding whether to opt-out in the event there is a new notice. *See Philip Morris v. Nat. Asbestos Workers Med.. Fund*, 214 F.3d 132, 135 (2d Cir. 2000) ("difficult to imagine cases in which it is appropriate to defer class certification until after decision on the merits" (citation omitted)).

*Ernst & Young LLP*, 856 F. Supp. 2d 638, 640 (S.D.N.Y. 2012) (serious questions going to merits); *Jock v. Sterling Jewelers, Inc.*, 738 F. Supp. 2d 445, 447 (S.D.N.Y. 2010) (Rakoff, *J.*) (likelihood of success on merits because "the Court of Appeals may disagree"). The granting of the petition – though not determinative – weighs heavily in favor of a stay. *Weber v. United States*, 484 F.3d 154, 159 (2d Cir. 2007) (23(f) "ensures that courts of appeals may review district court decisions that, although not 'final' within the meaning of 28 U.S.C. § 1291, sound a 'death-knell'") (citations omitted); Fed. R. Civ. P. 23(f), Advisory Committee's note to 1998 amendment (23(f) alleviates for "appeal-worthy certification issues" risk that class certification "may force a defendant to settle rather than incur the costs of defending a class action and run the risk of potentially ruinous liability."); *accord Pena v. Taylor Farms Pac., Inc.*, 2015 WL 5103157, at *3 (E.D. Cal. Aug. 31, 2015). Other considerations also apply here, as there are vast numbers of worldwide class members and astronomical claimed class-wide damages (including against an agency of a foreign state), which could force a settlement to avoid the in terrorem effects of a class. Plaintiffs' attempt to have a trial on common issues would undercut the entire purpose of the interlocutory nature of Rule 23(f). This would deprive Defendants of the benefits of the Second Circuit's 23(f) grant, and the ability to make an informed decision regarding settlement. The Circuit could have waited for a final decision to review class certification but instead recognized the need for expedited interlocutory review.

The resolution of the petition will dramatically affect the form and finality of trial. The *Morrison* issue goes to the binding effect of any class resolution. Depending on the Circuit's decision, the class action – if tried now – may need to be retried in its entirety. *Jock*, 738 F. Supp. 2d at 448 ("likelihood of unnecessary, duplicative litigation can warrant a stay"). For instance, if the Second Circuit determines that Defendants have a jury trial right to a determination regarding "domesticity" of securities transactions, rather than that determination being made through "bureaucratic processes," then the parties may be required to re-litigate the entire trial, as each individual class member will be required to prove to a jury that it entered into a "domestic transaction." And because the *Morrison* issue implicates threshold questions of ascertainability and notice, a reversal even in part could require new notice or a plan of notice. The *Basic* issue goes to the merits and class certification. *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2412 (2014) (requirements for presumption apply equally at certification). If that issue is resolved favorably to defendants, whole swaths of alleged misstatements that no individual or class plaintiff claims to have actually relied on would be eliminated (along with the proof regarding materiality, falsity and scienter attendant to them). Moreover, class members presently deciding whether to opt out would need a revised notice and to know whether the Section 10(b) claim, the Section 11 claim, or both, are subject to a class-wide resolution in order to make an informed decision. Without that, (for example) a putative member of both classes who would have pursued all issues independently if it had known one class would be overturned would inadvertently be placed in the position of being bound by adverse determinations in the other class case based on faulty notice.

Finally, if a stay is not granted, Defendants will potentially waste substantial amounts of time and resources unnecessarily litigating an eight-week trial. By contrast, if granted, the stay would be relatively brief – essentially the duration between argument and decision in Defendants' expedited appeal. Considerations of judicial economy favor a stay as well.

2

Respectfully submitted,

CLEARY GOTTLIEB STEEN &
HAMILTON LLP

By: ___ s/ Lewis J. Liman _____
       Lewis J. Liman
       Roger A. Cooper

       One Liberty Plaza
       New York, New York  10006
       (212) 225-2000

*Attorneys for the Petrobras*
*Defendants*

KING & SPALDING LLP

By: ___ s/ Michael Pauze _____
       Michael Pauze
       Israel Dahan

       1700 Pennsylvania Avenue, NW
       Washington, D.C. 20006
       (202) 626-3737

*Attorneys for Defendants*
*PricewaterhouseCoopers Auditores*
*Independentes*

MORVILLO, ABRAMOWITZ, GRAND,
IASON, & ANELLO P.C.

By: ___ s/ Edward Spiro _____
       Elkan Abramowitz
       Edward Spiro

       565 Fifth Avenue
       New York, New York  10017
       (212) 880-9460

*Attorneys for Defendant Jose Sergio*
*Gabrielli*

SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP

By: ___ s/ Jay B. Kasner _____
       Jay B. Kasner
       Scott D. Musoff
       Jeremy A. Berman

       Four Times Square
       New York, New York  10036
       (212) 735-3000

*Attorneys for the Underwriter Defendants*

GOODWIN PROCTER LLP

By: ___ s/ Richard Strassberg _____
       Richard Strassberg
       Daniel Roeser

       620 Eighth Avenue
       New York, New York  10018
       (212) 813-8859

*Attorneys for Defendant Maria Das Gracas*
*Silva Foster*



**Jeremy A. Lieberman**
Senior Partner

June 23, 2016

**BY EMAIL**

The Honorable Jed S. Rakoff
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, New York 10007-1312

Re:     *In re Petrobras Securities Litigation*, No. 14-cv-9662 (JSR)

Dear Judge Rakoff,

This letter is on behalf of the Class Plaintiffs and Individual Plaintiffs (together, "Plaintiffs") in the above-referenced action.  Defendants' motion to stay proceedings pending their request for interlocutory appeal seeks to stall the day of reckoning and sidestep the Court's repeated orders to prepare this case for trial on September 19.  Defendants also gloss over the four factors that courts generally assess when evaluating a motion to stay, none of which are met here: (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.  *See Jock v. Sterling Jewelers, Inc.*, 738 F. Supp. 2d 445, 447 (S.D.N.Y. 2010) (Rakoff, J.).

First, merely referencing that the Second Circuit granted its petition falls far short of a "strong showing" of likely success.  Defendants also fail to address this Court's rigorous and comprehensive order certifying the Class following full briefing, oral argument, and an evidentiary hearing during which market efficiency experts were questioned at length.  Further, where, as here, the appeal challenges a grant of class certification, the Second Circuit "accord[s] the district court noticeably more deference than when [there is] a denial of class certification." *In re Salomon Analyst Metromedia Litig.*, 544 F.3d 474, 480 (2d Cir. 2008) (citation omitted) (*abrogated on other grounds by Amgen Inc. v. Connecticut Retirement Plans and Trust Funds*, 133 S.Ct. 1184 (2013).  Indeed, in light of the "modest premise" articulated by *Halliburton II* in granting class certification, it is difficult to imagine that the Second Circuit would not affirm, at least in part, the certification of the Classes in this Action.

Second, Defendants have failed to show irreparable injury absent a stay.  Merits and expert discovery demonstrate that Plaintiffs have suffered more than a billion dollars in losses on an individual basis.  Plaintiffs have committed to proceeding to trial irrespective of the Second Circuit's ruling on class certification.  Moreover, Defendants are simply incorrect that the Second Circuit's decision with respect to establishing and maintaining the fraud on the market presumption of reliance will somehow impact the scope of the trial.  Appeals in *Goldman, Barclays* and this matter relate to the quantum of evidence required to rebut the presumption of reliance pursuant to FRE 301, which would then place the burden of proving price impact on plaintiffs in order to maintain class certification.  *See In re Goldman Sachs Group, Inc. Sec. Litig.*, No. 16-250, Dkt.1, 80; *Strougo v.*

jalieberman@pomlaw.com

600 Third Avenue, New York, New York 10016  tel: 212.661.1100  www.pomerantzlaw.com

NEW YORK          CHICAGO          LOS ANGELES          WESTON, FL

*Barclays PLC*, No. 16-450, Dkt. 1, 55. But Plaintiffs will need to prove price impact at trial in any event by proving damages, which will necessarily address the issue of price inflation. These two elements are inextricably intertwined and will be established at trial concurrently by Plaintiffs' experts, regardless of class certification. Defendants similarly overstate the impact of *Morrison*. As the Court previously determined, Class Plaintiffs and certain Individual Plaintiffs adequately alleged domestic purchases of Petrobras notes, and thus have standing to bring claims regardless of class certification. If an adverse ruling on class certification triggers the deluge of individual claims that Defendants portend, the trial proceedings on this matter will provide a roadmap for adjudicating *Morrison* issues for any future claimants, further promoting judicial efficiency. Indeed, the Court has already set the framework for handling late opt-out filings as part of the trial schedule. *See* Order, Dkt. 315. Finally, Defendants' claim that they will be deprived of an informed settlement decision absent a stay ignores their high degree of sophistication. Defendants are represented by top-tier legal counsel and fourteen purported experts. They are more than capable of evaluating the strengths and weaknesses of the case and the likelihood that the Second Circuit will grant or deny the appeal.

Third, a stay will cause substantial injury to Plaintiffs. There is no basis to contend that any delay in the litigation will be minimal, and the Second Circuit having ordered expedited briefing provides no guarantee that it will also issue an expedited mandate. Recent experience by Class Counsel indicates that the time from expedited appeal to mandate issuance can take upwards of ten months. *See, e.g., Rosado et al. v. China North Ne. Petroleum Holdings Ltd.*, No. 11-4544, Dkt. 1, 113 (nearly ten months from notice of appeal to mandate). Further, to the extent Defendants contend that acceptance of this appeal is related to the *Barclays* appeal, that appeal will not be argued until the week of October 10, 2016, further delaying proceedings. *See Strougo v. Barclays PLC*, No. 16-1912, Dkt. 6. Moreover, Brazil is currently undergoing an unprecedented economic and political upheaval, with the viability of state-owned Petrobras at the center of the crisis. *See* Paul Kiernan, *Brazil's Economy Tanks as Political Upheaval Looms*, Wall Street Journal, Apr. 13, 2016. Delaying trial to an undetermined date in 2017, while Petrobras' viability wanes, strongly prejudices Plaintiffs.

Additionally, class notice has been issued, fact discovery ended months ago, expert discovery is all but closed, and summary judgment briefs are to be filed Monday. Plaintiffs and their counsel, experts and trial consultants have worked tirelessly and made accommodations for a trial to begin in 88 days. Just last month the Court denied a motion to amend claims against PricewaterhouseCoopers Auditores Independentes ("PwC"), observing that in light of the looming September trial date, "there would be no reasonable way to cure the unfairness to PwC without severely disrupting this schedule." *In re Petrobras Sec. Litig.*, 14-cv-9662 (JSR), 2016 WL 3144395, at *2 (S.D.N.Y. May 5, 2016). PwC and other Defendants should not use the impending trial date as both a sword and shield.

Finally, there is no public interest served by granting the stay. Given this late stage and the individual claims of Plaintiffs that will remain unaltered by the appeal, allowing this litigation to proceed hardly rises to a waste of substantial amounts of time and resources. The public interest is greater served by allowing Plaintiffs to have their day in court.

In sum, regardless of the outcome of the appeal, a trial will be held regarding falsity, materiality, scienter, loss causation, damages (including price impact) and *Morrison, i.e.*, all aspects of Section 10(b) and 11 claims. It is difficult to conceive how delaying adjudication of these matters for an indeterminate amount of time would promote judicial economy.

Respectfully submitted,

**POMERANTZ LLP**

By: s/ Jeremy A. Lieberman

*Class Counsel*

600 Third Avenue, 20th Floor
New York, New York 10016
(212) 661-1100

**KESSLER TOPAZ
MELTZER & CHECK LLP**

By: s/ Matthew Mustokoff

*Liaison Counsel for Individual Plaintiffs*

280 King of Prussia Road
Radnor, Pennsylvania 19087
(610) 667-7706

3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
                                    :
In re: PETROBRAS SECURITIES         :      14-cv-9662 (JSR)
LITIGATION                          :
                                    :      MEMORANDUM ORDER
This Document Applies to: ALL CASES :
                                    :
------------------------------------x
JED S. RAKOFF, U.S.D.J.

     Defendants in this consolidated class action and numerous
parallel individual actions seek a stay of all proceedings in
all these actions until the Court of Appeals for the Second
Circuit resolves their interlocutory appeal on the issue of
class certification in the class action. Plaintiffs in both the
class action and the individual actions oppose. Upon
consideration of the parties' letter briefing, which will be
docketed with this Order, the Court denies defendants' request
for the reasons that follow, not least of which is the severe
burden it will impose on this Court in managing a complex
litigation of which the class action is but one, arguably
secondary piece.

     The general details of this case are set forth in the
Court's Opinion dated July 30, 2015, familiarity with which is
here presumed. In brief, plaintiffs allege that defendant
Petróleo Brasileiro S.A. – Petrobras ("Petrobras") was at the
center of a multi-year, multi-billion dollar bribery and
kickback scheme, in connection with which defendants, including

various former officers and directors of Petrobras and its
subsidiaries (the "Individual Defendants"), Petrobras's
independent auditor, PricewaterhouseCoopers Auditores
Independentes ("PwC"), and the various underwriters of
Petrobras's debt offerings (the "Underwriter Defendants"), made
false and misleading statements in violation of the Securities
Act of 1933 (the "Securities Act") and the Securities Exchange
Act of 1934 (the "Exchange Act").

On February 2, 2016, this Court certified two classes. See
Opinion and Order dated Feb. 2, 2016, ECF No. 428. Beforehand,
however, no fewer than 27 substantial entities, such as pension
funds, institutional investors, and others, had "opted out" of
the class action and brought their own, individual actions.
Defendants, pursuant to Fed. R. Civ. P. 23(f), filed a motion in
the Second Circuit for leave to appeal from the class
certification. On June 15, 2016, the Second Circuit granted
defendants' Rule 23(f) petition and expedited their appeal. See
Order dated June 15, 2016, Petroleo Brasileiro S.A. Petrobras v.
Universities Superannuation Scheme Ltd., No. 16-463 (2d Cir.
June 15, 2016), ECF No. 120. None of this directly related,
however, to the 27 parallel individual actions. Nevertheless,
defendants now request a stay of proceedings in all these
consolidated actions.

2

Although Fed. R. Civ. P. 23(f) allows a court of appeals to permit an appeal from an order granting class certification, "[a]n appeal does not stay proceedings in the district court unless the district judge or the court of appeals so orders." Under the "traditional" standard for a stay, courts consider four factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." Nken v. Holder, 556 U.S. 418, 426 (2009) (quoting Hilton v. Braunskill, 481 U.S. 770, 776 (1987)). "The party requesting a stay bears the burden of showing that the circumstances justify [one]." Nken, 556 U.S. at 434. In addition, in the Rule 23(f) context, the Second Circuit has stated that "a stay will not issue unless the likelihood of error on the part of the district court tips the balance of hardships in favor of the party seeking the stay." Sumitomo Copper Litig. v. Credit Lyonnais Rouse, Ltd., 262 F.3d 134, 140 (2d Cir. 2001).

Even if viewed solely in terms of the class action itself, a stay would not meet this standard. But when the stay request is coupled to a request to derail the entire litigation while the Second Circuit considers an issue that only relates to the

3

class action, the arguments for a stay here become even less
persuasive.

As to the class action, the first Nken factor is
indeterminate here because this Court does not know the Second
Circuit's reasons for granting defendants' petition. Defendants'
petition raised two issues: first, whether the certification of
global classes violates the implicit and express requirements of
Fed. R. Civ. P. 23 in light of Morrison v. Nat'l Austl. Bank
Ltd., 561 U.S. 247 (2010), and, second, whether plaintiffs
satisfied their evidentiary burden to invoke the presumption of
reliance under Basic Inc. v. Levinson, 485 U.S. 224 (1988). The
Second Circuit generally only grants a Rule 23(f) petition when
"(1) . . . the certification order will effectively terminate
the litigation and there has been a substantial showing that the
district court's decision is questionable, or (2) [when] the
certification order implicates a legal question about which
there is a compelling need for immediate resolution." Sumitomo,
262 F.3d at 139. Here, the second issue raised by defendants is
already the subject of two pending appeals before the Second
Circuit, see In re Goldman Sachs Group, Inc.,
No. 16-250; Strougo v. Barclays PLC, No. 16-450, and so the
certification may well have implicated a pressing legal
question, which would not bear on defendants' likelihood of

4

success. But since this is just a matter of speculation, the first Nken factor weighs in favor of neither party.

The second Nken factor weighs in favor of plaintiffs because, even as to the class action itself, defendants will not be irreparably injured if a stay does not issue. Defendants claim that they will be injured in several ways. To begin with, defendants argue that, if the Second Circuit determines that this Court erred on the Morrison issue, the class action "may need to be retried in its entirety." Defendants' Letter dated June 22, 2016, at 2. But defendants do not explain why this would be the case. Were the class to be decertified on Morrison grounds, the named class plaintiffs, who are themselves large entities, represent that they would proceed as individual plaintiffs on their own sizeable claims even without representing the classes, and would therefore continue to trial (along with the 27 large opt-out entities) on what would be largely the same issues regardless of class certification.[1] As such, defendants would not be irreparably injured without a

---

[1] Defendants point out that the Second Circuit might rule that defendants have a right to a jury determination of whether transactions in Petrobras securities were domestic under Morrison. But such a determination would be in addition to the issues already set for trial. Contrary to defendants' claims, a jury determination of domesticity would not require any other issue to be re-litigated.

5

stay, regardless of the Second Circuit's ultimate resolution of
the Morrison issue.

Defendants also argue that, if the Second Circuit
determines that this Court erred on the presumption of reliance
issue, the scope of the trial will be significantly altered
because "whole swaths of alleged misstatements that no
individual or class plaintiff claims to have actually relied on
would be eliminated." Defendants' Letter dated June 22, 2016, at
2. This is not correct. Even if the Second Circuit concludes
that class plaintiffs failed to carry their evidentiary burden
to establish the Basic presumption of reliance for class
certification purposes, questions of how defendants' alleged
misstatements affected the markets for Petrobras securities will
almost certainly still be contested on summary judgment and at
trial, in connection with issues of reliance and damages, even
if class plaintiffs ultimately proceed as individual plaintiffs.
As such, the scope of the trial will not be altered
significantly by the Second Circuit's decision on the Basic
issue, and any attendant injury to defendants will be minimal.

Further, defendants argue that denial of their stay request
would "deprive [them] of the benefits of the Second Circuit's
23(f) grant, and the ability to make an informed decision
regarding settlement." Defendants' Letter dated June 22, 2016,
at 2. However, the Second Circuit has stated that "parties

should not view Rule 23(f) as a vehicle to delay proceedings in the district court." Sumitomo, 262 F.3d at 140. This statement has particular application here where defendants seek to exploit the possibility of a stay for Rule 23(f) purposes into a device for stalling an entire litigation that has evolved into one that is primarily a non-class action. Moreover, as plaintiffs point out, defendants are represented by excellent legal counsel and have offered the opinions of fourteen experts. It is highly unlikely that they are unable to make an informed decision regarding settlement. Accordingly, defendants have failed to show that they will be irreparably injured in the absence of a stay.

The third Nken factor also weighs against granting a stay because issuance of the stay would substantially injure the other parties interested in the proceeding. There are 27 parallel individual actions that will go to trial with the class action, regardless of whether it remains a class action. Plaintiffs in all of these cases have worked diligently to abide by this Court's scheduling and case management orders. As mentioned, these 27 individual plaintiffs are large entities – e.g., the Ohio Public Employees Retirement System, PIMCO funds – with sizable holdings in Petrobras securities. Their efforts were driven, in part, by this Court's repeated reminders that the trial date of September 19, 2016, was set in stone. See,

7

e.g., Memorandum Order dated May 5, 2016, at 3-4, ECF No. 585

(denying plaintiffs leave to file a fifth amended complaint in

part because of undue delay). Moreover, although the Second

Circuit has ordered that defendants' appeal shall be heard as

early as September 26, 2016, see Order dated June 16, 2016,

Petroleo Brasileiro S.A. Petrobras v. Universities

Superannuation Scheme Ltd., No. 16-1914 (2d Cir. June 16, 2016),

ECF No. 15, defendants can make no firm representation as to

when the Second Circuit will resolve the appeal and issue the

mandate. As such, defendants are asking the Court to make

plaintiffs in 28 different actions wait for an indefinite period

of time. It is notorious that the bane of the American legal

process is expensive, dispiriting, undue delay, and in this

case, given the relative subordinate position of the class

action, the requested stay would serve to magnify these

difficulties.

The fourth Nken factor also weighs against granting a stay

because the public interest would be disserved by granting the

stay. Without explanation, defendants argue that

"[c]onsiderations of judicial economy favor a stay." Defendants'

Letter dated June 22, 2016, at 2. This is blatantly incorrect;

on the contrary, considerations of judicial economy weigh

heavily against granting a stay. The Court has set aside a full

two months to try this consolidated group of 28 complicated

8

cases. It was not an easy matter for this judge, who, though on senior status, continues to take a full load of cases, to free up that amount of time. The schedule, moreover, was set in consultation with the parties, all of whom are represented by busy counsel who would have their own scheduling issues if a new trial date had to be set at some uncertain time in the future. More broadly, the public interest is served by the speedy and effective administration of justice, not least in cases of such obvious public interest as this one. The stay here sought would indefinitely delay the consolidated trial of 28 significant cases, only one of which is a class action, and would thereby not only do egregious harm to the ability of this or any other district court to manage its docket in such complex circumstances but would also disserve the strong public interest in the speedy and effective administration of justice.

Accordingly, although the first <u>Nken</u> factor is indeterminate, the latter three factors weigh against granting a stay.

For the foregoing reasons, the Court concludes that the balance of hardships does not remotely tip in favor of defendants. <u>See</u> <u>Sumitomo</u>, 262 F.3d at 140. Defendants' request for a stay is hereby denied.

SO ORDERED.
Dated:    New York, NY
          June 24, 2016

_____
JED S. RAKOFF, U.S.D.J.



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------
                                    :
In re: PETROBRAS SECURITIES         :          14-cv-9662 (JSR)
LITIGATION                          :              ORDER
                                    :
------------------------------------x

JED S. RAKOFF, U.S.D.J.

On December 8, 2014, plaintiff in *Kaltman v. Petroleo Brasileiro S.A. – Petrobras* ("Petrobras"), 14-cv-9662, filed a class action complaint on behalf of investors in defendant Petrobras, a Brazilian oil company, alleging that it violated the federal securities laws by concealing a multi-year, multi-billion dollar bribery and kickback scheme. Pursuant to the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4(a)(3)(A)(i), a notice was published in a national newswire advising members of the proposed class of their right to move the Court to serve as Lead Plaintiff no later than February 6, 2015. Four separate complaints asserting substantially similar claims were subsequently filed, and were marked as related to *Kaltman*. *See Ngo v. Petroleo Brasileiro*, 14-cv-9760; *Messing v. Petroleo Brasileiro*, 14-cv-9847; *City of Providence v. Petroleo Brasileiro et al.*, 14-cv-10117; *Kennedy v. Petroleo Brasileiro*, 15-cv-93. By Order dated February 17, 2015, the Court consolidated the five related cases under the above caption.

In advance of the February 6, 2015 deadline, the Court received nine motions for appointment as Lead Plaintiff. Five of those movants subsequently withdrew their motions, leaving four remaining

1

candidates: (1) the "SKAGEN-Danske" group, consisting of three European asset management companies - SKAGEN AS, Danske Invest Management A/S, and Danske Invest Management Company; (2) the "State Retirement Systems" group, consisting of three State pension funds - the Ohio Public Employees Retirement System, the Public Employee Retirement System of Idaho, and the Employees' Retirement System of the State of Hawaii; (3) Universities Superannuation Scheme, Ltd., the trustee of a pension fund based in Liverpool, England; and (4) Daniela Freitas Da Silva, an individual investor. On February 20, 2015, the Court held a hearing at which it received testimony from representatives of the remaining movants and heard argument from their counsel. Following the hearing, the Court gave the movants an opportunity to submit additional briefing.

Having carefully reviewed all the parties' submissions and the testimony received at the hearing, the Court hereby appoints Universities Superannuation Scheme, Ltd. as Lead Plaintiff and approves its choice of Lead Counsel, Pomerantz LLP. A Memorandum explaining the reasons for this ruling will issue in due course. The Clerk is directed to close numbers 8, 14, 17, 22, 24, 28, 31, 34, 36, and 39 on the docket of this case. Counsel for Lead Plaintiff and for defendant are ordered to jointly telephone the Court on Friday, March 6, 2015 at 2:00 PM to schedule further proceedings.

SO ORDERED.

Dated:    New York, NY
          March 4, 2015                    JED S. RAKOFF, U.S.D.J.

2

Rakoff J.

FILED

DATE FILED: 3/24/15

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE PETROBRAS SECURITIES
LITIGATION

14-cv-9662 (JSR)

## [PROPOSED] SCHEDULING AND CONSOLIDATION ORDER

On December 8, 2014, plaintiff in *Kaltman v. Petróleo Brasileiro S.A. - Petrobras et al.*,
14-cv-9662, filed a class action complaint on behalf of investors in defendant Petróleo Brasileiro
S.A. – Petrobras ("Petrobras"), alleging that Petrobras violated the federal securities laws. Four
separate complaints asserting substantially similar claims against Petrobras and other named
defendants were subsequently filed. *See Ngo v. Petróleo Brasileiro S.A. – Petrobras et al.*, 14-
cv-9760; *Messing v. Petróleo Brasileiro S.A. – Petrobras et al.*, 14-cv-9847; *City of Providence
v. Petróleo Brasileiro S.A. - Petrobras et al.*, 14-cv-10117; *Kennedy v. Petróleo Brasileiro S.A. –
Petrobras et al.*, 15-cv-93. By Order dated February 17, 2015, the Court consolidated the five
related cases under the above caption (the "Consolidated Securities Litigation").

After motion practice and a hearing to appoint Lead Plaintiff and Lead Counsel, on
March 4, 2015 the Court appointed Universities Superannuation Scheme, Ltd. ("USS") as Lead
Plaintiff and Pomerantz LLP as Lead Counsel. Then, on March 6, 2015, the Court set the
following schedule with respect to the Consolidated Securities Litigation:

- USS shall file a consolidated complaint no later than March 27, 2015;

- Defendants shall move to dismiss or answer the consolidated complaint no later
  than April 17, 2015;

- USS shall file any opposition to any motion to dismiss no later than May 8, 2015;

- Defendants shall file any reply no later than May 22, 2015; and

1

- Oral argument on the motion to dismiss is scheduled for May 29, 2015 at 2:00 p.m.

In the event that additional actions may be brought against Petrobras or other defendants that relate to the same subject matter as in the Consolidated Securities Litigation ("Individual Actions"), coordination of any such Individual Actions and the Consolidated Securities Litigation is appropriate as set forth below.

It is hereby ORDERED as follows:

## I. CONSOLIDATION AND STAY

1. Any Individual Action that may be filed is consolidated with this Consolidated Securities Litigation for pre-trial purposes, pursuant to Fed. R. Civ. P. 42(a).

2. The requirement that any defendant named and served in an Individual Action must move, answer or otherwise respond in that action is stayed until 28 days following a decision on any pending motions to dismiss in the Consolidated Securities Litigation (a "Response"). If circumstances necessitate action by any Individual Action plaintiff or defendant to protect interests unique to such Individual Action plaintiff or defendant, such plaintiff or defendant may seek relief from the stay by appropriate motion. All defenses of any defendant named and served in an Individual Action, including but not limited to defenses based on a lack of personal jurisdiction or lack of subject matter jurisdiction, are hereby preserved until the filing of a Response.

## II. CONSOLIDATED DOCKET

3. A Consolidated Docket, 14-cv-9662 (JSR), was established by the February 17 Order for the proceedings in this Consolidated Securities Litigation, which were consolidated for all purposes. The Clerk will maintain a master consolidated docket according to that Order.

## III. NEWLY FILED OR TRANSFERRED ACTIONS

4. Any defendant who has notice of the filing in or transfer to this Court of a related case shall promptly:

(a) Mail a copy of this Order to the attorneys for the plaintiff(s) in the newly filed or transferred case; and

(b) File a notice of service of this Order in the Consolidated Docket.

5. The Court requests the assistance of counsel in calling to the attention of the Clerk of the Court the filing or transfer of any case which might be consolidated with the Consolidated Securities Litigation.

## IV. APPLICATION OF THIS ORDER TO PENDING AND SUBSEQUENT CASES

6. This Order shall apply generally to the Consolidated Securities Litigation, any Individual Actions that may be filed, and any case which relates to the same subject matter as any of the foregoing actions that is subsequently filed in or transferred to this Court and assigned to the undersigned, unless a party objecting to the consolidation of that case or to any other provision of this Order serves an application for relief from this Order or from any of its provisions within ten (10) days of the date a copy of this Order is served upon counsel for such

party.  The provisions of this Order shall apply to such action pending the Court's ruling on the application.

SO ORDERED:

Dated: New York, NY
March 24, 2015

_____
Jed. S. Rakoff , U.S.D.J.

4

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE PETROBRAS SECURITIES
LITIGATION

14-cv-9662 (JSR)

**[PROPOSED] AMENDED CIVIL CASE MANAGEMENT PLAN**

**The Court requires that this case shall be <u>ready for trial</u> on**
**September 19, 2016.**

After consultation with counsel for the parties, the following Amended Case Management Plan is adopted, which amends certain scheduling matters as set forth herein. This plan is also a scheduling order pursuant to Rules 16 and 26(f) of the Federal Rules of Civil Procedure. Initially capitalized terms not otherwise defined herein have the meanings ascribed to them in the Court's Order Coordinating Pre-Trial Matters (D.I. 195, 8/3/2015).

A.   Any Individual Action filed after December 31, 2015, will automatically be stayed in all respects until after the completion of the aforesaid trial ~~scheduled to begin 9/19/16.~~

B.   Discovery (in addition to the disclosures required by Fed. R. Civ. P. 26(a)):

1.   <u>Documents.</u> Document requests may be served as required, but no document request may be served later than 30 days prior to the date of the close of discovery as set forth in item 6 below.

2.   <u>Experts.</u> Every party-proponent of a claim (including any counterclaim, cross-claim, or third-party claim) that intends to offer expert testimony in respect of such claim must make the disclosures required by Fed. R. Civ. P. 26(a)(2) by <u>May 6, 2016</u>. Every party-opponent of such claim that intends to offer expert testimony in opposition to such claim must make the disclosures required by Fed. R. Civ. P. 26(a)(2) by <u>May 27, 2016</u>. No expert testimony (whether designated as "rebuttal" or otherwise) will be permitted by other experts or beyond the scope of the opinions covered by the aforesaid disclosures except upon prior express permission of the Court, application for which must be made no later than 10 days after the date specified in the immediately preceding sentence. All experts may be deposed, and such depositions must be completed by <u>June 15, 2016</u>.

3.   <u>Depositions.</u> Except as set forth below, all witness depositions must be completed by <u>April 29, 2016</u>. Unless counsel agree otherwise or the Court so orders, depositions shall not commence until all parties have completed the initial disclosures required by Fed. R. Civ. P. 26(a)(1), ~~or until four weeks from the date of this Order, whichever is earlier.~~ Depositions shall proceed concurrently, with no party having priority, and no deposition shall extend beyond one business day without prior leave of the Court. All depositions taken of Individual Plaintiffs and related third parties on issues that are unique to the Individual Actions must be completed by <u>May 30, 2016</u>.

1

4.      Document Production.  The parties are under an obligation to complete their production of documents as soon as practicable after being served with document requests.  The parties in the Class Action shall ~~make~~ have made all reasonable efforts to substantially complete the production of documents by January 1, 2016 in response to any document requests served by September 1, 2015.  Plaintiffs in the Individual Actions shall make all reasonable efforts to substantially complete the production of documents by January 31, 2016.



5.      Requests to Admit.  Requests to Admit, if any, must be served by March 30, 2016.

6.      Except as set forth above with respect to the Individual Actions, all discovery is to be completed by April 29, 2016.  Interim deadlines for items 1–6 above may be extended by the parties on consent without application to the Court, provided the parties are certain they can still meet the discovery completion date set forth in this paragraph.  The discovery completion date may be adjourned only upon a showing to the Court of extraordinary circumstances, and may not be extended on consent.

C.      Summary Judgment:

1.      Post-discovery summary judgment motions in the form prescribed by the Court's Individual Rules of Practice may be brought on without further consultation with the Court provided that a Notice of any such motion, in the form specified in the Court's Individual Rules of Practice, is filed no later than June 20, 2016, and provided that the moving papers are served by June 27, 2016, answering papers by July 18, 2016, and reply papers by July 29, 2016.  Each party must file its respective papers with the Clerk of the Court on the same date that such papers are served.  Additionally, on the same date that any papers are served and filed, counsel filing and serving the papers must arrange to deliver courtesy non-electronic hard copies to the Courthouse for delivery to Chambers.

2.      On issues that are unique to Individual Actions, post-discovery summary judgment in the form prescribed by the Court's Individual Rules of Practice may be brought on without further consultation with the Court provided that a Notice of any such motion, in the form specified in the Court's Individual Rules of Practice, is filed no later than July 29, 2016, provided that the moving papers are served by August 5, 2016, answering papers by August 22, 2016, and reply papers by August 31, 2016.  Each party must file its respective papers with the Clerk of the Court on the same date that such papers are served.  Additionally, on the same date that any papers are served and filed, counsel filing and serving the papers must arrange to deliver courtesy non-electronic hard copies to the Courthouse for delivery to Chambers.  No oral argument will be heard on these motions.

D.      A final pre-trial conference, as well as oral argument on any post-discovery summary judgment motions, shall be held on _8/5/16 at 2 p.m._  [date to be inserted by the Court].  The timing and other requirements for the Joint Pretrial Order and/or other pre-trial submissions shall be governed by the Court's Individual Rules of Practice.  The actual trial date shall under no circumstances be later than September 19, 2016.

filed under C.h above

E.      All motions and applications shall be governed by Judge Rakoff's Individual Rules of Practice.  Counsel shall promptly familiarize themselves with all of the Court's Individual Rules, as well as with the Local Rules for the United States District Court for the Southern District of New York.

SO ORDERED.

_____
JED S. RAKOFF
U.S.D.J.

DATED: New York, New York

_____1/8/16_____.

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of June 2016, I caused true and

accurate copies of the foregoing Appellants' Emergency Motion for a Stay Pending

Appeal to be served by person upon the following counsel:

Jeremy A. Lieberman
Marc I. Gross
John A. Kehoe
Emma Gilmore
For: POMERANTZ LLP
600 Third Avenue, 20th Floor
New York, NY 10016

*Counsel for Lead Plaintiff Universities Superannuation Scheme Limited,*
*North Carolina Department of State Treasurer, and the Class*

Brendan Cyr