# 16-1914-cv

## United States Court of Appeals

*for the*

## Second Circuit

UNIVERSITIES SUPERANNUATION SCHEME LIMITED, EMPLOYEES
RETIREMENT SYSTEM OF THE STATE OF HAWAII, NORTH CAROLINA
DEPARTMENT OF STATE TREASURER,

*Plaintiffs-Appellees,*

PETER KALTMAN, individually and on behalf of all others similarly situated,
DIMENSIONAL EMERGING MARKETS VALUE FUND, DFA
INVESTMENT DIMENSIONS GROUP INC., on behalf of its series Emerging

*(For Continuation of Caption See Inside Cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## OPPOSITION TO MOTION TO STAY ALL PROCEEDINGS

JEREMY A. LIEBERMAN
MARC I. GROSS
EMMA GILMORE
JOHN A. KEHOE
BRENDA F. SZYDLO
POMERANTZ LLP
*Attorneys for Plaintiffs-Appellees*
600 Third Avenue, 20th Floor
New York, New York 10016
(212) 661-1100

Markets Core Equity Portfolio, Emerging Markets Social Core Equity Portfolio and T.A. World ex U.S. Core Equity Portfolio, DFA INVESTMENT TRUST COMPANY, on behalf of its series The Emerging Markets Series, DFA AUSTRIA LIMITED, solely in its capacity as responsible entity for the Dimensional Emerging Markets Trust, DFA International Core Equity Fund, and DFA International Vector Equity Fund by Dimensional Fund Advisors Canada ULC solely in its capacity as Trustee, DIMENSIONAL FUNDS PLC, on behalf of its subfund Emerging Markets Value Fund, DIMENSIONAL FUNDS ICVC, on behalf of its sub-fund Emerging Markets Core Equity Fund, SKAGEN AS, DANSKE INVEST MANAGEMENT A/S, DANSKE INVEST MANAGEMENT COMPANY, NEW YORK CITY EMPLOYEES' RETIREMENT SYSTEM, NEW YORK CITY POLICE PENSION FUND, BOARD OF EDUCATION RETIREMENT SYSTEM OF THE CITY OF NEW YORK, TEACHERS' RETIREMENT SYSTEM OF THE CITY OF NEW YORK, NEW YORK CITY FIRE DEPARTMENT PENSION FUND, NEW YORK CITY DEFERRED COMPENSATION PLAN, FORSTA AP-FONDEN, TRANSAMERICA INCOME SHARES, INC., TRANSAMERICA FUNDS, TRANSAMERICA SERIES TRUST, TRANSAMERICA PARTNERS PORTFOLIOS, JOHN HANCOCK VARIABLE INSURANCE TRUST, JOHN HANCOCK FUNDS II, JOHN HANCOCK SOVEREIGN BOND FUND, JOHN HANCOCK BOND TRUST, JOHN HANCOCK STRATEGIC SERIES, JOHN HANCOCK INVESTMENT TRUST, JHF INCOME SECURITIES TRUST, JHF INVESTORS TRUST, JHF HEDGED EQUITY & INCOME FUND, ABERDEEN EMERGING MARKETS FUND, ABERDEEN GLOBAL EQUITY FUND, ABERDEEN GLOBAL NATURAL RESOURCES FUND, ABERDEEN INTERNATIONAL EQUITY FUND, each a series of Aberdeen Funds, ABERDEEN CANADA EMERGING MARKETS FUND, ABERDEEN CANADA SOCIALLY RESPONSIBLE GLOBAL FUND, ABERDEEN CANADA SOCIALLY RESPONSIBLE INTERNATIONAL FUND, ABERDEEN CANADA FUNDS EAFE PLUS EQUITY FUND and ABERDEEN CANADA FUNDS GLOBAL EQUITY FUND, each a series of Aberdeen Canada Funds, ABERDEEN EAFE PLUS ETHICAL FUND, ABERDEEN EAFE PLUS FUND, ABERDEEN EAFE PLUS SRI FUND, ABERDEEN EMERGING MARKETS EQUITY FUND, ABERDEEN FULLY HEDGED INTERNATIONAL EQUITIES FUND, ABERDEEN INTERNATIONAL EQUITY FUND, ABERDEEN GLOBAL EMERGING MARKETS EQUITY FUND, ABERDEEN GLOBAL ETHICAL WORLD EQUITY FUND, ABERDEEN GLOBAL RESPONSIBLE WORLD EQUITY FUND, ABERDEEN GLOBAL WORLD EQUITY DIVIDEND FUND, ABERDEEN GLOBAL WORLD EQUITY FUND, ABERDEEN GLOBAL WORLD RESOURCES EQUITY FUND, ABERDEEN EMERGING MARKETS EQUITY FUND, ABERDEEN ETHICAL WORLD EQUITY FUND, ABERDEEN MULTI-ASSET FUND, ABERDEEN WORLD EQUITY FUND, ABERDEEN LATIN AMERICA EQUITY FUND, INC., AAAID EQUITY PORTFOLIO, ALBERTA TEACHERS RETIREMENT FUND, AON HEWITT INVESTMENT CONSULTING, INC., AURION INTERNATIONAL DAILY EQUITY FUND, BELL ALIANT REGIONAL COMMUNICATIONS INC., BMO GLOBAL EQUITY CLASS, CITY OF ALBANY PENSION PLAN,

DESJARDINS DIVIDEND INCOME FUND, DESJARDINS EMERGING
MARKETS FUND, DESJARDINS GLOBAL ALL CAPITAL EQUITY FUND,
DESJARDINS OVERSEAS EQUITY VALUE FUND, DEVON COUNTY
COUNCIL GLOBAL EMERGING MARKET FUND, DEVON COUNTY
COUNCIL GLOBAL EQUITY FUND, DGIA EMERGING MARKETS
EQUITY FUND L.P., ERIE INSURANCE EXCHANGE, FIRST
TRUST/ABERDEEN EMERGING OPPORTUNITY FUND, GE UK PENSION
COMMON INVESTMENT FUND, HAPSHIRE COUNTY COUNCIL
GLOBAL EQUITY PORTFOLIO, LONDON BOROUGH OF HOUNSLOW
SUPPERANNUATION FUND, MACKENZIE UNIVERSAL SUSTAINABLE
OPPORTUNITIES CLASS, MARSHFIELD CLINIC, MOTHER THERESA
CARE AND MISSION TRUST, MOTHER THERESA CARE AND MISSION
TRUST, MTR CORPORATION LIMITED RETIREMENT SCHEME, MYRIA
ASSET MANAGMENT EMERGENCE, NATIONAL PENSION SERVICE,
NPS TRUST ACTIVE 14, OHIO PUBLIC EMPLOYEES RETIREMENT
SYSTEM, WASHINGTON STATE INVESTMENT BOARD, ABERDEEN
LATIN AMERICAN INCOME FUND LIMITED, ABERDEEN GLOBAL EX
JAPAN PENSION FUND PPIT, FS INTERNATIONAL EQUITY MOTHER
FUND, NN INVESTMENT PARTNERS B.V., acting in the capacity of
management company of the mutual fund NN Global Equity Fund, and in the
capacity of management company of the mutual fund NN Institutioneel Dividend
Aandelen Fonds, NN INVESTMENT PARTNERS LUXEMBOURG S.A., acting
in the capacity of management company SICAV and its Sub-Funds, and NN (L)
SICAV, for and on behalf of NN (L) Emerging Markets High Dividend, NN (L)
FIRST, AURA CAPITAL LTD., WGI EMERGING MARKETS FUND, LLC,
BILL AND MELINDA GATES FOUNDATION TRUST, BOARD OF
REGENTS OF THE UNIVERSITY OF TEXAS SYSTEM, TRUSTEES OF THE
ESTATE OF BERNICE PAUAHI BISHOP, LOUIS KENNEDY, individually
and on behalf of all others similarly situated, KEN NGO, individually and on
behalf of all others similarly situated, JONATHAN MESSING, individually
and on behalf of all others similarly situated, CITY OF PROVIDENCE,
individually and on behalf of all others similarly situated,
UNION ASSET MANAGEMENT HOLDING AG,

*Plaintiffs,*

– v. –

PETROLEO BRASILEIRO S.A. PETROBRAS, BB SECURITIES LTD.,
MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, BANK
OF CHINA (HONG KONG) LIMITED, BANCA IMI, S.P.A., SCOTIA
CAPITAL (USA) INC., THEODORE MARSHALL HELMS, PETROBRAS
GLOBAL FINANCE B.V., PETROBRAS AMERICA INC., CITIGROUP
GLOBAL MARKETS INC., ITAU BBA USA SECURITIES, INC., J.P.
MORGAN SECURITIES LLC, MORGAN STANLEY & CO. LLC,
MITSUBISHI UFJ SECURITIES (USA), INC., HSBC SECURITIES (USA)
INC., STANDARD CHARTERED BANK, BANCO BRADESCO BBI S.A.,

*Defendants-Appellants,*

JOSE SERGIO GABRIELLI, SILVIO SINEDINO PINHEIRO, PAULO
ROBERTO COSTA, JOSE CARLOS COSENZA, RENATO DE SOUZA
DUQUE, GUILLHERME DE OLIVEIRA ESTRELLA, JOSE MIRANDA

FORMIGL FILHO, MARIA DAS GRACAS SILVA FOSTER,
ALMIR GUILHERME BARBASSA, MARIANGELA MOINTEIRO TIZATTO,
JOSUE CHRISTIANO GOME DA SILVA, DANIEL LIMA DE OLIVEIRA,
JOSE RAIMUNDO BRANDA PEREIRA, SERVIO TULIO DA ROSA
TINOCO, PAULO JOSE ALVES, GUSTAVO TARDIN BARBOSA,
ALEXANDRE QUINTAO FERNANDES, MARCOS ANTONIO ZACARIAS,
CORNELIS FRANCISCUS JOZE LOOMAN, JP MORGAN SECURITIES LLC,
PRICEWATERHOUSECOOPERS AUDITORES INDEPENDENTES,

*Defendants.*

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................1

PRELIMINARY STATEMENT .............................................................1

FACTUAL AND PROCEDURAL BACKGROUND ..............................3

ARGUMENT .......................................................................................5

I.     In a Well-Reasoned Opinion, the District Court  Properly Denied Defendants' Motion for a Stay .......................................................5

     A.    Rule 23(f) Disfavors Delay of the Underlying Action, and the District Court's Denial of a Stay Should "Weigh Heavily" on a Reviewing Court....................................................................5

     B.    The District Court Correctly Recognized That Defendants' Petition Will Not Necessarily Succeed on the Merits.........................7

     C.    The District Court Correctly Found That Defendants' Requested Stay Would Cause Plaintiffs Substantial Harm..................9

     D.    Defendants Will Not Suffer "Irreparable Harm"—or Any Harm—if the Case Proceeds to Trial ..................................................11

          1.    There is no reasonable risk that any issues will need to be re-tried....................................................................................11

          2.    Defendants are fully capable of making an informed decision regarding settlement ...................................................14

     E.    The District Court Properly Recognized That the Public Interest Weighs Against Further Delay of This Action ...................................17

     F.    This Court Lacks Jurisdiction to Stay the Individual Actions ...........18

CONCLUSION ..................................................................................20

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

<u>Cases</u>

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
   677 F.3d 60 (2d Cir. 2012) ...............................................................4

*Beattie v. CenturyTel, Inc.*,
   No. 02-10277-BC, 2006 WL 1722207 (E.D. Mich. June 20, 2006) ...................6

*Bensinger v. Denbury Res. Inc.*,
   561 F. App'x 24 (2d Cir. 2014) ..........................................................8

*Blair v. Equifax Check Servs., Inc.*,
   181 F.3d 832 (7th Cir. 1999) ..........................................................5, 6

*Caldwell-Baker Co. v. Parsons*,
   392 F.3d 886 (7th Cir. 2004) ...........................................................18

*In re Elec. Books Antitrust Litig.*,
   No. 11 MD 2293 DLC, 2014 WL 1641699 (S.D.N.Y. Apr. 24,
   2014) .....................................................................................7

*In re Facebook, Inc. IPO Sec. and Derivative Litig.*,
   No. 12-cv-2389, 2015 WL 9582429 (S.D.N.Y. Dec. 29, 2015)...................8, 13

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
   574 F.3d 29 (2d Cir. 2009) ..............................................................8

*Halliburton Co. v. Erica P. John Fund, Inc.*,
   134 S. Ct. 2398 (2014).................................................................4, 9

*Hallmark Cards, Inc. v. Group One Ltd.*,
   110 F. App'x. 99 (Fed. Cir. 2004) .....................................................19

*Hilton v. Braunskill*,
   481 U.S. 770 (1987).....................................................................19

*Int'l Union, United Auto., Aerospace & Agricultural Implement
   Workers of Am. v. Scofield*,
   382 U.S. 205 (1965).....................................................................19

*Landis v. North Am. Co.*,
    299 U.S. 248 (1936)............................................................................................19

*M.D. v. Perry*,
    No. C-11-84, 2011 WL 2173673 (S.D. Tex. June 2, 2011), No. 11-
    40789 (5th Cir. Aug. 17, 2011) ..........................................................................6

*Menkes v. Stolt-Nielsen S.A.*,
    270 F.R.D. 80 (D. Conn. 2010) ..........................................................................9

*Nken v. Holder*,
    556 U.S. 418 (2009)........................................................................................1, 7

*In re Petrobras Sec. Litig.*,
    312 F.R.D. 354 (S.D.N.Y. Feb. 2, 2016) ...........................................................4

*In re Petrobras Sec. Litig.*,
    No. 14-cv-9662, 2016 WL 3619424 (S.D.N.Y. June 24, 2016)................*passim*

*Pompano-Windy City Partners, Ltd. v. Bear, Stearns & Co., Inc.*,
    698 F. Supp. 504 (S.D.N.Y. 1988) ...................................................................15

*In re Salomon Analyst Metromedia Litig.*
    544 F.3d 474 (2d Cir. 2008) ..............................................................................8

*SEC v. Citigroup Global Markets, Inc.*,
    673 F.3d 158 (2d Cir. 2012) ..............................................................................7

*In re Sumitomo Copper Litig.*,
    262 F.3d 134 (2d Cir. 2001) ..........................................................................5, 6

*Teachers' Ret. Sys. of Louisiana v. ACLN Ltd.*,
    No. 01-CV-118l4(MP), 2004 WL 1259924 (S.D.N.Y. June 3,
    2004) ................................................................................................................16

*Vega v. T-Mobile USA, Inc.*,
    564 F.3d 1256 (11th Cir. 2009) .......................................................................18

*In re Vivendi*,
    284 F.R.D. 144 (S.D.N.Y. 2012) ....................................................................13

**Unpublished Cases**

*AAL High Yield Bond fund and Delaware Delchester Fund*,
    No. 00-CV-01404 (N.D. Ala. Sept. 8, 2005) ......................................................11

*In re Am. Express Anti-Steering Rules Antitrust Litig.*,
    No. 12-MD-2221 (E.D.N.Y. Jan. 7, 2016) .........................................................19

*In re Goldman* Sachs *Grp., Inc. Sec. Litig.*,
    No. 10-cv-03461 (S.D.N.Y. Feb. 1, 2016) ...........................................................7

*Strougo v. Barclays PLC*,
    No. 14-cv-05797-VM (S.D.N.Y. July 5, 2016) ...........................................10, 14

*In re Facebook*,
    No. 15-4167 (2d Cir. May 12, 2016) ...............................................................13

**Rules**

Fed. R. App. P. 8(a)(1)(A) ...................................................................................18

Fed. R. Civ. P. 23(f) ....................................................................................*passim*

**Other Authorities**

16 C. Wright et al., FEDERAL PRACTICE AND PROCEDURE § 3937 (3d
    ed. 2010) ......................................................................................................18

5 Jerold S. Solowy et al., MOORE'S FEDERAL PRACTICE § 23.88 .............................1

MANUAL FOR COMPLEX LITIGATION § 21.28 (4th ed. 2004)..................................1, 5

# INTRODUCTION

Plaintiffs-Respondents ("Plaintiffs") submit this opposition to the emergency motion (the "Motion" or "Mot.") of Defendants-Petitioners ("Defendants") for a stay of the Class Action, and 27 related Actions (the "Individual Actions" or "Opt-Out Actions"). For the reasons set forth below, Plaintiffs respectfully request that this Court deny the Motion.

# PRELIMINARY STATEMENT

A Rule 23(f) petition challenging a District Court's grant of class certification "does ***not*** automatically impose a stay, either during the pendency of the petition or during any appeal that the court of appeals permits."[1] MANUAL FOR COMPLEX LITIGATION § 21.28 (4th ed. 2004); *see also* Fed. R. Civ. P. 23(f) advisory committee's note to 1998 amendment ("Permission to appeal does not stay trial court proceedings."). Indeed, a stay is an "intrusion into the ordinary processes of administration and judicial review, and accordingly is not a matter of right." *Nken v. Holder*, 556 U.S. 418, 427 (2009). Moreover, where, as here, "the trial court refuses a stay, ***its action and any explanation of its views should weigh heavily with the court of appeals***." Fed. R. Civ. P. 23(f) advisory committee note; *see also* 5 Jerold S. Solowy et al., MOORE'S FEDERAL PRACTICE § 23.88 (same).

---

[1] Unless otherwise stated, all emphasis is added.

Here, all of Defendants' reasons for delay have already been rejected by the District Court in a well-reasoned Order finding that a stay in this matter (1) would cause harm to Plaintiffs, (2) would not protect Defendants from the supposed irreparable harms, and (3) would fail to serve judicial economy. Moreover, Defendants do not, and cannot, explain why their motion for an emergency stay would give this Court jurisdiction to impose a stay on the 27 *individual* actions brought by the Opt-Out Plaintiffs, that will be tried *regardless* of this Court's ruling on the Rule 23(f) appeal. Under these circumstances, it would be wasteful to stay the virtually identical Action brought by the *Class* Plaintiffs, who are willing to proceed as individual plaintiffs at trial in the unlikely event that the Class were decertified.

Stripped of any valid claim of judicial economy, Defendants' Motion boils down to their argument that a stay should be granted because otherwise they might feel pressured into agreeing to a settlement. Mot. at 1-2, 6-7, 11-13, 18. But this does not provide any reason why a stay should be granted in ***this case***, as opposed to all cases in which a Rule 23(f) petition is granted. Indeed, delay of these proceedings can be prejudicial to Plaintiffs by pressuring them to settle before trial. Further, that reasoning is no basis to stay the 27 Individual Actions.

## FACTUAL AND PROCEDURAL BACKGROUND

For more than a decade, Petrobras surreptitiously colluded with members of a cartel of construction companies to inflate bids for contracts, with Petrobras executives collecting literally billions of dollars in bribes. Despite Petrobras' attempts to cast itself as the "victim" rather than the perpetrator of this fraud, Petrobras hid these massive kickbacks and bribes from investors throughout the Class Period by fraudulently capitalizing them as "assets" on the Company's books.

While raising tens of billions of dollars from U.S. investors through domestic transactions, Petrobras falsely denied numerous reports of corruption. When the fraud was revealed, the Company's share price plummeted more than 80% and soon thereafter it took a write-down of close to $17 billion.

After reviewing four rounds of briefing and three expert depositions, and conducting an extensive evidentiary hearing, the District Court issued a 49-page Opinion in which it certified a class of investors who purchased Petrobras ADRs and Notes. The District Court held that it was proper to include aftermarket purchasers of Petrobras securities within the Class because "[a]mending the Class definitions" to exclude such purchasers "would cut off purchasers who have valid claims under *Morrison*'s second prong, which holds that the securities laws apply

- 3 -

to securities purchased in 'domestic transactions.'" *See In re Petrobras Sec. Litig.*, 312 F.R.D. 354, 364 (S.D.N.Y. Feb. 2, 2016).

The District Court found that there was nothing unfeasible about the application of the "domestic transactions" test articulated in *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60 (2d Cir. 2012). Indeed, it had already evaluated whether the four proposed class representatives adequately pleaded that they purchased Petrobras securities in domestic transactions, finding that two met the *Absolute Activist* standard, while two did not. *Petrobras*, 312 F.R.D. at 364. Accordingly, the Court felt "'***confident*** that the *Morrison* determination is 'administratively feasible.'" *Id.*

The District Court further found that Petrobras' securities traded in an efficient market, holding that each factor courts generally consider as indicia of market efficiency provided evidence of market efficiency here. *Id.* at 364-371. The Court rejected Defendants' argument that Plaintiffs' market efficiency expert, Professor Steven Feinstein, erred by using a "Z-test," which, *inter alia*, did not take into consideration directionality of price movements. *Id.* at 369-72 (applying *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398 (2014)).

Defendants filed a Rule 23(f) petition, arguing that (i) the Class should not include aftermarket purchasers of Petrobras Notes due to issues of "ascertainability, predominance and superiority" in light of *Morrison*; and (ii)

Plaintiffs have not met "their evidentiary burden" to invoke the fraud on the market presumption of reliance due to Dr. Feinstein's methodology. *See* Mot. at 5-6. On June 15, 2016, this Court granted Defendants' petition.

## ARGUMENT

## I.    In a Well-Reasoned Opinion, the District Court Properly Denied Defendants' Motion for a Stay

On June 22, 2016, Defendants requested that the District Court grant a stay of this Action and the 27 related Individual Actions, pending resolution of the non-dispositive Rule 23(f) appeal. The District Court carefully analyzed the factors used to assess such a request and denied the motion due to, *inter alia*, the "severe burden it will impose on this Court in managing a complex litigation." *In re Petrobras Sec. Litig.*, No. 14-cv-9662, 2016 WL 3619424 (S.D.N.Y. June 24, 2016) ("Order").

### A.    Rule 23(f) Disfavors Delay of the Underlying Action, and the District Court's Denial of a Stay Should "Weigh Heavily" on a Reviewing Court

The grant of a Rule 23(f) petition "does not automatically impose a stay, either during the pendency of the petition or during any appeal that the court of appeals permits." *See* MANUAL FOR COMPLEX LITIGATION at § 21.28; *see also* Fed. R. Civ. P. 23(f) committee note ("Permission to appeal does not stay trial court proceedings."). To the contrary, "Rule 23(f) is drafted to avoid delay." *Blair v. Equifax Check Servs., Inc.*, 181 F.3d 832, 835 (7th Cir. 1999). *See In re Sumitomo*

*Copper Litig.*, 262 F.3d 134, 140 (2d Cir. 2001) ("parties should not view Rule 23(f) as a vehicle to delay proceedings in the district court"); Fed. R. Civ. P. 23(f) committee note (Rule 23(f)'s provisions were "designed to reduce the risk that attempted appeals will disrupt continuing proceedings."). Rather, the grant of a stay requires "a demonstration that the probability of error in the class certification decision is high enough that the costs of pressing ahead in the district court exceed the cost of waiting." *Blair*, 181 F.3d at 835; *Beattie v. CenturyTel, Inc.*, No. 02-10277-BC, 2006 WL 1722207, at *1 (E.D. Mich. June 20, 2006) (denying defendants' motion to stay despite the fact that the Sixth Circuit had granted a Rule 23(f) petition).

Moreover, the decision as to whether or not to grant a stay lies primarily with the District Court. "***If the trial court refuses a stay, its action and any explanation of its views should weigh heavily with the court of appeals***." Fed. R. Civ. P. 23(f) committee note. Accordingly, the Court of Appeals will typically defer to the judgment of the District Court, who can best assess the judicial economy that would be served through a stay. *See, e.g.*, *M.D. v. Perry*, No. C-11-84, 2011 WL 2173673, at *2 (S.D. Tex. June 2, 2011) (denying defendants' motion to stay, despite the fact that the Fifth Circuit had granted a Rule 23(f) petition), No.

11-40789 (5th Cir. Aug. 17, 2011) (denying defendants' motion for stay pending appeal). [2]

### B. The District Court Correctly Recognized That Defendants' Petition Will Not Necessarily Succeed on the Merits

In denying Defendants' motion for a stay, the District Court carefully analyzed the traditional factors used in determining such requests, including: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." Order at 3 (quoting *Nken v. Holder*, 556 U.S. 418, 426 (2009)).

With respect to the first factor, the granting of a Rule 23(f) petition does not portend a "strong showing" that the petitioner is likely to succeed. *See*, *e.g.*, *In re*

---

[2] Defendants rely heavily on *SEC v. Citigroup Global Markets, Inc.*, 673 F.3d 158 (2d Cir. 2012), which granted a litigation stay. *See* Mot. at 3, 13. However, *Citigroup* is easily distinguishable because it did not involve a Rule 23(f) petition, but rather a highly unusual circumstance, where the SEC and the defendant had reached a settlement that the District Court rejected. *Id.* at 160. Under those unique circumstances, **both parties** sought to have the case stayed, and the Second Circuit found that **both parties** would suffer irreparable harm if the case were to proceed to trial. *Id.* at 166.

Defendants also cite *In re Goldman Sachs Grp., Inc. Sec. Litig.*, as an example where the district court "stayed the entire action pending resolution of the Rule 23(f) appeal." However, Defendants fail to mention that this stay was by stipulation of **both parties**. *In re Goldman* Sachs *Grp., Inc. Sec. Litig.*, No. 10-cv-03461 (S.D.N.Y. Feb. 1, 2016) ECF No. 177.

*Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29 (2d Cir. 2009) (affirming district court's grant of class certification, despite granting a Rule 23(f) petition); *Bensinger v. Denbury Res. Inc.*, 561 F. App'x 24, 25 (2d Cir. 2014) (same). The District Court acknowledged this when it found that the first factor does not weigh in favor of either party. Order at 4-5. Here, Defendants fail to make that showing.[3]

Indeed, with respect to the *Morrison* issue relating to the Petrobras Notes, acceptance of Defendants' argument would render it *impossible* to certify a class of any securities in a secondary market that do not trade on a U.S. exchange. There is no plausible reading of *Morrison* that yields such a result. Moreover, lack of ascertainably is rarely a justification for denial of class certification, particularly in this case where the District Court was readily able to determine which Plaintiffs satisfied *Absolute Activists'* criteria and which did not. *In re Visa Check/MasterMoney Antitrust Litig*., 280 F.3d 124, 140 (2d Cir. 2001) ("failure to certify an action . . . on the sole ground that it would be unmanageable is disfavored and should be the exception rather than the rule"); *see also In re Facebook, Inc. IPO Sec. and Derivative Litig.*, No. 12-cv-2389, 2015 WL 9582429 at *16 (S.D.N.Y. Dec. 29, 2015) (it is "administratively feasible to determine

---

[3] "When reviewing a grant of class certification," as is the case here, the Second Circuit "accord[s] the district court noticeably more deference than when [it] review[s] a denial of class certification." *In re Salomon Analyst Metromedia Litig*. 544 F.3d 474, 484 (2d Cir. 2008), *abrogated on other grounds by Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184 (2013).

- 8 -

whether an investor is a member of the institutional investor subclass, the retail investor subclass, or no subclass at all"); *Menkes v. Stolt-Nielsen S.A.*, 270 F.R.D. 80, 93 (D. Conn. 2010) (finding ascertainable whether class members made U.S. based purchases of foreign stock, where plaintiff proposed administrative procedure that included the review of plaintiffs' trading records).

With respect to the District Court's finding regarding market efficiency, during the Class Period Petrobras had one of the largest market capitalizations in the world, and was broadly covered by analysts and credit rating agencies, thus easily satisfying the "modest premise" that its securities incorporated publicly available information. *Halliburton*, 134 S. Ct. at 2410. Indeed, if Petrobras securities do not trade in an efficient market, it is hard to imagine which securities would.

### C. The District Court Correctly Found That Defendants' Requested Stay Would Cause Plaintiffs Substantial Harm

The District Court determined that any delay is unnecessary because ***both*** the Class Action brought by Plaintiffs ***and*** the 27 Individual Actions brought by ***hundreds*** of Opt-Out Plaintiffs can proceed with this litigation ***regardless*** of this Court's decision regarding class certification. The inconvenience and harm Defendants seek to impose upon the Plaintiffs is not insignificant. *See* Order at 7 (noting that this case, due to the number of Opt-Out Plaintiffs, has "evolved into one that is primarily a non-class action," and that the Opt-Out Plaintiffs "will go to

trial . . . regardless of whether" the Rule 23(f) appeal is granted). The same is true of Lead Plaintiff and Class Plaintiffs, which suffered more than $150 million in losses on their Class Period transactions in Petrobras. Order at 7-9. Moreover, although Defendants disparagingly refer to the hundreds of Opt-Out Plaintiffs as "tag-alongs" (Mot. at 2, 5, 13, 14, 17), these plaintiffs allege damages, in the aggregate, of more than ***$1 billion***. Mustokoff Decl. ¶ 12.[4]  Indeed, in *Strougo v. Barclays PLC*, No. 14-cv-05797-VM, (S.D.N.Y. July 5, 2016), where defendants' 23(f) petition was granted on the same day as Defendants' petition in this matter, the District Court denied defendants' motion to stay pending resolution of the Second Circuit's grant of a Rule 23(f) petition where, as here, lead plaintiffs are willing to try the case as individual plaintiffs.  *Strougo*, ECF No. 92.  In *Strougo*, plaintiffs alleged significantly smaller damages, less than $100,000—in contrast to the more than $1billion sought individually by the Class and Opt Out Plaintiffs. *Id.*

---

[4] The Opt-Out Plaintiffs have successfully opposed 2 rounds of motions to dismiss, produced millions of pages of documents, met and conferred with Defendants regarding discovery, raised disputes separately with the District Court, and responded to interrogatories and requests for admission. *Id.* at ¶¶ 7-8. Moreover, counsel for the Opt-Out Plaintiffs have defended the depositions of over 60 Opt-Out Plaintiff representatives, participated in the depositions of more than 100 third-party investment managers and advisors, and submitted a total of 9 expert reports (including 4 to opine on damages issues that are particular to them.) *Id.* at ¶ 9-11.

Furthermore, Defendants have already obtained a litigation advantage due to the District Court's trial schedule as Plaintiffs have been denied the ability to amend their Complaint due to the possibility of an imminent trial. *See* Order at 7-8. Also, all Plaintiffs "have worked diligently to abide by [the District Court's] scheduling and case management orders" (Order at 7) and **all** Plaintiffs are willing and able to proceed with this action individually irrespective of Class Certification. The parties, the witnesses and the District Court all have cleared their schedules and made arrangements for this complex, two-month trial. There simply is no reason to add costly delays now by granting Defendants' request for a stay. *See* Order, *AAL High Yield Bond fund and Delaware Delchester Fund*, No. 00-cv-01404 (N.D. Ala. Sept. 8, 2005) ECF No. 240 (denying motion to stay where the case "has finally been scheduled for trial" and "[t]he court sees no reason to delay the trial").

### D. Defendants Will Not Suffer "Irreparable Harm"—or Any Harm—if the Case Proceeds to Trial

#### 1. There is no reasonable risk that any issues will need to be re-tried

Defendants argue that if they succeed in their appeal related to the ascertainability of secondary market purchasers of Petrobras Notes, it could require "a searching individualized inquiry" to determine whether individual shares were purchased or acquired in a "domestic transaction." Mot. at 16. As an initial matter,

the record is clear that the vast majority of aftermarket purchasers of the Petrobras Notes meet such a "domesticity" challenge.[5] Moreover, even if Defendants were successful on their *Morrison* challenge, **all** Plaintiffs would proceed to trial just the same. Order at 5. And even if this Court were to find that an individual determination of "domesticity" is necessary for certain claims to succeed, that would not require **re**-litigation of anything. At the trial scheduled for September 19, 2016, the finder of fact would make findings regarding the Class Plaintiffs and Opt-Outs' ability to satisfy *Morrison*, which would provide a framework for making subsequent determinations with respect to any additional individual actions, to the extent such actions are filed.

Defendants further contend that if they succeed in their challenge to the presumption of reliance stemming from the efficiency of the market for Petrobras securities, then "whole swaths of alleged misstatements that no individual or class plaintiff claims to have actually relied on would be eliminated." Mot. at 15. However, Lead Plaintiff and the Opt-Out Plaintiffs will introduce **both** evidence of

---

[5] For example, witnesses from PIMCO and WAMCO, two of the individual plaintiffs, explained that the vast majority of secondary market purchases of Petrobras Notes were made through U.S. brokers. *See*, *e.g.*, Gilmore Decl. Ex. 2, Chia-Liang Lian Deposition Transcript at 130:18-131:17 (a majority of the brokers were located "onshore in the U.S."); Gilmore Decl. Ex. 3, Steven Saruwatari Deposition Transcript at 198:2-200:8 (transactions involved "a dealer located in the US, typically, New York"); Gilmore Decl. Ex. 4 (Kofi Bentsi Deposition Transcript at 215:24-220:5 (most of the brokers were "based in New York").

market efficiency through expert testimony **and** evidence of individual reliance at trial. Order at 6 (finding that "the scope of the trial will not be altered significantly by the Second Circuit's decision on the *Basic* issue," in part because Plaintiffs may "ultimately proceed [at trial] as individual plaintiffs"). This refutes Defendants' premise that a grant of the Rule 23(f) appeal would require **re**-litigation of the issues decided at trial.[6]

Thus, even if Defendants were to succeed in their challenge to the *Basic* presumption, the evidence presented at trial would be essentially **the same**. *See* Order at 6. The existence of an efficient market, including Defendants' proffered expert testimony regarding the issue, is still a question of fact that "will almost certainly still be contested on summary judgment and at trial." *Id.* However, Defendants will have the opportunity to present their own expert witnesses on this issue at trial. Indeed, Defendants' primary criticism of the District Court's finding regarding market efficiency is that it credited Dr. Feinstein's analysis of *Cammer's* "cause and effect" test (*Cammer* factor five), which purportedly failed to determine

---

[6] To the extent that Plaintiffs succeed in demonstrating Defendants' liability at trial, and there is a "need to demonstrate reliance on a plaintiff-by-plaintiff basis" for the entire class, as Defendants speculate may be required by this Court (Mot. at 16), that can be accomplished through bifurcated proceedings. *See In re Vivendi*, 284 F.R.D. 144 (S.D.N.Y. 2012) (finding that it was administratively feasible to manage the issue of individualized reliance through a special procedure conducted after the liability phase of trial); *see also In re Facebook*, 2015 WL 9582429 at *16 (contemplating a similar approach to that described by the *In re Vivendi* court), 15-4167 (2d Cir. May 12, 2016) (denying Rule 23(f) petition).

whether the studied price movements were directionally consistent with the subject news event. *See* Mot. at 16. Plaintiffs will need to demonstrate loss causation and damages as part of their case in chief, however, and therefore will need to prove that Petrobras' securities reacted negatively to new, corrective information.  In so doing, they will have necessarily proven "cause and effect" as well as the "directionality" Defendants claim was absent from Dr. Feinstein's report.  Thus, no aspect of market efficiency, loss causation or damages, would need to be retried in the unlikely event the Class is decertified.

Moreover, both Class Plaintiffs and Individual Plaintiffs will put forward evidence regarding individual reliance. Therefore, "the scope of the trial will not be altered significantly by the Second Circuit's decision," and any potential risk of harm to Defendants is "minimal." Order at 6.  *See also Strougo* at 7 (Defendants' fear of "litigation costs" insufficient to establish "irreparable harm").

### 2. Defendants are fully capable of making an informed decision regarding settlement

 Defendants further argue that if the case proceeds to trial, they would be "depriv[ed] of the benefits of the Second Circuit's 23(f) grant, and the ability to make an informed decision regarding settlement." Liman Decl. Ex. E. Defendants argue that the existence of the Class has an "*in terrorem*" effect that may "coerc[e] settlement even on groundless claims." Mot. at 11. But Defendants undercut this argument by seeking to stay the 27 Individual Actions, which have nothing to do

with the issues pertaining to class certification. Defendants contend that permitting the Opt-Out Plaintiffs to proceed to trial before the Lead Plaintiff would itself cause them harm because it would present "concerns that defendants would face collateral estoppel" in the event that they are found to be liable. Mot. at 13. But that argument has been rejected by the courts. *See*, *e.g.*, *Pompano-Windy City Partners, Ltd. v. Bear, Stearns & Co., Inc.*, 698 F. Supp. 504, 520 n.14 (S.D.N.Y. 1988) (rejecting argument that speculative concerns regarding collateral estoppel could constitute "irreparable harm," and denying stay of securities litigation where "certain of the present claims will go forward in this Court").

As the District Court has already determined, the "benefits" of a 23(f) grant do not include the stay of the underlying action, and denial of a stay therefore ***does not*** bypass this court's interlocutory review under Rule 23(f). Order at 5-7. Rather, the Rule 23(f) petition will be heard just the same, and Defendants will therefore fully enjoy "the benefits" of the Rule 23(f) petition. *Id*.[7]

While it is true that Rule 23(f) provides Defendants with a vehicle for challenging class certification in an expedited matter, that does not give Defendants the additional right to delay this trial. Here, it is readily apparent that Defendants seek to delay all of the related Actions, including the 27 that do not

---

[7] If this trial were to proceed, Defendants would still obtain the "benefits" of Rule 23(f) because this Court would not be deprived of jurisdiction to rule on the appeal.

relate to the Rule 23(f) appeal, **only** because they view delay as a means to gain settlement leverage. However, the parties "should not view Rule 23(f) as a vehicle to delay proceedings in the district court," Order at 7 (quoting *Sumitomo Copper*, 262 F.3d at 140), or as a means to gain settlement leverage. Indeed, equally plausible as Defendants' purported claims of "*in terrorem*" settlement effect is the likelihood Defendants are attempting to use 23(f) review as a tool to grind the wheels of justice to a halt in an attempt to pressure Plaintiffs to accept an unsatisfactory settlement. Order at 8 ("It is notorious that the bane of the American legal process is expensive, dispiriting undue delay").

To the extent that Defendants contend that delay is necessary in order for them to make an "informed decision" regarding settlement, the District Court rejected this argument as well: the fact that Defendants are represented by "excellent legal counsel," and have the benefit of "fourteen experts," further makes it "highly unlikely that they are unable to make an informed decision regarding settlement." Order at 7. *See Teachers' Ret. Sys. of Louisiana v. ACLN Ltd*., No. 01-CV-118l4(MP), 2004 WL 1259924, at *1 (S.D.N.Y. June 3, 2004) (denying request for a stay where defendants raised the differential between individual and class damages as a reason to grant a stay pending review of a class certification order); *In re Elec. Books Antitrust Litig.*, No. 11 MD 2293 DLC, 2014 WL

1641699, at *7 (S.D.N.Y. Apr. 24, 2014) (denying request for a stay given that defendant was not likely to suffer any harm if proceedings continued).

Simply put, the risk of *actual liability on the merits* (which Defendants can adequately evaluate, and which applies in every class action litigation) is not sufficient to demonstrate "irreparable harm."

### E. The District Court Properly Recognized That the Public Interest Weighs Against Further Delay of This Action

Finally, the District Court recognized that considerations of judicial economy weigh strongly *against* granting a stay of this action. Order at 8-9. The District Court found that it was "blatantly incorrect" to suggest that considerations of judicial economy would be served by further delaying this Action. Order at 8. **The opposite is true, as "considerations of judicial economy weigh heavily *against granting a stay*.**" *Id.* The District Court has "set aside a full two months to try this consolidated group of 28 complicated cases," which "was not an easy matter for this judge" in light of the Court's "full load of cases." Order at 9. The current schedule "was set in consultation with the parties, all of whom are represented by busy counsel who would have their own scheduling issues if a new trial date had to be set at some uncertain time in the future." *Id.* Moreover, this case involves issues of "such obvious public interest" that the "speedy and effective administration of justice" weighs in favor of denying the stay. *Id.* If a stay were granted, it would:

indefinitely delay the consolidated trial of 28 significant cases, only one of which is a class action, and would thereby not only do *egregious harm* to the ability of this or any other district court to manage its docket in such complex circumstances but would also disserve the strong public interest in the speedy and effective administration of justice.

*Id.*

## F. This Court Lacks Jurisdiction to Stay the Individual Actions

In any event, this Court has no jurisdiction to stay the Individual Actions, which bear separate dockets to the Class Action and are not impacted by the Class Certification Order.[8] The statute authorizing this appeal is 28 U.S.C. §1292(e), and Rule 23(f) is limited to class actions. Fed. R. Civ. P. 23(f) ("A court of appeals may permit an appeal from an order granting or denying class-action certification"). *Cf. Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1264 (11th Cir. 2009) ("As this interlocutory appeal is before us pursuant to Rule 23(f), our jurisdiction is limited to review of the district court's class certification decision"). Neither does the doctrine of "pendent jurisdiction" create appellate jurisdiction in

---

[8] A consolidation of cases that may result in a single unit of litigation for purposes of convenience and economy in administration "does not merge the suits into a single cause, or change the rights of the parties, or make those who are parties in one suit parties in another." *Johnson v. Manhattan R. Co.*, 289 U.S. 479, 496-97 (1933); *see similarly Cella v. Togum Constructeur Ensemleier en Industrie Alimentaire*, 173 F.3d 909, 912 (3d Cir. 1999) ([W]hile a consolidation order may result in a single unit of litigation, such an order does not create a single case for jurisdiction purposes").

- 18 -

the Individual Actions. *See Caldwell-Baker Co. v. Parsons*, 392 F.3d 886, 887-88 (7th Cir. 2004) ("To our knowledge, no appellate court has reviewed an order in Case #2 as 'pendent' to an order in Case #1, and we cannot imagine any circumstances that would justify such a step."); 16 C. Wright et al., FEDERAL PRACTICE AND PROCEDURE § 3937 (3d ed. 2010) (for pendent jurisdiction to attach, "[t]he appealable order must be appealed and have been entered *in the same action* as the other matter offered for review").[9]

---

[9] Even if this Court had jurisdiction over the Individual Actions, no statute, rule or common-law doctrine authorizes the relief. Rule 8 of the Federal Rules of Appellate Procedure authorizes both the District Court and the Court of Appeals to "a stay of the judgment or order of a district court pending appeal." Fed. R. App. P. 8(a)(1)(A). *See Hilton v. Braunskill*, 481 U.S. 770, 776 (1987) (Appellate Rule 8(a) "govern[s] the power of district courts and courts of appeals to stay *an order* pending appeal"); *Hallmark Cards, Inc. v. Group One Ltd.*, 110 F. App'x. 99, 100 (Fed. Cir. 2004) (motion to stay all proceedings in the district court pending the moving party's interlocutory appeal does "not fall under the rubric of Rule 8, and [was] not properly before this court"). *Cf. In re Am. Express Anti-Steering Rules Antitrust Litig.*, 12-MD-2221, Dkt. 730 at 7 n.12 (E.D.N.Y. Jan. 7, 2016) (interpreting Second Circuit opinion *sua sponte* staying litigation in action brought by the government, where the appeal involved a judgment *after* trial, as not "having any jurisdictional effect on the [antitrust] MP Actions, which were separately filed from the Government Action and are not currently before the Second Circuit").

Nor does Rule 23(f) supply the necessary authority. *See Int'l Union, United Auto., Aerospace & Agricultural Implement Workers of Am. v. Scofield*, 382 U.S. 205, 217 n.10 (1965) ("The Federal Rules of Civil Procedure, of course, apply only in the federal district courts"). Nor does this Court have "inherent authority" to stay proceedings in a different action. As the Supreme Court has explained, "the power to stay proceedings is incidental to the power inherent in every court to control the disposition of the cause on *its* docket with economy of time and effort

- 19 -

Because the 27 Individual Actions will proceed on the current schedule, staying the Class Action will effectively force the District Court to hold two trials on common issues, such as falsity, materiality, and scienter. This would do "egregious harm" to the District Court and also harm Class Plaintiffs, who are ready to proceed with a trial. This Court should not allow Defendants to delay resolution of these Actions.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully submit that this Court should deny the Motion.

DATED July 8, 2016                    Respectfully submitted,

---

for itself, for counsel, and for litigants." *Landis v. North Am. Co.*, 299 U.S. 248, 254 (1936).

- 20 -

By: /s/ Jeremy A. Lieberman

Jeremy A. Lieberman
Marc I. Gross
Emma Gilmore
John Kehoe
Brenda Szydlo
POMERANTZ LLP
600 Third Avenue, 20th Floor
New York, NY 10016
Tel: (212) 661-1100

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 North LaSalle
Suite 3505
Chicago, IL 60603
Tel: 312-377-1181
pdahlstrom@pomlaw.con

**POMERANTZ LLP**
Jennifer Pafiti
468 North Camden Drive
Beverly Hills, CA 90210
Tel: 310-285-5330
jpafiti@pomlaw.com

*Counsel for Lead Plaintiff Universities
Superannuation Scheme Ltd. and
Named Plaintiff North Carolina
Department of State Treasurer*

**LABATON SUCHAROW LLP**
Thomas A. Dubbs
Louis Gottlieb
140 Broadway
New York, NY 10005
Tel: (212) 907-0700
Fax: (212) 818-0477

*Counsel for Named Plaintiff Employees'*
*Retirement System of the State of*
*Hawaii*

**DECLARATION OF EMMA GILMORE**

## <u>DECLARATION OF EMMA GILMORE</u>

I, Emma Gilmore, declare and state under 28 U.S.C. § 1746 as follows:

1. I am a member of the Bar of this Court and a partner with the law firm Pomerantz LLP in New York, New York.

2. Attached as Exhibit 1 is a true and correct copy of Plaintiff's opposition to Defendants' Rule 23(f) petition seeking to appeal the District Court's Order granting Class Certification.

3. Attached as Exhibit 2 is a true and correct copy of the April 27, 2016 deposition transcript of Chia-Liang Lian.

4. Attached as Exhibit 3 is a true and correct copy of the April 13, 2016 deposition transcript of Steven Saruwatari.

5. Attached as Exhibit 4 is a true and correct copy of the May 20, 2016 deposition transcript of Kofi Betsi.

6. Attached as Exhibit 5 is a true and correct copy of *In re Goldman Sachs Grp., Inc. Sec. Litig.*, No. 10-cv-03461, Dkt. 177 (S.D.N.Y. Feb. 1, 2016).

7. Attached as Exhibit 6 is a true and correct copy of *Strougo v. Barclays PLC*, No. 14-cv-05797, Dkt. 92 (S.D.N.Y. July 5, 2016).

8. Attached as Exhibit 7 is a true and correct copy of *AAL High Yield Bond Fund and Delaware Delchester Fund*, No. 00-cv-01404, Dkt. 240 (N.D. Ala. Sept. 8, 2005).

9.     Attached as Exhibit 8 is a true and correct copy of *M.D. v. Perry*, No.

11-40789, Dkt. 511574910 (5th Cir. Aug. 17, 2011).

10.     Attached as Exhibit 9 is a true and correct copy of *In re Facebook*,

No. 15-4167, Dkt. 67 (2d Cir. May 12, 2016).

/s/ *Emma Gilmore*
**POMERANTZ LLP**
600 Third Avenue
New York, NY 10016
Phone:  (212) 661-1100
egilmore@pomlaw.com

***Class Counsel***

# EXHIBIT 1

# 16-0463-cv

## United States Court of Appeals

*for the*

## Second Circuit

———————————◆———————————

PETROLEO BRASILEIRO S.A. PETROBRAS,
PRICEWATERHOUSECOOPERS AUDITORES INDEPENDENTES,
BB SECURITIES LTD., THEODORE MARSHALL HELMS, PETROBRAS
GLOBAL FINANCE B.V., PETROBRAS AMERICA INC., CITIGROUP
GLOBAL MARKETS INC., ITAU BBA USA SECURITIES, INC., J.P.
MORGAN SECURITIES LLC, MORGAN STANLEY & CO. LLC,
MITSUBISHI UFJ SECURITIES (USA), INC., HSBC SECURITIES (USA)
INC., MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED,
STANDARD CHARTERED BANK, BANK OF CHINA (HONG KONG)
LIMITED, BANCO BRADESCO BBI S.A., BANCA IMI, S.p.A.,
SCOTIA CAPITAL (USA) INC.,

*Petitioners,*

*(For Continuation of Caption See Inside Cover)*

———————————————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## OPPOSITION TO DEFENDANTS' PETITION PURSUANT TO FED. R. CIV. P. 23(f) FOR LEAVE TO APPEAL FROM THE DISTRICT COURT'S ORDER GRANTING CLASS CERTIFICATION (VOLUME 1 OF 2)

POMERANTZ LLP
*Attorneys for Respondents*
600 Third Avenue, 20th Floor
New York, New York 10016
(212) 661-1100

— v. —

UNIVERSITIES SUPERANNUATION SCHEME LIMITED, UNION ASSET
MANAGEMENT HOLDING AG, EMPLOYEES RETIREMENT SYSTEM
OF THE STATE OF HAWAII, NORTH CAROLINA DEPARTMENT OF
STATE TREASURER,

*Respondents.*

# TABLE OF CONTENTS

I.   INTRODUCTION ........................................................................................1

II.  FACTUAL OVERVIEW ...........................................................................2

III. THE DISTRICT COURT'S CERTIFICATION ORDER ..............................3

    A.   Having Already Easily Applied *Morrison*'s "Domestic Transaction" Prong, the Court Held That It Was "Confident" That *Morrison*'s Determination Is "Administratively Feasible".....................................3

    B.   The Court Dutifully Followed *Halliburton II* .................................5

IV.  ARGUMENT.............................................................................................8

    A.   Defendants Fail to Identify Any "Legal Question" That Requires Immediate Resolution .........................................................................8

        1.   The District Court's Order Raises No Novel Issues About the Proper Identification of Class Members ..............................8

            a.   The District Court Correctly Found That the Class Was Defined by Objective Criteria That Were Administratively Feasible.................................................8

            b.   The District Court's Decision Is Entirely Consistent with *Morrison* ...............................................................15

        2.   The District Court's Finding That Petrobras' Securities Traded in an Efficient Market Does Not Require Review .......17

V.   CONCLUSION........................................................................................20

# TABLE OF AUTHORITIES

Cases

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
   677 F.3d 60 (2d Cir. 2012) ........................................................................ passim

*Amchem Prods, Inc. v. Windsor*,
   521 U.S. 591 (1997)...................................................................................16

*Brecher v. Republic of Argentina*,
   806 F.3d 22 (2d Cir. 2015) ........................................................................ passim

*Byrd v. Aaron's Inc.*,
   784 F.3d 154 (3d Cir. 2015) ................................................................... 12, 13

*Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*,
   No. 12-cv-5329, 2015 WL 5000849 (S.D.N.Y. Aug. 20, 2015) ........................20

*Ebin v. Kangadis Food Inc.*,
   297 F.R.D. 561 (S.D.N.Y. 2014) .................................................................12

*General Telephone Company of the Southwest v. Falcon*,
   457 U.S. 147 (1982)...................................................................................16

*Halliburton Co. v. Erica P. John Fund, Inc.*,
   134 S.Ct. 2398 (2014)..................................................................................2

*In re Blech Sec. Litig.*,
   187 F.R.D. 97 (S.D.N.Y. 1999) ..................................................................14

*In re Facebook, Inc., IPO Sec. and Derivative Litig.*,
   No. 12-cv-2389, 2015 WL 9582429 (S.D.N.Y. Dec. 29, 2015)............. 11, 12, 14

*In re Goldman Sachs Group, Inc. Sec. Litig.*,
   No. 10-cv-3461, 2015 WL 5613150 (S.D.N.Y. Sept. 24, 2015)........................20

*In re Groupon, Inc. Sec. Litig.*,
   No. 12-cv-2450, 2015 WL 1043321 (N.D. Ill. Mar. 5, 2015).............................20

*In re NII Holdings, Inc. Sec. Litig.*, No. 14-cv-227,
2015 U.S. Dist. LEXIS 156034 (E.D. Va. Nov. 17, 2015) ...................................20

*In re Smart Techs., Inc. Shareholder Litig.*,
295 F.R.D. 50 (S.D.N.Y. 2013) ...........................................................................14

*In re Sumitomo Copper Litig. v. Credit Lyonnais Rouse, Ltd.*,
262 F.3d 134 (2d Cir. 2001) ...........................................................................1, 8

*In re VisaCheck/MasterMoney Antitrust Litigation*,
280 F.3d 124 (2d Cir. 2001) ..........................................................................4, 5

*In re Vivendi Universal, S.A. Sec. Litig.*,
284 F.R.D. 144 (S.D.N.Y. 2012) ........................................................................12

*In re Winstar Communications Sec. Litig.*,
290 F.R.D. 437 (S.D.N.Y. 2013) ........................................................................19

*Lotes Co., Ltd. v. Hon Hai Precision Indus. Co.*,
753 F.3d 395 (2d Cir. 2014) ..............................................................................10

*Lumen v. Anderson*,
280 F.R.D. 451 (W.D. Mo. 2012) ......................................................................20

*McLaughlin v. American Tobacco Co.*,
522 F.3d 215 (2d Cir. 2008) ..............................................................................13

*Menkes v. Stolt-Nielsen S.A.*,
270 F.R.D. 80 (D. Conn. 2010) .........................................................................12

*Mullins v. Direct Digital, LLC*,
795 F.3d 654 (7th Cir. 2015) .............................................................................13

*Noble v. 93 Univ. Place Corp.*,
224 F.R.D. 330 (S.D.N.Y. 2004) ........................................................................13

*Seijas v. Republic of Argentina*,
606 F.3d 53 (2d Cir. 2010) ...................................................................... 1, 9, 17

*Siskind v. Sperry Ret. Program, Unisys*,
47 F.3d 498 (2d Cir. 1995) ................................................................................14

*Smilovits v. First Solar, Inc.*,
   295 F.R.D. 423 (D. Ariz. 2013) ...........................................................20

*Union Asset Mgmt. Holding A.G. v. Dell, Inc.*,
   669 F.3d 632 (5th Cir. 2012) .............................................................12

*United States v. Vilar*,
   729 F.3d 62 (2d Cir. 2013) ................................................................10

Rules

Federal Rule of Civil Procedure 23(f) .....................................................1

Rule 23(b)(3).............................................................................................4

Other Authorities

7AA Federal Practice & Procedure § 1780 ............................................16

Manual for Complex Litigation (Fourth) § 21.222 (2004) ....................13

McLaughlin on Class Actions § 4:2........................................................15

iv

Defendants fail to meet this Court's standard for Federal Rule of Civil Procedure 23(f) interlocutory review.

## I.   INTRODUCTION

This Court has made clear that "the standards of Rule 23(f) will rarely be met," *In re Sumitomo Copper Litig. v. Credit Lyonnais Rouse, Ltd.*, 262 F.3d 134, 139-40 (2d Cir. 2001), and Defendants have not come close to satisfying those rigorous standards here.  *First*, no compelling legal issue exists regarding the identification of class members pursuant to the application of the objective factors espoused by the Second Circuit in *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60 (2d Cir. 2012).  Indeed, when it served their litigation strategy, Defendants argued that "[e]ach of [*Absolute Activist*'s tests] establishes . . . a single location that . . . can be easily determined based on recognized and readily understood standards."  Defendants' contention that the District Court's order on ascertainability "is flatly inconsistent with *Brecher*" is equally meritless.  The history of *Brecher* (which includes similar cases filed against the Republic of Argentina) makes clear that a properly defined class containing a temporal limitation, as here, is perfectly ascertainable even when it includes purchases made in the secondary market.  *Seijas v. Republic of Argentina*, 606 F.3d 53, 58 (2d Cir. 2010) (*Seijas I*).  Indeed, *Seijas I* directly supports class certification here, as this Court allowed for certification of a significant number of unidentified secondary

1

market purchases on non-U.S. exchanges, as long as there was a temporal limitation on the class period—as is the Class certified by the District Court.

Defendants are advocating a bright-line rule that a class of purchasers on a secondary market of securities that are not traded on a U.S. exchange can **never** be certified. There is simply no support for such a draconian rule.

*Second*, Defendants contend that the District Court's decision raises an important issue of whether a class can be certified absent empirical evidence of market efficiency, but the court painstakingly engaged in a thorough analysis of exactly such evidence and found that Plaintiffs presented direct evidence of market efficiency. Defendants' remaining arguments on market efficiency underscore their expert's "absolutist" view of "fundamental" efficiency, which is directly at odds with the Supreme Court's decision in *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S.Ct. 2398, 2410 (2014) ("*Halliburton II*").

## II. FACTUAL OVERVIEW

This case represents a brazen money-laundering and bribery scheme perpetrated by Petrobras and its executives. To date, scores of Petrobras executives, cartel executives, and politicians have been jailed and convicted in connection with the scheme at the Company. For over a decade, Petrobras surreptitiously colluded with members of a cartel of construction companies to inflate bids for contracts, with Petrobras' top brass pocketing millions of dollars in

2

bribes and politicians—including those who appointed the Company's top executives to their positions—sharing in the proceeds. Petrobras hid these massive kickbacks and bribes throughout the Class Period by fraudulently capitalizing them as "assets" on the Company's books, as opposed to treating them as expenses as required by applicable accounting rules, reporting artificially inflated assets and artificially inflated net income. While raising billions of dollars from investors during the Class Period on U.S. exchanges or through other domestic transactions, Petrobras denied every whisper of corruption—from bribery, to bid rigging, to overpayments—keeping the investing public in the dark as to the corrupt core of Petrobras' operations for years. As a result of this decade-long scheme, Petrobras took a write-down of close to $17 billion. When the fraud was revealed, the Company's share price plummeted more than 80%.

## III. THE DISTRICT COURT'S CERTIFICATION ORDER

### A. Having Already Easily Applied *Morrison*'s "Domestic Transaction" Prong, the Court Held That It Was "Confident" That *Morrison*'s Determination Is "Administratively Feasible"

The District Court specifically addressed Defendants' attacks on "superiority on so-called 'ascertainability' grounds." Exhibit ("Ex") 1 at 20-23. In certifying the Class, the District Court squarely considered the Second Circuit's recent opinion in *Brecher* v. *Republic of Argentina*, 806 F.3d 22, 24 (2d Cir. 2015), reaffirming that "the touchstone of ascertainability is whether the class is

3

'sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member.'" *Id.* at 20-21. Abiding by the Second Circuit's guidance in *In re VisaCheck/MasterMoney Antitrust Litigation*, 280 F.3d 124, 140 (2d Cir. 2001), the District Court observed that "failure to certify an action under Rule 23(b)(3) on the sole ground that it would be unmanageable is disfavored and 'should be the exception rather than the rule.'" *Id.*

Defendants contended, however, that supposed nuances in the "domestic transaction" standard rendered it administratively unfeasible for the District Court and for putative class members to determine who is a class member and the amount of damages. *Id.* at 21. Remarkably, this newly-minted argument was a complete reversal of Defendants' earlier position, taken in connection with attacks levied on the Fourth Consolidated Amended Complaint that ***"[e]ach of [Absolute Activist's tests] establishes***, as the site of the transaction that is of congressional concern, ***a single location that***—although subject to proof—***can be easily determined based on recognized and readily understood standards***."). Ex. 2 at 6. This shift was not lost on the District Court: "Indeed, defendants themselves have elsewhere represented as much [that the *Morrison* determination is 'administratively feasible'] to the Court." Ex. 1 at 22.

The court refused to exclude off-exchange and aftermarket purchasers because "[a]mending the Class definitions in this way would cut off purchasers

4

who have valid claims under *Morrison*'s second prong, which holds that the securities laws apply to securities purchased in 'domestic transactions.'" *Id.* at 22. "This would not be a faithful application of *Morrison*." *Id*.

Significantly, the District Court found that there was nothing unfeasible about the application of the "domestic transactions" test, as the court had already evaluated whether the four proposed class representatives adequately pleaded that they purchased Petrobras securities in domestic transactions, finding that two plaintiffs met the standard, and two did not. *Id.* at 22. Accordingly, the court felt "**confident** that the *Morrison* determination is 'administratively feasible.'" *Id.* The court observed that "[t]he criteria identified by *Absolute Activist*, 677 F.3d 60 (2d Cir. 2012), as relevant to the determination of whether a transaction was domestic, are highly likely to be documented in a form susceptible to the bureaucratic processes of determining who belongs to a Class." *Id.* at 22-23. The court explained that, for example, documentation of "the placement of purchase orders" "is the sort of discrete, objective record routinely produced by the modern financial system that a court, a putative class member, or a claims administrator can use to determine whether a claim satisfies *Morrison*." *Id.* at 23.

## B. The Court Dutifully Followed *Halliburton II*

After receiving and reviewing four rounds of briefing and three expert depositions, and after conducting an extensive evidentiary hearing, the District

5

Court found that Petrobras' securities traded in an efficient market.  In a discussion spanning twenty pages, the court addressed each and every factor courts generally consider as indicia of market efficiency, and found that *each* factor (where applicable) provided evidence of market efficiency.  *Id*. at 24-45.  Particularly relevant here, the District Court applied *Cammer* factor five and found direct, empirical evidence of market efficiency. *Id*. at 33-45.  Plaintiffs' expert, Dr. Feinstein, ran event studies on Petrobras' securities and used a regression analysis to eliminate any price movements that were caused by external forces, such as moves in the wider market.  *Id*. at 33.  Dr. Feinstein then applied a well-established and commonly-used empirical "Z-test" to compare the proportion of event dates with statistically significant price movements to the proportion of non-event dates with statistically significant price movements, concluding that there was a statistically significant difference across Petrobras' securities.  *Id*. at 33-34.

While not required under *Halliburton II*, in addition to the Z-test, Dr. Feinstein performed a supplementary analysis examining the directionality of movements in Petrobras' securities.  The court assigned "limited weight" to this analysis.  *Id*. at 41.  It observed that "evidence of directionality or the degree of fit between expected and observed moves in a market need not be substantial to allow a finding of market efficiency."  *Id*.  The court reasoned that "[s]uch evidence goes to the accuracy of the price of a security, and the Supreme Court has explained that

6

it is not the accuracy of a price as a reflection of underlying value but instead the sensitivity of the price to false statements that underlies the *Basic* presumption." *Id*. at 41-42.[1]

Relatedly, the District Court also rejected Dr. Gompers' "absolutist" view of market efficiency that "in an efficient market, the price of a security should <u>always</u> move in response to the release of new value-relevant information that is materially different from expectations." *Id*. at 43-44. The court credited Dr. Feinstein's explanation that not every event will move a market and that the impact of an event depends on a multitude of factors including, among other things, the nature of the event, whether the information involved is truly new, whether a confounding event occurs simultaneously, the magnitude of background volatility, and how the event unfolded. *Id*.[2]

---

[1] The court pointed out that "[w]hether the market, upon receiving new information, moved in the precise way analysts or experts would expect it to move is not the key to unlocking *Basic*'s presumption of reliance," but "[w]hat is essential is evidence that, when the market received the new information, it 'generally affect[ed]' the price." *Id*. at 42. Here, the Z-test provided precisely such evidence. *Id*.

[2] The court explained that, contrary to Dr. Gompers' view, the Supreme Court in *Halliburton II* made clear that "market efficiency is a matter of degree" and that "*Basic*'s presumption of reliance . . . does not rest on a 'binary' view of market efficiency." *Id*. at 44.

## IV.  ARGUMENT

### A.  Defendants Fail to Identify Any "Legal Question" That Requires Immediate Resolution

"A novel legal question will not compel immediate review unless it is of fundamental importance to the development of the law of class actions and it is likely to escape effective review after entry of final judgment."  *Sumitomo*, 262 F.3d at 140.  Defendants present no such question.

#### 1.  The District Court's Order Raises No Novel Issues About the Proper Identification of Class Members

##### a.  The District Court Correctly Found That the Class Was Defined by Objective Criteria That Were Administratively Feasible

Defendants wrongly claim that the District Court's order is "flatly inconsistent with *Brecher*."  (Petitioners' Brief ("Pet") at 9).  In *Brecher*, a breach of contract action, the Second Circuit reversed a district court's decision certifying a class because, while the originally defined class "did not suffer from a lack of ascertainability," the district court modified and expanded the class definition *after a judgment on liability* by removing a "continuous holder" requirement, thus expanding the class to all holders of beneficial interest *without any limitation whatsoever as to time held.  Brecher*, 806 F.3d at 24-27.  This expansion permitted the class to remain fluid even after entry of judgment, raising the specter of one-way intervention. *Id*. Thus, the only issue that the *Brecher* Court had with class certification was the fact that the class period did not have any time limitation, a

8

deficiency not relevant here. Significantly, in an analogous case against the Republic of Argentina, the Second Circuit *affirmed* the original class certification because, as here, it contained a time limitation. *See Seijas I*. *In Seijas I*, the Second Circuit squarely rejected defendant Argentina's argument that since many of the bonds were traded in the secondary market, determining the classes' composition raises "major" manageability issues. *Id*. at 58. The Second Circuit held that "*manageability is an issue peculiarly within a district court's discretion* . . . and the district court determined that all eight classes satisfied this requirement." *Id*. at 58. "*In any event, we see no reason to second guess the district court's judgment as to manageability*."[3] Simply put, *Brecher* fully supports the District Court's order and provides no grounds for granting Defendants' Rule 23(f) petition.[4]

In *Absolute Activist*, the Second Circuit expressly espoused objective criteria aimed to determine whether *Morrison*'s "domestic transaction" test is met. The Second Circuit explained that "transactions involving securities that are not traded

---

[3] Remanding *Brecher* for an evidentiary hearing on damages, the Second Circuit explained that plaintiff Brecher "is identically situated to the *Seijas* plaintiffs." *Brecher*, 806 F.3d at 26 (2d Cir. 2015). On remand, the operative class definition remained the one that existed before the court's modification of the class, *i.e.*, the class definition contained a temporal restriction. Ex. 3 at 1.

[4] Defendants speculate that, in the event of a defendants' verdict, unspecified "restrictive foreign discovery" may make it harder for them to trace purchases to a domestic transaction, but such hypothetical impediments cannot function as a bar to class certification. Moreover, if the transactions occurred domestically, it is unlikely that there will be no relevant records in the United States.

9

on a domestic exchange are domestic if irrevocable liability is incurred or title passes within the United States." *Absolute Activist,* 677 F.3d at 69. Objective factors meeting these criteria include "facts concerning the formation of the contracts, the placement of purchase [or sale] orders, the passing of title, and the exchange of money." *Id*. at 70; *see also United States v. Vilar*, 729 F.3d 62, 78 (2d Cir. 2013) ("the record contains facts 'concerning the formation of the contracts' and 'the exchange of money,' which is precisely the sort that we indicated may suffice to prove that irrevocable liability was incurred in the [US]").[5]

The District Court easily applied these factors to find that named plaintiffs North Carolina Department of State Treasurer and Employees' Retirement System of the State of Hawaii adequately plead that irrevocable liability for their bond purchases incurred in the United States, meaning they had standing to bring Securities Act claims, and that the Universities Superannuation Scheme Ltd. and Union Asset Management Holding AG did not meet that standard. Ex. 4 at 5-12. The court examined objective factors such as the date the transaction was consummated, the location of named Plaintiffs' traders, the area codes from which

---

[5] Defendants improperly seek a different Second Circuit panel to "overrule" the *Absolute Activist* panel. In general, a panel of this Court is "bound by the decisions of prior panels until such time as they are overruled either by an en banc panel of our Court or by the Supreme Court." *Lotes Co., Ltd. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 405 (2d Cir. 2014) (citations omitted).

purchase confirmations were made, and the identity and location of underwriters.[6]

Even Defendants have admitted, when it served their litigation strategy, that "each of the ['irrevocable liability' and 'transfer of title' criteria] establishes . . . a single location that—although subject to proof—***can be easily determined based on recognized and readily understood standards***." Ex. 2 at 6.[7]

Other district courts have squarely rejected *Morrison*-type arguments as an impediment to class certification "in light of [*Absolute Activist*'s] ***doctrine that asks exactly where irrevocable liability was incurred***." *Id.* (emphasis added). *See In re Facebook, Inc., IPO Sec. and Derivative Litig.*, No. 12-cv-2389, 2015 WL 9582429 (S.D.N.Y. Dec. 29, 2015) (that IPO resulted in a significant percentage of foreign purchases in secondary market did not preclude certification).

As is the normal course in securities fraud and other actions, a claims

---

[6] This finding flatly contradicts Defendants' claim that the District Court certified the classes without any proof that class members could be ascertained. Pet. at 13. Moreover, the records relied on by the court to determine whether the named Plaintiffs could proceed as class representatives clearly show that several Defendants who were part of the underwriting syndicate were the counterparties to the disputed transactions. These same Defendants are also market makers in the notes at issue. Ex. 5 at ¶ 241. Thus, examination of Defendants' own records would provide, in many instances, sufficient information to determine whether a given transaction in Petrobras notes was domestic.

[7] Defendants' improper request for interrogatories and documents from unnamed Class members regarding the location of note purchases essentially acknowledges that Class membership can be determined on an objective basis. Ex. 6 at 4 (seeking, for example, "any documents relating to the location where you or any intermediary acting on your behalf in making such purchase was located when it agreed with the counterparty to purchase such debt security and where the counterparty was located when it agreed to make such sale.").

11

process after a judgment is entered will determine if the appropriate criteria of "domestic transactions" has been met. Trading broker records, for example, will reflect factors such as where and when the transaction was consummated, the price paid for the securities, where the client and broker were located, and the area codes from which purchase confirmations were made. Such process is administratively feasible. *See*, *e.g.*, *Facebook*, 2015 WL 9582429 at *16 ("Given that the subclasses may be ascertained with reference to investor records, it is administratively feasible to determine whether an investor is a member of the institutional investor subclass, the retail investor subclass, or no subclass at all"); *Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561, 567 (S.D.N.Y. 2014) (certifying class because "ascertainability difficulties, while formidable, should not be made into a device for defeating the action"); *Menkes v. Stolt-Nielsen S.A.*, 270 F.R.D. 80, 93 (D. Conn. 2010) (finding ascertainable whether class members made U.S. based purchases of foreign stock, where plaintiff proposed administrative procedure that included the review of plaintiffs' trading records); *In re Vivendi Universal, S.A. Sec. Litig.*, 284 F.R.D. 144, 155 (S.D.N.Y. 2012) (establishing claims process).[8]

---

[8] *See similarly Byrd v. Aaron's Inc.*, 784 F.3d 154, 169 (3d Cir. 2015) (finding proposed classes ascertainable because "there are 'objective records' that can 'readily identify' these class members"); *Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 640 (5th Cir. 2012) ("A quick look at [the] trading records is all that is required . . . It is a mechanical and objective standard . . . ").

Defendants also argue that they have the right to know the identity of all class members at this early stage in order to determine who will be bound by a judgment and to estimate potential damages. Pet. at 12-13. This is an impermissible demand that the class be *ascertained*, rather than ascertainable, where the latter is all that is required. *See, e.g., Noble v. 93 Univ. Place Corp.*, 224 F.R.D. 330, 338 (S.D.N.Y. 2004) ("Class members need not be ascertained prior to certification, but must be ascertainable at some point in the case."); *see also* Manual for Complex Litigation (Fourth) § 21.222 (2004) (same). Here, the classes certified by the District Court are clearly ascertainable because, at the appropriate time, claimants will either be able to show, through their trading records or other documentary evidence that they purchased the relevant Petrobras notes in domestic transactions, or they won't.[9]

---

[9] Defendants also contend that their due process rights would be violated, but as the Third Circuit has recently explained, "*Carrera* counsels that this due process right relates to the ability to 'challenge the *proof* used to demonstrate class membership' . . . here, [Plaintiffs] are not relying solely on unverified affidavits to establish ascertainability," but rather on objective proof such as order confirmations and trading records. *Byrd*, 784 F.3d at 171. *See similarly Mullins v. Direct Digital, LLC*, 795 F.3d 654, 671 (7th Cir. 2015) ("So long as the defendant is given the opportunity to challenge each class member's claim to recovery during the damages phase, the defendant's due process rights are protected"). *McLaughlin v. American Tobacco Co.*, 522 F.3d 215, 231 (2d Cir. 2008) (Pet. at 13), is entirely inapposite. There, the plaintiffs sought $800 billion in "fluid damages," which would have deprived the defendants of the opportunity to challenge individual claims. *Id*. at 233. Here, where Plaintiffs are not seeking fluid damages, and Defendants will be able to challenge individual claims after a trial on liability, there is no basis to find that either the Due Process clause (or the Rules Enabling

Defendants' argument suffers from other legal infirmities. First, Plaintiffs' burden of proof regarding the number of class members is delineated by Rule 23(a)'s numerosity requirement, which does not require Plaintiffs to show the precise number of class members. *See In re Blech Sec. Litig.,* 187 F.R.D. 97, 103 (S.D.N.Y. 1999).[10]

Second, it is not necessary for Plaintiffs to identify upfront exactly which potential class members will be able to satisfy all the elements of the class definition, and it is common for courts to certify classes which depend on a later adjudication. *See, e.g, Facebook,* 2015 WL 9582429, at *1 (certifying two Securities Act classes of investors who purchased in or traceable to Facebook's IPO, and "were damaged thereby"); *In re Smart Techs., Inc. Shareholder Litig.*, 295 F.R.D. 50, 53, 58-59 (S.D.N.Y. 2013) (certifying class under the Securities Act of persons who purchased common stock "in the United States"). In these cases, courts have certified classes whose precise identity cannot be determined before a finding of liability. "[T]he possibility that some members of the class may

---

Act) has been violated.

[10] Rule 23 does not grant Defendants the right to know early in the litigation exactly who comprises the class and will be bound by the judgment. Pet. at 12. In *Siskind v. Sperry Ret. Program, Unisys*, 47 F.3d 498, 503 (2d Cir. 1995), cited by Defendants, the Second Circuit overturned a judgment in favor of a class of employees, where the district court failed to certify a class under Rule 23. *Id.* Although the Second Circuit stated that Rule 23(c)(1) requires a defendant "be told promptly the number of parties to whom it may ultimately be liable," it is clear from context that the required notice to defendants was whether they would be subjected to a class action, and not the precise identity of the class. *See id.*

14

fail to prevail on their individual claims will not defeat class membership" on ascertainability grounds.  McLaughlin on Class Actions § 4:2 (12th ed.).

> **b.** **The District Court's Decision Is Entirely Consistent with *Morrison***

Defendants concoct a *Morrison* argument in an effort to create a question "of fundamental importance to the development of the law of class actions," but no such issue exists.  *Morrison* did not address class certification, but whether a plaintiff's transactions were covered by the federal securities laws.  Neither did *Morrison* inject **any** doubt as to whether "domestic transactions" give rise to liability under the federal securities laws: the United States federal securities laws apply to "transactions in securities listed on domestic exchanges, ***and domestic transactions in other securities.***" 561 U.S. at 266-67.  The court firmly grasped the practical effect of Defendants' attempt to undercut *Morrison*.  It observed that "[a]mending the Class definitions [to exclude off-exchange purchasers, aftermarket purchasers and purchasers from non-U.S. underwriters] ***would cut off purchasers who have valid claims under Morrison's second prong***, which holds that the securities laws apply to securities purchased in 'domestic transactions.'"  Ex. 1 at 22.  "This would not be a faithful application of *Morrison*."  *Id*.

Indeed, taking Defendants' argument to its logical conclusion would ***eliminate*** class action litigation for all purchases that are not made on U.S. exchanges—in direct contravention with *Morrison*.  In **any** offering conducted in

the United States by a large corporation (like Facebook or Petrobras), there will be at least some foreign purchasers of the securities. Given that reality, there will always be the need to determine whether each member of the proposed class made its purchases in the United States. Thus, if Defendants were correct that each such determination requires a mini-hearing, there could ***never*** be a class based on an IPO, or a class of bond purchasers (where the bond did not trade solely on a U.S. exchange). That outcome runs counter to fundamental class action policies—the class action devise is "peculiarly appropriate when the issues involved are common to the class as a whole." *General Telephone Company of the Southwest v. Falcon*, 457 U.S. 147, 155 (1982); *see also Amchem Prods, Inc. v. Windsor*, 521 U.S. 591, 615 (1997) (citations omitted).[11] The District Court recognized that doing away with securities class actions in such instances will result in "individual actions growing into an unmanageable flood." Ex. 1 at 19. Indeed, "the volume of opt-outs (exemplified by the fact that Petrobras was among the world's largest companies during the Class Period) demonstrates the need for a class action in these circumstances." *Id*.

Defendants also complain that Petrobras should not be subjected to liability

---

[11] *See also* Wright et al., 7AA *Federal Practice & Procedure* § 1780 ("[A] decision against class-action treatment should be rendered only when the ministerial efforts simply will not produce corresponding efficiencies. In no event should the court use the possibility of becoming involved with the administration of a complex lawsuit as a justification for evading the responsibilities imposed by Rule 23").

in the United States because the fraud "originated in Brazil," but the Second Circuit has already rejected this same argument in *Absolute Activist*. 677 F.3d at 69 ("Ewing's lack of contact with the United States may provide a basis for dismissing the case against him for lack of personal jurisdiction . . . but the transactional test announced in *Morrison* does not require that each defendant alleged to be involved in the fraudulent scheme engage in conduct in the United States").[12] And here, Defendants committed fraud *in* the United States by raising billions of dollars from sales on exchanges and other domestic transactions based on repeatedly false and misleading SEC filings. U.S. laws *do* apply to criminal enterprises such as Petrobras, who reap the benefits of the United States capital markets while defrauding investors who purchased on these markets.[13]

### 2. The District Court's Finding That Petrobras' Securities Traded in an Efficient Market Does Not Require Review

The District Court scrupulously followed *Halliburton II* in analyzing class-certification. Ex. 1 at 24-44. Defendants misleadingly claim that the District Court's market efficiency ruling raises an important issue of whether a class can be

---

[12] *See also Seijas I*, 606 F.3d 53 (affirming grant of class certification against the Republic of Argentina).

[13] Here, in connection with the bond offerings, Petrobras selected underwriters that were located in the United States; stated that the Underwriters would deliver the notes "against payment in New York"; selected New York law to govern the indenture, the notes, and the bond guarantees; selected the Southern District of New York as a forum for disputes; and disclaimed compliance with the laws of any jurisdiction other than the United States. *See* Ex. 7.

17

certified in the absence of empirical evidence of market efficiency but, as explained *supra* at 5-7, the court **analyzed and found** precisely this type of evidence: "though it is a somewhat involved analysis, the Court ultimately concludes that plaintiffs have satisfied the fifth *Cammer* factor . . . a statistically significant showing that statistically significant price returns are more likely to occur on event dates is sufficient as direct evidence of market efficiency and thereby to invoke *Basic*'s presumption of reliance at the class certification stage." Ex. 1 at 33, 44.  In fact, Defendants do not dispute that such an event study was conducted on news events and that this study showed a highly statistically significant relationship between news and price movements. (Ex. 5 ¶¶ 18-20, 160-61, 217-18, 285-86; Ex. 8 ¶¶ 9, 36-60).  Significantly, Defendants' expert never opined that the fifth *Cammer* factor (or any other factor) supported a finding of inefficiency, only that Dr. Feinstein's report was not sufficiently robust with respect to the fifth *Cammer* factor.  That is not a sufficient record to overturn an order granting class certification.

The District Court also considered evidence of directionality in movements of Petrobras' securities and gave it some weight.  Ex. 1 at 40-44.  As an initial matter, the magnitude, degree, or correctness of a stock-price reaction to new information is relevant only to the question of *fundamental* efficiency, not *Basic*'s *informational* efficiency, *i.e.*, whether "the prices of [securities] incorporate most

18

public information rapidly." *In re Winstar Communications Sec. Litig.*, 290 F.R.D. 437, 446 (S.D.N.Y. 2013). While not dispositive of informational market efficiency, directionality may be relevant to show that news did not have a price impact on the securities at issue. At class certification, Defendants did not dispute price impact. Nor did they argue that the stock price moved in a direction inconsistent with market efficiency. This issue cannot be raised now.

Notwithstanding Defendants' lack of an event study or any other study to demonstrate a lack of price impact, Plaintiffs did show in an empirical study that the price movement on "corruption event dates" was directionally appropriate given the nature of the news. Ex. 8 ¶¶ 52-58 and Appendix 2. Defendants did not and cannot dispute the directionality of the price movements on these dates. In addition, Plaintiffs showed that the direction of price movements on earnings announcement dates was not inconsistent with the nature of the news and analyst commentary. Ex. 8 ¶ 53 and Appendix 3. While Defendants questioned whether certain earnings announcement dates were correctly categorized as positive/negative/or neutral, they never argued or proved that the prices rose by statistically significant amounts in response to negative news, or that the security prices declined by statistically significant amounts in response to positive news.[14]

---

[14] Their argument is essentially a subjective disagreement with Plaintiffs' expert and the market place over how certain earnings news should have been interpreted. Ex. 9 pp. 49-50, 77-79; Ex. 10 pp. 604-605.

The District Court examined and considered this evidence.  Ex. 9 at pp. 49-50, 77-79; Ex. 1 at 40-44.  The court explained that, consistent with *Halliburton II*, "[w]hat is essential is evidence that, when the market received new information, it 'generally affect[ed]' the price."  Ex. 1 at 41-43.  The court explained that "Defendants' own arguments that Feinstein's tenor assessments were subjective demonstrate the wisdom of the Supreme Court's position," as "[a]ny assessment of the tenor of analyst coverage and the expected impact of an event on the market will be subjective."  *Id*. at 42.  "Indeed, the analyst reports released on May 15, 2011, and May 16, 2011, varied in their assessments of the same earnings event." *Id*.  As the District Court recognized, "[t]he Supreme Court has rejected Gompers' [defendants' market efficiency expert] absolutist view of market efficiency."[15]  *Id*. at 44.

## V.   CONCLUSION

Because Defendants have failed to identify any appropriate basis for interlocutory review, their Rule 23(f) petition should be denied.

---

[15] Indeed, Defendants' expert has been repeatedly rebuked by courts as "often describ[ing] a different conception of an efficient market than is used by the law." *Lumen v. Anderson*, 280 F.R.D. 451, 460 (W.D. Mo. 2012).  *See similarly In re Goldman Sachs Group, Inc. Sec. Litig.*, No. 10-cv-3461, 2015 WL 5613150 (S.D.N.Y. Sept. 24, 2015); *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, No. 12-cv-5329, 2015 WL 5000849 at *14, *17 (S.D.N.Y. Aug. 20, 2015); *In re NII Holdings, Inc. Sec. Litig.*, No. 14-cv-227, 2015 U.S. Dist. LEXIS 156034, at *27 (E.D. Va. Nov. 17, 2015); *In re Groupon, Inc. Sec. Litig.*, No. 12-cv-2450, 2015 WL 1043321, at *11 (N.D. Ill. Mar. 5, 2015); *Smilovits v. First Solar, Inc.,* 295 F.R.D. 423, 437 (D. Ariz. 2013).

DATED: February 26, 2016

**POMERANTZ LLP**

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
Marc I. Gross
Emma Gilmore
John Kehoe
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone: 212-661-1100
Facsimile: 212-661-8665

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 North LaSalle
Suite 3505
Chicago, IL 60603
Telephone: 312-377-1181
Facsimile: 312-377-1184

**POMERANTZ LLP**
Jennifer Pafiti
468 North Camden Drive
Beverly Hills, CA 90210
Telephone: 310-285-5330

*Attorneys for Lead Plaintiff and
Named Plaintiff North Carolina
Department of State Treasurer*

**LABATON SUCHAROW LLP**
Thomas A. Dubbs
Louis Gottlieb
140 Broadway
New York, NY 10005
Telephone: 212-907-0700
Facsimile: 212-818-0477

*Counsel for Employees' Retirement
System of the State of Hawaii*

# EXHIBIT 2

*IN RE PETROBRAS SECURITIES LITIGATION*
*CASE NO.: 14-cv-9662(JSR)*

*CHIA-LIANG LIAN*
*April 27, 2016*
*CONFIDENTIAL*



**ELLEN GRAUER**
COURT REPORTING CO. LLC

126 East 56th Street, Fifth Floor  New York, New York 10022
P:  212-750-6434   F:  212-750-1097
www.ellengrauer.com

*Original File 112213.TXT*
*Min-U-Script® with Word Index*

Page 1

1  UNITED STATES DISTRICT COURT

2  SOUTHERN DISTRICT OF NEW YORK

3  -------------------------------------------x

4  IN RE:  PETROBRAS SECURITIES LITIGATION

5  This Document Applies To:

6  ALL CASES

7  CASE NO.: 14-cv-9662(JSR)

8  -------------------------------------------x

9

10  * * * C O N F I D E N T I A L * * *

11

12                    865 South Figueroa Street
13                    Los Angeles, California
13
14                    April 27, 2016
14                    9:29 a.m.

15

16          Confidential videotaped deposition

17  of CHIA-LIANG LIAN, taken on behalf of the

18  Defendants, at Quinn Emanuel Urquhart & Sullivan,

19  LLP, before DEBORAH L. LUNDGREN, CSR No. 6727, a

20  Certified Shorthand Reporter in and for the

21  County of Los Angeles, State of California.

22

23          ELLEN GRAUER COURT REPORTING CO. LLC
23          126 East 56th Street, Fifth Floor
24          New York, New York 10022
24          212-750-6434
25          Ref:  112213

Page 2

1  A P P E A R A N C E S :

2

3  QUINN EMANUEL URQUHART & SULLIVAN, LLP

4  FOR THE PLAINTIFFS IN THE PIMCO ACTION AND THE

5  WITNESS

6          865 South Figueroa Street

7          Tenth Floor

8          Los Angeles, California  90017

9  BY:  KRISTEN BIRD

10         RYAN LANDES

11         kristenbird@quinnemanuel.com

12         213.443.3000

13

14  LABATON SUCHAROW

15  FOR THE PLAINTIFFS EMPLOYEES RETIREMENT SYSTEM IN

16  THE STATE OF HAWAII

17         140 Broadway

18         New York, New York  10005

19  BY:  IRA A. SCHOCHET

20         212.907.0700

21

22

23

24

25

Page 3

1     A P P E A R A N C E S : (Cont'd)

2

3  CLEARY GOTTLIEB STEEN & HAMILTON, LLP

4  FOR THE PETROBRAS DEFENDANTS

5  One Liberty Plaza

6  New York, New York  10004

7    BY: LUKE BAREFOOT

8  KATHERINE ELLIS

9  lbarefoot@cgsh.com

10  212.225.2000

11

12  SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP

13  FOR THE UNDERWRITER DEFENDANTS

14  155 North Wacker Drive

15  Chicago, Illinois  60606-1720

16    BY: MARIANNE H. COMBS

17  marianne.combs@skadden.com

18  312.407.0903

19

20

21

22

23

24

25

Page 4

1  A P P E A R A N C E S : (Cont'd)

2

3  KING & SPALDING

4  FOR THE DEFENDANT PwC BRAZIL

5          1185 Avenue of the Americas

6          Room 3422

7          New York, New York  10036-2601

8  BY:  EVAN CLAIRE ENNIS

9          eenniskslaw.com

10         212.556.2100

11

12  ALSO PRESENT:

13         JON SEIDEL, VIDEOGRAPHER

14

15

16

17

18

19

20

21

22

23

24

25

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL
CASE NO.: 14-cv-9662(JSR)

CHIA-LIANG LIAN
April 27, 2016

Page 5

```
 1  -------------------- I N D E X --------------------
 2  WITNESS          EXAMINATION BY          PAGE
 3  CHIA-LIANG LIAN    MS. ELLIS        10, 257
 4                     MR. SCHOCHET         251
 5
 6
 7  ---------------- E X H I B I T S ----------------
 8  LIAN           DESCRIPTION           FOR I.D.
 9  Exhibit 1     List of funds sponsored by      14
10                Western Asset in the PIMCO
11                action
12  Exhibit 2     List of funds in PIMCO case     14
13                advised by Western Asset
14  Exhibit 3     List of funds in                14
15                Internationale
16                Kapitalanlagesgesellschaft mb
17                case advised by Western Asset
18  Exhibit 4     E-mail string re DD questions   20
19                received from Mizuho AM on
20                a/c 3310
21  Exhibit 5     Western Asset's Amended         35
22                Responses to Interrogatories
23  Exhibit 6     9-10-10 Sample Request for      47
24                Proposal
25
```

Page 7

```
 1  ------------ E X H I B I T S (Cont'd) ------------
 2  LIAN           DESCRIPTION           FOR I.D.
 3  Exhibit 17    E-mail string re Draft          201
 4                Agenda: Citi investor trip
 5                to Brazil: November post
 6                election
 7  Exhibit 18    E-mail string re Internal       203
 8                update on Petrobras
 9  Exhibit 19    "Forbes Magazine" article re    204
10                Brazil stocks sink as Jim
11                Chanos slams Petrobras
12  Exhibit 20    E-mail string re fundamental    206
13                view of Petrobras
14  Exhibit 21    E-mail string re Petrobras      210
15                update 11-17-14
16  Exhibit 22    Western Asset document titled   219
17                "Petrobras"
18  Exhibit 23    E-mail string re California     223
19                State Teachers Retirement
20                System
21  Exhibit 24    E-mail string re Petrobras      228
22                gets CVM, SEC's approval for
23                loss calculation
24  Exhibit 25    E-mail string re Petrobras      229
25
```

Page 6

```
 1  ------------ E X H I B I T S (Cont'd) ------------
 2  LIAN           DESCRIPTION           FOR I.D.
 3  Exhibit 7     Document titled "Our            63
 4                Philosophy - Portfolio
 5                Management - Western Asset"
 6  Exhibit 8     E-mail string re Petrobras      73
 7                final
 8  Exhibit 9     Document titled                 105
 9                "Environmental, Social and
10                Governance (ESG)"
11  Exhibit 10    6-30-15 Form ADV - Part 2       127
12  Exhibit 11    Western Asset trade setup       140
13                receipts
14  Exhibit 12    "Forbes Magazine" excerpt       150
15  Exhibit 13    E-mail string re Brazil 2025    163
16                reopening
17  Exhibit 14    E-mail string re GNW Canada     167
18                MI cash
19  Exhibit 15    E-mail string with various      172
20                subject lines
21  Exhibit 16    E-mail string re Brazil -       195
22                PIMCO exposure
23
24
25
```

Page 8

```
 1  ------------ E X H I B I T S (Cont'd) ------------
 2  LIAN           DESCRIPTION           FOR I.D.
 3  Exhibit 26    E-mail string re update on      232
 4                Petrobras, April 1
 5  Exhibit 27    E-mail string re Petrobras      238
 6                downgrade risk
 7  Exhibit 28    E-mail string re EM update:     240
 8                Whither Petrobras's credit
 9                ratings?
10  Exhibit 29    E-mail string re Petrobras      244
11                (subsidiary issuers):
12                Results relief - no
13                extremes; hard work ahead
14                and attachment
15
16
17                (EXHIBITS TO BE PRODUCED)
18
19
20
21
22
23
24
25
```

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL
CASE NO.: 14-cv-9662(JSR)

CHIA-LIANG LIAN
April 27, 2016

Page 9

1    P R O C E E D I N G S
2   Los Angeles, California; Wednesday, April 27, 2016
3      9:33 a.m.
4      **THE VIDEOGRAPHER:** We are on the record at
5   9:33 a.m.
6      Good morning.  This is the video deposition
7   of Chia-Liang Lian taken in the matter of In Re
8   Petrobras Securities Litigation, Case No. 14-CV-9662
9   (JSR).
10     Today's date is Wednesday, April 27, 2016.
11  We are located at 865 South Figueroa Street in
12  Los Angeles, California.
13     My name is Jon Seidel with Ellen Grauer
14  Court Reporting, located at 126 East 56th Street in
15  New York, New York.
16     Will all counsel please identify themselves
17  for the record.
18     **MS. ELLIS:** Sure.  K.C. Ellis and Luke
19  Barefoot from Cleary Gottlieb Steen & Hamilton for
20  the Petrobras defendants.
21     **MS. COMBS:** Marianne Combs of Skadden Arps
22  for the Underwriter defendants.
23     **MR. SCHOCHET:** Ira Schochet from Labaton
24  Sucharow representing the Employees Retirement
25  System of the State of Hawaii.

Page 10

1      LIAN - CONFIDENTIAL
2      **MR. LANDES:** Ryan Landes of Quinn Emanuel
3   on behalf of the plaintiffs in the PIMCO action and
4   the witness.
5      **MS. BIRD:** And Kristen Bird of Quinn
6   Emanuel, also on behalf of the plaintiffs in --
7   in -- Western Asset plaintiffs.
8      **THE VIDEOGRAPHER:** Thank you.
9      **MS. ENNIS:** Evan Ennis of King & Spalding
10  for defendant PwC Brazil.
11     **THE REPORTER:** Please raise your right
12  hand.
13     Do you declare under penalty of perjury to
14  tell the truth, the whole truth, and nothing but the
15  truth?
16     **THE WITNESS:** Yes.
17
18     **EXAMINATION**
19     **BY MS. ELLIS:**
20  Q.  Please state your name for the record.
21  **A.  Chia-Liang Lian.**
22  Q.  And your business address?
23  **A.  Western Asset Management, 385 East Colorado**
24  **Boulevard, CA 91101.**
25  Q.  Have you ever been deposed before?

Page 11

1      LIAN - CONFIDENTIAL
2   **A.  No.**
3   Q.  Have you ever testified under oath?
4   **A.  No.**
5   Q.  You understand that the oath you took today
6   has the same effect as an oath that you would take
7   to testify before a jury or a judge?
8   **A.  Yes.**
9   Q.  I would like to just go over a few rules of
10  the road so that we're on the same page for the day.
11  The court reporter will be recording everything you
12  say; so it is important that you provide verbal
13  answers only, rather than just nodding or saying
14  "uh-huh."
15     Is that okay?
16  **A.  Yes.**
17  Q.  Only one person can speak at a time; so if
18  you could let me finish my questions before you
19  provide your responses, and I'll let you finish your
20  responses before I go on to the next question.
21     Is that okay?
22  **A.  Yes.**
23  Q.  And please tell me if you don't understand
24  a question.  If you do answer a question, I will
25  assume that you understood what I asked.

Page 12

1      LIAN - CONFIDENTIAL
2      Is that okay?
3   **A.  Yes.**
4   Q.  There may be objections from your counsel
5   to my questions from time to time.  Please go ahead
6   and answer unless she specifically directs you not
7   to answer.
8      Is that okay?
9   **A.  Yes.**
10  Q.  If at any point you'd like to take a break,
11  we can definitely do that.  I would just ask that we
12  not take a break while there is a question pending.
13     Is that okay?
14  **A.  Yes.**
15  Q.  Are there any circumstances today that
16  would prevent you from giving your testimony?
17  **A.  No.**
18  Q.  What did you do to prepare for this
19  deposition?
20  **A.  I met with my counsel.**
21  Q.  When did you meet with them?
22  **A.  I cannot recall the exact date.**
23  Q.  About approximately a week ago?  A month
24  ago?
25  **A.  Yesterday.  And another time, probably**

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL
CASE NO.: 14-cv-9662(JSR)

CHIA-LIANG LIAN
April 27, 2016

---

Page 13

1      LIAN - CONFIDENTIAL
2   about two or three weeks ago.
3   Q.   And how long did you meet?
4   A.   It was probably about five, six hours.
5   Q.   Total?
6   A.   Total?  Probably about ten.
7   Q.   And did you look at any documents during
8   your meetings with counsel?
9   A.   Docu- -- yes.
10  Q.   And did any of those documents refresh your
11  recollection?
12  A.   No.
13  Q.   Did you meet with or speak with anyone
14  besides counsel to prepare?
15  A.   No.
16  Q.   Did you ever speak with Mark Hughes about
17  this deposition?
18  A.   No.
19  Q.   What about Steven Saruwatari?
20  A.   No.
21  Q.   Did you review any documents on your own
22  without counsel to prepare for this deposition?
23  A.   No.
24  Q.   Do you recall receiving a notice to
25  preserve documents relating to Petrobras or

---

Page 14

1      LIAN - CONFIDENTIAL
2   Petrobras Securities?
3   A.   No.
4   Q.   During this deposition, I will refer to
5   Western Asset Management Company as "Western Asset."
6      Is that okay?
7   A.   That's fine.
8   Q.   And I will refer to the period from
9   October 16, 2010, to June 15, 2015, as "the relevant
10  period."
11     Is that okay?
12  A.   Yes.
13     (Exhibits 1, 2, and 3 were marked for
14     identification.)
15  MS. ELLIS:  This is 2.
16  Q.   Mr. Lian, if you could direct your
17  attention to what has been marked as Exhibit 1.
18  This is a list that we created of the funds that are
19  sponsored by Western Asset that are plaintiffs in
20  this lawsuit.
21     If just for purposes of today's deposition
22  we refer to those 52 entities listed here -- the
23  list begins with Western Asset Total Return
24  Unconstrained TRU Bond Master Fund, LTD, and ends
25  with Legg Mason Western Asset Global Credit Absolute

---

Page 15

1      LIAN - CONFIDENTIAL
2   Return Fund.  If we refer to these 52 entities
3   listed here as "the Western Asset funds," will you
4   understand what I'm referring to?
5   A.   I do not manage these funds individually,
6   but I do know that there is -- there is a -- there
7   is a range of funds available on all platform.
8   Q.   Okay.  So if I refer to these 52 -- and you
9   can keep that to refer to -- as "the Western Asset
10  funds," is that okay?
11  A.   Yes.
12  Q.   And looking now at what has been marked as
13  Exhibit 2, this is another list that we've created.
14  And these are 17 -- these 17 entities in this list
15  beginning with the Boeing Company Employee
16  Retirement Plans Master Trust and ending with PCS
17  Administration Master Pension Trust -- these 17
18  entities are plaintiffs in the same action that were
19  advised by Western Asset.
20     If I refer to these 17 entities as "the
21  separate account plaintiffs," is that okay?
22  A.   I do not manage these funds directly, but I
23  believe these are funds that are separate accounts
24  that are managed by Western Asset Management.
25  Q.   And, finally, if we look at what has been

---

Page 16

1      LIAN - CONFIDENTIAL
2   marked as Exhibit 3, this is a list we created of
3   entities in other actions that were also advised by
4   Western Asset.  If I refer to these entities as "the
5   other action plaintiffs," is that okay?
6   A.   I am not directly responsible for these
7   funds, but I believe this -- funds are separate
8   accounts managed by Western Asset.
9   Q.   So if I use the term "the other action
10  plaintiffs," you'll understand that I'm referring to
11  that list?
12  A.   Yes.
13  Q.   Thank you.
14     Would you please describe your educational
15  background beginning with college.
16  A.   I graduated with a Bachelor's Degree of --
17  a Bachelor's Degree in Economics from the National
18  University of Singapore in 1993.  I also am a holder
19  of a CFA designation or Charter Financial Analyst.
20  Q.   And when did you receive that designation?
21  A.   If memory serves me right, it was the year
22  2000.
23  Q.   And can you please describe your employment
24  following college?
25  A.   I started my career with a central bank in

---

Page 17

LIAN - CONFIDENTIAL

1  Singapore, Monetary Authority of Singapore. I spent
2  about four years, from '93 to '97. After that, I
3  joined Merrill Lynch in Singapore. This was '97,
4  roughly, to the year 2001, following which I joined
5  J.P. Morgan, '01 to '05.
6  Between '05 and 2011, I was a portfolio
7  manager with the firm PIMCO, but based in Singapore.
8  August of 2011, I joined Western Asset's Singapore
9  office as head of Asia. Roughly about two years
10  ago, I was reappointed or redesignated as co-head of
11  emerging markets for Western Asset to get --
12  alongside a former -- an employee, Keith Gardner.
13  The -- the transition period for the
14  leadership was to be two years, the first year both
15  of us being co-heads. This was March 2014 to
16  March 2015.
17  Since March 2015, I am the sole head of
18  emerging markets, while Keith continues to be
19  employee on the firm -- on the -- with the firm as
20  an advisor to the emerging markets team.
21  Q. While you were at J.P. Morgan and Merrill
22  Lynch, what sorts of -- what sort of work were you
23  doing there?
24  A. Sovereign credit --

Page 18

LIAN - CONFIDENTIAL

1  MS. BIRD: Objection. I'm sorry.
2  Objection to form.
3  THE WITNESS: Sovereign credit research.
4  BY MS. ELLIS:
5  Q. At both places?
6  A. Yes.
7  Q. And did you have a focus on particular
8  types of sovereigns?
9  A. Predominantly Asia, but we -- I was part of
10  the global emerging markets research team with both
11  companies and, therefore, worked in partnership with
12  colleagues covering all emerging markets zones or
13  regions.
14  Q. Did you have any responsibility for Brazil?
15  A. I do not.
16  MS. BIRD: Objection to form.
17  BY MS. ELLIS:
18  Q. And while you were at -- at PIMCO in
19  Singapore, what was your role there?
20  A. I was head of the Asia -- Asia team in
21  PIMCO.
22  Q. And in that role, did you have any focus on
23  emerging markets?
24  A. Yes.

Page 19

LIAN - CONFIDENTIAL

1  Q. Have you worked in emerging markets, then,
2  for most of your career?
3  MS. BIRD: Objection to form.
4  THE WITNESS: Yes. With a focus in
5  emerging Asia.
6  BY MS. ELLIS:
7  Q. How did your role change when you became
8  co-head of EM with Keith Gardner?
9  A. The responsibility broadened from Asia to
10  global emerging markets.
11  Q. Did you have investment responsibilities
12  while you were at PIMCO?
13  MS. BIRD: Objection to form.
14  MR. SCHOCHET: Objection to form.
15  Could we have a stipulation that one
16  objection on behalf of plaintiffs serves as an
17  objection on behalf of all plaintiffs?
18  MS. ELLIS: Yes.
19  MR. SCHOCHET: Thank you.
20  BY MS. ELLIS:
21  Q. Did you have investment responsibilities
22  while you were at PIMCO?
23  A. Yes.
24  Q. For what portfolio?

Page 20

LIAN - CONFIDENTIAL

1  A. Asia portfolios.
2  Q. Did you have any responsibility for Brazil
3  while in -- while at PIMCO?
4  MS. BIRD: Objection to form.
5  THE WITNESS: No, I do not.
6  BY MS. ELLIS:
7  Q. Did you ever have any focus on Petrobras
8  while at PIMCO?
9  A. No, I did not.
10  (Exhibit 4 was marked for
11  identification.)
12  BY MS. ELLIS:
13  Q. Do you recognize this e-mail chain?
14  MS. BIRD: And just for the record, has
15  this been marked as Exhibit 4?
16  MS. ELLIS: Yes, apologies.
17  Q. So you've just been handed what has been
18  marked as Exhibit 4. This is an e-mail chain. The
19  first e-mail in the chain is dated January 24, 2015,
20  and this bears Bates stamps Western 00015200 to
21  15213.
22  MS. BIRD: And, again, sorry, but just for
23  the record, I think the first e-mail in the chain
24  starts at the back, which is dated January 16, 2015,

Page 21

LIAN - CONFIDENTIAL

1    and the last e-mail in the chain is January 24,
2    2015.
3    **BY MS. ELLIS:**
4    Q.  Do you recognize this e-mail chain?
5    **A.  Give me some time.**
6    Q.  Sure.
7    **A.  I do not recall this e-mail trail.**
8    Q.  Looking at the subject line, what is
9    account 3310?
10   **A.  Account 3310 is an emerging market high**
11   **yield credit fund.**
12   Q.  And it appears that the context of this
13   e-mail was that a client was concerned about
14   underperformance in that account?
15   **MS. BIRD:** Objection to form.
16   **THE WITNESS:** I believe this -- on the
17   basis of looking at this e-mail trail, the client
18   might have been concerned about performance.
19   **BY MS. ELLIS:**
20   Q.  Looking at the first page of this document
21   at the paragraphs labeled 1 and 2, does this
22   accurately summarize your transition to your current
23   position?
24   **MS. BIRD:** Objection to form.

Page 22

LIAN - CONFIDENTIAL

1    **THE WITNESS:** The responses in question 1
2    and 2 generally reflects accurately the transition
3    period of leadership.
4    **BY MS. ELLIS:**
5    Q.  Were you promoted in April of 2014 or
6    March 2014?
7    **A.  The announcement was made in March; so**
8    **there probably was a formal date.  Again, could be**
9    **April 1.  You know, I -- I'm just not sure of the**
10   **exact date.**
11   Q.  And has Mr. Garner now retired?
12   **A.  He will be retiring end of this week,**
13   **May 1.**
14   Q.  So in January of 2015, you moved from
15   Singapore to Pasadena?
16   **A.  Yes.**
17   Q.  And did your responsibilities change at all
18   when you moved?
19   **A.  To the extent that I took up the**
20   **responsibility as global head of emerging markets**
21   **and the transition had already taken place, in the**
22   **last -- since March, April of 2014, those**
23   **responsibilities did not meaningfully change apart**
24   **from my relocation.**

Page 23

**LIAN - CONFIDENTIAL**

1    Q.  So from March 2014 to January 2015, you
2    were in charge of EM portfolios while in Singapore?
3    **A.  No.  That first year of transition, it was**
4    **a co-headship.  I was co-head of global emerging**
5    **markets alongside my colleague Keith Gardner.**
6    Q.  So -- but you had responsibilities for
7    global EM portfolios while still in Singapore?
8    **A.  Yeah.**
9    **MS. BIRD:** Objection to form.
10   **THE WITNESS:** That is correct.
11   **BY MS. ELLIS:**
12   Q.  Does the Singapore office perform
13   investment-related activities or just client service
14   activities?
15   **A.  Investment and client activities.**
16   Q.  And how large is the Singapore office
17   compared to the Pasadena office?
18   **A.  Could you clarify size difference?**
19   Q.  Number of employees.
20   **A.  In Singapore, the office was probably 22,**
21   **23 strong.  I'm not exactly sure how many employees**
22   **are in Pasadena, but it would be several times --**
23   Q.  Several times.
24   **A.  -- more than that in Singapore.**

Page 24

**LIAN - CONFIDENTIAL**

1    Q.  And you worked with those employees in
2    Pasadena from Singapore while you were EM co-head?
3    **MS. BIRD:** Objection to form.
4    **THE WITNESS:** That is right.  But since I
5    joined Western Asset in August of 2011, I --
6    Singapore by design focuses on emerging markets, and
7    that is a subset of the emerging markets business,
8    and, therefore, the partnership existed even prior
9    to my co-headship.
10   **BY MS. ELLIS:**
11   Q.  So you would have been involved in
12   discussions regarding global EM portfolios starting
13   in 2011?
14   **MS. BIRD:** Objection to form.
15   **THE WITNESS:** That is not correct.  The
16   discussion focuses on emerging markets in the
17   context of a global portfolio and less to do with my
18   involvement with the other regions.
19   **BY MS. ELLIS:**
20   Q.  Do you have investment responsibilities in
21   your current role?
22   **A.  Yes, I do.**
23   Q.  And any responsibilities for placing orders
24   for trades?

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL
CASE NO.: 14-cv-9662(JSR)

CHIA-LIANG LIAN
April 27, 2016

Page 25

1     LIAN - CONFIDENTIAL
2  A.  Yes, I do.
3  Q.  Who do you report to now?
4  A.  I report to the chief investment officer,
5  Ken Leech.
6  Q.  And who did you report to prior to April
7  or -- or March 2014?
8  A.  While I was based in Singapore, I was
9  directly reporting in to Ken Leech as head of
10  emerging Asia.
11  Q.  Are you currently employed by anyone other
12  than Western Asset?
13  A.  No.
14  Q.  Are you currently or have you ever been an
15  officer of any company?
16  A.  Could you clarify your question?
17  Q.  Have you ever had a role on a board of any
18  company?
19  A.  No.
20  Q.  Or been an officer of a company?
21  A.  No.
22  Q.  You stated earlier that you don't believe
23  that you manage the portfolio for the Western Asset
24  funds directly; is that correct?
25     MS. BIRD: Objection to form.

Page 26

1     LIAN - CONFIDENTIAL
2     THE WITNESS: What I meant is that I'm not
3  the primary assigned portfolio "managers" for those
4  portfolio.
5     BY MS. ELLIS:
6  Q.  Who is the primary assigned portfolio
7  manager?
8     MS. BIRD: Objection to form.
9     THE WITNESS: A range of investment
10  managers depending on the mandate of each final
11  account.
12     BY MS. ELLIS:
13  Q.  What types of portfolios do you directly
14  manage?
15     MS. BIRD: Objection to form.
16     THE WITNESS: I manage emerging market
17  portfolios.
18     BY MS. ELLIS:
19  Q.  With any specific focus?
20  A.  I'm not sure what the question is targeting
21  at, but asset classes that pertains to non-developed
22  markets come under my responsibility -- direct
23  responsibility.
24  Q.  Do you have indirect management of
25  responsibilities for other Western Asset funds?

Page 27

1     LIAN - CONFIDENTIAL
2  A.  We -- that term doesn't exist in the firm,
3  but as the sector head of emerging markets, we are
4  responsible for updates and strategies for
5  allocations to emerging markets across the firm's
6  portfolios.
7  Q.  So are you ultimately responsible for all
8  EM-related trading decisions?
9     MS. BIRD: Objection to form.
10     THE WITNESS: Discussions of ideas and
11  strategies directed by myself to the committee --
12  again, positionings and extra allocation can vary
13  from time to time depending on client mandates, and
14  that is where the assigned primary portfolio
15  managers are responsible. We provide the strategic
16  inputs to the internal audience.
17     BY MS. ELLIS:
18  Q.  You mentioned a committee. Who is on that
19  committee that you mentioned?
20  A.  I don't think I mentioned a committee.
21  Q.  You said, "Discussions of ideas and
22  strategies directed by myself to the committee."
23  A.  Oh.
24  Q.  Is there a committee of portfolio managers?
25  A.  Okay. So those committees are the global

Page 28

1     LIAN - CONFIDENTIAL
2  investment strategy committee of which I'm a member.
3     There is also another committee that I
4  lead. It is called the global emerging markets
5  committee. These are committees that -- we meet --
6  represent -- are represented by heads of the
7  respective sectors.
8  Q.  And is the purpose of those committees to
9  develop Western Asset's investment strategy?
10     MS. BIRD: Objection to form.
11     THE WITNESS: Broadly speaking, it is a
12  platform for the exchange of ideas, updates across
13  developed emerging and all other sectors that we are
14  investment managers of.
15     BY MS. ELLIS:
16  Q.  Taking, for an example, the situation of a
17  new issuance in a particular security, would a
18  portfolio manager have to run that by the -- the
19  committee that would be responsible for that area?
20     MS. BIRD: Objection to form.
21     THE WITNESS: The practice is, for a new
22  issue, the sector team will take the lead in
23  considering all factors driving strategic and
24  investment decisions, and the sector teams would
25  typically lead in terms of the discussion and

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL
CASE NO.: 14-cv-9662(JSR)

CHIA-LIANG LIAN
April 27, 2016

Page 29

1    LIAN - CONFIDENTIAL
2  recommendation of whether to participate or not to
3  participate in a given new issue.
4    **BY MS. ELLIS:**
5  Q.  And who would have the ultimate authority
6  for that decision of whether to participate in the
7  new issue?
8    **MS. BIRD:** Objection to form.
9    **THE WITNESS:** The decision, again, I'm not
10 sure -- could you clarify your question?
11   **BY MS. ELLIS:**
12 Q.  So at the end of the day, when Western
13 Asset has to decide whether to participate in the
14 issuance, who has the final say?
15 **A.  It is not that straightforward.  Where the**
16 **emerging markets team come in is to assess a**
17 **particular new issue on its own merits, considering**
18 **all publicly available information and valuation.**
19    **Whether we recommend a participate or pass,**
20 **regardless, individual portfolios managers, global**
21 **or in other sectors, will then consider, in the**
22 **context of our recommendation, whether or not it**
23 **fits into the specific guidelines of the menu of**
24 **funds that we manage for.**
25 Q.  If the recommendation, however, was not to

Page 30

1    LIAN - CONFIDENTIAL
2  purchase, would portfolio managers have any
3  authority to then purchase?
4  **A.  It is normally not the case.  This would**
5  **not normally be the case.**
6  Q.  Normally they would not purchase if the
7  recommendation was not to purchase?
8  **A.  That is generally the rule.**
9  Q.  And if the recommendation was generally
10 that the purchase was a good one, it would depend --
11 depend on the investment guidelines and other
12 specifics for each individual portfolio?
13 **A.  Generally, that is -- that is the guiding**
14 **principle.**
15 Q.  So looking back at the three lists that are
16 marked as Exhibits 1, 2, and 3, did you serve as the
17 portfolio manager for any of these entities?
18   **MS. BIRD:** At any time?
19   **BY MS. ELLIS:**
20 Q.  First at any time and then, in particular,
21 during the relevant time period.
22 **A.  Exhibit 1, No. 2.**
23 Q.  And could you read that name, please.
24 **A.  Western Asset Emerging Markets Corporate**
25 **Credit Securities Portfolio, LLC.**

Page 31

1    **LIAN - CONFIDENTIAL**
2  Q.  And when did you serve as the portfolio
3  manager for that entity?
4  **A.  I believe it is roughly from mid-2014**
5  **onwards.  No. 9, Legg Mason Global Funds PLC,**
6  **Western Asset Emerging Market Corporate Bond Fund.**
7  Q.  In the same time period?
8  **A.  I believe so.**
9    **10, Legg Mason Western Asset Emerging**
10 **Markets Total Return Bond Fund.  Roughly around the**
11 **same time as well.**
12    **22, Western Asset Emerging Markets Debt**
13 **Fund, Inc.**
14    **23, Western Asset Emerging Markets Income**
15 **Fund.**
16 Q.  I'm sorry.  That is Western Asset Emerging
17 Markets Income Fund II, Incorporated?
18 **A.  That's correct.**
19    **34, Western Asset Emerging Markets Debt**
20 **Fund.**
21    **I believe 24 comes under my charge as well.**
22 **Western Asset Worldwide Income Fund, Inc.**
23 Q.  Is that it?
24 **A.  To the best of my knowledge, yes.**
25 Q.  So for numbers 2, 9, 10, 22, 23, 24, and 34

Page 32

1    LIAN - CONFIDENTIAL
2  on Exhibit 1, you were the portfolio manager and
3  would have had sole responsibilities for decisions
4  to purchase --
5    **MS. BIRD:** Objection to form.
6    **BY MS. ELLIS:**
7  Q.  -- from roughly mid-2014 onwards?
8  **A.  So --**
9    **MS. BIRD:** Same objection.
10   **THE WITNESS:** So -- could you repeat the
11 question?
12   **BY MS. ELLIS:**
13 Q.  Would you have had ultimate authority on
14 whether or not to purchase in these funds during the
15 period that you were the portfolio manager?
16 **A.  I would be ultimately responsible for these**
17 **portfolios assigned to me.  Again, all purchases and**
18 **sales and transactions related to these funds are**
19 **premised on a collaborative team-based approach in**
20 **making decisions.**
21 Q.  Do you have an understanding of the
22 remaining entities on this list who would have been
23 the portfolio manager during the relevant time
24 period?
25 **A.  To the extent that we have interactions**

Page 33

1      LIAN - CONFIDENTIAL
2  internally and among the different desks, I have
3  some knowledge on some of these funds, but not all.
4  Q.  Which portfolio managers would have been
5  involved for the ones that you -- for the ones that
6  you know?
7      MS. BIRD: Objection to form.
8      THE WITNESS: For instance, our CIO, Ken
9  Leech, is the -- the lead manager, I believe, for
10  fund No. 7, the Macro Opportunities Bond Fund.
11      BY MS. ELLIS:
12  Q.  And do you know any others?
13  A.  I know about the sectors -- for instance,
14  high-yield fund or investment-grade fund, but I do
15  not know the exact -- I'm sorry.  There is no
16  investment-grade fund here, but high-yield fund
17  or -- but I do not know whom the ultimate assigned
18  portfolio manager is for each of the specific fund.
19  Q.  Looking at Exhibit 2, were you the
20  portfolio manager for any of these entities during
21  the relevant time period?
22  A.  I do not believe that I have response --
23  portfolio management responsibilities in a direct
24  sense in the listed accounts in Exhibit 2.
25  Q.  Do you know who does or who did?

Page 34

1      LIAN - CONFIDENTIAL
2  A.  No, I do not.
3  Q.  And what about the entities in Exhibit 3?
4  Were you the portfolio manager for any of these
5  entities during the relevant time period?
6  A.  I'm not directly responsible for these five
7  accounts on Exhibit 3.
8  Q.  Do you have some responsibility for these
9  five accounts?
10  A.  No, I do not.
11  Q.  Do you know who does?
12  A.  I do not.
13  Q.  We discussed a little bit the process for a
14  new issuance as an example of the research -- of the
15  research that would go in in the collaborative
16  process at Western Asset.  Would the process be any
17  different for secondary market purchases?
18      MS. BIRD: Objection to form.
19      THE WITNESS: The essence of the investment
20  process is not dissimilar, whether it is a primary
21  new issue or in terms of secondary market
22  transactions.
23      BY MS. ELLIS:
24  Q.  And specifically for secondary market
25  transactions in emerging markets issuances, would

Page 35

1      LIAN - CONFIDENTIAL
2  the research process be the same?
3  A.  Yes.  The process would be similar.
4      MS. ELLIS: 5.
5      (Exhibit 5 was marked for
6      identification.)
7      BY MS. ELLIS:
8  Q.  You've just been handed what has been
9  marked as Exhibit 5, which are the Western Asset
10  Funds Amended Responses to Defendants'
11  Interrogatories dated April 7, 2016.
12      Have you seen this document before?
13  A.  I do not believe I've seen this document.
14  Q.  If you could turn to the response to
15  interrogatory No. 1, which is on page 6, this asks
16  the Western Asset funds to "Identify all persons,
17  whether or not employed by you, who determine
18  whether to buy, sell, hold, hedge, or lend Petrobras
19  Securities."
20      Looking at the last paragraph of the
21  response, this states that yourself, Keith Gardner,
22  and Matt Duda made trading decisions for the
23  Petrobras securities during the relevant time
24  period.
25      To your knowledge, are you three the only

Page 36

1      LIAN - CONFIDENTIAL
2  individuals who made trading decisions with respect
3  to Petrobras Securities for the Western Asset funds,
4  the separate account plaintiffs, and the other
5  action plaintiffs during the relevant time period?
6  A.  As the senior members of the emerging
7  markets team, we are the members that made trading
8  decisions for Petrobras and all emerging
9  market-related securities.
10  Q.  During what time period respectively were
11  each of you responsible for making those trading
12  decisions for Petrobras Securities?
13  A.  Could you -- I'm not sure what the -- could
14  you clarify your question?
15  Q.  Sure.  So your responsibility for making
16  trading decisions for Petrobras Securities -- did
17  that begin in March 2014 or did that predate your
18  promotion to co-head?
19  A.  So as co-head alongside Keith Gardner
20  effective March 2014, we are responsible for making
21  those trading decisions.  Keith has been co-head --
22  I'm sorry -- head, co-head, and then, lately,
23  advisor.  So over that -- over the set relevant
24  period of time, Keith would also be responsible.
25  Q.  So beginning in 2010?

Page 37

1    LIAN - CONFIDENTIAL
2  **A.  That's correct.  Matt Duda -- I cannot**
3  **recall when he left the firm.  I believe it was**
4  **sometime around mid-2014 -- yeah, mid-2014.  So he**
5  **would be driving decisions alongside myself and**
6  **Keith in the different points in time during the**
7  **relevant period.**
8  Q.  So from the beginning of the relevant time
9  period until he left the firm around mid-2014?
10  **A.  I believe so.**
11  Q.  For non-emerging markets-focused accounts,
12  would the relevant portfolio manager have had a role
13  in making trading decisions for Petrobras
14  Securities?
15  **A.  Again --**
16     **MS. BIRD:** Objection to form.
17     Sorry.
18     **THE WITNESS:** We take a collaborative
19  approach to making investment decisions.  We are
20  responsible for the emerging markets sector.  And as
21  mentioned earlier, we would make recommendations,
22  but the -- you know, ultimately, it all depends on
23  nondedicated portfolios mandates that will differ
24  significantly one from another, but it would be
25  based on discussions with us and with the primary

Page 38

1    LIAN - CONFIDENTIAL
2  portfolio manager.
3     **BY MS. ELLIS:**
4  Q.  So the three of you would have been at
5  least involved in all discussions regarding
6  Petrobras trading decisions during the relevant time
7  period?
8  **A.  Most -- I'm -- all discussions I'm not**
9  **sure, but most of the discussions would be driven**
10  **between both sides.**
11  Q.  Do you know of any instances where
12  purchases of Petrobras Securities for plaintiffs --
13  so sorry -- for the Western Asset funds, the
14  separate account plaintiffs, and the other action
15  plaintiffs were made for non-EM funds without these
16  three people -- yourself, Keith Gardner, and Matt
17  Duda -- being involved?
18  **A.  To the best of my knowledge, most of these**
19  **transactions are -- trades would have involved some**
20  **prior discussions in one form or another.**
21  Q.  And you can think of no examples of a
22  situation where the three of you were not involved
23  and a purchase was made?
24  **A.  To the best of my knowledge, I do not think**
25  **so.**

Page 39

1    **LIAN - CONFIDENTIAL**
2  Q.  If you could turn to interrogatory No. 2,
3  this asks the Western Asset funds to "Identify all
4  persons employed by you who were responsible in any
5  respect, including by having investment authority or
6  discretion, for your investment, buying, selling,
7  holding, hedging, short selling, or lending of any
8  Petrobras Securities."
9     Looking at the last two sentences of this
10  response, this states that Mark Hughes and Robert
11  Abad performed research regarding Petrobras
12  Securities.  Did these individuals report to you
13  during the relevant time period?
14  **A.  Yes.**
15  Q.  Beginning in March 2014 or beginning
16  earlier?
17  **A.  March 2014.**
18  Q.  Did both Mark Hughes and Robert Abad
19  perform the same role with respect to the research
20  they performed?
21     **MS. BIRD:** Objection to form.
22     **THE WITNESS:** The roles are not identical.
23  Mark is a senior credit research analyst.  For Rob,
24  in addition to credit research role, he also manages
25  emerge -- portfolios.

Page 40

1    LIAN - CONFIDENTIAL
2     **BY MS. ELLIS:**
3  Q.  So he also has a -- he is also a portfolio
4  manager in addition to his research analyst role?
5  **A.  Correct.**
6  Q.  What types of portfolios does he manage?
7  **A.  Emerging market high-yield portfolios.**
8  Q.  And did he have those portfolio management
9  responsibilities for the entire relevant period?
10     **MS. BIRD:** Objection to form.
11     **THE WITNESS:** I do not recall the specific
12  time, but right till mid-2014 he was a portfolio
13  manager.
14     **BY MS. ELLIS:**
15  Q.  That is when he first became a portfolio
16  manager?
17  **A.  Yes.**
18  Q.  Is Robert Abad, or was he ever during the
19  relevant time period, a portfolio manager for any of
20  the entities we've discussed in Exhibits 1
21  through 3?
22     **MS. BIRD:** Objection to form.
23     **THE WITNESS:** I do not believe so.
24     **BY MS. ELLIS:**
25  Q.  If we could turn to interrogatory No. 3 on

Page 41

1    LIAN - CONFIDENTIAL
2  page 8, this asks the Western Asset funds to
3  "Identify all persons not employed by you, including
4  investment advisors or any other investment
5  professionals, who are responsible in any respect,
6  including by having investment authority or
7  discretion, for your investment, buying, selling,
8  holding, hedging, short selling, or lending of any
9  Petrobras Securities."
10    In looking at the last paragraph, this
11  states that Matt Duda is a former employee of
12  Western Asset and made trading decisions for the
13  Petrobras Securities during the relevant time
14  period -- time frame, I'm sorry -- and Jeff Nuruki
15  is a former employee of Western Asset and performed
16  research related to the Petrobras Securities during
17  the relevant time frame.
18    Did these individuals leave Western Asset
19  before you were promoted to co-head of EM?
20  **A.  Both left after I was appointed co-head.**
21  Q.  So they reported to you?
22  **A.  Until they left, yes.**
23  Q.  Do you know respectively when they each
24  left?
25  **A.  As far as I could recall, Matt -- probably**

Page 42

1    LIAN - CONFIDENTIAL
2  **sometime mid-2014; Jeff Nuruki, mid-2015.**
3  Q.  I'd like to discuss a little bit more the
4  research process that we were discussing.  Do you
5  perform your own research or do you rely exclusively
6  on research analysts?
7    **MS. BIRD:** Objection to form.
8    **THE WITNESS:** We have different team
9  members performing different primary roles; so
10  research analysts by designation are charged with
11  the responsibility of analyzing credits.
12    **BY MS. ELLIS:**
13  Q.  And do you perform any research as a
14  portfolio manager?
15  **A.  As head and portfolio manager of emerging**
16  **marketing markets, I do look across macroanalysis,**
17  **"macro" being economic-brought market analysis.  I**
18  **rely on my corporate credit colleagues in terms of**
19  **focusing on a list of hundreds of companies that we**
20  **focus on.**
21  Q.  So is it fair to say that the research
22  analysts focus more on the issuer-level research and
23  you focus more on the macroeconomic overarching
24  research?
25  **A.  Generally, that is the rule.**

Page 43

1    **LIAN - CONFIDENTIAL**
2  Q.  And what types of work product do research
3  analysts produce when they look into a particular
4  issuer?
5    **MS. BIRD:** Objection to form.
6    **THE WITNESS:** I'm not sure if I understand
7  your question.
8    **BY MS. ELLIS:**
9  Q.  In order to present the research that
10  they've done to you, do they write formal reports?
11  Is it usually verbal?  Or how is that research
12  communicated up to you?
13  **A.  It would be a combination of all forms**
14  **of -- multiple forms of communication in writing,**
15  **verbal discussion, and others.**
16  Q.  Under what particular circumstances do
17  analysts look into a particular issuer?
18  **A.  I -- could you --**
19  Q.  Are there any triggers that would lead you
20  to request a research report or to have research
21  analysts look into a particular issuer?
22    **MS. BIRD:** Objection to form.
23    **THE WITNESS:** The way we look at research
24  is that all investment decisions are fundament --
25  based on fundamentals.  It is not evoked or asked of

Page 44

1    LIAN - CONFIDENTIAL
2  only when required.  It is a necessary part of the
3  investment process.
4    **BY MS. ELLIS:**
5  Q.  Is there a particular list of emerging
6  markets issuers that are routinely covered where
7  research analysts keep up-to-date on those issuers?
8  **A.  All corporate securities that we cover are**
9  **routinely reported as earnings and other information**
10  **become available.**
11  Q.  And you mentioned corporate securities that
12  you cover.  Is that broader than the securities that
13  Western Asset holds?
14  **A.  I'm sorry.  I don't think I understand the**
15  **question.**
16  Q.  You mentioned that you -- that there is
17  certain corporate securities that you cover.  Does
18  -- is that list broader than the securities
19  that Western Asset holds in its accounts?
20  **A.  We do not -- I do not cover or am directly**
21  **responsible for individual corporate credits.  What**
22  **I would suggest is that there are securities that**
23  **emerging market portfolios may have exposure to that**
24  **other non-EM portfolios may not necessarily have**
25  **exposure to.**

Page 45

1    LIAN - CONFIDENTIAL
2  Q.  Do research analysts monitor any issuers
3  that are not currently in Western Asset's
4  portfolios?
5  A.  It is possible to the extent that it is a
6  first-time issuer, or there are already bonds
7  outstanding that we do not currently have exposure
8  to but are considering adding.
9  Q.  And what sources of information do research
10  analysts rely on when looking at a particular
11  issuer?
12    MS. BIRD: Objection to form.
13    THE WITNESS: Publicly available
14  information, particularly by companies or country
15  data.  In the case of sovereign credit research, we
16  also rely on sell-side brokerage reports.  We also
17  look to non-brokerage independent reports, as well
18  as analysis from rating agencies.
19    BY MS. ELLIS:
20  Q.  Was Petrobras one of the issuers that was
21  routinely covered by research analysts throughout
22  the relevant time period?
23    MS. BIRD: Objection to form.
24    THE WITNESS: I believe so.
25    BY MS. ELLIS:

Page 46

1    LIAN - CONFIDENTIAL
2  Q.  When they conduct research on a new
3  issuance, do research analysts typically --
4  typically make a recommendation to you about whether
5  or not to buy that new issuance?
6  A.  For new issue, it would be a collaboration
7  of both myself, the research analyst, as well as the
8  trader on the desk.
9  Q.  And in that collaboration, what role would
10  each of you have?
11  A.  The research analyst would cover the
12  extensive analysis on a stand-alone basis based on
13  publicly available information.  The trader would
14  analyze the valuations predominantly in terms of
15  where pricing comes in.  I would provide that
16  big-picture macro sort of analysis of background to
17  ascertain from overall market technical standpoint
18  if the new issue -- to make a recommendation on the
19  new issue.
20  Q.  So you would -- you would be the one to
21  ultimately make that recommendation?
22  A.  As head of the emerging markets team, all
23  EM-related decisions would fall under my
24  responsibility.
25  Q.  When discussing the type of information

Page 47

1    LIAN - CONFIDENTIAL
2  that you look at when researching the publicly
3  available information, you said that one of the
4  things you look at are analyst sell-side reports for
5  credit sovereign research.  Do you also look at
6  those things and consider them for nonsovereign
7  corporate credits?
8  A.  Yes.
9    (Exhibit 6 was marked for
10    identification.)
11    BY MS. ELLIS:
12  Q.  So you've just been handed what has been
13  marked as Exhibit 6, which is a document bearing
14  Bates stamps Western 01497891 to 7907.
15    Do you recognize this form of document?
16  A.  I do not recognize this specific document,
17  but I do recognize the format of this document.
18  Q.  What is a request for proposal?
19  A.  Typically, when a prospect or a client
20  needs an information or are interested -- is
21  interested in a particular mandate, they would ring
22  up -- they would contact Western Asset with a list
23  of questions, and this document essentially reflects
24  the responses to the client's or prospect's inquiry.
25  Q.  So when you said that you recognize this

Page 48

1    LIAN - CONFIDENTIAL
2  general form of document, you meant a request for
3  proposal, generally?
4  A.  Correct.
5  Q.  And in looking at the page with the Bates
6  stamps 7894 -- it is page 1 of the document -- this
7  document is meant to outline Western Asset's
8  investment philosophy and process and its investment
9  style; is that correct?
10    MS. BIRD: Objection to form.
11    THE WITNESS: This is an executive summary.
12  It reflects the firm's investment philosophy.
13    BY MS. ELLIS:
14  Q.  If you look at page 6, which has the Bates
15  stamp 7899, under item 10, this document states
16  that:
17    "Western Asset has one investment
18    process based on a team approach
19    using a combination of bottom-up
20    research and top-down macroeconomic
21    analysis that encompasses the use of
22    different fixed-income asset classes.
23    This process is represented by the
24    following figure."
25    Is that an accurate description of Western

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL
CASE NO.: 14-cv-9662(JSR)

CHIA-LIANG LIAN
April 27, 2016

Page 49

1      LIAN - CONFIDENTIAL
2  Asset's research process?
3  **A.   Broadly speaking, yes.**
4  Q.   There is a reference here to one investment
5  process.  So as we discussed, that means Western
6  Asset uses the same general strategy for the funds
7  it sponsors and for its client's individual
8  portfolios?
9  **A.   I believe that that statement was made to**
10 **reflect our philosophy of combining both top-down**
11 **bracket macro with bottom-up corporate or**
12 **microanalysis and dovetail that in a way that**
13 **presents a holistic approach to investment.**
14 Q.   In conducting top-down macroeconomic
15 analysis, is part of your purpose to develop a view
16 on a particular country?
17     MR. SCHOCHET: Objection to form.
18     THE WITNESS: So when we talk -- when I
19 talk about top-down, there are two parts of that.
20 The first part has got to do with global economic
21 developments that captures both developed and
22 emerging.  Macro or top-down for emerging markets
23 would also entail covering countries' specific
24 developments within the emerging markets space.
25     BY MS. ELLIS:

Page 50

1      LIAN - CONFIDENTIAL
2  Q.   And did you perform top-down macroeconomic
3  research with respect to Brazil during the relevant
4  time period?
5  **A.   Till 2015, June; correct?  Is that this --**
6  **yes.  I -- we have colleagues in Sao Paulo who are**
7  **responsible for the country analysis, but as head of**
8  **emerging markets team, I would also be heavily**
9  **involved.**
10 Q.   And who are those colleagues in Sao Paulo?
11 **A.   Paulo Clini, who heads up the investment**
12 **desk.**
13 Q.   Any others?
14 **A.   For macro, predominantly Paulo Clini.**
15 **There is another colleague, Adauto Lima, who is our**
16 **economist based in Sao Paulo.**
17 Q.   Did you develop a view on Brazil during the
18 relevant time period as a result of your research?
19     MS. BIRD: Objection to form.
20     THE WITNESS: Again, I'm not sure what --
21 could you clarify your question?
22     BY MS. ELLIS:
23 Q.   Did Western Asset view Brazil as a good
24 investment -- investments in Brazil as a good
25 investment during the relevant time period based on

Page 51

1      LIAN - CONFIDENTIAL
2  the research they had done into the country?
3      MS. BIRD: Objection to form.
4      MR. SCHOCHET: Objection to form.
5      THE WITNESS: The period concerns -- spans
6  a full-market cycle.  Events change.  Developments,
7  from time to time, evolve.  Our job in analyzing
8  macroeconomic trends is precisely to assess in a
9  timely fashion based on real-time information as
10 they become available.
11     BY MS. ELLIS:
12 Q.   At the beginning of the relevant time
13 period in 2010, did Western Asset have a view on
14 Brazil one way or the other?
15     MS. BIRD: Objection to form.
16     THE WITNESS: I am not certain of the
17 prevailing view at that point in time.
18     BY MS. ELLIS:
19 Q.   What about the prevailing view at the time
20 that you became co-head of EM?
21     MS. BIRD: Same objection.
22     THE WITNESS: There were concerns on the
23 macroeconomic cycle, but there were also elements of
24 valuation that the team believes makes Brazil
25 opportunities interesting.

Page 52

1      LIAN - CONFIDENTIAL
2      BY MS. ELLIS:
3  Q.   What were the concerns that you referenced?
4  **A.   Concerns in regards to the overall impact**
5  **from slowdown in global growth, as well as the**
6  **broader emerging market downdraft and its associated**
7  **impact on individual EM countries, including Brazil.**
8  Q.   And what were the elements that you
9  mentioned made Brazil interesting?
10 **A.   Primarily --**
11     MS. BIRD: Objection -- objection to form.
12     THE WITNESS: Primarily valuations.
13     BY MS. ELLIS:
14 Q.   And what do you mean by "valuations"?
15 **A.   Security prices.  There is also a**
16 **fundamental analysis on Brazil for a long -- from a**
17 **long-term secular perspective as one of the largest**
18 **emerging market countries in the world.**
19 Q.   The fundamental analysis on Brazil -- is
20 that Western Asset's fundamental analysis?
21 **A.   That is correct.**
22 Q.   And what was that long-term fundamental
23 analysis?
24     MS. BIRD: Objection to form.
25     THE WITNESS: Demographics, population,

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL
CASE NO.: 14-cv-9662(JSR)

CHIA-LIANG LIAN
April 27, 2016

Page 53

1    LIAN - CONFIDENTIAL
2  amongst others.
3    BY MS. ELLIS:
4  Q.   And the demographics and population were
5  some of the things that you thought made Brazil an
6  interesting investment?
7  A.   Amongst other factors.
8  Q.   When you said that valuations were
9  primarily what made Brazil an attractive investment,
10  did that mean that you thought that the market
11  prices were lower than, perhaps, the actual value of
12  those investments?
13    MR. SCHOCHET: Objection.
14    MS. BIRD: Objection to form.
15    THE WITNESS: I don't think investment
16  decisions are that simple.  Valuations entails a
17  range of considerations.
18    BY MS. ELLIS:
19  Q.   Looking at the diagram on the bottom of
20  this page, do you have an understanding of what this
21  represents?
22  A.   Yes.
23  Q.   And how would you describe this diagram?
24  A.   I'm not sure.
25    MS. BIRD: Objection to form.

Page 54

1    LIAN - CONFIDENTIAL
2    BY MS. ELLIS:
3  Q.   What is this diagram meant to represent?
4    MS. BIRD: Same objection.
5    THE WITNESS: As what the preceding
6  paragraph says, it is to reflect the investment
7  process.
8    BY MS. ELLIS:
9  Q.   The two circles towards the right-hand side
10  state "strategic portfolio" and then "client
11  portfolio."  What are the differences between a
12  strategic portfolio and a client portfolio?
13  A.   The difference lies primarily on
14  possibility of specific client guidelines that may
15  or may not permit the replication of the strategic
16  portfolio.
17  Q.   If you turn the page, and looking at the
18  second paragraph --
19  A.   Is that page 7?
20  Q.   Page 7, which has Bates stamp 7900.
21  Looking at the second paragraph here, this reads:
22    "The process begins with the outlook
23    for global growth.  The firm analyzes
24    the outlook for each of the major
25    currency blocks, focusing on the

Page 55

1    LIAN - CONFIDENTIAL
2    fundamental factors likely to impact
3    bond and currency markets over the
4    next six months to a year.  These
5    factors include levels and trends in
6    economic activity, inflation, and the
7    outlook for monetary and fiscal
8    policies."
9    Do you agree that this is -- that this is
10  how Western Asset begins its process -- its research
11  process?
12    MS. BIRD: Objection to form.
13    THE WITNESS: A broad agreement.
14    BY MS. ELLIS:
15  Q.   And at this stage in the investment
16  process, there is a focus on fundamental factors
17  likely to impact bond and currency markets?
18    MS. BIRD: Objection to form.
19    THE WITNESS: Again, this is dependent on
20  individual portfolios and guidelines and the
21  mandate.  Currency may or may not be relevant.
22    BY MS. ELLIS:
23  Q.   Focusing, though, not on the client
24  portfolios that we were discussing but on these
25  investments portfolios that were in the preceding

Page 56

1    LIAN - CONFIDENTIAL
2  diagram that -- sorry -- the strategic portfolios in
3  the preceding diagram, is this where the process
4  generally begins?
5  A.   General --
6    MS. BIRD: Objection to form.
7    THE WITNESS: Generally, that is the case.
8    BY MS. ELLIS:
9  Q.   Jumping down a paragraph, this states:
10    "The next stage involves Western
11    Asset's outlook for emerging markets
12    in general.  While the macroeconomics
13    play a dominant role, market
14    technicals not only influence value
15    over the course of the business
16    cycle, but help determine the
17    direction of the asset class over the
18    longer term."
19    What does "market technical" refer to?
20    MS. BIRD: Objection to form.
21    THE WITNESS: Technicals refer to both
22  demand and supply-side factors.  Demand for the
23  bonds by investors, supply in terms of issuance by
24  the issuers.
25    BY MS. ELLIS:

Page 57

1    LIAN - CONFIDENTIAL
2  Q.   And are you involved in the research
3  process described in both the paragraphs we read
4  before, the outlook for global growth and Western
5  Asset's outlook for emerging markets in general?
6  A.   Yes.  Alongside my colleagues in the other
7  generalist and sector teams.
8  Q.   Do you agree that these two stages do not
9  include any consideration of individual issuers?
10 A.   This is a process and at -- this is the
11 top-down process.  And by design, it would not
12 involve individual issuers.
13 Q.   Another paragraph down, this states:
14     "The final stage involves individual
15     security selection.  A detailed
16     comparison will typically examine
17     fixed versus floating issues,
18     inflation-linked versus nominal
19     issues, issue X versus issue Y, and
20     swaps versus cash bonds.  These
21     decisions may be influenced by
22     factors such as the likely direction
23     of interest rates, the spread levels
24     of emerging markets, corporate
25     issuers over their respective

Page 58

1    LIAN - CONFIDENTIAL
2     sovereign benchmarks, and the latest
3     inflation trends relative to the
4     degree of central bank credibility.
5     Needless to say, research teams
6     located globally play an important
7     role at this very important stage."
8     There is a reference here to "spread levels
9  of emerging markets corporate issuers over their
10 respective sovereign benchmarks."  Does "spread
11 levels" here refer to a difference in pricing
12 between corporate issuers and their respective
13 sovereigns?
14 A.   I believe --
15     MR. SCHOCHET: Object to form.
16     THE WITNESS: I believe this is -- it
17 refers to that.
18     BY MS. ELLIS:
19 Q.   And why is the spread between the pricings
20 of sovereign bonds and corporate bonds relevant to
21 the investment decision?
22 A.   This is because this is part of the
23 investment process in understanding and appreciating
24 relative value between different securities.
25 Q.   Is this a particular -- is this

Page 59

1    LIAN - CONFIDENTIAL
2  consideration particularly important in emerging
3  markets?
4     MS. BIRD: Objection to form.
5     MR. SCHOCHET: Objection.
6     THE WITNESS: It is one of many factors
7  that we considered in arriving at an investment
8  decision.
9     BY MS. ELLIS:
10 Q.   Beginning in -- in March 2014, what role
11 did the spread between Brazilian bonds and Petrobras
12 bonds play in the analysis of Petrobras Securities?
13     MR. SCHOCHET: Objection.
14     THE WITNESS: To the best of my
15 recollection, I do not recall how significant that
16 consideration was at that point in time.
17     BY MS. ELLIS:
18 Q.   Do you remember discussions regarding that
19 topic?
20 A.   No, I do not in March of 2014.
21 Q.   Sorry.  In March of 2014 to the end of the
22 relevant period?
23 A.   As we continuously monitor exposure in any
24 security that we have investment holdings, we will
25 continue to -- and monitor a whole range of factors

Page 60

1    LIAN - CONFIDENTIAL
2  that would influence our decision at any one given
3  point in time, and I would believe that this factor
4  would, amongst other factors, be part of the
5  consideration.
6  Q.   And -- and would you also believe that this
7  factor would have been one of the factors in
8  consideration with respect to the spread on
9  Petrobras as compared to Brazil?
10     MR. SCHOCHET: Objection.
11     THE WITNESS: The same -- the same
12 philosophy applies across all corporate securities
13 that we have in all emerging market countries.
14     BY MS. ELLIS:
15 Q.   This document states that the final stage
16 involves individual security selection.  Do you
17 agree that that is the final stage after you
18 complete your macroeconomic analysis?
19 A.   Again, without reading the entire document,
20 and bearing in mind this particular document is an
21 RFP for EM corporate credit mandate, this is not
22 inconsistent -- this statement is not inconsistent
23 with our philosophy and investment process.
24 Q.   Looking at the bottom of page 7, item 11,
25 this states that:

Page 61

1    LIAN - CONFIDENTIAL
2    "Direct contact with company's senior
3    management is a critical source of
4    information."
5    And going to the top of page 8,
6    "Frequency of contact can be as often
7    as daily, with a minimum required
8    contact on a quarterly basis based on
9    Western Asset's internal assessment
10   of risk."
11   Do you agree that direct contact with
12   company's senior management is a critical source of
13   information?
14       MS. BIRD: Objection to form.
15       THE WITNESS: Direct contact could come in
16   the form of written, face-to-face meeting, and other
17   forms of communication. As I mentioned earlier, we
18   do look closely at earnings and other information on
19   a timely basis.
20       BY MS. ELLIS:
21   Q.   And do you agree that -- that direct
22   contact is a critical source of information?
23   A.   In the --
24       MS. BIRD: Objection to form.
25       THE WITNESS: In the context of how I've

Page 62

1    LIAN - CONFIDENTIAL
2    defined, yes.
3        BY MS. ELLIS:
4    Q.   And focusing on face-to-face meetings and
5    direct written communication with company senior
6    management, who would have that type of direct
7    contact from Western Asset? Would it be the
8    portfolio managers? Researchers?
9    A.   It would be a combination of both the
10   analyst and all portfolio managers.
11   Q.   Did you ever have any meetings or
12   communications with Petrobras management?
13   A.   Not that I can recall.
14   Q.   Are you aware of any research analysts or
15   others who reported to you having direct contact
16   with Petrobras management during the relevant time
17   period?
18       MS. BIRD: Objection to form.
19       THE WITNESS: I believe so.
20       BY MS. ELLIS:
21   Q.   And who would that have been?
22   A.   To the best of my knowledge, my colleagues
23   in Sao Paulo might have some contact as well with
24   the management team.
25   Q.   Do you know when that direct contact would

Page 63

1    LIAN - CONFIDENTIAL
2    have taken place?
3    A.   I do not.
4    Q.   Do you have any understanding of the
5    substance of that direct communication?
6    A.   I -- at this point in time, I do not have
7    any recollection.
8        MS. ELLIS: 7.
9        (Exhibit 7 was marked for
10   identification.)
11       BY MS. ELLIS:
12   Q.   Sir, you've just been handed what has been
13   marked as Exhibit 7. This document does not have a
14   Bates stamp, but this is something that we obtained
15   from Western Asset's website.
16       Do you recognize the content of this
17   document?
18   A.   Yes, I do.
19   Q.   And this is a summary of Western Asset's
20   investment philosophy?
21   A.   Yes.
22   Q.   Looking at the first paragraph, this
23   states:
24       "Markets often misprice securities.
25       Prices deviate from fundamental fair

Page 64

1    LIAN - CONFIDENTIAL
2    value, but over time they adjust to
3    reflect inflation, credit quality
4    fundamentals, and liquidity
5    conditions. Consistently investing
6    in undervalued securities can deliver
7    superior investment returns."
8    What is "fundamental fair value"?
9        MS. BIRD: Objection to form.
10       THE WITNESS: Fundamental fair value is an
11   assess -- an analysis and a determination of an
12   estimated broad valuation of a security based on
13   fundamental research.
14       BY MS. ELLIS:
15   Q.   And when you say "fundamental research,"
16   what do you mean?
17   A.   For a company or for a sovereign?
18   Q.   Either. Both.
19   A.   So for a country we look at economic
20   growth, inflation, and other key macro -- what we
21   call key macroeconomic indicators.
22       For companies we rely on published
23   information in regards to balance sheet and income
24   statement.
25   Q.   Are there particular aspects of balance

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL
CASE NO.: 14-cv-9662(JSR)

CHIA-LIANG LIAN
April 27, 2016

Page 65

1    LIAN - CONFIDENTIAL
2  sheets or income statements that you focus on?
3  **A.  I do not believe we have a narrow focus.**
4  **Essentially, we look through and scrub through, you**
5  **know, and look for -- and -- in the context of**
6  **the -- the entire balance sheet or income statement.**
7  Q.  Western Asset believes that the market
8  price often differs from a security's fundamental
9  fair value; is that correct?
10 **A.  This is our assessment.**
11 Q.  Does Western Asset come up with a dollar
12 price that represents its view of fundamental fair
13 value?
14 **A.  Investment is a highly complex process.  We**
15 **take into account both quantitative and quality --**
16 **qualitative factors in determining fundamental fair**
17 **valuation.  And that valuation is less to do with a**
18 **specific quantifiable dollar price and more to do**
19 **with relative value and other considerations based**
20 **on the universe of securities that we're invested**
21 **in.**
22 Q.  And when you say "relative value," that is
23 relative to the market price?
24 **A.  No.  Relative to other comparable rated**
25 **securities in emerging markets in other parts of the**

Page 66

1    **LIAN - CONFIDENTIAL**
2  **region, or, for the case of companies, relative to**
3  **developed market similar credits.**
4  Q.  The next paragraph states:
5       "We can systematically identify
6       mispricings.  We believe we can
7       identify and capitalize on markets
8       and securities that are priced below
9       fundamental fair value.  We do this
10      through disciplined and rigorous
11      analysis, comparing prices to the
12      fundamental fair values estimated by
13      our macroeconomic and credit research
14      teams around the globe."
15 This reference to mispricings -- do you
16 understand that to mean securities where the market
17 price of a security diverges from Western Asset's
18 assessment of fundamental fair value?
19 **MS. BIRD:** Objection to form.
20 **THE WITNESS:** Again, in reference to how
21 I've just defined "fundamental fair value," this is
22 our belief.
23 **BY MS. ELLIS:**
24 Q.  That mispricings refer to --
25 **A.  Potentially, a security being out of line**

Page 67

1    **LIAN - CONFIDENTIAL**
2  **against relative -- other -- other -- other**
3  **securities that are comparable.**
4  Q.  And out of line with market price?
5  **A.  No.  This is -- the idea here really is to**
6  **look at -- start with fundamental research, assess**
7  **through all available information in the public**
8  **domain, and look at security values based on how**
9  **they stack up with other similar credits.**
10 Q.  Looking again at the first paragraph and
11 the title to that paragraph, this states that
12 "markets often misprice securities."  You don't
13 understand that to mean "market price"?
14 **MS. BIRD:** Objection to form.
15 **THE WITNESS:** Ultimately, investment is a
16 highly complex process that entails consideration of
17 a whole range of factors.  It is not as simple as
18 creating an equation and throwing in numbers to
19 crunch up with one particular level, a number, and
20 stack and remeasure it against current market
21 prices.
22    I would also add that it is a highly
23 evolving and dynamic trend, and things could change
24 quickly.  And hence, we believe, because of those
25 circumstances, that markets do misprice securities

Page 68

1    LIAN - CONFIDENTIAL
2  given the dynamic nature of financial markets.
3  **BY MS. ELLIS:**
4  Q.  So is it Western Asset's goal to purchase a
5  particular security at a time when the market is
6  mispricing that security?
7  **MS. BIRD:** Objection to form.
8  **THE WITNESS:** I believe all active
9  managers, including Western Asset, would strive to
10 do that as a goal for our clients.
11 **BY MS. ELLIS:**
12 Q.  So would it be your expectation that at any
13 time that Western Asset invested in any Petrobras
14 Securities, it had assessed that the fundamental
15 fair value of those securities was greater than the
16 market price at the time that it made those
17 purchases?
18 **MR. SCHOCHET:** Objection to form.
19 **MS. BIRD:** Objection to form.
20 **THE WITNESS:** Again, the investment
21 process, in terms of execution, is highly complex.
22 There are other shifting considerations, including
23 index changes, as a result of some of these events.
24    We have to take a holistic approach in
25 terms of making a specific decision in terms of

Page 69

1     LIAN - CONFIDENTIAL
2  buying or selling a security, and that would
3  include -- that same approach would apply to
4  Petrobras.
5     BY MS. ELLIS:
6  Q.  And that holistic approach is what Western
7  Asset here is calling fundamental fair value?
8  A.  I believe so.
9  Q.  So Western Asset would never decide to
10  purchase Petrobras Securities at a time when it
11  believed that fundamental fair value was lower than
12  market price; is that correct?
13     MS. BIRD: Objection to form.
14     THE WITNESS: Could you repeat?
15     BY MS. ELLIS:
16  Q.  So Western Asset would never decide to
17  invest in Petrobras Securities if it had assessed
18  that fundamental fair value in its own assessment
19  was lower than market price?
20  A.  Again, this would -- a decision would be
21  based on an analysis on market trends, fundamental
22  analysis based on information that we have at any
23  given time.
24  Q.  Understood.
25  A.  And the usual practice would be such if

Page 70

1     LIAN - CONFIDENTIAL
2  we -- the situation would be as such if we determine
3  that a -- the fundamental value of a security is
4  lower than what we -- what we see in the market.
5  Q.  Then what would happen?
6     MS. BIRD: Objection to form.
7     BY MS. ELLIS:
8  Q.  You said the situation would be "such."
9  I'm sorry.  I just didn't understand what you meant.
10  A.  So we would not purchase the security if
11  that is the research outcome or based on our
12  determination -- our analysis of information.  To
13  your question, if we determine that the fundamental
14  fair value is below what we view as fair, we would
15  not purchase the security in general.
16  Q.  When describing the investment process as
17  highly complex, you stated that there are other
18  shifting considerations, including index changes.
19  What role did index changes have when -- with
20  respect to pricing Petrobras Securities?
21     MS. BIRD: Objection to form.
22     THE WITNESS: In regards to Petrobras,
23  there were some meaningful changes as a result of
24  the rating downgrades, and we need to take into
25  account specific mandates that may or may not be

Page 71

1  affected by those technical changes.
2     BY MS. ELLIS:
3  Q.  Are there any trading decisions with
4  respect to Petrobras Securities that you can
5  identify as having been driven by index changes?
6     MS. BIRD: Objection to form.
7     THE WITNESS: To my recollection, in the
8  emerging market high-yield portfolio, that was one
9  case in point where the index change as a result of
10  the ratings meaningfully affect the mandate of the
11  portfolio.
12     BY MS. ELLIS:
13  Q.  Do you remember when that occurred?
14  A.  I do not.
15  Q.  Approximately?
16  A.  It was probably sometime in the -- the
17  first half of last year.
18  Q.  And did that affect Western Asset's
19  decision to sell Petrobras Securities?
20     MS. BIRD: Objection to form.
21     THE WITNESS: This is one of many factors
22  that we would take into consideration.
23     BY MS. ELLIS:
24  Q.  And did take into consideration in that

Page 72

1  situation?
2  A.  Correct.
3  Q.  Did you have any involvement in discussions
4  regarding Petrobras around early 2012?
5  A.  I do not believe I had.
6     MS. BIRD: We've been going for a while; so
7  whenever is convenient for a break, I'd like to take
8  one.
9     BY MS. ELLIS:
10  Q.  More generally, prior to being promoted to
11  co-head of EM, did you have any involvement in
12  Petrobras discussions?
13  A.  Specifically on Petrobras, no, not that I
14  can recall.
15  Q.  Any discussions on Brazil that you can
16  recall?
17  A.  Not that I could recall as well.
18     MS. ELLIS: Should we take a break?
19     THE REPORTER: Off the record.
20     THE VIDEOGRAPHER: This is the end of disk
21  No. 1.  The time is 11:13, and we're off the record.
22     (Recess.)
23     THE VIDEOGRAPHER: We are back on the
24  record.  This is the beginning of disk No. 2.  The

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL
CASE NO.: 14-cv-9662(JSR)

CHIA-LIANG LIAN
April 27, 2016

Page 73

1      LIAN - CONFIDENTIAL
2  time is 11:33.
3      (Exhibit 8 was marked for
4      identification.)
5      **BY MS. ELLIS:**
6  Q.  So you've just been handed what has been
7  marked as Exhibit 8, which is an e-mail chain.  The
8  e-mail on the first page is dated February 2, 2012,
9  and this document bears Bates stamps Western
10  00060458 to 60463.
11      Do you recognize this e-mail chain?
12  **A.  To the best of my knowledge, I do not**
13  **recall this e-mail chain.**
14  Q.  Looking at the third e-mail on the first
15  page, who is Stephen Walsh?
16  **A.  Stephen, or Steve Walsh as we call him --**
17  **he was a chief investment officer of Western Asset**
18  **at that point in time.**
19  Q.  Has he since left the company?
20  **A.  Yes.**
21  Q.  When did he leave?
22  **A.  I think it is probably around mid-2013 or**
23  **'14.  I -- I cannot recall his date of retirement.**
24  Q.  And who is Adrian Chee?
25  **A.  Adrian Chee was a Singapore-based credit**

Page 74

1      LIAN - CONFIDENTIAL
2  **analyst.**
3  Q.  Do you have an understanding of why Steve
4  Walsh forwarded this chain to you and Adrian Chee?
5      **MS. BIRD:** Objection to form.
6      **THE WITNESS:** I do not recall beyond
7  being -- for our information as stated in that
8  e-mail.
9      **BY MS. ELLIS:**
10  Q.  In looking down at the e-mail from Kevin
11  Ritter dated January 31, 2012, at 10:25 a.m. -- it
12  is the e-mail that begins on the bottom of the
13  second page, the page marked 60459.
14      Who is Kevin Ritter?
15  **A.  Then?  In 2012?  He was -- I believe he was**
16  **a trader for the emerging markets desk.**
17  Q.  And now?
18  **A.  He is a portfolio manager.**
19  Q.  When did he go from being a trader for the
20  emerging markets desk to being a portfolio manager?
21  **A.  I believe it was in mid-2015.  Again, that**
22  **is as best I can -- as I can recall.**
23  Q.  But he was a trader on the emerging markets
24  desk once you became co-head of EM?
25  **A.  Not immediately, but during my co-headship.**

Page 75

1      **LIAN - CONFIDENTIAL**
2  Q.  During your co-headship, he was a trader
3  for the emerging markets desk?
4  **A.  Initially.**
5  Q.  Yes.
6      And Kevin Ritter was writing about Western
7  Asset's participation in a new Petrobras issuance?
8  **A.  Again, I believe that was the case based on**
9  **this e-mail.  I was not involved with the emerging**
10  **markets team then in 2012, but based on what I'm**
11  **reading here, I believe that to be the case.**
12  Q.  Ritter wrote -- and this is on the top of
13  the page ending 460:
14      "Thanks for all the help.  In total,
15      a $250 million-plus order across
16      teams and strategies."
17      Do you know what he means -- what he meant
18  by "across teams and strategies"?
19      **MS. BIRD:** Objection to form.
20      **THE WITNESS:** I do not know in this
21  instance what that meant.
22      **BY MS. ELLIS:**
23  Q.  But your team at the time was not one of
24  the ones involved?
25      **MS. BIRD:** Objection to form.

Page 76

1      LIAN - CONFIDENTIAL
2      **THE WITNESS:** My team in Singapore was not
3  involved in this particular issue.
4      **BY MS. ELLIS:**
5  Q.  Going to your e-mail, which is on page 1,
6  you wrote back to Steve:
7      "Steve, yes.  Same tone in Asia where
8      recent new issues the desk
9      participated in -- Wharf, Korea
10      Telecom -- have held up extremely
11      well."
12      What did you mean by "same tone in Asia"?
13  **A.  To the best of my knowledge, the response**
14  **to Steve was part of the cross-office engagement**
15  **that we want and information sharing, and I believe**
16  **what I meant in that response was that markets were**
17  **generally trading well at that point in time.**
18  Q.  At the time, were any portfolios that you
19  held -- had responsibility for -- did any of those
20  portfolios purchase this issue?
21  **A.  I do not believe that -- that to be the**
22  **case.**
23  Q.  You can put that aside.
24      Do you have an understanding of why Western
25  Asset has a dedicated EM desk?

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL
CASE NO.: 14-cv-9662(JSR)

CHIA-LIANG LIAN
April 27, 2016

Page 77

1    LIAN - CONFIDENTIAL
2  **A.  I'm sorry.  I don't quite understand your**
3  **question.**
4  Q.  Is there a reason that Western Asset has a
5  desk that invests primarily in emerging markets?
6    **MR. SCHOCHET:** Objection to form and lacks
7  foundation.
8    **THE WITNESS:** Again, I am not certain the
9  context of the question, but I do believe that this
10  asset class has grown.  And many other long-term
11  real money players would also have a dedicated
12  emerging markets desk.
13    **BY MS. ELLIS:**
14  Q.  Given your experience in emerging markets,
15  are there risks involved in -- given your experience
16  in emerging markets, are there risks involved in
17  investing in emerging markets that are different
18  from those involved in investing in developed
19  markets?
20    **MS. BIRD:** Objection to form.
21    **THE WITNESS:** There are risks to
22  investment, whether develop or emerging, and we try
23  to take a holistic approach in terms of analyzing
24  and ensuring that all publicly available information
25  is taken into account when investing either in

Page 78

1    LIAN - CONFIDENTIAL
2  developed or in emerging markets.
3    **BY MS. ELLIS:**
4  Q.  Understanding that there are risks to
5  investing in either developed or emerging markets,
6  are any of those risks different for investing in
7  emerging markets than investing in developed
8  markets?
9    **MS. BIRD:** Same objection to form.
10    **THE WITNESS:** I'm not sure if it is so
11  clear-cut in terms of the definition between
12  developed and emerging.  Some countries in emerging
13  markets are higher-rated than others that are in
14  developed space.
15    **BY MS. ELLIS:**
16  Q.  Does the top-down macroeconomic research
17  that you perform differ when focusing on emerging
18  markets than when focusing on developed countries?
19  **A.  The general approach is similar, looking at**
20  **key macroeconomic data -- growth, inflation, amongst**
21  **others -- and long-term trends that I had mentioned**
22  **earlier -- demographics -- and potential for**
23  **domestic demand.**
24    **So the approach on the -- from a top-down**
25  **perspective for either developed and emerging are --**

Page 79

1    **LIAN - CONFIDENTIAL**
2  **the approach -- the approaches are not dissimilar.**
3  Q.  Generally, do you believe that the risk of
4  corruption is greater in -- in emerging markets than
5  in developed markets?
6    **MR. SCHOCHET:** Objection.
7    **THE WITNESS:** We do not make these
8  assumptions, and there are incidents of corruption
9  in both developed and emerging market countries.
10  Q.  Does it -- Western Asset have any policies
11  regarding the circumstances under which it will
12  invest in an issuer that has been involved in
13  corruption allegations?
14  **A.  Could you repeat and clarify your question?**
15  Q.  Are there any policies at Western Asset
16  about investing or not investing in an issuer that
17  has been involved in corruption allegations?
18  **A.  The policies are pretty much enshrined in**
19  **fundamental credit research that was discussed**
20  **earlier.**
21  Q.  So there would be no black-and-white line
22  between not investing in a company that has been
23  involved in corruption allegations?
24    **MR. SCHOCHET:** Objection.  Form.  Misstates
25

Page 80

1    LIAN - CONFIDENTIAL
2  the testimony.
3    **THE WITNESS:** Again, investments -- we take
4  a holistic approach, and we do not take one factor
5  in consideration and have it overwrite a slew of
6  other considerations.
7    **BY MS. ELLIS:**
8  Q.  Is it your view, based on your experience,
9  that risks of corruption are the same between
10  emerging markets and developed markets?
11    **MS. BIRD:** Objection to form.
12    **THE WITNESS:** Again, definitions of
13  developed and emerging is not necessarily clear, and
14  we do not want to make simplistic assumptions either
15  way.
16    **BY MS. ELLIS:**
17  Q.  What about between Brazil and the U.S.?
18  **A.  Likewise, we do not want to make simplistic**
19  **assumptions like that.**
20  Q.  So do you have no view one way or the other
21  on whether the risk of corruption would be the same
22  between Brazil and the U.S.?
23    **MR. SCHOCHET:** Object.
24    **MS. BIRD:** Objection to form.
25    **THE WITNESS:** The corruption -- it is not

Page 81

1     LIAN - CONFIDENTIAL
2  that we do not have a view. We determine a case for
3  or against based on analyzing all information to
4  come to a decision as opposed to make a prejudgment.
5     **BY MS. ELLIS:**
6  Q.  And what is Western Asset's view?
7  **A.  Regarding?**
8  Q.  You said that "we do have a view"?
9     **MR. SCHOCHET:** Objection. Form.
10  Q.  When asked whether you have no view one way
11  or the other on whether the risk of corruption would
12  be the same between Brazil and the U.S., you said
13  that you do have a view.
14  **A.  What I meant is we do not prejudge a**
15  **country or any country. We take fundamental**
16  **research as it is based on all available information**
17  **and investment decisions. We'll also take into**
18  **account a whole slew of other factors in arriving to**
19  **a decision.**
20  Q.  During the relevant period, did you believe
21  that Brazil had in place effective measures to
22  prevent corporate fraud?
23     **MS. BIRD:** Objection to form.
24     **THE WITNESS:** Again, my involvement in

Page 82

1     LIAN - CONFIDENTIAL
2  emerging markets formally started in March of 2014.
3  And when we look at global emerging markets, which
4  comprise many countries, we do not make prejudgment
5  on any single country without having a foundation or
6  evidence from a research process.
7     **BY MS. ELLIS:**
8  Q.  So based on your research process, did you
9  or, to your knowledge, did anyone at Western Asset
10  make an assessment of whether Brazil had in place
11  effective measures to prevent corporate fraud?
12     **MS. BIRD:** Objection to form.
13     **THE WITNESS:** I can only speak for myself
14  based on my co-headship that began in March 2014.
15  And I want to reiterate we do not prejudge any
16  country but assess on a real-time basis as public
17  information becomes available.
18     **BY MS. ELLIS:**
19  Q.  Understanding that you don't prejudge
20  any -- any countries, but then you do research, and
21  after having done that research, do you come to a
22  decision about whether a country has in place
23  effective measures to prevent corporate fraud?
24     **MS. BIRD:** Objection to form.
25     **THE WITNESS:** We rely on a range of

Page 83

1     LIAN - CONFIDENTIAL
2  resources, including independent research companies,
3  that provide information, both qualitative and
4  quantitative, and we would assess as -- you know, we
5  assess as what the data tells us as such.
6     **BY MS. ELLIS:**
7  Q.  And what is that assessment?
8     **MS. BIRD:** Objection to form.
9     **BY MS. ELLIS:**
10  Q.  Was it -- was a decision made?
11  **A.  Again, it is based on -- depending on the**
12  **time and information set that is -- that evolves,**
13  **and we were -- we do not -- I want to again**
14  **reiterate we focus on factors in regards to**
15  **governance, but that factor, you know, is one of**
16  **many other factors that we would take into**
17  **consideration as well in any form of investment.**
18  Q.  Was an assessment regarding governance made
19  with respect to Petrobras during the relevant time
20  period?
21     **MS. BIRD:** Objection to form.
22     **THE WITNESS:** Again, I took on
23  responsibility from March of 2014, and we -- as a
24  team, we would do our analysis and assessment as
25  more information became available thereafter.

Page 84

1     LIAN - CONFIDENTIAL
2     **BY MS. ELLIS:**
3  Q.  So it is an evolving assessment. Is that
4  what you're saying?
5  **A.  Based on information that comes -- that --**
6  **that is made public.**
7  Q.  So focusing at the time that you became
8  co-head in March 2014, was there an assessment at
9  that time made about Petrobras's governance factor?
10  **A.  Again, the point of governance applies**
11  **across all credits that we hold onto, and we**
12  **determine exposure and analyze our -- and -- and**
13  **make a judgment based on information that we get**
14  **across all companies and credits that we're invested**
15  **in.**
16  Q.  Understood.
17     I'm trying to get at what that judgment
18  was, though. You say that you make a judgment.
19  What was that judgment at the time that you joined
20  the EM team?
21     **MS. BIRD:** Objection. Form.
22     **THE WITNESS:** At the point of our -- of my
23  appointment in 2014, March, based on the information
24  available then, we simply looked at the -- rely on
25  the information and a whole slew of other factors in

Page 85

1    LIAN - CONFIDENTIAL
2  terms of making a judgment on an investment call at
3  that point in time.
4      BY MS. ELLIS:
5  Q.   And what was that judgment with respect to
6  the risk of corruption in Brazil?
7      MS. BIRD: Objection to form.
8      THE WITNESS: Again, I think that is
9  overgeneralizing, you know, potentially what is true
10  for one company to all of -- all companies within a
11  certain country.  We do not want to prejudge and
12  make statements or judgment without concrete
13  evidence in our assessment.
14      BY MS. ELLIS:
15  Q.   Was there a judgment with respect to the
16  risk of corruption at Petrobras?
17  **A.   That -- the concern -- that risk, as fixed**
18  **income investors, is always a factor that we would**
19  **take into consideration, amongst all other**
20  **considerations, in whether or not to invest in a**
21  **corporate security, and that would include**
22  **Petrobras.**
23  Q.   Was an assessment made whether the risk of
24  corruption at Petrobras was higher or lower than
25  other comparable issuers?

Page 86

1    LIAN - CONFIDENTIAL
2      MS. BIRD: Objection to form.
3      THE WITNESS: Again, I think that is
4  just -- way simplifies the investment process and
5  the -- and the surveillance that we do, you know,
6  across all corporate holdings that we have in our
7  portfolio.
8      We monitor on a real-time basis corporate
9  developments across all companies that we have
10  exposure to, including Petrobras.
11      BY MS. ELLIS:
12  Q.   And how do you quantify the risk of
13  corruption in a particular issuer?
14      MR. SCHOCHET: Objection to form.
15      THE WITNESS: Again, corporate governance
16  is a qualitative judgment and not a quantifiable
17  judgment.  Again, it would be based on our
18  assessment of a whole slew of factors that affect --
19  and it could be company-specific -- and we would
20  treat Petrobras the way we would for other corporate
21  securities that we're invested in.
22      BY MS. ELLIS:
23  Q.   Understanding that it is a qualitative
24  judgment, what was Western Asset's qualitative
25  judgment of the risk of corruption at Petrobras in

Page 87

1    LIAN - CONFIDENTIAL
2  March 2014 when you became co-head of EM?
3      MR. SCHOCHET: Objection to form.
4      THE WITNESS: When I took over as co-head
5  of emerging markets, we applied that same
6  surveillance across all credits based on the
7  information available then.
8      BY MS. ELLIS:
9  Q.   And you say that you applied the
10  surveillance across credits.  Is the purpose of
11  applying that surveillance to come to a qualitative
12  judgment?
13  **A.   Qualitative judgment in regards to the**
14  **point of governance.  And, obviously, it is a**
15  **dynamic process, and it evolves as the information**
16  **is set or shifts.**
17  Q.   So what was Western Asset's assessment of
18  the governance at Petrobras in March 2014?
19      MS. BIRD: Objection to form.
20      THE WITNESS: Our assessment would be based
21  on all the relevant documentation --
22      BY MS. ELLIS:
23  Q.   Right.
24  **A.   -- that had been put in place and made**
25  **available to investors like ourselves and others.**

Page 88

1    **LIAN - CONFIDENTIAL**
2  Q.   I'm not asking what the assessment was
3  based on.  I'm asking what the actual assessment
4  was.
5  **A.   For Western Asset?  Again, this -- this was**
6  **a credit that we look at, and based on the**
7  **then-available information set, there was no -- no**
8  **material information that was made available then**
9  **that we judged was one of substantive issue.  And we**
10  **would apply that to all credits that we have**
11  **exposure to.**
12  Q.   So there was no substantive issue that was
13  identified at that time with regards to governance
14  in Petrobras as of April 2014?
15      MS. BIRD: Objection to form.
16      THE WITNESS: Again, that whole judge --
17  that whole surveillance -- it is real-time and
18  ongoing, and when information evolves, we would
19  reevaluate our judgment.
20      BY MS. ELLIS:
21  Q.   Understood.
22      But at that time -- you said there was no
23  substantive issue that was identified at that time.
24  **A.   Based on the information that we get for**
25  **our credit analyst, you know, we analyze the**

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL
CASE NO.: 14-cv-9662(JSR)

CHIA-LIANG LIAN
April 27, 2016

Page 89

LIAN - CONFIDENTIAL
1     LIAN - CONFIDENTIAL
2  creditworthiness based on what the information set
3  tells us.
4  Q.   And the information set was telling you
5  that there was no substantive issue at that time?
6     MS. BIRD: Objection to form.
7     THE WITNESS: Put it differently, there was
8  no information that tells us otherwise at that point
9  in time.
10    BY MS. ELLIS:
11 Q.   And with respect to Brazil at the same time
12 period in March 2014, was there any information of a
13 substantive issue regarding the risk of corruption
14 in Brazil at the time?
15    MS. BIRD: Objection to form.
16    THE WITNESS: To the best of my knowledge,
17 you know, we -- we had continued to monitor, you
18 know, our exposure to Brazil, and there was no
19 meaningful information that would make -- lead us to
20 that conclusion at that point in time.
21    BY MS. ELLIS:
22 Q.   And did that assessment of Brazil change
23 during the relevant time period?
24 A.   I believe so.  As information begin --
25 becomes -- as new information becomes available.

Page 90

1     LIAN - CONFIDENTIAL
2  Q.   And how did it change?
3  A.   Can you clarify your question?
4  Q.   How did Western Asset's assess --
5  assessment of the risk of corruption in Brazil
6  change from the time that you became co-head in
7  March 2014 until the end of the relevant period in
8  2015?
9  A.   Again, it is less to do with me being the
10 co-head and making a change in the thought process
11 in evaluating Brazil and all emerging market
12 countries.  It is an ongoing process of surveillance
13 across multiple countries.  As such, it is --
14 myself, my colleagues, and a team across our global
15 offices would do that same surveillance for all the
16 countries involved over that period of time.
17 Q.   Right.  I wasn't -- I wasn't meaning to
18 suggest that it had to do with you being the
19 co-head.  I was just using that marker as the point
20 in time when your personal involvement so that you
21 would be able to speak to Western Asset's view
22 about -- about Brazil at that point, just because
23 that is when your personal involvement began.
24 A.   So --
25    MS. BIRD: Objection to the --

Page 91

1     LIAN - CONFIDENTIAL
2     THE WITNESS: -- again --
3     MS. BIRD: -- attorney statement.  Is there
4  a question?
5     BY MS. ELLIS:
6  Q.   So I think my question is from the time
7  period that you first became involved in assessing
8  Brazil in March 2014 until the end of the -- until
9  the end of the relevant period, did Western Asset's
10 view on the risk of corruption in Brazil -- its
11 assessment change?
12    MS. BIRD: Objection to form.
13    THE WITNESS: Again, the analysis and --
14 analysis is done from a team-based approach with
15 colleagues in Sao Paulo helping to do the
16 surveillance as new information becomes available.
17 And over the course of that period, there were new
18 and meaningful information that was made public that
19 causes us to reevaluate and think in terms of the
20 different aspects of fundamental factors in -- in
21 Brazil.  And we would do the same for every country
22 that we're invested in within emerging markets.
23    BY MS. ELLIS:
24 Q.   So Western Asset's assessment of the
25 fundamental factors in Brazil changed from

Page 92

1     LIAN - CONFIDENTIAL
2  March 2014 until the end of the relevant period?
3  A.   I don't think that is a fair and accurate
4  assessment.  It was -- it was -- it evolves over
5  time.  Bearing in mind myself and Keith were
6  co-heads, from that -- the one year after March of
7  2014.  So it evolves over time.  Again, just to
8  reiterate, with new information, you know, as
9  investors, we have, therefore, to take into account
10 if these developments will change or not change our
11 investment thesis.
12 Q.   Did the developments change Western Asset's
13 investment thesis with regards to Brazil?  The
14 developments between March 2014 and the end of the
15 relevant period.
16    MS. BIRD: Objection to form.
17    THE WITNESS: Investment is dynamic and
18 there are constantly shifting factors that are
19 involved at any one given in time.  "Shift" is not
20 quite the exact word as much as making sure that at
21 any given point in time surveillance on all of our
22 investments in Brazil are constantly monitored on a
23 real-time basis.
24    BY MS. ELLIS:
25 Q.   Focusing specifically on the risk of

Page 93

1    LIAN - CONFIDENTIAL
2  corruption, you testified that that risk changed
3  over the period after -- over the period after
4  April 2014.  What specifically changed?
5    MS. BIRD: Objection to form.
6    THE WITNESS: It start -- it -- as I say,
7  information towards the end of last year, the
8  so-called Lava Jato scandal created questions and
9  concerns for us as investors and, therefore, we need
10  to analyze and judge for ourselves on a real-time
11  basis as information is made available.
12    BY MS. ELLIS:
13  Q.  The information regarding Lava Jato that
14  emerged -- did that change Western Asset's
15  investment thesis regarding Brazil?
16  A.  Again, I wouldn't use the term "change" as
17  such, but all investors in Brazil, including Western
18  Asset, would want to keep tabs and keep an update on
19  the developments as it evolved.
20  Q.  So Western Asset had no reason to believe
21  there was a significant risk of corruption in Brazil
22  prior to the information regarding Lava Jato coming
23  into the market?
24    MS. BIRD: Objection to form.
25    THE WITNESS: I don't think I -- that that

Page 94

1    LIAN - CONFIDENTIAL
2  is what I -- I meant.  As I say, we do not prejudge
3  any country without basis.
4    BY MS. ELLIS:
5  Q.  But there was no information in the market
6  that Western Asset believed created a significant
7  risk of corruption in Brazil prior to the
8  information about Lava Jato becoming public?
9    MS. BIRD: Objection to form.
10    THE WITNESS: Again, we do not prejudge the
11  information that we rely on in our credit research
12  process.  It is based on publicly available
13  information as such.
14    BY MS. ELLIS:
15  Q.  And there was no publicly available
16  information prior to information about Lava Jato
17  becoming publicly available that led Western Asset
18  to believe that there was a significant risk of
19  corruption in Brazil?
20    MS. BIRD: Objection to form.
21    THE WITNESS: I do not want to suggest that
22  we take any risks lightly from an investor's point
23  of view, but certainly, based on the information
24  that we had access to in the public domain, there
25  was -- we do not believe that there was information

Page 95

1    LIAN - CONFIDENTIAL
2  that had a meaningful impact in terms of shaping our
3  expectations one way or another.
4    BY MS. ELLIS:
5  Q.  Prior to the information regarding Lava
6  Jato becoming publicly available?
7  A.  Generally speaking, yes.  And that would be
8  the same approach that we would apply for all
9  countries that we are invested -- invested in.
10  Q.  And what impact did the information about
11  Lava Jato have on Western Asset's assessment of
12  Brazil?
13    MS. BIRD: Objection to form.
14    THE WITNESS: Again, our assessment, the
15  investment process takes a holistic approach.  To
16  the extent that new information becomes available
17  from a fundamental research perspective, you know,
18  we had to incorporate those new information.  On the
19  market side, there is also changes in terms of the
20  way securities then were priced, and we obviously
21  need to take a holistic approach and consider all
22  factors that are related to our broad exposure.
23    BY MS. ELLIS:
24  Q.  And focusing specifically on the factor of
25  the Lava Jato information becoming public, what

Page 96

1    LIAN - CONFIDENTIAL
2  impact did that factor have on the holistic
3  assessment?
4  A.  The influence -- obviously, again, there is
5  no one single aspect that I could narrow on.  It has
6  an impact on fundamental credit research on
7  Petrobras.  It also had some degree of an impact on
8  the market pricing.
9  Q.  And what impact did the information
10  regarding Lava Jato have on the risk of corruption
11  in Brazil?
12    MS. BIRD: Objection to form.
13    THE WITNESS: Again, we do not want to make
14  any prejudgment for the country as a whole.
15  Frequently, what is true in one part may not
16  necessarily be true when applied to the whole.
17    BY MS. ELLIS:
18  Q.  So did it have no impact on Western Asset's
19  assessment of the risk of corruption in Brazil?
20    MS. BIRD: Objection to form.
21    THE WITNESS: Again, I don't think that
22  accurately represents our thought process to the
23  extent that it influences our credit research
24  process.  It has an impact on market pricing.  The
25  evolving developments from late 2014 would have an

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL
CASE NO.: 14-cv-9662(JSR)

CHIA-LIANG LIAN
April 27, 2016

Page 97

1     LIAN - CONFIDENTIAL
2  impact on -- on our assessment.
3     BY MS. ELLIS:
4  Q.  And what impact would they have?
5  A.  Just generally looking -- again, analyzing
6  the fundamental research on Petrobras, judging
7  valuations of the securities -- those would be the
8  impact that we would have to monitor and judge from
9  an investment standpoint.
10 Q.  Did the news of Lava Jato have an impact on
11 Western Asset's assessment of the risk of corruption
12 in Brazil?
13    MS. BIRD: Objection to form.  Asked and
14 answered.
15    THE WITNESS: Petrobras -- obviously, it is
16 a Brazilian corporate.  The news would have an
17 impact in the direct sense on Petrobras Securities.
18 Going back to my point, we do not prejudge any other
19 corporates that are not directly involved, or the
20 country -- certainly not to the whole of the
21 country.  Our surveillance is an ongoing process and
22 a dynamic one, and it is not influenced by one
23 single factor as such.
24    BY MS. ELLIS:
25 Q.  Were you aware that, prior to January 2014,

Page 98

1     LIAN - CONFIDENTIAL
2  companies could not be held liable in Brazil for
3  corruption or bribes paid by their employees?
4     MS. BIRD: Objection to form.
5     THE WITNESS: To the best of my knowledge,
6  no.
7     BY MS. ELLIS:
8  Q.  Did you do any research on the laws in
9  place in Brazil regarding corruption and fraud prior
10 to Western Asset making its investment in Petrobras?
11 A.  Again, I am co-head.  In -- I assumed the
12 role of a co-head in March of 2014, and my
13 understanding is from that point in time.
14 Q.  To your knowledge, did anyone else at
15 Western Asset conduct research on the laws in place
16 in Brazil regarding corruption and fraud prior to
17 making Western Asset's investment in Petrobras?
18    MS. BIRD: Objection to form.
19    THE WITNESS: I believe that my corporate
20 credit research colleagues would involve
21 considerations and analysis of those factors,
22 whether country or company specific, in their
23 research for individual corporate security.
24    BY MS. ELLIS:
25 Q.  So just to clarify, you personally did not

Page 99

1     LIAN - CONFIDENTIAL
2  do any research on the laws in place in Brazil
3  regarding corruption and fraud during the relevant
4  time period?
5  A.  I believe my colleagues in the corporate
6  credit research team in both Brazil and Pasadena
7  would have taken those factors into consideration.
8  Q.  Understood.
9     And you did not personally have involvement
10 in that?
11 A.  That is broadly true.
12 Q.  Are there any companies in particular in
13 which you have considered the risk of corruption and
14 bribery in deciding whether to purchase those
15 companies' securities?
16    MS. BIRD: Objection to form.
17    THE WITNESS: Again, I'm not sure the
18 context.  Could you clarify your question?
19    BY MS. ELLIS:
20 Q.  Are there any companies in which you
21 considered the risk of corruption or bribery in
22 deciding whether to purchase the securities?
23    MS. BIRD: Objection.
24    MR. SCHOCHET: Objection.
25    THE WITNESS: I believe that factor would

Page 100

1     LIAN - CONFIDENTIAL
2  be one of many factors that would be considered in
3  investment of any corporate securities.
4     BY MS. ELLIS:
5  Q.  Can you think of any examples in which that
6  factor influenced the decision of whether or not to
7  purchase the securities?
8     MS. BIRD: Objection to form.
9     THE WITNESS: Nothing -- no company comes
10 specifically to mind, but that rule would apply for
11 investments in corporate securities in general.
12    BY MS. ELLIS:
13 Q.  Have you done any research on companies
14 that were involved in allegations of violations of
15 the Foreign Corrupt Practices Act?
16 A.  To the best of my knowledge, I have not.
17 Q.  Do you know whether Western Asset is
18 invested in Statoil?
19 A.  I am not -- I'm not aware, to the best of
20 my knowledge.
21 Q.  Do you know if Western Asset is -- is
22 invested in Total?
23 A.  Total?  Could you define the name of the
24 company?
25 Q.  The French oil company.

Page 101

1     LIAN - CONFIDENTIAL
2  A.  **To the best of my knowledge, I believe we**
3  **do have exposure to Total.**
4  Q.  Are you aware that Total settled an
5  enforcement action with the SEC for violations of
6  the Foreign Corrupt Practices Act in May of 2013?
7     **MS. BIRD:** Objection to form.
8     **THE WITNESS:** I am unaware.
9     **BY MS. ELLIS:**
10 Q.  Do you have any understanding of whether
11 Total's involvement in corruption played any role in
12 Western Asset's investment decision?
13    **MR. SCHOCHET:** Objection.  Lack of
14 foundation.
15    **THE WITNESS:** I do not -- I'm not aware of
16 any information regarding to that issue.
17    **BY MS. ELLIS:**
18 Q.  Do you know if Western Asset has exposure
19 to Vale?
20 A.  **Yes.**
21 Q.  Are you aware of corruption allegations
22 concerning Vale's mining concession in Guinea?
23    **MS. BIRD:** Objection to form.
24    **THE WITNESS:** Again, my colleagues in the
25 credit research team would have documented points --

Page 103

1     LIAN - CONFIDENTIAL
2  Q.  Looking back at the portfolios that you
3  manage personally in Exhibits 1, 2, and 3, do you
4  know if any of those portfolios are invested in
5  Vale?
6  A.  **I believe some of the portfolios may have**
7  **exposure to Vale.**
8  Q.  And were you involved in those investment
9  decisions?
10 A.  **I lead, in terms of managing the portfolio,**
11 **the research credits -- the fundamental research**
12 **analysis performed by my credit research colleagues.**
13 Q.  And what impact, if any, did the research
14 that your colleagues performed regarding the
15 allegations of corruption in Guinea have on your
16 trading decision?
17    **MR. SCHOCHET:** Objection.  Lack of
18 foundation.
19    **THE WITNESS:** Again, any change in
20 investment call or decision involves a range of
21 considerations, both fundamentals, valuations, and
22 technical, and we would have to evaluate it -- the
23 decision from a holistic perspective.
24    **BY MS. ELLIS:**
25 Q.  Understanding that you evaluate from a

Page 102

1     LIAN - CONFIDENTIAL
2  relevant points that needs to be included in our
3  assessment of the "investability" of any security --
4  single security, and that would include Vale.
5     **BY MS. ELLIS:**
6  Q.  Do you know what role, if any, these
7  allegations had on Western Asset's decision to
8  invest in Vale?
9     **MR. SCHOCHET:** Objection.  Lack of
10 foundation.
11    **THE WITNESS:** Again, we take a holistic
12 approach to fundamental credit analysis.  We also
13 consider all relevant factors when making an
14 investment call, including valuations and other
15 fundamental factors that apply to individual
16 credits.
17    **BY MS. ELLIS:**
18 Q.  So the factor of Vale's corruption
19 allegations -- what impact would that have had on
20 Western Asset's decision to invest?
21    **MR. SCHOCHET:** Objection to form.
22    **MS. BIRD:** Objection to form.
23    **THE WITNESS:** I'm not sure if I understood
24 the question.
25    **BY MS. ELLIS:**

Page 104

1     LIAN - CONFIDENTIAL
2  holistic perspective, what role in that holistic
3  perspective did research regarding corruption on the
4  part of Vale have in that assessment?
5     **MR. SCHOCHET:** Same objection.
6     **THE WITNESS:** Again, we do not want to make
7  generalizations.  At any particular point in time,
8  investments is -- the process is dynamic.
9  Valuations move with time.  Factors, news,
10 information do change at any given point in time.  I
11 do not think that, you know, one factor would --
12 supersedes others in the context of making
13 evaluation on any purchase or sale decision.
14    **BY MS. ELLIS:**
15 Q.  At the point of time of Western Asset's
16 decision to invest in Vale, what role did the factor
17 of the risk of corruption have on that decision?
18    **MS. BIRD:** Objection to form.
19    **THE WITNESS:** Again, investments, until
20 considering all relevant information -- and we will
21 take that into account from a fundamental
22 standpoint, but importantly, there are other whole
23 range of fundamental factors that we would have to
24 take into consideration.
25    We would also have to judge the valuation's

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL
CASE NO.: 14-cv-9662(JSR)

CHIA-LIANG LIAN
April 27, 2016

Page 105

1    LIAN - CONFIDENTIAL
2  status at any given point in time when it comes to
3  making a decision.
4    **BY MS. ELLIS:**
5  Q.  Do you remember if the research done
6  regarding Vale's securities included issues
7  regarding corruption in Guinea?
8  **A.  To the best of my knowledge, I do not.**
9  Q.  You don't remember one way or the other?
10  **A.  Yes.**
11    **(Exhibit 9 was marked for**
12    **identification.)**
13  **BY MS. ELLIS:**
14  Q.  You've just been handed what has been
15  marked as Exhibit 9.  And again, this document does
16  not bear Bates stamps, but it is a document that we
17  obtained from Western Asset's website.
18    Do you recognize this document?
19  **A.  I have not seen this document.**
20  Q.  Is the content familiar to you?
21  **A.  In part, yes, in -- as it relates to ESG.**
22  Q.  Looking at the first paragraph, in the
23  third sentence in that paragraph this states:
24    "We believe that environmental,
25    social, and corporate governance

Page 106

1    LIAN - CONFIDENTIAL
2  (ESG) factors can affect the
3  creditworthiness of fixed income
4  issuers' securities and, therefore,
5  impact the performance of fixed
6  income investment portfolios.
7  Accordingly, we incorporate ESG
8  considerations in investment analysis
9  and decision making as a matter of
10  good investment principle."
11    Do you personally conduct research on ESG
12  factors?
13  **A.  I do not.**
14  Q.  Who generally performs that research on the
15  EM desk?
16  **A.  We have a team of colleagues based in**
17  **Pasadena and our global offices that covers -- that**
18  **cover emerging market corporate credit research.**
19  Q.  I previously asked you whether you
20  personally consider research on ESG factors.  I
21  should have asked you whether you performed research
22  on ESG factors, which I believe is what you're
23  answering; is that correct?
24  **A.  Correct.  Yes.**
25  Q.  Do you consider research on ESG factors?

Page 107

1    LIAN - CONFIDENTIAL
2  **MR. SCHOCHET:** Objection.  Form.
3  **THE WITNESS:** We would -- these would be
4  factors that would be part of the research analysis.
5  **BY MS. ELLIS:**
6  Q.  And looking at the fourth paragraph here,
7  this states:
8    "As a fixed income rather than equity
9    investor, Western Asset can best
10    exercise influence by letting the
11    financial management of companies in
12    which the firm invests know the
13    extent to which Western Asset seeks
14    compensation for low ESG ratings by
15    demanding a greater premium for
16    spread at the point of issue."
17    Do you recall ever seeing specific ESG
18  research related to Petrobras?
19    **MS. BIRD:** Objection to form.
20    **THE WITNESS:** Again, in analyzing any
21  corporate credit, there would be exposure to these
22  social considerations, as well as governance -- will
23  be included in part of the range of fundamental
24  factors that we would take into consideration by
25  analyzing emerging market corporates.

Page 108

1    LIAN - CONFIDENTIAL
2    **BY MS. ELLIS:**
3  Q.  So do you have a specific recollection of
4  seeing research performed on ESG factors for
5  Petrobras?
6  **A.  I'm not sure what you meant by "specific."**
7  **Could you clarify?**
8  Q.  Did anyone -- did any research analyst ever
9  write a report regarding Petrobras's ESG rating?
10    **MS. BIRD:** Objection to form.
11    **THE WITNESS:** Again, the judgment and these
12  factors are taken into account when we do our due
13  diligence for analyzing credits across all emerging
14  market companies, and that would include Petrobras,
15  in our holistic approach to analyzing corporate
16  credits.
17    **BY MS. ELLIS:**
18  Q.  So there wouldn't be a separate analysis of
19  ESG as a stand-alone report?
20  **A.  We do have considerations of ESG weaved**
21  **into the overall analysis of the stand-alone**
22  **research reports of companies that we maintain**
23  **internally.**
24  Q.  Do you have considerations of ESG related
25  to Petrobras?

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL
CASE NO.: 14-cv-9662(JSR)

CHIA-LIANG LIAN
April 27, 2016

Page 109

1     LIAN - CONFIDENTIAL
2  A.  In terms of the specific memory, as I say,
3  the considerations of ESG are reported and outlined
4  and weaved into reports that we make -- our research
5  analysts draft in our internal reports.
6  Q.  Do you know what Western Asset's assessment
7  of Petrobras's ESG factors were as of April 2014?
8     MS. BIRD: Objection.  Form.
9     THE WITNESS: Could you clarify the
10  question? I don't think I understand fully.
11     BY MS. ELLIS:
12  Q.  Did Western Asset make an assessment of
13  Petrobras's ESG performance?
14     MS. BIRD: Objection to form.
15     THE WITNESS: Again, as of March of 2014,
16  our analysis of Petrobras or any emerging market
17  corporate credit would take a holistic approach
18  encompassing quantitative information, as well as a
19  qualitative judgment, which would include these
20  factors at any one given point in time.
21     BY MS. ELLIS:
22  Q.  Does Western Asset ever exclude investments
23  in particular companies based on ESG factors?
24  A.  To the best of my knowledge, I am not aware
25  of any particular credit, but there are instances

Page 110

1     LIAN - CONFIDENTIAL
2  that such exclusion could be made but on a
3  client-directed basis rather than one from an
4  analyst's point of view.
5  Q.  In the paragraph that I just read, there
6  was a reference to "letting financial management of
7  companies in which Western Asset invests know the
8  extent to which it seeks compensation for low ESG
9  ratings."
10    Did Western Asset ever convey a message to
11  the financial management of Petrobras concerning its
12  ESG ratings?
13     MR. SCHOCHET: Objection to form.
14     THE WITNESS: As I said, I have not
15  directly been involved in interactions with
16  Petrobras, but we -- while we have had, you know,
17  meetings with companies that we are invested in, I
18  am not aware -- neither am I unaware or aware of
19  those forms of communication as such.
20     BY MS. ELLIS:
21  Q.  You testified that occasionally on a
22  client-directed basis, a client might direct Western
23  Asset to exclude investment in a particular issuer
24  due to ESG factors?
25  A.  I do not manage any such portfolios, but I

Page 111

1     LIAN - CONFIDENTIAL
2  believe there could be instances where a
3  client-directed guideline could apply.
4  Q.  To your knowledge, was Western -- did a
5  client ever direct Western Asset to exclude
6  Petrobras on this basis?
7  A.  To the best of my knowledge, I am neither
8  un- -- aware or unaware of.
9  Q.  To your knowledge, did Western Asset ever
10  perform an analysis of the premium, if any, that it
11  would seek for fixed income investments in Petrobras
12  based on its ESG ratings?
13     MS. BIRD: Objection to form.
14     THE WITNESS: Again, the valuation of the
15  security shifts how we define -- as fair value
16  evolves as new information in a public domain
17  becomes available.  And we want to ensure that the
18  surveillance is real time and taken in a way that
19  incorporates the most updated information.  And the
20  spread is one of many factors that we will take into
21  account in arriving in an investment decision.
22     BY MS. ELLIS:
23  Q.  And in particular in considering ESG
24  factors?
25  A.  In this instance, we would -- this would be

Page 112

1     LIAN - CONFIDENTIAL
2  one factor that we will consider.
3  Q.  Turning to the second page of this
4  document, in the third paragraph down, this states:
5     "We consider 'G' to be the most
6     important of the three ESG factors.
7     Without good governance, which
8     Western Asset takes to include strong
9     investor relations and financial
10     reporting, among other things, it is
11     hard to be confident that management,
12     leadership, and integrity will be in
13     place for the 'E' and 'S' factors.
14     Good governance should be a
15     fundamental of every business."
16     To your knowledge, did anyone at Western
17  Asset perform an evaluation of Petrobras ratings
18  specifically on the governance factor?
19     MS. BIRD: Objection to form.
20     THE WITNESS: The governance is one of many
21  factors that we take into account when evaluating
22  companies that we're invested in, and we would have
23  taken into account the qualitative assessment of
24  governance when applied to investments in Petrobras.
25     BY MS. ELLIS:

Page 113

1        LIAN - CONFIDENTIAL
2  Q.   And what was Western Asset's assessment of
3  Petrobras on the governance factor?
4        MS. BIRD: Objection to form.
5        THE WITNESS: The judgment -- it is a
6  qualitative consideration based on our interactions
7  and information that is made publicly available, and
8  we do not view the information that was provided
9  that creates any reason for us to think otherwise.
10       BY MS. ELLIS:
11  Q.  Based on publicly available information in
12  April 2014, did Western Asset have an assessment of
13  how Petrobras rated on the governance factor?
14       MS. BIRD: Objection to form.
15       THE WITNESS: Again, at that point in time,
16  I'm not -- based on the information that was
17  provided to investors and market participants alike,
18  this is -- as this research note speaks to,
19  governance is an important part of the equation when
20  analyzing companies, and this is one factor of many
21  that we would take into account in making an -- a
22  judgment call in regards to our assessment on
23  Petrobras.
24       BY MS. ELLIS:
25  Q.   In April 2014, was there any publicly

Page 114

1        LIAN - CONFIDENTIAL
2  available information that led Western Asset to be
3  particularly concerned about Petrobras's governance
4  factor?
5        MR. SCHOCHET: Objection.
6        MS. BIRD: Objection to form.
7        THE WITNESS: Again, you know, we take a
8  holistic approach to investments in our fundamental
9  analysis. And to the best of my knowledge, based on
10  what is available in terms of data and
11  information -- income statements and data, we
12  believed that we have arrived to a decision that was
13  consistent with our overall analysis of the company.
14       BY MS. ELLIS:
15  Q.   And that decision was that Petrobras rated
16  well on the governance factor?
17       MR. SCHOCHET: Objection.
18       MS. BIRD: Objection to form.
19       THE WITNESS: I don't think that is what I
20  have suggested. All I'm saying is that governance
21  would be part of that consideration in arriving in
22  an investment -- investment decision. This is --
23  you know, again, just to reiterate, fundamental
24  credit research entails a whole range of factors
25  that we have to take under consideration, and

Page 115

1  governance falls under one of them.
2        BY MS. ELLIS:
3  Q.   Understanding that there is a whole range
4  of factors, but focusing just on this one factor,
5  what was Western Asset's assessment of just that one
6  factor of Petrobras in April 2014?
7        MS. BIRD: Objection to form.
8        THE WITNESS: Again, when we look at
9  credits in any -- in Petrobras or any company, we
10  look in terms of what we know based on the public
11  domain. And we certainly look at a whole range of
12  all factors that pertains -- that are important
13  considerations when making an investment decision,
14  governance including, but more importantly, you
15  know, based on the information that is made
16  available for us to arrive at a judgment call in an
17  overall sense.
18       BY MS. ELLIS:
19  Q.   So based on the publicly available
20  information as of April 2014, Western Asset believed
21  that there was no publicly available information
22  that was inconsistent -- no publicly available
23  information on the governance factor with regards to
24  Petrobras that was inconsistent with its
25

Page 116

1        LIAN - CONFIDENTIAL
2  investment -- with its decision to invest?
3        MS. BIRD: Objection to form.
4        THE WITNESS: So, again, I mean, I have to
5  stress, investment decisions beginning with research
6  to the point of execution where market valuations
7  are an equally -- equally important part of the
8  equation, and I cannot recall, you know, what was
9  the market -- prevailing market environment back in
10  March, April of 2014.
11       But our judgment is based on all factors at
12  play, and we consider all in a holistic approach as
13  opposed to isolating specific in deriving an
14  investment conclusion.
15       MS. BIRD: If you're going to switch
16  topics, maybe we could -- I know our lunch is here;
17  so we can keep going if you want.
18       Or if -- do you want to take a break, C.L.?
19  It is up to you.
20       MS. ELLIS: It is up to you.
21       THE WITNESS: Oh, okay. Why don't --
22       MS. BIRD: Why don't we take a break?
23  Okay.
24       THE WITNESS: Yes.
25       MS. BIRD: Okay.

Page 117

1    LIAN - CONFIDENTIAL
2    THE VIDEOGRAPHER: Off the record. The
3  time is 12:42.
4    (Lunch recess taken at 12:42 p.m.)
5
6
7
8
9  Los Angeles, California; Wednesday, April 27, 2016;
10    1:36 p.m.
11
12    THE VIDEOGRAPHER: We are back on the
13  record. This is the beginning of disk No. 3. The
14  time is 1336.
15
16    EXAMINATION (CONTINUED)
17    BY MS. ELLIS:
18  Q.  Mr. Lian, once Western Asset makes the
19  decision to invest in a particular security, how
20  does it effectuate those trades?
21  A.  Could you repeat the question.
22  Q.  How does Western Asset effectuate its
23  trades?
24    MR. SCHOCHET: Objection. Form.
25    THE WITNESS: Effectuate as in --

Page 118

1    LIAN - CONFIDENTIAL
2    BY MS. ELLIS:
3  Q.  As in what is the process for -- for those
4  trades -- for the mechanics of those trades?
5    MR. SCHOCHET: Objection to form.
6    THE WITNESS: So the trader of a desk will
7  be responsible for purchasing or selling the
8  security.
9    BY MS. ELLIS:
10  Q.  Western Asset is not a broker/dealer
11  itself; is that correct?
12    MS. BIRD: Objection to form.
13    THE WITNESS: I believe that to be the
14  case. It is not a broker/dealer.
15    BY MS. ELLIS:
16  Q.  And Western Asset does not place trades
17  with any affiliated brokers?
18    MR. SCHOCHET: Objection. Form.
19    THE WITNESS: Can you define what you mean
20  by "affiliated brokers"?
21    BY MS. ELLIS:
22  Q.  Affiliated brokers would be any entities
23  under common ownership with Western Asset.
24  A.  I believe that to be the case.
25  Q.  Western Asset does not engage in principal

Page 119

1  trading; is that correct?
2    MR. SCHOCHET: Objection. Form.
3    MS. BIRD: Objection to form.
4    THE WITNESS: Could you define "principal
5  trading"?
6    BY MS. ELLIS:
7  Q.  Buying or selling for Western Asset's own
8  account at its own risk.
9  A.  I do not believe so.
10  Q.  What trading platforms would a trader from
11  a particular desk use in making trades?
12    MR. SCHOCHET: Objection to form.
13    THE WITNESS: Again, could you define what
14  is meant by "trading platform"?
15    BY MS. ELLIS:
16  Q.  Would they use Bloomberg, for instance,
17  or -- do you know how they would make those trades?
18  A.  So Bloomberg is a source of information and
19  messaging between us and broker/dealer. So that --
20  I mean, if that makes it a platform for trading,
21  yes, Bloomberg is one such platform.
22  Q.  So once Western Asset makes the decision to
23  buy, how are the orders for securities placed?
24    MR. SCHOCHET: Objection. Form.
25

Page 120

1    LIAN - CONFIDENTIAL
2    THE WITNESS: So as I mentioned earlier,
3  the sector -- the sector desk's trader would be
4  responsible for executing those trades with
5  counterparties.
6    BY MS. ELLIS:
7  Q.  And how would they communicate with those
8  counterparties?
9  A.  It could be verbal, over the phone; it
10  could be via the chat room on Bloomberg.
11  Q.  Do traders have the ability to place orders
12  for trades while they're outside of the office?
13    MR. SCHOCHET: Objection.
14    THE WITNESS: In general, normal practice
15  is when traders are on the road, they are not
16  supposed to trade -- execute trades.
17    BY MS. ELLIS:
18  Q.  Does Western Asset maintain any records
19  that reflect the location of the trader at the
20  particular time that a order for securities was
21  placed?
22    MS. BIRD: Objection to form.
23    THE WITNESS: To my knowledge, we have a
24  database that keeps track of key information
25  regarding trades executed by Western Asset. I'm not

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL
CASE NO.: 14-cv-9662(JSR)

CHIA-LIANG LIAN
April 27, 2016

Page 121

1    LIAN - CONFIDENTIAL
2  certain if the location -- it is -- it is one of the
3  information, but typically, by design, the name of
4  the trader, which is included as part of the
5  information, would give some information as to the
6  location of the trade.
7    BY MS. ELLIS:
8  Q.  And what information would the name of the
9  trader give as to the location of the trade?
10 A.  So if a trader is a Pasadena employee, it
11 would -- it would, by definition, be traded out of
12 Pasadena is what I meant.
13 Q.  And how would you know that it was traded
14 out of Pasadena?
15 A.  As I say, there is -- I -- I am unaware --
16 I do not know the specifics of the database within
17 the overall trading system, and I do not know if the
18 location of the trade is specified or whether the
19 information is kept.
20 Q.  Where the -- do you know whether the
21 location of the trader is specified?
22 A.  I -- I am not certain if I know the answer,
23 but the name of the trader would give an idea.
24 Q.  But the name of the trader wouldn't tell
25 you definitively where that trader was located when

Page 122

1    LIAN - CONFIDENTIAL
2  the -- when the order for a trade was placed?
3    MR. SCHOCHET: Objection to form.
4    MS. BIRD: Objection to form.
5    THE WITNESS: Again, I do not know the
6  specifics of the information within the Western
7  trading database.  It may or may not include the
8  location where a trade is executed.
9    BY MS. ELLIS:
10 Q.  When a broker/dealer buys or sells
11 securities as an agent for Western Asset, that
12 broker/dealer is typically transacting with another
13 broker/dealer who is transacting as an agent for its
14 customer.  Is that your understanding?
15   MS. BIRD: Objection to form.
16   THE WITNESS: I think the transaction, to
17 the extent that it matters to me as representing
18 Western Asset, is whom we face as an approved
19 counterparty, whether it a purchase or a sale.  I
20 do not have information in regards to what the --
21 the process of those trades beyond the transaction
22 between Western Asset and the approved counterparty.
23   BY MS. ELLIS:
24 Q.  And when you say "approved counterparty,"
25 you mean Western Asset's own broker/dealer?

Page 123

1    LIAN - CONFIDENTIAL
2  A.  No.  The -- the list of Wall Street banks
3  and -- that are -- the list of banks that we are
4  approved to trade with.  That's what I meant.
5  Q.  And what role do you understand those
6  approved banks to play in the trade?
7  A.  The role?  I'm not sure if I understand
8  your question, but we need a list of approved
9  counterparties to face for any trade, and we're
10 limited to that list of counterparties that are
11 approved prior by our legal team in Western with the
12 counterparty's legal team.  So that's what I meant
13 by "approved."
14 Q.  And those banks are acting as an agent for
15 Western Asset?
16   MS. BIRD: Objection to form.
17   THE WITNESS: I'm not sure if that is the
18 right characterization.  Again, they are in the
19 market-making business.  We transact on behalf of
20 our clients' purchase and sale of securities.  And
21 all I know is if -- at any given point in time the
22 trade is done in a way that reflects the normal
23 practice for a trade transaction.
24   BY MS. ELLIS:
25 Q.  Do you have an understanding of what occurs

Page 124

1    LIAN - CONFIDENTIAL
2  after Western Asset transacts with one of those
3  approved banks?
4    MS. BIRD: Objection to form.
5    THE WITNESS: What happens is predominantly
6  internal, meaning there is a process where the front
7  office, which is us, trading a particular security,
8  then key in the trade so that our mid and back
9  office can align those trades for settlement,
10 typically T plus 2 or 3, with their counterparts in
11 the financial institution while facing those trades.
12   BY MS. ELLIS:
13 Q.  Do you have an understanding of whether the
14 approved banks who buy or sell securities for
15 Western Asset are purchasing those securities on a
16 principal basis or as an agent for someone else?
17   MS. BIRD: Objection to form.
18   THE WITNESS: I do not believe that I have
19 information pertaining to those factors that you
20 have listed.
21   BY MS. ELLIS:
22 Q.  And do you have an understanding of whether
23 the broker/dealer with whom Western Asset interacts
24 is typically transacting with another broker/dealer
25 on the other side of that transaction?

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL
CASE NO.: 14-cv-9662(JSR)

CHIA-LIANG LIAN
April 27, 2016

Page 125

1     LIAN - CONFIDENTIAL
2  A.   As I've --
3      MR. SCHOCHET: Objection to form.
4      THE WITNESS: As I've said, I only know the
5  counterparty that I'm facing for a specific security
6  or transaction and nothing beyond that.
7      BY MS. ELLIS:
8  Q.  So when you say "counterparty," you don't
9  actually know the role that that entity played in
10  the transaction?
11     MR. SCHOCHET: Objection to form.
12     MS. BIRD: Objection to form.
13     THE WITNESS: Could you clarify your
14  question.
15     BY MS. ELLIS:
16  Q.  Do you have an understanding of whether the
17  entity with whom Western Asset transacts is acting
18  as an agent on behalf of someone else?
19     MS. BIRD: Objection to form.
20     THE WITNESS: We do not have those -- or I
21  do not believe that we have those information.
22     BY MS. ELLIS:
23  Q.  Or whether the entity with whom Western
24  Asset transacts -- is transacting with another
25  broker/dealer who is acting as agent for another

Page 126

1     LIAN - CONFIDENTIAL
2  entity?
3      MR. SCHOCHET: Objection to form.
4      MS. BIRD: Same objection.
5      THE WITNESS: All I know with a transaction
6  is that I face bank A, B, C for a given trade.  I do
7  not -- so that is as far as I know in terms of
8  external information in regards to a transaction --
9  any trade transaction.
10     BY MS. ELLIS:
11  Q.  And that bank that you face in these
12  transactions, does it typically tell you how your
13  trade was executed?  For an example, whether it was
14  executed on an exchange?
15  A.  I do not --
16     MS. BIRD: Objection to form.
17     THE WITNESS: Again, can you clarify what
18  you mean by "exchange"?
19     BY MS. ELLIS:
20  Q.  I apologize.  Withdrawn.
21     Do you have an understanding of whether the
22  Wall Street bank that you contact to place an order
23  for securities fills the order from its own
24  inventory of securities?
25  A.  I do not have information for any given

Page 127

1     LIAN - CONFIDENTIAL
2  trade transaction.
3  Q.  Following up on the way Western Asset
4  actually contacts these broker/dealers, you
5  mentioned, I believe, Bloomberg and the phone as two
6  possible scenarios.  Are there any other ways in
7  which Western Asset would contact those
8  broker/dealers?
9  A.  These are typically the two most used ways
10  of communication for a trade transaction.
11  Q.  Can you think of any other ways?
12  A.  At this point in time, I cannot.
13     (Exhibit 10 was marked for
14     identification.)
15     BY MS. ELLIS:
16  Q.  You've just been handed what has been
17  marked as Exhibit 10, and this is Western Asset's
18  form ADV, part 2 brochure.  And it is dated June 30,
19  2013.
20     Can you look at page 32 of this document?
21  In the third paragraph of that page, which states,
22  "Western Asset seeks to obtain best execution of its
23  clients' trades through monitoring and effectively
24  controlling the quality of trade decisions," do you
25  have an understanding of what "best execution" means

Page 128

1     LIAN - CONFIDENTIAL
2  in this context?
3  A.  First of all, I'm not familiar with this
4  document.
5      I think it basically means that -- in a
6  more generic sense, it basically means that the
7  trade is efficiently done in a way that conforms to
8  the needs of the clients.
9  Q.  Is your understanding that best execution
10  also includes best price?
11     MR. SCHOCHET: Objection.  Form -- form.
12  And lack of foundation.
13     THE WITNESS: Again, pricing is one of
14  several factors that we would consider in terms of
15  best execution.
16     BY MS. ELLIS:
17  Q.  You mentioned several banks that Western
18  Asset uses to effectuate its trades.  If Western
19  Asset's traders were able to obtain better execution
20  through a foreign bank, would you expect them to do
21  so?
22     MR. SCHOCHET: Objection.
23     MS. BIRD: Objection to form.
24     THE WITNESS: Could you define "foreign
25  bank"?

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL
CASE NO.: 14-cv-9662(JSR)

CHIA-LIANG LIAN
April 27, 2016

Page 129

1    LIAN - CONFIDENTIAL
2    BY MS. ELLIS:
3  Q.  A bank outside of the U.S.
4  A.  Again, I want to be sharper in terms of the
5  definition of "foreign bank" because there are
6  foreign banks that are based outside of the country
7  of domicile.  Would they be included, by definition,
8  as foreign bank?
9     For instance, a German bank with -- an
10  office in New York of a German bank?
11 Q.  Not the office in New York of a German
12  bank, but here I would say that a foreign
13  broker/dealer would include the German bank --
14 A.  In London?
15 Q.  -- the German branch of a --
16 A.  In London?
17 Q.  -- U.S. company.
18    MR. SCHOCHET: Same objection.
19    MS. BIRD: Join.
20    THE WITNESS: Again, I -- I don't know -- I
21  don't know the answer to the question.
22    BY MS. ELLIS:
23 Q.  Looking at the fifth paragraph on this same
24  page, this document states:
25    "In selecting brokers for execution,

Page 130

1    LIAN - CONFIDENTIAL
2  Western Asset seeks to ensure that
3  brokers are selected on the merits
4  and not because of other reasons.
5  Western Asset maintains an approved
6  broker list, which is designed to
7  limit trading only to those brokers
8  who demonstrate desk strength,
9  knowledgeable sales coverage, quality
10  research, capital commitment, and
11  financial stability.  Trades may only
12  be executed with those brokers on the
13  list."
14    To your knowledge, is location of a broker
15  a factor that Western Asset considers in selecting
16  this list of brokers?
17 A.  I do not know the answer to that question.
18 Q.  Do you have an understanding of the
19  location of the brokers on the approved broker list?
20 A.  Yes, to the extent that you have a specific
21  requirement directed by the client to trade with a
22  certain entity of a global bank.
23 Q.  So certain clients direct which
24  broker/dealers Western Asset can use?
25 A.  No.  There are specific instances where

Page 131

1    LIAN - CONFIDENTIAL
2  amongst the list of approved brokers that Western
3  Asset has, the client will have an added
4  requirement, for reasons that I don't know, that may
5  dictate the trade to face an entity -- a specific
6  location of that same counterparty.
7  Q.  Does the list of approved brokers include
8  brokers located outside of the United States?
9  A.  Most of the trades executed out of
10  Pasadena -- majority of them, to my knowledge, are
11  done onshore in the U.S.
12 Q.  But the list of approved brokers does
13  include brokers located outside of the United
14  States?
15    MR. SCHOCHET: Objection.
16    THE WITNESS: I don't have the specific
17  details to answer that question in an accurate way.
18    BY MS. ELLIS:
19 Q.  The situation you described when there are
20  specific instances when a client directs Western
21  Asset to use a particular location of a
22  broker/dealer -- did that instance ever occur with
23  any of the Western Asset funds, the separate account
24  plaintiffs or the other action plaintiffs in
25  Exhibits 1, 2, and 3?

Page 132

1    LIAN - CONFIDENTIAL
2    MR. SCHOCHET: Objection.
3    MS. BIRD: Objection to form.
4    MR. SCHOCHET: Form and lack of foundation.
5    THE WITNESS: I do not know.
6    BY MS. ELLIS:
7  Q.  For the trades in Petrobras Securities that
8  you were involved in, did the client ever direct
9  Western Asset to use a specific broker/dealer or
10  specific office of a broker/dealer?
11 A.  To the best of my knowledge, I am unaware
12  of any such situation.
13 Q.  Looking at page 33 of this document, in the
14  third paragraph on that page, this states:
15    "Western Asset does not maintain
16    directed brokerage arrangements on
17    its own initiative and generally
18    recommends against them in light of
19    the unique features of the
20    fixed-income market and the potential
21    impact on Western Asset's trading
22    decisions.  However, clients may
23    request that Western Asset direct the
24    client's brokerage to a particular
25    broker."

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL
CASE NO.: 14-cv-9662(JSR)

CHIA-LIANG LIAN
April 27, 2016

Page 133

1        LIAN - CONFIDENTIAL
2        Are you aware of whether any of the Western
3     Asset funds had directed brokerage arrangements
4     during the relevant period?
5        **A. I do not. I'm not aware.**
6     Q. And do you know if any of the separate
7     account plaintiffs had directed brokerage
8     arrangements during the relevant period?
9        **MR. SCHOCHET:** Objection. Lack of
10    foundation.
11       **THE WITNESS:** I do not have information to
12    that.
13       **BY MS. ELLIS:**
14    Q. And are you aware of whether any of the
15    other action plaintiffs had directed brokerage
16    arrangements during the relevant period?
17       **MR. SCHOCHET:** Same objection.
18       **THE WITNESS:** I do not have information
19    regarding to that.
20       **BY MS. ELLIS:**
21    Q. Are there occasions when it is in Western
22    Asset's interest or the interest of its clients to
23    buy or sell a security outside of U.S. trading
24    hours?
25       **MS. BIRD:** Objection to form.

Page 135

1        LIAN - CONFIDENTIAL
2     **A. To the best of my knowledge, the answer is**
3     **no.**
4     Q. You mentioned previously that trades are
5     placed by individuals on a desk-by-desk basis?
6     **A. Could you repeat that.**
7     Q. You said earlier that a trader for a
8     particular desk would have the responsibility for
9     the trades for that desk; is that correct?
10    **A. Yes, that's correct.**
11    Q. And where are those traders located?
12       **MS. BIRD:** Objection to form.
13       **THE WITNESS:** In which asset class?
14       **BY MS. ELLIS:**
15    Q. Starting with the EM desk, where are those
16    traders located?
17    **A. Most of the EM trades are executed out of**
18    **Pasadena.**
19    Q. And there are EM traders in other offices
20    as well?
21    **A. There are no EM traders outside of Pasadena**
22    **as such.**
23    Q. You stated that most of the EM trades are
24    executed out of Pasadena. Where are the remaining
25    EM trades executed out of?

Page 134

1        LIAN - CONFIDENTIAL
2        **THE WITNESS:** Could you repeat the
3     question.
4        **BY MS. ELLIS:**
5     Q. Are there occasions when it is in Western
6     Asset's interest or the interest of its clients to
7     buy or sell a security outside of U.S. trading
8     hours?
9        **MS. BIRD:** Same objection.
10       **THE WITNESS:** Yes. In the local markets of
11    Asia where the Asia time is much more liquid, these
12    trades will be handed over to the Singapore office
13    for execution for liquidity reasons.
14       **BY MS. ELLIS:**
15    Q. And did Western Asset ever buy or sell
16    securities outside of U.S. trading hours for
17    Petrobras?
18       **MS. BIRD:** Objection to form.
19       **THE WITNESS:** I do not have information and
20    I'm not aware of any such occurrence.
21       **BY MS. ELLIS:**
22    Q. While you were in the Singapore office,
23    were you ever -- ever aware of a Singapore office
24    executing trades with respect to Petrobras for
25    Western Asset?

Page 136

1        LIAN - CONFIDENTIAL
2     **A. Some trades are done out of Asia to the --**
3     **out of Singapore, rather, to the extent that**
4     **emerging Asian bonds are subsumed under the emerging**
5     **markets umbrella, and we do have some central and**
6     **eastern European trades for time zone considerations**
7     **that are traded out of London.**
8     Q. Are trades executed out of Western Asset's
9     Sao Paulo office?
10    **A. The Sao Paulo office focus on the local**
11    **business. So trades portfolios that are managed out**
12    **of Pasadena do not typically get traded out of Sao**
13    **Paulo.**
14    Q. Do they ever get traded out of Sao Paulo?
15    **A. To my knowledge, I do not believe so.**
16    Q. In instances where Western Asset has
17    purchased securities with the same CUSIP over time,
18    does Western Asset maintain records that would
19    indicate when it purchased each lot of securities.
20    **A. I do not know for sure, but I believe that**
21    **the internal database for our trading system would**
22    **have the information that you have just outlined.**
23    Q. And in a circumstance where Western Asset
24    purchased securities of the same CUSIP over time and
25    then decided to sell some but not all of that

Page 137

1     LIAN - CONFIDENTIAL
2  position, would Western Asset's records indicate the
3  purchase date of the securities that were sold?
4     MS. BIRD: Objection to form.
5     THE WITNESS: I'm not sure if I have the
6  answer to that question.
7     BY MS. ELLIS:
8  Q.   Were any of the accounts listed in Exhibits
9  1, 2, and 3 managed outside of Pasadena?
10     MS. BIRD: Objection to form.
11     THE WITNESS: I don't have an answer to
12  that question.
13     BY MS. ELLIS:
14  Q.   Were any of those -- any of the accounts
15  listed in Exhibits 1, 2, and 3 managed from Sao
16  Paulo?
17     MS. BIRD: Same objection.
18     THE WITNESS: I don't know for sure.
19     BY MS. ELLIS:
20  Q.   If an account was managed in one of the
21  foreign offices, the trading would have taken place
22  in that office as well?
23     MR. SCHOCHET: Objection.  Form.
24     THE WITNESS: Typically, yes, but not
25  always.

Page 138

1     LIAN - CONFIDENTIAL
2     As I've mentioned earlier, for the emerging
3  market funds where there are local Asian trades,
4  these are typically delegated to our Singapore
5  colleagues given the time zone advantages,
6  particularly market liquidity, during the New --
7  during the Asian hours.
8     BY MS. ELLIS:
9  Q.   So other than the circumstances of when
10  there are local Asian trades, trades typically occur
11  in the city where the account is managed?
12     MS. BIRD: Objection to form.
13     THE WITNESS: Again, generally speaking,
14  this seems usually the case, but I have insufficient
15  information to respond to that question in a
16  categorical way.
17     BY MS. ELLIS:
18  Q.   Are you aware of which Western -- Western
19  Asset entity was party to the investment management
20  agreements with the entities listed in Exhibits 1,
21  2, and 3?
22  A.   No, I'm not aware.
23  Q.   If it was the U.K. affiliate of Western
24  Asset that was party to those investment management
25  agreements, would that tell you where the account

Page 139

1  was managed?
2  A.   Not necessarily.  I mean, that's
3  insufficient information to determine in a
4  categorical way the location of the portfolio.
5  Q.   What information would you need to
6  determine in a categorical way the location of the
7  portfolio?
8  A.   Maybe --
9     MS. BIRD: Objection to form.
10     THE WITNESS: Maybe the way to seek a
11  clarification is that some funds are managed out of
12  one office that are directed to a client base of
13  another region; right?  So I'm not sure if you meant
14  the -- the accounts that are managed out of Pasadena
15  or whether the end client resides in the U.S. or in
16  Europe or Asia.  So I'm -- I'm -- in other words,
17  I'm not sure, you know, what -- what the question is
18  directing at.
19     BY MS. ELLIS:
20  Q.   Are there records that Western Asset keeps
21  that would show where the account is managed out of,
22  meaning where the people who manage that account are
23  located?
24  A.   Again, I believe that we have database of

Page 140

1     LIAN - CONFIDENTIAL
2  the details of every account that are under
3  management in the Western Asset database, and there
4  will be some information that will give an idea of
5  where the funds are managed -- which office the fund
6  is managed out of.
7     (Exhibit 11 was marked for
8  identification.)
9     BY MS. ELLIS:
10  Q.   You've just been handed what has been
11  marked as Exhibit 11, which is a document bearing
12  Bates stamps Western 01977767 to 01977866.
13     MS. BIRD: And just for the record, I think
14  these are not one document, but it is potentially
15  over 100 documents that are all produced together.
16     MS. ELLIS: I actually think this was --
17  this is a portion of a document -- of one document
18  that was all produced together.
19     MS. BIRD: Okay.  But these are separate
20  trade tickets; right?
21     MS. ELLIS: Yes.
22     MS. BIRD: Okay.
23     BY MS. ELLIS:
24  Q.   Looking just at the first page of this
25  document, do you recognize this form?

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL
CASE NO.: 14-cv-9662(JSR)

CHIA-LIANG LIAN
April 27, 2016

Page 141

1     LIAN - CONFIDENTIAL
2  A.  I do not recognize this form on a daily
3  basis.
4  Q.  Meaning what?
5  A.  From a desk perspective, the trade blotter
6  is where information that the desk would have access
7  to, and it doesn't come in this particular format.
8  Q.  Is the substantive information similar,
9  just in a different format?
10  A.  I don't know if it is identical, but the
11  key pieces of information are broadly consistent.
12  Q.  So looking at this document, this
13  confirmation reflects a purchase of Petrobras notes
14  maturing in 2040 with a trade date of November 4,
15  2010, and a settlement date of November 9, 2010; is
16  that correct?
17     MS. BIRD: And just to be clear, you're
18  looking at the front -- the front page of this
19  exhibit; correct?
20     MS. ELLIS: I'm looking at Bates stamp
21  97767.
22     MS. BIRD: Thank you.
23     THE WITNESS: Yes, that is what it says.
24  Trade date:  4 November 2010; and settlement date:
25  9 November, 2010.

Page 142

1     LIAN - CONFIDENTIAL
2     BY MS. ELLIS:
3  Q.  Looking at this document, do you know how
4  Western Asset placed the order for these securities?
5     MS. BIRD: Again, look -- the -- the --
6  just the first page of the document.
7     BY MS. ELLIS:
8  Q.  Looking at the first page of this document,
9  do you have an understanding of how Western Asset
10  placed the order for these securities?
11  A.  I don't think there is sufficient
12  information to respond to that question based on the
13  information here.
14  Q.  So the first page of this document does not
15  tell you how Western Asset placed the order for
16  these securities?
17     MR. SCHOCHET: Objection to form.
18     THE WITNESS: Again, could you define what
19  you meant by "how"?
20     BY MS. ELLIS:
21  Q.  What process was used to effectuate the
22  trade?
23     MR. SCHOCHET: Objection.
24     THE WITNESS: The trade ticket reflects the
25  transaction details.  It is a snapshot of a trade

Page 143

1     LIAN - CONFIDENTIAL
2  that was done, in this instance, on the 4th of
3  November 2010.  I don't think it provides
4  information in regards to the how.
5     BY MS. ELLIS:
6  Q.  Is there anything in the first page of this
7  document that allows you to determine the individual
8  who placed the order for the trade?
9  A.  I don't think there is information here
10  that gives me that piece of information.
11  Q.  And anything on the first page of this
12  document that allows you to determine where that
13  person was located when they placed the order for
14  this trade?
15  A.  I don't think there is information here
16  that guides me either way.
17  Q.  And are there other records that Western
18  Asset has access to that contains the information on
19  where the individual is located at the time they
20  place the order for the trade?
21     MS. BIRD: Objection to form.  Asked and
22  answered.
23     THE WITNESS: I -- I'm sure -- you know, I
24  believe the database -- as I said earlier, the
25  internal trading system does have information in

Page 144

1     LIAN - CONFIDENTIAL
2  regards to the individual that executed the trade on
3  this particular day.  So there will be information,
4  but this -- in this instance, based on page 1 of
5  Exhibit 11, there is no information here that tells
6  me about the individual or the location of trade.
7     BY MS. ELLIS:
8  Q.  And is there anything on the first page of
9  this exhibit that indicates the time of day the
10  order for this trade was placed?
11  A.  I do not believe there is a timestamp or
12  information in regards to the order.
13  Q.  Looking at the top left corner under
14  "Account," there is a portfolio number.  Do you see
15  that?
16  A.  Yes, I do.
17  Q.  What does that number signify?
18  A.  These numbers are given and assigned to
19  every portfolio that we manage internally.  This is
20  used as a reference for trades and other
21  trade-related issues.
22  Q.  Does that number tell you anything about
23  which Western Asset office is responsible for
24  managing that portfolio?
25  A.  I don't think there is information to

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL
CASE NO.: 14-cv-9662(JSR)

CHIA-LIANG LIAN
April 27, 2016

Page 145

LIAN - CONFIDENTIAL
1
2  ascertain that just by looking at the portfolio
3  number.
4  Q.  When you were based in Singapore, did the
5  portfolio numbers begin with a particular number?
6  A.  In the case of the Singapore portfolios
7  that I managed, most of them begin with the
8  number 8.
9  Q.  Do you know whether the number 2 is
10 typically assigned to a particular Western Asset
11 office?
12 A.  I'm not aware of it.
13 Q.  Are you aware of whether any other number
14 is typically assigned to any particular Western
15 Asset office?
16 A.  I'm not aware.
17 Q.  On the -- in the top right corner, you'll
18 see a heading, "Custodian Bank Information."
19 A.  Yes.
20 Q.  Once a trade settles, securities are
21 delivered to a custodian bank; is that correct?
22 A.  That is correct.
23 Q.  And would the funds used to pay for the
24 securities have been sent to the seller from that
25 same custodial bank?

Page 146

LIAN - CONFIDENTIAL
1
2  A.  Could you repeat the question, please.
3  Q.  Would the funds used to pay for the
4  securities have been sent from that same custodial
5  bank?
6  A.  So the custodian bank would deliver the
7  cash, in this instance, for the purchase, to the
8  counterparty, in this instance, Deutsche Bank, so
9  that the exchange of cash from State Street Boston
10 to Deutsche Bank, custodian, would be effected, and
11 then the security would be posted from Deutsche
12 Bank's custodian to State Street Boston, the
13 custodian bank, for this stated account, account
14 2321.  This is what I believe is the -- the
15 settlement process.
16 Q.  Do you have an understanding of where the
17 custodial bank account was actually located?
18 A.  In this instance, I -- I guess it is based
19 in Boston.
20 Q.  And are you basing that guess on the -- the
21 name of the custodial bank?
22 A.  Yes.  Based on what is available on this
23 information, although I cannot categorically know
24 for sure the location of the custodial bank beyond
25 what is stated on this particular trade form.

Page 147

LIAN - CONFIDENTIAL
1
2  Q.  Do you have an understanding of the system
3  where this document was gathered from?
4  A.  I do not.
5  Q.  And what system is the trade blotter that
6  you previously mentioned?
7  A.  It is an internal system that we use at the
8  front office to key in trades that we execute.
9  Q.  And who is responsible for keying in those
10 trades?
11 A.  The sector -- the sector -- the team.  So
12 emerging markets trades would typically be trade --
13 entered by the trader, although, from time to time,
14 portfolio managers would also key in trades in that
15 blotter.
16 Q.  And that blotter that you just described --
17 that is the system that you referenced that you
18 believe reflects the name of the Western Asset
19 individual that placed the trade?
20 A.  That is correct.
21 Q.  Towards the bottom of the first page of
22 this exhibit, you'll see a heading that reads,
23 "Settlement parties."
24 A.  Yes.
25 Q.  And below that, a line that reads,

Page 148

LIAN - CONFIDENTIAL
1
2  "Settlement location."  And next to that, there is a
3  code, "DTCYUS 33."  Do you have an understanding of
4  what that code -- it means?
5  A.  I do not.
6  Q.  To the right of that you'll see a reference
7  to "DTC."  Do you have an understanding of what that
8  refers to?
9  A.  To my knowledge, this is a platform for
10 settlement of trades executed by the investment
11 management companies with their respective
12 counterparties that they face for those
13 transactions.
14 Q.  Below that, on the line that reads,
15 "Buyer/Seller," there is a reference to a code
16 "0573."  Do you know what that signifies?
17 A.  I do not.
18 Q.  And to the right of that, it reads,
19 "Deutsche Bank."  Does that signify that Deutsche
20 Bank acted as the broker for Western Asset in this
21 transaction?
22 A.  It appears so.
23 Q.  Is there anything in this document that
24 allows you to determine whether Deutsche Bank acted
25 as principal or agent?

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL
CASE NO.: 14-cv-9662(JSR)

CHIA-LIANG LIAN
April 27, 2016

Page 149

1    LIAN - CONFIDENTIAL
2    **MS. BIRD:** Objection to form.
3    **THE WITNESS:** I don't know.
4    **BY MS. ELLIS:**
5 Q.  Do you have any understanding of where the
6    Deutsche Bank personnel involved were located?
7 **A.   Again, for this particular trade form, and**
8    **this trade that was executed on 4th of November,**
9    **2010, there is no information as stated on this**
10   **sheet that tells me the location of the**
11   **counterparty.**
12 Q.  Do you have an understanding that Deutsche
13   Bank has offices all over the world?
14 **A.   Yes.**
15 Q.  The last line under "Settlement Parties"
16   reads, "DELIV/RECV agent."  And this here states,
17   "2485."  Do you have an understanding of what that
18   refers to?
19 **A.   I do not.**
20 Q.  You can put that to the side.
21    You testified earlier that at a certain
22   point the market became aware of an alleged bribery
23   scheme at Petrobras that is known as Lava Jato; is
24   that correct?
25 **A.   Yes.**

Page 150

1    **LIAN - CONFIDENTIAL**
2 Q.  When did you first become aware of the
3    alleged bribery scheme?
4    **MS. BIRD:** Objection to form.
5    **THE WITNESS:** The timing was, to the best
6    of my knowledge, sometime late 2014.  And at
7    different points in time thereafter, the situation
8    had evolved considerably.  That was to my
9    understanding.
10   (Exhibit 12 was marked for
11   identification.)
12   **BY MS. ELLIS:**
13 Q.  You've just been handed what has been
14   marked as Exhibit 12, which is an article on the
15   "Forbes" website with the headline "Petrobras puts
16   Brazil President Dilma in hot seat," and the article
17   is dated March 23, 2014.
18    Do you recall being aware -- sorry.
19   Withdrawn.
20    At the top of the second page of this
21   document, it states:
22    "Over the last several weeks,
23    Petrobras has been inundated with
24    allegations of corruption.  Chalk it
25    up to the election cycle, but bad

Page 151

1    LIAN - CONFIDENTIAL
2    news has sprung a leak in the state
3    energy giant.  It's going to get
4    worse before it gets better."
5    Do you recall seeing news of this sort in
6    March of 2014?
7    **MS. BIRD:** Objection to form.
8    **THE WITNESS:** In March of 2014, I do not
9    recall of reading such releases.
10   **BY MS. ELLIS:**
11 Q.  So you -- so you -- you did not personally
12   become aware of any alleged bribery scheme at
13   Petrobras until late 2014?
14   **MS. BIRD:** Objection to form.
15   **THE WITNESS:** I had taken over as
16   co-headship around March 2014, and my scope of
17   business extends and include Brazil, but beyond
18   Brazil.  And at that point in time, to my knowledge,
19   that wasn't something that I was aware of.
20   **BY MS. ELLIS:**
21 Q.  And you became aware once you took over
22   your co-headship?
23   **MS. BIRD:** Objection to form.  Misstates
24   witness's testimony.
25   **THE WITNESS:** At that point in time, there

Page 152

1    LIAN - CONFIDENTIAL
2    were a slew of concerns and opportunities that we
3    have to discuss of which Latin American and all
4    opportunities within emerging market are part of.  I
5    do not recall specific -- I don't have an idea of
6    when it -- it started.
7    **BY MS. ELLIS:**
8 Q.  Western Asset continued to make purchases
9    of Petrobras Securities after learning of the
10   alleged scheme; is that correct?
11   **MS. BIRD:** Objection to form.
12   **THE WITNESS:** Could you define after -- the
13   time period after?
14   **BY MS. ELLIS:**
15 Q.  After late 2014.
16 **A.   Again --**
17   **MS. BIRD:** Objection to form.  I think that
18   precision and your date is important here, Counsel,
19   and I'm not sure what you mean by "late 2014."
20   **MR. SCHOCHET:** Join in the objection.
21   **BY MS. ELLIS:**
22 Q.  You testified that you first became aware
23   of the alleged bribery scheme in late 2014; is that
24   correct?
25 **A.   Broadly speaking, yes.**

Page 153

1      LIAN - CONFIDENTIAL
2  Q.  Do you have an understanding of which month
3  in 2014?
4  A.  I do not recall.
5  Q.  After the point in time when you became
6  aware of the alleged bribery scheme, did Western
7  Asset continue to make purchases at Petrobras
8  Securities?
9      MS. BIRD: I'm also going to again object
10 to form.  Also as to what "the alleged bribery
11 scheme entails."
12     THE WITNESS: And, again, decisions on
13 investment are not grounded on speculation and we do
14 not -- we do not attach allegations and assume them
15 to be factual points to consider when evaluating a
16 company or a country.
17     BY MS. ELLIS:
18 Q.  Did Western Asset continue to make
19 purchases at Petrobras Securities in 2015?
20 A.  Over the course of time, I believe taking
21 into account both fundamental analysis and valuation
22 considerations, we have made transactions at
23 different points in time as information -- or more
24 information becomes public.
25     MS. BIRD: You want to go off the record

Page 154

1      LIAN - CONFIDENTIAL
2  for a minute?
3      MR. BAREFOOT: That would be good,
4  actually.
5      MS. BIRD: Okay.
6      THE VIDEOGRAPHER: Off the record.  The
7  time is 1436.
8      (Recess.)
9      THE VIDEOGRAPHER: We are back on the
10 record.  The time is 1449.
11     BY MS. ELLIS:
12 Q.  Mr. Lian, even if you don't remember seeing
13 this specific article, was this the type of news and
14 analysis that Western Asset would have taken into
15 account making its investment decisions?
16     MR. SCHOCHET: Objection to form.
17     THE WITNESS: This would be part of the
18 information that, as a team, we would take into
19 account.  But as I want to reiterate, investment
20 decisions is based on consideration of a whole range
21 of fundamental factors and, importantly, we do not
22 speculate on -- on news and information such as
23 this.
24     MS. ELLIS: And just a clarifying point for
25 the record, the article that I was discussing was

Page 155

1  what was marked as Exhibit 12.
2  Q.  You stated that -- that Western Asset does
3  not speculate on the part of news and information
4  such as this.  Was it your view that when news first
5  came out about corruption at Petrobras, those were
6  only speculations?
7      MS. BIRD: Objection to form.
8      THE WITNESS: Could you repeat your
9  question, please.
10     BY MS. ELLIS:
11 Q.  When news first came to light about
12 corruption allegations at Petrobras, was it Western
13 Asset's view that, at that point, those were only
14 allegations that had not yet been proven?
15 A.  Again, news such as this remain, obviously,
16 in our radar screen in terms of ongoing surveillance
17 for our investment exposure, but critically, our
18 reliance is on official information provided by the
19 governments in the case of country credits, or
20 statements by management team in the case of
21 companies.
22 Q.  Looking at the third page of Exhibit 12,
23 this reads that:
24     "On Friday, one of Petrobras's former

Page 156

1      LIAN - CONFIDENTIAL
2  executive directors, Paulo Roberto da
3  Costa, was arrested by Federal Police
4  on allegations of money laundering
5  while at the company."
6      Do you remember when you first learned
7  about Paulo Roberto da Costa's arrest?
8  A.  I do not recall.
9  Q.  At the time, was it Western Asset's view
10 that Costa's arrest was speculation of bribery?
11     MS. BIRD: Objection to form.
12     THE WITNESS: Again, at that point in time
13 of the date of the said article on Exhibit 12, I was
14 co-head alongside my colleague Keith Gardner, and I
15 was not following closely to these allegations at
16 that point in time.
17     BY MS. ELLIS:
18 Q.  Is this the type of news that would have
19 had an impact on Western Asset's analysis of
20 Petrobras?
21     MR. SCHOCHET: Objection.
22     MS. BIRD: Join.
23     THE WITNESS: We will keep an eye on these
24 developments, but I just want to reiterate we do not
25 make changes to our investment decisions based on

Page 157

1    LIAN - CONFIDENTIAL
2  allegations, but importantly rely on official data
3  or information from governments and management teams
4  of companies.
5    **BY MS. ELLIS:**
6  Q.  Do you have an understanding of when, in
7  Western Asset's view, information regarding a
8  bribery scheme at Petrobras came to be understood as
9  official data or information?
10    **MS. BIRD:** Objection to form.
11    **THE WITNESS:** No, I don't, as I had only
12  assumed the role of co-head emerging markets around
13  the time of March, April 2014.
14    **BY MS. ELLIS:**
15  Q.  Would Western Asset have considered Costa's
16  arrest to be official data that it would have relied
17  upon?
18    **MS. BIRD:** Objection to form.
19    **THE WITNESS:** Again, I want to stress that
20  the arrest was on an allegation.  It is certainly an
21  event that we will keep an eye on, but we would not
22  make changes to our investment decision based on
23  developments that are just on an allegation or
24  speculation level.
25    **BY MS. ELLIS:**

Page 158

1    LIAN - CONFIDENTIAL
2  Q.  In Western Asset's view, at what point did
3  development shift from speculations to official
4  conclusions?
5    **MS. BIRD:** Objection to form.
6    **THE WITNESS:** Again, the situation
7  surrounding Petrobras was evolving and new
8  information was provided or made public at various
9  points in time.
10    I do not feel like I know at what point --
11  you know, what -- you know -- I couldn't -- I can't
12  answer your question to a position because we were
13  assessing in a -- on a real-time basis based on the
14  evolving information, proven or otherwise, over that
15  period of time.
16    **BY MS. ELLIS:**
17  Q.  What do you remember your reaction being
18  when news of corruption -- of alleged corruption at
19  Petrobras first came to your attention?
20    **MS. BIRD:** Objection to form.
21    **THE WITNESS:** Could you repeat the
22  question.
23    **BY MS. ELLIS:**
24  Q.  Do you remember what your reaction was when
25  you first learned of news of alleged corruption at

Page 159

1    LIAN - CONFIDENTIAL
2  Petrobras?
3    **MS. BIRD:** Same objection.
4    **THE WITNESS:** So as with any situation --
5  similar -- as with any similar such situations, the
6  reaction function would be to follow on a real-time
7  basis as information becomes available to determine
8  the course of action.
9    **BY MS. ELLIS:**
10  Q.  Did you have a personal reaction to the
11  news?  Were you surprised, or did you view it
12  otherwise?
13  **A.  Again, as I said in the earlier part of the**
14  **morning, that investments in corporate bond**
15  **securities, whether in emerging or in developed**
16  **markets, governance is one of several factors that**
17  **we consider and is something that we always keep in**
18  **mind.  So this would also be the case for Petrobras.**
19  Q.  Do you have any recollection of your
20  reaction to the news, specifically?
21    **MS. BIRD:** Objection to form.  Asked and
22  answered.
23    **THE WITNESS:** No, I don't.  It would be a
24  response that is not unlike any other such factors
25  that would evolve, whether on the downside or on the

Page 160

1    LIAN - CONFIDENTIAL
2  upside, for any security that we have exposure to.
3    **BY MS. ELLIS:**
4  Q.  So the news about the alleged corruption at
5  Petrobras was just one piece of news in the holistic
6  view that you've described earlier?
7    **MS. BIRD:** Objection to form.
8    **THE WITNESS:** Again, it is one of several
9  news or fundamental developments surrounding
10  Petrobras; so we will consider that in totality.
11    **BY MS. ELLIS:**
12  Q.  And it in itself, meaning the news of
13  alleged corruption at Petrobras, would not be
14  determinative for Western Asset's view of the
15  securities?
16    **MR. SCHOCHET:** Objection to form.
17    **MS. BIRD:** Objection to form.
18    **THE WITNESS:** Again, the allegation is an
19  allegation.  We would still rely on official
20  information provided by companies or countries and
21  not base an investment decision on allegation or
22  speculation.
23    **BY MS. ELLIS:**
24  Q.  Do you believe that at some point these
25  allegations became official news, something that

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL

CASE NO.: 14-cv-9662(JSR)

CHIA-LIANG LIAN

April 27, 2016

Page 161

1        LIAN - CONFIDENTIAL
2    Western Asset would have relied on?
3        MS. BIRD: Objection. Form. And asked and
4    answered.
5        THE WITNESS: Could you repeat the
6    question, please.
7        BY MS. ELLIS:
8    Q. So you've stated that the allegation is
9    just an allegation and Western Asset would rely on
10   official information. At a certain point in Western
11   Asset's view, did the news regarding the alleged
12   corruption at Petrobras become official, something
13   that Western Asset would have relied upon?
14       MS. BIRD: Same objection.
15       THE WITNESS: Again, I believe the entire
16   process was not discrete from a time perspective,
17   but it was an evolving process where different
18   pieces of information was made available in the
19   public domain.
20       BY MS. ELLIS:
21   Q. Did it ever evolve to the point of being
22   official news?
23       MS. BIRD: Objection to form.
24       THE WITNESS: Again, I -- you know, I think
25   I want to stress that this was not a discrete event,

Page 162

1        LIAN - CONFIDENTIAL
2    but it speaks to the complexity that I had
3    highlighted in terms of investments, in general,
4    where we had -- we have to monitor on a real-time
5    basis at any given point in time and judge the value
6    of a security based on those -- this developments
7    that's specific to the scandal -- excuse me -- as
8    well as valuations, technicals, and other factors
9    are fundamental factors that would go into making
10   decisions to buy or sell a certain credit.
11       BY MS. ELLIS:
12   Q. So at any point in time the allegations
13   regarding corruption at Petrobras were part of all
14   of the information that Western Asset was looking at
15   but was never a determinative factor?
16       MS. BIRD: Objection to form.
17       THE WITNESS: Again, I'm not sure if I know
18   what you meant by "determinant factor," but it is
19   certainly one piece of information that we need and
20   kept posted on a real-time basis.
21       But I just want to reiterate that
22   investments or decisions are premised on not one
23   single piece of information, even if some
24   "determinance" could have a dominant effect at any
25   one particular point in time.

Page 163

1        LIAN - CONFIDENTIAL
2        BY MS. ELLIS:
3    Q. So you cannot pinpoint a time when the news
4    regarding bribery at Petrobras became, in your view,
5    official?
6    A. To the best of my knowledge, the
7    informations that was evolving -- it was not
8    necessarily a discrete point in time where it became
9    from unofficial to official, and I cannot detail a
10   date -- a specific date when that happened. We were
11   using all available information in the public domain
12   to ascertain what that means, taking all those news
13   and information from the company to determine an
14   investment strategy relating to Petrobras.
15   Q. Even if you can't pinpoint a specific date,
16   was there any specific event or disclosure when the
17   allegations became official in Western Asset's view?
18   A. The -- the whole process was -- if that is
19   the right word -- evolutionary. It was changing.
20   New pieces of information that came up -- I don't
21   think I have an answer -- a specific answer to your
22   question, quite frankly.
23       (Exhibit 13 was marked for
24       identification.)
25       BY MS. ELLIS:

Page 164

1        LIAN - CONFIDENTIAL
2    Q. You've just been handed what has been
3    marked as Exhibit 13, which is an e-mail chain
4    bearing Bates stamps Western 01199936 through 38.
5        Looking at the page marked 99937, this is
6    an e-mail from Kevin Ritter to Credit New Issue and
7    EM desk Pasadena.
8        Would you have been on these LISTSERVs at
9    this time?
10   A. Yes, I would be.
11   Q. In September 2014, which is the -- when
12   this e-mail was dated, did Western Asset invest in a
13   ten-year Brazil sovereign bond?
14   A. To the best of my recollection, we probably
15   participated in this particular fundraising
16   exercise.
17   Q. Ritter writes, "This" -- and this is --
18   these are the last two sentences of his e-mail:
19       "This transaction is an opportunity
20       to top off Brazil sovereign risk at
21       the bid side or hopefully slightly
22       back of the bid side. Give us a
23       shout if you need to top off Brazil
24       exposures."
25       To your memory why did Western Asset --

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL
CASE NO.: 14-cv-9662(JSR)

CHIA-LIANG LIAN
April 27, 2016

Page 165

1    LIAN - CONFIDENTIAL
2    sorry. Withdrawn.
3        What does it mean to "top off Brazil
4    sovereign risk at the bid side"?
5        **MR. SCHOCHET:** Objection. Lack of
6    foundation.
7        **THE WITNESS:** I do not know what Kevin
8    Ritter meant by "top off Brazil exposure."
9        **BY MS. ELLIS:**
10   Q.   At this point, Western Asset was
11   recommending that its clients invest in Brazil?
12       **MS. BIRD:** Objection to form.
13       **THE WITNESS:** I do not have any
14   recollection of this particular Brazil 2025
15   reopening to make a categorical judgment that this
16   was the case.
17       **BY MS. ELLIS:**
18   Q.   Kevin Ritter also wrote in that same
19   e-mail:
20       "As most know, Brazilian external
21       assets have performed well as Marina
22       Silva has climbed in the polls."
23       Do you have an understanding of Western
24   Asset's views on the impact of the 2014 Brazil
25   presidential elections?

Page 166

1    LIAN - CONFIDENTIAL
2        **MS. BIRD:** Objection to form.
3        **THE WITNESS:** It would be one factor to
4    consider, given the political dynamics has potential
5    market impact on Brazilian assets.
6        **BY MS. ELLIS:**
7    Q.   Did Western Asset have a view on whether
8    the outcome of the 2014 Brazilian presidential
9    election would have an impact on the market price of
10   Petrobras Securities?
11   **A.   I do not recall if there was any specific**
12   **outcomes that we would determine either way.**
13   Q.   Is it your understanding that Kevin Ritter
14   believed that a victory for Marina Silva would
15   viewed as a positive for investors in Brazil?
16       **MR. SCHOCHET:** Objection to both form and
17   lack of foundation.
18       **THE WITNESS:** I -- I can't speak on behalf
19   of Kevin Ritter as such.
20       **BY MS. ELLIS:**
21   Q.   You don't recall whether you had a view
22   that victory for Marina Silva was anticipated to
23   have either a positive or a negative impact on
24   Petrobras Securities?
25       **MR. SCHOCHET:** Objection.

Page 167

1    LIAN - CONFIDENTIAL
2        **THE WITNESS:** I'm certain that in September
3    of 2014, as a team, we would have had some
4    follow-through analysis and attach probabilistic
5    outcomes given upcoming then-elections. I cannot
6    recall the details specific to other investment
7    implications that we had arrived in September of
8    2014.
9        **BY MS. ELLIS:**
10   Q.   What did you -- sorry.
11       You testified that "I cannot recall the
12   details specific to other investment implications
13   that we had arrived in September of 2014." What
14   did you mean by "other investment implications"?
15   **A.   What I meant is we would have done some**
16   **scenario analysis in terms of an attached**
17   **probabilistic outcomes of the election in the run-up**
18   **to the elections then. I cannot recall the**
19   **specifics of the different scenarios in terms of**
20   **investment implications on Brazilian assets.**
21       **(Exhibit 14 was marked for**
22       **identification.)**
23       **BY MS. ELLIS:**
24   Q.   You've just been handed what has been
25   marked as Exhibit 14, which is an e-mail chain

Page 168

1    LIAN - CONFIDENTIAL
2    bearing Bates stamps Western 00005196 to 5197.
3        Do you recognize this e-mail chain?
4    **A.   No, I do not.**
5    Q.   Looking at the e-mail at the bottom of the
6    first page, is Kevin Ritter communicating with a
7    client in this e-mail?
8        **MR. SCHOCHET:** Objection.
9        **THE WITNESS:** Yes.
10       **BY MS. ELLIS:**
11   Q.   And he is recommending Petrobras's 2023
12   bonds?
13       **MR. SCHOCHET:** Objection.
14       **THE WITNESS:** I cannot recall this e-mail
15   trail in detail beyond what is stated on the e-mail.
16       **BY MS. ELLIS:**
17   Q.   Based on what is stated, it appears as
18   though he is recommending Petrobras's 2023 bonds to
19   the client?
20       **MR. SCHOCHET:** Objection.
21       **MS. BIRD:** Objection to form.
22       **THE WITNESS:** Yep, based on what is stated
23   on this e-mail trail.
24       **BY MS. ELLIS:**
25   Q.   For most of Western Asset's clients, do you

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL
CASE NO.: 14-cv-9662(JSR)

CHIA-LIANG LIAN
April 27, 2016

Page 169

1    LIAN - CONFIDENTIAL
2  need this type of pre-approval for transactions?
3    MS. BIRD: Objection to form.
4    THE WITNESS: They are different client
5  types. There could be instances where clients have
6  unique parameters where some form of direct
7  preclearance is required. And in this instance,
8  this client is one such client.
9    BY MS. ELLIS:
10  Q. Do the clients listed in Exhibits 1, 2, and
11  3 require direct preclearance before Western Asset
12  makes transactions on their behalf?
13    MS. BIRD: Objection to form.
14    MR. SCHOCHET: Objection.
15    MS. BIRD: Lacks foundation.
16    MR. SCHOCHET: And lack of foundation.
17  Yeah. Okay.
18    THE WITNESS: I think -- could you repeat
19  the question.
20    BY MS. ELLIS:
21  Q. The clients that we've been discussing in
22  Exhibits 1, 2, and 3 --
23  A. Oh.
24  Q. -- the three lists that we talked about at
25  the beginning of the day, do you know whether those

Page 170

1    LIAN - CONFIDENTIAL
2  clients require direct preclearance before Western
3  Asset transacts on their behalf?
4    MR. SCHOCHET: Objection.
5    MS. BIRD: Same objection.
6    THE WITNESS: I do not believe that those
7  accounts have a similar guideline requirement.
8    BY MS. ELLIS:
9  Q. In his e-mail, Kevin Ritter writes:
10  "Production is ramping up at PETBRA
11  as the new fields come online, and we
12  expect some relief with regards to
13  downstream pricing in Brazil,
14  regardless of who wins the elections,
15  although upside surprises, perhaps,
16  should Silva win."
17  Do you know what "downstream pricing in
18  Brazil" refers to?
19    MS. BIRD: Objection to form.
20    THE WITNESS: I do not.
21    BY MS. ELLIS:
22  Q. Does this reference to "upside surprises,
23  perhaps, should Silva win" refresh your recollection
24  as to whether Western Asset had a view on the
25  potential impact of the outcome of the 2014

Page 171

1    LIAN - CONFIDENTIAL
2  Brazilian elections?
3    MR. SCHOCHET: Objection.
4    THE WITNESS: No.
5    BY MS. ELLIS:
6  Q. How do you interpret Kevin Ritter's
7  statement "upside surprises"?
8    MR. SCHOCHET: Objection.
9    THE WITNESS: Again, I do not want to
10  speculate the context of this e-mail exchange
11  between Kevin Ritter and our external client, and I
12  do not want to speculate what the term "upside
13  surprises" used in this context was intended to
14  mean.
15    BY MS. ELLIS:
16  Q. You were copied on these e-mails; is that
17  correct?
18  A. Yes.
19  Q. Would you have been involved in discussions
20  regarding Petrobras at this time?
21  A. I was co-head at this particular point in
22  time and was still managing the transition; so we
23  would have team discussions on strategies
24  alongside -- with co-head Keith Gardner as the
25  transition takes foot over the course of the one

Page 172

1    LIAN - CONFIDENTIAL
2  year after March 2014.
3  Q. And in connection with those discussions
4  that you were having at this time regarding
5  Petrobras, you have no recollection of the specifics
6  of any discussions regarding the potential outcome
7  of the Brazilian election?
8  A. I do --
9    MS. BIRD: Objection to form. Asked and
10  answered.
11    THE WITNESS: I do not. Again, the
12  election outcome was highly data dependent and
13  evolving in the run-up to that elections. I cannot
14  recall the specifics in regards to the presidential
15  elections.
16    BY MS. ELLIS:
17  Q. You describe the election outcome as
18  "highly data dependent." Do you have a recollection
19  of what types of data Western Asset was relying
20  upon?
21  A. In the case of the Brazilian elections,
22  there were regular polls by a few agencies that were
23  regularly made public.
24    (Exhibit 15 was marked for
25    identification.)

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL    CHIA-LIANG LIAN
CASE NO.: 14-cv-9662(JSR)    April 27, 2016

Page 173

1    LIAN - CONFIDENTIAL
2    BY MS. ELLIS:
3  Q.  You've just been handed what has been
4  marked as Exhibit 15, which is an e-mail chain
5  bearing Bates stamps Western 00002654 to 2658.
6    Do you recognize this e-mail chain?
7  A.  I do not.
8  Q.  Starting at the bottom of the page marked
9  2658, who is "Will" that you refer to in this
10  e-mail?
11  A.  Will is Wilfred Wong.  He is our team's
12  trader.
13  Q.  Meaning a trader for the EM desk?
14  A.  That's correct.
15  Q.  And looking at the subject line at the top
16  of that page, what is "PETBRA 19"?
17  A.  I believe it meant Petrobras -- Petrobras
18  Securities maturing in 2019.
19  Q.  And what are the CEMBI accounts?
20  A.  CEMBI stands for Corporate Emerging Market
21  Bond Index.  That is an externally-produced index by
22  J.P. Morgan that monitors a list of a -- a
23  representative index of emerging market corporate
24  securities.
25  Q.  And does Western Asset have accounts that

Page 174

1    LIAN - CONFIDENTIAL
2  use that index as a benchmark?
3  A.  Yes.
4  Q.  Are any of the Western Asset funds, the
5  separate account plaintiffs, or the other action
6  plaintiffs considered CEMBI accounts by Western
7  Asset?
8    MS. BIRD: Objection to form.
9    THE WITNESS: I -- I'm not aware of it, to
10  the best of my knowledge.  I -- I believe the
11  corporate emerging market portfolios have a
12  reference benchmark in corporate MB, as the name of
13  the fund suggests, but they are not segregated or
14  separate accounts.
15    BY MS. ELLIS:
16  Q.  Going to the second e-mail up on that same
17  page, still on 2658, Wilfred Wong writes to you:
18    "Hi, C.L. I mentioned to Jeff and
19  Rob that our cash built up to 3 to
20  4 percent from our recent reductions
21  in Russian corps AEFES and Argentine
22  corps."
23    Do you understand Jeff and Rob here to be
24  Jeff Nuruki and Robert Abad?
25  A.  I believe so.

Page 175

1    LIAN - CONFIDENTIAL
2  Q.  And slightly further down in that same
3  e-mail, Wilfred Wong wrote:
4    "The government has been a real drag
5  on PETBRA due to fuel price controls,
6  but there are some positive
7  catalysts, such as the elections and
8  recent production increases."
9    Do you know what he was referring to when
10  he referred to "fuel price controls"?
11    MS. BIRD: Objection. Form.
12    THE WITNESS: In the context of this
13  e-mail, I cannot recall what was meant by that
14  statement.
15    BY MS. ELLIS:
16  Q.  Generally, are you aware of fuel price
17  controls in Brazil?
18  A.  Yes.
19  Q.  And what are they?
20    MS. BIRD: Objection to form.
21    THE WITNESS: Meaning the government
22  provides subsidies and creates a situation where it
23  subsidizes the retail price of fuel.  That, I
24  believe, is what is meant in the context of fuel
25  price controls.

Page 176

1    LIAN - CONFIDENTIAL
2    BY MS. ELLIS:
3  Q.  And do you know why those would have been a
4  real drag on Petrobras?
5  A.  Again, I do not-- I cannot recall the
6  context of that comment made by Will.
7  Q.  Do you have a view, outside of this e-mail,
8  of the impact that fuel price controls would have on
9  Petrobras?
10  A.  No, not at that point in time.
11  Q.  Do you today?
12  A.  I can't recall.
13  Q.  Sorry.
14    Do you today have a view on what impact
15  fuel price controls would have on Petrobras
16  Securities?
17  A.  I am -- I do not follow the -- the company
18  credit because my research colleagues would follow
19  and be responsible for the day-to-day monitoring of
20  Petrobras.  And the way I would understand, fuel
21  price controls would be more in the form of its
22  impact on a broader base in terms of sovereign
23  credit and other more macro-related implications.
24  Q.  So the research analysts that report to you
25  would do research on the effect that fuel price

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL
CASE NO.: 14-cv-9662(JSR)

CHIA-LIANG LIAN
April 27, 2016

Page 177

1    LIAN - CONFIDENTIAL
2  controls might have on Petrobras?
3  A.  Amongst other considerations, the fuel
4  price control, I believe, would be one such factor
5  imputed into the analysis.
6  Q.  And do you have a recollection of what
7  their research showed at this point in time?
8  A.  I do not.  Excuse me.  I do not.
9  Q.  Do you have an understanding of what their
10  research showed at any point in time?
11  A.  Can you define "at any point in time"?
12  Q.  At any point when you had responsibility
13  for EM accounts.
14  A.  Again, it is one of several factors that we
15  will take into account when evaluating such similar
16  companies in emerging market countries.  I cannot
17  pinpoint one particular date where we discussed
18  specifically the fuel price control on Petrobras's
19  stand-alone credit fundamentals.
20  Q.  Do you have an understanding of generally
21  whether your research analyst determined that fuel
22  price controls were positive or negative for
23  Petrobras?
24  A.  I cannot recall over this particular point
25  what --

Page 178

1    LIAN - CONFIDENTIAL
2  Q.  At any point?
3  A.  Yeah.
4  Q.  Sorry.  I didn't mean to cut you off.
5     You can't recall at any point?
6  A.  At any point as in --
7  Q.  At any --
8  A.  Which defined period of time?
9  Q.  At any point in your life, can you recall
10  if research analysts told you whether fuel price
11  controls were positive or negative for the price of
12  Petrobras Securities?
13  A.  Again, this is one of several factors that
14  we look at.  I cannot recall, you know, a time where
15  this factor alone was discussed in terms of its
16  impact on Petrobras space on a comprehensive list of
17  factors that we believe would influence the
18  creditworthiness of Petrobras, of which fuel price
19  controls would be one of them.
20  Q.  Even though there is a comprehensive list
21  of factors that influences the price of a security
22  at any particular point, do each of the factors that
23  create that comprehensive list of factors have its
24  own impact on the price of a security?
25    MR. SCHOCHET:  Objection.  Form.

Page 179

1    LIAN - CONFIDENTIAL
2    MS. BIRD:  Objection to form.
3    THE WITNESS:  Again, I don't -- I do not want
4  to make generalizations, but we will consider all
5  factors that would affect the stand-alone matrix of
6  a company on an ongoing bases.  The fuel price
7  control -- in the case of Brazil, and, specifically,
8  Petrobras, there will be some influence in terms of
9  determining the trajectory of Petrobras's
10  creditworthiness.
11    BY MS. ELLIS:
12  Q.  And do you have an understanding of whether
13  that influence would affect the trajectory on an
14  upward or downward basis?
15  A.  I don't think there is a categorical
16  response.  The idea here really is one where the
17  fix -- the price controls through government
18  subsidies would not only have an impact on
19  Petrobras's stand-alone credit matrix, but it would
20  similarly have an impact on the sovereign. So we
21  would take that factor in consideration in terms of
22  investment implications.
23  Q.  And would that be a negative or a positive
24  consideration?
25  A.  So for which country or for which credit?

Page 180

1    LIAN - CONFIDENTIAL
2  Q.  For Petrobras.
3  A.  For Petrobras the price controls -- all
4  things equal, fuel subsidies would depress pricing,
5  and all things equal, that would not be viewed
6  favorably in most instances when analyze --
7  analyzing similar such -- such similar credits.
8  Q.  Did you have an understanding of whether
9  the outcome of the 2014 presidential election in
10  Brazil would have a potential impact on fuel price
11  controls?
12  A.  No.  I do not recall specifically what the
13  outcome of the presidential election and how that --
14  that would be highly speculative to the extent that
15  the electoral outcome was, you know, a relatively
16  close call.  So I do not recall any such instances.
17  Q.  In the next e-mail going up the chain -- so
18  this is the bottom of page 2657 -- you respond to
19  Wilfred Wong that going forward, you would want to
20  be included in all CEMBI-related communication.
21    And then the next e-mail is going up on the
22  chain, the -- the subject line appears to change and
23  these seem to be predated to the ones -- to the
24  e-mails that we just discussed.
25    Are these e-mails that Wilfred Wong then

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL
CASE NO.: 14-cv-9662(JSR)

CHIA-LIANG LIAN
April 27, 2016

Page 181

1     LIAN - CONFIDENTIAL
2  forwarded to you?
3     MS. BIRD: Objection. Form.
4     THE WITNESS: I don't know the answer to
5  that question.
6     BY MS. ELLIS:
7  Q.  In the e-mail on the next page -- this is
8  page 2656 -- from Robert Abad, Abad wrote to
9  Jean-Pierre Gil and Adriano Casarotto that:
10    "For some time, we've been running a
11    pretty sizeable UW," underwrite, "in
12    our broad EM corporate accounts on
13    Brazil sovereign downgrade fears, a
14    Dilma victory in October,
15    valuations," et cetera.
16    And in the next e-mail on the chain,
17  Jean-Pierre Gil responded:
18    "We didn't know you were underweight
19    on Petrobras. In fact, the last time
20    we discussed Petro a few months ago
21    with Duda and Kevin, we understood
22    you were somewhat overweight on the
23    name."
24    Do you know who is correct in this e-mail
25  exchange? Was Western Asset generally under or

Page 182

1     LIAN - CONFIDENTIAL
2  overweight Petrobras at this time?
3     MS. BIRD: Objection to form. Lacks
4  foundation.
5     THE WITNESS: Between those two dates, I
6  cannot recall with certainty if those statements
7  were made correctly or accurately for the CEMBI
8  portfolios.
9     BY MS. ELLIS:
10 Q.  In Abad's e-mail on 2656, he suggests that
11 in light of news -- in light of news with a --
12 sorry.
13    With "prospects for a more difficult
14    election for Dilma (with a non-remote
15    possibility of a surprise loss) now
16    that Marina is in the mix, our view
17    is that we should start collapsing
18    this underweight and slowly scale
19    towards a more neutral as we approach
20    the elections."
21    Does this refresh your recollection of
22 whether Western Asset had a view as to the potential
23 impact of the outcome of the 2014 presidential
24 election?
25 A.  No, it does not.

Page 183

1     LIAN - CONFIDENTIAL
2  Q.  In Jean-Pierre Gil's e-mail, in the second
3  paragraph -- at the bottom of that paragraph, he
4  writes:
5     "We see Petrobras improving over
6     time, even under a P.T.
7     administration. Under any other
8     government, we see tremendous upside,
9     specially Aécio's."
10    Do you know what "P.T." refers to here?
11 A.  Yes.
12 Q.  Is that a reference to the Workers' Party?
13 A.  That's correct.
14 Q.  And do you know whether Dilma Rousseff was
15 a Workers' Party candidate?
16 A.  Yes, I do.
17 Q.  And she was?
18 A.  She was a P.T. -- she -- she was
19 representing the P.T.
20 Q.  And his reference to "Aécio" -- is that a
21 reference to Aécio Neves?
22 A.  That's correct.
23 Q.  And that was Rousseff's challenger in the
24 election?
25 A.  I believe so.

Page 184

1     LIAN - CONFIDENTIAL
2  Q.  Do you have an understanding of why he saw
3  tremendous upside under the potential for an Aécio
4  administration?
5  A.  No. I do not want to speculate and put
6  words into JP's mouth. As I say, I don't recall
7  this chain of e-mails, and, therefore, I cannot make
8  categorical statements in regards to JP's view at
9  that particular point in time.
10 Q.  Looking at the next paragraph down, he
11 writes:
12    "On sovereign ratings, we agree that
13    losing the investment-grade status is
14    not in the radar in the short-term.
15    The closest to that is S&P, which
16    still has a BBB-/stable. We believe
17    they would first change the outlook
18    to negative before making a move,
19    considering it would be THE MOVE," in
20    all capitals, "to junk status. I do
21    think we could move towards that
22    direction under Dilma's reelection
23    scenario, but rating agencies would
24    wait and see how Dilma would conduct
25    her second term, and give her some

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL
CASE NO.: 14-cv-9662(JSR)

CHIA-LIANG LIAN
April 27, 2016

Page 185

1     LIAN - CONFIDENTIAL
2     time before taking that path."
3     Q. Do you recall any discussions around this
4     time connecting the potential for a ratings
5     downgrade to the outcome of the Brazil election in
6     2014?
7  A.  The discussion was surrounding Brazil's
8  investment-grade status, and the discussion not only
9  pertains to the election outcome, but also on other
10  macroeconomic indicators that suggests a
11  deterioration even prior to the presidential
12  election in late 2014.
13  Q. Do you have an understanding of why Abad
14  wrote that he thought that "we could move in the
15  direction of a downgrade under Dilma's reelection
16  scenario"?
17     MR. SCHOCHET: Objection. Lacks
18  foundation.
19     THE WITNESS: I think you mean JP in this
20  instance.
21     BY MS. ELLIS:
22  Q. Oh, I'm sorry. JP. You're correct.
23  A.  I don't know what he meant in the context
24  of this particular e-mail.
25  Q. In general, do you recall any discussions

Page 186

1     LIAN - CONFIDENTIAL
2     regarding Dilma's election and whether that might
3     make it more likely for Brazil's sovereign --
4     sovereign rating to lose its investment grade
5     status?
6     MR. SCHOCHET: Objection. Time frame.
7     THE WITNESS: Again, I do not recall the --
8     just the sole sort of nexus between the election and
9     the sovereign rating status.
10     What I could recall is growing concern
11     on -- of Brazil's investment-grade status as a
12     result of some fundamental indicators that suggest
13     trajectory that is on a downward bias. So that,
14     alongside with other factors, were taken into
15     consideration in -- as it relates to the -- the
16     discussion of Brazil's sovereign rating.
17     BY MS. ELLIS:
18  Q. And was one of those other factors that was
19     taken into consideration regarding Brazil's
20     sovereign rating the potential of a Rousseff
21     reelection?
22  A.  I cannot recall the specifics of it. All I
23  recall, to the best of my knowledge, was the
24  uncertainty at that point in time prior to the
25  presidential election. The outcome uncertainty

Page 187

1     LIAN - CONFIDENTIAL
2  certainly was a point that we were monitoring and
3  accessing.
4     MS. ELLIS: I think we have to take a break
5     for the tape; so if you wouldn't mind.
6     THE WITNESS: Okay.
7     THE VIDEOGRAPHER: This is the end of disk
8     No. 3. The time is 1542, and we're off the record.
9     (Recess.)
10     THE VIDEOGRAPHER: We are back on the
11     record. This is the beginning of disk No. 4. The
12     time is 1556.
13     BY MS. ELLIS:
14  Q. So continuing to look at Exhibit 15, and
15     looking specifically at page 2655 and the second
16     paragraph on that page, Jean-Pierre Gil wrote:
17     "Anyway, our view remains the same.
18     Petrobras is a quasi-sovereign, and
19     if it's offering an attractive spread
20     over Brazil's sovereign, we'd take
21     it."
22     Is this an accurate characterization of
23     Western Asset's investment philosophy with respect
24     to Petrobras at this time?
25     MR. SCHOCHET: Objection. Form.

Page 188

1     LIAN - CONFIDENTIAL
2     THE WITNESS: This comment was made by
3     Jean-Pierre in Sao Paulo. I would not want to make
4     generalization. Our view on Petrobras and any
5     security that we have exposure to take into
6     account as many relevant factors as there are
7     possible in a public domain, and I would not
8     characterize this statement and make
9     generalizations.
10     BY MS. ELLIS:
11  Q. At this time does Jean-Pierre Gil report to
12     you?
13  A.  He reports in to Sao Paulo head, Paulo
14  Clini, who heads up the investment desk for the
15  local business, and Paulo Clini reports in to me as
16  a head of global emerging markets.
17  Q. And all of those people you just mentioned
18     would be involved in what you described previously
19     as Western Asset's collaborative approach to
20     developing an investment strategy?
21  A.  The inputs from all global offices will be
22  taken into account in terms of our analysis at both
23  the country, as well as a corporate credit level.
24  Q. So when Jean-Pierre Gil writes, "Our view
25     remains the same" -- when he says "our," do you

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL
CASE NO.: 14-cv-9662(JSR)

CHIA-LIANG LIAN
April 27, 2016

Page 189

1     LIAN - CONFIDENTIAL
2  understand him to mean Western Asset's view?
3  A.  Again, I cannot recall this e-mail trail.
4  I can't speak on his behalf because I do not know
5  what he meant in that paragraph.
6  Q.  In the paragraph above, at the end of that
7  paragraph, Jean-Pierre Gil wrote:
8       "I remember we discussed the fact
9       that the spread over Brazil's
10      sovereign was close to an all-time
11      high, which didn't make sense
12      considering that Petro is very much
13      linked to the sovereign."
14      Did you agree at the time that Petrobras
15  was very much linked to the sovereign?
16      MR. SCHOCHET: Objection.
17      THE WITNESS: This comment was in an e-mail
18  chain that I was not included; so I -- I'm not sure
19  what the context of that statement was specifically
20  to an earlier discussion.
21      BY MS. ELLIS:
22  Q.  In general, did -- would you agree that
23  Petrobras is very much linked to the sovereign?
24      MR. SCHOCHET: Objection.
25      MS. BIRD: Objection to form.

Page 190

1     LIAN - CONFIDENTIAL
2      THE WITNESS: Again, we judge a corporate
3  credit by its own merit, and part of that would
4  entail considerations, including government stakes,
5  in which case Petrobras was a majority owned by the
6  government.
7      BY MS. ELLIS:
8  Q.  And your consideration including government
9  ownership -- what impact does that -- would that
10  have on Western Asset's view of a particular
11  corporate?
12  A.  Broadly --
13      MS. BIRD: Objection.  Sorry.  Objection to
14  form.  Misstates the witness's testimony.
15      THE WITNESS: Again, broadly speaking, and
16  going back to an earlier chart diagram, we want to
17  dovetail top-down with bottom-up analysis.  And to
18  the extent that we have a view on the sovereign,
19  government stakes in specific companies would be
20  part of the consideration in analyzing corporate
21  credits within our space.
22      BY MS. ELLIS:
23  Q.  And how would government stakes in specific
24  companies affect Western Asset's consideration of
25  those companies?

Page 191

1     LIAN - CONFIDENTIAL
2  A.  In a qualitative sense, in a more generic
3  sense, in systemically important companies, we view
4  that as one where there will be considerable
5  sovereign support, if necessary.  But again, that
6  would be one of many factors that we will take into
7  consideration.
8  Q.  And does Western Asset view Petrobras as a
9  systemically important corporate credit?
10  A.  Generally, yes.
11  Q.  Looking now at -- and do you have a view on
12  the potential for sovereign support for the
13  Petrobras credit?
14  A.  Specifically, we look at a range of matrix,
15  or matrices, in defining or arriving at a
16  qualitative judgment of sovereign support.  So
17  government stakes, critical industries would be some
18  of those considerations that are applied across all
19  state-owned enterprises in emerging market
20  countries.
21  Q.  Looking now at the first page of this
22  document Bates stamped 2654, who is Gavin James?
23  A.  Gavin James -- James is a -- a -- sort of a
24  manager of portfolio operations for the trading
25  desk.

Page 192

1     LIAN - CONFIDENTIAL
2  Q.  And do you have a recollection of why you
3  forwarded this e-mail chain to him?
4  A.  No, I do not.
5  Q.  In the first line of the e-mail, you -- you
6  write that "he," I believe meaning Abad, based on
7  the subject line, "has been adjusting the ex-Duda's
8  CEMBI portfolios."
9      What are the "ex-Duda's CEMBI portfolios"?
10  A.  As far as I can recall, these such
11  corporate emerging market bond portfolios were
12  previously assigned to Matthew Duda, and I believe
13  this was what I meant in that first line.
14  Q.  You said "previously assigned to Matthew
15  Duda."  Did they then become assigned to Robert
16  Abad?
17  A.  No.  They were reassigned to me after Matt
18  Duda's departure, I believe, which was sometime
19  around middle of 2014.
20  Q.  And were you upset because you felt that
21  Robert Abad was adjusting these portfolios without
22  keeping you informed?
23  A.  We apply a collaborative team-based
24  approach, and I would have assumed that trades would
25  all be kept posted from members of the team to

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL
CASE NO.: 14-cv-9662(JSR)

CHIA-LIANG LIAN
April 27, 2016

Page 193

1    LIAN - CONFIDENTIAL
2  myself as co-head of emerging markets.
3  Q.  So when you wrote that "he has been
4  adjusting the ex-Duda's CEMBI portfolios," did you
5  mean that he was making trades without first
6  consulting you?
7  A.  I do not know exactly what I meant at that
8  point in time, but I -- you know, as I say, the
9  point here really is transactions that pertain to
10 those portfolios were probably done without keeping
11 me informed.
12 Q.  And what did you mean when you wrote, "I
13 think he's trying to connect the dots with Sao Paulo
14 to raise his personal clout"?
15 A.  Honestly, I don't recall what I meant by
16 that second sentence or that -- the -- the last line
17 of the first paragraph.
18 Q.  You stated earlier that Robert Abad later
19 left the emerging markets desk; is that correct?
20 A.  Yes.
21 Q.  And you may have already said this, I
22 apologize, but when did that transition happen?
23 A.  I think it was sometime around March of
24 2015, if memory serves me right.
25 Q.  And did you have any involvement in that

Page 194

1    LIAN - CONFIDENTIAL
2  decision for him to transition off the EM desk?
3  A.  Myself with the approval and blessing of
4  the management -- senior management were involved in
5  that redesignation and -- reassignment, rather.
6  Q.  And did you request that he be reassigned?
7  A.  The proposal was from the senior management
8  to me.
9  Q.  To your knowledge, were any of these CEMBI
10 portfolios in which Robert Abad made trades without
11 first consulting you any of -- were any of them
12 portfolios on behalf of the clients in Exhibits 1,
13 2, and 3?
14 A.  I -- I don't have sufficient information to
15 prove or disprove that.
16 Q.  Is it possible that any of the CEMBI
17 portfolios in which Robert Abad made -- made trades
18 without first consulting you were portfolios on
19 behalf of the clients in Exhibits 1, 2, and 3?
20    MS. BIRD:  Objection to form.
21    THE WITNESS:  Again, there is no basis for
22 me to suggest one way or another.
23    BY MS. ELLIS:
24 Q.  Do you know how you might be able to tell
25 definitively if you had access to records?

Page 195

1    LIAN - CONFIDENTIAL
2    MS. BIRD:  Objection.  Form.
3    THE WITNESS:  Again, could you repeat the
4  question.
5    BY MS. ELLIS:
6  Q.  Would you be able to tell definitively
7  which accounts Robert Abad made trades in without
8  first consulting you if you had access to other
9  records at Western Asset's offices?
10 A.  Again, I don't have recollection of this
11 particular e-mail.  In terms of the circumstances
12 underpinning the e-mail chain, there are -- there is
13 a database system in it, but I do not know for sure
14 if I could determine with absolute certainty that I
15 could arrive at those conclusions.
16    (Exhibit 16 was marked for
17    identification.)
18    BY MS. ELLIS:
19 Q.  You've just been handed what has been
20 marked as Exhibit 16, and this is an e-mail chain
21 that bears Bates stamps Western 01203947 to 3950.
22    Do you recognize this e-mail chain?
23 A.  I do not.
24 Q.  Looking at the second e-mail, the e-mail
25 from you dated September 29, 2014, at 6:22 a.m., you

Page 196

1    LIAN - CONFIDENTIAL
2  forwarded a report on -- or extracts from a report
3  entitled "Uncovering opportunities in emerging
4  markets" by Mark Kiesel dated April 2014.
5    Who is Mark Kiesel?
6  A.  I believe Mark Kiesel is an investment
7  manager with PIMCO.
8  Q.  Did you ever work with Mark Kiesel while
9  you were at PIMCO?
10 A.  Not directly.
11 Q.  Did you work with him indirectly?
12 A.  Yes.
13 Q.  And what was your indirect working
14 relationship?
15 A.  To the extent that he has interest in
16 opportunities within the Asian credit space.
17 Q.  In forwarding extracts from this report,
18 you wrote:
19    "Not meaning to stir the pot, but
20    check out comments on Brazil dated
21    April 2014, only three months after
22    Gross declared the end of Brazil
23    lovefest in January."
24    What did you mean here by "not meaning to
25 stir the pot"?

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL
CASE NO.: 14-cv-9662(JSR)

CHIA-LIANG LIAN
April 27, 2016

Page 197

1      LIAN - CONFIDENTIAL
2  A.  To the best of my knowledge, I don't know
3  what I meant by the introductory statement.
4  Q.  Do you have any understanding of what you
5  might have meant?
6  A.  I don't.
7  Q.  Do you know who "Gross" refers to in this
8  sentence?
9  A.  I believe it refers to Bill Gross.
10  Q.  And who is Bill Gross?
11  A.  He is the founder and former CIO of PIMCO.
12  Q.  Looking at Mark Kiesel's comments in the
13  extracts from this report, in the second paragraph,
14  he writes:
15      "We left for Brazil cautious -- you
16      could even say mildly bearish -- on
17      the country due to concerns over
18      increased government involvement in
19      the economy and especially in
20      state-owned enterprises that some
21      believe have been used as 'agents for
22      social policy.'"
23      Do you have an understanding that these
24  state-owned enterprises that some believe have been
25  used as agents for social policy would have included

Page 198

1      LIAN - CONFIDENTIAL
2  Petrobras?
3  A.  I do not think I can speak on behalf of
4  Mark Kiesel beyond what is stated in this particular
5  extract.
6  Q.  Looking at the third page of this document
7  with Bates 3949, in the first new paragraph on that
8  page, this states:
9      "Relative value has improved
10      significantly for certain individual
11      credits as well.  Spreads for
12      Petrobras, one of the largest and
13      most important energy companies in
14      Brazil, have widened significantly
15      relative to both the sovereign spread
16      (figure 5) and the U.S. credit market
17      (figure 6).  The government's policy
18      of setting domestic gasoline and
19      diesel prices below international
20      market prices has caused large losses
21      and resulted in increased balance
22      sheet leverage for Petrobras.
23      Nevertheless, we believe the
24      Brazilian elections in October will
25      bring Petrobras some relief to raise

Page 199

1      LIAN - CONFIDENTIAL
2  domestic gas prices in the long run,
3  which should help improve cash flow."
4      Did you agree at this time that the
5  government's policy on fuel prices had caused large
6  losses and resulted in increased balance sheet
7  leverage for Petrobras?
8  A.  Again, this is a view of Mark Kiesel in
9  PIMCO.  We monitor views and thoughts in the public
10  domain of our key competitors, and this is one
11  report that was meant to understand, you know, what
12  other fund managers have in mind.
13  Q.  Was this view of Mark Kiesel at PIMCO
14  consistent with Western Asset's own view?
15  A.  I do not recall, as of that point in time,
16  if this was the view that Western Asset had shared
17  with PIMCO.
18  Q.  Do you recall whether the view of Mark
19  Kiesel at PIMCO reflected here was consistent with
20  your own personal view?
21  A.  No, I do not recall.
22  Q.  Did you have a personal view on the
23  government's policy on fuel prices and their impact
24  on Petrobras?
25  A.  I rely on my colleagues, who are

Page 200

1      LIAN - CONFIDENTIAL
2  responsible for the credit analysis of Petrobras
3  based of -- based on information in the public
4  domain.  And that reliance -- it is a critical part
5  of that team-based approach that we -- that is a
6  part of the investment thesis for Western Asset.
7  Q.  But you have ultimate responsibility for
8  that investment thesis; is that correct?
9  A.  As head of emerging -- and co-head at this
10  point in time, Keith and I would have -- would take
11  leadership role in investment decisions.
12  Q.  Do you know what you meant when you said
13  that -- I'm sorry, this is on page 3947 -- that
14  "Gross had declared the end of Brazil lovefest in
15  January"?
16  A.  I do not -- I do not recall the context
17  beyond what is stated in the e-mail that I had sent
18  out.
19  Q.  Did you have an understanding that PIMCO
20  had changed its views on investment in Brazil?
21  A.  I do not have any evidence or categorical
22  view of that because I was not a member of PIMCO.
23  It was more to do with, as this statement says,
24  "Gross declared the end of Brazil lovefest in
25  January."

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL
CASE NO.: 14-cv-9662(JSR)

CHIA-LIANG LIAN
April 27, 2016

Page 201

LIAN - CONFIDENTIAL
1
2  Q.  And what does it mean to "declare the end
3  of Brazil lovefest"?
4  A.  I cannot recall the exact context of what I
5  had written, but I -- it was -- probably speaks to
6  Bill Gross suggesting in the public domain that he
7  may not -- he may have ended -- he may have trimmed
8  some exposure in Brazil.  I do not have the
9  specifics to judge exactly what is meant by that
10  sentence that I wrote in September 2014.
11  Q.  Do you know why Mark Hughes responded to
12  you, "Whoops"?
13  A.  I don't.
14  Q.  Do you have an understanding of what
15  Mark -- do you have your own understanding of what
16  Mark Hughes meant when he responded, "Whoops"?
17  A.  No.
18      (Exhibit 17 was marked for
19      identification.)
20      BY MS. ELLIS:
21  Q.  You've just been handed what has been
22  marked as Exhibit 17, which is an e-mail chain
23  bearing Bates stamps Western 00125668 through
24  125678.
25      In November 2014, did you go on an investor

Page 202

LIAN - CONFIDENTIAL
1
2  trip to Brazil?
3  A.  It was not an organized investor trip as
4  such, but to spend an -- a week in the Brazil office
5  with my colleagues.  I do not recall of an investor
6  trip organized by Citi as such.
7  Q.  So this agenda reflected on pages 5670
8  through 5675 -- does this reflect the agenda of the
9  trip you went on, or did you not go on this
10  particular trip?
11  A.  I did not go on this particular trip.
12  Q.  Can you describe the circumstances of the
13  trip that you did go on in November 2014?
14  A.  It was part of spending time with the
15  Brazil local office and getting to know colleagues
16  in Sao Paulo.
17  Q.  Did you meet with any Brazilian officials
18  on that trip?
19  A.  I do not recall that I met any Brazilian
20  official during that period.
21  Q.  Have you ever met with any Brazilian
22  government officials?
23  A.  During which period of time?
24  Q.  Ever.
25  A.  Back in 20 -- no, that's not -- no, I have

Page 203

LIAN - CONFIDENTIAL
1
2  not met any Brazilian officials in a one-on-one
3  context.
4  Q.  Have you met any Brazilian officials in a
5  group context?
6  A.  As far as I can recall, I have not met
7  officials in the official capacity.
8  Q.  Have you ever had any telephone calls with
9  any Brazilian government officials in their official
10  capacity?
11  A.  Not that I could recall.
12  Q.  In this trip that you went on in
13  November 2014, did you meet with anyone from
14  Petrobras?
15  A.  I do not believe so.
16  Q.  If you could take a moment to just look at
17  the agenda on these pages, did you participate in
18  any of the meetings in this agenda?
19  A.  As far as I can recollect, I do not have
20  any impression of participating in this
21  Citibank-organized program.
22  Q.  Okay.  You can put that to the side.
23      (Exhibit 18 was marked for
24      identification.)
25      BY MS. ELLIS:

Page 204

LIAN - CONFIDENTIAL
1
2  Q.  You've just been handed what has been
3  marked as Exhibit 18, and this is an e-mail chain
4  bearing Bates Western 00134498.
5      Do you recognize this e-mail chain?
6  A.  I do not.
7  Q.  Do you have a recollection of discussions
8  regarding Petrobras's downgrade around October 22,
9  2014?
10  A.  No, I do not.
11  Q.  Kevin Ritter writes in response to your
12  e-mail:
13      "I think the Jim Chanos comments on
14      CNBC (link below) will probably be
15      the source of some client
16      questions/concerns."
17      Do you have a recollection of comments that
18  Jim Chanos made on CNBC regarding Petrobras around
19  this time?
20  A.  I do not.
21      (Exhibit 19 was marked for
22      identification.)
23      BY MS. ELLIS:
24  Q.  You've just been handed what has been
25  marked as Exhibit 19, which is the article -- the

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL
CASE NO.: 14-cv-9662(JSR)

CHIA-LIANG LIAN
April 27, 2016

Page 205

1     LIAN - CONFIDENTIAL
2  "Forbes" article that Kevin Ritter references in his
3  e-mail in Exhibit 18.
4     Have you ever seen this article?
5  A.  To the best of my knowledge, I do not
6  recall reading this article.
7  Q.  The first paragraph of this article, it
8  states:
9     "On Monday, famed investor and
10    regular CNBC guest Jim Chanos said
11    Brazilian state-owned oil company was
12    not an investment but investment
13    scheme.  He was referring to what
14    most Petrobras watchers already know:
15    That the company is used by the
16    government as a revenue stream and as
17    a means to control inflation as it
18    keeps a lock on gasoline prices."
19    Do you recall any discussions at Western
20  Asset about whether the Brazil government used
21  Petrobras as a revenue stream?
22  A.  I do not recall.
23  Q.  Do you know whether that assessment was
24  consistent with Western Asset's view of Petrobras at
25  this time?

Page 206

1     LIAN - CONFIDENTIAL
2     MS. BIRD: Objection to form.
3     THE WITNESS: As of that point in time, I
4  do not recall any such discussions based on a
5  specific comment or an article.
6     BY MS. ELLIS:
7  Q.  In Exhibit 18, Kevin Ritter wrote that he
8  thought that this -- that Jim Chanos's comments
9  reflected in this article will probably be "the
10  source of some client questions/concern."
11    Do you recall any similar comments being
12  the source of client concern?
13    MS. BIRD: Objection to form.
14    THE WITNESS: I do not.
15    (Exhibit 20 was marked for
16    identification.)
17    BY MS. ELLIS:
18  Q.  You've just been handed what's been marked
19  as Exhibit 20, which is an e-mail chain bearing
20  Bates stamp Western 00138142 to 143.
21    In Exhibit 18, you had requested that JP
22  and Adriano send an internal update to WA portfolio
23  management regarding yesterday's downgrade.  To your
24  recollection, was this e-mail from Adriano Casarotto
25  sent in response to that request?

Page 207

1     LIAN - CONFIDENTIAL
2  A.  I can't ascertain for sure this was a
3  response to the e-mail dated October 22.
4  Q.  Under the heading "Our take:  Implications
5  are limited," in the first bullet point, Adrian
6  Casarotto wrote:
7     "Moody's previous rating on Petrobras
8     was above the sovereign, which didn't
9     make sense in our view considering
10    the company's profile (state-owned
11    entity, very strategic for the
12    government, and subject to high
13    levels of intervention.)"
14    Did this reflect Western's Asset's view at
15  the time of Petrobras?
16  A.  This was the view of our analyst, Adriano,
17  in terms of his thoughts about the historical rating
18  of Petrobras.  And the statement was made in the
19  context, if that is correct, of the downgrade around
20  that same time from BAA2- -- well, from BAA1 to
21  BAA2, I do not recall this beyond what is stated in
22  that particular bullet.
23  Q.  Do you have an understanding of whether you
24  relied on Adriano Casarotto's research regarding
25  Petrobras around this time in making investment

Page 208

1     LIAN - CONFIDENTIAL
2  decisions for Petrobras?
3     MS. BIRD: Objection to form.
4     THE WITNESS: Again, it is a team-based
5  approach that we adopt where we have a senior credit
6  analyst in Pasadena partnering and looking for
7  additional inputs from the global offices, including
8  Sao Paulo and Singapore and London, in making an
9  investment decision.
10    BY MS. ELLIS:
11  Q.  So Adriano Casarotto's research would have
12  been one of the things you would have looked at in
13  making an investment decision regarding Petrobras?
14  A.  This would form part of the analysis in our
15  team-based approach between investment.
16  Q.  Did you agree at the time that the
17  implications of the downgrade in October 2014 of
18  Petrobras were limited?
19    MS. BIRD: Objection to form.
20    THE WITNESS: Again, I cannot recall at
21  that point in time if this was the way we judged the
22  situation.  But obviously, at that point in time,
23  based on information in the public domain and
24  considering the price actions of securities issued
25  by Petrobras, our -- our take, as it were, is

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL
CASE NO.: 14-cv-9662(JSR)

CHIA-LIANG LIAN
April 27, 2016

Page 209

1      LIAN - CONFIDENTIAL
2  prescribed in the way it was written based on all
3  available factors at that point in time.
4      BY MS. ELLIS:
5  Q.  Looking at the third bullet point still
6  under "Our take:  Implications are rated -- are
7  limited," this states:
8      "The current credit spread between
9      Petrobras and Brazil's sovereign,
10     approximately 150 basis points, is
11     not consistent considering our view
12     of the strong linkage between the
13     two; therefore, it justifies holding
14     a position."
15     Do you recall whether Western Asset's
16 recommendation to clients was to hold investments in
17 Petrobras at this time?
18     MS. BIRD: Objection to form.
19     THE WITNESS: I cannot recall with
20 precision if that is the case.
21     BY MS. ELLIS:
22 Q.  Do you have any reason to -- to believe
23 that it is not the case considering that is what
24 Adriano Casaratto wrote here?
25     MS. BIRD: Objection to form.

Page 210

1      LIAN - CONFIDENTIAL
2      THE WITNESS: Again, I can't definitively
3  make a response in light of the evolving news or
4  information alongside -- with price -- market price
5  actions to make a judgment at this point in time.
6      (Exhibit 21 was marked for
7      identification.)
8      BY MS. ELLIS:
9  Q.  You've just been handed what has been
10 marked as Exhibit 21, which is an e-mail chain
11 bearing Bates stamp Western --
12     MR. LANDES: Sorry.  I think it's just --
13     MR. BAREFOOT: It's coming.
14     MR. LANDES: Oh.  Sorry about that.
15     BY MS. ELLIS:
16 Q.  So this is an e-mail chain that has been
17 marked as Exhibit 21, and it bears Bates stamp
18 Western 000148588.
19     Do you recognize this e-mail chain?
20 A.  I do not recall this e-mail chain.
21 Q.  The e-mail that begins towards the bottom
22 of the first page of this exhibit, page 148588, is
23 an e-mail from you to Adriano Casaratto, Paulo
24 Clini, and Jean-Pierre Gil dated November 17, 2014.
25     In this e-mail, you wrote under the bullet

Page 211

1      LIAN - CONFIDENTIAL
2  point -- under the heading "Summary,"
3      "Maintain hold on Petrobras bonds, as
4      a substantial amount of negative news
5      has been priced in."
6      Was this a recommendation that Western
7  Asset was making to its clients at this point?
8      MS. BIRD: Objection to form.
9      THE WITNESS: Again, I cannot recall this
10 particular e-mail chain beyond what it is reflected
11 in the bullet point.
12     BY MS. ELLIS:
13 Q.  Do you have a recollection of this period
14 of time and Western Asset's general views on
15 Petrobras in November 2014?
16 A.  Again, as I said earlier, at this juncture,
17 there were different pieces of information --
18 informations that was evolving, and we, therefore,
19 have to monitor closely -- are based on, you know,
20 new information as such, and information that is
21 available on the public domain, and this is an
22 update that we are providing for internal desk, I
23 believe.
24 Q.  Under the -- under the heading entitled
25 "Investor call," there is a reference to a

Page 212

1      LIAN - CONFIDENTIAL
2  conference call hosted by Petrobras to invest -- "to
3  address investor concern regarding the delay of the
4  announcement of third quarter 2014 financial
5  statements."
6      Do you remember if you were a participant
7  on that call?
8  A.  I do not recall my participation in this
9  investor call.
10 Q.  Around this point in time, November 2014,
11 would you typically have been a participant on
12 investor calls with Petrobras?
13 A.  I do not believe that to be the case during
14 that time.
15 Q.  Do you recall there being investor concern
16 regarding the delay of the announcement of third
17 quarter 2014 financial statements on the part of
18 Petrobras?
19     MS. BIRD: Objection to form.
20     THE WITNESS: That was part of the evolving
21 informations that -- during that point in time, as
22 this update -- internal update would suggest.
23     BY MS. ELLIS:
24 Q.  Flipping to the next page, and this is
25 still under the -- and this is under the heading

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL
CASE NO.: 14-cv-9662(JSR)

CHIA-LIANG LIAN
April 27, 2016

Page 213

1    LIAN - CONFIDENTIAL
2  "Highlights of the call," this second bullet point
3  there --
4  A.  Excuse me.  Which bullet -- which paragraph
5  are you looking at?
6  Q.  So if you look on the third line down on
7  that page --
8  A.  Okay.
9  Q.  -- it says, "The following bullets are the
10  highlights of the call."  The second bullet point
11  there states:
12    "Nonvalue estimated for total
13    reinstatement of previous FS due to
14    bribery reallocations.  It will comes
15    decreasing fixed assets to pass on
16    financial income statements
17    originating losses on the amount of
18    reallocations."
19    Do you understand "FS" to mean financial
20  statements in this context?
21  A.  I'm not certain if that was used as a short
22  form.
23  Q.  Do you have any other understanding of what
24  "FS" might mean?
25  A.  I don't want to speculate on specifically

Page 214

1    LIAN - CONFIDENTIAL
2  exactly what "FS" meant.
3  Q.  At this point in time you testified that
4  Petrobras had delayed in releasing financial
5  statements; is that correct?
6  A.  I'm sorry?  Can you repeat?
7  Q.  You had testified that around this time,
8  Petrobras had delayed in releasing its financial
9  statements; is that correct?
10  A.  To the best of my knowledge, this was the
11  case at that point in time -- around that point in
12  time.
13  Q.  So in this bullet point where it states,
14  "The company expects to release an accurate FS,
15  which they expect to be approved by auditors," do
16  you have any other understanding of what "FS" might
17  mean other than financial statements?
18  A.  I don't have any other suggestions as to
19  what "FS" would have stood for.
20  Q.  At this point in time, did Western Asset
21  understand that a restatement of Petrobras's
22  financial statements would involve a decrease in the
23  book value of fixed assets to reflect the amount of
24  any bribes that were paid?
25    MS. BIRD:  Objection to form.

Page 215

1    LIAN - CONFIDENTIAL
2    THE WITNESS:  I do not recall the specifics
3  of the implication for this specific point --
4  at this specific point in time.
5    BY MS. ELLIS:
6  Q.  Do you have a general understanding of what
7  the restated financial statements were expected to
8  include?
9  A.  I do not.
10  Q.  Do you have an understanding of what
11  "nonvalue estimated" means at the beginning of this
12  bullet point?
13  A.  I do not.
14  Q.  Looking down to the last paragraph on --
15  looking at -- sorry -- the second-to-last paragraph
16  on this page -- oh, I'm sorry -- the second-to-last
17  paragraph -- I'm sorry -- the last paragraph of your
18  e-mail -- so this same page that we've been looking
19  on, you wrote:
20    "Since last Thursday, November 13,
21    2014, where the company delayed FS,
22    markets reacted heavily.  As on the
23    pictures below, the share price
24    decreased 7 percent (figure 2) and
25    the bond PETBRA 6 7/8 2040 suffered

Page 216

1    LIAN - CONFIDENTIAL
2    even more from 102 to 93 (figure 3),
3    an outcome that does not appear to be
4    justified in our view."
5    Is it fair to say that delays in releases
6  of financial statements create uncertainties for
7  investors?
8  A.  Generally speaking, delays can be a source
9  of a price volatility in securities.
10  Q.  And is that what you meant when you wrote,
11  "Where the company delayed FS, markets reacted
12  heavily"?
13  A.  This was for the context -- this was an
14  ongoing exchange of drafts between myself and my
15  colleagues, and I believe that statement was printed
16  by my colleagues in Sao Paulo.
17  Q.  So do -- you had no personal understanding
18  of whether markets reacted heavily when Petrobras
19  delayed FS?
20  A.  At that point in time, as this e-mail would
21  suggest, it had a meaningful impact in terms of
22  influencing market pricing.
23  Q.  And that -- and market pricing was,
24  therefore, impacted by the delay in financial
25  statements, not by the financial statements

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL
CASE NO.: 14-cv-9662(JSR)

CHIA-LIANG LIAN
April 27, 2016

Page 217

1      LIAN - CONFIDENTIAL
2  themselves?
3      MS. BIRD: Objection to form.
4      THE WITNESS: Again, I cannot recall in
5  precise details why markets reacted heavily.
6      BY MS. ELLIS:
7  Q.  But at this point, Petrobras had not yet
8  released its restated financial statements; is that
9  correct?
10 A.  I believe this to be the case.
11 Q.  Looking back at the first page of this
12 document, Paulo Clini responded to your e-mail
13 stating that:
14     "Petrobras's vulnerability to the
15     Brazilian real depreciation has to do
16     with one assumption we used in our
17     simulations: Domestic prices remain
18     flat even in a scenario of weaker
19     currency.  In order to do these
20     simulations, we are forced to
21     'control' some variables, keeping
22     some of them constant.  In the real
23     world, the company reaction to a
24     weaker Brazilian real would be to
25     readjust domestic prices to the new

Page 218

1      LIAN - CONFIDENTIAL
2  level of global oil prices.  So in
3  the end, the vulnerability to the
4  Brazilian real is not as high as the
5  simulation suggests."
6      Did you understand Paulo Clini to mean that
7  in the real world, Petrobras would readjust --
8  readjust domestic prices to the new level of global
9  oil prices if the Brazil real were to depreciate?
10 A.  I do not recall this e-mail exchange, and
11 I'm not certain as to the context for which Paulo
12 Clini's comment was made in that particular
13 sentence.
14 Q.  You replied thanking him for the insight,
15 and you wrote that:
16     "It is obviously assuring, at the
17     minimum, that there are avenues to
18     mitigate the fallout from Brazil real
19     weakness."
20     What did you understand "the avenues to
21 mitigate the fallout from Brazilian real weakness"
22 to mean?
23 A.  Again, this was a year and a half ago.  The
24 context of these exchange is not something that I
25 can recall with clarity, and I'm not certain what I

Page 219

1      LIAN - CONFIDENTIAL
2  had meant in that particular statement in this
3  e-mail exchange.
4      (Exhibit 22 was marked for
5      identification.)
6      BY MS. ELLIS:
7  Q.  You've just been handed what has been
8  marked as Exhibit 32 -- 22 -- I apologize, I'm
9  getting ahead of myself -- which is a PowerPoint
10 entitled "Petrobras," which bears Bates stamps
11 Western 01600457 to 600463.
12     Do you remember this presentation?
13 A.  I recall suggestions about putting together
14 a presentation deck, but I do not recall
15 specifically this deck in terms of the details.
16 Q.  Do you know who drafted this presentation?
17 A.  No, I do not.  It -- it is probably a team
18 effort, but I do not know.
19 Q.  Do you know whether this deck was put
20 together at your suggestion?
21 A.  No, I do not recall if it was my suggestion
22 or someone else's.
23 Q.  Looking at page 2, which is the page with
24 Bates stamp 00458, and looking specifically at the
25 six bullet points on that page, this reads:

Page 220

1      LIAN - CONFIDENTIAL
2      "Potential restatement:  Considering
3      news from 1 percent to 3 percent
4      bribery on CAPEX for total CAPEX of
5      last two years, approximately U.S.
6      $90 billion restatements from U.S.
7      $900 million to U.S. $2.7 billion
8      from CAPEX to OPEX, no cash impact."
9      Do you have an understanding of where this
10 range of values, U.S. 900 million to U.S.
11 2.7 billion, came from?
12 A.  No, I do not.
13 Q.  Do you have an understanding of what that
14 range of values refers to?
15 A.  No, I do not.
16 Q.  Do you know whether this was Western
17 Asset's own estimate of the restatement that -- that
18 Petrobras might make in its financial statements?
19     MS. BIRD: Objection to form.  Lacks
20 foundation.
21     THE WITNESS: I can't determine if this was
22 the case.
23     BY MS. ELLIS:
24 Q.  Do you recall any discussions around this
25 time about developing an estimate for the

Page 221

LIAN - CONFIDENTIAL
2 restatement that Petrobras would make with respect
3 to bribery in its financial statements?
4 **A. I recall ongoing discussions in an overall**
5 **sense on Petrobras, but I do not recall the**
6 **specifics to that discussion on Petrobras at this**
7 **point in time.**
8 Q. At any point in time, do you remember
9 Western Asset attempting to estimate the amount that
10 Petrobras would restate with regards to bribery in
11 its restated financial statements?
12 **A. To the best of my knowledge, I do not**
13 **recall specific attempts which may or may not have**
14 **been done at a corporate credit level.**
15 Q. If such -- if Western Asset had attempted
16 to develop such an estimate, who would have been
17 responsible for developing that estimate?
18 **A. And the question is, obviously, if -- I**
19 **would believe that if it had done that, it would be**
20 **a joint effort between our colleagues in Sao Paulo**
21 **alongside Mark Hughes and other colleagues on the**
22 **research team.**
23 Q. Do you have an understanding of whether
24 Mark Hughes was on the EM desk at this point in
25 time?

Page 222

LIAN - CONFIDENTIAL
2 **A. At this point in time, I do not think --**
3 **believe that Mark Hughes was a member of the**
4 **emerging markets team.**
5 Q. Would he nevertheless have been involved in
6 helping to develop an estimate for Petrobras's
7 possible restatements?
8 **A. I do not believe so.**
9 Q. Other than the colleagues in Sao Paulo,
10 therefore, do you think anyone else may have been
11 involved if Western Asset attempted to estimate the
12 amount that Petrobras was going to write down in its
13 financial statements regarding bribery?
14 **A. If this was the case, potentially a former**
15 **colleague, Jeff Nuruki, might have been involved**
16 **with that exercise.**
17 Q. If such an estimate had been made, would it
18 have been conveyed to you?
19 **MS. BIRD:** Objection. Form.
20 **THE WITNESS:** Again, you know, investment
21 decisions are made and presented to me. As head of
22 the emerging markets team, you know, I have broad
23 responsibilities. And individual credit research
24 and analysis are tasked to primary analysts who are
25 accountable to me in terms of the -- that sort of

Page 223

LIAN - CONFIDENTIAL
2 the analysis that they -- they make for individual
3 credits, including Petrobras.
4 **BY MS. ELLIS:**
5 Q. But you have no specific memory around this
6 time of anyone communicating to you a possible
7 estimate for the amount that Petrobras might write
8 down with regards to bribery in its restated
9 financial statements?
10 **A. No -- to the best of my knowledge, no**
11 **specific memory of those discussions other than**
12 **broader discussions, which may or may not include**
13 **more specific and company-related issues as such.**
14 **(Exhibit 23 was marked for**
15 **identification.)**
16 **BY MS. ELLIS:**
17 Q. So you've just been handed what has been
18 marked as Exhibit 23, which is an e-mail from Susan
19 Signori dated November 25, 2014, and that bears
20 Bates stamps Western 01508335 to 835 -- to 8336.
21 Do you recognize this e-mail?
22 **A. No, I do not.**
23 Q. Who is Susan Signori?
24 **A. She is a client service executive in**
25 **Western Asset.**

Page 224

LIAN - CONFIDENTIAL
2 Q. And is California State Teacher's
3 Retirement System a client of Western Asset?
4 **A. I can't ascertain for sure, but it is -- it**
5 **is probably the case.**
6 Q. Looking down to the paragraph below,
7 "Details," this states that:
8 "On November 18, 2014, SRS, CWC, CLL,
9 JP Gil, and Adriano Casarotto from
10 the Sao Paulo office had a call with
11 members of the CalSTRS credit team to
12 discuss Petrobras."
13 Is "CLL" a reference to you?
14 **A. I believe so.**
15 Q. And "SRS" is Susan Signori?
16 **A. I believe so.**
17 Q. Who is "CWC"?
18 **A. I do not know.**
19 Q. And looking at the next paragraph below,
20 this states:
21 "Darin asked that we provide
22 additional color on the significant
23 spread widening seen over the past
24 few weeks. It was a good
25 conversation with CLL, JPG, and AC

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL
CASE NO.: 14-cv-9662(JSR)

CHIA-LIANG LIAN
April 27, 2016

Page 225

1　　LIAN - CONFIDENTIAL
2　all adding value to the conversation.
3　Petrobras has postponed publishing
4　their financial statements three
5　times due to ongoing corruption
6　investigations and restatement of
7　company financials. They are
8　supposed to release unaudited
9　financials on December 12, then they
10　will have 30 days after to release an
11　audited statement. Petrobras will be
12　restating some portion of CAPEX to
13　OPEX. At the time of the call, our
14　estimate is that this charge would be
15　2.5 to 3 billion and generate a
16　loss."
17　　At this time, November 18, 2014, was it
18　Western Asset's estimate that Petrobras would
19　restate 2.5 to 3 billion worth of CAPEX to OPEX?
20　**A. I -- I cannot recall with precision beyond**
21　**what is stated in this meeting notes.**
22　Q. Do you have any reason to believe that
23　Ms. Signori's notes were not an accurate
24　representation of the call?
25　**A. There is no reason for me to doubt the**

Page 226

1　　**LIAN - CONFIDENTIAL**
2　**integrity of the minute notes.**
3　Q. Looking at the last paragraph on this page,
4　this reads:
5　　"In our opinion, the stand-alone
6　　credit profile of Petrobras would
7　　need to diverge four notches from the
8　　Brazilian sovereign rating to prompt
9　　the rating agencies to de-couple the
10　　rating of Petrobras and Brazil. It's
11　　fundamental for the country to keep
12　　up the health of Petrobras. A normal
13　　spread between Petrobras and the
14　　sovereign would be in the 50 to 100
15　　range. Currently, it is 200 basis
16　　points, which is a record high, and
17　　it doesn't seem to make sense (more
18　　of a reaction to the noise). There
19　　is a general sense that long-term
20　　investors will hold onto Petrobras,
21　　and most of the selling we are
22　　currently seeing is coming from
23　　nondedicated EM investors. Due to
24　　the close linkages with the Brazilian
25　　sovereign, we attach a low

Page 227

1　　LIAN - CONFIDENTIAL
2　probability of Petrobras being
3　downgraded below investment grade."
4　　At this time, did Western Asset believe
5　that pricing Petrobras notes 200 basis points below
6　Brazilian sovereign notes did not make sense?
7　**A. Again, I cannot recall the exact thought at**
8　**this particular point in time beyond what is**
9　**discussed, but what I do know is that this, if true,**
10　**and accurately reflecting Western Asset's view at**
11　**that point in time would incorporate fundamental**
12　**analysis based on then-available information, market**
13　**pricing, and other relevant factors that influence**
14　**our strategic position on Petrobras.**
15　Q. And, again, you have no reason to believe
16　that Ms. Signori's notes, with respect to these
17　points on the call, were not an accurate
18　representation of the call?
19　**A. Again, there is no basis for me to make a**
20　**judgment to disbelieve the integrity of the call**
21　**notes.**
22　Q. Ms. Signori links the 200 basis point
23　spread to a "reaction to the noise." Do you
24　understand that to be a reference to news concerning
25　corruption investigations?

Page 228

1　　LIAN - CONFIDENTIAL
2　　**MS. BIRD:** Objection. Form.
3　　**THE WITNESS:** Again, I cannot recall this
4　particular call or the context of it to make a
5　judgment as to whether the noise was in reference to
6　a specific or specific pieces of news then released
7　in the market.
8　　(Exhibit 24 was marked for
9　　identification.)
10　　**BY MS. ELLIS:**
11　Q. You've just been handed what has been
12　marked as Exhibit 24, which is an e-mail chain
13　bearing Bates stamps Western 00104263 to 4264.
14　　Do you recognize this e-mail chain?
15　**A. I do not.**
16　Q. In the bottom e-mail from Mark Hughes dated
17　March 25, 2015, at 5:53 a.m., he forwards news
18　stating that "Petrobras got CVM SEC's approval for
19　loss calculation." And he referred to that news as
20　"obviously positive."
21　　Do you recall any discussions regarding
22　approval for Petrobras's loss calculation?
23　**A. No, I do not recall discussion surrounding**
24　**SEC's approval for loss calculation.**
25　Q. And do you have any understanding of

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL
CASE NO.: 14-cv-9662(JSR)

CHIA-LIANG LIAN
April 27, 2016

Page 229

1    LIAN - CONFIDENTIAL
2  whether Western Asset viewed Petrobras receiving
3  such approval as positive news?
4    **MR. SCHOCHET:** Objection.
5    **MS. BIRD:** Same objection. Objection.
6  Form.
7    **THE WITNESS:** Again, this is part of the
8  evolving and additional information over the course
9  of time. I cannot recall with certainty what this
10  piece of news had meant for the creditworthiness of
11  Petrobras.
12    **BY MS. ELLIS:**
13  Q. In the top e-mail, Mark Hughes writes,
14  "Bring on the new issue." Does that help refresh
15  your recollection of how Western Asset viewed the
16  news that regulators had accepted Petrobras's
17  methodology to calculate losses?
18  **A. No.**
19    **(Exhibit 25 was marked for**
20    **identification.)**
21    **BY MS. ELLIS:**
22  Q. You've just been handed what has been
23  marked as Exhibit 25, which is an e-mail chain
24  bearing Bates stamps Western 00119691 to 9694.
25    Do you recognize this e-mail chain?

Page 230

1    LIAN - CONFIDENTIAL
2  **A. No, I do not.**
3  Q. In the bottom e-mail of the chain, you
4  wrote -- you wrote to Adriano Casaretto asking for a
5  summary of recent developments in Petrobras and
6  wrote:
7    "The Petrobras bonds have rallied a
8    lot and we are thinking of sending
9    out an e-mail to have non-EM accounts
10    trim some bonds 'dry powder' in
11    anticipation of potential new issue
12    (sovereign or Petrobras) and
13    still-significant uncertainties
14    ahead."
15    What did you mean by "dry powder in
16  anticipation of potential new issue"?
17  **A. I do not recall the exact context of my**
18  **e-mail exchange with my Sao Paulo colleagues, but as**
19  **I mentioned earlier, portfolio management entails a**
20  **range of considerations, one of which is to consider**
21  **the context of cash exposure for portfolios at any**
22  **given point in time. And "dry powder," I believe,**
23  **would speak to increasing cash positions in**
24  **anticipation of new issues of any particular company**
25  **or country that could -- that might be attractive**

Page 231

1    **LIAN - CONFIDENTIAL**
2  **from an investment point of view.**
3  Q. And in this particular context, this was
4  in -- in anticipation of potential new issue,
5  sovereign or Petrobras?
6  **A. Again, I cannot recall this e-mail and the**
7  **context of it, but potential -- you know, again, the**
8  **key word is "potential," and has been market**
9  **whispers and talks of these new issues in the**
10  **pipeline.**
11  Q. And you had wrote that Petrobras bonds had
12  "rallied a lot," meaning that a potential new issue
13  in Petrobras might be attractive?
14  **A. I'm not sure if that is what -- I cannot**
15  **recall the context of what I meant and whether the**
16  **first statement is related to the second.**
17  Q. And at this point in time, Western Asset
18  did not have an understanding of the historical
19  amount of write-offs that would be reflected in
20  Petrobras's restated financial statements?
21  **A. I can't recall with certainty to answer**
22  **that question as of April 1, 2015.**
23  Q. Do you have an understanding of when
24  Petrobras released its restated financial
25  statements?

Page 232

1    LIAN - CONFIDENTIAL
2  **A. No.**
3    **MS. BIRD:** Objection. Form.
4    **THE WITNESS:** No, I don't.
5    (Exhibit 26 was marked for
6    identification.)
7    **BY MS. ELLIS:**
8  Q. Just been handed what has been marked as
9  Exhibit 26, which is an e-mail chain bearing Bates
10  stamps Western 00127157 through 127160.
11    Do you recognize this e-mail chain?
12  **A. No, I do not.**
13  Q. In the e-mail from Kenneth Leech, which
14  begins on the bottom of the first page and is dated
15  April 22, 2015, at 8:56 p.m., he quotes language
16  stating:
17    "Non-EM looking to trim should
18    consider fade rally."
19    And then asked:
20    "Are we looking to trim? I feel this
21    issue has swirled for at least the
22    last month. My impression from Paulo
23    and JP has been that we are
24    ultimately positive on Petrobras.
25    Our thesis, endorsed by C.L., is that

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL
CASE NO.: 14-cv-9662(JSR)

CHIA-LIANG LIAN
April 27, 2016

Page 233

1    LIAN - CONFIDENTIAL
2    Petrobras is ultimately a ward of the
3    state. Saving Petrobras will be a
4    priority/Dilma ruling while Petrobras
5    defaults is a calamitous option."
6        Was Mr. Leech surprised that there was a
7    recommendation that certain accounts should trim
8    Petrobras exposure?
9        **MS. BIRD:** Objection to form.
10       **THE WITNESS:** I don't think there is any
11   basis to suggest that based on Ken's -- Mr. Leech's
12   e-mail.
13   **BY MS. ELLIS:**
14   Q.  He wrote that his impression is that:
15       "We are ultimately positive on
16       Petrobras because it is ultimately a
17       ward of the state."
18       He attributed that thesis to you.
19       Do you agree with that assessment?
20   **A.  Again, I do not want to put words into**
21   **Ken's mouth or vice versa.  I'm not sure what -- in**
22   **this context, it was probably used in a colloquial**
23   **sense, I presume, but I'm not sure if this was a**
24   **thesis that I had suggested, i.e., Petrobras being a**
25   **ward of the state.**

Page 234

1        LIAN - CONFIDENTIAL
2    Q.  Is it a thesis that you agree with?
3    **A.  The question is what is meant by "a ward of**
4    **the state."  I'm not certain if I understood the**
5    **precise definition of that phrase.**
6    Q.  Would you agree that, at this time, saving
7    Petrobras will be a priority for the Brazilian
8    government?
9    **A.  Again, when we look at Petrobras in terms**
10   **of managing our exposure, we look across a range of**
11   **fundamental, technical, and valuation**
12   **considerations.  The government nexus is one of many**
13   **factors that we would consider in terms of arriving**
14   **at an investment decision.**
15   Q.  And in considering that factor, would you
16   agree that saving Petrobras will be a priority for
17   the Brazilian government?
18   **A.  Petrobras --**
19       **MS. BIRD:** I'm sorry.  Objection.  Form.
20       **THE WITNESS:** Petrobras -- it is a key
21   quasi-sovereign of Brazil; so it would be one of an
22   important state-owned enterprise of the Republic of
23   Brazil.
24       **BY MS. ELLIS:**
25   Q.  Mr. Leech further wrote in the bottom

Page 235

1    LIAN - CONFIDENTIAL
2    paragraph of his e-mail:
3        "I'm a believer in our thesis, and I
4        don't believe it has changed.  But in
5        talking with Julien, I thought we
6        should re-review this with JP and
7        Paulo.  Maybe they have switched and
8        I am mistaken."
9        Were you aware at this time of whether or
10   not JP and Paulo had changed their views on
11   Petrobras?
12   **A.  In the context of this particular e-mail**
13   **exchange, I'm not aware of -- of any changes to**
14   **opinions.**
15   Q.  In general, were you aware of any changes
16   in the opinions of your Sao Paulo colleagues with
17   respect to Petrobras at this time?
18   **A.  Again, this whole process of evaluation has**
19   **been a dynamic, real-time basis with all relevant**
20   **factors shifting and evolving, and I -- and we are**
21   **constantly monitoring and risk -- and assessing our**
22   **judgment.  So I don't think I have a precise**
23   **question in regards to, you know, this particular**
24   **paragraph in terms of potential changes of views.**
25   Q.  The purpose of Western Asset's process of

Page 236

1        LIAN - CONFIDENTIAL
2    evaluation, which you described as a "dynamic,
3    real-time basis," is to come up with an investment
4    thesis; is that correct?
5    **A.  That is correct.**
6    Q.  And had the investment thesis changed
7    around this time, meaning April 1, 2014, with
8    regards to Petrobras?
9    **A.  I cannot recall to the best of my ability.**
10   Q.  And I'm sorry.  I should have said April 1,
11   2015.
12   **A.  Same response.  It has been more than a**
13   **year, and I can't recall with precision if this was**
14   **the case as of April 1, 2015.**
15   Q.  Wilfred Wong forwarded the e-mail we just
16   discussed to you.  Do you have an understanding of
17   why you are not on that e-mail chain initially?
18       **MR. SCHOCHET:** Objection.
19       **THE WITNESS:** As I had mentioned earlier,
20   trades are directed at the respective sector desk's
21   trader, and I believe that this was part of the
22   reason why Will was copied on this e-mail exchange
23   from Mr. Leech.
24       **BY MS. ELLIS:**
25   Q.  You wrote, "Thanks, Will.  I will reach out

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL
CASE NO.: 14-cv-9662(JSR)

CHIA-LIANG LIAN
April 27, 2016

```
 1      LIAN - CONFIDENTIAL
 2  to SKL."  "SKL" here is Kenneth Leech?
 3  A.  That's correct.
 4  Q.  And did you reach out to Kenneth Leech
 5  regarding the e-mail below?
 6  A.  I don't have any recollection if I did or
 7  didn't.
 8  Q.  Mark Hughes then wrote to you and stated:
 9      "Let me know if I can help with this
10      at all.  Obviously, we're talking
11      about tactical moves more than the
12      long-term that SKL is focused on."
13      What were the "tactical moves" that Mark
14  Hughes referred to?
15      MS. BIRD: Objection to form.
16      THE WITNESS: I don't know what is meant in
17  this instance other than considerations of
18  short-term shifts in portfolios versus the long-term
19  considerations that were mentioned earlier.  Again,
20  this is inferred.  I do not know the context of
21  Mark's comment.
22      BY MS. ELLIS:
23  Q.  And when he refers to "the long-term that
24  SKL is focused on," that means the long-term
25  positive thesis on Petrobras?
```

```
 1      LIAN - CONFIDENTIAL
 2      MS. BIRD: Objection to form.
 3      THE WITNESS: I believe it's the long-term
 4  considerations taken in totality.
 5      BY MS. ELLIS:
 6  Q.  Do you know what Western Asset's long-term
 7  view of Petrobras is?
 8  A.  I cannot recall with certainty what those
 9  long-term considerations at this point in time were
10  focused on.
11  Q.  Can you recall if the long-term view was
12  positive or negative at this time?
13      MS. BIRD: Objection to form.
14      THE WITNESS: No, I -- I cannot.
15      (Exhibit 27 was marked for
16      identification.)
17      BY MS. ELLIS:
18  Q.  You've just been handed what has been
19  marked as Exhibit 27, which is an e-mail chain
20  bearing Bates stamps Western 00130393 to 394.
21      Do you recognize this e-mail chain?
22  A.  No, I do not.
23  Q.  Looking at the bottom e-mail in the chain,
24  which is an e-mail from Kenneth Leech dated April 6,
25  2015, at 2:43 p.m., who is Carl Eichstaedt?
```

```
 1      LIAN - CONFIDENTIAL
 2  A.  Carl is one of our U.S. call portfolio
 3  managers.
 4  Q.  In this e-mail, and this is the third
 5  paragraph down, Mr. Leech writes:
 6      "My position from a value perspective
 7      is that we think the issues are miles
 8      underpriced.  We CAN'T," in all caps,
 9      "have a blanket sale recommendation."
10      Did you agree that Petrobras' issues were
11  miles underpriced at this time?
12      MR. SCHOCHET: Objection.
13      THE WITNESS: At this point in time, I do
14  not recall having this view or against this view
15  regarding the valuation of Petrobras.
16      BY MS. ELLIS:
17  Q.  You then forward this e-mail to certain
18  members of your team and wrote,
19      "Suggest the five of us do a call
20      Tuesday morning to respond."
21      Do you remember if that call took place?
22  A.  I -- I cannot recall this particular
23  conversation.
24  Q.  Do you remember if you responded to
25  Mr. Leech?
```

```
 1      LIAN - CONFIDENTIAL
 2  A.  I can't recall if I did or I did not.
 3  Q.  Do you recall any conversations with
 4  Mr. Leech at -- around this time regarding the value
 5  of Petrobras Securities?
 6  A.  No, I -- I cannot recall.
 7      Could we take a break after this.
 8      MR. BAREFOOT: We can take a break anytime
 9  you want.
10      MS. ELLIS: Do you want to do it now?
11      THE WITNESS: Yeah.  Thank you.
12      MS. ELLIS: Sure.
13      THE VIDEOGRAPHER: This is the end of disk
14  No. 4.  The time is 1729, and we're off the record.
15      (Recess.)
16      THE VIDEOGRAPHER: We are back on the
17  record.  This is the beginning of disk No. 5.  The
18  time is 1743.
19      (Exhibit 28 was marked for
20      identification.)
21      BY MS. ELLIS:
22  Q.  You've just been handed what has been
23  marked as Exhibit 28, which is an e-mail chain
24  bearing Bates stamps Western 00069827 through 69831.
25      Do you recognize this e-mail?
```

Page 241

1    LIAN - CONFIDENTIAL
2 A.  No, I do not.
3 Q.  Looking at the e-mail from you dated
4 Thursday, April 9, 2015, did this reflect your views
5 of Petrobras at the time?
6    MR. SCHOCHET: Objection.
7    THE WITNESS: This is part of the regular
8 update in the context of the evolving developments
9 on Petrobras and in the context of providing a
10 timely update to the rest of the investment
11 management desks of Pasadena.
12    BY MS. ELLIS:
13 Q.  Would this update have also been
14 communicated to clients?
15    MS. BIRD: Objection to form.
16    THE WITNESS: I'm not certain if this was
17 communicated to clients.
18    BY MS. ELLIS:
19 Q.  In the top e-mail, Kevin Ritter writes:
20    "Nice summary of western's current
21    thinking on Petrobras."
22    Do you agree that this is a summary of
23 Western's current thinking on Petrobras?
24 A.  I don't have specific recommend --
25 recollection, but to the extent that this was the

Page 242

1    LIAN - CONFIDENTIAL
2 update e-mail for the internal audience, this would
3 likely represent -- representative of our prevailing
4 investment thesis on Petrobras taking into
5 consideration all relevant factors.
6 Q.  If you turn to the third page, there is a
7 section entitled "Financial statements, truth or
8 dare." And in the second bullet point under that
9 heading, this -- you wrote:
10    "Sign-off from PwC on pending
11    financial statements is pivotal, not
12    only in averting debt acceleration,
13    but also to enable Petrobras to
14    access international bond markets
15    again. The ideal outcome is that the
16    released financial statements are
17    credible enough to avoid skepticism
18    without raising undue alarm.
19    Investors may remain reluctant to buy
20    Petrobras bonds again if PwC decides
21    to recognize a minor loss (USD 10
22    billion or below, in our view) and/or
23    to add a qualified opinion suggesting
24    more adjustments may follow pending
25    conclusion of the Lava Jato

Page 243

1    LIAN - CONFIDENTIAL
2 investigations."
3    Do you have an understanding of whether at
4 the time Western Asset viewed a loss of USD 10
5 billion or below as a minor loss for Petrobras?
6    MR. SCHOCHET: Object to form.
7    THE WITNESS: Again, this e-mail update was
8 sent by myself, but it represents collaborative -- a
9 collaboration amongst our colleagues. I do not
10 recall specifically the second bullet under
11 "Financial statements" and what that meant in the
12 context of the timing of that delivery of that
13 e-mail.
14    BY MS. ELLIS:
15 Q.  You also wrote:
16    "The ideal outcome is that the
17    released financial statements are
18    credible enough to avoid skepticism
19    without raising undue alarm."
20    Once the financial statements were actually
21 released, was it your view that they were credible
22 enough to avoid skepticism without raising undue
23 alarm?
24    MS. BIRD: Objection to form.
25    THE WITNESS: Again, this is a view of the

Page 244

1    LIAN - CONFIDENTIAL
2 emerging markets team. I do not recall if this
3 turned out to be the case upon release of the
4 financial statements.
5    BY MS. ELLIS:
6 Q.  Do you recall, in general terms, Western
7 Asset's reaction to the release of the financial
8 statements?
9    MS. BIRD: Objection. Form.
10    THE WITNESS: No, I don't.
11    (Exhibit 29 was marked for
12    identification.)
13    BY MS. ELLIS:
14 Q.  You've just been handed what has been
15 marked as Exhibit 29, which is an e-mail chain
16 bearing Bates stamps Western 00930985 through 0987.
17    Do you recognize this e-mail chain?
18 A.  No, I do not.
19 Q.  In this e-mail, Mark Hughes forwards a
20 report -- a research report from Merrill Lynch. And
21 in forwarding, he writes:
22    "You guys may have seen this, but the
23    quote/unquote 'unqualified opinion'
24    and decent cash balance seem pretty
25    positive."

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL
CASE NO.: 14-cv-9662(JSR)

CHIA-LIANG LIAN
April 27, 2016

Page 245

1      LIAN - CONFIDENTIAL
2      At the point when Petrobras released its
3   restated financial statements, do you recall any
4   discussions at Western Asset about whether that
5   release was on balance pretty positive for
6   Petrobras?
7      MR. SCHOCHET: Objection to form.
8      THE WITNESS: No, I do not recall.
9      BY MS. ELLIS:
10  Q.  You don't recall any discussions either way
11  about whether or not the release was a positive or a
12  negative for Petrobras?
13     MR. SCHOCHET: Same objection.
14     THE WITNESS: Yes.  As I say, this whole
15  process was evolving.  I do not recall specifically
16  if the release had a positive or negative impact in
17  our judgment of the -- the credit.
18     BY MS. ELLIS:
19  Q.  The Merrill Lynch report itself states --
20  and this is in the part of the report just below the
21  text in a box -- "Overall results provided no huge
22  surprises, which is good."
23     Do you recall whether Western Asset agreed
24  that there were no huge surprises in Petrobras's
25  restated financial statements?

Page 246

1      LIAN - CONFIDENTIAL
2   A.  No, I do not.
3   Q.  Turning to the next page, at the top of
4   that page, the Merrill Lynch report states,
5      "Asset impairment was in the
6      quote/unquote 'acceptable range.'"
7      Do you recall any discussions at Western
8   Asset about whether asset impairment in the released
9   financial statements was in the acceptable range?
10  A.  No, I do not.
11  Q.  Are you familiar with an offering of bonds
12  by Petrobras with a -- with a 100-year maturity in
13  the second quarter of 2015 after the release of
14  these financial statements?
15  A.  Yes.
16  Q.  And is -- is that offering known as the
17  century bond?
18  A.  It is -- I don't think that is a commonly
19  used word, but it was a -- a century bond.
20  Q.  And do you have an understanding that
21  Western Asset continued to make purchases of
22  Petrobras Securities for its clients after the
23  release of the restated financial statements?
24  A.  I cannot recall post-release the exact
25  trade transactions, as these transactions, if any,

Page 247

1      LIAN - CONFIDENTIAL
2   would just simply not be based on the release of the
3   statements, but it would be taken in the context of
4   considerations of all relevant factors, including
5   market pricing, other fundamental factors affecting
6   the country, or the asset class.  So I do not recall
7   specifically if there were transactions post the
8   release of the statements as such.
9   Q.  Do you know whether Western Asset made any
10  trans -- any purchases at Petrobras Securities after
11  April 22, 2015, regardless of what the basis for
12  those decisions were?
13  A.  I can't recall with certainty, but just in
14  the ordinary course of business, I would -- it would
15  not surprise me if there were trades that are --
16  related to Petrobras Securities that were executed
17  for a whole range of reasons.
18  Q.  The offering of bonds by Petrobras with a
19  100-year maturity in the second quarter of the
20  2015 -- did Western Asset make purchases of those
21  bonds for its client?
22  A.  I believe we participated in that new
23  issue.
24  Q.  And did you know -- do you know if Western
25  Asset made purchases of those bonds for any of the

Page 248

1      LIAN - CONFIDENTIAL
2   Western Asset funds listed in Exhibit 1?
3   A.  I don't have enough information to -- to
4   say yes or no without looking at the -- relooking at
5   the trade blotter.
6   Q.  You stated that you were familiar with what
7   I'll call the century bond, the bond offering with a
8   100-year maturity.  Do you recall any discussions
9   about the restated financials relative to an
10  assessment of whether or not to participate in that
11  offering?
12  A.  Again, the decision as to whether we should
13  participate or pass a new issue, including the
14  100-year bond issued by Petrobras, would take into
15  account all relevant information of which, looking
16  at the time sequence, the information subsequently
17  released by the company would be -- would have been
18  a part of that entire information set.
19  Q.  And what role in particular did those
20  financial statements play in Western Asset's
21  assessment of the century bond?
22  A.  I'm not sure if I understand the question.
23  Could you clarify.
24  Q.  Did the restated financial statements have
25  either a positive or negative impact on Western

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL     CHIA-LIANG LIAN
CASE NO.: 14-cv-9662(JSR)     April 27, 2016

Page 249

1     LIAN - CONFIDENTIAL
2 Asset's decision to participate in the issuance of
3 the century bond?
4     **MR. SCHOCHET:** Objection. Form.
5     **MS. BIRD:** Same objection.
6     **THE WITNESS:** Again, we -- we take -- every
7 investment decision are based on the whole range
8 of -- of factors and considerations, and it is not
9 narrowly focused of one particular issue. And I do
10 not recall with precision to answer your question.
11     **BY MS. ELLIS:**
12 Q. Have you read Petrobras's corruption
13 prevention program manual?
14 A. No.
15 Q. To your knowledge, did anyone else at
16 Western Asset read it during the relevant period?
17 **A. I'm not certain, but I believe that my**
18 **credit research colleagues may have kept note --**
19 **taken note of that piece of information.**
20 Q. Did any of them ever mention reading it to
21 you?
22 **A. I do not recall this to be the case.**
23 Q. Have you read Petrobras's Code of Ethics?
24 A. No.
25 Q. What about Petrobras's conduct guide?

Page 250

1     LIAN - CONFIDENTIAL
2 A. No.
3 Q. Have you ever read Petrobras's
4 "Fatos e Dados," or Facts and Data blog?
5 A. No.
6 Q. Have you ever heard of it?
7 A. No.
8 Q. Do you speak Portuguese?
9 A. No.
10 Q. Have you ever read any reports issued by
11 TCU?
12 A. No.
13     **MS. BIRD:** Objection to form.
14     **THE WITNESS:** No.
15     **BY MS. ELLIS:**
16 Q. And that is the Federal Court of Accounts
17 in Brazil?
18 A. No.
19 Q. Are you aware of anyone else at Western
20 Asset reviewing any TCU reports regarding Petrobras
21 during the relevant time period?
22 **A. I'm not aware.**
23 Q. I don't think I have any further questions
24 at this time. Is there any testimony that you would
25 like to clarify or reconsider?

Page 251

1     LIAN - CONFIDENTIAL
2 A. No.
3     **MR. SCHOCHET:** I have some questions.
4
5     **EXAMINATION**
6     **BY MR. SCHOCHET:**
7 Q. Good evening, Mr. Lian.
8 A. Good evening, sir.
9 Q. If you recall at the beginning of this
10 deposition, I identified myself as Ira Schochet, and
11 I represent the Employees Retirement System of the
12 State of Hawaii. I'm just going to ask you a few
13 questions.
14 A. Sure.
15 Q. If you recall, Mr. Lian, you were asked a
16 lot of questions concerning the determination of
17 fundamental fair value by Western Asset.
18 **A. (No audible response.)**
19 Q. You need to answer verbally.
20 **A. I'm sorry. Again --**
21 Q. Okay.
22 **A. Can you repeat the question again?**
23 Q. Yes. Sure.
24     If you recall, you were asked a number of
25 questions during this deposition concerning the

Page 252

1     LIAN - CONFIDENTIAL
2 determination of fundamental fair value. Do you --
3 **A. Yes.**
4 Q. -- recall that?
5 **A. Uh-huh.**
6 Q. Okay. And do you -- you recall you
7 testified that that determination is made based upon
8 both quantitative and qualitative analyses?
9 **A. Yes.**
10 Q. Okay. And if you recall, you testified
11 that -- that those analyses were holistic in nature?
12 **A. Correct.**
13 Q. Okay. And if you recall, you testified
14 that one of the factors that is considered is the
15 issuer's balance sheet?
16 **A. That's correct.**
17 Q. Okay. And another factor that is
18 considered is the issuer's income statement?
19 **A. That is correct.**
20 Q. And I -- am I correct that your testimony
21 was that, with respect to the issuer's balance
22 sheet, the -- the analyses or review is not narrow
23 in scope, that the entire balance sheet is looked
24 at; is that correct?
25 **A. That is correct.**

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL                    CHIA-LIANG LIAN
CASE NO.: 14-cv-9662(JSR)                                              April 27, 2016

Page 253

         LIAN - CONFIDENTIAL
1
2  Q.  Okay.  Now, if the issuer's -- if the value
3  of the reported assets on the issuer's balance sheet
4  are materially inflated, that is, they reported at a
5  value that is materially higher than their actual
6  value, would you agree that -- that that fact would
7  affect the determination of fundamental fair value?
8      MS. ELLIS: Objection to form.
9      THE WITNESS: To the extent that this is
10 the primary source of information from the company,
11 yes.  It would be a source of information that we
12 would rely on in our judgment of what the
13 fundamental value of the security.
14     BY MR. SCHOCHET:
15 Q.  And if the income -- if the income
16 reported -- or the earnings -- the earnings reported
17 on the issuer's income statement were materially
18 inflated such that the amount of earnings is -- that
19 is reported is materially higher than the actual
20 income that the company earned, would that affect
21 the determination of fundamental fair value?
22     MS. ELLIS: Objection to form.
23     THE WITNESS: That would be part of the
24 information set that we would rely on in deriving
25 the fundamental value.  And in the context of

Page 254

1      LIAN - CONFIDENTIAL
2  potential inflation of earnings, that would
3  similarly influence the fundamental valuations at
4  any one point in time.
5      BY MR. SCHOCHET:
6  Q.  Okay.  Is it fair to say that there is a
7  significant overlap between the factors of the
8  market -- the market considers in determining the
9  mark -- the price of the security and the factors
10 that are considered in determining fundamental fair
11 value?
12 A.  Could you repeat --
13 Q.  Sure.
14 A.  -- your question.
15 Q.  Is it fair to say that there is a
16 significant overlap between, one, the factors that
17 the market considers in determining the price of a
18 security and, two, the factors that -- that are
19 considered in determining fundamental fair value?
20     MS. ELLIS: Objection to form.
21     THE WITNESS: The market pricing itself --
22 it's a collective valuation of all market
23 participants who would, like ourselves at Western
24 Asset, be relying on what -- the available
25 information in the public domain.  So the answer is

Page 255

1      LIAN - CONFIDENTIAL
2  yes.
3      BY MR. SCHOCHET:
4  Q.  Is it -- is it fair to say that -- that the
5  determination of -- that -- withdrawn.
6      Is it fair to say that fundamental fair
7  value reflects the value that Western Asset expects
8  the market price will at some point go to?
9  A.  That is what we meant by fair value based
10 on the inputs that we have in the public information
11 domain.
12 Q.  Okay.  And is it also fair to say that the
13 only way that the portfolio clients of Western Asset
14 benefit from Western Asset's investment strategy is,
15 in fact, if the gap between market value and
16 fundamental value narrows such that market value
17 goes toward fundamental value?
18     MS. ELLIS: Objection to form.
19     THE WITNESS: So it is a dynamic process,
20 as you have outlined, and this is the investment
21 thesis of Western Asset in terms of security
22 selection.
23     BY MR. SCHOCHET:
24 Q.  Is the -- is that answer yes, that --
25 A.  Yes.  Yes.

Page 256

1      LIAN - CONFIDENTIAL
2  Q.  So -- so that -- is it fair to say, then,
3  that if at some point after the determination of
4  fundamental fair value, the -- the market price
5  falls because of the disclosure of previously
6  concealed material facts about the company, is it
7  fair to say in that event, it becomes harder for the
8  market price to go toward fundamental fair value?
9      MS. ELLIS: Objection to form.
10     THE WITNESS: In general, that would be the
11 case.
12     BY MR. SCHOCHET:
13 Q.  So is it -- is it -- is it, then, fair to
14 say based upon your -- this testimony of yours that
15 in terms of the success of Western Asset's
16 investment strategy, it is important that the price
17 of the stock reflects the market's valuation of all
18 material information about the company?
19     MS. ELLIS: Objection to form.
20     THE WITNESS: Yes.
21     BY MR. SCHOCHET:
22 Q.  And is it then -- stated another way, is it
23 then fair to say that for the success of Western
24 Asset's investment strategy, Western Asset is
25 relying on the market price to reflect all material

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL
CASE NO.: 14-cv-9662(JSR)

CHIA-LIANG LIAN
April 27, 2016

Page 257

1      LIAN - CONFIDENTIAL
2   facts about the issuer -- about the issuer?
3   **A.  Yes.**
4      **MS. ELLIS:** Objection.  Misstates
5   testimony.
6      **MR. SCHOCHET:** Thank you very much.  Those
7   are all the questions I have.
8      **MS. BIRD:** You have additional questions,
9   Counsel?
10
11     **FURTHER EXAMINATION**
12     **BY MS. ELLIS:**
13  Q.  Do you have any specific understanding of
14  what role value of reported assets in Petrobras's
15  financials for the years 2010 to 2014 played in
16  determining -- in determining fundamental fair
17  value?
18  **A.  In regards to this specific case of**
19  **Petrobras, that assessment is managed and monitored**
20  **by my credit research colleagues.**
21  Q.  So you don't personally have a specific
22  understanding of the role that reported assets
23  played in Western Asset's determination of
24  fundamental fair value of Petrobras?
25  **A.  Fundamental value -- the approach to our**

Page 258

1      **LIAN - CONFIDENTIAL**
2   **fundamental value investing is -- is similar across**
3   **securities, and we based our investment decisions**
4   **for -- on a whole range of factors.  And I would**
5   **include Petrobras to be one of these securities that**
6   **would fall into that exact same process.**
7   Q.  And does the factors -- and does the range
8   of factors that Western Asset considers in -- in
9   developing fundamental fair value include the value
10  of reported assets?
11  **A.  To the extent that the information from**
12  **financial statements, balance sheet, and income**
13  **statements is a source of information of a company**
14  **value, and that piece of information is part of**
15  **those financial statements, we would take these**
16  **factors into account.**
17  Q.  Do you have any understanding of the
18  specific way in which Western Asset would take
19  reported assets into account?
20  **A.  I do not have primary responsibility**
21  **covering credit -- corporate credit research.**
22  Q.  So no?
23  **A.  No.**
24     **MS. ELLIS:** We're done.
25     **MS. BIRD:** Okay.

Page 259

1   LIAN - CONFIDENTIAL
2   **THE REPORTER:** Off the record?
3   **MS. ELLIS:** Off the record.
4   **THE VIDEOGRAPHER:** This is the end of disk
5   No. 5 of 5.  The time is 1809, and we are off the
6   record.
7      (Ending time:  6:09 p.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 260

1      A C K N O W L E D G M E N T
2
3   STATE OF            )
4                 ) ss.:
5   COUNTY OF           )
6
7      I, CHIA-LIANG LIAN, hereby
8   certify that I have read the transcript of my
9   testimony taken under oath in my deposition;
10  that the transcript is a true, complete and
11  correct record of my testimony, and that the
12  answers on the record as given by me are true
13  and correct.
14
15  _____
16     CHIA-LIANG LIAN
17
18  Signed and subscribed to before
19  me, this _____ day of _____, 20__.
20
21  _____
22  Notary Public, State of _____
23
24
25

Page 261

1          C E R T I F I C A T E

2

3          I, DEBORAH L. LUNDGREN, CSR No. 6727, RPR,

4    a certified shorthand reporter in and for the State

5    of California, do hereby certify:

6          That prior to being examined, the witness

7    named in the foregoing proceedings declared under

8    penalty of perjury to testify to the truth, the

9    whole truth, and nothing but the truth;

10          That said proceedings were taken by me in

11   shorthand at the time and place herein named and was

12   thereafter transcribed into typewriting under my

13   direction, said transcript being a true and correct

14   transcription of my shorthand notes.

15          Pursuant to Federal Rule 30(e), transcript

16   review was not requested;

17          I further certify that I have no interest

18   in the outcome of this action.

19          IN WITNESS WHEREOF, I have hereunto

20   set my hand this 29th day of April, 2016.

21

22

23   _____

24   DEBORAH L. LUNDGREN

25   CSR NO. 6727, RPR

---

Page 262

1                ***ERRATA***

2        ELLEN GRAUER COURT REPORTING  CO. LLC
          126 East 56th Street, Fifth Floor
3            New York, New York 10022
                 212-750-6434
4

5    NAME OF CASE: IN RE: PETROBRAS SECURITIES
     DATE OF DEPOSITION: April 22, 2016
6    NAME OF WITNESS: MARK HUGHES

7    PAGE  LINE  FROM      TO        REASON

8    ____|___|_____|_____|_____

9    ____|___|_____|_____|_____

10   ____|___|_____|_____|_____

11   ____|___|_____|_____|_____

12   ____|___|_____|_____|_____

13   ____|___|_____|_____|_____

14   ____|___|_____|_____|_____

15   ____|___|_____|_____|_____

16   ____|___|_____|_____|_____

17   ____|___|_____|_____|_____

18   ____|___|_____|_____|_____

19   ____|___|_____|_____|_____

20   ____|___|_____|_____|_____

21                      _____

22   Subscribed and sworn before me

23   this_____day of _____, 20__.

24   _____   _____

25   (Notary Public)        My Commission Expires:

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL
CASE NO.: 14-cv-9662(JSR)

CHIA-LIANG LIAN
April 27, 2016

## $

**$2.7 (1)**
220:7
**$250 (1)**
75:15
**$90 (1)**
220:6
**$900 (1)**
220:7

## A

**Abad (14)**
39:11,18;40:18;
174:24;181:8,8;
185:13;192:6,16,21;
193:18;194:10,17;
195:7
**Abad's (1)**
182:10
**ability (2)**
120:11;236:9
**able (4)**
90:21;128:19;
194:24;195:6
**above (2)**
189:6;207:8
**Absolute (2)**
14:25;195:14
**AC (1)**
224:25
**acceleration (1)**
242:12
**acceptable (2)**
246:6,9
**accepted (1)**
229:16
**access (6)**
94:24;141:6;
143:18;194:25;195:8;
242:14
**accessing (1)**
187:3
**Accordingly (1)**
106:7
**account (41)**
15:21;21:10,11,15;
26:11;36:4;38:14;
65:15;70:25;77:25;
81:19;92:9;104:21;
108:12;111:21;
112:21,23;113:21;
119:9;131:23;133:7;
137:20;138:11,25;
139:22,23;140:2;
144:14;146:13,13,17;
153:21;154:15,19;
174:5;177:15;188:6,
22;248:15;258:16,19
**accountable (1)**
222:25

**accounts (21)**
15:23;16:8;33:24;
34:7,9;37:11;44:19;
137:8,14;139:15;
170:7;173:19,25;
174:6,14;177:13;
181:12;195:7;230:9;
233:7;250:16
**accurate (7)**
48:25;92:3;131:17;
187:22;214:14;
225:23;227:17
**accurately (5)**
21:23;22:3;96:22;
182:7;227:10
**across (18)**
27:5;28:12;42:16;
60:12;75:15,18;
84:11,14;86:6,9;87:6,
10;90:13,14;108:13;
191:18;234:10;258:2
**Act (2)**
100:15;101:6
**acted (2)**
148:20,24
**acting (3)**
123:14;125:17,25
**action (11)**
10:3;15:18;16:5,9;
36:5;38:14;101:5;
131:24;133:15;159:8;
174:5
**actions (3)**
16:3;208:24;210:5
**active (1)**
68:8
**activities (3)**
23:14,15,16
**activity (1)**
55:6
**actual (4)**
53:11;88:3;253:5,
19
**actually (6)**
125:9;127:4;
140:16;146:17;154:4;
243:20
**Adauto (1)**
50:15
**add (2)**
67:22;242:23
**added (1)**
131:3
**adding (2)**
45:8;225:2
**addition (2)**
39:24;40:4
**additional (4)**
208:7;224:22;
229:8;257:8
**address (2)**
10:22;212:3
**adjust (1)**

64:2
**adjusting (3)**
192:7,21;193:4
**adjustments (1)**
242:24
**Administration (3)**
15:17;183:7;184:4
**adopt (1)**
208:5
**Adrian (4)**
73:24,25;74:4;
207:5
**Adriano (10)**
181:9;206:22,24;
207:16,24;208:11;
209:24;210:23;224:9;
230:4
**ADV (1)**
127:18
**advantages (1)**
138:5
**advised (2)**
15:19;16:3
**advisor (2)**
17:21;36:23
**advisors (1)**
41:4
**Aécio (3)**
183:20,21;184:3
**Aécio's (1)**
183:9
**AEFES (1)**
174:21
**affect (9)**
71:11,19;86:18;
106:2;179:5,13;
190:24;253:7,20
**affected (1)**
71:2
**affecting (1)**
247:5
**affiliate (1)**
138:23
**affiliated (3)**
118:17,20,22
**again (124)**
20:23;22:9;27:12;
29:9;32:17;37:15;
50:20;55:19;60:19;
66:20;67:10;68:20;
69:20;74:21;75:8;
77:8;80:3,12;81:25;
83:11,13,22;84:10;
85:8;86:3,15,17;88:5,
16;90:9;91:2,13;92:7;
93:16;94:10;95:14;
96:4,13,21;97:5;
98:11;99:17;101:24;
102:11;103:19;104:6,
19;105:15;107:20;
108:11;109:15;
111:14;113:15;114:7,
23;115:9;116:4;

119:14;122:5;123:18;
126:17;128:13;129:4,
20;138:13;139:25;
142:5,18;149:7;
152:16;153:9,12;
155:16;156:12;
157:19;158:6;159:13;
160:8,18;161:15,24;
162:17;171:9;172:11;
176:5;177:14;178:13;
179:3;186:7;189:3;
190:2,15;191:5;
194:21;195:3,10;
199:8;208:4,20;
210:2;211:9,16;
217:4;218:23;222:20;
227:7,15,19;228:3;
229:7;231:6,7;
233:20;234:9;235:18;
237:19;242:15,20;
243:7,25;248:12;
249:6;251:20,22
**against (5)**
67:2,20;81:3;
132:18;239:14
**agencies (4)**
45:18;172:22;
184:23;226:9
**agenda (1)**
202:7,8;203:17,18
**agent (8)**
122:11,13;123:14;
124:16;125:18,25;
148:25;149:16
**agents (2)**
197:21,25
**ago (6)**
12:23,24;13:2;
17:11;181:20;218:23
**agree (17)**
55:9;57:8;60:17;
61:11,21;184:12;
189:14,22;199:4;
208:16;233:19;234:2,
6,16;239:10;241:22;
253:6
**agreed (1)**
245:23
**agreement (1)**
55:13
**agreements (2)**
138:20,25
**ahead (3)**
12:5;219:9;230:14
**alarm (3)**
242:18;243:19,23
**align (1)**
124:9
**alike (1)**
113:17
**allegation (7)**
157:20,23;160:18,
19,21;161:8,9

**allegations (18)**
79:14,18,24;
100:14;101:21;102:7,
19;103:15;150:24;
153:14;155:13,15;
156:4,15;157:2;
160:25;162:12;
163:17
**alleged (12)**
149:22;150:3;
151:12;152:10,23;
153:6,10;158:18,25;
160:4,13;161:11
**allocation (1)**
27:12
**allocations (1)**
27:5
**allows (3)**
143:7,12;148:24
**all-time (1)**
189:10
**alone (1)**
178:15
**alongside (10)**
17:13;23:6;36:19;
37:5;57:6;156:14;
171:24;186:14;210:4;
221:21
**although (3)**
146:23;147:13;
170:15
**always (3)**
85:18;137:25;
159:17
**Amended (1)**
35:10
**American (1)**
152:3
**among (2)**
33:2;112:10
**amongst (8)**
53:2,7;60:4;78:20;
85:19;131:2;177:3;
243:9
**amount (8)**
211:4;213:17;
214:23;221:9;222:12;
223:7;231:19;253:18
**analyses (3)**
252:8,11,22
**analysis (45)**
42:17;45:18;46:12,
16;48:21;49:15;50:7;
52:16,19,20,23;59:12;
60:18;64:11;66:11;
69:21,22;70:12;
83:24;91:13,14;
98:21;102:12;103:12;
106:8;107:4;108:18,
21;109:16;111:10;
114:9,13;153:21;
154:14;156:19;167:4,
16;177:5;188:22;

190:17;200:2;208:14;
222:24;223:2;227:12
**Analyst (13)**
16:19;39:23;40:4;
46:7,11;47:4;62:10;
74:2;88:25;108:8;
177:21;207:16;208:6
**analysts (16)**
42:6,10,22;43:3,17,
21;44:7;45:2,10,21;
46:3;62:14;109:5;
176:24;178:10;
222:24
**analyst's (1)**
110:4
**analyze (5)**
46:14;84:12;88:25;
93:10;180:6
**analyzes (1)**
54:23
**analyzing (12)**
42:11;51:7;77:23;
81:3;97:5;107:20,25;
108:13,15;113:20;
180:7;190:20
**and/or (1)**
242:22
**Angeles (3)**
9:2,12;117:9
**announcement (3)**
22:8;212:4,16
**answered (5)**
97:14;143:22;
159:22;161:4;172:10
**anticipated (1)**
166:22
**anticipation (4)**
230:11,16,24;231:4
**apart (1)**
22:24
**apologies (1)**
20:17
**apologize (3)**
126:20;193:22;
219:8
**appear (1)**
216:3
**appears (4)**
21:13;148:22;
168:17;180:22
**applied (5)**
87:5,9;96:16;
112:24;191:18
**applies (2)**
60:12;84:10
**apply (7)**
69:3;88:10;95:8;
100:10;102:15;111:3;
192:23
**applying (1)**
87:11
**appointed (1)**
41:20

**appointment (1)**
84:23
**appreciating (1)**
58:23
**approach (28)**
32:19;37:19;48:18;
49:13;68:24;69:3,6;
77:23;78:19,24;79:2;
80:4;91:14;95:8,15,
21;102:12;108:15;
109:17;114:8;116:12;
182:19;188:19;
192:24;200:5;208:5,
15;257:25
**approaches (1)**
79:2
**approval (5)**
194:3;228:18,22,
24;229:3
**approved (16)**
122:18,22,24;
123:4,6,8,11,13;
124:3,14;130:5,19;
131:2,7,12;214:15
**approximately (4)**
12:23;71:16;
209:10;220:5
**April (27)**
9:2,10;22:6,10,23;
25:6;35:11;88:14;
93:4;109:7;113:12,
25;115:7,21;116:10;
117:9;157:13;196:4,
21;231:22;232:15;
236:7,10,14;238:24;
241:4;247:11
**area (1)**
28:19
**Argentine (1)**
174:21
**around (22)**
31:10;37:4,9;66:14;
72:5;73:22;151:16;
157:12;185:3;192:19;
193:23;204:8,18;
207:19,25;212:10;
214:7,11;220:24;
223:5;236:7;240:4
**ARPS (2)**
3:12;9:21
**arrangements (4)**
132:16;133:3,8,16
**arrest (4)**
156:7,10;157:16,20
**arrested (1)**
156:3
**arrive (2)**
115:17;195:15
**arrived (3)**
114:12;167:7,13
**arriving (6)**
59:7;81:19;111:21;
114:21;191:15;

234:13
**article (12)**
150:14,16;154:13,
25;156:13;204:25;
205:2,4,6,7;206:5,9
**ascertain (5)**
46:17;145:2;
163:12;207:2;224:4
**Asia (14)**
17:10;18:10,21,21;
19:6,10;20:2;25:10;
76:7,12;134:11,11;
136:2;139:17
**Asian (5)**
136:4;138:3,7,10;
196:16
**aside (1)**
76:23
**aspect (1)**
96:5
**aspects (2)**
64:25;91:20
**assess (8)**
29:16;51:8;64:11;
67:6;82:16;83:4,5;
90:4
**assessed (2)**
68:14;69:17
**assessing (3)**
91:7;158:13;235:21
**assessment (42)**
61:9;65:10;66:18;
69:18;82:10;83:7,18,
24;84:3,8;85:13,23;
86:18;87:17,20;88:2,
3;89:22;90:5;91:11,
24;92:4;95:11,14;
96:3,19;97:2,11;
102:3;104:4;109:6,
12;112:23;113:2,12,
22;115:6;205:23;
233:19;248:10,21;
257:19
**Asset (199)**
10:7,23;14:5,5,19,
23,25;15:3,9,19,24;
16:4,8;17:12;24:6;
25:12,23;26:21,25;
29:13;30:24;31:6,9,
12,14,16,19,22;34:16;
35:9,16;36:3;38:13;
39:3;41:2,12,15,18;
44:13,19;47:22;
48:17,22;49:6;50:23;
51:13;55:10;56:17;
62:7;65:7,11;68:9,13;
69:7,9,16;73:17;
76:25;77:4,10;79:11,
16;82:9;88:5;93:18,
20;94:6,17;98:10,15;
100:17,21;101:18;
107:9,13;109:12,22;
110:7,10,23;111:5,9;

112:8,17;113:12;
114:2;115:21;117:18,
22;118:10,16,23,25;
119:23;120:18,25;
122:11,18,22;123:15;
124:2,15,23;125:17,
24;127:3,7,22;
128:18;130:2,5,15,24;
131:3,21,23;132:9,15,
23;133:3;134:15,25;
135:13;136:16,18,23;
138:19,24;139:21;
140:3;142:4,9,15;
143:18;144:23;
145:10,15;147:18;
148:20;152:8;153:7,
18;154:14;155:3;
157:15;161:2,9,13;
162:14;164:12,25;
165:10;166:7;169:11;
170:3,24;172:19;
173:25;174:4,7;
181:25;182:22;191:8;
199:16;200:6;205:20;
211:7;214:20;221:9,
15;222:11;223:25;
224:3;227:4;229:2,
15;231:17;243:4;
245:4,23;246:5,8,8,
21;247:6,9,20,25;
248:2;249:16;250:20;
251:17;254:24;255:7,
13,21;256:24;258:8,
18
**assets (10)**
165:21;166:5;
167:20;213:15;
214:23;253:3;257:14,
22;258:10,19
**Asset's (78)**
17:9;28:9;45:3;
48:7;49:2;52:20;
56:11;57:5;61:9;
63:15,19;66:17;68:4;
71:19;75:7;81:6;
86:24;87:17;90:4,21;
91:9,24;92:12;93:14;
95:11;96:18;97:11;
98:17;101:12;102:7,
20;104:15;105:17;
109:6;113:2;115:6;
119:8;122:25;127:17;
128:19;132:21;
133:22;134:6;136:8;
137:2;155:14;156:9,
19;157:7;158:2;
160:14;161:11;
163:17;165:24;
168:25;187:23;
188:19;189:2;190:10,
24;195:9;199:14;
205:24;207:14;
209:15;211:14;

112:8,17;113:12;
220:17;225:18;
227:10;235:25;238:6;
244:7;248:20;249:2;
255:14;256:15,24;
257:23
**assigned (11)**
26:3,6;27:14;32:17;
33:17;144:18;145:10,
14;192:12,14,15
**associated (1)**
52:6
**assume (2)**
11:25;153:14
**assumed (3)**
98:11;157:12;
192:24
**assumption (1)**
217:16
**assumptions (3)**
79:8;80:14,19
**assuring (1)**
218:16
**attach (3)**
153:14;167:4;
226:25
**attached (1)**
167:16
**attempted (2)**
221:15;222:11
**attempting (1)**
221:9
**attempts (1)**
221:13
**attention (2)**
14:17;158:19
**attorney (1)**
91:3
**attractive (4)**
53:9;187:19;
230:25;231:13
**attributed (1)**
233:18
**audible (1)**
251:18
**audience (2)**
27:16;242:2
**audited (1)**
225:11
**auditors (1)**
214:15
**August (2)**
17:9;24:6
**Authority (6)**
17:2;29:5;30:3;
32:13;39:5;41:6
**available (40)**
15:7;29:18;44:10;
45:13;46:13;47:3;
51:10;67:7;77:24;
81:17;82:17;83:25;
84:24;87:7,25;88:8;
89:25;91:16;93:11;
94:12,15,17;95:6,16;

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL
CASE NO.: 14-cv-9662(JSR)

CHIA-LIANG LIAN
April 27, 2016

111:17;113:7,11;
114:2,10;115:17,20,
22,23;146:22;159:7;
161:18;163:11;209:3;
211:21;254:24
**avenues (2)**
218:17,20
**averting (1)**
242:12
**avoid (3)**
242:17;243:18,22
**aware (35)**
62:14;97:25;
100:19;101:4,15,21;
109:24;110:18,18;
111:8;133:2,5,14;
134:20,23;138:18,22;
145:12,13,16;149:22;
150:2,18;151:12,19,
21;152:22;153:6;
174:9;175:16;235:9,
13,15;250:19,22

**B**

**BAA1 (1)**
207:20
**BAA2 (1)**
207:21
**BAA2- (1)**
207:20
**Bachelor's (2)**
16:16,17
**back (16)**
20:25;30:15;72:24;
76:6;97:18;103:2;
116:9;117:12;124:8;
154:9;164:22;187:10;
190:16;202:25;
217:11;240:16
**background (2)**
16:15;46:16
**bad (1)**
150:25
**balance (12)**
64:23,25;65:6;
198:21;199:6;244:24;
245:5;252:15,21,23;
253:3;258:12
**bank (31)**
16:25;58:4;126:6,
11,22;128:20,25;
129:3,5,8,9,10,12,13;
130:22;145:18,21,25;
146:5,6,8,10,13,17,21,
24;148:19,20,24;
149:6,13
**banks (8)**
123:2,3,6,14;124:3,
14;128:17;129:6
**Bank's (1)**
146:12
**BAREFOOT (5)**

3:7;9:19;154:3;
210:13;240:8
**base (3)**
139:13;160:21;
176:22
**based (75)**
17:8;25:8;37:25;
43:25;46:12;48:18;
50:16,25;51:9;61:8;
64:12;65:19;67:8;
69:21,22;70:11;75:8,
10;80:8;81:3,17;82:8,
14;83:11;84:5,13,23;
86:17;87:6,20;88:3,6,
24;89:2;94:12,23;
106:16;109:23;
111:12;113:6,11,16;
114:9;115:11,16,20;
116:11;129:6;142:12;
144:4;145:4;146:18,
22;154:20;156:25;
157:22;158:13;162:6;
168:17,22;192:6;
200:3,3;206:4;
208:23;209:2;211:19;
227:12;233:11;247:2;
249:7;252:7;255:9;
256:14;258:3
**bases (1)**
179:6
**basically (2)**
128:5,6
**basing (1)**
146:20
**basis (30)**
21:18;46:12;61:8,
19;82:16;86:8;92:23;
93:11;94:3;110:3,22;
111:6;124:16;135:5;
141:3;158:13;159:7;
162:5,20;179:14;
194:21;209:10;
226:15;227:5,19,22;
233:11;235:19;236:3;
247:11
**Bates (38)**
20:21;47:14;48:5,
14;54:20;63:14;73:9;
105:16;140:12;
141:20;164:4;168:2;
173:5;191:22;195:21;
198:7;201:23;204:4;
206:20;210:11,17;
219:10,24;223:20;
228:13;229:24;232:9;
238:20;240:24;
244:16
**BBB-/stable (1)**
184:16
**bear (1)**
105:16
**bearing (17)**
47:13;60:20;92:5;

140:11;164:4;168:2;
173:5;201:23;204:4;
206:19;210:11;
228:13;229:24;232:9;
238:20;240:24;
244:16
**bearish (1)**
197:16
**bears (6)**
20:21;73:9;195:21;
210:17;219:10;
223:19
**became (17)**
19:8;40:15;51:20;
74:24;83:25;84:7;
87:2;90:6;91:7;
149:22;151:21;
152:22;153:5;160:25;
163:4,8,17
**become (6)**
44:10;51:10;150:2;
151:12;161:12;
192:15
**becomes (9)**
82:17;89:25,25;
91:16;95:16;111:17;
153:24;159:7;256:7
**becoming (4)**
94:8,17;95:6,25
**began (2)**
82:14;90:23
**begin (4)**
36:17;89:24;145:5,
7
**beginning (16)**
15:15;16:15;36:25;
37:8;39:15,15;51:12;
59:10;72:25;116:5;
117:13;169:25;
187:11;215:11;
240:17;251:9
**begins (7)**
14:23;54:22;55:10;
56:4;74:12;210:21;
232:14
**behalf (13)**
10:3,6;19:17,18;
123:19;125:18;
166:18;169:12;170:3;
189:4;194:12,19;
198:3
**belief (1)**
66:22
**believer (1)**
235:3
**believes (2)**
51:24;65:7
**below (15)**
66:8;70:14;147:25;
148:14;198:19;
204:14;215:23;224:6,
19;227:3,5;237:5;
242:22;243:5;245:20

**benchmark (2)**
174:2,12
**benchmarks (2)**
58:2,10
**benefit (1)**
255:14
**besides (1)**
13:14
**best (36)**
31:24;38:18,24;
59:14;62:22;73:12;
74:22;76:13;89:16;
98:5;100:16,19;
101:2;105:8;107:9;
109:24;111:7;114:9;
127:22,25;128:9,10,
15;132:11;135:2;
150:5;163:6;164:14;
174:10;186:23;197:2;
205:5;214:10;221:12;
223:10;236:9
**better (2)**
128:19;151:4
**beyond (12)**
74:6;122:21;125:6;
146:24;151:17;
168:15;198:4;200:17;
207:21;211:10;
225:20;227:8
**bias (1)**
186:13
**bid (3)**
164:21,22;165:4
**big-picture (1)**
46:16
**Bill (3)**
197:9,10;201:6
**billion (7)**
220:6,7,11;225:15,
19;242:22;243:5
**Bird (221)**
10:5,5;18:2,17;
19:4,14;20:5,15,23;
21:16,25;23:10;24:4,
15;25:25;26:8,15;
27:9;28:10,20;29:8;
30:18;32:5,9;33:7;
34:18;37:16;39:21;
40:10,22;42:7;43:5,
22;45:12,23;48:10;
50:19;51:3,15,21;
52:11,24;53:14,25;
54:4;55:12,18;56:6,
20;59:4;61:14,24;
62:18;64:9;66:19;
67:14;68:7,19;69:13;
70:6,21;71:7,21;72:7;
74:5;75:19,25;77:20;
78:9;80:11,24;81:24;
82:12,24;83:8,21;
84:21;85:7;86:2;
87:19;88:15;89:6,15;
90:25;91:3,12;92:16;

93:5,24;94:9,20;
95:13;96:12,20;
97:13;98:4,18;99:16,
23;100:8;101:7,23;
102:22;104:18;
107:19;108:10;109:8,
14;111:13;112:19;
113:4,14;114:6,18;
115:8;116:3,15,22,25;
118:12;119:4;120:22;
122:4,15;123:16;
124:4,17;125:12,19;
126:4,16;128:23;
129:19;132:3;133:25;
134:9,18;135:12;
137:4,10,17;138:12;
139:10;140:13,19,22;
141:17,22;142:5;
143:21;149:2;150:4;
151:7,14,23;152:11,
17;153:9,25;154:5;
155:8;156:11,22;
157:10,18;158:5,20;
159:3,21;160:7,17;
161:3,14,23;162:16;
165:12;166:2;168:21;
169:3,13,15;170:5,19;
172:9;174:8;175:11,
20;179:2;181:3;
182:3;189:25;190:13;
194:20;195:2;206:2,
13;208:3,19;209:18,
25;211:8;212:19;
214:25;217:3;220:19;
222:19;228:2;229:5;
232:3;233:9;234:19;
237:15;238:2,13;
241:15;243:24;244:9;
249:5;250:13;257:8;
258:25
**bit (2)**
34:13;42:3
**black-and-white (1)**
79:22
**blanket (1)**
239:9
**blessing (1)**
194:3
**blocks (1)**
54:25
**blog (1)**
250:4
**Bloomberg (5)**
119:17,19,22;
120:10;127:5
**blotter (5)**
141:5;147:5,15,16;
248:5
**board (1)**
25:17
**Boeing (1)**
15:15
**Bond (19)**

14:24;31:6,10;
33:10;55:3,17;
159:14;164:13;
173:21;192:11;
215:25;242:14;
246:17,19;248:7,7,14,
21;249:3
**bonds (19)**
45:6;56:23;57:20;
58:20,20;59:11,12;
136:4;168:12,18;
211:3;230:7,10;
231:11;242:20;
246:11;247:18,21,25
**book (1)**
214:23
**Boston (3)**
146:9,12,19
**both (23)**
17:15;18:6,11;
38:10;39:18;41:20;
46:7;49:10,21;56:21;
57:3;62:9;64:18;
65:15;79:9;83:3;99:6;
103:21;153:21;
166:16;188:22;
198:15;252:8
**bottom (14)**
53:19;60:24;74:12;
147:21;168:5;173:8;
180:18;183:3;210:21;
228:16;230:3;232:14;
234:25;238:23
**bottom-up (3)**
48:19;49:11;190:17
**Boulevard (1)**
10:24
**box (1)**
245:21
**bracket (1)**
49:11
**branch (1)**
129:15
**Brazil (88)**
10:10;18:15;20:3;
50:3,17,23,24;51:14,
24;52:7,9,16,19;53:5,
9;60:9;72:16;80:17,
22;81:13,22;82:10;
85:6;89:11,14,18,22;
90:5,11,22;91:8,10,
21,25;92:13,22;93:15,
17,21;94:7,19;95:12;
96:11,19;97:12;98:2,
9,16;99:2,6;150:16;
151:17,18;164:13,20,
23;165:3,8,11,14,24;
166:15;170:13,18;
175:17;179:7;180:10;
181:13;185:5;196:20,
22;197:15;198:14;
200:14,20,24;201:3,8;
202:2,4,15;205:20;

218:9,18;226:10;
234:21,23;250:17
**Brazilian (26)**
59:11;97:16;
165:20;166:5,8;
167:20;171:2;172:7,
21;198:24;202:17,19,
21;203:2,4,9;205:11;
217:15,24;218:4,21;
226:8,24;227:6;
234:7,17
**Brazil's (8)**
185:7;186:3,11,16,
19;187:20;189:9;
209:9
**break (9)**
12:10,12;72:8,19;
116:18,22;187:4;
240:7,8
**bribery (17)**
99:14,21;149:22;
150:3;151:12;152:23;
153:6,10;156:10;
157:8;163:4;213:14;
220:4;221:3,10;
222:13;223:8
**bribes (2)**
98:3;214:24
**bring (2)**
198:25;229:14
**broad (5)**
55:13;64:12;95:22;
181:12;222:22
**broadened (1)**
19:10
**broader (5)**
44:12,18;52:6;
176:22;223:12
**Broadly (7)**
28:11;49:3;99:11;
141:11;152:25;
190:12,15
**brochure (1)**
127:18
**broker (5)**
130:6,14,19;
132:25;148:20
**broker/dealer (14)**
118:10,14;119:20;
122:10,12,13,25;
124:23,24;125:25;
129:13;131:22;132:9,
10
**broker/dealers (3)**
127:4,8;130:24
**brokerage (6)**
45:16;132:16,24;
133:3,7,15
**brokers (14)**
118:17,20,22;
129:25;130:3,7,12,16,
19;131:2,7,8,12,13
**built (1)**

174:19
**bullet (13)**
207:5,22;209:5;
210:25;211:11;213:2,
4,10;214:13;215:12;
219:25;242:8;243:10
**bullets (1)**
213:9
**business (9)**
10:22;24:8;56:15;
112:15;123:19;
136:11;151:17;
188:15;247:14
**buy (9)**
35:18;46:5;119:24;
124:14;133:23;134:7,
15;162:10;242:19
**Buyer/Seller (1)**
148:15
**buying (4)**
39:6;41:7;69:2;
119:8
**buys (1)**
122:10

## C

**CA (1)**
10:24
**calamitous (1)**
233:5
**calculate (1)**
229:17
**calculation (3)**
228:19,22,24
**California (4)**
9:2,12;117:9;224:2
**call (25)**
64:21;73:16;85:2;
102:14;103:20;
113:22;115:17;
180:16;211:25;212:2,
7,9;213:2,10;224:10;
225:13,24;227:17,18,
20;228:4;239:2,19,
21;248:7
**called (1)**
28:4
**calling (1)**
69:7
**calls (2)**
203:8;212:12
**CalSTRS (1)**
224:11
**came (6)**
155:6,12;157:8;
158:19;163:20;
220:11
**can (45)**
11:17;12:11;15:9;
16:23;27:12;38:21;
61:6;62:13;64:6;66:5,
6;71:5;72:15,16;

74:22,22;76:23;
82:13;90:3;100:5;
106:2;107:9;116:17;
118:19;124:9;126:17;
127:11,20;130:24;
149:20;177:11;178:9;
192:10;198:3;202:12;
203:6,19,22;214:6;
216:8;218:25;237:9;
238:11;240:8;251:22
**candidate (1)**
183:15
**capacity (2)**
203:7,10
**CAPEX (5)**
220:4,4,8;225:12,
19
**capital (1)**
130:10
**capitalize (1)**
66:7
**capitals (1)**
184:20
**caps (1)**
239:8
**captures (1)**
49:21
**career (2)**
16:25;19:3
**Carl (2)**
238:25;239:2
**Casarotto (7)**
181:9;206:24;
207:6;209:24;210:23;
224:9;230:4
**Casarotto's (2)**
207:24;208:11
**Case (35)**
9:8;30:4,5;45:15;
56:7;66:2;71:10;75:8,
11;76:22;81:2;
118:14,24;138:14;
145:6;155:20,21;
159:18;165:16;
172:21;179:7;190:5;
209:20,23;212:13;
214:11;217:10;
220:22;222:14;224:5;
236:14;244:3;249:22;
256:11;257:18
**cash (9)**
57:20;146:7,9;
174:19;199:3;220:8;
230:21,23;244:24
**catalysts (1)**
175:7
**categorical (7)**
138:16;139:5,7;
165:15;179:15;184:8;
200:21
**categorically (1)**
146:23
**caused (2)**

198:20;199:5
**causes (1)**
91:19
**cautious (1)**
197:15
**CEMBI (9)**
173:19,20;174:6;
182:7;192:8,9;193:4;
194:9,16
**CEMBI-related (1)**
180:20
**central (3)**
16:25;58:4;136:5
**century (5)**
246:17,19;248:7,
21;249:3
**certain (21)**
44:17;51:16;77:8;
85:11;121:2,22;
130:22,23;149:21;
161:10;162:10;167:2;
198:10;213:21;
218:11,25;233:7;
234:4;239:17;241:16;
249:17
**certainly (6)**
94:23;97:20;
115:12;157:20;
162:19;187:2
**certainty (6)**
182:6;195:14;
229:9;231:21;238:8;
247:13
**certify (1)**
260:8
**cetera (1)**
181:15
**CFA (1)**
16:19
**chain (47)**
20:14,19,20,24;
21:2,5;73:7,11,13;
74:4;164:3;167:25;
168:3;173:4,6;
180:17,22;181:16;
184:7;189:18;192:3;
195:12,20,22;201:22;
204:3,5;206:19;
210:10,16,19,20;
211:10;228:12,14;
229:23,25;230:3;
232:9,11;236:17;
238:19,21,23;240:23;
244:15,17
**Chalk (1)**
150:24
**challenger (1)**
183:23
**change (20)**
19:8;22:18,24;51:6;
67:23;71:10;89:22;
90:2,6,10;91:11;
92:10,10,12;93:14,16;

103:19;104:10;
180:22;184:17
**changed (7)**
91:25;93:2,4;
200:20;235:4,10;
236:6
**changes (12)**
68:23;70:18,19,23;
71:2,6;95:19;156:25;
157:22;235:13,15,24
**changing (1)**
163:19
**Chanos (3)**
204:13,18;205:10
**Chanos's (1)**
206:8
**characterization (2)**
123:18;187:22
**characterize (1)**
188:8
**charge (3)**
23:3;31:21;225:14
**charged (1)**
42:10
**chart (1)**
190:16
**Charter (1)**
16:19
**chat (1)**
120:10
**check (1)**
196:20
**Chee (3)**
73:24,25;74:4
**Chia-Liang (4)**
9:7;10:21;260:7,16
**Chicago (1)**
3:15
**chief (2)**
25:4;73:17
**CIO (2)**
33:8;197:11
**circles (1)**
54:9
**circumstance (1)**
136:23
**circumstances (7)**
12:15;43:16;67:25;
79:12;138:9;195:11;
202:12
**Citi (1)**
202:6
**Citibank-organized (1)**
203:21
**city (1)**
138:11
**CL (3)**
116:18;174:18;
232:25
**clarification (1)**
139:12
**clarify (15)**
23:19;25:16;29:10;

36:14;50:21;79:15;
90:3;98:25;99:18;
108:7;109:9;125:13;
126:17;248:23;
250:25
**clarifying (1)**
154:24
**clarity (1)**
218:25
**class (4)**
56:17;77:10;
135:13;247:6
**classes (2)**
26:21;48:22
**clear (2)**
80:13;141:17
**clear-cut (1)**
78:11
**CLEARY (2)**
3:3;9:19
**client (30)**
21:14,18;23:14,16;
27:13;47:19;54:10,
12,14;55:23;110:22;
111:5;130:21;131:3,
20;132:8;139:13,16;
168:7,19;169:4,8,8;
171:11;204:15;
206:10,12;223:24;
224:3;247:21
**client-directed (3)**
110:3,22;111:3
**clients (20)**
68:10;128:8;
130:23;132:22;
133:22;134:6;165:11;
168:25;169:5,10,21;
170:2;194:12,19;
209:16;211:7;241:14,
17;246:22;255:13
**clients' (2)**
123:20;127:23
**client's (3)**
47:24;49:7;132:24
**climbed (1)**
165:22
**Clini (7)**
50:11,14;188:14,
15;210:24;217:12;
218:6
**Clini's (1)**
218:12
**CLL (3)**
224:8,13,25
**close (3)**
180:16;189:10;
226:24
**closely (3)**
61:18;156:15;
211:19
**closest (1)**
184:15
**clout (1)**

193:14
**CNBC (3)**
204:14,18;205:10
**code (4)**
148:3,4,15;249:23
**co-head (27)**
17:11;19:9;23:5;
24:3;36:18,19,21,22;
41:19,20;51:20;
72:12;74:24;84:8;
87:2,4;90:6,10,19;
98:11,12;156:14;
157:12;171:21,24;
193:2;200:9
**co-heads (2)**
17:16;92:6
**co-headship (7)**
23:5;24:10;74:25;
75:2;82:14;151:16,22
**collaboration (3)**
46:6,9;243:9
**collaborative (6)**
32:19;34:15;37:18;
188:19;192:23;243:8
**collapsing (1)**
182:17
**colleague (4)**
23:6;50:15;156:14;
222:15
**colleagues (29)**
18:13;42:18;50:6,
10;57:6;62:22;90:14;
91:15;98:20;99:5;
101:24;103:12,14;
106:16;138:5;176:18;
199:25;202:5,15;
216:15,16;221:20,21;
222:9;230:18;235:16;
243:9;249:18;257:20
**collective (1)**
254:22
**college (2)**
16:15,24
**colloquial (1)**
233:22
**color (1)**
224:22
**Colorado (1)**
10:23
**combination (3)**
43:13;48:19;62:9
**combining (1)**
49:10
**COMBS (3)**
3:16;9:21,21
**coming (3)**
93:22;210:13;
226:22
**comment (6)**
176:6;188:2;
189:17;206:5;218:12;
237:21
**comments (6)**

196:20;197:12;
204:13,17;206:8,11
**commitment (1)**
130:10
**committee (10)**
27:11,18,19,20,22,
24;28:2,3,5,19
**committees (3)**
27:25;28:5,8
**common (1)**
118:23
**commonly (1)**
246:18
**communicate (1)**
120:7
**communicated (3)**
43:12;241:14,17
**communicating (2)**
168:6;223:6
**communication (7)**
43:14;61:17;62:5;
63:5;110:19;127:10;
180:20
**communications (1)**
62:12
**companies (31)**
18:12;42:19;45:14;
64:22;66:2;83:2;
84:14;85:10;86:9;
98:2;99:12,20;
100:13;107:11;
108:14,22;109:23;
110:7,17;112:22;
113:20;148:11;
155:22;157:4;160:20;
177:16;190:19,24,25;
191:3;198:13
**companies' (1)**
99:15
**Company (36)**
14:5;15:15;25:15,
18,20;62:5;64:17;
73:19;79:23;85:10;
98:22;100:9,24,25;
114:13;115:10;
129:17;153:16;156:5;
163:13;176:17;179:6;
205:11,15;214:14;
215:21;216:11;
217:23;225:7;230:24;
248:17;253:10,20;
256:6,18;258:13
**company-related (1)**
223:13
**company's (3)**
61:2,12;207:10
**company-specific (1)**
86:19
**comparable (3)**
65:24;67:3;85:25
**compared (2)**
23:18;60:9
**comparing (1)**

66:11
**comparison (1)**
57:16
**compensation (2)**
107:14;110:8
**competitors (1)**
199:10
**complete (2)**
60:18;260:10
**complex (4)**
65:14;67:16;68:21;
70:17
**complexity (1)**
162:2
**comprehensive (3)**
178:16,20,23
**comprise (1)**
82:4
**concealed (1)**
256:6
**concern (5)**
85:17;186:10;
206:12;212:3,15
**concerned (3)**
21:14,19;114:3
**concerning (5)**
101:22;110:11;
227:24;251:16,25
**concerns (7)**
51:5,22;52:3,4;
93:9;152:2;197:17
**concession (1)**
101:22
**conclusion (3)**
89:20;116:14;
242:25
**conclusions (2)**
158:4;195:15
**concrete (1)**
85:12
**conditions (1)**
64:5
**conduct (5)**
46:2;98:15;106:11;
184:24;249:25
**conducting (1)**
49:14
**conference (1)**
212:2
**confident (1)**
112:11
**CONFIDENTIAL (250)**
10:1;11:1;12:1;
13:1;14:1;15:1;16:1;
17:1;18:1;19:1;20:1;
21:1;22:1;23:1;24:1;
25:1;26:1;27:1;28:1;
29:1;30:1;31:1;32:1;
33:1;34:1;35:1;36:1;
37:1;38:1;39:1;40:1;
41:1;42:1;43:1;44:1;
45:1;46:1;47:1;48:1;
49:1;50:1;51:1;52:1;

53:1;54:1;55:1;56:1;
57:1;58:1;59:1;60:1;
61:1;62:1;63:1;64:1;
65:1;66:1;67:1;68:1;
69:1;70:1;71:1;72:1;
73:1;74:1;75:1;76:1;
77:1;78:1;79:1;80:1;
81:1;82:1;83:1;84:1;
85:1;86:1;87:1;88:1;
89:1;90:1;91:1;92:1;
93:1;94:1;95:1;96:1;
97:1;98:1;99:1;100:1;
101:1;102:1;103:1;
104:1;105:1;106:1;
107:1;108:1;109:1;
110:1;111:1;112:1;
113:1;114:1;115:1;
116:1;117:1;118:1;
119:1;120:1;121:1;
122:1;123:1;124:1;
125:1;126:1;127:1;
128:1;129:1;130:1;
131:1;132:1;133:1;
134:1;135:1;136:1;
137:1;138:1;139:1;
140:1;141:1;142:1;
143:1;144:1;145:1;
146:1;147:1;148:1;
149:1;150:1;151:1;
152:1;153:1;154:1;
155:1;156:1;157:1;
158:1;159:1;160:1;
161:1;162:1;163:1;
164:1;165:1;166:1;
167:1;168:1;169:1;
170:1;171:1;172:1;
173:1;174:1;175:1;
176:1;177:1;178:1;
179:1;180:1;181:1;
182:1;183:1;184:1;
185:1;186:1;187:1;
188:1;189:1;190:1;
191:1;192:1;193:1;
194:1;195:1;196:1;
197:1;198:1;199:1;
200:1;201:1;202:1;
203:1;204:1;205:1;
206:1;207:1;208:1;
209:1;210:1;211:1;
212:1;213:1;214:1;
215:1;216:1;217:1;
218:1;219:1;220:1;
221:1;222:1;223:1;
224:1;225:1;226:1;
227:1;228:1;229:1;
230:1;231:1;232:1;
233:1;234:1;235:1;
236:1;237:1;238:1;
239:1;240:1;241:1;
242:1;243:1;244:1;
245:1;246:1;247:1;
248:1;249:1;250:1;
251:1;252:1;253:1;

254:1;255:1;256:1;
257:1;258:1;259:1
**confirmation (1)**
141:13
**conforms (1)**
128:7
**connect (1)**
193:13
**connecting (1)**
185:4
**connection (1)**
172:3
**consider (18)**
29:21;47:6;95:21;
102:13;106:20,25;
112:2,5;116:12;
128:14;153:15;
159:17;160:10;166:4;
179:4;230:20;232:18;
234:13
**considerable (1)**
191:4
**considerably (1)**
150:8
**consideration (27)**
57:9;59:2,16;60:5,
8;67:16;71:23,25;
80:5;83:17;85:19;
99:7;104:24;107:24;
113:6;114:21,25;
154:20;179:21,24;
186:15,19;190:8,20,
24;191:7;242:5
**considerations (27)**
53:17;65:19;68:22;
70:18;80:6;85:20;
98:21;103:21;106:8;
107:22;108:20,24;
109:3;115:14;136:6;
153:22;177:3;190:4;
191:18;230:20;
234:12;237:17,19;
238:4,9;247:4;249:8
**considered (10)**
59:7;99:13,21;
100:2;157:15;174:6;
252:14,18;254:10,19
**considering (13)**
28:23;29:17;45:8;
104:20;111:23;
184:19;189:12;207:9;
208:24;209:11,23;
220:2;234:15
**considers (4)**
130:15;254:8,17;
258:8
**consistent (6)**
114:13;141:11;
199:14,19;205:24;
209:11
**Consistently (1)**
64:5
**constant (1)**

217:22
**constantly (3)**
92:18,22;235:21
**consulting (4)**
193:6;194:11,18;
195:8
**contact (13)**
47:22;61:2,6,8,11,
15,22;62:7,15,23,25;
126:22;127:7
**contacts (1)**
127:4
**contains (1)**
143:18
**Cont'd (1)**
3:1
**content (2)**
63:16;105:20
**context (39)**
21:13;24:18;29:22;
61:25;65:5;77:9;
99:18;104:12;128:2;
171:10,13;175:12,24;
176:6;185:23;189:19;
200:16;201:4;203:3,
5;207:19;213:20;
216:13;218:11,24;
228:4;230:17,21;
231:3,7,15;233:22;
235:12;237:20;241:8,
9;243:12;247:3;
253:25
**continue (3)**
59:25;153:7,18
**continued (4)**
89:17;117:16;
152:8;246:21
**continues (1)**
17:19
**continuing (1)**
187:14
**continuously (1)**
59:23
**control (4)**
177:4,18;179:7;
205:17
**control' (1)**
217:21
**controlling (1)**
127:24
**controls (14)**
175:5,10,17,25;
176:8,15,21;177:2,22;
178:11,19;179:17;
180:3,11
**convenient (1)**
72:8
**conversation (3)**
224:25;225:2;
239:23
**conversations (1)**
240:3
**convey (1)**

110:10
**conveyed (1)**
222:18
**copied (1)**
171:16;236:22
**corner (2)**
144:13;145:17
**Corporate (48)**
30:24;31:6;42:18;
44:8,11,17,21;47:7;
49:11;57:24;58:9,12,
20;60:12,21;81:23;
82:11,23;85:21;86:6,
8,15,20;97:16;98:19,
23;99:5;100:3,11;
105:25;106:18;
107:21;108:15;
109:17;159:14;
173:20,23;174:11,12;
181:12;188:23;190:2,
11,20;191:9;192:11;
221:14;258:21
**corporates (2)**
97:19;107:25
**corps (2)**
174:21,22
**correctly (1)**
182:7
**Corrupt (2)**
100:15;101:6
**corruption (50)**
79:4,8,14,18,24;
80:9,21,25;81:12;
85:6,16,24;86:13,25;
89:13;90:5;91:10;
93:2,21;94:7,19;
96:10,19;97:11;98:3,
9,16;99:3,13,21;
101:11,21;102:18;
103:15;104:3,17;
105:7;150:24;155:6,
13;158:18,18,25;
160:4,13;161:12;
162:13;225:5;227:25;
249:12
**Costa (1)**
156:3
**Costa's (3)**
156:7,10;157:15
**counsel (8)**
9:16;12:4,20;13:8,
14,22;152:18;257:9
**counterparties (5)**
120:5,8;123:9,10;
148:12
**counterparts (1)**
124:10
**counterparty (8)**
122:19,22,24;
125:5,8;131:6;146:8;
149:11
**counterparty's (1)**
123:12

**countries (15)**
52:7,18;60:13;
78:12,18;79:9;82:4,
20;90:12,13,16;95:9;
160:20;177:16;
191:20
**countries' (1)**
49:23
**country (26)**
45:14;49:16;50:7;
51:2;64:19;81:16,16;
82:5,16,22;85:11;
91:21;94:3;96:14;
97:20,21;98:22;
129:6;153:16;155:20;
179:25;188:23;
197:17;226:11;
230:25;247:6
**COUNTY (1)**
260:5
**course (7)**
56:15;91:17;
153:20;159:8;171:25;
229:8;247:14
**Court (3)**
9:14;11:11;250:16
**cover (6)**
44:8,12,17,20;
46:11;106:18
**coverage (1)**
130:9
**covered (2)**
44:6;45:21
**covering (3)**
18:13;49:23;258:21
**covers (1)**
106:17
**create (2)**
178:23;216:6
**created (5)**
14:18;15:13;16:2;
93:8;94:6
**creates (2)**
113:9;175:22
**creating (1)**
67:18
**credibility (1)**
58:4
**credible (3)**
242:17;243:18,21
**Credit (55)**
14:25;17:25;18:4;
21:12;30:25;39:23,
24;42:18;45:15;47:5;
60:21;64:3;66:13;
73:25;79:20;88:6,25;
94:11;96:6,23;98:20;
99:6;101:25;102:12;
103:12;106:18;
107:21;109:17,25;
114:24;162:10;164:6;
176:18,23;177:19;
179:19,25;188:23;

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL
CASE NO.: 14-cv-9662(JSR)

CHIA-LIANG LIAN
April 27, 2016

190:3;191:9,13;
196:16;198:16;200:2;
208:5;209:8;221:14;
222:23;224:11;226:6;
245:17;249:18;
257:20;258:21,21
**credits (20)**
42:11;44:21;47:7;
66:3;67:9;84:11,14;
87:6,10;88:10;
102:16;103:11;
108:13,16;115:10;
155:20;180:7;190:21;
198:11;223:3
**creditworthiness (5)**
89:2;106:3;178:18;
179:10;229:10
**critical (5)**
61:3,12,22;191:17;
200:4
**critically (1)**
155:18
**cross-office (1)**
76:14
**crunch (1)**
67:19
**currency (5)**
54:25;55:3,17,21;
217:19
**current (6)**
21:23;24:22;67:20;
209:8;241:20,23
**currently (6)**
25:11,14;45:3,7;
226:15,22
**CUSIP (2)**
136:17,24
**custodial (4)**
145:25;146:4,17,21
**Custodian (7)**
145:18,21;146:6,
10,12,13,24
**customer (1)**
122:14
**cut (1)**
178:4
**CVM (1)**
228:18
**CWC (2)**
224:8,17
**cycle (4)**
51:6,23;56:16;
150:25

**D**

**da (2)**
156:2,7
**Dados (1)**
250:4
**daily (2)**
61:7;141:2
**dare (1)**

242:8
**Darin (1)**
224:21
**data (12)**
45:15;78:20;83:5;
114:10,11;157:2,9,16;
172:12,18,19;250:4
**database (4)**
120:24;121:16;
122:7;136:21;139:25;
140:3;143:24;195:13
**date (16)**
9:10;12:22;22:9,11;
73:23;137:3;141:14,
15,24,24;152:18;
156:13;163:10,10,15;
177:17
**dated (18)**
20:20,25;35:11;
73:8;74:11;127:18;
150:17;164:12;
195:25;196:4,20;
207:3;210:24;223:19;
228:16;232:14;
238:24;241:3
**dates (1)**
182:5
**day (6)**
11:10;29:12;144:3,
9;169:25;260:19
**days (1)**
225:10
**day-to-day (1)**
176:19
**Debt (3)**
31:12,19;242:12
**December (1)**
225:9
**decent (1)**
244:24
**decide (3)**
29:13;69:9,16
**decided (1)**
136:25
**decides (1)**
242:20
**deciding (2)**
99:14,22
**decision (41)**
29:6,9;58:21;59:8;
60:2;68:25;69:20;
71:20;81:4,20;82:22;
83:10;100:6;101:12;
102:7,20;103:16,20,
23;104:13,16,17;
105:3;106:9;111:12;
114:12,15,22;115:14;
116:2;117:19;119:23;
157:22;160:21;194:2;
208:9,13;234:14;
248:12;249:2,7
**decisions (36)**
27:8;28:24;32:3,20;

35:22;36:2,8,12,16,
21;37:5,13,19;38:6;
41:12;43:24;46:23;
53:16;57:21;71:4;
81:18;103:9;116:5;
127:24;132:22;
153:12;154:15,20;
156:25;162:10,22;
200:11;208:2;222:21;
247:12;258:3
**deck (3)**
219:14,15,19
**declare (2)**
10:13;201:2
**declared (3)**
196:22;200:14,24
**de-couple (1)**
226:9
**decrease (1)**
214:22
**decreased (1)**
215:24
**decreasing (1)**
213:15
**dedicated (2)**
76:25;77:11
**defaults (1)**
233:5
**defendant (1)**
10:10
**DEFENDANTS (4)**
3:4,13;9:20,22
**Defendants' (1)**
35:10
**define (9)**
100:23;111:15;
118:19;119:5,14;
128:24;142:18;
152:12;177:11
**defined (3)**
62:2;66:21;178:8
**defining (1)**
191:15
**definitely (1)**
12:11
**definition (5)**
78:11;121:11;
129:5,7;234:5
**definitions (1)**
80:12
**definitively (4)**
121:25;194:25;
195:6;210:2
**Degree (4)**
16:16,17;58:4;96:7
**delay (3)**
212:3,16;216:24
**delayed (5)**
214:4,8;215:21;
216:11,19
**delays (2)**
216:5,8
**delegated (1)**

138:4
**DELIV/RECV (1)**
149:16
**deliver (2)**
64:6;146:6
**delivered (1)**
145:21
**delivery (1)**
243:12
**Demand (3)**
56:22,22;78:23
**demanding (1)**
107:15
**Demographics (3)**
52:25;53:4;78:22
**demonstrate (1)**
130:8
**departure (1)**
192:18
**depend (2)**
30:10,11
**dependent (3)**
55:19;172:12,18
**depending (3)**
26:10;27:13;83:11
**depends (1)**
37:22
**deposed (1)**
10:25
**deposition (9)**
9:6;12:19;13:17,22;
14:4,21;251:10,25;
260:9
**depreciate (1)**
218:9
**depreciation (1)**
217:15
**depress (1)**
180:4
**deriving (2)**
116:13;253:24
**describe (5)**
16:14,23;53:23;
172:17;202:12
**described (6)**
57:3;131:19;
147:16;160:6;188:18;
236:2
**describing (1)**
70:16
**description (1)**
48:25
**design (3)**
24:7;57:11;121:3
**designation (3)**
16:19,20;42:10
**designed (1)**
130:6
**desk (27)**
46:8;50:12;74:16,
20,24;75:3;76:8,25;
77:5,12;106:15;
118:6;119:12;130:8;

135:4,15;141:5,6;
164:7;173:13;188:14;
191:25;193:19;194:2;
211:22;221:24
**desk-by-desk (1)**
135:5
**desks (2)**
33:2;241:11
**desk's (2)**
120:3;236:20
**detail (2)**
163:9;168:15
**detailed (1)**
57:15
**details (8)**
131:17;140:2;
142:25;167:6,12;
217:5;219:15;224:7
**deterioration (1)**
185:11
**determinance (1)**
162:24
**determinant (1)**
162:18
**determination (10)**
64:11;70:12;
251:16;252:2,7;
253:7,21;255:5;
256:3;257:23
**determinative (2)**
160:14;162:15
**determine (16)**
35:17;56:16;70:2,
13;81:2;84:12;139:4,
7;143:7;12;148:24;
159:7;163:13;166:12;
195:14;220:21
**determined (1)**
177:21
**determining (8)**
65:16;179:9;254:8,
10,17,19;257:16,16
**Deutsche (8)**
146:8,10,11;
148:19,19,24;149:6,
12
**develop (6)**
28:9;49:15;50:17;
77:22;221:16;222:6
**developed (16)**
28:13;49:21;66:3;
77:18;78:2,5,7,12,14,
18,25;79:5,9;80:10,
13;159:15
**developing (4)**
188:20;220:25;
221:17;258:9
**development (1)**
158:3
**developments (15)**
49:21,24;51:6;86:9;
92:10,12,14;93:19;
96:25;156:24;157:23;

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL
CASE NO.: 14-cv-9662(JSR)

CHIA-LIANG LIAN
April 27, 2016

160:9;162:6;230:5;
241:8
**deviate (1)**
63:25
**diagram (6)**
53:19,23;54:3;56:2,
3;190:16
**dictate (1)**
131:5
**diesel (1)**
198:19
**differ (2)**
37:23;78:17
**difference (3)**
23:19;54:13;58:11
**differences (1)**
54:11
**different (7)**
33:2;34:17;37:6;
42:8,9;48:22;58:24;
77:17;78:6;91:20;
141:9;150:7;153:23;
161:17;167:19;169:4;
211:17
**differently (1)**
89:7
**differs (1)**
65:8
**difficult (1)**
182:13
**diligence (1)**
108:13
**Dilma (5)**
150:16;181:14;
182:14;183:14;
184:24
**Dilma's (3)**
184:22;185:15;
186:2
**direct (21)**
14:16;26:22;33:23;
61:2,11,15,21;62:5,6,
15,25;63:5;97:17;
110:22;111:5;130:23;
132:8,23;169:6,11;
170:2
**directed (9)**
27:11,22;130:21;
132:16;133:3,7,15;
139:13;236:20
**directing (1)**
139:19
**direction (4)**
56:17;57:22;
184:22;185:15
**directly (10)**
15:22;16:6;25:9,24;
26:13;34:6;44:20;
97:19;110:15;196:10
**directors (1)**
156:2
**directs (2)**
12:6;131:20

**disbelieve (1)**
227:20
**disciplined (1)**
66:10
**disclosure (2)**
163:16;256:5
**discrete (3)**
161:16,25;163:8
**discretion (2)**
39:6;41:7
**discuss (3)**
42:3;152:3;224:12
**discussed (11)**
34:13;40:20;49:5;
79:20;177:17;178:15;
180:24;181:20;189:8;
227:9;236:16
**discussing (5)**
42:4;46:25;55:24;
154:25;169:21
**discussion (9)**
24:17;28:25;43:15;
185:7,8;186:16;
189:20;221:6;228:23
**discussions (30)**
24:13;27:10,21;
37:25;38:5,8,9,20;
59:18;72:4,13,16;
171:19,23;172:3,6;
185:3,25;204:7;
205:19;206:4;220:24;
221:4;223:11,12;
228:21;245:4,10;
246:7;248:8
**disk (8)**
72:21,25;117:13;
187:7,11;240:13,17;
259:4
**disprove (1)**
194:15
**dissimilar (2)**
34:20;79:2
**diverge (1)**
226:7
**diverges (1)**
66:17
**Docu- (1)**
13:9
**document (45)**
21:21;35:12,13;
47:13,15,16,17,23;
48:2,6,7,15;60:15,19,
20;63:13,17;73:9;
105:15,16,18,19;
112:4;127:20;128:4;
129:24;132:13;
140:11,14,17,17,25;
141:12;142:3,6,8,14;
143:7,12;147:3;
148:23;150:21;
191:22;198:6;217:12
**documentation (1)**
87:21

**documented (1)**
101:25
**documents (5)**
13:7,10,21,25;
140:15
**dollar (2)**
65:11,18
**domain (14)**
67:8;94:24;111:16;
115:12;161:19;
163:11;188:7;199:10;
200:4;201:6;208:23;
211:21;254:25;
255:11
**domestic (6)**
78:23;198:18;
199:2;217:17,25;
218:8
**domicile (1)**
129:7
**dominant (2)**
56:13;162:24
**done (16)**
43:10;51:2;82:21;
91:14;100:13;105:5;
123:22;128:7;131:11;
136:2;143:2;167:15;
193:10;221:14,19;
258:24
**dots (1)**
193:13
**doubt (1)**
225:25
**dovetail (2)**
49:12;190:17
**down (12)**
56:9;57:13;74:10;
112:4;175:2;184:10;
213:6;215:14;222:12;
223:8;224:6;239:5
**downdraft (1)**
52:6
**downgrade (7)**
181:13;185:5,15;
204:8;206:23;207:19;
208:17
**downgraded (1)**
227:3
**downgrades (1)**
70:24
**downside (1)**
159:25
**downstream (2)**
170:13,17
**downward (2)**
179:14;186:13
**draft (1)**
109:5
**drafted (1)**
219:16
**drafts (1)**
216:14
**drag (2)**

175:4;176:4
**Drive (1)**
3:14
**driven (2)**
38:9;71:6
**driving (2)**
28:23;37:5
**dry (3)**
230:10,15,22
**DTC (1)**
148:7
**DTCYUS (1)**
148:3
**Duda (7)**
35:22;37:2;38:17;
41:11;181:21;192:12,
15
**Duda's (1)**
192:18
**due (7)**
108:12;110:24;
175:5;197:17;213:13;
225:5;226:23
**during (38)**
13:7;14:4;30:21;
32:14,23;33:20;34:5;
35:23;36:5,10;37:6;
38:6;39:13;40:18;
41:13,16;50:3,17,25;
62:16;74:25;75:2;
81:21;83:19;89:23;
99:3;133:4,8,16;
138:6,7;202:20,23;
212:13,21;249:16;
250:21;251:25
**dynamic (9)**
67:23;68:2;87:15;
92:17;97:22;104:8;
235:19;236:2;255:19
**dynamics (1)**
166:4

**E**

**E' (1)**
112:13
**earlier (20)**
25:22;37:21;39:16;
61:17;78:22;79:21;
120:2;135:7;138:2;
143:24;149:21;
159:13;160:6;189:20;
190:16;193:18;
211:16;230:19;
236:19;237:19
**early (1)**
72:5
**earned (1)**
253:20
**earnings (6)**
44:9;61:18;253:16,
16,18;254:2
**East (2)**

9:14;10:23
**eastern (1)**
136:6
**economic (3)**
49:20;55:6;64:19
**economic-brought (1)**
42:17
**Economics (1)**
16:17
**economist (1)**
50:16
**economy (1)**
197:19
**educational (1)**
16:14
**effect (3)**
11:6;162:24;176:25
**effected (1)**
146:10
**effective (4)**
36:20;81:22;82:11,
23
**effectively (1)**
127:23
**effectuate (5)**
117:20,22,25;
128:18;142:21
**efficiently (1)**
128:7
**effort (2)**
219:18;221:20
**Eichstaedt (1)**
238:25
**Either (10)**
64:18;77:25;78:5,
25;80:14;143:16;
166:12,23;245:10;
248:25
**election (17)**
150:25;166:9;
167:17;172:7,12,17;
180:9,13;182:14,24;
183:24;185:5,9,12;
186:2,8,25
**elections (10)**
165:25;167:18;
170:14;171:2;172:13,
15,21;175:7;182:20;
198:24
**electoral (1)**
180:15
**elements (2)**
51:23;52:8
**Ellen (1)**
9:13
**ELLIS (303)**
3:8;9:18,18;10:19;
14:15;18:5,18;19:7,
19,21;20:7,13,17;
21:4,20;22:5;23:12;
24:11,20;26:5,12,18;
27:17;28:15;29:4,11;
30:19;32:6,12;33:11;

34:23;35:4,7;38:3;
40:2,14,24;42:12;
43:8;44:4;45:19,25;
47:11;48:13;49:25;
50:22;51:11,18;52:2,
13;53:3,18;54:2,8;
55:14,22;56:8,25;
58:18;59:9,17;60:14;
61:20;62:3,20;63:8,
11;64:14;66:23;68:3,
11;69:5,15;70:7;71:3,
13,24;72:10,19;73:5;
74:9;75:22;76:4;
77:13;78:3,15;79:10;
80:7,16;81:5,10;82:7,
18;83:6,9;84:2;85:4,
14;86:11,22;87:8,22;
88:20;89:10,21;91:5,
23;92:24;93:12;94:4,
14;95:4,23;96:17;
97:3,24;98:7,24;
99:19;100:4,12;
101:9,17;102:5,17,25;
103:24;104:14;105:4,
13;107:5;108:2,17;
109:11,21;110:20;
111:22;112:25;
113:10,24;114:14;
115:3,19;116:20;
117:17;118:2,9,15,21;
119:7,16;120:6,17;
121:7;122:9,23;
123:24;124:12,21;
125:7,15,22;126:10,
19;127:15;128:16;
129:2,22;131:18;
132:6;133:13,20;
134:4,14,21;135:14;
137:7,13,19;138:8,17;
139:20;140:9,16,21,
23;141:20;142:2,7,
20;143:5;144:7;
149:4;150:12;151:10,
20;152:7,14,21;
153:17;154:11,24;
155:11;156:17;157:5,
14,25;158:16,23;
159:9;160:3,11,23;
161:7,20;162:11;
163:2,25;165:9,17;
166:6,20;167:9,23;
168:10,16,24;169:9,
20;170:8,21;171:5,
15;172:16;173:2;
174:15;175:15;176:2;
179:11;181:6;182:9;
185:21;186:17;187:4,
13;188:10;189:21;
190:7,22;194:23;
195:5,18;201:20;
203:25;204:23;206:6,
17;208:10;209:4,21;
210:8,15;211:12;

212:23;215:5;217:6;
219:6;220:23;223:4,
16;228:10;229:12,21;
232:7;233:13;234:24;
236:24;237:22;238:5,
17;239:16;240:10,12,
21;241:12,18;243:14;
244:5,13;245:9,18;
249:11;250:15;253:8,
22;254:20;255:18;
256:9,19;257:4,12;
258:24;259:3
**else (6)**
98:14;124:16;
125:18;222:10;
249:15;250:19
**else's (1)**
219:22
**EM (28)**
19:9;23:3,8;24:3,
13;41:19;51:20;52:7;
60:21;72:12;74:24;
76:25;84:20;87:2;
106:15;135:15,17,19,
21,23,25;164:7;
173:13;177:13;
181:12;194:2;221:24;
226:23
**e-mail (118)**
20:14,19,20,24;
21:2,5,8,14,18;73:7,8,
11,13,14;74:8,10,12;
75:9;76:5;164:3,6,12,
18;165:19;167:25;
168:3,5,7,14,15,23;
170:9;171:10;173:4,
6,10;174:16;175:3,
13;176:7;180:17,21;
181:7,16,24;182:10;
183:2;185:24;189:3,
17;192:3,5;195:11,12,
20,22,24,24;200:17;
201:22;204:3,5,12;
205:3;206:19,24;
207:3;210:10,16,19,
20,21,23,25;211:10;
215:18;216:20;
217:12;218:10;219:3;
223:18,21;228:12,14,
16;229:13,23,25;
230:3,9,18;231:6;
232:9,11,13;233:12;
235:2,12;236:15,17,
22;237:5;238:19,21,
23,24;239:4,17;
240:23,25;241:3,19;
242:2;243:7,13;
244:15,17,19
**e-mails (4)**
171:16;180:24,25;
184:7
**Emanuel (2)**
10:2,6

**emerge (1)**
39:25
**emerged (1)**
93:14
**emerging (104)**
17:12,19,21;18:11,
13,24;19:2,6,11;
21:11;22:21;23:5;
24:7,8,17;25:10;
26:16;27:3,5;28:4,13;
29:16;30:24;31:6,9,
12,14,16,19;34:25;
36:6,8;37:20;40:7;
42:15;44:5,23;46:22;
49:22,22,24;50:8;
52:6,18;56:11;57:5,
24;58:9;59:2;60:13;
65:25;71:9;74:2;76:20,
23;75:3,9;77:5,12,14,
16,17,22;78:2,5,7,12,
12,17,25;79:4,9;
80:10,13;82:2,3;87:5;
90:11;91:22;106:18;
107:25;108:13;
109:16;136:4,4;
138:2;147:12;152:4;
157:12;159:15;
173:20,23;174:11;
177:16;188:16;
191:19;192:11;193:2,
19;196:3;200:9;
222:4,22;244:2
**employed (4)**
25:11;35:17;39:4;
41:3
**Employee (6)**
15:15;17:13,20;
41:11,15;121:10
**Employees (6)**
9:24;23:20,22;24:2;
98:3;251:11
**employment (1)**
16:23
**EM-related (2)**
27:8;46:23
**enable (1)**
242:13
**encompasses (1)**
48:21
**encompassing (1)**
109:18
**end (20)**
22:13;29:12;59:21;
72:21;90:7;91:8,9;
92:2,14;93:7;139:16;
187:7;189:6;196:22;
200:14,24;201:2;
218:3;240:13;259:4
**ended (1)**
201:7
**ending (3)**
15:16;75:13;259:7
**endorsed (1)**

232:25
**ends (1)**
14:24
**energy (2)**
151:3;198:13
**enforcement (1)**
101:5
**engage (1)**
118:25
**engagement (1)**
76:14
**ENNIS (2)**
10:9,9
**enough (4)**
242:17;243:18,22;
248:3
**enshrined (1)**
79:19
**ensure (2)**
111:17;130:2
**ensuring (1)**
77:24
**entail (2)**
49:23;190:4
**entails (5)**
53:16;67:16;
114:24;153:11;
230:19
**entered (1)**
147:13
**enterprise (1)**
234:22
**enterprises (3)**
191:19;197:20,24
**entire (6)**
40:9;60:19;65:6;
161:15;248:18;
252:23
**entities (15)**
14:22;15:2,4,18,
20;16:3,4;30:17;
32:22;33:20;34:3,5;
40:20;118:22;138:20
**entitled (4)**
196:3;211:24;
219:10;242:7
**entity (9)**
31:3;125:9,17,23;
126:2;130:22;131:5;
138:19;207:11
**environment (1)**
116:9
**environmental (1)**
105:24
**equal (2)**
180:4,5
**equally (2)**
116:7,7
**equation (3)**
67:18;113:19;116:8
**equity (1)**
107:8
**ESG (24)**

105:21;106:2,7,11,
20,22,25;107:14,17;
108:4,9,19,20,24;
109:3,7,13,23;110:8,
12,24;111:12,23;
112:6
**especially (1)**
197:19
**essence (1)**
34:19
**essentially (2)**
47:23;65:4
**estimate (11)**
220:17,25;221:9,
16,17;222:6,11,17;
223:7;225:14,18
**estimated (4)**
64:12;66:12;
213:12;215:11
**et (1)**
181:15
**Ethics (1)**
249:23
**Europe (1)**
139:17
**European (1)**
136:6
**evaluate (2)**
103:22,25
**evaluating (4)**
90:11;112:21;
153:15;177:15
**evaluation (4)**
104:13;112:17;
235:18;236:2
**Evan (1)**
10:9
**even (10)**
24:9;154:12;
162:23;163:15;
178:20;183:6;185:11;
197:16;216:2;217:18
**evening (2)**
251:7,8
**event (4)**
157:21;161:25;
163:16;256:7
**Events (2)**
51:6;68:23
**evidence (3)**
82:6;85:13;200:21
**evoked (1)**
43:25
**evolutionary (1)**
163:19
**evolve (3)**
51:7;159:25;161:21
**evolved (2)**
93:19;150:8
**evolves (6)**
83:12;87:15;88:18;
92:4,7;111:16
**evolving (15)**

67:23;84:3;96:25;
158:7,14;161:17;
163:7;172:13;210:3;
211:18;212:20;229:8;
235:20;241:8;245:15
**exact (9)**
12:22;22:11;33:15;
92:20;201:4;227:7;
230:17;246:24;258:6
**exactly (4)**
23:22;193:7;201:9;
214:2
**EXAMINATION (4)**
10:18;117:16;
251:5;257:11
**examine (1)**
57:16
**example (3)**
28:16;34:14;126:13
**examples (2)**
38:21;100:5
**exchange (13)**
28:12;126:14,18;
146:9;171:10;181:25;
216:14;218:10,24;
219:3;230:18;235:13;
236:22
**exclude (3)**
109:22;110:23;
111:5
**exclusion (1)**
110:2
**exclusively (1)**
42:5
**excuse (3)**
162:7;177:8;213:4
**ex-Duda's (3)**
192:7,9;193:4
**execute (2)**
120:16;147:8
**executed (14)**
120:25;122:8;
126:13,14;130:12;
131:9;135:17,24,25;
136:8;144:2;148:10;
149:8;247:16
**executing (2)**
120:4;134:24
**execution (9)**
68:21;116:6;
127:22,25;128:9,15,
19;129:25;134:13
**executive (3)**
48:11;156:2;223:24
**exercise (3)**
107:10;164:16;
222:16
**Exhibit (76)**
14:17;15:13;16:2;
20:11,16,19;30:22;
32:2;33:19,24;34:3,7;
35:5,9;47:9,13;63:9,
13;73:3,7;105:11,15;

127:13,17;140:7,11;
141:19;144:5,9;
147:22;150:10,14;
155:2,23;156:13;
163:23;164:3;167:21,
25;172:24;173:4;
187:14;195:16,20;
201:18,22;203:23;
204:3,21,25;205:3;
206:7,15,19,21;210:6,
10,17,22;219:4,8;
223:14,18;228:8,12;
229:19,23;232:5,9;
238:15,19;240:19,23;
244:11,15;248:2
**Exhibits (12)**
14:13;30:16;40:20;
103:3;131:25;137:8,
15;138:20;169:10,22;
194:12,19
**exist (1)**
27:2
**existed (1)**
24:9
**expect (3)**
128:20;170:12;
214:15
**expectation (1)**
68:12
**expectations (1)**
95:3
**expected (1)**
215:7
**expects (2)**
214:14;255:7
**experience (3)**
77:14,15;80:8
**exposure (21)**
44:23,25;45:7;
59:23;84:12;86:10;
88:11;89:18;95:22;
101:3,18;103:7;
107:21;155:18;160:2;
165:8;188:5;201:8;
230:21;233:8;234:10
**exposures (1)**
164:24
**extends (1)**
151:17
**extensive (1)**
46:12
**extent (16)**
22:20;32:25;45:5;
95:16;96:23;107:13;
110:8;122:17;130:20;
136:3;180:14;190:18;
196:15;241:25;253:9;
258:11
**external (3)**
126:8;165:20;
171:11
**externally-produced (1)**
173:21

**extra (1)**
27:12
**extract (1)**
198:5
**extracts (3)**
196:2,17;197:13
**extremely (1)**
76:10
**eye (2)**
156:23;157:21

## F

**face (6)**
122:18;123:9;
126:6,11;131:5;
148:12
**face-to-face (2)**
61:16;62:4
**facing (2)**
124:11;125:5
**fact (4)**
181:19;189:8;
253:6;255:15
**factor (33)**
60:3,7;80:4;83:15;
84:9;85:18;95:24;
96:2;97:23;99:25;
100:6;102:18;104:11,
16;112:2,18;113:3,13,
20;114:4,16;115:5,7,
24;130:15;162:15,18;
166:3;177:4;178:15;
179:21;234:15;
252:17
**factors (87)**
28:23;53:7;55:2,5,
16;56:22;57:22;59:6,
25;60:4,7;65:16;
67:17;71:22;81:19;
83:14,16;84:25;
86:18;91:20,25;
92:18;95:22;98:21;
99:7;100:2;102:13,
15;104:9,23;106:2,12,
20,22,25;107:4,24;
108:4,12;109:7,20,23;
110:24;111:20,24;
112:6,13,21;114:24;
115:5,13;116:11;
124:19;128:14;
154:21;159:16,24;
162:8,9;177:14;
178:13,17,21,22,23;
179:5;186:14,18;
188:6;191:6;209:3;
227:13;234:13;
235:20;242:5;247:4,
5;249:8;252:14;
254:7,9,16,18;258:4,
7,8,16
**Facts (3)**
250:4;256:6;257:2

**factual (1)**
153:15
**fade (1)**
232:18
**fair (42)**
42:21;63:25;64:8,
10;65:9,12,16;66:9,
12,18,21;68:15;69:7,
11,18;70:14,14;92:3;
111:15;216:5;251:17;
252:2;253:7,21;
254:6,10,15,19;255:4,
6,6,9,12;256:2,4,7,8,
13,23;257:16,24;
258:9
**fall (2)**
46:23;258:6
**fallout (2)**
218:18,21
**falls (2)**
115:2;256:5
**famed (1)**
205:9
**familiar (4)**
105:20;128:3;
246:11;248:6
**far (5)**
41:25;126:7;
192:10;203:6,19
**fashion (1)**
51:9
**Fatos (1)**
250:4
**favorably (1)**
180:6
**fears (1)**
181:13
**features (1)**
132:19
**February (1)**
73:8
**Federal (2)**
156:3;250:16
**feel (2)**
158:10;232:20
**felt (1)**
192:20
**few (5)**
11:9;172:22;
181:20;224:24;
251:12
**fields (1)**
170:11
**fifth (1)**
129:23
**Figueroa (1)**
9:11
**figure (5)**
48:24;198:16,17;
215:24;216:2
**fills (1)**
126:23
**final (5)**

26:10;29:14;57:14;
60:15,17
**finally (1)**
15:25
**Financial (46)**
16:19;68:2;107:11;
110:6,11;112:9;
124:11;130:11;212:4,
17;213:16,19;214:4,8,
17,22;215:7;216:6,24,
25;217:8;220:18;
221:3,11;222:13;
223:9;225:4;231:20,
24;242:7,11,16;
243:11,17,20;244:4,7;
245:3,25;246:9,14,23;
248:20,24;258:12,15
**financials (1)**
225:7,9;248:9;
257:15
**fine (1)**
14:7
**finish (2)**
11:18,19
**firm (8)**
17:8,20,20;27:2;
37:3,9;54:23;107:12
**firm's (2)**
27:5;48:12
**first (48)**
17:15;20:20,24;
21:21;23:4;30:20;
40:15;49:20;63:22;
67:10;71:18;73:8,14;
91:7;105:22;128:3;
140:24;142:6,8,14;
143:6,11;144:8;
147:21;150:2;152:22;
155:5,12;156:6;
158:19,25;168:6;
184:17;191:21;192:5,
13;193:5,17;194:11,
18;195:8;198:7;
205:7;207:5;210:22;
217:11;231:16;
232:14
**first-time (1)**
45:6
**fiscal (1)**
55:7
**fits (1)**
29:23
**five (4)**
13:4;34:6,9;239:19
**fix (1)**
179:17
**fixed (8)**
57:17;85:17;106:3,
5;107:8;111:11;
213:15;214:23
**fixed-income (2)**
48:22;132:20
**flat (1)**

217:18
**Flipping (1)**
212:24
**floating (1)**
57:17
**FLOM (1)**
3:12
**flow (1)**
199:3
**focus (13)**
18:8,23;19:5;20:8;
26:19;42:20,22,23;
55:16;65:2,3;83:14;
136:10
**focused (4)**
237:12,24;238:10;
249:9
**focuses (2)**
24:7,17
**focusing (10)**
42:19;54:25;55:23;
62:4;78:17,18;84:7;
92:25;95:24;115:5
**follow (4)**
159:6;176:17,18;
242:24
**following (6)**
16:24;17:5;48:24;
127:3;156:15;213:9
**follow-through (1)**
167:4
**foot (1)**
171:25
**Forbes (2)**
150:15;205:2
**forced (1)**
217:20
**Foreign (9)**
100:15;101:6;
128:20,24;129:5,6,8,
12;137:21
**form (241)**
18:3,17;19:4,14,15;
20:5;21:16,25;23:10;
24:4,15;25:25;26:8,
15;27:9;28:10,20;
29:8;32:5;33:7;34:18;
37:16;38:20;39:21;
40:10,22;42:7;43:5,
22;45:12,23;47:15;
48:2,10;49:17;50:19;
51:3,4,15;52:11,24;
53:14,25;55:12,18;
56:6,20;58:15;59:4;
61:14,16,24;62:18;
64:9;66:19;67:14;
68:7,18,19;69:13;
70:6,21;71:7,21;74:5;
75:19,25;77:6,20;
78:9;79:25;80:11,24;
81:9,24;82:12,24;
83:8,17,21;84:21;
85:7;86:2,14;87:3,19;

88:15;89:6,15;91:12;
92:16;93:5,24;94:9,
20;95:13;96:12,20;
97:13;98:4,18;99:16;
100:8;101:7,23;
102:22;104:18;107:2,
19;108:10;109:8,14;
110:13;111:13;
112:19;113:4,14;
114:6,18;115:8;
116:3;117:24;118:5,
12,18;119:3,4,13,25;
120:22;122:3,4,15;
123:16;124:4,17;
125:3,11,12,19;126:3,
16;127:18;128:11,11,
23;132:3,4;133:25;
134:18;135:12;137:4,
10,23;138:12;139:10;
140:25;141:2;142:17;
143:21;146:25;149:2,
7;150:4;151:7,14,23;
152:11,17;153:10;
154:16;155:8;156:11;
157:10,18;158:5,20;
159:21;160:7,16,17;
161:3,23;162:16;
165:12;166:2,16;
168:21;169:3,6,13;
170:19;172:9;174:8;
175:11,20;176:21;
178:25;179:2;181:3;
182:3;187:25;189:25;
190:14;194:20;195:2;
206:2,13;208:3,14,19;
209:18,25;211:8;
212:19;213:22;
214:25;217:3;220:19;
222:19;228:2;229:6;
232:3;233:9;234:19;
237:15;238:2,13;
241:15;243:6,24;
244:9;245:7;249:4;
250:13;253:8,22;
254:20;255:18;256:9,
19
**formal (2)**
22:9;43:10
**formally (1)**
82:2
**format (3)**
47:17;141:7,9
**former (6)**
17:13;41:11,15;
155:25;197:11;
222:14
**forms (4)**
43:13,14;61:17;
110:19
**forward (2)**
180:19;239:17
**forwarded (5)**
74:4;181:2;192:3;

196:2;236:15
**forwarding (2)**
196:17;244:21
**forwards (2)**
228:17;244:19
**foundation (15)**
77:7;82:5;101:14;
102:10;103:18;
128:12;132:4;133:10;
165:6;166:17;169:15,
16;182:4;185:18;
220:20
**founder (1)**
197:11
**four (2)**
17:3;226:7
**fourth (1)**
107:6
**frame (3)**
41:14,17;186:6
**frankly (1)**
163:22
**fraud (6)**
81:23;82:11,23;
98:9,16;99:3
**French (1)**
100:25
**Frequency (1)**
61:6
**Frequently (1)**
96:15
**Friday (1)**
155:25
**front (4)**
124:6;141:18,18;
147:8
**FS (10)**
213:13,19,24;
214:2,14,16,19;
215:21;216:11,19
**fuel (19)**
175:5,10,16,23,24;
176:8,15,20,25;177:3,
18,21;178:10,18;
179:6;180:4,10;
199:5,23
**full-market (1)**
51:6
**fully (1)**
109:10
**function (1)**
159:6
**Fund (20)**
14:24;15:2;21:12;
31:6,10,13,15,17,20,
22;33:10,10,14,14,16,
16,18;140:5;174:13;
199:12
**fundament (1)**
43:24
**fundamental (70)**
52:16,19,20,22;
55:2,16;63:25;64:8,

10,13,15;65:8,12,16;
66:9,12,18,21;67:6;
68:14;69:7,11,18,21;
70:3,13;79:20;81:16;
91:20,25;95:17;96:6;
97:6;102:12,15;
103:11;104:21,23;
107:23;112:15;114:8,
23;153:21;154:21;
160:9;162:9;186:12;
226:11;227:11;
234:11;247:5;251:17;
252:2;253:7,13,21,25;
254:3,10,19;255:6,16,
17;256:4,8;257:16,24,
25;258:2,9
**fundamentals (4)**
43:25;64:4;103:21;
177:19
**fundraising (1)**
164:15
**funds (33)**
14:18;15:3,5,7,10,
22,23;16:7,7;25:24;
26:25;29:24;31:5;
32:14,18;33:3;35:10,
16;36:3;38:13,15;
39:3;41:2;49:6;
131:23;133:3;138:3;
139:12;140:5;145:23;
146:3;174:4;248:2
**further (4)**
175:2;234:25;
250:23;257:11

# G

**G' (1)**
112:5
**gap (1)**
255:15
**Gardner (8)**
17:13;19:9;23:6;
35:21;36:19;38:16;
156:14;171:24
**Garner (1)**
22:12
**gas (1)**
199:2
**gasoline (2)**
198:18;205:18
**gathered (1)**
147:3
**Gavin (2)**
191:22,23
**general (18)**
48:2;49:6;56:5,12;
57:5;70:15;78:19;
100:11;120:14;162:3;
185:25;189:22;
211:14;215:6;226:19;
235:15;244:6;256:10
**generalist (1)**

57:7
**generalization (1)**
188:4
**generalizations (3)**
104:7;179:4;188:9
**generally (21)**
22:3;30:8,9,13;
42:25;48:3;56:4,7;
72:11;76:17;79:3;
95:7;97:5;106:14;
132:17;138:13;
175:16;177:20;
181:25;191:10;216:8
**generate (1)**
225:15
**generic (2)**
128:6;191:2
**German (5)**
129:9,10,11,13,15
**gets (1)**
151:4
**giant (1)**
151:3
**Gil (8)**
181:9,17;187:16;
188:11,24;189:7;
210:24;224:9
**Gil's (1)**
183:2
**given (21)**
29:3;60:2;68:2;
69:23;77:14,15;
92:19,21;104:10;
105:2;109:20;123:21;
126:6,25;138:5;
144:18;162:5;166:4;
167:5;230:22;260:12
**gives (1)**
143:10
**giving (1)**
12:16
**Global (25)**
14:25;18:11;19:11;
22:21;23:5,8;24:13,
18;27:25;28:4;29:20;
31:5;49:20;52:5;
54:23;57:4;82:3;
90:14;106:17;130:22;
188:16,21;208:7;
218:2,8
**globally (1)**
58:6
**globe (1)**
66:14
**goal (2)**
68:4,10
**goes (1)**
255:17
**Good (12)**
9:6;30:10;50:23,24;
106:10;112:7,14;
154:3;224:24;245:22;
251:7,8

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL
CASE NO.: 14-cv-9662(JSR)

CHIA-LIANG LIAN
April 27, 2016

**GOTTLIEB (2)**
3:3;9:19
**governance (25)**
83:15,18;84:9,10;
86:15;87:14,18;
88:13;105:25;107:22;
112:7,14,18,20,24;
113:3,13,19;114:3,16,
20;115:2,15,24;
159:16
**government (19)**
175:4,21;179:17;
183:8;190:4,6,8,19,
23;191:17;197:18;
202:22;203:9;205:16,
20;207:12;234:8,12,
17
**governments (2)**
155:20;157:3
**government's (3)**
198:17;199:5,23
**grade (2)**
186:4;227:3
**graduated (1)**
16:16
**Grauer (1)**
9:13
**greater (3)**
68:15;79:4;107:15
**Gross (7)**
196:22;197:7,9,10;
200:14,24;201:6
**grounded (1)**
153:13
**group (1)**
203:5
**growing (1)**
186:10
**grown (1)**
77:10
**growth (5)**
52:5;54:23;57:4;
64:20;78:20
**guess (2)**
146:18,20
**guest (1)**
205:10
**guide (1)**
249:25
**guideline (2)**
111:3;170:7
**guidelines (4)**
29:23;30:11;54:14;
55:20
**guides (1)**
143:16
**guiding (1)**
30:13
**Guinea (3)**
101:22;103:15;
105:7
**guys (1)**
244:22

## H

**half (2)**
71:18;218:23
**HAMILTON (2)**
3:3;9:19
**hand (1)**
10:12
**handed (27)**
20:18;35:8;47:12;
63:12;73:6;105:14;
127:16;134:12;
140:10;150:13;164:2;
167:24;173:3;195:19;
201:21;204:2,24;
206:18;210:9;219:7;
223:17;228:11;
229:22;232:8;238:18;
240:22;244:14
**happen (2)**
70:5;193:22
**happened (1)**
163:10
**happens (1)**
124:5
**hard (1)**
112:11
**harder (1)**
256:7
**Hawaii (2)**
9:25;251:12
**head (14)**
17:10,18;18:21;
22:21;25:9;27:3;
36:22;42:15;46:22;
50:7;188:13,16;
200:9;222:21
**heading (7)**
145:18;147:22;
207:4;211:2,24;
212:25;242:9
**headline (1)**
150:15
**heads (3)**
28:6;50:11;188:14
**health (1)**
226:12
**heard (1)**
250:6
**heavily (5)**
50:8;215:22;
216:12,18;217:5
**hedge (1)**
35:18
**hedging (2)**
39:7;41:8
**held (3)**
76:10,19;98:2
**help (5)**
56:16;75:14;199:3;
229:14;237:9
**helping (2)**

91:15;222:6
**hence (1)**
67:24
**hereby (1)**
260:7
**Hi (1)**
174:18
**high (5)**
21:11;189:11;
207:12;218:4;226:16
**higher (3)**
85:24;253:5,19
**higher-rated (1)**
78:13
**highlighted (1)**
162:3
**Highlights (2)**
213:2,10
**highly (8)**
65:14;67:16,22;
68:21;70:17;172:12,
18;180:14
**high-yield (4)**
33:14,16;40:7;71:9
**historical (2)**
207:17;231:18
**hold (5)**
35:18;84:11;
209:16;211:3;226:20
**holder (1)**
16:18
**holding (3)**
39:7;41:8;209:13
**holdings (2)**
59:24;86:6
**holds (2)**
44:13,19
**holistic (18)**
49:13;68:24;69:6;
77:23;80:4;95:15,21;
96:2;102:11;103:23;
104:2,2;108:15;
109:17;114:8;116:12;
160:5;252:11
**Honestly (1)**
193:15
**hopefully (1)**
164:21
**hosted (1)**
212:2
**hot (1)**
150:16
**hours (5)**
13:4;133:24;134:8,
16;138:7
**huge (2)**
245:21,24
**Hughes (13)**
13:16;39:10,18;
201:11,16;221:21,24;
222:3;228:16;229:13;
237:8,14;244:19
**hundreds (1)**

42:19

## I

**idea (5)**
67:5;121:23;140:4;
152:5;179:16
**ideal (2)**
242:15;243:16
**ideas (3)**
27:10,21;28:12
**identical (2)**
39:22;141:10
**identification (27)**
14:14;20:12;35:6;
47:10;63:10;73:4;
105:12;127:14;140:8;
150:11;163:24;
167:22;172:25;
195:17;201:19;
203:24;204:22;
206:16;210:7;219:5;
223:15;228:9;229:20;
232:6;238:16;240:20;
244:12
**identified (3)**
88:13,23;251:10
**identify (7)**
9:16;35:16;39:3;
41:3;66:5,7;71:6
**ie (1)**
233:24
**II (1)**
31:17
**Illinois (1)**
3:15
**immediately (1)**
74:25
**impact (42)**
52:4,7;55:2,17;
95:2,10;96:2,6,7,9,18,
24;97:2,4,8,10,17;
102:19;103:13;106:5;
132:21;156:19;
165:24;166:5,9,23;
170:25;176:8,14,22;
178:16,24;179:18,20;
180:10;182:23;190:9;
199:23;216:21;220:8;
245:16;248:25
**impacted (1)**
216:24
**impairment (2)**
246:5,8
**implication (1)**
215:3
**implications (9)**
167:7,12,14,20;
176:23;179:22;207:4;
208:17;209:6
**important (14)**
11:12;58:6,7;59:2;
112:6;113:19;115:13;

116:7;152:18;191:3,
9;198:13;234:22;
256:16
**importantly (4)**
104:22;115:15;
154:21;157:2
**impression (3)**
203:20;232:22;
233:14
**improve (1)**
199:3
**improved (1)**
198:9
**improving (1)**
183:5
**imputed (1)**
177:5
**Inc (2)**
31:13,22
**incidents (1)**
79:8
**include (17)**
55:5;57:9;69:3;
85:21;102:4;108:14;
109:19;112:8;122:7;
129:13;131:7,13;
151:17;215:8;223:12;
258:5,9
**included (8)**
102:2;105:6;
107:23;121:4;129:7;
180:20;189:18;
197:25
**includes (1)**
128:10
**including (18)**
39:5;41:3,6;52:7;
68:9,22;70:18;83:2;
86:10;93:17;102:14;
115:15;190:4,8;
208:7;223:3;247:4;
248:13
**Income (19)**
31:14,17,22;64:23;
65:2,6;85:18;106:3,6;
107:8;111:11;114:11;
213:16;252:18;
253:15,15,17,20;
258:12
**inconsistent (4)**
60:22,22;115:23,25
**incorporate (3)**
95:18;106:7;227:11
**Incorporated (1)**
31:17
**incorporates (1)**
111:19
**increased (3)**
197:18;198:21;
199:6
**increases (1)**
175:8
**increasing (1)**

230:23
11,13,16,16,23,25;
**independent (2)**
95:5,10,16,18,25;
45:17;83:2
96:9;101:16;104:10,
**index (9)**
20;109:18;111:16,19;
68:23;70:18,19;
113:7,8,11,16;114:2,
71:6,10;173:21,21,23;
11;115:16,21,22,24;
174:2
119:19;120:24;121:3,
**indicate (2)**
5,5,8,19;122:6,20;
136:19;137:2
124:19;125:21;126:8,
**indicates (1)**
25;133:11,18;134:19;
144:9
136:22;138:15;139:4,
**indicators (3)**
6;140:4;141:6,8,11;
64:21;185:10;
142:12,13;143:4,9,10,
186:12
15,18,25;144:3,5,12,
**indirect (2)**
25;145:18;146:23;
26:24;196:13
149:9;153:23,24;
**indirectly (1)**
154:18,22;155:4,19;
196:11
157:3,7,9;158:8,14;
**individual (20)**
159:7;160:20;161:10,
29:20;30:12;44:21;
18;162:14,19,23;
49:7;52:7;55:20;57:9,
163:11,13,20;194:14;
12,14;60:16;98:23;
200:3;208:23;210:4;
102:15;143:7,19;
211:17,20,20;227:12;
144:2,6;147:19;
229:8;248:3,15,16,18;
198:10;222:23;223:2
249:19;253:10,11,24;
**individually (1)**
254:25;255:10;
15:5
256:18;258:11,13,14
**individuals (4)**
**informations (3)**
36:2;39:12;41:18;
163:7;211:18;
135:5
212:21
**industries (1)**
**informed (2)**
191:17
192:22;193:11
**inferred (1)**
**Initially (2)**
237:20
75:4;236:17
**inflated (2)**
**initiative (1)**
253:4,18
132:17
**inflation (7)**
**inputs (4)**
55:6;58:3;64:3,20;
27:16;188:21;
78:20;205:17;254:2
208:7;255:10
**inflation-linked (1)**
**inquiry (1)**
57:18
47:24
**influence (9)**
**insight (1)**
56:14;60:2;96:4;
218:14
107:10;178:17;179:8,
**instance (15)**
13;227:13;254:3
33:8,13;75:21;
**influenced (3)**
111:25;119:17;129:9;
57:21;97:22;100:6
131:22;143:2;144:4;
**influences (2)**
146:7,8,18;169:7;
96:23;178:21
185:20;237:17
**influencing (1)**
**instances (9)**
216:22
38:11;109:25;
**information (163)**
111:2;130:25;131:20;
29:18;44:9;45:9,14;
136:16;169:5;180:6,
46:13,25;47:3,20;
16
51:9;61:4,13,18,22;
**institution (1)**
64:23;67:7;69:22;
124:11
70:12;74:7;76:15;
**insufficient (2)**
77:24;81:3,17;82:17;
138:14;139:4
83:3,12,25;84:5,13,
**integrity (3)**
23,25;87:7,15;88:7,8,
112:12;226:2;
18,24;89:2,4,8,12,19,
227:20
24,25;91:16,18;92:8;
**intended (1)**
93:7,11,13,22;94:5,8,
171:13

**interactions (3)**
32:25;110:15;113:6
**interacts (1)**
124:23
**interest (6)**
57:23;133:22,22;
134:6,6;196:15
**interested (2)**
47:20,21
**interesting (3)**
51:25;52:9;53:6
**internal (11)**
27:16;61:9;109:5;
124:6;136:21;143:25;
147:7;206:22;211:22;
212:22;242:2
**internally (3)**
33:2;108:23;144:19
**international (2)**
198:19;242:14
**interpret (1)**
171:6
**Interrogatories (1)**
35:11
**interrogatory (3)**
35:15;39:2;40:25
**intervention (1)**
207:13
**into (44)**
29:23;43:3,17,21;
51:2;65:15;70:24;
71:23,25;77:25;
81:18;83:16;85:19;
92:9;93:23;99:7;
104:21,24;107:24;
108:12,21;109:4;
111:20;112:21,23;
113:21;153:21;
154:14,18;162:9;
177:5,15;184:6;
186:14,19;188:5,22;
191:6;233:20;242:4;
248:14;258:6,16,19
**introductory (1)**
197:3
**inundated (1)**
150:23
**inventory (1)**
126:24
**invest (11)**
69:17;79:13;85:20;
102:8,20;104:16;
116:2;117:19;164:12;
165:11;212:2
**investability (1)**
102:3
**invested (12)**
65:20;68:13;84:14;
86:21;91:22;95:9,9;
100:18,22;103:4;
110:17;112:22
**investigations (3)**
225:6;227:25;243:2

**investing (11)**
64:5;77:17,18,25;
78:5,6,7;79:17,17,23;
258:2
**investment (121)**
19:12,22;23:16;
24:21;25:4;26:9;28:2,
9,14,24;30:11;34:19;
37:19;39:5,6;41:4,4,6,
7;43:24;44:3;48:8,8,
12,17;49:4,13;50:11,
14,25;53:6,9,15;54:6;
55:15;58:21,23;59:7,
24;60:23;63:20;64:7;
65:14;67:15;68:20;
70:16;73:17;77:22;
81:18;83:17;85:2;
86:4;92:11,13,17;
93:15;95:15;97:9;
98:10,17;100:3;
101:12;102:14;103:8,
20;106:6,8,10;
110:23;111:21;
114:22,22;115:14;
116:2,5,14;138:19,24;
148:10;153:13;
154:15,19;155:18;
156:25;157:22;
160:21;163:14;167:6,
12,14,20;179:22;
186:4;187:23;188:14,
20;196:6;200:6,8,11,
20;205:12,12;207:25;
208:9,13,15;222:20;
227:3;231:2;234:14;
236:3,6;241:10;
242:4;249:7;255:14,
20;256:16,24;258:3
**investment-grade (5)**
33:14,16;184:13;
185:8;186:11
**investment-related (1)**
23:14
**investments (16)**
50:24;53:12;55:25;
80:3;92:22;100:11;
104:8,19;109:22;
111:11;112:24;114:8;
159:14;162:3,22;
209:16
**investor (11)**
107:9;112:9;
201:25;202:3,5;
205:9;211:25;212:3,
9,12,15
**investors (12)**
56:23;85:18;87:25;
92:9;93:9,17;113:17;
166:15;216:7;226:20,
23;242:19
**investor's (1)**
94:22
**invests (3)**

77:5;107:12;110:7
**involve (3)**
57:12;98:20;214:22
**involved (32)**
24:12;33:5;38:5,17,
19,22;50:9;57:2;75:9,
24;76:3;77:15,16,18;
79:13,18,24;90:16;
91:7;92:19;97:19;
100:14;103:8;110:15;
132:8;149:6;171:19;
188:18;194:4;222:5,
11,15
**involvement (10)**
24:19;72:4,12;
81:25;90:20,23;99:9;
101:11;193:25;
197:18
**involves (4)**
56:10;57:14;60:16;
103:20
**Ira (2)**
9:23;251:10
**isolating (1)**
116:13
**issuance (8)**
28:17;29:14;34:14;
46:3,5;56:23;75:7;
249:2
**issuances (1)**
34:25
**issue (29)**
28:22;29:3,7,17;
34:21;46:6,18,19;
57:19,19;76:3,20;
88:9,12,23;89:5,13;
101:16;107:16;164:6;
229:14;230:11,16;
231:4,12;232:21;
247:23;248:13;249:9
**issued (3)**
208:24;248:14;
250:10
**issuer (11)**
43:4,17,21;45:6,11;
79:13,17;86:13;
110:23;257:2,2
**issuer-level (1)**
42:22
**issuers (11)**
44:6,7;45:2,20;
56:24;57:9,12,25;
58:9,12;85:25
**issuers' (1)**
106:4
**issuer's (6)**
252:15,18,21;
253:2,3,17
**issues (10)**
57:17,19;76:8;
105:6;144:21;223:13;
230:24;231:9;239:7,
10

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL
CASE NO.: 14-cv-9662(JSR)

CHIA-LIANG LIAN
April 27, 2016

item (2)
48:15;60:24

**J**

James (3)
191:22,23,23
January (10)
20:20,25;21:2;
22:15;23:2;74:11;
97:25;196:23;200:15,
25
Jato (12)
93:8,13,22;94:8,16;
95:6,11,25;96:10;
97:10;149:23;242:25
Jean-Pierre (9)
181:9,17;183:2;
187:16;188:3,11,24;
189:7;210:24
Jeff (6)
41:14;42:2;174:18,
23,24;222:15
Jim (4)
204:13,18;205:10;
206:8
job (1)
51:7
Join (3)
129:19;152:20;
156:22
joined (5)
17:4,5,9;24:6;84:19
joint (1)
221:20
Jon (1)
9:13
JP (10)
17:6,22;173:22;
185:19,22;206:21;
224:9;232:23;235:6,
10
JPG (1)
224:25
JP's (2)
184:6,8
JSR (1)
9:9
judge (8)
11:7;88:16;93:10;
97:8;104:25;162:5;
190:2;201:9
judged (2)
88:9;208:21
judging (1)
97:6
judgment (29)
84:13,17,18,19;
85:2,5,12,15;86:16,
17,24,25;87:12,13;
88:19;108:11;109:19;
113:5,22;115:17;
116:11;165:15;

191:16;210:5;227:20;
228:5;235:22;245:17;
253:12
Julien (1)
235:5
Jumping (1)
56:9
juncture (1)
211:16
June (3)
14:9;50:5;127:18
junk (1)
184:20
jury (1)
11:7
justified (1)
216:4
justifies (1)
209:13

**K**

KATHERINE (1)
3:8
KC (1)
9:18
keep (9)
15:9;44:7;93:18,18;
116:17;156:23;
157:21;159:17;
226:11
keeping (3)
192:22;193:10;
217:21
keeps (3)
120:24;139:21;
205:18
Keith (14)
17:13,19;19:9;23:6;
35:21;36:19,21,24;
37:6;38:16;92:5;
156:14;171:24;
200:10
Ken (3)
25:5,9;33:8
Kenneth (4)
232:13;237:2,4;
238:24
Ken's (2)
233:11,21
kept (4)
121:19;162:20;
192:25;249:18
Kevin (17)
74:10,14;75:6;
164:6;165:7,18;
166:13,19;168:6;
170:9;171:6,11;
181:21;204:11;205:2;
206:7;241:19
key (11)
64:20,21;78:20;
120:24;124:8;141:11;

147:8,14;199:10;
231:8;234:20
keying (1)
147:9
Kiesel (8)
196:4,5,6,8;198:4;
199:8,13,19
Kiesel's (1)
197:12
King (1)
10:9
knowledge (41)
31:24;33:3;35:25;
38:18,24;62:22;
73:12;76:13;82:9;
89:16;98:5,14;
100:16,20;101:2;
105:8;109:24;111:4,
7,9;112:16;114:9;
120:23;130:14;
131:10;132:11;135:2;
136:15;148:9;150:6;
151:18;163:6;174:10;
186:23;194:9;197:2;
205:5;214:10;221:12;
223:10;249:15
knowledgeable (1)
130:9
known (2)
149:23;246:16
Korea (1)
76:9
Kristen (1)
10:5

**L**

Labaton (1)
9:23
labeled (1)
21:22
Lack (9)
101:13;102:9;
103:17;128:12;132:4;
133:9;165:5;166:17;
169:16
lacks (5)
77:6;169:15;182:3;
185:17;220:19
Landes (4)
10:2,2;210:12,14
language (1)
232:15
large (3)
23:17;198:20;199:5
largest (2)
52:17;198:12
last (18)
21:2;22:23;35:20;
39:9;41:10;71:18;
93:7;149:15;150:22;
164:18;181:19;
193:16;215:14,17,20;

220:5;226:3;232:22
late (7)
96:25;150:6;
151:13;152:15,19,23;
185:12
lately (1)
36:22
later (1)
193:18
latest (1)
58:2
Latin (1)
152:3
laundering (1)
156:4
Lava (12)
93:8,13,22;94:8,16;
95:5,11,25;96:10;
97:10;149:23;242:25
laws (3)
98:8,15;99:2
lawsuit (1)
14:20
lbarefoot@cgshcom (1)
3:9
lead (7)
28:4,22,25;33:9;
43:19;89:19;103:10
leadership (4)
17:15;22:4;112:12;
200:11
leak (1)
151:2
learned (2)
156:6;158:25
learning (1)
152:9
least (2)
38:5;232:21
leave (2)
41:18;73:21
led (2)
94:17;114:2
Leech (13)
25:5,9;33:9;232:13;
233:6;234:25;236:23;
237:2,4;238:24;
239:5,25;240:4
Leech's (1)
233:11
left (9)
37:3,9;41:20,22,24;
73:19;144:13;193:19;
197:15
legal (2)
123:11,12
Legg (3)
14:25;31:5,9
lend (1)
35:18
lending (2)
39:7;41:8
less (3)

24:18;65:17;90:9
letting (2)
107:10;110:6
level (6)
67:19;157:24;
188:23;218:2,8;
221:14
levels (5)
55:5;57:23;58:8,11;
207:13
leverage (2)
198:22;199:7
liable (1)
98:2
Lian (259)
9:7;10:1,21;11:1;
12:1;13:1;14:1,16;
15:1;16:1;17:1;18:1;
19:1;20:1;21:1;22:1;
23:1;24:1;25:1;26:1;
27:1;28:1;29:1;30:1;
31:1;32:1;33:1;34:1;
35:1;36:1;37:1;38:1;
39:1;40:1;41:1;42:1;
43:1;44:1;45:1;46:1;
47:1;48:1;49:1;50:1;
51:1;52:1;53:1;54:1;
55:1;56:1;57:1;58:1;
59:1;60:1;61:1;62:1;
63:1;64:1;65:1;66:1;
67:1;68:1;69:1;70:1;
71:1;72:1;73:1;74:1;
75:1;76:1;77:1;78:1;
79:1;80:1;81:1;82:1;
83:1;84:1;85:1;86:1;
87:1;88:1;89:1;90:1;
91:1;92:1;93:1;94:1;
95:1;96:1;97:1;98:1;
99:1;100:1;101:1;
102:1;103:1;104:1;
105:1;106:1;107:1;
108:1;109:1;110:1;
111:1;112:1;113:1;
114:1;115:1;116:1;
117:1;118:1;
119:1;120:1;121:1;
122:1;123:1;124:1;
125:1;126:1;127:1;
128:1;129:1;130:1;
131:1;132:1;133:1;
134:1;135:1;136:1;
137:1;138:1;139:1;
140:1;141:1;142:1;
143:1;144:1;145:1;
146:1;147:1;148:1;
149:1;150:1;151:1;
152:1;153:1;154:1,
12;155:1;156:1;
157:1;158:1;159:1;
160:1;161:1;162:1;
163:1;164:1;165:1;
166:1;167:1;168:1;
169:1;170:1;171:1;

Ellen Grauer Court Reporting Co. LLC

172:1;173:1;174:1;
175:1;176:1;177:1;
178:1;179:1;180:1;
181:1;182:1;183:1;
184:1;185:1;186:1;
187:1;188:1;189:1;
190:1;191:1;192:1;
193:1;194:1;195:1;
196:1;197:1;198:1;
199:1;200:1;201:1;
202:1;203:1;204:1;
205:1;206:1;207:1;
208:1;209:1;210:1;
211:1;212:1;213:1;
214:1;215:1;216:1;
217:1;218:1;219:1;
220:1;221:1;222:1;
223:1;224:1;225:1;
226:1;227:1;228:1;
229:1;230:1;231:1;
232:1;233:1;234:1;
235:1;236:1;237:1;
238:1;239:1;240:1;
241:1;242:1;243:1;
244:1;245:1;246:1;
247:1;248:1;249:1;
250:1;251:1,7,15;
252:1;253:1;254:1;
255:1;256:1;257:1;
258:1;259:1;260:7,16

**Liberty (1)**
  3:5
**lies (1)**
  54:13
**life (1)**
  178:9
**light (5)**
  132:18;155:12;
  182:11,11;210:3
**lightly (1)**
  94:22
**likely (5)**
  55:2,17;57:22;
  186:3;242:3
**Likewise (1)**
  80:18
**Lima (1)**
  50:15
**limit (1)**
  130:7
**limited (4)**
  123:10;207:5;
  208:18;209:7
**line (14)**
  21:9;66:25;67:4;
  79:22;147:25;148:14;
  149:15;173:15;
  180:22;192:5,7,13;
  193:16;213:6
**link (1)**
  204:14
**linkage (1)**
  209:12

**linkages (1)**
  226:24
**linked (3)**
  189:13,15,23
**links (1)**
  227:22
**liquid (1)**
  134:11
**liquidity (3)**
  64:4;134:13;138:6
**list (26)**
  14:18,23;15:13,14;
  16:2,11;32:22;42:19;
  44:5,18;47:22;123:2,
  3,8,10;130:6,13,16,
  19;131:2,7,12;
  173:22;178:16,20,23
**listed (9)**
  14:22;15:3;33:24;
  124:20;137:8,15;
  138:20;169:10;248:2
**lists (2)**
  30:15;169:24
**LISTSERVs (1)**
  164:8
**Litigation (1)**
  9:8
**little (2)**
  34:13;42:3
**LLC (1)**
  30:25
**LLP (2)**
  3:3,12
**local (6)**
  134:10;136:10;
  138:3,10;188:15;
  202:15
**located (13)**
  9:11,14;58:6;
  121:25;131:8,13;
  135:11,16;139:24;
  143:13,19;146:17;
  149:6
**location (17)**
  120:19;121:2,6,9,
  18,21;122:8;130:14,
  19;131:6,21;139:5,7;
  144:6;146:24;148:2;
  149:10
**lock (1)**
  205:18
**London (4)**
  129:14,16;136:7;
  208:8
**long (3)**
  13:3;52:16;199:2
**longer (1)**
  56:18
**long-term (13)**
  52:17,22;77:10;
  78:21;226:19;237:12,
  18,23,24;238:3,6,9,11
**look (32)**

13:7;15:25;42:16;
  43:3,17,21,23;45:17;
  47:2,4,5;48:14;61:18;
  64:19;65:4,5;67:6,8;
  82:3;88:6;115:9,11,
  12;127:20;142:5;
  178:14;187:14;
  191:14;203:16;213:6;
  234:9,10
**looked (3)**
  84:24;208:12;
  252:23
**looking (64)**
  15:12;21:9,18,21;
  30:15;33:19;35:20;
  39:9;41:10;45:10;
  48:5;53:19;54:17,21;
  60:24;63:22;67:10;
  73:14;74:10;78:19;
  97:5;103:2;105:22;
  107:6;129:23;132:13;
  140:24;141:12,18,20;
  142:3,8;144:13;
  145:2;155:23;162:14;
  164:5;168:5;173:15;
  184:10;187:15;
  191:11,21;195:24;
  197:12;198:6;208:6;
  209:5;213:5;215:14,
  15,18;217:11;219:23,
  24;224:6,19;226:3;
  232:17,20;238:23;
  241:3;248:4,15
**Los (3)**
  9:2,12;117:9
**lose (1)**
  186:4
**losing (1)**
  184:13
**loss (8)**
  182:15;225:16;
  228:19,22,24;242:21;
  243:4,5
**losses (4)**
  198:20;199:6;
  213:17;229:17
**lot (4)**
  136:19;230:8;
  231:12;251:16
**lovefest (4)**
  196:23;200:14,24;
  201:3
**low (3)**
  107:14;110:8;
  226:25
**lower (5)**
  53:11;69:11,19;
  70:4;85:24
**LTD (1)**
  14:24
**LUKE (2)**
  3:7;9:18
**lunch (2)**

116:16;117:4
**Lynch (5)**
  17:4,23;244:20;
  245:19;246:4

**M**

**Macro (7)**
  33:10;42:17;46:16;
  49:11,22;50:14;64:20
**macroanalysis (1)**
  42:16
**macroeconomic (12)**
  42:23;48:20;49:14;
  50:2;51:8,23;60:18;
  64:21;66:13;78:16,
  20;185:10
**macroeconomics (1)**
  56:12
**macro-related (1)**
  176:23
**maintain (5)**
  108:22;120:18;
  132:15;136:18;211:3
**maintains (1)**
  130:5
**major (1)**
  54:24
**majority (2)**
  131:10;190:5
**makes (5)**
  51:24;117:18;
  119:21,23;169:12
**making (27)**
  32:20;36:11,15,20;
  37:13,19;68:25;85:2;
  90:10;92:20;98:10,
  17;102:13;104:12;
  105:3;106:9;113:21;
  115:14;119:12;
  154:15;162:9;184:18;
  193:5;207:25;208:8,
  13;211:7
**manage (11)**
  15:5,22;25:23;
  26:14,16;29:24;40:6;
  103:3;110:25;139:23;
  144:19
**managed (15)**
  15:24;16:8;136:11;
  137:9,15,20;138:11;
  139:2,12,15,22;140:5,
  6;145:7;257:19
**Management (28)**
  10:23;14:5;15:24;
  26:24;33:23;40:8;
  61:3,12;62:6,12,16,
  24;107:11;110:6,11;
  112:11;138:19,24;
  140:3;148:11;155:21;
  157:3;194:4,4,7;
  206:23;230:19;
  241:11

**manager (24)**
  17:8;26:7;28:18;
  30:17;31:3;32:2,15,
  23;33:9,18,20;34:4;
  37:12;38:2;40:4,13,
  16,19;42:14,15;74:18,
  20;191:24;196:7
**managers (14)**
  26:3,10;27:15,24;
  28:14;29:20;30:2;
  33:4;62:8,10;68:9;
  147:14;199:12;239:3
**manages (1)**
  39:24
**managing (4)**
  103:10;144:24;
  171:22;234:10
**mandate (5)**
  26:10;47:21;55:21;
  60:21;71:11
**mandates (3)**
  27:13;37:23;70:25
**manual (1)**
  249:13
**many (13)**
  23:22;59:6;71:22;
  77:10;82:4;83:16;
  100:2;111:20;112:20;
  113:20;188:6;191:6;
  234:12
**March (39)**
  17:16,17,18;22:7,8,
  23;23:2;25:7;36:17,
  20;39:15,17;59:10,20,
  21;82:2,14;83:23;
  84:8,23;87:2,18;
  89:12;90:7;91:8;92:2,
  6,14;98:12;109:15;
  116:10;150:17;151:6,
  8,16;157:13;172:2;
  193:23;228:17
**MARIANNE (2)**
  3:16;9:21
mariannecombs@skaddencom (1)
  3:17
**Marina (1)**
  165:21;166:14,22;
  182:16
**Mark (25)**
  13:16;39:10,18,23;
  196:4,5,6,8;197:12;
  198:4;199:8,13,18;
  201:11,15,16;221:21,
  24;222:3;228:16;
  229:13;237:8,13;
  244:19;254:9
**marked (63)**
  14:13,17;15:12;
  16:2;20:11,16,19;
  30:16;35:5,9;47:9,13;
  63:9,13;73:3,7;74:13;
  105:11,15;127:13,17;
  140:7,11;150:10,14;

155:2;163:23;164:3,
5;167:21,25;172:24;
173:4,8;195:16,20;
201:18,22;203:23;
204:3,21,25;206:15,
18;210:6,10,17;219:4,
8;223:14,18;228:8,
12;229:19,23;232:5,
8;238:15,19;240:19,
23;244:11,15
**marker (1)**
90:19
**market (78)**
21:11;26:16;31:6;
34:17,21,24;40:7;
42:17;44:23;46:17;
52:6,18;53:10;56:13,
19;60:13;65:7,23;
66:3,16;67:4,13,20;
68:5,16;69:12,19,21;
70:4;71:9;79:9;90:11;
93:23;94:5;95:19;
96:8,24;106:18;
107:25;108:14;
109:16;113:17;116:6,
9,9;132:20;138:3,6;
149:22;152:4;166:5,
9;173:20,23;174:11;
177:16;191:19;
192:11;198:16,20;
210:4;216:22,23;
227:12;228:7;231:8;
247:5;254:8,8,17,21,
22;255:8,15,16;256:4,
8,25
**marketing (1)**
42:16
**market-making (1)**
123:19
**market-related (1)**
36:9
**markets (89)**
17:12,19,21;18:11,
13,24;19:2,11;22:21;
23:6;24:7,8,17;26:22;
27:3,5;28:4;29:16;
30:24;31:10,12,14,17,
19;34:25;36:7;37:20;
42:16;44:6;46:22;
49:22,24;50:8;55:3,
17;56:11;57:5,24;
58:9;59:3;63:24;
65:25;66:7;67:12,25;
68:2;74:16,20,23;
75:3,10;76:16;77:5,
12,14,16,17,19;78:2,
5,7,8,13,18;79:4,5;
80:10,10;82:2,3;87:5;
91:22;134:10;136:5;
147:12;157:12;
159:16;188:16;193:2,
19;196:4;215:22;
216:11,18;217:5;

222:4,22;242:14;
244:2
**market's (1)**
256:17
**markets-focused (1)**
37:11
**Mark's (1)**
237:21
**Mason (3)**
14:25;31:5,9
**Master (3)**
14:24;15:16,17
**material (4)**
88:8;256:6,18,25
**materially (4)**
253:4,5,17,19
**matrices (1)**
191:15
**matrix (3)**
179:5,19;191:14
**Matt (6)**
35:22;37:2;38:16;
41:11,25;192:17
**matter (2)**
9:7;106:9
**matters (1)**
122:17
**Matthew (2)**
192:12,14
**maturing (2)**
141:14;173:18
**maturity (3)**
246:12;247:19;
248:8
**may (32)**
12:4;22:14;44:23,
24;54:14,15;55:21,
21;57:21;70:25,25;
96:15;101:6;103:6;
122:7,7;130:11;
131:4;132:22;193:21;
201:7,7,7;221:13,13;
222:10;223:12,12;
242:19,24;244:22;
249:18
**maybe (4)**
116:16;139:9,11;
235:7
**MB (1)**
174:12
**MEAGHER (1)**
3:12
**mean (29)**
52:14;53:10;64:16;
66:16;67:13;76:12;
116:4;118:19;119:21;
122:25;126:18;139:3;
152:19;165:3;167:14;
171:14;178:4;185:19;
189:2;193:5,12;
196:24;201:2;213:19,
24;214:17;218:6,22;
230:15

**meaning (12)**
90:17;124:6;
139:23;141:4;160:12;
173:13;175:21;192:6;
196:19,24;231:12;
236:7
**meaningful (5)**
70:23;89:19;91:18;
95:2;216:21
**meaningfully (2)**
22:24;71:11
**means (10)**
49:5;75:17;127:25;
128:5,6;148:4;
163:12;205:17;
215:11;237:24
**meant (43)**
26:2;48:2,7;54:3;
70:9;75:17,21;76:16;
81:15;94:2;108:6;
119:15;121:12;123:4,
12;139:14;142:19;
162:18;165:8;167:15;
173:17;175:13,24;
185:23;189:5;192:13;
193:7,15;197:3,5;
199:11;200:12;201:9,
16;214:2;216:10;
219:2;229:10;231:15;
234:3;237:16;243:11;
255:9
**measures (3)**
81:22;82:11,23
**mechanics (1)**
118:4
**meet (6)**
12:21;13:3,13;28:5;
202:17;203:13
**meeting (2)**
61:16;225:21
**meetings (5)**
13:8;62:4,11;
110:17;203:18
**member (3)**
28:2;200:22;222:3
**members (6)**
36:6,7;42:9;192:25;
224:11;239:18
**memory (6)**
16:21;109:2;
164:25;193:24;223:5,
11
**mention (1)**
249:20
**mentioned (20)**
27:18,19,20;37:21;
44:11,16;52:9;61:17;
78:21;120:2;127:5;
128:17;135:4;138:2;
147:6;174:18;188:17;
230:19;236:19;
237:19
**menu (1)**

29:23
**merit (1)**
190:3
**merits (2)**
29:17;130:3
**Merrill (5)**
17:4,22;244:20;
245:19;246:4
**message (1)**
110:10
**messaging (1)**
119:20
**met (6)**
12:20;202:19,21;
203:2,4,6
**methodology (1)**
229:17
**microanalysis (1)**
49:12
**mid (1)**
124:8
**mid-2013 (1)**
73:22
**mid-2014 (7)**
31:4;32:7;37:4,4,9;
40:12;42:2
**mid-2015 (2)**
42:2;74:21
**middle (1)**
192:19
**might (14)**
21:19;62:23;
110:22;177:2;186:2;
194:24;197:5;213:24;
214:16;220:18;
222:15;223:7;230:25;
231:13
**mildly (1)**
197:16
**miles (2)**
239:7,11
**million (2)**
220:7,10
**million-plus (1)**
75:15
**mind (6)**
60:20;92:5;100:10;
159:18;187:5;199:12
**minimum (2)**
61:7;218:17
**mining (1)**
101:22
**minor (2)**
242:21;243:5
**minute (2)**
154:2;226:2
**misprice (3)**
63:24;67:12,25
**mispricing (1)**
68:6
**mispricings (3)**
66:6,15,24
**Misstates (4)**

79:25;151:23;
190:14;257:4
**mistaken (1)**
235:8
**mitigate (2)**
218:18,21
**mix (1)**
182:16
**moment (1)**
203:16
**Monday (1)**
205:9
**Monetary (2)**
17:2;55:7
**money (2)**
77:11;156:4
**monitor (9)**
45:2;59:23,25;86:8;
89:17;97:8;162:4;
199:9;211:19
**monitored (2)**
92:22;257:19
**monitoring (4)**
127:23;176:19;
187:2;235:21
**monitors (1)**
173:22
**month (3)**
12:23;153:2;232:22
**months (3)**
55:4;181:20;196:21
**Moody's (1)**
207:7
**more (24)**
23:25;42:3,22,23;
65:18;72:11;83:25;
115:15;128:6;134:11;
153:23;176:21,23;
182:13,19;186:3;
191:2;200:23;216:2;
223:13;226:17;
236:12;237:11;
242:24
**Morgan (3)**
17:6,22;173:22
**morning (3)**
9:6;159:14;239:20
**most (17)**
19:3;38:8,9,18;
111:19;112:5;127:9;
131:9;135:17,23;
145:7;165:20;168:25;
180:6;198:13;205:14;
226:21
**mouth (2)**
184:6;233:21
**move (5)**
104:9;184:18,19,
21;185:14
**moved (2)**
22:15,19
**moves (2)**
237:11,13

**much (7)**
  79:19;92:20;
  134:11;189:12,15,23;
  257:6
**multiple (2)**
  43:14;90:13
**myself (13)**
  27:11,22;37:5;46:7;
  82:13;90:14;92:5;
  193:2;194:3;216:14;
  219:9;243:8;251:10

**N**

**name (12)**
  9:13;10:20;30:23;
  100:23;121:3,8,23,24;
  146:21;147:18;
  174:12;181:23
**narrow (3)**
  65:3;96:5;252:22
**narrowly (1)**
  249:9
**narrows (1)**
  255:16
**National (1)**
  16:17
**nature (2)**
  68:2;252:11
**necessarily (5)**
  44:24;80:13;96:16;
  139:3;163:8
**necessary (2)**
  44:2;191:5
**need (10)**
  70:24;93:9;95:21;
  123:8;139:6;162:19;
  164:23;169:2;226:7;
  251:19
**Needless (1)**
  58:5
**needs (3)**
  47:20;102:2;128:8
**negative (10)**
  166:23;177:22;
  178:11;179:23;
  184:18;211:4;238:12;
  245:12,16;248:25
**neither (2)**
  110:18;111:7
**neutral (1)**
  182:19
**Nevertheless (2)**
  198:23;222:5
**Neves (1)**
  183:21
**New (45)**
  3:6,6;9:15,15;
  28:17,21;29:3,7,17;
  34:14,21;46:2,5,6,18,
  19;75:7;76:8;89:25;
  91:16,17;92:8;95:16,
  18;111:16;129:10,11;

138:6;158:7;163:20;
  164:6;170:11;198:7;
  211:20;217:25;218:8;
  229:14;230:11,16,24;
  231:4,9,12;247:22;
  248:13
**news (37)**
  97:10,16;104:9;
  151:2,5;154:13,22;
  155:4,5,12,16;156:18;
  158:18,25;159:11,20;
  160:4,5,9,12,25;
  161:11,22;163:3,12;
  182:11,11;210:3;
  211:4;220:3;227:24;
  228:6,17,19;229:3,10,
  16
**next (13)**
  11:20;55:4;56:10;
  66:4;148:2;180:17,
  21;181:7,16;184:10;
  212:24;224:19;246:3
**nexus (2)**
  186:8;234:12
**Nice (1)**
  241:20
**nodding (1)**
  11:13
**noise (3)**
  226:18;227:23;
  228:5
**nominal (1)**
  57:18
**non-brokerage (1)**
  45:17
**nondedicated (2)**
  37:23;226:23
**non-developed (1)**
  26:21
**non-EM (4)**
  38:15;44:24;230:9;
  232:17
**non-emerging (1)**
  37:11
**non-remote (1)**
  182:14
**nonsovereign (1)**
  47:6
**Nonvalue (2)**
  213:12;215:11
**normal (3)**
  120:14;123:22;
  226:12
**normally (3)**
  30:4,5,6
**North (1)**
  3:14
**not- (1)**
  176:5
**Notary (1)**
  260:22
**notches (1)**
  226:7

**note (3)**
  113:18;249:18,19
**notes (8)**
  141:13;225:21,23;
  226:2;227:5,6,16,21
**notice (1)**
  13:24
**November (16)**
  141:14,15,24,25;
  143:3;149:8;201:25;
  202:13;203:13;
  210:24;211:15;
  212:10;215:20;
  223:19;224:8;225:17
**Number (11)**
  23:20;67:19;
  144:14,17,22;145:3,5,
  8,9,13;251:24
**numbers (4)**
  31:25;67:18;
  144:18;145:5
**Nuruki (4)**
  41:14;42:2;174:24;
  222:15

**O**

**oath (4)**
  11:3,5,6;260:9
**Object (4)**
  58:15;80:23;153:9;
  243:6
**Objection (282)**
  18:2,3,17;19:4,14,
  15,17,18;20:5;21:16,
  25;23:10;24:4,15;
  25:25;26:8,15;27:9;
  28:10,20;29:8;32:5,9;
  33:7;34:18;37:16;
  39:21;40:10,22;42:7;
  43:5,22;45:12,23;
  48:10;49:17;50:19;
  51:3,4,15,21;52:11,
  11,24;53:13,14,25;
  54:4;55:12,18;56:6,
  20;59:4,5,13;60:10;
  61:14,24;62:18;64:9;
  66:19;67:14;68:7,18,
  19;69:13;70:6,21;
  71:7,21;74:5;75:19,
  25;77:6,20;78:9;79:6,
  25;80:11,24;81:9,24;
  82:12,24;83:8,21;
  84:21;85:7;86:2,14;
  87:3,19;88:15;89:6,
  15;90:25;91:12;
  92:16;93:5,24;94:9,
  20;95:13;96:12,20;
  97:13;98:4,18;99:16,
  23,24;100:8;101:7,13,
  23;102:9,21,22;
  103:17;104:5,18;
  107:2,19;108:10;

109:8,14;110:13;
  111:13;112:19;113:4,
  14;114:5,6,17,18;
  115:8;116:3;117:24;
  118:5,12,18;119:3,4,
  13,25;120:13,22;
  122:3,4,15;123:16;
  124:4,17;125:3,11,12,
  19;126:3,4,16;128:11,
  22,23;129:18;131:15;
  132:2,3;133:9,17,25;
  134:9,18;135:12;
  137:4,10,17,23;
  138:12;139:10;
  142:17,23;143:21;
  149:2;150:4;151:7,
  14,23;152:11,17,20;
  154:16;155:8;156:11,
  21;157:10,18;158:5,
  20;159:3,21;160:7,16,
  17;161:3,14,23;
  162:16;165:5,12;
  166:2,16,25;168:8,13,
  20,21;169:3,13,14;
  170:4,5,19;171:3,8;
  172:9;174:8;175:11,
  20;178:25;179:2;
  181:3;182:3;185:17;
  186:6;187:25;189:16,
  24,25;190:13,13;
  194:20;195:2;206:2,
  13;208:3,19;209:18,
  25;211:8;212:19;
  214:25;217:3;220:19;
  222:19;228:2;229:4,
  5,5;232:3;233:9;
  234:19;236:18;
  237:15;238:2,13;
  239:12;241:6,15;
  243:24;244:9;245:7,
  13;249:4,5;250:13;
  253:8,22;254:20;
  255:18;256:9,19;
  257:4
**objections (1)**
  12:4
**obtain (2)**
  127:22;128:19
**obtained (2)**
  63:14;105:17
**obviously (10)**
  87:14;95:20;96:4;
  97:15;155:16;208:22;
  218:16;221:18;
  228:20;237:10
**occasionally (1)**
  110:21
**occasions (2)**
  133:21;134:5
**occur (2)**
  131:22;138:10
**occurred (1)**
  71:14

**occurrence (1)**
  134:20
**occurs (1)**
  123:25
**October (6)**
  14:9;181:14;
  198:24;204:8;207:3;
  208:17
**Off (16)**
  72:20,22;117:2;
  153:25;154:6;164:20,
  23;165:3,8;178:4;
  187:8;194:2;240:14;
  259:2,3,5
**offering (6)**
  187:19;246:11,16;
  247:18;248:7,11
**office (26)**
  17:10;23:13,17,18,
  21;120:12;124:7,9;
  129:10,11;132:10;
  134:12,22,23;136:9,
  10;137:22;139:13;
  140:5;144:23;145:11,
  15;147:8;202:4,15;
  224:10
**officer (4)**
  25:4,15,20;73:17
**offices (8)**
  90:15;106:17;
  135:19;137:21;
  149:13;188:21;195:9;
  208:7
**official (16)**
  155:19;157:2,9,16;
  158:3;160:19,25;
  161:10,12,22;163:5,9,
  17;202:20;203:7,9
**officials (6)**
  202:17,22;203:2,4,
  7,9
**often (4)**
  61:6;63:24;65:8;
  67:12
**oil (4)**
  100:25;205:11;
  218:2,9
**once (6)**
  74:24;117:18;
  119:23;145:20;
  151:21;243:20
**One (87)**
  3:5;11:17;19:16;
  30:10;37:24;38:20;
  45:20;46:20;47:3;
  48:17;49:4;51:14;
  52:17;59:6;60:2,7;
  67:19;71:9,22;72:9;
  75:23;80:4,20;81:11;
  83:15;85:10;88:9;
  92:6,19;95:3;96:5,15;
  97:22,22;100:2;
  104:11;105:9;109:20;

110:3;111:20;112:2,
20;113:20;115:2,5,6;
119:22;121:2;124:2;
128:13;137:20;
139:13;140:14,17;
155:25;159:16;160:5,
8;162:19,22,25;
166:3;169:8;171:25;
177:4,14,17;178:13,
19;179:16;186:18;
191:4,6;194:22;
198:12;199:10;
208:12;217:16;
230:20;234:12,21;
239:2;249:9;252:14;
254:4,16;258:5
**one-on-one (1)**
203:2
**ones (4)**
33:5,5;75:24;
180:23
**ongoing (8)**
88:18;90:12;97:21;
155:17;179:6;216:14;
221:4;225:5
**online (1)**
170:11
**only (17)**
11:13;17;35:25;
44:2;56:14;82:13;
125:4;130:7,11;
155:7,14;157:11;
179:18;185:8;196:21;
242:12;255:13
**onshore (1)**
131:11
**onto (2)**
84:11;226:20
**onwards (2)**
31:5;32:7
**operations (1)**
191:24
**OPEX (3)**
220:8;225:13,19
**opinion (2)**
226:5;242:23
**opinion' (1)**
244:23
**opinions (2)**
235:14,16
**Opportunities (6)**
33:10;51:25;152:2,
4;196:3,16
**opportunity (1)**
164:19
**opposed (2)**
81:4;116:13
**option (1)**
233:5
**order (15)**
43:9;75:15;120:20;
122:2;126:22,23;
142:4,10,15;143:8,13,

20;144:10,12;217:19
**orders (3)**
24:24;119:24;
120:11
**ordinary (1)**
247:14
**organized (2)**
202:3,6
**originating (1)**
213:17
**others (9)**
33:12;43:15;50:13;
53:2;62:15;78:13,21;
87:25;104:12
**otherwise (4)**
89:8;113:9;158:14;
159:12
**ourselves (1)**
87:25;93:10;254:23
**out (26)**
66:25;67:4;121:11,
14;131:9;135:17,24,
25;136:2,3,7,8,11,12,
14;139:12,15,22;
140:6;155:6;196:20;
200:18;230:9;236:25;
237:4;244:3
**outcome (16)**
70:11;166:8;
170:25;172:6,12,17;
180:9,13,15;182:23;
185:5,9;186:25;
216:3;242:15;243:16
**outcomes (3)**
166:12;167:5,17
**outline (1)**
48:7
**outlined (3)**
109:3;136:22;
255:20
**outlook (7)**
54:22,24;55:7;
56:11;57:4,5;184:17
**outside (11)**
120:12;129:3,6;
131:8,13;133:23;
134:7,16;135:21;
137:9;176:7
**outstanding (1)**
45:7
**over (35)**
11:9;36:23,23;55:3;
56:15,17;57:25;58:9;
64:2;87:4;90:16;
91:17;92:4,7;93:3,3;
120:9;134:12;136:17,
24;140:15;149:13;
150:22;151:15,21;
153:20;158:14;
171:25;177:24;183:5;
187:20;189:9;197:17;
224:23;229:8
**overall (8)**

46:17;52:4;108:21;
114:13;115:18;
121:17;221:4;245:21
**overarching (1)**
42:23
**overgeneralizing (1)**
85:9
**overlap (2)**
254:7,16
**overweight (2)**
181:22;182:2
**overwrite (1)**
80:5
**own (15)**
13:21;29:17;42:5;
69:18;119:8,9;
122:25;126:23;
132:17;178:24;190:3;
199:14,20;201:15;
220:17
**owned (1)**
190:5
**ownership (2)**
118:23;190:9

**P**

**page (66)**
11:10;21:21;35:15;
41:2;48:5,6,14;53:20;
54:17,19,20;60:24;
61:5;73:8,15;74:13,
13;75:13;76:5;112:3;
127:20,21;129:24;
132:13,14;140:24;
141:18;142:6,8,14;
143:6,11;144:4,8;
147:21;150:20;
155:23;164:5;168:6;
173:8,16;174:17;
180:18;181:7,8;
187:15,16;191:21;
198:6,8;200:13;
210:22,22;212:24;
213:7;215:16,18;
217:11;219:23,23,25;
226:3;232:14;242:6;
246:3,4
**pages (2)**
202:7;203:17
**paid (2)**
98:3;214:24
**paragraph (41)**
35:20;41:10;54:6,
18,21;56:9;57:13;
63:22;66:4;67:10,11;
105:22,23;107:6;
110:5;112:4;127:21;
129:23;132:14;183:3,
3;184:10;187:16;
189:5,6,7;193:17;
197:13;198:7;205:7;
213:4;215:14,15,17,

17;224:6,19;226:3;
235:2,24;239:5
**paragraphs (2)**
21:22;57:3
**parameters (1)**
169:6
**part (37)**
18:10;44:2;49:15,
20;58:22;60:4;76:14;
96:15;104:4;105:21;
107:4,23;113:19;
114:21;116:7;121:4;
127:18;152:4;154:17;
155:4;159:13;162:13;
190:3,20;200:4,6;
202:14;208:14;
212:17,20;229:7;
236:21;241:7;245:20;
248:18;253:23;
258:14
**participant (2)**
212:6,11
**participants (2)**
113:17;254:23
**participate (9)**
29:2,3,6,13,19;
203:17;248:10,13;
249:2
**participated (3)**
76:9;164:15;247:22
**participating (1)**
203:20
**participation (2)**
75:7;212:8
**particular (66)**
18:8;28:17;29:17;
30:20;43:3,16,17,21;
44:5;45:10;47:21;
49:16;58:25;60:20;
64:25;67:19;68:5;
76:3;86:13;99:12;
104:7;109:23,25;
117:19;119:12;
120:20;124:7;131:21;
132:24;135:8;141:7;
144:3;145:5,10,14;
146:25;149:7;162:25;
164:15;165:14;
171:21;177:17,24;
178:22;184:9;185:24;
190:10;195:11;198:4;
202:10,11;207:22;
211:10;218:12;219:2;
227:8;228:4;230:24;
231:3;235:12,23;
239:22;248:19;249:9
**particularly (4)**
45:14;59:2;114:3;
138:6
**parties (2)**
147:23;149:15
**partnering (1)**

208:6
**partnership (2)**
18:12;24:9
**parts (2)**
49:19;65:25
**party (4)**
138:19,24;183:12,
15
**Pasadena (19)**
22:16;23:18,23;
24:3;99:6;106:17;
121:10,12,14;131:10;
135:18,21,24;136:12;
137:9;139:15;164:7;
208:6;241:11
**pass (5)**
29:19;213:15;
248:13
**past (1)**
224:23
**path (1)**
185:2
**Paulo (34)**
50:6,10,11,14,16;
62:23;91:15;136:9,
10,13,14;137:16;
156:2,7;188:3,13,13,
15;193:13;202:16;
208:8;210:23;216:16;
217:12;218:6,11;
221:20;222:9;224:10;
230:18;232:22;235:7,
10,16
**pay (2)**
145:23;146:3
**PCS (1)**
15:16
**penalty (1)**
10:13
**pending (3)**
12:12;242:10,24
**Pension (1)**
15:17
**people (3)**
38:16;139:23;
188:17
**percent (4)**
174:20;215:24;
220:3,3
**perform (8)**
23:13;39:19;42:5,
13;50:2;78:17;
111:10;112:17
**performance (3)**
21:19;106:5;109:13
**performed (8)**
39:11,20;41:15;
103:12,14;106:21;
108:4;165:21
**performing (1)**
42:9
**performs (1)**
106:14

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL
CASE NO.: 14-cv-9662(JSR)

CHIA-LIANG LIAN
April 27, 2016

**perhaps (3)**
53:11;170:15,23
**period (54)**
14:8,10;17:14;22:4;
30:21;31:7;32:15,24;
33:21;34:5;35:24;
36:5,10,24;37:7,9;
38:7;39:13;40:9,19;
41:14;45:22;50:4,18,
25;51:5,13;59:22;
62:17;81:21;83:20;
89:12,23;90:7,16;
91:7,9,17;92:2,15;
93:3,3;99:4;133:4,8,
16;152:13;158:15;
178:8;202:20,23;
211:13;249:16;
250:21
**perjury (1)**
10:13
**permit (1)**
54:15
**person (2)**
11:17;143:13
**personal (7)**
90:20,23;159:10;
193:14;199:20,22;
216:17
**personally (7)**
98:25;99:9;103:3;
106:11,20;151:11;
257:21
**personnel (1)**
149:6
**persons (3)**
35:16;39:4;41:3
**perspective (9)**
52:17;78:25;95:17;
103:23;104:2,3;
141:5;161:16;239:6
**pertain (1)**
193:9
**pertaining (1)**
124:19
**pertains (3)**
26:21;115:13;185:9
**PETBRA (4)**
170:10;173:16;
175:5;215:25
**Petro (2)**
181:20;189:12
**PETROBRAS (229)**
3:4;9:8,20;13:25;
14:2;20:8;35:18,23;
36:3,8,12,16;37:13;
38:6,12;39:8,11;41:9,
13,16;45:20;59:11,
12;60:9;62:12,16;
68:13;69:4,10,17;
70:20,22;71:5,20;
72:5,13,14;75:7;
83:19;85:16,22,24;
86:10,20,25;87:18;

88:14;96:7;97:6,15,
17;98:10,17;107:18;
108:5,14,25;109:16;
110:11,16;111:6,11;
112:17,24;113:3,13,
23;114:15;115:7,10,
25;132:7;134:17,24;
141:13;149:23;
150:15,23;151:13;
152:9;153:7,19;
155:6,13;156:20;
157:8;158:7,19;
159:2,18;160:5,10,13;
161:12;162:13;163:4,
14;166:10,24;171:20;
172:5;173:17,17;
176:4,9,15,20;177:2,
23;178:12,16,18;
179:8;180:2,3;
181:19;182:2;183:5;
187:18,24;188:4;
189:14,23;190:5;
191:8,13;198:2,12,22,
25;199:7,24;200:2;
203:14;204:18;
205:14,21,24;207:7,
15,18,25;208:2,13,18,
25;209:9,17;211:3,
15;212:2,12,18;214:4,
8;216:18;217:7;
218:7;219:10;220:18;
221:2,5,6,10;222:12;
223:3,7;224:12;
225:3,11,18;226:6,10,
12,13,20;227:2,5,14;
228:18;229:2,11;
230:5,7,12;231:5,11,
13,24;232:24;233:2,3,
4,8,16,24;234:7,9,16,
18,20;235:11,17;
236:8;237:25;238:7;
239:15;240:5;241:5,
9,21,23;242:4,13,20;
243:5;245:2,6,12;
246:12,22;247:10,16,
18;248:14;250:20;
257:19,24;258:5
**Petrobras' (1)**
239:10
**Petrobras's (24)**
84:9;108:9;109:7,
13;114:3;155:25;
168:11,18;177:18;
179:9,19;204:8;
214:21;217:14;222:6;
228:22;229:16;
231:20;245:24;
249:12,23,25;250:3;
257:14
**philosophy (7)**
48:8,12;49:10;
60:12,23;63:20;
187:23

**phone (2)**
120:9;127:5
**phrase (1)**
234:5
**pictures (1)**
215:23
**piece (7)**
143:10;160:5;
162:19,23;229:10;
249:19;258:14
**pieces (5)**
141:11;161:18;
163:20;211:17;228:6
**PIMCO (17)**
10:3;17:8;18:19,22;
19:13,23;20:4,9;
196:7,9;197:11;
199:9,13,17,19;
200:19,22
**pinpoint (3)**
163:3,15;177:17
**pipeline (1)**
231:10
**pivotal (1)**
242:11
**place (16)**
22:22;63:2;81:22;
82:10,22;87:24;98:9,
15;99:2;112:13;
118:16;120:11;
126:22;137:21;
143:20;239:21
**placed (11)**
119:24;120:21;
122:2;135:5;142:4,
10,15;143:8,13;
144:10;147:19
**places (1)**
18:6
**placing (1)**
24:24
**plaintiffs (21)**
10:3,6,7;14:19;
15:18,21;16:5,10;
19:17,18;36:4,5;
38:12,14,15;131:24,
24;133:7,15;174:5,6
**Plans (1)**
15:16
**platform (6)**
15:7;28:12;119:15,
21,22;148:9
**platforms (1)**
119:11
**play (6)**
56:13;58:6;59:12;
116:12;123:6;248:20
**played (4)**
101:11;125:9;
257:15,23
**players (1)**
77:11
**Plaza (1)**

3:5
**PLC (1)**
31:5
**please (11)**
9:16;10:11,20;
11:23;12:5;16:14,23;
30:23;146:2;155:10;
161:6
**plus (1)**
124:10
**pm (5)**
117:4,10;232:15;
238:25;259:7
**point (109)**
12:10;51:17;59:16;
60:3;63:6;71:10;
73:18;76:17;84:10,
22;85:3;87:14;89:8,
20;90:19,22;92:21;
94:22;97:18;98:13;
104:7,10,15;105:2;
107:16;109:20;110:4;
113:15;116:6;123:21;
127:12;149:22;
151:18,25;153:5;
154:24;155:14;
156:12,16;158:2,10;
160:24;161:10,21;
162:5,12,25;163:8;
165:10;171:21;
176:10;177:7,10,11,
12,24;178:2,5,6,9,22;
184:9;186:24;187:2;
193:8,9;199:15;
200:10;206:3;207:5;
208:21,22;209:3,5;
210:5;211:2,7,11;
212:10,21;213:2,10;
214:3,11,11,13,20;
215:3,4,12;216:20;
217:7;221:7,8,24;
222:2;227:8,11,22;
230:22;231:2,17;
238:9;239:13;242:8;
245:2;254:4;255:8;
256:3
**points (12)**
37:6;101:25;102:2;
150:7;153:15,23;
158:9;209:10;219:25;
226:16;227:5,17
**Police (1)**
156:3
**policies (4)**
55:8;79:11,16,19
**policy (4)**
197:25;198:17;
199:5,23
**policy' (1)**
197:22
**political (1)**
166:4
**polls (2)**

165:22;172:22
**population (2)**
52:25;53:4
**portfolio (58)**
17:7;19:25;24:18;
25:23;26:3,4,6;27:14,
24;28:18;30:2,12,17,
25;31:2;32:2,15,23;
33:4,18,20,23;34:4;
37:12;38:2;40:3,8,12,
15,19;42:14,15;54:10,
11,12,12,16;62:8,10;
71:9,12;74:18,20;
86:7;103:10;139:5,8;
144:14,19,24;145:2,5;
147:14;191:24;
206:22;230:19;239:2;
255:13
**portfolios (44)**
20:2;23:3,8;24:13;
26:13,17;27:6;29:20;
32:17;37:23;39:25;
40:6,7;44:23,24;45:4;
49:8;55:20,24,25;
56:2;76:18,20;103:2,
4,6;106:6;110:25;
136:11;145:6;174:11;
182:8;192:8,9,11,21;
193:4,10;194:10,12,
17,18;230:21;237:18
**portion (2)**
140:17;225:12
**Portuguese (1)**
250:8
**position (6)**
21:24;137:2;
158:12;209:14;
227:14;239:6
**positionings (1)**
27:12
**positions (1)**
230:23
**positive (17)**
166:15,23;175:6;
177:22;178:11;
179:23;228:20;229:3;
232:24;233:15;
237:25;238:12;
244:25;245:5,11,16;
248:25
**possibility (2)**
54:14;182:15
**possible (6)**
45:5;127:6;188:7;
194:16;222:7;223:6
**post (1)**
247:7
**posted (3)**
146:11;162:20;
192:25
**postponed (1)**
225:3
**post-release (1)**

246:24

**pot (2)**
196:19,25

**potential (20)**
78:22;132:20;
166:4;170:25;172:6;
180:10;182:22;184:3;
185:4;186:20;191:12;
220:2;230:11,16;
231:4,7,8,12;235:24;
254:2

**Potentially (4)**
66:25;85:9;140:14;
222:14

**powder (2)**
230:15,22

**powder' (1)**
230:10

**PowerPoint (1)**
219:9

**practice (4)**
28:21;69:25;
120:14;123:23

**Practices (2)**
100:15;101:6

**pre-approval (1)**
169:2

**preceding (3)**
54:5;55:25;56:3

**precise (3)**
217:5;234:5;235:22

**precisely (1)**
51:8

**precision (5)**
152:18;209:20;
225:20;236:13;
249:10

**preclearance (3)**
169:7,11;170:2

**predate (1)**
36:17

**predated (1)**
180:23

**Predominantly (4)**
18:10;46:14;50:14;
124:5

**prejudge (7)**
81:15;82:15,19;
85:11;94:2,10;97:18

**prejudgment (3)**
81:4;82:4;96:14

**premised (2)**
32:19;162:22

**premium (2)**
107:15;111:10

**prepare (3)**
12:18;13:14,22

**prescribed (1)**
209:2

**present (1)**
43:9

**presentation (3)**
219:12,14,16

**presented (1)**
222:21

**presents (1)**
49:13

**preserve (1)**
13:25

**President (1)**
150:16

**presidential (8)**
165:25;166:8;
172:14;180:9,13;
182:23;185:11;
186:25

**presume (1)**
233:23

**pretty (4)**
79:19;181:11;
244:24;245:5

**prevailing (4)**
51:17,19;116:9;
242:3

**prevent (4)**
12:16;81:23;82:11,
23

**prevention (1)**
249:13

**previous (2)**
207:7;213:13

**previously (7)**
106:19;135:4;
147:6;188:18;192:12,
14;256:5

**price (45)**
65:8,12,18,23;
66:17;67:4,13;68:16;
69:12,19;128:10;
166:9;175:5,10,16,23,
25;176:8,15,21,25;
177:4,18,22;178:10,
11,18,21,24;179:6,17;
180:3,10;208:24;
210:4,4;215:23;
216:9;254:9,17;
255:8;256:4,8,16,25

**priced (3)**
66:8;95:20;211:5

**prices (16)**
52:15;53:11;63:25;
66:11;67:21;198:19,
20;199:2,5,23;
205:18;217:17,25;
218:2,8,9

**pricing (15)**
46:15;58:11;70:20;
96:8;24;128:13;
170:13,17;180:4;
216:22,23;227:5,13;
247:5;254:21

**pricings (1)**
58:19

**Primarily (5)**
52:10,12;53:9;
54:13;77:5

**primary (9)**
26:3,6;27:14;34:20;
37:25;42:9;222:24;
253:10;258:20

**principal (4)**
118:25;119:5;
124:16;148:25

**principle (2)**
30:14;106:10

**printed (1)**
216:15

**prior (14)**
24:9;25:6;38:20;
72:11;93:22;94:7,16;
95:5;97:25;98:9,16;
123:11;185:11;
186:24

**priority (2)**
234:7,16

**priority/Dilma (1)**
233:4

**probabilistic (2)**
167:4,17

**probability (1)**
227:2

**probably (16)**
12:25;13:4,6;22:9;
23:21;41:25;71:17;
73:22;164:14;193:10;
201:5;204:14;206:9;
219:17;224:5;233:22

**process (53)**
34:13,16,16,20;
35:2,3;42:4;44:3;
48:8,18,23;49:2,5;
54:7,22;55:10,11,16;
56:3;57:3,10,11;
58:23;60:23;65:14;
67:16;68:21;70:16;
82:6,8;86:4;87:15;
90:10,12;94:12;
95:15;96:22,24;
97:21;104:8;118:3;
122:21;124:6;142:21;
146:15;161:16,17;
163:18;235:18,25;
245:15;255:19;258:6

**produce (1)**
43:3

**produced (2)**
140:15,18

**product (1)**
43:2

**Production (2)**
170:10;175:8

**professionals (1)**
41:5

**profile (2)**
207:10;226:6

**program (2)**
203:21;249:13

**promoted (3)**
22:6;41:19;72:11

**promotion (1)**
36:18

**prompt (1)**
226:8

**proposal (3)**
47:18;48:3;194:7

**prospect (1)**
47:19

**prospects (1)**
182:13

**prospect's (1)**
47:24

**prove (1)**
194:15

**proven (2)**
155:15;158:14

**provide (6)**
11:12,19;27:15;
46:15;83:3;224:21

**provided (6)**
113:8,17;155:19;
158:8;160:20;245:21

**provides (2)**
143:3;175:22

**providing (2)**
211:22;241:9

**PT (4)**
183:6,10,18,19

**public (23)**
67:7;82:16;84:6;
91:18;94:8,24;95:25;
111:16;115:11;
153:24;158:8;161:19;
163:11;172:23;188:7;
199:9;200:3;201:6;
208:23;211:21;
254:25;255:10;
260:22

**publicly (15)**
29:18;45:13;46:13;
47:2;77:24;94:12,15,
17;95:6;113:7,11,25;
115:20,22,23

**published (1)**
64:22

**publishing (1)**
225:3

**purchase (22)**
30:2,3,6,7,10;32:4,
14;38:23;68:4;69:10;
70:10,15;76:20;
99:14,22;100:7;
104:13;122:19;
123:20;137:3;141:13;
146:7

**purchased (3)**
136:17,19,24

**purchases (11)**
32:17;34:17;38:12;
68:17;152:8;153:7,
19;246:21;247:10,20,
25

**purchasing (2)**

118:7;124:15

**purpose (4)**
28:8;49:15;87:10;
235:25

**purposes (1)**
14:21

**put (8)**
76:23;87:24;89:7;
149:20;184:5;203:22;
219:19;233:20

**puts (1)**
150:15

**putting (1)**
219:13

**PwC (3)**
10:10;242:10,20

---

## Q

**qualified (1)**
242:23

**qualitative (13)**
65:16;83:3;86:16,
23,24;87:11,13;
109:19;112:23;113:6;
191:2,16;252:8

**quality (4)**
64:3;65:15;127:24;
130:9

**quantifiable (2)**
65:18;86:16

**quantify (1)**
86:12

**quantitative (4)**
65:15;83:4;109:18;
252:8

**quarter (4)**
212:4,17;246:13;
247:19

**quarterly (1)**
61:8

**quasi-sovereign (2)**
187:18;234:21

**questions/concern (1)**
206:10

**questions/concerns (1)**
204:16

**quickly (1)**
67:24

**Quinn (2)**
10:2,5

**quite (3)**
77:2;92:20;163:22

**quote/unquote (2)**
244:23;246:6

**quotes (1)**
232:15

---

## R

**radar (2)**
155:17;184:14

**raise (3)**

10:11;193:14;
198:25
**raising (3)**
242:18;243:19,22
**rallied (2)**
230:7;231:12
**rally (1)**
232:18
**ramping (1)**
170:10
**range (24)**
15:7;26:9;53:17;
59:25;67:17;82:25;
103:20;104:23;
107:23;114:24;115:4,
12;154:20;191:14;
220:10,14;226:15;
230:20;234:10;246:9;
247:17;249:7;258:4,7
**range' (1)**
246:6
**rated (4)**
65:24;113:13;
114:15;209:6
**rates (1)**
57:23
**rather (5)**
11:13;107:8;110:3;
136:3;194:5
**rating (13)**
45:18;70:24;108:9;
184:23;186:4,9,16,20;
207:7,17;226:8,9,10
**ratings (8)**
71:11;107:14;
110:9,12;111:12;
112:17;184:12;185:4
**Re (1)**
9:7
**reach (2)**
236:25;237:4
**reacted (4)**
215:22;216:11,18;
217:5
**reaction (9)**
158:17,24;159:6,
10,20;217:23;226:18;
227:23;244:7
**read (9)**
30:23;57:3;110:5;
249:12,16,23;250:3,
10;260:8
**reading (5)**
60:19;75:11;151:9;
205:6;249:20
**readjust (3)**
217:25;218:7,8
**reads (9)**
54:21;147:22,25;
148:14,18;149:16;
155:24;219:25;226:4
**real (12)**
77:11;111:18;

175:4;176:4;217:15,
22,24;218:4,7,9,18,21
**reallocations (2)**
213:14,18
**really (3)**
67:5;179:16;193:9
**real-time (12)**
51:9;82:16;86:8;
88:17;92:23;93:10;
158:13;159:6;162:4,
20;235:19;236:3
**reappointed (1)**
17:11
**reason (8)**
77:4;93:20;113:9;
209:22;225:22,25;
227:15;236:22
**reasons (4)**
130:4;131:4;
134:13;247:17
**reassigned (2)**
192:17;194:6
**reassignment (1)**
194:5
**recall (124)**
12:22;13:24;21:8;
37:3;40:11;41:25;
59:15;62:13;72:15,
17,18;73:13,23;74:6,
22;107:17;116:8;
150:18;151:5,9;
152:5;153:4;156:8;
166:11,21;167:6,11,
18;168:14;172:14;
175:13;176:5,12;
177:24;178:5,9,14;
180:12,16;182:6;
184:6;185:3,25;
186:7,10,22,23;189:3;
192:10;193:15;
199:15,18,21;200:16;
201:4;202:5,19;
203:6,11;205:6,19,22;
206:4,11;207:21;
208:20;209:15,19;
210:20;211:9;212:8,
15;215:2;217:4;
218:10,25;219:13,14,
21;220:24;221:4,5,
13;225:20;227:7;
228:3,21,23;229:9;
230:17;231:6,15,21;
236:9,13;238:8,11;
239:14,22;240:2,3,6;
243:10;244:2,6;
245:3,8,10,15,23;
246:7,24;247:6,13;
248:8;249:10,22;
251:9,15,24;252:4,6,
10,13
**receive (1)**
16:20
**receiving (2)**

13:24;229:2
**recent (4)**
76:8;174:20;175:8;
230:5
**Recess (5)**
72:23;117:4;154:8;
187:9;240:15
**recognize (24)**
20:14;21:5;47:15,
16,17,25;63:16;
73:11;105:18;140:25;
141:2;168:3;173:6;
195:22;204:5;210:19;
223:21;228:14;
229:25;232:11;
238:21;240:25;
242:21;244:17
**recollect (1)**
203:19
**recollection (22)**
13:11;59:15;63:7;
71:8;108:3;159:19;
164:14;165:14;
170:23;172:5,18;
177:6;182:21;192:2;
195:10;204:7,17;
206:24;211:13;
229:15;237:6;241:25
**recommend (2)**
29:19;241:24
**recommendation (12)**
29:2,22,25;30:7,9;
46:4,18,21;209:16;
211:6;233:7;239:9
**recommendations (1)**
37:21
**recommending (3)**
165:11;168:11,18
**recommends (1)**
132:18
**reconsider (1)**
250:25
**record (25)**
9:4,17;10:20;20:15,
24;72:20,22,25;117:2,
13;140:13;153:25;
154:6,10,25;187:8,11;
226:16;240:14,17;
259:2,3,6;260:11,12
**recording (1)**
11:11
**records (7)**
120:18;136:18;
137:2;139:21;143:17;
194:25;195:9
**redesignated (1)**
17:11
**redesignation (1)**
194:5
**reductions (1)**
174:20
**reelection (3)**
184:22;185:15;

186:21
**reevaluate (2)**
88:19;91:19
**refer (13)**
14:4,8,22;15:2,8,9,
20;16:4;56:19,21;
58:11;66:24;173:9
**reference (17)**
49:4;58:8;66:15,20;
110:6;144:20;148:6,
15;170:22;174:12;
183:12,20,21;211:25;
224:13;227:24;228:5
**referenced (2)**
52:3;147:17
**references (1)**
205:2
**referred (3)**
175:10;228:19;
237:14
**referring (4)**
15:4;16:10;175:9;
205:13
**refers (9)**
58:17;148:8;
149:18;170:18;
183:10;197:7,9;
220:14;237:23
**reflect (9)**
49:10;54:6;64:3;
120:19;202:8;207:14;
214:23;241:4;256:25
**reflected (5)**
199:19;202:7;
206:9;211:10;231:19
**reflecting (1)**
227:10
**reflects (9)**
22:3;47:23;48:12;
123:22;141:13;
142:24;147:18;255:7;
256:17
**refresh (4)**
13:10;170:23;
182:21;229:14
**regarding (47)**
24:13;38:5;39:11;
59:18;72:5;79:12;
81:7;83:18;89:13;
93:13,15,22;95:5;
96:10;98:9,16;99:3;
101:16;103:14;104:3;
105:6,7;108:9;
120:25;133:19;157:7;
161:11;162:13;163:4;
171:20;172:4,6;
186:2,19;204:8,18;
206:23;207:24;
208:13;212:3,16;
222:13;228:21;237:5;
239:15;240:4;250:20
**regardless (3)**
29:20;170:14;

247:11
**regards (22)**
52:4;64:23;70:22;
83:14;87:13;88:13;
92:13;113:22;115:24;
122:20;126:8;143:4;
144:2,12;170:12;
172:14;184:8;221:10;
223:8;235:23;236:8;
257:18
**region (2)**
66:2;139:14
**regions (2)**
18:14;24:19
**regular (3)**
172:22;205:10;
241:7
**regularly (1)**
172:23
**regulators (1)**
229:16
**reinstatement (1)**
213:13
**reiterate (7)**
82:15;83:14;92:8;
114:23;154:19;
156:24;162:21
**related (7)**
32:18;41:16;95:22;
107:18;108:24;
231:16;247:16
**relates (2)**
105:21;186:15
**relating (2)**
13:25;163:14
**relations (1)**
112:9
**relationship (1)**
196:14
**relative (11)**
58:3,24;65:19,22,
23,24;66:2;67:2;
198:9,15;248:9
**relatively (1)**
180:15
**release (12)**
214:14;225:8,10;
244:3,7;245:5,11,16;
246:13,23;247:2,8
**released (9)**
217:8;228:6;
231:24;242:16;
243:17,21;245:2;
248:8;248:17
**releases (2)**
151:9;216:5
**releasing (1)**
214:4,8
**relevant (49)**
14:9;30:21;32:23;
33:21;34:5;35:23;
36:5,23;37:7,8,12;
38:6;39:13;40:9,19;

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL
CASE NO.: 14-cv-9662(JSR)

CHIA-LIANG LIAN
April 27, 2016

41:13,17;45:22;50:3,
18,25;51:12;55:21;
58:20;59:22;62:16;
81:21;83:19;87:21;
89:23;90:7;91:9;92:2,
15;99:3;102:2,13;
104:20;133:4,8,16;
188:6;227:13;235:19;
242:5;247:4;248:15;
249:16;250:21

**reliance (2)**
155:19;200:4

**relied (4)**
157:16;161:2,13;
207:24

**relief (2)**
170:12;198:25

**relocation (1)**
22:25

**relooking (1)**
248:4

**reluctant (1)**
242:19

**rely (14)**
42:5,18;45:10,16;
64:22;82:25;84:24;
94:11;157:2;160:19;
161:9;199:25;253:12,
24

**relying (3)**
172:19;254:24;
256:25

**remain (3)**
155:16;217:17;
242:19

**remaining (2)**
32:22;135:24

**remains (2)**
187:17;188:25

**remeasure (1)**
67:20

**remember (14)**
59:18;71:14;105:5,
9;154:12;156:6;
158:17,24;189:8;
212:6;219:12;221:8;
239:21,24

**reopening (1)**
165:15

**repeat (15)**
32:10;69:14;79:15;
117:21;134:2;135:6;
146:2;155:9;158:21;
161:5;169:18;195:3;
214:6;251:22;254:12

**replication (1)**
54:15

**replied (1)**
218:14

**report (19)**
25:3,4,6;39:12;
43:20;108:9,19;
176:24;188:11;196:2,

2,17;197:13;199:11;
244:20,20;245:19,20;
246:4

**reported (13)**
41:21;44:9;62:15;
109:3;253:3,4,16,16,
19;257:14,22;258:10,
19

**REPORTER (4)**
10:11;11:11;72:20;
259:2

**Reporting (3)**
9:14;25:9;112:10

**reports (11)**
43:10;45:16,17;
47:4;108:22;109:4,5;
188:13,15;250:10,20

**represent (4)**
28:6;54:3;242:3;
251:11

**representation (2)**
225:24;227:18

**representative (2)**
173:23;242:3

**represented (2)**
28:6;48:23

**representing (3)**
9:24;122:17;183:19

**represents (4)**
53:21;65:12;96:22;
243:8

**Republic (1)**
234:22

**request (6)**
43:20;47:18;48:2;
132:23;194:6;206:25

**requested (1)**
206:21

**require (2)**
169:11;170:2

**required (3)**
44:2;61:7;169:7

**requirement (3)**
130:21;131:4;170:7

**re-review (1)**
235:6

**research (107)**
18:4,11;34:14,15;
35:2;39:11,19,23,24;
40:4;41:16;42:4,5,6,
10,13,21,22,24;43:2,
9,11,20,20,23;44:7;
45:2,9,15,21;46:2,3,7,
11;47:5;48:20;49:2;
50:3,18;51:2;55:10;
57:2;58:5;62:14;
64:13,15;66:13;67:6;
70:11;78:16;79:20;
81:17;82:6,8,20,21;
83:2;94:11;95:17;
96:6,23;97:6;98:8,15,
20,23;99:2,6;100:13;
101:25;103:11,11,12,

13;104:3;105:5;
106:11,14,18,20,21,
25;107:4,18;108:4,8,
22;109:4;113:18;
114:24;116:5;130:10;
176:18,24,25;177:7,
10,21;178:10;207:24;
208:11;221:22;
222:23;244:20;
249:18;257:20;
258:21

**Researchers (1)**
62:8

**researching (1)**
47:2

**resides (1)**
139:16

**resources (1)**
83:2

**respect (18)**
36:2;39:5,19;41:5;
50:3;60:8;70:20;71:5;
83:19;85:5,15;89:11;
134:24;187:23;221:2;
227:16;235:17;
252:21

**respective (6)**
28:7;57:25;58:10,
12;148:11;236:20

**respectively (2)**
36:10;41:23

**respond (4)**
138:15;142:12;
180:18;239:20

**responded (5)**
181:17;201:11,16;
217:12;239:24

**response (14)**
33:22;35:14,21;
39:10;76:13,16;
159:24;179:16;
204:11;206:25;207:3;
210:3;236:12;251:18

**responses (5)**
11:19,20;22:2;
35:10;47:24

**responsibilities (12)**
19:12,22;22:18,24;
23:7;24:21,24;26:25;
32:3;33:23;40:9;
222:23

**responsibility (16)**
18:15;19:10;20:3;
22:21;26:22,23;34:8;
36:15;42:11;46:24;
76:19;83:23;135:8;
177:12;200:7;258:20

**responsible (22)**
16:6;27:4,7,15;
28:19;32:16;34:6;
36:11,20,24;37:20;
39:4;41:5;44:21;50:7;
118:7;120:4;144:23;

147:9;176:19;200:2;
221:17

**rest (1)**
241:10

**restate (2)**
221:10;225:19

**restated (11)**
215:7;217:8;
221:11;223:8;231:20,
24;245:3,25;246:23;
248:9,24

**restatement (5)**
214:21;220:2,17;
221:2;225:6

**restatements (2)**
220:6;222:7

**restating (1)**
225:12

**result (5)**
50:18;68:23;70:23;
71:10;186:12

**resulted (2)**
198:21;199:6

**results (1)**
245:21

**retail (1)**
175:23

**retired (1)**
22:12

**Retirement (5)**
9:24;15:16;73:23;
224:3;251:11

**retiring (1)**
22:13

**Return (3)**
14:23;15:2;31:10

**returns (1)**
64:7

**revenue (2)**
205:16,21

**review (2)**
13:21;252:22

**reviewing (1)**
250:20

**RFP (1)**
60:21

**right (14)**
10:11;16:21;24:5;
40:12;87:23;90:17;
123:18;139:14;
140:20;145:17;148:6,
18;163:19;193:24

**right-hand (1)**
54:9

**rigorous (1)**
66:10

**ring (1)**
47:21

**risk (28)**
61:10;79:3;80:21;
81:12;85:6,16,17,23;
86:12,25;89:13;90:5;
91:10;92:25;93:2,21;

94:7,18;96:10,19;
97:11;99:13,21;
104:17;119:9;164:20;
165:4;235:21

**risks (7)**
77:15,16,21;78:4,6;
80:9;94:22

**Ritter (17)**
74:11,14;75:6,12;
164:6,17;165:8,18;
166:13,19;168:6;
170:9;171:11;204:11;
205:2;206:7;241:19

**Ritter's (1)**
171:6

**road (2)**
11:10;120:15

**Rob (3)**
39:23;174:19,23

**Robert (11)**
39:10,18;40:18;
174:24;181:8;192:15,
21;193:18;194:10,17;
195:7

**Roberto (2)**
156:2,7

**role (27)**
18:20,23;19:8;
24:22;25:17;37:12;
39:19,24;40:4;46:9;
56:13;58:7;59:10;
70:19;98:12;101:11;
102:6;104:2,16;
123:5,7;125:9;
157:12;200:11;
248:19;257:14,22

**roles (2)**
39:22;42:9

**room (1)**
120:10

**roughly (5)**
17:5,10;31:4,10;
32:7

**Rousseff (2)**
183:14;186:20

**Rousseff's (1)**
183:23

**routinely (3)**
44:6,9;45:21

**rule (3)**
30:8;42:25;100:10

**rules (1)**
11:9

**ruling (1)**
233:4

**run (2)**
28:18;199:2

**running (1)**
181:10

**run-up (2)**
167:17;172:13

**Russian (1)**
174:21

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL
CASE NO.: 14-cv-9662(JSR)

CHIA-LIANG LIAN
April 27, 2016

**Ryan (1)**
10:2

**S**

**S' (1)**
112:13
**S&P (1)**
184:15
**sale (4)**
104:13;122:19;
123:20;239:9
**sales (2)**
32:18;130:9
**same (52)**
11:6,10;15:18;31:7,
11;32:9;35:2;39:19;
49:6;51:21;54:4;
60:11,11;69:3;76:7,
12;78:9;80:9,21;
81:13;87:5;89:11;
90:15;91:21;95:8;
104:5;126:4;129:18,
23;131:6;133:17;
134:9;136:17,24;
137:17;145:25;146:4;
159:3;161:14;165:18;
170:5;174:16;175:2;
187:17;188:25;
207:20;215:18;229:5;
236:12;245:13;249:5;
258:6
**Sao (21)**
50:6,10,16;62:23;
91:15;136:9,10,12,14;
137:15;188:3,13;
193:13;202:16;208:8;
216:16;221:20;222:9;
224:10;230:18;
235:16
**Saruwatari (1)**
13:19
**Saving (3)**
233:3;234:6,16
**saw (1)**
184:2
**saying (3)**
11:13;84:4;114:20
**scale (1)**
182:18
**scandal (2)**
93:8;162:7
**scenario (4)**
167:16;184:23;
185:16;217:18
**scenarios (2)**
127:6;167:19
**scheme (9)**
149:23;150:3;
151:12;152:10,23;
153:6,11;157:8;
205:13
**Schochet (90)**

9:23,23;19:15,20;
49:17;51:4;53:13;
58:15;59:15,13;60:10;
68:18;77:6;79:6,25;
80:23;81:9;86:14;
87:3;99:24;101:13;
102:9,21;103:17;
104:5;107:2;110:13;
114:5,17;117:24;
118:5,18;119:3,13,25;
120:13;122:3;125:3,
11;126:3;128:11,22;
129:18;131:15;132:2,
4;133:9,17;137:23;
142:17,23;152:20;
154:16;156:21;
160:16;165:5;166:16,
25;168:8,13,20;
169:14,16;170:4;
171:3,8;178:25;
185:17;186:6;187:25;
189:16,24;229:4;
236:18;239:12;241:6;
243:6;245:7,13;
249:4;251:3,6,10;
253:14;254:5;255:3,
23;256:12,21;257:6
**scope (2)**
151:16;252:23
**screen (1)**
155:17
**scrub (1)**
65:4
**seat (1)**
150:16
**SEC (1)**
101:5
**second (19)**
54:18,21;74:13;
112:3;150:20;174:16;
183:2;184:25;187:15;
193:16;195:24;
197:13;213:2,10;
231:16;242:8;243:10;
246:13;247:19
**secondary (3)**
34:17,21,24
**second-to-last (2)**
215:15,16
**SEC's (2)**
228:18,24
**section (1)**
242:7
**sector (10)**
27:3;28:22,24;
37:20;57:7;120:3,3;
147:11,11;236:20
**sectors (4)**
28:7,13;29:21;
33:13
**secular (1)**
52:17
**Securities (91)**

9:8;14:2;30:25;
35:19,23;36:3,9,12,
16;37:14;38:12;39:8,
12;41:9,13,16;44:8,
11,12,17,18,22;58:24;
59:12;60:12;63:24;
64:6;65:20,25;66:8,
16;67:3,12,25;68:14,
15;69:10,17;70:20;
71:5,20;86:21;95:20;
97:7,17;99:15,22;
100:3,7,11;105:6;
106:4;119:24;120:20;
122:11;123:20;
124:14,15;126:23,24;
132:7;134:16;136:17,
19,24;137:3;142:4,10,
16;145:20,24;146:4;
152:9;153:8,19;
159:15;160:15;
166:10,24;173:18,24;
176:16;178:12;
208:24;216:9;240:5;
246:22;247:10,16;
258:3,5
**security (36)**
28:17;52:15;57:15;
59:24;60:16;64:12;
66:17,25;67:8;68:5,6;
69:2;70:3,10,15;
85:21;98:23;102:3,4;
111:15;117:19;118:8;
124:7;125:5;133:23;
134:7;146:11;160:2;
162:6;178:21,24;
188:5;253:13;254:9,
18;255:21
**security's (1)**
65:8
**seeing (5)**
107:17;108:4;
151:5;154:12;226:22
**seek (2)**
111:11;139:11
**seeks (4)**
107:13;110:8;
127:22;130:2
**seem (3)**
180:23;226:17;
244:24
**seems (1)**
138:14
**segregated (1)**
174:13
**Seidel (1)**
9:13
**selected (1)**
130:3
**selecting (2)**
129:25;130:15
**selection (3)**
57:15;60:16;255:22
**sell (8)**

9:8;14:2;30:25;
35:19,23;36:3,9,12,
16;37:14;38:12;39:8,
12;41:9,13,16;44:8,
11,12,17,18,22;58:24;
59:12;60:12;63:24;
64:6;65:20,25;66:8,
16;67:3,12,25;68:14,
15;69:10,17;70:20;
71:5,20;86:21;95:20;
97:7,17;99:15,22;
100:3,7,11;105:6;
106:4;119:24;120:20;
122:11;123:20;
124:14,15;126:23,24;
132:7;134:16;136:17,
19,24;137:3;142:4,10,
16;145:20,24;146:4;
152:9;153:8,19;
159:15;160:15;
166:10,24;173:18,24;
176:16;178:12;
208:24;216:9;240:5;
246:22;247:10,16;
258:3,5

35:18;71:20;
124:14;133:23;134:7,
15;136:25;162:10
**seller (1)**
145:24
**selling (5)**
39:6,7;41:7,8;69:2;
118:7;119:8;226:21
**sells (1)**
122:10
**sell-side (2)**
45:16;47:4
**send (1)**
206:22
**sending (1)**
230:8
**senior (8)**
36:6;39:23;61:2,12;
62:5;194:4,7;208:5
**sense (13)**
33:24;97:17;
115:18;128:6;189:11;
191:2,3;207:9;221:5;
226:17;19;227:6;
233:23
**sent (5)**
145:24;146:4;
200:17;206:25;243:8
**sentence (5)**
105:23;193:16;
197:8;201:10;218:13
**sentences (2)**
39:9;164:18
**separate (11)**
15:21,23;16:7;36:4;
38:14;108:18;131:23;
133:6;140:19;174:5,
14
**September (6)**
164:11;167:2,7,13;
195:25;201:10
**sequence (1)**
248:16
**serve (2)**
30:16;31:2
**serves (3)**
16:21;19:17;193:24
**service (2)**
23:14;223:24
**set (8)**
36:23;83:12;87:16;
88:7;89:2,4;248:18;
253:24
**setting (1)**
198:18
**settled (1)**
101:4
**settlement (8)**
124:9;141:15,24;
146:15;147:23;148:2,
10;149:15
**settles (1)**
145:20

**several (7)**
23:23,24;128:14,
17;150:22;159:16;
160:8;177:14;178:13
**shaping (1)**
95:2
**share (1)**
215:23
**shared (1)**
199:16
**sharing (1)**
76:15
**sharper (1)**
129:4
**sheet (10)**
64:23;65:6;149:10;
198:22;199:6;252:15,
22,23;253:3;258:12
**sheets (1)**
65:2
**Shift (2)**
92:19;158:3
**shifting (4)**
68:22;70:18;92:18;
235:20
**shifts (3)**
87:16;111:15;
237:18
**short (3)**
39:7;41:8;213:21
**short-term (2)**
184:14;237:18
**shout (1)**
164:23
**show (1)**
139:22
**showed (2)**
177:7,10
**side (8)**
54:9;95:19;124:25;
149:20;164:21,22;
165:4;203:22
**sides (1)**
38:10
**Signed (1)**
260:18
**significant (7)**
59:15;93:21;94:6,
18;224:22;254:7,16
**significantly (3)**
37:24;198:10,14
**signifies (1)**
148:16
**signify (2)**
144:17;148:19
**Sign-off (1)**
242:10
**Signori (4)**
223:19,23;224:15;
227:22
**Signori's (2)**
225:23;227:16
**Silva (5)**

snapshot (1)
142:25
so-called (1)
93:8
social (4)
105:25;107:22;
197:22,25
sold (1)
137:3
sole (3)
17:18;32:3;186:8
someone (3)
124:16;125:18;
219:22
sometime (6)
37:4;42:2;71:17;
150:6;192:18;193:23
somewhat (1)
181:22
sorry (31)
18:2;20:23;31:16;
33:15;36:22;37:17;
38:13;41:14;44:14;
56:2;59:21;70:9;77:2;
150:18;165:2;167:10;
176:13;178:4;182:12;
185:22;190:13;
200:13;210:12,14;
214:6;215:15,16,17;
234:19;236:10;
251:20
sort (6)
17:23;46:16;151:5;
186:8;191:23;222:25
sorts (1)
17:23
source (11)
61:3,12,22;119:19;
204:15;206:10,12;
216:8;253:10,11;
258:13
sources (1)
45:9
South (1)
9:11
Sovereign (38)
17:25;18:4;45:15;
47:5;58:2,10,20;
64:17;164:13,20;
165:4;176:22;179:20;
181:13;184:12;186:3,
4,9,16,20;187:20;
189:10,13,15,23;
190:18;191:5,12,16;
198:15;207:8;209:9;
226:8,14,25;227:6;
230:12;231:5
sovereigns (2)
18:9;58:13
space (5)
49:24;78:14;
178:16;190:21;
196:16

165:22;166:14,22;
170:16,23
similar (13)
35:3;66:3;67:9;
78:19;141:8;159:5,5;
170:7;177:15;180:7,
7;206:11;258:2
similarly (2)
179:20;254:3
simple (2)
53:16;67:17
simplifies (1)
86:4
simplistic (2)
80:14,18
simply (2)
84:24;247:2
simulation (1)
218:5
simulations (2)
217:17,20
Singapore (26)
16:18;17:2,2,4,8,9;
18:20;22:16;23:3,8,
13,17,21,25;24:3,7;
25:8;76:2;134:12,22,
23;136:3;138:4;
145:4,6;208:8
Singapore-based (1)
73:25
single (5)
82:5;96:5;97:23;
102:4;162:23
situation (12)
28:16;38:22;70:2,8;
72:2;131:19;132:12;
150:7;158:6;159:4;
175:22;208:22
situations (1)
159:5
six (3)
13:4;55:4;219:25
size (1)
23:19
sizeable (1)
181:11
SKADDEN (2)
3:12;9:21
skepticism (3)
242:17;243:18,22
SKL (4)
237:2,2,12,24
SLATE (1)
3:12
slew (5)
80:5;81:19;84:25;
86:18;152:2
slightly (2)
164:21;175:2
slowdown (1)
52:5
slowly (1)
182:18

Spalding (1)
10:9
spans (1)
51:5
speak (10)
11:17;13:13,16;
82:13;90:21;166:18;
189:4;198:3;230:23;
250:8
speaking (7)
28:11;49:3;95:7;
138:13;152:25;
190:15;216:8
speaks (3)
113:18;162:2;201:5
specially (1)
183:9
specific (50)
26:19;29:23;33:18;
40:11;47:16;49:23;
54:14;65:18;68:25;
70:25;98:22;107:17;
108:3,6;109:2;
116:13;125:5;130:20,
25;131:5,16,20;132:9,
10;152:5;154:13;
162:7;163:10,15,16,
21;166:11;167:6,12;
190:19,23;206:5;
215:3,4;221:13;
223:5,11,13;228:6,6;
241:24;257:13,18,21;
258:18
specifically (21)
12:6;34:24;72:14;
92:25;93:4;95:24;
100:10;112:18;
159:20;177:18;179:7;
180:12;187:15;
189:19;191:14;
213:25;219:15,24;
243:10;245:15;247:7
specifics (10)
30:12;121:16;
122:6;167:19;172:5,
14;186:22;201:9;
215:2;221:6
specified (2)
121:18,21
speculate (6)
154:22;155:4;
171:10,12;184:5;
213:25
speculation (4)
153:13;156:10;
157:24;160:22
speculations (2)
155:7;158:3
speculative (1)
180:14
spend (1)
202:4
spending (1)

202:14
spent (1)
17:2
sponsored (1)
14:19
sponsors (1)
49:7
spread (15)
57:23;58:8,10,19;
59:11;60:8;107:16;
111:20;187:19;189:9;
198:15;209:8;224:23;
226:13;227:23
Spreads (1)
198:11
sprung (1)
151:2
SRS (2)
224:8,15
ss (1)
260:4
stability (1)
130:11
stack (2)
67:9,20
stage (6)
55:15;56:10;57:14;
58:7;60:15,17
stages (1)
57:8
stakes (4)
190:4,19,23;191:17
stamp (8)
48:15;54:20;63:14;
141:20;206:20;
210:11,17;219:24
stamped (1)
191:22
stamps (19)
20:21;47:14;48:6;
73:9;105:16;140:12;
164:4;168:2;173:5;
195:21;201:23;
219:10;223:20;
228:13;229:24;
232:10;238:20;
240:24;244:16
stand-alone (7)
46:12;108:19,21;
177:19;179:5,19;
226:5
standpoint (3)
46:17;97:9;104:22
stands (1)
173:20
start (3)
67:6;93:6;182:17
started (3)
16:25;82:2;152:6
starting (3)
24:13;135:15;173:8
starts (1)
20:25

State (14)
9:25;10:20;54:10;
146:9,12;151:2;
224:2;233:3,17,25;
234:4;251:12;260:3,
22
stated (20)
25:22;70:17;74:7;
135:23;146:13,25;
149:9;155:3;161:8;
168:15,17,22;193:18;
198:4;200:17;207:21;
225:21;237:8;248:6;
256:22
statement (18)
49:9;60:22;64:24;
65:6;91:3;171:7;
175:14;188:8;189:19;
197:3;200:23;207:18;
216:15;219:2;225:11;
231:16;252:18;
253:17
statements (47)
65:2;85:12;114:11;
155:21;182:6;184:8;
212:5,17;213:16,20;
214:5,9,17,22;215:7;
216:6,25,25;217:8;
220:18;221:3,11;
222:13;223:9;225:4;
231:20,25;242:7,11,
16;243:11,17,20;
244:4,8;245:3,25;
246:9,14,23;247:3,8;
248:20,24;258:12,13,
15
state-owned (6)
191:19;197:20,24;
205:11;207:10;
234:22
states (30)
35:21;39:10;41:11;
48:15;56:9;57:13;
60:15,25;63:23;66:4;
67:11;105:23;107:7;
112:4;127:21;129:24;
131:8,14;132:14;
149:16;150:21;198:8;
205:8;209:7;213:11;
214:13;224:7,20;
245:19;246:4
stating (3)
217:13;228:18;
232:16
Statoil (1)
100:18
status (7)
105:2;184:13,20;
185:8;186:5,9,11
STEEN (2)
3:3;9:19
Stephen (2)
73:15,16

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL
CASE NO.: 14-cv-9662(JSR)

CHIA-LIANG LIAN
April 27, 2016

**Steve (5)**
73:16;74:3;76:6,7,
14
**Steven (1)**
13:19
**still (7)**
23:8;160:19;
171:22;174:17;
184:16;209:5;212:25
**still-significant (1)**
230:13
**stipulation (1)**
19:16
**stir (2)**
196:19,25
**stock (1)**
256:17
**stood (1)**
214:19
**straightforward (1)**
29:15
**strategic (8)**
27:15;28:23;54:10,
12,15;56:2;207:11;
227:14
**strategies (6)**
27:4,11,22;75:16,
18;171:23
**strategy (8)**
28:2,9;49:6;163:14;
188:20;255:14;
256:16,24
**stream (2)**
205:16,21
**Street (6)**
9:11,14;123:2;
126:22;146:9,12
**strength (1)**
130:8
**stress (3)**
116:5;157:19;
161:25
**strive (1)**
68:9
**strong (3)**
23:22;112:8;209:12
**style (1)**
48:9
**subject (5)**
21:9;173:15;
180:22;192:7;207:12
**subscribed (1)**
260:18
**subsequently (1)**
248:16
**subset (1)**
24:8
**subsidies (3)**
175:22;179:18;
180:4
**subsidizes (1)**
175:23
**substance (1)**

63:5
**substantial (1)**
211:4
**substantive (6)**
88:9,12,23;89:5,13;
141:8
**subsumed (1)**
136:4
**success (2)**
256:15,23
**Sucharow (1)**
9:24
**suffered (1)**
215:25
**sufficient (2)**
142:11;194:14
**suggest (9)**
44:22;90:18;94:21;
186:12;194:22;
212:22;216:21;
233:11;239:19
**suggested (2)**
114:20;233:24
**suggesting (2)**
201:6;242:23
**suggestion (2)**
219:20,21
**suggestions (2)**
214:18;219:13
**suggests (4)**
174:13;182:10;
185:10;218:5
**summarize (1)**
21:23
**summary (6)**
48:11;63:19;211:2;
230:5;241:20,22
**superior (1)**
64:7
**supersedes (1)**
104:12
**supply (1)**
56:23
**supply-side (1)**
56:22
**support (3)**
191:5,12,16
**supposed (2)**
120:16;225:8
**Sure (40)**
9:18;21:7;22:10;
23:22;26:20;29:10;
36:13,15;38:9;43:6;
50:20;53:24;78:10;
92:20;99:17;102:23;
108:6;123:7,17;
136:20;137:5,18;
139:14,18;143:23;
146:24;152:19;
162:17;189:18;
195:13;207:2;224:4;
231:14;233:21,23;
240:12;248:22;

251:14,23;254:13
**surprise (2)**
182:15;247:15
**surprised (2)**
159:11;233:6
**surprises (6)**
170:15,22;171:7,
13;245:22,24
**surrounding (4)**
158:7;160:9;185:7;
228:23
**surveillance (12)**
86:5;87:6,10,11;
88:17;90:12,15;
91:16;92:21;97:21;
111:18;155:17
**Susan (3)**
223:18,23;224:15
**swaps (1)**
57:20
**swirled (1)**
232:21
**switch (1)**
116:15
**switched (1)**
235:7
**System (11)**
9:25;121:17;
136:21;143:25;147:2,
5,7,17;195:13;224:3;
251:11
**systematically (1)**
66:5
**systemically (2)**
191:3,9

**T**

**tabs (1)**
93:18
**tactical (2)**
237:11,13
**talk (2)**
49:18,19
**talked (1)**
169:24
**talking (2)**
235:5;237:10
**talks (1)**
231:9
**tape (1)**
187:5
**targeting (1)**
26:20
**tasked (1)**
222:24
**TCU (2)**
250:11,20
**Teacher's (1)**
224:2
**team (36)**
17:21;18:11,21;
28:22;29:16;36:7;

42:8;46:22;48:18;
50:8;51:24;62:24;
75:10,23;76:2;83:24;
84:20;90:14;99:6;
101:25;106:16;
123:11,12;147:11;
154:18;155:21;167:3;
171:23;192:25;
219:17;221:22;222:4,
22;224:11;239:18;
244:2
**team-based (6)**
32:19;91:14;
192:23;200:5;208:4,
15
**teams (7)**
28:24;57:7;58:5;
66:14;75:16,18;157:3
**team's (1)**
173:11
**technical (5)**
46:17;56:19;71:2;
103:22;234:11
**technicals (3)**
56:14,21;162:8
**Telecom (1)**
76:10
**telephone (1)**
203:8
**telling (1)**
89:4
**tells (5)**
83:5;89:3,8;144:5;
149:10
**ten (1)**
13:6
**ten-year (1)**
164:13
**term (6)**
16:9;27:2;56:18;
93:16;171:12;184:25
**terms (41)**
28:25;34:21;42:18;
46:14;56:23;68:21,
25,25;77:23;78:11;
85:2;91:19;95:2,19;
103:10;109:2;114:10;
115:11;126:7;128:14;
129:4;155:17;162:3;
167:16,19;176:22;
178:15;179:8,21;
188:22;195:11;
207:17;216:21;
219:15;222:25;234:9,
13;235:24;244:6;
255:21;256:15
**testified (11)**
11:3;93:2;110:21;
149:21;152:22;
167:11;214:3,7;
252:7,10,13
**testify (1)**
11:7

**testimony (10)**
12:16;80:2;151:24;
190:14;250:24;
252:20;256:14;257:5;
260:9,11
**thanking (1)**
218:14
**Thanks (2)**
75:14;236:25
**then-available (2)**
88:7;227:12
**then-elections (1)**
167:5
**thereafter (2)**
83:25;150:7
**therefore (10)**
18:12;24:9;92:9;
93:9;106:4;184:7;
209:13;211:18;
216:24;222:10
**thesis (15)**
92:11,13;93:15;
200:6,8;232:25;
233:18,24;234:2;
235:3;236:4,6;
237:25;242:4;255:21
**thinking (3)**
230:8;241:21,23
**third (13)**
73:14;105:23;
112:4;127:21;132:14;
155:23;198:6;209:5;
212:4,16;213:6;
239:4;242:6
**though (4)**
55:23;84:18;
168:18;178:20
**thought (8)**
53:5,10;90:10;
96:22;185:14;206:8;
227:7;235:5
**thoughts (2)**
199:9;207:17
**three (10)**
13:2;30:15;35:25;
38:4,16,22;112:6;
169:24;196:21;225:4
**throughout (1)**
45:21
**throwing (1)**
67:18
**Thursday (2)**
215:20;241:4
**ticket (1)**
142:24
**tickets (1)**
140:20
**till (2)**
40:12;50:5
**timely (3)**
51:9;61:19;241:10
**times (3)**
23:23,24;225:5

Ellen Grauer Court Reporting Co. LLC

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL
CASE NO.: 14-cv-9662(JSR)

CHIA-LIANG LIAN
April 27, 2016

**timestamp (1)**
144:11
**timing (2)**
150:5;243:12
**title (1)**
67:11
**today (4)**
11:5;12:15;176:11,
14
**Today's (2)**
9:10;14:21
**together (4)**
140:15,18;219:13,
20
**told (1)**
178:10
**tone (2)**
76:7,12
**took (6)**
11:5;22:20;83:22;
87:4;151:21;239:21
**top (13)**
61:5;75:12;144:13;
145:17;150:20;
164:20,23;165:3,8;
173:15;229:13;
241:19;246:3
**top-down (10)**
48:20;49:10,14,19,
22;50:2;57:11;78:16,
24;190:17
**topic (1)**
59:19
**topics (1)**
116:16
**Total (11)**
13:5,6;14:23;31:10;
75:14;100:22,23;
101:3,4;213:12;220:4
**totality (2)**
160:10;238:4
**Total's (1)**
101:11
**toward (2)**
255:17;256:8
**towards (6)**
54:9;93:7;147:21;
182:19;184:21;
210:21
**track (1)**
120:24
**trade (43)**
120:16;121:6,9,18;
122:2,8;123:4,6,9,22,
23;124:8;126:6,9,13;
127:2,10,24;128:7;
130:21;131:5;140:20;
141:5,14,24;142:22,
24,25;143:8,14,20;
144:2,6,10;145:20;
146:25;147:5,12,19;
149:7,8;246:25;248:5
**traded (5)**

**trader (22)**
46:8,13;74:16,19,
23;75:2;118:6;
119:11;120:3,19;
121:4,9,10,21,23,24,
25;135:7;147:13;
173:12,13;236:21
**trade-related (1)**
144:21
**traders (7)**
120:11,15;128:19;
135:11,16,19,21
**trades (48)**
24:25;38:19;
117:20,23;118:4,4,16;
119:12,18;120:4,12,
16,25;122:21;124:9,
11;127:23;128:18;
130:11;131:9;132:7;
134:12,24;135:4,9,17,
23,25;136:2,6,8,11;
138:3,10,10;144:20;
147:8,10,12,14;
148:10;192:24;193:5;
194:10,17;195:7;
236:20;247:15
**trading (30)**
27:8;35:22;36:2,7,
11,16,21;37:13;38:6;
41:12;71:4;76:17;
103:16;119:2,6,11,15,
21;121:17;122:7;
124:7;130:7;132:21;
133:23;134:7,16;
136:21;137:21;
143:25;191:24
**trail (5)**
21:8,18;168:15,23;
189:3
**trajectory (3)**
179:9,13;186:13
**trans (1)**
247:10
**transact (1)**
123:19
**transacting (4)**
122:12,13;124:24;
125:24
**transaction (14)**
122:16,21;123:23;
124:25;125:6,10;
126:5,8,9;127:2,10;
142:25;148:21;
164:19
**transactions (13)**
32:18;34:22,25;
38:19;126:12;148:13;
153:22;169:2,12;
193:9;246:25,25;
247:7
**transacts (4)**

**124:2;125:17,24;**
170:3
**transcript (2)**
260:8,10
**transition (9)**
17:14;21:23;22:3,
22;23:4;171:22,25;
193:22;194:2
**treat (1)**
86:20
**tremendous (2)**
183:8;184:3
**trend (1)**
67:23
**trends (5)**
51:8;55:5;58:3;
69:21;78:21
**triggers (1)**
43:19
**trim (4)**
230:10;232:17,20;
233:7
**trimmed (1)**
201:7
**trip (9)**
202:2,3,6,9,10,11,
13,18;203:12
**TRU (1)**
14:24
**true (7)**
85:9;96:15,16;
99:11;227:9;260:10,
12
**Trust (2)**
15:16,17
**truth (4)**
10:14,14,15;242:7
**try (1)**
77:22
**trying (2)**
84:17;193:13
**Tuesday (1)**
239:20
**turn (5)**
35:14;39:2;40:25;
54:17;242:6
**turned (1)**
244:3
**Turning (2)**
112:3;246:3
**two (14)**
13:2;17:10,15;39:9;
49:19;54:9;57:8;
127:5,9;164:18;
182:5;209:13;220:5;
254:18
**type (5)**
46:25;62:6;154:13;
156:18;169:2
**types (6)**
18:9;26:13;40:6;
43:2;169:5;172:19
**typically (19)**

28:25;46:3,4;47:19;
57:16;121:3;122:12;
124:10,24;126:12;
127:9;136:12;137:24;
138:4,10;145:10,14;
147:12;212:11

**U**

**UK (1)**
138:23
**ultimate (4)**
29:5;32:13;33:17;
200:7
**ultimately (9)**
27:7;32:16;37:22;
46:21;67:15;232:24;
233:2,15,16
**umbrella (1)**
136:5
**un- (1)**
111:8
**unaudited (1)**
225:8
**unaware (5)**
101:8;110:18;
111:8;121:15;132:11
**uncertainties (2)**
216:6;230:13
**uncertainty (2)**
186:24,25
**Unconstrained (1)**
14:24
**Uncovering (1)**
196:3
**under (32)**
10:13;11:3;26:22;
31:21;43:16;46:23;
48:15;79:12;114:25;
115:2;118:23;136:4;
140:2;144:13;149:15;
181:25;183:6,7;
184:3,22;185:15;
207:4;209:6;210:25;
211:2,24,24;212:25,
25;242:8;243:10;
260:9
**underperformance (1)**
21:15
**underpinning (1)**
195:12
**underpriced (2)**
239:8,11
**understood (9)**
11:25;69:24;84:16;
88:21;99:8;102:23;
157:8;181:21;234:4
**undervalued (1)**
64:6
**underweight (3)**
181:11,18;182:18
**UNDERWRITER (2)**
3:13;9:22

**undue (2)**
242:18;243:19,22
**unique (2)**
132:19;169:6
**United (2)**
131:8,13
**universe (1)**
65:20
**University (1)**
16:18
**unless (1)**
12:6
**unlike (1)**
159:24
**unofficial (1)**
163:9
**unqualified (1)**
244:23
**up (21)**
22:20;43:12;47:22;
50:11;65:11;67:9,19;
76:10;116:19,20;
127:3;150:25;163:20;
170:10;174:16,19;
180:17,21;188:14;
226:12;236:3
**upcoming (1)**
167:5
**update (10)**
93:18;206:22;
211:22;212:22,22;
241:8,10,13;242:2;
243:7
**updated (1)**
111:19
**updates (2)**
27:4;28:12
**upon (6)**
157:17;161:13;
172:20;244:3;252:7;
256:14
**upset (1)**
192:20
**upside (7)**
160:2;170:15,22;
171:7,12;183:8;184:3
**up-to-date (1)**
44:7
**upward (1)**
179:14
**USD (2)**
242:21;243:4
**use (10)**
16:9;48:21;93:16;
119:12,17;130:24;
131:21;132:9;147:7;
174:2
**used (14)**
127:9;142:21;
144:20;145:23;146:3;
171:13;197:21,25;
205:15,20;213:21;
217:16;233:22;

246:19

**uses (2)**
49:6;128:18

**using (3)**
48:19;90:19;163:11

**usual (1)**
69:25

**usually (2)**
43:11;138:14

**UW (1)**
181:11

**V**

**Vale (7)**
101:19;102:4,8;
103:5,7;104:4,16

**Vale's (3)**
101:22;102:18;
105:6

**valuation (11)**
29:18;51:24;64:12;
65:17,17;111:14;
153:21;234:11;
239:15;254:22;
256:17

**valuations (13)**
46:14;52:12,14;
53:8,16;97:7;102:14;
103:21;104:9;116:6;
162:8;181:15;254:3

**valuation's (1)**
104:25

**value (54)**
53:11;56:14;58:24;
64:2,8,10;65:9,13,19,
22;66:9,18,21;68:15;
69:7,11,18;70:3,14;
111:15;162:5;198:9;
214:23;225:2;239:6;
240:4;251:17;252:2;
253:2,5,6,7,13,21,25;
254:11,19;255:7,7,9,
15,16,16,17;256:4,8;
257:14,17,24,25;
258:2,9,9,14

**values (4)**
66:12;67:8;220:10,
14

**variables (1)**
217:21

**various (1)**
158:8

**vary (1)**
27:12

**verbal (4)**
11:12;43:11,15;
120:9

**verbally (1)**
251:19

**versa (1)**
233:21

**versus (5)**

57:17,18,19,20;
237:18

**via (1)**
120:10

**vice (1)**
233:21

**victory (3)**
166:14,22;181:14

**video (1)**
9:6

**VIDEOGRAPHER (13)**
9:4;10:8;72:21,24;
117:2,12;154:6,9;
187:7,10;240:13,16;
259:4

**view (71)**
49:15;50:17,23;
51:13,17,19;65:12;
70:14;80:8,20;81:2,6,
8,11,14;90:21;91:10;
94:23;110:4;113:8;
155:5,14;156:9;
157:7;158:2;159:11;
160:6,14;161:11;
163:4,17;166:7,21;
170:24;176:7,14;
182:16,22;184:8;
187:17;188:4,24;
189:2;190:10,18;
191:3,8,11;199:8,13,
14,16,18,20,22;
200:22;205:24;207:9,
14,16;209:11;216:4;
227:10;231:2;238:7,
11;239:14,14;242:22;
243:21,25

**viewed (5)**
166:15;180:5;
229:2,15;243:4

**views (7)**
165:24;199:9;
200:20;211:14;
235:10,24;241:4

**violations (2)**
100:14;101:5

**volatility (1)**
216:9

**vulnerability (2)**
217:14;218:3

**W**

**WA (1)**
206:22

**Wacker (1)**
3:14

**wait (1)**
184:24

**Wall (2)**
123:2;126:22

**Walsh (3)**
73:15,16;74:4

**ward (4)**

233:2,17,25;234:3

**watchers (1)**
205:14

**way (30)**
43:23;49:12;51:14;
80:15,20;81:11;86:4,
20;95:3,20;105:9;
111:18;123:22;127:3;
128:7;131:17;138:16;
139:5,7,11;143:16;
166:12;176:20;
194:22;208:21;209:2;
245:10;255:13;
256:22;258:18

**ways (3)**
127:6,9,11

**weaker (2)**
217:18,24

**weakness (2)**
218:19,21

**weaved (2)**
108:20;109:4

**website (3)**
63:15;105:17;
150:15

**Wednesday (3)**
9:2,10;117:9

**week (3)**
12:23;22:13;202:4

**weeks (3)**
13:2;150:22;224:24

**Western (293)**
10:7,23;14:5,5,19,
23,25;15:3,9,19,24;
16:4,8;17:9,12;20:21;
24:6;25:12,23;26:25;
28:9;29:12;30:24;
31:6,9,12,14,16,19,
22;34:16;35:9,16;
36:3;38:13;39:3;41:2,
12,15,18;44:13,19;
45:3;47:14,22;48:7,
17,25;49:5;50:23;
51:13;52:20;55:10;
56:10;57:4;61:9;62:7;
63:15,19;65:7,11;
66:17;68:4,9,13;69:6,
9,16;71:19;73:9,17;
75:6;76:24;77:4;
79:11,16;81:6;82:9;
86:24;87:17;88:5;
90:4,21;91:9,24;
92:12;93:14,17,20;
94:6,17;95:11;96:18;
97:11;98:10,15,17;
100:17,21;101:12,18;
102:7,20;104:15;
105:17;107:9,13;
109:6,12,22;110:7,10,
22;111:4,5,9;112:8,
16;113:2,12;114:2;
115:6,21;117:18,22;
118:10,16,23,25;

119:8,23;120:18,25;
122:6,11,18,22,25;
123:11,15;124:2,15,
23;125:17,23;127:3,7,
17,22;128:17,18;
130:2,5,15,24;131:2,
20,23;132:9,15,21,23;
133:2,21;134:5,15,25;
136:8,16,18,23;137:2;
138:18,18,23;139:21;
140:3,12;142:4,9,15;
143:17;144:23;
145:10,14;147:18;
148:20;152:8;153:6,
18;154:14;155:3,13;
156:9,19;157:7,15;
158:2;160:14;161:2,
9,10,13;162:14;
163:17;164:4,12,25;
165:10,23;166:7;
168:2,25;169:11;
170:2,24;172:19;
173:5,25;174:4,6;
181:25;182:22;
187:23;188:19;189:2;
190:10,24;191:8;
195:9,21;199:14,16;
200:6;201:23;204:4;
205:19,24;206:20;
209:15;210:11,18;
211:6,14;214:20;
219:11;220:16;221:9,
15;222:11;223:20,25;
224:3;225:18;227:4,
10;228:13;229:2,15,
24;231:17;232:10;
235:25;238:6,20;
240:24;243:4;244:6,
16;245:4,23;246:7,
21;247:9,20,24;248:2,
20,25;249:16;250:19;
251:17;254:23;255:7,
13,14,21;256:15,23,
24;257:23;258:8,18

**Western's (3)**
207:14;241:20,23

**Wharf (1)**
76:9

**what's (1)**
206:18

**whenever (1)**
72:8

**whispers (1)**
231:9

**whole (22)**
10:14;59:25;67:17;
81:19;84:25;86:18;
88:16,17;96:14,16;
97:20;104:22;114:24;
115:4,12;154:20;
163:18;235:18;
245:14;247:17;249:7;
258:4

**Whoops (2)**
201:12,16

**widened (1)**
198:14

**widening (1)**
224:23

**Wilfred (6)**
173:11;174:17;
175:3;180:19,25;
236:15

**win (2)**
170:16,23

**wins (1)**
170:14

**Withdrawn (4)**
126:20;150:19;
165:2;255:5

**within (8)**
49:24;85:10;91:22;
121:16;122:6;152:4;
190:21;196:16

**without (17)**
13:22;38:15;60:19;
82:5;85:12;94:3;
112:7;192:21;193:5,
10;194:10,18;195:7;
242:18;243:19,22;
248:4

**witness (253)**
10:4,16;18:4;19:5;
20:6;21:17;22:2;
23:11;24:5,16;26:2,9,
16;27:10;28:11,21;
29:9;32:10;33:8;
34:19;37:18;39:22;
40:11,23;42:8;43:6,
23;45:13,24;48:11;
49:18;50:20;51:5,16,
22;52:12,25;53:15;
54:5;55:13,19;56:7,
21;58:16;59:6,14;
60:11;61:15,25;
62:19;64:10;66:20;
67:15;68:8,20;69:14;
70:22;71:8,22;74:6;
75:20;76:2;77:8;21;
78:10;79:7;80:3,12,
25;81:25;82:13,25;
83:22;84:22;85:8;
86:3,15;87:4,20;
88:16;89:7,16;91:2,
13;92:17;93:6,25;
94:10,21;95:14;
96:13,21;97:15;98:5,
19;99:17,25;100:9;
101:8,15,24;102:11,
23;103:19;104:6,19;
107:3,20;108:11;
109:9,15;110:14;
111:14;112:20;113:5,
15;114:7,19;115:9;
116:4,21,24;117:25;
118:6,13,19;119:5,14;

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL
CASE NO.: 14-cv-9662(JSR)

CHIA-LIANG LIAN
April 27, 2016

120:2,14,23;122:5,16;
123:17;124:5,18;
125:4,13,20;126:5,17;
128:13,24;129:20;
131:16;132:5;133:11,
18;134:2,10,19;
135:13;137:5,11,18,
24;138:13;139:11;
141:23;142:18,24;
143:23;149:3;150:5;
151:8,15,25;152:12;
153:12;154:17;155:9;
156:12,23;157:11,19;
158:6,21;159:4,23;
160:8,18;161:5,15,24;
162:17;165:7,13;
166:3,18;167:2;
168:9,14,22;169:4,18;
170:6,20;171:4,9;
172:11;174:9;175:12,
21;179:3;181:4;
182:5;185:19;186:7;
187:6;188:2;189:17;
190:2,15;194:21;
195:3;206:3,14;
208:4,20;209:19;
210:2;211:9;212:20;
215:2;217:4;220:21;
222:20;228:3;229:7;
232:4;233:10;234:20;
236:19;237:16;238:3,
14;239:13;240:11;
241:7,16;243:7,25;
244:10;245:8,14;
249:6;250:14;253:9,
23;254:21;255:19;
256:10,20
**witness's (2)**
151:24;190:14
**Wong (6)**
173:11;174:17;
175:3;180:19,25;
236:15
**word (4)**
92:20;163:19;
231:8;246:19
**words (3)**
139:17;184:6;
233:20
**work (4)**
17:23;43:2;196:8,
11
**worked (3)**
18:12;19:2;24:2
**Workers' (2)**
183:12,15
**working (1)**
196:13
**world (4)**
52:18;149:13;
217:23;218:7
**Worldwide (1)**
31:22

worse (1)
151:4
**worth (1)**
225:19
**write (5)**
43:10;108:9;192:6;
222:12;223:7
**write-offs (1)**
231:19
**writes (12)**
164:17;170:9;
174:17;183:4;184:11;
188:24;197:14;
204:11;229:13;239:5;
241:19;244:21
**writing (2)**
43:14;75:6
**written (4)**
61:16;62:5;201:5;
209:2
**wrote (30)**
75:12;76:6;165:18;
175:3;181:8;185:14;
187:16;189:7;193:3,
12;196:18;201:10;
206:7;207:6;209:24;
210:25;215:19;
216:10;218:15;230:4,
4,6;231:11;233:14;
234:25;236:25;237:8;
239:18;242:9;243:15

**Y**

**year (11)**
16:21;17:5,15;23:4;
55:4;71:18;92:6;93:7;
172:2;218:23;236:13
**years (5)**
17:3,10,15;220:5;
257:15
**Yep (1)**
168:22
**Yesterday (1)**
12:25
**yesterday's (1)**
206:23
**yield (1)**
21:12
**York (6)**
3:6,6;9:15,15;
129:10,11

**Z**

**zone (2)**
136:6;138:5
**zones (1)**
18:13

**0**

**00002654 (1)**

173:5
**00005196 (1)**
168:2
**000148588 (1)**
210:18
**00015200 (1)**
20:21
**00060458 (1)**
73:10
**00069827 (1)**
240:24
**00104263 (1)**
228:13
**00119691 (1)**
229:24
**00125668 (1)**
201:23
**00127157 (1)**
232:10
**00130393 (1)**
238:20
**00134498 (1)**
204:4
**00138142 (1)**
206:20
**00458 (1)**
219:24
**00930985 (1)**
244:16
**01 (1)**
17:6
**01199936 (1)**
164:4
**01203947 (1)**
195:21
**01497891 (1)**
47:14
**01508335 (1)**
223:20
**01600457 (1)**
219:11
**01977767 (1)**
140:12
**01977866 (1)**
140:12
**05 (2)**
17:6,7
**0573 (1)**
148:16
**0987 (1)**
244:16

**1**

**1 (30)**
14:13,17;21:22;
22:2,10,14;30:16,22;
32:2;35:15;40:20;
48:6;72:22;76:5;
103:3;131:25;137:9,
15;138:20;144:4;
169:10,22;194:12,19;
220:3;231:22;236:7,

10,14;248:2
**1:36 (1)**
117:10
**10 (7)**
31:9,25;48:15;
127:13,17;242:21;
243:4
**10:25 (1)**
74:11
**100 (2)**
140:15;226:14
**10004 (1)**
3:6
**100-year (4)**
246:12;247:19;
248:8,14
**102 (1)**
216:2
**11 (4)**
60:24;140:7,11;
144:5
**11:13 (1)**
72:22
**11:33 (1)**
73:2
**12 (6)**
150:10,14;155:2,
23;156:13;225:9
**12:42 (2)**
117:3,4
**125678 (1)**
201:24
**126 (1)**
9:14
**127160 (1)**
232:10
**13 (3)**
163:23;164:3;
215:20
**1336 (1)**
117:14
**14 (3)**
73:23;167:21,25
**143 (1)**
206:20
**1436 (1)**
154:7
**1449 (1)**
154:10
**148588 (1)**
210:22
**14-CV-9662 (1)**
9:8
**15 (4)**
14:9;172:24;173:4;
187:14
**150 (1)**
209:10
**15213 (1)**
20:22
**1542 (1)**
187:8
**155 (1)**

3:14
**1556 (1)**
187:12
**16 (4)**
14:9;20:25;195:16,
20
**17 (7)**
15:14,14,17,20;
201:18,22;210:24
**1729 (1)**
240:14
**1743 (1)**
240:18
**18 (7)**
203:23;204:3;
205:3;206:7,21;
224:8;225:17
**1809 (1)**
259:5
**19 (3)**
173:16;204:21,25
**1993 (1)**
16:18

**2**

**2 (27)**
14:13,15;15:13;
21:22;22:3;30:16,22;
31:25;33:19,24;39:2;
72:25;73:8;103:3;
124:10;127:18;
131:25;137:9,15;
138:21;145:9;169:10,
22;194:13,19;215:24;
219:23
**2.5 (2)**
225:15,19
**2.7 (1)**
220:11
**2:43 (1)**
238:25
**20 (3)**
202:25;206:15,19
**20_ (1)**
260:19
**200 (3)**
226:15;227:5,22
**2000 (1)**
16:22
**2001 (1)**
17:5
**2010 (10)**
14:9;36:25;51:13;
141:15,15,24,25;
143:3;149:9;257:15
**2011 (4)**
17:7,9;24:6,14
**2012 (5)**
72:5;73:8;74:11,15;
75:10
**2013 (2)**
101:6;127:19

Ellen Grauer Court Reporting Co. LLC

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL
CASE NO.: 14-cv-9662(JSR)

CHIA-LIANG LIAN
April 27, 2016

**2014 (82)**
17:16;22:6,7,23;
23:2;25:7;36:17,20;
39:15,17;59:10,20,21;
82:2,14;83:23;84:8,
23;87:2,18;88:14;
89:12;90:7;91:8;92:2,
7,14;93:4;96:25;
97:25;98:12;109:7,
15;113:12,25;115:7,
21;116:10;150:6,17;
151:6,8,13,16;152:15,
19,23;153:3;157:13;
164:11;165:24;166:8;
167:3,8,13;170:25;
172:2;180:9;182:23;
185:6,12;192:19;
195:25;196:4,21;
201:10,25;202:13;
203:13;204:9;208:17;
210:24;211:15;212:4,
10,17;215:21;223:19;
224:8;225:17;236:7;
257:15
**2015 (22)**
14:9;17:17,18;
20:20,25;21:3;22:15;
23:2;50:5;90:8;
153:19;193:24;
228:17;231:22;
232:15;236:11,14;
238:25;241:4;246:13;
247:11,20
**2016 (4)**
9:2,10;35:11;117:9
**2019 (1)**
173:18
**2023 (2)**
168:11,18
**2025 (1)**
165:14
**2040 (2)**
141:14;215:25
**21 (3)**
210:6,10,17
**212.225.2000 (1)**
3:10
**22 (9)**
23:21;31:12,25;
204:8;207:3;219:4,8;
232:15;247:11
**23 (6)**
23:22;31:14,25;
150:17;223:14,18
**2321 (1)**
146:14
**24 (6)**
20:20;21:2;31:21,
25;228:8,12
**2485 (1)**
149:17
**25 (4)**
223:19;228:17;

229:19,23
**26 (2)**
232:5,9
**2654 (1)**
191:22
**2655 (1)**
187:15
**2656 (2)**
181:8;182:10
**2657 (1)**
180:18
**2658 (3)**
173:5,9;174:17
**27 (5)**
9:2,10;117:9;
238:15,19
**28 (2)**
240:19,23
**29 (3)**
195:25;244:11,15

**3**

**3 (24)**
14:13;16:2;30:16;
34:3,7;40:21,25;
103:3;117:13;124:10;
131:25;137:9,15;
138:21;169:11,22;
174:19;187:8;194:13,
19;216:2;220:3;
225:15,19
**30 (2)**
127:18;225:10
**31 (1)**
74:11
**312.407.0903 (1)**
3:18
**32 (2)**
127:20;219:8
**33 (2)**
132:13;148:3
**3310 (2)**
21:10,11
**34 (2)**
31:19,25
**38 (1)**
164:4
**385 (1)**
10:23
**394 (1)**
238:20
**3947 (1)**
200:13
**3949 (1)**
198:7
**3950 (1)**
195:21

**4**

**4 (8)**
20:11,16,19;

141:14,24;174:20;
187:11;240:14
**4264 (1)**
228:13
**460 (1)**
75:13
**4th (2)**
143:2;149:8

**5**

**5 (7)**
35:4,5,9;198:16;
240:17;259:5,5
**5:53 (1)**
228:17
**50 (1)**
226:14
**5197 (1)**
168:2
**52 (3)**
14:22;15:2,8
**5670 (1)**
202:7
**5675 (1)**
202:8
**56th (1)**
9:14

**6**

**6 (7)**
35:15;47:9,13;
48:14;198:17;215:25;
238:24
**6:09 (1)**
259:7
**6:22 (1)**
195:25
**600463 (1)**
219:11
**60459 (1)**
74:13
**60463 (1)**
73:10
**60606-1720 (1)**
3:15
**69831 (1)**
240:24

**7**

**7 (9)**
33:10;35:11;54:19,
20;60:24;63:8,9,13;
215:24
**7/8 (1)**
215:25
**7894 (1)**
48:6
**7899 (1)**
48:15
**7900 (1)**

54:20
**7907 (1)**
47:14

**8**

**8 (5)**
41:2;61:5;73:3,7;
145:8
**8:56 (1)**
232:15
**8336 (1)**
223:20
**835 (1)**
223:20
**865 (1)**
9:11

**9**

**9 (7)**
31:5,25;105:11,15;
141:15,25;241:4
**9:33 (2)**
9:3,5
**900 (1)**
220:10
**91101 (1)**
10:24
**93 (2)**
17:3;216:2
**9694 (1)**
229:24
**97 (2)**
17:3,4
**97767 (1)**
141:21
**99937 (1)**
164:5

# EXHIBIT 3

*IN RE PETROBRAS SECURITIES LITIGATION*

---

*STEVEN SARUWATARI 30(b)(6)*
*April 13, 2016*
*CONFIDENTIAL*

---



**ELLEN GRAUER**
COURT REPORTING CO. LLC

126 East 56th Street, Fifth Floor  New York, New York 10022
P: 212-750-6434   F: 212-750-1097
www.ellengrauer.com

*Original File 112320.TXT*
*Min-U-Script® with Word Index*

**Page 1**

1  UNITED STATES DISTRICT COURT

2  SOUTHERN DISTRICT OF NEW YORK
   ----------------------------------------x

3  IN RE PETROBRAS SECURITIES LITIGATION

4  This Document Applies To:

5  ALL CASES

6  CASE NO.: 14-cv-9662(JSR)

7  ----------------------------------------x

8  * * * C O N F I D E N T I A L * * *

9

10                One Liberty Plaza
                  New York, New York

11                April 13, 2016
                  9:39 a.m.

12

13

14          VIDEOTAPED DEPOSITION of 30(b)(6)

15  and 30(b)(1) Witness, STEVEN SARUWATARI, before

16  Melissa Gilmore, a Shorthand Reporter and

17  Notary Public of the State of New York.

18

19

20

21

22

23          ELLEN GRAUER COURT REPORTING COL LLC
            126 East 56th Street, Fifth Floor

24          New York, New York 10022
            212-750-6434

25          REF:  112320

**Page 2**

1  A P P E A R A N C E S :

2

3  QUINN EMANUEL URQUHART & SULLIVAN, LLP

4  Attorneys for Plaintiffs Western Asset, PIMCO

5  and the Witness

6       865 South Figueroa Street, 10th Floor

7       Los Angeles, California 90017

8  BY:  HARRY A. OLIVAR, JR., ESQ.

9       RYAN LANDES, ESQ.

10      PHONE 213-443-3176

11      FAX 213-443-3100

12      E-MAIL harryolivar@quinnemanuel.com

13           ryanlandes@quinnemanuel.com

14

15

16  GRANT & EISENHOFER P.A.

17  Attorneys for Plaintiffs in Transamerica and

18  INKA Actions

19      123 Justison Street

20      Wilmington, Delaware 19801

21  BY:  DAVID M. HAENDLER, ESQ.

22      PHONE 302-622-7192

23      FAX 302-622-7100

24      E-MAIL dhaendler@gelaw.com

25

**Page 3**

1     A P P E A R A N C E S :  (Cont'd)

2

3  CLEARY GOTTLIEB STEEN & HAMILTON LLP

4  Attorneys for Petrobras Defendants

5  One Liberty Plaza

6  New York, New York 10006-1470

7    **BY:** LUKE A. BAREFOOT, ESQ.

8  DANIELLE P. MINDLIN, ESQ.

9  PHONE 212-225-2829

10 FAX 212-225-3999

11 E-MAIL lbarefoot@cgsh.com

12    dmindlin@cgsh.com

13

14

15

16

17

18

19

20

21

22

23

24

25

**Page 4**

1     A P P E A R A N C E S :  (Cont'd)

2

3  SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

4  Attorneys for Underwriter Defendants

5       155 North Wacker Drive

6       Chicago, Illinois 60606-1720

7  BY:  MARIANNE H. COMBS, ESQ.

8       PHONE 312-407-0837

9       FAX 312-827-9451

10      E-MAIL marianne.combs@skadden.com

11

12

13  LABATON SUCHAROW

14  Attorneys for Employees' Retirement System of

15  the State of Hawaii

16      140 Broadway

17      New York, New York 10005

18  BY:  BARRY MICHAEL OKUN, ESQ.

19      PHONE 212-907-0846

20      FAX 212-883-7046

21      E-MAIL bokun@labaton.com

22

23  ALSO PRESENT:

24      DAN MACOM, Videographer

25

Page 5

```
1  ------------------- I N D E X -------------------
2  WITNESS          EXAMINATION BY            PAGE
3  STEVEN SARUWATARI  MR. BAREFOOT   12, 287, 291
4                     MR. HAENDLER          286
5                     MR. OKUN              287
6
7
8  ---------------- E X H I B I T S ----------------
9  WESTERN ASSET    DESCRIPTION          FOR I.D.
10 Exhibit 1        Amended Notice of        19
11                  Subpoena for Testimony of
12                  Western Asset Management
13                  Company
14 Exhibit 2        Plaintiffs in PIMCO Funds  19
15 Exhibit 3        Notice of Rule 30(b)(6)    19
16                  Deposition of Plaintiffs
17 Exhibit 4        Amended Notice of Rule     31
18                  30(b)6) Deposition of
19                  Steve Saruwatari
20 Exhibit 5        Subinvestment Management   46
21                  Agreement, Bates Stamped
22                  WESTERN01986013 through
23                  1986034
24
25
```

Page 6

```
1  ------------ E X H I B I T S (Cont'd) -----------
2  WESTERN ASSET    DESCRIPTION          FOR I.D.
3  Exhibit 6        Investment Management      64
4                   Agreement, Bates Stamped
5                   BWC00002153 through 2174
6  Exhibit 7        Subadvisory Agreement,     69
7                   John Hancock Funds II,
8                   Bates Stamped
9                   PBR-JH-00000790 through
10                  799
11 Exhibit 8        Sample Request for         72
12                  Proposal, Bates Stamped
13                  WESTERN01497891 through
14                  1497907
15 Exhibit 9        Form ADV - Part 2          78
16 Exhibit 10       Morgan Stanley - Global    86
17                  Advisor Research, Bates
18                  Stamped WESTERN00052465
19                  through 52517
20 Exhibit 11       The Western Asset Funds    94
21                  Amended Responses to
22                  Defendants'
23                  Interrogatories
24
25
```

Page 7

```
1  ------------ E X H I B I T S (Cont'd) -----------
2  WESTERN ASSET    DESCRIPTION          FOR I.D.
3  Exhibit 12       Our Philosophy -          121
4                   Portfolio Management -
5                   Western Asset
6  Exhibit 13       Summarized Analysis of    132
7                   Petrobras Securities,
8                   Bates Stamped
9                   WESTERN01481078
10 Exhibit 14       E-Mail With Attachment,   138
11                  Bates Stamped
12                  WESTERN01232823 through
13                  1232826
14 Exhibit 15       Emerging Markets: What    178
15                  Forces Are at Work?
16 Exhibit 16       Environment, Social and   181
17                  Governance, Investment
18                  Policy Statement
19 Exhibit 17       E-Mail With Attachment,   185
20                  Bates Stamped
21                  WESTERN01295633 through
22                  12965640
23 Exhibit 18       Trade Confirmation, Bates  210
24                  Stamped WESTERN01977767
25                  through 1977768
```

Page 8

```
1  ------------ E X H I B I T S (Cont'd) -----------
2  WESTERN ASSET    DESCRIPTION          FOR I.D.
3  Exhibit 19       Trade Confirmation, Bates  217
4                   Stamped WESTERN0197795
5                   through 1977796
6  Exhibit 20       Spreadsheet, Bates        221
7                   Stamped WESTERN00001828
8  Exhibit 21       Appendix to Western       237
9                   Asset's Second Amended
10                  Complaint
11 Exhibit 22       Appendix B to Second      238
12                  Amended Complaint of the
13                  John Hancock Funds II
14 Exhibit 23       E-Mail, Bates Stamped     242
15                  WESTERN01353743
16 Exhibit 24       E-Mail, Bates Stamped     245
17                  WESTERN01600452 through
18                  1600463
19 Exhibit 25       E-Mail, Bates Stamped     262
20                  WESTERN01508335 to
21                  1508336
22 Exhibit 26       E-Mail, Bates Stamped     270
23                  WESTERN01757226 through
24                  1757234
25
```

Page 9

```
 1  ----------- E X H I B I T S (Cont'd) -----------
 2  WESTERN ASSET      DESCRIPTION            FOR I.D.
 3  Exhibit 27         E-Mail With Attachment,    273
 4                     Bates Stamped
 5                     WESTERN00075316 through
 6                     75319
 7  Exhibit 28         E-Mail With Attachment,    275
 8                     Bates Stamped
 9                     WESTERN00137773 through
10                     137778
11  Exhibit 29         E-Mail With Attachment,    278
12                     Bates Stamped
13                     WESTERN00069827 through
14                     69831
15  Exhibit 30         Excerpt of Petrobras Form  282
16                     20-F
17
18
19              (EXHIBITS TO BE PRODUCED)
20
21
22
23
24
25
```

Page 11

1 　**MS. COMBS:** Marianne Combs for the
2 underwriter defendants.
3 　**MR. HAENDLER:** David Haendler for
4 the Transamerica plaintiffs.
5 　**MR. OKUN:** Barry Okun of Labaton
6 Sucharow for the Employees' Retirement
7 System of the State of Hawaii.
8 　**MR. LANDES:** Ryan Landes with Quinn
9 Emanuel for Western Asset.
10 　**MR. OLIVAR:** Harry Olivar, Quinn
11 Emanuel, for the PIMCO and Western Asset
12 plaintiffs and the witness.
13 　**MR. OKUN:** Before we get started, I
14 just want to state something for the
15 record.
16 　As I said, I represent the
17 Employees' Retirement System of the State
18 of Hawaii. We only got notice of this
19 deposition yesterday. We are here,
20 obviously, but we reserve all our rights
21 with respect to questions that do concern
22 or may concern our client, Hawaii, or its
23 investments or that may affect -- or that
24 could affect Hawaii's claims.
25 　**THE VIDEOGRAPHER:** May our court

Page 10

1 　P R O C E E D I N G S
2
3 　**THE VIDEOGRAPHER:** This is tape one.
4 We are now on the record. The time is
5 9:39 a.m. Today is Wednesday, April 13,
6 2016.
7 　This is the opening of the
8 deposition of Mr. Steven Saruwatari in the
9 matter of In Re Petrobras Securities
10 Litigation.
11 　This deposition is being held at the
12 offices of Cleary, Gottlieb, Steen &
13 Hamilton, which is located at One Liberty
14 Plaza in New York, New York.
15 　Our court reporter today is
16 Ms. Melissa Gilmore with Ellen Grauer
17 Court Reporting. I'm the legal
18 videographer, Dan Macom, also with Ellen
19 Grauer Court Reporting.
20 　Wound counsel please introduce
21 themselves and state whom they represent
22 for the record?
23 　**MR. BAREFOOT:** Luke Barefoot and
24 Danielle Mindlin for the Petrobras
25 defendants.

Page 12

1 reporter please swear in the witness?
2 S T E V E N  S A R U W A T A R I,  called
3 as a witness, having been duly sworn by a
4 Notary Public, was examined and testified
5 as follows:
6
7 EXAMINATION BY
8 　**MR. BAREFOOT:**
9 Q. Good morning Mr. Saruwatari.
10 A. **Good morning.**
11 Q. Could I ask you to state your name
12 　for the record?
13 A. **Steven Saruwatari.**
14 Q. And your business address?
15 A. **385 East Colorado, Pasadena, 91101,**
16 　**State of California.**
17 Q. Have you ever been deposed before?
18 A. **No.**
19 Q. Do you understand that the oath that
20 　our court reporter has just administered has
21 　the same effect as an oath given if you were
22 　testifying before a judge or a jury?
23 A. **Yes.**
24 Q. Since you haven't been deposed
25 　before, let me just go over a few rules of the

Page 13

SARUWATARI - CONFIDENTIAL
2  road so we're clear on how we will proceed
3  today.
4      Our court reporter is recording
5  everything that's being said, so I'd ask that
6  you please give verbal answers.  Is that okay?
7  A.  Sure.
8  Q.  And I will ask you to please refrain
9  from using uh-huh or uh-uh because those can be
10  difficult to record.  Is that okay?
11  A.  Yes.
12  Q.  I will ask that we only speak one
13  person at a time.  So please let me finish my
14  question before you begin your answer and I'll
15  allow you to finish your answer before I move
16  on to the next question.  Okay?
17  A.  Yes.
18  Q.  Your counsel may have objections to
19  the form of our questions from time to time.
20  Please let him an opportunity to get those
21  objections stated, but then unless you are
22  instructed otherwise, you can go ahead and
23  answer.  Okay?
24  A.  Okay.
25  Q.  If, at any point today, you don't

Page 14

SARUWATARI - CONFIDENTIAL
2  understand any of my questions, please let me
3  know.  If you go ahead and answer the question,
4  I'll assume that you have understood.  Okay?
5  A.  Okay.
6  Q.  At any point today, if you would
7  like to take a break, please let us know.  We
8  are happy to accommodate that.
9      My only request would be that if
10  there's a question pending, that you answer the
11  question that's pending before we break.  Okay?
12  A.  Yes.
13  Q.  Mr. Saruwatari, what did you do to
14  prepare for today's deposition?
15  A.  I spoke to numerous people at
16  Western Asset and I met with counsel.
17  Q.  Who did you speak with at Western
18  Asset?
19  A.  Keith Gardner, former head of
20  emerging markets debt.
21      Chia-Liang Lian, current head of
22  emerging markets debt.  Chia-Liang Lian, so
23  C-H-I-A, dash, L-I-A-N-G, space, L-I-A-N.
24      Mark Hughes, senior research analyst
25  on the emerging markets debt team.

Page 15

SARUWATARI - CONFIDENTIAL
2      Kevin Ritter, portfolio manager on
3  the emerging markets debt team.
4      Adam Wright, he's one of our
5  attorneys.  And I spoke to Harry and Ryan.
6      I think that covers all of the folks
7  I spoke to.
8  Q.  Over what period of time did you
9  speak with the individuals at Western Asset,
10  aside from your outside counsel, in preparation
11  for your deposition?
12  A.  Over the last, say, three weeks.
13  Q.  Did you meet with those individuals
14  together or separately?
15  A.  Sometimes together, but other times
16  separately.
17  Q.  Do you have an estimate of the total
18  amount of time you spent preparing with those
19  individuals for your deposition?
20  A.  I'd say between 20 and 25 hours.
21  Q.  Were there particular subjects or
22  topics that you discussed with some of those
23  individuals rather than others?
24      MR. OLIVAR: And you're leaving out
25  outside counsel?

Page 16

SARUWATARI - CONFIDENTIAL
2      MR. BAREFOOT: Correct.
3  Q.  My question pertains to the
4  individuals at Western Asset rather than Quinn
5  Emanuel.
6  A.  Can you specify -- I mean, yeah, I
7  spoke to each one of those folks, and there was
8  possibly different topics.
9  Q.  Sure.  Let's just go through.
10      Mr. Gardner, what are the topics
11  that you discussed with Mr. Gardner in
12  preparation for your deposition?
13  A.  General investment strategy and
14  investment decision making.
15  Q.  Did you discuss with Mr. Gardner
16  Western Asset's investments in Petrobras
17  specifically?
18  A.  Yes.
19  Q.  And for Mr. Lian, first off, is it
20  all right if we refer to Mr. Lian as C.L.
21  today?
22  A.  Yes.
23  Q.  What were the topics that you
24  discussed with Mr. Lian?
25  A.  A variety of topics, again, he is

Page 17

```
 1      SARUWATARI - CONFIDENTIAL
 2   now the current head, because there was a
 3   change during the period, so similar topics,
 4   investment strategy, investment decision
 5   making.
 6   Q.  And also Western Assets' investments
 7   in Petrobras securities?
 8   A.  Correct.
 9   Q.  What about Mark Hughes, what are the
10   topics you covered with him?
11   A.  Mark Hughes is a senior credit
12   analyst on the desk, and so spoke to him about
13   research, research process and related matters.
14   Q.  Mr. Ritter, what are the topics that
15   you covered with him in preparation?
16   A.  Kevin was a trader at the beginning
17   of the period, and now he is a portfolio
18   manager.  So I spoke to him about similar,
19   trading execution, trading process, investment
20   strategy, investment process.
21   Q.  And Mr. Wright was in-house counsel
22   at Western Asset?
23   A.  Yes.
24   Q.  Turning to your preparation that you
25   undertook with the folks from Quinn Emanuel,
```

Page 18

```
 1      SARUWATARI - CONFIDENTIAL
 2   how long did you meet with them?
 3   A.  Let's see.  We had four meetings.
 4   Say ten hours or so.
 5   Q.  When did those meetings occur?
 6   A.  Over the last three weeks.
 7   Q.  Putting aside for the moment any
 8   documents that you reviewed with counsel, did
 9   you review any documents in preparation for
10   your deposition?
11   A.  Yes, I did.
12   Q.  What were those documents?
13   A.  Trade tickets, e-mails, research
14   reports, marketing materials, probably other,
15   yeah, spreadsheets.
16   Q.  Do you have an understanding of
17   whether all of the documents that you reviewed
18   in preparation for your deposition were
19   produced to the defendants in this action?
20   A.  I'm sorry.  Can you repeat that?
21   Q.  Do you have an understanding of
22   whether the documents that you reviewed in
23   preparation for your deposition were produced
24   to the defendants in this action?
25   A.  Produced for the defendants?
```

Page 19

```
 1      SARUWATARI - CONFIDENTIAL
 2   Q.  Produced to the defendants.  Do you
 3   have an understanding of whether your counsel
 4   has made available the documents that you
 5   reviewed in preparation for this deposition to
 6   Petrobras?
 7   A.  I'm not aware of it.
 8   Q.  Are there any circumstances that
 9   would prevent you from giving your best
10   testimony today?
11   A.  No.
12      MR. BAREFOOT:  I would like to have
13   this marked as Exhibit 1.
14      (Western Asset Exhibit 1, Amended
15   Notice of Subpoena for Testimony of
16   Western Asset Management Company, marked
17   for identification.)
18      MR. BAREFOOT:  I would like to have
19   this marked as Exhibit 2, please.
20      (Western Asset Exhibit 2, Plaintiffs
21   in PIMCO Funds, marked for
22   identification.)
23      MR. BAREFOOT:  I would like to have
24   this marked as Exhibit 3.
25      (Western Asset Exhibit 3, Notice of
```

Page 20

```
 1      SARUWATARI - CONFIDENTIAL
 2   Rule 30(b)(6) Deposition of Plaintiffs,
 3   marked for identification.)
 4   A.  (Perusing.)
 5   Q.  Mr. Saruwatari, if I could have you
 6   turn first to what's been marked as Western
 7   Asset Exhibit 1, the amended notice of 30(b)(6)
 8   deposition of plaintiffs.
 9      Do you recognize this document?
10   A.  Yes.
11   Q.  And you understand that you are
12   testifying today as a representative of Western
13   Asset Management Company?
14   A.  That's correct.
15   Q.  Is it all right if I refer to
16   Western Asset Management Company today as
17   Western Asset?
18   A.  Sure.
19   Q.  If I could ask you to turn to pages
20   two to three of this document, you'll see it
21   reads, "Please take notice that, pursuant to
22   Rules 26 and 30 of the Federal Rules of Civil
23   Procedure."
24   A.  Two and three?
25   Q.  I apologize.  I think I have the
```

Page 21

1     SARUWATARI - CONFIDENTIAL
2  wrong exhibit number.
3     So if I could ask you to turn to
4  Exhibit 3. Excuse me.
5  A.  Yeah.
6  Q.  And turn to pages two to three of
7  Exhibit 3. You'll see it reads, "Please take
8  notice that, pursuant to Rules 26 and 30 of the
9  Federal Rules of Civil Procedure, Defendants
10  Petróleo Brasileiro S.A., Petrobras, Petrobras
11  Global Finance B.V., and Theodore Helms,
12  (together, the Petrobras defendants) will take
13  the deposition upon oral examination," and then
14  it lists a number of entities.
15     Do you see that?
16  A.  Yes.
17  Q.  If I refer to each of those
18  entities, beginning with Western Asset Total
19  Return Unconstrained (TRU) Bond Master Fund,
20  Limited, and ending with, on page three, Legg
21  Mason Western Asset Global Credit Absolute
22  Return Fund as the Western Asset Funds, will
23  you understand that definition for today?
24  A.  Just give me a minute to look
25  through it.

Page 22

1     SARUWATARI - CONFIDENTIAL
2  Q.  Of course.
3  A.  (Perusing.) Ending with Legg Mason
4  Western Asset Global Credit Absolute Return
5  Fund?
6  Q.  Correct.
7  A.  Yes.
8  Q.  So if I refer to each of those
9  entities collectively as the Western Asset
10  Funds for today's deposition, you'll understand
11  that to mean to each of these entities
12  together, correct?
13  A.  Yes.
14  Q.  And you understand that you are
15  testifying today as a representative of these
16  Western Asset Funds?
17  A.  Yes.
18  Q.  If I could ask you to turn to page
19  six of this document, please. You see the
20  heading there Matters on Which Examination is
21  Requested?
22  A.  Uh-huh. Yes.
23  Q.  You see the matter number four under
24  that heading?
25  A.  (Perusing.) Yes.

Page 23

1     SARUWATARI - CONFIDENTIAL
2  Q.  For the moment, I'd like to put
3  aside the second part of matter number four,
4  which reads, "As well as transaction data
5  regarding your transactions in the following
6  categories of non-Petrobras issuers."
7  A.  Okay.
8  Q.  Putting aside that portion of
9  category four, are you prepared and authorized
10  to testify on each of the matters set out in
11  this notice?
12     MR. OLIVAR: If you need to review
13  them, go ahead.
14  A.  (Perusing.) I'm sorry. Am I being
15  asked to confirm that I can testify to these
16  things, the categories and locations of
17  documents, stored information and tangible
18  things in your possession?
19  Q.  Sorry, Mr. Saruwatari. I want you
20  to, for one moment, put aside the second part
21  of category four, which begins, "Transaction
22  data regarding your transactions in the
23  following categories of non-Petrobras issuers."
24  A.  Okay.
25  Q.  Putting aside that subsection of

Page 24

1     SARUWATARI - CONFIDENTIAL
2  topic number four, are you authorized and
3  prepared to testify on behalf of Western Asset
4  and the Western Asset Funds on all of the other
5  matters set forth in this notice?
6  A.  Yes.
7  Q.  And with respect to that second
8  section of category four -- of topic number
9  four that we have been discussing, are you
10  authorized and prepared to testify on behalf of
11  Western Asset and the Western Asset Funds on
12  that portion of that topic?
13  A.  Yes.
14  Q.  If I could ask you to turn back to
15  topic number one, please.
16  A.  Uh-huh.
17  Q.  You will see, at the end there, that
18  there is a time period that references the
19  period from October 16, 2010 through June 15,
20  2015.
21     If I refer to that time period today
22  as the relevant period, will you understand
23  that for purposes of our deposition?
24  A.  Yes.
25  Q.  If I could ask you to turn to page

Page 25

SARUWATARI - CONFIDENTIAL

1　　SARUWATARI - CONFIDENTIAL
2　four of this exhibit.  You'll see that there's
3　a reference there in item ten under the heading
4　Definitions that reads, "Plaintiffs, as used
5　herein, means the Western Asset Funds and the
6　separate account plaintiffs in this action,
7　other than the Western Asset Funds that
8　delegated investment authority to Western
9　Asset."
10　　　If I could ask you to turn now to
11　Exhibit 2, please.  You'll see that Exhibit 2
12　lists 17 different entities, beginning with The
13　Boeing Company Employee Retirement Plans Master
14　Trust and ending with PCS Administration Master
15　Pension Trust.
16　　　Do you see that list?
17　A.  Yes.
18　Q.  Do you understand that Western Asset
19　served as an investment manager for each of the
20　entities listed on this Exhibit 2 during the
21　relevant period?
22　A.  Yes.
23　Q.  And if I refer to all of these
24　entities that are listed on Exhibit 2 today as
25　the separate account plaintiffs, will you

Page 26

1　　SARUWATARI - CONFIDENTIAL
2　understand that for purposes of our deposition?
3　A.  Yes.
4　Q.  Thank you.  You can put those two
5　documents to the side.  And if I could ask you
6　now to turn back to what was marked as
7　Exhibit 1.
8　　　Do you recognize this document?
9　A.  Yes.
10　Q.  And it's the amended notice of
11　subpoena for testimony of Western Asset
12　Management Company, pursuant to which you are
13　also testifying today?
14　A.  Yes.
15　Q.  If I could --
16　　　MR. OLIVAR: I do want to let the
17　witness know one thing.
18　　　These are the official copies of the
19　exhibits.  So if you write something on
20　them, it will be probably on there
21　forever.  So just -- it may be a better
22　idea to take notes on a notepad if you
23　need to rather than you write Exhibit 2,
24　separate account plaintiffs, rather than
25　writing on the actual exhibit.  I don't

Page 27

1　　SARUWATARI - CONFIDENTIAL
2　know if counsel cares, but it might make
3　for a cleaner record.
4　　　MR. BAREFOOT: That's fine.
5　　　THE WITNESS: Thank you.
6　　　BY MR. BAREFOOT:
7　Q.  Turning back to what's been marked
8　as Exhibit 1, if I could ask you to look at
9　page two.  And if I could ask you to look at
10　item number 11 on page two, which reads,
11　"Plaintiffs," and then lists five different
12　entities."
13　　　Do you see that?
14　A.  Yes.
15　Q.  And those entities are Employees'
16　Retirement System of the State of Hawaii,
17　Internationale Kapital mbH, which entity I will
18　refer to in shorthand as INKA, John Hancock
19　Variable Insurance Trust, John Hancock Funds II
20　and Mass Mutual Select Strategic Bond Fund.
21　　　Do you see those five entities?
22　A.  Yes.
23　Q.  And Western Asset also served as an
24　investment manager for each of these five
25　entities during the relevant period; is that

Page 28

1　　SARUWATARI - CONFIDENTIAL
2　correct?
3　A.  Yes.
4　　　MR. OKUN: Objection.  Sorry.  You
5　can answer and did.
6　Q.  And you'll understand if I refer
7　collectively to these five entities today as
8　the other action plaintiffs?
9　　　And I -- could you just answer
10　verbally?  I'm sorry.  The court reporter
11　didn't take down your nod.
12　A.  I'm sorry.  What was the question?
13　Q.  You'll understand if I refer today
14　to these five entities listed in item number 11
15　on page two of Exhibit 1 as the other action
16　plaintiffs?
17　A.  Yes.
18　Q.  And if I could ask you to turn to
19　page four of this document, you'll see that --
20　if I could draw your attention to item number
21　five under the heading Matters on Which
22　Examination is Requested, it's substantially
23　the same as item number four in Exhibit 3 that
24　we just looked at.
25　　　So if I could, again, ask you to put

Page 29

```
1         SARUWATARI - CONFIDENTIAL
2    aside the separate -- the second section of
3    item number five, putting that section aside,
4    are you authorized and prepared to testify on
5    behalf of Western Asset on each of the matters
6    on which examination is requested, 1 through 12
7    in Exhibit 1?
8    A.  Yes.
9    Q.  And with respect, again, to the
10   second half of topic five in Exhibit 1 that
11   begins reading, "Transaction data regarding
12   your transactions made on behalf of these
13   plaintiffs," are you also authorized and
14   prepared to testify on that topic on behalf of
15   Western Asset?
16   A.  You're talking about the second part
17   of number five?
18   Q.  Correct.
19   A.  (Perusing.)  In the following
20   categories of non-Petrobras issuers, is that
21   the part you're talking about?
22   Q.  Correct.
23   A.  (Perusing.)  It's pretty broad.
24   Depends on the question, but yes.
25   Q.  Okay.  Now that we have gotten
```

Page 30

```
1         SARUWATARI - CONFIDENTIAL
2    through that, you understand that all the
3    questions that I'm asking you today will be
4    questions -- withdrawn.
5         You understand that your answers
6    today are binding on Western Asset, correct?
7    A.  Yes.
8    Q.  And you understand that all the
9    questions I'm asking you today on these
10   subjects that we've just looked at are being
11   asked in your capacity as a representative of
12   Western Asset Management?
13   A.  Yes.
14   Q.  And the Western Asset Funds?
15   A.  Yes.
16   Q.  So unless you say otherwise in your
17   answer, or I expressly ask in your question,
18   I'd like to be clear that I will understand
19   your answer as being given in your capacity as
20   a representative of Western Asset and the
21   Western Asset Funds.  Is that okay?
22        MR. OLIVAR:  Objection to the form.
23   A.  Yes.
24        MR. BAREFOOT:  Can I have this
25   marked as Exhibit 4, please?
```

Page 31

```
1         SARUWATARI - CONFIDENTIAL
2         (Western Asset Exhibit 4, Amended
3    Notice of Rule 30(b)6) Deposition of Steve
4    Saruwatari, marked for identification.)
5    Q.  Mr. Saruwatari, do you recognize
6    this document?
7    A.  (Perusing.)  I'm not sure we
8    reviewed this, but if I could take a minute to
9    review it.
10   Q.  Sure.
11   A.  (Perusing.)  I understand it.
12   Q.  And you understand that, pursuant to
13   this Rule Number 4, you're also here to
14   testify in your personal capacity?
15   A.  Yes.
16   Q.  But as we discussed, unless I
17   specifically ask, all of your responses and all
18   of my questions will be directed to your
19   capacity as a representative of Western Asset
20   and the Western Asset Funds?
21   A.  I understand.
22   Q.  Mr. Saruwatari, could you describe
23   your educational background beginning with
24   college?
25   A.  Undergraduate degree at the
```

Page 32

```
1         SARUWATARI - CONFIDENTIAL
2    University of Southern California, and then a
3    graduate degree at UCLA.
4    Q.  What was your degree from USC?
5    A.  Bachelor of science in accounting.
6    Q.  And what year did you graduate with
7    that degree from USC?
8    A.  1987.
9    Q.  And the graduate degree from UCLA,
10   what was that in?
11   A.  Master's in business administration.
12   Q.  And what year did you obtain that
13   degree?
14   A.  2001.
15   Q.  Do you hold any certifications aside
16   from this degree?
17   A.  Yes.
18   Q.  And what are those?
19   A.  Chartered financial analyst.  You're
20   just asking specifically for certification?
21   Q.  Correct.  When did you obtain your
22   certified financial analyst --
23   A.  Chartered.
24   Q.  Chartered financial analyst, excuse
25   me, certification?
```

Page 33

1      SARUWATARI - CONFIDENTIAL
2  A.  2003.
3  Q.  And are you or were you also a CPA?
4  A.  Yes.
5  Q.  When did you obtain your CPA
6  license?
7  A.  1988.
8  Q.  And are you currently an active CPA?
9  A.  Inactive.
10  Q.  When did you become inactive?
11  A.  Several years ago.
12  Q.  And when did you join Western Asset?
13  A.  1994.
14  Q.  Where were you employed immediately
15  before Western Asset?
16  A.  At a company called Spicers Paper
17  Company.
18  Q.  Spicers?
19  A.  Spicers Paper Company.
20  Q.  And what was your position there?
21  A.  Controller.
22  Q.  And how long did you hold that
23  position?
24  A.  About four years.
25  Q.  So approximately 1990 to 1994?

Page 34

1      SARUWATARI - CONFIDENTIAL
2  A.  Yeah.  1991, at the beginning, to
3  the end of 1994.
4  Q.  What were your primary
5  responsibilities as controller at Spicers
6  Paper?
7  A.  Typical responsibilities that a
8  controller has overseeing the finances of a
9  company.
10  Q.  And where were you employed prior to
11  Spicers Paper Company?
12  A.  At Coopers & Lybrand.
13  Q.  What was your position at Coopers &
14  Lybrand?
15  A.  Ended as a senior associate.
16  Q.  Were you on an audit team?
17  A.  Yes.
18  Q.  Did you focus on any particular
19  industries while in an auditing role at Coopers
20  & Lybrand?
21  A.  No.  Very broad.  I had broad
22  experience in various industries.
23  Q.  Did you have auditing responsibility
24  for any oil and gas companies?
25  A.  No.

Page 35

1      SARUWATARI - CONFIDENTIAL
2  Q.  Did you have auditing responsibility
3  for any companies that were headquartered in
4  Brazil?
5  A.  No.
6  Q.  I'm sorry if I asked this.  How long
7  were you at Coopers & Lybrand?
8  A.  About three years.
9  Q.  Three years.  So approximately 1988
10  to 1991?
11  A.  Correct.
12  Q.  Do you speak Portuguese?
13  A.  I do not.
14  Q.  Turning back to Western Asset, when
15  you began working at Western Asset in 1994,
16  what was your position?
17  A.  I'm sorry.  What was that again?
18  Q.  When you began working at Western
19  Asset in approximately 1994, what was your
20  position at that time?
21  A.  I was a financial officer.
22  Q.  What was your primary
23  responsibilities as a financial officer?
24  A.  Similar to controller, just
25  overseeing the finances of Western Asset.

Page 36

1      SARUWATARI - CONFIDENTIAL
2  Q.  So you did not have any
3  responsibilities with respect to Western
4  Asset's investments for its clients?
5      MR. OLIVAR: Objection to form.
6      Go ahead.
7  A.  I did not oversee investments at
8  that time.  It was corporate finances.
9  Q.  How long did you hold that financial
10  officer position at Western Asset?
11  A.  Until 2001.
12  Q.  And what position did you take on in
13  2001?
14  A.  I then joined the product team,
15  developing new products for Western.
16  Q.  What is the role of the product
17  team?
18  A.  The role of the product team has
19  evolved over time as Western has grown.  At
20  that time, it was a very small group that
21  primarily developed new products as Western was
22  growing.
23  Q.  When you say developed new products,
24  developed new investment products for Western
25  Asset clients?

Page 37

SARUWATARI - CONFIDENTIAL

1
2  A.  Yes, and developed retail funds.
3  Q.  Is your current position -- do you
4  still hold the same position at Western Asset?
5  A.  I do not.
6  Q.  What is your current position?
7  A.  I am the emerging markets debt and
8  Asian bond product specialist.
9  Q.  Emerging markets debt and Asian bond
10  product specialist.
11  When did you take on that role?
12  A.  In 2011.
13  Q.  And what are your primary
14  responsibilities in that role?
15  A.  As a product specialist, generally,
16  we are responsible to develop new products,
17  commercialize new products and support all the
18  products in your asset class.
19  Q.  What's entailed in supporting the
20  products in your asset class?
21  A.  Basically, there's a lot of
22  investors in our asset class that need to be --
23  that a relationship needs to be maintained.
24  Client service executives maintain those
25  relationships and interact directly with our

Page 38

SARUWATARI - CONFIDENTIAL

1
2  investors, our clients.
3  And if there's any specific
4  questions regarding emerging markets debt or
5  Asian bonds, they would come to the product
6  specialist and we would help support client
7  relationships.
8  Q.  When you talked about developing new
9  products or commercializing new products, what
10  do you mean by products?
11  A.  What I mean by products is financial
12  products.  So maybe another term would be
13  strategies.
14  Q.  So not necessarily only new funds or
15  new instruments, but strategies used by
16  existing funds?
17  A.  Yeah, instruments is probably not
18  the right term.  It's really -- maybe an
19  example would help.
20  If you're developing a new emerging
21  markets bond fund, that's a strategy.  That
22  strategy has, typically, a benchmark.  Some do
23  not have benchmarks, like in the case of an
24  unconstrained strategy, and you would then
25  liaise with various teams to develop that

Page 39

SARUWATARI - CONFIDENTIAL

1
2  strategy.
3  Q.  Throughout the relevant period that
4  we discussed, have you had any direct
5  investment responsibilities?
6  MR. OLIVAR: Objection to form.
7  You can answer.
8  A.  Yeah, I am a part of the client
9  service and marketing team, and there's another
10  team that is the investment management team.
11  Investment management team has direct
12  responsibility for formulating strategy.
13  Q.  And the client servicing and
14  marketing team that you are a part of does not
15  have that investment responsibility?
16  A.  No.  We are responsible to know what
17  is going on in all of our portfolios, though,
18  yes, but I do not execute trades.
19  Q.  And who do you report to in -- well,
20  let's take it in two pieces.  Sorry.
21  Prior to your new role in 2011, who
22  did you report to?
23  A.  Prior to my new role?
24  Q.  Prior to taking on the role in 2011
25  as the emerging markets debt and Asian bond

Page 40

SARUWATARI - CONFIDENTIAL

1
2  product specialist, who did you report to?
3  A.  Prior to that role, I had another
4  role where I spent four years in our Tokyo
5  office leading the client service and marketing
6  effort there, and I reported to the global --
7  I'm sorry, not global, but international head
8  of client service and marketing, which is
9  different from the global.  International is
10  everything ex-US.
11  Q.  Do you recall when in -- when,
12  approximately, in 2011 you took on the new
13  product specialist role?
14  A.  It was probably middle of 2011,
15  second quarter.
16  Q.  And at that point, you moved back to
17  Pasadena?
18  A.  Yes.
19  Q.  And once you took on that new role
20  and moved back to Pasadena, who did you report
21  to at that point?
22  A.  I should clarify.  I moved back to
23  Pasadena.  Then I was given that role, and I
24  reported to, at that time, the head of
25  products.

Page 41

SARUWATARI - CONFIDENTIAL

1    SARUWATARI - CONFIDENTIAL
2  Q.  Who was the head of products at that
3  time?
4  A.  Don Plotsky.
5  Q.  Is that P-L-O-T-S-K-Y?
6  A.  Correct.
7  Q.  Is he still the head of products?
8  A.  No.
9  Q.  Who is now the head of products?
10  A.  Goran Hagegard.  G-O-R-A-N.
11  Hagegard is spelled H-A-G-E-G-A-R-D.
12  Q.  And you report now to Goran
13  Hagegard?
14  A.  Correct.
15  Q.  When did he become the person to
16  whom you reported?
17  A.  It was December of 2014, I believe.
18  I could be off there, but approximately then,
19  when he was named the head of products.
20  Q.  Are you currently employed by anyone
21  other than Western Asset?
22  A.  I am not.
23  Q.  Do you serve as a member of any
24  boards of directors or boards of trustees?
25  A.  I do not.

Page 42

1    SARUWATARI - CONFIDENTIAL
2  Q.  How much does Western Asset
3  currently have under management?
4  A.  Approximately 400 and -- I think
5  last count was 430 billion.
6  Q.  In general, how has that figure
7  changed over the relevant period?
8    MR. OLIVAR: Objection to form and
9  outside the topics, but go ahead.
10  A.  2010, I want to guess, this was
11  after the crisis, so we were probably at about
12  450 billion through the entire period,
13  approximately.
14  Q.  When Western Asset manages
15  investments or makes purchases and sales of
16  securities for clients, subject to the client's
17  investment guidelines or criteria, Western
18  Asset generally has full discretion to make
19  those investment decisions; is that correct?
20  A.  It really depends on the Investment
21  Management Agreement, because we do have
22  instances where we don't have full discretion.
23  Q.  For each of the separate account
24  plaintiffs that we discussed at the beginning
25  of the deposition, does Western Asset have full

Page 43

1    SARUWATARI - CONFIDENTIAL
2  discretionary investment authority subject to
3  compliance with each of those separate account
4  plaintiffs' investment guidelines or criteria?
5    MR. OKUN: Objection to form.
6    You can go ahead.
7  A.  I would have to say I would have to
8  look at the Investment Management Agreements
9  for these.
10  Q.  Have you reviewed the Investment
11  Management Agreements for the separate account
12  plaintiffs in preparation for today's
13  deposition?
14  A.  No.
15    MR. OLIVAR: Luke, can we have an
16  agreement that an objection by one counsel
17  counts for all?
18    MR. BAREFOOT: Yes.
19    MR. OLIVAR: Thank you.
20  Q.  Do you have an understanding of
21  whether Western Asset is vested with
22  discretionary authority for the other action
23  plaintiffs?
24    MR. OKUN: Objection.
25  A.  Can you repeat the question?

Page 44

1    SARUWATARI - CONFIDENTIAL
2  Q.  Do you have an understanding of
3  whether Western Asset is vested with
4  discretionary authority for the other action
5  plaintiffs?
6    MR. OKUN: And, again, objection.
7  Q.  If it's helpful, the other action
8  plaintiffs were listed in definition number 11
9  in Exhibit 1.
10  A.  (Perusing.)  Again, I'd have to look
11  at the Investment Management Agreements for
12  those.
13  Q.  You indicated that the role that you
14  currently have includes client facing
15  responsibilities?
16  A.  Yes.
17  Q.  Do you review the Investment
18  Management Agreement each time you're speaking
19  with a client about its investments?
20  A.  I don't necessarily review the -- I
21  may, but I review things that are contained in
22  the IMA.
23  Q.  What are the things that are
24  contained in the IMA that you would review?
25  A.  We have an internal system where --

Page 45

SARUWATARI - CONFIDENTIAL
1
2   where clients -- client facing representatives
3   can access and it summarizes things that are
4   contained in the IMA.
5   Q.   What's the name of that system?
6   A.   CARS, C-A-R-S.
7   Q.   Do you know what that stands for?
8   A.   I used to, but I don't now.
9   Q.   What are the things that are
10   contained in the CARS system that are drawn
11   from the Investment Management Agreements?
12      MR. OKUN: Objection.
13      Go ahead.
14   A.   Each account has an account number,
15   so you just type in the account number and it
16   pulls up the account.  And there, there's a
17   summary of many things related to the account.
18      There is a thing called the
19   guideline matrix which gives you a summary of
20   eligible securities and specific restrictions
21   and a variety of other things about the account
22   but, generally speaking, those are the things
23   I'd be interested in.
24      It really depends on the discussion
25   of -- the topic of discussion that I'm about to

Page 46

SARUWATARI - CONFIDENTIAL
1
2   have with a client.
3      MR. BAREFOOT: I'm going to ask that
4   this document bearing Bates number
5   WESTERN01986013 through 034 be marked as
6   Exhibit 5.
7      (Western Asset Exhibit 5,
8   Subinvestment Management Agreement, Bates
9   Stamped WESTERN01986013 through 1986034,
10   marked for identification.)
11   Q.   Mr. Saruwatari, do you recognize
12   this document that's been marked as Exhibit 5?
13   A.   (Perusing.)  When you say recognize,
14   does that mean I've seen it before?
15   Q.   Well, let me ask, are you familiar
16   with this form of agreement?
17   A.   Yes.  It's an Investment Management
18   Agreement.
19   Q.   And it's between Legg Mason
20   Investments (Europe) Limited and Western Asset,
21   correct?
22   A.   Yes.
23   Q.   If I could draw your attention to
24   the third page of the agreement, section three.
25      MR. OLIVAR: Just so the record is

Page 47

SARUWATARI - CONFIDENTIAL
1
2   clear, it looks to me like there may be
3   two agreements, one attached to the other.
4      MR. BAREFOOT: I agree.
5      MR. OLIVAR: But you're talking
6   about the first one?
7      MR. BAREFOOT: Correct.
8   Q.   Turning to section three on page
9   three.
10      MR. OKUN: Just to be clear, maybe
11   you should read the document numbers so we
12   all know which page three we're talking
13   about since there are two agreements, each
14   of which has a page three.
15   Q.   Okay.  We're talking about Bates
16   number 1986015.  On that page, you'll see that
17   Section 3.1 reads, "The subinvestment manager
18   shall be responsible for investment and
19   reinvestment of the assets of the funds with a
20   view to achieving the stated investment
21   objective and policies of the funds as set out
22   in the prospectus and in accordance with the
23   provisions of the articles of association of
24   the company, hereinafter called the articles.
25   The subinvestment manager shall comply, at all

Page 48

SARUWATARI - CONFIDENTIAL
1
2   times, with the investment restrictions and
3   borrowing restrictions of the funds as set out
4   in the prospectus."
5      Reading this section, do you
6   understand that, subject to compliance with the
7   prospectus and articles of association of the
8   client, Western Asset has investment discretion
9   to invest the client's assets?
10      MR. OKUN: Objection.
11   A.   You said client, and this says
12   prospectus.  It could be different.
13      So we are trying to achieve the
14   stated investment objective and policy of the
15   fund as set out in the prospectus.  The client
16   doesn't drive that necessarily.
17   Q.   And maybe we should go to Section
18   3.2, which is immediately below that on the
19   page ending Bates stamp 6015.
20      It reads, "Without prejudice to the
21   generality of clause 3.1 above, the
22   subinvestment manager shall have and is hereby
23   granted the authority for the account of the
24   funds.  A, to issue orders and instructions
25   with respect to the disposition of the

Page 49

```
 1      SARUWATARI - CONFIDENTIAL
 2   investments, monies and other assets of the
 3   funds."
 4      Do you see that language?
 5   A.  Yes.
 6   Q.  Do you understand that, subject to
 7   compliance with Section 3.1, that vests Western
 8   Asset with discretionary authority to invest
 9   the fund's assets?
10      MR. OKUN: Objection.
11   A.  Yeah, I'm not -- I'm not reading the
12   word "discretionary" here.  So I'm just
13   saying -- I mean, what this says is we are
14   granted the authority to issue orders and
15   instructions.
16      So I guess it's how you define
17   discretionary.
18   Q.  So pursuant to this agreement,
19   Western Asset makes investment decisions on
20   behalf of Legg Mason Investments (Europe)
21   Limited, correct?
22      MR. OKUN: Objection.
23   A.  In pursuant with this subinvestment
24   management agreement, correct, yes.
25   Q.  Correct.  And whenever Western Asset
```

Page 50

```
 1      SARUWATARI - CONFIDENTIAL
 2   makes a purchase of securities on behalf of
 3   Legg Mason Investments (Europe) Limited,
 4   pursuant to this agreement, that investment
 5   decision is made by Western Asset?
 6      MR. OKUN: Objection.
 7   A.  Correct.
 8   Q.  And to the extent that Western Asset
 9   purchased Petrobras securities on behalf of
10   Legg Mason Investments (Europe) Limited
11   pursuant to this agreement, that decision to
12   invest in Petrobras securities would have been
13   made by Western Asset?
14      MR. OKUN: Objection.
15   A.  Western Asset, if they invested in
16   Petrobras in this particular fund, Western
17   Asset made that decision, yeah, as a firm.  I
18   mean, there are individuals making these
19   decisions.
20   Q.  Understood.  My question was about
21   Western Asset.
22   A.  Okay.
23   Q.  That it would be someone at Western
24   Asset on behalf of the firm who made the
25   decision to invest in Petrobras securities?
```

Page 51

```
 1      SARUWATARI - CONFIDENTIAL
 2   A.  Okay.
 3      MR. OKUN: Objection.
 4      Go ahead.
 5   Q.  Do you recognize this as a form of
 6   agreement that Western Asset typically uses?
 7      MR. OKUN: Objection.
 8   A.  I can't say it's typical or
 9   atypical.  I mean, I've seen it before.  I'd
10   have to look at more to say that this is
11   typical.
12   Q.  With respect to each of the separate
13   account plaintiffs -- withdrawn.
14      With respect to each of the Western
15   Asset Funds that we discussed at the beginning,
16   to the extent those funds invested in Petrobras
17   securities, that investment decision was made
18   by Western Asset, correct?
19      MR. OKUN: Objection.
20   A.  With respect to the funds?
21   Q.  Correct.  With respect to the
22   Western Asset Funds, any investments made on
23   behalf of those funds in Petrobras securities,
24   the investment decision would have been paid by
25   Western Asset?
```

Page 52

```
 1      SARUWATARI - CONFIDENTIAL
 2      MR. OKUN: Objection stands.
 3   A.  Yeah, there was no other party to
 4   make those decisions.  So Western Asset is the
 5   party making that decision.
 6   Q.  And the Western Asset Funds don't
 7   have their own employees?
 8   A.  I'm not -- I'm not sure about that.
 9   I'm not sure about that.  I'm just trying to
10   think of an instance where they might employ an
11   attorney or staff member.  I'm not sure.
12   Q.  Each of the Western Asset Funds,
13   even if they employed individuals, the
14   individuals they employed were not the
15   individuals who would have made the decision to
16   purchase Petrobras securities on behalf of the
17   Western Asset Funds, correct?
18   A.  To clarify, you're saying the folks
19   that may have been employed by the funds
20   directly did not make the decision to purchase
21   Petrobras securities?
22   Q.  Correct.
23      MR. OKUN: I'm going to object to
24   the form, but go ahead.
25   A.  The investment management team who
```

Page 53

SARUWATARI - CONFIDENTIAL

1  SARUWATARI - CONFIDENTIAL
2  was making the decision to buy Petrobras
3  securities are employed by Western Asset.
4  Q.   And with respect to the other action
5  plaintiffs, it would similarly be investment
6  professionals employed by Western Asset who
7  would have made the decision to invest in
8  Petrobras securities on behalf of the other
9  action plaintiffs?
10     MR. OKUN: Objection.
11  A.  That is correct.
12  Q.   And, finally, with respect to the
13  separate account plaintiffs, similarly,
14  individuals employed by Western Asset would
15  have been those responsible for making the
16  decision to purchase Petrobras securities on
17  behalf of the separate account plaintiffs?
18     MR. OKUN: Objection.
19  A.  That's correct.
20  Q.   If we could turn briefly back to
21  this Exhibit 5.
22  A.  Sure.
23  Q.   As your counsel noted, this exhibit
24  actually contains two agreements.
25     If we could look at the second of

Page 54

1  SARUWATARI - CONFIDENTIAL
2  those agreements, which begins on the page
3  ending Bates stamp 6024.
4  A.  Uh-huh.
5  Q.   Do you see that that is a
6  Subinvestment Management Agreement between Legg
7  Mason Investments (Europe) Limited and Western
8  Asset Management Company, Limited?
9  A.  Yes.
10  Q.   Is Western Asset Management Company,
11  Limited, the UK affiliate of Western Asset?
12  A.  It is our office -- it represents
13  our office based in London, yes.
14  Q.   And it's an affiliate -- that entity
15  is an affiliate of Western Asset?
16  A.  Our business is organized in a
17  fashion where we're a compilation of various
18  legal entities due to regulations. So Western
19  Asset Management Company, the first agreement,
20  is the office based in the United States, and
21  Western Asset Management Company, Limited,
22  represents the office based in London.
23  Q.   Are there other arrangements or
24  agreements that you're aware of where Western
25  Asset Management Company, Limited, serves as

Page 55

1  SARUWATARI - CONFIDENTIAL
2  the investment manager for clients?
3     MR. OLIVAR: Objection to form.
4  Outside the scope.
5  A.  Can you repeat that again?
6  Q.   Are you aware of instances where
7  Western Asset Management Company, Limited, as
8  opposed to Western Asset, serves as the
9  investment manager for clients?
10     MR. OLIVAR: Same objection.
11  A.  Yes.
12  Q.   And are you aware of instances where
13  individuals employed by Western Asset
14  Management Company, Limited, are the ones
15  making investment decisions for clients?
16     MR. OKUN: Objection as to form.
17     MR. OLIVAR: Objection.
18  A.  Yes, the investment professionals in
19  our London office are making investment
20  decisions -- are making investment decisions
21  for the investments that they are making, yes.
22  Q.   Are you aware of whether Western
23  Asset Management Company, Limited, had
24  investment authority for any of the Western
25  Asset Funds' investments in Petrobras

Page 56

1  SARUWATARI - CONFIDENTIAL
2  securities?
3     MR. OLIVAR: Same objection.
4  A.  I'm not sure.
5  Q.   Are you aware of whether Western
6  Asset Management Company, Limited, had
7  investment authority for any of the other
8  action plaintiffs' investments in Petrobras
9  securities?
10     MR. OKUN: Objection.
11  A.  I'm not sure.
12  Q.   Are you aware of whether Western
13  Asset Management Company, Limited, had
14  investment authority with respect to any of the
15  separate account plaintiffs' investments in
16  Petrobras securities?
17     MR. OLIVAR: Same objection.
18  A.  I'm not sure.
19  Q.   You mentioned that Western Asset
20  Management Company, Limited, is one of the
21  Western Asset companies that operate around the
22  world; is that fair?
23  A.  Yes.
24  Q.   So there are other companies located
25  abroad that are under common control with

Page 57

1       SARUWATARI - CONFIDENTIAL
2   Western Asset?
3       MR. OLIVAR: Objection to form.
4   A.  Common control.  Yeah.
5   Operationally, we run the business as one
6   business with legal entities around the world
7   representing various offices around the world.
8   Q.   And you testified that Western Asset
9   Management Company, Limited, has investment
10  authority for certain of Western Asset's
11  clients?
12      MR. OKUN: Objection.
13  A.  Yes.
14  Q.   Would the same be the case for the
15  other offices of Western Asset?
16      MR. OKUN: Objection.
17      MR. OLIVAR: Outside the scope.
18  A.  Yes.
19  Q.   You can put that to the side.
20  Talking a little more about Western
21  Asset's operations.  You indicated that all of
22  Western Asset's offices around the world
23  operate on an integrated basis?
24  A.  On a --
25  Q.   Integrated basis.

Page 58

1       SARUWATARI - CONFIDENTIAL
2   A.  Yes.  We are on a globally
3   integrated platform.
4   Q.   Where are Western Asset's offices
5   other than Pasadena?
6   A.  New York, London; Singapore;
7   Australia; Sao Paulo, Brazil; and sales office
8   in Hong Kong; a sales office in Dubai.
9       How many do I have there?
10  Q.   You have New York, London,
11  Singapore, Australia, Sao Paulo, and then sales
12  offices in Hong Kong and Dubai.
13  A.  Yeah.
14  Q.   You mentioned that you were in the
15  Tokyo office.
16  A.  Tokyo.  Sorry.
17  Q.   Is Tokyo a sales office or a
18  full-service office?
19  A.  Full-service office.
20  Q.   So for the offices in London,
21  Singapore, Australia, Sao Paulo and Tokyo, the
22  individuals in those offices are placing trade
23  orders for their clients?
24  A.  And Pasadena.  Did you mention
25  Pasadena?

Page 59

1       SARUWATARI - CONFIDENTIAL
2   Q.   I specifically did not mention New
3   York or Pasadena.
4       So focusing only on New York,
5   Singapore, Australia, Sao Paulo and Tokyo, your
6   full-service offices abroad, the individuals in
7   those offices are placing orders for securities
8   on behalf of their clients?
9       MR. OLIVAR: You said New York.  I
10  think you might have meant London.
11  Q.   I'll try again.
12      Focusing on the offices abroad,
13  specifically, London, Singapore, Australia, Sao
14  Paulo and Tokyo, individuals in those offices
15  are placing orders for securities on behalf of
16  their clients?
17  A.  Yeah.  Just to define your
18  terminology, full service, we have investment
19  management capabilities and sales and service
20  capabilities in London, Singapore, Australia
21  Sao Paulo, Tokyo, Pasadena, New York.
22      We only have service and sales
23  capabilities in Dubai and Hong Kong.
24  Q.   And the investment management
25  capabilities that you have in London,

Page 60

1       SARUWATARI - CONFIDENTIAL
2   Singapore, Australia, Sao Paulo and Tokyo would
3   include the ability to place orders for
4   securities on behalf of clients?
5   A.  Yes, in their local jurisdictions.
6   Q.   What do you mean, in their local
7   jurisdictions?
8   A.  Well, since each one of these is a
9   legal entity, it needs -- it needs legal
10  authority to place orders and actually trade.
11  So if we are buying an Asian bond, for example,
12  in Pasadena for an account, the account needs
13  to have given authority, legal authority for
14  the Singapore account -- Singapore office to
15  trade on that account.
16      So each legal entity, to my
17  understanding, needs to have legal authority to
18  trade by account.
19  Q.   Do you have an understanding of how
20  clients give authority to Western Asset
21  offices, other than the office located in
22  Pasadena, to place orders for securities on
23  their behalf?
24      MR. OKUN: Objection.
25  A.  Typically, those are documented in

Page 61

SARUWATARI - CONFIDENTIAL

1    SARUWATARI - CONFIDENTIAL
2  an Investment Management Agreement signed by
3  both parties.
4  Q.  Do you have an understanding of
5  whether the Western Asset Funds have given
6  authority for any Western Asset offices located
7  outside of the United States to place
8  securities orders on behalf of the Western
9  Asset Funds?
10    MR. OLIVAR: Objection to form.
11  A.  I'd have to review the -- the
12  driving document there would be -- for a fund
13  would be the prospectus.  I would have to
14  review the prospectus, but I think if you
15  reviewed it, you could easily tell who was
16  authorized to trade on its behalf and who was
17  not.
18  Q.  In your experience, is it common for
19  clients to authorize Western Asset offices
20  outside of the United States to place
21  securities trades on their behalf?
22    MR. OLIVAR: Objection to form.
23    MR. OKUN: Objection.
24  A.  Is it common for clients, mutual
25  funds, separate accounts?

Page 62

1    SARUWATARI - CONFIDENTIAL
2  Q.  Why don't we start with Western
3  Asset Funds?
4    Is it common for the Western Asset
5  Funds to authorize offices outside of the
6  United States to perform securities trades on
7  their behalf?
8    MR. OLIVAR: Objection to form.
9  A.  Generally speaking, you want to
10  leverage the global organization.  So you would
11  want your London office to be -- to have the
12  ability to trade in European securities.
13    So it's just a general statement,
14  yes.  What you're trying to do is leverage the
15  global organization with offices around the
16  world.
17  Q.  Do you have an understanding of
18  whether any of the separate account plaintiffs
19  have authorized Western Asset offices outside
20  of the United States to place securities trades
21  on their behalf?
22    MR. OLIVAR: Objection to form.
23  A.  Again, I'd have to look at the
24  Investment Management Agreement.  I think it's
25  pretty clear in the document, in those

Page 63

1    SARUWATARI - CONFIDENTIAL
2  documents, what offices and legal entities have
3  been authorized to trade.
4  Q.  Would that information be in the
5  prospectus or in the Investment Management
6  Agreement?
7  A.  For a mutual fund, it would be the
8  prospectus is the driving document.  For a
9  separate account and other action plaintiffs,
10  it would be Investment Management Agreement.
11  Q.  Okay.
12    MR. BAREFOOT: Why don't we take a
13  short break?
14    THE VIDEOGRAPHER: We are now off
15  the record.  The time is 10:49 a.m.
16    (Recess taken.)
17    THE VIDEOGRAPHER: This is tape two
18  of the deposition of Mr. Steven
19  Saruwatari.  We are now back on the
20  record.  The time is 11:11 a.m.
21    MR. OKUN: Okay.  Before we proceed
22  on, I just wanted to clarify a statement
23  that I made at the outset of the
24  deposition.  I'm Barry Okun from Labaton
25  Sucharow representing plaintiff Hawaii.

Page 64

1    SARUWATARI - CONFIDENTIAL
2    I had noted that we did not receive
3  notice of this deposition until yesterday.
4  It's implicit, but I would like to state
5  explicitly for the record that we object
6  to that notice as untimely and inadequate
7  in that it gave us insufficient time to
8  prepare.
9    Having said that, subject to that
10  objection and subject to the reservation
11  of all of our rights that I stated on the
12  record before, we are prepared, you know,
13  we are proceeding today.
14    Okay.  Thank you.
15    MR. BAREFOOT: And I will just note
16  for the record that we disagree with your
17  characterization.
18    If I could have the next exhibit
19  marked.  This document bears Bates stamp
20  BWC00002153 to 2174.
21    (Western Asset Exhibit 6, Investment
22  Management Agreement, Bates Stamped
23  BWC00002153 through 2174, marked for
24  identification.)
25  A.  (Perusing.)

Page 65

1      **SARUWATARI - CONFIDENTIAL**
2 Q.  Mr. Saruwatari, do you recognize
3 this document?
4 **A.  It's an Investment Management**
5 **Agreement.**
6 Q.  And it's specifically an Investment
7 Management Agreement between Western Management
8 Company, Limited, and Baha World Centre,
9 correct?
10 **A.  Yes.**
11 Q.  And Baha World Centre is one of the
12 separate account plaintiffs we discussed
13 earlier, correct?
14 **A.  Yes.**
15 Q.  And before we took a break, you had
16 testified that, in a case of separate accounts,
17 whether or not other offices or affiliates of
18 Western Asset would be authorized to place
19 trades on those entities' behalf would depend
20 on the terms of the Investment Management
21 Agreement, correct?
22     **MR. OKUN:** Objection.
23 **A.  Yes.**
24 Q.  If I could specifically direct your
25 attention to the first page ending in Bates

Page 66

1      SARUWATARI - CONFIDENTIAL
2 2153 under the heading Definition, do you see
3 the term "affiliate" which reads, "means in
4 relation to the manager, any person or entity
5 controlling, controlled by or under common
6 control with the manager."
7     Do you see that language?
8 **A.  Yes.**
9 Q.  Then if I could please turn your
10 attention to the -- page four of the agreement
11 ending in Bates stamp 2156, and if I could
12 specifically direct you to Section 5, the
13 heading of which is Appointment of Affiliate.
14     It reads, "The manager may employ
15 the services of one or more of its affiliates
16 in the management of the portfolio and may
17 delegate the exercise of all or any of its
18 powers, discretions and duties under this
19 agreement to such affiliates without further
20 consultation with the customer."
21     Do you see that language?
22 **A.  Yes.**
23 Q.  Is it your understanding that,
24 pursuant to that language, Western Asset
25 Management Company, Limited -- withdrawn.

Page 67

1      SARUWATARI - CONFIDENTIAL
2     Is it your understanding that,
3 pursuant to this language in Section 5, Baha
4 World Centre had authorized any of Western
5 Asset's affiliates around the world to place
6 orders for securities on its behalf?
7     **MR. OKUN:** Objection.
8 **A.  I think you have to focus on the**
9 **word "may," you know, we may employ the**
10 **services and we may delegate. That doesn't**
11 **mean that that happened.**
12 Q.  Is this the type of language that
13 you testified about earlier pursuant to which
14 affiliates of Western Asset around the world
15 would be authorized to trade on behalf of
16 clients?
17     **MR. OKUN:** Objection.
18 **A.  Yeah, it appears the -- the**
19 **investor, the client, authorized Western Asset.**
20 Q.  And where this type of language
21 appears in an Investment Management Agreement,
22 any of Western Management's offices around the
23 world would have been authorized to trade on
24 behalf of the client?
25     **MR. OKUN:** Objection.

Page 68

1      SARUWATARI - CONFIDENTIAL
2 **A.  If that was necessary, yes.**
3 Q.  What are the circumstances under
4 which it would be necessary or beneficial for
5 affiliates of Western Asset located abroad to
6 place trades on behalf of a client?
7     **MR. OLIVAR:** Objection to form.
8     You can answer.
9     **MR. OKUN:** Objection.
10 **A.  What are the circumstances? It**
11 **really, really depends. There's a variety of**
12 **circumstances.**
13     **You know, if you look at a trade**
14 **ticket, you will be able to figure out whether**
15 **or not, you know, the -- the outside of US**
16 **affiliate traded, but there's just a -- there's**
17 **a variety of circumstances where a non-US**
18 **affiliate would -- would execute a trade or**
19 **invest on behalf of a client.**
20 Q.  You can put that to the side.
21     **MR. BAREFOOT:** If I could have
22 marked, as Exhibit 7, this document
23 bearing Bates stamped PBR-JH-00000790
24 through 799.
25     (Western Asset Exhibit 7,

Page 69

```
 1        SARUWATARI - CONFIDENTIAL
 2   Subadvisory Agreement, John Hancock Funds
 3   II, Bates Stamped PBR-JH-00000790 through
 4   799, marked for identification.)
 5   A.  (Perusing.)
 6   Q.  Do you recognize this document?
 7   A.  It's a Subadvisor Agreement between
 8   John Hancock and Western Asset.
 9   Q.  And, specifically, it's related to
10   John Hancock Funds II.
11       Do you see that?
12   A.  Yes.
13       MR. HAENDLER:  Objection.
14   Q.  And that was one of the other action
15   plaintiffs that we discussed at the outset,
16   correct?
17   A.  Yes.
18   Q.  If I could turn your attention to
19   page three of the agreement ending in Bates
20   stamp 792, you see that there's a Section 5,
21   the heading of which is Supplemental
22   Arrangements.
23       And it reads, "The subadvisor may
24   enter into arrangements with other persons
25   affiliated with the subadvisor to better enable
```

Page 70

```
 1        SARUWATARI - CONFIDENTIAL
 2   it to fulfill its obligations under this
 3   agreement for the provision of certain
 4   personnel and facilities to the subadvisor
 5   provided that the subadvisor shall be
 6   responsible for any acts or omissions of such
 7   other persons and shall notify the advisor in
 8   writing before entering into such arrangements.
 9       Do you understand that language to
10   similarly permit Western Asset to utilize its
11   foreign affiliates for the placing of trades on
12   behalf of John Hancock Funds II?
13       MR. HAENDLER:  Objection to form.
14       MR. OLIVAR:  Objection to form.
15   A.  It says here that we have to notify
16   the advisor in writing before entering into
17   such arrangements.
18   Q.  Do you have an understanding that,
19   subject to notifying the advisor in writing,
20   this language would have permitted Western
21   Asset to delegate to its foreign affiliates the
22   ability to place trades on behalf of John
23   Hancock Funds II?
24       MR. OLIVAR:  Objection.
25   A.  Yeah.  It doesn't necessarily mean
```

Page 71

```
 1        SARUWATARI - CONFIDENTIAL
 2   that that has happened, but this language
 3   permits it.
 4   Q.  Do you have an understanding, one
 5   way or the other, on whether Western Asset
 6   delegated authority to enter into any
 7   securities transactions to any of its foreign
 8   affiliates on behalf of John Hancock Funds II?
 9   A.  I do not.
10   Q.  You can put that to the side.
11       Mr. Saruwatari, Western Asset
12   generally manages only fixed income portfolios,
13   correct?
14   A.  Western Asset manages equities in
15   Brazil as part of balanced mandates, but aside
16   from that, primarily, we manage fixed income
17   only.
18   Q.  During the relevant period, did
19   Western Asset ever invest in any Petrobras
20   equities or Petrobras American depository
21   shares for any of the Western Asset Funds?
22   A.  Not to my knowledge.
23   Q.  Did Western Asset, during the
24   relevant period, ever invest in any Petrobras
25   equity or Petrobras ADS for any of the separate
```

Page 72

```
 1        SARUWATARI - CONFIDENTIAL
 2   account plaintiffs or other action plaintiffs?
 3       MR. OKUN:  Objection as to form.
 4       Go ahead.
 5   A.  Again, I'd have to look at the trade
 6   blotters and whatnot, but not to my knowledge.
 7       MR. BAREFOOT:  I'm going to have
 8   marked, as Exhibit 8, a document bearing
 9   Bates stamp WESTERN01497891 through 907.
10       (Western Asset Exhibit 8, Sample
11   Request for Proposal, Bates Stamped
12   WESTERN01497891 through 1497907, marked
13   for identification.)
14   A.  (Perusing.)
15   Q.  Mr. Saruwatari, do you recognize
16   this document?
17   A.  It's an RFP for emerging markets
18   corporate credit.
19   Q.  Is it a specific RFP or is it a
20   sample of an RFP?
21   A.  It appears to be a sample.
22   Q.  And this is the form of document
23   that would have been sent to prospective
24   clients?
25       MR. OLIVAR:  Objection.
```

Page 73

SARUWATARI - CONFIDENTIAL

1     A.   Typically, we get a questionnaire,
2   an RFP from investors, and we answer their
3   questions.
4        In the case of them specifically
5   asking for a sample, we would send this.
6   Q.   If I could turn your attention to
7   the first page of the document, which ends in
8   Bates stamp 894, please.
9        You'll see it reads, "In this
10   document, Western Asset will seek to outline
11   its investment philosophy and process, the
12   depths and capabilities of its resources, its
13   investment style and track record."
14        Do you agree that that's what this
15   document aims to do?
16       MR. OLIVAR: Objection to form.
17   A.   I think, typically, these documents
18   tend to educate the investor, in a summary
19   format, a little bit about Western, learning
20   more about Western, and it's not necessarily
21   limited to those four bullet points.
22   Q.   But part of the topics on which it
23   aims to educate the investor is Western Asset's
24   investment style?

Page 74

SARUWATARI - CONFIDENTIAL

1     A.   Not necessarily style, but
2   philosophy and process, yes.
3   Q.   What do you understand the reference
4   on page ending Bates stamp 894, its investment
5   style, to refer to?
6        MR. OLIVAR: Objection to form,
7   foundation, scope.
8   A.   (Perusing.) I don't see anything
9   here that spells out the style.
10   Q.   And aside from --
11   A.   But I think, you know, generally
12   speaking, an investor wants to know, you know,
13   how we -- how we make our investment decisions,
14   what the process is, what the philosophy is,
15   and what our capabilities are, and in doing so,
16   an investor can determine our style.
17   Q.   If I could ask you to turn to page
18   six of this document, which ends in Bates stamp
19   7899. You'll see there item labeled number ten
20   says, "Please make a thorough description or
21   send a presentation of your investment process
22   (PowerPoint presentations or similar are
23   acceptable)."
24        And it reads, "Western Asset has one

Page 75

SARUWATARI - CONFIDENTIAL

1   investment process based on a team approach
2   using a combination of bottom-up research and
3   top-down macroeconomic analysis that
4   encompasses the use of different fixed income
5   asset classes."
6        Do you see that language?
7   A.   Yes.
8   Q.   There's a reference here to one
9   investment process.
10       Am I correct that that same
11   investment process would have been used for
12   each of the Western Asset Funds, the separate
13   account plaintiffs, and the other action
14   plaintiffs?
15       MR. OKUN: Objection.
16       MR. OLIVAR: Objection to form.
17   A.   This RFP is for a specific strategy
18   which is emerging markets corporate credit,
19   which is a dedicated EMD strategy. So this
20   process is applicable to that particular
21   strategy.
22   Q.   Would the investment process through
23   which Western Asset decided to invest in
24   Petrobras securities on behalf of the Western

Page 76

SARUWATARI - CONFIDENTIAL

1   Asset Funds differ from the process it used for
2   the separate account plaintiffs or the other
3   action plaintiffs?
4        MR. OLIVAR: Objection to form.
5   A.   It really depends on the strategy of
6   the separate accounts, of the mutual funds and
7   of the other action plaintiffs. To the extent
8   they were an emerging market cooperate credit
9   strategy, this process would have been
10   deployed.
11        With respect to specific Petrobras
12   securities, I think it would be fair to say the
13   same process is used as it enters other
14   strategies, other broad market strategies.
15   Q.   When you say it would be the same
16   process as it enters other strategies, what do
17   you mean -- what are you referring to "it"?
18   A.   Well --
19       MR. OKUN: Objection.
20   A.   I think you are talking a couple
21   things.
22        One is an investment process that
23   describes the entire process. The research
24   process surrounding Petrobras is contained

Page 77

SARUWATARI - CONFIDENTIAL

1   SARUWATARI - CONFIDENTIAL
2   within an investment process. So if you were
3   to isolate the research surrounding Petrobras
4   that is conducted by our research analyst, the
5   outcome of that would be the same, whether or
6   not it's -- so we are talking investment
7   process. I'm referring to -- and I'm referring
8   to the research process.
9   Q. So the research process that Western
10  Asset employed with respect to Petrobras would
11  have been equally applicable to the investments
12  it made on behalf of each of the Western Asset
13  Funds, the other action plaintiffs and the
14  separate account plaintiffs?
15      MR. OKUN: Objection.
16  A. I wouldn't say it's exact, because
17  each account has different benchmarks. They
18  have different guidelines, different
19  restrictions, and so -- and so you got to look
20  at every single account uniquely and determine
21  whether or not Petrobras securities are
22  eligible for those type of accounts, but the
23  research process surrounding Petrobras is
24  conducted by a research team.
25  Q. And that same research team would

Page 78

1   SARUWATARI - CONFIDENTIAL
2   support investments in Petrobras securities for
3   each of the Western Asset plaintiffs -- the
4   Western Asset Funds, the separate account
5   plaintiffs and the other action plaintiffs?
6       MR. OKUN: Objection.
7   A. Yes.
8   Q. Why don't you put that document that
9   we've marked as Exhibit 8 to the side for a
10  moment?
11      MR. BAREFOOT: And let's mark,
12  instead, a document that does not bear a
13  Bates stamp, but that I will represent to
14  you we've obtained from Western Asset's
15  website.
16      (Western Asset Exhibit 9, Form ADV -
17  Part 2, marked for identification.)
18  Q. Mr. Saruwatari, do you recognize
19  this document?
20  A. Form ADV, part 2.
21  Q. And this is a document that Western
22  Asset files with the Securities and Exchange
23  Commission describing certain aspects of its
24  operations; is that correct?
25  A. Yes.

Page 79

1   SARUWATARI - CONFIDENTIAL
2   Q. If I could turn your attention to
3   page 16 of this document, please. You'll see,
4   towards the bottom of that page, there's a
5   heading that reads Global Investment Strategy
6   and Process.
7       Do you see that?
8   A. Yes.
9   Q. And this description, the global
10  investment strategy and process, is not
11  specific to any portfolio; is that correct?
12      MR. OLIVAR: Objection to form.
13  A. (Perusing.) It doesn't appear to
14  be.
15  Q. If I could turn your attention to
16  the next page, please, page 17. You'll see at
17  the top of the page it reads, "The key areas of
18  focus for these local strategies are as
19  follows: Sector allocation, subsector
20  allocation, issue selection, duration and yield
21  curve positioning."
22      Can you describe the sector
23  allocation process?
24      MR. OLIVAR: Objection to form,
25  outside the scope.

Page 80

1   SARUWATARI - CONFIDENTIAL
2   A. It really depends on the strategy.
3   I think what you're looking at here is sort of
4   a -- a broad description, because this is for
5   the form ADV trying to articulate sort of, in
6   general terms, what the investment process at
7   Western Asset is.
8       Sector allocation can mean different
9   things to different strategies.
10  Q. At what stage in the investment
11  process as described in this form ADV would
12  Western Asset make a decision to invest in a
13  specific issuer or a specific security for a
14  client?
15      MR. OLIVAR: Objection to form.
16  A. To a specific security?
17  Q. Why don't we start with the
18  question, at what stage in the investment
19  process would Western Asset make the
20  determination to invest in a specific issuer on
21  behalf of a client?
22  A. If you look at the -- if you look at
23  the diagram, just to the left of client
24  portfolio, you'll see where a securities
25  section is made.

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL

STEVEN SARUWATARI 30(b)(6)
April 13, 2016

Page 81

SARUWATARI - CONFIDENTIAL

1    SARUWATARI - CONFIDENTIAL
2  Q.   And you are referring to the
3  portfolio on page 16 of this Exhibit 9?
4  A.   Yes.
5  Q.   Are you familiar with the terms
6  "bottom-up research" and "top-down
7  macroeconomic analysis"?
8  A.   Yes.
9  Q.   How is the term "bottom-up research"
10  generally used at Western Asset?
11  A.   Bottom-up research is -- is the
12  fundamental analysis that takes place.  Again,
13  the terminology is -- may differ from strategy
14  to strategy, but, generally speaking, bottom-up
15  research is the fundamental analysis of -- of
16  an issuer.
17  Q.   And top-down macroeconomic analysis,
18  what does that generally refer to at Western
19  Asset?
20  A.   Top-down macro is self-explanatory.
21  It refers to examination of sort of the
22  macroeconomic environment you're dealing in.
23  So there's a view you have on the -- on the
24  macroeconomic environment.
25      In the instance of a US portfolio,

Page 82

1    SARUWATARI - CONFIDENTIAL
2  that would be the global macroeconomic
3  environment.  In the instance of an emerging
4  market portfolio, it would be the -- it would
5  include the macroeconomic environment of the
6  country that you're researching.
7  Q.   And Western Asset would take into
8  account both bottom-up research and the
9  top-down macroeconomic analysis in determining
10  whether to invest in any particular security on
11  behalf of a client?
12  A.   Yes, we look at -- we look at a
13  variety of different things.  I think, again,
14  this is just a summarized way of describing a
15  top down and bottom up, but anytime we're
16  investing in a security, we are looking at all
17  the information that's available out there for
18  an issuer, whether it be public filings, things
19  that the issuer is saying, research --
20  in-person research meetings with the issuer.
21      We could be looking at rating agency
22  reports.  Bloomberg is a good source of
23  information for research.  Meeting with company
24  management in the case of a corporation.
25      So when we are making an investment

Page 83

1    SARUWATARI - CONFIDENTIAL
2  decision on an issue -- issuer, we are doing a
3  lot of rigorous research that encompasses all
4  that.
5      And just to clarify, I probably
6  didn't mention everything.  It's not limited to
7  that, but just to give you an idea.
8  Q.   Understood.  If we could turn back
9  to this diagram that you referred to on page 16
10  of Exhibit 9.
11  A.   Uh-huh.
12  Q.   You indicated that it's at the
13  subsector and security selection phase that the
14  decision to invest in any particular issuer is
15  made; is that correct?
16  A.   Yes.
17  Q.   So prior to selecting any particular
18  issuer, all of the other factors indicated in
19  this diagram are first considered?
20      MR. OLIVAR: Objection to form.
21  A.   Yeah, I think when you're trying to
22  construct a portfolio, again, you're looking at
23  a variety of different things, top-down
24  macroeconomic global environment, you're
25  looking at the investor's guidelines and

Page 84

1    SARUWATARI - CONFIDENTIAL
2  benchmarks, and then, based on all of those
3  views and restrictions, you're trying to
4  construct a strategic portfolio in a fashion
5  that meets the investor's objectives.
6      It's hard to -- to say this is for
7  any specific strategy.  It's -- again, it's a
8  depiction, it's a broad articulation because
9  you're not going to -- we have -- we have many
10  products, and you're not going to be able to
11  describe every single one in detail.
12      So, again, it's sort of a broad
13  articulation of how Western Asset's investment
14  process is implemented.
15  Q.   If you could turn back to page 18,
16  please, and focus on the heading that reads
17  Issue Selection.
18      It reads, "Issue selection is
19  primarily a bottom-up process to determine
20  mispriced or undervalued securities.  Western
21  Asset's research process provides an ongoing
22  assessment of changing credit characteristics
23  and of securities with characteristics such as
24  floating interest rates, hidden underlying
25  assets or credit backing and securities issued

Page 85

SARUWATARI - CONFIDENTIAL
1
2  in mergers.  Also assessed are newly-issued
3  securities.  Armed with these sector and issue
4  analyses, the investment team selects its
5  issues."
6      Would Western Asset's research on a
7  particular issuer be generally available to the
8  portfolio managers for all of its clients?
9  A.   Available to the portfolio manager
10   or available to the clients?
11 Q.   Available to the portfolio manager
12  for all of the clients on whose behalf the
13  portfolio manager was making investment
14  decisions.
15 A.   We are constantly doing research and
16   the research is an ongoing process, and any
17   portfolio manager that chooses to invest in any
18   particular issuer can have access to that
19   research, if they so choose.
20 Q.   You can put that document to the
21  side.
22      When Western Asset makes the
23  decision to invest in a particular security on
24  behalf of a fund or a client, who is it at
25  Western Asset that makes that decision?

Page 86

SARUWATARI - CONFIDENTIAL
1
2  A.   Generally, Western's approach is a
3   team-based approach.  So, you know, it's
4   usually a team of people that are discussing
5   this and researching this.  That's not to say
6   there aren't assigned analysts per issuer, but,
7   generally, it's a team discussion that takes
8   place, and the ultimate decision is made by the
9   lead portfolio manager on the account.
10     MR. BAREFOOT: I would like to have
11  marked, as Exhibit 10, a document bearing
12  Bates stamp WESTERN00052465 through 517.
13     (Western Asset Exhibit 10, Morgan
14  Stanley - Global Advisor Research, Bates
15  Stamped WESTERN00052465 through 52517,
16  marked for identification.)
17 A.   (Perusing.)
18 Q.   Do you recognize this document?
19 A.   It looks like it's a deck that's put
20   together for Morgan Stanley Global Advisor
21   Research for a meeting that was held in
22   December 2014, potentially.
23 Q.   I want to specifically direct your
24  attention to page 12 of this document, which
25  ends in Bates stamp 477.

Page 87

SARUWATARI - CONFIDENTIAL
1
2      You see this list of individuals
3  under the heading Emerging Market Debt
4  Resources?
5  A.   Yes.
6  Q.   And you see they are in five
7  separate columns labeled Portfolio Managers,
8  Research/Credit Analysts, Traders, Portfolio
9  Analysts and Product Team?
10 A.   Yes.
11 Q.   In order to try to understand the
12  decision-making process, I would like to walk
13  through the role that each of these groups has
14  in the ultimate decision to invest in a
15  particular security on behalf of a client.
16      Why don't we start on the right with
17  the product team.  What role does the product
18  team have in the ultimate decision to invest in
19  a particular security on behalf of the client?
20 A.   As I mentioned earlier, the product
21   team is part of the client service and
22   marketing larger team, and they are responsible
23   for product development, product
24   commercialization and product support.  And
25   they are responsible to know what is going on

Page 88

SARUWATARI - CONFIDENTIAL
1
2   in a portfolio, to represent the investment
3   management team, to articulate the strategies
4   and performance, potentially.  And they do not
5   make investment management decisions.
6  Q.   When you say they potentially have
7  responsibility for articulating strategies and
8  performance, what did you mean by that?
9  A.   If the meeting calls for that.  If
10   it's a client portfolio review, we would be
11   asked to articulate the performance of the
12   account and the strategies that resulted in
13   that performance.
14 Q.   For the client?
15 A.   For that particular account, yes.
16 Q.   Turning to the portfolio analyst
17  column, what is their role in the ultimate
18  decision of whether to purchase a particular
19  security for a client?
20 A.   A portfolio analyst is more of an
21   operational role.  They monitor portfolios on a
22   daily basis, and as cash comes in or cash goes
23   out, they are responsible to ensure that the --
24   that the accounts are properly positioned and
25   calibrated and -- yeah, I think that covers

Page 89

SARUWATARI - CONFIDENTIAL
1
2 what they do.
3 Q. The monitoring that the portfolio
4 analysts form of portfolios on a daily basis,
5 is that of a particular client's portfolio or
6 is it a broader analysis?
7 A. These portfolio analysts listed here
8 are part of the EMD team, and so they would be
9 responsible for respective accounts that are
10 the responsibility of this EMD team, and those
11 are dedicated emerging market debt strategies
12 that this team is responsible for.
13 Q. Moving to the traders column, what
14 is their role in the purchase of a security for
15 a particular client?
16 A. Yeah, traders are generally the
17 folks that are executing the trades. But,
18 again, going back to Western's team approach
19 and flat organization, traders also wear other
20 hats, conduct research. They are expected to
21 talk to the Street and get market color, and
22 they are expected to know what's going on in
23 the markets, obviously.
24 So even though these are neatly
25 organized on this sheet of paper, there are

Page 90

SARUWATARI - CONFIDENTIAL
1
2 other responsibilities that each one of these
3 column headings perform.
4 Q. With respect to the function of
5 executing the trades, are there individuals
6 other than traders that perform that function?
7 A. Only when a trader is out on
8 vacation or out ill or out of the office, in
9 general, someone would step in and execute the
10 trades, and if -- there's an authorized list at
11 Western that allows certain individuals to
12 trade.
13 Q. Is that authorized list specific to
14 the fund or client?
15 A. Not in my understanding. It's a --
16 it's a global list of authorized traders.
17 Q. And as this indicates, there are
18 emerging markets debt traders in Sao Paulo and
19 Singapore; is that correct?
20 A. That's correct.
21 Q. Turning to the column labeled
22 Research Credit Analyst, what is the role of
23 this group in the ultimate decision of whether
24 to purchase a security for a client?
25 A. So research and credit analysts are

Page 91

SARUWATARI - CONFIDENTIAL
1
2 what you would typically think of a research
3 credit analyst does, is they are the ones that
4 are doing the, typically, the bottom-up
5 research on issuers, and each one of these
6 folks are assigned either an industry or by
7 issuer and are responsible to -- to conduct the
8 research for the team.
9 Q. Were any of the individuals listed
10 on this page, 477, under the heading Research,
11 assigned to research Petrobras during the
12 relevant period?
13 A. This document was generated in 2014.
14 So it does not list, for example, Mark Hughes,
15 who joined the team in March of 2015, and he is
16 a senior research analyst coordinating the
17 research of emerging market corporate bonds.
18 Jeff Nuruki at the time, second from
19 the bottom, was on the team, left the firm in
20 2015, was participating in the research of
21 Petrobras.
22 And I'm moving over one column.
23 Also who is not listed here is Matt Duda, who
24 left the firm in mid-2014, and he was sort of
25 the lead portfolio manager in charge of

Page 92

SARUWATARI - CONFIDENTIAL
1
2 emerging markets credit at that time and
3 conducted Petrobras research.
4 But the team has undergone some
5 change since December 3, 2014, the date of this
6 document, or I should say, actually, the date
7 of the document is, because we update this
8 quarterly, is September 30, 2014, at the
9 bottom.
10 Q. And turning to the portfolio manager
11 column, what is their role with respect to the
12 process through which a decision is made to
13 invest in any particular security for a client?
14 A. Portfolio managers are the ones
15 ultimately responsible to develop and implement
16 the investment strategy, construct portfolios,
17 manage risk.
18 And so, again, it's typically what
19 you would think of a portfolio manager, the
20 lead person responsible and held accountable
21 for a portfolio's results.
22 Q. And the portfolio manager is also
23 the one who's ultimately responsible for
24 authorizing any particular trade on behalf of a
25 client; is that correct?

Page 93

SARUWATARI - CONFIDENTIAL
1
2 A. Yes, portfolio managers are the ones
3 directing the trades.
4 Q. You indicated that Western Asset was
5 a flat organization, but what are the lines of
6 reporting between these various groups?
7 MR. OLIVAR: Objection to form.
8 A. Yeah, this -- this slide doesn't
9 show lines of reporting. It just lists out all
10 of the members of the emerging market debt
11 team. The product team reports in to client
12 service and marketing.
13 Portfolio analysts report in to --
14 I'm not sure of the title, but they report in
15 to the person who is in charge of all of the
16 portfolio analysts. It's an operational role,
17 support role.
18 And then traders, research analysts,
19 portfolio -- traders, research analysts report
20 in to respective portfolio managers. As a
21 matter of fact, some portfolio managers might
22 report in to other portfolio managers.
23 So, again, this is not an org chart
24 of direct or indirect lines of reporting.
25 Q. If I could ask you to turn to the

Page 94

1 SARUWATARI - CONFIDENTIAL
2 page Bates stamped 52499 of this document.
3 Do you see there is a listing of
4 Western Asset Emerging Market Debt Fund's top
5 ten holdings and top ten corporate issuers as
6 of September 30, 2014; is that correct?
7 A. Yes.
8 Q. And Petrobras was one of the top ten
9 corporate issuers as of that date for that
10 fund; is that correct?
11 A. Yes.
12 Q. And Vale, the Brazilian mining
13 company, was also one of the top ten corporate
14 issuers for the Western Asset Emerging Markets
15 Debt Fund as of that date?
16 A. Yes.
17 Q. You can put this to the side for
18 now.
19 MR. BAREFOOT: If I could have
20 marked, as Exhibit 11, Western Asset's
21 amended interrogatory responses.
22 (Western Asset Exhibit 11, The
23 Western Asset Funds Amended Responses to
24 Defendants' Interrogatories, marked for
25 identification.)

Page 95

1 SARUWATARI - CONFIDENTIAL
2 Q. Mr. Saruwatari, do you recognize
3 this document?
4 A. (Perusing.) Yes.
5 Q. And this is the Western Asset Funds'
6 amended responses to the Petrobras defendants'
7 interrogatories, correct?
8 A. Yes.
9 Q. Have you reviewed this prior to
10 today's deposition?
11 A. Yes.
12 Q. If I could turn your attention to
13 page six of the document. You'll see there
14 that interrogatory number one asks for,
15 "Identify all persons (whether or not employed
16 by you) who determine whether to buy, sell,
17 hold, hedge or lend Petrobras securities."
18 If you look down at the bottom of
19 the page, it reads, "Subject to and without
20 waiving the foregoing objections, the Western
21 Asset Funds respond as follows: C.L. Lian,
22 Keith Gardner and Matt Duda made trading
23 decisions for the Petrobras securities during
24 the relevant time frame."
25 A. Correct.

Page 96

1 SARUWATARI - CONFIDENTIAL
2 Q. Were each of those individuals
3 portfolio managers for the Western Asset Funds
4 during the relevant time frame?
5 MR. OLIVAR: Objection to the form
6 of the question.
7 A. Again, during the relevant time
8 frame, we've had some changes on the team.
9 Keith Gardner was the head of the emerging
10 markets debt team up until April of 2014. C.L.
11 then joined the team as a co-head, and for one
12 year, C.L. and Keith co-headed the team.
13 And then, for the last year, up
14 until the end of the relevant time frame, C.L.
15 became the sole head in April of 2015, and
16 Keith Gardner served as an advisor from
17 April 2015 to the end of the relevant period.
18 And then Matt Duda left the firm in
19 middle of 2014.
20 Q. Do you have an understanding of how
21 these three individuals were identified as the
22 individuals who made the trading decisions for
23 the Western Asset Funds' investments in
24 Petrobras securities during the relevant time
25 period?

Page 97

1  SARUWATARI - CONFIDENTIAL
2  **MR. OLIVAR:** Objection to form.
3 A.  **I don't know how they were**
4 **identified.**
5 Q.  If I could point your attention to
6 interrogatory number two on the next page, page
7 seven.  It asks to, "Identify all persons
8 employed by you who were responsible in any
9 respect, including by having investment
10 authority or discretion, for your investment,
11 buying, selling, holding, hedging, short
12 selling or lending of any Petrobras
13 securities."
14  If you go to the bottom of the page,
15 it reads, in the response, "Subject to and
16 without waiving the foregoing objections, the
17 Western Asset Funds respond as follows:  C.L.
18 Lian and Keith Gardner are currently employed
19 by Western Asset Management Company (Western
20 Asset), and made trading decisions for the
21 Petrobras securities during the relevant time
22 frame.  Mark Hughes is currently employed by
23 Western Asset and performed research regarding
24 Petrobras securities.  Robert Abad is currently
25 employed by Western Asset and performed

Page 98

1  SARUWATARI - CONFIDENTIAL
2 research related to the Petrobras securities
3 during the relevant time frame."
4  Do you have an understanding of how
5 Mr. Hughes was identified as performing
6 research regarding Petrobras securities during
7 the relevant time frame?
8  **MR. OLIVAR:** Objection to form.
9 A.  **I'm sorry.  You're asking the same**
10 **question, do I have an understanding.  Can you**
11 **clarify?**
12 Q.  Well, it's actually a different
13 question, because before I was asking how
14 Mr. Lian, Mr. Gardner and Mr. Duda were
15 identified as the persons who made the
16 determination whether to buy or sell Petrobras
17 securities.
18  In interrogatory number two,
19 Mr. Hughes is identified as someone who
20 performed research regarding Petrobras
21 securities during the relevant time frame.
22  Do you have an understanding of how
23 Mr. Hughes was identified as having performed
24 that role?
25  **MR. OLIVAR:** Objection to form.

Page 99

1  SARUWATARI - CONFIDENTIAL
2 A.  **Mark joined the team in March 2015**
3 **as -- as a research analyst covering emerging**
4 **market corporate credit.**
5 Q.  Was he specifically assigned to
6 cover Petrobras?
7 A.  **I'm not sure of that.  Yeah, I'm not**
8 **sure if he was specifically covering Petrobras,**
9 **but his role is to -- is to generally**
10 **coordinate the investments in emerging market**
11 **corporate bonds, which would include, you know,**
12 **the whole universe of corporate bonds.**
13 Q.  Just to be clear, would you
14 categorize Petrobras as an emerging market
15 corporate?
16 A.  **Yes.  Well, Petrobras is partially**
17 **government owned.  The way we define a quasi**
18 **sovereign is 100 percent owned or guaranteed.**
19 **In Petrobras' case, it's not 100 percent owned**
20 **or guaranteed.  So it carries the risk of a**
21 **corporate bond.**
22 Q.  And Western Asset categorized
23 Petrobras as a corporate bond during the
24 relevant period?
25 A.  **Depends on -- you know, some would**

Page 100

1  **SARUWATARI - CONFIDENTIAL**
2 **characterize Petrobras as a quasi sovereign,**
3 **you know, not using that strict definition,**
4 **right?  So quasi sovereign is a loose sort of**
5 **definition -- I mean, a loose term.  It varies**
6 **from firm to firm.  Even within our firm, from**
7 **person to person.**
8 **So I would just say Mark was**
9 **responsible for the coverage of emerging market**
10 **corporate bonds.**
11 **Petrobras securities was -- was**
12 **something that he became involved in when he**
13 **joined the team.**
14 Q.  And Petrobras was part of the
15 universe of emerging market corporate bonds
16 that Mr. Hughes covered as a research analyst?
17 A.  **Maybe I can clarify it.**
18 **There's a benchmark called the JP**
19 **Morgan Corporate Emerging Market Bond Index.**
20 **There are mandates that are managed against**
21 **that benchmark.  Petrobras is included in that**
22 **benchmark.**
23 Q.  What aspects of research on
24 Petrobras securities was Mr. Hughes responsible
25 for?

Page 101

SARUWATARI - CONFIDENTIAL

1      SARUWATARI - CONFIDENTIAL
2  A.  Well, again, I mean, he joined the
3  team in March of 2015.  The coverage before
4  that was the responsibility of Matt Duda, who
5  left the team in the middle of 2014.
6      When analysts are asked to cover a
7  certain security, they are pretty much looking
8  at, again, all the information that's out
9  there.  So they are reviewing public filings,
10  quarterly earning reports, you know, things
11  that Petrobras are saying, meetings with --
12  potentially meetings with the issuer, rating
13  agency reports.
14      So they are reviewing a variety of
15  different things, you know, because we -- we
16  don't just look at one aspect.
17  Q.  You indicated that Mr. Duda was
18  primarily covering Petrobras up until the time
19  of his departure from the firm in mid 2014; is
20  that correct?
21  A.  That's correct.
22  Q.  Was there anyone at Western Asset
23  who was primarily responsible for researching
24  Petrobras between the time of Mr. Duda's
25  departure and Mr. Hughes joining the team in

Page 102

1      SARUWATARI - CONFIDENTIAL
2  March 2015?
3  A.  Yeah.  Again, the team went through
4  some changes related to C.L. joining the team
5  as a co-head, so -- and the team evolved as
6  well.
7      One of the things that we started
8  doing, call it early 2015, was -- was using the
9  Brazil office in a more involved way, not to
10  say that that wasn't the case beforehand, but
11  there's a gentleman named Adriano Casarotto,
12  who was asked to sort of help us do research on
13  Petrobras, look at -- again, look at news
14  reports on their time frame, some written up in
15  Portuguese, and help conduct the research.
16      Again, it was -- you know, our
17  research process is a team approach, and so
18  Adriano and Mark worked together once Mark
19  joined the team.
20  Q.  Was Mr. Casarotto primarily
21  responsible for researching Petrobras between
22  the time of Mr. Duda's departure and Mr. Hughes
23  joining the firm?
24      MR. OLIVAR: Objection to form.
25  A.  No, I wouldn't -- maybe that's not

Page 103

1      SARUWATARI - CONFIDENTIAL
2  an accurate characterization.  I mean, it was
3  being covered by the team.  Adriano was helping
4  out.
5  Q.  Are there other -- sorry.  Go ahead.
6  A.  Go ahead.
7  Q.  Are there other individuals on the
8  team, other than Mr. Casarotto, that you have
9  in mind who were responsible for covering
10  research in Petrobras securities between
11  mid-2014 and March 2015?
12  A.  Jeff Nuruki was still with the firm
13  at that time, and was covering Petrobras.  I
14  should have mentioned that -- I did mention
15  that on the team page, but, yeah, so because of
16  the changes that took place, Jeff Nuruki was
17  helping out with the research there as well.
18      His role was a research analyst
19  based in Pasadena, and along with, again, the
20  team in Pasadena, conducting research, but so,
21  again, Adriano, Jeff Nuruki, when Matt left,
22  and not only when Matt left, I mean, Jeff was
23  helping out Matt at that time when Matt was
24  still with the firm.
25  Q.  The individuals that are identified

Page 104

1      SARUWATARI - CONFIDENTIAL
2  in this response to interrogatory number two,
3  each of Mr. Gardner, Mr. Hughes and Mr. Abad
4  were based in Pasadena throughout the relevant
5  period; is that correct?
6  A.  C.L. was relocated from Singapore
7  office.
8  Q.  Sorry.  I was asking first about
9  Mr. Gardner, Mr. Hughes and Mr. Abad.
10      They were all based in Pasadena
11  throughout the relevant period; is that
12  correct?
13  A.  Mr. Gardner, Mr. Hughes and
14  Mr. Abad, yes.
15  Q.  And the same for Mr. Duda?
16  A.  Yes.
17  Q.  And then let's go to Mr. Lian.  At
18  what point during the relevant period did he
19  move from Singapore to Pasadena?
20  A.  C.L. was named the co-head in
21  April 2014, shuttling back and forth between
22  Pasadena and Singapore until January of 2015
23  when he relocated to the US.
24  Q.  So for the trades in Petrobras
25  securities that were directed by Mr. Lian prior

Page 105

SARUWATARI - CONFIDENTIAL
1
2  to April 2014, he generally would have directed
3  those trades from Singapore?
4      MR. OLIVAR: Objection to form.
5  A.  You mean during the time he was
6  shuttling back and forth?
7  Q.  Well, you indicated that he began
8  shuttling back and forth in April 2014; is that
9  correct?
10 A.  During the transition, yes.
11 Q.  So prior to April 2014, he was based
12 in Singapore?
13 A.  Prior to 2014, he was based in
14 Singapore, yes.
15 Q.  And he had responsibility for making
16 the ultimate trading decisions for certain of
17 the investments in Petrobras securities; is
18 that correct?
19     MR. OLIVAR: Objection to form.
20 A.  Both C.L. and Keith were working as
21 co-heads.  So Keith was based in Pasadena.
22 C.L. -- and helped out when C.L. was away.
23    I would say, yeah, that they worked
24 together to direct trades for the Petrobras
25 securities.

Page 106

SARUWATARI - CONFIDENTIAL
1
2  Q.  Is there a process through which a
3  portfolio manager has to expressly authorize a
4  trade in any particular security?
5      MR. OLIVAR: Objection to form.
6  A.  I'm not aware of any formal process
7  at Western Asset.  Again, it's team based.
8  There's a lot of communication that goes on
9  between the team members via phone, e-mail,
10 Bloomberg chat, and so there's not, that I'm
11 aware of, a formal process by which that
12 happens.
13 Q.  Would Mr. Lian have had authority to
14 direct trades in Petrobras securities without
15 the involvement of or approval of Mr. Gardner
16 and Mr. Duda?
17     MR. OLIVAR: Objection to form.
18 A.  Yeah.  And, during that transition
19 period -- during that transition period, you
20 know, Matt was still around for part of that
21 time.
22 Q.  Prior to Mr. Lian returning to
23 Pasadena in approximately April 2014, would
24 Mr. Lian have been authorized to direct trades
25 in Petrobras securities without the approval of

Page 107

SARUWATARI - CONFIDENTIAL
1
2  Mr. Gardner or Mr. Duda?
3  A.  January 2015, you mean?
4  Q.  I thought you indicated that the
5  time period that Mr. Lian began shuttling back
6  and forth between Singapore and Pasadena was
7  approximately April 2014; is that correct?
8  A.  When he was named the co-head,
9  that's correct.
10 Q.  And prior to April 2014, he was
11 based in Singapore, correct?
12 A.  Correct.
13 Q.  So prior to April 2014, would
14 Mr. Lian have had the authorization and ability
15 to direct trades in Petrobras securities
16 without the approval of Mr. Gardner or
17 Mr. Duda?
18     MR. OLIVAR: Objection to form,
19 lacks foundation.
20 A.  No.  C.L. -- C.L. was the head of
21 the Asian investment team, ex-Japan at that
22 time.  So he would have -- he would have not
23 directed any Petrobras trades.  That would have
24 been Keith Gardner or Matt Duda.
25     THE VIDEOGRAPHER: Counsel, we need

Page 108

SARUWATARI - CONFIDENTIAL
1
2  to change the tape.
3      MR. BAREFOOT: Okay.
4      THE VIDEOGRAPHER: We are now off
5  the record.  The time is 12:22 p.m.
6      (Recess taken.)
7      THE VIDEOGRAPHER: This is tape
8  three of the deposition of Mr. Steven
9  Saruwatari.  We are now back on the
10 record.  The time is 12:41 p.m.
11     BY MR. BAREFOOT:
12 Q.  Mr. Saruwatari, if I could have you
13 turn back to what was marked as Exhibit 11, the
14 amended interrogatory responses.
15 A.  Yes.
16 Q.  And if I could direct you, again, to
17 interrogatory number one, which, in response to
18 the question to identify all persons who
19 determined whether to buy, sell, hold, hedge or
20 lend Petrobras securities, identifies C.L.
21 Lian, Keith Gardner and Matt Duda.
22    I want to make sure I'm
23 understanding your testimony as to the time
24 period during which Mr. Lian made trading
25 decisions for Petrobras securities.

Page 109

```
 1      SARUWATARI - CONFIDENTIAL
 2      Is it Western Asset's testimony
 3   that, prior to April 2014, Mr. Lian did not
 4   make any trading decisions for Petrobras
 5   securities?
 6   A.  That's correct.
 7   Q.  So the only individuals who made
 8   trading decisions for Petrobras securities
 9   during the relevant time period -- withdrawn.
10      So the only individuals that made
11   trading decisions for Petrobras securities
12   prior to April 2014 were Mr. Gardner and
13   Mr. Duda?
14      MR. OLIVAR: Within the relevant
15   period.
16      MR. BAREFOOT: Correct.
17      MR. OLIVAR: You're not talking
18   about the '90s. Yeah.
19      MR. BAREFOOT: I'll ask it again.
20   Q.  So the only individuals, from the
21   beginning of the relevant period until
22   April 2014, who made trading decisions for
23   Petrobras securities were Mr. Gardner and
24   Mr. Duda?
25   A.  When you say only and trading
```

Page 110

```
 1      SARUWATARI - CONFIDENTIAL
 2   decisions, okay, there are -- there are broad
 3   strategies that might contain Petrobras
 4   securities.
 5      When a portfolio manager is
 6   directing a Petrobras security into his or her
 7   portfolio, is that considered a trading
 8   decision in this definition?
 9   Q.  Well, we're talking only -- I should
10   clarify. We're talking only about the Western
11   Asset Funds, the separate account plaintiffs
12   and the other action plaintiffs.
13      So any purchases of Petrobras
14   securities made from the beginning of the
15   relevant time period until April 2014 for each
16   of the Western Asset Funds, the separate
17   account plaintiffs and the other action
18   plaintiffs, am I correct that the only
19   individuals who made those trading decisions
20   were Mr. Gardner and Mr. Duda?
21   A.  The funds and separate accounts and
22   other action plaintiff accounts are not all
23   emerging market debt dedicated strategies.
24      There are lead portfolio managers
25   assigned, depending on the strategy. The
```

Page 111

```
 1      SARUWATARI - CONFIDENTIAL
 2   general practice is that lead portfolio manager
 3   would go to the emerging market desk and --
 4   and, you know, collaborate with the emerging
 5   market desk on, you know, securities that are
 6   outside their -- their expertise.
 7      So in this case, Petrobras is traded
 8   off the emerging market desk. So, again, I
 9   think only is a strong word, but generally
10   speaking, Keith Gardner and Matt Duda were
11   making decisions on Petrobras securities.
12   Q.  You indicated that you were not
13   aware of how Mr. Gardner and Mr. Duda, as well
14   as Mr. Lian, were identified for purposes of
15   this interrogatory response.
16      Are there records that would reflect
17   the process that you've described as to whether
18   it would have been Mr. Gardner and Mr. Duda who
19   made the trading decisions or whether it would
20   have been a lead portfolio manager for a
21   non-emerging markets fund?
22   A.  I doubt there would be a record of
23   that. If you're talking about executing the
24   trade, the trade record would show generally
25   what office is executing the trade.
```

Page 112

```
 1      SARUWATARI - CONFIDENTIAL
 2   Q.  You indicated that the execution of
 3   the trade is separate from the decision to make
 4   the securities trade; is that correct?
 5      MR. OLIVAR: Objection to form.
 6   A.  Again, that was more of a general
 7   statement. Dedicated traders are used
 8   throughout our firm for efficiency purposes,
 9   but that's not to say that Keith and Matt
10   cannot make trades if they are on the
11   authorized list.
12   Q.  Okay. This interrogatory asked for
13   an identification of who made the decision to
14   buy, sell, hold, hedge or lend Petrobras
15   securities. And it identifies Mr. Lian,
16   Mr. Gardner and Mr. Duda.
17      Is it your testimony that there are
18   other individuals who made trading decisions
19   for Petrobras securities on behalf of the
20   Western Asset Funds, the separate account
21   plaintiffs and the other action plaintiffs
22   during the relevant period?
23      MR. OLIVAR: Objection to form.
24      MR. OKUN: Objection to form.
25   A.  Again, you used the word "the only."
```

Page 113

SARUWATARI - CONFIDENTIAL

1    I can't attest to that, the only persons.
2        I don't know if others at the firm
3    made -- made decisions, but our general
4    practice is that if it's -- if it's a broad
5    strategy or a non-EMD dedicated portfolio, the
6    general practice is for them to collaborate
7    with the folks on the EMD desk, and the EMD
8    desk would be responsible to make those trades.
9  Q.   And the broad strategy and non-EM
10   portfolio, where there could have been other
11   individuals that made the trading decisions,
12   would that broad strategy or non-EM portfolio
13   apply to any of the Western Asset Funds?
14       MR. OKUN: Objection.
15 A.   Possibly, because the mutual funds
16   that I saw on that list are not all
17   EMD-dedicated portfolios.
18 Q.   Would the possibility that other
19   individuals made trading decisions because it
20   was a broad strategy or non-EM portfolio also
21   apply to the separate account plaintiffs or the
22   other action plaintiffs?
23       MR. OKUN: Objection.
24 A.   Can you repeat that?

Page 114

SARUWATARI - CONFIDENTIAL

1  Q.   Your testimony is that there could
2    be instances, in the instance of a broad
3    strategy or non-EM portfolio, in which
4    individuals other than Mr. Gardner, Mr. Lian
5    and Mr. Duda would have made trading decisions
6    for Petrobras securities during the relevant
7    time period, correct?
8        MR. OKUN: Objection. Sorry. Go
9    ahead.
10       MR. OLIVAR: Objection to form.
11 A.   It's not Keith Gardner or Matt Duda
12   who decide whether Petrobras goes into a broad
13   strategy portfolio. It's the lead portfolio
14   manager that decides and is responsible for
15   everything that's in their portfolio.
16       In the case of an EMD-dedicated
17   portfolio, it is Keith Gardner and Matt Duda
18   who decide that they are going to put Petrobras
19   in the portfolio.
20 Q.   Are there broad strategy or non-EM
21   portfolios that apply to the separate account
22   plaintiffs?
23       MR. OKUN: Objection.
24 A.   Are there broad strategy accounts?

Page 115

SARUWATARI - CONFIDENTIAL

1  A.   Yes.
2  Q.   So there are separate account
3    plaintiffs for whom individuals other than
4    Mr. Lian, Mr. Gardner and Mr. Duda would have
5    made the trading decision to invest in
6    Petrobras securities during the relevant time
7    period?
8        MR. OLIVAR: Objection to form.
9        MR. OKUN: Objection.
10 A.   Again, maybe terminology.
11       Can you define what trading
12   decisions --
13 Q.   Do you have an understanding of what
14   this answer, which was given on behalf of
15   Western Asset, means when it indicates that,
16   "The Western Asset Funds respond as follows:
17   C.L. Lian, Keith Gardner and Matt Duda made
18   trading decisions for the Petrobras securities
19   during the relevant time period"?
20       What does the reference to making
21   trading decisions in that response of Western
22   Asset mean?
23       MR. OLIVAR: Objection to form.
24   And, Counsel, there is no need to raise

Page 116

SARUWATARI - CONFIDENTIAL

1    your voice to the witness.
2  A.   Yeah, I'm not trying to be
3    difficult. I'm just trying to understand,
4    because you're using some very definitive
5    words, like are these the only people that
6    would have made those decisions. And just
7    knowing what I know about Western, and how we
8    manage money, okay, if it's a broad strategy,
9    they are going to collaborate with the desk,
10   and the EMD desk would then collaborate with
11   that team, and they would likely, general
12   practice, likely execute that trade.
13 Q.   To the extent the fund or client was
14   emerging markets focused, it's your testimony
15   that it would have been Mr. Gardner, Mr. Duda
16   or Mr. Lian that made the Petrobras trading
17   decisions during the relevant period; is that
18   correct?
19 A.   That's correct.
20       MR. OKUN: Objection.
21 Q.   Are there non-EM focused portfolios
22   or broad strategy portfolios that apply to the
23   other action plaintiffs?
24       MR. OKUN: Objection.

Page 117

1          SARUWATARI - CONFIDENTIAL
2  A.  What exhibit was that?
3  Q.  It was Exhibit 1.
4       MR. OLIVAR: Page two, Exhibit 1.
5  Q.  Definition number 11.
6  A.  (Perusing.) Yeah. Knowing that
7  these portfolios are not dedicated EMD
8  portfolios, they fall in the bucket of broad
9  strategies or maybe even global -- global
10 strategies. I would have to look at the
11 benchmarks for each one of these to know
12 exactly, but I do know that these are not
13 dedicated EMD portfolios benchmarked against
14 EMD benchmarks.
15 Q.  So you cannot testify that trading
16 decisions made on behalf of these other action
17 plaintiffs, during the relevant period, in
18 Petrobras securities would have been made by
19 one of Mr. Lian, Mr. Gardner or Mr. Duda?
20      MR. OLIVAR: Objection to form.
21 A.  I'm just telling you the facts. I
22 don't know that for a fact.
23 Q.  You don't know, one way or the
24 other, whether investments in Petrobras
25 securities during the relevant period would

Page 118

1          SARUWATARI - CONFIDENTIAL
2  have been made -- withdrawn.
3       You don't know, one way or the
4  other, whether trading decisions for Petrobras
5  securities during the relevant time period for
6  the other action plaintiffs would have been
7  made by Mr. Lian, Mr. Gardner or Mr. Duda?
8       MR. OLIVAR: Objection to form.
9  A.  Again, I don't -- I don't know that
10 for a fact. I mean, again, just broad strategy
11 portfolio managers are responsible for -- for
12 everything in their portfolios.
13 Q.  And those broad strategy portfolio
14 managers would have been individuals other than
15 Mr. Lian, Mr. Gardner and Mr. Duda?
16 A.  That's correct.
17      MR. OLIVAR: Let him finish the
18 question before you start your answer for
19 the record.
20 Q.  Similarly, with respect to the
21 separate account plaintiffs, you don't know,
22 one way or the other, whether trading decisions
23 for Petrobras securities, during the relevant
24 time period, on behalf of the separate account
25 plaintiffs were made by Mr. Lian, Mr. Gardner

Page 119

1          SARUWATARI - CONFIDENTIAL
2  and Mr. Duda?
3       MR. OLIVAR: Objection to form.
4  A.  To the extent that these are not,
5  again, dedicated EMD strategies benchmarked to
6  an EMD benchmark, they all have different
7  portfolio managers, again, depending on what
8  the strategy is.
9  Q.  Are there any of the separate
10 account plaintiffs that are emerging markets
11 dedicated?
12 A.  It doesn't appear to me that they
13 are.
14 Q.  And you would put them all in the
15 bucket of broad strategy, non-EM portfolios?
16 A.  Yeah. When I say broad strategies,
17 I mean -- I really mean anything that's non --
18 that's not a dedicated EMD portfolio. So broad
19 strategy, global bond, core would be a broad
20 strategy portfolio, because it invests in --
21 it's benchmarked to the Barclays global
22 aggregate and, therefore, yeah, it would have
23 exposure to EM exposures, but it's not a
24 dedicated EMD portfolio.
25 Q.  And in the instances where portfolio

Page 120

1          SARUWATARI - CONFIDENTIAL
2  managers, other than Mr. Lian, Mr. Duda or
3  Mr. Gardner, would have made the trading
4  decisions in Petrobras securities for the
5  separate account plaintiffs during the relevant
6  time period, are there any records at Western
7  Asset that would reflect the identities of
8  those portfolio managers?
9       MR. OLIVAR: Objection to form,
10 lacks foundation.
11      Go ahead.
12 A.  I don't believe trading records
13 document the portfolio manager making the
14 decision. The trade tickets I looked at will
15 identify the office that is making -- that is
16 making the trade.
17      You know, I mean, making the trade
18 and making the decision, probably two different
19 things, right? But, generally speaking, I
20 don't believe the trade records will reflect
21 that.
22 Q.  So the trading records would not
23 reflect the portfolio manager who made the
24 decision to invest in Petrobras securities
25 during the relevant period?

Page 121

```
 1        SARUWATARI - CONFIDENTIAL
 2        MR. OLIVAR: Objection to form.
 3   A.  Not to my knowledge.
 4   Q.  You can put that to the side.  Thank
 5   you for clarifying.
 6        MR. BAREFOOT: If I could have
 7   marked, as Exhibit 12, a document that is
 8   not Bates stamped, but that I will
 9   represent to you we obtained from Western
10   Asset's website.
11        (Western Asset Exhibit 12, Our
12   Philosophy - Portfolio Management -
13   Western Asset, marked for identification.)
14   Q.  Mr. Saruwatari, are you familiar
15   with this text?
16   A.  Yes, this is our investment
17   philosophy.
18   Q.  If I could refer you to the first
19   header, which reads Markets Often Misprice
20   Securities.  It reads, "Prices deviate from
21   fundamental fair value, but over time, they
22   adjust to reflect inflation, credit quality
23   fundamentals and liquidity conditions.
24   Consistently investing in undervalued
25   securities can deliver superior investment
```

Page 122

```
 1        SARUWATARI - CONFIDENTIAL
 2   returns."
 3        What is fundamental fair value
 4   referenced in this text?
 5        MR. OLIVAR: Objection to form,
 6   lacks foundation, outside the scope.
 7   A.  I think securities have -- based on
 8   research and analysis, securities are analyzed,
 9   and there would be a fair value placed on that
10   security or a range of fair values placed on
11   that security.
12        This is just -- the term
13   "fundamental" is just the analysis of a
14   security based on the -- again, all of the
15   information that we're analyzing, right?
16        So to my earlier point, we're going
17   to under -- we're going to look at public
18   filings and quarterly earnings and rating
19   agency reports, reports potentially from the
20   IMF or the World Bank, discussions with company
21   management in the case of a corporate, and try
22   to -- and seek to assign a range of fair value.
23   Q.  And just to be clear, that
24   fundamental fair value is a figure that Western
25   Asset ascribes to the security?
```

Page 123

```
 1        SARUWATARI - CONFIDENTIAL
 2        MR. OLIVAR: Same objections.
 3   A.  Yeah, based on our analysis, we
 4   would -- we would attempt to determine the fair
 5   value of a security.
 6   Q.  And that analysis would take into
 7   account Western Asset's subjective expertise?
 8        MR. OLIVAR: Same objections.
 9   A.  Again, there's some objective
10   information in there.  There's some subjective
11   information in there.
12        You know, it's a combination of,
13   really, quantitative analysis and qualitative
14   analysis to arrive at some range of fair value
15   for a security.
16   Q.  And that fundamental fair value
17   would not necessarily be based on the market
18   value of the security?
19        MR. OLIVAR: Same objections.
20   A.  Well, I think the market price --
21   market price, not value, but market price can
22   deviate from what we believe the value is.
23   Q.  Thank you for clarifying.
24        And Western Asset's philosophy seeks
25   to identify instances where its assessment of
```

Page 124

```
 1        SARUWATARI - CONFIDENTIAL
 2   the fundamental fair value of a security is
 3   different from the market price of that
 4   security?
 5        MR. OLIVAR: Same objections.
 6   A.  Value investing is exactly that,
 7   it's seeking to -- to find securities in the
 8   marketplace that are misvalued based on a
 9   variety of different factors.
10   Q.  Is there a record or system where
11   Western Asset would systematically record its
12   assessment of the fundamental fair value of a
13   security that it was investing in?
14   A.  We're not a model-driven shop.  We
15   don't have a black box that we enter numbers
16   into and then out comes some number.  The
17   analysis is really ongoing.
18        And, again, it's just based on all
19   the information that we can get our hands on
20   out there, both quantitative information and
21   qualitative information, and it's constantly
22   being updated to reflect the changing market
23   conditions.
24   Q.  Do you have an understanding of
25   whether, during the relevant period, Western
```

Page 125

SARUWATARI - CONFIDENTIAL

1 Asset believed that any of the Petrobras
2 securities that it invested in had a
3 fundamental fair value that was different than
4 the market price for those securities at the
5 time it purchased them?
6 MR. OLIVAR: Same objections.
7 A. I'm sorry. Can you repeat that?
8 Q. Do you have an understanding of
9 whether during the relevant period, Western
10 Asset ascribed a fundamental fair value to any
11 of the Petrobras securities that it invested in
12 that was different from the market price at the
13 time it purchased the security?
14 MR. OLIVAR: Same objections.
15 A. Well, again, we're seeking to
16 identify fair value, compare it to market
17 price, and, again, that's taking into
18 consideration all the things that are available
19 in the marketplace.
20 Q. Given your investment philosophy,
21 you would not expect that Western Asset would
22 have purchased Petrobras securities at a time
23 that its fundamental fair value it ascribed to
24 those securities was lower than the market

Page 126

SARUWATARI - CONFIDENTIAL

1 price of those securities; is that fair?
2 MR. OLIVAR: Same objections.
3 A. I think it's a lot more complex than
4 that, because the strategies have different
5 benchmarks, they have different risk profiles,
6 you know, so taking all of that into
7 consideration, you know, I don't think that's a
8 true statement.
9 Q. Does the -- does Western Asset's
10 assessment of the fundamental fair value of a
11 security depend on the benchmark of the
12 portfolio at issue?
13 MR. OLIVAR: Same objections.
14 A. Indirectly, maybe. You know, the
15 benchmark is -- is an index where you have many
16 investors investing in mandates that are
17 benchmarked against any particular benchmark,
18 and if Petrobras is included in that, then you
19 just have more investors.
20 So, you know, I think that market
21 price would -- would be impacted by that.
22 The fundamental value, again, is an
23 analysis of the quantitative information out
24 there that's available and sort of our

Page 127

SARUWATARI - CONFIDENTIAL

1 subjective view of all the other things that we
2 learn from review of reports, review of
3 analysis by rating agencies and discussion with
4 company management.
5 Q. So once Western Asset has an
6 assessment of the fundamental fair value of a
7 security, how does it use that fundamental fair
8 value in making an investment decision?
9 MR. OLIVAR: Same objections.
10 A. Again, I mean, generally speaking,
11 this is our philosophy. So we are a long-term
12 value investor. We are always seeking to find
13 or, generally speaking, to find securities
14 that -- that have fair value that are different
15 than the market prices.
16 So I just go back to our philosophy,
17 that's -- that's generally how we make money
18 for investors.
19 Q. And when you say you're looking for
20 fundamental fair values that are different than
21 market prices you're looking for fundamental
22 Western Asset ascribed fair values that are
23 higher than market prices, correct?
24 MR. OLIVAR: Same objections.

Page 128

SARUWATARI - CONFIDENTIAL

1 A. Generally speaking, yes.
2 Q. So it would not be your expectation
3 that, at the time that Western Asset invested
4 in any Petrobras securities during the relevant
5 period, that Western Asset's assessment of the
6 fundamental fair value of those securities
7 would have been less than their market price at
8 the time of purchase?
9 MR. OLIVAR: Same objections.
10 A. Yeah, I don't anticipate an instance
11 where -- where we would have invested in
12 Petrobras if market price was -- was below fair
13 value.
14 Q. Below Western Asset's assessment of
15 fair value?
16 A. Below Western's assessment.
17 Q. Would it generally be your
18 expectation that, at the time that Western
19 Asset invested in Petrobras securities during
20 the relevant period, its assessment of
21 fundamental fair value would have been higher
22 than the market price at the time of purchase?
23 MR. OLIVAR: Same objections.
24 A. Would have been higher than the

Page 129

```
 1        SARUWATARI - CONFIDENTIAL
 2   market price?
 3   Q.  Correct. Would it be -- would it
 4   generally be your expectation that, at the time
 5   Western Asset invested in Petrobras securities
 6   during the relevant period, its assessment of
 7   fundamental fair value would have been higher
 8   than the market price at the time of purchase?
 9   A.  Again, going back to value
10   investing, that's what we're seeking out, is
11   securities that trade at a market price that we
12   believe have been, you know, sold off below
13   what we believe is fair value.
14        MR. OLIVAR: Move to strike for
15   purposes of interposing objections. Same
16   objections.
17   Q.  You can put this document to the
18   side, and if you'd like, we can break for
19   lunch.
20        THE VIDEOGRAPHER: We are now off
21   the record. The time is 1:10 p.m.
22        (Luncheon recess taken at 1:10 p.m.)
23
24
25
```

Page 130

```
 1        SARUWATARI - CONFIDENTIAL
 2   A F T E R N O O N   S E S S I O N
 3        (Time noted:  2:07 p.m.)
 4   S T E V E N   S A R U W A T A R I,   resumed
 5   and testified as follows:
 6        THE VIDEOGRAPHER: This is tape four
 7   of the deposition of Mr. Steven
 8   Saruwatari. We are now back on the
 9   record. The time is 2:07 p.m.
10   CONTINUED EXAMINATION
11        BY MR. BAREFOOT:
12   Q.  Mr. Saruwatari, I understand that
13   there's some aspects of your testimony from
14   this morning that you would like to supplement
15   or clarify; is that correct?
16   A.  Yes.
17   Q.  Please go ahead.
18   A.  With respect to interrogatory number
19   one, I was able to talk to C.L. and Mark Hughes
20   over lunch break to confirm what we were
21   talking about.
22        C.L., Keith Gardner and Matt Duda
23   were always involved in trading decisions
24   regarding Petrobras. They were either the only
25   one with respect to, for example, an
```

Page 131

```
 1        SARUWATARI - CONFIDENTIAL
 2   EM-dedicated portfolio or with other types of
 3   portfolios, it would have been in collaboration
 4   with the lead PMs there.
 5   Q.  I believe that you testified this
 6   morning that Mr. Lian would not have had any
 7   involvement in trading decisions for Petrobras
 8   securities prior to April 2014.
 9        Does that remain the case?
10   A.  That's correct. I should have
11   clarified the periods. But, yes, C.L. was not
12   involved prior to April 2014.
13   Q.  Does it remain the case that there
14   would be no documents or records that would
15   reflect who the individual was that made the
16   trading decisions for Petrobras securities
17   during the relevant time period?
18   A.  That remains the case.
19   Q.  Thank you.
20   A.  You're welcome.
21   Q.  Actually, one further question.
22        Were Mr. Lian or Mr. Hughes able to
23   identify any of the other trading -- any of the
24   other portfolio managers with whom they
25   collaborated on the trading decisions for
```

Page 132

```
 1        SARUWATARI - CONFIDENTIAL
 2   Petrobras securities during the relevant time
 3   frame?
 4        MR. OLIVAR: Objection to form.
 5   A.  I didn't ask them that question, so
 6   I don't have any names for you.
 7        But, again, I mean, just to clarify,
 8   if I didn't make that clear enough, it's just a
 9   general practice for portfolio managers to
10   always collaborate with a sector specialist, in
11   this case, Petrobras falls under the EM desk,
12   so C.L., up until -- or after April 2014 and
13   Keith Gardner and/or Matt Duda were involved in
14   those trading decisions.
15   Q.  Thank you.
16        (Western Asset Exhibit 13,
17   Summarized Analysis of Petrobras
18   Securities, Bates Stamped WESTERN01481078,
19   marked for identification.)
20   Q.  I'm going to show you a document
21   that has been marked Western Asset Exhibit 13,
22   and it bears Bates stamp WESTERN01481078.
23   A.  (Perusing.)
24   Q.  Mr. Saruwatari, do you recognize
25   this document?
```

Page 133

```
 1        SARUWATARI - CONFIDENTIAL
 2   A.  Looks like a summarized analysis of
 3   Petrobras securities.
 4   Q.  When you say a summarized analysis,
 5   what do you mean?
 6   A.  Well, I mean, this -- this is sort
 7   of a summary of the research that takes place.
 8   It's a one-page page document, and doesn't
 9   document every single analysis that's been
10   performed on Petrobras, but it looks like this
11   was summarized maybe for purposes of -- of
12   sending to interested parties.
13   Q.  I was actually going to ask you
14   that, do you have an understanding of the
15   purposes for which this was prepared?
16   A.  From time to time, our investors
17   will ask about exposures in their portfolio in
18   which case a document like this would be
19   prepared and forwarded to that interested
20   party.
21   Q.  When you referred to a summary
22   analysis, is there a larger format of Western
23   Asset document that provides analysis on
24   Petrobras or other issuers that you had in
25   mind?
```

Page 134

```
 1        SARUWATARI - CONFIDENTIAL
 2   A.  Yeah, there's not necessarily a
 3   standard format that Western uses to document
 4   all of their research.  It comes in different
 5   forms.  You know, there might be e-mails, there
 6   might be summaries, commentary that's sent out.
 7   There might be a more involved discussion on
 8   Petrobras from time to time, but Western Asset
 9   does not have a formal template.
10   Q.  If I could point you to the first
11   non-header line in this document, which reads,
12   "Petrobras is a long-term holding of WA's EM
13   team and offers value compared to straight US
14   dollar sovereign bond exposure, as well as
15   comparable US-integrated oil and gas
16   companies."
17        The reference to long-term holding,
18   do you have an understanding of how long
19   Western Asset had invested in Petrobras?
20   A.  I don't.
21   Q.  The reference to value comparison to
22   straight US dollar sovereign bond exposure, why
23   was Western Asset comparing Petrobras to
24   straight US sovereign bond exposure?
25   A.  If an investor is invested in a
```

Page 135

```
 1        SARUWATARI - CONFIDENTIAL
 2   strategy that is allowed emerging markets
 3   exposure, over the years, you know, Latin
 4   America has been a large part of emerging
 5   markets debt.  Some of the benchmarks have
 6   emerging markets debt securities in them.
 7        And so in order to get Brazil
 8   exposure, you would buy the sovereign bond, the
 9   government bond issued by Brazil, or you would
10   buy a corporate bond domiciled in Brazil.
11        So I think this is an attempt to --
12   this is a relative value that was conducted, it
13   looks like, and it's basically saying that it
14   offers value compared to buying the bond that's
15   issued by Brazil, the government bond that's
16   issued by Brazil.  So this is a statement of
17   relative value.
18   Q.  If I could turn your attention to
19   the third bullet in this paragraph, under the
20   heading Investment Outlook.  It reads, "Even on
21   the back of the company's extensive capex
22   program, and coincident increase in nominal
23   long-term debt, its balance sheet remains
24   extremely strong.  As illustrated in the
25   capitalization table below, PBR had cash and
```

Page 136

```
 1        SARUWATARI - CONFIDENTIAL
 2   cash equivalence well in excess of short-term
 3   debt at the end of the Q3 2011," and then it
 4   goes on.
 5        Do you have an understanding of what
 6   the reference to the company's extensive capex
 7   program is?
 8   A.  I don't.
 9   Q.  Do you have an understanding of
10   Western Asset's views on or around January 2012
11   of Petrobras' capex program?
12   A.  I think, this time frame, Matt Duda
13   would have been the analyst and the portfolio
14   manager writing this up.  He would have been --
15   he would have been aware of their extensive
16   capex program.
17   Q.  But you do not, as a representative
18   of Western Asset, have an understanding of
19   Western Asset's views of Petrobras' capex
20   program on or around this time?
21        MR. OLIVAR:  Objection to form,
22   beyond the scope.
23   A.  No, I don't.
24   Q.  You see the reference in the text
25   that I just pointed you to, to its being
```

Page 137

```
 1        SARUWATARI - CONFIDENTIAL
 2   Petrobras' balance sheet remaining extremely
 3   strong.
 4        Do you have an understanding of what
 5   aspects of Petrobras' balance sheet drove that
 6   conclusion by Western Asset?
 7   A.  Yeah, I think the financial
 8   highlights below is just an excerpt of some of
 9   the publicly available information, financial
10   information on Petrobras, and one of the many
11   things that Western research analysts are
12   looking for is asset coverage being a
13   bondholder.  A research analyst would be
14   concerned about, you know, what assets are
15   there to cover the liabilities.
16        So in this statement, it looks like
17   that's -- that's sort of the analysis that's
18   being conducted.  And, again, I mean, it's just
19   an excerpt.  It's one -- one aspect of the
20   assessment.
21   Q.  Do you have an understanding of
22   whether this analysis was discussed with
23   representatives of any of the separate account
24   plaintiffs or other action plaintiffs on or
25   around January 2012?
```

Page 138

```
 1        SARUWATARI - CONFIDENTIAL
 2   A.  I do not have that knowledge.
 3   Q.  You can put this one to the side,
 4   please.
 5        MR. BAREFOOT: I'm going to have
 6   marked, as Exhibit 14, a document
 7   beginning Bates stamp WESTERN01232823 and
 8   ending Bates stamp 826.
 9        (Western Asset Exhibit 14, E-Mail
10   With Attachment, Bates Stamped
11   WESTERN01232823 through 1232826, marked
12   for identification.)
13   Q.  Mr. Saruwatari, do you recognize --
14   let's start with the cover e-mail, which is
15   Bates stamped 823.
16        Have you seen this e-mail before?
17   A.  (Perusing.)  Yes, probably, I have.
18   Q.  You'll see that it's addressed in
19   the "to" field to something called Global
20   Strategy.
21        Is that a listserv at Western Asset?
22   A.  Yeah, it's an e-mail distribution
23   list containing portfolio managers primarily.
24   Q.  Are you on that listserv?
25   A.  I am not.
```

Page 139

```
 1        SARUWATARI - CONFIDENTIAL
 2   Q.  Do you have an understanding of
 3   whether Mr. Lian, Mr. Gardner or Mr. Duda were
 4   on this listserv at this time?
 5   A.  2012.  I'd have to -- I have to go
 6   back and look.
 7        During that time frame, Keith
 8   Gardner and Matt Duda were probably on that
 9   list.
10   Q.  When you say that you have to go
11   back and look, are there records that reflect
12   who was on a particular listserv at a
13   particular time?
14   A.  Yeah.  I think you can actually look
15   into the e-mail distribution list, and the list
16   of the individuals are listed there.
17   Q.  In the cc list, there's a field that
18   says "EMD Pasadena."
19        Is that also a listserv?
20   A.  Yes.
21   Q.  Are you on that listserv?
22   A.  During this time, yes, I was.
23   Q.  And what about Mr. Lian, Mr. Duda
24   and Mr. Gardner?
25   A.  My knowledge is Mr. Lian was -- was
```

Page 140

```
 1        SARUWATARI - CONFIDENTIAL
 2   not, Gardner, yes, and Duda, yes.
 3   Q.  And there is also a listserv at the
 4   end of that cc line, "WA portfolio management
 5   Sao Paulo."
 6        Do you see that?
 7   A.  Yes.
 8   Q.  Is that also a listserv?
 9   A.  Yes.
10   Q.  Do you have an understanding of who
11   generally belongs to that listserv?
12   A.  Portfolio managers in our Sao Paulo
13   office.
14   Q.  And you'll see the sender of this
15   e-mail is Chris Orndorff?
16        Who is he?
17   A.  He is a portfolio manager based in
18   Pasadena.
19   Q.  The subject of the e-mail is "Note
20   on Petrobras from our own Paschoal Paione," if
21   I'm pronouncing that correctly.
22        Who is Paschoal Paione?
23   A.  I do not know him personally, but
24   appears to be an analyst in our Sao Paulo
25   office.
```

Page 141

SARUWATARI - CONFIDENTIAL
1
2  Q.  What are you basing that conclusion
3     on?
4  A.  Based on Chris Orndorff's note.
5  Q.  There is a reference in the body of
6     the e-mail to Paulo Clini.
7        Do you know who Paulo Clini?
8  A.  Paulo Clini is the head of our
9     investment management team in Sao Paulo.
10 Q.  That's his current position?
11 A.  Yes.
12 Q.  And that was also his position in
13    November 2012?
14 A.  I believe so.
15 Q.  If I could ask you to turn now to
16    the attachment which begins with Bates stamp
17    824.
18       Have you also seen this document
19    before?
20 A.  I don't recall.
21 Q.  Would it be typical, in your
22    experience, for research notes of this type to
23    be circulated to the entire emerging markets
24    team?
25 A.  Yes.

Page 142

SARUWATARI - CONFIDENTIAL
1
2  Q.  If I could refer you to the first
3     paragraph of this e-mail, which reads, "PBR has
4     been in the spotlight since its capitalization
5     process back to 2010.  Rumors about government
6     interference in company's strategic decisions
7     has always been a source of concern for bond
8     and equity holders."
9        Do you have an understanding of what
10    is referred to by rumors about government
11    interference in company's strategic decisions?
12 A.  Being that they are a corporation
13    that's more than majority owned by the
14    government, that's probably what that's in
15    reference to.
16 Q.  Do you have an understanding of what
17    the rumors about government interference are
18    that are referred to in this document?
19 A.  No, not at that time.
20 Q.  Do you have an understanding
21    currently?
22 A.  I mean, there's always rumors about
23    the government interfering in Petrobras'
24    affairs, and we try not to make, you know,
25    decisions solely based on these rumors.

Page 143

SARUWATARI - CONFIDENTIAL
1
2  Q.  When you say you try not to make
3     decisions based solely on these rumors, do you
4     have an understanding of what role these rumors
5     about government interference played in Western
6     Asset's analysis of Petrobras around this time
7     period?
8  A.  Again, just going back to the
9     analysis of Petrobras as a company and
10    Petrobras securities, your research analysts
11    are expected to go through the full gamut of
12    information available out there.  You know,
13    rumors is just one, maybe even a little aspect
14    of -- of what's to -- what's to even analyze.
15       There is information being given by
16    the company, and we believe information being
17    given by the company to Western is true and
18    accurate.  Whether it's a public filing or an
19    in-person meeting with management, whatever
20    they're telling us, we have to believe that's
21    true and accurate.
22       Rumors can be circulated by numerous
23    sources, including the media, and sometimes
24    they don't have the company's interest -- best
25    interest at hand.

Page 144

SARUWATARI - CONFIDENTIAL
1
2  Q.  Do you know who at Western Asset
3     would have an understanding of what rumors
4     about government interference are referred to
5     in this document?
6     MR. OLIVAR: Objection to the form.
7  A.  Yeah, rumors could mean anything.
8     So I would say, at the time this was written,
9     probably Paschoal was the only one
10    knowledgeable about what he was talking about
11    here in terms of the rumors, what rumors.
12 Q.  If I could direct your attention
13    down to the fourth paragraph on the same page.
14    It reads, "Petrobras' greatest problem is the
15    existing difference between domestic fuel
16    prices versus the import price parity (gasoline
17    and diesel domestic prices are set by the
18    government)."
19       In or around November 2012, was it
20    Western Asset's view that the fuel price
21    versus -- domestic fuel price versus import
22    price parity was Petrobras' greatest problem?
23    MR. OLIVAR: Objection to form.
24 A.  I think it was Paschoal's opinion
25    that it was Petrobras' greatest problem.  I'm

Page 145

1      SARUWATARI - CONFIDENTIAL
2 not -- I can't make the statement that it was
3 everyone's opinion that that was Petrobras'
4 greatest problem.
5 Q. Are you aware of anyone on the
6 emerging markets desk disagreeing with
7 Paschoal's analysis?
8 A. No, I wasn't.
9 Q. Do you have an understanding whether
10 it was Western Asset's view around this time
11 period that the domestic fuel versus import
12 price parity was a larger problem for Petrobras
13 than its capitalization program?
14     MR. OLIVAR: Objection to form.
15 A. Can you repeat that again?
16 Q. Do you have an understanding of
17 whether it was Western Asset's view, in or
18 around November 2012, that Petrobras'
19 difference between domestic fuel and imported
20 fuel prices was a larger problem than its
21 capitalization program?
22     MR. OLIVAR: Same objection.
23 A. No, I was not aware of that.
24 Q. One way or the other?
25 A. Yeah, one way or the other. We --

Page 146

1      SARUWATARI - CONFIDENTIAL
2 again, we take into consideration a variety of
3 different factors when analyzing a company and
4 their securities and, you know, the difference
5 between fuel prices, domestic and import price
6 parity and capex programs are just two aspects
7 of innumerous factors that are taken into
8 consideration when making an investment in an
9 issuer.
10 Q. Do you have an understanding of how
11 research notes like this would have been used
12 by the emerging markets team in making
13 investment decisions?
14 A. I think this is just information
15 sharing. We have our folks in Brazil looking
16 at Petrobras. We have our folks in Pasadena
17 looking at Petrobras. So it's a way to share
18 information, and then we take this information
19 and we supplement it with our own analysis and
20 our own experience and knowledge and supplement
21 it with all the other information that's out
22 there.
23     This is just a couple pages of
24 analysis that was done at just a particular
25 point in time, and I'm not even sure why he

Page 147

1      SARUWATARI - CONFIDENTIAL
2 wrote this.
3 Q. If I could ask you to turn to the
4 second page of this note, ending in Bates stamp
5 2825. I just want to focus on the last line of
6 the last paragraph on this page, which reads,
7 "Even in this scenario, we highlight that the
8 company would not lose its investment grade, as
9 Petrobras debts are counterguaranteed by the
10 Brazilian government."
11     The line which references a
12 counterguarantee by the Brazilian government,
13 do you have an understanding of what that
14 refers to?
15 A. I'm not familiar with the
16 terminology "counterguaranteed." Petrobras'
17 debts are not necessarily guaranteed by the
18 Brazilian government.
19     There's a view that Petrobras' debts
20 would be backed by the government should they
21 run into trouble, because they are owned, more
22 than majority owned by the government, and it's
23 a strategic asset to Brazil, but I think this
24 statement is fairly strong.
25 Q. Was it Western Asset's views that

Page 148

1      SARUWATARI - CONFIDENTIAL
2 Petrobras' debts would effectively be backed or
3 guaranteed by the Brazilian government?
4 A. I'm sorry. What was that question
5 again?
6 Q. Was it Western Asset's views -- was
7 it Western Asset's view that Petrobras' debts
8 would be backed or guaranteed by the Brazilian
9 government?
10 A. At the time of this writing?
11 Q. In or around November 2012.
12 A. I would say that's a fair statement.
13 Q. Did that view change over the
14 relevant period?
15 A. I would say the view had been
16 debated fairly regularly, but given the fact
17 that Petrobras is a strategic asset, it's the
18 oil and gas company of the country, I would say
19 it's a fair statement to say that Western Asset
20 believed the Brazilian government would --
21 would help financially should Petrobras get --
22 get into trouble.
23 Q. And Western Asset held that view
24 given -- withdrawn.
25     Western Asset held that view

Page 149

```
 1      SARUWATARI - CONFIDENTIAL
 2   throughout the relevant period?
 3   A.  I think it would be fair to say
 4   that.
 5   Q.  If I could ask you to turn the page
 6   to the last page of this document, which is
 7   Bates ending 2826.
 8      If you focus on the second paragraph
 9   in this document, specifically the last two
10   sentences, it reads, "We have a sort of
11   contrarian view about PBR shares at these
12   levels given that in our base case scenario the
13   company will get the necessary price readjust
14   it needs to keep investing in a steady pace.
15   Moreover, we believe that most of the bad news
16   are already priced in since the company has
17   been trading at 6.0X P/E 2013 (against 8.0X P/E
18   average for majors oil companies) and offers
19   around 100 percent potential upside based on
20   the DCF analysis."
21      Do you see that language?
22   A.  Yes.
23   Q.  In these two sentences, is this
24   research note talking about Petrobras equity
25   rather than Petrobras debt?
```

Page 150

```
 1      SARUWATARI - CONFIDENTIAL
 2   A.  Now that I'm reading this, that's
 3   what it appears, if we're talking about price
 4   earning ratios.
 5   Q.  That was going to be my next
 6   question.  The 6.0 P to E against 8.0 P to E,
 7   that's a price to earning ratio?
 8   A.  I believe that's what they're
 9   talking about here.
10   Q.  And the DCF analysis is a discounted
11   cash flow analysis, correct?
12   A.  I believe so.
13   Q.  Do you have an understanding of how
14   Western Asset calculated Petrobras' discounted
15   cash flows at this time?
16   A.  I don't have a detailed analysis or
17   understanding.  But, again, the research
18   analyst's role is to take all of the financial
19   information that's publicly available to them
20   provided by the company or provided through
21   regulators, and taking that and -- and
22   Petrobras is a publicly traded company, so that
23   information would be available, and based on
24   that analysis, quantitative analysis, that's
25   likely how they got to that statement, although
```

Page 151

```
 1      SARUWATARI - CONFIDENTIAL
 2   I don't -- I've never looked at the analysis,
 3   and I don't have knowledge of that analysis.
 4   Q.  Do you have a general understanding
 5   of whether the book value of Petrobras'
 6   property, plant and equipment would have been
 7   an element in the discounted cash flow
 8   analysis?
 9      MR. OLIVAR: Objection to form.
10   A.  Discounted cash flow is exactly
11   that.  It uses the stream of cash flows related
12   to an asset and discounts them to present
13   value.  And cash flows are based on -- are
14   based on cash flows.
15   Q.  Right.  And the cash flows that
16   Petrobras would have had from a particular
17   asset in the future would not depend on the
18   price that Petrobras paid for that asset; is
19   that correct?
20      MR. OLIVAR: Objection to form.
21   A.  If you're talking about what has
22   historically been paid, no.  But if you're
23   talking about projections of what is to be
24   paid, that does factor into cash flow.
25   Q.  So the past expenditures on
```

Page 152

```
 1      SARUWATARI - CONFIDENTIAL
 2   property, plant and equipment would not be
 3   relevant to a calculation of future discounted
 4   cash flows?
 5      MR. OLIVAR: Objection to form,
 6   misstates testimony.
 7      You can answer.
 8   A.  Yeah, I think that's the way a
 9   discounted cash flow analysis works.
10   Q.  You can put this document to the
11   side.
12      I know we talked about references to
13   Petrobras being a long-time holding of Western
14   Asset's.
15      Do you have an understanding of when
16   Petrobras was first purchased by Western Asset
17   on behalf of any of the separate account
18   plaintiffs or other action plaintiffs in
19   particular?
20   A.  I don't have specific knowledge of
21   that.  The records -- easy to go back to the
22   records and figure that out.
23   Q.  Understood.
24      Do any of the Western Asset Funds
25   still hold their investments in Petrobras.
```

Page 153

SARUWATARI - CONFIDENTIAL

1    SARUWATARI - CONFIDENTIAL
2  A.  Yes, we do.
3  Q.  Do you have an understanding of the
4  rough magnitude of investments remaining today
5  on behalf of the Western Asset Funds in
6  Petrobras securities?
7     MR. OLIVAR: Objection to form.
8     You can answer.
9  A.  It really varies on the mutual fund.
10    MR. OLIVAR: Also outside the scope.
11    Go ahead.
12 A.  It really varies on the fund and,
13  again, guidelines, restrictions, benchmarks,
14  but it would be easy to go back to the records
15  and figure that out.
16 Q.  Do you have a rough sense of the
17  orders of magnitude, rough dollar amounts in
18  the aggregate of Petrobras securities that are
19  currently held by the Western Asset Funds?
20    MR. OLIVAR: Objection to form,
21  outside the scope, and asked and answered.
22    Go ahead.
23 A.  I do not.
24 Q.  But you do have an understanding
25  that the Western Asset Funds continue to hold

Page 154

1    SARUWATARI - CONFIDENTIAL
2  some investments in Petrobras securities?
3     MR. OLIVAR: Same objections.
4  A.  Yes.
5  Q.  If I asked you the same question
6  about the separate account plaintiffs and
7  whether they continue to hold investments in
8  Petrobras securities, do you know the answer?
9     MR. OLIVAR: Same objections, and
10  compound.
11    Go ahead.
12 A.  Again, I'd have to look at each
13  account's holdings list to see if they're still
14  holding securities today.
15 Q.  Do you have an understanding, in
16  general, of whether any of the separate account
17  plaintiffs continue to hold investments in
18  Petrobras securities?
19    MR. OLIVAR: Same objections.
20  Outside the scope.
21 A.  Again, I would have to look at the
22  strategy and benchmarks and holdings reports.
23 Q.  You would have to look at the
24  strategy and benchmarks to determine whether
25  they, today, hold investments in Petrobras

Page 155

1    SARUWATARI - CONFIDENTIAL
2  securities?
3  A.  Well, I think it would be easier if
4  we just looked at the holdings, holdings
5  report, but if I had access to the strategies
6  and the benchmarks, you might be able to -- to
7  imply whether or not they have them, because
8  some of these benchmarks have Brazil exposure
9  in the benchmarks.
10 Q.  Do you have an understanding of
11  whether, during the relevant period, anyone at
12  Western Asset reviewed what's called the facts
13  and data blog?
14 A.  I'm not familiar with the facts and
15  data blog.
16 Q.  In Portuguese, it's called the fatos
17  e dados blog.
18    Are you familiar with that?
19 A.  No, I'm not.
20 Q.  Are you familiar with whether anyone
21  at Western Asset reviewed the fatos e dados
22  blog during the relevant time period?
23 A.  I'm not.
24 Q.  Do you have an understanding of who
25  was responsible, if anyone, at Western Asset

Page 156

1    SARUWATARI - CONFIDENTIAL
2  during the relevant time period for reviewing
3  Petrobras' public filings?
4  A.  During what period?
5  Q.  The relevant period.
6  A.  Again, it would have been a variety
7  of people, but during the relevant period, I
8  think we covered that Matt Duda was the lead
9  portfolio manager for emerging markets
10  corporate credit, and he would have been the
11  lead researcher as well on Petrobras.
12    There were other -- Keith Gardner
13  was looking at -- even though they're portfolio
14  managers, they wear the hat of research as
15  well. They don't just manage portfolios. They
16  do research. Keith Gardner would have been on
17  that list.
18    And then, you know, as noted
19  earlier, folks in our Sao Paulo office were
20  reviewing them, but in our Sao Paulo office,
21  like I mentioned, we manage equities and fixed,
22  so there was -- it appears to me that Paschoal
23  was an equity analyst at that time, reviewing
24  Petrobras or responsible to review Petrobras
25  and producing research notes.

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL

STEVEN SARUWATARI 30(b)(6)
April 13, 2016

Page 157

SARUWATARI - CONFIDENTIAL
1
And then Jeff Nuruki, I mentioned
2
before, was involved helping Matt Duda conduct
3
research.
4
Q.  Do you have an understanding of what
5
aspects of Petrobras' public filings were
6
relevant to their investment decisions?
7
MR. OLIVAR: Objection to form.
8
A.  Again, I think public filings are a
9
very, very good source of information.  They
10
are reported to the SEC.  They are reported to
11
regulatory agencies, especially for a publicly
12
traded company.  We have to assume that they
13
are true and accurate, especially since they
14
are audited by reputable auditing companies.
15
So it's a very, very good source of
16
information, but it's not the only source of
17
information.  You know, there's information
18
that's being given by the company directly
19
to -- to the marketplace, through investor
20
meetings.  There's rating agencies that monitor
21
these companies, and we look at those reports
22
as well.
23
So there's a variety of documents
24
that we're looking at to evaluate issuer
25

Page 158

SARUWATARI - CONFIDENTIAL
1
securities, regular basis.
2
Q.  And focusing on Petrobras' public
3
filings, you don't have an understanding of
4
what aspects of those public filings
5
were used to make investment decisions in
6
Petrobras securities?
7
MR. OLIVAR: Objection to form.
8
A.  Generally speaking, public
9
documents, like an annual report, for example,
10
contain some pretty valuable information about
11
the balance sheet, profit and loss statement,
12
cash flows, and those are clarified with notes
13
to financial statements that contain some
14
valuable information.
15
So I would say, generally, most of
16
the information that's available publicly is
17
looked at.
18
Q.  Do you have an understanding of what
19
aspects of Petrobras' public filings were
20
utilized in the investment decisions in
21
Petrobras securities that Western Asset made
22
during the relevant period?
23
MR. OLIVAR: Objection to form.
24
Asked and answered.
25

Page 159

SARUWATARI - CONFIDENTIAL
1
Go ahead.
2
A.  What -- can you clarify what
3
aspects?  I just mentioned balance sheet,
4
income statement, cash flows, notes to
5
financial statements, the commentary that's
6
given at the beginning of an annual report.  We
7
rely on a lot of that to -- to make investment
8
decisions.
9
We believe that information there is
10
true and accurate, and it could be relied on to
11
make investment decisions.
12
Q.  Understood.  But you don't have an
13
understanding of what aspects of Petrobras'
14
public filings were utilized to make investment
15
decisions during the relevant period?
16
MR. OLIVAR: Objection to form,
17
asked and answered, misstates testimony.
18
Go ahead.
19
A.  Give me an example of what you mean
20
by aspect, and maybe I could clarify that for
21
you.
22
Q.  You indicated that, in general,
23
public reports have a lot of different
24
information.  They have cash flow information.
25

Page 160

SARUWATARI - CONFIDENTIAL
1
They have profit and loss statements.  They
2
have, in the case of an oil and gas company,
3
information about production capacity.
4
Are there specific aspects of
5
Petrobras' public statements that Western Asset
6
relied on in making investment decisions in
7
Petrobras securities?
8
MR. OLIVAR: Same objections.
9
A.  Again, we don't rely on one -- one
10
thing in the public filings to make a -- a
11
investment decision on issuers and Petrobras in
12
particular.
13
We rely on all of the information
14
holistically, and take all of that into
15
consideration when it comes to reviewing public
16
filings of issuers.
17
Q.  Do you have an understanding of
18
whether the historical cost of Petrobras'
19
property, plant and equipment was utilized in
20
making any investment decision in Petrobras
21
securities during the relevant period?
22
MR. OLIVAR: Same objections.
23
A.  For a bondholder, it's asset
24
coverage.  That's one of the many statistics,
25

Page 161

    SARUWATARI - CONFIDENTIAL
1
2   but it's seeing what kind of assets they have
3   to cover their liabilities.  And property,
4   plant and equipment is a component of the asset
5   side of the balance sheet.
6       And so our team would research that,
7   would analyze that and would determine if there
8   is appropriate asset coverage for the
9   liabilities and for purposes of, you know,
10  Petrobras' debt securities.
11  Q.  In determining asset coverage, would
12  Western Asset look at the current or
13  replacement value of the asset, or would it
14  look at the historical cost that the issuer
15  paid to purchase the assets?
16      MR. OLIVAR: Same objections.
17  A.  Again, generally speaking, we would
18  be looking at all of that.  An analysis is
19  not -- does not get you to a single number.  It
20  gets you to a range of -- of outcomes.
21      And so we would be looking at
22  historical costs on the balance sheet.  We
23  would be looking at replacement value.  We
24  would be looking at future replacement value.
25  We would be looking at a lot of different

Page 162

    SARUWATARI - CONFIDENTIAL
1
2   things about assets and what's the -- what's
3   the value of those assets in order to cover
4   their debt securities.
5   Q.  Mr. Saruwatari, how would the past
6   cost of an asset be relevant to asset coverage
7   for a bondholder going forward?
8       MR. OKUN: Objection.
9       MR. OLIVAR: Same objections.
10  A.  How would the past cost be relevant
11  to us?  Well, I think -- I think you rely on
12  the fact that this is the way, generally,
13  accounting principles guide you to report asset
14  values.
15      You might use the past cost in
16  comparison to other oil and gas companies.  You
17  might use the past historical cost to guide you
18  in that relative value analysis when you are
19  doing the analysis, because if other well-known
20  gas companies are keeping their records in the
21  same fashion under generally accepted
22  accounting principles, then you could make some
23  relative value comparisons.
24      Yeah.  So, again, it's one measure
25  of asset value.  It's not the only measure of

Page 163

    SARUWATARI - CONFIDENTIAL
1
2   asset value.  You can have replacement value.
3   You can -- maybe you determine that some of
4   those assets might be worth more than what's
5   stated on the books, maybe less.
6       But, again, it's sort of that
7   holistic approach, trying to arrive at some
8   range of values to guide you in your decision
9   making.
10  Q.  Do you have an understanding of how
11  Western Asset, if at all, used the past cost of
12  property, plant and equipment in evaluating
13  asset coverage for its investments in Petrobras
14  securities?
15      MR. OLIVAR: Objection to form.
16  Same objections.
17  A.  Yeah, again, the numbers that are
18  publicly reported are taken into our analysis.
19  Those are actually the first starting point of
20  the analysis, and that begins the analysis of
21  asset value.
22      Again, guides us in trying to come
23  to a fair assessment of the value of those
24  assets.
25      So, clearly, we do rely on balance

Page 164

    SARUWATARI - CONFIDENTIAL
1
2   sheet information, profit and loss information,
3   cash flow information stated in those public
4   documents.
5   Q.  Mr. Saruwatari, I want to ask a very
6   specific question.
7       How, if at all, does Western Asset
8   use the past cost that Petrobras spent on
9   property, plant and equipment to evaluate asset
10  coverage in making a decision of whether to
11  invest in Petrobras securities?  I'm not asking
12  about profit and loss information.  I'm not
13  asking about cash flow information.
14      I'm asking how, during the relevant
15  period, Western Asset used the past cost of
16  property, plant and equipment to evaluate asset
17  coverage in making its determination to invest
18  in Petrobras?
19      MR. OLIVAR: Same objections, asked
20  and answered.
21      Go ahead.
22  A.  Past cost is what you pay for an
23  asset, and it's subsequently depreciated based
24  on the guidance given by generally accepted
25  accounting principles.  That guidance is

Page 165

1    SARUWATARI - CONFIDENTIAL
2  consistent amongst oil and gas companies, and,
3  therefore, the past cost would then play into
4  the net book value of property, plant and
5  equipment. That would give you some indication
6  of asset coverage, one indication of asset
7  coverage.
8    As a bondholder, you want to make
9  sure that your debt, particularly if it's
10 secured by those assets, is covered by such
11 assets, and not just property, plant and
12 equipment. The other assets on the balance
13 sheet. There could be cash on the balance
14 sheet. There could be receivables, inventory,
15 et cetera.
16   All the assets on the balance sheet
17 are considered, but definitely the book value
18 of property, plant and equipment is a good
19 starting point to determine what your coverage
20 would be.
21 Q. Do you have an understanding of
22 whether or not Western Asset took into account
23 the book value of Petrobras' property, plant
24 and equipment in making its specific investment
25 decisions in Petrobras securities?

Page 166

1    SARUWATARI - CONFIDENTIAL
2    MR. OLIVAR: Objection, asked and
3  answered multiple times.
4    Go ahead.
5    MR. OKUN: And other objections as
6  to form as well.
7    MR. OLIVAR: Same objections.
8  A. Yeah, the book value -- the
9  historical cost is important in making
10 investment decision. It's one -- it's one
11 component of the analysis when making an
12 investment decision as with any issuer, but
13 it's not the only -- it's not the only thing
14 that's analyzed.
15   All -- all of the information on the
16 balance sheet, the income statement, the cash
17 flow analysis, generally, those are the three
18 financial statements that are required, and we
19 are making assessments based on the numbers
20 that are printed there, including the
21 historical cost of capital expenditures that
22 are depreciated in guidance in accordance with
23 generally accepted accounting principles that
24 provide a net book value that would be an
25 indication of the value of that asset as a

Page 167

1    SARUWATARI - CONFIDENTIAL
2  starting point.
3  Q. Do you have a specific understanding
4  of what role, if any, the historical cost of
5  Petrobras' PP&E played in Western Asset's
6  decisions to invest in Petrobras securities
7  during the relevant period?
8    MR. OLIVAR: Same objection. It was
9  asked and answered multiple times. One
10 more.
11   MR. BAREFOOT: It's not been
12 answered. I've had general testimony.
13 I've not had an answer about what role
14 Petrobras' historical PP&E had in Western
15 Asset's decisions to invest in Petrobras
16 securities.
17   MR. OLIVAR: Object to the speech.
18   Go ahead and answer. Same
19 objections.
20 A. It plays -- it plays an important
21 role in the investment management decision
22 making as does a lot of other factors, but
23 property, plant and equipment is one component
24 of the analysis.
25   So it does play an important role,

Page 168

1    SARUWATARI - CONFIDENTIAL
2  and we rely on those numbers as true and
3  accurate, especially if they are audited by a
4  reputable accounting firm.
5  Q. Aside from an understanding that it
6  played an important role, do you have any
7  further understanding of what role, if any,
8  Petrobras' historical cost of property, plant
9  and equipment played in Western Asset's
10 decisions to invest in Petrobras securities
11 during the relevant period?
12   MR. OKUN: Objection.
13   MR. OLIVAR: Same objections. It's
14 been answered multiple times.
15   If you want to answer it again, go
16 ahead.
17 Q. Do you have anything to testify to
18 other than it played an important role?
19   MR. OLIVAR: Same objections, asked
20 and answered.
21   Go ahead. Give your testimony.
22 A. At the risk of sounding repetitive,
23 balance sheet information, profit and loss
24 information, cash flow information is all
25 relied upon to make an investment decision

Page 169

SARUWATARI - CONFIDENTIAL

1 factored in as part of the overall analysis to
2 come to a buy, sell or hold decision. The
3 publicly available information that is
4 available is relied on heavily.
5 Q. You testified that the historical
6 cost of Petrobras' property, plant and
7 equipment played an important role in Western
8 Asset's decisions to invest in Petrobras
9 securities; is that correct?
10 A. That is correct.
11 MR. OKUN: Objection.
12 Q. What role did Petrobras' property,
13 plant and equipment play in that investment
14 decision?
15 MR. OKUN: Objection.
16 MR. OLIVAR: Objection. I don't
17 know what you're asking. Maybe the
18 witness does, but he has answered it about
19 ten times. I think it's getting to the
20 point of harassment, but go ahead and
21 answer --
22 MR. BAREFOOT: If the witness has
23 anything to add to the role that the
24 property, plant and equipment had in the

Page 170

SARUWATARI - CONFIDENTIAL

1 investment decision, other than the fact
2 that it was important, I would like to
3 have that testimony, and I'm not asking
4 about general public statements. I'm
5 asking specifically about the historical
6 cost of Petrobras' property, plant and
7 equipment in Western Asset's decisions to
8 invest in Petrobras securities.
9 MR. OLIVAR: Okay.
10 MR. OKUN: Objection.
11 MR. OLIVAR: He has given you a lot
12 of answers, but you can -- he wants to
13 know if you have anything to add.
14 A. I have nothing further to add.
15 Q. You testified earlier that Western
16 Asset has a dedicated emerging markets desk; is
17 that correct?
18 A. Yes.
19 Q. Why does Western Asset have a
20 dedicated group that focuses on emerging
21 markets as opposed to developed markets?
22 MR. OLIVAR: Objection to form,
23 beyond the scope, but you can answer.
24 A. It's just the way that Western Asset

Page 171

SARUWATARI - CONFIDENTIAL

1 has elected to organize its business. Not all
2 fixed income asset management firms are
3 organized this way, but we believe that, in
4 trying to cover approximately 75 countries in
5 this universe, approximately 500 corporate
6 issuers, you have to have some focus.
7 So we have elected to organize our
8 business in this way.
9 Q. Is it Western Asset's view that
10 emerging markets are more volatile than
11 developed markets?
12 MR. OLIVAR: Objection to form.
13 Beyond the scope also.
14 You can answer.
15 A. At times, yes. That's not
16 necessarily always the case.
17 Q. Do you have an understanding of
18 whether the countries covered by the emerging
19 markets desk have fewer regulations than
20 developed markets?
21 MR. OLIVAR: Same objections.
22 A. You are talking about emerging
23 markets as a whole, so it's hard to make that
24 broad statement, but there are certain

Page 172

SARUWATARI - CONFIDENTIAL

1 countries that have fewer regulations.
2 Q. Prior to January 2014, did Western
3 Asset believe that Brazil had effective
4 measures in place to prevent corporate fraud
5 during the relevant period prior -- I'm going
6 to withdraw that.
7 Did Western Asset believe, prior to
8 January 2014, that Brazil had in place
9 effective measures to prevent corporate fraud?
10 MR. OLIVAR: Objection to form,
11 outside the scope.
12 You can answer.
13 A. General understanding is that fraud
14 is very difficult to detect, and even developed
15 markets have very, very strong regulations and
16 strong controls, but when two or more people
17 want to commit fraud, it's -- it can be -- it's
18 doable.
19 Q. Did Western Asset undertake any
20 research on the laws in place in Brazil
21 regarding corruption prior to making any
22 investments in Petrobras securities during the
23 relevant period?
24 MR. OLIVAR: Same objections.

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL

STEVEN SARUWATARI 30(b)(6)
April 13, 2016

Page 173

```
1    SARUWATARI - CONFIDENTIAL
2    You can answer.
3 A.  I'm not sure specifically on that,
4    but generally our analysis of corporate
5    securities would include an analysis of,
6    country analysis or sovereign analysis, where
7    you examine the country that you are investing
8    in, and that would generally include rules of
9    law, governance, the political arena and -- to
10   ensure that an investment you are making in
11   that country would not be negatively impacted
12   by the government.
13 Q.  Do you have a specific understanding
14   of whether Western Asset conducted that type of
15   an analysis with respect to Brazil prior to
16   making any investments in Petrobras securities?
17 A.  Specifically related to corruption?
18 Q.  Well, you talked generally about
19   conducting a country analysis that involved
20   rules of law, governance, political controls.
21   Did Western Asset conduct that type
22   of general analysis with respect to Brazil
23   prior to investing in Petrobras securities
24   during the relevant period?
25 A.  Yes, we did.
```

Page 174

```
1    SARUWATARI - CONFIDENTIAL
2 Q.  Do you have an understanding of
3    whether that analysis covered any consideration
4    of the laws in place in Brazil during the time
5    regarding corruption and fraud?
6 A.  I'm not aware.
7 Q.  Was Western Asset aware that, prior
8    to January 2014, companies could not be held
9    liable in Brazil for corruption or bribes paid
10   by their employees?
11   MR. OLIVAR: Objection to form.
12   You can answer.
13 A.  I'm not sure.
14 Q.  Does Western Asset have any policies
15   regarding circumstances under which it will or
16   will not invest in an issuer that is involved
17   in corruption allegations?
18 A.  Not necessarily.  Again, when making
19   an investment in an issuer or an issue, we take
20   into consideration all the information that is
21   available to us, and so to make a broad
22   statement that we won't invest in any companies
23   that have been known to be corrupt, that's
24   probably untrue.
25 Q.  Do you know whether Western Asset
```

Page 175

```
1    SARUWATARI - CONFIDENTIAL
2    has invested in companies that were being
3    investigated for violations of the Foreign
4    Corrupt Practices Act?
5    MR. OLIVAR: Objection to form,
6    beyond the scope.
7    Go ahead.
8 A.  Not that I'm aware.
9 Q.  Do you know whether Western Asset
10   has invested in Statoil?
11   MR. OLIVAR: Same objections.
12   Go ahead.
13 A.  Can you remind me what the country
14   is?
15 Q.  Norway.
16 A.  I'm not aware.
17 Q.  Not aware, one way or the other, of
18   whether Western Asset has invested in Statoil?
19   MR. OLIVAR: Let him finish the
20   question before you answer.  Same
21   objections.
22   Go ahead.
23 A.  Yeah.  Norway wouldn't be included
24   in the universe of emerging markets, but
25   outside of that, I'm not aware.
```

Page 176

```
1    SARUWATARI - CONFIDENTIAL
2 Q.  Do you know whether Western Asset
3    has invested in the French oil company Total?
4 A.  I am not aware of that.
5 Q.  We saw before that Western Asset, at
6    least some of the Western Asset Funds, had
7    invested in the Brazilian mining company, Vale,
8    during the relevant period.
9    Do you recall that?
10 A.  Yes.
11 Q.  Do you know whether Western Asset
12   Funds are still invested in Vale?
13   MR. OLIVAR: Same objections.
14   Outside of the scope.
15   You can answer.
16 A.  I believe we are still invested in
17   Vale.
18 Q.  Is Western Asset aware of corruption
19   allegations concerning Vale's mining
20   concessions in Guinea?
21   MR. OLIVAR: Same objections.
22 A.  I'm not personally aware of that,
23   but it's possible that a research analyst
24   covering Vale is familiar with that.
25 Q.  Do you know what, if any, those
```

Page 177

```
 1        SARUWATARI - CONFIDENTIAL
 2   corruption allegations played in Western
 3   Asset's investment decisions in Vale?
 4   A.  I am not.
 5        THE VIDEOGRAPHER: Five minutes to
 6   tape change.
 7        MR. BAREFOOT: We'll take a quick
 8   break.
 9        THE VIDEOGRAPHER: We are now off
10   the record.  The time is 3:12 p.m.
11   (Recess taken.)
12        THE VIDEOGRAPHER: This is tape five
13   of the deposition of Mr. Steven
14   Saruwatari.  We are now back on the
15   record.  The time is 3:29 p.m., April 13,
16   2016.
17   BY MR. BAREFOOT:
18   Q.  Mr. Saruwatari, I'm going to show
19   you a document that's been marked as Exhibit 15
20   that does not bear a Bates stamp, but that I
21   will represent to you we obtained from your
22   website.
23        (Western Asset Exhibit 15, Emerging
24   Markets: What Forces Are at Work?, marked
25   for identification.)
```

Page 178

```
 1        SARUWATARI - CONFIDENTIAL
 2   Q.  Do you recognize this document as a
 3   question and answer session with Mr. Abad who
 4   we discussed earlier?
 5   A.  Yes.
 6   Q.  There is one specific line I want to
 7   direct your attention to on page three of this
 8   document, please.
 9        Under the subheading Brazil, the
10   second paragraph there reads, "Sources of
11   additional market volatility currently remain
12   in place:  Brazil faces a potentially
13   protracted period of high inflation on
14   weather-related food price pressures and the
15   unwinding of costly public tariffs and general
16   election this October.  It remains to be seen
17   just how much elected officials will tilt
18   towards more market-friendly policies that help
19   generate a more constructive balance between
20   growth and inflation.  A continuation of the
21   current unpopular measures would be a clear
22   negative for Brazil."
23        Do you see the reference here to
24   general elections this October, meaning October
25   of 2014?
```

Page 179

```
 1        SARUWATARI - CONFIDENTIAL
 2   A.  Yes.
 3   Q.  Do you have an understanding --
 4   withdrawn.
 5        Do you also see the language about
 6   how much elected officials will tilt towards
 7   market-friendly policies in the future?
 8   A.  Yes.
 9   Q.  Did Western Asset have an
10   understanding that the outcome of the 2014
11   general elections in Brazil would have an
12   impact on the prices of securities for
13   Brazilian issuers?
14        MR. OLIVAR: Objection, beyond the
15   scope.
16        You can answer.
17   A.  Again, we -- in our country
18   analysis, we are doing an analysis of a variety
19   of things, and elections are one of those
20   things, and we watch elections very closely to
21   determine what the political environment is
22   going to be, you know, prior to election and
23   then after the election.
24   Q.  As part of that monitoring and
25   country analysis, did Western Asset develop a
```

Page 180

```
 1        SARUWATARI - CONFIDENTIAL
 2   view on how the outcome of the 2014 general
 3   election in Brazil would affect the prices of
 4   securities for Brazilian companies?
 5        MR. OLIVAR: Same objections.
 6   A.  Not that I'm aware of.
 7   Q.  You see the reference here that a
 8   continuation of the current unpopular measures
 9   would be a clear negative for Brazil.
10        Do you understand that to mean that
11   a victory for the current administration would
12   have a negative impact on the prices of
13   Brazilian issuers?
14        MR. OLIVAR: Same objections.
15   A.  I don't know if that's specifically
16   related to the current administration versus
17   what's going to be a new administration, but a
18   continuation of the current unpopular measures,
19   a current unpopular things that are in place,
20   if there was a continuation, would be a clear
21   negative for Brazil.  That's a statement that's
22   being made, yes.
23   Q.  Do you have an understanding of what
24   specific role, if any, the October 2014 general
25   election in Brazil had in Western Asset's
```

Page 181

```
 1        SARUWATARI - CONFIDENTIAL
 2   decisions with respect to investments in
 3   Petrobras securities around that time?
 4        MR. OLIVAR: Same objections.
 5 A.  I'm not aware one way or the other.
 6 Q.  You can put that exhibit to the
 7   side, please.
 8        (Western Asset Exhibit 16,
 9   Environment, Social and Governance,
10   Investment Policy Statement, marked for
11   identification.)
12 Q.  Mr. Saruwatari, I'm showing you
13   what's previously been marked as Exhibit 16,
14   which is not Bates stamped, but I will also
15   represent to you that we obtained from your
16   website.
17        Are you familiar with this document?
18 A.  I have not read it, but it is --
19   appears to be an explanation of our ESG
20   policies.
21 Q.  Are you familiar with those ESG
22   policies at Western Asset?
23 A.  Generally.
24 Q.  If I could direct your attention to
25   the fourth paragraph down in the right column
```

Page 182

```
 1        SARUWATARI - CONFIDENTIAL
 2   which reads, "As a fixed income, rather than
 3   equity investor, Western Asset can best
 4   exercise influence by letting the financial
 5   management of companies in which the firm
 6   invests know the extent to which Western Asset
 7   seeks compensation for low ESG ratings by
 8   demanding a greater premium (or spread) at the
 9   point of issue."
10        Do you have an understanding of how
11   Western Asset ascribes OSG ratings to
12   particular issuers?
13        MR. OLIVAR: Objection to form.
14   Beyond the scope.
15        ESG?
16        MR. BAREFOOT: The document is
17   entitled Environmental, Social and
18   Governance (ESG).
19        MR. OLIVAR: Right. The transcript
20   has OSG.
21        MR. BAREFOOT: Oh, I apologize.
22        MR. OLIVAR: I think you said ESG,
23   then OSG. I just wanted it to be clear.
24 A.  Can you repeat your question?
25 Q.  Yes. I apologize.
```

Page 183

```
 1        SARUWATARI - CONFIDENTIAL
 2        You see the reference in the fourth
 3   paragraph in the section of the text that I
 4   read that refers to low OS -- low ESG ratings.
 5        Do you have an understanding --
 6 A.  Yes.
 7 Q.  -- of Western Asset's practices in
 8   ascribing ESG ratings to particular issuers?
 9        MR. OLIVAR: Same objections.
10 A.  No, I don't.
11 Q.  Do you have an understanding of
12   whether Western Asset undertook an analysis of
13   ESG factors as to Petrobras during the relevant
14   period?
15 A.  No, I don't.
16 Q.  Do you have an understanding of
17   whether, at any point, Western Asset
18   communicated to Petrobras a desire for
19   compensation in exchange for low ESG ratings as
20   referenced in this document?
21        MR. OLIVAR: Same objections.
22 A.  I'm not aware.
23 Q.  If I could have you turn to the
24   second page of this document. The third
25   paragraph down reads, "We consider 'G' to be
```

Page 184

```
 1        SARUWATARI - CONFIDENTIAL
 2   the most important of the three ESG factors.
 3   Without good governance (which Western Asset
 4   takes to include strong investor relations and
 5   financial reporting, among other things) it is
 6   hard to be confident that management,
 7   leadership and integrity will be in place for
 8   the E and S factors. Good governance should be
 9   a fundamental of every business."
10        Do you have an understanding of
11   whether, during the relevant period, Western
12   Asset undertook any analysis of the G factor at
13   Petrobras?
14        MR. OLIVAR: Same objections.
15 A.  Specific to Petrobras, I'm not
16   aware. But, generally, that's the practice of,
17   and the work of research analysts to -- to,
18   again, examine all these things, including good
19   governance.
20 Q.  And you're not aware of any analysis
21   that those research analysts or anyone else at
22   Western Asset undertook of governance at
23   Petrobras specifically during the relevant
24   period?
25 A.  I'm not.
```

Page 185

SARUWATARI - CONFIDENTIAL

1
2 Q.  You can put that to the side,
3 please.
4     MR. BAREFOOT: If I could ask this
5 document to be marked as Exhibit 17
6 bearing Bates stamp WESTERN01295633
7 through 5640.
8     (Western Asset Exhibit 17, E-Mail
9 With Attachment, Bates Stamped
10 WESTERN01295633 through 12965640, marked
11 for identification.)
12 Q.  Mr. Saruwatari, do you recognize
13 this document as an e-mail from Jean-Pierre Gil
14 to the EM desk Pasadena listserv dated
15 February 4, 2015?
16 A.  Yes.
17 Q.  Who is Mr. Gil?
18 A.  He is currently the leading
19 corporate credit research in Brazil and -- or
20 broader Latin America.
21 Q.  And is he based in Sao Paulo?
22 A.  Based in Sao Paulo, yes.
23 Q.  If I could turn your attention to
24 the third paragraph in this e-mail -- excuse
25 me -- the second paragraph.  It reads, "In our

Page 186

SARUWATARI - CONFIDENTIAL

1
2 view, the recent price action is mostly related
3 to Camargo Correa's potential involvement in
4 Lava Jato investigations (there have been
5 rumors for some days that Camargo's executives
6 could accept a plea bargain to reveal new
7 information re: Petrobras scandal).  The
8 slowdown of the local economy should affect its
9 business for awhile (Brazil plus Argentina
10 equals 70 percent of revenues), but that's not
11 the major driver for the recent weakness.  We
12 believe Camargo's potential involvement should
13 be limited to its construction operations, so
14 its cement business should be reasonably
15 isolated from a potential escalation of
16 investigations."
17     Do you see that language?
18 A.  Yes.
19 Q.  From this language, do you have an
20 understanding that Western Asset did not view
21 involvement in the Lava Jato scandal as,
22 itself, a basis to foreclose an investment in
23 an issuer?
24     MR. OLIVAR: Objection.  Same
25 objections.

Page 187

SARUWATARI - CONFIDENTIAL

1
2     You can answer.
3 A.  I wouldn't characterize it that way.
4 Based on what I'm reading here, there's only
5 potential involvement at this stage in the Lava
6 Jato investigations, and then there have been
7 rumors.  So those are just rumors.  There's
8 nothing that's been confirmed.
9     So I wouldn't say that knowing
10 potential involvement in Lava Jato would
11 foreclose a decision to not invest here.
12 Q.  Consistent with your prior
13 testimony, you don't have an understanding that
14 actual involvement in Lava Jato itself would
15 foreclose Western Asset from investing in any
16 issuer in particular; is that correct?
17     MR. OLIVAR: Objection to form,
18 foundation, vague and ambiguous.
19     You can answer.
20 A.  Again, there's nothing here
21 confirming involvement in Lava Jato.  If there
22 was a statement of confirmation of involvement
23 in Lava Jato, maybe the statements would be
24 different.
25 Q.  Western Asset doesn't have and

Page 188

SARUWATARI - CONFIDENTIAL

1
2 didn't have, during the relevant period, a
3 policy against investing in any companies that
4 had confirmed involvement in the Lava Jato
5 investigation; is that correct?
6     MR. OLIVAR: Objection to form.
7     You can answer.
8     MR. OKUN: Objection.
9 A.  Yeah, Lava Jato is a corruption
10 scandal that started in 2013.  So Western Asset
11 does not have a policy for -- Western Asset
12 cannot foresee corruption investigations
13 happening.  So, therefore, it's hard to develop
14 a policy to address those.
15 Q.  And Western Asset does not have any
16 policy about investing or not investing in
17 companies that have involvement in Lava Jato;
18 is that correct?
19     MR. OLIVAR: During the relevant
20 period or currently?
21 Q.  At any time, did Western Asset have
22 a policy against investing in companies that
23 had involvement in Lava Jato?
24     MR. OLIVAR: Objection to form.
25     You can answer.

Page 189

```
 1        SARUWATARI - CONFIDENTIAL
 2        MR. OKUN: Objection.
 3   A.  No.  Yeah, the answer is no.
 4   Q.  If I could direct your attention to
 5   the fifth paragraph down, it reads, "Last but
 6   not least, Brazilian cement companies were
 7   involved in a cartel case and were fined by
 8   CADE (antitrust regulator) in 2014.
 9   InterCement got a US dollar 100 million fine
10   and were forced to sell assets.  Although the
11   decision is subject to appeal by the companies,
12   it was important to clarify the maximum
13   penalties companies may be subject to, which in
14   the case of InterCement, won't be material from
15   a credit standpoint."
16        Do you have an understanding, from
17   that reference, that it was Western Asset's
18   view that the hundred million dollar fine was
19   not material, from a credit standpoint, for its
20   analysis of investments in InterCement?
21        MR. OLIVAR: Objection to form.
22   Beyond the scope.
23        MR. OKUN: Objection.
24        MR. OLIVAR: You may answer.
25   A.  Yeah, it's really hard for me to
```

Page 190

```
 1        SARUWATARI - CONFIDENTIAL
 2   make a statement about materiality when I don't
 3   have all of the information here.
 4   Q.  Is that how you interpret Mr. Gil's
 5   statement in this e-mail?
 6        MR. OKUN: Objection.
 7        MR. OLIVAR: Same objections.  Also
 8   lacks foundation.
 9   A.  I could just read what he wrote at
10   the time, which is they were involved in a
11   cartel case.  They were fined a hundred
12   million, and they were forced to sell assets.
13   That's all I can read here.
14   Q.  Do you also read that the hundred
15   million dollar fine, in his analysis, was not
16   material from a credit standpoint?
17   A.  He's not -- I don't think he's
18   saying that.
19        MR. OKUN: Excuse me.  Objection.
20   Go ahead.
21        MR. OLIVAR: Same objections.
22   A.  Yeah, he doesn't mention anything
23   about materiality or immateriality.  He's
24   mentioning a statement about a fine and the
25   dollar amount.
```

Page 191

```
 1        SARUWATARI - CONFIDENTIAL
 2   Q.  I want to refer you to the last
 3   sentence of this paragraph we have been looking
 4   at.  "Although the decision is subject to
 5   appeal by the companies, it was important to
 6   clarify the maximum penalties companies may be
 7   subject to, which in the case of InterCement,
 8   won't be material from a credit standpoint."
 9        Do you interpret that --
10   A.  Okay.
11   Q.  -- in any way other than analysis of
12   the materiality of that fine as to a credit
13   standpoint of InterCement?
14        MR. OKUN: Objection.
15        MR. OLIVAR: Same objections.
16   A.  It does appear that he is saying
17   it's not material or it won't be material, but,
18   again, it's a bit of a confusing statement in
19   my view.  The decision is subject to appeal,
20   and it was important to clarify the maximum
21   penalties companies may be subject to.
22        So I'm not exactly sure what he is
23   saying here.  Is the hundred million not
24   material?  It's hard for me to make that
25   connection.
```

Page 192

```
 1        SARUWATARI - CONFIDENTIAL
 2   Q.  That's fine.  You can put that to
 3   the side.
 4        We talked a little earlier about
 5   traders who actually place orders and execute
 6   trades in securities for clients.
 7        I'm correct that Western Asset is
 8   not, itself, a broker/dealer; is that correct?
 9   A.  Yes, I believe we are not a
10   broker/dealer.
11   Q.  And Western Asset does not, on
12   behalf of its clients, place securities trades
13   with any affiliates that are broker/dealers; is
14   that correct?
15   A.  I believe that's the case.
16   Q.  And Western Asset does not engage in
17   principal trading?
18   A.  Can you define principal trading?
19   Q.  Western Asset does not acquire
20   securities for the purpose of reselling them to
21   its clients or other investors.
22   A.  That's correct.
23   Q.  How do Western Asset's traders
24   effectuate trades in securities for the Western
25   Asset Funds?
```

Page 193

1           SARUWATARI - CONFIDENTIAL
2  A.  They would get -- the trader would
3  get instruction from the portfolio managers,
4  and then the trader would reach out to dealers.
5  I'm not exactly sure how many dealers they are
6  required to reach out to, but a number of
7  dealers, to ensure the client or the investor
8  of the portfolio is getting a fair price.
9       The trader would actually negotiate
10  prices as well.
11  Q.  Do you have an understanding of how,
12  mechanically, the trader reaches out to the
13  broker/dealers?
14  A.  I believe -- well, there are
15  probably a few methods.  One is just picking up
16  the phone.  I think, generally, that's how most
17  of the business is conducted.
18       I believe some of it might be done
19  through e-mail or chat or some electronic
20  means.
21  Q.  Do you have a specific understanding
22  of what methods, other than calling
23  broker/dealers, are used by Western Asset's
24  traders?
25  A.  No, I'm not exactly familiar with

Page 194

1           SARUWATARI - CONFIDENTIAL
2  all the different methods.
3  Q.  But you believe that there are
4  methods where they can get quotations for
5  securities trades other than over the phone?
6  A.  Oh, yeah.  Bloomberg, Bloomberg
7  chat, for example.
8  Q.  Are you aware of any examples other
9  than Bloomberg?
10  A.  No, I'm not.
11  Q.  Okay.  You mentioned earlier that
12  there may be times when someone other than the
13  designated trader is the one to execute the
14  trade in instances where the designated traders
15  are out of the office traveling or ill; is that
16  correct?
17  A.  Yes.
18  Q.  So do traders have the ability to
19  place securities trades on behalf of Western
20  Asset funds while they are outside of the
21  office?
22  A.  Yes.  They can -- they can actually
23  speak to somebody in the office.  They can
24  write an e-mail -- the portfolio manager can
25  write an e-mail to the trader to communicate

Page 195

1       SARUWATARI - CONFIDENTIAL
2  that.
3  Q.  Sorry.  I was focused on the
4  traders, the individuals who place and
5  effectuate the securities trades.
6  A.  I see.  I see.
7  Q.  Are they able to place orders for
8  securities trades on behalf of the Western
9  Asset Funds while they are outside of the
10  office?
11  A.  No.  Generally speaking, no.
12  Usually, it's a trader that's situated in the
13  office.
14  Q.  We talked a little about the means
15  through which those traders might get
16  quotations or prices from a number of
17  broker/dealers.
18       Do you have an understanding of how
19  they actually place the order for a securities
20  trade on behalf of the Western Asset Funds?
21  A.  Are you talking about a new issue or
22  a secondary?
23  Q.  Let's talk about secondary.
24  A.  Secondary.  Yeah, again, it's pick
25  up the phone.  Generally, you pick up the

Page 196

1       SARUWATARI - CONFIDENTIAL
2  phone, speak to dealers, you know, talk about
3  the quantity and the price, you know, canvass
4  the dealer community, and then transact with a
5  dealer that has the most favorable price for
6  the investor.
7  Q.  And how do they typically
8  communicate that order to the dealer that
9  they've determined that has the most favorable
10  price or execution for the customer?
11  A.  Generally, it's by telephone.
12  Q.  Is there anything that would prevent
13  them from doing that while they are outside of
14  the office?
15       MR. OLIVAR:  Objection to form.
16  A.  No.  I suppose a dealer can do that,
17  talk on the phone while they are outside of the
18  office and dial the dealer, but this is -- this
19  is an activity that requires a lot of focus and
20  discipline.  Again, generally speaking, the
21  traders are going to be in the office making
22  those trades.
23  Q.  The broker/dealer that Western
24  Asset's traders are dealing with to place
25  orders in securities for the Western Asset

Page 197

SARUWATARI - CONFIDENTIAL

1     SARUWATARI - CONFIDENTIAL
2   Funds or other Western Asset clients, do you
3   have an understanding of whether those
4   broker/dealers are typically transacting with
5   other broker/dealers who are acting as agent
6   for the counterparty?
7     MR. OLIVAR: Objection to form.
8   A.  I'm sorry.  I didn't understand that
9   question.
10  Q.  Whenever Western Asset's traders
11  place an order for securities with a
12  broker/dealer, do the traders have an
13  understanding of whether that broker/dealer is
14  acting as principal or as agent?
15  A.  When you say principal, they are
16  buying for their own book of business?
17  Q.  Correct.  Do you have an
18  understanding of whether the broker is acting
19  as principal as the counterparty to the
20  transaction with Western Asset or acting as
21  agent for Western Asset in effectuating the
22  trade?
23  A.  When you say agent, an agent for
24  another third party that's trying to sell that
25  security or buy that security?

Page 198

1     SARUWATARI - CONFIDENTIAL
2   Q.  Let's talk about the simple scenario
3   where the broker/dealer is acting as principal
4   and Western Asset places an order for
5   securities with that broker/dealer acting as
6   principal.
7     Is Western Asset aware of whether
8   it's purchasing the securities from the
9   broker/dealer as principal or whether the
10  broker/dealer is acting as an intermediary?
11  A.  Generally, broker/dealers are acting
12  to provide liquidity for the market.  So in
13  order to buy a security, there needs to be a
14  seller.  So I'm not sure you described that as
15  an intermediary, but there needs to be a
16  seller.  And Western is the buyer.
17    So are they acting as an
18  intermediary or an agent in that respect?  You
19  know, sometimes they are selling off their
20  balance sheet.  Other times, they are matching
21  buyer and seller.  So it could be either case.
22  Q.  Understood.  And when Western Asset
23  places the order for the Western Asset Funds or
24  for another Western Asset client, with the
25  broker/dealer, is it aware of whether the

Page 199

1     SARUWATARI - CONFIDENTIAL
2   broker/dealer is acting as principal or acting
3   as an intermediary?
4   A.  Yeah, I'm not sure whether the
5   trader knows that or not.
6   Q.  Do you know if there are any records
7   that Western Asset has that would clarify or
8   confirm whether the broker/dealer, in respect
9   of any transaction, is acting as principal?
10  A.  I'm not aware of any records.
11  Q.  In the instance that you described,
12  where the broker/dealer is acting as an
13  intermediary, is not acting as the counterparty
14  to the securities transaction with Western
15  Asset, does the broker/dealer inform Western
16  Asset of who the seller or counterparty to the
17  transaction is?
18  A.  I'm not aware, but usually that's
19  confidential information, I would believe.
20  Q.  And so, in those instances, Western
21  Asset is also not aware of the location of the
22  counterparty at the time it places the
23  securities order?
24  A.  Generally speaking, when you're
25  dealing with -- I think, yeah, again, you have

Page 200

1     SARUWATARI - CONFIDENTIAL
2   to sort of look at the trade ticket.  It
3   depends on the security you're dealing with,
4   but when you're dealing with, in our world,
5   dollar-denominated securities, and the trader
6   is situated in Pasadena, the Pasadena trader is
7   transacting with -- with a dealer located in
8   the US, typically, New York.
9   Q.  If I could ask you to turn back to
10  what we had marked as Exhibit 9.  That's the
11  ADV form, part 2.  Sorry.  It was page 32,
12  please.
13    And if could direct your attention
14  to the fifth paragraph in this sentence -- in
15  this document, excuse me, which reads, "In
16  selecting brokers for execution, Western Asset
17  seeks to ensure that brokers are selected on
18  the merits and not because of other reasons.
19  Western Asset maintains an approved broker list
20  which is designed to limit trading only to
21  those brokers who demonstrate desk strength,
22  knowledgeable sales coverage, quality research,
23  capital commitment and financial stability.
24  Trades may only be executed with those brokers
25  on the list."

Page 201

```
 1        SARUWATARI - CONFIDENTIAL
 2      Is that an accurate description of
 3    Western Asset's broker selection policy?
 4 A.  Yes.
 5 Q.  Is the approved broker list limited
 6    to US broker/dealers?
 7 A.  In the US, yes.
 8 Q.  When you say in the US, what do you
 9    mean?
10 A.  The approved broker list, and I'd
11    have to take a look at it, probably contains a
12    list of brokers that, for example, the
13    Singapore office can use.  So there's probably
14    a -- I'd have to take a look at it, but I think
15    this ADV, because it's being filed with the --
16    with the SEC, is perhaps talking about the US
17    approved broker list.
18 Q.  When you're talking about the US
19    broker list, what I'm trying to clarify is,
20    what are you qualifying with US?  Is it the
21    country of issuance of the security?  Is it the
22    location of the trader?
23      When you refer to US broker list,
24    what are you referring to?
25 A.  Well, generally, a US trader based
```

Page 202

```
 1        SARUWATARI - CONFIDENTIAL
 2    in New York or Pasadena would be transacting
 3    with a US broker.
 4 Q.  Is the broker list for traders
 5    located in Pasadena and New York limited to US
 6    broker/dealers?
 7 A.  I'd have to take a look at the list,
 8    but it's possible there's other brokers on
 9    there.
10 Q.  Whenever a US-based trader from
11    Western Asset contacts a broker/dealer in the
12    United States, do they have any understanding
13    of where the individuals on behalf of that
14    broker that are going to effectuate the trade
15    are located?
16 A.  Generally speaking, yes.  We have,
17    you know, typical phone systems that have
18    direct dials into these dealers with a push of
19    a button.  And so preprogrammed numbers, you
20    know, dial Goldman Sachs, push a number, you
21    get Goldman Sachs, New York.
22 Q.  In those instances, does Western
23    Asset have any records that reflect which
24    Goldman Sachs entity is actually the
25    counterparty to the transaction?
```

Page 203

```
 1        SARUWATARI - CONFIDENTIAL
 2 A.  Do we have records?
 3 Q.  Correct.
 4 A.  We would have to look at the trade
 5    ticket, but I believe on the trade ticket there
 6    is a counterparty name, and there's a
 7    counterparty address, and if the address is US,
 8    then that's the counterparty that we transacted
 9    that trade with.
10 Q.  And when you say counterparty, you
11    are referring to, and I should have been
12    clearer in my question, the broker/dealer that
13    you dealt with in placing the securities order?
14 A.  That's correct, the dealer that we
15    transacted with.
16 Q.  One last question on this form ADV.
17    If you could flip over to the next page, 33.
18      If I could direct you to the second
19    full paragraph that begins, "Western Asset does
20    not maintain directed brokerage arrangements on
21    its own initiative, and generally recommends
22    against them in light of the unique features of
23    the fixed income market and the potential
24    impact on Western Asset's trading decisions.
25    However, clients may request that Western Asset
```

Page 204

```
 1        SARUWATARI - CONFIDENTIAL
 2    direct the client's brokerage to a particular
 3    broker.  A directed brokerage arrangement
 4    involves a client directive obliging Western
 5    Asset to utilize a particular broker or brokers
 6    without regard to best execution."
 7      Do you have an understanding of
 8    whether any of the -- well, withdrawn.
 9      None of the Western Asset Funds have
10    directed brokerage arrangements; is that
11    correct?
12 A.  I believe that's correct.
13 Q.  Do you have an understanding of
14    whether any of the separate account plaintiffs
15    have directed brokerage arrangements?
16      MR. OKUN: I object to that.
17 A.  I'm not aware.  They would be
18    contained in the investment management
19    agreements as -- generally, as a written
20    contractual arrangement.
21 Q.  And the same would be the case for
22    the other action plaintiffs if, to the extent
23    there was a directed brokerage arrangement, it
24    would be specified in the investment management
25    agreement?
```

Page 205

```
 1      SARUWATARI - CONFIDENTIAL
 2      MR. OKUN: Objection.
 3  A.  I believe so.
 4  Q.  Are there instances when Western
 5  Asset enters into a transaction to buy or sell
 6  a security outside of US trading hours from one
 7  of its US offices?
 8      MR. OLIVAR: Objection to form,
 9  outside the scope.
10  A.  I'm sorry.  Can you repeat that
11  again?
12  Q.  Are there occasions when Western
13  Asset will enter into a transaction to buy or
14  sell securities from one of its US offices
15  outside of US trading hours?
16  A.  Yes.
17  Q.  Do you have an understanding of how
18  US broker/dealers effectuate securities
19  transactions outside of US market hours?
20      MR. OKUN: Objection.
21      MR. OLIVAR: Same objections.
22  A.  Maybe we have to go back to the
23  first question.  Maybe I misunderstood it.
24      The Pasadena office may direct a
25  trade outside of office hours to, for example,
```

Page 206

```
 1      SARUWATARI - CONFIDENTIAL
 2  the Singapore office, to trade in their hours.
 3  Q.  Do you have an understanding of
 4  whether someone from the Pasadena office may
 5  transact with a US broker/dealer outside of US
 6  market hours?
 7      MR. OLIVAR: Same objections.
 8  A.  I don't think that happens.  Once
 9  market hours are closed here in the US, then a
10  trader can't execute a trade.
11  Q.  And in those instances, if Western
12  Asset wanted to enter into a securities
13  transaction, they would use a non-US
14  broker/dealer or a non-US counterparty?
15      MR. OKUN: Objection.
16      MR. BAREFOOT: Same objections,
17  lacks foundation.
18  A.  Possibly. Yeah, possibly.  Again,
19  there needs to be authority given to that
20  office, and that typically comes from the
21  investors.
22  Q.  Aside from transacting through its
23  affiliated offices, are there ways in which
24  Western Asset places trades outside of US
25  market hours?
```

Page 207

```
 1      SARUWATARI - CONFIDENTIAL
 2      MR. OLIVAR: Same objections, scope.
 3  A.  I don't believe so.
 4  Q.  Are there times when the Western
 5  Asset Funds build up a position in a particular
 6  security with the same CUSIP over time making
 7  purchases at different price points?
 8  A.  Yes.
 9  Q.  In those instances, would that
10  Western Asset Fund, when it makes a sale of
11  that CUSIP, have a way to allocate that sale to
12  one of the particular purchases?
13      MR. OLIVAR: Objection to form,
14  outside the scope.
15  A.  I believe that's called a
16  cross-trade, and cross-trades are not -- are
17  not -- are prohibited at Western Asset.
18  Q.  Let me -- let me re-ask the
19  question, because I may have phrased it poorly.
20      If one of the Western Asset Funds
21  purchased a hundred dollars worth of bonds in
22  September, and then purchased a hundred dollars
23  worth of those same bonds with the same CUSIP
24  in October, and then sold $50 worth of those
25  bonds with the same CUSIP, would the Western
```

Page 208

```
 1      SARUWATARI - CONFIDENTIAL
 2  Asset Fund have any ability to track that
 3  particular bond sale to either the September or
 4  October purchase?
 5      MR. OLIVAR: Same objection.
 6      You can answer.
 7  A.  I'm not exactly sure of all the
 8  logistics, but I think what you're referring to
 9  is specific identification of a buy and then
10  matching it with up with a sale; is that --
11  Q.  Correct.  Where you have multiple
12  purchases of a security with the same CUSIP for
13  the same fund, and then a sale of less than all
14  of the holdings in that same CUSIP, is there
15  any way to allocate or link the sale with one
16  of those particular purchases?
17  A.  I think --
18      MR. OLIVAR: Same objections.
19      Go ahead.
20  A.  If I'm not mistaken and, again, I'm
21  unfamiliar with all of the logistics, but when
22  you're making a sale, you have the ability to
23  identify the securities you're selling, to
24  identify those and say I want to sell those
25  securities.
```

Page 209

1    SARUWATARI - CONFIDENTIAL
2        So I believe you can identify the
3    securities you wish to sell, even though they
4    are all the same lot, because if they are
5    bought at different times, they might have
6    different ramifications on the gain/loss.
7    Q.   So you believe that Western Asset's
8    custodian segregates purchases of securities
9    with the same CUSIP made at different times to
10   enable that sort of tracking?
11       MR. OLIVAR: Same objections.
12   A.   Yeah.  Again, I'm not sure what
13   happens at the custody level.  I would think
14   that there is an ability to do that.
15   Q.   But you don't have specific
16   understanding of how that would work?
17   A.   No.
18       MR. BAREFOOT: I'm going to show you
19   a document that's being marked as
20   Exhibit 20 -- pardon me -- Exhibit 18,
21   bearing Bates stamp WESTERN0197767 to 68.
22       (Western Asset Exhibit 18, Trade
23   Confirmation, Bates Stamped
24   WESTERN01977767 through 1977768, marked
25   for identification.)

Page 210

1    SARUWATARI - CONFIDENTIAL
2    Q.   Mr. Saruwatari, do you recognize
3    this as one of the trade confirmations for one
4    of the Western Asset Funds' accounts,
5    specifically the Western Asset Emerging Markets
6    Debt Portfolio?
7    A.   Yes.
8    Q.   And this the general format for
9    trade confirmations maintained by Western Asset
10   that you've referred to in your testimony
11   today?
12   A.   Yes.
13   Q.   And this specific confirmation on
14   the Bates page ending 67 reflects a purchase of
15   Petrobras notes maturing in January 2040.
16   A.   Correct.
17   Q.   And because you've indicated that
18   this is a standard format, if I ask you about
19   what a field in this form signifies, that would
20   be the same for all of Western Asset's trade
21   confirmations that are in this format; is that
22   fair?
23       MR. OLIVAR: Objection to form.
24   A.   Should be, if it's in this template.
25   Q.   Do you have an understanding from

Page 211

1    SARUWATARI - CONFIDENTIAL
2    this document of how Western Asset placed the
3    order for these securities?
4    A.   How we placed the order, meaning if
5    it was by phone or by e-mail or by chat?
6    Q.   Correct.  How Western Asset
7    committed to the dealer to enter into this
8    securities transaction.
9    A.   Not by looking at this trade ticket,
10   no.
11   Q.   Is there another type of document
12   maintained by Western Asset that would reflect
13   that information that you're aware of?
14   A.   Well, I think, if you looked at the
15   transaction number, which is an internal
16   reference number, and you looked at the details
17   surrounding this trade, there might be more
18   information we can -- we can look at that might
19   tell us a little bit more information than this
20   trade ticket is telling us.
21   Q.   What system are those details based
22   on transaction number maintained in?
23   A.   I'm not exactly sure.
24   Q.   Is there anything in this document
25   or this form of document that allows you to

Page 212

1    SARUWATARI - CONFIDENTIAL
2    determine the individual from Western Asset who
3    actually placed the order for this trade?
4    A.   By looking simply at this trade
5    ticket, no.
6    Q.   And, again, are there any other
7    documents that Western Asset maintains or has
8    access to that reflect that level of detail?
9    A.   Yeah.  I think, if you -- again, if
10   you look at that reference number, there might
11   be more information about this trade in the
12   system that's just not printed here.
13   Q.   Okay.  Is there anything in this
14   document that permits you to determine where
15   the person was located when they placed the
16   order for this trade?
17   A.   By inference or by explicit?
18   Q.   Let's start with explicit.
19   A.   I don't see anything here explicitly
20   that tells me who placed the order.
21   Q.   What inference would you suggest
22   drawing about who could have placed the order
23   for this trade?
24   A.   Up in the right corner, it says
25   State Street Boston, custodian bank

Page 213

SARUWATARI - CONFIDENTIAL
1
2  information. So that might indicate or we
3  might be able to infer this was a US
4  transaction trader in Pasadena placing the
5  trade with a counterparty in the US.
6  Q. Well, actually, let's talk about
7  that custodian bank information.
8      What role do you understand the
9  custodian bank played in this transaction?
10 A. Oh, you know what? I'm going to
11 retract that. That's a custodian bank. So
12 State Street Boston is the bank that custodies
13 the assets, yeah.
14 Q. So the securities, once they were
15 purchased, would have been delivered to State
16 Street Boston, correct?
17 A. That's correct, yeah.
18 Q. And the funds to purchase the
19 securities would have been wired from State
20 Street Boston?
21 A. That's correct, yes.
22 Q. Towards the bottom of the page, you
23 will see a heading that says Settlement
24 Parties.
25     Do you see that?

Page 214

SARUWATARI - CONFIDENTIAL
1
2  A. Yeah.
3  Q. And it reads, "Settlement location,
4  DTCYUS33."
5      Do you have an understanding of what
6  that code represents?
7  A. Not exactly.
8  Q. Next to that, there's, in the
9  right-hand column, the words "DTC."
10     Do you have an understanding of what
11 that signifies as to settlement location?
12 A. Yeah. DTC is generally the clearing
13 house for US trades.
14 Q. Below that, there's a line that
15 reads, "Buyer/seller," and there is a code,
16 0573.
17     Do you have an understanding of what
18 that refers to?
19 A. Appears maybe that's a number for
20 Deutsche Bank.
21 Q. And you are inferring that from the
22 fact that, to the right column of that number,
23 there's the words "Deutsche Bank"?
24 A. Yes.
25 Q. Is there anything in this document,

Page 215

SARUWATARI - CONFIDENTIAL
1
2  as we were discussing earlier, that enables you
3  to determine whether, in this transaction,
4  Deutsche was acting as a dealer or acting as
5  the principal in this transaction, selling the
6  securities to Western Asset?
7  A. By looking at this document, no.
8  Q. Is there anything that enables you
9  to determine which Deutsche Bank entity was the
10 dealer or counterparty in this transaction?
11 A. Not explicitly, but by inference,
12 again, DTC, generally, US transactions. So
13 Deutsche Bank US likely transacted this.
14 Q. And what is the basis for your
15 conclusion that Deutsche Bank US likely
16 transacted with Western Asset?
17 A. Again, it's just by inference,
18 because it says DTC here. So DTC are generally
19 for US transactions.
20 Q. You have an understanding that
21 Deutsche Bank has offices all over the world,
22 correct?
23 A. Yes.
24 Q. The last line here says, "Deliv/Recv
25 agent," and has a code 2485.

Page 216

SARUWATARI - CONFIDENTIAL
1
2      Do you have an understanding of what
3  that refers to?
4  A. Not really.
5  Q. If I could ask you to just flip the
6  page to another example of these type of trade
7  tickets, ending in Bates number 768.
8      Focusing, again, on the settlement
9  parties at the bottom of the page, you'll see
10 here that the buyer/seller has a code 187, and
11 a reference in the right-hand column, J.P.
12 Morgan.
13     Is your testimony the same, that
14 from this document, you would not be able to
15 tell which J.P. Morgan entity was involved in
16 this transaction?
17 A. No, I would not.
18 Q. You can put that to the side,
19 please.
20     MR. BAREFOOT: I'm going to have
21 marked, as Exhibit 19, a document bearing
22 Bates stamp WESTERN01977795.
23     (Western Asset Exhibit 19, Trade
24 Confirmation, Bates Stamped WESTERN0197795
25 through 1977796, marked for

Page 217

1     SARUWATARI - CONFIDENTIAL
2  identification.)
3  Q.  Mr. Saruwatari, do you recognize
4  this as another example of a trade ticket in a
5  similar format for a purchase of a Petrobras
6  bond?
7  A.  Yes.
8  Q.  And this one is for another Western
9  Asset Fund, the Western Asset Global Credit
10  Absolute Return Fund.
11  A.  Yes.
12  Q.  If I could refer you to the
13  custodian bank here on the top right-hand
14  corner, it reads, "Bank of New York Brussels."
15     Do you have an understanding of what
16  that refers to?
17  A.  I don't.
18  Q.  Do you have an understanding of
19  whether the custodial account used to hold
20  these securities is located in the United
21  States?
22  A.  Just by looking at the portfolio
23  number which starts with a five, I could tell
24  that this portfolio is managed out of our
25  London office.

Page 218

1     SARUWATARI - CONFIDENTIAL
2  Q.  What about the portfolio number,
3  which is a section of this document that I
4  neglected to ask about, signifies that to you?
5  A.  5656?
6  Q.  Uh-huh.
7  A.  It starts with a five.
8  Q.  So which numbers in the field
9  portfolio correlate to Western Asset offices
10  located abroad?
11  A.  Generally, the portfolio number, the
12  first portfolio number would -- and, again,
13  this is not in all instances, but generally
14  would have some indication of the office
15  managing -- managing the portfolio.
16  Q.  And you indicated that portfolio
17  numbers beginning in five generally correspond
18  to Western Asset's London office; is that
19  correct?
20  A.  Yes, I believe so.
21  Q.  Are there other numbers that begin
22  the portfolio field that are correlated or
23  associated with other Western Asset offices?
24  A.  On this trade ticket or in general?
25  Q.  In this form of trade ticket.

Page 219

1     SARUWATARI - CONFIDENTIAL
2  A.  Yeah, you know, there's again, just
3  generally, there's-- there's some rhyme or
4  reason to that first number.  And, again, my
5  knowledge is that anything that starts with a
6  five is managed out of London office.
7  Q.  If I could ask you to flip the page
8  and look at the next trade ticket which ends in
9  796 on the same exhibit.  You'll see that the
10  portfolio number here begins with a two.
11  A.  Yeah.
12  Q.  Does that signify anything to you
13  about the location of the Western Asset office
14  that was responsible for managing this
15  portfolio?
16  A.  Yes.  I believe a two would indicate
17  Pasadena, but two would not be the only number
18  that indicates Pasadena.  Pasadena has the most
19  number of accounts, I believe.  So you might
20  get into other numbers, but two generally is --
21  and, again, I mean, when we first started the
22  business, we started with an account number
23  one.  So there are some account numbers that
24  have, for example, 984 is managed out of
25  Pasadena, but it doesn't start with a two.

Page 220

1     SARUWATARI - CONFIDENTIAL
2     So it's just legacy.  As we grew, we
3  tried to organize account numbers by office.
4  Q.  If the portfolio number on a trade
5  ticket begins with a one, does that signify
6  anything to you about the location of the
7  office responsible for this trade?
8     MR. OLIVAR: Objection to form.
9  A.  I believe if it started with a
10  one -- I mean, it would be associated with a
11  office, but I'm not sure what office if it
12  started with a one.
13  Q.  If it started with a two, that would
14  generally be associated with Pasadena?
15  A.  I believe so, yes.
16  Q.  What if it started with a three?
17  A.  I'm not entirely sure.  Again, there
18  is rhyme and reason to the first number,
19  generally.  So there's something to be inferred
20  by that first number, but I don't know all the
21  offices and codes.
22  Q.  Are there numbers, other than five,
23  three and two, that you have knowledge as to
24  the significance of that number when it appears
25  in the portfolio form -- portfolio field, I'm

Page 221

```
 1        SARUWATARI - CONFIDENTIAL
 2    sorry, on this form of trade ticket?  Go ahead.
 3    A.   If it starts with a seven, it's in
 4    Tokyo, having spent four years there.
 5    Q.   Are there any documents that you're
 6    aware of that reflect that portfolio number
 7    correlation and explain the numbering system?
 8    A.   No.
 9    Q.   You just know that from your
10    experience?
11    A.   Know that from my experience.
12    Q.   You can put that to the side,
13    please.
14        MR. BAREFOOT: I'm going to show you
15    a document that's being marked as
16    Exhibit 20.  This document was produced to
17    us in native format bearing Bates stamp
18    WESTERN00001828, and then we've printed
19    out the spreadsheet in the native format
20    so it's easier to read.
21        (Western Asset Exhibit 20,
22    Spreadsheet, Bates Stamped
23    WESTERN00001828, marked for
24    identification.)
25    Q.   Are you familiar with this
```

Page 222

```
 1        SARUWATARI - CONFIDENTIAL
 2    spreadsheet?
 3    A.   Yes.
 4        MR. OLIVAR: 20 is the combination
 5    of the two?
 6        MR. BAREFOOT: Correct.
 7    Q.   What is this spreadsheet?
 8    A.   It's just a spreadsheet that has
 9    information about purchases and sales of
10    Petrobras securities.
11    Q.   And you've seen this spreadsheet
12    before today?
13    A.   Yes, I have.
14    Q.   Do you understand whether this
15    spreadsheet was maintained in this form by
16    Western Asset in the ordinary course or whether
17    this was prepared for purposes of this
18    litigation?
19        MR. OLIVAR: Objection to form.
20    A.   I'm not aware of either way.
21    Q.   Do you have an understanding of
22    whether this spreadsheet reflects all of the
23    Western Asset Funds transactions in Petrobras
24    securities during the relevant period?
25    A.   Hard for me to attest that this is
```

Page 223

```
 1        SARUWATARI - CONFIDENTIAL
 2    all of the trades, but it looks to be a pretty
 3    comprehensive list.
 4    Q.   Same question as to the separate
 5    account plaintiffs.
 6    A.   Yes.
 7        MR. OKUN: Objection as to form, but
 8    go ahead.
 9    Q.   I want to ask you about the first
10    column on the left-hand side in this
11    spreadsheet that bears the heading Reference
12    Number.
13        Do you have an understanding what
14    that reference number refers to?
15    A.   I understand that to be just an
16    internal reference number of the transaction.
17    Q.   Is there any correspondence or
18    significance to the number in relation to the
19    location of the office that was responsible for
20    the trade?
21    A.   Not that I'm aware of.
22    Q.   The next column bears the heading
23    Memo Number.
24        Do you have an understanding of what
25    that number corresponds to?
```

Page 224

```
 1        SARUWATARI - CONFIDENTIAL
 2    A.   Just another internal number, I
 3    believe, that comes from our settlement system.
 4    Q.   What is your settlement system?
 5    A.   I'm not exactly sure what it's
 6    called, but numbers that are generated as
 7    things settle.
 8    Q.   The next column to the right has the
 9    header Status.  You'll see that some of the
10    status reads, "SWIFT Bank received," and other
11    of them read, "SWIFT fax sent."
12        Do you have an understanding of what
13    that language signifies?
14    A.   SWIFT is an electronic system, as I
15    understand it, and where it says fax sent,
16    that's actually a fax.  That's more of a
17    mechanical method.
18    Q.   Do you have an understanding of what
19    was received by the bank or what was sent by
20    fax in this column, what it's referring to?
21    A.   I don't.
22    Q.   The next column reads, "ATP deal,"
23    and has a series of numbers for each of these
24    trades.
25        Do you have an understanding of what
```

Page 225

1          SARUWATARI - CONFIDENTIAL
2    that refers to?
3  **A.   ATP stands for Advanced Trading**
4  **Platform, and it's just another number that**
5  **comes out of one of our systems.**
6  Q.   What is the Advanced Trading
7    Platform?
8  **A.   It's -- it's a platform by which we**
9  **trade.  I'm not familiar with all of the ins**
10  **and outs of that platform.**
11  Q.   Do you have an understanding of
12    whether it's an actual trading platform as
13    opposed to a recordkeeping system?
14  **A.   It's our trading platform.  It's**
15  **used to trade.**
16  Q.   The next column is entitled OFC.
17    Do you see that?
18  **A.   Yes.**
19  Q.   And most of these transactions are
20    listed as PAS in that column.
21    What does that refer to?
22  **A.   OFC is the office.**
23  Q.   Uh-huh.
24  **A.   And PAS is Pasadena.**
25  Q.   What does PAS -- I'm sorry.  Go

Page 226

1          SARUWATARI - CONFIDENTIAL
2    ahead.
3  **A.   So Pasadena is executing these**
4  **trades.**
5  Q.   What do you mean Pasadena is
6    executing these trades?  What specific role did
7    individuals in Pasadena play in executing these
8    trades?
9  **A.   They entered the trade ticket and**
10  **they also -- somebody in Pasadena executed the**
11  **trade, a trader in Pasadena.**
12  Q.   When you say that they entered the
13    trade ticket, they entered the trade ticket
14    into a specific system?  Someone from the
15    Pasadena office entered the trade ticket into a
16    system?
17  **A.   Yes.**
18  Q.   Do you have an understanding from
19    this column of whether the individuals who
20    placed the securities order were actually
21    located in Pasadena at the time that they
22    placed that order?
23  **A.   Yeah.  If it says Pasadena here,**
24  **PAS, this trade is coming out of Pasadena.**
25  Q.   What does that mean, this trade is

Page 227

1          SARUWATARI - CONFIDENTIAL
2    coming out of Pasadena?  Does that indicate
3    that the individual who committed to place the
4    order with a broker was actually physically
5    located in Pasadena at the time they placed
6    that order or just that that's the office in
7    which they are generally based?
8      MR. OLIVAR: Objection to form.
9  **A.   The Pasadena office is the one**
10  **executing the trade.**
11  Q.   So this does not indicate the
12    location of the individual at the time they
13    actually placed the order with the
14    broker/dealer?
15      MR. OLIVAR: Objection to form.
16      MR. OKUN: Objection.
17  **A.   Again, generally, the trader is**
18  **sitting in Pasadena executing these trades, and**
19  **Pasadena appears there in the office column.**
20  Q.   But what this correlates to is the
21    location in which the trader is generally
22    based, not the physical location of the trader
23    at the time it placed the order for the
24    securities; is that correct?
25      **MR. OLIVAR:** Objection.

Page 228

1          SARUWATARI - CONFIDENTIAL
2      **MR. OKUN:** Objection.
3      **MR. OLIVAR:** Same objections.
4  **A.   Yeah, there's a trader that sits in**
5  **Pasadena, generally, and they are placing the**
6  **trade through the dealer community, and then**
7  **they are entering this ticket in.  So that's**
8  **why PAS is appearing here.**
9  Q.   We talked before about scenarios
10    where clients had authorized Western Asset to
11    effectuate securities trades through its
12    foreign affiliates.
13    If there was a scenario where a
14    dealer in Pasadena called Western Asset's
15    office in Tokyo to place a trade, how would
16    that be reflected in this column?
17  **A.   It would probably indicate the**
18  **three-letter symbol for the office, and I**
19  **believe -- let me see if I can find an example.**
20  **All right.  So on the second to the**
21  **last page, you will see some that are marked**
22  **LON.  So that would be an indication that the**
23  **London office is placing the trade.**
24  Q.   And you have a specific
25    understanding that if a trader in Pasadena

Page 229

1    SARUWATARI - CONFIDENTIAL
2    called one of Western Asset's affiliates to
3    place the trade, that the OFC column in the
4    spreadsheet would then reflect that affiliate
5    office rather than Pasadena?
6    A.  Yes.
7    Q.  If you go to the right-hand, tenth
8    column from the right on this spreadsheet,
9    there's a column labeled Broker.
10   A.  Yes.
11   Q.  So that would identify the broker
12   that Western Asset used to place the order for
13   these securities?
14   A.  That's correct.
15   Q.  And in instances where, for example,
16   the broker is listed as Morgan Stanley, this
17   spreadsheet wouldn't reflect which Morgan
18   Stanley entity or office was responsible for
19   that trade?
20   A.  Not explicitly, but by inference, I
21   can say, office, Pasadena, US Morgan Stanley.
22   Q.  And that inference is based on your
23   supposition that the Pasadena office would be
24   dealing with a US Morgan Stanley entity?
25   A.  That's correct.

Page 230

1    SARUWATARI - CONFIDENTIAL
2    Q.  And you have an understanding that
3    Morgan Stanley has offices all over the world?
4    A.  I do.
5    MR. BAREFOOT:  Okay.  We can take a
6    break.
7    THE VIDEOGRAPHER:  We are now off
8    the record.  The time is 4:40 p.m.
9    (Recess taken.)
10   THE VIDEOGRAPHER:  This is tape six
11   of the deposition of Mr. Steven
12   Saruwatari.  We are now back on the
13   record.  The time is 4:54 p.m.
14   BY MR. BAREFOOT:
15   Q.  Mr. Saruwatari, before we move off
16   of this topic, I wanted to ask a few follow-up
17   questions.
18   When we were speaking generally
19   about the ways in which Western Asset places
20   orders for securities, we were speaking
21   generally about secondary issues.
22   How does Western Asset subscribe to
23   securities through initial offerings?
24   A.  Initial offerings.  So I think the
25   first step --

Page 231

1    SARUWATARI - CONFIDENTIAL
2    MR. OKUN:  Objection.
3    Go ahead.  Sorry.
4    A.  The first step that we do is we --
5    the team has to have gone through the analysis
6    and research and have had made a decision to
7    participate in the new issue.  There are
8    instances where the team goes through that
9    process and ops not to participate, but in the
10   case that we elect to participate, that's
11   usually the first step.
12   The EM desk would reach out to
13   portfolio managers at the firm and discuss the
14   new issue that's upcoming.  Generally, you
15   know, some commentary on the new issue, some
16   information about price, yield levels, and then
17   the EM desk would generally have a
18   recommendation, we are going to participate,
19   we're not going to participate.
20   In the case that we say we're going
21   to participate, we gather information from the
22   various portfolio managers, and there's sort of
23   a preliminary list put together of those
24   accounts that are going to participate in a new
25   issue.

Page 232

1    SARUWATARI - CONFIDENTIAL
2    That is run through a system, a
3    pre-trade system, to ensure that those accounts
4    are eligible, are not going to violate any
5    guidelines, et cetera, not going to violate any
6    restrictions, and that list is then whittled
7    down a little further.
8    So now we have sort of a preliminary
9    list of those that will participate that has
10   been sort of filtered through the necessary
11   systems, at which time we have indication of
12   the rough size of the order.
13   On the day of the IPO, of the new
14   issue, the underwriters will set the price,
15   and -- based on demand from the entire
16   marketplace.  And that price is, again,
17   evaluated to determine if we're going to
18   participate.
19   The prices often change from initial
20   yield level talk, price talk, and if the price
21   is still acceptable, then we go ahead and place
22   that order.
23   Q.  And how, mechanically, do Western
24   Asset's traders place that order?
25   MR. OKUN:  Objection.

Page 233

SARUWATARI - CONFIDENTIAL

1
2 **A.   So as the next step would be --**
3 **okay.  So how would they place that order?**
4 **Either through e-mail or through a telephone**
5 **conversation.**
6 Q.   With the underwriters?
7 **A.   With the underwriters or through**
8 **other means of communication, I suppose,**
9 **Bloomberg, Bloomberg chat.**
10 Q.   Would those transactions placed
11 through an initial offering be reflected in the
12 same sort of trade tickets that we've seen, or
13 is there another type of record that would be
14 maintained by Western Asset to reflect those
15 transactions?
16 **A.   I believe you will see a similar**
17 **trade ticket parsed out by account.**
18 Q.   Turning back to Exhibits 18 and 19,
19 which were the two examples of trade tickets
20 that we had looked at.
21 **A.   Uh-huh.**
22 Q.   We discussed the reference to kind
23 of large global investment banks such as
24 Deutsche Bank, J.P. Morgan or Morgan Stanley,
25 and you had testified that it was your

Page 234

SARUWATARI - CONFIDENTIAL

1
2 supposition that this was the US affiliate of
3 those entities that was involved in these
4 transactions; is that correct?
5 **MR. OLIVAR:** Objection to form.
6 **A.   Can you repeat the question?**
7 Q.   Sure.  When we had looked at these
8 documents previously, Exhibits 18 and 19, they
9 referred to the settlement parties as including
10 entities such as Deutsche Bank, Morgan Stanley
11 and J.P. Morgan, without referencing the
12 specific entity or office affiliated with those
13 institutions that was involved in the
14 transaction; is that correct?
15 **A.   Yes, by inference, that's correct.**
16 Q.   Well, it's your inference that it
17 was the US affiliate of these institutions; is
18 that correct?
19 **A.   That is correct.  The marking DTC on**
20 **the trade ticket.**
21 Q.   But there aren't any other records
22 or documents maintained by Western Asset that
23 specify which affiliate of Deutsche Bank, J.P.
24 Morgan or Morgan Stanley or the like that were
25 actually involved in these trades; is that

Page 235

SARUWATARI - CONFIDENTIAL

1
2 correct?
3 **A.   Not to my knowledge.**
4 Q.   And it's your understanding that
5 those entities do operate foreign
6 broker/dealers?
7 **A.   That's correct.**
8 Q.   We also discussed the reference
9 number that is included in the fields of
10 information on the forms -- withdrawn.
11 We discussed the reference number
12 that's included as one of the fields in
13 Exhibits 18 and 19; is that correct?
14 **MR. OLIVAR:** Objection to form.
15 **A.   Yes, okay.**
16 Q.   And you testified that, by looking
17 up the reference number that's listed on each
18 of those forms, Western Asset systems might
19 have more information about each of these
20 transactions?
21 **MR. OKUN:** Objection.
22 **A.   That's correct.**
23 Q.   Do you have an understanding of what
24 additional information is contained in Western
25 Asset's systems with respect to these trades

Page 236

SARUWATARI - CONFIDENTIAL

1
2 based on the reference number?
3 **MR. OKUN:** Objection.
4 **A.   I'll reference Exhibit, is that 20?**
5 **So you can cross-reference the reference number**
6 **onto the spreadsheet.**
7 Q.   So the information that's reflected
8 in Exhibit 20 is the additional level of detail
9 that you were referencing in your testimony?
10 **A.   Correct.  There actually could be**
11 **more.  I don't know.  But there's a lot more**
12 **information on the spreadsheet than there is on**
13 **the trade ticket.**
14 Q.   You were referring to systems or
15 records at Western Asset that may contain
16 additional detail based on the reference
17 number.
18 Are you aware of whether there's
19 additional detail based on the reference number
20 beyond what's reflected in Exhibit 20?
21 **MR. OLIVAR:** Objection, asked and
22 answered.
23 You may answer again.
24 **A.   I'm not aware.**
25 Q.   Okay.  You can put those again to

Page 237

1     SARUWATARI - CONFIDENTIAL
2 the side. Thank you.
3     MR. BAREFOOT: I'm going to show you
4 a document that is not Bates stamped, but
5 that has been filed in this action and
6 that I will have marked as Western Asset
7 Number 21.
8     (Western Asset Exhibit 21, Appendix
9 to Western Asset's Second Amended
10 Complaint, marked for identification.)
11 Q. And I will represent to you that
12 this is the appendix to Western Asset's Second
13 Amend Complaint in this action.
14     Are you familiar with this document?
15 A. No.
16 Q. Are you familiar with where the
17 underlying information in this document came
18 from with respect to trades managed by Western
19 Asset?
20 A. Give me a second to look at it.
21 (Perusing.)
22     Yeah. So it's got CUSIP numbers,
23 trade dates, quantity, purchase price and trade
24 executed in what city.
25 Q. Are you familiar -- I'm sorry. Go

Page 238

1     SARUWATARI - CONFIDENTIAL
2 ahead.
3 A. Or what trade executed in what
4 office.
5 Q. Are you familiar with where the
6 information reflected in that right-hand column
7 you were just referring to, trade executed, was
8 drawn from?
9 A. Not exactly where, but it likely
10 comes from our systems. No different than
11 information contained in Exhibit 20.
12 Q. You can put that to the side.
13     MR. BAREFOOT: I'm going to have
14 marked, as Exhibit 22, a document that
15 also does not bear a Bates stamp, but that
16 I will represent to you has been filed in
17 this action, and it is an exhibit to the
18 Second Amended Complaint of the John
19 Hancock Funds II.
20     (Western Asset Exhibit 22, Appendix
21 B to Second Amended Complaint of the John
22 Hancock Funds II, marked for
23 identification.)
24 Q. Have you seen this document before
25 today?

Page 239

1     SARUWATARI - CONFIDENTIAL
2 A. I have not.
3 Q. If I can briefly and specifically
4 draw your attention to the first page of this
5 document, and the five trades about halfway
6 down that page that are listed under investment
7 manager, Western Asset Management Company.
8     Do you see those?
9 A. Yes.
10 Q. And you'll see to the right of that
11 it says, "Trade executed (location of
12 investment manager)."
13     Do you have an understanding of
14 where this information was gathered from?
15     MR. HAENDLER: Objection.
16 A. I suspect it was gathered from the
17 same systems.
18 Q. And on the column just to the right
19 of that, it lists counterparty.
20     Would you have any understanding as
21 to where the counterparty information there was
22 gathered from?
23     MR. HAENDLER: Objection.
24 A. Footnote one says counterparty names
25 are taken from trading orders.

Page 240

1     SARUWATARI - CONFIDENTIAL
2 Q. Do you have an understanding of
3 whether Western Asset provided any of this
4 information to the John Hancock Funds?
5     MR. HAENDLER: Objection.
6 A. Any of this information?
7 Q. The information in the counterparty
8 column.
9 A. I'm not aware.
10 Q. And as we discussed, Western
11 Asset -- well, withdrawn.
12     If you look at the first entity
13 under Western Asset Management Company, it
14 lists Morgan Stanley Co., Incorporated.
15     Do you see that?
16 A. Yes.
17 Q. And as we discussed, Western Asset
18 systems do not generally record the specific
19 name of the dealer's entity that was involved
20 in the transaction.
21     MR. OLIVAR: Objection to form.
22 A. Yes.
23 Q. So do you have an understanding of
24 where the specific identification of Morgan
25 Stanley Co., Incorporated, as opposed to Morgan

Page 241

```
 1        SARUWATARI - CONFIDENTIAL
 2   Stanley, came from in this document?
 3        MR. HAENDLER: Objection.
 4   A.  Where the dealer name came from
 5   there?
 6   Q.  Where the specific entity affiliated
 7   with the dealer came from.  So, for example,
 8   when we were looking at Western Asset records,
 9   they generally did not identify the specific
10   entity affiliated with Morgan Stanley that was
11   involved in the transaction.
12        So do you have an understanding of
13   where the full entity name listed in this
14   document came from?
15        MR. HAENDLER: Objection.
16   A.  Trading records.
17   Q.  And that's based on what's listed in
18   the footnote?
19   A.  Listed in the footnote, yes.
20   Q.  You'll see that, for example, the
21   second trade on the spreadsheet, it lists J.P.
22   Morgan Chase Bank/RBS Securities, Inc.
23        Do you have an understanding of what
24   respective roles, if any, those two entities
25   played in this transaction?
```

Page 242

```
 1        SARUWATARI - CONFIDENTIAL
 2        MR. HAENDLER: Objection.
 3   A.  I do not.
 4   Q.  You can put that to the side.
 5        MR. BAREFOOT: I'm going to show you
 6   a document that is being marked as Western
 7   Asset Exhibit 23 bearing Bates stamp
 8   WESTERN01353743.
 9        (Western Exhibit 23, E-Mail, Bates
10   Stamped WESTERN01353743, marked for
11   identification.)
12   Q.  Do you recognize this document as an
13   e-mail from Adauto Lima, dated September 8,
14   2014, with a subject line, "New scandal
15   involving Petrobras and Dilma's administration
16   (for internal use only)."
17   A.  Yes.
18   Q.  Have you seen this document before
19   today?
20   A.  I have not.
21   Q.  If I could draw your attention to
22   the first paragraph, it reads, "The main
23   magazines, newspapers and TV channels released
24   a scandal involving Petrobras and important
25   political leaders from parties in the President
```

Page 243

```
 1        SARUWATARI - CONFIDENTIAL
 2   Dilma coalition, which might have important
 3   consequences in the political race."
 4        Do you see that language?
 5   A.  Yes.
 6   Q.  Do you have an understanding whether
 7   this was the first time that Western Asset was
 8   made aware of the potential scandal that is now
 9   known as Lava Jato?
10        MR. OLIVAR: Objection to form.
11   A.  It was sometime around the fourth
12   quarter of 2014 that the -- I think the term
13   Lava Jato placed on the scandal and somewhere
14   around that time frame.
15   Q.  Regardless of the specific time --
16   withdrawn.
17        Regardless of the specific name
18   given to the scandal, do you have an
19   understanding of whether, on or around
20   September 8, 2014, was the first time that
21   Western Asset learned of the bribery scandal at
22   Petrobras that is now known as Lava Jato?
23        MR. OLIVAR: Same objections.
24   A.  I would say that's fairly
25   reasonable.
```

Page 244

```
 1        SARUWATARI - CONFIDENTIAL
 2   Q.  Do you have any more specific
 3   understanding of -- withdrawn.
 4        Do you have any understanding as to
 5   whether, prior to this e-mail, Western Asset
 6   had any knowledge of the scandal involving
 7   Petrobras that is now known as Lava Jato?
 8        MR. OLIVAR: Same objections.
 9   A.  No, I don't.
10   Q.  Who is Adauto Lima?
11   A.  Adauto Lima is an economist in our
12   Sao Paulo office.
13   Q.  The e-mail is addressed to WA
14   portfolio management.
15        Is that also a listserv?
16   A.  Yes.
17   Q.  And who is generally on that
18   listserv?
19   A.  Portfolio management team.
20   Q.  And that would include Mr. Lian,
21   Mr. Duda and Mr. Gardner?
22   A.  Yes.  By this time, Duda had left
23   the firm.
24   Q.  Understood.  You can put this to the
25   side.
```

Page 245

SARUWATARI - CONFIDENTIAL

1      SARUWATARI - CONFIDENTIAL
2      I'm going to show you a document
3   that's being marked as Western Asset Exhibit 24
4   and bears Bates numbers WESTERN01600452 through
5   463.
6      (Western Asset Exhibit 24, E-Mail,
7   Bates Stamped WESTERN01600452 through
8   1600463, marked for identification.)
9   Q.  Do you recognize this as an e-mail
10  and its corresponding attachment from Adriano
11  Casarotta dated November 17, 2014?
12  A.  Yes.
13  Q.  Does the -- withdrawn.
14     You'll see at the top of the e-mail
15  the header Summary.  The first bullet point
16  underneath reading, "Maintain 'hold' on
17  Petrobras bonds as a substantial amount of
18  negative news has been priced in."
19     Second bullet, "The spread over
20  sovereign seems too wide for an entity that is
21  intrinsically linked to the state."
22     On or around November 17, 2014 was
23  Western Asset recommending a hold on Petrobras
24  bonds?
25  A.  At this time, yes.

Page 246

1      SARUWATARI - CONFIDENTIAL
2   Q.  And, partially, the rationale for
3   that was the substantial amount of negative
4   news has been priced in, correct?
5      MR. OLIVAR: Objection to form.
6   A.  Yeah, the hold analysis -- I mean,
7   the hold recommendation is based on, again, not
8   just negative news being priced into the market
9   price, but based on the ongoing analysis that
10  we generally conduct in the analysis of the
11  issuer and the issues that we're investing in.
12  Q.  You'll see at the bottom a header in
13  all caps that reads, "Investor call."
14  A.  Yes.
15  Q.  Do you have an understanding of
16  whether this summarizes an investor call that
17  Petrobras held around this time?
18  A.  (Perusing.) Yeah.
19  Q.  If I could draw your attention to
20  the second page, which bears Bates stamp 453.
21  Specifically, the second bullet
22  which reads, "Non-value estimated for total
23  reinstatement of previous FS due to bribery
24  reallocations.  It will comes decreasing fixed
25  assets to pass on financial income statements

Page 247

1      SARUWATARI - CONFIDENTIAL
2   originating losses on the amount of
3   reallocations."
4      In this bullet, do you understand FS
5   to refer to financial statements?
6   A.  Yes.
7   Q.  Where it reads "reinstatement," do
8   you believe that is intended to be restatement?
9      MR. OLIVAR: Objection to form.
10  A.  Some of the memo is
11  grammatically not correct.
12  Q.  And, at this point, Western Asset
13  understood that the restatement of previous
14  financial statements would involve a decrease
15  of fixed assets; is that correct?
16     MR. OLIVAR: Objection to form.
17  A.  No, I don't think that's correct.
18  At this stage, there's nothing here that's
19  confirming that assets will be restated.
20     I'm not exactly sure what non-value
21  estimated for total restatement of previous
22  financial statements due to bribery
23  reallocations means, actually.
24  Q.  If you read the second sentence,
25  which reads, "It will comes decreasing fixed

Page 248

1      SARUWATARI - CONFIDENTIAL
2   assets to pass on financial income statements,
3   originating losses on the amount of
4   reallocations," how do you understand that
5   statement?
6      MR. OLIVAR: Objection to form.
7      MR. OKUN: Objection.
8   A.  I do not understand what is being
9   communicated here.  It will comes decreasing
10  fixed assets to pass on financial income
11  statements -- I don't know what he is trying to
12  communicate here.
13     MR. OLIVAR: You have to be careful
14  reading things quickly, because she needs
15  to take all that down.
16     THE WITNESS: Oh.
17  Q.  In the first three words of that
18  bullet, where it reads, "Non-value estimated,"
19  do you have an understanding of what non-value
20  is intended to refer to?
21  A.  I do not know what is being
22  communicated in the second bullet point.
23  Q.  Okay.  If you go to the last
24  paragraph, it reads, "Since last Thursday,
25  November 13, 2014, where the company delayed

Page 249

1      SARUWATARI - CONFIDENTIAL
2   FS, markets reacted heavily, as on the pictures
3   bellow, the share price decreased 7 percent
4   (figure two) and the bond PETBRA 6 and 7/8
5   2040, suffered even more from 102 to 93 (figure
6   three)."
7      Do you see that language?
8   A.  Yes.
9   Q.  Do you have an understanding that
10  delays in the release of financial statements
11  generally create uncertainties for investors?
12      MR. OLIVAR: Objection to form,
13  beyond the scope.
14  A.  Yes.  A delay in the financial
15  statement obviously created a sell-off in the
16  securities.
17  Q.  And that sell-off in the securities
18  was separate and apart from any impact that the
19  ultimate restatement of the financial
20  statements had; is that correct?
21      MR. OKUN: Objection.
22      MR. OLIVAR: Objection to form.
23  A.  That is not correct.  I think a
24  delay in financial statements just is
25  uncertainty, and there's a lot of things that

Page 250

1      SARUWATARI - CONFIDENTIAL
2   can be insinuated why financial statements are
3   being delayed, and investors read many things
4   through that.
5      There's nothing being confirmed at
6   this stage.  All we knew was the company
7   delayed financial statements.
8      So I think the market is somehow
9   pricing that into prices, asset prices.
10  Q.  And, at this point in time, there
11  was not information in the market as to what
12  the results of the ultimate restatement would
13  be; is that correct?
14      MR. OKUN: Objection.
15      MR. OLIVAR: Objection to form,
16  outside the scope and calls for expert
17  testimony.
18  A.  As of November 2014, again, a delay
19  in financial statements created uncertainty,
20  and prices sold off.  I'm not necessarily an
21  efficient market expert, but, obviously, the
22  delay in financial statements created a
23  sell-off in the securities.
24  Q.  Mr. Saruwatari, were you involved
25  personally in any of the discussions in the

Page 251

1      SARUWATARI - CONFIDENTIAL
2   fourth quarter of 2014 at Western Asset about
3   Petrobras?
4   A.  Can you rephrase that?  What do you
5   mean personally?
6   Q.  Were you, yourself, as opposed to --
7   you're sitting here today as a representative
8   of Western Asset, but were you, Mr. Saruwatari,
9   involved in discussions at Western Asset in the
10  fourth quarter of 2014 concerning Petrobras?
11  A.  Yes, I was.
12  Q.  What was your role in those
13  discussions?
14  A.  As an EMD product specialist.
15  Q.  What's your recollection of those
16  discussions?
17      MR. OLIVAR: Objection to form, but
18  go ahead.
19  A.  Are you talking about around
20  November 17, right?
21  Q.  I was speaking, generally, about the
22  fourth quarter of 2014.
23  A.  Fourth quarter of 2014.
24  Q.  Actually, you know what?  Why don't
25  we start with the first e-mail that we saw in

Page 252

1      SARUWATARI - CONFIDENTIAL
2   which Western Asset was made aware of the
3   bribery scheme that ultimately became known as
4   Lava Jato was in September 2014.
5      So beginning in September 2014, what
6   is your recollection of your involvement in
7   discussions at Western Asset concerning
8   Petrobras.
9      MR. OLIVAR: Objection to the form
10  of the question.
11  A.  Yeah, at that stage, you know, I
12  don't think it was being widely discussed at
13  that time, because I'm not even included on
14  this e-mail.
15      And so around September 8, my -- my
16  involvement was minimal.
17  Q.  At what point do you recall being
18  involved in discussions at Western Asset about
19  the bribery scheme at Petrobras?
20  A.  Involved, meaning I was listening in
21  on discussions that were taking place.  So I
22  just wanted to clarify that.
23      Again, I'm not the analyst that's
24  analyzing the security, but there's-- there was
25  active discussion between the members, EMDT

Page 253

1    SARUWATARI - CONFIDENTIAL
2  members in Pasadena about this, and also
3  collaborating with our colleagues in Brazil and
4  trying to obtain information as it came in
5  almost on a daily basis.
6  Q.  And when did you first begin
7  listening in on those discussions?
8  A.  I'm going to guess, it's my
9  recollection, probably around December 2014.
10 Q.  Do you have a recollection of what
11 triggered your involvement in those
12 discussions?
13    MR. OLIVAR: Objection to form.
14 A.  I don't.  I participate in a lot of
15 discussions so that I can gather some
16 information in order to discuss these things
17 with investors.  So I'm responsible to have --
18 have a certain level of knowledge regarding
19 events.
20 Q.  If we could turn back to what's been
21 marked as Exhibit 24, and flip to the
22 attachment to the e-mail, which is a credit
23 research updated balance sheet report delay
24 deck dated November 17, 2014.
25    Have you seen this document before?

Page 254

1    SARUWATARI - CONFIDENTIAL
2  A.  (Perusing.)  I don't think so.
3  Q.  If I could draw your attention to, and
4  I realize the font is slightly small,
5  specifically to page two of this deck, which
6  ends in Bates stamp 458.
7  A.  Uh-huh.
8  Q.  If I could draw your attention to
9  the sixth bullet under the header Facts,
10 Postponement of 3Q '14 FS.  It reads,
11 "Potential restatement considering news from
12 1 percent to 3 percent bribery on capex for
13 total capex of last two years, approximately US
14 90" -- I can't make out of the rest of that,
15 but do you see that language?
16 A.  Yes.
17 Q.  Do you have an understanding of what
18 the 1 percent to 3 percent bribery on capex
19 reference refers to?
20 A.  (Perusing.)  I think, reading
21 through this, the 1 to 3 percent refers to the
22 adjustment that may be necessary on capex.
23 Q.  And this was Western Asset's
24 internal assessment of what the likely
25 adjustment would be, correct?

Page 255

1    SARUWATARI - CONFIDENTIAL
2    MR. OLIVAR: Objection to form.
3  A.  I don't know for a fact.  Again,
4  it's -- at this time, there was a lot of
5  information coming out from the company, and
6  also information being reported in the media,
7  and so there was -- and then there's research
8  being done by rating agencies and the Street,
9  the dealer community, and so I think this is
10 not just a Western Asset putting a 1 to
11 3 percent.  It's probably considering all the
12 facts that are out there that this is the range
13 at this stage that was -- was being projected.
14 Q.  Did Western Asset agree, on or
15 around approximately November 17, 2014, with an
16 estimate of 1 to 3 percent restatement of
17 capex --
18    MR. OKUN: Objection.
19 Q.  -- as the likely impact of the Lava
20 Jato scheme?
21    MR. OKUN: I apologize for jumping
22 in.  Objection.
23    MR. OLIVAR: Objection to form,
24 beyond the scope.
25    Go ahead.

Page 256

1    SARUWATARI - CONFIDENTIAL
2  A.  The question again was --
3  Q.  Did Western Asset, itself, agree, on
4  or around November 17, 2014, with an estimate
5  of 1 to 3 percent restatement of capex as the
6  likely outcome on the financial statements of
7  the Lava Jato scheme?
8    MR. OLIVAR: Same objections.
9    MR. OKUN: Objection stands.
10 A.  I don't think agree is the right
11 word.  What's being communicated here is a
12 potential restatement that's being reported to
13 the team via this document, and being
14 discussed, but I don't think -- nowhere in this
15 document is telling me that we agree with that
16 to 3 percent.  It's just being shared.
17 Q.  Do you have an understanding of
18 whether that was Western Asset's own internal
19 assessment of the likely impact on financial
20 statements of the Lava Jato scheme?
21    MR. OLIVAR: Same objections.
22    MR. OKUN: Objection.
23 A.  No.  Western Asset was looking at
24 all the information coming out.  So this is not
25 necessarily Western Asset's sole assessment,

Page 257

1    SARUWATARI - CONFIDENTIAL
2    because we're looking at numerous factors. As
3    a matter of fact, it's very difficult, at this
4    stage of the scandal development, for Western
5    to even make -- make assessments.
6        So this is just a rough estimate
7    based on what was being discussed in the
8    marketplace.
9    Q.  Do you have an actual understanding
10   of whether this is simply a restatement of what
11   is being discussed in the marketplace or an
12   estimate that Western Asset itself prepared or
13   adopted?
14       MR. OLIVAR: Objection to form.
15       MR. OKUN: Objection.
16   A.  Yeah.  Again, just by looking at
17   this -- at this one slide, no, I'm not aware
18   that this was Western Asset's estimate.
19   Q.  And aside from looking at the slide,
20   you don't have an understanding, one way or
21   another, of whether, in November 2014, Western
22   Asset had developed its own assessment of the
23   likely impact on Petrobras' financial
24   statements of the Lava Jato scheme?
25       MR. OLIVAR: Same objections.

Page 258

1    SARUWATARI - CONFIDENTIAL
2    A.  Western was looking at any
3    information that they could get their hands on
4    at the time, and trying to evaluate the
5    situation on a regular -- on a regular basis.
6    So this was -- yeah, this was not necessarily
7    Western's sole assessment.
8    Q.  Do you have an understanding of
9    whether or not Western Asset developed an
10   assessment of the likely impact on Petrobras'
11   financial statements in November 2014 of the
12   bribery scheme that became known as Lava Jato?
13       MR. OKUN: Objection.
14   Q.  Do you have an understanding one way
15   or the other?
16   A.  I don't think the company even knew
17   at this stage what the likely impact would have
18   been, because that was dependent on a variety
19   of different factors, including what the
20   auditors, I believe PricewaterhouseCoopers, was
21   going to them to -- to restate.  So it
22   wasn't even the company that had control over
23   that, that number, that estimate.  I don't
24   think anybody knew what the estimates were at
25   that time.

Page 259

1    SARUWATARI - CONFIDENTIAL
2    Q.  I'm not asking what the company
3    knew.  I'm asking whether, in November 2014,
4    Western Asset had developed an assessment of
5    the likely impact on Petrobras' financial
6    statements of the bribery scheme that became
7    known as Lava Jato?
8        Do you have an understanding on that
9    one way or another?
10       MR. OLIVAR: Objection to form.
11       MR. OKUN: Objection.
12       MR. OLIVAR: Asked and answered and
13   compound.
14   A.  Again, we had -- we had an idea of,
15   considering all the information that was coming
16   out, and it's stated here.  That's what's being
17   shared with the team, the potential
18   restatement, considering news, from 1 to
19   3 percent.
20       So, again, the grammar is not proper
21   here, but what's being shared with the team is
22   in that what's out there in the marketplace,
23   there's going to be a potential restatement of
24   1 to 3 percent of capex for bribery, and it
25   doesn't state anything more than that.

Page 260

1    SARUWATARI - CONFIDENTIAL
2    Q.  Well, if you go to the next line, it
3    states that the restatements from US
4    900 million to 2.7 billion from capex to opex,
5    does that correlate to the 1 to 3 percent
6    adjustment referenced in the prior line?
7        MR. OKUN: Objection.
8    A.  I believe that's just simple math,
9    because the second part of that is for total
10   capex of last two years was 90 billion.  So you
11   just apply 1 to 3 percent to the 90 billion,
12   and you get 900 million to 2.7 billion.
13   Q.  And that range, 900 million to US
14   2.7 billion, was the assessment of the impact
15   on the financial statements and the portion
16   that would be reclassified from capex to opex?
17       MR. OKUN: Objection.
18   A.  It wasn't Western's sole assessment.
19   I'm going to emphasize that, because it was
20   based on all the information that was coming
21   out at a very rapid pace.  It was an attempt by
22   whoever prepared this to share with the team
23   what is being discussed in the marketplace.
24       So what is the potential restatement
25   that's being discussed amongst all the

Page 261

1      SARUWATARI - CONFIDENTIAL
2  information that we had at our fingertips that
3  was coming out on a regular basis.
4  Q.  Are you aware of whether anyone at
5  Western Asset, in approximately November 2014,
6  disagreed with this range of estimates?
7      MR. OKUN: Objection.
8      MR. OLIVAR: Objection to form.
9  A.  I think, at this stage of the
10 scandal, everything was extremely uncertain.
11 So I don't think anybody -- anybody -- anybody
12 agreed that 1 to 3 percent was the right
13 number.  I'm not saying that wasn't the right
14 number, but everyone was skeptical at this
15 stage of the scandal, the information that was
16 coming out, trying to assess it to the best of
17 our ability, and determining, you know, an
18 assessment of the securities that we -- that we
19 held.
20 Q.  Do you have an understanding of
21 whether anyone at Western Asset assessed the
22 likely impact to the financial statements at a
23 figure other than the range that's reflected in
24 this Exhibit 24?
25     MR. OKUN: Objection.

Page 262

1      SARUWATARI - CONFIDENTIAL
2      MR. OLIVAR: Objection to form.
3  A.  No, I'm not aware of that.
4      MR. OLIVAR: Also outside the scope.
5  Q.  You can put this to the side.
6      MR. BAREFOOT: I'm going to show you
7  a document that is being marked Western
8  Asset Exhibit 25, bearing Bates stamp
9  WESTERN01508335 to 336.
10     (Western Asset Exhibit 25, E-Mail,
11 Bates Stamped WESTERN01508335 to 1508336,
12 marked for identification.)
13 Q.  Do you recognize this as an e-mail
14 from Susan Signori, dated Tuesday, November 25,
15 2014?
16 A.  Yes.
17 Q.  Does this e-mail reflect
18 memorialization of a call between individuals
19 from Western Asset and the California State
20 Teachers' Retirement System?
21 A.  That's correct.
22 Q.  You'll see in the line under the
23 heading Details, it reads, "On November 18,
24 2014, SRS, CWC, CLL, JP Gil and Adriano
25 Casarotto from the Sao Paulo office, had a call

Page 263

1      SARUWATARI - CONFIDENTIAL
2  with members of the CalSTRS' credit team to
3  discuss Petrobras."
4  Q.  Do you have an understanding of who
5  each of those initials refer to?
6  A.  SRS is Susan Signori.  CWC, I don't
7  know who that is.  JP Gil is Jean-Pierre Gil in
8  our Brazil office.  And Adriano Casarotto is
9  also in our Brazil office.
10     THE VIDEOGRAPHER: I'm sorry.
11 There's something wrong with the witness'
12 microphone.  Can we go off the record for
13 a second?  The time is 5:40 p.m.
14     (Recess taken.)
15     THE VIDEOGRAPHER: We are now back
16 on the record.  The time is 5:42.
17     BY MR. BAREFOOT:
18 Q.  Mr. Saruwatari, you indicated that
19 you were not aware of who the initials for CWC
20 corresponded to.
21     If I can point you to the next page
22 of this document, you'll see the last line
23 says, "Relationship, CSA, Charles Colby."
24     Does that help you at all with who
25 CWC is?

Page 264

1      SARUWATARI - CONFIDENTIAL
2  A.  Yes, it does.  It's probably Charles
3  Colby.
4  Q.  And who is Charles Colby?
5  A.  Charles Colby is the client service
6  associate for the CalSTRS relationship.
7  Q.  And in the list of initials in this
8  line we have been focusing on, C.L. is C.L.
9  Lian.
10 A.  That's correct.
11 Q.  If I could focus you on the second
12 paragraph of this e-mail.  It reads, "Darin
13 asked that we provide additional color on the
14 significant spread widening seen over the past
15 few weeks.  It was a good conversation with
16 CLL, JPG and AC, all adding value to the
17 conversation.  Petrobras has postponed
18 publishing their financial statements three
19 times due to ongoing corruption investigations
20 and restatement of company financials.  They
21 are supposed to release unaudited financials on
22 December 12, and then they will have 30 days
23 after to release an audited statement.
24 Petrobras will be restating some portion of
25 capex to opex.  At the time of the call, our

Page 265

SARUWATARI - CONFIDENTIAL
1 estimate is that this charge would be 2.5 to
2 3 billion and generate a loss."
3 From this document, do you have an
4 understanding that, at least as of November 25,
5 2014 -- actually, withdrawn.
6 You'll see that this call refers --
7 this e-mail refers to the call as taking place
8 on November 18, 2014; is that correct?
9 A. That's correct.
10 Q. So do you have an understanding
11 that, at least as of November 18, 2014, Western
12 Asset had developed an estimate of the impact
13 on Petrobras financial statements of the
14 bribery allegations of 2.5 billion to
15 3 billion?
16 A. It appears that's the case.
17 MR. OKUN: Objection.
18 Q. You understand that the estimated
19 impact on those financial statements would be a
20 reclassification of that portion of previously
21 booked capex to opex?
22 MR. OLIVAR: Objection to form.
23 A. It appears that's the case, looking
24 at this e-mail.

Page 266

SARUWATARI - CONFIDENTIAL
1 Q. Beyond looking at this e-mail, do
2 you have an understanding of how Western Asset
3 developed that estimate?
4 MR. OKUN: Objection.
5 A. I do not.
6 Q. Do you know who at Western Asset
7 would know how that estimate was developed?
8 A. Again, it would probably be the team
9 consisting of Adriano, JP, C.L. At this time,
10 Jeff Nuruki was still a part of the team. So
11 the team of people looking at Petrobras.
12 Q. If I could direct your attention to
13 the last paragraph in this e-mail. It reads,
14 "In our opinion, the stand-alone credit of
15 Petrobras would need to diverge four notches
16 from the Brazilian sovereign rating to prompt
17 the ratings agencies to decouple the rating of
18 Petrobras and Brazil. It's fundamental for the
19 country to keep up the health of Petrobras. A
20 normal spread between Petrobras and the
21 sovereign would be in the 50 to 100 range.
22 Currently, it is 200 BPS, which is a record
23 high, and it doesn't seem to make sense (more
24 of a reaction to the noise.)"

Page 267

SARUWATARI - CONFIDENTIAL
1 Do you understand that to mean that,
2 on or around November 18, 2014, Western Asset
3 believed that the pricing on Petrobras notes
4 relative to the Brazilian sovereign notes did
5 not reflect their fair market value?
6 MR. OLIVAR: Objection to form,
7 outside the scope.
8 You can answer.
9 A. Yeah. Again, I'm not an expert on
10 market efficiency, but I believe the prices,
11 what's being communicated here, the prices of
12 the bond are reflecting the information that's
13 available out there, and pricing it in. And
14 there is -- there's a communication being made
15 here that the spread to the sovereign would be
16 50 to 100 basis points.
17 Q. Do you see the reference to, "A
18 normal spread between Petrobras and the
19 sovereign would be in the 50 to 100 range.
20 Currently, it is 200 BPS, which is a record
21 high, and it doesn't seem to make sense"?
22 A. Yes.
23 Q. Do you have an understanding of what
24 that is intended to communicate about Western

Page 268

SARUWATARI - CONFIDENTIAL
1 Asset's assessment of the pricing of Petrobras
2 bonds relative to the pricing of Brazilian
3 sovereign bonds?
4 MR. OLIVAR: Same objections.
5 MR. OKUN: Objection.
6 A. Again, I think this is just an
7 assessment being made by the team communicated
8 to CalSTRS as to -- as to, you know, what the
9 market is pricing in based on the new news
10 that's come out in recent days and weeks, and
11 versus -- versus a sovereign bond, and so it
12 appears that, at this time, 200 basis points
13 was the spread between Petrobras securities and
14 sovereign -- and equivalent maturity duration
15 sovereign bonds.
16 Q. Do you have an understanding of
17 whether the reference to reaction to the noise
18 refers to the news concerning the Lava Jato
19 investigation?
20 MR. OLIVAR: Same objections.
21 A. Reaction to the noise means all the
22 stuff that's going on out there that -- the
23 news that's being reported about -- about
24 the -- the breaking news that's being reported

Page 269

1          SARUWATARI - CONFIDENTIAL
2    about the scandal and, you know, what the media
3    is -- is out there saying.
4          So I think that's -- reaction to the
5    noise is probably in reference to all of the --
6    the information that's coming out, some of
7    which, you know, may be -- may be just
8    projections, estimates.
9    Q.  Going back to the estimate of 2.5 to
10   3 billion as the magnitude of the restatement,
11   do you have an understanding of when Western
12   Asset first developed that estimate?
13        MR. OLIVAR: Same objections.
14   A.  I'm not exactly sure.
15   Q.  Do you have an understanding of
16   whether it was at any point before November 18,
17   2014?
18        MR. OKUN: Objection.
19   A.  I'm not sure.
20   Q.  You can put that to the side.
21        MR. BAREFOOT: I'm going to show you
22   a document that's being marked as Western
23   Asset Exhibit 26, which bears Bates
24   stamped WESTERN01757226 through 234.
25        (Western Asset Exhibit 26, E-Mail,

Page 270

1          SARUWATARI - CONFIDENTIAL
2    Bates Stamped WESTERN01757226 through
3    1757234, marked for identification.)
4    Q.  Do you recognize this document as an
5    e-mail from Adriano Casarotto to Sing Yin Lee
6    and others dated November -- pardon me --
7    December 19, 2014?
8    A.  Yes.
9    Q.  Have you seen this e-mail before
10   today?
11   A.  Yeah, I may have.  I'm included in
12   the distribution.
13   Q.  Is this around the time that you
14   first personally became involved in Western
15   Asset's discussions about Petrobras in fourth
16   quarter of 2014?
17   A.  Roughly, yes.
18   Q.  If I could turn your attention to
19   the second page of this e-mail, which is Bates
20   stamped ending 227.
21        If I could draw your attention to
22   the portion in the e-mail under the heading
23   Lawsuits from ADR investors, and specifically
24   the second bullet, which reads, "Petrobras is
25   defending itself as victim of the corruption

Page 271

1          SARUWATARI - CONFIDENTIAL
2    scandal.  The experience in this case of
3    lawsuit shows that even if not material, the
4    companies usually make agreements to close the
5    lawsuit as Siemens, Total, Statoil and other
6    cases demonstrated."
7          Do you recall any discussion around
8    this time of Petrobras defending itself as a
9    victim of the corruption scandal?
10   A.  No, I do not.
11   Q.  Do you recall any discussion around
12   this time of comparisons between Petrobras and
13   each of the companies mentioned in this bullet,
14   Siemens, Total and Statoil?
15   A.  No.
16   Q.  If I could draw your attention to
17   the next page ending in Bates stamp 7228.  The
18   first full paragraph under the bullets there
19   reads, "We run two simulations, the first
20   keeping domestic prices at current levels, what
21   shows no material change in projected cash
22   burn.  In the second scenario, we reintroduced
23   the retail fuel tax at the same level as it was
24   in 2012 (BRL .23 per liter.)  In this
25   simulation, we see an increase of USD 3 billion

Page 272

1          SARUWATARI - CONFIDENTIAL
2    in cash burn for the next two years.  Both
3    simulations consider the parameters of Brent at
4    $50, and BRL at 2.75."
5          And if you flip past those
6    scenarios, you'll see a line that reads, "P.S.
7    The numbers for 2014 do not consider write-offs
8    related to the 'car wash operation.'"
9          Do you have an understanding of
10   whether Western Asset ran any simulations for
11   the potential impact of write-offs related to
12   the car wash operation on Petrobras' financial
13   statements?
14   A.  I'm not familiar.
15   Q.  Not familiar one way or the other on
16   whether those scenarios were run?
17   A.  Yeah, I'm not familiar with that.
18   Q.  And these two scenarios that are run
19   in this e-mail, each do not consider any
20   write-offs related to the car wash operation?
21        MR. OLIVAR: Objection to form.
22   A.  They do not appear to, yeah.
23   Q.  You can put that to the side.
24        MR. BAREFOOT: Mr. Saruwatari, I'm
25   going to show you a document that's being

Page 273

SARUWATARI - CONFIDENTIAL
1
2  marked as Western Asset Exhibit 27 bearing
3  Bates stamp WESTERN00075316.
4      (Western Asset Exhibit 27, E-Mail
5  With Attachment, Bates Stamped
6  WESTERN00075316 through 75319, marked for
7  identification.)
8  Q.  Do you recognize the top e-mail that
9  appears to be from you to you dated January 12,
10  2015?
11  A.  Yes.
12  Q.  Do you have an understanding of why
13  you would have forwarded this e-mail to
14  yourself?
15  A.  I don't recall.  Sometimes I forward
16  things to myself.
17  Q.  Okay.  If I could direct your
18  attention to the second page.  The first full
19  bullet on that page reads, "Although the
20  situation remains fluid in regards to the graft
21  investigation and deterioration of Brazil's
22  economic conditions, our outlook for Petrobras
23  has not changed.  We believe there is value in,
24  all caps, holding the position given pricing
25  and economic linkages between the company and

Page 274

SARUWATARI - CONFIDENTIAL
1
2  the sovereign."
3      Is it fair to say that around this
4  time, January 12, 2015, Western Assets'
5  strategy was to hold investments in Petrobras
6  given the economic linkages between Petrobras
7  and Brazil?
8      MR. OKUN: Objection.
9      MR. OLIVAR: Same objections.
10  A.  I would say that our -- our
11  recommendation at this time was to hold
12  Petrobras, but not just given the economic
13  linkages between the company and the sovereign.
14      So the hold recommendation is a
15  recommendation that's based on, again, the
16  comprehensive analysis that we're doing for
17  Petrobras or for any issuer, for that matter,
18  where we have a recommendation.
19      So, you know, it's not just
20  because -- it's not just because of pricing.
21  It's not just because of economic linkages
22  between the company and the sovereign.  It's
23  because of all the other analysis that is
24  ongoing.
25  Q.  You can put that to the side.

Page 275

SARUWATARI - CONFIDENTIAL
1
2      Mr. Saruwatari, I'm going to show
3  you a document that's being marked as Western
4  Asset Exhibit 28 bearing Bates WESTERN00137773
5  ending 778.
6      (Western Asset Exhibit 28, E-Mail
7  With Attachment, Bates Stamped
8  WESTERN00137773 through 137778, marked for
9  identification.)
10  Q.  Do you recognize this as an e-mail
11  from yourself to Colleen Cavanaugh and others
12  dated March 2, 2015?
13  A.  Yes.
14  Q.  And if you'll go down two e-mails in
15  the chain, there's an e-mail from Colleen
16  Cavanaugh to you dated February 27, 2015.
17      Do you see that?
18  A.  Yes.
19  Q.  And it reads, "As we discussed this
20  morning, I did send Braeburn a paragraph on our
21  rationale for recommending we continue to hold
22  Petrobras.  Unfortunately, they do need more
23  information.  As I mentioned, this downgrade
24  brings the credit below the quality permissible
25  in their guidelines.  Since we are, in essence,

Page 276

SARUWATARI - CONFIDENTIAL
1
2  asking for an exception to hold this credit,
3  they need more information."
4      Do you recall discussions with
5  Braeburn around this time about a potential
6  exception to allow their portfolio to continue
7  to maintain holdings in Petrobras securities?
8      MR. OKUN: Objection.
9  A.  I did not have those discussions,
10  but Colleen -- I am aware that Colleen
11  Cavanaugh had those discussions.
12  Q.  Do you recall any similar
13  discussions with other Western Asset clients
14  around this time period?
15      MR. OKUN: Objection.
16      MR. OLIVAR: Objection to form.
17  A.  I can't name specifics, but,
18  generally speaking, when there's headlines
19  about certain exposures contained in investment
20  portfolios, we do get phone calls.
21  Q.  If you read further on in the e-mail
22  it reads, "They are looking for a one-pager
23  that describes our credit view.  My contact
24  info suggested such as:  Why we think the bonds
25  are money good."

Page 277

SARUWATARI - CONFIDENTIAL
1
2    Do you have an understanding of
3  whether, around February 27, 2015, it was
4  Western Asset's view that investments in
5  Petrobras bonds were, quote/unquote, money
6  good?
7    MR. OLIVAR: Objection to form.
8  A.  Give me a minute because I'm looking
9  at the -- actual holdings of this.
10  (Perusing.)
11    I don't think I have the actual
12  holdings of Braeburn's exposures.
13    So what the investor is asking is
14  why we think the bonds in their portfolio are
15  money good.
16  Q.  Do you have an understanding from
17  this e-mail that whichever particular Petrobras
18  bonds were in Braeburn's portfolio it was
19  Western Asset's view in February 2015 that
20  those bonds were, quote, money good?
21    MR. OLIVAR: Same objections.
22  A.  It was your opinion that Petrobras
23  would continue to -- my recollection of the
24  Petrobras -- the Braeburn situation, it was our
25  opinion that the -- that Petrobras would

Page 278

1    SARUWATARI - CONFIDENTIAL
2  continue to pay their coupon and pay back their
3  principal for the specific securities that were
4  held in their portfolios.
5  Q.  Do you recall having that discussion
6  with any other Western Asset clients around
7  this time period?
8    MR. OKUN: Objection.
9  A.  Not specifically.
10  Q.  You can put that to the side.
11    THE VIDEOGRAPHER: We are now off
12  the record.  The time is 6:02 p.m.
13  (Recess taken.)
14    THE VIDEOGRAPHER: This is tape
15  seven of the deposition of Mr. Steven
16  Saruwatari.  We are now back on the
17  record.  The time is 6:11 p.m., April 13,
18  2016.
19  (Western Asset Exhibit 29, E-Mail
20  With Attachment, Bates Stamped
21  WESTERN00069827 through 69831, marked for
22  identification.)
23    BY MR. BAREFOOT:
24  Q.  Mr. Saruwatari, I'm going to show
25  you a document that's been marked as Western

Page 279

1    SARUWATARI - CONFIDENTIAL
2  Asset Exhibit 29, sorry, bearing Bates stamp
3  WESTERN00069827 through 831.
4    Do you recognize this as an e-mail
5  from Kevin Ritter to the GNW emerging markets
6  team listserv?
7  A.  Yes.
8  Q.  What is the GNW emerging markets
9  team listserv?
10  A.  GNW stands for Genworth, one of our
11  clients.
12  Q.  It's also sent to the CS team
13  insurance.
14    Do you understand what that listserv
15  is?
16  A.  Client service team for the
17  insurance business.
18  Q.  Is Genworth an insurance company?
19  A.  Genworth is an insurance company,
20  yes.
21  Q.  You'll see this contains an e-mail
22  embedded below from C.L. Lian to the WA
23  portfolio management service.
24    If I could direct your attention
25  within that e-mail to the third page, which

Page 280

1    SARUWATARI - CONFIDENTIAL
2  bears Bates stamp 829, you'll see the heading
3  there, Financial Statements: Truth or Dare?
4  And the second bullet reads, "Sign off from PwC
5  on pending financial statements is pivotable"
6  -- "pivotal not only in averting debt
7  acceleration, but also to enable Petrobras to
8  access international bond markets again.  The
9  ideal outcome is that the released financial
10  statements are credible enough to avoid
11  skepticism without raising undue alarm.
12  Investors may remain reluctant to buy Petrobras
13  bonds again if PwC decides to recognize a minor
14  loss (USD 10 billion or below, in our view),
15  and/or to add a qualified opinion suggesting
16  more adjustments may follow pending conclusion
17  of the Lava Jato investigations."
18    Do you have an understanding of what
19  the purpose or use of these summary talking
20  points were?
21    MR. OLIVAR: Objection to form.
22  A.  (Perusing.)  Not exactly sure, but
23  around the time from fourth quarter 2014 as we
24  went forward and we learned more information,
25  again, we're constantly doing analysis.  We're

Page 281

1      SARUWATARI - CONFIDENTIAL
2  sharing information with portfolio management
3  team. We're fielding questions from clients.
4      So I think this was a summary of our
5  thinking on Petrobras on or around April 9,
6  2015.
7  Q.  And this was a summary that was
8  generally available to the Western Asset's
9  emerging markets team and not specifically
10  limited to Genworth; is that correct?
11  A.  Yeah, it looks like the first e-mail
12  was sent to portfolio management and EM global,
13  which includes portfolio managers and EM
14  emerging markets global distribution.
15  Q.  In the bullet that we were just
16  looking at where it reads, "Investors may
17  remain reluctant to buy Petrobras bonds again
18  if PwC decides to recognize a minor loss (USD
19  10 billion or below, in our view)," was it
20  Western Asset's view in April 2015 that a
21  financial restatement of 10 billion US dollars
22  or below would be a minor loss for Petrobras?
23      MR. OLIVAR: Objection to form,
24  outside the scope.
25      Go ahead.

Page 282

1      SARUWATARI - CONFIDENTIAL
2  A.  I'm just trying to get my time frame
3  perspective. At this stage, April 10, 2015,
4  financial -- audited financial statements, I
5  believe, had not yet been released. Am I
6  correct?
7  Q.  That is correct.
8  A.  (Perusing.) Yeah, I guess based on
9  the analysis performed here by the team and
10  summarized by C.L. that's what it appears to
11  convey, yes.
12  Q.  You can put that to the side.
13      Mr. Saruwatari, I'm going to mark as
14  Exhibit 30 what I believe will be our last
15  exhibit. This is not Bates stamped, but I will
16  represent to you that this is an excerpt of the
17  Petrobras Form 20-F for the fiscal year ended
18  December 2013.
19      (Western Asset Exhibit 30, Excerpt
20  of Petrobras Form 20-F, marked for
21  identification.)
22  Q.  If I could draw your attention --
23  this is an excerpt, but if I could draw your
24  attention to page 11 of this except under the
25  heading Balance Sheet Data.

Page 283

1      SARUWATARI - CONFIDENTIAL
2  A.  Yes.
3  Q.  You'll see under assets a line
4  labeled Property, Plant and Equipment with the
5  figure for 2013, two hundred twenty-seven nine
6  hundred one billion dollars.
7      Do you see that?
8  A.  Yes.
9  Q.  Does Western Asset believe that this
10  figure was accurate when reported?
11      MR. OLIVAR: Objection to form,
12  outside the scope.
13      MR. OKUN: Objection.
14  A.  When this was released, which my
15  guess was sometime in 2014, and this was an
16  audited financial statement, so, again, we
17  relied heavily on the audited financial
18  statements, and, you know, I don't believe
19  there was things out there to -- for to us
20  question the integrity of management in
21  their -- in their reporting, and on top of that
22  it was -- if this was filed with the SEC, this
23  must have been an unqualified opinion.
24      So we believe that to be true and
25  accurate, yes.

Page 284

1      SARUWATARI - CONFIDENTIAL
2  Q.  Does Western Asset now believe that
3  this figure of property, plant and equipment
4  was accurate when it was reported?
5      MR. OKUN: Objection.
6      MR. OLIVAR: Objection to form,
7  improper contention question for the
8  witness, calls for expert testimony.
9  Q.  You can answer.
10      MR. OLIVAR: It's also outside the
11  scope of the topics.
12  A.  Well, in hindsight, obviously these
13  are the numbers that were in question and
14  ultimately did get restated.
15  Q.  Does Western Asset have an
16  assessment of the amount by which this figure
17  for property, plant and equipment was
18  overstated?
19      MR. OLIVAR: Same objections.
20      MR. OKUN: Objection.
21      MR. OLIVAR: Improper question for a
22  fact witness.
23      You can do your best.
24  A.  Yeah, at the time of the financial
25  statement release, we didn't have an estimate,

Page 285

SARUWATARI - CONFIDENTIAL
1    and, today, we go -- we sort of rely on the
2    figures that were then subsequently re-audited
3    by PricewaterhouseCoopers.
4        MR. BAREFOOT: I have nothing
5    further.
6        MR. OLIVAR: Thank you. Any other
7    counsel have questions for the witness?
8        THE VIDEOGRAPHER: We are now off
9    the record. The time is 6:20 p.m.
10       (Recess taken.)
11       MR. OLIVAR: I want to mark the
12   whole transcript as confidential. We will
13   sort out the nonconfidential portions
14   later.
15       THE VIDEOGRAPHER: We are now back
16   on the record. The time is 6:22 p.m.
17       MR. HAENDLER: I have a couple of
18   matters that I would like to state for the
19   record. One is, at the outset, I stated
20   that I was representing the plaintiffs in
21   the Transamerica action. I should clarify
22   that I'm also here representing the
23   plaintiff in the INKA action.
24       I would also like to state that I

Page 286

SARUWATARI - CONFIDENTIAL
1    join in the objections raised by counsel
2    for Hawaii regarding the timeliness of the
3    April 11, 2016 amended notice and subpoena
4    for testimony of Western Asset Management
5    Company pursuant to Rule 30(b)(6) and we
6    reserve all our rights.
7        I just have a few questions.
8    EXAMINATION BY
9        MR. HAENDLER:
10   Q. Mr. Saruwatari, are you familiar
11   with the Western Asset employee named Dylan
12   Moeller?
13   A. Dylan Moeller, yes.
14   Q. What was his job title during the
15   relevant period?
16   A. I believe he served on the RFP team
17   for a period of time, and currently he is a
18   client service associate, but I don't know
19   exactly when he was transferred to the client
20   service associate team.
21       MR. OLIVAR: Can we get a spelling
22   of that last name?
23       THE WITNESS: Moeller,
24   M-O-E-L-L-E-R, I believe.

Page 287

SARUWATARI - CONFIDENTIAL
1    Q. And do you know what office
2    Mr. Moeller worked out of during the relevant
3    period?
4    A. Pasadena office.
5    Q. Thank you I have no further
6    questions.
7        MR. BAREFOOT: Two follow-up
8    questions. I can take the mic if that's
9    okay.
10       MR. HAENDLER: Sure.
11   FURTHER EXAMINATION
12       BY MR. BAREFOOT:
13   Q. Mr. Saruwatari, given Mr. Moeller's
14   role as a client service associate and member
15   of the RFP team, would he have had any role or
16   involvement in executing trades or placing
17   orders for securities for Western Asset's
18   clients?
19   A. No, not in those roles.
20       MR. BAREFOOT: Nothing further.
21   EXAMINATION BY
22       MR. OKUN:
23   Q. As I said before, my name is Barry
24   Okun, and I represent plaintiff Employees'

Page 288

SARUWATARI - CONFIDENTIAL
1    Retirement System of the State of Hawaii, and I
2    have a few questions.
3        You testified before that part of
4    Western Asset's investment analysis was to
5    determine a fundamental fair value for the --
6    for a security and see how that compared to its
7    market price.
8        Now, in determining fundamental fair
9    value, if Western Asset was aware that
10   Petrobras had purchased certain plants at
11   hundreds of million of dollars in excess of the
12   plant's true value, would that -- you know, and
13   that was not reflected in the -- and that
14   inflated value was what was listed on their
15   financial statements, would that have affected
16   your -- Western Asset's evaluation of the
17   fundamental fair value of Petrobras'
18   securities?
19       MR. BAREFOOT: Objection to form.
20   Q. You can answer.
21   A. Most certainly if we were aware that
22   some fraud had been committed, not only would
23   that impact the analysis, the quantitative
24   analysis, that would also speak to the

Page 289

SARUWATARI - CONFIDENTIAL
1
2  integrity of management. And if we questioned
3  the integrity of management, then you must ask
4  yourself the question, what else can we not
5  believe on these reported financial statements,
6  and what else have they fraudulently told the
7  auditors at the time, PricewaterhouseCoopers.
8      So had we known that at the time, in
9  hindsight, it would most definitely affect
10 Western Asset's assessment of fundamental
11 value.
12 Q.  And since it would affect your --
13 and it would also -- just to nail it down the
14 obvious, it would also affect your decision to
15 purchase Petrobras -- Petrobras bonds at their
16 then market price?
17     MR. BAREFOOT: Objection to form.
18 A.  Yes, I mean, again, when we buy
19 securities on a security-by-security basis, we
20 are evaluating -- fundamental value is one of
21 the items that we consider in the analysis, and
22 we're doing qualitative analysis. We're
23 meeting with company management. We're looking
24 rating agency reports. We're looking at
25 Bloomberg. We're looking at -- we're talking

Page 290

SARUWATARI - CONFIDENTIAL
1
2  to the dealer and seeing what information that
3  we can gain there.
4      So, yes, it would definitely impact
5  our decision to invest in Petrobras securities.
6  Q.  You also testified before about what
7  the extent that your knowledge of an issuer
8  engaging in corrupt practices might play --
9  might play in your investment decisions.
10     My question to you is that if you
11 had known that key members of Petrobras'
12 management were taking millions of dollars of
13 bribes and passing them on, at least in part to
14 Brazilian governmental officials, would that
15 have effected your decision to purchase
16 Petrobras securities at their then market
17 price?
18     MR. BAREFOOT: Objection.
19 A.  Again, when we buy securities, we
20 take into consideration everything we know at
21 the time. Corruption would be one of those,
22 and it would be a very important factor in the
23 purchase decision.
24     Again, if we can -- if we -- if we
25 cannot rely on -- on the senior members of the

Page 291

SARUWATARI - CONFIDENTIAL
1
2  management team to tell us the truth and for us
3  to rely on what we believe are true and
4  accurate financial statements, which are part
5  of the quantitative analysis, and we can't rely
6  on anything they tell us in conference calls,
7  investor calls, it's going to be hard for
8  Western Asset to come to a fair assessment of
9  the markets -- the securities' fundamental
10 value.
11 Q.  Okay. That's all I have.
12     MR. BAREFOOT: One final question.
13 FURTHER EXAMINATION
14     BY MR. BAREFOOT:
15 Q.  Mr. Saruwatari, you testified
16 earlier concerning the difficulty of preventing
17 and detecting fraud not only in emerging
18 markets but in developed markets.
19     Do you recall that testimony?
20 A.  Yes.
21 Q.  Does Western Asset have any
22 understanding or analysis of Petrobras' ability
23 to uncover and detect the scheme that later
24 became known as Lava Jato?
25     MR. OLIVAR: Objection to form and

Page 292

SARUWATARI - CONFIDENTIAL
1
2  also outside the scope.
3      Go ahead.
4  A.  Petrobras -- the question was
5  Petrobras' ability to detect fraud.
6  Q.  To uncover and detect the scheme
7  that became known as Lava Jato.
8      MR. OLIVAR: Same objections.
9  Q.  Has Western Asset performed any
10 analysis of Petrobras' efforts or ability to
11 detect and uncover the scheme that became known
12 as Lava Jato?
13     MR. OLIVAR: Please don't share any
14 communications with counsel in that
15 answer, but leaving those out, you can
16 answer. Same objections.
17 A.  I'm not exactly sure what you're
18 getting at. Can you repeat it?
19 Q.  Has Western Asset performed any
20 analysis or reached any conclusion of
21 Petrobras' ability to detect and uncover the
22 scheme that became known as Lava Jato?
23     MR. OLIVAR: Same objections. Same
24 instruction.
25 A.  I think in the analysis of corporate

Page 293

```
 1      SARUWATARI - CONFIDENTIAL
 2   research, emerging market corporate research or
 3   corporate research, in general for that matter,
 4   should a company even have those practices if
 5   the senior members of the management team are
 6   the ones responsible to lead that company and
 7   create such policies, then I think you can make
 8   an assumption that they're not going to
 9   implement those policies or enforce those
10   policies.
11      So it's -- fraud is, again, very,
12   very difficult to detect when you have senior
13   management professionals colluding with one
14   another to implement that fraud.
15   Q.  Do you have any understanding of the
16   involvement of any particular members of the
17   management team at Petrobras in the Lava Jato
18   scheme?
19      MR. OLIVAR: Objection to form.
20   A.  I believe there was a senior member
21   of the Petrobras team that was -- that was
22   named, I believe it was in the period of
23   twenty -- early 2014 or maybe even late 2014, a
24   senior member of the team was involved in
25   fraud.
```

Page 294

```
 1      SARUWATARI - CONFIDENTIAL
 2   Q.  Who is the senior member of the
 3   Petrobras team that you believe was involved in
 4   fraud in late 2014?
 5      MR. OLIVAR: Objection to form,
 6   outside the scope.
 7   A.  I actually don't remember his name.
 8   Q.  And what is the basis of your
 9   testimony that that unknown senior member of
10   the Petrobras team was actually involved in any
11   fraudulent activity?
12      MR. OLIVAR: Same objections.
13   A.  I believe he was -- at least my
14   knowledge of that was he was investigated and
15   was found to be involved in some fraudulent
16   activity.
17   Q.  Was found by whom to be involved in
18   some activity?
19   A.  The authorities.
20   Q.  What authorities?
21   A.  Brazilian authorities.
22   Q.  Do you have an understanding of
23   whether there was a judicial decision on the
24   fraud that you believe was investigated of this
25   particular senior manager?
```

Page 295

```
 1      SARUWATARI - CONFIDENTIAL
 2      MR. OLIVAR: Same objections.
 3   A.  I'm not sure.
 4      MR. BAREFOOT: Nothing further.
 5      MR. OLIVAR: Everyone finished?
 6      Thank you everyone.
 7      THE VIDEOGRAPHER: This concludes
 8   today's deposition.  We are now off the
 9   record.  The time is 6:33 p.m.  Thank you.
10      (Time noted:  6:33 p.m.)
```

Page 296

```
 1           A C K N O W L E D G M E N T
 2
 3   STATE OF               )
 4                          :ss
 5   COUNTY OF              )
 6
 7       I, STEVEN SARUWATARI, hereby certify
 8   that I have read the transcript of my testimony
 9   taken under oath in my deposition of April 13,
10   2016; that the transcript is a true, complete
11   and correct record of my testimony, and that
12   the answers on the record as given by me are
13   true and correct.
14
15                   _____
16                      STEVEN SARUWATARI
17
18   Signed and subscribed to before me
19   this _____ day of _____, 20___.
20
21   _____
22   Notary Public, State of New York
23
24
25
```

Page 297

```
 1              C E R T I F I C A T E

 2

 3   STATE OF NEW YORK  )

 4                      :ss

 5   COUNTY OF RICHMOND )

 6

 7           I, MELISSA GILMORE, a Notary Public

 8   within and for the State of New York, do hereby

 9   certify:

10           That STEVEN SARUWATARI, the witness

11   whose deposition is hereinbefore set forth, was

12   duly sworn by me and that such deposition is a

13   true record of the testimony given by such

14   witness.

15           I further certify that I am not

16   related to any of the parties to this action by

17   blood or marriage; and that I am in no way

18   interested in the outcome of this matter.

19           IN WITNESS WHEREOF, I have hereunto

20   set my hand this 18th day of April, 2016.

21

22

23

24   _____

25   MELISSA GILMORE
```

Page 298

```
 1              *** ERRATA SHEET ***

 2        ELLEN GRAUER COURT REPORTING CO. LLC
          126 East 56th Street, Fifth Floor
 3            New York, New York 10022
                  212-750-6434
 4

 5   NAME OF CASE: IN RE PETROBRAS SECURITIES
     DATE OF DEPOSITION: APRIL 13, 2016
 6   NAME OF WITNESS: STEVEN SARUWATARI

 7   PAGE  LINE      FROM        TO        REASON

 8   ____|____|_____|_____|_____

 9   ____|____|_____|_____|_____

10   ____|____|_____|_____|_____

11   ____|____|_____|_____|_____

12   ____|____|_____|_____|_____

13   ____|____|_____|_____|_____

14   ____|____|_____|_____|_____

15   ____|____|_____|_____|_____

16   ____|____|_____|_____|_____

17   ____|____|_____|_____|_____

18   ____|____|_____|_____|_____

19   ____|____|_____|_____|_____

20

21            _____

22   Subscribed and sworn before me
     this____day of_____,20__.
23

24   _____    _____

25   (Notary Public)       My Commission Expires:
```

**$**

**$50 (2)**
207:24;272:4

**A**

**Abad (5)**
97:24;104:3,9,14;
178:3
**ability (13)**
60:3;62:12;70:22;
107:14;194:18;208:2,
22;209:14;261:17;
291:22;292:5,10,21
**able (8)**
68:14;84:10;
130:19;131:22;155:6;
195:7;213:3;216:14
**above (1)**
48:21
**abroad (5)**
56:25;59:6,12;68:5;
218:10
**Absolute (3)**
21:21;22:4;217:10
**AC (1)**
264:16
**acceleration (1)**
280:7
**accept (1)**
186:6
**acceptable (2)**
74:24;232:21
**accepted (3)**
162:21;164:24;
166:23
**access (5)**
45:3;85:18;155:5;
212:8;280:8
**accommodate (1)**
14:8
**accordance (2)**
47:22;166:22
**account (59)**
25:6,25;26:24;
42:23;43:3,11;45:14,
14,15,16,17,21;48:23;
51:13;53:13,17;
56:15;60:12,12,14,15,
18;62:18;63:9;65:12;
72:2;75:14;76:3;
77:14,17,20;78:4;
82:8;86:9;88:12,15;
110:11,17;112:20;
113:22;114:22;115:3;
118:21,24;119:10;
120:5;123:7;137:23;
152:17;154:6,16;
165:22;204:14;
217:19;219:22,23;
220:3;223:5;233:17

**accountable (1)**
92:20
**accounting (6)**
32:5;162:13,22;
164:25;166:23;168:4
**accounts (13)**
61:25;65:16;76:7;
77:22;88:24;89:9;
110:21,22;114:25;
210:4;219:19;231:24;
232:3
**account's (1)**
154:13
**accurate (11)**
103:2;143:18,21;
157:14;159:11;168:3;
201:2;283:10,25;
284:4;291:4
**achieve (1)**
48:13
**achieving (1)**
47:20
**acquire (1)**
192:19
**Act (1)**
175:4
**acting (16)**
197:5,14,18,20;
198:3,5,10,11,17;
199:2,2,9,12,13;
215:4,4
**action (36)**
18:19,24;25:6;28:8,
15;43:22;44:4,7;53:4,
9;56:8;63:9;69:14;
72:2;75:14;76:4,8;
77:13;78:5;110:12,
17,22;112:21;113:23;
116:24;117:16;118:6;
137:24;152:18;186:2;
204:22;237:5,13;
238:17;285:22,24
**active (2)**
33:8;252:25
**activity (4)**
196:19;294:11,16,
18
**acts (1)**
70:6
**actual (6)**
26:25;187:14;
225:12;257:9;277:9,
11
**actually (26)**
53:24;60:10;92:6;
98:12;131:21;133:13;
139:14;163:19;192:5;
193:9;194:22;195:19;
202:24;212:3;213:6;
224:16;226:20;227:4,
13;234:25;236:10;
247:23;251:24;265:6;
294:7,10

**Adam (1)**
15:4
**Adauto (3)**
242:13;244:10,11
**add (4)**
169:24;170:14,15;
280:15
**adding (1)**
264:16
**additional (6)**
178:11;235:24;
236:8,16,19;264:13
**address (4)**
12:14;188:14;
203:7,7
**addressed (2)**
138:18;244:13
**adjust (1)**
121:22
**adjustment (3)**
254:22,25;260:6
**adjustments (1)**
280:16
**administered (1)**
12:20
**Administration (6)**
25:14;32:11;
180:11,16,17;242:15
**adopted (1)**
257:13
**ADR (1)**
270:23
**Adriano (9)**
102:11,18;103:3,
21;245:10;262:24;
263:8;266:10;270:5
**ADS (1)**
71:25
**ADV (7)**
78:16,20;80:5,11;
200:11;201:15;
203:16
**Advanced (2)**
225:3,6
**advisor (6)**
70:7,16,19;86:14,
20;96:16
**affairs (1)**
142:24
**affect (7)**
11:23,24;180:3;
186:8;289:9,12,14
**affected (1)**
288:16
**affiliate (11)**
54:11,14,15;66:3,
13;68:16,18;229:4;
234:2,17,23
**affiliated (5)**
69:25;206:23;
234:12;241:6,10
**affiliates (12)**
65:17;66:15,19;

**67:5,14;68:5;70:11,**
21;71:8;192:13;
228:12;229:2
**again (112)**
16:25;28:25;29:9;
35:17;44:6,10;55:5;
59:11;62:23;72:5;
81:12;82:13;83:22;
84:7,12;89:18;92:18;
93:23;96:7;101:2,8;
102:3,13,16;103:19,
21;106:7,18;108:16;
109:19;111:8;112:6,
25;115:11;118:9,10;
119:5,7;122:14;
123:9;124:18;125:16,
18;126:23;127:11;
129:9;132:7;137:18;
143:8;145:15;146:2;
148:5;150:17;153:13;
154:12,21;156:6;
157:9;160:10;161:17;
162:24;163:6,17,22;
168:15;174:18;
179:17;184:18;
187:20;191:18;
195:24;196:20;
199:25;205:11;
206:18;208:20;
209:12;212:6,9;
215:12,17;216:8;
218:12;219:2,4,21;
220:17;227:17;
232:16;236:23,25;
246:7;250:18;252:23;
255:3;256:2;257:16;
259:14,20;266:9;
267:10;268:7;274:15;
280:8,13,25;281:17;
283:16;289:18;
290:19,24;293:11
**against (8)**
100:20;117:13;
126:18;149:17;150:6;
188:3,22;203:22
**agencies (5)**
127:4;157:12,21;
255:8;266:18
**agency (4)**
82:21;101:13;
122:19;289:24
**agent (7)**
197:5,14,21,23,23;
198:18;215:25
**aggregate (2)**
119:22;153:18
**ago (1)**
33:11
**agree (6)**
47:4;73:15;255:14;
256:3,10,15
**agreed (1)**
261:12

**Agreement (30)**
42:21;43:16;44:18;
46:8,16,18,24;49:18,
24;50:4,11;51:6;54:6,
19;61:2;62:24;63:6,
10;64:22;65:5,7,21;
66:10,19;67:21;69:2,
7,19;70:3;204:25
**Agreements (11)**
43:8,11;44:11;
45:11;47:3,13;53:24;
54:2,24;204:19;271:4
**ahead (18)**
13:22;14:3;23:13;
36:6;42:9;43:6;45:13;
51:4;52:24;72:4;
103:5,6;114:10;
120:11;130:17;
153:11,22;154:11;
159:2,19;164:21;
166:4;167:18;168:16,
21;169:21;175:7,12,
22;190:20;208:19;
221:2;223:8;226:2;
231:3;232:21;238:2;
251:18;255:25;
281:25;292:3
**aims (2)**
73:16,24
**alarm (1)**
280:11
**allegations (4)**
174:17;176:19;
177:2;265:15
**allocate (2)**
207:11;208:15
**allocation (4)**
79:19,20,23;80:8
**allow (2)**
13:15;276:6
**allowed (1)**
135:2
**allows (2)**
90:11;211:25
**almost (1)**
253:5
**along (1)**
103:19
**although (4)**
150:25;189:10;
191:4;273:19
**always (6)**
127:13;130:23;
132:10;142:7,22;
171:17
**ambiguous (1)**
187:18
**Amend (1)**
237:13
**Amended (12)**
19:14;20:7;26:10;
31:2;94:21,23;95:6;
108:14;237:9;238:18,

21;286:4
**America (2)**
135:4;185:20
**American (1)**
71:20
**among (1)**
184:5
**amongst (2)**
165:2;260:25
**amount (7)**
15:18;190:25;
245:17;246:3;247:2;
248:3;284:16
**amounts (1)**
153:17
**analyses (1)**
85:4
**analysis (84)**
75:4;81:7,12,15,17;
82:9;89:6;122:8,13;
123:3,6,13,14;124:17;
126:24;127:4;132:17;
133:2,4,9,22,23;
137:17,22;143:6,9;
145:7;146:19,24;
149:20;150:10,11,16,
24,24;151:2,3,8;
152:9;161:18;162:18,
19;163:18,20,20;
166:11,17;167:24;
169:2;173:4,5,6,6,15,
19,22;174:3;179:18,
18,25;183:12;184:12,
20;189:20;190:15;
191:11;231:5;246:6,
9,10;274:16,23;
280:25;282:9;288:5,
24,25;289:21,22;
291:5,22;292:10,20,
25
**analyst (20)**
14:24;17:12;32:19,
22,24;77:4;88:16,20;
90:22;91:3,16;99:3;
100:16;103:18;
136:13;137:13;
140:24;156:23;
176:23;252:23
**analysts (15)**
86:6;87:8,9;89:4,7;
90:25;93:13,16,18,19;
101:6;137:11;143:10;
184:17,21
**analyst's (1)**
150:18
**analyze (2)**
143:14;161:7
**analyzed (2)**
122:8;166:14
**analyzing (3)**
122:15;146:3;
252:24
**and/or (2)**

132:13;280:15
**annual (2)**
158:10;159:7
**answered (12)**
153:21;158:25;
159:18;164:20;166:3;
167:9,12;168:14,20;
169:19;236:22;
259:12
**anticipate (1)**
128:11
**antitrust (1)**
189:8
**apart (1)**
249:18
**apologize (4)**
20:25;182:21,25;
255:21
**appeal (3)**
189:11;191:5,19
**appear (4)**
79:13;119:12;
191:16;272:22
**appearing (1)**
228:8
**appears (15)**
67:18,21;72:21;
140:24;150:3;156:22;
181:19;214:19;
220:24;227:19;
265:17,24;268:13;
273:9;282:10
**Appendix (3)**
237:8,12;238:20
**applicable (2)**
75:21;77:11
**apply (5)**
113:14,22;114:22;
116:23;260:11
**Appointment (1)**
66:13
**approach (6)**
75:2;86:2,3;89:18;
102:17;163:7
**appropriate (1)**
161:8
**approval (3)**
106:15,25;107:16
**approved (4)**
200:19;201:5,10,17
**approximately (14)**
33:25;35:9,19;
40:12;41:18;42:4,13;
106:23;107:7;171:5,
6;254:13;255:15;
261:5
**April (25)**
10:5;96:10,15,17;
104:21;105:2,8,11;
106:23;107:7,10,13;
109:3,12,22;110:15;
131:8,12;132:12;
177:15;278:17;281:5,

20;282:3;286:4
**areas (1)**
79:17
**arena (1)**
173:9
**Argentina (1)**
186:9
**Armed (1)**
85:3
**around (40)**
56:21;57:6,7,22;
62:15;67:5,14,22;
106:20;136:10,20;
137:25;143:6;144:19;
145:10,18;148:11;
149:19;181:3;243:11,
14,19;245:22;246:17;
251:19;252:15;253:9;
255:15;256:4;267:3;
270:13;271:7,11;
274:3;276:5,14;
277:3;278:6;280:23;
281:5
**arrangement (3)**
204:3,20,23
**arrangements (8)**
54:23;69:22,24;
70:8,17;203:20;
204:10,15
**arrive (2)**
123:14;163:7
**articles (3)**
47:23,24;48:7
**articulate (3)**
80:5;88:3,11
**articulating (1)**
88:7
**articulation (2)**
84:8,13
**ascribed (3)**
125:11,24;127:23
**ascribes (2)**
122:25;182:11
**ascribing (1)**
183:8
**Asian (6)**
37:8,9;38:5;39:25;
60:11;107:21
**aside (14)**
15:10;18:7;23:3,8,
20,25;29:2,3;32:15;
71:15;74:11;168:5;
206:22;257:19
**aspect (4)**
101:16;137:19;
143:13;159:21
**aspects (11)**
78:23;100:23;
130:13;137:5;146:6;
157:6;158:5,20;
159:4,14;160:5
**assess (1)**
261:16

**assessed (2)**
85:2;261:21
**assessment (27)**
84:22;123:25;
124:12;126:11;127:7;
128:6,15,17,21;129:6;
137:20;163:23;
254:24;256:19,25;
257:22;258:7,10;
259:4;260:14,18;
261:18;268:2,8;
284:16;289:10;291:8
**assessments (2)**
166:19;257:5
**Asset (412)**
11:9,11;14:16,18;
15:9;16:4;17:22;
19:14,16,20,25;20:7,
13,16,17;21:18,21,22;
22:4,9,16;24:3,4,11,
11;25:5,7,9,18;26:11;
27:23;29:5,15;30:6,
12,14,20,21;31:2,2,19,
20;33:12,15;35:14,15,
19,25;36:10,25;37:4,
18,20,22;41:21;42:2,
14,18,25;43:21;44:3;
46:7,20;48:8;49:8,19,
25;50:5,8,13,15,17,
21,24;51:6,15,18,22,
25;52:4,6,12,17;53:3,
6,14;54:8,10,11,15,
19,21,25;55:7,8,13,
23,25;56:6,13,19,21;
57:2,8,15;60:20;61:5,
6,9,19;62:3,4,19;
64:21;65:18;66:24;
67:14,19;68:5,25;
69:8;70:10,21;71:5,
11,14,19,21,23;72:10;
73:11;74:25;75:6,13,
24;76:2;77:10,12;
78:3,4,16,22;80:7,12,
19;81:10,19;82:7;
85:22,25;86:13;93:4;
94:4,14,22,23;95:5,
21;96:3,23;97:17,19,
20,23,25;99:22;
101:22;106:7;110:11,
16;112:20;113:14;
115:16,17,23;120:7;
121:11,13;122:25;
127:6,23;128:4,20;
129:5;132:16,21;
133:23;134:8,19,23;
136:18;137:6,12;
138:9,21;144:2;
147:23;148:17,19,23,
25;150:14;151:12,17,
18;152:16,24;153:5,
19,25;155:12,21,25;
158:22;160:6,24;

161:4,8,11,12,13;
162:6,6,13,25;163:2,
11,13,21;164:7,9,15,
16,23;165:6,6,22;
166:25;170:17,20,25;
171:3;172:4,8,20;
173:14,21;174:7,14,
25;175:9,18;176:2,5,
6,11,18;177:23;179:9,
25;181:8,22;182:3,6,
11;183:12,17;184:3,
12,22;185:8;186:20;
187:15,25;188:10,11,
15,21;192:7,11,16,19,
25;194:20;195:9,20;
196:25;197:2,20,21;
198:4,7,22,23,24;
199:7,15,16,21;
200:16,19;202:11,23;
203:19,25;204:5,9;
205:5,13;206:12,24;
207:5,10,17,20;208:2;
209:22;210:4,5,9;
211:2,6,12;212:2,7;
215:6,16;216:23;
217:9,9;218:9,23;
219:13;221:21;
222:16,23;228:10;
229:12;230:19,22;
233:14;234:22;
235:18;236:15;237:6,
8,19;238:20;239:7;
240:3,11,13,17;241:8;
242:7;243:7,21;
244:5;245:3,6,23;
247:12;250:9;251:2,
8,9;252:2,7,18;
255:10,14;256:3,23;
257:12,22;258:9;
259:4;261:5,21;
262:8,10,19;265:13;
266:3,7;267:3;
269:12,23,25;272:10;
273:2,4;275:4,6;
276:13;278:6,19;
279:2;282:19;283:9;
284:2,15;286:5,12;
288:10;291:8,21;
292:9,19
**assets (25)**
47:19;48:9;49:2,9;
84:25;137:14;161:2,
15;162:2,3;163:4,24;
165:10,11,12,16;
189:10;190:12;
213:13;246:25;
247:15,19;248:2,10;
283:3
**Assets' (2)**
17:6;274:4
**Asset's (69)**
16:16;36:4;57:10,
21,22;58:4;67:5;

73:24;78:14;84:13,
21;85:6;94:20;109:2;
121:10;123:7,24;
126:10;128:6,15;
136:10,19;143:6;
144:20;145:10,17;
147:25;148:6,7;
152:14;167:5,15;
168:9;169:9;170:8;
171:10;177:3;180:25;
183:7;189:17;192:23;
193:23;196:24;
197:10;201:3;203:24;
209:7;210:20;218:18;
228:14;229:2;232:24;
235:25;237:9,12;
254:23;256:18,25;
257:18;268:2;270:15;
277:4,19;281:8,20;
287:18;288:5,17;
289:10
**assign (1)**
122:22
**assigned (5)**
86:6;91:6,11;99:5;
110:25
**associate (5)**
34:15;264:6;
286:19,21;287:15
**associated (3)**
218:23;220:10,14
**association (2)**
47:23;48:7
**assume (2)**
14:4;157:13
**assumption (1)**
293:8
**ATP (2)**
224:22;225:3
**attached (1)**
47:3
**Attachment (8)**
138:10;141:16;
185:9;245:10;253:22;
273:5;275:7;278:20
**attempt (3)**
123:4;135:11;
260:21
**attention (31)**
28:20;46:23;65:25;
66:10;69:18;73:7;
79:2,15;86:24;95:12;
97:5;135:18;144:12;
178:7;181:24;185:23;
189:4;200:13;239:4;
242:21;246:19;254:3,
8;266:13;270:18,21;
271:16;273:18;
279:24;282:22,24
**attest (2)**
113:2;222:25
**attorney (1)**
52:11

**Attorneys (2)**
3:4;15:5
**atypical (1)**
51:9
**audit (1)**
34:16
**audited (6)**
157:15;168:3;
264:23;282:4;283:16,
17
**auditing (4)**
34:19,23;35:2;
157:15
**auditors (2)**
258:20;289:7
**Australia (7)**
58:7,11,21;59:5,13,
20;60:2
**authorities (3)**
294:19,20,21
**authority (21)**
25:8;43:2,22;44:4;
48:23;49:8,14;55:24;
56:7,14;57:10;60:10,
13,13,17,20;61:6;
71:6;97:10;106:13;
206:19
**authorization (1)**
107:14
**authorize (3)**
61:19;62:5;106:3
**authorized (19)**
23:9;24:2,10;29:4,
13;61:16;62:19;63:3;
65:18;67:4,15,19,23;
90:10,13,16;106:24;
112:11;228:10
**authorizing (1)**
92:24
**available (18)**
19:4;82:17;85:7,9,
10,11;125:19;126:25;
137:9;143:12;150:19,
23;158:17;169:4,5;
174:21;267:14;281:8
**average (1)**
149:18
**averting (1)**
280:6
**avoid (1)**
280:10
**aware (50)**
19:7;54:24;55:6,12,
22;56:5,12;106:6,11;
111:13;136:15;145:5,
23;174:6,7;175:8,16,
17,25;176:4,18,22;
180:6;181:5;183:22;
184:16,20;194:8;
198:7,25;199:10,18,
21;204:17;211:13;
221:6;222:20;223:21;
236:18,24;240:9;

243:8;252:2;257:17;
261:4;262:3;263:19;
276:10;288:10,22
**away (1)**
105:22
**awhile (1)**
186:9

**B**

**Bachelor (1)**
32:5
**back (39)**
24:14;26:6;27:7;
35:14;40:16,20,22;
53:20;63:19;83:8;
84:15;89:18;104:21;
105:6,8;107:5;108:9,
13;127:17;129:9;
130:8;135:21;139:6,
11;142:5;143:8;
152:21;153:14;
177:14;200:9;205:22;
230:12;233:18;
253:20;263:15;269:9;
278:2,16;285:16
**backed (3)**
147:20;148:2,8
**background (1)**
31:23
**backing (1)**
84:25
**bad (1)**
149:15
**Baha (3)**
65:8,11;67:3
**balance (17)**
135:23;137:2,5;
158:12;159:4;161:5,
22;163:25;165:12,13,
16;166:16;168:23;
178:19;198:20;
253:23;282:25
**balanced (1)**
71:15
**Bank (19)**
122:20;212:25;
213:7,9,11,12;214:20,
23;215:9,13,15,21;
217:13,14;224:10,19;
233:24;234:10,23
**Bank/RBS (1)**
241:22
**banks (1)**
233:23
**Barclays (1)**
119:21
**BAREFOOT (61)**
3:7;10:23,23;12:8;
16:2;19:12,18,23;
27:4,6;30:24;43:18;
46:3;47:4,7;63:12;
64:15;68:21;72:7;

78:11;86:10;94:19;
108:3,11;109:16,19;
121:6;130:11;138:5;
167:11;169:23;177:7,
17;182:16,21;185:4;
206:16;209:18;
216:20;221:14;222:6;
230:5,14;237:3;
238:13;242:5;262:6;
263:17;269:21;
272:24;278:23;285:5;
287:8,13,21;288:20;
289:17;290:18;
291:12,14;295:4
**bargain (1)**
186:6
**Barry (3)**
11:5;63:24;287:24
**base (1)**
149:12
**based (49)**
54:13,20,22;75:2;
84:2;103:19;104:4,
10;105:11,13,21;
106:7;107:11;122:7,
14;123:3,17;124:8,
18;140:17;141:4;
142:25;143:3;149:19;
150:23;151:13,14;
164:23;166:19;
185:21,22;187:4;
201:25;211:21;227:7,
22;229:22;232:15;
236:2,16,19;241:17;
246:7,9;257:7;
260:20;268:10;
274:15;282:8
**Basically (2)**
37:21;135:13
**basing (1)**
141:2
**basis (14)**
57:23,25;88:22;
89:4;158:2;186:22;
215:14;253:5;258:5;
261:3;267:17;268:13;
289:19;294:8
**Bates (66)**
46:4,8;47:15;48:19;
54:3;64:19,22;65:25;
66:11;68:23;69:3,19;
72:9,11;73:9;74:5,19;
78:13;86:12,14,25;
94:2;121:8;132:18,
22;138:7,8,10,15;
141:16;147:4;149:7;
177:20;181:14;185:6,
9;209:21,23;210:14;
216:7,22,24;221:17,
22;237:4;238:15;
242:7,9;245:4,7;
246:20;254:6;262:8,
11;269:23;270:2,19;

271:17;273:3,5;
275:4,7;278:20;
279:2;280:2;282:15
**bear (2)**
78:12;177:20;
238:15
**bearing (13)**
46:4;68:23;72:8;
86:11;185:6;209:21;
216:21;221:17;242:7;
262:8;273:2;275:4;
279:2
**bears (8)**
64:19;132:22;
223:11,22;245:4;
246:20;269:23;280:2
**became (10)**
96:15;100:12;
252:3;258:12;259:6;
270:14;291:24;292:7,
11,22
**become (2)**
33:10;41:15
**beforehand (1)**
102:10
**began (4)**
35:15,18;105:7;
107:5
**begin (3)**
13:14;218:21;253:6
**beginning (13)**
17:16;21:18;25:12;
31:23;34:2;42:24;
51:15;109:21;110:14;
138:7;159:7;218:17;
252:5
**begins (8)**
23:21;29:11;54:2;
141:16;163:20;
203:19;219:10;220:5
**behalf (51)**
24:3,10;29:5,12,14;
49:20;50:2,9,24;
51:23;52:16;53:8,17;
59:8,15;60:4,23;61:8,
16,21;62:7,15;65:19;
67:6,15,24;68:6,19;
70:12,22;71:8;75:25;
77:12;80:21;82:11;
85:12,24;87:15,19;
92:24;112:19;115:15;
117:16;118:24;
152:17;153:5;192:12;
194:19;195:8,20;
202:13
**bellow (1)**
249:3
**belongs (1)**
140:11
**below (13)**
48:18;128:13,15,
17;129:12;135:25;
137:8;214:14;275:24;

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL

STEVEN SARUWATARI 30(b)(6)
April 13, 2016

279:22;280:14;
281:19,22
**benchmark (8)**
38:22;100:18,21,
22;119:6;126:12,16,
18
**benchmarked (4)**
117:13;119:5,21;
126:18
**benchmarks (13)**
38:23;77:17;84:2;
117:11,14;126:6;
135:5;153:13;154:22,
24;155:6,8,9
**beneficial (1)**
68:4
**best (6)**
19:9;143:24;182:3;
204:6;261:16;284:23
**better (2)**
26:21;69:25
**beyond (11)**
136:22;170:24;
171:14;175:6;179:14;
182:14;189:22;
236:20;249:13;
255:24;266:2
**billion (16)**
42:5,12;260:4,10,
11,12,14;265:3,15,16;
269:10;271:25;
280:14;281:19,21;
283:6
**binding (1)**
30:6
**bit (3)**
73:20;191:18;
211:19
**black (1)**
124:15
**blog (4)**
155:13,15,17,22
**Bloomberg (8)**
82:22;106:10;
194:6,6,9;233:9,9;
289:25
**blotters (1)**
72:6
**boards (2)**
41:24,24
**body (1)**
141:5
**Boeing (1)**
25:13
**Bond (26)**
21:19;27:20;37:8,9;
38:21;39:25;60:11;
99:21,23;100:19;
119:19;134:14,22,24;
135:8,9,10,14,15;
142:7;208:3;217:6;
249:4;267:13;268:12;
280:8

**bondholder (4)**
137:13;160:24;
162:7;165:8
**bonds (22)**
38:5;91:17;99:11,
12;100:10,15;207:21,
23,25;245:17,24;
268:3,4,16;276:24;
277:5,14,18,20;
280:13;281:17;
289:15
**book (7)**
151:5;165:4,17,23;
166:8,24;197:16
**booked (1)**
265:22
**books (1)**
163:5
**borrowing (1)**
48:3
**Boston (4)**
212:25;213:12,16,
20
**both (5)**
61:3;82:8;105:20;
124:20;272:2
**bottom (9)**
79:4;82:15;91:19;
92:9;95:18;97:14;
213:22;216:9;246:12
**bottom-up (8)**
75:3;81:6,9,11,14;
82:8;84:19;91:4
**bought (1)**
209:5
**box (1)**
124:15
**BPS (2)**
266:23;267:21
**Braeburn (3)**
275:20;276:5;
277:24
**Braeburn's (2)**
277:12,18
**Brasileiro (1)**
21:10
**Brazil (34)**
35:4;58:7;71:15;
102:9;135:7,9,10,15,
16;146:15;147:23;
155:8;172:4,9,21;
173:15,22;174:4,9;
178:9,12,22;179:11;
180:3,9,21,25;185:19;
186:9;253:3;263:8,9;
266:19;274:7
**Brazilian (17)**
94:12;147:10,12,
18;148:3,8,20;176:7;
179:13;180:4,13;
189:6;266:17;267:5;
268:3;290:14;294:21
**Brazil's (1)**

273:21
**break (8)**
14:7,11;63:13;
65:15;129:18;130:20;
177:8;230:6
**breaking (1)**
268:25
**Brent (1)**
272:3
**bribery (11)**
243:21;246:23;
247:22;252:3,19;
254:12,18;258:12;
259:6,24;265:15
**bribes (2)**
174:9;290:13
**briefly (2)**
53:20;239:3
**brings (1)**
275:24
**BRL (2)**
271:24;272:4
**broad (27)**
29:23;34:21,21;
76:15;80:4;84:8,12;
110:2;113:5,10,13,21;
114:3,13,21,25;116:9,
23;117:8;118:10,13;
119:15,16,18,19;
171:25;174:21
**broader (2)**
89:6;185:20
**broker (17)**
197:18;200:19;
201:3,5,10,17,19,23;
202:3,4,14;204:3,5;
227:4;229:9,11,16
**broker/dealer (19)**
192:8,10;196:23;
197:12,13;198:3,5,9,
10,25;199:2,8,12,15;
202:11;203:12;206:5,
14;227:14
**broker/dealers (11)**
192:13;193:13,23;
195:17;197:4,5;
198:11;201:6;202:6;
205:18;235:6
**brokerage (6)**
203:20;204:2,3,10,
15,23
**brokers (7)**
200:16,17,21,24;
201:12;202:8;204:5
**Brussels (1)**
217:14
**bucket (2)**
117:8;119:15
**build (1)**
207:5
**bullet (14)**
73:22;135:19;
245:15,19;246:21;

247:4;248:18,22;
254:9;270:24;271:13;
273:19;280:4;281:15
**bullets (1)**
271:18
**burn (2)**
271:22;272:2
**business (14)**
12:14;32:11;54:16;
57:5,6;171:2,9;184:9;
186:9,14;193:17;
197:16;219:22;
279:17
**button (1)**
202:19
**buy (17)**
53:2;95:16;98:16;
108:19;112:14;135:8,
10;169:3;197:25;
198:13;205:5,13;
208:9;280:12;281:17;
289:18;290:19
**buyer (2)**
198:16,21
**Buyer/seller (2)**
214:15;216:10
**buying (4)**
60:11;97:11;
135:14;197:16
**BV (1)**
21:11
**BWC00002153 (2)**
64:20,23

**C**

**CADE (1)**
189:8
**calculated (1)**
150:14
**calculation (1)**
152:3
**calibrated (1)**
88:25
**California (3)**
12:16;32:2;262:19
**call (8)**
102:8;246:13,16;
262:18,25;264:25;
265:7,8
**called (12)**
12:2;33:16;45:18;
47:24;100:18;138:19;
155:12,16;207:15;
224:6;228:14;229:2
**calling (1)**
193:22
**calls (6)**
88:9;250:16;
276:20;284:8;291:6,7
**CalSTRS (2)**
264:6;268:9
**CalSTRS' (1)**

263:2
**Camargo (1)**
186:3
**Camargo's (2)**
186:5,12
**came (6)**
237:17;241:2,4,7,
14;253:4
**can (113)**
13:9,22;16:6;18:20;
23:15;26:4;28:5;
30:24;39:7;43:6,15,
25;45:3;55:5;57:19;
68:8,20;71:10;74:17;
79:22;80:8;85:18,20;
94:17;98:10;100:17;
113:25;115:12;121:4,
25;123:21;124:19;
125:8;129:17,18;
138:3;139:14;143:22;
145:15;152:7,10;
153:8;159:3;163:2,3;
170:13,24;171:15;
172:13,18;173:2;
174:12;175:13;
176:15;179:16;181:6;
182:3,24;185:2;
187:2;19;188:7,25;
190:13;192:2,18;
194:4,22,22,23,24;
196:16;201:13;
205:10;208:6;209:2;
211:18,18;216:18;
221:12;228:19;
229:21;230:5;234:6;
236:5,25;238:12;
239:3;242:4;244:24;
250:2;251:4;253:15;
262:5;263:12,21;
267:9;269:20;272:23;
274:25;278:10;
282:12;284:9,23;
286:22;287:9;288:21;
289:4;290:3,24;
292:15,18;293:7
**canvass (1)**
196:3
**capabilities (6)**
59:19,20,23,25;
73:13;74:16
**capacity (5)**
30:11,19;31:14,19;
160:4
**capex (18)**
135:21;136:6,11,
16,19;146:6;254:12,
13,18,22;255:17;
256:5;259:24;260:4,
10,16;264:25;265:22
**capital (2)**
166:21;200:23
**capitalization (4)**
135:25;142:4;

145:13,21
**caps (2)**
246:13;273:24
**car (3)**
272:8,12,20
**careful (1)**
248:13
**cares (1)**
27:2
**carries (1)**
99:20
**CARS (2)**
45:6,10
**C-A-R-S (1)**
45:6
**cartel (2)**
189:7;190:11
**Casarotta (1)**
245:11
**Casarotto (6)**
102:11,20;103:8;
262:25;263:8;270:5
**case (30)**
38:23;57:14;65:16;
73:5;82:24;99:19;
102:10;111:7;114:17;
122:21;131:9,13,18;
132:11;133:18;
149:12;160:3;171:17;
189:7,14;190:11;
191:7;192:15;198:21;
204:21;231:10,20;
265:17,24;271:2
**cases (1)**
271:6
**cash (25)**
88:22,22;135:25;
136:2;150:11,15;
151:7,10,11,13,14,15,
24;152:4,9;158:13;
159:5,25;164:3,13;
165:13;166:16;
168:24;271:21;272:2
**categories (4)**
23:6,16,23;29:20
**categorize (1)**
99:14
**categorized (1)**
99:22
**category (3)**
23:9,21;24:8
**Cavanaugh (2)**
275:16;276:11
**Cavanuagh (1)**
275:11
**cc (2)**
139:17;140:4
**cement (2)**
186:14;189:6
**Centre (3)**
65:8,11;67:4
**certain (10)**
57:10;70:3;78:23;

90:11;101:7;105:16;
171:25;253:18;
276:19;288:11
**certainly (1)**
288:22
**certification (2)**
32:20,25
**certifications (1)**
32:15
**certified (1)**
32:22
**cetera (2)**
165:15;232:5
**chain (1)**
275:15
**change (7)**
17:3;92:5;108:2;
148:13;177:6;232:19;
271:21
**changed (2)**
42:7;273:23
**changes (3)**
96:8;102:4;103:16
**changing (2)**
84:22;124:22
**channels (1)**
242:23
**characteristics (2)**
84:22,23
**characterization (2)**
64:17;103:2
**characterize (2)**
100:2;187:3
**charge (3)**
91:25;93:15;265:2
**Charles (1)**
263:23;264:2,4,5
**chart (1)**
93:23
**Chartered (3)**
32:19,23,24
**Chase (1)**
241:22
**chat (5)**
106:10;193:19;
194:7;211:5;233:9
**C-H-I-A (1)**
14:23
**Chia-Liang (2)**
14:21,22
**choose (1)**
85:19
**chooses (1)**
85:17
**Chris (2)**
140:15;141:4
**circulated (2)**
141:23;143:22
**circumstances (6)**
19:8;68:3,10,12,17;
174:15
**city (1)**
237:24

**Civil (2)**
20:22;21:9
**CL (25)**
16:20;95:21;96:10,
12,14;97:17;102:4;
104:6,20;105:20,22,
22;107:20,20;108:20;
115:18;130:19,22;
131:11;132:12;264:8,
8;266:10;279:22;
282:10
**claims (1)**
11:24
**clarified (2)**
131:11;158:13
**clarify (18)**
40:22;52:18;63:22;
83:5;98:11;100:17;
110:10;130:15;132:7;
159:3,21;189:12;
191:6,20;199:7;
201:19;252:22;
285:22
**clarifying (2)**
121:5;123:23
**class (3)**
37:18,20,22
**classes (1)**
75:6
**clause (1)**
48:21
**cleaner (1)**
27:3
**clear (12)**
13:2;30:18;47:2,10;
62:25;99:13;122:23;
132:8;178:21;180:9,
20;182:23
**clearer (1)**
203:12
**clearing (1)**
214:12
**clearly (1)**
163:25
**CLEARY (2)**
3:3;10:12
**client (44)**
11:22;37:24;38:6;
39:8,13;40:5,8;44:14,
19;45:2;46:2;48:8,11,
15;67:19,24;68:6,19;
80:14,21,23;82:11;
85:24;87:15,19,21;
88:10,14,19;89:15;
90:14,24;92:13,25;
93:11;116:14;193:7;
198:24;204:4;264:5;
279:16;286:19,20;
287:15
**clients (32)**
36:4,25;38:2;42:16;
45:2;55:2,9,15;57:11;
58:23;59:8,16;60:4,

20;61:19,24;67:16;
72:24;85:8,10,12;
192:6,12,21;197:2;
203:25;228:10;
276:13;278:6;279:11;
281:3;287:19
**client's (4)**
42:16;48:9;89:5;
204:2
**Clini (3)**
141:6,7,8
**CLL (2)**
262:24;264:16
**close (1)**
271:4
**closed (1)**
206:9
**closely (1)**
179:20
**Co (2)**
240:14,25
**coalition (1)**
243:2
**code (4)**
214:6,15;215:25;
216:10
**codes (1)**
220:21
**co-head (4)**
96:11;102:5;
104:20;107:8
**co-headed (1)**
96:12
**co-heads (1)**
105:21
**coincident (1)**
135:22
**Colby (4)**
263:23;264:3,4,5
**collaborate (5)**
111:4;113:7;
116:10,11;132:10
**collaborated (1)**
131:25
**collaborating (1)**
253:3
**collaboration (1)**
131:3
**colleagues (1)**
253:3
**collectively (2)**
22:9;28:7
**Colleen (4)**
275:11,15;276:10,
10
**college (1)**
31:24
**colluding (1)**
293:13
**color (2)**
89:21;264:13
**Colorado (1)**
12:15

20;61:19,24;67:16;
72:24;85:8,10,12;
192:6,12,21;197:2;
203:25;228:10;
276:13;278:6;279:11;
281:3;287:19
**column (26)**
88:17;89:13;90:3,
21;91:22;92:11;
181:25;214:9,22;
216:11;223:10,22;
224:8,20,22;225:16,
20;226:19;227:19;
228:16;229:3,8,9;
238:6;239:18;240:8
**columns (1)**
87:7
**combination (3)**
75:3;123:12;222:4
**COMBS (2)**
11:1,1
**coming (9)**
226:24;227:2;
255:5;256:24;259:15;
260:20;261:3,16;
269:6
**commentary (3)**
134:6;159:6;231:15
**commercialization (1)**
87:24
**commercialize (1)**
37:17
**commercializing (1)**
38:9
**Commission (1)**
78:23
**commit (1)**
172:18
**commitment (1)**
200:23
**committed (3)**
211:7;227:3;288:23
**common (6)**
56:25;57:4;61:18,
24;62:4;66:5
**communicate (4)**
194:25;196:8;
248:12;267:25
**communicated (6)**
183:18;248:9,22;
256:11;267:12;268:8
**communication (3)**
106:8;233:8;267:15
**communications (1)**
292:14
**community (3)**
196:4;228:6;255:9
**companies (27)**
34:24;35:3;56:21,
24;134:16;149:18;
157:15,22;162:16,20;
165:2;174:8,22;
175:2;180:4;182:5;
188:3,17,22;189:6,11,
13;191:5,6,21;271:4,
13
**Company (63)**
19:16;20:13,16;
25:13;26:12;33:16,

17,19;34:9,11;47:24;
54:8,10,19,21,25;
55:7,14,23;56:6,13,
20;57:9;65:8;66:25;
82:23;94:13;97:19;
122:20;127:5;143:9,
16,17;146:3;147:8;
148:18;149:13,16;
150:20,22;157:13,19;
160:3;176:3,7;239:7;
240:13;248:25;250:6;
255:5;258:16,22;
259:2;264:20;273:25;
274:13,22;279:18,19;
286:6;289:23;293:4,6

**company's (5)**
135:21;136:6;
142:6,11;143:24

**comparable (1)**
134:15

**compare (1)**
125:17

**compared (2)**
134:13;135:14;
288:7

**comparing (1)**
134:23

**comparison (2)**
134:21;162:16

**comparisons (2)**
162:23;271:12

**compensation (2)**
182:7;183:19

**compilation (1)**
54:17

**Complaint (4)**
237:10,13;238:18,
21

**complex (1)**
126:4

**compliance (3)**
43:3;48:6;49:7

**comply (1)**
47:25

**component (3)**
161:4;166:11;
167:23

**compound (2)**
154:10;259:13

**comprehensive (2)**
223:3;274:16

**concern (3)**
11:21,22;142:7

**concerned (1)**
137:14

**concerning (5)**
176:19;251:10;
252:7;268:19;291:16

**concessions (1)**
176:20

**concludes (1)**
295:7

**conclusion (5)**

137:6;141:2;
215:15;280:16;
292:20

**conditions (3)**
121:23;124:23;
273:22

**conduct (6)**
89:20;91:7;102:15;
157:3;173:21;246:10

**conducted (7)**
77:4,24;92:3;
135:12;137:18;
173:14;193:17

**conducting (2)**
103:20;173:19

**conference (1)**
291:6

**confident (1)**
184:6

**CONFIDENTIAL (285)**
13:1;14:1;15:1;
16:1;17:1;18:1;19:1;
20:1;21:1;22:1;23:1;
24:1;25:1;26:1;27:1;
28:1;29:1;30:1;31:1;
32:1;33:1;34:1;35:1;
36:1;37:1;38:1;39:1;
40:1;41:1;42:1;43:1;
44:1;45:1;46:1;47:1;
48:1;49:1;50:1;51:1;
52:1;53:1;54:1;55:1;
56:1;57:1;58:1;59:1;
60:1;61:1;62:1;63:1;
64:1;65:1;66:1;67:1;
68:1;69:1;70:1;71:1;
72:1;73:1;74:1;75:1;
76:1;77:1;78:1;79:1;
80:1;81:1;82:1;83:1;
84:1;85:1;86:1;87:1;
88:1;89:1;90:1;91:1;
92:1;93:1;94:1;95:1;
96:1;97:1;98:1;99:1;
100:1;101:1;102:1;
103:1;104:1;105:1;
106:1;107:1;108:1;
109:1;110:1;111:1;
112:1;113:1;114:1;
115:1;116:1;117:1;
118:1;119:1;120:1;
121:1;122:1;123:1;
124:1;125:1;126:1;
127:1;128:1;129:1;
130:1;131:1;132:1;
133:1;134:1;135:1;
136:1;137:1;138:1;
139:1;140:1;141:1;
142:1;143:1;144:1;
145:1;146:1;147:1;
148:1;149:1;150:1;
151:1;152:1;153:1;
154:1;155:1;156:1;
157:1;158:1;159:1;
160:1;161:1;162:1;

163:1;164:1;165:1;
166:1;167:1;168:1;
169:1;170:1;171:1;
172:1;173:1;174:1;
175:1;176:1;177:1;
178:1;179:1;180:1;
181:1;182:1;183:1;
184:1;185:1;186:1;
187:1;188:1;189:1;
190:1;191:1;192:1;
193:1;194:1;195:1;
196:1;197:1;198:1;
199:1,19;200:1;
201:1;202:1;203:1;
204:1;205:1;206:1;
207:1;208:1;209:1;
210:1;211:1;212:1;
213:1;214:1;215:1;
216:1;217:1;218:1;
219:1;220:1;221:1;
222:1;223:1;224:1;
225:1;226:1;227:1;
228:1;229:1;230:1;
231:1;232:1;233:1;
234:1;235:1;236:1;
237:1;238:1;239:1;
240:1;241:1;242:1;
243:1;244:1;245:1;
246:1;247:1;248:1;
249:1;250:1;251:1;
252:1;253:1;254:1;
255:1;256:1;257:1;
258:1;259:1;260:1;
261:1;262:1;263:1;
264:1;265:1;266:1;
267:1;268:1;269:1;
270:1;271:1;272:1;
273:1;274:1;275:1;
276:1;277:1;278:1;
279:1;280:1;281:1;
282:1;283:1;284:1;
285:1,13;286:1;
287:1;288:1;289:1;
290:1;291:1;292:1;
293:1;294:1;295:1

**confirm (3)**
23:15;130:20;199:8

**confirmation (4)**
187:22;209:23;
210:13;216:24

**confirmations (3)**
210:3,9,21

**confirmed (3)**
187:8;188:4;250:5

**confirming (2)**
187:21;247:19

**confusing (1)**
191:18

**connection (1)**
191:25

**consequences (1)**
243:3

**consider (5)**

183:25;272:3,7,19;
289:21

**consideration (8)**
125:19;126:8;
146:2,8;160:16;
174:3,20;290:20

**considered (3)**
83:19;110:7;165:17

**considering (4)**
254:11;255:11;
259:15,18

**consistent (2)**
165:2;187:12

**Consistently (1)**
121:24

**consisting (1)**
266:10

**constantly (3)**
85:15;124:21;
280:25

**construct (3)**
83:22;84:4;92:16

**construction (1)**
186:13

**constructive (1)**
178:19

**consultation (1)**
66:20

**contact (1)**
276:23

**contacts (1)**
202:11

**contain (3)**
110:3;158:11,14;
236:15

**contained (9)**
44:21,24;45:4,10;
76:25;204:18;235:24;
238:11;276:19

**containing (1)**
138:23

**contains (3)**
53:24;201:11;
279:21

**Cont'd (1)**
3:1

**contention (1)**
284:7

**continuation (4)**
178:20;180:8,18,20

**continue (7)**
153:25;154:7,17;
275:21;276:6;277:23;
278:2

**CONTINUED (1)**
130:10

**contractual (1)**
204:20

**contrarian (1)**
149:11

**control (4)**
56:25;57:4;66:6;
258:22

**controlled (1)**
66:5

**Controller (4)**
33:21;34:5,8;35:24

**controlling (1)**
66:5

**controls (2)**
172:17;173:20

**conversation (3)**
233:5;264:15,17

**convey (1)**
282:11

**cooperate (1)**
76:9

**Coopers (4)**
34:12,13,19;35:7

**coordinate (1)**
99:10

**coordinating (1)**
91:16

**copies (1)**
26:18

**core (1)**
119:19

**corner (2)**
212:24;217:14

**corporate (27)**
36:8;72:18;75:19;
91:17;94:5,9,13;99:4,
11,12,15,21,23;
100:10,15,19;122:21;
135:10;156:10;171:6;
172:5,10;173:4;
185:19;292:25;293:2,
3

**corporation (2)**
82:24;142:12

**Correa's (1)**
186:3

**correctly (1)**
140:21

**correlate (2)**
218:9;260:5

**correlated (1)**
218:22

**correlates (1)**
227:20

**correlation (1)**
221:7

**correspond (1)**
218:17

**corresponded (1)**
263:20

**correspondence (1)**
223:17

**corresponding (1)**
245:10

**corresponds (1)**
223:25

**corrupt (3)**
174:23;175:4;290:8

**corruption (13)**
172:22;173:17;

174:5,9,17;176:18;
177:2;188:9,12;
264:19;270:25;271:9;
290:21
**cost (17)**
160:19;161:14;
162:6,10,15,17;
163:11;164:8,15,22;
165:3;166:9,21;
167:4;168:8;169:7;
170:7
**costly (1)**
178:15
**costs (1)**
161:22
**counsel (16)**
10:20;13:18;14:16;
15:10,25;17:21;18:8;
19:3;27:2;43:16;
53:23;107:25;115:25;
285:8;286:2;292:14
**count (1)**
42:5
**counterguarantee (1)**
147:12
**counterguaranteed (2)**
147:9,16
**counterparty (17)**
197:6,19;199:13,
16,22;202:25;203:6,7,
8,10;206:14;213:5;
215:10;239:19,21,24;
240:7
**countries (3)**
171:5,19;172:2
**country (11)**
82:6;148:18;173:6,
7,11,19;175:13;
179:17,25;201:21;
266:20
**counts (1)**
43:17
**couple (3)**
76:21;146:23;
285:18
**coupon (1)**
278:2
**course (2)**
22:2;222:16
**court (7)**
10:15,17,19;11:25;
12:20;13:4;28:10
**cover (7)**
99:6;101:6;137:15;
138:14;161:3;162:3;
171:5
**coverage (14)**
100:9;101:3;
137:12;160:25;161:8,
11;162:6;163:13;
164:10,17;165:6,7,19;
200:22
**covered (8)**

17:10,15;100:16;
103:3;156:8;165:10;
171:19;174:3
**covering (6)**
99:3,8;101:18;
103:9,13;176:24
**covers (2)**
15:6;88:25
**CPA (3)**
33:3,5,8
**create (2)**
249:11;293:7
**created (3)**
249:15;250:19,22
**credible (1)**
280:10
**credit (28)**
17:11;21:21;22:4;
72:18;75:19;76:9;
84:22,25;90:22,25;
91:3;92:2;99:4;
121:22;156:10;
185:19;189:15,19;
190:16;191:8,12;
217:9;253:22;263:2;
266:15;275:24;276:2,
23
**crisis (1)**
42:11
**criteria (2)**
42:17;43:4
**cross-reference (1)**
236:5
**cross-trade (1)**
207:16
**cross-trades (1)**
207:16
**CS (1)**
279:12
**CSA (1)**
263:23
**current (13)**
14:21;17:2;37:3,6;
141:10;161:12;
178:21;180:8,11,16,
18,19;271:20
**currently (15)**
33:8;41:20;42:3;
44:14;97:18,22,24;
142:21;153:19;
178:11;185:18;
188:20;266:23;
267:21;286:18
**curve (1)**
79:21
**CUSIP (8)**
207:6,11,23,25;
208:12,14;209:9;
237:22
**custodial (1)**
217:19
**custodian (6)**
209:8;212:25;

213:7,9,11;217:13
**custodies (1)**
213:12
**custody (1)**
209:13
**customer (2)**
66:20;196:10
**CWC (4)**
262:24;263:6,19,25

**D**

**dados (2)**
155:17,21
**daily (3)**
88:22;89:4;253:5
**Dan (1)**
10:18
**DANIELLE (2)**
3:8;10:24
**Dare (1)**
280:3
**Darin (1)**
264:12
**dash (1)**
14:23
**data (6)**
23:4,22;29:11;
155:13,15;282:25
**date (4)**
92:5,6;94:9,15
**dated (9)**
185:14;242:13;
245:11;253:24;
262:14;270:6;273:9;
275:12,16
**dates (1)**
237:23
**David (1)**
11:3
**day (1)**
232:13
**days (3)**
186:5;264:22;
268:11
**DCF (2)**
149:20;150:10
**deal (1)**
224:22
**dealer (16)**
196:4,5,8,16,18;
200:7;203:14;211:7;
215:4,10;228:6,14;
241:4,7;255:9;290:2
**dealers (5)**
193:4,5,7;196:2;
202:18
**dealer's (1)**
240:19
**dealing (6)**
81:22;196:24;
199:25;200:3,4;
229:24

**dealt (1)**
203:13
**debated (1)**
148:16
**debt (26)**
14:20,22,25;15:3;
37:7,9;38:4;39:25;
87:3;89:11;90:18;
93:10;94:4,15;96:10;
110:23;135:5,6,23;
136:3;149:25;161:10;
162:4;165:9;210:6;
280:6
**debts (5)**
147:9,17,19;148:2,
7
**December (7)**
41:17;86:22;92:5;
253:9;264:22;270:7;
282:18
**decide (2)**
114:13,19
**decided (1)**
75:24
**decides (3)**
114:15;280:13;
281:18
**decision (54)**
16:14;17:4;50:5,11,
17,25;51:17,24;52:5,
15,20;53:2,7,16;
80:12;83:2,14;85:23,
25;86:8;87:14,18;
88:18;90:23;92:12;
110:8;112:3,13;
115:6;120:14,18,24;
127:9;160:12,21;
163:8;164:10;166:10,
12;167:21;168:25;
169:3,15;170:2;
187:11;189:11;191:4,
19;231:6;289:14;
290:5,15,23;294:23
**decision-making (1)**
87:12
**decisions (64)**
42:19;49:19;50:19;
52:4;55:15,20,20;
74:14;85:14;88:5;
95:23;96:22;97:20;
105:16;108:25;109:4,
8,11,22;110:2,19;
111:11,19;112:18;
113:4,12,20;114:6;
115:13,19,22;116:7,
18;117:16;118:4,22;
120:4;130:23;131:7,
16,25;132:14;142:6,
11,25;143:3;146:13;
157:7;158:6,21;
159:9,12,16;160:7;
165:25;167:6,15;
168:10;169:9;170:8;

177:3;181:2;203:24;
290:7
**deck (3)**
86:19;253:24;254:5
**decouple (1)**
266:18
**decrease (1)**
247:14
**decreased (1)**
249:3
**decreasing (3)**
246:24;247:25;
248:9
**dedicated (13)**
75:20;89:11;
110:23;112:7;113:6;
117:7,13;119:5,11,18,
24;170:17,21
**Defendants (9)**
3:4;10:25;11:2;
18:19,24,25;19:2;
21:9,12
**Defendants' (2)**
94:24;95:6
**defending (2)**
270:25;271:8
**define (5)**
49:16;59:17;99:17;
115:12;192:18
**definitely (3)**
165:17;289:9;290:4
**definition (7)**
21:23;44:8;66:2;
100:3,5;110:8;117:5
**Definitions (1)**
25:4
**definitive (1)**
116:5
**degree (7)**
31:25;32:3,4,7,9,13,
16
**delay (5)**
249:14,24;250:18,
22;253:23
**delayed (3)**
248:25;250:3,7
**delays (1)**
249:10
**delegate (3)**
66:17;67:10;70:21
**delegated (2)**
25:8;71:6
**Deliv/Recv (1)**
215:24
**deliver (1)**
121:25
**delivered (1)**
213:15
**demand (1)**
232:15
**demanding (1)**
182:8
**demonstrate (1)**

200:21
**demonstrated (1)**
271:6
**departure (3)**
101:19,25;102:22
**depend (3)**
65:19;126:12;
151:17
**dependent (1)**
258:18
**depending (2)**
110:25;119:7
**Depends (8)**
29:24;42:20;45:24;
68:11;76:6;80:2;
99:25;200:3
**depiction (1)**
84:8
**deployed (1)**
76:11
**deposed (2)**
12:17,24
**deposition (30)**
10:8,11;11:19;
14:14;15:11,19;
16:12;18:10,18,23;
19:5;20:2,8;21:13;
22:10;24:23;26:2;
31:3;42:25;43:13;
63:18,24;64:3;95:10;
108:8;130:7;177:13;
230:11;278:15;295:8
**depository (1)**
71:20
**depreciated (2)**
164:23;166:22
**depths (1)**
73:13
**describe (3)**
31:22;79:22;84:11
**described (4)**
80:11;111:17;
198:14;199:11
**describes (2)**
76:24;276:23
**describing (2)**
78:23;82:14
**description (4)**
74:21;79:9;80:4;
201:2
**designated (2)**
194:13,14
**designed (1)**
200:20
**desire (1)**
183:18
**desk (16)**
17:12;111:3,5,8;
113:8,9;116:10,11;
132:11;145:6;170:17;
171:20;185:14;
200:21;231:12,17
**detail (5)**

84:11;212:8;236:8,
16,19
**detailed (1)**
150:16
**details (3)**
211:16,21;262:23
**detect (7)**
172:15;291:23;
292:5,6,11,21;293:12
**detecting (1)**
291:17
**deterioration (1)**
273:21
**determination (3)**
80:20;98:16;164:17
**determine (16)**
74:17;77:20;84:19;
95:16;123:4;154:24;
161:7;163:3;165:19;
179:21;212:2,14;
215:3,9;232:17;288:6
**determined (2)**
108:19;196:9
**determining (4)**
82:9;161:11;
261:17;288:9
**Deutsche (10)**
214:20,23;215:4,9,
13,15,21;233:24;
234:10,23
**develop (5)**
37:16;38:25;92:15;
179:25;188:13
**developed (16)**
36:21,23,24;37:2;
170:22;171:12,21;
172:15;257:22;258:9;
259:4;265:13;266:4,
8;269:12;291:18
**developing (3)**
36:15;38:8,20
**development (2)**
87:23;257:4
**deviate (2)**
121:20;123:22
**diagram (3)**
80:23;83:9,19
**dial (2)**
196:18;202:20
**dials (1)**
202:18
**diesel (1)**
144:17
**differ (2)**
76:2;81:13
**difference (3)**
144:15;145:19;
146:4
**different (37)**
16:8;25:12;27:11;
40:9;48:12;75:5;
77:17,18,18;80:8,9;
82:13;83:23;98:12;

101:15;119:6;120:18;
124:3,9;125:4,13;
126:5,6;127:15,21;
134:4;146:3;159:24;
161:25;187:24;194:2;
207:7;209:5,6,9;
238:10;258:19
**difficult (5)**
13:10;116:4;
172:15;257:3;293:12
**difficulty (1)**
291:16
**Dilma (1)**
243:2
**Dilma's (1)**
242:15
**direct (23)**
39:4,11;65:24;
66:12;86:23;93:24;
105:24;106:14,24;
107:15;108:16;
144:12;178:7;181:24;
189:4;200:13;202:18;
203:18;204:2;205:24;
266:13;273:17;
279:24
**directed (9)**
31:18;104:25;
105:2;107:23;203:20;
204:3,10,15,23
**directing (2)**
93:3;110:6
**directive (1)**
204:4
**directly (3)**
37:25;52:20;157:19
**directors (1)**
41:24
**disagree (1)**
64:16
**disagreed (1)**
261:6
**disagreeing (1)**
145:6
**discipline (1)**
196:20
**discounted (6)**
150:10,14;151:7,
10;152:3,9
**discounts (1)**
151:12
**discretion (4)**
42:18,22;48:8;
97:10
**discretionary (6)**
43:2,22;44:4;49:8,
12,17
**discretions (1)**
66:18
**discuss (4)**
16:15;231:13;
253:16;263:3
**discussed (23)**

15:22;16:11,24;
31:16;39:4;42:24;
51:15;65:12;69:15;
137:22;178:4;233:22;
235:8,11;240:10,17;
252:12;256:14;257:7,
11;260:23,25;275:19
**discussing (3)**
24:9;86:4;215:2
**discussion (9)**
45:24,25;86:7;
127:4;134:7;252:25;
271:7,11;278:5
**discussions (16)**
122:20;250:25;
251:9,13,16;252:7,18,
21;253:7,12,15;
270:15;276:4,9,11,13
**disposition (1)**
48:25
**distribution (4)**
138:22;139:15;
270:12;281:14
**diverge (1)**
266:16
**dmindlin@cgshcom (1)**
3:12
**doable (1)**
172:19
**document (102)**
20:9,20;22:19;26:8;
28:19;31:6;46:4,12;
47:11;61:12;62:25;
63:8;64:19;65:3;
68:22;69:6;72:8,16;
22:73:8,11,16;74:19;
78:8,12,19,21;79:3;
85:20;86:11,18,24;
91:13;92:6,7;94:2;
95:3,13;120:13;
121:7;129:17;132:20,
25;133:8,9,18,23;
134:3,11;138:6;
141:18;142:18;144:5;
149:6,9;152:10;
177:19;178:2,8;
181:17;182:16;
183:20,24;185:5,13;
200:15;209:19;211:2,
11,24,25;212:14;
214:25;215:7;216:14,
21;218:3;221:15,16;
237:4,14,17;238:14,
24;239:5;241:2,14;
242:6,12,18;245:2;
253:25;256:13,15;
262:7;263:22;265:4;
269:22;270:4;272:25;
275:3;278:25
**documented (1)**
60:25
**documents (18)**
18:8,9,12,17,22;

19:4;23:17;26:5;63:2;
73:18;131:14;157:24;
158:10;164:4;212:7;
221:5;234:8,22
**dollar (7)**
134:14,22;153:17;
189:9,18;190:15,25
**dollar-denominated (1)**
200:5
**dollars (6)**
207:21,22;281:21;
283:6;288:12;290:12
**domestic (7)**
144:15,17,21;
145:11,19;146:5;
271:20
**domiciled (1)**
135:10
**Don (1)**
41:4
**done (3)**
146:24;193:18;
255:8
**doubt (1)**
111:22
**down (12)**
28:11;82:15;95:18;
144:13;181:25;
183:25;189:5;232:7;
239:6;248:15;275:14;
289:13
**downgrade (1)**
275:23
**draw (11)**
28:20;46:23;239:4;
242:21;246:19;254:3,
8;270:21;271:16;
282:22,23
**drawing (1)**
212:22
**drawn (2)**
45:10;238:8
**drive (1)**
48:16
**driver (1)**
186:11
**driving (2)**
61:12;63:8
**drove (1)**
137:5
**DTC (6)**
214:9,12;215:12,
18,18;234:19
**DTCYUS33 (1)**
214:4
**Dubai (3)**
58:8,12;59:23
**Duda (41)**
91:23;95:22;96:18;
98:14;101:4,17;
104:15;106:16;107:2,
17,24;108:21;109:13,
24;110:20;111:10,13,

18;112:16;114:6,12,
18;115:5,18;116:16;
117:19;118:7,15;
119:2;120:2;130:22;
132:13;136:12;139:3,
8,23;140:2;156:8;
157:3;244:21,22
**Duda's (2)**
101:24;102:22
**due (4)**
54:18;246:23;
247:22;264:19
**duly (1)**
12:3
**duration (2)**
79:20;268:15
**during (66)**
17:3;25:20;27:25;
71:18,23;91:11;
95:23;96:4,7,24;
97:21;98:3,6,21;
99:23;104:18;105:5,
10;106:18,19;108:24;
109:9;112:22;114:7;
115:7,20;116:18;
117:17,25;118:5,23;
120:5,25;124:25;
125:10;128:5,20;
129:6;131:17;132:2;
139:7,22;155:11,22;
156:2,4,7;158:23;
159:16;160:22;
164:14;167:7;168:11;
172:6,23;173:24;
174:4;176:8;183:13;
184:11,23;188:2,19;
222:24;286:15;287:3
**duties (1)**
66:18
**Dylan (2)**
286:12,14

## E

**earlier (11)**
65:13;67:13;87:20;
122:16;156:19;
170:16;178:4;192:4;
194:11;215:2;291:16
**early (2)**
102:8;293:23
**earning (3)**
101:10;150:4,7
**earnings (1)**
122:18
**easier (2)**
155:3;221:20
**easily (1)**
61:15
**East (1)**
12:15
**easy (2)**
152:21;153:14

**economic (5)**
273:22,25;274:6,
12,21
**economist (1)**
244:11
**economy (1)**
186:8
**educate (2)**
73:19,24
**educational (1)**
31:23
**effect (1)**
12:21
**effected (1)**
290:15
**effective (2)**
172:4,10
**effectively (1)**
148:2
**effectuate (5)**
192:24;195:5;
202:14;205:18;
228:11
**effectuating (1)**
197:21
**efficiency (2)**
112:8;267:11
**efficient (1)**
250:21
**effort (1)**
40:6
**efforts (1)**
292:10
**either (6)**
91:6;130:24;
198:21;208:3;222:20;
233:4
**elect (1)**
231:10
**elected (4)**
171:2,8;178:17;
179:6
**election (5)**
178:16;179:22,23;
180:3,25
**elections (4)**
178:24;179:11,19,
20
**electronic (2)**
193:19;224:14
**element (1)**
151:7
**eligible (3)**
45:20;77:22;232:4
**Ellen (2)**
10:16,18
**else (3)**
184:21;289:4,6
**EM (8)**
119:23;132:11;
134:12;185:14;
231:12,17;281:12,13
**E-MAIL (57)**

3:11;106:9;138:9,
14,16,22;139:15;
140:15,19;141:6;
142:3;185:8,13,24;
190:5;193:19;194:24,
25;211:5;233:4;
242:9,13;244:5,13;
245:6,9,14;251:25;
252:14;253:22;
262:10,13,17;264:12;
265:8,25;266:2,14;
269:25;270:5,9,19,22;
272:19;273:4,8,13;
275:6,10,15;276:21;
277:17;278:19;279:4,
21,25;281:11
**e-mails (3)**
18:13;134:5;275:14
**Emanuel (4)**
11:9,11;16:5;17:25
**embedded (1)**
279:22
**EMD (15)**
75:20;89:8,10;
113:8,8;116:11;
117:7,13,14;119:5,6,
18,24;139:18;251:14
**EMD-dedicated (2)**
113:18;114:17
**EM-dedicated (1)**
131:2
**EMDT (1)**
252:25
**emerging (55)**
14:20,22,25;15:3;
37:7,9;38:4,20;39:25;
72:17;75:19;76:9;
82:3;87:3;89:11;
90:18;91:17;92:2;
93:10;94:4,14;96:9;
99:3,10,14;100:9,15,
19;110:23;111:3,4,8;
116:15;119:10;135:2,
4,6;141:23;145:6;
146:12;156:9;170:17,
21;171:11,19,23;
175:24;177:23;210:5;
279:5,8;281:9,14;
291:17;293:2
**emphasize (1)**
260:19
**employ (3)**
52:10;66:14;67:9
**employed (16)**
33:14;34:10;41:20;
52:13,14,19;53:3,6,
14;55:13;77:10;
95:15;97:8,18,22,25
**Employee (2)**
25:13;286:12
**employees (2)**
52:7;174:10
**Employees' (4)**

11:6,17;27:15;
287:25
**enable (3)**
69:25;209:10;280:7
**enables (2)**
215:2,8
**encompasses (2)**
75:5;83:3
**end (6)**
24:17;34:3;96:14,
17;136:3;140:4
**Ended (2)**
34:15;282:17
**ending (17)**
21:20;22:3;25:14;
48:19;54:3;65:25;
66:11;69:19;74:5;
138:8;147:4;149:7;
210:14;216:7;270:20;
271:17;275:5
**ends (5)**
73:8;74:19;86:25;
219:8;254:6
**enforce (1)**
293:9
**engage (1)**
192:16
**engaging (1)**
290:8
**enough (2)**
132:8;280:10
**ensure (5)**
88:23;173:10;
193:7;200:17;232:3
**entailed (1)**
37:19
**enter (6)**
69:24;71:6;124:15;
205:13;206:12;211:7
**entered (4)**
226:9,12,13,15
**entering (3)**
70:8,16;228:7
**enters (3)**
76:14,17;205:5
**entire (4)**
42:12;76:24;
141:23;232:15
**entirely (1)**
220:17
**entities (20)**
21:14,18;22:9,11;
25:12,20,24;27:12,15,
21,25;28:7,14;54:18;
57:6;63:2;234:3,10;
235:5;241:24
**entities' (1)**
65:19
**entitled (2)**
182:17;225:16
**entity (17)**
27:17;54:14;60:9,
16;66:4;202:24;

215:9;216:15;229:18,
24;234:12;240:12,19;
241:6,10,13;245:20
**environment (7)**
81:22,24;82:3,5;
83:24;179:21;181:9
**Environmental (1)**
182:17
**equally (1)**
77:11
**equals (1)**
186:10
**equipment (20)**
151:6;152:2;
160:20;161:4;163:12;
164:9,16;165:5,12,18,
24;167:23;168:9;
169:8,14,25;170:8;
283:4;284:3,17
**equities (3)**
71:14,20;156:21
**equity (5)**
71:25;142:8;
149:24;156:23;182:3
**equivalence (1)**
136:2
**equivalent (1)**
268:15
**escalation (1)**
186:15
**ESG (11)**
181:19,21;182:7,
15,18,22;183:4,8,13,
19;184:2
**especially (3)**
157:12,14;168:3
**ESQ (2)**
3:7,8
**essence (1)**
275:25
**estimate (14)**
15:17;255:16;
256:4;257:6,12,18;
258:23;265:2,13;
266:4,8;269:9,12;
284:25
**estimated (4)**
246:22;247:21;
248:18;265:19
**estimates (3)**
258:24;261:6;269:8
**et (2)**
165:15;232:5
**Europe (5)**
46:20;49:20;50:3,
10;54:7
**European (1)**
62:12
**evaluate (4)**
157:25;164:9,16;
258:4
**evaluated (1)**
232:17

**evaluating (2)**
163:12;289:20
**evaluation (1)**
288:17
**even (20)**
52:13;89:24;100:6;
117:9;135:20;143:13,
14;146:25;147:7;
156:13;172:15;209:3;
249:5;252:13;257:5;
258:16,22;271:3;
293:4,23
**events (1)**
253:19
**everyone (3)**
261:14;295:5,6
**everyone's (1)**
145:3
**evolved (2)**
36:19;102:5
**exact (1)**
77:16
**exactly (16)**
117:12;124:6;
151:10;191:22;193:5,
25;208:7;211:23;
214:7;224:5;238:9;
247:20;269:14;
280:22;286:20;
292:17
**EXAMINATION (11)**
12:7;21:13;22:20;
28:22;29:6;81:21;
130:10;286:9;287:12,
22;291:13
**examine (2)**
173:7;184:18
**examined (1)**
12:4
**example (16)**
38:19;60:11;91:14;
130:25;158:10;
159:20;194:7;201:12;
205:25;216:6;217:4;
219:24;228:19;
229:15;241:7,20
**examples (2)**
194:8;233:19
**except (1)**
282:24
**exception (2)**
276:2,6
**excerpt (5)**
137:8,19;282:16,
19,23
**excess (2)**
136:2;288:12
**Exchange (2)**
78:22;183:19
**Excuse (5)**
21:4;32:24;185:24;
190:19;200:15
**execute (7)**

39:18;68:18;90:9;
116:13;192:5;194:13;
206:10
**executed (6)**
200:24;226:10;
237:24;238:3,7;
239:11
**executing (10)**
89:17;90:5;111:23,
25;226:3,6,7;227:10,
18;287:17
**execution (5)**
17:19;112:2;
196:10;200:16;204:6
**executives (2)**
37:24;186:5
**exercise (2)**
66:17;182:4
**Exhibit (99)**
19:13,14,19,20,24,
25;20:7;21:2,4,7;
25:2,11,11,20,24;
26:7,23,25;27:8;
28:15,23;29:7,10;
30:25;31:2,13;44:9;
46:6,7,12;53:21,23;
64:18,21;68:22,25;
72:8,10;78:9,16;81:3;
83:10;86:11,13;
94:20,22;108:13;
117:2,3,4;121:7,11;
132:16,21;138:6,9;
177:19,23;181:6,8,13;
185:5,8;200:10;
209:20,20,22;216:21,
23;219:9;221:16,21;
236:4,8,20;237:8;
238:11,14,17,20;
242:7,9;245:3,6;
253:21;261:24;262:8,
10;269:23,25;273:2,
4;275:4,6;278:19;
279:2;282:14,15,19
**exhibits (4)**
26:19;233:18;
234:8;235:13
**existing (2)**
38:16;144:15
**ex-Japan (1)**
107:21
**expect (1)**
125:22
**expectation (3)**
128:3,19;129:4
**expected (3)**
89:20,22;143:11
**expenditures (2)**
151:25;166:21
**experience (7)**
34:22;61:18;
141:22;146:20;
221:10,11;271:2
**expert (4)**

250:16,21;267:10;
284:8
**expertise (2)**
111:6;123:7
**explain (1)**
221:7
**explanation (1)**
181:19
**explicit (2)**
212:17,18
**explicitly (4)**
64:5;212:19;
215:11;229:20
**exposure (7)**
119:23;134:14,22,
24;135:3,8;155:8
**exposures (4)**
119:23;133:17;
276:19;277:12
**expressly (2)**
30:17;106:3
**extensive (3)**
135:21;136:6,15
**extent (8)**
50:8;51:16;76:8;
116:14;119:4;182:6;
204:22;290:7
**extremely (3)**
135:24;137:2;
261:10
**ex-US (1)**
40:10

## F

**faces (1)**
178:12
**facilities (1)**
70:4
**facing (2)**
44:14;45:2
**fact (10)**
93:21;117:22;
118:10;148:16;
162:12;170:2;214:22;
255:3;257:3;284:22
**factor (3)**
151:24;184:12;
290:22
**factored (1)**
169:2
**factors (10)**
83:18;124:9;146:3,
7;167:22;183:13;
184:2,8;257:2;258:19
**facts (5)**
117:21;155:12,14;
254:9;255:12
**fair (42)**
56:22;76:13;
121:21;122:3,9,10,22,
24;123:4,14,16;124:2,
12;125:4,11,17,24;

126:2,11;127:7,8,15,
21,23;128:7,13,16,22;
129:7,13;148:12,19;
149:3;163:23;193:8;
210:22;267:6;274:3;
288:6,9,18;291:8
**fairly (3)**
147:24;148:16;
243:24
**fall (1)**
117:8
**falls (1)**
132:11
**familiar (21)**
46:15;81:5;121:14;
147:15;155:14,18,20;
176:24;181:17,21;
193:25;221:25;225:9;
237:14,16,25;238:5;
272:14,15,17;286:11
**fashion (3)**
54:17;84:4;162:21
**fatos (2)**
155:16,21
**favorable (2)**
196:5,9
**FAX (5)**
3:10;224:11,15,16,
20
**features (1)**
203:22
**February (4)**
185:15;275:16;
277:3,19
**Federal (2)**
20:22;21:9
**few (6)**
12:25;193:15;
230:16;264:15;286:8;
288:3
**fewer (2)**
171:20;172:2
**field (6)**
138:19;139:17;
210:19;218:8,22;
220:25
**fielding (1)**
281:3
**fields (2)**
235:9,12
**fifth (2)**
189:5;200:14
**figure (12)**
42:6;68:14;122:24;
152:22;153:15;249:4,
5;261:23;283:5,10;
284:3,16
**figures (1)**
285:3
**filed (4)**
201:15;237:5;
238:16;283:22
**files (1)**

78:22
**filing (1)**
143:18
**filings (12)**
82:18;101:9;
122:18;156:3;157:6,
9;158:4,5,20;159:15;
160:11,17
**filtered (1)**
232:10
**final (1)**
291:12
**finally (1)**
53:12
**Finance (1)**
21:11
**finances (3)**
34:8;35:25;36:8
**financial (53)**
32:19,22,24;35:21,
23;36:9;38:11;137:7,
9;150:18;158:14;
159:6;166:18;182:4;
184:5;200:23;246:25;
247:5,14,22;248:2,10;
249:10,14,19,24;
250:2,7,19,22;256:6,
19;257:23;258:11;
259:5;260:15;261:22;
264:18;265:14,20;
272:12;280:3,5,9;
281:21;282:4,4;
283:16,17;284:24;
288:16;289:5;291:4
**financially (1)**
148:21
**financials (2)**
264:20,21
**find (4)**
124:7;127:13,14;
228:19
**fine (7)**
27:4;189:9,18;
190:15,24;191:12;
192:2
**fined (2)**
189:7;190:11
**fingertips (1)**
261:2
**finish (4)**
13:13,15;118:17;
175:19
**finished (1)**
295:5
**firm (18)**
50:17,24;91:19,24;
96:18;100:6,6,6;
101:19;102:23;
103:12,24;112:8;
113:3;168:4;182:5;
231:13;244:23
**firms (1)**
171:3

**first (38)**
16:19;20:6;47:6;
54:19;65:25;73:8;
83:19;104:8;121:18;
134:10;142:2;152:16;
163:19;205:23;
218:12;219:4,21;
220:18,20;223:9;
230:25;231:4,11;
239:4;240:12;242:22;
243:7,20;245:15;
248:17;251:25;253:6;
269:12;270:14;
271:18,19;273:18;
281:11

**fiscal (1)**
282:17

**five (18)**
27:11,21,24;28:7,
14,21;29:3,10,17;
87:6;177:5,12;
217:23;218:7,17;
219:6;220:22;239:5

**fixed (11)**
71:12,16;75:5;
156:21;171:3;182:2;
203:23;246:24;
247:15,25;248:10

**flat (2)**
89:19;93:5

**flip (5)**
203:17;216:5;
219:7;253:21;272:5

**floating (1)**
84:24

**flow (10)**
150:11;151:7,10,
24;152:9;159:25;
164:3,13;166:17;
168:24

**flows (8)**
150:15;151:11,13,
14,15;152:4;158:13;
159:5

**fluid (1)**
273:20

**focus (9)**
34:18;67:8;79:18;
84:16;147:5;149:8;
171:7;196:19;264:11

**focused (3)**
116:15,22;195:3

**focuses (1)**
170:21

**focusing (5)**
59:4,12;158:3;
216:8;264:8

**folks (10)**
15:6;16:7;17:25;
52:18;89:17;91:6;
113:8;146:15,16;
156:19

**follow (1)**

**following (3)**
23:5,23;29:19

**follows (6)**
12:5;79:19;95:21;
97:17;115:17;130:5

**follow-up (2)**
230:16;287:8

**font (1)**
254:4

**food (1)**
178:14

**Footnote (1)**
239:24;241:18,19

**force (1)**
258:21

**forced (2)**
189:10;190:12

**Forces (1)**
177:24

**foreclose (3)**
186:22;187:11,15

**foregoing (2)**
95:20;97:16

**foreign (6)**
70:11,21;71:7;
175:3;228:12;235:5

**foresee (1)**
188:12

**forever (1)**
26:21

**form (137)**
13:19;30:22;36:5;
39:6;42:3;43:5;46:16;
51:5;52:24;55:3,16;
57:3;61:10,22;62:8,
22;68:7;70:13,14;
72:3,22;73:17;74:7;
75:17;76:5;78:16,20;
79:12,24;80:5,11,15;
83:20;89:4;93:7;96:5;
97:2;98:8,25;102:24;
105:4,19;106:5,17;
107:18;112:5,23,24;
114:11;115:9,24;
117:20;118:8;119:3;
120:9;121:2;122:5;
132:4;136:21;144:6,
23;145:14;151:9,20;
152:5;153:7,20;
157:8;158:8,24;
159:17;163:15;166:6;
170:23;171:13;
172:11;174:11;175:5;
182:13;187:17;188:6,
24;189:21;196:15;
197:7;200:11;203:16;
205:8;207:13;210:19,
23;211:25;218:25;
220:8,25;221:2;
222:15,19;223:7;
227:8,15;234:5;
235:14;240:21;

243:10;246:5;247:9,
16;248:6;249:12,22;
250:15;251:17;252:9;
253:13;255:2,23;
257:14;259:10;261:8;
262:2;265:23;267:7;
272:21;276:16;277:7;
280:21;281:23;
282:17,20;283:11;
284:6;288:20;289:17;
291:25;293:19;294:5

**formal (3)**
106:6,11;134:9

**format (9)**
73:20;133:22;
134:3;210:8,18,21;
217:5;221:17,19

**former (1)**
14:19

**forms (3)**
134:5;235:10,18

**formulating (1)**
39:12

**forth (5)**
24:5;104:21;105:6,
8;107:6

**forward (3)**
162:7;273:15;
280:24

**forwarded (2)**
133:19;273:13

**found (2)**
294:15,17

**foundation (7)**
74:8;107:19;
120:10;122:6;187:18;
190:8;206:17

**four (18)**
18:3;22:23;23:3,9,
21;24:2,8,9;25:2;
28:19,23;33:24;40:4;
66:10;73:22;130:6;
221:4;266:16

**fourth (10)**
144:13;181:25;
183:2;243:11;251:2,
10,22,23;270:15;
280:23

**frame (14)**
95:24;96:4,8,14;
97:22;98:3,7,21;
102:14;132:3;136:12;
139:7;243:14;282:2

**fraud (13)**
172:5,10,14,18;
174:5;288:23;291:17;
292:5;293:11,14,25;
294:4,24

**fraudulent (2)**
294:11,15

**fraudulently (1)**
289:6

**French (1)**

176:3

**FS (4)**
246:23;247:4;
249:2;254:10

**fuel (8)**
144:15,20,21;
145:11,19,20;146:5;
271:23

**fulfill (1)**
70:2

**full (9)**
42:18,22,25;59:18;
143:11;203:19;
241:13;271:18;
273:18

**full-service (3)**
58:18,19;59:6

**function (2)**
90:4,6

**Fund (22)**
21:19,22;22:5;
27:20;38:21;48:15;
50:16;61:12;63:7;
85:24;90:14;94:10,
15;111:21;116:14;
153:9,12;207:10;
208:2,13;217:9,10

**fundamental (29)**
81:12,15;121:21;
122:3,13,24;123:16;
124:2,12;125:4,11,24;
126:11,23;127:7,8,21,
22;128:7,22;129:7;
184:9;266:19;288:6,
9,18;289:10,20;291:9

**fundamentals (1)**
121:23

**Funds (76)**
19:21;21:22;22:10,
16;24:4,11;25:5,7;
27:19;30:14,21;
31:20;37:2;38:14,16;
47:19,21;48:3,24;
49:3;51:15,16,20,22,
23;52:6,12,17,19;
61:5,9,25;62:3,5;69:2,
10;70:12,23;71:8,21;
75:13;76:2,7;77:13;
78:4;94:23;95:21;
96:3;97:17;110:11,
16,21;112:20;113:14,
16;115:17;152:24;
153:5,19,25;176:6,12;
192:25;194:20;195:9,
20;197:2;198:23;
204:9;207:5,20;
213:18;222:23;
238:19,22;240:4

**Funds' (4)**
55:25;95:5;96:23;
210:4

**fund's (2)**
49:9;94:4

**further (12)**
66:19;131:21;
168:7;170:15;232:7;
276:21;285:6;287:6,
12,21;291:13;295:4

**future (2)**
151:17;152:3;
161:24;179:7

---

## G

**G' (1)**
183:25

**gain (2)**
290:3

**gain/loss (1)**
209:6

**gamut (1)**
143:11

**Gardner (44)**
14:19;16:10,11,15;
95:22;96:9,16;97:18;
98:14;104:3,9,13;
106:15;107:2,16,24;
108:21;109:12,23;
110:20;111:10,13,18;
112:16;114:5,12,18;
115:5,18;116:16;
117:19;118:7,15,25;
120:3;130:22;132:13;
139:3,8,24;140:2;
156:12,16;244:21

**gas (7)**
34:24;134:15;
148:18;160:3;162:16,
20;165:2

**gasoline (1)**
144:16

**gather (2)**
231:21;253:15

**gathered (2)**
239:14,16,22

**gave (1)**
64:7

**General (26)**
16:13;42:6;62:13;
80:6;90:9;111:2;
112:6;113:4,7;
116:12;132:9;151:4;
154:16;159:23;
167:12;170:5;172:14;
173:22;178:15,24;
179:11;180:2,24;
210:8;218:24;293:3

**generality (1)**
48:21

**generally (75)**
37:15;42:18;45:22;
62:9;71:12;74:12;
81:10,14,18;85:7;
86:2,7;89:16;99:9;
105:2;111:9,24;
120:19;127:11,14,18;

128:2,18;129:4;
140:11;158:9,16;
161:17;162:12,21;
164:24;166:17,23;
173:4,8,18;181:23;
184:16;193:16;
195:11,25;196:11,20;
198:11;199:24;
201:25;202:16;
203:21;204:19;
214:12;215:12,18;
218:11,13,17;219:3,
20;220:14,19;227:7,
17,21;228:5;230:18,
21;231:14,17;240:18;
241:9;244:17;246:10;
249:11;251:21;
276:18;281:8
**generate (2)**
178:19;265:3
**generated (2)**
91:13;224:6
**gentleman (1)**
102:11
**Genworth (4)**
279:10,18,19;
281:10
**gets (1)**
161:20
**Gil (5)**
185:13,17;262:24;
263:7,7
**Gilmore (1)**
10:16
**Gil's (1)**
190:4
**given (22)**
12:21;30:19;40:23;
60:13;61:5;115:15;
125:21;143:15,17;
148:16,24;149:12;
157:19;159:7;164:24;
170:12;206:19;
243:18;273:24;274:6,
12;287:14
**gives (1)**
45:19
**giving (1)**
19:9
**Global (24)**
21:11,21;22:4;40:6,
7,9;62:10,15;79:5,9;
82:2;83:24;86:14,20;
90:16;117:9,9;
119:19,21;138:19;
217:9;233:23;281:12,
14
**globally (1)**
58:2
**GNW (3)**
279:5,8,10
**goes (5)**
88:22;106:8;

114:13;136:4;231:8
**Goldman (3)**
202:20,21,24
**Good (14)**
12:9,10;82:22;
157:10,16;165:18;
184:3,8,18;264:15;
276:25;277:6,15,20
**Goran (2)**
41:10,12
**G-O-R-A-N (1)**
41:10
**GOTTLIEB (2)**
3:3;10:12
**governance (8)**
173:9,20;181:9;
182:18;184:3,8,19,22
**government (20)**
99:17;135:9,15;
142:5,10,14,17,23;
143:5;144:4,18;
147:10,12,18,20,22;
148:3,9,20;173:12
**governmental (1)**
290:14
**grade (1)**
147:8
**graduate (3)**
32:3,6,9
**graft (1)**
273:20
**grammar (1)**
259:20
**grammatically (1)**
247:11
**granted (2)**
48:23;49:14
**Grauer (2)**
10:16,19
**greater (1)**
182:8
**greatest (4)**
144:14,22,25;145:4
**grew (1)**
220:2
**group (3)**
36:20;90:23;170:21
**groups (2)**
87:13;93:6
**growing (1)**
36:22
**grown (1)**
36:19
**growth (1)**
178:20
**guaranteed (5)**
99:18,20;147:17;
148:3,8
**guess (5)**
42:10;49:16;253:8;
282:8;283:15
**guidance (3)**
164:24,25;166:22

**guide (3)**
162:13,17;163:8
**guideline (1)**
45:19
**guidelines (7)**
42:17;43:4;77:18;
83:25;153:13;232:5;
275:25
**guides (1)**
163:22
**Guinea (1)**
176:20

## H

**HAENDLER (13)**
11:3,3;69:13;70:13;
239:15,23;240:5;
241:3,15;242:2;
285:18;286:10;
287:11
**Hagegard (3)**
41:10,11,13
**H-A-G-E-G-A-R-D (1)**
41:11
**half (1)**
29:10
**halfway (1)**
239:5
**HAMILTON (2)**
3:3;10:13
**Hancock (11)**
27:18,19;69:2,8,10;
70:12,23;71:8;
238:19,22;240:4
**hand (1)**
143:25
**hands (2)**
124:19;258:3
**happened (2)**
67:11;71:2
**happening (1)**
188:13
**happens (3)**
106:12;206:8;
209:13
**happy (1)**
14:8
**harassment (1)**
169:21
**hard (8)**
84:6;171:24;184:6;
188:13;189:25;
191:24;222:25;291:7
**Harry (2)**
11:10;15:5
**hat (1)**
156:14
**hats (1)**
89:20
**Hawaii (7)**
11:7,18,22;27:16;
63:25;286:3;288:2

**Hawaii's (1)**
11:24
**head (13)**
14:19,21;17:2;40:7,
24;41:2,7,9,19;96:9,
15;107:20;141:8
**header (5)**
121:19;224:9;
245:15;246:12;254:9
**heading (19)**
22:20,24;25:3;
28:21;66:2,13;69:21;
79:5;84:16;87:3;
91:10;135:20;213:23;
223:11,22;262:23;
270:22;280:2;282:25
**headings (1)**
90:3
**headlines (1)**
276:18
**headquartered (1)**
35:3
**health (1)**
266:20
**heavily (3)**
169:5;249:2;283:17
**hedge (3)**
95:17;108:19;
112:14
**hedging (1)**
97:11
**held (10)**
10:11;86:21;92:20;
148:23,25;153:19;
174:8;246:17;261:19;
278:4
**Helms (1)**
21:11
**help (7)**
38:6,19;102:12,15;
148:21;178:18;
263:24
**helped (1)**
105:22
**helpful (1)**
44:7
**helping (4)**
103:3,17,23;157:3
**hereby (1)**
48:22
**herein (1)**
25:5
**hereinafter (1)**
47:24
**hidden (1)**
84:24
**high (3)**
178:13;266:24;
267:22
**higher (4)**
127:24;128:22,25;
129:7
**highlight (1)**

147:7
**highlights (1)**
137:8
**hindsight (2)**
284:12;289:9
**historical (11)**
160:19;161:14,22;
162:17;166:9,21;
167:4,14;168:8;
169:6;170:6
**historically (1)**
151:22
**hold (12)**
32:15;33:22;36:9;
37:4;95:17;108:19;
112:14;152:25;
153:25;154:7,17,25;
169:3;217:19;245:23;
246:6,7;274:5,11,14;
275:21;276:2
**hold' (1)**
245:16
**holders (1)**
142:8
**holding (6)**
97:11;134:12,17;
152:13;154:14;
273:24
**holdings (9)**
94:5;154:13,22;
155:4,4;208:14;
276:7;277:9,12
**holistic (1)**
163:7
**holistically (1)**
160:15
**Hong (3)**
58:8,12;59:23
**hours (10)**
15:20;18:4;205:6,
15,19,25;206:2,6,9,25
**house (1)**
214:13
**Hughes (17)**
14:24;17:9,11;
91:14;97:22;98:5,19,
23;100:16,24;101:25;
102:22;104:3,9,13;
130:19;131:22
**hundred (8)**
189:18;190:11,14;
191:23;207:21,22;
283:5,6
**hundreds (1)**
288:12

## I

**idea (3)**
26:22;83:7;259:14
**ideal (1)**
280:9
**identification (33)**

19:17,22;20:3;31:4;
46:10;64:24;69:4;
72:13;78:17;86:16;
94:25;112:13;121:13;
132:19;138:12;
177:25;181:11;
185:11;208:9;209:25;
217:2;221:24;237:10;
238:23;240:24;
242:11;245:8;262:12;
270:3;273:7;275:9;
278:22;282:21
**identified (8)**
96:21;97:4;98:5,15,
19,23;103:25;111:14
**identifies (2)**
108:20;112:15
**Identify (7)**
95:15;97:7;108:18;
120:15;123:25;
125:17;131:23;
208:23,24;209:2;
229:11;241:9
**identities (1)**
120:7
**II (8)**
27:19;69:3,10;
70:12,23;71:8;
238:19,22
**ill (2)**
90:8;194:15
**illustrated (1)**
135:24
**IMA (3)**
44:22,24;45:4
**IMF (1)**
122:20
**immateriality (1)**
190:23
**immediately (2)**
33:14;48:18
**impact (17)**
179:12;180:12;
203:24;249:18;
255:19;256:19;
257:23;258:10,17;
259:5;260:14;261:22;
265:13,20;272:11;
288:24;290:4
**impacted (2)**
126:22;173:11
**implement (3)**
92:15;293:9,14
**implemented (1)**
84:14
**implicit (1)**
64:4
**imply (1)**
155:7
**import (4)**
144:16,21;145:11;
146:5
**important (14)**

166:9;167:20,25;
168:6,18;169:8;
170:3;184:2;189:12;
191:5,20;242:24;
243:2;290:22
**imported (1)**
145:19
**improper (2)**
284:7,21
**Inactive (2)**
33:9,10
**inadequate (1)**
64:6
**Inc (1)**
241:22
**include (7)**
60:3;82:5;99:11;
173:5,8;184:4;244:20
**included (7)**
100:21;126:19;
175:23;235:9,12;
252:13;270:11
**includes (2)**
44:14;281:13
**including (6)**
97:9;143:23;
166:20;184:18;234:9;
258:19
**income (11)**
71:12,16;75:5;
159:5;166:16;171:3;
182:2;203:23;246:25;
248:2,10
**Incorporated (2)**
240:14,25
**increase (2)**
135:22;271:25
**Index (2)**
100:19;126:16
**indicate (5)**
213:2;219:16;
227:2,11;228:17
**indicated (14)**
44:13;57:21;83:12,
18;93:4;101:17;
105:7;107:4;111:12;
112:2;159:23;210:17;
218:16;263:18
**indicates (3)**
90:17;115:16;
219:18
**indication (6)**
165:5,6;166:25;
218:14;228:22;
232:11
**indirect (1)**
93:24
**Indirectly (1)**
126:15
**individual (4)**
131:15;212:2;
227:3,12
**individuals (39)**

15:9,13,19,23;16:4;
50:18;52:13,14,15;
53:14;55:13;58:22;
59:6,14;87:2;90:5,11;
91:9;96:2,21,22;
103:7,25;109:7,10,20;
110:19;112:18;
113:12,20;114:5;
115:4;118:14;139:16;
195:4;202:13;226:7,
19;262:18
**industries (2)**
34:19,22
**industry (1)**
91:6
**infer (1)**
213:3
**inference (8)**
212:17,21;215:11,
17;229:20,22;234:15,
16
**inferred (1)**
220:19
**inferring (1)**
214:21
**inflated (1)**
288:15
**inflation (3)**
121:22;178:13,20
**influence (1)**
182:4
**info (1)**
276:24
**inform (1)**
199:15
**information (89)**
23:17;63:4;82:17,
23;101:8;122:15;
123:10,11;124:19,20,
21;126:24;137:9,10;
143:12,15,16;146:14,
18,18,21;150:19,23;
157:10,17,18,18;
158:11,15,17;159:10,
25,25;160:4,14;164:2,
2,3,12,13;166:15;
168:23,24,24;169:4;
174:20;186:7;190:3;
199:19;211:13,18,19;
212:11;213:2,7;
222:9;231:16,21;
235:10,19,24;236:7,
12;237:17;238:6,11;
239:14,21;240:4,6,7;
250:11;253:4,16;
255:5,6;256:24;
258:3;259:15;260:20;
261:2,15;267:13;
269:6;275:23;276:3;
280:24;281:2;290:2
**in-house (1)**
17:21
**initial (4)**

230:23,24;232:19;
233:11
**initials (1)**
263:5,19;264:7
**initiative (1)**
203:21
**INKA (2)**
27:18;285:24
**innumerous (1)**
146:7
**in-person (2)**
82:20;143:19
**ins (1)**
225:9
**insinuated (1)**
250:2
**instance (6)**
52:10;81:25;82:3;
114:3;128:11;199:11
**instances (15)**
42:22;55:6,12;
114:3;119:25;123:25;
194:14;199:20;
202:22;205:4;206:11;
207:9;218:13;229:15;
231:8
**instead (1)**
78:12
**institutions (2)**
234:13,17
**instructed (1)**
13:22
**instruction (2)**
193:3;292:24
**instructions (2)**
48:24;49:15
**instruments (2)**
38:15,17
**insufficient (1)**
64:7
**Insurance (5)**
27:19;279:13,17,
18,19
**integrated (3)**
57:23,25;58:3
**integrity (4)**
184:7;283:20;
289:2,3
**intended (3)**
247:8;248:20;
267:25
**interact (1)**
37:25
**InterCement (5)**
189:9,14,20;191:7,
13
**interest (3)**
84:24;143:24,25
**interested (3)**
45:23;133:12,19
**interference (5)**
142:6,11,17;143:5;
144:4

interfering (1)
142:23
**intermediary (5)**
198:10,15,18;
199:3,13
**internal (7)**
44:25;211:15;
223:16;224:2;242:16;
254:24;256:18
**international (3)**
40:7,9;280:8
**Internationale (1)**
27:17
**interposing (1)**
129:15
**interpret (2)**
190:4;191:9
**Interrogatories (2)**
94:24;95:7
**interrogatory (10)**
94:21;95:14;97:6;
98:18;104:2;108:14,
17;111:15;112:12;
130:18
**into (33)**
69:24;70:8,16;71:6;
82:7;110:6;114:13;
123:6;124:16;125:18;
126:7;139:15;146:2,
7;147:21;148:22;
151:24;160:15;
163:18;165:3,22;
174:20;202:18;205:5,
13;206:12;211:7;
219:20;226:14,15;
246:8;250:9;290:20
**intrinsically (1)**
245:21
**introduce (1)**
10:20
**inventory (1)**
165:14
**invest (31)**
48:9;49:8;50:12,25;
53:7;68:19;71:19,24;
75:24;80:12,20;
82:10;83:14;85:17,
23;87:14,18;92:13;
115:6;120:24;164:11,
17;167:6,15;168:10;
169:9;170:9;174:16,
22;187:11;290:5
**invested (17)**
50:15;51:16;125:3,
12;128:4,12,20;
129:5;134:19,25;
175:2,10,18;176:3,7,
12,16
**investigated (3)**
175:3;294:14,24
**investigation (3)**
188:5;268:20;
273:21

**investigations (6)**
186:4,16;187:6;
188:12;264:19;
280:17
**investing (15)**
82:16;121:24;
124:6,13;126:17;
129:10;149:14;173:7,
23;187:15;188:3,16,
16,22;246:11
**investment (123)**
16:13,14;17:4,4,19,
20;25:8,19;27:24;
36:24;39:5,10,11,15;
42:17,19,20;43:2,4,8,
10;44:11,17;45:11;
46:17;47:18,20;48:2,
8,14;49:19;50:4;
51:17,24;52:25;53:5;
55:2,9,15,18,19,20,
24;56:7,14;57:9;
59:18,24;61:2;62:24;
63:5,10;64:21;65:4,6,
20;67:21;73:12,14,
25;74:5,14,22;75:2,
10,12,23;76:23;77:2,
6;79:5,10;80:6,10,18;
82:25;84:13;85:4,13;
88:2,5;92:16;97:9,10;
107:21;121:16,25;
125:21;127:9;135:20;
141:9;146:8,13;
147:8;157:7;158:6,
21;159:8,12,15;160:7,
12,21;165:24;166:10,
12;167:21;168:25;
169:14;170:2;173:10;
174:19;177:3;181:10;
186:22;204:18,24;
233:23;239:6,12;
276:19;288:5;290:9
**investments (37)**
11:23;16:16;17:6;
36:4,7;42:15;44:19;
46:20;49:2,20;50:3,
10;51:22;54:7;55:21,
25;56:8,15;77:11;
78:2;96:23;99:10;
105:17;117:24;
152:25;153:4;154:2,
7,17,25;163:13;
172:23;173:16;181:2;
189:20;274:5;277:4
**investor (16)**
67:19;73:19,24;
74:13,17;127:13;
134:25;157:20;182:3;
184:4;193:7;196:6;
246:13,16;277:13;
291:7
**investors (15)**
37:22;38:2;73:3;
126:17,20;127:19;

133:16;192:21;
206:21;249:11;250:3;
253:17;270:23;
280:12;281:16
**investor's (2)**
83:25;84:5
**invests (2)**
119:20;182:6
**involve (1)**
247:14
**involved (27)**
100:12;102:9;
130:23;131:12;
132:13;134:7;157:3;
173:19;174:16;189:7;
190:10;216:15;234:3,
13,25;240:19;241:11;
250:24;251:9;252:18,
20;270:14;293:24;
294:3,10,15,17
**involvement (18)**
106:15;131:7;
186:3,12,21;187:5,10,
14,21,22;188:4,17,23;
252:6,16;253:11;
287:17;293:16
**involves (1)**
204:4
**involving (3)**
242:15,24;244:6
**IPO (1)**
232:13
**isolate (1)**
77:3
**isolated (1)**
186:15
**issuance (1)**
201:21
**issue (16)**
48:24;49:14;79:20;
83:2;84:17,18;85:3;
126:13;174:19;182:9;
195:21;231:7,14,15,
25;232:14
**issued (4)**
84:25;135:9,15,16
**issuer (25)**
80:13,20;81:16;
82:18,19,20;83:2,14,
18;85:7,18;86:6;91:7;
101:12;146:9;157:25;
161:14;166:12;
174:16,19;186:23;
187:16;246:11;
274:17;290:7
**issuers (15)**
23:6,23;29:20;91:5;
94:5,9,14;133:24;
160:12,17;171:7;
179:13;180:13;
182:12;183:8
**issues (3)**
85:5;230:21;246:11

**item (7)**
25:3;27:10;28:14,
20,23;29:3;74:20
**items (1)**
289:21

## J

**January (10)**
104:22;107:3;
136:10;137:25;172:3,
9;174:8;210:15;
273:9;274:4
**Jato (29)**
186:4,21;187:6,10,
14,21,23;188:4,9,17,
23;243:9,13,22;
244:7;252:4;255:20;
256:7,20;257:24;
258:12;259:7;268:19;
280:17;291:24;292:7,
12,22;293:17
**Jean-Pierre (2)**
185:13;263:7
**Jeff (7)**
91:18;103:12,16,
21,22;157:2;266:11
**job (1)**
286:15
**John (11)**
27:18,19;69:2,8,10;
70:12,22;71:8;
238:18,21;240:4
**join (2)**
33:12;286:2
**joined (7)**
36:14;91:15;96:11;
99:2;100:13;101:2;
102:19
**joining (3)**
101:25;102:4,23
**JP (10)**
100:18;216:11,15;
233:24;234:11,23;
241:21;262:24;263:7;
266:10
**JPG (1)**
264:16
**judge (1)**
12:22
**judicial (1)**
294:23
**jumping (1)**
255:21
**June (1)**
24:19
**jurisdictions (2)**
60:5,7
**jury (1)**
12:22

## K

**Kapital (1)**
27:17
**keep (2)**
149:14;266:20
**keeping (2)**
162:20;271:20
**Keith (20)**
14:19;95:22;96:9,
12,16;97:18;105:20,
21;107:24;108:21;
111:10;112:9;114:12,
18;115:18;130:22;
132:13;139:7;156:12,
16
**Kevin (3)**
15:2;17:16;279:5
**key (2)**
79:17;290:11
**kind (2)**
161:2;233:22
**knew (6)**
250:6;258:16,24;
259:3
**knowing (3)**
116:8;117:6;187:9
**knowledge (15)**
71:22;72:6;121:3;
138:2;139:25;146:20;
151:3;152:20;219:5;
220:23;235:3;244:6;
253:18;290:7;294:14
**knowledgeable (2)**
144:10;200:22
**known (13)**
174:23;243:9,22;
244:7;252:3;258:12;
259:7;289:8;290:11;
291:24;292:7,11,22
**knows (1)**
199:5
**Kong (3)**
58:8,12;59:23

## L

**Labaton (2)**
11:5;63:24
**labeled (5)**
74:20;87:7;90:21;
229:9;283:4
**lacks (3)**
107:19;120:10;
122:6;190:8;206:17
**Landes (2)**
11:8,8
**language (19)**
49:4;66:7,21,24;
67:3,12,20;70:9,20;
71:2;75:7;149:21;
179:5;186:17,19;
224:13;243:4;249:7;
254:15
**large (2)**

135:4;233:23
**larger (4)**
87:22;133:22;
145:12,20
**last (21)**
15:12;18:6;42:5;
96:13;147:5,6;149:6,
9;189:5;191:2;
203:16;215:24;
228:21;248:23,24;
254:13;260:10;
263:22;266:14;
282:14;286:23
**late (2)**
293:23;294:4
**later (2)**
285:15;291:23
**Latin (2)**
135:3;185:20
**Lava (29)**
186:4,21;187:5,10,
14,21,23;188:4,9,17,
23;243:9,13,22;
244:7;252:4;255:19;
256:7,20;257:24;
258:12;259:7;268:19;
280:17;291:24;292:7,
12,22;293:17
**law (2)**
173:9,20
**laws (2)**
172:21;174:4
**lawsuit (2)**
271:3,5
**Lawsuits (1)**
270:23
**lbarefoot@cgshcom (1)**
3:11
**lead (11)**
86:9;91:25;92:20;
110:24;111:2,20;
114:14;131:4;156:8,
11;293:6
**leaders (1)**
242:25
**leadership (1)**
184:7
**leading (2)**
40:5;185:18
**learn (1)**
127:3
**learned (2)**
243:21;280:24
**learning (1)**
73:20
**least (6)**
176:6;189:6;265:5,
12;290:13;294:13
**leaving (2)**
15:24;292:15
**Lee (1)**
270:5
**left (8)**

80:23;91:19,24;
96:18;101:5;103:21,
22;244:22
**left-hand (1)**
223:10
**legacy (1)**
220:2
**legal (9)**
10:17;54:18;57:6;
60:9,13,16,17;63:2
**Legg (7)**
21:20;22:3;46:19;
49:20;50:3,10;54:6
**lend (3)**
95:17;108:20;
112:14
**lending (1)**
97:12
**less (3)**
128:8;163:5;208:13
**letting (1)**
182:4
**level (6)**
209:13;212:8;
232:20;236:8;253:18;
271:23
**levels (3)**
149:12;231:16;
271:20
**leverage (2)**
62:10,14
**liabilities (3)**
137:15;161:3,9
**liable (1)**
174:9
**liaise (1)**
38:25
**Lian (37)**
14:21,22;16:19,20,
24;95:21;97:18;
98:14;104:17,25;
106:13,22,24;107:5,
14;108:21,24;109:3;
111:14;112:15;114:5;
115:5,18;116:17;
117:19;118:7,15,25;
120:2;131:6,22;
139:3,23,25;244:20;
264:9;279:22
**L-I-A-N (1)**
14:23
**L-I-A-N-G (1)**
14:23
**Liberty (2)**
3:5;10:13
**license (1)**
33:6
**light (1)**
203:22
**likely (15)**
116:12,13;150:25;
215:13,15;238:9;
254:24;255:19;256:6,

19;257:23;258:10,17;
259:5;261:22
**Lima (3)**
242:13;244:10,11
**limit (1)**
200:20
**Limited (25)**
21:20;46:20;49:21;
50:3,10;54:7,8,11,21,
25;55:7,14,23;56:6,
13,20;57:9;65:8;
66:25;73:22;83:6;
186:13;201:5;202:5;
281:10
**line (15)**
134:11;140:4;
147:5,11;178:6;
214:14;215:24;
242:14;260:2,6;
262:22;263:22;264:8;
272:6;283:3
**lines (3)**
93:5,9,24
**link (1)**
208:15
**linkages (4)**
273:25;274:6,13,21
**linked (1)**
245:21
**liquidity (2)**
121:23;198:12
**list (30)**
25:16;87:2;90:10,
13,16;91:14;112:11;
113:17;138:23;139:9,
15,15,17;154:13;
156:17;200:19,25;
201:5,10,12,17,19,23;
202:4,7;223:3;
231:23;232:6,9;264:7
**listed (16)**
25:20,24;28:14;
44:8;89:7;91:9,23;
139:16;225:20;
229:16;235:17;239:6;
241:13,17,19;288:15
**listening (2)**
252:20;253:7
**listing (1)**
94:3
**lists (7)**
21:14;25:12;27:11;
93:9;239:19;240:14;
241:21
**listserv (16)**
138:21,24;139:4,
12,19,21;140:3,8,11;
185:14;244:15,18;
279:6,9,14,23
**liter (1)**
271:24
**Litigation (2)**
10:10;222:18

**little (7)**
57:20;73:20;
143:13;192:4;195:14;
211:19;232:7
**LLP (1)**
3:3
**local (4)**
60:5,6;79:18;186:8
**located (13)**
10:13;56:24;60:21;
61:6;68:5;200:7;
202:5,15;212:15;
217:20;218:10;
226:21;227:5
**location (11)**
199:21;201:22;
214:3,11;219:13;
220:6;223:19;227:12,
21,22;239:11
**locations (1)**
23:16
**logistics (2)**
208:8,21
**LON (1)**
228:22
**London (15)**
54:13,22;55:19;
58:6,10,20;59:10,13,
20,25;62:11;217:25;
218:18;219:6;228:23
**long (5)**
18:2;33:22;35:6;
36:9;134:18
**long-term (4)**
127:12;134:12,17;
135:23
**long-time (1)**
152:13
**look (40)**
21:24;27:8,9;43:8;
44:10;51:10;53:25;
62:23;68:13;72:5;
77:19;80:22,22;
82:12,12;95:18;
101:16;102:13,13;
117:10;122:17;139:6,
11,14;154:12,21,23;
157:22;161:12,14;
200:2;201:11,14;
202:7;203:4;211:18;
212:10;219:8;237:20;
240:12
**looked (10)**
28:24;30:10;
120:14;151:2;155:4;
158:18;211:14,16;
233:20;234:7
**looking (39)**
80:3;82:16,21;
83:22,25;101:7;
127:20,22;137:12;
146:15,17;156:13;
157:25;161:18,21,23,

24,25;191:3;211:9;
212:4;215:7;217:22;
235:16;241:8;256:23;
257:2,16,19;258:2;
265:24;266:2,12;
276:22;277:8;281:16;
289:23,24,25
**looks (8)**
47:2;86:19;133:2,
10;135:13;137:16;
223:2;281:11
**loose (2)**
100:4,5
**lose (1)**
147:8
**loss (9)**
158:12;160:2;
164:2,12;168:23;
265:3;280:14;281:18,
22
**losses (2)**
247:2;248:3
**lot (15)**
37:21;83:3;106:8;
126:4;159:8,24;
161:25;167:22;
170:12;196:19;209:4;
236:11;249:25;
253:14;255:4
**low (4)**
182:7;183:4,4,19
**lower (1)**
125:25
**LUKE (3)**
3:7;10:23;43:15
**lunch (2)**
129:19;130:20
**Luncheon (1)**
129:22
**Lybrand (4)**
34:12,14,20;35:7**

**M**

**Macom (1)**
10:18
**macro (1)**
81:20
**macroeconomic (9)**
75:4;81:7,17,22,24;
82:2,5,9;83:24
**magazines (1)**
242:23
**magnitude (3)**
153:4,17;269:10
**main (1)**
242:22
**maintain (4)**
37:24;203:20;
245:16;276:7
**maintained (7)**
37:23;210:9;
211:12,22;222:15;

233:14;234:22
**maintains (2)**
200:19;212:7
**major (1)**
186:11
**majority (2)**
142:13;147:22
**majors (1)**
149:18
**makes (6)**
42:15;49:19;50:2;
85:22,25;207:10
**making (40)**
16:14;17:5;50:18;
52:5;53:2,15;55:15,
19,20,21;82:25;
85:13;105:15;111:11;
115:21;120:13,15,16,
17,18;127:9;146:8,
12;160:7,21;163:9;
164:10,17;165:24;
166:9,11,19;167:22;
172:22;173:10,16;
174:18;196:21;207:6;
208:22
**manage (5)**
71:16;92:17;116:9;
156:15,21
**managed (5)**
100:20;217:24;
219:6,24;237:18
**Management (78)**
19:16;20:13,16;
26:12;30:12;39:10,
11;42:3,21;43:8,11;
44:11,18;45:11;46:8,
17;49:24;52:25;54:6,
8,10,19,21,25;55:7,
14,23;56:6,13,20;
57:9;59:19,24;61:2;
62:24;63:5,10;64:22;
65:4,7,7,20;66:16,25;
97:19;121:12;122:21;
127:5;140:4;141:9;
143:19;167:21;171:3;
182:5;184:6;204:18,
24;239:7;240:13;
244:14,19;279:23;
281:2,12;283:20;
286:5;289:2,3,23;
290:12;291:2;293:5,
13,17
**Management's (1)**
67:22
**manager (35)**
15:2;17:18;25:19;
27:24;47:17,25;
48:22;55:2,9;66:4,6,
14;85:9,11,13,17;
86:9;91:25;92:10,19,
22;106:3;110:5;
111:2,20;114:15;

120:13,23;136:14;
140:17;156:9;194:24;
239:7,12;294:25
**managers (23)**
85:8;87:7;92:14;
93:2,20,21,22;96:3;
110:24;118:11,14;
119:7;120:2,8;
131:24;132:9;138:23;
140:12;156:14;193:3;
231:13,22;281:13
**manages (3)**
42:14;71:12,14
**managing (3)**
218:15,15;219:14
**mandates (3)**
71:15;100:20;
126:17
**many (8)**
45:17;58:9;84:9;
126:16;137:10;
160:25;193:5;250:3
**March (6)**
91:15;99:2;101:3;
102:2;103:11;275:12
**Marianne (1)**
11:1
**Mark (13)**
14:24;17:9,11;
78:11;91:14;97:22;
99:2;100:8;102:18,
18;130:19;282:13;
285:12
**marked (67)**
19:13,16,19,21,24;
20:3,6;26:6;27:7;
30:25;31:4;46:5,10,
12;64:19,23;68:22;
69:4;72:8,12;78:9,17;
86:11,16;94:20,24;
108:13;121:7,13;
132:19,21;138:6,11;
177:19,24;181:10,13;
185:5,10;200:10;
209:19,24;216:21,25;
221:15,23;228:21;
237:6,10;238:14,22;
242:6,10;245:3,8;
253:21;262:7,12;
269:22;270:3;273:2,
6;275:3,8;278:21,25;
282:20
**market (57)**
76:9,15;82:4;87:3;
89:11,21;91:17;
93:10;94:4;99:4,10,
14;100:9,15,19;
110:23;111:3,5,8;
123:17,20,21,21;
124:3,22;125:5,13,17,
25;126:21;127:16,22,
24;128:8,13,23;129:2,
8,11;178:11;198:12;

203:23;205:19;206:6,
9,25;246:8;250:8,11,
21;267:6,11;268:10;
288:8;289:16;290:16;
293:2
**market-friendly (2)**
178:18;179:7
**marketing (7)**
18:14;39:9,14;40:5,
8;87:22;93:12
**marketplace (8)**
124:8;125:20;
157:20;232:16;257:8,
11;259:22;260:23
**markets (48)**
14:20,22,25;15:3;
37:7,9;38:4,21;39:25;
72:17;75:19;89:23;
90:18;92:2;94:14;
96:10;111:21;116:15;
119:10;121:19;135:2,
5,6;141:23;145:6;
146:12;156:9;170:17,
22,22;171:11,12,20,
21,24;172:16;175:24;
177:24;210:5;249:2;
279:5,8;280:8;281:9,
14;291:9,18,18
**marking (1)**
234:19
**Mason (7)**
21:21;22:3;46:19;
49:20;50:3,10;54:7
**Mass (1)**
27:20
**Master (3)**
21:19;25:13,14
**Master's (1)**
32:11
**matching (2)**
198:20;208:10
**material (9)**
189:14,19;190:16;
191:8,17,17,24;271:3,
21
**materiality (3)**
190:2,23;191:12
**materials (1)**
18:14
**math (1)**
260:8
**matrix (1)**
45:19
**Matt (22)**
91:23;95:22;96:18;
101:4;103:21,22,23,
23;106:20;107:24;
108:21;111:10;112:9;
114:12,18;115:18;
130:22;132:13;
136:12;139:8;156:8;
157:3
**matter (7)**

10:9;22:23;23:3;
93:21;257:3;274:17;
293:3
**matters (7)**
17:13;22:20;23:10;
24:5;28:21;29:5;
285:19
**maturing (1)**
210:15
**maturity (1)**
268:15
**maximum (3)**
189:12;191:6,20
**may (34)**
11:22,23,25;13:18;
26:21;44:21;47:2;
52:19;66:14,16;67:9,
9,10;69:23;81:13;
189:13,24;191:6,21;
194:12;200:24;
203:25;205:24;206:4;
207:19;236:15,23;
254:22;269:7,7;
270:11;280:12,16;
281:16
**maybe (20)**
38:12,18;47:10;
48:17;100:17;102:25;
115:11;117:9;126:15;
133:11;143:13;
159:21;163:3,5;
169:18;187:23;
205:22,23;214:19;
293:23
**mbH (1)**
27:17
**mean (43)**
16:6;22:11;38:10,
11;46:14;49:13;
50:18;51:9;60:6;
67:11;70:25;76:18;
80:8;88:8;100:5;
101:2;103:2,22;
105:5;107:3;115:23;
118:10;119:17,17;
120:17;121:11;132:7;
133:5,6;137:18;
142:22;144:7;159:20;
180:10;201:9;219:21;
220:10;226:5,25;
246:6;251:5;267:2;
289:18
**meaning (3)**
178:24;211:4;
252:20
**means (8)**
25:5;66:3;115:16;
193:20;195:14;233:8;
247:23;268:22
**meant (1)**
59:10
**measure (2)**
162:24,25

**measures (5)**
172:5,10;178:21;
180:8,18
**mechanical (1)**
224:17
**mechanically (2)**
193:12;232:23
**media (3)**
143:23;255:6;269:2
**meet (2)**
15:13;18:2
**Meeting (5)**
82:23;86:21;88:9;
143:19;289:23
**meetings (6)**
18:3,5;82:20;
101:11,12;157:21
**meets (1)**
84:5
**Melissa (1)**
10:16
**member (7)**
41:23;52:11;
287:15;293:20,24;
294:2,9
**members (9)**
93:10;106:9;
252:25;253:2;263:2;
290:11,25;293:5,16
**Memo (2)**
223:23;247:10
**memorialization (1)**
262:18
**mention (5)**
58:24;59:2;83:6;
103:14;190:22
**mentioned (10)**
56:19;58:14;87:20;
103:14;156:21;157:2;
159:4;194:11;271:13;
275:23
**mentioning (1)**
190:24
**mergers (1)**
85:2
**merits (1)**
200:18
**met (1)**
14:16
**method (1)**
224:17
**methods (4)**
193:15,22;194:2,4
**mic (1)**
287:9
**microphone (1)**
263:12
**mid (1)**
101:19
**mid-2014 (2)**
91:24;103:11
**middle (3)**
40:14;96:19;101:5

**might (25)**
27:2;52:10;59:10;
93:21;110:3;134:5,6,
7;155:6;162:15,17;
163:4;193:18;195:15;
209:5;211:17,18;
212:10;213:2,3;
219:19;235:18;243:2;
290:8,9
**million (9)**
189:9,18;190:12,
15;191:23;260:4,12,
13;288:12
**millions (1)**
290:12
**mind (2)**
103:9;133:25
**MINDLIN (2)**
3:8;10:24
**minimal (1)**
252:16
**mining (3)**
94:12;176:7,19
**minor (3)**
280:13;281:18,22
**minute (3)**
21:24;31:8;277:8
**minutes (1)**
177:5
**Misprice (1)**
121:19
**mispriced (1)**
84:20
**misstates (2)**
152:6;159:18
**mistaken (1)**
208:20
**misunderstood (1)**
205:23
**misvalued (1)**
124:8
**model-driven (1)**
124:14
**Moeller (4)**
286:13,14,24;287:3
**M-O-E-L-L-E-R (1)**
286:25
**Moeller's (1)**
287:14
**moment (4)**
18:7;23:2,20;78:10
**money (6)**
116:9;127:18;
276:25;277:5,15,20
**monies (1)**
49:2
**monitor (2)**
88:21;157:21
**monitoring (2)**
89:3;179:24
**more (33)**
51:10;57:20;66:15;
73:21;88:20;102:9;

112:6;126:4,20;
134:7;142:13;147:21;
163:4;167:10;171:11;
172:17;178:18,19;
211:17,19;212:11;
224:16;235:19;
236:11,11;244:2;
249:5;259:25;266:24;
275:22;276:3;280:16,
24

**Moreover (1)**
149:15

**Morgan (21)**
86:13,20;100:19;
216:12,15;229:16,17,
21,24;230:3;233:24,
24;234:10,11,24,24;
240:14,24,25;241:10,
22

**morning (5)**
12:9,10;130:14;
131:6;275:20

**most (10)**
149:15;158:16;
184:2;193:16;196:5,
9;219:18;225:19;
288:22;289:9

**mostly (1)**
186:2

**move (3)**
13:15;104:19;
129:14;230:15

**moved (3)**
40:16,20,22

**Moving (2)**
89:13;91:22

**much (4)**
42:2;101:7;178:17;
179:6

**multiple (4)**
166:3;167:9;
168:14;208:11

**must (2)**
283:23;289:3

**Mutual (6)**
27:20;61:24;63:7;
76:7;113:16;153:9

**myself (1)**
273:16

## N

**nail (1)**
289:13

**name (11)**
12:11;45:5;203:6;
240:19;241:4,13;
243:17;276:17;
286:23;287:24;294:7

**named (6)**
41:19;102:11;
104:20;107:8;286:12;
293:22

**names (2)**
132:6;239:24

**native (2)**
221:17,19

**neatly (1)**
89:24

**necessarily (14)**
38:14;44:20;48:16;
70:25;73:21;74:2;
123:17;134:2;147:17;
171:17;174:18;
250:20;256:25;258:6

**necessary (5)**
68:2,4;149:13;
232:10;254:22

**need (8)**
23:12;26:23;37:22;
107:25;115:25;
266:16;275:22;276:3

**needs (10)**
37:23;60:9,9,12,17;
149:14;198:13,15;
206:19;248:14

**negative (7)**
178:22;180:9,12,
21;245:18;246:3,8

**negatively (1)**
173:11

**neglected (1)**
218:4

**negotiate (1)**
193:9

**net (2)**
165:4;166:24

**New (40)**
3:6,6;10:14,14;
36:15,21,23,24;37:16,
17;38:8,9,14,15,20;
39:21,23;40:12,19;
58:6,10;59:2,4,9,21;
180:17;186:6;195:21;
200:8;202:2,5,21;
217:14;231:7,14,15,
24;232:13;242:14;
268:10

**newly-issued (1)**
85:2

**news (11)**
102:13;149:15;
245:18;246:4,8;
254:11;259:18;
268:10,19,24,25

**newspapers (1)**
242:23

**next (17)**
13:16;64:18;79:16;
97:6;150:5;203:17;
214:8;219:8;223:22;
224:8,22;225:16;
233:2;260:2;263:21;
271:17;272:2

**nine (1)**
283:5

**nod (1)**
28:11

**noise (4)**
266:25;268:18,22;
269:5

**nominal (1)**
135:22

**non (1)**
119:17

**nonconfidential (1)**
285:14

**None (1)**
204:9

**non-EM (7)**
113:10,13,21;
114:4,21;116:22;
119:15

**non-EMD (1)**
113:6

**non-emerging (1)**
111:21

**non-header (1)**
134:11

**non-Petrobras (3)**
23:6,23;29:20

**non-US (3)**
68:17;206:13,14

**Non-value (4)**
246:22;247:20;
248:18,19

**normal (2)**
266:21;267:19

**Norway (2)**
175:15,23

**Notary (1)**
12:4

**notches (1)**
266:16

**note (5)**
64:15;140:19;
141:4;147:4;149:24

**noted (5)**
53:23;64:2;130:3;
156:18;295:10

**notepad (1)**
26:22

**notes (9)**
26:22;141:22;
146:11;156:25;
158:13;159:5;210:15;
267:4,5

**notice (13)**
11:18;19:15,25;
20:7,21;21:8;23:11;
24:5;26:10;31:3;64:3,
6;286:4

**notify (2)**
70:7,15

**notifying (1)**
70:19

**November (24)**
141:13;144:19;
145:18;148:11;

245:11,22;248:25;
250:18;251:20;
253:24;255:15;256:4;
257:21;258:11;259:3;
261:5;262:14,23;
265:5,9,12;267:3;
269:16;270:6

**nowhere (1)**
256:14

**number (72)**
21:2,14;22:23;23:3;
24:2,8,15;27:10;
28:14,20,23;29:3,17;
31:13;44:8;45:14,15;
46:4;47:16;74:20;
95:14;97:6;98:18;
104:2;108:17;117:5;
124:16;130:18;
161:19;193:6;195:16;
202:20;211:15,16,22;
212:10;214:19,22;
216:7;217:23;218:2,
11,12;219:4,10,17,19,
22;220:4,18,20,24;
221:6;223:12,14,16,
18,23,25;224:2;
225:4;235:9,11,17;
236:2,5,17,19;237:7;
258:23;261:13,14

**numbering (1)**
221:7

**numbers (19)**
47:11;124:15;
163:17;166:19;168:2;
202:19;218:8,17,21;
219:20,23;220:3,22;
224:6,23;237:22;
245:4;272:7;284:13

**numerous (5)**
14:15;143:22;257:2

**Nuruki (6)**
91:18;103:12,16,
21;157:2;266:11

## O

**oath (2)**
12:19,21

**object (4)**
52:23;64:5;167:17;
204:16

**Objection (222)**
28:4;30:22;36:5;
39:6;42:8;43:5,16,24;
44:6;45:12;48:10;
49:10,22;50:6,14;
51:3,7,19;52:2;53:10,
18;55:3,10,16,17;
56:3,10,17;57:3,12,
16;60:24;61:10,22,
23;62:8,22;64:10,
65:22;67:7,17,25;
68:7,9;69:13;70:13,

14,24;72:3,25;73:17;
74:7;75:16,17;76:5,
20;77:15;78:6;79:12,
24;80:15;83:20;93:7;
96:5;97:2;98:8,25;
102:24;105:4,19;
106:5,17;107:18;
112:5,23,24;113:15,
24;114:9,11,24;115:9,
10,24;116:21,25;
117:20;118:8;119:3;
120:9;121:2;122:5;
132:4;136:21;144:6,
23;145:14,22;151:9,
20;152:5;153:7,20;
157:8;158:8,24;
159:17;162:8;163:15;
166:2;167:8;168:12;
169:12,16,17;170:11,
23;171:13;172:11;
174:11;175:5;179:14;
182:13;186:24;
187:17;188:6,8,24;
189:2,21,23;190:6,19;
191:14;196:15;197:7;
205:2,8,20;206:15;
207:13;208:5;210:23;
220:8;222:19;223:7;
227:8,15,16,25;228:2;
231:2;232:25;234:5;
235:14,21;236:3,21;
239:15,23;240:5,21;
241:3,15;242:2;
243:10;246:5;247:9,
16;248:6,7;249:12,21,
22;250:14,15;251:17;
252:9;253:13;255:2,
18,22,23;256:9,22;
257:14,15;258:13;
259:10,11;260:7,17;
261:7,8,25;262:2;
265:18,23;266:5;
267:7;268:6;269:18;
272:21;274:8;276:8,
15,16;277:7;278:8;
280:21;281:23;
283:11,13;284:5,6,20;
288:20;289:17;
290:18;291:25;
293:19;294:5

**objections (72)**
13:18,21;95:20;
97:16;123:2,8,19;
124:5;125:7,15;
126:3,14;127:10,25;
128:10,24;129:15,16;
154:3,9,19;160:9,23;
161:16;162:9;163:16;
164:19;166:5,7;
167:19;168:13,19;
171:22;172:25;
175:11,21;176:13,21;
180:5,14;181:4;

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL

STEVEN SARUWATARI 30(b)(6)
April 13, 2016

183:9,21;184:14;
186:25;190:7,21;
191:15;205:21;206:7,
16;207:2;208:18;
209:11;228:3;243:23;
244:8;256:8,21;
257:25;268:5,21;
269:13;274:9;277:21;
284:19;286:2;292:8,
16,23;294:12;295:2
**objective (3)**
47:21;48:14;123:9
**objectives (1)**
84:5
**obligations (1)**
70:2
**obliging (1)**
204:4
**obtain (4)**
32:12,21;33:5;
253:4
**obtained (4)**
78:14;121:9;
177:21;181:15
**obvious (1)**
289:14
**obviously (5)**
11:20;89:23;
249:15;250:21;
284:12
**occasions (1)**
205:12
**occur (1)**
18:5
**October (7)**
24:19;178:16,24,
24;180:24;207:24;
208:4
**OFC (3)**
225:16,22;229:3
**off (17)**
16:19;41:18;63:14;
108:4;111:8;129:12,
20;177:9;198:19;
230:7,15;250:20;
263:12;278:11;280:4;
285:9;295:8
**offering (1)**
233:11
**offerings (2)**
230:23,24
**offers (3)**
134:13;135:14;
149:18
**office (68)**
40:5;54:12,13,20,
22;55:19;58:7,8,15,
17,18,19;60:14,21;
62:11;90:8;102:9;
104:7;111:25;120:15;
140:13,25;156:19,20;
194:15,21,23;195:10,
13;196:14,18,21;

201:13;205:24,25;
206:2,4,20;217:25;
218:14,18;219:6,13;
220:3,7,11,11;223:19;
225:22;226:15;227:6,
9,19;228:15,18,23;
229:5,18,21,23;
234:12;238:4;244:12;
262:25;263:8,9;
287:2,5
**officer (3)**
35:21,23;36:10
**offices (29)**
10:12;57:7,15,22;
58:4,12,20,22;59:6,7,
12,14;60:21;61:6,19;
62:5,15,19;63:2;
65:17;67:22;205:7,
14;206:23;215:21;
218:9,23;220:21;
230:3
**official (1)**
26:18
**officials (3)**
178:17;179:6;
290:14
**Often (2)**
121:19;232:19
**oil (8)**
34:24;134:15;
148:18;149:18;160:3;
162:16;165:2;176:3
**Okun (97)**
11:5,5,13;28:4;
43:5,24;44:6;45:12;
47:10;48:10;49:10,
22;50:6,14;51:3,7,19;
52:2,23;53:10,18;
55:16;56:10;57:12,
16;60:24;61:23;
63:21,24,65:22;67:7,
17,25;68:9;72:3;
75:16;76:20;77:15;
78:6;112:24;113:15,
24;114:9,24;115:10;
116:21,25;162:8;
166:5;168:12;169:12,
16;170:11;188:8;
189:2,23;190:6,19;
191:14;204:16;205:2,
20;206:15;223:7;
227:16;228:2;231:2;
232:25;235:21;236:3;
248:7;249:21;250:14;
255:18,21;256:9,22;
257:15;258:13;
259:11;260:7,17;
261:7,25;265:18;
266:5;268:6;269:18;
274:8;276:8,15;
278:8;283:13;284:5,
20;287:23,25
**Olivar (217)**

11:10,10;15:24;
23:12;26:16;30:22;
36:5;39:6;42:8;43:15,
19;46:25;47:5;55:3,
10,17;56:3,17;57:3,
17;59:9;61:10,22;
62:8,22;68:7;70:14,
24;72:25;73:17;74:7;
75:17;76:5;79:12,24;
80:15;83:20;93:7;
96:5;97:2;98:8,25;
102:24;105:4,19;
106:5,17;107:18;
109:14,17;112:5,23;
114:11;115:9,24;
117:4,20;118:8,17;
119:3;120:9;121:2;
122:5;123:2,8,19;
124:5;125:7,15;
126:3,14;127:10,25;
128:10,24;129:14;
132:4;136:21;144:6,
23;145:14,22;151:9,
20;152:5;153:7,10,
20;154:3,9,19;157:8;
158:8,24;159:17;
160:9,23;161:16;
162:9;163:15;164:19;
166:2,7;167:8,17;
168:13,19;169:17;
170:10,12,23;171:13,
22;172:11,25;174:11;
175:5,11,19;176:13,
21;179:14;180:5,14;
181:4;182:13,19,22;
183:9,21;184:14;
186:24;187:17;188:6,
19,24;189:21,24;
190:7,21;191:15;
196:15;197:7;205:8,
21;206:7;207:2,13;
208:5,18;209:11;
210:23;220:8;222:4,
19;227:8,15,25;
228:3;234:5;235:14;
236:21;240:21;
243:10,23;244:8;
246:5;247:9,16;
248:6,13;249:12,22;
250:15;251:17;252:9;
253:13;255:2,23;
256:8,21;257:14,25;
259:10,12;261:8;
262:2,4;265:23;
267:7;268:5,21;
269:13;272:21;274:9;
276:16;277:7,21;
280:21;281:23;
283:11;284:6,10,19,
21;285:7,12;286:22;
291:25;292:8,13,23;
293:19;294:5,12;
295:2,5

**omissions (1)**
70:6
**once (5)**
40:19;102:18;
127:6;206:8;213:14
**One (95)**
3:5;10:3,13;13:12;
15:4;16:7;23:20;
24:15;26:17;43:16;
47:3,6;56:20;57:5;
60:8;65:11;66:15;
69:14;71:4;74:25;
75:9;76:23;84:11;
90:2;91:5,22;92:23;
94:8,13;95:14;96:11;
101:16;102:7;108:17;
117:11,19,23;118:3,
22;130:19,25;131:21;
137:10,19,19;138:3;
143:13;144:9;145:24,
25;160:10,10,25;
162:24;165:6;166:10,
10;167:9,23;175:17;
178:6;179:19;181:5;
193:15;194:13;
203:16;205:6,14;
207:12,20;208:15;
210:3,3;217:8;
219:23;220:5,10,12;
225:5;227:9;229:2;
235:12;239:24;
257:17,20;258:14;
259:9;272:15;279:10;
283:6;285:20;289:20;
290:21;291:12;
293:13
**one-page (1)**
133:8
**one-pager (1)**
276:22
**ones (5)**
55:14;91:3;92:14;
93:2;293:6
**ongoing (6)**
84:21;85:16;
124:17;246:9;264:19;
274:24
**only (35)**
11:18;13:12;14:9;
38:14;59:4,22;71:12,
17;90:7;103:22;
109:7,10,20,25;110:9,
10,18;111:9;112:25;
113:2;116:6;130:24;
144:9;157:17;162:25;
166:13,13;187:4;
200:20,24;219:17;
242:16;280:6;288:23;
291:17
**onto (1)**
236:6
**opening (1)**
10:7

**operate (3)**
56:21;57:23;235:5
**operation (2)**
272:12,20
**operation' (1)**
272:8
**operational (2)**
88:21;93:16
**Operationally (1)**
57:5
**operations (3)**
57:21;78:24;186:13
**opex (4)**
260:4,16;264:25;
265:22
**opinion (7)**
144:24;145:3;
266:15;277:22,25;
280:15;283:23
**opportunity (1)**
13:20
**opposed (5)**
55:8;170:22;
225:13;240:25;251:6
**ops (1)**
231:9
**oral (1)**
21:13
**order (29)**
87:11;135:7;162:3;
195:19;196:8;197:11;
198:4,13,23;199:23;
203:13;211:3,4;
212:3,16,20,22;
226:20,22;227:4,6,13,
23;229:12;232:12,22,
24;233:3;253:16
**orders (17)**
48:24;49:14;58:23;
59:7,15;60:3,10,22;
61:8;67:6;153:17;
192:5;195:7;196:25;
230:20;239:25;
287:18
**ordinary (1)**
222:16
**org (1)**
93:23
**organization (4)**
62:10,15;89:19;
93:5
**organize (3)**
171:2,8;220:3
**organized (3)**
54:16;89:25;171:4
**originating (2)**
247:2;248:3
**Orndorff (1)**
140:15
**Orndorff's (1)**
141:4
**OS (1)**
183:4

**OSG (3)**
182:11,20,23
**others (4)**
15:23;113:3;270:6;
275:11
**otherwise (2)**
13:22;30:16
**out (58)**
15:24;23:10;47:21;
48:3,15;68:14;74:10;
82:17;88:23;90:7,8,8;
93:9;101:8;103:4,17,
23;105:22;124:16,20;
126:24;129:10;134:6;
143:12;146:21;
152:22;153:15;193:4,
6,12;194:15;217:24;
219:6,24;221:19;
225:5;226:24;227:2;
231:12;233:17;
254:14;255:5,12;
256:24;259:16,22;
260:21;261:3,16;
267:14;268:11,23;
269:3,6;283:19;
285:14;287:3;292:15
**outcome (5)**
77:5;179:10;180:2;
256:6;280:9
**outcomes (1)**
161:20
**outline (1)**
73:11
**Outlook (2)**
135:20;273:22
**outs (1)**
225:10
**outset (3)**
63:23;69:15;285:20
**outside (39)**
15:10,25;42:9;55:4;
57:17;61:7,20;62:5,
19;68:15;79:25;
111:6;122:6;153:10,
21;154:20;172:12;
175:25;176:14;
194:20;195:9;196:13,
17;205:6,9,15,19,25;
206:5,24;207:14;
250:16;262:4;267:8;
281:24;283:12;
284:10;292:2;294:6
**over (19)**
12:25;15:8,12;18:6;
36:19;42:7;91:22;
121:21;130:20;135:3;
148:13;194:5;203:17;
207:6;215:21;230:3;
245:19;258:22;
264:14
**overall (1)**
169:2
**oversee (1)**

36:7
**overseeing (2)**
34:8;35:25
**overstated (1)**
284:18
**own (8)**
52:7;140:20;
146:19,20;197:16;
203:21;256:18;
257:22
**owned (6)**
99:17,18,19;
142:13;147:21,22

**P**

**P/E (2)**
149:17,17
**pace (2)**
149:14;260:21
**page (65)**
21:20;22:18;24:25;
27:9,10;28:15,19;
46:24;47:8,12,14,16;
48:19;54:2;65:25;
66:10;69:19;73:8;
74:5,18;79:3,4,16,16,
17;81:3;83:9;84:15;
86:24;91:10;94:2;
95:13,19;97:6,6,14;
103:15;117:4;133:8;
144:13;147:4,6;
149:5,6;178:7;
183:24;200:11;
203:17;210:14;
213:22;216:6,9;
219:7;228:21;239:4,
6;246:20;254:5;
263:21;270:19;
271:17;273:18,19;
279:25;282:24
**pages (3)**
20:19;21:6;146:23
**paid (6)**
51:24;151:18,22,
24;161:15;174:9
**Paione (2)**
140:20,22
**Paper (5)**
33:16,19;34:6,11;
89:25
**paragraph (21)**
135:19;142:3;
144:13;147:6;149:8;
178:10;181:25;183:3,
25;185:24,25;189:5;
191:3;200:14;203:19;
242:22;248:24;
264:12;266:14;
271:18;275:20
**parameters (1)**
272:3
**pardon (2)**

209:20;270:6
**parity (4)**
144:16,22;145:12;
146:6
**parsed (1)**
233:17
**part (23)**
23:3,20;29:16,21;
39:8,14;71:15;73:23;
78:17,20;87:21;89:8;
100:14;106:20;135:4;
169:2;179:24;200:11;
260:9;266:11;288:4;
290:13;291:4
**partially (2)**
99:16;246:2
**participate (10)**
231:7,9,10,18,19,
21,24;232:9,18;
253:14
**participating (1)**
91:20
**particular (38)**
15:21;34:18;50:16;
75:21;82:10;83:14,
17;85:7,18,23;87:15,
19;88:15,18;89:5,15;
92:13,24;106:4;
126:18;139:12,13;
146:24;151:16;
152:19;160:13;
182:12;183:8;187:16;
204:2,5;207:5,12;
208:3,16;277:17;
293:16;294:25
**particularly (1)**
165:9
**parties (6)**
61:3;133:12;
213:24;216:9;234:9;
242:25
**party (4)**
52:3,5;133:20;
197:24
**PAS (5)**
225:20,24,25;
226:24;228:8
**Pasadena (59)**
12:15;40:17,20,23;
58:5,24,25;59:3,21;
60:12,22;103:19,20;
104:4,10,19,22;
105:21;106:23;107:6;
139:18;140:18;
146:16;185:14;200:6,
6;202:2,5;205:24;
206:4;213:4;219:17,
18,18,25;220:14;
225:24;226:3,5,7,10,
11,15,21,23,24;227:2,
5,9,18,19;228:5,14,
25;229:5,21,23;
253:2;287:5

**Paschoal (4)**
140:20,22;144:9;
156:22
**Paschoal's (2)**
144:24;145:7
**pass (3)**
246:25;248:2,10
**passing (1)**
290:13
**past (12)**
151:25;162:5,10,
15,17;163:11;164:8,
15,22;165:3;264:14;
272:5
**Paulo (21)**
58:7,11,21;59:5,14,
21;60:2;90:18;140:5,
12,24;141:6,7,8,9;
156:19,20;185:21,22;
244:12;262:25
**pay (3)**
164:22;278:2,2
**PBR (3)**
135:25;142:3;
149:11
**PBR-JH-00000790 (2)**
68:23;69:3
**PCS (1)**
25:14
**penalties (3)**
189:13;191:6,21
**pending (4)**
14:10,11;280:5,16
**Pension (1)**
25:15
**people (6)**
14:15;86:4;116:6;
156:7;172:17;266:12
**per (2)**
86:6;271:24
**percent (19)**
99:18,19;149:19;
186:10;249:3;254:12,
12,18,18,21;255:11,
16;256:5,16;259:19,
24;260:5,11;261:12
**perform (3)**
62:6;90:3,6
**performance (4)**
88:4,8,11,13
**performed (8)**
97:23,25;98:20,23;
133:10;282:9;292:9,
19
**performing (1)**
98:5
**perhaps (1)**
201:16
**period (79)**
15:8;17:3,17;24:18,
19,21,22;25:21;
27:25;39:3;42:7,12;
71:18,24;91:12;

96:17,25;99:24;
104:5,11,18;106:19,
19;107:5;108:24;
109:9,15,21;110:15;
112:22;114:8;115:8,
20;116:18;117:17,25;
118:5,24;120:6,25;
124:25;125:10;128:6,
21;129:6;131:17;
143:7;145:11;148:14;
149:2;155:11,22;
156:2,4,5,7;158:23;
159:16;160:22;
164:15;167:7;168:11;
172:6,24;173:24;
176:8;178:13;183:14;
184:11,24;188:2,20;
222:24;276:14;278:7;
286:16,18;287:4;
293:22
**periods (1)**
131:11
**permissible (1)**
275:24
**permit (1)**
70:10
**permits (2)**
71:3;212:14
**permitted (1)**
70:20
**person (8)**
13:13;41:15;66:4;
92:20;93:15;100:7,7;
212:15
**personal (1)**
31:14
**personally (5)**
140:23;176:22;
250:25;251:5;270:14
**personnel (1)**
70:4
**persons (7)**
69:24;70:7;95:15;
97:7;98:15;108:18;
113:2
**perspective (1)**
282:3
**pertains (1)**
16:3
**Perusing (27)**
20:4;22:3,25;23:14;
29:19,23;31:7,11;
44:10;46:13;64:25;
69:5;72:14;74:9;
79:13;86:17;95:4;
117:6;132:23;138:17;
237:21;246:18;254:2,
20;277:10;280:22;
282:8
**PETBRA (1)**
249:4
**Petrobras (234)**
3:4;10:9,24;16:16;

17:7;19:6;21:10,10,
12;50:9,12,16,25;
51:16,23;52:16,21;
53:2,8,16;55:25;56:8,
16;71:19,20,24,25;
75:25;76:12,25;77:3,
10,21,23;78:2;91:11,
21;92:3;94:8;95:6,17,
23;96:24;97:12,21,
24;98:2,6,16,20;99:6,
8,14,16,23;100:2,11,
14,21,24;101:11,18,
24;102:13,21;103:10,
13;104:24;105:17,24;
106:14,25;107:15,23;
108:20,25;109:4,8,11,
23;110:3,6,13;111:7,
11;112:14,19;114:7,
13,19;115:7,19;
116:17;117:18,24;
118:4,23;120:4,24;
125:2,12,23;126:19;
128:5,13,20;129:5;
130:24;131:7,16;
132:2,11,17;133:3,10,
24;134:8,12,19,23;
137:10;140:20;143:6,
9,10;145:12;146:16,
17;147:9;148:17,21;
149:24,25;150:22;
151:16,18;152:13,16,
25;153:6,18;154:2,8,
18,25;156:11,24,24;
158:7,22;160:8,12,21;
163:13;164:8,11,18;
165:25;167:6,15;
168:10;169:9;170:9;
172:23;173:16,23;
181:3;183:13,18;
184:13,15,23;186:7;
210:15;217:5;222:10,
23;242:15,24;243:22;
244:7;245:17,23;
246:17;251:3,10;
252:8,19;263:3;
264:17,24;265:14;
266:12,16,19,20,21;
267:4,19;268:2,14;
270:15,24;271:8,12;
273:22;274:5,6,12,17;
275:22;276:7;277:5,
17,22,24,25;280:7,12;
281:5,17,22;282:17,
20;288:11;289:15,15;
290:5,16;292:4;
293:17,21;294:3,10
**Petrobras' (42)**
99:19;136:11,19;
137:2,5;142:23;
144:14,22,25;145:3,
18;147:16,19;148:2,
7;150:14;151:5;
156:3;157:6;158:3,

20;159:14;160:6,19;
161:10;165:23;167:5,
14;168:8;169:7,13;
170:7;257:23;258:10;
259:5;272:12;288:18;
290:11;291:22;292:5,
10,21
**Petróleo (1)**
21:10
**phase (1)**
83:13
**philosophy (9)**
73:12;74:3,15;
121:12,17;123:24;
125:21;127:12,17
**PHONE (10)**
3:9;106:9;193:16;
194:5;195:25;196:2,
17;202:17;211:5;
276:20
**phrased (1)**
207:19
**physical (1)**
227:22
**physically (1)**
227:4
**pick (2)**
195:24,25
**picking (1)**
193:15
**pictures (1)**
249:2
**pieces (1)**
39:20
**PIMCO (2)**
11:11;19:21
**pivotable (1)**
280:5
**pivotal (1)**
280:6
**place (38)**
60:3,10,22;61:7,20;
62:20;65:18;67:5;
68:6;70:22;81:12;
86:8;103:16;133:7;
172:5,9,21;174:4;
178:12;180:19;184:7;
192:5,12;194:19;
195:4,7,19;196:24;
197:11;227:3;228:15;
229:3,12;232:21,24;
233:3;252:21;265:8
**placed (15)**
122:9,10;211:2,4;
212:3,15,20,22;
226:20,22;227:5,13,
23;233:10;243:13
**places (5)**
198:4,23;199:22;
206:24;230:19
**placing (9)**
58:22;59:7,15;
70:11;203:13;213:4;

228:5,23;287:17
**plaintiff (4)**
63:25;110:22;
285:24;287:25
**plaintiffs (66)**
11:4,12;19:20;20:2,
8;25:4,6,25;26:24;
27:11;28:8,16;29:13;
42:24;43:12,23;44:5,
8;51:13;53:5,9,13,17;
62:18;63:9;65:12;
69:15;72:2,2;75:14,
15;76:3,4,8;77:13,14;
78:3,5,5;110:11,12,
17,18;112:21,21;
113:22,23;114:23;
115:4;116:24;117:17;
118:6,21,25;119:10;
120:5;137:24,24;
152:18,18;154:6,17;
204:14,22;223:5;
285:21
**plaintiffs' (3)**
43:4;56:8,15
**Plans (1)**
25:13
**plant (20)**
151:6;152:2;
160:20;161:4;163:12;
164:9,16;165:4,11,18,
23;167:23;168:8;
169:7,14,25;170:7;
283:4;284:3,17
**plants (1)**
288:11
**plant's (1)**
288:13
**platform (7)**
58:3;225:4,7,8,10,
12,14
**play (6)**
165:3;167:25;
169:14;226:7;290:8,9
**played (9)**
143:5;167:5;168:6,
9,18;169:8;177:2;
213:9;241:25
**plays (2)**
167:20,20
**Plaza (2)**
3:5;10:14
**plea (1)**
186:6
**please (30)**
10:20;12:1;13:6,8,
13,20;14:2,7;19:19;
20:21;21:7;22:19;
24:15;25:11;30:25;
66:9;73:9;74:21;79:3,
16;84:16;130:17;
138:4;178:8;181:7;
185:3;200:12;216:19;
221:13;292:13

**Plotsky (1)**
41:4
**P-L-O-T-S-K-Y (1)**
41:5
**plus (1)**
186:9
**pm (17)**
108:5,10;129:21,
22;130:3,9;177:10,
15;230:8,13;263:13;
278:12,17;285:10,17;
295:9,10
**PMs (1)**
131:4
**point (22)**
13:25;14:6;40:16,
21;97:5;104:18;
122:16;134:10;
146:25;163:19;
165:19;167:2;169:21;
182:9;183:17;245:15;
247:12;248:22;
250:10;252:17;
263:21;269:16
**pointed (1)**
136:25
**points (5)**
73:22;207:7;
267:17;268:13;
280:20
**policies (9)**
47:21;174:14;
178:18;179:7;181:20,
22;293:7,9,10
**policy (8)**
48:14;181:10;
188:3,11,14,16,22;
201:3
**political (5)**
173:9,20;179:21;
242:25;243:3
**poorly (1)**
207:19
**portfolio (107)**
15:2;17:17;66:16;
79:11;80:24;81:3,25;
82:4;83:22;84:4;85:8,
9,11,13,17;86:9;87:7,
8;88:2,10,16,20;89:3,
5,7;91:25;92:10,14,
19,22;93:2,13,16,19,
20,21,22;96:3;106:3;
110:5,7,24;111:2,20;
113:6,11,13,21;114:4,
14,14,16,18,20;
118:11,13;119:7,18,
20,24,25;120:8,13,23;
121:12;126:13;131:2,
24;132:9;133:17;
136:13;138:23;140:4,
12,17;156:9,13;193:3,
8;194:24;210:6;
217:22,24;218:2,9,11,

12,15,16,22;219:10,
15;220:4,25,25;
221:6;231:13,22;
244:14,19;276:6;
277:14,18;279:23;
281:2,12,13
**portfolios (18)**
39:17;71:12;88:21;
89:4;92:16;113:18;
114:22;116:22,23;
117:7,8,13;118:12;
119:15;131:3;156:15;
276:20;278:4
**portfolio's (1)**
92:21
**portion (6)**
23:8;24:12;260:15;
264:24;265:21;
270:22
**portions (1)**
285:14
**Portuguese (3)**
35:12;102:15;
155:16
**position (14)**
33:20,23;34:13;
35:16,20;36:10,12;
37:3,4,6;141:10,12;
207:5;273:24
**positioned (1)**
88:24
**positioning (1)**
79:21
**possession (1)**
23:18
**possibility (1)**
113:19
**possible (2)**
176:23;202:8
**possibly (4)**
16:8;113:16;
206:18,18
**postponed (1)**
264:17
**Postponement (1)**
254:10
**potential (15)**
149:19;186:3,12,
15;187:5,10;203:23;
243:8;254:11;256:12;
259:17,23;260:24;
272:11;276:5
**potentially (6)**
86:22;88:4,6;
101:12;122:19;
178:12
**PowerPoint (1)**
74:23
**powers (1)**
66:18
**PP&E (2)**
167:5,14
**practice (6)**

111:2;113:5,7;
116:13;132:9;184:16
**Practices (4)**
175:4;183:7;290:8;
293:4
**prejudice (1)**
48:20
**preliminary (2)**
231:23;232:8
**premium (1)**
182:8
**preparation (9)**
15:10;16:12;17:15,
24;18:9,18,23;19:5;
43:12
**prepare (2)**
14:14;64:8
**prepared (11)**
23:9;24:3,10;29:4,
14;64:12;133:15,19;
222:17;257:12;
260:22
**preparing (1)**
15:18
**preprogrammed (1)**
202:19
**present (1)**
151:12
**presentation (1)**
74:22
**presentations (1)**
74:23
**President (1)**
242:25
**pressures (1)**
178:14
**pre-trade (1)**
232:3
**pretty (5)**
29:23;62:25;101:7;
158:11;223:2
**prevent (4)**
19:9;172:5,10;
196:12
**preventing (1)**
291:16
**previous (3)**
246:23;247:13,21
**previously (3)**
181:13;234:8;
265:21
**price (43)**
123:20,21,21;
124:3;125:5,13,18;
126:2,22;128:8,13,23;
129:2,8,11;144:16,20,
21,22;145:12;146:5;
149:13;150:3,7;
151:18;178:14;186:2;
193:8;196:3,5,10;
207:7;231:16;232:14,
16,20,20;237:23;
246:9;249:3;288:8;

289:16;290:17
**priced (4)**
149:16;245:18;
246:4,8
**Prices (20)**
121:20;127:16,22,
24;144:16,17;145:20;
146:5;179:12;180:3,
12;193:10;195:16;
232:19;250:9,9,20;
267:11,12;271:20
PricewaterhouseCoopers (3)
258:20;285:4;289:7
**pricing (8)**
250:9;267:4,14;
268:2,3,10;273:24;
274:20
**primarily (7)**
36:21;71:16;84:19;
101:18,23;102:20;
138:23
**primary (3)**
34:4;35:22;37:13
**principal (12)**
192:17,18;197:14,
15,19;198:3,6,9;
199:2,9;215:5;278:3
**principles (4)**
162:13,22;164:25;
166:23
**printed (3)**
166:20;212:12;
221:18
**prior (28)**
34:10;39:21,23,24;
40:3;83:17;95:9;
104:25;105:11,13;
106:22;107:10,13;
109:3,12;131:8,12;
172:3,6,8,22;173:15,
23;174:7;179:22;
187:12;244:5;260:6
**probably (21)**
18:14;26:20;38:17;
40:14;42:11;83:5;
120:18;138:17;139:8;
142:14;144:9;174:24;
193:15;201:11,13;
228:17;253:9;255:11;
264:2;266:9;269:5
**problem (6)**
144:14,22,25;
145:4,12,20
**Procedure (2)**
20:23;21:9
**proceed (2)**
13:2;63:21
**proceeding (1)**
64:13
**process (43)**
17:13,19,20;73:12;
74:3,15,22;75:2,10,
12,21,23;76:2,10,14,

17,23,24,25;77:2,7,8,
9,23;79:6,10,23;80:6,
11,19;84:14,19,21;
85:16;87:12;92:12;
102:17;106:2,6,11;
111:17;142:5;231:9
**produced (5)**
18:19,23,25;19:2;
221:16
**producing (1)**
156:25
**product (18)**
36:14,16,18;37:8,
10,15;38:5;40:2,13;
87:9,17,17,20,23,23,
24;93:11;251:14
**production (1)**
160:4
**products (19)**
36:15,21,23,24;
37:16,17,18,20;38:9,
9,10,11,12;40:25;
41:2,7,9,19;84:10
**professionals (1)**
53:6;55:18;293:13
**profiles (1)**
126:6
**profit (5)**
158:12;160:2;
164:2,12;168:23
**program (7)**
135:22;136:7,11,
16,20;145:13,21
**programs (1)**
146:6
**prohibited (1)**
207:17
**projected (2)**
255:13;271:21
**projections (2)**
151:23;269:8
**prompt (1)**
266:17
**pronouncing (1)**
140:21
**proper (1)**
259:20
**properly (1)**
88:24
**property (20)**
151:6;152:2;
160:20;161:3;163:12;
164:9,16;165:4,11,18,
23;167:23;168:8;
169:7,13,25;170:7;
283:4;284:3,17
**Proposal (1)**
72:11
**prospective (1)**
72:23
**prospectus (9)**
47:22;48:4,7,12,15;
61:13,14;63:5,8

**protracted (1)**
178:13
**provide (3)**
166:24;198:12;
264:13
**provided (4)**
70:5;150:20,20;
240:3
**provides (2)**
84:21;133:23
**provision (1)**
70:3
**provisions (1)**
47:23
**PS (1)**
272:6
**Public (20)**
12:4;82:18;101:9;
122:17;143:18;156:3;
157:6,9;158:3,5,9,20;
159:15,24;160:6,11,
16;164:3;170:5;
178:15
**publicly (7)**
137:9;150:19,22;
157:12;158:17;
163:18;169:4
**publishing (1)**
264:18
**pulls (1)**
45:16
**purchase (19)**
50:2;52:16,20;
53:16;88:18;89:14;
90:24;128:9,23;
129:8;161:15;208:4;
210:14;213:18;217:5;
237:23;289:15;
290:15,23
**purchased (9)**
50:9;125:6,14,23;
152:16;207:21,22;
213:15;288:11
**purchases (8)**
42:15;110:13;
207:7,12;208:12,16;
209:8;222:9
**purchasing (1)**
198:8
**purpose (2)**
192:20;280:19
**purposes (9)**
24:23;26:2;111:14;
112:8;129:15;133:11,
15;161:9;222:17
**pursuant (12)**
20:21;21:8;26:12;
31:12;49:18,23;50:4,
11;66:24;67:3,13;
286:6
**push (2)**
202:18,20
**put (33)**

23:2,20;26:4;28:25;
57:19;68:20;71:10;
78:8;85:20;86:19;
94:17;114:19;119:14;
121:4;129:17;138:3;
152:10;181:6;185:2;
192:2;216:18;221:12;
231:23;236:25;
238:12;242:4;244:24;
262:5;269:20;272:23;
274:25;278:10;
282:12
**Putting (5)**
18:7;23:8,25;29:3;
255:10
**PwC (2)**
280:4,13;281:18

### Q

**Q3 (1)**
136:3
**qualified (1)**
280:15
**qualifying (1)**
201:20
**qualitative (3)**
123:13;124:21;
289:22
**quality (3)**
121:22;200:22;
275:24
**quantitative (6)**
123:13;124:20;
126:24;150:24;
288:24;291:5
**quantity (2)**
196:3;237:23
**quarter (8)**
40:15;243:12;
251:2,10,22,23;
270:16;280:23
**quarterly (3)**
92:8;101:10;122:18
**quasi (3)**
99:17;100:2,4
**questionnaire (1)**
73:2
**quick (1)**
177:7
**quickly (1)**
248:14
**Quinn (4)**
11:8,10;16:4;17:25
**quotations (2)**
194:4;195:16
**quote (1)**
277:20
**quote/unquote (1)**
277:5

### R

**race (1)**
243:3
**raise (1)**
115:25
**raised (1)**
286:2
**raising (1)**
280:11
**ramifications (1)**
209:6
**ran (1)**
272:10
**range (11)**
122:10,22;123:14;
161:20;163:8;255:12;
260:13;261:6,23;
266:22;267:20
**rapid (1)**
260:21
**rates (1)**
84:24
**rather (7)**
15:23;16:4;26:23,
24;149:25;182:2;
229:5
**rating (9)**
82:21;101:12;
122:18;127:4;157:21;
255:8;266:17,18;
289:24
**ratings (6)**
182:7,11;183:4,8,
19;266:18
**ratio (1)**
150:7
**rationale (2)**
246:2;275:21
**ratios (1)**
150:4
**Re (2)**
10:9;186:7
**reach (3)**
193:4,6;231:12
**reached (1)**
292:20
**reaches (1)**
193:12
**reacted (1)**
249:2
**reaction (4)**
266:25;268:18,22;
269:4
**read (11)**
47:11;181:18;
183:4;190:9,13,14;
221:20;224:11;
247:24;250:3;276:21
**reading (8)**
29:11;48:5;49:11;
150:2;187:4;245:16;
248:14;254:20
**readjust (1)**
149:13

**reads (56)**
20:21;21:7;23:4;
25:4;27:10;47:17;
48:20;66:3,14;69:23;
73:10;74:25;79:5,17;
84:16,18;95:19;
97:15;121:19,20;
134:11;135:20;142:3;
144:14;147:6;149:10;
178:10;182:2;183:25;
185:25;189:5;200:15;
214:3,15;217:14;
224:10,22;242:22;
246:13,22;247:7,25;
248:18,24;254:10;
262:23;264:12;
266:14;270:24;
271:19;272:6;273:19;
275:19;276:22;280:4;
281:16
**realize (1)**
254:4
**reallocations (4)**
246:24;247:3,23;
248:4
**really (14)**
38:18;42:20;45:24;
68:11,11;76:6;80:2;
119:17;123:13;
124:17;153:9,12;
189:25;216:4
**re-ask (1)**
207:18
**reason (2)**
219:4;220:18
**reasonable (1)**
243:25
**reasonably (1)**
186:14
**reasons (1)**
200:18
**re-audited (1)**
285:3
**recall (11)**
40:11;141:20;
176:9;252:17;271:7,
11;273:15;276:4,12;
278:5;291:19
**receivables (1)**
165:14
**receive (1)**
64:2
**received (2)**
224:10,19
**recent (3)**
186:2,11;268:11
**Recess (8)**
63:16;108:6;
129:22;177:11;230:9;
263:14;278:13;
285:11
**reclassification (1)**
265:21

**reclassified (1)**
260:16
**recognize (27)**
20:9;26:8;31:5;
46:11,13;51:5;65:2;
69:6;72:15;78:18;
86:18;95:2;132:24;
138:13;178:2;185:12;
210:2;217:3;242:12;
245:9;262:13;270:4;
273:8;275:10;279:4;
280:13;281:18
**recollection (5)**
251:15;252:6;
253:9,10;277:23
**recommendation (6)**
231:18;246:7;
274:11,14,15,18
**recommending (2)**
245:23;275:21
**recommends (1)**
203:21
**record (38)**
10:4,22;11:15;
12:12;13:10;27:3;
46:25;63:15,20;64:5,
12,16;73:14;108:5,
10;111:22,24;118:19;
124:10,11;129:21;
130:9;177:10,15;
230:8,13;233:13;
240:18;263:12,16;
266:23;267:21;
278:12,17;285:10,17,
20;295:9
**recording (1)**
13:4
**recordkeeping (1)**
225:13
**records (19)**
111:16;120:6,12,
20,22;131:14;139:11;
152:21,22;153:14;
162:20;199:6,10;
202:23;203:2;234:21;
236:15;241:8,16
**refer (20)**
16:20;20:15;21:17;
22:8;24:21;25:23;
27:18;28:6,13;74:6;
81:18;121:18;142:2;
191:2;201:23;217:12;
225:21;247:5;248:20;
263:5
**reference (33)**
25:3;74:4;75:9;
115:21;134:17,21;
136:6,24;141:5;
142:15;178:23;180:7;
183:2;189:17;211:16;
212:10;216:11;
223:11,14,16;233:22;
235:8,11,17;236:2,4,

5,16,19;254:19;
267:18;268:18;269:5
**referenced (3)**
122:4;183:20;260:6
**references (3)**
24:18;147:11;
152:12
**referencing (2)**
234:11;236:9
**referred (7)**
83:9;133:21;
142:10,18;144:4;
210:10;234:9
**referring (7)**
76:18;77:7,7;81:2;
201:24;203:11;208:8;
224:20;236:14;238:7
**refers (13)**
81:21;147:14;
183:4;214:18;216:3;
217:16;223:14;225:2;
254:19,21;265:7,8;
268:19
**reflect (17)**
111:16;120:7,20,
23;121:22;124:22;
131:15;139:11;
202:23;211:12;212:8;
221:6;229:4,17;
233:14;262:17;267:6
**reflected (7)**
228:16;233:11;
236:7,20;238:6;
261:23;288:14
**reflecting (1)**
267:13
**reflects (2)**
210:14;222:22
**refrain (1)**
13:8
**regard (1)**
204:6
**regarding (13)**
23:5,22;29:11;38:4;
97:23;98:6,20;
130:24;172:22;174:5,
15;253:18;286:3
**Regardless (2)**
243:15,17
**regards (1)**
273:20
**regular (4)**
158:2;258:5,5;
261:3
**regularly (1)**
148:16
**regulations (4)**
54:18;171:20;
172:2,16
**regulator (1)**
189:8
**regulators (1)**
150:21

**regulatory (1)**
157:12
**reinstatement (2)**
246:23;247:7
**reintroduced (1)**
271:22
**reinvestment (1)**
47:19
**related (12)**
17:13;45:17;69:9;
98:2;102:4;151:11;
173:17;180:16;186:2;
272:8,11,20
**relation (2)**
66:4;223:18
**relations (1)**
184:4
**relationship (3)**
37:23;263:23;264:6
**relationships (2)**
37:25;38:7
**relative (6)**
135:12,17;162:18,
23;267:5;268:3
**release (4)**
249:10;264:21,23;
284:25
**released (4)**
242:23;280:9;
282:5;283:14
**relevant (73)**
24:22;25:21;27:25;
39:3;42:7;71:18,24;
91:12;95:24;96:4,7,
14,17,24;97:21;98:3,
7,21;99:24;104:4,11,
18;109:9,14,21;
110:15;112:22;114:7;
115:7,20;116:18;
117:17,25;118:5,23;
120:5,25;124:25;
125:10;128:5,21;
129:6;131:17;132:2;
148:14;149:2;152:3;
155:11,22;156:2,5,7;
157:7;158:23;159:16;
160:22;162:6,10;
164:14;167:7;168:11;
172:6,24;173:24;
176:8;183:13;184:11,
23;188:2,19;222:24;
286:16;287:3
**relied (5)**
159:11;160:7;
168:25;169:5;283:17
**relocated (2)**
104:6,23
**reluctant (2)**
280:12;281:17
**rely (10)**
159:8;160:10,14;
162:11;163:25;168:2;
285:2;290:25;291:3,5

**remain (5)**
131:9,13;178:11;
280:12;281:17
**remaining (2)**
137:2;153:4
**remains (4)**
131:18;135:23;
178:16;273:20
**remember (1)**
294:7
**remind (1)**
175:13
**repeat (10)**
18:20;43:25;55:5;
113:25;125:8;145:15;
182:24;205:10;234:6;
292:18
**repetitive (1)**
168:22
**rephrase (1)**
251:4
**replacement (4)**
161:13,23,24;163:2
**report (14)**
39:19,22;40:2,20;
41:12;93:13,14,19,22;
155:5;158:10;159:7;
162:13;253:23
**reported (13)**
40:6,24;41:16;
157:11,11;163:18;
255:6;256:12;268:24,
25;283:10;284:4;
289:5
**reporter (5)**
10:15;12:1,20;13:4;
28:10
**Reporting (7)**
10:17,19;93:6,9,24;
184:5;283:21
**reports (13)**
18:14;82:22;93:11;
101:10,13;102:14;
122:19,19;127:3;
154:22;157:22;
159:24;289:24
**represent (11)**
10:21;11:16;78:13;
88:2;121:9;177:21;
181:15;237:11;
238:16;282:16;
287:25
**representative (7)**
20:12;22:15;30:11,
20;31:19;136:17;
251:7
**representatives (2)**
45:2;137:23
**representing (4)**
57:7;63:25;285:21,
23
**represents (3)**
54:12,22;214:6

**reputable (2)**
157:15;168:4
**request (3)**
14:9;72:11;203:25
**Requested (3)**
22:21;28:22;29:6
**required (2)**
166:18;193:6
**requires (1)**
196:19
**research (84)**
14:24;17:13,13;
18:13;75:3;76:24;
77:3,4,8,9,23,24,25;
81:6,9,11,15;82:8,19,
20,23;83:3;84:21;
85:6,15,16,19;86:14,
21;89:20;90:22,25;
91:2,5,8,10,11,16,17,
20;92:3;93:18,19;
97:23;98:2,6,20;99:3;
100:16,23;102:12,15,
17;103:10,17,18,20;
122:8;133:7;134:4;
137:11,13;141:22;
143:10;146:11;
149:24;150:17;
156:14,16,25;157:4;
161:6;172:21;176:23;
184:17,21;185:19;
200:22;231:6;253:23;
255:7;293:2,2,3
**Research/Credit (1)**
87:8
**researcher (1)**
156:11
**researching (4)**
82:6;86:5;101:23;
102:21
**reselling (1)**
192:20
**reservation (1)**
64:10
**reserve (2)**
11:20;286:7
**resources (2)**
73:13;87:4
**respect (27)**
11:21;24:7;29:9;
36:3;48:25;51:12,14,
20,21;53:4,12;56:14;
76:12;77:10;90:4;
92:11;97:9;118:20;
130:18,25;173:15,22;
181:2;198:18;199:8;
235:25;237:18
**respective (3)**
89:9;93:20;241:24
**respond (3)**
95:21;97:17;115:17
**response (5)**
97:15;104:2;
108:17;111:15;

115:22
**responses (5)**
31:17;94:21,23;
95:6;108:14
**responsibilities (8)**
34:5,7;35:23;36:3;
37:14;39:5;44:15;
90:2
**responsibility (8)**
34:23;35:2;39:12,
15;88:7;89:10;101:4;
105:15
**responsible (31)**
37:16;39:16;47:18;
53:15;70:6;87:22,25;
88:23;89:9,12;91:7;
92:15,20,23;97:8;
100:9,24;101:23;
102:21;103:9;113:9;
114:15;118:11;
155:25;156:24;
219:14;220:7;223:19;
229:18;253:17;293:6
**rest (1)**
254:14
**restate (1)**
258:21
**restated (2)**
247:19;284:14
**restatement (16)**
247:8,13,21;
249:19;250:12;
254:11;255:16;256:5,
12;257:10;259:18,23;
260:24;264:20;
269:10;281:21
**restatements (1)**
260:3
**restating (1)**
264:24
**restrictions (7)**
45:20;48:2,3;77:19;
84:3;153:13;232:6
**resulted (1)**
88:12
**results (2)**
92:21;250:12
**resumed (1)**
130:4
**retail (2)**
37:2;271:23
**Retirement (6)**
11:6,17;25:13;
27:16;262:20;288:2
**retract (1)**
213:11
**Return (4)**
21:19,22;22:4;
217:10
**returning (1)**
106:22
**returns (1)**
122:2

**reveal (1)**
186:6
**revenues (1)**
186:10
**review (13)**
18:9;23:12;31:9;
44:17,20,21,24;61:11,
14;88:10;127:3,3;
156:24
**reviewed (10)**
18:8,17,22;19:5;
31:8;43:10;61:15;
95:9;155:12,21
**reviewing (6)**
101:9,14;156:2,20,
23;160:16
**RFP (7)**
72:17,19,20;73:3;
75:18;286:17;287:16
**rhyme (2)**
219:3;220:18
**right (21)**
16:20;20:15;38:18;
87:16;100:4;120:19;
122:15;151:15;
181:25;182:19;
212:24;214:22;224:8;
228:20;229:8;239:10,
18;251:20;256:10;
261:12,13
**right-hand (5)**
214:9;216:11;
217:13;229:7;238:6
**rights (3)**
11:20;64:11;286:7
**rigorous (1)**
83:3
**risk (4)**
92:17;99:20;126:6;
168:22
**Ritter (3)**
15:2;17:14;279:5
**road (1)**
13:2
**Robert (1)**
97:24
**role (44)**
34:19;36:16,18;
37:11,14;39:21,23,24;
40:3,4,13,19,23;
44:13;87:13,17;
88:17,21;89:14;
90:22;92:11;93:16,
17;98:24;99:9;
103:18;143:4;150:18;
167:4,13,21,25;168:6,
7,18;169:8,13,24;
180:24;213:8;226:6;
251:12;287:15,16
**roles (2)**
241:24;287:20
**rough (5)**
153:4,16,17;

232:12;257:6
**Roughly (1)**
270:17
**Rule (3)**
20:2;31:3;286:6
**rules (7)**
12:25;20:22,22;
21:8,9;173:8,20
**Rumors (16)**
142:5,10,17,22,25;
143:3,4,13,22;144:3,
7,11,11;186:5;187:7,7
**run (5)**
57:5;147:21;232:2;
271:19;272:16,18
**Ryan (2)**
11:8;15:5

## S

**SA (1)**
21:10
**Sachs (3)**
202:20,21,24
**sale (7)**
207:10,11;208:3,
10,13,15,22
**sales (9)**
42:15;58:7,8,11,17;
59:19,22;200:22;
222:9
**same (104)**
12:21;28:23;37:4;
55:10,17;56:3,17;
57:14;75:11;76:14,
16;77:5,25;98:9;
104:15;123:2,8,19;
124:5;125:7,15;
126:3,14;127:10,25;
128:10,24;129:15;
144:13;145:22;154:3,
5,9,19;160:9,23;
161:16;162:9,21;
163:16;164:19;166:7;
167:8,18;168:13,19;
171:22;172:25;
175:11,20;176:13,21;
180:5,14;181:4;
183:9,21;184:14;
186:24;190:7,21;
191:15;204:21;
205:21;206:7,16;
207:2,6,23,23,25;
208:5,12,13,14,18;
209:4,9,11;210:20;
216:13;219:9;223:4;
228:3;233:12;239:17;
243:23;244:8;256:8,
21;257:25;268:5,21;
269:13;271:23;274:9;
277:21;284:19;292:8,
16,23;293:4;294:12;
295:2

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL

STEVEN SARUWATARI 30(b)(6)
April 13, 2016

**Sample (4)**
72:10,20,21;73:6
**Sao (18)**
58:7,11,21;59:5,13,
21;60:2;90:18;140:5,
12,24;141:9;156:19,
20;185:21,22;244:12;
262:25
**Saruwatari (327)**
10:8;12:9,13;13:1;
14:1,13;15:1;16:1;
17:1;18:1;19:1;20:1,
5;21:1;22:1;23:1,19;
24:1;25:1;26:1;27:1;
28:1;29:1;30:1;31:1,
4,5,22;32:1;33:1;
34:1;35:1;36:1;37:1;
38:1;39:1;40:1;41:1;
42:1;43:1;44:1;45:1;
46:1,11;47:1;48:1;
49:1;50:1;51:1;52:1;
53:1;54:1;55:1;56:1;
57:1;58:1;59:1;60:1;
61:1;62:1;63:1,19;
64:1;65:1,2;66:1;
67:1;68:1;69:1;70:1;
71:1,11;72:1,15;73:1;
74:1;75:1;76:1;77:1;
78:1,18;79:1;80:1;
81:1;82:1;83:1;84:1;
85:1;86:1;87:1;88:1;
89:1;90:1;91:1;92:1;
93:1;94:1;95:1,2;
96:1;97:1;98:1;99:1;
100:1;101:1;102:1;
103:1;104:1;105:1;
106:1;107:1;108:1,9,
12;109:1;110:1;
111:1;112:1;113:1;
114:1;115:1;116:1;
117:1;118:1;119:1;
120:1;121:1,14;
122:1;123:1;124:1;
125:1;126:1;127:1;
128:1;129:1;130:1,8,
12;131:1;132:1,24;
133:1;134:1;135:1;
136:1;137:1;138:1,
13;139:1;140:1;
141:1;142:1;143:1;
144:1;145:1;146:1;
147:1;148:1;149:1;
150:1;151:1;152:1;
153:1;154:1;155:1;
156:1;157:1;158:1;
159:1;160:1;161:1;
162:1,5;163:1;164:1,
5;165:1;166:1;167:1;
168:1;169:1;170:1;
171:1;172:1;173:1;
174:1;175:1;176:1;
177:1,14,18;178:1;
179:1;180:1;181:1,

12;182:1;183:1;
184:1;185:1,12;
186:1;187:1;188:1;
189:1;190:1;191:1;
192:1;193:1;194:1;
195:1;196:1;197:1;
198:1;199:1;200:1;
201:1;202:1;203:1;
204:1;205:1;206:1;
207:1;208:1;209:1;
210:1,2;211:1;212:1;
213:1;214:1;215:1;
216:1;217:1,3;218:1;
219:1;220:1;221:1;
222:1;223:1;224:1;
225:1;226:1;227:1;
228:1;229:1;230:1,
12,15;231:1;232:1;
233:1;234:1;235:1;
236:1;237:1;238:1;
239:1;240:1;241:1;
242:1;243:1;244:1;
245:1;246:1;247:1;
248:1;249:1;250:1,
24;251:1,8;252:1;
253:1;254:1;255:1;
256:1;257:1;258:1;
259:1;260:1;261:1;
262:1;263:1,18;
264:1;265:1;266:1;
267:1;268:1;269:1;
270:1;271:1;272:1,
24;273:1;274:1;
275:1,2;276:1;277:1;
278:1,16,24;279:1;
280:1;281:1;282:1,
13;283:1;284:1;
285:1;286:1,11;
287:1,14;288:1;
289:1;290:1;291:1,
15;292:1;293:1;
294:1;295:1
**saw (3)**
113:17;176:5;
251:25
**saying (10)**
49:13;52:18;82:19;
101:11;135:13;
190:18;191:16,23;
261:13;269:3
**scandal (16)**
186:7,21;188:10;
242:14,24;243:8,13,
18,21;244:6;257:4;
261:10,15;269:2;
271:2,9
**scenario (5)**
147:7;149:12;
198:2;228:13;271:22
**scenarios (4)**
228:9;272:6,16,18
**scheme (13)**
252:3,19;255:20;

256:7,20;257:24;
258:12;259:6;291:23;
292:6,11,22;293:18
**science (1)**
32:5
**scope (30)**
55:4;57:17;74:8;
79:25;122:6;136:22;
153:10,21;154:20;
170:24;171:14;
172:12;175:6;176:14;
179:15;182:14;
189:22;205:9;207:2,
14;249:13;250:16;
255:24;262:4;267:8;
281:24;283:12;
284:11;292:2;294:6
**SEC (3)**
157:11;201:16;
283:22
**second (35)**
23:3,20;24:7;29:2,
10,16;40:15;53:25;
91:18;147:4;149:8;
178:10;183:24;
185:25;203:18;
228:20;237:9,12,20;
238:18,21;241:21;
245:19;246:20,21;
247:24;248:22;260:9;
263:13;264:11;
270:19,24;271:22;
273:18;280:4
**secondary (4)**
195:22,23,24;
230:21
**section (15)**
24:8;29:2,3;46:24;
47:8,17;48:5,17;49:7;
66:12;67:3;69:20;
80:25;183:3;218:3
**Sector (5)**
79:19,22;80:8;85:3;
132:10
**secured (1)**
165:10
**Securities (186)**
10:9;17:7;42:16;
45:20;50:2,9,12,25;
51:17,23;52:16,21;
53:3,8,16;56:2,9,16;
59:7,15;60:4,22;61:8,
21;62:6,12,20;67:6;
71:7;75:25;76:13;
77:21;78:2,22;80:24;
84:20,23,25;85:3;
95:17,23;96:24;
97:13,21,24;98:2,6,
17,21;100:11,24;
103:10;104:25;
105:17,25;106:14,25;
107:15;108:20,25;
109:5,8,11,23;110:4,

14;111:5,11;112:4,15,
19;114:7;115:7,19;
117:18,25;118:5,23;
120:4,24;121:20,25;
122:7,8;124:7;125:3,
5,12,23,25;126:2;
127:14;128:5,7,20;
129:5,11;131:8,16;
132:2,18;133:3;
135:6;143:10;146:4;
153:6,18;154:2,8,14,
18;155:2;158:2,7,22;
160:8,22;161:10;
162:4;163:14;164:11;
165:25;167:6,16;
168:10;169:10;170:9;
172:23;173:5,16,23;
179:12;180:4;181:3;
192:6,12,20,24;194:5,
19;195:5,8,19;
196:25;197:11;198:5,
8;199:14,23;200:5;
203:13;205:14,18;
206:12;208:23,25;
209:3,8;211:3,8;
213:14,19;215:6;
217:20;222:10,24;
226:20;227:24;
228:11;229:13;
230:20,23;241:22;
249:16,17;250:23;
261:18;268:14;276:7;
278:3;287:18;288:19;
289:19;290:5,16,19
**securities' (1)**
291:9
**security (38)**
80:13,16;82:10,16;
83:13;85:23;87:15,
19;88:19;89:14;
90:24;92:13;101:7;
106:4;110:6;122:10,
11,14,25;123:5,15,18;
124:2,4,13;125:14;
126:12;127:8;197:25,
25;198:13;200:3;
201:21;205:6;207:6;
208:12;252:24;288:7
**security-by-security (1)**
289:19
**seeing (2)**
161:2;290:2
**seek (2)**
73:11;122:22
**seeking (4)**
124:7;125:16;
127:13;129:10
**seeks (3)**
123:24;182:7;
200:17
**seem (2)**
266:24;267:22
**seems (1)**

245:20
**segregates (1)**
209:8
**Select (1)**
27:20
**selected (1)**
200:17
**selecting (2)**
83:17;200:16
**selection (5)**
79:20;83:13;84:17,
18;201:3
**selects (1)**
85:4
**self-explanatory (1)**
81:20
**sell (12)**
95:16;98:16;
108:19;112:14;169:3;
189:10;190:12;
197:24;205:5,14;
208:24;209:3
**seller (4)**
198:14,16,21;
199:16
**selling (5)**
97:11,12;198:19;
208:23;215:5
**sell-off (3)**
249:15,17;250:23
**send (3)**
73:6;74:22;275:20
**sender (1)**
140:14
**sending (1)**
133:12
**senior (12)**
14:24;17:11;34:15;
91:16;290:25;293:5,
12,20,24;294:2,9,25
**sense (3)**
153:16;266:24;
267:22
**sent (7)**
72:23;134:6;
224:11,15,19;279:12;
281:12
**sentence (3)**
191:3;200:14;
247:24
**sentences (2)**
149:10,23
**separate (42)**
25:6,25;26:24;29:2;
42:23;43:3,11;51:12;
53:13,17;56:15;
61:25;62:18;63:9;
65:12,16;71:25;
75:13;76:3,7;77:14;
78:4;87:7;110:11,16,
21;112:3,20;113:22;
114:22;115:3;118:21,
24;119:9;120:5;

137:23;152:17;154:6,
16;204:14;223:4;
249:18
**separately (2)**
15:14,16
**September (9)**
92:8;94:6;207:22;
208:3;242:13;243:20;
252:4,5,15
**series (1)**
224:23
**serve (1)**
41:23
**served (4)**
25:19;27:23;96:16;
286:17
**serves (2)**
54:25;55:8
**service (14)**
37:24;39:9;40:5,8;
59:18,19,22;87:21;
93:12;264:5;279:16;
286:19,21;287:15
**services (2)**
66:15;67:10
**servicing (1)**
39:13
**session (1)**
178:3
**set (7)**
23:10;24:5;47:21;
48:3,15;144:17;
232:14
**settle (1)**
224:7
**Settlement (7)**
213:23;214:3,11;
216:8;224:3,4;234:9
**seven (3)**
97:7;221:3;278:15
**Several (1)**
33:11
**shall (5)**
47:18,25;48:22;
70:5,7
**share (4)**
146:17;249:3;
260:22;292:13
**shared (3)**
256:16;259:17,21
**shares (2)**
71:21;149:11
**sharing (2)**
146:15;281:2
**sheet (17)**
89:25;135:23;
137:2,5;158:12;
159:4;161:5,22;
164:2;165:13,14,16;
166:16;168:23;
198:20;253:23;
282:25
**shop (1)**

124:14
**short (2)**
63:13;97:11
**shorthand (1)**
27:18
**short-term (1)**
136:2
**show (14)**
93:9;111:24;
132:20;177:18;
209:18;221:14;237:3;
242:5;245:2;262:6;
269:21;272:25;275:2;
278:24
**showing (1)**
181:12
**shows (2)**
271:3,21
**shuttling (4)**
104:21;105:6,8;
107:5
**side (28)**
26:5;57:19;68:20;
71:10;78:9;85:21;
94:17;121:4;129:18;
138:3;152:11;161:5;
181:7;185:2;192:3;
216:18;221:12;
223:10;237:2;238:12;
242:4;244:25;262:5;
269:20;272:23;
274:25;278:10;
282:12
**Siemens (2)**
271:5,14
**Sign (1)**
280:4
**signed (1)**
61:2
**significance (2)**
220:24;223:18
**significant (1)**
264:14
**signifies (4)**
210:19;214:11;
218:4;224:13
**signify (2)**
219:12;220:5
**Signori (2)**
262:14;263:6
**similar (7)**
17:3,18;35:24;
74:23;217:5;233:16;
276:12
**similarly (4)**
53:5,13;70:10;
118:20
**simple (2)**
198:2;260:8
**simply (2)**
212:4;257:10
**simulation (1)**
271:25

**simulations (3)**
271:19;272:3,10
**Sing (1)**
270:5
**Singapore (20)**
58:6,11,21;59:5,13,
20;60:2,14,14;90:19;
104:6,19,22;105:3,12,
14;107:6,11;201:13;
206:2
**single (4)**
77:20;84:11;133:9;
161:19
**sits (1)**
228:4
**sitting (2)**
227:18;251:7
**situated (2)**
195:12;200:6
**situation (3)**
258:5;273:20;
277:24
**six (4)**
22:19;74:19;95:13;
230:10
**sixth (1)**
254:9
**size (1)**
232:12
**skeptical (1)**
261:14
**skepticism (1)**
280:11
**slide (3)**
93:8;257:17,19
**slightly (1)**
254:4
**slowdown (1)**
186:8
**small (2)**
36:20;254:4
**Social (2)**
181:9;182:17
**sold (3)**
129:12;207:24;
250:20
**sole (4)**
96:15;256:25;
258:7;260:18
**solely (2)**
142:25;143:3
**somebody (2)**
194:23;226:10
**somehow (1)**
250:8
**someone (6)**
50:23;90:9;98:19;
194:12;206:4;226:14
**sometime (2)**
243:11;283:15
**Sometimes (4)**
15:15;143:23;
198:19;273:15

**somewhere (1)**
243:13
**sorry (27)**
18:20;23:14,19;
28:4,10,12;35:6,17;
39:20;40:7;58:16;
98:9;103:5;104:8;
114:9;125:8;148:4;
195:3;197:8;200:11;
205:10;221:2;225:25;
231:3;237:25;263:10;
279:2
**sort (20)**
80:3,5;81:21;84:12;
91:24;100:4;102:12;
126:25;133:6;137:17;
149:10;163:6;200:2;
209:10;231:22;232:8,
10;233:12;285:2,14
**sounding (1)**
168:22
**source (5)**
82:22;142:7;
157:10,16,17
**sources (2)**
143:23;178:10
**Southern (1)**
32:2
**sovereign (21)**
99:18;100:2,4;
134:14,22,24;135:8;
173:6;245:20;266:17,
22;267:5,16,20;268:4,
12,15,16;274:2,13,22
**space (1)**
14:23
**speak (7)**
13:12;14:17;15:9;
35:12;194:23;196:2;
288:25
**speaking (20)**
44:18;45:22;62:9;
74:13;81:14;111:10;
120:19;127:11,14;
128:2;158:9;161:17;
195:11;196:20;
199:24;202:16;
230:18,20;251:21;
276:18
**specialist (8)**
37:8,10,15;38:6;
40:2,13;132:10;
251:14
**specific (38)**
38:3;45:20;72:19;
75:18;76:12;79:11;
80:13,13,16,20;84:7;
90:13;152:20;158:5;
160:5;164:6;165:24;
167:3;173:13;178:6;
180:24;184:15;
193:21;208:9;209:15;
210:13;226:6,14;

228:24;234:12;
240:18,24;241:6,9;
243:15,17;244:2;
278:3
**specifically (26)**
16:17;31:17;32:20;
59:2,13;65:6,24;
66:12;69:9;73:5;
86:23;99:5,8;149:9;
170:6;173:3,17;
180:15;184:23;210:5;
239:3;246:21;254:5;
270:23;278:9;281:9
**specifics (1)**
276:17
**specified (1)**
204:24
**specify (2)**
16:6;234:23
**speech (1)**
167:17
**spelled (1)**
41:11
**spelling (1)**
286:22
**spells (1)**
74:10
**spent (4)**
15:18;40:4;164:8;
221:4
**Spicers (5)**
33:16,18,19;34:5,
11
**spoke (6)**
14:15;15:5,7;16:7;
17:12,18
**spotlight (1)**
142:4
**spread (7)**
182:8;245:19;
264:14;266:21;
267:16,19;268:14
**spreadsheet (15)**
221:19,22;222:2,7,
8,11,15,22;223:11;
229:4,8,17;236:6,12;
241:21
**spreadsheets (1)**
18:15
**SRS (1)**
262:24;263:6
**stability (1)**
200:23
**staff (1)**
52:11
**stage (12)**
80:10,18;187:5;
247:18;250:6;252:11;
255:13;257:4;258:17;
261:9,15;282:3
**stamp (31)**
48:19;54:3;64:19;
66:11;69:20;72:9;

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL

STEVEN SARUWATARI 30(b)(6)
April 13, 2016

73:9;74:5,19;78:13;
86:12,25;132:22;
138:7,8;141:16;
147:4;177:20;185:6;
209:21;216:22;
221:17;238:15;242:7;
246:20;254:6;262:8;
271:17;273:3;279:2;
280:2
**Stamped (27)**
46:9;64:22;68:23;
69:3;72:11;86:15;
94:2;121:8;132:18;
138:10,15;181:14;
185:9;209:23;216:24;
221:22;237:4;242:10;
245:7;262:11;269:24;
270:2,20;273:5;
275:7;278:20;282:15
**stand-alone (1)**
266:15
**standard (2)**
134:3;210:18
**standpoint (5)**
189:15,19;190:16;
191:8,13
**stands (5)**
45:7;52:2;225:3;
256:9;279:10
**Stanley (14)**
86:14,20;229:16,
18,21,24;230:3;
233:24;234:10,24;
240:14,25;241:2,10
**start (8)**
62:2;80:17;87:16;
118:18;138:14;
212:18;219:25;
251:25
**started (9)**
11:13;102:7;
188:10;219:21,22;
220:9,12,13,16
**starting (3)**
163:19;165:19;
167:2
**starts (4)**
217:23;218:7;
219:5;221:3
**state (18)**
10:21;11:7,14,17;
12:11,16;27:16;64:4;
212:25;213:12,15,19;
245:21;259:25;
262:19;285:19,25;
288:2
**stated (8)**
13:21;47:20;48:14;
64:11;163:5;164:3;
259:16;285:20
**statement (28)**
62:13;63:22;112:7;
126:9;135:16;137:16;

145:2;147:24;148:12,
19;150:25;158:12;
159:5;166:16;171:25;
174:22;180:21;
181:10;187:22;190:2,
5,24;191:18;248:5;
249:15;264:23;
283:16;284:25
**statements (39)**
158:14;159:6;
160:2,6;166:18;
170:5;187:23;246:25;
247:5,14,22;248:2,11;
249:10,20,24;250:2,7,
19,22;256:6,20;
257:24;258:11;259:6;
260:15;261:22;
264:18;265:14,20;
272:13;280:3,5,10;
282:4;283:18;288:16;
289:5;291:4
**States (8)**
54:20;61:7,20;62:6,
20;202:12;217:21;
260:3
**statistics (1)**
160:25
**Statoil (4)**
175:10,18;271:5,14
**Status (2)**
224:9,10
**steady (1)**
149:14
**STEEN (2)**
3:3;10:12
**step (5)**
90:9;230:25;231:4,
11;233:2
**Steve (1)**
31:3
**Steven (8)**
10:8;12:13;63:18;
108:8;130:7;177:13;
230:11;278:15
**still (11)**
37:4;41:7;103:12,
24;106:20;152:25;
154:13;176:12,16;
232:21;266:11
**stored (1)**
23:17
**straight (3)**
134:13,22,24
**Strategic (6)**
27:20;84:4;142:6,
11;147:23;148:17
**strategies (19)**
38:13,15;76:15,15,
17;79:18;80:9;88:3,7,
12;89:11;110:3,23;
117:9,10;119:5,16;
126:5;155:5
**strategy (42)**

16:13;17:4,20;
38:21,22,24;39:2,12;
75:18,20,22;76:6,10;
79:5,10;80:2;81:13,
14;84:7;92:16;
110:25;113:6,10,13,
21;114:4,14,21,25;
116:9,23;118:10,13;
119:8,15,19,20;135:2;
138:20;154:22,24;
274:5
**stream (1)**
151:11
**Street (6)**
89:21;212:25;
213:12,16,20;255:8
**strength (1)**
200:21
**strict (1)**
100:3
**strike (1)**
129:14
**strong (7)**
111:9;135:24;
137:3;147:24;172:16,
17;184:4
**stuff (1)**
268:23
**style (6)**
73:14,25;74:2,6,10,
17
**Subadvisor (5)**
69:7,23,25;70:4,5
**Subadvisory (1)**
69:2
**subheading (1)**
178:9
**Subinvestment (6)**
46:8;47:17,25;
48:22;49:23;54:6
**subject (17)**
42:16;43:2;48:6;
49:6;64:9,10;70:19;
95:19;97:15;140:19;
189:11,13;191:4,7,19,
21;242:14
**subjective (3)**
123:7,10;127:2
**subjects (2)**
15:21;30:10
**Subpoena (3)**
19:15;26:11;286:4
**subscribe (1)**
230:22
**subsection (1)**
23:25
**subsector (2)**
79:19;83:13
**subsequently (2)**
164:23;285:3
**substantial (2)**
245:17;246:3
**substantially (1)**

28:22
**Sucharow (2)**
11:6;63:25
**suffered (1)**
249:5
**suggest (1)**
212:21
**suggested (1)**
276:24
**suggesting (1)**
280:15
**summaries (1)**
134:6
**summarized (6)**
82:14;132:17;
133:2,4,11;282:10
**summarizes (2)**
45:3;246:16
**summary (9)**
45:17,19;73:19;
133:7,21;245:15;
280:19;281:4,7
**superior (1)**
121:25
**supplement (3)**
130:14;146:19,20
**Supplemental (1)**
69:21
**support (5)**
37:17;38:6;78:2;
87:24;93:17
**supporting (1)**
37:19
**suppose (2)**
196:16;233:8
**supposed (1)**
264:21
**supposition (2)**
229:23;234:2
**Sure (38)**
13:7;16:9;20:18;
31:7,10;52:8,9,11;
53:22;56:4,11,18;
93:14;99:7,8;108:22;
146:25;165:9;173:3;
174:13;191:22;193:5;
198:14;199:4;208:7;
209:12;211:23;
220:11,17;224:5;
234:7;247:20;269:14,
19;280:22;287:11;
292:17;295:3
**surrounding (4)**
76:25;77:3,23;
211:17
**Susan (2)**
262:14;263:6
**suspect (1)**
239:16
**swear (1)**
12:1
**SWIFT (3)**
224:10,11,14

**sworn (1)**
12:3
**symbol (1)**
228:18
**System (20)**
11:7,17;27:16;
44:25;45:5,10;
124:10;211:21;
212:12;221:7;224:3,
4,14;225:13;226:14,
16;232:2,3;262:20;
288:2
**systematically (1)**
124:11
**systems (9)**
202:17;225:5;
232:11;235:18,25;
236:14;238:10;
239:17;240:18

## T

**table (1)**
135:25
**talk (9)**
89:21;130:19;
195:23;196:2,17;
198:2;213:6;232:20,
20
**talked (6)**
38:8;152:12;
173:18;192:4;195:14;
228:9
**talking (26)**
29:16,21;47:5,12,
15;57:20;76:21;77:6;
109:17;110:9,10;
111:23;130:21;
144:10;149:24;150:3,
9;151:21,23;171:23;
195:21;201:16,18;
251:19;280:19;
289:25
**tangible (1)**
23:17
**tape (9)**
10:3;63:17;108:2,7;
130:6;177:6,12;
130:10;278:14
**tariffs (1)**
178:15
**tax (1)**
271:23
**Teachers' (1)**
262:20
**team (90)**
14:25;15:3;34:16;
36:14,17,18;39:9,10,
10,11,14;52:25;75:2;
77:24,25;85:4;86:4,7;
87:9,17,18,21,22;
88:3;89:8,10,12,18;
91:8,15,19;92:4;

93:11,11;96:8,10,11,
12;99:2;100:13;
101:3,5,25;102:3,4,5,
17,19;103:3,8,15,20;
106:7,9;107:21;
116:12;134:13;141:9,
24;146:12;161:6;
231:5,8;244:19;
256:13;259:17,21;
260:22;263:2;266:9,
11,12;268:8;279:6,9,
12,16;281:3,9;282:9;
286:17,21;287:16;
291:2;293:5,17,21,24;
294:3,10

**team-based (1)**
86:3

**teams (1)**
38:25

**telephone (2)**
196:11;233:4

**telling (4)**
117:21;143:20;
211:20;256:15

**tells (1)**
212:20

**template (2)**
134:9;210:24

**ten (8)**
18:4;25:3;74:20;
94:5,5,8,13;169:20

**tend (1)**
73:19

**tenth (1)**
229:7

**term (7)**
38:12,18;66:3;81:9;
100:5;122:12;243:12

**terminology (4)**
59:18;81:13;
115:11;147:16

**terms (4)**
65:20;80:6;81:5;
144:11

**testified (13)**
12:4;57:8;65:16;
67:13;130:5;131:5;
169:6;170:16;233:25;
235:16;288:4;290:6;
291:15

**testify (9)**
23:10,15;24:3,10;
29:4,14;31:14;
117:15;168:17

**testifying (4)**
12:22;20:12;22:15;
26:13

**testimony (23)**
19:10,15;26:11;
108:23;109:2;112:17;
114:2;116:15;130:13;
152:6;159:18;167:12;
168:21;170:4;187:13;

210:10;216:13;236:9;
250:17;284:8;286:5;
291:19;294:9

**Theodore (1)**
21:11

**therefore (3)**
119:22;165:3;
188:13

**there's- (2)**
219:3;252:24

**thinking (1)**
281:5

**third (8)**
46:24;135:19;
183:24;185:24;
197:24;279:25

**thorough (1)**
74:21

**though (4)**
39:17;89:24;
156:13;209:3

**thought (1)**
107:4

**three (24)**
15:12;18:6;20:20,
24;21:6,20;35:8,9;
46:24;47:8,9,12,14;
69:19;96:21;108:8;
166:17;178:7;184:2;
220:16,23;248:17;
249:6;264:18

**three-letter (1)**
228:18

**Throughout (5)**
39:3;104:4,11;
112:8;149:2

**Thursday (1)**
248:24

**ticket (21)**
68:14;200:2;203:5,
5;211:9,20;212:5;
217:4;218:24,25;
219:8;220:5;221:2;
226:9,13,15;228:7;
233:17;234:20;
236:13

**tickets (5)**
18:13;120:14;
216:7;233:12,19

**tilt (2)**
178:17;179:6

**timeliness (1)**
286:3

**times (13)**
15:15;48:2;166:3;
167:9;168:14;169:20;
171:16;194:12;
198:20;207:4;209:5,
9;264:19

**title (2)**
93:14;286:15

**Today (30)**
10:5,15;13:3,25;

14:6;16:21;19:10;
20:12,16;21:23;
22:15;24:21;25:24;
26:13;28:7,13;30:3,6,
9;64:13;153:4;
154:14,25;210:11;
222:12;238:25;
242:19;251:7;270:10;
285:2

**today's (5)**
14:14;22:10;43:12;
95:10;295:8

**together (8)**
15:14,15;21:12;
22:12;86:20;102:18;
105:24;231:23

**Tokyo (11)**
40:4;58:15,16,17,
21;59:5,14,21;60:2;
221:4;228:15

**told (1)**
289:6

**took (5)**
40:12,19;65:15;
103:16;165:22

**top (10)**
79:17;82:15;94:4,5,
8,13;217:13;245:14;
273:8;283:21

**top-down (6)**
75:4;81:6,17,20;
82:9;83:23

**topic (8)**
24:2,8,12,15;29:10,
14;45:25;230:16

**topics (11)**
15:22;16:8,10,23,
25;17:3,10,14;42:9;
73:23;284:11

**total (9)**
15:17;21:18;176:3;
246:22;247:21;
254:13;260:9;271:5,
287:17

**towards (4)**
79:4;178:18;179:6;
213:22

**track (2)**
73:14;208:2

**tracking (1)**
209:10

**Trade (87)**
18:13;58:22;60:10,
15,18;61:16;62:12;
63:3;67:15,23;68:13,
18;72:5;90:12;92:24;
106:4;111:24,24,25;
112:3,4;116:13;
120:14,16,17,20;
129:11;194:14;
195:20;197:22;200:2;
202:14;203:4,5,9;
205:25;206:2,10;

209:22;210:3,9,20;
211:9,17,20;212:3,4,
11,16,23;215:5;216:6,
23;217:4;218:24,25;
219:8;220:4,7;221:2;
223:20;225:9,15;
226:9,11,13,13,15,24,
25;227:10;228:6,15,
23;229:3,19;233:12,
17,19;234:20;236:13;
237:23,23;238:3,7;
239:11;241:21

**traded (4)**
68:16;111:7;
150:22;157:13

**trader (23)**
17:16;90:7;193:2,4,
9,12;194:13,25;
195:12;199:5;200:5,
6;201:22,25;202:10;
206:10;213:4;226:11;
227:17,21,22;228:4,
25

**Traders (23)**
87:8;89:13,16,19;
90:6,16,18;93:18,19;
112:7;192:5,23;
193:24;194:14,18;
195:4,15;196:21,24;
197:10,12;202:4;
232:24

**trades (44)**
39:18;61:21;62:6,
20;65:19;68:6;70:11,
22;89:17;90:5,10;
93:3;104:24;105:3,
24;106:14,24;107:15,
23;112:10;113:9;
192:6,12,24;194:5,19;
195:5,8;196:22;
200:24;206:24;
214:13;223:2;224:24;
226:4,6,8;227:18;
228:11;234:25;
235:25;237:18;239:5;
287:17

**trading (49)**
17:19,19;95:22;
96:22;97:20;105:16;
108:24;109:4,8,11,22,
25;110:7,19;111:19;
112:18;113:12,20;
114:6;115:6,12,19,22;
116:17;117:15;118:4,
22;120:3,12,22;
130:23;131:7,16,23,
25;132:14;149:17;
192:17,18;200:20;
203:24;205:6,15;
225:3,6,12,14;239:25;
241:16

**transact (2)**
196:4;206:5

**transacted (2)**
203:8,15;215:13,16

**transacting (4)**
197:4;200:7;202:2;
206:22

**transaction (25)**
23:4,21;29:11;
197:20;199:9,14,17;
202:25;205:5,13;
206:13;211:8,15,22;
213:4,9;215:3,5,10;
216:16;223:16;
234:14;240:20;
241:11,25

**transactions (13)**
23:5,22;29:12;71:7;
205:19;215:12,19;
222:23;225:19;
233:10,15;234:4;
235:20

**Transamerica (2)**
11:4;285:22

**transcript (2)**
182:19;285:13

**transferred (1)**
286:20

**transition (3)**
105:10;106:18,19

**traveling (1)**
194:15

**tried (1)**
220:3

**triggered (1)**
253:11

**trouble (2)**
147:21;148:22

**TRU (1)**
21:19

**true (9)**
126:9;143:17,21;
157:14;159:11;168:2;
283:24;288:13;291:3

**Trust (3)**
25:14,15;27:19

**trustees (1)**
41:24

**Truth (2)**
280:3;291:2

**try (5)**
59:11;87:11;
122:21;142:24;143:2

**trying (18)**
48:13;52:9;62:14;
80:5;83:21;84:3;
116:3,4;163:7,22;
171:5;197:24;201:19;
248:11;253:4;258:4;
261:16;282:2

**Tuesday (1)**
262:14

**turn (31)**
20:6,19;21:3,6;
22:18;24:14,25;

25:10;26:6;28:18;
53:20;66:9;69:18;
73:7;74:18;79:2,15;
83:8;84:15;93:25;
95:12;108:13;135:18;
141:15;147:3;149:5;
183:23;185:23;200:9;
253:20;270:18
**Turning (8)**
17:24;27:7;35:14;
47:8;88:16;90:21;
92:10;233:18
**TV (1)**
242:23
**twenty (1)**
293:23
**twenty-seven (1)**
283:5
**two (41)**
20:20,24;21:6;26:4;
27:9,10;28:15;39:20;
47:3,13;53:24;63:17;
97:6;98:18;104:2;
117:4;120:18;146:6;
149:9,23;172:17;
219:10,16,17,20,25;
220:13,23;222:5;
233:19;241:24;249:4;
254:5,13;260:10;
271:19;272:2,18;
275:14;283:5;287:8
**type (10)**
45:15;67:12,20;
77:22;141:22;173:14,
21;211:11;216:6;
233:13
**types (1)**
131:2
**Typical (5)**
34:7;51:8,11;
141:21;202:17
**typically (12)**
38:22;51:6;60:25;
73:2,18;91:2,4;92:18;
196:7;197:4;200:8;
206:20

**U**

**UCLA (2)**
32:3,9
**uh-uh (1)**
13:9
**UK (1)**
54:11
**ultimate (8)**
86:8;87:14,18;
88:17;90:23;105:16;
249:19;250:12
**ultimately (4)**
92:15,23;252:3;
284:14
**unaudited (1)**

264:21
**uncertain (1)**
261:10
**uncertainties (1)**
249:11
**uncertainty (2)**
249:25;250:19
**Unconstrained (2)**
21:19;38:24
**uncover (4)**
291:23;292:6,11,21
**under (26)**
22:23;25:3;28:21;
42:3;56:25;66:2,5,18;
68:3;70:2;87:3;91:10;
122:17;132:11;
135:19;162:21;
174:15;178:9;239:6;
240:13;254:9;262:22;
270:22;271:18;
282:24;283:3
**undergone (1)**
92:4
**Undergraduate (1)**
31:25
**underlying (2)**
84:24;237:17
**underneath (1)**
245:16
**understood (8)**
14:4;50:20;83:8;
152:23;159:13;
198:22;244:24;
247:13
**undertake (1)**
172:20
**undertook (4)**
17:25;183:12;
184:12,22
**undervalued (2)**
84:20;121:24
**underwriter (1)**
11:2
**underwriters (3)**
232:14;233:6,7
**undue (1)**
280:11
**unfamiliar (1)**
208:21
**Unfortunately (1)**
275:22
**unique (1)**
203:22
**uniquely (1)**
77:20
**United (7)**
54:20;61:7,20;62:6,
20;202:12;217:20
**universe (4)**
99:12;100:15;
171:6;175:24
**University (1)**
32:2

unknown (1)
294:9
**unless (3)**
13:21;30:16;31:16
**unpopular (4)**
178:21;180:8,18,19
**unqualified (1)**
283:23
**untimely (1)**
64:6
**untrue (1)**
174:24
**unwinding (1)**
178:15
**up (16)**
45:16;82:15;96:10,
13;101:18;102:14;
132:12;136:14;
193:15;195:25,25;
207:5;208:10;212:24;
235:17;266:20
**upcoming (1)**
231:14
**update (1)**
92:7
**updated (2)**
124:22;253:23
**upon (2)**
21:13;168:25
**upside (1)**
149:19
**US-based (1)**
202:10
**USC (2)**
32:4,7
**USD (3)**
271:25;280:14;
281:18
**use (9)**
75:5;127:8;162:15,
17;164:8;201:13;
206:13;242:16;
280:19
**used (17)**
25:4;38:15;45:8;
75:12;76:2,14;81:10;
112:7,25;146:11;
158:6;163:11;164:15;
193:23;217:19;
225:15;229:12
**uses (3)**
51:6;134:3;151:11
**using (5)**
13:9;75:3;100:3;
102:8;116:5
**US-integrated (1)**
134:15
**usually (5)**
86:4;195:12;
199:18;231:11;271:4
**utilize (2)**
70:10;204:5
**utilized (3)**

158:21;159:15;
160:20

**V**

**vacation (1)**
90:8
**vague (1)**
187:18
**Vale (6)**
94:12;176:7,12,17,
24;177:3
**Vale's (1)**
176:19
**valuable (2)**
158:11,15
**value (66)**
121:21;122:3,9,22,
24;123:5,14,16,18,21,
22;124:2,6,12;125:4,
11,17,24;126:11,23;
127:7,9,13,15;128:7,
14,16,22;129:7,9,13;
134:13,21;135:12,14,
17;151:5,13;161:13,
23,24;162:3,18,23,25;
163:2,2,21,23;165:4,
17,23;166:8,24,25;
264:16;267:6;273:23;
288:6,10,13,15,18;
289:11,20;291:10
**values (5)**
122:10;127:21,23;
162:14;163:8
**Variable (1)**
27:19
**varies (3)**
100:5;153:9,12
**variety (13)**
16:25;45:21;68:11,
17;82:13;83:23;
101:14;124:9;146:2;
156:6;157:24;179:18;
258:18
**various (6)**
34:22;38:25;54:17;
57:7;93:6;231:22
**verbal (1)**
13:6
**verbally (1)**
28:10
**versus (7)**
144:16,21,21;
145:11;180:16;
268:12,12
**vested (2)**
43:21;44:3
**vests (1)**
49:7
**via (2)**
106:9;256:13
**victim (2)**
270:25;271:9

**victory (1)**
180:11
**VIDEOGRAPHER (22)**
10:3,18;11:25;
63:14,17;107:25;
108:4,7;129:20;
130:6;177:5,9,12;
230:7,10;263:10,15;
278:11,14;285:9,16;
295:7
**view (25)**
47:20;81:23;127:2;
144:20;145:10,17;
147:19;148:7,13,15,
23,25;149:11;171:10;
180:2;186:2,20;
189:18;191:19;
276:23;277:4,19;
280:14;281:19,20
**views (5)**
84:3;136:10,19;
147:25;148:6
**violate (2)**
232:4,5
**violations (1)**
175:3
**voice (1)**
116:2
**volatile (1)**
171:11
**volatility (1)**
178:11

**W**

**WA (3)**
140:4;244:13;
279:22
**waiving (2)**
95:20;97:16
**walk (1)**
87:12
**wants (2)**
74:13;170:13
**WA's (1)**
134:12
**wash (3)**
272:8,12,20
**watch (1)**
179:20
**way (26)**
71:5;82:14;99:17;
102:9;117:23;118:3,
22;145:24,25;146:17;
152:8;162:12;170:25;
171:4,9;175:17;
181:5;187:3;191:11;
207:11;208:15;
222:20;257:20;
258:14;259:9;272:15
**ways (2)**
206:23;230:19
**weakness (1)**

186:11
**wear (2)**
89:19;156:14
**weather-related (1)**
178:14
**website (4)**
78:15;121:10;
177:22;181:16
**Wednesday (1)**
10:5
**weeks (4)**
15:12;18:6;264:15;
268:11
**welcome (1)**
131:20
**well-known (1)**
162:19
**Western (469)**
11:9,11;14:16,17;
15:9;16:4,16;17:6,22;
19:14,16,20,25;20:6,
12,16,17;21:18,21,22;
22:4,9,16;24:3,4,11,
11;25:5,7,8,18;26:11;
27:23;29:5,15;30:6,
12,14,20,21;31:2,19,
20;33:12,15;35:14,15,
18,25;36:3,10,15,19,
21,24;37:4;41:21;
42:2,14,17,25;43:21;
44:3;46:7,20;48:8;
49:7,19,25;50:5,8,13,
15,16,21,23;51:6,14,
18,22,25;52:4,6,12,
17;53:3,6,14;54:7,10,
11,15,18,21,24;55:7,
8,13,22,24;56:5,12,
19,21;57:2,8,10,15,
20,22;58:4;60:20;
61:5,6,8,19;62:2,4,19;
64:21;65:7,18;66:24;
67:4,14,19,22;68:5,
25;69:8;70:10,20;
71:5,11,14,19,21,23;
72:10;73:11,20,21,24;
74:25;75:13,24,25;
77:9,12;78:3,4,14,16,
21;80:7,12,19;81:10,
18;82:7;84:13,20;
85:6,22,25;86:13;
90:11;93:4;94:4,14,
20,22,23;95:5,20;
96:3,23;97:17,19,19,
23,25;99:22;101:22;
106:7;109:2;110:10,
16;112:20;113:14;
115:16,17,22;116:8;
120:6;121:9,11,13;
122:24;123:7,24;
124:11,25;125:10,22;
126:10;127:6,23;
128:4,6,15,19;129:5;
132:16,21;133:22;

134:3,8,19,23;136:10,
18,19;137:6,11;138:9,
21;143:5,17;144:2,
20;145:10,17;147:25;
148:6,7,19,23,25;
150:14;152:13,16,24;
153:5,19,25;155:12,
21,25;158:22;160:6;
161:12;163:11;164:7,
15;165:22;167:5,14;
168:9;169:8;170:8,
16,20,25;171:10;
172:3,8,20;173:14,21;
174:7,14,25;175:9,18;
176:2,5,6,11,18;
177:2,23;179:9,25;
180:25;181:8,22;
182:3,6,11;183:7,12,
17;184:3,11,22;
185:8;186:20;187:15,
25;188:10,11,15,21;
189:17;192:7,11,16,
19,23,24;193:23;
194:19;195:8,20;
196:23,25;197:2,10,
20,21;198:4,7,16,22,
23,24;199:7,14,15,20;
200:16,19;201:3;
202:11,22;203:19,24,
25;204:4,9;205:4,12;
206:11,24;207:4,10,
17,20,25;209:7,22;
210:4,5,9,20;211:2,6,
12;212:2,7;215:6,16;
216:23;217:8,9;
218:9,18,23;219:13;
221:21;222:16,23;
228:10,14;229:2,12;
230:19,22;232:23;
233:14;234:22;
235:18,24;236:15;
237:6,8,9,12,18;
238:20;239:7;240:3,
10,13,17;241:8;242:6,
9;243:7,21;244:5;
245:3,6,23;247:12;
251:2,8,9;252:2,7,18;
254:23;255:10,14;
256:3,18,23,25;257:4,
12,18,21;258:2,9;
259:4;261:5,21;
262:7,10,19;265:12;
266:3,7;267:3,25;
269:11,22,25;270:14;
272:10;273:2,4;
274:4;275:3,6;
276:13;277:4,19;
278:6,19,25;281:8,20;
282:19;283:9;284:2,
15;286:5,12;287:18;
288:5,10,17;289:10;
291:8,21;292:9,19
**WESTERN00001828 (2)**

221:18,23
**WESTERN00052465 (2)**
86:12,15
**WESTERN00069827 (2)**
278:21;279:3
**WESTERN00075316 (2)**
273:3,6
**WESTERN00137773 (2)**
275:4,8
**WESTERN01232823 (2)**
138:7,11
**WESTERN01295633 (2)**
185:6,10
**WESTERN01353743 (2)**
242:8,10
**WESTERN01481078 (2)**
132:18,22
**WESTERN01497891 (2)**
72:9,12
**WESTERN01508335 (2)**
262:9,11
**WESTERN01600452 (2)**
245:4,7
**WESTERN01757226 (2)**
269:24;270:2
**WESTERN0197767 (1)**
209:21
**WESTERN01977767 (1)**
209:24
**WESTERN01977795 (1)**
216:22
**WESTERN0197795 (1)**
216:24
**WESTERN01986013 (2)**
46:5,9
**Western's (5)**
86:2;89:18;128:17;
258:7;260:18
**whatnot (1)**
72:6
**what's (22)**
20:6;27:7;37:19;
45:5;89:22;143:14,
14;155:12;162:2,2;
163:4;180:17;181:13;
236:20;241:17;
251:15;253:20;
256:11;259:16,21,22;
267:12
**whenever (3)**
49:25;197:10;
202:10
**whichever (1)**
277:17
**whittled (1)**
232:6
**whole (3)**
99:12;171:24;
285:13
**who's (1)**
92:23
**whose (1)**
85:12

**wide (1)**
245:20
**widely (1)**
252:12
**widening (1)**
264:14
**wired (1)**
213:19
**wish (1)**
209:3
**withdraw (1)**
172:7
**withdrawn (14)**
30:4;51:13;66:25;
109:9;118:2;148:24;
179:4;204:8;235:10;
240:11;243:16;244:3;
245:13;265:6
**within (4)**
77:2;100:6;109:14;
279:25
**Without (11)**
48:20;66:19;95:19;
97:16;106:14,25;
107:16;184:3;204:6;
234:11;280:11
**witness (13)**
11:12;12:1,3;26:17;
27:5;116:2;169:19,
23;248:16;284:8,22;
285:8;286:24
**witness' (1)**
263:11
**word (5)**
49:12;67:9;111:9;
112:25;256:11
**words (4)**
116:6;214:9,23;
248:17
**Work (3)**
177:24;184:17;
209:16
**worked (3)**
102:18;105:23;
287:3
**working (3)**
35:15,18;105:20
**works (1)**
152:9
**world (15)**
56:22;57:6,7,22;
62:16;65:8,11;67:4,5,
14,23;122:20;200:4;
215:21;230:3
**worth (4)**
163:4;207:21,23,24
**Wound (1)**
10:20
**Wright (2)**
15:4;17:21
**write (4)**
26:19,23;194:24,25
**write-offs (3)**

272:7,11,20
**writing (6)**
26:25;70:8,16,19;
136:14;148:10
**written (3)**
102:14;144:8;
204:19
**wrong (2)**
21:2;263:11
**wrote (2)**
147:2;190:9

---

**Y**

**year (5)**
32:6,12;96:12,13;
282:17
**years (10)**
33:11,24;35:8,9;
40:4;135:3;221:4;
254:13;260:10;272:2
**yesterday (2)**
11:19;64:3
**yield (5)**
79:20;231:16;
232:20
**Yin (1)**
270:5
**York (15)**
3:6,6;10:14,14;
58:6,10;59:3,4,9,21;
200:8;202:2,5,21;
217:14

---

**0**

**034 (1)**
46:5
**0573 (1)**
214:16

---

**1**

**1 (23)**
19:13,14;20:7;26:7;
27:8;28:15;29:6,7,10;
44:9;117:3,4;254:12,
18,21;255:10,16;
256:5;259:18,24;
260:5,11;261:12
**1:10 (2)**
129:21,22
**10 (6)**
86:11,13;280:14;
281:19,21;282:3
**10:49 (1)**
63:15
**100 (7)**
99:18,19;149:19;
189:9;266:22;267:17,
20
**10006-1470 (1)**
3:6

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL

STEVEN SARUWATARI 30(b)(6)
April 13, 2016

**102 (1)**
249:5
**11 (9)**
27:10;28:14;44:8;
94:20,22;108:13;
117:5;282:24;286:4
**11:11 (1)**
63:20
**12 (7)**
29:6;86:24;121:7,
11;264:22;273:9;
274:4
**12:22 (1)**
108:5
**12:41 (1)**
108:10
**1232826 (1)**
138:11
**12965640 (1)**
185:10
**13 (6)**
10:5;132:16,21;
177:15;248:25;
278:17
**137778 (1)**
275:8
**14 (3)**
138:6,9;254:10
**1497907 (1)**
72:12
**15 (3)**
24:19;177:19,23
**1508336 (1)**
262:11
**16 (6)**
24:19;79:3;81:3;
83:9;181:8,13
**1600463 (1)**
245:8
**17 (10)**
25:12;79:16;185:5,
8;245:11,22;251:20;
253:24;255:15;256:4
**1757234 (1)**
270:3
**18 (11)**
84:15;209:20,22;
233:18;234:8;235:13;
262:23;265:9,12;
267:3;269:16
**187 (1)**
216:10
**19 (6)**
216:21,23;233:18;
234:8;235:13;270:7
**1977768 (1)**
209:24
**1977796 (1)**
216:25
**1986015 (1)**
47:16
**1986034 (1)**
46:9

**1987 (1)**
32:8
**1988 (2)**
33:7;35:9
**1990 (1)**
33:25
**1991 (2)**
34:2;35:10
**1994 (5)**
33:13,25;34:3;
35:15,19

---

**2**

**2 (11)**
19:19,20;25:11,11,
20,24;26:23;78:17,
20;200:11;275:12
**2.5 (3)**
265:2,15;269:9
**2.7 (3)**
260:4,12,14
**2.75 (1)**
272:4
**2:07 (2)**
130:3,9
**20 (9)**
15:20;209:20;
221:16,21;222:4;
236:4,8,20;238:11
**200 (3)**
266:23;267:21;
268:13
**2001 (3)**
32:14;36:11,13
**2003 (1)**
33:2
**2010 (3)**
24:19;42:10;142:5
**2011 (6)**
37:12;39:21,24;
40:12,14;136:3
**2012 (8)**
136:10;137:25;
139:5;141:13;144:19;
145:18;148:11;
271:24
**2013 (4)**
149:17;188:10;
282:18;283:5
**2014 (70)**
41:17;86:22;91:13;
92:5,8;94:6;96:10,19;
101:5,19;104:21;
105:2,8,11,13;106:23;
107:7,10,13;109:3,12,
22;110:15;131:8,12;
132:12;172:3,9;
174:8;178:25;179:10;
180:2,24;189:8;
242:14;243:12,20;
245:11,22;248:25;
250:18;251:2,10,22,

23;252:4,5;253:9,24;
255:15;256:4;257:21;
258:11;259:3;261:5;
262:15,24;265:6,9,12;
267:3;269:17;270:7,
16;272:7;280:23;
283:15;293:23,23;
294:4
**2015 (22)**
24:20;91:15,20;
96:15,17;99:2;101:3;
102:2,8;103:11;
104:22;107:3;185:15;
273:10;274:4;275:12,
16;277:3,19;281:6,
20;282:3
**2016 (4)**
10:6;177:16;
278:18;286:4
**2040 (2)**
210:15;249:5
**20-F (2)**
282:17,20
**21 (2)**
237:7,8
**212-225-2829 (1)**
3:9
**212-225-3999 (1)**
3:10
**2153 (1)**
66:2
**2156 (1)**
66:11
**2174 (2)**
64:20,23
**22 (2)**
238:14,20
**227 (1)**
270:20
**23 (3)**
242:7,9;271:24
**234 (1)**
269:24
**24 (4)**
245:3,6;253:21;
261:24
**2485 (1)**
215:25
**25 (5)**
15:20;262:8,10,14;
265:5
**26 (4)**
20:22;21:8;269:23,
25
**27 (4)**
273:2,4;275:16;
277:3
**28 (2)**
275:4,6
**2825 (1)**
147:5
**2826 (1)**
149:7

**29 (2)**
278:19;279:2

---

**3**

**3 (22)**
19:24,25;21:4,7;
28:23;92:5;254:12,
18,21;255:11,16;
256:5,16;259:19,24;
260:5,11;261:12;
265:3,16;269:10;
271:25
**3.1 (3)**
47:17;48:21;49:7
**3.2 (1)**
48:18
**3:12 (1)**
177:10
**3:29 (1)**
177:15
**30 (7)**
20:22;21:8;92:8;
94:6;264:22;282:14,
19
**30b6 (4)**
20:2,7;31:3;286:6
**32 (1)**
200:11
**33 (1)**
203:17
**336 (1)**
262:9
**385 (1)**
12:15
**3Q (1)**
254:10

---

**4**

**4 (4)**
30:25;31:2,13;
185:15
**4:40 (1)**
230:8
**4:54 (1)**
230:13
**400 (1)**
42:4
**430 (1)**
42:5
**450 (1)**
42:12
**453 (1)**
246:20
**458 (1)**
254:6
**463 (1)**
245:5
**477 (2)**
86:25;91:10

---

**5**

**5 (7)**
46:6,7,12;53:21;
66:12;67:3;69:20
**5:40 (1)**
263:13
**5:42 (1)**
263:16
**50 (3)**
266:22;267:17,20
**500 (1)**
171:6
**517 (1)**
86:12
**52499 (1)**
94:2
**52517 (1)**
86:15
**5640 (1)**
185:7
**5656 (1)**
218:5

---

**6**

**6 (2)**
64:21;249:4
**6.0 (1)**
150:6
**6.0X (1)**
149:17
**6:02 (1)**
278:12
**6:11 (1)**
278:17
**6:20 (1)**
285:10
**6:22 (1)**
285:17
**6:33 (2)**
295:9,10
**6015 (1)**
48:19
**6024 (1)**
54:3
**67 (1)**
210:14
**68 (1)**
209:21
**69831 (1)**
278:21

---

**7**

**7 (3)**
68:22,25;249:3
**7/8 (1)**
249:4
**70 (1)**
186:10
**7228 (1)**

---

271:17
**75 (1)**
171:5
**75319 (1)**
273:6
**768 (1)**
216:7
**778 (1)**
275:5
**7899 (1)**
74:20
**792 (1)**
69:20
**796 (1)**
219:9
**799 (2)**
68:24;69:4

**8**

**8 (6)**
72:8,10;78:9;
242:13;243:20;
252:15
**8.0 (1)**
150:6
**8.0X (1)**
149:17
**823 (1)**
138:15
**824 (1)**
141:17
**826 (1)**
138:8
**829 (1)**
280:2
**831 (1)**
279:3
**894 (2)**
73:9;74:5

**9**

**9 (5)**
78:16;81:3;83:10;
200:10;281:5
**9:39 (1)**
10:5
**90 (3)**
254:14;260:10,11
**900 (3)**
260:4,12,13
**907 (1)**
72:9
**90s (1)**
109:18
**91101 (1)**
12:15
**93 (1)**
249:5
**984 (1)**
219:24

# EXHIBIT 4

*IN RE PETROBRAS SECURITIES LITIGATION*

*KOFI BENTSI*
*May 20, 2016*
*CONFIDENTIAL*



**ELLEN GRAUER**
COURT REPORTING CO. LLC

126 East 56th Street, Fifth Floor  New York, New York 10022
P:  212-750-6434   F:  212-750-1097
www.ellengrauer.com

*Original File 112341.TXT*
*Min-U-Script® with Word Index*

**Page 1**

1  UNITED STATES DISTRICT COURT

2  SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------X

3  IN RE PETROBRAS SECURITIES

4  LITIGATION,

5  No. 14-CV-9662 (JSR)

---------------------------------------------X

6

7  * * * C O N F I D E N T I A L * * *

8

9  865 South Figueroa Street
Los Angeles, California

10  May 20, 2016
8:39 a.m.

11

12  Deposition of KOFI BENTSI, in the matter

13  of In Re Petrobras Securities Litigation, before

14  DEBORAH L. LUNDGREN, CSR No. 6727, a Certified

15  Shorthand Reporter in and for the County of Los

16  Angeles, State of California.

17

18

19

20

21

22

23  ELLEN GRAUER COURT REPORTING CO. LLC
126 East 56th Street, Fifth Floor

24  New York, New York 10022
212-750-6434

25  Ref: 112341

**Page 2**

1  A P P E A R A N C E S :

2

3  FOR THE PLAINTIFFS IN THE PIMCO ACTION and the witness:

4  QUINN EMANUEL URQUHART & SULLIVAN, LLP

5  BY: JOHN P. D'AMATO

6  865 South Figueroa Street, Tenth Floor

7  Los Angeles, California 90017

8  213.443.3000

9

10  FOR THE PLAINTIFFS EMPLOYEES RETIREMENT SYSTEM IN THE

11  STATE OF HAWAII:

12  LABATON SUCHAROW

13  BY: DAVID J. GOLDSMITH

14  140 Broadway

15  New York, New York 10005

16  212.907.0896

17

18  FOR THE PETROBRAS DEFENDANTS:

19  CLEARY GOTTLIEB STEEN & HAMILTON, LLP

20  BY: DANIELLE MINDLIN

21  VANESSA C. RICHARDSON

22  One Liberty Plaza

23  New York, New York 10004

24  212.225.2000

25

**Page 3**

1  A P P E A R A N C E S (Cont'd):

2

3  FOR THE UNDERWRITER DEFENDANTS:

4  SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP

5  BY: MARIANNE H. COMBS

6  155 North Wacker Drive

7  Chicago, Illinois 60606-1720

8  312.407.0903

9

10  FOR THE DEFENDANT PRICEWATERHOUSE COOPERS AUDITORES

11  INDEPENDENTES:

12  KING & SPALDING, LLP

13  BY: RYAN GABAY (Via telephone)

14  1185 Avenue of the Americas, Rm 3422

15  New York, New York 10036

16  212.556.2137

17

18  ALSO PRESENT:

19  JON SEIDEL, VIDEOGRAPHER

20

21

22

23

24

25

**Page 4**

1  -------------------- I N D E X --------------------

2  WITNESS                    EXAMINATION BY              PAGE

3  KOFI BENTSI              MS. MINDLIN              8, 285

4  MS. COMBS                        272

5  MR. GOLDSMITH                    275

6

7

8  ----------------- E X H I B I T S -----------------

9  BENTSI          DESCRIPTION                   FOR I.D.

10  Exhibit 1    E-mail string re Japan post info -      39

11  Please read

12  Exhibit 2    E-mail string re Brazil research       60

13  trip

14  Exhibit 3    April 2014 Document titled             79

15  "Opportunities in Emerging

16  Markets" by Mark Kiesel

17  Exhibit 4    E-mail string re Ex Petrobras          92

18  Director arrested - Veja -B-

19  Exhibit 5    E-mail string re Odebrecht             98

20  Drilling (PIMCO: BB-; Agencies:

21  Baa3/BBB/BBB): New Issue and

22  Credit Update

23  Exhibit 6    5-8-14 E-mail between Bentsi and       105

24  Rahman re Thoughts

25

Page 5

1  -------------- E X H I B I T S (Cont'd) --------------
2  BENTSI       DESCRIPTION          FOR I.D.
3  Exhibit 7   4-9-14 Bloomberg chat between      116
4     Bentsi and Lima
5  Exhibit 8   11-19-14 E-mail string with      130
6     attachment re Trade
7     Recommendation - Switch out of
8     Petrobras LT bonds into middle of
9     curve
10 Exhibit 9   E-mail string between Barbassa and  151
11    Bentsi re Thanks
12 Exhibit 10   E-mail string between Bentsi and   159
13    Lima re PETBRA thoughts
14 Exhibit 11   E-mail string re PBR Board and CVM  181
15 Exhibit 12   E-mail string re PBR: New      190
16    management not new company and re
17 PBR: New management = New company
18 Exhibit 13   E-mail chain re Good luck today,   199
19    Ivan
20 Exhibit 14   5-13-13 Fixed Income Trade      221
21    Memorandum, Emerging Market,
22    Petrobras
23 Exhibit 15   7-31-14 Fixed Income Trade      231
24    Memorandum Emerging Market,
25    Petrobras

Page 6

1  -------------- E X H I B I T S (Cont'd) --------------
2  BENTSI       DESCRIPTION          FOR I.D.
3  Exhibit 16   4-1-12 Fixed Income Trade      239
4     Memorandum Emerging Market,
5     Petrobras
6  Exhibit 17   3-3-15 Bloomberg chat between   246
7     Bentsi and Lima
8  Exhibit 18   3-11-15 Bloomberg chat between  250
9     Bentsi and Lima
10 Exhibit 19   6-1-15 E-mail string re destroy   259
11    immediately and re Please increase
12    UBF order to 100 mn for Petrobras
13    100y, thanks
14 Exhibit 20   5-13-13 Fixed Income Trade      282
15    Memorandum Emerging Market,
16    Petrobras
17
18
19    (EXHIBITS TO BE PRODUCED)
20
21
22
23
24
25

Page 7

1  Los Angeles, California; Friday, May 20, 2016
2  8:39 a.m.
3
4     THE VIDEOGRAPHER: We are on the record at
5  8:39 a.m.
6     Good morning.  This is the video deposition of
7  Kofi -- Kofi Bentsi taken in the matter of In Re
8  Petrobras Securities Litigation, case No. 14-CV-9662
9  (JSR).
10    Today's date is Friday, May 20, 2016.  We are
11 located at 865 South Figueroa Street in Los Angeles,
12 California.  My name is Jon Seidel with Ludwig Klein
13 Reporters & Video -- excuse me -- with Ellen Grauer
14 Court Reporting located at 126 East 56th Street in
15 New York, New York.
16    Will all counsel please identify themselves for
17 the record.
18    MS. MINDLIN: Danielle Mindlin, Cleary Gottlieb
19 Steen & Hamilton, for the Petrobras defendants.  Along
20 with me is my colleague Vanessa Richardson.
21    MS. COMBS: Marianne Combs of Skadden Arps for
22 the underwriter defendants.
23    THE WITNESS: Kofi Bentsi for PIMCO.
24    MR. D'AMATO: John D'Amato, Quinn Emanuel,
25 for -- sorry -- on behalf of the witness and PIMCO.

Page 8

1     MR. GOLDSMITH: David Goldsmith, Labaton
2  Sucharow, for the Employees Retirement System of the
3  State of Hawaii.
4     MR. D'AMATO: And I think there is somebody on
5  the phone.
6     MR. GABAY: Ryan Gabay on behalf of
7  Pricewaterhouse Coopers Auditores Independentes.
8     THE VIDEOGRAPHER: Thank you.
9     THE REPORTER: Okay.  Please raise your right
10 hand.
11    Do you declare under penalty of perjury to tell
12 the truth, the whole truth, and nothing but the truth?
13    THE WITNESS: I do.
14
15    EXAMINATION
16    BY MS. MINDLIN:
17 Q.  Good morning.
18 A.  Morning.
19 Q.  Will you state your name for the record.
20 A.  Kofi Bentsi from PIMCO.
21 Q.  Mr. Bentsi, have you ever been deposed before?
22 A.  No.
23 Q.  As you can see, this morning there is a court
24 reporter who is recording everything, and, therefore, I
25 ask that you provide verbal answers only, rather than

Page 9

BENTSI - CONFIDENTIAL

1  BENTSI - CONFIDENTIAL
2  nodding your head or shaking your head.  And I will try
3  not to talk over you as you're answering, and I ask that
4  you wait until I've finished my question until you
5  respond.  Is that okay?
6  A.  Sure.
7  Q.  During the course of the day, there may be
8  objections to form from your counsel.  Once the
9  objection has been stated, you can go ahead and answer
10 the question unless you're given an instruction not to
11 answer.
12    Understand?
13 A.  Okay.
14 Q.  Okay.  We will take breaks throughout the day.
15 And we can take a break at your request, but if there is
16 a question pending, I ask that you answer the question
17 and then we can take --
18 A.  Certainly.
19 Q.  -- the break.
20 A.  Certainly.
21 Q.  Are there any circumstances today that would
22 prevent you from giving truthful and accurate testimony?
23 A.  No.
24 Q.  What did you do to prepare for today's
25 deposition?

Page 10

1  BENTSI - CONFIDENTIAL
2  A.  We went over the guidelines of a deposition and
3  that would be it.
4  Sorry.  Is it too low?
5  MR. D'AMATO:  I'm going to caution you not to
6  give content of any communication between attorney and
7  client.
8  BY MS. MINDLIN:
9  Q.  And when you say "we," does that mean you and
10 your counsel?
11 A.  Yes.
12 Q.  And without telling me what you discussed with
13 your counsel, can you tell me how long you met for?
14 A.  Seven hours.
15 Q.  And when did that meeting occur?
16 A.  Yesterday.
17 Q.  Who was at that meeting?  Again, without
18 telling me anything you talked about.
19 A.  Counsel.
20 Q.  And when you say "counsel," were there specific
21 individuals?
22 A.  Yes.  Counsel.
23 Q.  Mr. D'Amato?
24 A.  Mr. D'Amato --
25 Q.  Anyone else?

Page 11

1  BENTSI - CONFIDENTIAL
2  A.  -- and an associate from Mr. D'Amato's firm.
3  Q.  Did you have any other meetings with counsel to
4  prepare other than the one you had yesterday?
5  A.  No.  We had a conference call.
6  Q.  About how long ago was the conference call?
7  A.  Three weeks ago.
8  Q.  Was anyone else on the conference call along
9  with you and counsel?
10 A.  Other plaintiff -- other -- yes.
11 Q.  And who was that?
12 A.  To my recollection of who was on the call, it
13 would have been Mike Gomez and Natalia Lima and Lupin
14 Rahman --
15 Q.  Other than the --
16 A.  -- and Zeljka Bosner.
17 Q.  Excuse me.
18    Other than the call with those individuals and
19 counsel and your meeting yesterday with counsel, did you
20 meet with anyone else to prepare for the deposition?
21 A.  No.
22 Q.  Did you look at any documents when you were
23 preparing with counsel that helped refresh your
24 recollection of things?
25 A.  No.

Page 12

1  BENTSI - CONFIDENTIAL
2  Q.  Did you look at any documents other than during
3  your meeting with counsel?
4  A.  No.
5  Q.  Did you do anything else to prepare?
6  A.  No.
7  Q.  What is your position at PIMCO currently?
8  A.  I'm a portfolio manager in the emerging markets
9  group.
10 Q.  Since when have you held that position?
11 A.  Since 2011.
12 Q.  And when did you join PIMCO?
13 A.  2011.
14 Q.  In about what month, if you remember?
15 A.  June.
16 Q.  Have your job responsibilities changed since
17 you joined PIMCO in June 2011?
18 A.  Not really.
19 Q.  Before PIMCO, where did you work?
20 A.  Credit Suisse.
21 Q.  And what was your position there?
22 A.  Emerging markets bond trader.
23 Q.  Did you have a specific area of focus when you
24 were at Credit Suisse within emerging markets?
25 A.  Latin America.

Page 13

```
 1      BENTSI - CONFIDENTIAL
 2   Q.  And with respect to the types of products that
 3   you focused on, were there anything -- anything
 4   specific?
 5   A.  Bonds, loans, and credit derivatives.
 6   Q.  And now at PIMCO which types of products do you
 7   focus on?
 8   A.  All credit products.
 9   Q.  And do you have a geographical focus within
10   emerging markets?
11   A.  No.
12   Q.  Before Credit Suisse, where did you work?
13   A.  J.P. Morgan.
14   Q.  And at J.P. Morgan, what was your position?
15   A.  Emerging markets -- sorry -- U.S. high yield.
16   Q.  How long did you work at J.P. Morgan?
17   A.  I worked at J.P. Morgan two times.  I worked at
18   J.P. Morgan previously in emerging markets.  I left to
19   go to Morgan Stanley, and then came back to J.P. Morgan
20   to work in U.S. high yield.
21   Q.  So then to go backwards chronologically, you
22   worked at --
23   A.  Two years in J.P. Morgan, U.S. high yield, two
24   years in Morgan Stanley in emerging markets, and then I
25   spent seven years at J.P. Morgan in emerging markets.
```

Page 14

```
 1      BENTSI - CONFIDENTIAL
 2   Q.  And before your seven years at J.P. Morgan in
 3   emerging markets, where did you work?
 4   A.  I was in college.
 5   Q.  Where did you go to college?
 6   A.  Bowdoin College.
 7   Q.  And what is your degree in from Bowdoin?
 8   A.  Economics.
 9   Q.  What year did you obtain your degree at
10   Bowdoin?
11   A.  1996.
12   Q.  Do you have any other university or college
13   degrees?
14   A.  No.
15   Q.  Do you hold any professional credentials or
16   licenses?
17   A.  No.
18   Q.  In your current role at PIMCO, who do you
19   report to?
20   A.  Mike Gomez.
21   Q.  Have you reported to Mike Gomez during the
22   entirety of your employment at PIMCO?
23   A.  Yes.
24   Q.  Do you have anyone else to whom you directly
25   report?
```

Page 15

```
 1      BENTSI - CONFIDENTIAL
 2   A.  No.
 3   Q.  What are your day-to-day responsibilities at
 4   PIMCO?
 5   A.  Managing EM corporate bond portfolio or
 6   portfolios.
 7   Q.  And are there specific portfolios for which you
 8   are responsible?
 9   A.  Yes.
10   Q.  Which are those?
11   A.  Specifically by number or by name?
12   Q.  If you can provide each, that would be very
13   helpful.
14   A.  I can provide you by number.
15   Q.  Okay.
16   A.  7621, 6979, 6599, 7480, and 7940.
17   Q.  7940 was the last one?
18   A.  Exactly.
19   Q.  And are these portfolios managed exclusively by
20   you or do you work with someone else in managing them?
21   A.  I am PM 1 on those portfolios.
22   Q.  Are you PM 2 or PM -- another number on other
23   portfolios?
24   A.  Yes.
25   Q.  And can you describe those other portfolios
```

Page 16

```
 1      BENTSI - CONFIDENTIAL
 2   that you work on?
 3   A.  Describe them in what way?
 4   Q.  In the sense of -- first, who is PM 1 on the
 5   other portfolios you work on?
 6   A.  Said Saffari.
 7   Q.  Is he the only person who is PM 1 on a
 8   portfolio that you work on?
 9   A.  Yes.
10   Q.  And what about Mr. Gomez's portfolios?  Do you
11   have responsibilities for those?
12   A.  No.  Mr. Gomez -- no.
13   Q.  How many of Mr. Saffari's portfolios are you
14   working on right now?
15   A.  Four.
16   Q.  And if you go back to the beginning of your
17   employment at PIMCO, have there been other portfolios
18   that you have worked on in which you were not PM 1 but
19   also working on the portfolio along with someone else?
20   A.  Sorry.  That is actually five, not four.
21   Q.  Okay.  That -- and when you say "five," you
22   mean with respect to Mr. Saffari's portfolios?
23   A.  Yes, exactly.  And I work on -- I was -- I've
24   always been on those portfolios.
25   Q.  And going back in time, have there been other
```

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL

KOFI BENTSI
May 20, 2016

Page 17

BENTSI - CONFIDENTIAL

1 BENTSI - CONFIDENTIAL
2 portfolios that you've been on at PIMCO?
3 **A. Not to my recollection.**
4 Q. So starting with the portfolios for which you
5 are PM 1, do those have a specific focus or profile?
6 **A. No. Emerging markets.**
7 Q. And within emerging markets, are they part of a
8 specific strategy?
9 **A. Corporate bonds, corporate credit.**
10 Q. And, obviously, these numbers are meaningful to
11 you but not to me. Is there a way that I could
12 understand what these numbers correspond to?
13 **A. They just refer to separate accounts,**
14 **basically.**
15 Q. And when you say "separate accounts," does that
16 mean companies or entities that hire PIMCO to manage
17 their funds?
18 **A. Yes.**
19 Q. And do you know which separate accounts these
20 are?
21 **A. Not to the best -- not immediately at hand, no.**
22 Q. I'm sorry. I couldn't quite hear you.
23 **A. No.**
24 Q. And how did you get assigned these particular
25 separate accounts?

Page 18

1 BENTSI - CONFIDENTIAL
2 **A. Could you explain the question?**
3 Q. How did it come to be that you were the
4 portfolio manager 1 for portfolio 7621?
5 **A. I'm not sure I understand the question. I was**
6 **hired as a portfolio manager.**
7 Q. And so someone assigned you -- when you came
8 in --
9 **A. Right.**
10 Q. -- they said, "Mr. Bentsi" --
11 **A. At the time --**
12 Q. -- "7621 is going to be one of yours"?
13 **A. Yes.**
14 Q. Okay. And for the court reporter's sake, I
15 think she is finding it tricky because we are going
16 rapid fire here. So if you'll wait until I'm done
17 and --
18 **A. Okay.**
19 Q. -- I'll try to wait until you're done.
20 **A. Okay.**
21 Q. That will help her.
22 **A. Apologies.**
23 Q. So you don't know which separate accounts these
24 portfolio numbers correspond to; right?
25 **A. I can go through them one by one if you want.**

Page 19

1 **BENTSI - CONFIDENTIAL**
2 Q. Yes. That would be very helpful.
3 So 7621 -- who is that?
4 **A. Haspa.**
5 Q. Haspa?
6 **A. Yeah.**
7 Q. And does "Haspa" stand for something?
8 **A. Something in German.**
9 MR. D'AMATO: Can I make a suggestion? Whoever
10 is on the phone, if you could put -- whoever is on the
11 phone, if you could put it on mute unless you have an
12 objection. We're getting feedback here. Thank you.
13 MR. GOLDSMITH: Had the same thought.
14 BY MS. MINDLIN:
15 Q. And the next portfolio was 6979. Who is that?
16 **A. I believe that would be San Francisco pension.**
17 Q. How about 6599?
18 **A. Does not come to mind right now.**
19 Q. What about 7480?
20 **A. Mass Mutual.**
21 Q. And how about 7940?
22 **A. Does not come to mind.**
23 Q. You mentioned also that there were five
24 portfolios of Mr. Saffari's that you work on. Do you
25 know the numbers for those portfolios as well?

Page 20

1 BENTSI - CONFIDENTIAL
2 **A. 709, 4719, 9170, 9780, and 9735.**
3 Q. So let's go through those one by one, and if
4 you can recall who they correspond to, that would be
5 helpful to know.
6 709?
7 **A. That is a public mutual fund.**
8 Q. 4719?
9 **A. Public mutual fund.**
10 Q. Uh-huh. 9170?
11 **A. That would be MUFJ.**
12 Q. 9780?
13 **A. That would be Nomura.**
14 Q. And how about 9735?
15 **A. To my recollection, that is Norinchukin.**
16 **Norinchukin.**
17 Q. Can you spell that last one?
18 **A. N-o-r-i-n-c-h-u-k-i-n.**
19 Q. Other than the management of these portfolios,
20 do you have other day-to-day responsibilities at PIMCO?
21 **A. No.**
22 Q. Do you perform any research on sovereigns or
23 issuers?
24 **A. No.**
25 Q. And with respect to the portfolios that we

Page 21

BENTSI - CONFIDENTIAL

1    BENTSI - CONFIDENTIAL
2  discussed, do they contain only fixed-income
3  investments?
4  A.   Yes, as the target audience or target holding.
5  Q.   And when you say that, does it mean that there
6  are some times when they have other kinds of
7  investments?
8  A.   They may or may not have investments if they
9  were -- if -- if -- in -- and in many scenarios, they're
10  not credit bonds.
11  Q.   During the years that you've been -- strike
12  that.  During the years when -- from when you started
13  at PIMCO through the end of 2015, did these portfolios
14  have Petrobras securities in them?
15  A.   Yes.
16  Q.   Did they have Petrobras notes?
17  A.   Yes.
18  Q.   Did they have any Petrobras equity?
19  A.   No.
20  Q.   Did they have any other type of product that
21  referenced Petrobras securities?
22    MR. D'AMATO:  Object to form.
23    THE WITNESS:  Not to my recollection.
24    BY MS. MINDLIN:
25  Q.   Setting aside the portfolios for which you are

Page 22

1    BENTSI - CONFIDENTIAL
2  PM 1 -- or on Mr. Saffari's are you PM 2?  I should ask
3  that question.
4  A.   Sorry.  What is that?
5  Q.   Let me go back.
6    On Mr. Saffari's portfolios, are you known as
7  PM 2?
8  A.   Yes.
9  Q.   Okay.  I just thought it would be helpful to
10  have a shorthand.
11  A.   Uh-huh.
12  Q.   Setting aside the portfolios for which you're
13  PM 1 and PM 2, are there other portfolios for which you
14  have a broader or more general kind of responsibility?
15    MR. D'AMATO:  Object to form.
16    THE WITNESS:  Yeah.  I don't really understand
17  the question.
18    BY MS. MINDLIN:
19  Q.   Do you discuss with portfolio managers on other
20  portfolios the investments that they're making?
21  A.   Yes.
22  Q.   Do you have any decision-making responsibility
23  for other portfolios?
24  A.   No.
25  Q.   When you discuss with other managers the

Page 23

1    BENTSI - CONFIDENTIAL
2  decisions they are making, where do those discussions
3  occur?
4  A.   Could you be more specific?
5  Q.   So do you talk about them in the office?
6  A.   Yes.
7  Q.   Do you talk about them in meetings?
8  A.   Sometimes.
9  Q.   And about how often are your meetings with
10  other portfolio managers?
11  A.   Irregular meetings, certainly, and regular
12  meetings.
13  Q.   Are there any regular meetings for portfolio
14  managers who invested in Petrobras securities in the
15  years between when you joined PIMCO and May 2015?
16    MR. D'AMATO:  Object to form.
17    THE WITNESS:  There are regular meetings about
18  corporate credit.
19    BY MS. MINDLIN:
20  Q.   Were there any regular meetings concerning
21  Petrobras securities that you remember having
22  participated in?
23  A.   No.
24  Q.   Were there ad hoc meetings concerning Petrobras
25  that you remember having participated in?

Page 24

1    BENTSI - CONFIDENTIAL
2  A.   I would imagine so, yes.
3  Q.   Are there any that you recall specifically?
4  A.   Not to my recollection right now, no.
5  Q.   Who at PIMCO do you remember talking about
6  Petrobras with during the years between when you joined
7  PIMCO and May 2015?
8  A.   Specifically?  I think that -- I cannot think
9  of anyone who I can think speak of specifically.  It
10  is -- it is something we talk about all the time, like
11  any other corporate credits.
12  Q.   Does anyone at PIMCO currently report to you?
13  A.   Officially, no.
14  Q.   And unofficially?
15  A.   No.
16  Q.   Do you understand Portuguese?
17  A.   Not really, no.
18  Q.   Going back to the portfolios that you manage,
19  did those contain exclusively emerging markets products?
20  A.   No.
21  Q.   What other products are in there?
22  A.   They may have exposure to U.S. credit products
23  or global credit products.
24  Q.   When you say "global credit products," is that
25  in contrast to EM credit products?

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL

Page 25

1 BENTSI - CONFIDENTIAL
2 A. Yes.
3 Q. What --
4 A. EM global, there is EM U.S., and everything
5 else would be under the global, as in European credit,
6 largely. European corporate credit.
7 Q. So when you say "global," it means mostly
8 European corporate credit?
9 A. (No audible response.)
10 Q. And are Brazilian investments generally
11 considered EM investments?
12 A. Yes.
13 Q. Are there any times when a Brazil investment is
14 not an EM credit?
15 A. No.
16 Q. When investing in EM credits, do you take into
17 account research about the countries you're investing
18 in?
19 A. Sorry. Could you repeat the question.
20 Q. When you're investing in an EM corporate
21 credit, do you take into account research about the
22 country?
23 A. Yes.
24 Q. How do you incorporate country research into
25 your investment decisions?

Page 26

1 BENTSI - CONFIDENTIAL
2 MR. D'AMATO: Object to form.
3 MR. GOLDSMITH: Counsel, can we have an
4 agreement as we've had in other depositions about the
5 objection counting for both parties on the --
6 MR. D'AMATO: Objection by -- by one preserves
7 it for everybody; so you don't all have to keep
8 trying -- or you don't have to chime in if I do.
9 MR. GOLDSMITH: You can -- thank you for
10 articulating it better than I did.
11 MS. MINDLIN: That is fine.
12 MR. GOLDSMITH: Okay.
13 THE WITNESS: Could you repeat the question.
14 BY MS. MINDLIN:
15 Q. How do you incorporate country research into
16 your analysis of corporate credits?
17 A. It is going to be one of the factors in
18 analyzing a corporate credit.
19 Q. And since it is one of the factors, how do you
20 use country research?
21 MR. D'AMATO: Same objection.
22 THE WITNESS: It is one of the factors. I
23 think it would be hard to measure how you use it, but it
24 would be one of the factors in evaluating corporate
25 credit.

Page 27

1 BENTSI - CONFIDENTIAL
2 BY MS. MINDLIN:
3 Q. What form does country research come to you in?
4 A. Many different forms.
5 Q. Does it come from within PIMCO?
6 A. Yes.
7 Q. And who does it come from with respect to
8 Brazil?
9 A. Lupin Rahman.
10 Q. Has that been true during the entirety of your
11 time at PIMCO?
12 A. Yes.
13 Q. And other than from within PIMCO, where does
14 Brazil country research come from?
15 A. There are many other sources. Investment
16 banks, I would assume.
17 Q. How about the news?
18 A. The newspaper would be one.
19 Q. Do you follow the Brazilian news?
20 A. I do.
21 Q. How do you follow it? Rather, do you read any
22 particular publications?
23 A. Yes.
24 Q. Which are those?
25 A. "Financial Times," "Wall Street Journal,"

Page 28

1 BENTSI - CONFIDENTIAL
2 Brazilian paper sometimes.
3 Q. Which Brazilian papers do you read?
4 A. "Valor" and "Folha."
5 Q. Do you read them in Portuguese or in English?
6 A. Portuguese.
7 Q. And --
8 A. Google Translate.
9 Q. So you'll look at them in Portuguese and then
10 use Google Translate to help parse the articles?
11 A. Sometimes, yes.
12 Q. Are there any other Portuguese news sources
13 that you remember relying on in the last four years or
14 so?
15 A. I do not rely on them, but I might read them.
16 Q. And how about any Brazilian colleagues at
17 PIMCO? Do they provide news to you?
18 A. Yes.
19 Q. And which colleagues in Brazil provide news to
20 you?
21 A. Natalia Lima.
22 Q. Anyone else?
23 A. Vinicius Silva, and, I guess, Ismael Orenstein.
24 Q. Do you read analysts' reports on Brazil?
25 A. Yes.

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL

KOFI BENTSI
May 20, 2016

---

BENTSI - CONFIDENTIAL

1     BENTSI - CONFIDENTIAL
2 Q.  Do you have particular analysts whose reports
3 you read more often than others?
4 A.  **I read analysts -- they write reports about**
5 **credits that I invest in.**
6 Q.  So just to draw the distinction between country
7 research and credit research, do you rely on analysts'
8 reports concerning Brazil rather than specific credits?
9 A.  **I rely on both research pieces.**
10 Q.  And are there specific country researchers
11 whose reports you remember relying on in the last four
12 years or so?
13     MR. D'AMATO: Object to form.
14     THE WITNESS: I rely on country research in
15 general.
16     BY MS. MINDLIN:
17 Q.  From any specific analyst?
18 A.  **No. All our analysts produce country research,**
19 **and we have to use that as a -- one of the factors in**
20 **making an investment decision.**
21 Q.  And so when you talk about "our analysts,"
22 you're talking about analysts from within PIMCO?
23 A.  **Yes.**
24 Q.  Are there analysts outside of PIMCO whose
25 country research you rely on or -- rather -- let me

---

1     BENTSI - CONFIDENTIAL
2 rephrase that.
3     Are there analysts from outside PIMCO whose --
4 whose reports you regularly read respecting Brazil?
5 A.  **I cannot think of anyone I regularly read. I**
6 **read a lot of research, though.**
7 Q.  From both inside and outside PIMCO?
8 A.  **Yes.**
9 Q.  Again, focusing on country research, do you
10 monitor the stability of the political situation of the
11 countries that you're investing in?
12 A.  **Yes.**
13 Q.  And is that true for Brazil during the last
14 five years?
15 A.  **Yes.**
16 Q.  How about interest rate trends? Are those
17 relevant?
18     MR. D'AMATO: Object to form.
19     THE WITNESS: They may be a factor at times,
20 yes.
21     BY MS. MINDLIN:
22 Q.  Have interest rate trends been relevant to
23 Brazil investments in the last five years?
24 A.  **Can we be more specific about which interest**
25 **rate trends you're referring to?**

---

1     BENTSI - CONFIDENTIAL
2 Q.  Let's start first with U.S. interest rate
3 trends. Have those impacted Brazil investments to
4 your -- best of your recollection?
5 A.  **To some extent, yes.**
6 Q.  And how have they impacted Brazil investments?
7 A.  **They may or may not have gone up or down, and**
8 **that may have affected bond prices in Brazil, yes.**
9 Q.  And if the U.S. interest rate has gone down,
10 has that -- how has that affected bond prices in Brazil?
11 A.  **Theoretically, it should cause Brazil prices to**
12 **go up and yields to come down as well.**
13 Q.  Do you recall, with respect to Petrobras,
14 whether that occurred in the last five years?
15 A.  **No.**
16 Q.  What about foreign exchange ratios? Are those
17 relevant to your investment decisions?
18     MR. D'AMATO: Object to form.
19     THE WITNESS: It is one of the factors we use
20 in making an -- an assessment of Brazil credit, yes.
21     BY MS. MINDLIN:
22 Q.  And did you use foreign exchange ratios in
23 making an assessment of Petrobras in the last five
24 years?
25 A.  **No. The -- an analyst -- our corporate credit**

---

1     BENTSI - CONFIDENTIAL
2 **analyst would use foreign exchange ratios, yes.**
3 Q.  And when you talk about your corporate credit
4 analyst, are you thinking of someone specific?
5 A.  **Zeljka Bosner.**
6 Q.  Other than Ms. Bosner, was there somebody whose
7 corporate credit research you used with respect to
8 Petrobras?
9 A.  **Not to my recollection.**
10 Q.  Speaking now, again, generally, what is the
11 relevance of sovereign support for issuers when you're
12 analyzing investments?
13     MR. D'AMATO: Object to form.
14     THE WITNESS: That is a very subjective
15 question with a very subjective answer.
16     BY MS. MINDLIN:
17 Q.  And specifically now with respect to Petrobras,
18 did you take into account the question of sovereign
19 support for the company during the last five years?
20 A.  **It is a factor in assessing the credit quality,**
21 **yes.**
22 Q.  And was -- what was your assessment of state
23 support for Petrobras during the last five years?
24     MR. D'AMATO: Object to form.
25     THE WITNESS: I -- I would not say I can recall

---

Page 33

BENTSI - CONFIDENTIAL
1
2 the -- the level of sovereign support I thought over the
3 last five years, but I'd say it is not a static -- in my
4 opinion, it is not a static estimation of support.
5    BY MS. MINDLIN:
6 Q.   Meaning that there was a change in your
7 personal assessment of the level of sovereign support
8 for the company?
9 A.   There was a change not in, necessarily, my
10 estimation of the support, but there was a change in the
11 ability to support over the -- over the period, or the
12 need for support over the period.
13 Q.   And, first, if you can talk about the ability
14 to support, can you identify a period of time when the
15 government's ability to support Petrobras changed?
16 A.   I cannot identify a period, no.
17 Q.   Or can you identify a particular time?
18 A.   I cannot identify a particular time, no.
19 Q.   And what about the need for support over the
20 last five years?  What is your recollection of whether
21 Petrobras's need for support changed?
22    MR. D'AMATO: Object to form.
23    THE WITNESS: Petrobras's need for support
24 would increase as its own credit quality worsened.
25    BY MS. MINDLIN:

Page 34

1    BENTSI - CONFIDENTIAL
2 Q.   Did you talk about that issue with your
3 colleagues at PIMCO?
4 A.   I may or may not have.  I cannot recall
5 specifically.
6 Q.   We talked a little bit about credit research,
7 and specifically Ms. Bosner's research on Petrobras.
8 Was there anyone else who was informally providing
9 research on Petrobras other than Ms. Bosner, Ms. Lima,
10 Mr. Silva, and Mr. Orenstein?
11 A.   Not to my recollection, no.
12 Q.   Do you have an understanding whether an
13 assessment of issuer fundamentals is part of credit
14 research at PIMCO?
15    MR. D'AMATO: Object to form.
16    THE WITNESS: I'm sorry.  Could you repeat the
17 question.
18    BY MS. MINDLIN:
19 Q.   At PIMCO, in assembling credit research,
20 Ms. Bosner does a number of things; right?
21 A.   Certainly.
22 Q.   And I know that you are, of course, not
23 Ms. Bosner; so she has her approach.  But did you
24 understand her to analyze issuer fundamentals when --
25 when performing credit research?

Page 35

1    BENTSI - CONFIDENTIAL
2    MR. D'AMATO: Object to form.
3    THE WITNESS: My expectation would be that she
4 provided -- she did fundamental research when providing
5 fundamental research reports, yes.
6    BY MS. MINDLIN:
7 Q.   And what constitutes fundamental research
8 reports?
9 A.   Looking at balance sheets, income statements,
10 cash flow statements, and understanding the general
11 political environment.
12 Q.   As a portfolio manager, were there specific
13 metrics of -- regarding fundamentals that were important
14 to you?
15 A.   Not specific metrics, no.  It is a -- one --
16 most -- each metric would be one of the factors in
17 assessing a credit.
18 Q.   Were leverage ratios?
19 A.   That would be a factor, yes.
20 Q.   Future cash flows of an issuer?
21 A.   Another factor, yes.
22 Q.   Was historical book value of an issuer
23 important to you?
24 A.   That would be a factor, yes.
25    MR. D'AMATO: Object to form.

Page 36

1    BENTSI - CONFIDENTIAL
2    BY MS. MINDLIN:
3 Q.   Well, why would that be a factor?
4 A.   Why would historical book value be a factor in
5 assessing a credit?
6 Q.   Yeah.
7 A.   So they would give you a sense of how much has
8 been invested in a credit or in an asset.
9 Q.   Did you understand whether Ms. Bosner was
10 including historical book value in her assessments of
11 Petrobras in the last five years?
12    MR. D'AMATO: Object to form.
13    THE WITNESS: I can't speak to what Ms. Bosner
14 actually did.
15    BY MS. MINDLIN:
16 Q.   But you read her reports; right?
17 A.   But I read her reports, yes.
18 Q.   And do you remember whether that metric,
19 meaning historical book value, was included?
20 A.   Her reports include a balance sheet.
21 Q.   In addition to sovereign research and credit
22 research, are there other things you take into account
23 when determining whether to buy, sell, or hold the
24 credit of a given issuer?
25 A.   There are many factors that go into credit

Page 37

BENTSI - CONFIDENTIAL

2 research; so that would be a very loose question.
3 Q. So let's assume for only this question's
4 purposes that Ms. Bosner's reports would contain the
5 entirety of the credit research on a given issuer --
6 we're not talking about Petrobras now -- and then you
7 have separate sovereign research. Are there other
8 buckets that you would typically consider in making an
9 investment decision?
10 MR. D'AMATO: Object to form.
11 THE WITNESS: I'm not sure I understand the
12 question, to be frank.
13 BY MS. MINDLIN:
14 Q. Other than research, what goes into an
15 investment decision, meaning whether to buy, sell, or
16 hold the bonds of a given issuer?
17 MR. D'AMATO: Object to form.
18 THE WITNESS: I'd say research is an important
19 factor going into making an investment decision, yes.
20 BY MS. MINDLIN:
21 Q. And other than research, is there anything else
22 that goes into it?
23 A. Nothing specifically that I can -- comes to
24 mind at the moment, no, but I would say that research is
25 a factor along with other things, yes.

Page 38

BENTSI - CONFIDENTIAL

2 Q. Do you recall any of the other things?
3 A. No. I think research is a factor.
4 Q. Is research the only factor?
5 MR. D'AMATO: Object to form.
6 THE WITNESS: It is one of the many factors.
7 BY MS. MINDLIN:
8 Q. And what are some of the other factors?
9 A. There are a myriad of factors that are specific
10 and general. I'd say research is one of the main
11 factors, yes.
12 Q. Can you identify any other factors?
13 A. Not to my recollection right now, no.
14 Q. Which PIMCO office are you based in right now?
15 A. London.
16 Q. When did you move to London?
17 A. January 2015.
18 Q. Why did you move to the London office?
19 A. We relocated the Munich office to the London
20 office, and I relocated to London.
21 Q. And had you previously been in the Munich
22 office?
23 A. I was previously in the Newport office.
24 Q. So when the Munich office, which you had not
25 been part of, moved to London, you joined that office?

Page 39

BENTSI - CONFIDENTIAL

2 A. Yes.
3 Q. And before that, you were in the Newport
4 office. And before that, were you anywhere else?
5 A. No.
6 Q. So you started in Newport?
7 A. Yes.
8 Q. Does Mr. Saffari work in --
9 A. New- --
10 Q. -- London?
11 A. Newport.
12 (Exhibit 1 was marked for
13 identification.)
14 THE WITNESS: Thank you.
15 BY MS. MINDLIN:
16 Q. The court reporter has handed you what has been
17 marked for identification Bentsi Exhibit 1. It is Bates
18 stamped PIMCO 01906648. It is an e-mail from Brigitte
19 Posch on September 17, 2012.
20 Do you recognize this e-mail?
21 A. No.
22 Q. Do you see your name in the cc line?
23 A. Yes.
24 Q. Does it look like an e-mail that you would have
25 received?

Page 40

BENTSI - CONFIDENTIAL

2 A. Yes.
3 Q. Did you work with Ms. Posch during your time
4 at --
5 A. Yes.
6 Q. -- PIMCO?
7 And this e-mail from her has at the bottom of
8 the first page, the number 1, which says:
9 "Oil. We reduced our overweight to
10 Petrobras, although it remains our
11 key position in the sector."
12 Do you see that?
13 A. I do.
14 Q. Do you recall a reduction in -- to the
15 overweight in September 2012?
16 A. I do not.
17 Q. Do you know why PIMCO -- strike that.
18 When -- when Ms. Posch writes "our overweight,"
19 do you know who she was referring to?
20 A. Can I have time to read this message?
21 Q. Sure.
22 So I just have questions about the first two
23 pages?
24 A. Okay.
25 Q. If you go down again to No. 1 on the front page

Page 41

BENTSI - CONFIDENTIAL

1 and you see, "We reduced our overweight," do you -- do
2 you know who that referred to?
3 you know who that referred to?
4     MR. D'AMATO: Object to form.
5     THE WITNESS: I cannot really speak to what
6 Brigitte meant by "our overweight."
7     BY MS. MINDLIN:
8 Q. And when someone in PIMCO uses the term
9 "overweight," what does it mean?
10     MR. D'AMATO: Object to form.
11     THE WITNESS: I cannot speak to how other
12 people use the word "overweight".
13     BY MS. MINDLIN:
14 Q. But how about you? When you use the word
15 "overweight," what does it mean?
16 A. I have an index bogey which I benchmark to.
17 And if I'm overweight or underweight versus that
18 benchmark -- if I have more of a position versus the
19 benchmark.
20 Q. And am I -- did I hear you correctly when you
21 said "bogey"?
22 A. Bogey. Yes.
23 Q. And --
24 A. Is another word for an index benchmark.
25 Colloquial term.

Page 42

BENTSI - CONFIDENTIAL

1
2 Q. Is there an official title to the benchmark
3 that you use?
4 A. Many portfolios have different benchmarks.
5 Q. And --
6 A. Each portfolio has a different benchmark.
7 Q. And with respect to the portfolios that we
8 earlier discussed that you are PM 1 for, do they each
9 have a different benchmark?
10 A. 7621 has an investment-grade-only benchmark.
11 Q. Uh-huh.
12 A. CEMBI investment grade.
13     The 7940 is a blend of CEMBI and EMBI --
14 Q. And --
15 A. -- benchmarks.
16 Q. -- if I could ask you to interpret "CEMBI" and
17 "EMBI" for us, what do those stand for?
18 A. Corporate emerging credit -- sorry. It is
19 corporate emerging market bond index. And emerging
20 market bond index would be EMBI. E-M-B-I, EMBI.
21 Q. And the distinction between those is the
22 inclusion of corporates versus general emerging market
23 bonds?
24 A. EMBI would be sovereign and -- quasi-sovereign,
25 essentially, and corporate credit is -- as its name.

Page 43

BENTSI - CONFIDENTIAL

1
2 Q. Is Petrobras considered a quasi-sovereign?
3 A. By some, yes.
4 Q. And for your portfolios, does Petrobras count
5 as a quasi-sovereign?
6 A. It is a corporate credit.
7 Q. Corporate.
8     Has it been a corporate credit during the
9 entirety of the last five years?
10 A. Again, this is a personal interpretation.
11 A. Understood.
12 A. Yes.
13 Q. And the benchmarks that you identified -- are
14 those PIMCO-specific benchmarks?
15 A. No.
16 Q. Are they published benchmarks?
17 A. Yes.
18 Q. And who publishes them?
19 A. J.P. Morgan.
20 Q. With respect to Mr. Saffari's portfolios, are
21 those managed also with respect to J.P. Morgan
22 benchmarks?
23 A. Yes.
24 Q. Do you have any portfolios that you're
25 responsible for that are not benchmarked?

Page 44

BENTSI - CONFIDENTIAL

1
2 A. No.
3 Q. Do you know whether PIMCO has any
4 nonbenchmarked portfolios?
5 A. I do not know, no.
6 Q. So is it fair to say that "our overweight" to
7 Petrobras would mean that a given portfolio was
8 overweight the benchmark with respect to Petrobras?
9     MR. D'AMATO: Object to form.
10     THE WITNESS: Yes.
11     BY MS. MINDLIN:
12 Q. When PIMCO decides to reduce its position in a
13 given issuer relative to the benchmark, does PIMCO have
14 total discretion over that decision?
15 A. There is -- I'm not sure I understand the
16 question.
17 Q. Do -- where there is a separate account who is
18 in charge of a given portfolio -- I'm sorry. I
19 shouldn't say "in charge." Strike that.
20     Where there is a separate account whose funds
21 are being managed in a given portfolio, does that
22 separate account have decision-making ability with
23 respect to investment decisions for the portfolio?
24     MR. D'AMATO: Object to form.
25     BY MS. MINDLIN:

BENTSI - CONFIDENTIAL

1
2 Q.  You can still answer.
3 A.  I'm not sure I understand the question, but I
4 think what you're saying is:  Does a portfolio manager
5 have -- have the mandates to be overweight or
6 underweight a credit in a portfolio?
7 Q.  Right.
8 A.  Yes.  A portfolio manager usually has the
9 mandate to be overweight or underweight in a portfolio.
10 Q.  And whether to be overweight or underweight is
11 a judgment call?
12 A.  Based on --
13 MR. D'AMATO: Object to form.
14 THE WITNESS: It is a decision based on
15 research and a belief in the investment prospects of the
16 asset, or a judgment in the investment prospects of an
17 asset.  Sorry.  I mumble a lot.
18 MR. GOLDSMITH: Please speak up.  I can't hear
19 it.  I'd appreciate it.
20 THE WITNESS: I mumble a lot.
21 MR. GOLDSMITH: That is okay.  Thank you.
22 BY MS. MINDLIN:
23 Q.  In your experience, is the decision to be
24 overweight or underweight reflective of PIMCO's views on
25 how good an investment is at a given -- good an

1 BENTSI - CONFIDENTIAL
2 investment in a given credit is at a point in time?
3 MR. D'AMATO: Objection to form.
4 THE WITNESS: I'm not sure I understand the
5 question, but I -- I would say it -- it would be a
6 factor, if anything.
7 BY MS. MINDLIN:
8 Q.  If you turn to the next page, which has at the
9 bottom the Bates number ending 49, there is a No. 1
10 entitled "Petrobras".
11 Do you see that?
12 A.  Yes.
13 Q.  And the paragraph begins, "Because of Brazilian
14 refined products fixed-price policy."
15 What do you understand the "refined products
16 fixed-price policy" to refer to?
17 A.  I would assume that the discussion is around
18 the fixed pricing of gasoline and -- and diesel in
19 Brazil.
20 Q.  And those fixed prices are controlled by the
21 government of Brazil?
22 A.  They may or may not be determined by Petrobras
23 itself.  By the direction of the government is the
24 supposition.
25 Q.  The supposition of the e-mail?

1 BENTSI - CONFIDENTIAL
2 A.  Supposition of the e-mail and the market.  But
3 the decision tree around pricing of gasoline and petrol
4 is by Petrobras.
5 Q.  Do you understand whether the government
6 separately imposed any controls on domestic gas prices
7 in the last five years?
8 A.  I do not know that as a fact, no.
9 Q.  And the next clause reads:
10 "PBR EBITDA is less sensitive to
11 movements in oil prices and other
12 large NOCs."
13 Do you see that?
14 A.  Yes.
15 Q.  And "PBR EBITDA" refers to Petrobras EBITDA?
16 A.  Yes.
17 Q.  And do you have an understanding why Petrobras
18 EBITDA would be less sensitive to movements in oil
19 prices than other large NOCs?
20 A.  The -- the implication here is that because
21 Petrobras fixes its own prices, it is no longer
22 sensitive on either its inputs or its outputs prices.
23 Q.  Meaning that its earnings aren't sensitive to
24 movements in oil prices?
25 A.  The implication here is that its earnings

1 BENTSI - CONFIDENTIAL
2 aren't sensitive -- are less sensitive to pricing
3 because it determines its inputs and its outputs
4 pricing.
5 Q.  And how do you interpret the inputs and outputs
6 part of this or -- where do you see the inputs and
7 outputs part of the analysis coming from this
8 communication?
9 A.  The implication here is that inputs would be
10 oil prices --
11 Q.  Uh-huh.
12 A.  -- and outputs would be the refined products.
13 And since the company determines the price of its inputs
14 and the price of its outputs, it is -- its EBITDA is
15 less sensitive.  That is an assumption.
16 Q.  And whose assumption is that?
17 A.  Whoever wrote this.
18 Q.  Do you know who wrote it?
19 A.  Nope.
20 Q.  Did you agree with that assessment?
21 A.  It is certainly one of a -- a valid -- an
22 opinion.
23 Q.  But you don't know whose it was?
24 A.  I do not know whose it was.  I think it has an
25 assumption on both ends.

Case 16-1914, Document 54, 07/08/2016, 1811110, Page281 of 417

Page 49

1      **BENTSI - CONFIDENTIAL**
2 Q. And when you say "on both ends," you mean with
3 respect to inputs and outputs?
4 **A. Yes.**
5 Q. The reference to "NOC" is -- is that national
6 oil companies?
7 **A. Yes.**
8 Q. Was -- were NOCs the typical companies to which
9 Petrobras was "confer" -- compared during the last five
10 years or so at PIMCO?
11     **MR. D'AMATO:** Object to form.
12     **THE WITNESS:** I cannot speak to what other
13 people compared Petrobras to.
14     **BY MS. MINDLIN:**
15 Q. What did you think the appropriate comparisons
16 were for Petrobras in the last five years?
17 **A. All oil and gas --**
18     **MR. D'AMATO:** Object to form.
19     **THE WITNESS:** My personal comparison pool would
20 be all oil and gas companies.
21     **BY MS. MINDLIN:**
22 Q. And within oil and gas companies, did you
23 constrain that by geography?
24     **MR. D'AMATO:** Objection to form.
25     **THE WITNESS:** Not to my recollection, no.

Page 50

1     BENTSI - CONFIDENTIAL
2     **BY MS. MINDLIN:**
3 Q. Do you remember any specific companies that you
4 thought were good comparisons for Petrobras?
5 **A. Not to my recollection, no.**
6 Q. Where the communication goes on, its -- a
7 sentence ahead, it says:
8     "The biggest issue for PBR is
9     continued access to funding given
10     large CF burn."
11     Do you see that?
12 **A. Yes.**
13 Q. Do you know what "CF burn" refers to?
14 **A. Yes. Cash flow.**
15 Q. Do you remember discussions at PIMCO of
16 cash-flow burn at Petrobras?
17 **A. Not specific conversations, no.**
18 Q. Do you remember a general conversation about
19 it?
20 **A. Yes.**
21 Q. And what do you remember about the general
22 conversation?
23 **A. Continued concern about the high negative-free**
24 **cash flow at Petrobras.**
25 Q. Do you remember a time when that conversation

Page 51

1     BENTSI - CONFIDENTIAL
2 was most active?
3 **A. Not to my --**
4     **MR. D'AMATO:** Objection to form.
5     **THE WITNESS:** -- recollection, no.
6     **BY MS. MINDLIN:**
7 Q. The communication goes on, if you skip another
8 sentence or so, and says:
9     "In short, the company would probably
10     need to cut annual CAPEX by 10
11     billion, 20 percent, and issue 10
12     billion of equity to get leverage
13     metrics down to 3.5x."
14     Do you see that?
15 **A. Yes.**
16 Q. And the leverage metrics of 3.5x -- is that net
17 debt to EBITDA?
18 **A. That is a good question.**
19 Q. Do you know?
20 **A. No.**
21     **MR. D'AMATO:** Objection to form, the previous
22 question.
23     **BY MS. MINDLIN:**
24 Q. When -- if you look back to the middle of the
25 paragraph, there is a reference to "net debt/EBITDA."

Page 52

1     BENTSI - CONFIDENTIAL
2     Do you see that?
3 **A. Yes.**
4 Q. Does that clue you in about whether the 3.5x
5 would be a net debt-to-EBITDA ratio?
6 **A. The implication would be that they're referring**
7 **to the same leverage, yeah -- metrics, yes.**
8     **MR. D'AMATO:** I'm sorry? I'm sorry?
9     **THE WITNESS:** The -- sorry. The implication
10 would be that they are referring to the same leverage
11 metrics, yes.
12     **BY MS. MINDLIN:**
13 Q. And was that a leverage metric that you
14 considered important in assessing Petrobras?
15     **MR. D'AMATO:** Object to form.
16     **THE WITNESS:** It would certainly be one of a
17 myriad of factors we would use in assessing Petrobras.
18     **BY MS. MINDLIN:**
19 Q. Were there discussions at PIMCO that you
20 remember about potential cuts to Petrobras CAPEX?
21 **A. Not specific conversations, no.**
22 Q. Did anyone --
23 **A. There were -- there were conversations,**
24 **obviously.**
25 Q. And what do you remember about those

Page 53

1      BENTSI - CONFIDENTIAL
2 conversations?
3   **A.**  **Conversations suggesting different ways in**
4 **which they could cut CAPEX, certainly.**
5  **Q.**  Did you think that Petrobras should cut CAPEX?
6     **MR. D'AMATO:** Object to form.
7     **THE WITNESS:** It was certainly one of the
8 options available to them.
9     **BY MS. MINDLIN:**
10  **Q.**  Did you have an understanding that reductions
11 in CAPEX could decrease production by Petrobras?
12     **MR. D'AMATO:** Object to form.
13     **THE WITNESS:** I might have an opinion that a
14 reduction in CAPEX may reduce the production. There are
15 other ways in which they could maintain their production
16 in the same level.
17     **BY MS. MINDLIN:**
18  **Q.**  Did you discuss with your colleagues at PIMCO
19 ways that Petrobras could maintain production?
20   **A.**  **We may have discussed if they could reduce**
21 **CAPEX and if that might affect production.**
22  **Q.**  Do you remember any of those conversations?
23   **A.**  **Not specifically.**
24  **Q.**  Did you have a view of whether Petrobras should
25 reduce its CAPEX?

Page 54

1      BENTSI - CONFIDENTIAL
2   **A.**  **I thought of that -- that as one of the myriad**
3 **of different options available to the company to reduce**
4 **their leverage.**
5  **Q.**  The paragraph goes on and says:
6     "I think at that level PBR would
7     still get IG rating due to its
8     quasi-sov status."
9     Do you see that?
10  **A.**  **Yes.**
11  **Q.**  And "quasi-sov" -- that refers to
12 quasi-sovereign?
13  **A.**  **Yes.**
14  **Q.**  And does that mean investment-grade rating
15 where it says "IG"?
16  **A.**  **Yes.**
17  **Q.**  So this means that the writer thought that
18 Petrobras would still get an investment-grade rating due
19 to its quasi-sovereign status even though it had high
20 leverage metrics?
21   **A.**  **That would seem to be the implication, yes.**
22  **Q.**  Was that a view that you had of Petrobras
23 during the last five years?
24   **A.**  **I do not recall what my view was at the time,**
25 **no.**

Page 55

1     **BENTSI - CONFIDENTIAL**
2  **Q.**  Do you know whether this was a view that your
3 colleagues at PIMCO held in September 2012?
4   **A.**  **I do not recall or even know who actually wrote**
5 **that piece.**
6  **Q.**  Did you have any -- personally, did you have
7 any specific concerns about Petrobras's financial health
8 in September 2012?
9  **A.**  I don't --
10     **MR. D'AMATO:** Object to form.
11     **THE WITNESS:** I do not remember how I felt
12 in -- about Petrobras in 2012. I do not remember how I
13 felt about it in 2012, specifically, or do not recall.
14     **BY MS. MINDLIN:**
15  **Q.**  You can set that document aside.
16     **MR. D'AMATO:** Can we take a quick break?
17     **MS. MINDLIN:** Sure.
18     **MR. D'AMATO:** I was wondering if this is okay.
19     **MS. MINDLIN:** Yes.
20     **THE WITNESS:** Okay. Thanks.
21     **THE VIDEOGRAPHER:** Off the record. The time is
22 9:39.
23     (Recess.)
24     **THE VIDEOGRAPHER:** We are back on the record.
25 The time is 9:47.

Page 56

1      BENTSI - CONFIDENTIAL
2     **BY MS. MINDLIN:**
3  **Q.**  We were talking a few minutes ago about
4 maintaining investment-grade status; right?
5     **MR. D'AMATO:** Could I ask whoever is on the
6 phone to mute again.
7     Thanks. Sorry.
8     **THE WITNESS:** Are you referring to this
9 article?
10     **BY MS. MINDLIN:**
11  **Q.**  Yeah. In general, though.
12  **A.**  **Okay.**
13  **Q.**  The article -- sorry. The e-mail referred to
14 whether Petrobras could maintain investment-grade
15 status; right?
16  **A.**  **Okay.**
17     **MR. D'AMATO:** Object --
18     **THE WITNESS:** Are you --
19     **MR. D'AMATO:** Objection to form.
20     **THE WITNESS:** I was going to say is it a
21 question or a statement?
22     **BY MS. MINDLIN:**
23  **Q.**  I'm just asking if you remember that is what we
24 were talking about before the break.
25   **A.**  **Got it. I remember we were talking about this**

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL

Page 57

BENTSI - CONFIDENTIAL

1    BENTSI - CONFIDENTIAL
2 article.
3 Q. And going back to that e-mail, there is a
4 reference in the paragraph about Petrobras on the second
5 page marked 49 at the bottom to "PBR would still get IG
6 rating due to quasi-sov status"; right?
7 A. I see the statement here that says that.
8 Q. Do you remember discussions with your
9 colleagues about whether Petrobras would maintain
10 investment-grade status?
11 A. I do not recall specific conversations. We had
12 many conversations around Petrobras's rating over the
13 course of the last five years, yes.
14 Q. What do you remember about the discussions of
15 Petrobras's rating?
16    MR. D'AMATO: Object to form.
17    THE WITNESS: There were many, many
18 conversations around Petrobras's ratings and its ratings
19 trajectory from over the last five years, certainly.
20    BY MS. MINDLIN:
21 Q. Do you remember a concern that Petrobras would
22 be downgraded by the ratings agencies?
23 A. Yes.
24 Q. Why were you concerned about a downgrade?
25 A. Amongst many other factors, a downgrade would

Page 58

1    BENTSI - CONFIDENTIAL
2 lead to widening in spreads, perhaps.
3 Q. Did you --
4    MR. D'AMATO: And objection to form to the last
5 question. Didn't want to interrupt him.
6    MS. MINDLIN: Counsel, if you are going to
7 object, could you please state the objection after the
8 question before the answer?
9    MR. D'AMATO: I -- I'm trying to.
10    MS. MINDLIN: Okay.
11    MR. D'AMATO: I did not want to cut -- cut him
12 off once he had started.
13    MS. MINDLIN: Understood.
14 Q. What effect would a widening in Petrobras
15 spreads have on your decision whether to overweight or
16 underweight Petrobras?
17 A. There are many different ways one might
18 interpret a widening of spreads. One might think it was
19 justified or unjustified and make an investment decision
20 based on that.
21 Q. And when you say "justified or unjustified,"
22 you mean that the markets' effect of widening the spread
23 for Petrobras might or might not be in line with how you
24 perceived the value of Petrobras bonds?
25    MR. D'AMATO: Object to form.

Page 59

1    BENTSI - CONFIDENTIAL
2    THE WITNESS: I might think that the markets'
3 reaction to a particular piece of news might overstate
4 or understate the real -- the real impacts to the credit
5 or the -- or credit quality of a company.
6    BY MS. MINDLIN:
7 Q. Do you remember times in 2013 when the market
8 had overstated or understated the real impact to the
9 credit quality of Petrobras?
10    MR. D'AMATO: Object to form.
11    THE WITNESS: I do not recall anything
12 specific, no.
13    BY MS. MINDLIN:
14 Q. Do you remember times in 2014 when you thought
15 the market had overstated or understated the impact to
16 the credit quality of Petrobras?
17    MR. D'AMATO: Object to form.
18    THE WITNESS: I do not recall specifically, no.
19    BY MS. MINDLIN:
20 Q. How about in 2015?
21 A. I have a very bad memory. I do not recall
22 specifically, no.
23 Q. Do you remember whether there was a -- any
24 discussion between you and your colleagues at PIMCO
25 about how the market was reacting to news about

Page 60

1    BENTSI - CONFIDENTIAL
2 Petrobras?
3 A. I would expect that we had constant dialogue
4 about how the market was reacting to news about
5 Petrobras, but I do not recommend -- recall specific
6 conversations now.
7    (Exhibit 2 was marked for
8    identification.)
9    BY MS. MINDLIN:
10 Q. The court reporter handed you what has been
11 marked for identification Bentsi Exhibit 2, and it is
12 Bates stamped PIMCO 00369353. It is an e-mail from
13 Lupin Rahman on March 21, 2014, and it is addressed to
14 you.
15    Do you see your name there?
16 A. I do.
17 Q. Is this an e-mail that you received?
18 A. It looks that way.
19 Q. In the e-mail, if you go to the bottom of the
20 page, you see a note from you to Lupin Rahman and
21 others.
22    Do you see that?
23 A. I do.
24 Q. And you say:
25    "I will be in Brazil next week

Page 61

BENTSI - CONFIDENTIAL

1 visiting companies with M. Kiesel and
2 our research team."
3 Does "M. Kiesel" refer to Mark Kiesel?
4 **A. It does.**
5 Q. At this point in time, what was Mark Kiesel's
6 role in -- at PIMCO?
7 **A. He was a portfolio manager in the**
8 **investment-grade group.**
9 Q. You said in the investment-grade group?
10 **A. Yes. He is an investment-grade portfolio**
11 **manager.**
12 Q. Is he still?
13 **A. Yes, he is.**
14 Q. And if you turn the page, there is a list of
15 companies visited.
16 Do you see that?
17 **A. Yes.**
18 Q. And Petrobras is the first listed company?
19 **A. Yes.**
20 Q. And there are a number of other companies
21 there?
22 **A. Yes.**
23 Q. Do you remember going on a trip to Brazil in
24 March or April 2014?

Page 62

BENTSI - CONFIDENTIAL

1 **A. Vaguely, yes.**
2 Q. Who went on the trip along with you?
3 **A. Do not recall specifically, but I imagine the**
4 **credit analysts that covered the respective credits were**
5 **on the trip.**
6 Q. So for Petrobras, that would have been Zeljka
7 Bosner?
8 **A. Zeljka Bosner.**
9 Q. Do you remember meeting with Petrobras during
10 that trip?
11 **A. I do not recall specifically, no.**
12 Q. Do you remember other trips when you met with
13 Petrobras in 2014?
14 **A. I do not recall specifically, no, but I am sure**
15 **that I met them, yes.**
16 Q. How often did you travel to Brazil in 2014?
17 **A. I don't recall specifically, but I would say**
18 **"one" or twice.**
19 Q. Was that true also in 2013?
20 **A. I do not recall, but perhaps.**
21 Q. How about 2015? Do you remember whether your
22 trips continued?
23 **A. It would be roughly the same amount, yes.**
24 Q. And in the bottom e-mail, it looks like you

Page 63

BENTSI - CONFIDENTIAL

1 offer, to the group you're writing to, to send you
2 questions; right?
3 **A. Yes.**
4 Q. Is that something that you did -- typically did
5 before a trip to Brazil?
6 **A. I believe it is good practice, yes.**
7 Q. And in response, you received the topmost
8 e-mail from Lupin Rahman; right?
9 **A. Yes.**
10 Q. And Ms. Rahman was the country researcher for
11 Brazil?
12 **A. Exactly.**
13 Q. And she provides you with what she called "a
14 couple of questions," although it actually is quite a
15 few. You see the list 1 through 7 here; right?
16 **A. Yes.**
17 Q. The first one says, "1/break even FX for
18 Petrobras."
19 Do you -- what do you understand her to ask in
20 No. 1?
21 **MR. D'AMATO:** Object to form.
22 **THE WITNESS:** It is a good question. I would
23 guess that she perhaps meant what the foreign exchange
24 rate would have to be for Petrobras to be making money

Page 64

BENTSI - CONFIDENTIAL

1 by some metric.
2 **BY MS. MINDLIN:**
3 Q. Do you know what metric she meant break even
4 on?
5 **A. No. No.**
6 Q. Were -- was Ms. Rahman, to the best of your
7 recollection, concerned about the implications of the
8 foreign exchange rate for Petrobras at this point in
9 time?
10 **MR. D'AMATO:** Object to form.
11 **THE WITNESS:** I'm sure it was a factor in her
12 assessment of Petrobras.
13 **BY MS. MINDLIN:**
14 Q. Do you remember talking about the impact of the
15 foreign exchange on Petrobras in early 2014?
16 **A. Not specifically, but it was a constant**
17 **conversation.**
18 Q. And is that because the real was weakening
19 against the dollar?
20 **A. It is because of the foreign exchange risk**
21 **implicit in Petrobras alone -- all the time, whether up**
22 **or down.**
23 Q. And when you say the "foreign exchange risk
24 implicit in Petrobras," can you explain what you mean?

Page 65

BENTSI - CONFIDENTIAL

1
2 **A.   Based on its pricing policy, it has some**
3 **foreign exchange risk, and that can affect positively or**
4 **negatively the credit quality of the company if it was**
5 **to maintain the same policy till the end of time.**
6 Q.   How does the foreign exchange risk positively
7 impact the credit quality of the company, or in what
8 instances would it positively affect the credit quality
9 of the company?
10 **A.   There are a lot of assumptions in that**
11 **statement.  So I wouldn't necessarily say I subscribe to**
12 **it, but some people might look at whether they thought**
13 **that the pricing policy was more important than the debt**
14 **load of the company.**
15 Q.   And the pricing policy means the control on the
16 price of --
17 **A.   Yes.**
18 Q.   -- oil or gas?
19 **A.   Control of the prices of gasoline and -- and**
20 **diesel.**
21 Q.   Domestically in Brazil?
22 **A.   Yes.**
23 Q.   Do you remember anyone in particular who
24 thought that the domestic pricing policy for gasoline
25 and diesel was more important than the debt load of the

Page 66

BENTSI - CONFIDENTIAL

1
2 company?
3 **A.   No one specifically, no.**
4 Q.   Was it anyone at PIMCO?
5 **A.   I don't think anyone specifically would have**
6 **thought that as one of the factors in looking at the**
7 **company.  I don't -- I think -- I don't think I can**
8 **remember whether someone thought it was the most**
9 **important factor or the only factor, no.  I don't**
10 **remember that.**
11 Q.   And was the general gist of that theory that
12 the domestic pricing policy would support the company
13 despite a significant debt load?
14 **MR. D'AMATO:** Object to form.
15 **THE WITNESS:** Yeah.  The domestic pricing
16 policy at -- in this period was actually hurting the
17 company.
18 **BY MS. MINDLIN:**
19 Q.   So when you say "in this period," we're talking
20 about -- around March 2014?
21 **A.   Yes.**
22 Q.   And if you expand beyond March 2014, was the
23 domestic pricing policy -- is there a time period when
24 the domestic pricing policy was hurting the company?
25 **MR. D'AMATO:** Object to form.

Page 67

BENTSI - CONFIDENTIAL

1
2 **THE WITNESS:** There is a general interpretation
3 that there was a large period of time in which the
4 pricing policy locally was hurting the credit quality of
5 the company, yes.
6 **BY MS. MINDLIN:**
7 Q.   And how was the pricing policy hurting the
8 company?
9 **A.   The assumption or the -- the -- I guess the**
10 **reality is that prices of gasoline and diesel in Brazil**
11 **were too low compared to their oil inputs.**
12 Q.   And as a result --
13 **A.   The company --**
14 Q.   -- Petrobras --
15 **A.   -- was losing money, yes.**
16 Q.   And how did Petrobras losses affect PIMCO's
17 decisions about its buy, sell, holds in Petrobras
18 securities?
19 **MR. D'AMATO:** Object to form.
20 **THE WITNESS:** Sorry.  Could you repeat the
21 question.
22 **BY MS. MINDLIN:**
23 Q.   Sure.  Sure.
24 **A.   Or rephrase the question, please.**
25 Q.   I can, yeah.

Page 68

BENTSI - CONFIDENTIAL

1
2 You said a minute ago during this period of
3 time, Petrobras was losing money as a result of the --
4 **A.   Or not making as much money as it could be,**
5 **yes.**
6 Q.   So Petrobras was not making as much money as it
7 could be as a result of the domestic price controls;
8 right?
9 **A.   Because of its pricing policy, Petrobras was**
10 **not making as much money as it could be.**
11 Q.   Was there any effect on PIMCO's decisions
12 whether to buy, sell, or hold Petrobras securities
13 resulting from the fact that Petrobras was not making as
14 much money as it could have been?
15 **A.   It certainly would have been one of the factors**
16 **in a buy, sell, or hold decision, but there were a lot**
17 **of assumptions about how long you think a policy will**
18 **last, and other things, of course.**
19 Q.   What were your assumptions at this point in
20 time about whether the domestic pricing policy would
21 last?
22 **A.   I do not recall.**
23 Q.   Do you remember whether anyone else had
24 assumptions that you remember?
25 **A.   Not specifically, but I'm sure they did.**

Page 69

BENTSI - CONFIDENTIAL

1
2  Q.  Was the question over domestic pricing policy
3  creating volatility in the prices of Petrobras
4  securities?
5      MR. D'AMATO: Object to form.
6      THE WITNESS: I -- I don't recall the
7  discussion around how -- and as a market discussion,
8  about how the -- the pricing policy was affecting
9  decisions.  It is -- everyone had their own assumptions
10 about how long they thought the policy would last or if
11 they thought the policy was a -- real policy.
12     BY MS. MINDLIN:
13 Q.  Did you think the policy was a real policy?
14 A.  I might have had opinions at the time,
15 certainly, yes.
16 Q.  And what were they?
17 A.  I do not recall, but -- offhand what they
18 specifically were, no, but they were always developing,
19 certainly.
20 Q.  If you go down the list to No. 3, Ms. Rahman
21 writes, "Are they feeling Chinese slowdown headwinds?"
22     Do you see that?
23 A.  Yes.
24 Q.  What did you -- what do you understand now
25 "Chinese slowdown headwinds" to mean?

Page 70

BENTSI - CONFIDENTIAL

1
2  A.  I -- I would infer that she was suggesting that
3  there was a slowdown in China ahead and whether that was
4  affecting Petrobras or other Brazilian corporates.
5  Q.  Do you have any memory about an effect on
6  Petrobras of a slowdown in China?
7  A.  Not specifically, no, or --
8  Q.  Do you remember --
9  A.  -- not directly.
10 Q.  Do you remember talking about it during your
11 trip to Brazil?
12 A.  My trip to Brazil was covering a lot of
13 Brazilian corporates.  So that would have been one of
14 the factors affecting other companies, certainly.
15 Q.  And how would the Chinese slowdown affect
16 Brazilian corporates?
17 A.  Depending on what segment they were in, it
18 would affect the demand for their products --
19 Q.  And --
20 A.  -- and the pricing of their products.
21 Q.  I'm sorry.  I shouldn't have --
22 A.  That is okay.
23 Q.  -- hopped in there.
24     What do you remember about the effect on
25 Petrobras of a potential slowdown in China?

Page 71

BENTSI - CONFIDENTIAL

1
2      MR. D'AMATO: Object to form.
3      THE WITNESS: Yeah.  I do not recall any
4  specific impressions at the time of what a China
5  slowdown would affect Petrobras.
6      BY MS. MINDLIN:
7  Q.  What -- do you have any sense of why Ms. Rahman
8  was asking about it?
9      MR. D'AMATO: Object to form.
10     THE WITNESS: Well, I think -- I do not know
11 why Ms. Rahman was specifically asking about -- the
12 question, but it certainly would be a fair question to
13 ask on a Brazil research trip if China slowdown would
14 affect other Brazilian corporates, yes.
15     BY MS. MINDLIN:
16 Q.  Is that because the demand for oil by Chinese
17 companies would have lessened if Chinese industry was
18 slowing down?
19 A.  There may be many direct or indirect ways in
20 which a China slowdown could affect Brazilian companies,
21 and Petrobras is one of them.  I'm sure she wanted to
22 address, whether direct and indirect, what her roots
23 were.
24 Q.  If you go down to No. 4, there is a line --
25 ends with the words, "Everyone waiting for elections."

Page 72

BENTSI - CONFIDENTIAL

1
2      Do you see that?
3  A.  Yes.
4  Q.  Do you remember talking about the Brazil
5  elections in 2014?
6  A.  It would have been a conversation -- a constant
7  conversation.  I don't recall specific conversations,
8  no.
9  Q.  Do you remember when the elections took place?
10 A.  That is a good question.  I believe November,
11 but I don't recall specifically.
12 Q.  And so this e-mail is in March; right?
13 A.  Yes.
14 Q.  So do you remember discussions about the
15 Brazilian elections taking place throughout those --
16 A.  (Inaudible interruption.)
17 Q.  -- the period of time between March and when
18 they occurred in the fall?
19 A.  I would expect that the conversation around
20 elections would have happened for at least a year before
21 the election, yes.
22 Q.  And why is the election important for
23 discussing -- for portfolio managers who invest in
24 Brazil?
25     MR. D'AMATO: Object to form.

Page 73

1     BENTSI - CONFIDENTIAL
2     **THE WITNESS:** I'd say -- it would have been a
3  factor in many -- in any investment process.
4     **BY MS. MINDLIN:**
5  Q.  The elections would have been a factor?
6  **A.  Yes.**
7  Q.  And how are the elections a factor?  Is it the
8  fact of the election, or is it something about the
9  election's outcome, or something else?
10    **MR. D'AMATO:** Object to form.
11    **THE WITNESS:** Any election outcome may
12 determine what the different -- in any country would
13 determine what the policy "followed" post-elections
14 would be and how that might affect the companies in that
15 country.
16    **BY MS. MINDLIN:**
17 Q.  So in an election year, what is the effect on
18 the prices of securities in a company -- in a country
19 that is having an election?
20 **A.  I cannot --**
21    **MR. D'AMATO:** Object to form.
22    **THE WITNESS:** Yeah.  I cannot speak to how a --
23 an election -- any election in any country would affect
24 the prices.  In my -- if there was a -- I can
25 hypothesize that if there was a lot of volatility or a

Page 74

1  large difference between the policies of two different
2  candidates, that might lead to a -- a lot of volatility
3  in asset prices as respective parties look closer to
4  winning --
5     **BY MS. MINDLIN:**
6  Q.  Do you remember a large difference --
7  **A.  -- like Trump or Clinton.**
8  Q.  So right now in the Trump/Clinton showdown,
9  what is the effect on the prices of U.S. stocks?
10    **MR. D'AMATO:** Object to form.
11    **MR. GOLDSMITH:** Objection.
12    **THE WITNESS:** I can only hypothesize that a lot
13 of volatility would come from not knowing what either
14 policies would be or how they would affect the -- the
15 economies or asset prices.
16    **BY MS. MINDLIN:**
17 Q.  Do you remember there being a significant
18 difference between the people who were running for
19 president in Brazil in 2014?
20    **MR. D'AMATO:** Objection to form.
21    **THE WITNESS:** I recall there being a difference
22 in policy between the candidates, yes.  There were many
23 candidates, if you remember.
24    **BY MS. MINDLIN:**

Page 75

1     BENTSI - CONFIDENTIAL
2  Q.  So there was Dilma, who was the incumbent;
3  right?
4  **A.  Yes.**
5  Q.  And then there was the opposition; right?
6  **A.  Two oppositions.**
7  Q.  And what do --
8  **A.  Just two?**
9  Q.  -- you remember about the opposition?
10 **A.  Three?  Three -- three opposition.**
11 Q.  What do you remember about the three
12 oppositions?
13 **A.  I remember there being a Marina Silva, an "Ezio**
14 **Naylips," and I do not recall the gentleman who died,**
15 **who was the frontrunner at one point or another.**
16 Q.  Do you remember whether there was volatility in
17 the Brazilian markets around the elections in 2014?
18    **MR. D'AMATO:** Object to form.
19    **THE WITNESS:** Okay.  There was a lot of
20 volatility in -- in Brazil around the elections, and
21 that might have been due to the elections or other
22 things, certainly.  But there was certainly a lot of
23 volatility in the elections, if that is the insinuation,
24 yes.
25    **BY MS. MINDLIN:**

Page 76

1     BENTSI - CONFIDENTIAL
2  Q.  Was there volatility in the price of Petrobras
3  securities around the elections in 2014?
4  **A.  I do not recall, but there was a lot of**
5  **volatility in general.**
6  Q.  In the Brazil market?
7  **A.  Yes.**
8  Q.  If you go down to No. 7, it talks about the
9  chance of a Dilma reelection in the first round.
10    Do you see that?
11 **A.  Yes.**
12 Q.  Do you have any sense why Ms. Rahman refers
13 specifically to the chances of a Dilma reelection?
14    **MR. D'AMATO:** Object to form.
15    **THE WITNESS:** I can only assume that Ms. Rahman
16 was suggesting -- suggesting that we find out what the
17 chances of -- of a Dilma reelection were in the first
18 round, and that is how I would have interpreted the
19 question.
20    **BY MS. MINDLIN:**
21 Q.  Was a Dilma reelection going to be a negative
22 for Petrobras?
23    **MR. D'AMATO:** Object to form.
24    **THE WITNESS:** I cannot infer from this e-mail
25 whether she thought that was positive or negative.  I

Page 77

BENTSI - CONFIDENTIAL
1
2  think she was -- the question seems to ask whether there
3  was a chance of it happening.
4    **BY MS. MINDLIN:**
5  Q.  Setting that communication aside, which you can
6  do, did you have an opinion whether Dilma's reelection
7  would be good or bad for Petrobras?
8    **MR. D'AMATO:** Object to form.
9    **THE WITNESS:** I do not recall my opinion at the
10  time of whether a Dilma reelection necessarily would be
11  good or bad for Petrobras, but I would -- I would say it
12  would be a more a function of whether you thought the
13  person would continue their policies or not.
14    **BY MS. MINDLIN:**
15  Q.  And specifically, were there policies that you
16  were thinking of when you said that just now?
17  **A.  Nothing specific.  I'm just saying that if you**
18  **had a candidate who was in power, you'd have to also not**
19  **necessarily be looking at whether that candidate would**
20  **be reelected or whether they would also continue the**
21  **same policies they had in the first term.**
22  Q.  Did you --
23  **A.  That is an actual assumption.**
24  Q.  Did you have a view whether Dilma was likely to
25  continue the policies that were in place during her

Page 78

BENTSI - CONFIDENTIAL
1
2  first term?
3  **A.  I think the views were never static.  Certainly**
4  **dynamic in terms of our opinions about whether those**
5  **policies would be continued or not.**
6  Q.  So you went on the Brazil trip in April 2014?
7  **A.  Yes, I -- I guess.**
8  Q.  What do you remember about your views of the
9  Brazilian market after that trip?
10  **A.  I -- I don't recall that -- the outcome from**
11  **that trip in particular, no.**
12  Q.  Do you remember whether Mark Kiesel had any
13  views after that trip that you discussed with him?
14  **A.  I do not recall specifically, no.  As I recall,**
15  **we had a meeting, perhaps, on it.  I don't --**
16  Q.  You had a meeting on it with folks at PIMCO?
17  **A.  We might have had a conference call about**
18  **his -- his out- -- outlook, I imagine.**
19  Q.  Do you remember --
20  **A.  I do not specifically remember a meeting or a**
21  **call, but I would assume that would have happened.**
22  Q.  Do you remember what your view was of Petrobras
23  specifically coming out of the trip?
24  **A.  No.**
25  Q.  Do you have any recollection of Mark's view of

Page 79

BENTSI - CONFIDENTIAL
1
2  Petrobras coming out of the trip?
3  **A.  (No audible response.)**
4  Q.  Was that a no?
5  **A.  No.  Sorry.**
6  Q.  For the court reporter, you have to answer
7  verbally.
8  **A.  No.**
9    **(Exhibit 3 was marked for**
10    **identification.)**
11    **THE WITNESS:** Thank you.
12    **BY MS. MINDLIN:**
13  Q.  The court reporter has just marked and handed
14  to you what has been marked Bentsi Exhibit 3, and it is
15  Bates stamped PIMCO 0039482.  And it is titled
16  "Opportunities in Emerging Markets."  On the right side
17  it says "Mark Kiesel, April 2014."
18  **A.  Yeah.**
19  Q.  Do you remember this memo?
20  **A.  I do.**
21  Q.  How do you remember it?
22  **A.  It was one of Mark's perspectives.**
23  Q.  Did you say "perspectives"?
24  **A.  Yes.  He sometimes writes perspect- -- he**
25  **writes a -- monthly, I think it is, or a quarterly.**

Page 80

BENTSI - CONFIDENTIAL
1
2  Q.  And so this is one of his periodic updates?
3  **A.  Yes.**
4  Q.  To whom did his periodic updates go?
5  **A.  I believe to -- I do not know specifically who**
6  **they went to.  I know they went internally and**
7  **externally.**
8  Q.  Did you receive them?
9  **A.  Yes.**
10  Q.  Do you still?
11  **A.  I -- I assume so, yes.**
12  Q.  Do you know who externally received these
13  updates?
14  **A.  No.**
15  Q.  Did you participate in drafting the update with
16  Mark?
17  **A.  I may have edited, perhaps, or seen it**
18  **beforehand.**
19  Q.  And is that because you were on the trip with
20  him?
21  **A.  Yes.**
22  Q.  If you turn to the second page of the memo, and
23  it ends in 83 in the Bates stamp, there is a section
24  entitled "Brazil trip."
25    Do you see that section?

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL

Page 81

BENTSI - CONFIDENTIAL
2 A. Yes.
3 Q. And it says at the end of the first paragraph:
4 "Collectively, our team left for
5 Brazil cautious, and you could say
6 even -- you could even say mildly
7 bearish on the country based on the
8 following concerns."
9 Do you see that?
10 A. Yes.
11 Q. And there are a number of factors listed here.
12 The first one refers to "a state-run economy which is
13 high cost"; right?
14 A. Yes.
15 Q. And "uncompetitive given unions and high labor
16 costs" -- do you see that?
17 A. Yes.
18 Q. Do you recall your concerns at PIMCO about
19 unions and labor costs?
20 MR. D'AMATO: Object to form.
21 THE WITNESS: I do not recall that discussion,
22 no.
23 BY MS. MINDLIN:
24 Q. The next concern is "poor infrastructure and
25 longer-term investment in the private sector."

Page 82

BENTSI - CONFIDENTIAL
2 Do you recall how that was impacting the
3 Brazilian market at this point in time?
4 MR. D'AMATO: Object to form.
5 THE WITNESS: Not specifically, but it would
6 have been always -- you know, both would be factors in
7 assessing Brazilian corporate and equity credit, I
8 guess, or corporate and equity markets and their
9 viability for the future.
10 BY MS. MINDLIN:
11 Q. The unions and high labor costs -- were those
12 relevant to Petrobras, in your view?
13 A. It is one of the factors. Petrobras does have
14 a union.
15 Q. Did the union at Petrobras affect the company's
16 earnings?
17 MR. D'AMATO: Object to form.
18 THE WITNESS: It would be one of the factors.
19 Certainly having a union -- having a high-employee base
20 and having a union would reduce your ability to change
21 your operating cost.
22 BY MS. MINDLIN:
23 Q. What about poor infrastructure? Did that have
24 an effect on Petrobras?
25 MR. D'AMATO: Object to form.

Page 83

BENTSI - CONFIDENTIAL
2 THE WITNESS: It is -- it would certainly be a
3 factor. It would be hard to quantify how specific a
4 factor it was.
5 BY MS. MINDLIN:
6 Q. The third bullet here refers to "high
7 government involvement in some companies which are used
8 as agents of social policy."
9 Do you see that?
10 A. Uh-huh.
11 Q. Would that factor be relevant to Petrobras in
12 your view?
13 MR. D'AMATO: Object to form.
14 THE WITNESS: I would assume that was -- that
15 would be Mark's implication, as maybe Petrobras would be
16 one of those companies.
17 BY MS. MINDLIN:
18 Q. Do you have a sense of what was meant by
19 "agents of social policy"?
20 MR. D'AMATO: Same objection.
21 THE WITNESS: I can only tell you what I
22 interpret.
23 BY MS. MINDLIN:
24 Q. And now sitting here in the deposition, what do
25 you interpret "agents of social policy" to mean?

Page 84

BENTSI - CONFIDENTIAL
2 A. I would assume he is referring to a policy of
3 subsidized pricing in -- in gasoline and diesel --
4 Q. The same --
5 A. -- electricity. Same policy we discussed
6 before.
7 Q. The fourth bullet is "external vulnerability to
8 global growth and in particularly to a China slowdown."
9 Is that China slowdown the same China slowdown
10 that we discussed when talking about the previous
11 exhibit?
12 MR. D'AMATO: Object to form.
13 THE WITNESS: I would assume that he is talking
14 about the risk of a China slowdown and how that would
15 affect the whole Brazilian corporate ecosystem, as
16 opposed to anything specific.
17 BY MS. MINDLIN:
18 Q. If you continue down the page -- if you look at
19 the paragraph following the bullets, at the end of that
20 paragraph Mark writes:
21 "The qualitative insights and
22 judgments from our trip confirmed a
23 highly bearish sentiment, which was
24 consistent across almost all the
25 companies we visited."

Ellen Grauer Court Reporting Co. LLC

Page 85

BENTSI - CONFIDENTIAL
1
2   Do you see that sentence?
3 A. I see the sentence, yes.
4 Q. Do you remember a "highly bearish sentiment"
5 during the Brazil trip?
6   MR. D'AMATO: Object to form.
7   THE WITNESS: I do not recall specifically the
8 context of this trip or any highly -- highly bearish
9 sentiment or what -- what he actually meant by that.
10   BY MS. MINDLIN:
11 Q. As a portfolio manager, when faced with a --
12 strike that.
13   Are there instances when you, as a portfolio
14 manager, choose to invest in a country where the overall
15 sentiment is quote/unquote "bearish"?
16   MR. D'AMATO: Object to form.
17   THE WITNESS: I think the investment process
18 has many factors. It is not necessarily -- a sentiment
19 would be one of the factors in an investment decision.
20 Certainly valuation would be another factor.
21   BY MS. MINDLIN:
22 Q. How do you assess valuation as a portfolio
23 manager?
24 A. There may be a myriad ways of assessing
25 valuation, but certainly looking at what the spread of a

Page 86

1   BENTSI - CONFIDENTIAL
2 bond is or -- some people might use yield or price, and
3 seeing whether that represented -- or how far that --
4 how far away that was away from their interpretation or
5 their determination of fair value.
6 Q. So comparing the spread or the yield of a bond
7 to the manager's interpretation of the fair value of
8 that?
9 A. That would be what I would use to drive an
10 investment decision, yes.
11 Q. How did you determine fair value for a credit
12 that you were potentially going to invest in?
13 A. Well, we have a large research facility that
14 would look through the credits and determine what its --
15 its -- what it thought the -- the risks were, and we'd
16 use that as a way of determining what you thought the
17 valuation should be, and then determine what -- how far
18 away is -- away -- how far away that is from fair value.
19 Q. Do you remember in 2014, in the spring, whether
20 there was a difference between the way that the market
21 was pricing Petrobras and the way that you were pricing
22 Petrobras?
23 A. I don't --
24   MR. D'AMATO: Objection.
25   THE WITNESS: -- remember specifically, no.

Page 87

1   BENTSI - CONFIDENTIAL
2   BY MS. MINDLIN:
3 Q. If you look to the next page, which ends in 84,
4 there is a section that is entitled "Emerging markets
5 relative value improves."
6   Do you see that section?
7 A. I do.
8 Q. And if you go down to the third paragraph --
9 A. I do.
10 Q. -- you see a paragraph -- I'm sorry.
11   The second sentence says:
12   "Specifically in the case of
13   Petrobras, one of the largest and
14   most important companies in Brazil,
15   spreads have widened significantly
16   relative to both the sovereign spread
17   of Brazil, as well as relative to the
18   U.S. credit market."
19   Do you see that?
20 A. I do.
21   Do you mind if I read these last few pages to
22 see what he is -- what is the --
23 Q. Go ahead.
24 A. -- the tenor of the message?
25 Q. So I think we were looking at the portion of

Page 88

1   BENTSI - CONFIDENTIAL
2 page 84 that begins in the last paragraph on the page
3 with the sentence, "Specifically in the case of
4 Petrobras"; right?
5   MR. D'AMATO: The -- counsel, the Bates are cut
6 off on our copies.
7   MS. MINDLIN: I --
8   MR. D'AMATO: So I think it is the one with,
9 "Emerging markets relative value improves." Is that the
10 right page?
11   MS. MINDLIN: That is correct. And I --
12   MR. D'AMATO: Okay.
13   MS. MINDLIN: -- apologize about the Bates
14 numbers.
15   MR. D'AMATO: No problem. We're clear.
16   BY MS. MINDLIN:
17 Q. The reference to spreads widening significantly
18 to the sovereign spread of Brazil -- does that mean the
19 difference in basis points between the Petrobras bond in
20 a given maturity and the Brazilian government bond in
21 the same maturity?
22 A. Yes.
23   MR. D'AMATO: Object to form.
24   BY MS. MINDLIN:
25 Q. And "the U.S. credit market" -- does that mean

Page 89

BENTSI - CONFIDENTIAL

1 the spread over the U.S. Treasury?
2 Q. When you say "on a performance perspective" --
3 **MR. D'AMATO:** Object to form.
4 **THE WITNESS:** I do not know what Mark was using
5 as his reference point for the U.S. credit markets,
6 but -- to be frank, I do not know what Mark is referring
7 to as his reference point for the sovereign spread of
8 Brazil either, but I assume it is somewhere in this --
9 in this paper.
10 **BY MS. MINDLIN:**
11 Q. It looks as though the way that the document
12 was produced to us doesn't contain the chart 5 that is
13 referred to; so we don't have the benefit of that.
14 Would it ordinarily be the case that when
15 someone would refer to the sovereign spread, they would
16 mean the government bond issued by that country?
17 **A. If correctly done, it would mean they're**
18 **looking at the spread of Petrobras compared to either**
19 **the sovereign spread of a bond issued by the Brazilian**
20 **government or commonly -- also, an alternative would be**
21 **a five-year credit derivative or respective credit**
22 **derivative for that maturity.**
23 **BY MS. MINDLIN:**
24 Q. What kind of credit derivatives?
25 **A. A CDS. Just the regular credit derivative**

Page 90

BENTSI - CONFIDENTIAL

1 swap. It is not relevant.
2 **swap. It is not relevant.**
3 Q. Are there certain kinds of credits for which
4 you use the CDS as a baseline to which you compare
5 things?
6 **A. It is -- it is just a choice in -- of what**
7 **people choose to be their reference points as a -- there**
8 **are two different moving parts; so one can say that**
9 **one -- you know, you can choose two different reference**
10 **points and say what -- whether it is a wide or a tighter**
11 **reference.**
12 Q. And the widening of spreads, however you
13 measure it, would mean that the bonds are being priced
14 more weakly in the market?
15 **MR. D'AMATO:** Object to form.
16 **THE WITNESS:** Yeah. The -- do you want to
17 rephrase the question?
18 **BY MS. MINDLIN:**
19 Q. Why don't you answer, and then we can see.
20 **A. I think what you are asking is that if we saw**
21 **widening in spread of a -- Petrobras versus whatever**
22 **sovereign spread metric you were using, whether that**
23 **would -- whether that would indicate that Petrobras was**
24 **underperforming versus the sovereign on a performance**
25 **perspective.**

Page 91

BENTSI - CONFIDENTIAL

1 **BENTSI - CONFIDENTIAL**
2 Q. When you say "on a performance perspective" --
3 **A. Or a return perspective.**
4 Q. -- you mean a performance of the --
5 **A. Return perspective.**
6 Q. -- bonds?
7 **A. I mean from a return perspective which one is**
8 **underperforming.**
9 Q. So here the Petrobras credit instruments are
10 underperforming?
11 **A. That would seem to be the suggestion, yes.**
12 Q. The next sentence says:
13 "What is happening to Petrobras is a
14 unique situation and one in which we
15 feel represents an opportunity for
16 investors with a longer-term time
17 horizon."
18 Do you see that?
19 **A. Uh-huh.**
20 Q. Do you know what was meant by "unique
21 situation" in that sentence?
22 **A. I don't, but I can only assume that he was**
23 **referring -- suggesting as an investment opportunity.**
24 Q. And at this point in time, you were aware of
25 the Lava Jato investigation; right?

Page 92

BENTSI - CONFIDENTIAL

1 **BENTSI - CONFIDENTIAL**
2 **MR. D'AMATO:** Object to form.
3 **THE WITNESS:** I do not know that.
4 **BY MS. MINDLIN:**
5 Q. Were you aware at this point of the arrest of
6 Paulo Roberto Costa by the Brazilian federal police?
7 **MR. D'AMATO:** Object to form.
8 **THE WITNESS:** I do not know that.
9 (Exhibit 4 was marked for
10 identification.)
11 **THE WITNESS:** Thank you.
12 **BY MS. MINDLIN:**
13 Q. The court reporter has handed you what has been
14 marked Bentsi Exhibit 4, and it is an e-mail from David
15 Cortez that is Bates stamped PIMCO 01552783.
16 Do you recognize this e-mail?
17 **A. I do not.**
18 Q. Do you know who David Cortez is?
19 **A. I do not.**
20 Q. And do you see your name at the end of the bcc
21 line?
22 **A. I do.**
23 Q. Is -- is this a type of e-mail that you would
24 have received at PIMCO?
25 **MR. D'AMATO:** Object to form.

Page 93

BENTSI - CONFIDENTIAL
1
2     THE WITNESS: It certainly looks like an e-mail
3  I received or may have received.
4     BY MS. MINDLIN:
5  Q.  And it looks like it is an e-mail with the
6  subject line "Ex-Petrobras director arrested, Veja -B-."
7     Do you see that?
8  A.  Yes.
9  Q.  Is Veja the Brazilian publication that you
10 mentioned when we started the deposition?
11 A.  Yes.
12 Q.  So it is a news article, then; right?
13 A.  Yes.  It was probably -- I would assume it came
14 out of a news -- news article.
15 Q.  And in the second -- sorry.
16    In the fourth line down, it says, "Paulo
17 Roberto de Costa, Petrobras's ex-director of its
18 refinery and gas station arms, is considered the brown
19 bag man," and goes on in the next paragraph to say that
20 he was arrested; right?
21 A.  That is what the e-mail says, yes.
22 Q.  Does this e-mail refresh your recollection at
23 all about when you learned about an investigation
24 relating to Petrobras?
25 A.  No.

Page 94

BENTSI - CONFIDENTIAL
1
2  Q.  Do you know whether your team discussed during
3  the Brazil trip in 2014, in April, investigations --
4  A.  I do not --
5  Q.  -- related to Petrobras?
6  A.  I do not recall now.
7  Q.  You can set that aside --
8  A.  Okay.
9  Q.  -- the Exhibit 4.
10    So if you go back to Exhibit 3, which we were
11 talking about, do you -- do you know why Mark was
12 recommending Petrobras as an investment opportunity?
13    MR. D'AMATO: Object to form.
14    THE WITNESS: I do not know why Mark was
15 specifically recommending it -- Petrobras as an
16 investment opportunity, no.
17    BY MS. MINDLIN:
18 Q.  If you turn to page 85, there is a -- the
19 end of that paragraph in the same section -- I know you
20 don't have the benefit of the Bates stamps.
21    MR. D'AMATO: Actually, we do on that page.
22    MS. MINDLIN: Okay.  Well, now you do.
23    MR. D'AMATO: It is the last page.
24    BY MS. MINDLIN:
25 Q.  The last page of the document refers to

Page 95

BENTSI - CONFIDENTIAL
1
2  Petrobras having "significant financial flexibility
3  through the quality of its assets."
4     Do you see that?
5  A.  I do.
6  Q.  And what were the quality of Petrobras's assets
7  and -- I'm sorry -- "and reserve base," the sentence
8  ends?
9     MR. D'AMATO: Object to form.
10    THE WITNESS: I would assume that Mark is
11 referring to its investment over the last how many years
12 in infrastructure and its oil reserve base.
13    BY MS. MINDLIN:
14 Q.  What do you remember about Petrobras's
15 infrastructure investments?
16 A.  Briefly, I would say Petrobras has large
17 investments in infrastructure across Brazil in
18 transportation and distribution and refineries.
19 Q.  Were you aware of any specific refinery
20 projects that Petrobras was working on during this
21 period of time?
22 A.  I'm aware of some of the refineries that
23 Petrobras has, yes.
24 Q.  Are you aware of the Abreu e Lima refinery?
25 A.  Sí.  Yes.

Page 96

BENTSI - CONFIDENTIAL
1
2  Q.  Are you aware of the cost overruns for the
3  Abreu e Lima refinery?
4  A.  I am aware of those now, certainly.  I think I
5  would have been aware of those -- I might have been
6  aware of those then, yes.
7  Q.  And "then" means in April of 2014?
8  A.  In April 2014.
9  Q.  Do you think you were aware of those cost
10 overruns at Abreu e Lima before April 2014?
11 A.  I would say that the cost overruns for the
12 refineries at Petrobras as a whole were pretty well
13 documented.
14 Q.  And when you say "well documented," does that
15 mean in Petrobras's financial statements?
16 A.  I would have said more popular literature,
17 the -- discussing how expensive the projects had become.
18 Q.  So the news, for example, would have been one
19 component of the popular literature?
20 A.  It might have been a source of input, yes.  I
21 can't recall specifically where I would have picked that
22 up, but certainly.
23 Q.  Were you aware of the Comperj refinery as well?
24 A.  It was another refinery, yes.
25 Q.  Were you aware of cost overruns at the Comperj

Page 97

BENTSI - CONFIDENTIAL

1 refinery?

2 **A. I think they have cost overruns at every**

3 **refinery, but I do not recall specifically.**

4 Q. And just as with Abreu e Lima, would you have

5 been aware of those cost overruns by April 2014?

6 **A. I -- I do not recall specifically, no. I can**

7 **only assume.**

8 Q. But was it the case that the general cost

9 overruns at Petrobras's refineries -- strike that.

10 You said a moment ago that the cost overruns

11 for the refineries at Petrobras as a whole were pretty

12 well documented; right?

13 **A. Yes.**

14 Q. And that applies not just to the Abreu e Lima

15 refinery but all of Petrobras's ongoing refinery --

16 **A. My interpretation --**

17 Q. -- projects?

18 **A. My interpretation was there was overruns at all**

19 **the projects, yes.**

20 Q. The videographer mentioned that we have to

21 change the tape; so if we could take a short break --

22 **A. Sure.**

23 Q. -- that would be good.

24 **THE VIDEOGRAPHER:** This is the end of disk

Page 98

BENTSI - CONFIDENTIAL

1 No. 1. The time is 10:37, and we are off the record.

2 (Recess.)

3 **THE VIDEOGRAPHER:** We are back on the record.

4 This is the beginning of disk No. 2. The time is 10:47.

5 (Exhibit 5 was marked for

6 identification.)

7 **THE WITNESS:** Thank you.

8 **BY MS. MINDLIN:**

9 Q. The court reporter handed you what has been

10 marked for identification Bentsi Exhibit 5, and it is

11 Bates stamped PIMCO 00621045. It is an e-mail that

12 looks like it is sent by you on Monday, May 5, 2014.

13 Do you recognize this e-mail?

14 **A. I do not.**

15 Q. But it looks like you were the sender of it?

16 **A. It does indeed.**

17 Q. If you look down the page to the third

18 paragraph, it says:

19 "Again, if you're going to buy

20 PETBRA, which I don't recommend, you

21 should certainly be taking ODEBRE

22 first as a better value."

23 Do you see that small paragraph?

24 **A. I do.**

Page 99

BENTSI - CONFIDENTIAL

1 Q. And where it says "PETBRA," P-E-T-B-R-A, does

2 that mean Petrobras?

3 **A. That is a ticker for Petrobras, yes.**

4 Q. And O-D-E-B-R-E in the next line is Odebrecht?

5 **A. Yes.**

6 Q. And does that refer to Odebrecht or a specific

7 Odebrecht entity, if you know?

8 **A. It would be referring to Odebrecht drilling,**

9 **which is one of the -- the projects underneath Odebrecht**

10 **Oil & Gas.**

11 Q. With respect to the parenthetical where you

12 say, "Which I don't recommend," why didn't you recommend

13 buying Petrobras at this point in time?

14 **A. I do not recall.**

15 Q. Was it based on the risk of investing in

16 Brazil?

17 **A. I do not recall.**

18 **MR. D'AMATO:** Object to form.

19 (Discussion held off the record.)

20 **BY MS. MINDLIN:**

21 Q. If you look down the page -- and you see the

22 chart below the paragraph; right?

23 **A. Yes.**

24 Q. There is a number of fields here. If you go to

Page 100

BENTSI - CONFIDENTIAL

1 the third field, it says, "The price"; right?

2 **A. Yes.**

3 Q. And is that the price of the --

4 **A. Bonds?**

5 Q. -- bonds listed in the previous field?

6 **A. Yes.**

7 Q. And if you go to the column labeled "OAS" two

8 over --

9 **A. Yes.**

10 Q. -- what does "OAS" stand for?

11 **A. Option-adjusted spread.**

12 Q. Would you use the option-adjusted spread to

13 compare the credits of two different issuers?

14 **A. Yes.**

15 Q. How would you use it?

16 **A. It would give us some sense of the relative**

17 **valuation or relative yield or spread pickup between the**

18 **two bonds.**

19 Q. Did you think at this point that Odebrecht was

20 a -- better as a relative value than Odebrecht?

21 **MR. D'AMATO:** Object to form.

22 **MS. MINDLIN:** I'm sorry. I misspoke.

23 Q. Did you think at this point that Petrobras was

24 not as good a relative value than Odebrecht?

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL

KOFI BENTSI
May 20, 2016

Page 101

BENTSI - CONFIDENTIAL

1  BENTSI - CONFIDENTIAL
2  MR. D'AMATO: Object to form.
3  THE WITNESS: The e-mail would seem to suggest
4  that I thought at the time that Odebrecht offered more
5  performance upside than Petrobras, as it was only
6  trading a hundred basis points wider than Petrobras.
7  BY MS. MINDLIN:
8  Q. "Wider than" means further away from the
9  baseline?
10 A. Well, good question. Wider than Petrobras was
11 being -- using the -- using Petrobras as the base and --
12 and it -- what our estimation of how far or how much
13 wider Odebrecht had to be to "compense" you --
14 compensate you for the increased credit risk as being
15 invested in Odebrecht as opposed to Petrobras. It would
16 seem to suggest that I thought you were being
17 compensated more than the risk you were taking in being
18 invested in Odebrecht.
19 Q. So in making the determination whether to
20 invest in Petrobras or Odebrecht, you were weighing the
21 risk of the investment against the payout --
22 A. Yeah.
23 Q. -- that you would get?
24 A. Exactly.
25 Q. If you look in the main paragraph of the e-mail

Page 102

1  BENTSI - CONFIDENTIAL
2  at the top of the page, it says:
3  "Granted, Odebrecht could still have
4  additional issues that are unrelated
5  to Petrobras's ability to pay."
6  Do you see that?
7  A. Yes.
8  Q. What were -- what were the issues about
9  Petrobras's ability to pay?
10 A. Well, one of the credit risks in
11 an Odebrecht -- in these Odebrecht bonds would have been
12 its risk that Petrobras was unable to pay Odebrecht for
13 the services provided. I was -- the e-mail highlights
14 that that was one of the risks. There were other
15 operational risks in terms of actually being able to
16 provide the services and keep the rigs upstanding --
17 ongoing -- yeah -- the drilling rigs working.
18 Q. Did you have any understanding of the reasons
19 why there was operational risks for Odebrecht at that
20 point in time?
21 A. There is operational risks for all rigs. They
22 might have a -- any kind of operational failures,
23 blowouts, et cetera.
24 Q. And with respect to the -- Petrobras' ability
25 to pay, did you have concerns about Petrobras's ability

Page 103

1  BENTSI - CONFIDENTIAL
2  to pay at that point in time?
3  A. No, nothing specific. It was more relating
4  to -- I believe the statement was more highlighting the
5  different factors that would go into an investment
6  decision, and then one can weigh what those different
7  factors would be, or how much risk there was in each one
8  of those factors. I wouldn't necessarily say I -- I
9  thought that Petrobras had a risk of not paying in the
10 immediate sense.
11 Q. Is there always risk related to an issuer's
12 ability to pay on its contract?
13 A. Is there always risk? I wouldn't say always,
14 but yes. There is always risk that an issuer -- in any
15 contract, there is always risk that the opposite part of
16 the contract would be unable to pay or unable to perform
17 as per the contract.
18 Q. And at this point in time, did the Lava Jato
19 investigation impact your assessment of Petrobras's
20 ability to pay on its contracts?
21 MR. D'AMATO: Object to form.
22 THE WITNESS: I cannot speak to when I knew the
23 Lava Jato drama, but -- so I can't -- and I don't see
24 that referenced here.
25 BY MS. MINDLIN:

Page 104

1  BENTSI - CONFIDENTIAL
2  Q. And since it is not referenced, it was
3  presumably not the reason why you were concerned about
4  Petrobras's ability to pay?
5  MR. D'AMATO: Object to form.
6  THE WITNESS: Yeah. I -- I can't -- I cannot
7  speak to that. I just do not see a reference; so I do
8  not know when I knew of Lava Jato.
9  BY MS. MINDLIN:
10 Q. If you turn inside the document to the page
11 that ends in Bates 56, the third paragraph down begins
12 on "On January 6." Do you see that?
13 A. I do. Would you like me to read the whole
14 thing first to help you?
15 Q. I don't think that you need to because I don't
16 think that we're going to spend a lot of time talking
17 about most of these interior pages. So if you want to
18 take a moment to look at that paragraph, I think that
19 might make more sense. But first --
20 MR. D'AMATO: Well, I mean, you can look at
21 whatever you need to put it in context.
22 MS. MINDLIN: Absolutely.
23 Q. In the paragraph that we were looking at, there
24 is a reference to Petrobras's "mismanagement of
25 contracts."

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL

Page 105

```
 1       BENTSI - CONFIDENTIAL
 2    Do you see that?
 3 A.  Yes.
 4 Q.  What did you understand at this point in time
 5 about Petrobras's mismanagement of contracts?
 6 A.  I -- I do not understand it then or -- I'm not
 7 sure I can understand now what was -- what was meant --
 8 what was meant to be implied by "mismanagement of
 9 contracts."
10 Q.  Did you understand whether Petrobras had been
11 accused by anyone of mismanaging contracts?
12 A.  No.
13 Q.  Did you understand whether contracts were
14 mismanaged that were between Odebrecht and Petrobras?
15 A.  Again, I do not know what the writer was
16 implying by the statement Petrobras's "mismanagement of
17 contracts."  I can only assume it was referring to
18 something to do with oil rigs, but I can only assume
19 that.
20 Q.  You can set that aside.
21    (Exhibit 6 was marked for
22    identification.)
23    BY MS. MINDLIN:
24 Q.  The court reporter handed you the exhibit that
25 has been marked Exhibit 6, I believe -- Bentsi
```

Page 106

```
 1       BENTSI - CONFIDENTIAL
 2 Exhibit 6, which is Bates stamped PIMCO 00349896.  It is
 3 an e-mail from you to Lupin Rahman on May 8, 2014.
 4    Do you recognize this e-mail?
 5 A.  I do not, but it is written by me.
 6 Q.  So if you look first down the page to the first
 7 e-mail in the chain, under "On May 8 at 3:49 a.m.," you
 8 said, "Everyone is bearish" -- I'm sorry.
 9    The beginning of the second line:
10    "In general, there is no theme of
11    crisis, but everyone is bearish
12    because there is no solution to
13    current problems in next six months,
14    and the problems can only seemingly
15    get worse within that time frame with
16    added electricity risk."
17    Do you see that?
18 A.  Yes.
19 Q.  When you wrote "everyone is bearish," do you
20 know who "everyone" was?
21 A.  That was more of a general term highlighting
22 just the theme from the trip of people we had interacted
23 with.  It would have been a generalization, certainly.
24 Q.  And so a general sense that the market is
25 heading downward?
```

Page 107

```
 1       BENTSI - CONFIDENTIAL
 2    MR. D'AMATO: Objection to form.
 3    THE WITNESS: Yeah.  I would say that a term
 4 like that, when used in -- in the context "everyone is
 5 bearish," would suggest that everyone is -- has a
 6 negative opinion about an environment, a context, a
 7 story.  It does not necessarily mean that they think
 8 prices or -- will go down, necessarily, or they just
 9 think a situation will worsen.
10    BY MS. MINDLIN:
11 Q.  So in May 2014, or at least at the beginning of
12 May, you perceived that there was a general sense --
13 A.  My trip to Brazil -- I -- from what I'm
14 inferring, suggests a general sense of pessimism.
15 Q.  And do you remember why there was no solution
16 to the current problems in the next six months from
17 then?
18 A.  I do not really recall specifically what I was
19 referring to as in "the next six months."  It certainly
20 could have been -- the elections is one option, but I
21 think more likely it was just referring to the fact that
22 there was no obvious solution to the current weak
23 environment that Brazil was experiencing at the time.
24 Q.  And what is the reference to "electricity risk"
25 about?
```

Page 108

```
 1       BENTSI - CONFIDENTIAL
 2 A.  There was a drought in Brazil at the time.
 3 Q.  And what was the effect of the drought on risk,
 4 if any?
 5    MR. D'AMATO: Objection to form.
 6    THE WITNESS: The drought in -- had increased
 7 the prices of electricity, which is obviously increasing
 8 the costs for a lot of corporates in -- in Brazil, and
 9 there was an electricity shortage overall.
10    BY MS. MINDLIN:
11 Q.  Do you know whether the drought was increasing
12 Petrobras's costs at that point in time?
13 A.  I don't think Petrobras specifically was
14 suffering from the -- the drought, but I don't remember
15 that specifically.
16 Q.  The next line says:
17    "Risk is obviously around what Dilma
18    will let happen to ensure the win."
19    Here, does "Dilma" refer to Dilma Rousseff, who
20 was the incumbent?
21 A.  Yes.
22 Q.  And what was the risk that you were referring
23 to here?
24 A.  The risk that I would -- I would suggest -- the
25 risk that Dilma would fix pricing policies or economic
```

Page 109

BENTSI - CONFIDENTIAL

1    policies to ensure popular support ahead of an election.
2    Q.  What would have been the impact for Petrobras
3    of Dilma's fixing pricing policies ahead of the
4    election?
5    A.  Well, there were many opportun- -- many
6    different pricing policies she could have adjusted.  At
7    a glance, I think I was referring to the electricity
8    pricing, but, certainly, she could also have fixed
9    gasoline and diesel pricing.
10   Q.  At this point in time in May, was the market
11   for Petrobras bonds reacting to the risk around the
12   election?
13   A.  I do not -- I cannot tell that from this
14   e-mail.
15   Q.  Separate from the e-mail, do you remember
16   whether the market was reacting to election risks?
17   A.  I don't remember that, no.
18   Q.  If you look further down in the -- after the
19   next little caret, the second line down says:
20        "CFO intimated in meeting that he
21        thought mid year was likely, which is
22        in line with my thinking."
23        Do you know whether this refers to the CFO of
24   Petrobras?

Page 110

BENTSI - CONFIDENTIAL

1    A.  I believe it does, yes.
2    Q.  And who is that?
3    A.  At the time it would have been Barbassa.
4    Q.  Did you meet with Barbassa in Brazil?
5    A.  I believe so, yes.
6    Q.  And was that during your April trip that you
7    went on with Mark?
8    A.  I believe so, yes.
9    Q.  What do you remember about the trip?
10       I'm sorry.  What do you remember about the
11   meeting with Barbassa?
12   A.  Nothing specifically comes to mind.
13   Q.  Why did you meet with him?
14   A.  We try to meet with all the important
15   executives of the companies we're invested in.
16   Q.  If you go down the page, there is a -- next
17   caret says, "Macro backdrop."
18       Do you see that?
19   A.  Yes.
20   Q.  It says:
21       "Macro backdrop will end up being the
22       discussion point as corporates look
23       good ex Caixa and Petrobras."
24       Do you see that?

Page 111

BENTSI - CONFIDENTIAL

1    A.  Yes.
2    Q.  Does that mean corporates look good except for
3    Caixa and Petrobras?
4    A.  That seems to be my opinion at the time, yes.
5    Q.  Do you remember why you did not think Petrobras
6    looked good at that point in time?
7    A.  No.
8    Q.  If you look further down, the communication
9    reads:
10       "Petrobras can be milked, but the
11       problems are now getting too big to
12       be ignored and likely to be used as a
13       political tool against Dilma, hence
14       the need to keep it on its feet ahead
15       of elections."
16       What does "Petrobras can be milked" mean?
17   A.  In reading this, I think at the time I was
18   referring to the fact that you could keep the pricing
19   policy favorable to the public, and, thus, the company
20   suffer to benefit and subsidize the voters.
21   Q.  Meaning that the public would want the domestic
22   gas prices to maintain -- I'm sorry -- to stay low?
23   A.  To stay low.
24   Q.  And, therefore, Petrobras would suffer because

Page 112

BENTSI - CONFIDENTIAL

1    it would suffer from the lower prices?
2    A.  Yes.
3    Q.  When you said the problems were "getting too
4    big to be ignored," do you remember whether there were
5    problems other than the domestic pricing policy?
6    A.  I think I was referring to the overall leverage
7    in the company.
8    Q.  And when you say "leverage," did you mean the
9    leverage of net debt to EBITDA was too high?
10   A.  Yes.  Net debt to EBITDA being too high.
11   Q.  How would those problems have been used as a
12   political tool against Dilma?
13   A.  Well, the -- the suggestion is that as
14   Petrobras gets -- worsens as a credit and is no longer
15   able to fund as a highly levered company, it might -- it
16   might create a distress scenario for the company and/or
17   the country if it had to support the company.
18   Q.  Were you concerned as an investor about a
19   potential distress scenario for Petrobras?
20   A.  I would say that it always has to be one of the
21   potential position -- outcomes one has to consider.
22   Q.  Was your understanding that the market had
23   identified the same risks that you did with respect to
24   Petrobras investments at this point in time?

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL

**KOFI BENTSI**
**May 20, 2016**

Page 113

BENTSI - CONFIDENTIAL
1
2 A. I can't -- I cannot tell that from this e-mail.
3 Q. Do you know in general, stepping away from the
4 e-mail, whether the market perceived the same risks that
5 you did with respect to Petrobras investments at this
6 point in time?
7 MR. D'AMATO: Objection to form.
8 THE WITNESS: It would be a -- guess at best.
9 BY MS. MINDLIN:
10 Q. So at the bottom of that paragraph, there is a
11 line that says:
12 "Mark," quote, "if I was the
13 political opposition, I would take a
14 stock chart of Petrobras and just
15 keep showing it everywhere."
16 Do you know why you copied that quote into this
17 e-mail?
18 A. I thought it was a good example of the way you
19 could use Petrobras as a tool against Dilma.
20 Q. And what was going on with Petrobras's stock at
21 that point?
22 A. It was on a downward trajectory.
23 Q. And so if the opposition showed the downward
24 trajectory, that would help propel them into power
25 through the election?

Page 114

BENTSI - CONFIDENTIAL
1
2 MR. D'AMATO: Object to form.
3 THE WITNESS: The suggestion is that if the
4 opposition showed the decline in value of Petrobras,
5 which the government has a large share holding in, that
6 would -- could be used as a political tool against
7 Dilma.
8 BY MS. MINDLIN:
9 Q. Did you have a sense whether if Petrobras kept
10 declining, the government would step in to support it?
11 A. I would have said that I did not have an
12 opinion at the time or did not think it was necessarily
13 relevant.
14 Q. And why was it not necessarily relevant?
15 A. Did I have an opinion at the time if
16 Petrobras -- if the government was going to step in
17 to -- to defend Petrobras was the question?
18 Q. Well, that was the question, but you
19 had said that you didn't think it was necessarily
20 relevant whether the government would step in to support
21 it.
22 A. I look at it from the perspective of there
23 being a myriad of outcomes, but there being also a
24 process to get to those outcomes. And I think we were
25 too early in the process for me to worry about whether

Page 115

BENTSI - CONFIDENTIAL
1
2 the government would step in to -- to protect Petrobras.
3 Q. And so that was as of May. Did you later begin
4 to think more about whether the government would step in
5 to protect Petrobras?
6 A. I would say that we always consider the
7 potential for Petro- -- for the government to step in
8 and support Petrobras, but I'd also say that when
9 spreads are at around 200 basis points, there is a long
10 way to go until someone steps in to save you.
11 Q. And so when you were talking about the spreads,
12 I think you were referring back to Exhibit 5, which
13 showed the Odebrecht and Petrobras bond spreads; is that
14 right?
15 A. Exactly.
16 Q. And so at around 200 basis points, that is a
17 reflection of the relative risk of the credit?
18 A. Yes.
19 Q. And your sense was that the credit at that
20 point in time was secure?
21 MR. D'AMATO: Object to form.
22 THE WITNESS: I think that spread references or
23 reflects the market's perception of relative security.
24 I would say that -- though, that if something is trading
25 at 200 basis points or 105 to 115 points in bond price,

Page 116

BENTSI - CONFIDENTIAL
1
2 that the -- the market would seem to not be too
3 concerned about a distress scenario.
4 BY MS. MINDLIN:
5 Q. But you yourself thought that Petrobras was, at
6 that point in time, not a good investment; right?
7 MR. D'AMATO: Object to form.
8 THE WITNESS: I don't necessarily see that
9 here. That is why I'm hesitating. I'm not -- I don't
10 know if you're referring to this particular e-mail or
11 referring back to here instead.
12 BY MS. MINDLIN:
13 Q. I guess -- why don't you set that one aside
14 and --
15 (Exhibit 7 was marked for
16 identification.)
17 THE WITNESS: Thank you.
18 BY MS. MINDLIN:
19 Q. The court reporter handed you what she just
20 marked Bentsi Exhibit 7. It is Bates stamped
21 PIMCO 00603377. And it looks like a Bloomberg chat
22 between you and Natalia Lima; is that right?
23 A. Yes.
24 Q. Do you recognize this chat?
25 A. No.

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL

Page 117

BENTSI - CONFIDENTIAL

1
2 Q. Does it look like a chat that you had with
3 Ms. Lima?
4 A. Yes.
5 Q. If you turn inside the chat to the page that
6 ends in 79, at the top of the page at 20:57:04, you
7 said, "I" -- you said, "Think I already sold PBR."
8 And this was on April 9, 2014; right?
9 A. Give me one moment.
10 Q. Sure.
11 So if you look on the page that ends 79, toward
12 the top of the page, you said, "Think I already sold
13 PBR"?
14 Do you see that?
15 A. Yes.
16 Q. Do you remember selling Petrobras bonds around
17 this period of time?
18 A. I don't remember specifically, no, but it
19 seems -- the message seems to suggest that.
20 Q. If you look down the page at 21:07:25, you
21 said:
22 "The one thing I am convinced of is
23 that there is a lot of risk in
24 Brazil."
25 Do you see that?

Page 118

BENTSI - CONFIDENTIAL

1
2 A. Yes, I do.
3 Q. Why was there a lot of risk in Brazil?
4 A. Within the context of the drought and of the
5 potential for electricity rationing, there was a lot of
6 risk in Brazil.
7 Q. It -- all the risk was related to the drought?
8 A. That was one of the risks I'm focusing on here,
9 yes.
10 Q. And how do you know you were focusing on the
11 drought risk here?
12 A. I think -- I think the -- the suggestion is
13 that that was the one thing that was not being factored
14 into pricing right now.
15 Q. I see.
16 And did you share with your PIMCO colleagues
17 your concern that they were not pricing in the drought
18 risk?
19 A. If -- from what I can infer from this e-mail --
20 and I don't remember specifically -- it sounds like we
21 had a call about Brazil, probably post the trip, in
22 which the droughts or the rationing risk was
23 highlighted.
24 Q. And where are you looking in the communication
25 right now?

Page 119

BENTSI - CONFIDENTIAL

1
2 A. I look at -- is it Bates? Bate?
3 Q. Bates.
4 A. Bate? Bates 80.
5 Q. You're really becoming a lawyer today.
6 A. The top line:
7 "I didn't do that great of a job of
8 highlighting how risky this rationing
9 thing is at the call today."
10 Q. And that was Ms. Lima. And you interpret her
11 now to be referring to rationing of energy?
12 A. Yes.
13 Q. And you said at 21:11:58:
14 "I was reading about it and it didn't
15 really trigger in my head until I
16 went on trip."
17 And do you mean -- "it" meaning the concern or
18 risk about the electricity?
19 A. The electricity pricing, electricity shortages,
20 and the drought impact, yes.
21 Q. And now thinking more about the drought, did
22 the drought and the rationing have an effect on
23 Petrobras?
24 MR. D'AMATO: Object to form.
25 THE WITNESS: I don't think it necessarily had

Page 120

BENTSI - CONFIDENTIAL

1
2 an effect on Petrobras, but I don't recall -- recall
3 that. Yeah. It would -- it would have an effect on
4 Brazil risk overall, perhaps, and indirectly on
5 Petrobras.
6 BY MS. MINDLIN:
7 Q. One other question is related to the page Bates
8 ending 81. It is at 21:17:10. You said:
9 "That wasn't the concern. My concern
10 was that you get the PIMCO fire
11 stampede reaction."
12 What is the PIMCO fire stampede reaction?
13 A. Sorry. I'm just -- if you don't mind, I just
14 want to read through the exact context of that.
15 Q. Uh-huh.
16 A. I think I was -- I think I was making a
17 humorous joke about the size of PIMCO trying to enter or
18 exit a market in a liquid market.
19 Q. And if PIMCO changed its position in
20 an illiquid market, could that affect prices in that
21 market?
22 A. That is what I --
23 MR. D'AMATO: Object to form.
24 THE WITNESS: That is what I am suggesting or
25 making fun of, yes.

Page 121

1    BENTSI - CONFIDENTIAL
2    **BY MS. MINDLIN:**
3    Q.  Do you remember whether PIMCO's buying or
4    selling Petrobras bonds could have affected prices for
5    those bonds?
6    **MR. D'AMATO:** Objection to form.
7    **THE WITNESS:** I don't recall, no.  We should
8    probably -- we should be -- probably be more specific
9    when we say PIMCO.  There is a lot of many different
10   portfolio managers within PIMCO; so --
11   **BY MS. MINDLIN:**
12   Q.  Did you have a view whether there was a certain
13   portfolio manager or set of managers whose moves were
14   take -- going to react -- I'm sorry -- whose moves in
15   the market were going to affect the market here?
16   **A.  I don't recall.  It was more of a**
17   **generalization -- general joke, but I also was -- wanted**
18   **to highlight the fact that we want to keep -- there are**
19   **a lot of different parties that move in different**
20   **directions.**
21   Q.  And when you say "different parties," you
22   mean --
23   **A.  Portfolio managers.**
24   Q.  -- there are different portfolio managers
25   within PIMCO, and they could be potentially working at

Page 122

1    BENTSI - CONFIDENTIAL
2    cross purposes, or if they worked --
3    **A.  I just didn't want to have a generalization of**
4    **PIMCO.**
5    Q.  I see.
6    **MR. D'AMATO:** Objection to form.
7    **BY MS. MINDLIN:**
8    Q.  And do you have a recollection of any specific
9    securities that you thought, at this time, could be
10   affected by the fire stampede reaction?
11   **A.  I don't recall a fire stampede reaction; so**
12   **I -- I don't recall anything more than a -- the -- the**
13   **allusion to humor.**
14   Q.  So you weren't thinking of any specific issuer?
15   **A.  I don't think there was anything specific, no.**
16   Q.  Do you remember whether Petrobras bonds were
17   liquid or illiquid at this point?
18   **A.  I -- I don't remember specifically, but I would**
19   **have said relatively liquid.**
20   Q.  Was there a point in which they became less
21   liquid?
22   **A.  In general, I would have said they were less**
23   **liquid post the downgrade.**
24   Q.  And when you refer to "the downgrade" --
25   **A.  Recent downgrade below investment grade.**

Page 123

1    **BENTSI - CONFIDENTIAL**
2    Q.  And --
3    **A.  Not the most recent downgrade, but --**
4    **MR. D'AMATO:** Got to let her get the question
5    out.  Let her --
6    **THE WITNESS:** Yeah.
7    **MR. D'AMATO:** It is -- it is really tough for
8    the court reporter to keep it -- keep it straight for
9    the record, especially since I will occasionally object.
10   **MS. MINDLIN:** Yes.
11   **MR. D'AMATO:** To keep them all straight, it is
12   important to wait until she gets her question out before
13   you answer.
14   **THE WITNESS:** You go ahead.  You got it.
15   **BY MS. MINDLIN:**
16   Q.  So you said that Petrobras bonds were less
17   liquid after the rating agencies downgraded them; is
18   that correct?
19   **A.  After the rating agencies downgraded them below**
20   **investment grade, they were illiquid on a relative basis**
21   **compared to usual.**
22   Q.  And when you say "usual," do you mean before
23   the downgrade?
24   **A.  Before the downgrade and six months after the**
25   **downgrade, or three months after the downgrade, yes.**

Page 124

1    **BENTSI - CONFIDENTIAL**
2    Q.  And which downgrade --
3    **A.  They went through a period of illiquidity.**
4    Q.  What was the time period for the period of
5    illiquidity?
6    **A.  Maybe a month.  I don't remember specifically.**
7    **You asked if there was a period of illiquidity.  That is**
8    **the only reason why I suggested it.**
9    Q.  Did PIMCO have concerns about a ratings
10   downgrade before it happened?
11   **A.  PIMCO will always be looking at all ratings and**
12   **trying to make a judgment about whether they will be**
13   **upgraded or downgraded, certainly, if that makes sense.**
14   Q.  If you anticipate that there may be a
15   downgrade, does that have an effect on the volatility in
16   the price of bonds?
17   **MR. D'AMATO:** Objection to form.
18   **THE WITNESS:** A downgrade is not necessarily
19   relevant in terms of -- in my opinion, it is not
20   particularly relevant in terms of its valuation of a
21   corporate credit.  We make our own estimation of whether
22   we think something should be valued as opposed to
23   looking at the valuation based on a -- on Moody's or
24   S&P.  That is it.  If you're searching for the
25   downgrades in 2015, not 2014 --

Page 125

1    BENTSI - CONFIDENTIAL
2    **BY MS. MINDLIN:**
3    Q.  So the -- there was a Moody's downgrade in the
4    fall of 2014 -- right? -- specifically with respect to
5    Petrobras?
6    **A.  I don't remember that.**
7    Q.  So your downgrade that you're thinking about is
8    the February --
9    **A.  Subsequent --**
10   Q.  -- 2015 downgrade?
11   **A.  Below -- below investment grade is what I was**
12   **referring to.**
13   Q.  Okay.
14       MR. D'AMATO:  Again, you've got to let her
15   finish.
16       THE WITNESS:  Sorry.
17       MR. D'AMATO:  It's okay.
18       THE WITNESS:  Impatient.
19   Q.  If you make your estimation of where you think
20   a credit should be valued, does the Moody's or S&P
21   rating have any relevance to your investment decision?
22       MR. D'AMATO:  Object to form.
23       THE WITNESS:  It would be a factor in our
24   decision tree as whether the investment prospects or

Page 126

1    BENTSI - CONFIDENTIAL
2    timing of an investment would -- would happen.
3    Certainly, we had at the time Zeljka looking at the
4    credit and making a judgment call about what a credit
5    should be rated from a PIMCO-rating perspective.
6        If -- however, some mandates might have
7    specific compliance issues around Moody's or S&P ratings
8    that they have to be in compliance with.
9        **BY MS. MINDLIN:**
10   Q.  When you say "some mandates," does that mean
11   certain portfolios have that requirement?
12   **A.  Yeah.**
13   Q.  The --
14   **A.  For example, the investment-grade portfolio**
15   **would have to be investment grade -- investment bonds.**
16       THE REPORTER:  I'm sorry?
17       **BY MS. MINDLIN:**
18   Q.  I'm not sure if the court reporter got that.
19   **A.  The investment-grade portfolio would have to**
20   **have investment-grade bonds in it; so it would have to**
21   **be before a downgrade.  Right?**
22   Q.  Did the downgrade of Petrobras require you to
23   sell any of the bonds in the portfolios that you held?
24   **A.  If a -- if a portfolio had Petrobras in it, it**
25   **would have had to sell on the downgrade, yes.**

Page 127

1    **BENTSI - CONFIDENTIAL**
2    Q.  Do you remember that happening?
3    **A.  Some portfolios had to sell ahead of a**
4    **downgrade, yes.**
5    Q.  Did any of yours have to sell?
6    **A.  I do not recall specifically, no.**
7    Q.  So if you knew that some of the portfolios
8    would have to sell on a downgrade, wouldn't that affect
9    your concern about whether a downgrade was coming?
10       **MR. D'AMATO:**  Objection to form.
11       THE WITNESS:  It would -- I mean -- maybe
12   rephrase this statement.  It would affect your judgment
13   about whether -- your timing on investing in -- in an
14   asset if you thought there was a downgrade coming.  Is
15   that what you mean?
16       **BY MS. MINDLIN:**
17   Q.  And how would it affect it?
18   **A.  Well, certainly, if you thought there was a**
19   **downgrade coming and you could -- and your portfolio**
20   **could not hold investment -- subinvestment-grade**
21   **securities, you would not invest, or you'd wait until**
22   **you had some outlook on the rating.**
23   Q.  Do you remember the market's reaction to a
24   coming downgrade of Petrobras bonds in 2015?
25       **MR. D'AMATO:**  Objection to form.

Page 128

1    BENTSI - CONFIDENTIAL
2    **THE WITNESS:**  Can you be more specific?  Sorry.
3    **BY MS. MINDLIN:**
4    Q.  You mentioned earlier the downgrade of
5    Petrobras bonds below investment grade in 2015; right?
6    **A.  Yes.**
7    Q.  Do you remember whether the market reacted to
8    the downgrade of Petrobras bonds below investment grade
9    in 2015?
10   **A.  Certainly, in anticipation of the second**
11   **downgrade, there was a market illiquidity as some**
12   **supposed or assumed, there would be a large amount of --**
13   **these are all assumptions, of course -- that there would**
14   **be a large amount of bonds that need to be sold post the**
15   **downgrade.**
16   Q.  What was the effect on the prices of Petrobras
17   bonds at that point in time?
18   **A.  It was one of the added factors in a general**
19   **period of weakness.**
20   Q.  Do you recall whether there was an impact on
21   the price of Petrobras equity knowing that you are
22   primarily a fixed income investor?
23   **A.  I don't recall, no.**
24   Q.  Did any of your job responsibilities change in
25   the spring of 2014?

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL

Page 129

BENTSI - CONFIDENTIAL

1
2 A.  Not that I recall, no.
3 Q.  Is there any reason why your e-mail
4 communications might have been separately stored, or was
5 there a transition of sorts in your electronic mailbox?
6 A.  We might have invented the system.  I have no
7 idea.
8 Q.  Okay.  Are the -- we had a question about the
9 productions, but it obviously is something that we can
10 take up with counsel --
11 A.  Okay.
12 Q.  -- and doesn't relate to you.  But wanted to
13 just know if there was an obvious explanation.
14 A.  Right.  So -- sorry.  What -- what -- the
15 question is there was no e-mail before?
16    MR. D'AMATO: There was no question.
17    MS. MINDLIN: There is no question.
18    MR. D'AMATO: That was the hand wave.
19    BY MS. MINDLIN:
20 Q.  When you were talking about the second
21 downgrade a minute ago, did you mean the Moody's
22 downgrade in February 2015, if you know?
23 A.  Was that a second downgrade below investment
24 grade?
25 Q.  I'm not positive myself.  I think it may have

Page 130

BENTSI - CONFIDENTIAL

1
2 been.
3 A.  Me neither, then.
4 Q.  Okay.  We'll see if we can figure that out.
5    (Exhibit 8 was marked for
6    identification.)
7    BY MS. MINDLIN:
8 Q.  The court reporter has just handed you what has
9 been marked for identification Bentsi Exhibit 8, and it
10 is Bates stamped PIMCO 00729598.  It is an e-mail from
11 you to Natalia Lima on November 19, 2014.  Its subject
12 is "Forward: Trade recommendations - switch out of
13 Petrobras LT bonds into middle of curve."
14    Do you remember this e-mail?
15 A.  I don't remember it specifically, but it looks
16 like something that I would have had input on.
17 Q.  And what kind of input would you have had?
18 A.  If I was in the office, I probably would have
19 had editing, or I may have written it myself.
20 Q.  If you go down the page, there is a "From:"
21 line.  It says, "EM PM Corp." --
22 A.  Yes.
23 Q.  -- as the sender.
24 A.  Yes.
25 Q.  Who is EM PM Corp.?

Page 131

BENTSI - CONFIDENTIAL

1
2 A.  That is a group e-mail for EM corporate PMs
3 that we use.
4 Q.  And when you say "EM corporate PMs," that means
5 emerging market corporate portfolio managers?
6 A.  Exactly.
7 Q.  And if it is sent from that address, is there a
8 particular person who generally is the sender?
9 A.  No one in -- specifically.  It could have been
10 myself or others.
11 Q.  The subject line where it refers to "Petrobras
12 LT bonds" -- what does "LT" stand for?
13 A.  Long-term.
14 Q.  And why was there a recommendation at this
15 point to switch out of Petrobras long-term bonds into
16 the middle of the curve?
17 A.  From what I'm reading, suggestion was that
18 there was more value in the ten-year bonds than the
19 longer-dated bonds.  And the -- and the recommendation
20 of us was to move into a different part of the curve to
21 take advantage of that.
22 Q.  And how did you make the assessment that there
23 was more value in the middle of the curve?
24 A.  Well, this particular e-mail seems to focus
25 more on the historical spread differential --

Page 132

BENTSI - CONFIDENTIAL

1
2 Q.  Uh-huh.
3 A.  -- and -- and assign some value to being very
4 far from the historical differential.
5 Q.  Where is the historical differential?
6 A.  Well, one way to see that is to look at the
7 charts.
8 Q.  Are you on page 600?
9 A.  That is one of them, yes.  600 or 601.  601 is
10 probably easier.
11 Q.  So explain the historical levels that you
12 referred to.
13 A.  Well, the bottom chart on 601, for example,
14 would show you the historical spread difference between
15 two bonds --
16 Q.  Uh-huh.
17 A.  -- at the bottom.  And the chart -- the table
18 at the top of that page and the chart directly beneath
19 that would show you where that was -- where looking back
20 one year, your current spread was as a function -- as
21 a -- you know, a part of the range.
22    If you look at a one-year range or -- or the
23 range one-year lookback, and it looked like -- we are --
24 the one edge -- one end of the histogram; so it just --
25 I don't even know how -- what to call that, to be honest

Page 133

BENTSI - CONFIDENTIAL
1  BENTSI - CONFIDENTIAL
2  with you, because I can barely see it. But if you can
3  see the Z score, it's 2.4.
4  Q. Yes.
5  A. So that would suggest that this was quite far
6  from the mean lately.
7  Q. And that is the Z score for the --
8  A. I believe it is the --
9  Q. -- mid-range bonds?
10  A. That is the Z score, I believe, for the 2021
11  versus the 2000 and -- let's see. I can't --
12  unfortunately, you can't really read the tables. I
13  can't really tell you which one it is, but it is
14  basically a Z score for one of these two tables, one of
15  these two charts.
16  And the suggestion being -- being so far away
17  from the mean, this -- if -- if you believe in
18  mean-reverting markets, you would make money or you
19  should optimize and move into a different part of the
20  curve.
21  Q. Do you remember whether you made that move at
22  this point in time?
23  A. I do not know.
24  Q. Do you remember whether others at PIMCO made
25  that move at this point in time?

Page 134

1  BENTSI - CONFIDENTIAL
2  A. I do not know.
3  Q. Do you remember whether people returned this
4  action-needed checklist to you?
5  A. They should have, yes.
6  Q. And how many different people would return a
7  checklist like this to you in response to an e-mail like
8  this one?
9  A. It depends. Certainly we -- you know, if -- if
10  needed, we might follow up with the respective portfolio
11  managers to make sure they saw the e-mail. It is sent
12  only to the holders even though -- so the -- the -- the
13  list is to the relevant people anyway.
14  Q. So when you say it is sent to the holders, if
15  you're -- we're looking now at the first page of the
16  document, the "To" line. Those are the people who hold
17  the long-dated Petrobras bonds at that point in time?
18  A. That seems to be the -- yeah -- the tenor of
19  the e-mail, yes.
20  Q. This is November 2014; right?
21  A. Yes.
22  Q. Are -- were you aware of any particular risks
23  related to Petrobras bond investments at that point in
24  time?
25  MR. D'AMATO: Objection to form.

Page 135

1  BENTSI - CONFIDENTIAL
2  THE WITNESS: I do not recall off the top of my
3  head what I thought in November.
4  BY MS. MINDLIN:
5  Q. If you look at the -- in the middle of the
6  communication, there is a section called "Credit
7  highlights (see research from Z. Bosner attached)."
8  Do you see that?
9  A. Yes.
10  Q. And "Z. Bosner" is Zeljka Bosner, the credit
11  analyst for Petrobras?
12  A. Yes.
13  Q. If you look -- No. 1 refers to the company's
14  announcement that it will postpone the release of the
15  third-quarter results; right?
16  A. Yes.
17  Q. And at this point in time, had the market
18  reacted to the company's announcement that it would be
19  postponing the release of its results?
20  A. I cannot determine that from the information
21  provided.
22  Q. What was your view of the company's
23  announcement that it would postpone release of its
24  third-quarter results?
25  MR. D'AMATO: Objection to form.

Page 136

1  BENTSI - CONFIDENTIAL
2  THE WITNESS: I do not recall my -- I don't
3  necessarily recall my view at the time of the market's
4  response to the company not releasing its results.
5  BY MS. MINDLIN:
6  Q. Were you concerned about whether the company
7  would be able to release its financial results?
8  A. Based on if it was an important factor to
9  consider in an investment decision, if they would be
10  able to release their results for Q3 or Q4.
11  Q. Why was it important?
12  A. It would limit access to market.
13  Q. When you say that, do you mean if the company
14  missed the release of its results within the required
15  time frame, the company would therefore not have access
16  to the market?
17  MR. D'AMATO: Objection to form.
18  THE WITNESS: Would you like to repeat the
19  question.
20  BY MS. MINDLIN:
21  Q. Well, let me rephrase it.
22  You said that it would limit access to market
23  if the company was not able to release its financial
24  results; right?
25  A. The question?

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL

Page 137

BENTSI - CONFIDENTIAL

1
2 Q. Is that right? Do I have right what you said?
3 A. Okay. What I was saying was the -- if the
4 company was -- did not release its financials, Q3
5 financials, there might be covenants that might limit
6 its ability to issue or fund its -- its investment
7 program. I do not know what those covenants are off the
8 top of my head or -- I don't recall them at the time,
9 but certainly that would be a concern.
10 Q. And what would be the impact for the company of
11 not being able to fund its investment program?
12 A. That it couldn't invest.
13 Q. Would that ultimately lower its output?
14 MR. D'AMATO: Objection to form.
15 THE WITNESS: It may lower its production in
16 the future if that inability to invest was over a very
17 prolonged period of time.
18 BY MS. MINDLIN:
19 Q. Did you have any view at this point in time
20 whether the company's future ability to invest was
21 imperiled?
22 MR. D'AMATO: Objection to form.
23 THE WITNESS: I think that was
24 not probably the major concern at the time.
25 BY MS. MINDLIN:

Page 138

BENTSI - CONFIDENTIAL

1
2 Q. What was the major concern at the time?
3 A. I would guess it would be more about funding
4 its debt maturities in the near term than it would have
5 been about future -- just as one of the factors, as
6 opposed to just future CAPEX.
7 Q. And what was the concern about funding its debt
8 maturities?
9 A. The company has a lot of debt maturing and a
10 lot of high coupons; so in terms of -- debt service
11 would be one of the major concerns in a company that no
12 longer has access to the market but has to pay down
13 debt.
14 Q. Did that concern about funding its debt
15 maturities affect your decisions about investments in
16 Petrobras at this point in time?
17 A. It certainly would have been one of the major
18 factors to look at, yes.
19 Q. If you look down to No. 8, it says:
20 "The assumed fraud will likely result
21 in write-downs of refining assets for
22 the amount of, quote/unquote,
23 'overcharges'."
24 Do you see that?
25 A. Yes.

Page 139

BENTSI - CONFIDENTIAL

1
2 Q. Do you remember a discussion of the likely
3 write-downs of refining assets?
4 A. Is there a specific discussion you're referring
5 to?
6 Q. Do you remember discussing it with colleagues?
7 A. I think that there was a general discussion
8 about what those write-downs could be hypothetically or
9 when they could happen certainly.
10 Q. And so you were concerned about when they could
11 happen; right?
12 MR. D'AMATO: Objection to form.
13 THE WITNESS: We were concerned about them
14 happening.
15 BY MS. MINDLIN:
16 Q. But you knew that they would happen; right?
17 MR. D'AMATO: Objection to form.
18 THE WITNESS: This is an assumed fraud, and
19 thus a -- potential write-downs. We had no real
20 substance to make any value judgments based on that.
21 Just an increased, heightened risk of something.
22 BY MS. MINDLIN:
23 Q. The "Credit highlights" section continues at
24 No. 8:
25 "This will lead to impairment charges

Page 140

BENTSI - CONFIDENTIAL

1
2 that will need to flow through the
3 income statement and will lower book
4 value of refining assets."
5 A. Right.
6 Q. It continues on the next page:
7 "We do not see any direct impact on
8 credit metrics from the write-downs."
9 Do you see that?
10 A. Yes.
11 Q. Did you talk with Ms. Bosner about impact on
12 credit metrics from the write-downs?
13 MR. D'AMATO: Objection to form.
14 THE WITNESS: I may or may not have done.
15 BY MS. MINDLIN:
16 Q. Did you have an assessment of the direct impact
17 on credit metrics from the write-downs?
18 MR. D'AMATO: Objection to form.
19 THE WITNESS: I think credit metrics is one
20 factor in assessing a credit. It might not have had
21 direct impact on the specific credit metrics, i.e. net
22 debt to EBITDA as an example, but it certainly would
23 have had other impacts on how you would look at a
24 company.
25 BY MS. MINDLIN:

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL

KOFI BENTSI
May 20, 2016

Page 141

BENTSI - CONFIDENTIAL

1 Q. What would the other impacts be?
2 A. Well, any write-down, if that is what we --
3 we're talking about, one would wonder -- would have to
4 question how large the write-down was -- was, or was
5 going to be, or whether it was the last write-down or
6 whether it put into question other assets -- items
7 that -- on the balance sheet that might be in question.
8 Q. Do you remember whether you asked Ms. Bosner to
9 assess the likely size of the write-down?
10 A. We did not have any sense of what the
11 write-down would be or -- in terms of how large it would
12 be in -- with regard to fraud, certainly not. We
13 would -- we had no way, as far as I know or I can think
14 of -- way of assessing how one would -- how much fraud
15 there was.
16 Q. But you knew at this point that it would lower
17 the book value of refining assets on the balance sheet;
18 right?
19 A. I think you --
20 MR. D'AMATO: Objection to form.
21 THE WITNESS: -- are making an assumption that
22 if there is something of -- there is some fraud, then
23 there may be some change in valuation, but unable to
24 make assessment if there was a fraud or how much that

Page 142

BENTSI - CONFIDENTIAL

1 change would be.
2 BY MS. MINDLIN:
3 Q. If you look at the end of the document, there
4 is a section called "Credit curve (using system price)."
5 A. Okay.
6 Q. It is the last page.
7 A. Yeah.
8 Q. What is the system price?
9 A. That is simply the price at which we mark the
10 book every night.
11 Q. Who marks the books for Petrobras?
12 A. I believe it is an external pricing service.
13 Q. Do you know which service it is?
14 A. Absolutely not.
15 Q. Do you check the book daily for your
16 portfolios?
17 A. In what regard?
18 Q. Do you monitor the P&L in your portfolio?
19 A. I -- I monitor the P&L in my portfolio, yes.
20 Q. And how do you do that?
21 A. We have daily reports that reflect the -- the
22 daily alpha or return on a portfolio on a daily basis.
23 Q. Do you look at specific positions when you're
24 looking at your daily P&L?

Page 143

BENTSI - CONFIDENTIAL

1 A. I look at specific positions every day across
2 the portfolio, yes.
3 Q. Do you remember a time period when you were
4 monitoring Petrobras specifically in your daily P&L?
5 A. If I had Petrobras positions, then I'd have
6 been monitoring it, yes. I don't remember specifically
7 monitoring Petrobras, no.
8 Q. Do you have Petrobras in your portfolio right
9 now?
10 A. I do.
11 Q. Do you know what percentage of your portfolio
12 is Petrobras?
13 A. Right now, close to 2 percent.
14 Q. And are you overweight or underweight or market
15 weight the index in your portfolios with respect to
16 Petrobras?
17 MR. D'AMATO: Objection to form.
18 THE WITNESS: I'm currently overweight.
19 BY MS. MINDLIN:
20 Q. Starting now and going backwards --
21 A. Okay.
22 Q. -- is there a period when you were not
23 overweight Petrobras in your portfolios?
24 MR. D'AMATO: Objection to form.

Page 144

BENTSI - CONFIDENTIAL

1 THE WITNESS: I'm sure there was.
2 BY MS. MINDLIN:
3 Q. Do you remember specifically in late 2014
4 whether you made a decision to change the weighting in
5 your portfolio of Petrobras?
6 A. I do not recall specifically what my weighting
7 would have been around Petrobras, but I would say that
8 any assessment of Petrobras should be looked at within
9 the context of other investment opportunities in -- in
10 the relevant sector. So my own weight or underweight of
11 Petrobras may not necessarily be a function of my view
12 on Petrobras alone, but it is just one of the factors.
13 Q. And your assessment is made on the basis of
14 relative value of Petrobras and other credits?
15 A. Yes. As one factor, sure. Certainly.
16 Q. In early 2015, did you change the weighting of
17 Petrobras in your portfolio?
18 A. I do not recall specifically, no.
19 Q. Do you remember at any point whether there was
20 a discussion at PIMCO about changing the weighting of
21 Petrobras in PIMCO portfolios?
22 A. I do not specifically recall any specific
23 discussion about that, but I would imagine that
24 discussions happened during the covenant breach about

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL

KOFI BENTSI
May 20, 2016

Page 145

1    BENTSI - CONFIDENTIAL
2  reducing ratings of Petrobras.
3  Q.  And when you speak about "the covenant breach,"
4  what are you referring to?
5  A.  Not filing financials on time.
6  Q.  There was a concern at PIMCO that Petrobras
7  would experience a technical default of its loan
8  covenants?
9  A.  Petrobras had an increased risk of not filing
10 its Q4 financials in time and it would have been a
11 technical default, yes.
12 Q.  How was the market reacting to the possibility
13 of that technical default?
14    MR. D'AMATO: Objection to form.
15    THE WITNESS: I don't recall specifically, but
16 I'd say it was a very volatile period, certainly.
17    BY MS. MINDLIN:
18 Q.  Do you -- strike that.
19    Was the possibility of technical default a
20 contributor to volatility in the price of Petrobras
21 bonds?
22 A.  It was one of the major factors, yes.
23 Q.  During about what time period was that?
24 A.  I would have thought it would be from the
25 period they did not file their Q4 financials up until

Page 146

1    BENTSI - CONFIDENTIAL
2  when they did file their Q4 financials, but I can't
3  remember specifically off the top of my head, no.
4  Q.  And so the initial announcement was in
5  November 2014 that --
6  A.  For Q3.
7  Q.  -- they would not?
8  A.  For Q3.
9  Q.  And do you know when they did file their
10 financials in 2015?
11    MR. D'AMATO: Objection to form.
12    MS. MINDLIN: I think the transcript is not the
13 same as the question.
14    BY MS. MINDLIN:
15 Q.  Do you know when Petrobras filed their
16 financial statements in 2015?
17 A.  I do not recall the specific date, no.
18 Q.  Does April 2015 sound right to you?
19 A.  Sounds roughly correct.
20 Q.  So between November 2014 and April 2015,
21 questions around whether Petrobras would file its
22 financials were a contributor to volatility in Petrobras
23 bond prices?
24 A.  I think that is a fair assumption.
25 Q.  Did you talk with anyone at Petrobras about the

Page 147

1    BENTSI - CONFIDENTIAL
2  timing of Petrobras's financial statements?
3    MR. GOLDSMITH: Objection to form.
4    BY MS. MINDLIN:
5  Q.  Did you talk with anyone at Petrobras about
6  when they would file their financial statements in 2014?
7  A.  2014?
8  Q.  After they first announced that they would not
9  file them until later than they had initially expected.
10    MR. D'AMATO: Objection to form.
11    THE WITNESS: Do not recall anything specific,
12 but I may have done.
13    BY MS. MINDLIN:
14 Q.  Do you remember whether you spoke with anyone
15 at Petrobras about when they would file their financial
16 statements in 2015?
17 A.  I do.
18 Q.  What do you remember?
19 A.  I remember asking when they were going to file
20 their financial statements, and they were going to file
21 them in 2015.
22 Q.  Who did you speak with at Petrobras about that?
23 A.  I believe I might have spoken to Almir
24 Barbosa -- or Barbassa, and I may have spoken to Ivan
25 Monteiro.

Page 148

1    BENTSI - CONFIDENTIAL
2  Q.  Anyone else at Petrobras?
3  A.  Maybe -- maybe Ted Helms.
4  Q.  What do you remember about your conversations
5  with Almir Barbassa?
6    MR. D'AMATO: Objection to form.
7    BY MS. MINDLIN:
8  Q.  What do you remember about your conversations
9  with Barbassa?
10 A.  I don't remember much specific about the
11 conversation beyond a lack of resolution.
12 Q.  And when you say "a lack of resolution," what
13 do you mean?
14 A.  No specific date as to when the -- or what time
15 frame they're filing.
16 Q.  And why did you approach Barbassa?
17 A.  My suggestion at the time was for them to get a
18 waiver from the bondholders in the loan group.
19 Q.  And why did you make that suggestion?
20 A.  Because the risk of them not filing was too
21 high; so I thought they should get a -- a covenant
22 waiver instead from their creditors as opposed to run
23 the risk of not filing in time.
24 Q.  How did you come to understand that the risk of
25 them not filing was too high?

Page 149

BENTSI - CONFIDENTIAL

1     BENTSI - CONFIDENTIAL
2  A.  Well, if they didn't file, theoretically,
3  creditors could accelerate on their credit and demand
4  par immediately.
5  Q.  And how did that affect your Petrobras
6  investments?
7  A.  Well, it would have been good to get par,
8  but -- but it was more advising them on what was the
9  right strategy from their perspective.
10  Q.  Let's take that in two pieces.
11     You said it would have been good to get par.
12  Did you have a reason to think you were not going to get
13  par if that happened?
14  A.  No.  I just meant compared to the prices at the
15  time, it would have been good to get par instead because
16  those -- it would have been good to get par because par
17  was higher than the prices at the time, but I was also
18  advising them from a corporate -- a management --
19  corporate finance perspective, that was their best
20  solution.
21  Q.  How did you come to be the person at PIMCO who
22  was involved -- or a person at PIMCO who was involved in
23  the corporate management discussions with Petrobras?
24  A.  Unclear.
25  Q.  What were your concerns about Petrobras's

Page 150

1     BENTSI - CONFIDENTIAL
2  corporate management?
3  A.  I would not say I had, necessarily, concerns
4  about Petrobras's corporate management.  I was just
5  trying to assist and give my experience what I thought
6  their best -- what best served them as a process.
7  Q.  As a process to ensure that they did not enter
8  technical default?
9  A.  Yes.
10  Q.  Did you work with them in order to help them
11  get their financial statements filed?
12  A.  I had nothing more than suggestions about how
13  to manage the process.  They managed the process on
14  their own.
15  Q.  What were your suggestions about how to manage
16  the process?
17  A.  To -- from my recollection, it was more around
18  addressing creditors immediately and working on a
19  covenant waiver as soon as possible.
20  Q.  You're aware that there was a changeover in the
21  Petrobras leadership in February 2015?
22  A.  Yes.
23  Q.  What was your view of the new leadership?
24  A.  Positive.
25  Q.  Why was it positive?

Page 151

1     BENTSI - CONFIDENTIAL
2  A.  I had experience of Ivan Monteiro from his
3  previous assignment at Banco do Brasil; so I thought it
4  was going to be a constructive change.
5  Q.  And how about the CEO change?  Did you have a
6  view of that change?
7  A.  I do not have any experience of Bendine
8  beforehand, so I had no opinion, per se.
9  Q.  Did you meet with Bendine in Brazil?
10  A.  No.
11  Q.  Did you meet with Ivan Monteiro during the
12  winter of 2015?
13  A.  I don't think so.
14     (Exhibit 9 was marked for
15     identification.)
16     THE WITNESS:  Thank you.
17     BY MS. MINDLIN:
18  Q.  The court reporter has handed you what has been
19  marked Bentsi Exhibit 9 for identification.  It is Bates
20  stamped PBRCG-I 00032657.  It is an e-mail from Almir
21  Guilherme Barbassa to you dated Wednesday, January 14,
22  2015.
23  A.  Okay.
24  Q.  Do you recognize this e-mail?
25  A.  I recognize that it was from me at some point,

Page 152

1     BENTSI - CONFIDENTIAL
2  yes.
3  Q.  Do you remember communicating with Mr. Barbassa
4  by e-mail in January 2015?
5  A.  I do.
6  Q.  Do you remember whether you first contacted him
7  or he contacted you?
8  A.  I do not.
9  Q.  If you go to the first e-mail in the chain, it
10  begins on the page that starts 60.  And I think it --
11  the pages beyond that are sort of those boilerplate
12  warnings and stuff like that.
13     MR. D'AMATO:  Wow.
14     BY MS. MINDLIN:
15  Q.  So at the bottom of this page, the
16  communication begins:
17     "Almir, thanks for taking the time to
18     walk us through recent developments
19     at the company."
20     That is the beginning of the e-mail that you
21  wrote to him?
22  A.  Looks like it.
23  Q.  And it was on December 30, 2014?
24  A.  Okay.
25  Q.  What do you remember about walking through

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL

**KOFI BENTSI**
**May 20, 2016**

Page 153

1      BENTSI - CONFIDENTIAL
2  developments at the company?
3  **A.  I do not remember the context of this -- for**
4  **that statement or whether there was a call or a meeting.**
5  Q.   The next sentence says:
6       "As very large bondholders, we
7       consider ourselves your partners with
8       a similar desire in wanting the
9       current issues resolved with the
10      least amount of negative financial
11      impact"; right?
12 **A.  Yes.**
13 Q.   How did you offer help to Petrobras at this
14 point in time?
15 **A.  Well, I think at this time, we were suggesting**
16 **they come up with contingency planning -- is what I note**
17 **from here.**
18 Q.   And when you refer here in the e-mail to
19 "contingencies," you said that there was "ample room for
20 slippage in reporting."
21      Does that mean the reporting of the financials?
22 **A.  Yes.**
23 Q.   And why did you think there was ample room for
24 slippage in reporting?
25 **A.  Well, the financial reporting was determined by**

Page 154

1      BENTSI - CONFIDENTIAL
2  **the accountants; so the accountants would determine the**
3  **timetable, and so there was obviously no way of them**
4  **controlling the timetable.**
5  Q.   And when you say "no way of them," you mean no
6  way of Petrobras?
7  **A.  No way of Petrobras to control the timetable.**
8  **At least that was the assumption at the time.**
9  Q.   And at the end of the e-mail, you said:
10      "Let us know if there is any way we
11      can help going forward.  We are
12      always available."
13      Do you remember whether Petrobras reached out
14 to you following this e-mail?
15 **A.  I -- I don't remember, but I guess they did,**
16 **because I can see the one afterwards.**
17 Q.   And in the one afterward, Almir Barbassa writes
18 back to you and thanked you for reaching out; right?
19 **A.  Yes.**
20 Q.   And at the end of the first paragraph, he
21 writes,
22      "We recognize the situation remains
23      fluid and we need to keep these
24      options open"; right?
25 **A.  Sorry.  Which ones are you looking at?**

Page 155

1      **BENTSI - CONFIDENTIAL**
2  Q.   Oh.  Sorry if I've confused you.  I'm at the
3  top of the page labeled 60 --
4  **A.  Okay.**
5  Q.   -- in the middle of Barbassa's response to you.
6  **A.  Okay.**
7      **MR. D'AMATO:** The top paragraph?
8      **MS. MINDLIN:** It is the top paragraph at the
9  end of the paragraph.
10 Q.   Did you share this response with others at
11 PIMCO?
12 **A.  Well, he sent it to myself and a few others; so**
13 **they were already shared.  Is that what you mean?**
14 Q.   Other than the folks who were copied on the
15 e-mail chain, which looks like you are the recipient,
16 and then Christian Stracke, Michael Gomez, Said Saffari,
17 and Zeljka Bosner, would you have forwarded
18 Mr. Barbassa's e-mail to others at PIMCO?
19 **A.  I don't remember specifically who I would have**
20 **forward this -- who I forwarded this to.  I can -- yeah.**
21 Q.   And a couple days later on January 5 you write
22 back to Barbassa.  And I'm now on the page that is
23 numbered 59.  You write:
24      "Almir, thanks for coming back to us.
25      No.  I understand the base case

Page 156

1      BENTSI - CONFIDENTIAL
2  scenario you are working with.  The
3  markets are rapidly pricing in a high
4  probability of a financial accident
5  from Petrobras."
6      Do you see that?
7  **A.  Yes.**
8  Q.   What did you mean by a financial accident?
9  **A.  Well, it says the markets are pricing in a high**
10 **probability of financial accident, which would suggest**
11 **the markets are pricing in a high probability that**
12 **Petrobras wouldn't file their financials in time.**
13 Q.   If you go to the first page of the e-mail chain
14 now, there is an e-mail from you that is at the bottom
15 of the page, and it says:
16      "Almir, thanks for accepting the
17      meeting on January 30.  We look
18      forward to meeting you again.  We are
19      also hoping to schedule a meeting
20      with Ms. Foster."
21      Do you remember meeting with Mr. Barbassa on
22 January 30?
23 **A.  I do not recall the meeting, but I assume it**
24 **happened.**
25 Q.   And by January 30, Petrobras had already

---

Page 157

1    BENTSI - CONFIDENTIAL
2  announced to the public that it was not filing financial
3  statements that month; right?
4  **A.  That seems about right.  For Q4, you mean?**
5  **Yes.  Is that for Q4?  No.  For Q3.**
6  Q.  For Q3.
7    Do you remember talking with Petrobras about
8  the fact that it had not filed its "3Q" results by the
9  end of January?
10  **A.  I don't remember the specific conversation, no,**
11  **but I imagine I did.**
12  Q.  Did you have concerns about Petrobras at that
13  point in time at the end of January?
14  **A.  What concerns?**
15  Q.  What were your concerns, if you had concerns,
16  at the end of January?
17  **A.  I may have had concerns about their ability to**
18  **file in time and -- Q3 financials, and I may have had**
19  **concerns about their ability to file the Q4 financials**
20  **in time.  I do not remember specifically discussing.**
21  Q.  Was the market still at that point in time
22  pricing in the risk that Petrobras would not file its
23  financials in time?
24  **A.  I don't recall specifically, but the market**
25  **certainly had a heightened fear of them not filing**

---

Page 158

1    **BENTSI - CONFIDENTIAL**
2  **financials.**
3  Q.  If you look above in the chain, there is a
4  response that says:
5    "Kofi, I invited President Graca to
6    our meeting on the 30th, but as of
7    yet, I do not have a response."
8    Did President Graca attend the meeting with you
9  in January?
10  **A.  No.**
11  Q.  At any point later?
12  **A.  No.**
13  Q.  At any point earlier?
14  **A.  I have never met President Graca.**
15  Q.  You can put that aside.
16  **A.  Thanks.**
17    **MS. MINDLIN:** Counsel, if it makes sense, we
18  **might want to take a break now.**
19    **MR. D'AMATO:** Okay.  Let me -- let's take the
20  **break.  I'm going to check to see about lunch.**
21    **MS. MINDLIN:** Okay.
22    **THE VIDEOGRAPHER:** This is the end of disk
23  No. 2.  The time is 12:14, and we are off the record.
24
25

---

Page 159

1    BENTSI - CONFIDENTIAL
2  Los Angeles, California; Friday, May 20, 2016;
3    1:05 p.m.
4
5    EXAMINATION (CONTINUED)
6    **THE VIDEOGRAPHER:** We are back on the record.
7  This is the beginning of disk No. 3.  The time is 1305.
8    (Exhibit 10 was marked for
9    identification.)
10    **BY MS. MINDLIN:**
11  Q.  Good afternoon.
12    The court reporter --
13  **A.  Okay.**
14  Q.  -- has handed you what she has just marked
15  Exhibit 10 for identification, Bentsi Exhibit 10.  The
16  Bates number is PIMCO 000713954.  It is an e-mail from
17  you to Natalia Lima on January 30, 2015, entitled
18  "Forward:  PETBRA thoughts."
19    Do you recognize this e-mail?
20  **A.  I don't, but I'm looking through it right now.**
21    **Okay.**
22  Q.  It looks like this is, at the top, an e-mail
23  that you forwarded to Natalia Lima; right?
24  **A.  Yes.**
25  Q.  And below there are a series of e-mails

---

Page 160

1    BENTSI - CONFIDENTIAL
2  beginning with one from Michael Gomez --
3  **A.  Yes.**
4  Q.  -- on the page ending 55?
5  **A.  Yes.**
6  Q.  Do you remember the Michael Gomez e-mail
7  entitled "PETBRA thoughts"?
8  **A.  I don't, but I've read it now.**
9  Q.  Michael Gomez addresses the e-mail to the
10  "Investment committee - permanent."
11  **A.  Right.**
12  Q.  Is that the PIMCO investment committee?
13  **A.  Yes.**
14  Q.  And where it says "permanent," that means the
15  permanent members of that committee?
16  **A.  Exactly.**
17  Q.  Is there an emerging markets representative on
18  that committee?
19  **A.  There may or may not have been at the time.**
20  **Not clear.**
21  Q.  Is there now one?
22  **A.  No.**
23  Q.  Where it says "EM new issue" after that, what
24  does that represent?
25    **MR. D'AMATO:** Objection to form.

---

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL

Page 161

BENTSI - CONFIDENTIAL

1    BENTSI - CONFIDENTIAL
2    **THE WITNESS:** It is -- it is an e-mail group
3  for most EM members on the PMs -- on the PM side and, I
4  believe, trade support as well.
5    **BY MS. MINDLIN:**
6  Q.  Are you a member of EM new issue --
7  **A.  Yes.**
8  Q.  -- as an e-mail group?
9  **A.  Yes.**
10  Q.  And just for the court reporter's sake, please
11  wait until the question is over --
12  **A.  I'm sorry.**
13  Q.  -- because I know it makes her job a little
14  harder otherwise.
15     You would have received this e-mail when
16  Michael Gomez sent it; right?
17  **A.  Yes.**
18  Q.  If you look down the page to the bottom -- last
19  paragraph, actually, on the next page, it says:
20     "Bosner, Kofi, and Lupin are meeting
21     with the company right now; so they
22     will have more color from that
23     meeting shortly."
24     Where it says "Kofi," does that refer to you?
25  **A.  Yes.**

Page 162

1    BENTSI - CONFIDENTIAL
2  Q.  And "Bosner" is Zeljka Bosner?
3  **A.  Yeah.**
4  Q.  And "Lupin" is Lupin Rahman?
5  **A.  Exactly.**
6  Q.  Do you remember meeting with those two women
7  and Petrobras at the end of January of 2015?
8  **A.  I don't remember specifically, but -- yes.  I**
9  **know I did meet with them, yes.**
10  Q.  What do you remember about that meeting?
11  **A.  It was a meeting scheduled for January 30 with,**
12  **I believe, the CFO and -- and IR -- finance department**
13  **and IR.  And we met with, I think, the drilling group as**
14  **well.**
15  Q.  So when you say "IR," you mean investor
16  relations?
17  **A.  Investor relations.  Yes, exactly.**
18  Q.  And why did you meet with the drilling group?
19  **A.  I think we met with the drilling group.  I'm**
20  **not sure.**
21  Q.  If you didn't --
22  **A.  Production group.  Go ahead.**
23     **MR. D'AMATO:** If you're done, could I just
24  check on the -- realtime doesn't seem to be going.
25     (Discussion held off the record.)

Page 163

1    BENTSI - CONFIDENTIAL
2    **THE VIDEOGRAPHER:** Off the record.  The time is
3  1310.
4     (Discussion held off the record.)
5    **THE VIDEOGRAPHER:** We are back on the record.
6  The time is 1311.
7    **BY MS. MINDLIN:**
8  Q.  You mentioned a moment ago the drilling group?
9  **A.  I might have been wrong.  I was saying**
10  **production group, but, yeah, I -- I still don't remember**
11  **whether it was that meeting or a different meeting.**
12  Q.  And do you remember generally meeting with the
13  production group during this approximate time period?
14  **A.  I met with them in 2015.  I know that.**
15  Q.  What did you meet with the production group
16  about?
17  **A.  We try and meet with various parts of the**
18  **company and -- during these meetings; so that is --**
19  Q.  Do you remember anything that you discussed
20  with the production group during your 2015 meeting?
21  **A.  No.  It would have been a standard**
22  **informational about what their -- their outlook for**
23  **production was and how things were coming along and how**
24  **they feel the production curve was and what kind of**
25  **results they were getting.  Pretty standard affair.**

Page 164

1    BENTSI - CONFIDENTIAL
2  Q.  Do you remember in 2015 approximately when the
3  meeting occurred?
4  **A.  No.  I just remember that it happened in 2015.**
5  Q.  Do you know whether it was before or after
6  Petrobras issued its financials for the third quarter,
7  which occurred in April of that year?
8  **A.  It was probably after that.**
9  Q.  If you look at the beginning of Michael Gomez's
10  e-mail, it says, "A couple thoughts here from Brazil on
11  Petrobras."
12     Was Michael Gomez also on the Brazil trip?
13  **A.  I don't recall that.  Yes, he was.  He was --**
14  **but he wasn't actually in the Petrobras meeting.**
15  Q.  Did you separately send a report to him --
16  others at PIMCO with respect to your Petrobras meeting?
17  **A.  I don't believe so.  I believe once they -- I**
18  **don't believe so.  I mean, once he sent this, I don't**
19  **think I followed up on it.**
20  Q.  So this reflected whatever information you,
21  Ms. Bosner, and Ms. Rahman provided to Mr. Gomez, and he
22  relayed this in this e-mail to others at PIMCO?
23  **A.  To the best of my --**
24     **MR. D'AMATO:** Objection to form.
25     **THE WITNESS:** To the best of my recollection, I

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL

KOFI BENTSI
May 20, 2016

Page 165

1      BENTSI - CONFIDENTIAL
2  don't remember sending an e-mail; so that is what I
3  know.
4      BY MS. MINDLIN:
5  Q.   In the first paragraph of Mr. Gomez's e-mail,
6  he refers to "clarity on Petrobras."  Do you know what
7  that referred to?
8  A.  I think he was referring to the financial
9  statements being filed.
10 Q.   And did he mean the timing of when they would
11 be filed?
12 A.  I believe he was referring to them just being
13 filed, yes, in time for -- before the -- any covenant
14 breaches.  Yes.
15 Q.   And in the next paragraph, he writes:
16      "So everybody knows what is at stake.
17      Everybody wants to comply with all of
18      the deadlines."
19      The deadlines were deadlines for filing the
20 financial statements to avoid a technical default?
21 A.  Yes.
22 Q.   And "everybody" there -- do you know what that
23 referred to?
24 A.  I don't know who he is qualifying -- qualifying
25 as "everybody," but I'm -- I presume he is referring to

Page 166

1      BENTSI - CONFIDENTIAL
2  everybody he has spoken to.
3  Q.   Would that have included the Brazilian
4  government?
5  A.  If he spoke to someone in the Brazilian
6  government and they said that to him, yes.
7  Q.   It -- later in the paragraph, it says:
8      "The problem they have is they are
9      coming -- the problem they have is
10     that they are having a hard time
11     coming up with a valuation
12     methodology that PwC will sign off
13     on."
14     Do you see that language?
15 A.  Yes.
16 Q.   Do you remember a discussion about the
17 valuation methodology around this time period?
18 A.  I remember there being a discussion about there
19 needing to be a new valuation methodology to -- to
20 arrive at a new valuation.  No one had a sense of what
21 that valuation methodology would be or what the -- what
22 the different options could be.  No one ever spoke to
23 PwC; so we didn't know what they thought.
24 Q.   When you say "no one," meaning no one at PIMCO
25 spoke to PwC?

Page 167

1      BENTSI - CONFIDENTIAL
2  A.  Oh.
3  Q.   Is that -- is that what you mean?
4  A.  Yes.
5  Q.   And did you speak with any other external
6  consultants --
7  A.  Spoke with the company.
8  Q.   Did you speak with any other accountants or
9  accounting firms about the valuation methodology?
10 A.  I don't recall.  May have spoken formally with
11 an accountant about how they would approach a valuation,
12 but I don't recall specifically the conversations.
13 Q.   What was the reason for speaking with another
14 accountant about the valuation methodology?
15 A.  If I spoke to an accountant, I would have asked
16 them -- and I -- to be frank, I don't -- I just remember
17 thinking that would be a good idea.  I would have asked
18 them how they would have valued -- how they would
19 address this problem in their experience.  It is more of
20 a hypothetical situation how would you -- if you were
21 faced with this problem, what would you do?
22 Q.   I see, but --
23 A.  We have -- yeah.
24 Q.   -- you didn't actually have that conversation?
25 A.  No.  I don't -- I did not have any accountants

Page 168

1      BENTSI - CONFIDENTIAL
2  to call, no.
3  Q.   The next line refers to the "SEC signing off."
4      Do you see that?
5  A.  Yep.
6  Q.   As well as "local regulators signing off."
7      Do you see that as well?
8  A.  Yes.
9  Q.   Do you remember discussing whether the SEC
10 would sign off on the valuation methodology chosen for
11 the financials?
12     MR. D'AMATO:  Objection to form.
13     THE WITNESS:  Yeah.  These are a lot of
14 hypothetical statements that are sort of -- maybe stated
15 as a -- as fact or history.  There was more -- it was
16 more of a -- we were working with very incomplete
17 information.  We didn't have a sense on what exactly
18 would be the valuation or how they would arrive at a
19 valuation.  We just knew that they had to arrive at a
20 new valuation since they had assessed that they didn't
21 like the old valuation.
22     BY MS. MINDLIN:
23 Q.   And you knew they were having a hard time
24 coming up with the --
25 A.  We knew the --

Page 169

BENTSI - CONFIDENTIAL

1  Q.  -- appropriate valuation methodology?
2  A.  Yeah.  We just knew they had a hard time coming
3  with up a methodology.  That is all we knew.
4  Q.  Did that create risk, the fact that it was hard
5  for Petrobras to come up with a methodology?
6  A.  I think that we could -- I don't think it was
7  anything different from what we already knew by the fact
8  that they couldn't -- the PwC wasn't willing to sign off
9  on the -- didn't create any increased risk related to
10  the fact that PwC wasn't willing to sign off on the
11  financial statements in the first place.
12  Q.  So that risk had been going on for some period
13  of time already by that point?
14  A.  I would have said at the moment, PwC wasn't
15  willing to sign off on the valuation.  That was -- you
16  knew by assumption that they were going to have to come
17  up with a new valuation methodology.
18  Q.  And you said that you already knew that PwC
19  wasn't willing to sign off on the first methodology by
20  this point; right?
21  A.  They said in Q3 they weren't willing to sign
22  off on the statements.
23  Q.  So there was some period of time when you knew
24  that PwC was not willing to sign off on the valuation
25

Page 170

BENTSI - CONFIDENTIAL

1  methodology; right?
2  A.  They said at Q3 they weren't willing to sign
3  off on the statements.
4  Q.  So there was some period of time after that
5  when you were wondering whether PwC would find the
6  methodology that it was willing to sign off on?
7  A.  We spent time thinking, "Well, if you're not
8  willing to sign off on that statement, how are you going
9  to come -- arrive at a valuation of the assets without
10  any kind of real facts to base it on?"  That was a
11  natural next step.
12  Q.  Were others in the market -- or rather --
13  strike that.
14      Were other investors asking the same question
15  you were about whether PwC would come up with a
16  methodology that would be acceptable?
17      MR. D'AMATO: Objection to form.
18      THE WITNESS: I would -- I would assume so.  I
19  do not know that for a fact.
20  BY MS. MINDLIN:
21  Q.  Do you know whether the market was pricing in
22  the uncertainty around the methodology at that point in
23  time?
24      MR. D'AMATO: Objection to form.
25

Page 171

BENTSI - CONFIDENTIAL

1      THE WITNESS: Again, I would assume that the
2  market recognized that if PwC was unwilling to sign
3  financials on X date, they were going to have to arrive
4  at some end, not have a clear determined number as an --
5  as an input.  They were going to have to come up with a
6  new methodology of how to value the assets.  I would
7  assume everyone else thought that as well.
8      BY MS. MINDLIN:
9  Q.  And that uncertainty started when PwC first
10  said it was unwilling to sign off and continued until
11  Petrobras filed its financials?
12  A.  Well, the uncertainty --
13      MR. D'AMATO: Objection to form.
14      THE WITNESS: The uncertainty -- sorry.  The
15  uncertainty would have started when PwC did not sign off
16  on statements.  I don't think anything -- anything more
17  than that.
18      BY MS. MINDLIN:
19  Q.  And was it -- the uncertainty resolved after
20  the financials were filed in April for Q3?
21      MR. D'AMATO: Objection to form.
22      THE WITNESS: The -- I would say there was a
23  lot more clarity, at least on the financials on, what
24  accountants' evaluation of the assets were, yes.
25

Page 172

BENTSI - CONFIDENTIAL

1  BY MS. MINDLIN:
2  Q.  If you look down to the next paragraph, it
3  says:
4      "Everybody we talked to said that
5      Petrobras risk is government risk.
6      This company is too big to fail."
7      Do you understand who "everybody" is in this
8  context?
9  A.  I think Mike is referring to everyone he might
10  have spoken to on this trip and their response to the
11  question whether Petrobras could default, I guess.
12  Q.  What was your view at this point in time
13  whether Petrobras could default?
14  A.  I do not recall specifically, but I would say
15  that it never occurred to me that they would not be a
16  risk -- it would certainly be a risk that they could
17  have a technical default.  That is a realistic
18  problem -- was a realistic problem.  And then when I
19  look at "too big to fail," as I said before, there is a
20  large gap between prices of -- current prices and prices
21  you need to get to fail --
22  Q.  And when you --
23  A.  -- and be saved.
24      Do you need me to repeat that?
25

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL

Page 173

BENTSI - CONFIDENTIAL

1
2 Q.  Gomez goes on to say:
3      "But there is no magic bullet around
4      these reporting issues.  My strong
5      suggestion to the finance minister
6      was that if they need more time, to
7      ask for covenant waiver right away."
8 A.  Yes.
9 Q.  Were you involved in discussion about the
10 covenant waiver?
11 A.  Not with the finance minister, no.
12 Q.  Were you involved with discussions with
13 Petrobras about the covenant waiver?
14 A.  Yes.
15 Q.  What do you remember about those discussions?
16 A.  Just suggestion that they file -- that they get a
17 covenant waiver rather than risk not filing in time.
18 Q.  In the next paragraph, the second sentence
19 says:
20      "This reporting issue will be with us
21      for a while so the volatility can
22      remain high."
23      Do you see that sentence?
24 A.  Yes.
25 Q.  The "reporting issue," again, refers to the

Page 174

BENTSI - CONFIDENTIAL

1
2 filing of the financials; is that right?
3 A.  Exactly.
4 Q.  And what was the connection between the
5 reporting issue and volatility?
6 A.  Well, the risk was they didn't file the Q3
7 financials or Q4 financials, at which point they would
8 be unable to access the market, one; and, two, there
9 might be an acceleration of their bonds.  At the time,
10 to my recollection, there was a hedge fund soliciting
11 bondholders to accelerate the bonds.
12 Q.  And was that causing volatility?
13      MR. D'AMATO: Objection to form.
14      THE WITNESS: It was causing heightened fear.
15 I don't remember volatility, per se.
16      BY MS. MINDLIN:
17 Q.  Was the possibility of acceleration of the
18 bonds causing heightened fear about Petrobras's
19 fundamentals?
20      MR. D'AMATO: Objection to form.
21      THE WITNESS: I think there was a lack of
22 clarity about what an acceleration would mean.  Nothing
23 more.
24      BY MS. MINDLIN:
25 Q.  Did heightened fear at the end of January 2015

Page 175

BENTSI - CONFIDENTIAL

1
2 translate into any effect on the price of Petrobras
3 bonds?
4      MR. D'AMATO: Objection to form.
5      THE WITNESS: I don't remember specifically
6 where Petrobras bonds were in January 2015 or what this
7 impact would have -- was having in terms of volatility.
8 I can just only assume that the fear of them not filing
9 in time would create a lot of stress in the market.
10 Whether it was a -- more than one, I think it was --
11 yeah.  I'll leave it at that.
12      BY MS. MINDLIN:
13 Q.  Do you remember whether the fear of Petrobras
14 not filing in time actually created stress in the
15 market?
16      MR. D'AMATO: Objection to form.
17      THE WITNESS: I think it did.  It was
18 certainly --
19      BY MS. MINDLIN:
20 Q.  If you --
21 A.  -- one of the factors.
22 Q.  What were some other factors that you remember?
23 A.  Well, I think that not filing in time -- in
24 time was one -- was one of the factors, largely because
25 they reduced their ability to access the market, and

Page 176

BENTSI - CONFIDENTIAL

1
2 they had a large debt profile, maturity profile, and
3 interest expense and CAPEX that they hadn't addressed
4 yet.
5 Q.  Did you talk with Petrobras about addressing
6 the debt profile?
7 A.  In what capacity?
8 Q.  During your January 30 meeting, did you have
9 discussions about their debt profile?
10 A.  Only to say that it was highly levered and
11 couldn't afford to have these kind of risks.
12 Q.  So did you expect Petrobras to reduce their
13 CAPEX in the coming months?
14 A.  I wouldn't say there was a -- a specific plan
15 for them to reduce their CAPEX in the coming months,
16 assuming in hindsight there was a pretty aggressive
17 change in CAPEX post the change of management.  But at
18 the time, we hadn't specifically talked about reducing
19 CAPEX any more than, you know, guided every single
20 quarter.  I think Almir even makes allusion to reducing
21 the CAPEX in one of these e-mails right here.
22 Q.  So you had some expectation that that was part
23 of what management was thinking about; right?
24      MR. D'AMATO: Objection to form.
25      THE WITNESS: We -- it was one of the factors.

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL

Page 177

```
 1      BENTSI - CONFIDENTIAL
 2  We actually knew that CAPEX would come down, yes.
 3      BY MS. MINDLIN:
 4  Q.  In the next paragraph, which is on the next
 5  page ending 56, Michael Gomez says:
 6      "So we can have more risk premium
 7      built into all Brazilian assets
 8      here."
 9      Do you see that?
10  A.  Yes.
11  Q.  And what does he mean by "more risk premium
12  built into all Brazilian assets," if you know?
13  A.  I can't speak for Mike, but I can only say what
14  I infer.  I think he is referring to the stress in
15  Brazilian assets creating wider spreads or more risk
16  premium.
17  Q.  What was causing the stress on Brazilian assets
18  at that point in time?
19  A.  One factor would certainly have been
20  Petrobras's inability to file financials and potential
21  for a default scenario.
22  Q.  Was the foreign exchange rate also causing
23  stress at that point in time?
24  A.  I can't say I remember what the foreign
25  exchange rate was at the time.  It may have been a
```

Page 178

```
 1      BENTSI - CONFIDENTIAL
 2  factor.
 3  Q.  Michael Gomez's e-mail refers to "the currency
 4  rate sovereign spreads," and then, of course, Petrobras
 5  in the following sentence.  Do you -- strike that.
 6      Does it help you remember any discussion about
 7  the effect of foreign exchange or currency issues on the
 8  Brazilian market at that point in time?
 9  A.  Does that statement help --
10  Q.  Yeah.
11  A.  -- me remember?  No.  I think that statement --
12  I think that statement is poorly written, but I think
13  what he is saying is that it would be -- one of the --
14  those three would be the assets in which would have more
15  risk premium.
16  Q.  More risk premium would be in the currency
17  rates and sovereign --
18  A.  Rates and sovereign spreads, and then, of
19  course, Petrobras.
20      MR. D'AMATO:  Got to wait for her to finish.
21      THE WITNESS:  Sorry.
22      BY MS. MINDLIN:
23  Q.  The next sentence says:
24      "But I do think and I do agree
25      Petrobras Inc. equals Brazil."
```

Page 179

```
 1      BENTSI - CONFIDENTIAL
 2      What -- if you know -- strike that.
 3      Do you know what Michael Gomez meant when he
 4  said "Petrobras Inc. equals Brazil"?
 5  A.  I think what he was trying to suggest was that
 6  Petrobras would -- would see some support from the
 7  sovereign in the distress scenario.  That is an -- that
 8  is an opinion.
 9  Q.  Was that a controversial opinion at that point
10  in time?
11      MR. D'AMATO:  Objection to form.
12      THE WITNESS:  I don't know if it was a
13  controversial opinion, no.
14      BY MS. MINDLIN:
15  Q.  Do you know whether others in the market shared
16  Michael Gomez's view that Petrobras Inc. equals Brazil
17  around the end of January 2015?
18      MR. D'AMATO:  Objection to form.
19      THE WITNESS:  I think it would have been one
20  interpretation of the support they could -- the company
21  may see in a distress scenario.  Again, as I said
22  before, I think the key part is to recognize that when
23  you get that sovereign support -- to elaborate, you
24  don't get that sovereign support when bonds are trading
25  at 80, you get it when they're trading at 20; so you
```

Page 180

```
 1      BENTSI - CONFIDENTIAL
 2  need to lose a lot of money first.
 3      BY MS. MINDLIN:
 4  Q.  And your view personally at that point in time
 5  was that Petrobras bond prices were not sufficiently
 6  depressed to warrant the sovereign support?
 7  A.  In hindsight or looking back, I would imagine,
 8  knowing myself, that my view would have been that
 9  Petrobras wouldn't see support unless they were unable
10  to actually make a lot -- a lot -- able to go -- make
11  any of these payments and -- and there were no other
12  solutions available to them.
13  Q.  And when you say "payments," do you mean --
14  A.  If it was acceleration -- yeah.
15  Q.  Wait for the end of the question before you
16  answer.
17      But when you say "payments," do you mean debt
18  payments?
19  A.  Assuming some -- an acceleration of the debt,
20  if there was payment due, the sovereign would have to
21  make payment due.  That is the assumption.
22  Q.  What about dividend payments?  Were you talking
23  about those at all at this period of time?
24      MR. D'AMATO:  Objection to form.
25      THE WITNESS:  That may have been occurring in
```

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL

Page 181

BENTSI - CONFIDENTIAL
1 BENTSI - CONFIDENTIAL
2 other conversations, certainly.
3 BY MS. MINDLIN:
4 Q. Do you remember anything about dividend
5 payments being discussed at the meeting with Petrobras?
6 A. I don't remember anything specifically, but I
7 would imagine that we would certainly suggest that they
8 reduce their dividend payments.
9 Q. Did you think that the dividend payments were
10 too high at Petrobras?
11 A. I think companies that are short on cash flow
12 should not pay dividends.
13 Q. You can set that document aside.
14 (Exhibit 11 was marked for
15 identification.)
16 BY MS. MINDLIN:
17 Q. The court reporter has handed you what has been
18 marked Bentsi Exhibit 11 for identification. It is
19 Bates stamped PIMCO 00500792. The subject line is "Re:
20 PBR board and CVM." This e-mail was sent by Christian
21 Stracke to Michael Gomez and you.
22 Do you recognize it?
23 A. I recognize it was sent to me, yes.
24 Q. If you look at the back page of the chain, it
25 begins on February 10, 2015, and there is a note from

Page 182

1 BENTSI - CONFIDENTIAL
2 Natalia Lima saying that a PBR board member sent her a
3 message saying he would be in Rio and could meet in the
4 afternoon.
5 Do you remember that happening?
6 A. I remember --
7 MR. D'AMATO: Objection to form.
8 THE WITNESS: I remember the context of the
9 meeting, yes.
10 BY MS. MINDLIN:
11 Q. What was the context of the meeting?
12 A. A Petrobras independent board member made
13 himself available to us to discuss Petrobras.
14 Q. Did you meet with him?
15 A. The e-mail was about setting up a -- a meeting
16 or a conference call, or videoconference, I believe it
17 was, with him.
18 Q. And did that video or conference --
19 videoconference or conference call or some other meeting
20 with him occur?
21 A. Yes.
22 Q. Who is the board member in question?
23 A. I think it was -- I think it says here. I
24 believe his name is Mauro Cunha. No -- yeah. Mauro
25 Cunha.

Page 183

1 BENTSI - CONFIDENTIAL
2 Q. What did you discuss at the meeting with Mauro
3 Cunha?
4 A. Again, the meeting was more to stress to him
5 how important it was for them to pursue a waiver and the
6 risks of not pursuing a waiver.
7 Q. And he was the one who initially approached
8 someone at PIMCO; right?
9 A. I don't exactly recall the exact connection,
10 but I believe so, yes.
11 Q. Do you know why he chose to approach PIMCO?
12 MR. D'AMATO: Objection to form.
13 THE WITNESS: I -- I don't know why he chose to
14 approach PIMCO, but I would imagine it is because we
15 were the largest bondholder.
16 BY MS. MINDLIN:
17 Q. What did Mr. Cunha tell you at the meeting when
18 you discussed the waiver?
19 A. His -- well, my concern was that the waiver had
20 not been discussed with the board, or anyone else, and
21 it had not been discussed beyond the finance office. He
22 suggested that it had been discussed with the board and
23 that they were -- it was one of the options they were
24 looking at.
25 Q. At that point in time, were you frustrated that

Page 184

1 BENTSI - CONFIDENTIAL
2 the company was not taking your waiver idea more
3 seriously?
4 MR. D'AMATO: Object to form.
5 THE WITNESS: I was worried that the company
6 was not taking the problem seriously, yes.
7 BY MS. MINDLIN:
8 Q. Did you raise your concern again with others
9 at -- strike that.
10 Did you raise your worry with people at the
11 company?
12 A. I may have raised it with, I mean, the finance
13 department, yes.
14 Q. So about ten days had passed between the
15 earlier communication and this one; right?
16 A. (No audible response.)
17 Q. Did you go back again to the company and say
18 that you were still concerned as of February 10 or 11?
19 MR. D'AMATO: Object to form.
20 THE WITNESS: Without full memory, I would say
21 that -- knowing myself, yes.
22 BY MS. MINDLIN:
23 Q. And when you made -- when you had these
24 discussions with the company, did you talk about the
25 amount of the write-down that the company was going to

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL

KOFI BENTSI
May 20, 2016

Page 185

BENTSI - CONFIDENTIAL
1
2  have to make?
3  A.  No.
4  Q.  If you look at the first page of this document,
5  it ends 792, there is an e-mail in the middle of the
6  page from Michael Gomez on February 11.
7    Do you see that one?
8  A.  Yes.
9  Q.  And he says -- I think he messages:
10   "If you are at all unsure about your
11   ability to get audited financials in
12   time, you must pursue waiver.  It
13   will be significantly more costly for
14   you if you do not."
15   Do you see that language there?
16 A.  I do.
17 Q.  And with respect to the reference to
18 "significantly more costly," do you know what Michael
19 Gomez meant?
20 A.  I can't speak for Mike specifically, but I will
21 say that the risk -- the reason why we approached them
22 about getting -- getting a consent waiver in the first
23 place was because the longer they waited to get a
24 waiver, the more expensive it would become.  So with
25 every day passing, it became more and more expensive

Page 186

BENTSI - CONFIDENTIAL
1
2  because the danger was higher of them falling into
3  technical default.
4  Q.  And when you say "more expensive," can you
5  explain what you mean?
6  A.  How much you have to pay for a consent waiver
7  from creditors.
8  Q.  And were you performing analyses about the
9  increased cost of obtaining the consent waiver at that
10 point in time?
11 A.  We were not performing, necessarily, an
12 analysis on it, but it is just more knowing how markets
13 operate.  They would demand more to be paid for the same
14 thing --
15 Q.  Did --
16 A.  -- as the risk increased.
17 Q.  Did you talk with Petrobras about the cost of
18 the consent waiver?
19 A.  Not in absolute numbers, but just to explain to
20 them the risk they -- they were looking at.  The cost
21 they were looking at was increasing as they were waiting
22 or doing whatever they were doing.
23 Q.  And at this point in time, you were speaking
24 regularly with individuals at Petrobras, to the best of
25 your recollection?

Page 187

BENTSI - CONFIDENTIAL
1
2  A.  I would send them weekly messages, I assume.
3  Q.  Did you talk with them in those messages
4  about --
5  A.  Highly repetitive messages.
6    MR. D'AMATO:  Still got to wait for her, even
7  if it is funny.
8  BY MS. MINDLIN:
9  Q.  And you're saying they were highly repetitive
10 because they were focused on the importance to you of
11 Petrobras obtaining the consent waiver from the
12 bondholders swiftly?
13 A.  Yes.
14 Q.  Did you talk with them about their progress in
15 finding a path toward audited financial statements?
16 A.  No.  I don't think that that was necessarily --
17 I think it was better to look at it as we are in a risk
18 management business.  I like to think of it as a risk
19 management business.  It was more about protecting them
20 in case they weren't able to get their financials filed
21 in time, they need to buy insurance.  They should have
22 gotten the waiver.  As opposed to risk, trying to get
23 the financials done in time.  Unless they had
24 100 percent surety they were going to get the financials
25 done in time, they were playing a very risky game, and

Page 188

BENTSI - CONFIDENTIAL
1
2  that was what I was trying to explain to the finance
3  department.
4  Q.  Were Petrobras bonds pricing in that risk at
5  that point in time?
6    MR. D'AMATO:  Objection to form.
7    THE WITNESS:  Yeah.  I can't really make that
8  judgment.
9  BY MS. MINDLIN:
10 Q.  What do you remember about -- strike that.
11   Did you talk with other investors about the
12 importance of a waiver in January and February 2015?
13 A.  I don't believe so, no.
14 Q.  Why not?
15 A.  I wasn't in the -- the game of getting
16 bondholders together to try and get a waiver done or --
17 or extort a higher waiver fee.  It was more about making
18 sure the company understood the risks and resolved the
19 problems quickly.
20 Q.  So your interest at that point in time was in
21 Petrobras obtaining a waiver at the lowest possible cost
22 as quickly as possible?
23   MR. D'AMATO:  Objection to form.
24   THE WITNESS:  My hope is they would obtain a
25 waiver at a low cost and most efficient manner.

Page 189

BENTSI - CONFIDENTIAL
BY MS. MINDLIN:
Q. And why didn't you continue to talk with them
about their progress on the financials?
MR. D'AMATO: Objection to form.
THE WITNESS: Again, it was not so much that I
had a -- any sense of how the financials were going or
their progress in -- filing financials. It was more
of a risk management approach to the problem.
BY MS. MINDLIN:
Q. Were bond prices reacting at all to the risk at
that point in time?
A. I -- I don't -- I don't have anything that
reminds me what the bond prices were at the time, but --
sorry. I can't tell you.
Q. Did you think that the -- strike that.
Were you concerned about changes in Petrobras
bond prices during that period of time?
A. I think it is a very hard question. I'm
concerned about Petrobras bond price changes at --
whether they are up or down every day; so --
Q. Were you particularly concerned during
February 2015 about the price of Petrobras bonds?
A. I do not recall being particularly concerned.
I was more concerned about their approach to the problem

Page 190

BENTSI - CONFIDENTIAL
and whether they were going to resolve it in time.
(Exhibit 12 was marked for
identification.)
THE WITNESS: Thank you.
BY MS. MINDLIN:
Q. You can set No. 11 aside -- document No. 11,
and take a look at what the court reporter has just
handed you, which has been marked for identification
Bentsi Exhibit 12. And it is an e-mail from Zeljka
Bosner to you copying Natalia Lima, and the subject line
is "Re: Forward: PBR new management, not new company."
It is Bates stamped PIMCO 00800765.
Do you recognize this e-mail?
A. No. But if you can give me a second, I can
read through it.
(Pause in proceedings.)
BY MS. MINDLIN:
Q. It looks like an e-mail that you received?
A. Yes. Certainly.
Q. If you turn inside to the page ending 67 and
you look at the Credit Suisse subscription notification
here -- do you see that?
A. Yes.
Q. The title is "PBR new management equals new

Page 191

BENTSI - CONFIDENTIAL
company"; right?
A. Yes.
Q. Do you remember discussions about whether the
new management equaled a new company at this point in
time?
MR. D'AMATO: Objection to form.
THE WITNESS: I remember discussion -- I
remember that being one of the topics of discussion at
the time. Certainly would be able to happen. I don't
really think we knew who the management was, but maybe
I'm wrong.
BY MS. MINDLIN:
Q. What -- what were concerns -- what were the
concerns that you discussed about new management?
A. Well, the hope would be the new management
would push the company -- company in a different
direction and/or address their filing issues.
Q. And when you say the "filing issues," you mean
getting the filing in --
A. Yes.
Q. -- is that right?
A. Exactly.
Q. When you look to the next page -- I'm sorry.
Going the other way.

Page 192

BENTSI - CONFIDENTIAL
If you look at the page ending 66, which is the
e-mail from Vinicius Silva --
A. Right.
Q. -- that forwards the Credit Suisse
notification -- if you look at the subject line, it
looks like it got changed, and now it says "Rather than
new management equals new company, new management not
new company."
Do you see that?
A. Yes.
Q. Do you know why he changed it?
A. I hadn't even noticed that. Very observant.
Q. Thinking about it now, do you have a sense of
why he changed it?
MR. D'AMATO: Objection to form.
THE WITNESS: I -- I -- I can only assume what
he was thinking, but -- I don't know.
BY MS. MINDLIN:
Q. Did you have a view about whether the new
management was going to take the company in a new
direction in February 2015?
A. To -- it is not clear to me we actually knew
who new management was at the time; so that is one
thing. I think I do remember a gap between Graca and

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL

KOFI BENTSI
May 20, 2016

Page 193

BENTSI - CONFIDENTIAL
1   Barbassa resigning and us getting new management; so I
2   don't remember if this was in the interim.  Certainly, I
3   would have had an opinion that -- dependent on who the
4   new management was, would determine whether the company
5   was going to move in a different direction or not.
6   Q.  If you look at the same page, there is an
7   e-mail from Zeljka Bosner on February 4, 2015, 2:32 p.m.
8   Do you see that one?
9   A.  Yes.
10  Q.  And Zeljka Bosner says:
11      "Well, it is a function of no CAPEX
12      cuts, no dividend cuts, and no asset
13      sales and/or equity issuance."
14  Do you know what she was referring to with this
15  sentence?
16  A.  I can say what I infer from it.
17  Q.  Go ahead.
18  A.  I believe she was looking at the number of --
19  the projected cash shortfall from the Credit Suisse
20  research piece, and looking at the assumptions in the
21  line -- that cash shortfall, and suggesting they were
22  unrealistic.
23  Q.  Did you have an opinion about whether they were
24  unrealistic?

Page 194

BENTSI - CONFIDENTIAL
1   A.  I do have an opinion that a cash shortfall that
2   assumes the company can make, has no flexibility around
3   CAPEX, dividends, or asset sales would be unrealistic,
4   yes.
5   Q.  And so did you have a view of how Petrobras
6   should proceed at that point in time with respect to
7   CAPEX cuts?
8       MR. D'AMATO: Objection to form.
9       THE WITNESS: I think that they had many levers
10  they could pull to improve their position.  Certainly
11  CAPEX cuts, dividend cuts, and asset sales or equity
12  issuance would be four very good options.  I think
13  Zeljka's only point, at least at -- from what I'm
14  inferring, is that the -- the cash shortfall that the
15  analyst is projecting seems to take no account of the
16  opportunities or options available to the company.
17      BY MS. MINDLIN:
18  Q.  What were the opportunities and options
19  available to the company at that point in time?
20  A.  Well, assuming they were able to get their
21  filing done on time, they would have options of cutting
22  CAPEX, cutting the dividend, asset sales, or equity
23  issuance or some kind of recapitalization of some sort.
24  Q.  If you look at the top of the page, there is a

Page 195

BENTSI - CONFIDENTIAL
1   line and a -- in an e-mail that begins on the previous
2   page.  It says:
3       "The key issue is probably the
4       shortfall in production volume
5       outlook."
6   Do you see that?
7   A.  Yes.
8   Q.  What was the outlook on Petrobras's production
9   volume during early February 2015?
10      MR. D'AMATO: Objection to form.
11      THE WITNESS: I don't know -- I believe Said is
12  saying that he thinks the key issue is the production
13  shortfall or outlook.
14      BY MS. MINDLIN:
15  Q.  So Said was worried about the shortfall in
16  production at this point in time according to the --
17  your interpretation of this e-mail?
18  A.  That seems to be -- my interpretation is he was
19  talking about the production shortfall.
20  Q.  Did you have a concern about the shortfall in
21  production at that point?
22  A.  I did not think that was the most immediate
23  concern, but it certainly might have been a factor.
24  Q.  Do you think whether others -- strike that.

Page 196

BENTSI - CONFIDENTIAL
1   Do you think others in the market shared Said's
2   concern about a production shortfall at that point in
3   time?
4   A.  I don't think it was the key issue is my
5   personal perspective.
6   Q.  Do you know whether the market was pricing in
7   production shortfalls at that point with respect to bond
8   prices?
9       MR. D'AMATO: Objection to form.
10      THE WITNESS: I think at the time, to my
11  recollection, Petrobras had a very aggressive production
12  target, and the -- most of the market did not -- had a
13  very different production target -- production target.
14  So I don't think it was a key issue, because it seems to
15  me the whole market thought that Petrobras's production
16  target was too high.
17      BY MS. MINDLIN:
18  Q.  If you go up on the first page up the chain to
19  the e-mail from Zeljka on February 4, 2015, she says:
20      "I wish people would read my notes
21      with the same level of attention they
22      give to sell-side reports."
23  Do you see that?
24  A.  Yes.

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL

Page 197

BENTSI - CONFIDENTIAL

2 Q. When she says "my notes," do you know what she
3 meant?
4     MR. D'AMATO: Objection to form.
5     THE WITNESS: Well, I think she is referring to
6 the fact that she is -- repeats herself two e-mails in a
7 row.
8     BY MS. MINDLIN:
9 Q. Meaning inside this chain, she basically says
10 the same thing twice?
11 A. Yes.
12 Q. Do you remember other instances when Zeljka's
13 notes on Petrobras were falling on deaf ears?
14     MR. D'AMATO: Objection to form.
15     MR. GOLDSMITH: Objection to form.
16     THE WITNESS: I don't think, necessarily, that
17 means that she -- well, I don't know if she felt they
18 were falling on deaf ears, but I don't know if that --
19 that means they were falling on deaf ears. I just know
20 that in this particular e-mail chain, she -- which --
21 which is addressing the Credit Suisse research piece
22 about a cash shortfall, she highlights glaring
23 inconsistencies in that -- in those assumptions and is
24 sidetracked by a discussion about production --
25 production growth. But I think that would be what I

Page 198

1     BENTSI - CONFIDENTIAL
2 assume she is reacting to.
3     BY MS. MINDLIN:
4 Q. Do you remember any instances when you
5 discussed with other portfolio managers Zeljka Bosner's
6 credit reports on Petrobras?
7 A. I don't remember specific conversations, no.
8 Q. Do you remember any conversations in which
9 portfolio managers said that they disagreed with Zeljka
10 Bosner's advice on Petrobras?
11 A. I don't remember specific conversations, no.
12 Q. Do you remember any general sense of whether
13 people agreed or disagreed with Zeljka Bosner's analysis
14 of Petrobras?
15 A. I think it is routine and common for research
16 analysts and portfolio managers not to necessarily agree
17 on all -- all facets of their research or all the
18 research views. That is just a natural state.
19 Q. Were there any specific aspects of Zeljka
20 Bosner's research on Petrobras that you personally did
21 not agree with?
22 A. Me personally? None that come to mind, no.
23 Q. And are you aware of any aspects of Zeljka
24 Bosner's research on Petrobras that someone else at
25 PIMCO disagreed with?

Page 199

1     BENTSI - CONFIDENTIAL
2     MR. D'AMATO: Objection to form.
3     THE WITNESS: I'm not aware of any, but
4 certainly it seems that some might have been more
5 focused on the production outlook or something like
6 that. I -- I don't know.
7     BY MS. MINDLIN:
8 Q. Were you part of any discussions when someone
9 disagreed verbally with Zeljka Bosner with respect to
10 Petrobras production guidance?
11 A. I don't remember that, no, but I'm just -- I'm
12 just going by the e-mail in front of me.
13 Q. Understood.
14     You can set that one aside.
15     (Exhibit 13 was marked for
16     identification.)
17     THE WITNESS: Okay.
18     BY MS. MINDLIN:
19 Q. The court reporter has just handed you another
20 exhibit, which has been marked for identification
21 Exhibit 13. It is Bates stamped PIMCO 00869330. It is
22 an e-mail from you to Zeljka Bosner on February 20,
23 2015, titled "Forward: Good luck today, Ivan."
24     Do you recognize this e-mail?
25 A. I do.

Page 200

1     BENTSI - CONFIDENTIAL
2 Q. How do you recognize it?
3 A. I -- I wrote it.
4 Q. What do you remember about writing this e-mail?
5 A. I remember more the context of it.
6 Q. And what do you remember about the context for
7 the e-mail?
8 A. Ivan had just joined the firm and -- I don't
9 remember exactly when, particularly, but it was more
10 around making him aware of the current difficulties or,
11 on my estimation, of what the difficulties the -- the
12 company faced, and the fact that Aurelius, as a hedge
13 fund, was reaching out to bondholders to organize.
14 Q. And so you previously knew Ivan from his old
15 job --
16 A. Yes.
17 Q. -- right?
18 A. Yes.
19 Q. And so you were writing to him to explain your
20 general view of the situation with respect to Petrobras
21 at that point in time?
22 A. Just give an opinion, yes.
23 Q. And when you wrote at the end of the e-mail,
24 "Good luck today, Ivan, and let me know if you need
25 anything," do you know what he was doing "today,"

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL

Page 201

BENTSI - CONFIDENTIAL

1    BENTSI - CONFIDENTIAL
2  meaning on that day?
3  **A.  I think there was a board meeting, but I don't**
4  **remember.  It might have been anything.**
5  Q.  If you look at the third paragraph of your
6  e-mail, you say, "It would be" -- in the second line:
7      "It would be beneficial to give them
8      some comfort through access to your
9      legal opinions on the subject and
10     access to PwC to discuss the steps
11     you're taking in your ability to file
12     in due time."
13     Do you see that?
14  **A.  Yes.**
15  Q.  And when you say "them" here, do you know who
16  you meant?
17  **A.  I believe I was referring to the rating**
18  **agencies.**
19  Q.  And why did you suggest that it might have been
20  beneficial to give the rating agencies access to legal
21  opinions on the subject of the Q3 financials?
22  **A.  My memory is a little bit -- going back, if**
23  **I -- if I remember correctly, there was some question**
24  **about whether the financial -- the filing of -- whether**
25  **the filing -- the Q3 filing was -- was compliant with**

Page 202

1    BENTSI - CONFIDENTIAL
2  **IFRS.  And there was some doubt -- and there was some**
3  **doubt that Aurelius was going to use that as a -- as an**
4  **opportunity to put the -- put the bonds into technical**
5  **default.**
6      **And so we wanted -- what I was -- what I was**
7  **suggesting was that the -- Petrobras allow the**
8  **company -- Petrobras allow the rating agencies to speak**
9  **with the auditors so they can get some comfort around**
10  **the methodology and they could get a legal opinion from**
11  **the counsel -- yourselves -- that the -- that the --**
12  **that the -- that the filing was compliant.**
13  Q.  Did you think a discussion between the rating
14  agencies and the accountants would help prevent a
15  downgrade by the rating agencies?
16  **A.  I thought it was one -- certainly one of the**
17  **things to consider, yes.**
18  Q.  And why did you care about preventing a
19  downgrade?
20      **MR. D'AMATO:** Objection to form.
21      **THE WITNESS:** I look as -- sorry.  I look at
22  our -- our role as a -- as large creditors of most
23  companies, as also partners -- partners with creditors
24  in trying to -- and as partners, we try to advise them
25  on what we think are the best solutions for them to

Page 203

1    BENTSI - CONFIDENTIAL
2  address certain situations.
3      It would not be good for a highly levered
4  company with large CAPEX needs to move into high yield;
5  so it was important for Petrobras to stay as an
6  investment-grade credit in my opinion.
7      **BY MS. MINDLIN:**
8  Q.  So broadly speaking, you were trying to help
9  Petrobras here?
10  **A.  Yes.**
11  Q.  You didn't discuss at this point in time with
12  Ivan the likely size of the write-down in the
13  financials, did you?
14  **A.  No.**
15  Q.  Why not?
16  **A.  In what capacity?  Sorry.**
17  Q.  Why didn't you discuss with Ivan the likely
18  size of the write-down?
19  **A.  I would say that it probably would not be --**
20  **that would be, at least in my guess -- I don't know if**
21  **it would be material, but it would certainly be**
22  **nonpublic information.**
23  Q.  You can set that document aside.
24      When you make an investment at PIMCO -- strike
25  that.

Page 204

1    BENTSI - CONFIDENTIAL
2      When you buy or sell securities at PIMCO, are
3  there tangible steps you have to take to effect the
4  trade?
5  **A.  No.  In what sense?  They have to be -- repeat**
6  **your question.**
7  Q.  Maybe I can clarify.
8      So if you've taken in your mind -- you've
9  resolved to buy shares of Petrobras -- I'm sorry --
10  Petrobras notes -- it doesn't really matter which
11  offering for the purpose of this question.
12  **A.  Okay.**
13  Q.  Do you enter the trade into a system?
14  **A.  Generally, you'd make sure the trade was**
15  **compliant with the account.  We have trading assistants**
16  **who make sure that any trade is compliant with the --**
17  **the guidelines of an account.  And if it is, then the**
18  **trade will process through to the respective trader**
19  **and -- and is executed.**
20  Q.  So I want to know more about how the trade
21  processes through to the respective trader.  What is
22  your understanding of that process?
23  **A.  The -- certainly there are probably better**
24  **people to talk to about it than me, but the trade**
25  **assistant would input the -- the trade into a -- a**

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL

Page 205

BENTSI - CONFIDENTIAL

1    BENTSI - CONFIDENTIAL
2  system called TSOX.
3  Q.  Could you spell that?
4  A.  T-S-O-X.
5      That is just a -- a Bloomberg order management
6  system.  It will arrive at the -- the respective
7  execution desk.  They will see the order in Bloomberg,
8  trade, and book the ticket in -- in -- in Bloomberg, and
9  that reduces -- it removes the order from the list of
10 things to do.
11     MR. GOLDSMITH: Mr. Bentsi, would you mind
12 raising your voice a little bit?
13     THE WITNESS: Sorry.
14     MR. GOLDSMITH: Thank you.
15     THE WITNESS: Which part did you miss?
16     MR. GOLDSMITH: It is okay.
17     THE WITNESS: The whole day?
18     BY MS. MINDLIN:
19 Q.  Do you personally have access to the TSOX
20 system?
21 A.  Yes.
22 Q.  And do you generally enter your trades into the
23 TSOX system yourself?
24 A.  I know how to, yes.
25 Q.  And do you have a dedicated trading assistant?

Page 206

1    BENTSI - CONFIDENTIAL
2  A.  I have a -- we have a team.
3  Q.  How many people are on the trading assistant
4  team?
5  A.  I would say there are usually two to three in
6  each time zone.
7  Q.  And what are the time zones?
8  A.  Asia, Europe, and Americas.
9  Q.  Where are the Asia trading assistants based?
10 A.  Singapore.
11 Q.  Where are the Europe trading assistants based?
12 A.  Now London.
13 Q.  And did they move at some point from Munich?
14 A.  Yes.
15 Q.  When was that, if you know?
16 A.  I assume it was around March of 2015.
17 Q.  And --
18 A.  Maybe June.  Somewhere in that time frame.
19 Q.  So March or June 2015?
20 A.  March to June 2015 is the transition.
21 Q.  And what about the Americas trading assistants?
22 A.  They are in Newport.  This is for emerging
23 markets only.  Everyone has their own trading
24 assistants.
25 Q.  So these are the trading assistants with whom

Page 207

1    BENTSI - CONFIDENTIAL
2  you had worked --
3  A.  Yes.
4  Q.  -- in your current role as portfolio manager?
5  A.  Exactly.
6  Q.  Is this the same team that would work with
7  other emerging markets portfolio managers?
8  A.  Yes.
9  Q.  And is that true for all EM portfolio managers
10 worldwide?
11 A.  All EM portfolio managers worldwide would be
12 using those -- their trading assistant.  Case -- in
13 example, any other portfolio manager that is not in
14 emerging markets would not be using those portfolio --
15 those trading assistants.
16 Q.  Understood.
17     And if I remember correctly, there are certain
18 portfolios that are not EM portfolios that still contain
19 Petrobras --
20 A.  Exactly.
21 Q.  -- securities?
22 A.  Exactly.
23 Q.  Let's wait for the court reporter.  I know this
24 is very exciting stuff, but you should wait until I
25 finish my question before you answer.

Page 208

1    BENTSI - CONFIDENTIAL
2      So if you were not an EM portfolio manager,
3  would you still have coverage in each time zone?
4  A.  Not necessarily.
5  Q.  And do you know for portfolios that are not EM
6  portfolios but do invest in Petrobras securities, where
7  those trading assistants are based?
8      MR. GOLDSMITH: Objection to form.
9      THE WITNESS: I do not -- I cannot speak for
10 all of them, but I would say that -- yeah.  I can't
11 speak for all of them.  Sorry.
12     BY MS. MINDLIN:
13 Q.  How do the trading assistants get the
14 information that they need for the trades from you?
15 A.  Well, I would send them an e-mail on Bloomberg
16 saying I want to do X trade, then they put it in the
17 system.  They would make sure it was compliant with the
18 guidelines and then they'd put -- input it into the
19 system.
20 Q.  And when you speak about "the guidelines," what
21 kind of guidelines are those?
22 A.  Well, the account might have a guideline -- a
23 credit limit guideline or a -- ratings limit guidelines.
24 You don't have any compliance breaches; so --
25 Q.  Are there guideline limits about how much of a

Page 209

BENTSI - CONFIDENTIAL

1  given issuer's --
2  **A.   Some portfolios can have guidelines -- slow**
3  **down?**
4      MR. D'AMATO: Wait for her to finish.
5      BY MS. MINDLIN:
6  Q.   You were saying some portfolios have
7  guidelines.  Go ahead.
8  **A.   Some portfolios have guidelines around**
9  **concentration limits or issuer limits, yes.**
10 Q.   Do any of your portfolios have concentration
11 limits for Petrobras?
12 **A.   I think all our portfolios have guidelines**
13 **around single-name-issuer limits as a -- from a**
14 **compliance perspective.**
15 Q.   Do you know what the guideline is with respect
16 to single-name-issuer limits?
17 **A.   I think, from my portfolio, it would be around**
18 **5 percent.**
19 Q.   And so that would mean that you wouldn't be
20 allowed to have more than 5 percent of your portfolio
21 consist of Petrobras or another single-name issuer?
22 **A.   I believe so.**
23 Q.   Do you know whether you ever went over the
24 5 percent limit for Petrobras?

Page 210

BENTSI - CONFIDENTIAL

1  **A.   I have never come close to the 5 percent limit.**
2  Q.   Do you know whether other portfolio managers
3  have come close or exceeded the 5 percent limit?
4  **A.   I do not know, no.**
5  Q.   When you put an order through via e-mail or
6  Bloomberg to your trading assistant, do you know which
7  trading assistant is going to get that order?
8  **A.   Not necessarily, no.**
9  Q.   And so you have 24/7 coverage from trading
10 assistants?
11 **A.   Yes.**
12 Q.   Do you know when a trade is executed, which
13 trading assistant puts it through?
14 **A.   No.**
15 Q.   What do the trading assistants do once they get
16 your order?
17     MR. D'AMATO: Objection to form.
18     THE WITNESS: They -- from my understanding or
19 from what -- I would expect them to respond that they
20 have received the order.
21     BY MS. MINDLIN:
22 Q.   So usually what happens is that you send an
23 e-mail or Bloomberg, and a trading assistant, who could
24 be located in any of these three regions, will send you

Page 211

BENTSI - CONFIDENTIAL

1  a confirmation back saying that they got the order?
2      MR. D'AMATO: Objection to form.
3      THE WITNESS: Just to be clear, I -- if I was
4  sitting in Newport, I would send an order to the Newport
5  trading assistant saying to buy X bonds.  They would
6  make sure the trade is in -- compliant with the system
7  and input it into TSOX, at which point it would be sent
8  to the trading desk, which would execute the trade and
9  book it into -- into the -- in Bloomberg, into the
10 portfolio.
11     BY MS. MINDLIN:
12 Q.   And so where do the Europe and Asia desks come
13 into play if you're sitting in Newport?
14     MR. D'AMATO: Objection to form.
15     THE WITNESS: They wouldn't come into play from
16 a point of an execution of the trade.  They'd come into
17 play in terms of -- they would be the ones who know what
18 I was trying to do.  The trades are executed in the
19 respective business centers.
20     BY MS. MINDLIN:
21 Q.   I may have become confused, but you would
22 e-mail -- you have 24/7 trade coverage from these three
23 teams; correct?
24 **A.   They are trade assistants.  This is different**

Page 212

BENTSI - CONFIDENTIAL

1  **from traders.**
2  Q.   So the idea here is that you communicate to the
3  trading assistants who are in these three locations.  Do
4  I understand correctly that you can communicate with any
5  of these three teams for your trades?
6      MR. D'AMATO: Objection to form.
7      THE WITNESS: They are middle office.  Okay?
8      BY MS. MINDLIN:
9  Q.   Got it.
10 **A.   They are in three different business centers to**
11 **support respective groups in three different business**
12 **centers.  That -- they would not -- they don't execute**
13 **trades.  They wouldn't necessarily be applicable for**
14 **this discussion, but since it is a global portfolio, I**
15 **have trading assistants at every business center, yes.**
16 Q.   So right now if you execute a trade, do you
17 send your e-mail or Bloomberg to the Europe trading
18 assistants, or do you send it to all three teams?
19 **A.   Well --**
20     MR. D'AMATO: Objection to form.
21     THE WITNESS: If I'm in London, I can -- I
22 would usually send it to a global list of -- of trading
23 assistants that captures the trade.
24     BY MS. MINDLIN:

Page 213

BENTSI - CONFIDENTIAL
1
2  Q.  So when you were in Newport back before you
3  moved over to Europe, did you also send it to a global
4  list of trading assistants?
5      MR. D'AMATO: Objection to form.
6      THE WITNESS: I'd probably send it straight to
7  the trading assistants in Newport.
8      BY MS. MINDLIN:
9  Q.  And why the distinction?  Because it seems like
10 now you send it to the global list, and previously you
11 only sent it to Newport.
12     MR. D'AMATO: Objection to form.
13     THE WITNESS: I would say they're just more --
14 the global list is a larger capture list.  That is all.
15     BY MS. MINDLIN:
16 Q.  So it is a practical consideration?
17 A.  Yeah.  If I'm in different time zones, I
18 don't -- I want to make sure that the right people get
19 the message.
20 Q.  When you are traveling away from London, do you
21 still make trading decisions?
22 A.  Yes.
23 Q.  And so from wherever you are in the world,
24 you'll send your e-mail to the trading assistants?
25     MR. D'AMATO: Objection to form.

Page 214

1      BENTSI - CONFIDENTIAL
2      THE WITNESS: I will make sure -- yes.
3      BY MS. MINDLIN:
4  Q.  And when you are in Newport --
5  A.  Managing a portfolio is a global -- sorry.
6  Managing portfolios on a 24-hour basis, basically, is
7  how it works.
8      (Telephonic interruption.)
9      BY MS. MINDLIN:
10 Q.  So when you were in Newport --
11 A.  Yes.
12 Q.  -- before you moved to London, you were also
13 managing portfolios on a 24-hour basis; right?
14 A.  Yes.
15 Q.  And so you would travel somewhere else in the
16 world and still make trading decisions?
17 A.  Yes.
18 Q.  And you would, in turn, e-mail the trading
19 assistant team to make your trades?
20 A.  Yes.
21     MR. D'AMATO: Objection to form.
22     BY MS. MINDLIN:
23 Q.  When the trading --
24 A.  To input the trades.
25 Q.  To input your trades.

Page 215

1      BENTSI - CONFIDENTIAL
2  A.  Yes.
3  Q.  Into the TSOX system?
4  A.  Exactly.
5  Q.  And you have the option personally to implement
6  your trades via TSOX; correct?
7  A.  I could input the trades into TSOX myself if I
8  wanted to, yes.
9  Q.  And dividing between when you did it yourself
10 and the trading assistants did it, do you have an
11 approximate sense of proportion?
12     MR. D'AMATO: Objection to form.
13     THE WITNESS: Yeah.  I wouldn't -- not clear to
14 me.  It is random order.
15     BY MS. MINDLIN:
16 Q.  Once the trading assistants get the TSOX order,
17 do you know which trader they give the trade to to
18 execute?
19 A.  The trades would go to the respective business
20 centers, as in the system -- whoever is in -- everyone
21 globally can see the system.  The respective business
22 center picks up the trade and each -- any trader can
23 pick up the trade if they want to and execute the trade.
24 Q.  And where are the traders located?
25 A.  Newport for Americas, London for Europe, and

Page 216

1      BENTSI - CONFIDENTIAL
2  Singapore for Asia.
3  Q.  You talked about the respective business
4  center.  Does the "respective" mean the portfolio
5  manager -- where the portfolio manager is based,
6  means that --
7  A.  For the trading?  For the trading is a -- the
8  trading is a function of wherever the asset is.  So if I
9  want to trade something in a Hong Kong name, Singapore
10 will pick it up and trade.  So Newport will always trade
11 what is in Latin America.
12 Q.  Are there exceptions?
13 A.  There can be exceptions, yes.
14 Q.  What are the exceptions that you remember?
15 A.  If you're in London and you want to trade
16 Brazil currency and Newport hasn't woken up yet because
17 it is 3:00 o'clock in the morning, you might -- that'd
18 be an exception that you might pass it through the
19 London desk.
20 Q.  And what if it was 3:00 in the morning and you
21 wanted to trade Petrobras bonds?  Would you also trade
22 those through London?
23     MR. GOLDSMITH: Objection to form.
24     THE WITNESS: The Petrobras bonds wouldn't
25 trade through London just because liquidity is in

Page 217

BENTSI - CONFIDENTIAL
1    BENTSI - CONFIDENTIAL
2  New York time zone.  So the only -- the only caveat to
3  that would be if they were in euro.
4    BY MS. MINDLIN:
5  Q.  If which were in Europe?
6  A.  Euro.  Euro.
7  Q.  Oh, euro?
8  A.  If the currency was in euro, yeah.
9  Q.  Meaning if they were euro bonds?
10  A.  As in -- well, not euro bonds.  If the currency
11  was in euro.
12  Q.  Okay.  I just want to make sure that I
13  understand what you mean.
14  A.  The term "euro bonds" is a -- is a mixed term.
15  Q.  But if you --
16  A.  Before the euro, we had euro bonds; so old guys
17  like me get kind of crossed up when you say "euro".
18  Q.  Understood.
19    So what I think you're saying right now is that
20  if there was a U.S. dollar-denominated Petrobras note,
21  it would be traded --
22  A.  It could be traded out of Europe before Newport
23  gets in.
24  Q.  Could it be --
25  A.  As it is, we don't do that, but it could be,

Page 218

1    BENTSI - CONFIDENTIAL
2  hypothetically.
3  Q.  And why do you say you don't do that?
4  A.  Because I believe that, especially in these
5  scenarios, people should trade the credit regardless of
6  the currency because they can see the relative valuation
7  differences between one bond and the other.  So
8  something like Petrobras we trade out of Newport, even
9  if it is in euro.
10  Q.  So that is a belief about what should happen;
11  right?
12  A.  Exactly.
13  Q.  But you don't know that to happen all the time,
14  do you?
15    MR. GOLDSMITH: Objection to form.
16    THE WITNESS: I don't know that to happen all
17  the time, but I know that is what I've told people to
18  do.
19    BY MS. MINDLIN:
20  Q.  And that is with respect to the trades in your
21  portfolios?
22  A.  That is a global mandate.
23  Q.  But you don't know for a fact globally whether
24  all Petrobras bond trading happens in Newport?
25    MR. GOLDSMITH: Objection to form.

Page 219

1    BENTSI - CONFIDENTIAL
2    MR. D'AMATO: Objection to form.
3    THE WITNESS: I know that I requested that all
4  trading in Petrobras be done by the same team, and I
5  expect that, but --
6    BY MS. MINDLIN:
7  Q.  And have you issued --
8  A.  -- I don't know that.
9  Q.  -- that instruction with respect to all trading
10  for all of PIMCO or with respect to your portfolios?
11  A.  All of PIMCO.
12  Q.  And how did it come to pass that you were
13  issuing the instruction for all of PIMCO?
14  A.  I thought it was a good idea.
15  Q.  So once the traders get the request to trade,
16  did they have specific brokers that they work with?
17  A.  No.  They work on their best-price basis.
18  Q.  And do you know where the brokers that they
19  work with are located?
20  A.  Largely New York.
21  Q.  How do you know that they're in New York?
22  A.  For Petrobras?  Most Latin American corporate
23  dealer desks are based in New York.
24  Q.  So your understanding is based on the usual
25  practice, but it is not something that --

Page 220

1    BENTSI - CONFIDENTIAL
2  A.  There may be exceptions to the rule, certainly.
3    MR. D'AMATO: You got to wait for her to
4  finish.
5    THE WITNESS: Sorry.
6    BY MS. MINDLIN:
7  Q.  Does PIMCO trade Petrobras equity?
8  A.  It can do.
9  Q.  Do you -- you said earlier you don't have any
10  Petrobras equity in your portfolios?
11  A.  No.
12  Q.  Do you know which portfolio managers trade
13  Petrobras equity?
14  A.  Not off the top of my head, no.
15  Q.  Do you know whether they trade the
16  Bovespa-traded shares in Brazil?
17  A.  Depending on the type of portfolio they
18  would -- it would be, they would either trade the
19  Bovespa shares or the ADRs.
20  Q.  And is there a way that you could tell which
21  portfolio would trade which?
22  A.  Presumably by looking at the guidelines or
23  whether they had local accounts.
24  Q.  Are you familiar with Research Affiliates?
25  A.  Research Affiliates?  Associates?

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL

KOFI BENTSI
May 20, 2016

Page 221

BENTSI - CONFIDENTIAL

1
2 Q. Research Affiliates.
3 A. Could you be more specific?
4 Q. Is there an entity that advises PIMCO with
5 respect to anything that you're aware of that is called
6 Research Affiliates?
7 A. I don't think so.
8 Q. Do you get trade tickets for the trades that
9 are executed for your portfolios?
10 A. I don't see them -- trade tickets, no. Depends
11 on we -- how we define trade tickets. Yeah.
12 (Exhibit 14 was marked for
13 identification.)
14 BY MS. MINDLIN:
15 Q. The court reporter handed you what has been
16 marked for identification Exhibit 14, and it is Bates
17 stamped HRS 00330978.
18 Do you recognize this form of document?
19 A. I do.
20 Q. How do you recognize it?
21 A. It is a trade ticket or recap.
22 Q. Do you regularly receive trade ticket or recaps
23 that look like this?
24 A. No. This would be more for middle office. It
25 is a block confirm.

Page 222

BENTSI - CONFIDENTIAL

1
2 Q. And when you say "a block confirm," what does
3 that mean?
4 A. It usually tells where the allocations are --
5 it is a confirmation of the trade and tells where the
6 allocations were to whichever accounts.
7 Q. And where do you see the allocation on this
8 confirm?
9 A. Page number -- it says account No. 23.
10 Q. Yeah. Do you know what account No. 23 is?
11 A. No.
12 Q. And at the top right corner there is a line
13 that says, "Portfolio Mgr. Kofi Bentsi"?
14 A. Yes.
15 Q. Does that reflect that you were the portfolio
16 manager for this trade?
17 A. I think in this particular case, it looks like
18 it says I -- I did the trade, but I can't tell that.
19 Q. And where do you see that it looks like you did
20 the trade?
21 A. Exactly. I don't actually know that, but I can
22 see the trade is in my name and is entered by someone
23 who is in middle office. I don't know the account
24 No. 23 -- well, I can see actually who the account
25 No. 23 is; so I know that I did the trade.

Page 223

BENTSI - CONFIDENTIAL

1
2 Q. And who is account No. 23?
3 A. I don't know the specific account, but I can
4 see the portfolio manager.
5 Q. And where do you see that?
6 A. It says "PM initials."
7 Q. Yes. I do see that on the right-hand side, the
8 last column of the --
9 A. Yes. Exactly.
10 Q. -- chart.
11 MR. D'AMATO: Last column?
12 BY MS. MINDLIN:
13 Q. So the initials are "WG"; right?
14 A. (No audible response.)
15 Q. And who does that stand for?
16 A. William Gross III.
17 Q. He was the portfolio manager for this account
18 at this point in time?
19 A. Yes.
20 Q. And was he your supervisor at that point in
21 time?
22 A. He would have been the senior person at the
23 firm at that time, yes.
24 Q. And so did you report via Michael Gomez to
25 Mr. Gross?

Page 224

BENTSI - CONFIDENTIAL

1
2 A. Yes.
3 Q. And what was your responsibility for making
4 trades for account No. 23?
5 A. I believe I only executed this trade. Not --
6 nothing more.
7 Q. And do you know how you would have been asked
8 to execute this trade?
9 A. I have no recollection of the -- the entire
10 process in which this came to happen -- this trade came
11 to happen, but it looks like I was -- it might have been
12 a new-issue note -- a new issue.
13 Q. If you look in the top line --
14 A. Uh-huh.
15 Q. -- at the broker, it says, "Citigrp Glbl."
16 Do you see that?
17 A. Yes.
18 Q. Does that stand for Citigroup Global?
19 A. Yes.
20 Q. Do you know where Citigroup executed the trade?
21 A. As in which location or which price?
22 Q. Which location?
23 A. New York.
24 Q. And how do you know it was New York?
25 A. Because it was Petrobras.

Page 225

BENTSI - CONFIDENTIAL

1

2  Q.  But that is just an assumption; right?

3     MR. GOLDSMITH: Objection to form.

4     MR. D'AMATO: Objection.

5     THE WITNESS: I believe it was done in

6  New York --

7     BY MS. MINDLIN:

8  Q.  What --

9  A.  -- with Citigroup.

10  Q.  What is your belief based on?

11  A.  I think that if I look at the date on this

12  trade, it was in 2013, which means I was in Newport

13  executing a Petrobras trade with Citigroup.  Would have

14  been likely New York office; so I think that is a fair

15  assumption.

16  Q.  But you never talked to the broker at Citigroup

17  for your trade; right?

18  A.  I might have done for this trade.

19  Q.  And how often do you talk with the brokers for

20  your trades?

21  A.  It is highly dependent on how busy I am.

22  Q.  Why would you decide to speak with a broker as

23  opposed to having the trader do that?

24  A.  I find it very informative.  I enjoy the

25  discussion.

Page 226

BENTSI - CONFIDENTIAL

1

2  Q.  What is informative about the discussion?

3  A.  What other people are doing in the market, what

4  other people think about the market.

5  Q.  Did you have --

6  A.  It reminds me of an old time.

7  Q.  You said it reminds you of an old time?

8  A.  Yes.

9  Q.  What old times does it remind you of?

10  A.  I used to be a trader once.

11  Q.  What did you trade when you were a trader?

12  A.  Latin American corporate debt.

13  Q.  Did you trade Petrobras?

14  A.  Yes.

15  Q.  What were the years when you were a trader?

16  A.  Something like Latin American -- something like

17  Petrobras?

18  Q.  Yes.

19  A.  I would say probably between 2009 and 2011.

20  Q.  Was that at JPM?

21  A.  That would have been at Credit Suisse.

22  Q.  At Credit Suisse.

23     Did you use colleagues at Credit Suisse to

24  trade Petrobras?

25  A.  Not usually.

Page 227

BENTSI - CONFIDENTIAL

1

2  Q.  Did you have a preferred broker that you traded

3  Petrobras with?

4     MR. D'AMATO: Objection to form.

5     THE WITNESS: Not particularly.

6     BY MS. MINDLIN:

7  Q.  When you talked about Petrobras with brokers

8  generally, what kind of information did they provide?

9  A.  I talk about all bonds with -- with brokers,

10  and it is just more to see whether something was

11  interesting, if they had any ideas that might be -- had

12  potential to make money, or they looked -- they had an

13  opinion about something that looked distressed, or if

14  they were liquidity position or potential.

15  Q.  In 2014, did you learn anything from brokers

16  about Petrobras that affected your decisions whether to

17  purchase or sell Petrobras bonds?

18  A.  Nothing comes to mind.  No, I do not recall

19  that.

20  Q.  During 2015, did you learn anything from

21  brokers about Petrobras that affected your decisions

22  whether to purchase or sell Petrobras bonds?

23  A.  No.

24  Q.  How about earlier than that in time that --

25  A.  No.

Page 228

BENTSI - CONFIDENTIAL

1

2  Q.  Did you have a sense from brokers about

3  Petrobras liquidity during 2014 and '15?

4     MR. D'AMATO: Objection to form.

5     THE WITNESS: I may have asked whether they

6  thought June -- you know, bonds were liquid at any

7  period of time.  That would seem like a very normal

8  question to ask --

9     BY MS. MINDLIN:

10  Q.  Did you talk --

11  A.  -- in -- in a credit.

12  Q.  Sorry.

13  A.  Yeah.

14  Q.  Did you talk about pricing with the brokers

15  when you called?

16  A.  Can you be more specific?  Sorry.

17  Q.  Did you talk about the spread for a Petrobras

18  bond when you called a broker?

19  A.  I might have said it looks very wide or it

20  looks very tight.  That is about the -- the -- yeah.

21  That is about the extent of the discussion, if they had

22  an opinion as to whether it was too wide or too tight.

23  It is more a discussion around their opinions, one.  But

24  two, also, their opinions about liquidity in the market,

25  whether there is -- you know, what the -- what -- how --

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL

KOFI BENTSI
May 20, 2016

Page 229

BENTSI - CONFIDENTIAL

1    BENTSI - CONFIDENTIAL
2  how much liquidity and how easy is it to do X, Y, or Z.
3  Q.  Do you know who the counterparty to this trade
4  was?
5  A.  Citibank.
6  Q.  And so Citibank was PIMCO's counterparty?
7  A.  Yes.
8  Q.  And could it have been Citigroup's London
9  office doing this trade?
10    MR. GOLDSMITH: Objection to form.
11    THE WITNESS: It could not have -- I don't
12  believe it is Citigroup's London office in this trade.
13  I think if you look at the -- the broker ID, it is
14  Citigroup -- that is Citigroup U.S.
15    BY MS. MINDLIN:
16  Q.  And if I'm correct, Citigroup U.S. is Citigroup
17  Global Markets, Inc.  It is a broker/dealer; right?
18  A.  Which is different from Salomon Brothers
19  International, which is the broker/dealer for Citigroup
20  in London.
21  Q.  And what is the role of Citigroup Global
22  Markets, Limited?
23  A.  I don't know, but I know that that is -- the
24  two counterparties are Citigroup in the U.S. and Salomon
25  Brothers International in -- in the U.K.

Page 230

1    BENTSI - CONFIDENTIAL
2  Q.  And how are you familiar with Salomon Brothers
3  International in the U.K.?  From PIMCO?
4  A.  Yes.
5  Q.  And it is your understanding that if a trade
6  were executed through Citigroup's London office, it
7  would appear as a Salomon Brother's trade?
8  A.  Yes.
9  Q.  Do you know whether Citigroup acted as agent or
10  principal here?
11  A.  I don't know that, but I assume this is
12  probably a new issue if I had to guess.
13  Q.  And what is your guess based on?
14  A.  It is highly unlikely that Citigroup has a
15  capacity to trade a 175 million bond all in one trade.
16  Q.  Just because of the sheer amount?
17  A.  Yes.
18  Q.  Did you participate in diligence calls before
19  offerings of Petrobras bonds?
20  A.  How are we defining "diligence calls"?
21  Q.  Did you participate in calls with book runners
22  before new issuances?
23  A.  Could you be more specific?
24  Q.  Did you participate in calls with underwriters
25  of bonds?

Page 231

1    BENTSI - CONFIDENTIAL
2  A.  Yes.
3  Q.  Did you participate in calls with underwriters
4  of bonds before -- strike that.
5    Did you participate in calls with underwriters
6  of Petrobras bonds?
7    MR. D'AMATO: Objection to form.
8    THE WITNESS: I participated in calls with
9  underwriters -- bond underwriters, certainly.  Whether I
10  participated with bond -- bond underwriters around
11  Petrobras, I have, yes, certainly.
12    BY MS. MINDLIN:
13  Q.  Do you remember which offering --
14  A.  No.
15  Q.  -- that was for?
16  A.  Most likely most of them.
17    MR. D'AMATO: Is this a time when we can take a
18  break?
19    MS. MINDLIN: Sure.
20    THE VIDEOGRAPHER: This is the end of disk
21  No. 3.  The time is 1437, and we are off the record.
22    (Recess.)
23    THE VIDEOGRAPHER: We are back on the record.
24  This is the beginning of disk No. 4.  The time is 1454.
25    (Exhibit 15 was marked for

Page 232

1    BENTSI - CONFIDENTIAL
2  identification.)
3    BY MS. MINDLIN:
4  Q.  The court reporter has handed you what has been
5  marked Exhibit 15 -- Bentsi Exhibit 15, which is Bates
6  stamped PIMCO 00221670.
7    You recognize this form of document?
8  A.  I do.
9  Q.  And if you look to the right, at the top you
10  see a portfolio manager line; right?
11  A.  Vinicius Silva, yes.
12  Q.  And do you know Mr. Silva?
13  A.  Yes.
14  Q.  What is his role at PIMCO?
15  A.  He is a portfolio manager slash execution on
16  the EM desk in Newport Beach.
17  Q.  When you say "slash execution," what do you
18  mean?
19  A.  Well, he -- he would have executed this trade.
20  It wouldn't have been for his own portfolio.
21  Q.  Whose portfolio was it for?
22  A.  Judging by the initials, it would have been
23  Scott Mather.
24  Q.  Could you spell the last name?
25  A.  M-a-t-h-e-r, Mather.

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL

**KOFI BENTSI**
**May 20, 2016**

Page 233

BENTSI - CONFIDENTIAL

1

2 Q. And Mr. Mather is also based in Newport?

3 A. Yes.

4 Q. And you -- the initials to which you're

5 referring are in the middle of the page where it says

6 "SAM"?

7 A. Yes.

8 Q. Where it says below the portfolio manager line,

9 "Entered by VPMSILVA," what does "Entered by" refer to,

10 if you know?

11 A. He booked the trade.

12 Q. And when you say he booked it, does that mean

13 he entered it into the system?

14 A. Well, this is a Bloomberg ticket; so what they

15 would have -- what would happen is he booked it into

16 the -- he booked it into Bloomberg is what I'm reading

17 from here.

18 Q. And is that Bloomberg TSOX?

19 A. Well, Bloom- -- TSOX is a part of Bloomberg

20 inside of -- it is a Bloomberg system.

21 Q. And when he booked it, does that mean that it

22 was Mr. Silva rather than a trader whose message reached

23 a broker?

24 A. When I say he booked it, I mean he entered this

25 trade into the system, as in he entered the buy ticket

Page 234

BENTSI - CONFIDENTIAL

1

2 or -- what is this one? -- the sell ticket, which is --

3 and if you notice the previous one, the sell ticket was

4 entered by Tadashi Tsueyoshi.

5 Q. Right. So let's go back and look at that just

6 so we can compare. On Exhibit 14, that was the "Entered

7 by" line --

8 A. Right.

9 Q. -- and Mr. Tsueyoshi is listed there on --

10 A. Exactly.

11 Q. -- the Exhibit 14.

12 A. Exactly.

13 Q. What is Mr. Tsueyoshi's role?

14 A. He is in the trade support role.

15 Q. So he is a trading assistant by role?

16 A. Exactly.

17 Q. Which office is he located in?

18 A. Newport.

19 Q. So let's look back at the next exhibit, 15. If

20 you look at the broker entry, here it reads,

21 "UBS London."

22 Do you see that?

23 A. Yes.

24 Q. And does that mean that UBS London was the

25 broker for this trade?

Page 235

BENTSI - CONFIDENTIAL

1

2 A. I don't know what I should read from that, to

3 be honest.

4 Q. But when you look back at Exhibit 14, you

5 looked at the broker line and you said it was Citigroup?

6 A. Yes. I agree with that.

7 Q. This looks similar to me. Does it look similar

8 to you?

9 MR. D'AMATO: Objection to form.

10 THE WITNESS: I would have to check to see what

11 UBS in -- I guess in New York now -- what their code is

12 for me to really know why that -- it seems surprising to

13 me it says UBS London.

14 BY MS. MINDLIN:

15 Q. Why is it surprising?

16 A. Because I have a portfolio manager in Newport

17 executed by a trader who I know has always been in

18 Newport and is booking to an entity suggested as London.

19 Q. Who is the trader to which you're referring?

20 A. Vinicius booked the trade.

21 Q. Oh. So you're saying -- when you say

22 "portfolio manager" and "trader," you're referring to

23 the same person, Mr. Silva?

24 A. Yeah.

25 Q. When you look down the page a little, you see

Page 236

BENTSI - CONFIDENTIAL

1

2 the PIMCO block confirmation, "Johnson Yang"?

3 A. Yes.

4 Q. Who is that?

5 A. He is trade support. He would be, I guess,

6 back office. He is also in Newport. That is another

7 reason why it seems surprising to me it says UBS London.

8 Q. Do you have a reason to believe that the trade

9 ticket is incorrect?

10 MR. GOLDSMITH: Object to form.

11 THE WITNESS: I don't necessarily know if this

12 trade ticket is incorrect. I would say that I would

13 want to know what the broker code for UBS in New York

14 is. I know that in London, we book U -- let's see --

15 ULW; so I don't know why this says UBS London and is

16 booked for New York. But that is just an opinion.

17 BY MS. MINDLIN:

18 Q. And where do you see it is booked for New York?

19 A. Well, you see, UBS London usually comes from

20 the code next to it.

21 Q. So the code next to it, looking at the page, is

22 ULO?

23 A. Right.

24 Q. And --

25 A. And if I was in London, I was booking it, I

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL

KOFI BENTSI
May 20, 2016

---

Page 237

BENTSI - CONFIDENTIAL

1 would book ULW --
2
3 Q.  So --
4 A.  -- I believe.
5 Q.  -- ULW is what you know to be the London code.
6 What do you know ULO to be?
7 A.  It doesn't strike -- it doesn't remind -- I --
8 it doesn't come -- doesn't seem familiar to me, but
9 there could be any reason why it is a different code.
10 Could have --
11 Q.  You don't --
12 A.  -- been for any particular reason this account
13 could only face certain parts of the UBS entity, or
14 certain accounts -- certain Euroclear accounts.
15 BY MS. MINDLIN:
16 Q.  And do you mind spelling Euroclear for the
17 court reporter.
18 A.  E-u-r-o-c-l-e-a-r.
19 Q.  Are there certain accounts that must be cleared
20 by a Euroclear?
21 A.  I'm -- I'm hypothesizing here on -- given the
22 fact that I don't recognize that -- why it would go to
23 UBS London.  It could be -- a simple answer is simply
24 that the code for UBS New York is -- they clear through
25 UBS London.  I don't know.

---

Page 238

BENTSI - CONFIDENTIAL

1
2 Q.  Meaning that a broker who is in New York would
3 clear its trades via UBS in London?
4 A.  These codes --
5 MR. D'AMATO: Object to form.
6 THE WITNESS: Sorry.  These codes, to the best
7 of my ability, all reference the same -- can reference
8 the same Euroclear account.  So there might be a case
9 where someone booked this trade to ULO, and it didn't --
10 it went straight to the right -- the same Euroclear
11 account as the U.S. Euroclear account.
12 BY MS. MINDLIN:
13 Q.  Let's step back.
14 What is a U.S. Euroclear account?
15 A.  Well, there is no real U.S. Euroclear account.
16 It is just UBS's account.  But I'm saying if you were
17 booking a trade to the U.S. office, they would have --
18 they might have the same Euroclear account as ULO.  I
19 don't know.
20 Q.  And when you're talking about "they," are you
21 speaking about UBS or PIMCO?
22 A.  UBS.  UBS.  PIMCO's account is -- to me, is
23 clearly Newport.
24 Q.  And that is because you see Mr. Silva's name?
25 A.  That is because I see Mr. Silva's name,

---

Page 239

BENTSI - CONFIDENTIAL

1
2 Mr. Johnson Yang's name, and Scott Mather's name on the
3 same ticket.  There was no reason why it would go
4 through -- and it is a dollar bond; there is no
5 reason why it would go through London as a trade.
6 Q.  Do you know where Mr. Silva was when he entered
7 the trade?
8 A.  No, I do not, but I know he has never been to
9 London.
10 Q.  Do you know whether he has ever traveled
11 internationally?
12 A.  Yes, he has.
13 Q.  And you don't know whether or not he was inside
14 the United States at the very moment when he entered
15 this trade, do you?
16 A.  I cannot assert where he was when he entered
17 this trade, no, not by looking -- not at the moment, no.
18 Q.  And you don't know one way or the other why the
19 broker here is listed as UBS London, do you?
20 A.  Nope.
21 Q.  You can set that one aside.
22 A.  Okay.
23 Oh.  See?
24 MR. D'AMATO: Wait for a question.
25 (Exhibit 16 was marked for

---

Page 240

BENTSI - CONFIDENTIAL

1
2 identification.)
3 BY MS. MINDLIN:
4 Q.  The court reporter has handed you what she has
5 marked Bentsi Exhibit 16, and it is Bates stamped PIMCO
6 00221530.
7 Do you recognize this form of document?
8 A.  Yes.
9 Q.  And it is another trade memorandum, fixed
10 income?
11 A.  Yes.
12 Q.  If you look at the top right, you see the
13 portfolio manager listed as Tim Haaf; correct?
14 A.  Yes.
15 Q.  Who is Mr. Haaf?
16 A.  He is a portfolio manager in the emerging
17 markets group in --
18 Q.  In where?
19 A.  Munich.
20 Q.  And is he still based in Munich?
21 A.  Yes.
22 Q.  Where is the trading team that Mr. Haaf uses?
23 A.  Well, he uses a -- old -- he would use all
24 three trading teams -- Newport, London, or Singapore --
25 to trade whatever the -- whatever asset was in question.

---

Ellen Grauer Court Reporting Co. LLC

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL

KOFI BENTSI
May 20, 2016

Page 241

BENTSI - CONFIDENTIAL

1  I can't really see who entered this trade beyond Tim
2  himself. It might have been middle office in Munich.
3  Q. And the PIMCO block confirmation name, Martina
4  Benke -- do you recognize that name?
5  A. I do not, but I would hazard a guess that she
6  wasn't from Newport.
7  Q. If you look on the trade ticket at the broker
8  entry, again it says "UBS London ULO."
9  Do you see that?
10 A. Yes.
11 Q. Does that mean that the broker for this trade
12 was UBS London?
13 MR. D'AMATO: Objection to form.
14 BY MS. MINDLIN:
15 Q. Does that mean that the broker for this trade
16 was UBS London?
17 MR. D'AMATO: Objection to form.
18 THE WITNESS: I know that the trade -- the
19 broker was UBS. Again, I cannot assert which one
20 that -- whether that is UBS London or not --
21 BY MS. MINDLIN:
22 Q. So even --
23 A. -- because I don't understand that.
24 Q. Even though it says UBS London, you don't know

Page 242

BENTSI - CONFIDENTIAL

1  whether or not it was the London entity?
2  MR. D'AMATO: Objection to form.
3  THE WITNESS: I do not recognize that broker
4  code; so I don't know why it says that.
5  BY MS. MINDLIN:
6  Q. And where it says "ULO," that is the broker
7  code that you were saying you don't recognize?
8  A. Exactly.
9  Q. In general, do you only recognize the broker by
10 the code rather than the entity name?
11 A. Yes.
12 Q. Does the code always designate the location of
13 the broker?
14 MR. D'AMATO: Objection to form.
15 THE WITNESS: Two codes may have the same
16 Euroclear number.
17 BY MS. MINDLIN:
18 Q. Can you explain what you mean by "Two codes may
19 have the same Euroclear number"?
20 A. To my understanding, you can have ULS and ULST,
21 and they might have the same Euroclear number.
22 Q. And in your experience, do trades in Petrobras
23 securities trade by a Euroclear?
24 MR. D'AMATO: Objection to form.

Page 243

BENTSI - CONFIDENTIAL

1  THE WITNESS: No.
2  BY MS. MINDLIN:
3  Q. Sorry. I couldn't hear your answer.
4  A. No.
5  Q. And so what is the relevance here of a
6  Euroclear number?
7  A. Well, I was giving an example. They might --
8  the trade might be trading -- selling Euroclear or DTC
9  or Cedel.
10 Q. So it could sell by Euroclear or DTC or what?
11 A. Or Cedel. Cedel. Whatever you want -- however
12 you want to say it.
13 Q. Could you spell that for the court reporter?
14 A. C-e-d-e-l.
15 Q. When you execute a trade, do you have any way
16 of knowing whether it'll settle via Euroclear or DTC or
17 Cedel?
18 A. It is usually a function of the accounts and --
19 of the portfolio or account, and whether it has accounts
20 open in the Euroclear or not.
21 Q. And by default, is there one of those systems
22 through which it will settle?
23 A. Usually, you would want -- you'd usually have
24 accounts selling Euroclear; so U.S. accounts, in which

Page 244

BENTSI - CONFIDENTIAL

1  case they might settle through DTC instead.
2  Q. And would some U.S. accounts settle via
3  Euroclear as well?
4  A. Yes.
5  Q. In your -- strike that.
6  In your experience, do most European accounts
7  settle via Euroclear?
8  MR. D'AMATO: Objection to form.
9  THE WITNESS: Most European accounts don't need
10 a DTC account, and most U.S. accounts have a Euroclear
11 account.
12 BY MS. MINDLIN:
13 Q. And do you know for Petrobras securities -- I'm
14 sorry. Strike that.
15 Do you know for Petrobras notes which system
16 the trades cleared on?
17 A. Petrobras notes can settle either in Euroclear
18 or DTC.
19 Q. How do you know which one they settled on?
20 A. I don't.
21 Q. Is there a document that PIMCO retained in the
22 ordinary course that shows which system they settled on?
23 MR. D'AMATO: Objection to form.
24 THE WITNESS: I would assume so.

Page 245

1    BENTSI - CONFIDENTIAL
2    **BY MS. MINDLIN:**
3  Q. But I'm correct that you don't know what
4  document that would be?
5  **A. No, I don't -- no, I do not.**
6  Q. You can set that aside.
7     Earlier in the day, we were talking about a
8  period of illiquidity after a second downgrade; correct?
9  **A. Yes.**
10 Q. I wanted to clarify the timing for the second
11 downgrade. As I understand it, there was an initial
12 downgrade in the fall of 2014 by Moody's; correct?
13 **A. Could you be more specific about what the**
14 **ratings changes were?**
15 Q. On October 21, there was a downgrade by one
16 notch by Moody's that kept the investment-grade rating
17 for Petrobras bonds.
18 A. Okay.
19    MR. D'AMATO: Objection to form.
20    **BY MS. MINDLIN:**
21 Q. Is that the first downgrade that you are
22 remembering?
23    MR. D'AMATO: Objection to form.
24    THE WITNESS: I would have said the important
25 downgrade would be downgrade from investment grade to

Page 246

1    BENTSI - CONFIDENTIAL
2  high yield. I believe that was in 2015.
3    **BY MS. MINDLIN:**
4  Q. And --
5  **A. The second one would be the most important one,**
6  **not the first.**
7  Q. "The second one" meaning the downgrade to high
8  yield from investment grade?
9  **A. No, no.**
10 Q. So there was a downgrade on February 24, 2015,
11 when Moody's downgraded Petrobras from investment grade
12 to high yield. Okay?
13 **A. Okay.**
14 Q. Is that the first downgrade in your mind?
15 **A. Yes.**
16 Q. And the second downgrade would have been the
17 next one after that --
18 **A. Uh-huh.**
19 Q. -- when a second agency downgraded Petrobras
20 from investment grade to high yield?
21 **A. Exactly.**
22 Q. And do you recall when that happened?
23 **A. No.**
24 Q. Okay. Thank you.
25    (Exhibit 17 was marked for

Page 247

1    BENTSI - CONFIDENTIAL
2  identification.)
3    THE WITNESS: Thank you.
4    **BY MS. MINDLIN:**
5  Q. The court reporter just handed you what has
6  been marked Bentsi Exhibit 17, and it is a chat between
7  you and Natalia Lima that is Bates stamped PIMCO
8  00766712.
9     Do you recognize this as a chat between you and
10 Natalia Lima?
11 **A. I do.**
12 Q. If you turn to the page ending 15 --
13 **A. Can you give me a moment to read through it?**
14    Okay. Page 15, you said? Sorry.
15 Q. Yes, please.
16 **A. Okay.**
17 Q. If you look in the middle of that page, you see
18 at 13:51:55:
19    "I had this discussion once about it,
20    and we still own the wrong bonds last
21    I checked."
22    Do you see that language?
23 **A. Sorry. I'm just trying to read up to -- catch**
24 **up with it.**
25    **Okay. Sorry. Yes.**

Page 248

1    **BENTSI - CONFIDENTIAL**
2  Q. Do you know from the context, now that you've
3  read through it, what you meant by "the wrong bonds"?
4  **A. Yes.**
5  Q. What did you mean?
6  **A. This is discussion about PDVSA.**
7  Q. PDVSA as shown on the page ending 13?
8  **A. Yes.**
9  Q. And immediately above the comment about the
10 wrong bonds, you say something about Petrobras; correct?
11 At 13:50:53?
12 **A. Yes.**
13 Q. And how do you know that "the wrong bonds"
14 refers to PDVSA and not Petrobras?
15 **A. Because I could see from my scattered writing**
16 **that discussion is around OID, original issue discount,**
17 **and that was a -- that was in conjunction with a**
18 **conversation about a client -- a client meeting she had**
19 **discussing PDVSA.**
20    **If I look at the previous page, page 14, I ask**
21 **her not to talk about OID again. That was why I know it**
22 **was around PDVSA.**
23 Q. And what is OID?
24 **A. Original issue discount.**
25 Q. But what does that mean?

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL

KOFI BENTSI
May 20, 2016

Page 249

BENTSI - CONFIDENTIAL
1
2  A.  It is when a bond is issued at a discount --
3  to -- at an extreme discount, basically.  Basically, if
4  you look -- yeah.  You have to ask me the questions.
5  Q.  Well, why was PDVSA issuing its bond at an
6  extreme discount?
7    MR. D'AMATO: Objection to form.
8    THE WITNESS: I can't speak to PDVSA why they
9  were doing it, but if they were looking to -- if they
10  were exchanging -- what -- if they were exchanging bonds
11  for past-due bills, they might have given people bonds
12  instead.  Whether -- whether it is -- OID refers to
13  receiving a bond at 50 and how much -- what percentage
14  of that $0.50 on the dollar, what cents -- what
15  percentage of that dollar would you have to pay tax on
16  or what -- and -- and which would count as a
17  naturally-accrued income.
18    BY MS. MINDLIN:
19  Q.  You can set that aside.
20    MR. D'AMATO: I assume this transcript is a
21  confidential portion?
22    MS. MINDLIN: If you wish to designate it that
23  way, you may.
24    THE WITNESS: That would be appreciated.
25    MR. D'AMATO: I will, yes.

Page 250

BENTSI - CONFIDENTIAL
1
2  (Exhibit 18 was marked for
3  identification.)
4    THE WITNESS: Thank you.
5    BY MS. MINDLIN:
6  Q.  The court reporter has handed you Exhibit
7  Bentsi 18, which is Bates stamped PIMCO 00781100.  It is
8  another chat between Natalia Lima and you dated
9  March 11, 2015.
10    Do you recognize this as a chat between you and
11  Ms. Lima?
12  A.  I do.
13  Q.  If you turn to the center of the chat, at the
14  page ending 105 --
15  A.  Just give me a second to catch up to --
16  Q.  Sure.
17  A.  -- get the context.
18    Did you say 05 or 15?
19  Q.  I'm sorry.  I may have misspoken, but if you
20  would look at -- actually, at the bottom of 04.
21  A.  Okay.
22  Q.  At 12:57:13, you write:
23    "I'm not sure this story really gives
24    us any indication about whether PwC
25    would or would not sign financials,

Page 251

BENTSI - CONFIDENTIAL
1
2  and it certainly doesn't preclude PwC
3  signing off on a qualified audit in
4  any case."
5    Do you see that language?
6  A.  Yes.
7  Q.  What does "this story" refer to, if you know?
8  A.  I don't recall.
9  Q.  And the question whether PwC would or would not
10  sign financials relates to Petrobras's financials?
11  A.  Yes.
12  Q.  What do you remember in early March 2015 about
13  Petrobras's financials?
14    MR. D'AMATO: Objection to form.
15    BY MS. MINDLIN:
16  Q.  What do you remember in early March 2015 --
17  strike that.
18    Do you remember discussing with Ms. Lima the
19  question whether PwC would or would not sign financials?
20  A.  I remember discussing with Ms. Lima and -- not
21  specific conversation, but I'd say we discussed at
22  length the different -- and, of course, with -- with
23  Zeljka the different context in which Petrobras could
24  get their financials signed.
25  Q.  And --

Page 252

BENTSI - CONFIDENTIAL
1
2  A.  There was a lot of height- -- you know,
3  opinions and assumptions.
4  Q.  What were the opinions and assumptions?
5  A.  Well, we didn't have a whole lot of experience,
6  perhaps, with the -- with -- you know, certainly from
7  the other side, seeing what the company was dealing with
8  or facing.  So it was more what -- what were the
9  scenarios a company was facing on PwC and what -- under
10  what scenarios would PwC sign on their financials.
11  Q.  At this point were you still concerned about
12  the company's ability to file financials before a
13  technical default?
14  A.  Yes.
15  Q.  How was that affecting your decisions about
16  Petrobras bond investments?
17    MR. D'AMATO: Objection to form.
18    THE WITNESS: I can't say I recall how it was
19  affecting my decisions around Petrobras bond
20  investments.  I would say that it would have been a
21  factor, certainly, in any -- in any decision.  But more
22  importantly, I think this discussion is more around how
23  Petrobras could get PwC to sign on its financials.
24    BY MS. MINDLIN:
25  Q.  At this point in time, were you continuing to

Page 253

BENTSI - CONFIDENTIAL

1 urge Petrobras to make progress with respect to its
2 financials?
3 A. I can't remember specifically, but if the
4 financials -- financials had not been signed yet, then I
5 can only imagine I was, yes, conv- -- making contact
6 with them to sign financial -- to make some other plans
7 in case they couldn't get their financials signed.
8 Q. Did you continue those discussions up until the
9 point at which the financials for the third quarter were
10 filed?
11 A. Yes.
12 Q. And that was in late April 2015?
13 A. Yes.
14 Q. And after the third quarter financials were
15 filed, did you continue to speak with Petrobras about
16 their ability to file financials for the fourth quarter?
17 A. I believe so, yes.
18 Q. And why did you continue to speak with
19 Petrobras about that?
20 A. Well, because it was important that -- it was
21 more important they file the fourth -- fourth-quarter
22 financials.
23 Q. Why was it more important that they file the
24 fourth-quarter financials?
25

Page 254

BENTSI - CONFIDENTIAL

1 A. As far as my -- from my recollection, the
2 third-quarter financials were -- the covenants around
3 third-quarter financials were in the loans and not in
4 the bonds, whereas in the -- on -- the fourth-quarter
5 financials required them to file for the bonds. That is
6 my recollection.
7 Q. And the default risk was greater in connection
8 with the bonds than the loans?
9 A. Yes.
10 MR. D'AMATO: Objection to form.
11 BY MS. MINDLIN:
12 Q. If you look in the middle of the page ending 05
13 now, it looks like a continuation of the paragraph we
14 just examined, but it contains additional text which
15 says:
16 "In any case, all indications suggest
17 that we will see the company make
18 adjustments for both the
19 bribes/overcharging and the
20 overstatements of the assets. That
21 is our base case."
22 Do you see that language?
23 A. Yes.
24 Q. Why did your base case include the assumption
25

Page 255

BENTSI - CONFIDENTIAL

1 that the company would make an adjustment for the
2 quote/unquote "bribes/overcharging and the
3 overstatements of the assets"?
4 A. That is an opinion, certainly, but I think at
5 the time my opinion was that if they were going to have
6 to make cuts on their balance sheet, they would use
7 that -- they would -- to get PwC to sign off on it, they
8 would need to -- to have an adjustment both for whatever
9 the overcharging estimate was and whatever the actual
10 value of the asset was. That was -- that was a -- an
11 opinion.
12 Q. And your concern at this point in time was
13 ensuring that the financials actually got filed to
14 prevent a technical default; right?
15 A. That was one the factors, certainly, yes.
16 Q. But the amount of the ultimate adjustment was
17 not material; right?
18 MR. D'AMATO: Objection to form.
19 THE WITNESS: I don't see that. What -- does
20 it say that here?
21 BY MS. MINDLIN:
22 Q. No. I don't think it says it here, but in
23 general.
24 MR. D'AMATO: Objection. Your question?
25

Page 256

BENTSI - CONFIDENTIAL

1 BY MS. MINDLIN:
2 Q. The question is whether the amount of the
3 write-down or adjustment was material to your decisions
4 at this point in time in March 2015.
5 MR. D'AMATO: Objection to form.
6 THE WITNESS: Right. I think those are two --
7 two separate problems. One is around actually filing
8 and the technical default that might -- that might
9 ensue, and the other is around the size of any
10 adjustment on the balance sheet.
11 BY MS. MINDLIN:
12 Q. But in this communication and the other
13 communications we've reviewed, you don't refer to the
14 amount of the write-down; right?
15 MR. D'AMATO: Objection to form.
16 THE WITNESS: I don't refer to the amount of
17 the write-down in this communication, no.
18 BY MS. MINDLIN:
19 Q. And in the other communications that we
20 referred -- that we examined today, you also did not
21 refer to the amount of the write-down; correct?
22 MR. D'AMATO: Objection to form.
23 THE WITNESS: I think it is very hard to make
24 an assessment of -- and I don't think we even know now
25

Page 257

BENTSI - CONFIDENTIAL

1  BENTSI - CONFIDENTIAL
2  what the assessment of the write-down is as a function
3  of bribery and overcharging.  It would be very hard for
4  me to make that estimate.
5      BY MS. MINDLIN:
6  Q.  It is correct that Petrobras in June 2015
7  invested in -- strike that.
8      It's correct that PIMCO in June 2015 invested
9  in the Petrobras century bond; right?
10 A.  Certainly.
11 Q.  At that point the financials had already been
12 restated; correct?
13 A.  To my recollection, yes.
14 Q.  And by then you knew the amount of the
15 adjustment; correct?
16 A.  In that time, yes.
17 Q.  And at that point in time, you nevertheless
18 made the decision to participate in the century bond
19 issuance; correct?
20 A.  Correct.
21 Q.  Why did PIMCO decide to buy a portion of the
22 century bond issuance?
23     MR. D'AMATO: Objection to form.
24     THE WITNESS: I can't speak to all of PIMCO as
25 to why some portfolio managers would have bought the

Page 258

1  BENTSI - CONFIDENTIAL
2  century bond, but I would say that one of the factors
3  that would go into any decision to buy Petrobras bonds
4  in 2015 post-financials being filed was, certainly, the
5  change in management and the new direction of the
6  company, the potential new direction of the company, and
7  the access to -- to markets as being two major factors
8  and the relative value of Petrobras versus other assets
9  in the -- in the investment spectrum.
10     BY MS. MINDLIN:
11 Q.  So the relative value of Petrobras versus other
12 assets continued to be favorable, in your personal view,
13 even after the 2014 financials were filed?
14     MR. D'AMATO: Objection to form.
15     THE WITNESS: The -- an impression on the --
16 Petrobras's valuation is usually based on ways --
17 what -- what the price of the bond is at purchase and
18 what you think that the risks are.  So at that period --
19 time, one might have thought that the -- the price was
20 attractive relative to the risks and the other
21 investment options available at the time.
22     BY MS. MINDLIN:
23 Q.  Do you remember whether PIMCO bought Petrobras
24 bonds in late February 2015?
25 A.  I do not remember specifically, no.

Page 259

1  BENTSI - CONFIDENTIAL
2  Q.  Do you, looking back, have a sense of whether
3  PIMCO had decided to change its position in Petrobras
4  around that time?
5      MR. D'AMATO: Objection to form.
6      THE WITNESS: I don't remember anything
7  specific, no.
8      (Exhibit 19 was marked for
9      identification.)
10     BY MS. MINDLIN:
11 Q.  The court reporter just handed you what has
12 been marked Bentsi Exhibit 19 for identification.  It is
13 Bates stamped PIMCO 00663163.  It is an e-mail from you
14 to Natalia Lima on June 1, 2015.
15     Do you recognize this e-mail?
16 A.  I do.
17 Q.  How do you recognize it?
18 A.  It says it is from me.
19 Q.  And if you look down the chain starting at the
20 back page, there is a chart that says "Firm-wide PMs."
21     Do you see that?
22 A.  Yes.
23 Q.  And what did the "Firm-wide PMs" listing refer
24 to?
25 A.  Sorry.  What is the question?

Page 260

1  BENTSI - CONFIDENTIAL
2  Q.  The "Firm-wide PMs" column on the back page --
3  A.  Yes.
4  Q.  -- what does that refer to?
5      MR. D'AMATO: Objection to form.
6      THE WITNESS: The list is a list of portfolio
7  managers or portfolio manager groups within the firm.
8      BY MS. MINDLIN:
9  Q.  And the subject line in the very first e-mail
10 at the bottom of that page is "Please increase UBF order
11 to 100mn for Petrobras 100-year, thanks"; right?
12 A.  Yes.
13 Q.  What do you understand that to mean?
14 A.  Mohit is giving an order to increase the -- the
15 order for that group of portfolio managers to 100
16 million.  You see on the table above, it says, "UBF,"
17 and next to it, "Order 100 million."
18 Q.  And the "Petrobras 100-year" -- is that the
19 century bond?
20 A.  Yes.
21 Q.  With respect to "UBF," does that mean the
22 unconcerned bond fund?
23 A.  Yes.
24     MR. D'AMATO: Objection to form.
25     BY MS. MINDLIN:

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL

KOFI BENTSI
May 20, 2016

Page 261

BENTSI - CONFIDENTIAL

1  Q.  Did you have responsibility for any of the
2  funds or portfolios placing an order for the century
3  bond?
4  A.  I don't believe so, no.  Not to my
5  recollection.
6  Q.  What did you think about the decision by your
7  PIMCO colleagues to invest in the century bond?
8      MR. D'AMATO: Objection to form.
9      THE WITNESS: I had a different opinion about
10  what was -- offered the most value within the
11  Petrobras/Brazil corporate spectrum.
12      BY MS. MINDLIN:
13  Q.  What was your opinion about what offered value
14  in the Petrobras/Brazil corporate spectrum?
15  A.  Without thinking specifically, I think my
16  preference was for shorter-dated bonds in Petrobras.
17  Q.  Why did you think that shorter-dated bonds were
18  a better value?
19  A.  I thought that the company was going to
20  continue to execute on its recovery plan, which meant
21  the shorter-dated bonds would outperform the
22  longer-dated bonds.
23  Q.  And what did you perceive at that point in time
24  to be the risks of investing in shorter-dated bonds from

Page 262

BENTSI - CONFIDENTIAL

1  Petrobras?
2  A.  What did I perceive to be the risks?
3  Q.  Yeah.
4  A.  No different from investing in longer-dated
5  bonds.
6  Q.  And what were the risks that were involved in
7  investing in shorter- or longer-dated Petrobras bonds at
8  that point in time?
9      MR. D'AMATO: Objection to form.
10      THE WITNESS: Well, certainly, one of the risks
11  would have been execution risks.
12      BY MS. MINDLIN:
13  Q.  What do you mean by that?
14  A.  The company was executing a recovery plan on
15  many different -- on many different levels; so there is,
16  obviously, a risk that they weren't able to execute on
17  that plan. They weren't able to cut CAPEX, stop paying
18  dividends, asset sales, reduce their corporate
19  governance issues.
20  Q.  What were the corporate governance issues, as
21  you understood them, at this point in time?
22  A.  Well, the -- the Lava Jato story had still not
23  been -- well, still has -- still has not been resolved
24  or concluded; so there was always risk that more stories

Page 263

BENTSI - CONFIDENTIAL

1  would come out about Petrobras.
2  Q.  And with respect to this e-mail, the subject
3  line changes in the very last e-mail, and you say then
4  to Natalia Lima, "Destroy immediately."
5      Why did you say that?
6  A.  Yeah.  That might have been a bit of an
7  exaggeration.  It was more just around not having her
8  forward this on to anybody else.
9  Q.  Because it was secret?
10  A.  I wouldn't say it was secret, no, but I didn't
11  really want to be the one distributing to everybody else
12  inadvertently everyone's order or the size of the
13  orders.
14  Q.  Because you had a view of whether the size of
15  the orders was the right thing?
16      MR. D'AMATO: Objection to form.
17      THE WITNESS: I -- I had -- I'm sure I had
18  opinions -- I can't even recall them right now -- about
19  whether it was the right thing or whether it was too big
20  an order or whether it was the right point in the curve
21  to be invested in.
22      BY MS. MINDLIN:
23  Q.  Did you talk with Ms. Lima about the century
24  bond?

Page 264

BENTSI - CONFIDENTIAL

1  A.  I -- I would think I did, but I also would
2  have -- also say that my preference was for
3  shorter-dated bonds.  I thought that was the best
4  opportunity in Petrobras, and I thought -- and so that
5  was -- my personal preference for my portfolios or
6  anything I was invested in would be for something
7  shorter than 100 years.  As a rule, though, I don't
8  really believe in 100-year bonds anyway; so --
9  Q.  Did you read Petrobras's 6-K when it filed its
10  third-quarter financials in April of 2015?
11  A.  I do not recall.
12  Q.  Did you read Petrobras's 20-F when it filed its
13  full-year financials in May 2015?
14  A.  I do not recall.
15      MR. D'AMATO: Objection to form.
16      BY MS. MINDLIN:
17  Q.  Do you know the amount of the asset write-down
18  that was reflected in those filings?
19      MR. D'AMATO: Objection to form.
20      THE WITNESS: I don't -- I know -- I do not
21  recall.
22      BY MS. MINDLIN:
23  Q.  Do you know whether the amount of the
24  write-down was -- strike that.

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL

Page 265

BENTSI - CONFIDENTIAL
1
2     In your opinion was the amount of the
3  write-down accurate?
4     **MR. D'AMATO:** Objection to form.
5     **THE WITNESS:** I have no opinion whether it was
6  accurate or not, no.
7     **BY MS. MINDLIN:**
8  Q.  In your view, did the amount of the write-down
9  matter for your investments in Petrobras securities?
10    **MR. D'AMATO:** Objection to form.
11    **MR. GOLDSMITH:** Objection to form.
12    **THE WITNESS:** I think that there are two things
13 that would be, in my opinion, important.  The fact that
14 there was a write-down and the reasons why there was a
15 write-down, and then you can write -- might add on what
16 the size of that write-down was.  But I think that,
17 certainly, the reasons for why there was a write-down
18 overwhelm anything else.
19    **BY MS. MINDLIN:**
20 Q.  Why does the fact that the reason -- excuse me.
21 Strike that.
22    You said the reasons why there was a write-down
23 overwhelm anything else; right?
24 **A.  I said it was one of the factors that would**
25 **overwhelm everything else.**

Page 266

1     **BENTSI - CONFIDENTIAL**
2  Q.  Why would --
3  **A.  Three factors I gave, yeah.**
4  Q.  Why was the reasons for the write-down the most
5  important factor?
6  **A.  Well, any --**
7     **MR. D'AMATO:** Objection to form.
8     Go ahead.
9     **THE WITNESS:** Okay.  If you look at the reasons
10 for a write-down as a function of corruption, then,
11 certainly that is concerning from a corporate
12 governance's perspective.  Yeah.
13    **BY MS. MINDLIN:**
14 Q.  What were your efforts to understand
15 Petrobras's corporate governance standards during the
16 period between 2012 and 2014?
17    **MR. D'AMATO:** Objection to form.
18    **THE WITNESS:** I cannot recall specifically what
19 my concerns around the corporate -- Petrobras's
20 corporate governance, but a general assumption is not to
21 assume that companies have poor corporate governance.
22    **BY MS. MINDLIN:**
23 Q.  Do you have a sense of whether corporate
24 governance standards are the same in Brazil as in the
25 United States?

Page 267

1     BENTSI - CONFIDENTIAL
2     **MR. D'AMATO:** Objection to form.
3     **THE WITNESS:** Many have opinions about whether
4  corporate governance in Brazil are better or worse than
5  they are in the United States.  I don't -- I try not to
6  have that -- necessarily that baseline perspective.
7     **BY MS. MINDLIN:**
8  Q.  Do you have a way that you look at issuers
9  that you invest in from a corporate governance
10 standpoint?
11    **MR. D'AMATO:** Objection to form.
12    **THE WITNESS:** No systematic way of evaluating a
13 company for its corporate governance, no.
14    **BY MS. MINDLIN:**
15 Q.  Do you take into account corporate governance
16 with respect to the issuers you invest in?
17 A.  Yes.
18 Q.  How do you do so?
19 **A.  Well, certainly, it should -- it should demand**
20 **a higher risk premium if you have poorer corporate**
21 **governance.**
22 Q.  Did you take steps to assess Petrobras's
23 corporate governance during the period between 2012 and
24 2015?
25    **MR. D'AMATO:** Objection to form.

Page 268

1     BENTSI - CONFIDENTIAL
2     **THE WITNESS:** We met -- we met with management
3  on a consistent basis.  We obviously had a pretty
4  thorough financial analysis of their numbers on a
5  consistent basis.  I wouldn't say that we worked --
6  well, working assumption was that there was corruption
7  at Petrobras, no.
8     **BY MS. MINDLIN:**
9  Q.  Did you read Petrobras's corruption prevention
10 program manual ever?
11 **A.  I don't recall.**
12 Q.  Did you ever read Petrobras's code of ethics?
13 **A.  I don't recall.**
14 Q.  Did you have any understanding whether
15 Ms. Bosner read either of those?
16 **A.  I have no understanding -- I have no**
17 **assumption.  I would assume she did, but I have no --**
18 **I -- I wouldn't know.**
19 Q.  Do you have a method for checking whether your
20 credit analysts are looking at corporate governance
21 standards in assessing credits?
22 **A.  No systematic way, no.**
23 Q.  Is it something that you look for when you read
24 credit reports of -- written by credit analysts at
25 PIMCO?

Page 269

BENTSI - CONFIDENTIAL

1    MR. D'AMATO: Objection to form.
2    THE WITNESS: I might notice if they make an
3    assump- -- a judgment call about the credit corporate
4    governance of a particular company. That is not
5    unusual.
6    BY MS. MINDLIN:
7    Q. When allegations about Lava Jato came out in
8    2014, did you talk about them with Zeljka Bosner?
9
10   **A. I'm sure we did, yes.**
11   Q. What do you recall about your discussions
12   specifically of the corruption allegations?
13   **A. Specifically? I don't remember specific**
14   **conversations with Zeljka about them.**
15   Q. Do you remember conversations with other people
16   within PIMCO about the corruption allegations?
17   **A. I think I would have spoken with most people**
18   **within PIMCO about the corruption allegations. I don't**
19   **remember anything specific about it beyond the size.**
20   Q. And when you say "beyond the size," what do you
21   mean?
22   **A. I think that the only thing that was -- well,**
23   **the -- not the only, but certainly the -- the surprise**
24   **was certainly the scale of the problem.**
25   Q. When you say "the surprise," you mean you were

Page 270

BENTSI - CONFIDENTIAL

1
2    surprised by the scale of the problem at a certain point
3    in time?
4    **A. Yes.**
5    Q. Do you know when that was?
6    **A. Not specifically, no.**
7    Q. Did you read the Brazilian press that you
8    earlier referred to to learn more about Lava Jato?
9    **A. That is probably when I got very interested in**
10   **the Brazilian press, yes.**
11   Q. And did Ms. Lima send you articles about Lava
12   Jato?
13   **A. Yes.**
14   Q. Did you discuss corruption with the Petrobras
15   executives that you met with during the fall of 2014 and
16   winter 2015?
17   **MR. D'AMATO:** Objection to form.
18   **THE WITNESS:** I don't recall specifically, no.
19   **BY MS. MINDLIN:**
20   Q. You met with Petrobras -- strike that.
21   You met with a couple of people from Petrobras
22   around the end of January 2015; right?
23   **A. Okay.**
24   Q. Do you remember talking about the corruption
25   allegations at that point in time?

Page 271

BENTSI - CONFIDENTIAL

1
2    **A. I do not recall that, no.**
3    Q. Do you remember any conversation with anyone
4    from Petrobras when you talked about the corruption
5    allegations?
6    **A. I do remember conversations with Almir about**
7    **corruption allegations and their ongoing investigation.**
8    **That was about the extent of their response to any**
9    **corruption allegation charges.**
10   Q. And you were in approximately weekly contact
11   with Petrobras during the winter of 200- -- late winter
12   2015; correct?
13   **A. Yeah, as much as possible.**
14   Q. And in your approximately weekly contact, did
15   you discuss the corruption allegations?
16   **A. No. That wasn't necessarily the focal point of**
17   **the calls, but I did understand that they were having**
18   **investigations to get a sense of the size of the**
19   **problem.**
20   **MS. MINDLIN:** Counsel, could we take a break
21   for about five minutes at this point?
22   **MR. D'AMATO:** Sure.
23   **THE VIDEOGRAPHER:** Off the record. The time is
24   1548.
25   (Recess.)

Page 272

BENTSI - CONFIDENTIAL

1
2    **THE VIDEOGRAPHER:** We are back on the record.
3    The time is 1604.
4    **MS. MINDLIN:** I don't have any further
5    questions at this time.
6    **MR. D'AMATO:** Okay. I take it you're calling
7    next?
8    **MS. COMBS:** I do. Just a few. Very brief.
9
10   **EXAMINATION**
11   **BY MS. COMBS:**
12   Q. Mr. Bentsi, my name is Marianne Combs, and I'm
13   with the firm of Skadden Arps. And we represent some of
14   the underwriter defendants in the Petrobras class
15   action, as well as some of the individual actions
16   related to this case. And by "underwriter defendants,"
17   I'm referring to Citigroup Global, HSBC, Morgan Stanley
18   and Company, and JPM -- J.P. Morgan, excuse me.
19   Earlier you testified that you participated in
20   calls with some bond underwriters, and you also
21   testified that you had calls with bond underwriters
22   around Petrobras; is that correct?
23   **A. That is a fair statement.**
24   Q. And you couldn't remember for which specific
25   offerings those calls may have taken place; is that

Case 16-1914, Document 54, 07/08/2016, 1811110, Page337 of 417

Page 273

1    BENTSI - CONFIDENTIAL
2  correct?
3  **A.  That is a fair statement.**
4  Q.  So do you have any recollection of calls you
5  participated in with underwriters around the 2013
6  offerings for Petrobras notes?
7  **A.  Who were lead managers on the 2013 issuers?**
8  Q.  I believe that would have been Citigroup.
9  **A.  No.  I believe that was the 2019; is that**
10 **right?  2019s and 2024s?  Is that correct?**
11 Q.  I thought the 2013 ones were the --
12 **A.  2016, 2019, and 2024 is what my guess --**
13   THE REPORTER: I'm sorry?
14   THE WITNESS: 2016, 2019, and 2024.  Yes.  I
15 would have spoken to the -- to the lead managers on
16 those issues, yes.
17   BY MS. COMBS:
18 Q.  Do you recall the specific conversations you
19 had?
20 **A.  Most of the conversations about -- certainly**
21 **with the lead managers are usually around pricing and**
22 **size --**
23 Q.  Uh-huh.
24 **A.  -- and trying to understand how -- you know,**
25 **how they are -- where they are planning to bring the**

Page 274

1    BENTSI - CONFIDENTIAL
2  **deal and how they are planning on -- you know, making**
3  **sure they understand the importance of our order.**
4  Q.  And apart from discussing pricing and size, do
5  you remember any other topics covered during those
6  conversations?
7  **A.  No.**
8  Q.  Do you remember any questions you may have
9  asked?
10 **A.  No.**
11 Q.  Do you recall participating in calls with
12 underwriters for the 2014 note offerings?
13 **A.  Could you be more specific of which bonds they**
14 **were?**
15 Q.  The 2014 bonds.  I think those were the ones
16 that had ten-year maturity in 2024.
17 **A.  2024?  Is -- if it was just a 20 -- a 10-year**
18 **bond, I do not recall specifically.  I know that I -- I**
19 **know that the 3-year bond -- in 2013, I guess what**
20 **you're saying?**
21 Q.  Uh-huh.
22 **A.  -- is one I certainly know that I was involved**
23 **in conversation on.  Generally all discussions, however,**
24 **are not around credit specific, but more around pricing**
25 **and size and trying to manage the issuer to bring a**

Page 275

1    **BENTSI - CONFIDENTIAL**
2  **reasonable deal given the market.**
3  Q.  And the conversations around the 2013 bonds
4  that you recall for the 2016 maturity, do you remember
5  any other topics covered beyond pricing and size?
6  **A.  I do not.**
7    MS. COMBS: I have nothing further.  Thank you.
8    MR. GOLDSMITH: I -- I have a few.
9
10   EXAMINATION
11   BY MR. GOLDSMITH:
12 Q.  Mr. Bentsi, good afternoon.
13 **A.  Good afternoon.**
14 Q.  I want to thank you for your cooperation today.
15 Again, my name is David Goldsmith.  I'm an attorney with
16 the law firm of Labaton Sucharow in New York.  I
17 represent the Employees Retirement System of the State
18 of Hawaii.  We are -- or Hawaii ERS, as we call it, is a
19 plaintiff and class representative in the class action
20 against Petrobras and other defendants.  So --
21 **A.  Okay.**
22 Q.  -- as PIMCO is a plaintiff in its own
23 individual action against Petrobras, Hawaii is one of
24 the plaintiffs and one of the class representatives in a
25 class action against Petrobras.

Page 276

1    BENTSI - CONFIDENTIAL
2  **A.  Okay.**
3    MR. D'AMATO: And you've got to wait for him to
4  finish asking before you answer.
5    BY MR. GOLDSMITH:
6  Q.  Yeah.  Same rules --
7  **A.  Okay.**
8  Q.  Same rules apply, please, so the court reporter
9  can get everything down.
10   So I just have a few questions for you -- for
11 you today, and then we can all go to London, or wherever
12 we're going.
13   Earlier today, Mr. Bentsi, Ms. Mindlin asked
14 you some questions about conversations that you've had
15 with Petrobras senior management.  I know that you've
16 had a number of conversations and meetings, and one of
17 the -- one of the meetings that -- that you had that she
18 asked you about was with Ivan Monteiro; right?
19 **A.  (No audible response.)**
20 Q.  And -- and one of the -- and the subject matter
21 of the meeting was the -- was the write-down.  And --
22 and I'm not -- I'm going to paraphrase.  This is not
23 intended to quote anyone, but Ms. Mindlin asked if you
24 had discussed the -- well, she asked if you discussed
25 the write-down.  I believe you said yes.

Page 277

BENTSI - CONFIDENTIAL

1    BENTSI - CONFIDENTIAL
2    And she then asked if you had discussed the
3    size of the write-down, and I believe you said no.  And
4    Ms. Mindlin then asked why not, and I believe your
5    answer was -- and please correct me if I'm wrong.  I
6    believe your answer was something to the effect of, "I
7    believe that would have been nonpublic information."
8  **A.  Exactly.**
9  Q.  Do I have that right?
10 **A.  I believe that --**
11   **MS. MINDLIN:** Objection to form.
12   **BY MR. GOLDSMITH:**
13 Q.  Okay.  Now, can you -- can you explain why the
14 fact that it would have been nonpublic information is
15 significant in this context?
16 **A.  Well, certainly we would not want to have**
17 **nonpublic information because that would restrict our**
18 **ability to trade the securities.  That would be the**
19 **biggest concern.**
20   **And -- and so I think on both sides, both**
21 **ourselves and -- and certainly the company, I would**
22 **imagine, would be very -- would be loathe to have any**
23 **kind of transfer of material nonpublic information.**
24 Q.  So is it correct to say that in the many
25 conversations and meetings, whether in-person or by

Page 278

1    BENTSI - CONFIDENTIAL
2  telephone, that you have had with Petrobras personnel
3  over the period -- relevant period in this case, you
4  have made efforts not to receive material nonpublic
5  information?
6  **A.  One of the reasons why the communication is**
7  **usually by e-mail is by design so we give information**
8  **rather than receive information.**
9  Q.  Uh-huh.
10 **A.  The -- the discussions are generally all about**
11 **giving what we think should be done rather than hearing**
12 **what they are planning to do.  Certainly, take a**
13 **write-down if you want, but do something quickly.**
14 Q.  And to the best of your knowledge and
15 recollection, have you ever come to be in possession of
16 material nonpublic information concerning Petrobras
17 securities since you've been with PIMCO?
18 **A.  No, we have not.**
19 Q.  So let's talk about the e-mails for a minute.
20   If I could direct your attention to Bentsi
21 Exhibit 9, please, which should be in front of you, and
22 you can also take out Bentsi Exhibit 13, which is also
23 in that pile.  You can take your time to find it.
24 **A.  Okay.**
25 Q.  So you talked just a moment ago about

Page 279

1    BENTSI - CONFIDENTIAL
2  information by e-mail, and Ms. Mindlin put two
3  e-mails -- e-mails or e-mail exchanges in front of you
4  earlier today, and those are Exhibits 9 and 13.
5    Do you generally recall answering questions
6  about these two documents?
7  **A.  I do.**
8  Q.  So looking at the longer document, Exhibit 9,
9  I'd like you to take another look at the document.  And
10 you can take as long as you need to flip through it, and
11 can you satisfy yourself that there is nothing in this
12 document that, in your view, constitutes material
13 nonpublic information regarding Petrobras securities?
14 **A.  I will.**
15   **I can confirm there is nothing in there that**
16 **constitutes material nonpublic information.**
17 Q.  Thank you.
18   And I'm going to ask you the same question with
19 respect to Exhibit 13, please.  Can you look through
20 Exhibit 13, take as long as you need to, and satisfy --
21   (Telephonic interruption.)
22   **BY MS. MINDLIN:**
23 Q.  Can you look at Exhibit 13, please, and take as
24 long as you need to, and satisfy yourself that there is
25 nothing in this document that constitutes material --

Page 280

1    BENTSI - CONFIDENTIAL
2  that in your view constitutes material nonpublic
3  information regarding Petrobras securities.
4  **A.  There is nothing in here that constitutes**
5  **material nonpublic information.**
6  Q.  Thank you.
7    Can I direct your attention now to Exhibit 14,
8  please.  And this is the trade memorandum that
9  Ms. Mindlin placed in front of you earlier today --
10 **A.  Yes.**
11 Q.  -- and you answered a number of questions about
12 it.
13 **A.  Yes.**
14 Q.  And do you recall generally giving testimony
15 about this document?
16 **A.  Yes.**
17 Q.  Okay.  So you pointed, among -- among other
18 indicia on this document, Mr. Bentsi, you pointed to the
19 initials "WG" as the -- as the portfolio manager where
20 it says "PM" and then "INIT"?
21 **A.  Yes.**
22 Q.  And you identified a Mr. William Gross?
23 **A.  Yes.**
24 Q.  What is -- what was Mr. Gross's position at
25 PIMCO at this point in time, which is May of 2013?

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL

Page 281

1    BENTSI - CONFIDENTIAL
2  A.  He would have been CEO and CIO and portfolio
3   manager on this account.
4  Q.  Uh-huh.  And do you happen to know the name of
5   the client on the account?
6  A.  I do not.
7  Q.  Okay.  I will represent to you that this
8   document was produced from the files of -- my client,
9   of Hawaii ERS.
10  A.  Okay.
11  Q.  You can see that in the Bates number -- you can
12   see that in the prefix of the Bates number at the lower
13   right corner.
14  A.  Okay.
15  Q.  Okay.  Just so you're aware.
16    Take as much time to look again if you need to
17   review the document, but I just want to ask you more
18   generally -- I mean, as a -- looking at the various
19   codes and numbers and indicia, and based on your -- your
20   experience as a -- as a portfolio manager, as a bond
21   trader, and -- with your name being on the document,
22   I mean, do you have any doubt, as a practical matter,
23   that the trade that is reflected in this document was
24   executed in Newport Beach, California, and transacted
25   with a counterparty located in the United States?

Page 282

1    BENTSI - CONFIDENTIAL
2    MS. MINDLIN: Objection to form.
3    THE WITNESS: I would say I have no doubt at
4   all it was -- it was executed out of Newport Beach based
5   on the fact that it has my name on it and the time-stamp
6   on it, date on it, counterparty, and the person who --
7   middle office who confirmed the ticket and who had
8   entered the ticket.
9    BY MR. GOLDSMITH:
10  Q.  And I also asked whether you have a -- whether
11   you have doubt that it was transacted with a
12   counterparty located in the United States.  Can you
13   comment on that?
14  A.  The broker code, SAL, is the broker code for
15   Citigroup in New York.
16  Q.  Thank you.  You can set that aside.
17    I would like the court reporter to mark as
18   Exhibit 20 -- it is the next number -- a document --
19   document -- one for him.  I'm sorry.  My bad.
20    MR. D'AMATO: The one the court reporter will
21   mark.
22    MR. GOLDSMITH: Right.
23   (Exhibit 20 was marked for
24   identification.)
25    BY MR. GOLDSMITH:

Page 283

1    BENTSI - CONFIDENTIAL
2  Q.  This is a document Bates stamped HRS 00330987
3   through 991.
4  A.  Okay.
5  Q.  All right.  Do you have a -- Mr. Bentsi, do you
6   have exhibit Bentsi 20 in front of you?
7  A.  I do.
8  Q.  All right.  And do you recognize this document?
9  A.  I do.
10  Q.  Can you describe it in brief terms, please.
11  A.  It is a trade ticket for 122.5 million
12   Petrobras 2016 bonds.
13  Q.  And do you see your name in the upper
14   right-hand corner?
15  A.  I do.
16  Q.  And what does that signify to you?
17  A.  It signifies that I was the portfolio manager
18   who was -- trade was booked by --
19  Q.  And --
20  A.  -- or traded -- who traded this new issue.
21  Q.  Thank you.
22    And is it fair to say that this is,
23   essentially, the same type of document as Bentsi
24   Exhibit 14, which we just looked at?
25  A.  Yes.

Page 284

1    BENTSI - CONFIDENTIAL
2  Q.  And is this -- was this trade done for the same
3   account as the trade reflected in Bentsi Exhibit 14?
4  A.  Yes.  Account 23, yes.
5  Q.  And is the portfolio manager the same,
6   Mr. Gross?
7  A.  Yes.
8  Q.  By the way, Mr. Gross was based in Newport
9   Beach, California, at this point in time; correct?
10  A.  Yes.
11  Q.  Okay.  And the -- if you look in the -- in
12   the -- near the top of the document, sort of in the
13   middle, it has got a broker code "J.P. LLC" and then
14   "JPS".
15    Do you recognize that broker code?
16  A.  J.P. Morgan Securities.
17  Q.  And does "JPS" signify anything to you?
18  A.  Yes.  J.P. Morgan Securities, New York.  Yes.
19  Q.  New York you said?
20  A.  Yes.  It is the same broker code.  The broker
21   code is JPS.  The broker is J.P.  it would have been a
22   new issue facing J.P. Morgan as the securities -- as a
23   clearing broker.
24  Q.  So take as much time you need to look at the
25   document, but is it your view, based on your knowledge

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL

Page 285

BENTSI - CONFIDENTIAL

1 BENTSI - CONFIDENTIAL
2 of PIMCO procedure and your experience as a portfolio
3 manager and as a bond trader, that this trade was
4 executed in Newport Beach, California, and transacted
5 with a counterparty located within the United States?
6 MS. MINDLIN: Objection to form.
7 THE WITNESS: Considering the trade was done by
8 me in 2013 with -- booked by Ms. Tsueyoshi from Newport,
9 confirmed by Johnson in Newport, and for a U.S. account
10 facing J.P. Morgan New York, I would say that it was
11 done in the U.S., yes.
12 BY MR. GOLDSMITH:
13 Q. Do you have any --
14 A. Doubt?
15 Q. -- doubt about that as practical matter?
16 A. I have no doubt.
17 MR. GOLDSMITH: Thank you very much. I have no
18 further questions at this time.
19 MR. D'AMATO: Anybody have redirect?
20 MS. MINDLIN: I have a couple short questions.
21
22 FURTHER EXAMINATION
23 BY MS. MINDLIN:
24 Q. Mr. Bentsi, if you'd look back at Exhibit 14,
25 you said that "SAL" as a broker code refers to Citibank

Page 286

1 BENTSI - CONFIDENTIAL
2 in New York; is that right?
3 A. Yes.
4 Q. How do you know that?
5 A. Because when I was in New York, I used to book
6 against SAL, and when I was in Newport, I used to book
7 against SAL, and I know that this broker code for London
8 is SBI.
9 Q. And when you say the "broker code for London,"
10 you mean the Citibank broker code for London?
11 A. Yes.
12 Q. Okay. If you'd look at Exhibit 20 now, the
13 other exhibit that you've just discussed, you said that
14 JPS was the clearing broker; correct?
15 A. J.P. Morgan Securities, who I suspect that --
16 who I think that -- J.P. Morgan Securities, yes.
17 Q. And you suspected that J.P. Morgan Securities
18 was the clearing broker; correct?
19 A. Yes.
20 Q. How do you know that the J.P. Morgan broker
21 acting with respect to this particular trade was located
22 in New York?
23 A. Broker code for J.P. Morgan in London would be
24 JML.
25 Q. Well, setting aside the broker code, how do you

Page 287

1 BENTSI - CONFIDENTIAL
2 know that the specific person acting for J.P. Morgan
3 Securities was located in New York at the time that this
4 trade was executed?
5 MR. GOLDSMITH: Objection to form.
6 THE WITNESS: This is a new issue. It was --
7 the -- the deal done in 2013. It is -- so it would have
8 been done out of the New York office anyway, from the
9 New York salesperson. It was booked by myself in 2013.
10 I was based in Newport. It is entered by Tadashi --
11 Mr. Tsueyoshi, who is based in Newport, and it is
12 confirmed by Russ Johnson, who is based in Newport, for
13 Mr. Gross, who happens to be in Newport.
14 So like -- I would say that with almost all
15 certainty, that this was certainly done in Newport as a
16 trade, and -- and since it is a new issue from J.P.
17 Morgan in Latin America, it would have been booked out
18 of New York.
19 BY MS. MINDLIN:
20 Q. And how do you know that a new issue for
21 J.P. -- how do you know that a new issue would have been
22 booked out of New York?
23 A. Well, certainly, the salesperson and the
24 syndicate I would have been speaking to on this deal
25 would have been in New York.

Page 288

1 BENTSI - CONFIDENTIAL
2 Q. And how do you know that?
3 A. Because any new issue Petrobras in dollars
4 would be done out of New York syndicate.
5 Q. Do you specifically recall speaking with
6 somebody on May 13, 2013, with respect to the purchase
7 of --
8 A. Yes.
9 Q. -- this --
10 A. Yes.
11 Q. Let me finish the question.
12 -- with respect to the purchase of these bonds?
13 A. Yes.
14 Q. And who did you speak with?
15 A. It would have been with Jonas Knoll. We spoke
16 about this on the -- just with -- yes.
17 Q. I'm sorry. Did you identify a specific
18 individual?
19 A. I imagine it would have been -- the syndicate
20 person at J.P. Morgan would have been Jonas Knoll.
21 Q. And the last name is spelled N-o-l-l?
22 A. K-n-o-l-l.
23 Q. And you recall a conversation with Mr. Knoll on
24 this date?
25 A. I do believe that on this day, we -- PIMCO

Page 289

1       **BENTSI - CONFIDENTIAL**
2   **participated in 2016 bonds in relatively large size.**
3   Q.  Do you believe that PIMCO participated in the
4   issuance, or do you know that you spoke with Mr. Knoll
5   on this date?
6   **A.  Well, I know that --**
7       MR. D'AMATO: Objection to form.
8       THE WITNESS: -- we bought 300 million of a
9   deal; so I know that I was involved in making sure it
10  happened, and I know that I spoke to Mr. Knoll to make
11  sure it happened, yes.
12      BY MS. MINDLIN:
13  Q.  How do you know that you spoke with Mr. Knoll
14  to make sure it happened?
15  **A.  My recollection says that, yes.**
16  Q.  Did you speak with him on the phone?
17  **A.  Yes.**
18  Q.  Do you know where he was when you were talking
19  with him?
20  **A.  I would assume he was in New York, but I cannot**
21  **recall that, no.**
22  Q.  If you go back to Exhibit 14, which was the
23  trade ticket for which Citigroup was the broker, did you
24  speak with someone at Citigroup on that date?
25  **A.  I likely did, yes.**

Page 290

1       **BENTSI - CONFIDENTIAL**
2   Q.  Do you know whether or not you did?
3   **A.  I believe I did, yes.**
4   Q.  And why do you believe that you did?
5   **A.  I think on this particular deal, I spoke with**
6   **every dealer who was involved on that deal.**
7   Q.  And when you say "every dealer," does that mean
8   every broker/dealer on the street who was participating
9   in the offering?
10  **A.  I spoke to the two key lead underwriters on the**
11  **deal as a -- usually, that would be my practice.**
12  Q.  Understood.
13      So you -- do you remember an individual by name
14  you spoke with?
15  **A.  In this case, yes, but I'm not actually**
16  **specifically sure that he was in the office per se.**
17  Q.  I don't have anything further.
18  **A.  Jeff Hunter.  Okay.**
19      THE REPORTER: Off the record?
20      MS. MINDLIN: Yes.
21      MR. GOLDSMITH: Yes.
22      MR. D'AMATO: What is the usual stipulation for
23  the transcript?
24      THE REPORTER: Are we off the record?
25      MR. D'AMATO: Yes.

Page 291

1   BENTSI - CONFIDENTIAL
2       **THE VIDEOGRAPHER:** This is the end of disk 4 of
3   4.  The time is 1628, and we're off the record.
4       (Ending time:  6:28 p.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 292

1       A C K N O W L E D G M E N T
2
3   STATE OF              )
4       ) ss.:
5   COUNTY OF              )
6
7       I, KOFI BENTSI, hereby certify that I have read
8   the transcript of my testimony taken under oath in my
9   deposition; that the transcript is a true, complete and
10  correct record of my testimony, and that the answers on
11  the record as given by me are true and correct.
12
13
14
15  _____
16  KOFI BENTSI
17
18  Signed and subscribed to before
19  me, this _____ day of _____, 20__.
20
21  _____
22  Notary Public, State of _____
23
24
25

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL

Page 293

```
 1              C E R T I F I C A T E

 2

 3       I, DEBORAH L. LUNDGREN, CSR No. 6727, RPR, a

 4  certified shorthand reporter in and for the State of

 5  California, do hereby certify:

 6       That prior to being examined, the witness named

 7  in the foregoing proceedings declared under penalty of

 8  perjury to testify to the truth, the whole truth, and

 9  nothing but the truth;

10       That said proceedings were taken by me in

11  shorthand at the time and place herein named and was

12  thereafter transcribed into typewriting under my

13  direction, said transcript being a true and correct

14  transcription of my shorthand notes.

15       Pursuant to Federal Rule 30(e), transcript

16  review was not requested;

17       I further certify that I have no interest in

18  the outcome of this action.

19              May 25, 2016

20

21

22

23  _____

24  DEBORAH L. LUNDGREN

25  CSR NO. 6727, RPR
```

Page 294

```
 1              ***ERRATA***

 2       ELLEN GRAUER COURT REPORTING  CO. LLC
         126 East 56th Street, Fifth Floor
 3           New York, New York 10022
                 212-750-6434
 4

 5  NAME OF CASE: IN RE PETROBRAS SECURITIES LITIGATION
    DATE OF DEPOSITION: MAY 20, 2016
 6  NAME OF WITNESS: KOFI BENTSI

 7  PAGE  LINE  FROM     TO        REASON

 8   ____|___|_____|_____|_____

 9   ____|___|_____|_____|_____

10   ____|___|_____|_____|_____

11   ____|___|_____|_____|_____

12   ____|___|_____|_____|_____

13   ____|___|_____|_____|_____

14   ____|___|_____|_____|_____

15   ____|___|_____|_____|_____

16   ____|___|_____|_____|_____

17   ____|___|_____|_____|_____

18   ____|___|_____|_____|_____

19   ____|___|_____|_____|_____

20   ____|___|_____|_____|_____

21                    _____

22  Subscribed and sworn before me

23  this_____day of _____, 20__.

24  _____    _____

25  (Notary Public)      My Commission Expires:
```

**$**

**$0.50 (1)**
249:14

**A**

**ability (23)**
33:11,13,15;44:22;
82:20;102:5,9,24,25;
103:12,20;104:4;
137:6,20;157:17,19;
175:25;185:11;
201:11;238:7;252:12;
253:17;277:18
**able (12)**
102:15;112:16;
136:7,10,23;137:11;
180:10;187:20;
191:10;194:21;
262:17,18
**above (3)**
158:3;248:9;260:16
**Abreu (5)**
95:24;96:3,10;97:5,
15
**absolute (1)**
186:19
**Absolutely (2)**
104:22;142:15
**accelerate (2)**
149:3;174:11
**acceleration (5)**
174:9,17,22;
180:14,19
**acceptable (1)**
170:17
**accepting (1)**
156:16
**access (12)**
50:9;136:12,15,22;
138:12;174:8;175:25;
201:8,10,20;205:19;
258:7
**accident (3)**
156:4,8,10
**according (1)**
195:17
**account (37)**
25:17,21;32:18;
36:22;44:17,20,22;
194:16;204:15,17;
208:22;222:9,10,23,
24;223:2,3,17;224:4;
237:12;238:8,11,11,
14,15,16,18,22;
243:20;244:11,12;
267:15;281:3,5;
284:3,4;285:9
**accountant (3)**
167:11,14,15
**accountants (5)**

154:2,2;167:8,25;
202:14
**accountants' (1)**
171:25
**accounting (1)**
167:9
**accounts (18)**
17:13,15,19,25;
18:23;220:23;222:6;
237:14,14,19;243:19,
20,25,25;244:3,7,10,
11
**accurate (3)**
9:22;265:3,6
**accused (1)**
105:11
**across (3)**
84:24;95:17;143:2
**acted (1)**
230:9
**acting (2)**
286:21;287:2
**action (4)**
272:15;275:19,23,
25
**action-needed (1)**
134:4
**actions (1)**
272:15
**active (1)**
51:2
**actual (2)**
77:23;255:10
**actually (21)**
16:20;36:14;55:4;
63:15;66:16;85:9;
94:21;102:15;161:19;
164:14;167:24;
175:14;177:2;180:10;
192:23;222:21,24;
250:20;255:14;256:8;
290:15
**ad (1)**
23:24
**add (1)**
265:15
**added (2)**
106:16;128:18
**addition (1)**
36:21
**additional (2)**
102:4;254:15
**address (5)**
71:22;131:7;
167:19;191:18;203:2
**addressed (2)**
60:13;176:3
**addresses (1)**
160:9
**addressing (3)**
150:18;176:5;
197:21
**adjusted (1)**

109:7
**adjustment (6)**
255:2,9,17;256:4,
11;257:15
**adjustments (1)**
254:19
**ADRs (1)**
220:19
**advantage (1)**
131:21
**advice (1)**
198:10
**advise (1)**
202:24
**advises (1)**
221:4
**advising (2)**
149:8,18
**affair (1)**
163:25
**affect (21)**
53:21;65:3,8;67:16;
70:15,18;71:5,14,20;
73:14,23;74:15;
82:15;84:15;120:20;
121:15;127:8,12,17;
138:15;149:5
**affected (6)**
31:8,10;121:4;
122:10;227:16,21
**affecting (5)**
69:8;70:4,14;
252:15,19
**Affiliates (4)**
220:24,25;221:2,6
**afford (1)**
176:11
**afternoon (4)**
159:11;182:4;
275:12,13
**afterward (1)**
154:17
**afterwards (1)**
154:16
**Again (22)**
10:17;30:9;32:10;
40:25;43:10;56:6;
98:20;105:15;125:14;
156:18;171:2;173:25;
179:21;183:4;184:8,
17;189:6;241:9,20;
248:21;275:15;
281:16
**against (11)**
64:20;101:21;
111:14;112:13;
113:19;114:6;275:20,
23,25;286:6,7
**agencies (8)**
57:22;123:17,19;
201:18,20;202:8,14,
15
**agency (1)**

246:19
**agent (1)**
230:9
**agents (2)**
83:8,19,25
**aggressive (2)**
176:16;196:12
**ago (8)**
11:6,7;56:3;68:2;
97:11;129:21;163:8;
278:25
**agree (5)**
48:20;178:24;
198:16,21;235:6
**agreed (1)**
198:13
**agreement (1)**
26:4
**ahead (13)**
9:9;50:7;70:3;
87:23;109:2,4;
111:15;123:14;127:3;
162:22;193:18;209:8;
266:8
**allegation (1)**
271:9
**allegations (8)**
269:8,12,16,18;
270:25;271:5,7,15
**allocation (1)**
222:7
**allocations (2)**
222:4,6
**allow (2)**
202:7,8
**allowed (1)**
209:21
**allusion (1)**
122:13;176:20
**Almir (9)**
147:23;148:5;
151:20;152:17;
154:17;155:24;
156:16;176:20;271:6
**almost (2)**
84:24;287:14
**alone (2)**
64:22;144:13
**Along (6)**
7:19;11:8;16:19;
37:25;62:3;163:23
**alpha (1)**
142:23
**alternative (1)**
89:20
**although (2)**
40:10;63:15
**always (16)**
16:24;69:18;82:6;
103:11,13,13,14,15;
112:21;115:6;124:11;
154:12;216:10;
235:17;242:13;

262:25
**America (3)**
12:25;216:11;
287:17
**American (3)**
219:22;226:12,16
**Americas (4)**
3:14;206:8,21;
215:25
**among (2)**
280:17,17
**Amongst (1)**
57:25
**amount (17)**
62:24;128:12,14;
138:22;153:10;
184:25;230:16;
255:17;256:3,15,17,
22;257:14;264:18,24;
265:2,8
**ample (1)**
153:19,23
**analyses (1)**
186:8
**analysis (5)**
26:16;48:7;186:12;
198:13;268:4
**analyst (6)**
29:17;31:25;32:2,4;
135:11;194:16
**analysts (11)**
29:2,4,18,21,22,24;
30:3;62:5;198:16;
268:20,24
**analysts' (2)**
28:24;29:7
**analyze (1)**
34:24
**analyzing (2)**
26:18;32:12
**and/or (3)**
112:17;191:18;
193:14
**Angeles (3)**
7:1,11;159:2
**announced (2)**
147:8;157:2
**announcement (4)**
135:14,18,23;146:4
**annual (1)**
51:10
**answered (1)**
280:11
**anticipate (1)**
124:14
**anticipation (1)**
128:10
**apart (1)**
274:4
**Apologies (1)**
18:22
**apologize (1)**
88:13

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL

**appear (1)**
230:7
**applicable (1)**
212:14
**applies (1)**
97:15
**apply (1)**
276:8
**appreciate (1)**
45:19
**appreciated (1)**
249:24
**approach (7)**
34:23;148:16;
167:11;183:11,14;
189:9,25
**approached (2)**
183:7;185:21
**appropriate (2)**
49:15;169:2
**approximate (2)**
163:13;215:11
**approximately (3)**
164:2;271:10,14
**April (16)**
61:25;78:6;79:17;
94:3;96:7,8,10;97:6;
110:7;117:8;146:18,
20;164:7;171:21;
253:13;264:11
**area (1)**
12:23
**arms (1)**
93:18
**around (49)**
46:17;47:3;57:12,
18;66:20;69:7;72:19;
75:17,20;76:3;
108:17;109:12;115:9,
16;117:16;126:7;
144:8;146:21;150:17;
166:17;170:23;173:3;
179:17;194:3;200:10;
202:9;206:16;209:9,
14,18;228:23;231:10;
248:16,22;252:19,22;
254:3;256:8,10;
259:4;263:8;266:19;
270:22;272:22;273:5,
21;274:24,24;275:3
**ARPS (3)**
3:4;7:21;272:13
**arrest (1)**
92:5
**arrested (2)**
93:6,20
**arrive (6)**
166:20;168:18,19;
170:10;171:4;205:6
**article (5)**
56:9,13;57:2;93:12,
14
**articles (2)**

28:10;270:11
**articulating (1)**
26:10
**Asia (4)**
206:8,9;211:13;
216:2
**aside (17)**
21:25;22:12;55:15;
77:5;94:7;105:20;
116:13;158:15;
181:13;190:7;199:14;
203:23;239:21;245:6;
249:19;282:16;
286:25
**aspects (2)**
198:19,23
**assembling (1)**
34:19
**assert (2)**
239:16;241:20
**assess (3)**
85:22;141:10;
267:22
**assessed (1)**
168:20
**assessing (10)**
32:20;35:17;36:5;
52:14,17;82:7;85:24;
140:20;141:15;
268:21
**assessment (15)**
31:20,23;32:22;
33:7;34:13;48:20;
64:13;103:19;131:22;
140:16;141:25;144:9,
14;256:25;257:2
**assessments (1)**
36:10
**asset (15)**
36:8;45:16,17;74:4,
16;127:14;193:13;
194:4,12,23;216:8;
240:25;255:11;
262:19;264:18
**assets (19)**
95:3,6;138:21;
139:3;140:4;141:7,
18;170:10;171:7,25;
177:7,12,15,17;
178:14;254:21;255:4;
258:8,12
**assign (1)**
132:3
**assigned (2)**
17:24;18:7
**assignment (1)**
151:3
**assist (1)**
150:5
**assistant (11)**
204:25;205:25;
206:3;207:12;210:7,
8,14,24;211:6;

214:19;234:15
**assistants (21)**
204:15;206:9,11,
21,24,25;207:15;
208:7,13;210:11,16;
211:25;212:4,16,19,
24;213:4,7,24;215:10,
16
**associate (1)**
11:2
**Associates (1)**
220:25
**assume (31)**
27:16;37:3;46:17;
76:15;78:21;80:11;
83:14;84:2,13;89:8;
91:22;93:13;95:10;
97:8;105:17,18;
156:23;170:19;171:2,
8;175:8;187:2;
192:17;198:2;206:16;
230:11;244:25;
249:20;266:21;
268:17;289:20
**assumed (3)**
128:12;138:20;
139:18
**assumes (1)**
194:3
**assuming (3)**
176:16;180:19;
194:21
**assump- (1)**
269:4
**assumption (16)**
48:15,16,25;67:9;
77:23;141:22;146:24;
154:8;169:17;180:21;
225:2,15;254:25;
266:20;268:6,17
**assumptions (10)**
65:10;68:17,19,24;
69:9;128:13;193:21;
197:23;252:3,4
**attached (1)**
135:7
**attachment (1)**
5:6
**attend (1)**
158:8
**attention (3)**
196:22;278:20;
280:7
**attorney (2)**
10:6;275:15
**attractive (1)**
258:20
**audible (5)**
25:9;79:3;184:16;
223:14;276:19
**audience (1)**
21:4
**audit (1)**

251:3
**audited (2)**
185:11;187:15
**AUDITORES (2)**
3:10;8:7
**auditors (1)**
202:9
**Aurelius (2)**
200:12;202:3
**available (8)**
53:8;54:3;154:12;
180:12;182:13;
194:17,20;258:21
**Avenue (1)**
3:14
**avoid (1)**
165:20
**aware (20)**
91:24;92:5;95:19,
22,24;96:2,4,5,6,9,23,
25;97:6;134:22;
150:20;198:23;199:3;
200:10;221:5;281:15
**away (10)**
86:4,4,18,18,18;
101:8;113:3;133:16;
173:7;213:20

---

## B

**B- (1)**
93:6
**back (36)**
13:19;16:16,25;
22:5;24:18;51:24;
55:24;57:3;94:10;
98:4;115:12;116:11;
132:19;154:18;
155:22,24;159:6;
163:5;180:7;181:24;
184:17;201:22;211:2;
213:2;231:23;234:5,
19;235:4;236:6;
238:13;259:2,20;
260:2;272:2;285:24;
289:22
**backdrop (2)**
110:18,22
**backwards (2)**
13:21;143:21
**bad (4)**
59:21;77:7,11;
282:19
**bag (1)**
93:19
**balance (6)**
35:9;36:20;141:8,
18;255:7;256:11
**Banco (1)**
151:3
**banks (1)**
27:16
**Barbassa (14)**

5:10;110:4,5,12;
147:24;148:5,9,16;
151:21;152:3;154:17;
155:22;156:21;193:2
**Barbassa's (2)**
155:5,18
**Barbosa (1)**
147:24
**barely (1)**
133:2
**base (8)**
82:19;95:7,12;
101:11;155:25;
170:11;254:22,25
**based (28)**
38:14;45:12,14;
58:20;65:2;81:7;
99:16;124:23;136:8;
139:20;206:9,11;
208:7;216:5;219:23,
24;225:10;230:13;
233:2;240:20;258:16;
281:19;282:4;284:8,
25;287:10,11,12
**baseline (3)**
90:4;101:9;267:6
**basically (6)**
17:14;133:14;
197:9;214:6;249:3,3
**basis (13)**
88:19;101:6;115:9,
16,25;123:20;142:23;
144:14;214:6,13;
219:17;268:3,5
**Bate (2)**
119:2,4
**Bates (32)**
39:17;46:9;60:12;
79:15;80:23;88:5,13;
92:15;94:20;98:12;
104:11;106:2;116:20;
119:2,3,4;120:7;
130:10;151:19;
159:16;181:19;
190:13;199:21;
221:16;232:5;240:5;
247:7;250:7;259:13;
281:11,12;283:2
**bcc (1)**
92:20
**Beach (5)**
232:16;281:24;
282:4;284:9;285:4
**bearish (9)**
81:7;84:23;85:4,8,
15;106:8,11,19;107:5
**became (2)**
122:20;185:25
**become (3)**
96:17;185:24;
211:22
**becoming (1)**
119:5

    **Ellen Grauer Court Reporting Co. LLC**     **(2) appear - becoming**

**beforehand (2)**
80:18;151:8
**begin (1)**
115:3
**beginning (9)**
16:16;98:5;106:9;
107:11;152:20;159:7;
160:2;164:9;231:24
**begins (7)**
46:13;88:2;104:11;
152:10,16;181:25;
195:2
**behalf (2)**
7:25;8:6
**belief (3)**
45:15;218:10;
225:10
**below (10)**
99:23;122:25;
123:19;125:11,11;
128:5,8;129:23;
159:25;233:8
**benchmark (10)**
41:16,18,19,24;
42:2,6,9,10;44:8,13
**benchmarked (1)**
43:25
**benchmarks (6)**
42:4,15;43:13,14,
16,22
**Bendine (2)**
151:7,9
**beneath (1)**
132:18
**beneficial (2)**
201:7,20
**benefit (3)**
89:13;94:20;111:21
**Benke (1)**
241:5
**BENTSI (327)**
5:2,4,11,12;6:2,7,9;
7:7,23;8:20,21;9:1;
10:1;11:1;12:1;13:1;
14:1;15:1;16:1;17:1;
18:1;10;19:1;20:1;
21:1;22:1;23:1;24:1;
25:1;26:1;27:1;28:1;
29:1;30:1;31:1;32:1;
33:1;34:1;35:1;36:1;
37:1;38:1;39:1,17;
40:1;41:1;42:1;43:1;
44:1;45:1;46:1;47:1;
48:1;49:1;50:1;51:1;
52:1;53:1;54:1;55:1;
56:1;57:1;58:1;59:1;
60:1,11;61:1;62:1;
63:1;64:1;65:1;66:1;
67:1;68:1;69:1;70:1;
71:1;72:1;73:1;74:1;
75:1;76:1;77:1;78:1;
79:1,14;80:1;81:1;
82:1;83:1;84:1;85:1;

86:1;87:1;88:1;89:1;
90:1;91:1;92:1,14;
93:1;94:1;95:1;96:1;
97:1;98:1,11;99:1;
100:1;101:1;102:1;
103:1;104:1;105:1,
25;106:1;107:1;
108:1;109:1;110:1;
111:1;112:1;113:1;
114:1;115:1;116:1,
20;117:1;118:1;
119:1;120:1;121:1;
122:1;123:1;124:1;
125:1;126:1;127:1;
128:1;129:1;130:1,9;
131:1;132:1;133:1;
134:1;135:1;136:1;
137:1;138:1;139:1;
140:1;141:1;142:1;
143:1;144:1;145:1;
146:1;147:1;148:1;
149:1;150:1;151:1,
19;152:1;153:1;
154:1;155:1;156:1;
157:1;158:1;159:1,
15;160:1;161:1;
162:1;163:1;164:1;
165:1;166:1;167:1;
168:1;169:1;170:1;
171:1;172:1;173:1;
174:1;175:1;176:1;
177:1;178:1;179:1;
180:1;181:1,18;
182:1;183:1;184:1;
185:1;186:1;187:1;
188:1;189:1;190:1,
10;191:1;192:1;
193:1;194:1;195:1;
196:1;197:1;198:1;
199:1;200:1;201:1;
202:1;203:1;204:1;
205:1,11;206:1;
207:1;208:1;209:1;
210:1;211:1;212:1;
213:1;214:1;215:1;
216:1;217:1;218:1;
219:1;220:1;221:1;
222:1,13;223:1;
224:1;225:1;226:1;
227:1;228:1;229:1;
230:1;231:1;232:1,5;
233:1;234:1;235:1;
236:1;237:1;238:1;
239:1;240:1,5;241:1;
242:1;243:1;244:1;
245:1;246:1;247:1,6;
248:1;249:1;250:1,7;
251:1;252:1;253:1;
254:1;255:1;256:1;
257:1;258:1;259:1,
12;260:1;261:1;
262:1;263:1;264:1;
265:1;266:1;267:1;

268:1;269:1;270:1;
271:1;272:1,1,12;
273:1;274:1;275:1,
12;276:1,13;277:1;
278:1,20,22;279:1;
280:1,18;281:1;
282:1;283:1,5,6,23;
284:1,3;285:1,24;
286:1;287:1;288:1;
289:1;290:1;291:1;
292:7,16
**best (14)**
17:21;31:4;64:7;
113:8;149:19;150:6,
6;164:23,25;186:24;
202:25;238:6;264:4;
278:14
**best-price (1)**
219:17
**better (7)**
26:10;98:23;
100:21;187:17;
204:23;261:19;267:4
**beyond (5)**
66:22;148:11;
152:11;183:21;241:2;
269:19,20;275:5
**big (5)**
111:12;112:5;
172:7,20;263:20
**biggest (2)**
50:8;277:19
**billion (2)**
51:11,12
**bills (1)**
249:11
**bit (4)**
34:6;201:22;
205:12;263:7
**blend (1)**
42:13
**block (4)**
221:25;222:2;
236:2;241:4
**Bloom- (1)**
233:19
**Bloomberg (17)**
5:3;6:6,8;116:21;
205:5,7,8;208:15;
210:7,24;211:10;
212:18;233:14,16,18,
19,20
**blowouts (1)**
102:23
**Board (8)**
5:14;181:20;182:2,
12,22;183:20,22;
201:3
**bogey (3)**
41:16,21,22
**boilerplate (1)**
152:11
**bond (51)**

12:22;15:5;31:8,10;
42:19,20;86:2,6;
88:19,20;89:16,19;
115:13,25;134:23;
146:23;180:5;189:11,
14,18,20;196:8;218:7,
24;228:18;230:15;
231:9,10,10;239:4;
249:2,5,13;252:16,19;
257:9,18,22;258:2,17;
260:19,22;261:4,8;
263:25;272:20,21;
274:18,19;281:20;
285:3
**bondholder (1)**
183:15
**bondholders (6)**
148:18;153:6;
174:11;187:12;
188:16;200:13
**bonds (88)**
5:8;13:5;17:9;
21:10;37:16;42:23;
58:24;90:13;91:6;
100:5,6,19;102:11;
109:12;117:16;121:4,
5;122:16;123:16;
124:16;126:15,20,23;
127:24;128:5,8,14,17;
130:13;131:12,15,18,
19;132:15;133:9;
134:17;145:21;174:9,
11,18;175:3,6;
179:24;188:4;189:23;
202:4;211:6;216:21,
24;217:9,10,14,16;
227:9,17,22;228:6;
230:19,25;231:4,6;
245:17;247:20;248:3,
10,13;249:10,11;
254:5,6,9;258:3,24;
261:17,18,22,23,25;
262:6,8;264:4,9;
274:13,15;275:3;
283:12;288:12;289:2
**book (15)**
35:22;36:4,10,19;
140:3;141:18;142:11,
16;205:8;211:10;
230:21;236:14;237:2;
286:5,6
**booked (15)**
233:11,12,15,16,21,
24;235:20;236:16,18;
238:9;283:18;285:8;
287:9,17,22
**booking (3)**
235:18;236:25;
238:17
**books (1)**
142:12
**Bosner (27)**
11:16;32:5,6;34:9,

20,23;36:9,13;62:8,9;
135:7,10,10;140:11;
141:9;155:17;161:20;
162:2,2;164:21;
190:11;193:8,11;
199:9,22;268:15;
269:9
**Bosner's (7)**
34:7;37:4;198:5,10,
13,20,24
**both (11)**
26:5;29:9;30:7;
48:25;49:2;82:6;
87:16;254:19;255:9;
277:20,20
**bottom (13)**
40:7;46:9;57:5;
60:19;62:25;113:10;
132:13,17;152:15;
156:14;161:18;
250:20;260:10
**bought (3)**
257:25;258:23;
289:8
**Bovespa (1)**
220:19
**Bovespa-traded (1)**
220:16
**Bowdoin (3)**
14:6,7,10
**Brasil (1)**
151:3
**Brazil (63)**
25:13;27:8,14;
28:19,24;29:8;30:4,
13,23;31:3,6,8,10,11,
20;46:19,21;60:25;
61:24;62:17;63:6,12;
65:21;67:10;70:11,
12;71:13;72:4,24;
74:20;75:20;76:6;
78:6;80:24;81:5;85:5;
87:14,17;88:18;89:8;
94:3;95:17;99:17;
107:13,23;108:2,8;
110:5;117:24;118:3,
6,21;120:4;151:9;
164:10,12;178:25;
179:4,16;216:16;
220:16;266:24;267:4
**Brazilian (30)**
25:10;27:19;28:2,3,
16;46:13;70:4,13,16;
71:14,20;72:15;
75:17;78:9;82:3,7;
84:15;88:20;89:19;
92:6;93:9;166:3,5;
177:7,12,15,17;178:8;
270:7,10
**breach (2)**
144:25;145:3
**breaches (2)**
165:14;208:24

**break (10)**
9:15,19;55:16;
56:24;64:4;97:22;
158:18,20;231:18;
271:20
**breaks (1)**
9:14
**bribery (1)**
257:3
**bribes/overcharging (2)**
254:20;255:3
**brief (2)**
272:8;283:10
**Briefly (1)**
95:16
**Brigitte (2)**
39:18;41:6
**bring (2)**
273:25;274:25
**broader (1)**
22:14
**broadly (1)**
203:8
**broker (39)**
224:15;225:16,22;
227:2;228:18;229:13;
233:23;234:20,25;
235:5;236:13;238:2;
239:19;241:8,12,16,
20;242:4,7,10,14;
282:14,14;284:13,15,
20,20,21,23;285:25;
286:7,9,10,14,18,20,
23,25;289:23
**broker/dealer (3)**
229:17,19;290:8
**brokers (9)**
219:16,18;225:19;
227:7,9,15,21;228:2,
14
**Brothers (3)**
229:18,25;230:2
**Brother's (1)**
230:7
**brown (1)**
93:18
**buckets (1)**
37:8
**built (2)**
177:7,12
**bullet (3)**
83:6;84:7;173:3
**bullets (1)**
84:19
**burn (3)**
50:10,13,16
**business (9)**
187:18,19;211:20;
212:11,12,16;215:19,
21;216:3
**busy (1)**
225:21
**buy (13)**

36:23;37:15;67:17;
68:12,16;98:20;
187:21;204:2,9;
211:6;233:25;257:21;
258:3
**buying (2)**
99:14;121:3

## C

**Caixa (2)**
110:24;111:4
**California (6)**
7:1,12;159:2;
281:24;284:9;285:4
**call (18)**
11:5,6,8,12,18;
45:11;78:17,21;
118:21;119:9;126:4;
132:25;153:4;168:2;
182:16,19;269:4;
275:18
**called (7)**
63:14;135:6;142:5;
205:2;221:5;228:15,
18
**calling (1)**
272:6
**calls (13)**
230:18,20,21,24;
231:3,5,8;271:17;
272:20,21,25;273:4;
274:11
**came (6)**
13:19;18:7;93:13;
224:10,10;269:8
**can (118)**
8:23;9:9,15,17;
10:13;15:12,14,25;
18:25;19:9;20:4,17;
24:9;26:3,9;30:24;
32:25;33:13,14,17;
37:23;38:12;40:20;
45:2;55:15,16;64:25;
65:3;66:7;67:25;
73:24;74:13;76:15;
77:5;83:21;90:8,9,19;
91:22;94:7;97:7;
103:6;104:20;105:7,
17,18,20;106:14;
111:11,17;118:19;
128:2;129:9;130:4;
133:2,2;141:14;
154:11,16;155:20;
158:15;173:21;175:8;
177:6,13;181:13;
186:4;190:7,15,15;
192:17;193:17;194:3;
199:14;202:9;203:23;
204:7;209:3;212:5,
22;215:21,22;216:13;
218:6;220:8;222:21,
24;223:3;228:16;

231:17;234:6;238:7;
239:21;242:19,21;
244:18;245:6;247:13;
249:19;253:6;265:15;
276:9,11;277:13,13;
278:22,23;279:10,11,
15,19,23;280:7;
281:11,11;282:12,16;
283:10
**candidate (2)**
77:18,19
**candidates (3)**
74:3,23,24
**capacity (3)**
176:7;203:16;
230:15
**CAPEX (23)**
51:10;52:20;53:4,5,
11,14,21,25;138:6;
176:3,13,15,17,19,21;
177:2;193:12;194:4,
8,12,23;203:4;262:18
**capture (1)**
213:14
**captures (1)**
212:24
**care (1)**
202:18
**caret (2)**
109:20;110:18
**case (19)**
7:8;87:12;88:3;
89:14;97:9;155:25;
187:20;207:12;
222:17;238:8;244:2;
251:4;253:8;254:17,
22,25;272:16;278:3;
290:15
**cash (10)**
35:10,20;50:14,24;
181:11;193:20,22;
194:2,15;197:22
**cash-flow (1)**
50:16
**catch (2)**
247:23;250:15
**cause (1)**
31:11
**causing (5)**
174:12,14,18;
177:17,22
**caution (1)**
10:5
**cautious (1)**
81:5
**caveat (1)**
217:2
**cc (1)**
39:22
**CDS (2)**
89:25;90:4
**Cedel (4)**
243:10,12,12,18

**C-e-d-e-l (1)**
243:15
**CEMBI (3)**
42:12,13,16
**center (4)**
212:16;215:22;
216:4;250:13
**centers (4)**
211:20;212:11,13;
215:20
**cents (1)**
249:14
**century (8)**
257:9,18,22;258:2;
260:19;261:3,8;
263:24
**CEO (2)**
151:5;281:2
**certain (10)**
90:3;121:12;
126:11;203:2;207:17;
237:13,14,14,19;
270:2
**Certainly (78)**
9:18,20;23:11;
34:21;48:21;52:16;
53:4,7;57:19;68:15;
69:15,19;70:14;
71:12;75:22,22;78:3;
82:19;83:2;85:20,25;
93:2;96:4,22;98:22;
106:23;107:19;109:9;
124:13;126:3;127:18;
128:10;134:9;137:9;
138:17;139:9;140:22;
141:13;144:16;
145:16;157:25;
172:17;175:18;
177:19;181:2,7;
190:20;191:10;193:3;
194:11;195:24;199:4;
202:16;203:21;
204:23;220:2;231:9,
11;251:2;252:6,21;
255:5,16;257:10;
258:4;262:11;265:17;
266:11;267:19;
269:23,24;273:20;
274:22;277:16,21;
278:12;287:15,23
**certainty (1)**
287:15
**certify (1)**
292:7
**cetera (1)**
102:23
**CF (2)**
50:10,13
**CFO (3)**
109:21,24;162:12
**chain (12)**
5:18;106:7;152:9;
155:15;156:13;158:3;

181:24;196:19;197:9,
20;259:19
**chance (2)**
76:9;77:3
**chances (2)**
76:13,17
**change (17)**
33:6,9,10;82:20;
97:22;128:24;141:24;
142:2;144:5,17;
151:4,5,6;176:17,17;
258:5;259:3
**changed (7)**
12:16;33:15,21;
120:19;192:7,12,15
**changeover (1)**
150:20
**changes (4)**
189:17,20;245:14;
263:4
**changing (1)**
144:21
**charge (2)**
44:18,19
**charges (2)**
139:25;271:9
**chart (8)**
89:12;99:23;
113:14;132:13,17,18;
223:10;259:20
**charts (2)**
132:7;133:15
**chat (12)**
5:3;6:6,8;116:21,
24;117:2,5;247:6,9;
250:8,10,13
**check (4)**
142:16;158:20;
162:24;235:10
**checked (1)**
247:21
**checking (1)**
268:19
**checklist (2)**
134:4,7
**Chicago (1)**
3:7
**chime (1)**
26:8
**China (10)**
70:3,6,25;71:4,13,
20;84:8,9,9,14
**Chinese (5)**
69:21,25;70:15;
71:16,17
**choice (1)**
90:6
**choose (3)**
85:14;90:7,9
**chose (2)**
183:11,13
**chosen (1)**
168:10

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL

**Christian (2)**
155:16;181:20
**chronologically (1)**
13:21
**CIO (1)**
281:2
**circumstances (1)**
9:21
**Citibank (4)**
229:5,6;285:25;
286:10
**Citigroup (20)**
224:18,20;225:9,
13,16;229:14,14,16,
16,19,21,24;230:9,14;
235:5;272:17;273:8;
282:15;289:23,24
**Citigroup's (3)**
229:8,12;230:6
**Citigrp (1)**
224:15
**clarify (2)**
204:7;245:10
**clarity (3)**
165:6;171:24;
174:22
**class (5)**
272:14;275:19,19,
24,25
**clause (1)**
47:9
**clear (8)**
88:15;160:20;
171:5;192:23;211:4;
215:13;237:24;238:3
**cleared (2)**
237:19;244:17
**clearing (3)**
284:23;286:14,18
**clearly (1)**
238:23
**Cleary (1)**
7:18
**client (5)**
10:7;248:18,18;
281:5,8
**Clinton (1)**
74:8
**close (3)**
143:14;210:2,4
**closer (1)**
74:4
**clue (1)**
52:4
**code (24)**
235:11;236:13,20,
21;237:5,9,24;242:5,
8,11,13;268:12;
282:14,14;284:13,15,
20,21;285:25;286:7,9,
10,23,25
**codes (5)**
238:4,6;242:16,19;

281:19
**colleague (1)**
7:20
**colleagues (11)**
28:16,19;34:3;
53:18;55:3;57:9;
59:24;118:16;139:6;
226:23;261:8
**Collectively (1)**
81:4
**college (4)**
14:4,5,6,12
**Colloquial (1)**
41:25
**color (1)**
161:22
**column (4)**
100:8;223:8,11;
260:2
**COMBS (8)**
3:5;7:21,21;272:8,
11,12;273:17;275:7
**comfort (2)**
201:8;202:9
**coming (15)**
48:7;78:23;79:2;
127:9,14,19,24;
155:24;163:23;166:9,
11;168:24;169:3;
176:13,15
**comment (2)**
248:9;282:13
**committee (4)**
160:10,12,15,18
**common (1)**
198:15
**commonly (1)**
89:20
**communicate (2)**
212:3,5
**communicating (1)**
152:3
**communication (13)**
10:6;48:8;50:6;
51:7;77:5;111:9;
118:24;135:6;152:16;
184:15;256:13,18;
278:6
**communications (3)**
129:4;256:14,20
**companies (21)**
17:16;49:6,8,20,22;
50:3;61:2,16,21;
70:14;71:17,20;
73:14;83:7,16;84:25;
87:14;110:16;181:11;
202:23;266:21
**company (78)**
5:16,17;32:19;33:8;
48:13;51:9;54:3;59:5;
61:19;65:4,7,9,14;
66:2,7,12,17,24;67:5,
8,13;73:18;111:20;

112:8,16,17,18;136:4,
6,13,15,23;137:4,10;
138:9,11;140:24;
152:19;153:2;161:21;
163:18;167:7;172:7;
179:20;184:2,5,11,17,
24,25;188:18;190:12;
191:2,5,17,17;192:8,
9,21;193:5;194:3,17,
20;200:12;202:8;
203:4;252:7,9;
254:18;255:2;258:6,
6;261:20;262:15;
267:13;269:5;272:18;
277:21
**company's (6)**
82:15;135:13,18,
22;137:20;252:12
**compare (3)**
90:4;100:14;234:6
**compared (7)**
49:9,13;67:11;
89:18;123:21;149:14;
169:10
**comparing (1)**
86:6
**comparison (1)**
49:19
**comparisons (2)**
49:15;50:4
**compensate (1)**
101:14
**compensated (1)**
101:17
**compense (1)**
101:13
**Comperj (2)**
96:23,25
**complete (1)**
292:9
**compliance (4)**
126:7,8;208:24;
209:15
**compliant (6)**
201:25;202:12;
204:15,16;208:17;
211:7
**comply (1)**
165:17
**component (1)**
96:19
**concentration (2)**
209:10,11
**concern (21)**
50:23;57:21;81:24;
118:17;119:17;120:9,
9;127:9;137:9,24;
138:2,7,14;145:6;
183:19;184:8;195:21,
24;196:3;255:13;
277:19
**concerned (15)**
57:24;64:8;104:3;

112:19;116:3;136:6;
139:10,13;184:18;
189:17,20,22,24,25;
252:11
**concerning (5)**
23:20,24;29:8;
266:11;278:16
**concerns (17)**
55:7;81:8,18;
102:25;124:9;138:11;
149:25;150:3;157:12,
14,15,15,17,19;
191:14,15;266:19
**concluded (1)**
262:25
**confer (1)**
49:9
**conference (7)**
11:5,6,8;78:17;
182:16,18,19
**CONFIDENTIAL (284)**
9:1;10:1;11:1;12:1;
13:1;14:1;15:1;16:1;
17:1;18:1;19:1;20:1;
21:1;22:1;23:1;24:1;
25:1;26:1;27:1;28:1;
29:1;30:1;31:1;32:1;
33:1;34:1;35:1;36:1;
37:1;38:1;39:1;40:1;
41:1;42:1;43:1;44:1;
45:1;46:1;47:1;48:1;
49:1;50:1;51:1;52:1;
53:1;54:1;55:1;56:1;
57:1;58:1;59:1;60:1;
61:1;62:1;63:1;64:1;
65:1;66:1;67:1;68:1;
69:1;70:1;71:1;72:1;
73:1;74:1;75:1;76:1;
77:1;78:1;79:1;80:1;
81:1;82:1;83:1;84:1;
85:1;86:1;87:1;88:1;
89:1;90:1;91:1;92:1;
93:1;94:1;95:1;96:1;
97:1;98:1;99:1;100:1;
101:1;102:1;103:1;
104:1;105:1;106:1;
107:1;108:1;109:1;
110:1;111:1;112:1;
113:1;114:1;115:1;
116:1;117:1;118:1;
119:1;120:1;121:1;
122:1;123:1;124:1;
125:1;126:1;127:1;
128:1;129:1;130:1;
131:1;132:1;133:1;
134:1;135:1;136:1;
137:1;138:1;139:1;
140:1;141:1;142:1;
143:1;144:1;145:1;
146:1;147:1;148:1;
149:1;150:1;151:1;
152:1;153:1;154:1;
155:1;156:1;157:1;

158:1;159:1;160:1;
161:1;162:1;163:1;
164:1;165:1;166:1;
167:1;168:1;169:1;
170:1;171:1;172:1;
173:1;174:1;175:1;
176:1;177:1;178:1;
179:1;180:1;181:1;
182:1;183:1;184:1;
185:1;186:1;187:1;
188:1;189:1;190:1;
191:1;192:1;193:1;
194:1;195:1;196:1;
197:1;198:1;199:1;
200:1;201:1;202:1;
203:1;204:1;205:1;
206:1;207:1;208:1;
209:1;210:1;211:1;
212:1;213:1;214:1;
215:1;216:1;217:1;
218:1;219:1;220:1;
221:1;222:1;223:1;
224:1;225:1;226:1;
227:1;228:1;229:1;
230:1;231:1;232:1;
233:1;234:1;235:1;
236:1;237:1;238:1;
239:1;240:1;241:1;
242:1;243:1;244:1;
245:1;246:1;247:1;
248:1;249:1,21;
250:1;251:1;252:1;
253:1;254:1;255:1;
256:1;257:1;258:1;
259:1;260:1;261:1;
262:1;263:1;264:1;
265:1;266:1;267:1;
268:1;269:1;270:1;
271:1;272:1;273:1;
274:1;275:1;276:1;
277:1;278:1;279:1;
280:1;281:1;282:1;
283:1;284:1;285:1;
286:1;287:1;288:1;
289:1;290:1;291:1
**confirm (4)**
221:25;222:2,8;
279:15
**confirmation (4)**
211:2;222:5;236:2;
241:4
**confirmed (4)**
84:22;282:7;285:9;
287:12
**confused (2)**
155:2;211:22
**conjunction (1)**
248:17
**connection (3)**
174:4;183:9;254:8
**consent (5)**
185:22;186:6,9,18;
187:11

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL

consider (6)
37:8;112:22;115:6;
136:9;153:7;202:17
consideration (1)
213:16
considered (4)
25:11;43:2;52:14;
93:18
Considering (1)
285:7
consist (1)
209:22
consistent (3)
84:24;268:3,5
constant (3)
60:3;64:17;72:6
constitutes (6)
35:7;279:12,16,25;
280:2,4
constrain (1)
49:23
constructive (1)
151:4
consultants (1)
167:6
contact (3)
253:6;271:10,14
contacted (2)
152:6,7
contain (5)
21:2;24:19;37:4;
89:12;207:18
contains (1)
254:15
Cont'd (3)
3:1;5:1;6:1
content (1)
10:6
context (17)
85:8;104:21;107:4,
6;118:4;120:14;
144:10;153:3;172:9;
182:8,11;200:5,6;
248:2;250:17;251:23;
277:15
contingencies (1)
153:19
contingency (1)
153:16
continuation (1)
254:14
continue (9)
77:13,20,25;84:18;
189:3;253:9,16,19;
261:21
continued (7)
50:9,23;62:23;78:5;
159:5;171:11;258:12
continues (2)
139:23;140:6
continuing (1)
252:25
contract (4)

103:12,15,16,17
contracts (7)
103:20;104:25;
105:5,9,11,13,17
contrast (1)
24:25
contributor (2)
145:20;146:22
control (3)
65:15,19;154:7
controlled (1)
46:20
controlling (1)
154:4
controls (2)
47:6;68:7
controversial (2)
179:9,13
conv- (1)
253:6
conversation (15)
50:18,22,25;64:18;
72:6,7,19;148:11;
157:10;167:24;
248:18;251:21;271:3;
274:23;288:23
conversations (28)
50:17;52:21,23;
53:2,3,22;57:11,12,
18;60:6;72:7;148:4,8;
167:12;181:2;198:7,
8,11;269:14,15;
271:6;273:18,20;
274:6;275:3;276:14,
16;277:25
convinced (1)
117:22
cooperation (1)
275:14
COOPERS (2)
3:10;8:7
copied (2)
113:16;155:14
copies (1)
88:6
copying (1)
190:11
corner (3)
222:12;281:13;
283:14
Corp (2)
130:21,25
corporate (52)
15:5;17:9,9;23:18;
24:11;25:6,8,20;
26:16,18,24;31:25;
32:3,7;42:18,19,25;
43:6,7,8;82:7,8;
84:15;124:21;131:2,
4,5;149:18,19,23;
150:2,4;219:22;
226:12;261:12,15;
262:19,21;266:11,15,

19,20,21,23;267:4,9,
13,15,20,23;268:20;
269:4
corporates (8)
42:22;70:4,13,16;
71:14;108:8;110:23;
111:3
correctly (5)
41:20;89:17;
201:23;207:17;212:5
correspond (3)
17:12;18:24;20:4
corruption (12)
266:10;268:6,9;
269:12,16,18;270:14,
24;271:4,7,9,15
Cortez (2)
92:15,18
cost (15)
81:13;82:21;96:2,9,
11,25;97:3,6,9,11;
186:9,17,20;188:21,
25
Costa (2)
92:6;93:17
costly (2)
185:13,18
costs (5)
81:16,19;82:11;
108:8,12
counsel (20)
7:16;9:8;10:10,13,
19,20,22;11:3,9,19,
19,23;12:3;26:3;58:6;
88:5;129:10;158:17;
202:11;271:20
count (2)
43:4;249:16
counterparties (1)
229:24
counterparty (6)
229:3,6;281:25;
282:6,12;285:5
counting (1)
26:5
countries (2)
25:17;30:11
country (21)
25:22,24;26:15,20;
27:3,14;29:6,10,14,
18,25;30:9;63:11;
73:12,15,18,23;81:7;
85:14;89:16;112:18
COUNTY (1)
292:5
couple (5)
63:15;155:21;
164:10;270:21;
285:20
coupons (1)
138:10
course (9)
9:7;34:22;57:13;

68:18;128:13;178:4,
19;244:23;251:22
Court (32)
7:14;8:23;18:14;
39:16;60:10;79:6,13;
92:13;98:10;105:24;
116:19;123:8;126:18;
130:8;151:18;159:12;
161:10;181:17;190:8;
199:19;207:23;
221:15;232:4;237:17;
240:4;243:14;247:5;
250:6;259:11;276:8;
282:17,20
covenant (9)
144:25;145:3;
148:21;150:19;
165:13;173:7,10,13,
17
covenants (4)
137:5,7;145:8;
254:3
coverage (3)
208:3;210:10;
211:23
covered (3)
62:5;274:5;275:5
covering (1)
70:12
create (4)
112:17;169:5,10;
175:9
created (1)
175:14
creating (2)
69:3;177:15
credentials (1)
14:15
Credit (99)
12:20,24;13:5,8,12;
17:9;21:10;23:18;
24:22,23,24,25;25:5,
6,8,14,21;26:18,25;
29:7;31:20,25;32:3,7,
20;33:24;34:6,13,19,
25;35:17;36:5,8,21,
24,25;37:5;42:18,25;
43:6,8;45:6;46:2;
59:4,5,9,16;62:5;65:4,
7,8;67:4;82:7;86:11;
87:18;88:25;89:5,21,
21,24,25;91:9;
101:14;102:10;
112:15;115:17,19;
124:21;125:21;126:4,
4;135:6,10;139:23;
140:8,12,17,19,20,21;
142:5;149:3;190:22;
192:5;193:20;197:21;
198:6;203:6;208:23;
218:5;226:21,22,23;
228:11;268:20,24,24;
269:4;274:24

creditors (6)
148:22;149:3;
150:18;186:7;202:22,
23
credits (11)
24:11;25:16;26:16;
29:5,8;62:5;86:14;
90:3;100:14;144:15;
268:21
crisis (1)
106:11
cross (1)
122:2
crossed (1)
217:17
Cunha (1)
182:24,25;183:3,17
currency (7)
178:3,7,16;216:16;
217:8,10;218:6
current (9)
14:18;106:13;
107:16,22;132:20;
153:9;172:21;200:10;
207:4
currently (3)
12:7;24:12;143:19
curve (9)
5:9;130:13;131:16,
20,23;133:20;142:5;
163:24;263:21
cut (7)
51:10;53:4,5;58:11,
11;88:5;262:18
cuts (7)
52:20;193:13,13;
194:8,12,12;255:7
cutting (2)
194:22,23
CVM (2)
5:14;181:20

# D

daily (6)
142:16,22,23,23,25;
143:5
D'AMATO (244)
7:24,24;8:4;10:5,
23,24;19:9;21:22;
22:15;23:16;26:2,6,
21;29:13;30:18;
31:18;32:13,24;
33:22;34:15;35:2,25;
36:12;37:10,17;38:5;
41:4,10;44:9,24;
45:13;46:3;49:11,18,
24;51:4,21;52:8,15;
53:6,12;55:10,16,18;
56:5,17,19;57:16;
58:4,9,11,25;59:10,
17;63:22;64:11;
66:14,25;67:19;69:5;

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL

71:2,9;72:25;73:10,
21;74:11,21;75:18;
76:14,23;77:8;81:20;
82:4,17,25;83:13,20;
84:12;85:6,16;86:24;
88:5,8,12,15,23;89:3;
90:15;92:2,7,25;
94:13,21,23;95:9;
99:19;100:22;101:2;
103:21;104:5,20;
107:2;108:5;113:7;
114:2;115:21;116:7;
119:24;120:23;121:6;
122:6;123:4,7,11;
124:17;125:14,17,23;
127:10,25;129:16,18;
134:25;135:25;
136:17;137:14,22;
139:12,17;140:13,18;
141:21;143:18,25;
145:14;146:11;
147:10;148:6;152:13;
155:7;158:19;160:25;
162:23;164:24;
168:12;170:18,25;
171:14,22;174:13,20;
175:4,16;176:24;
178:20;179:11,18;
180:24;182:7;183:12;
184:4,19;187:6;
188:6,23;189:5;
191:7;192:16;194:9;
195:11;196:10;197:4,
14;199:2;202:20;
209:5;210:18;211:3,
15;212:7,21;213:5,12,
25;214:21;215:12;
219:2;220:3;223:11;
225:4;227:4;228:4;
231:7,17;235:9;
238:5;239:24;241:14,
18;242:3,15,25;244:9,
24;245:19,23;249:7,
20,25;251:14;252:17;
254:11;255:19,25;
256:6,16,23;257:23;
258:14;259:5;260:5,
24;261:9;262:10;
263:17;264:16,20;
265:4,10;266:7,17;
267:2,11,25;269:2;
270:17;271:22;272:6;
276:3;282:20;285:19;
289:7;290:22,25

**D'Amato's (1)**
11:2
**danger (1)**
186:2
**Danielle (1)**
7:18
**date (9)**
7:10;146:17;
148:14;171:4;225:11;

282:6;288:24;289:5,
24
**dated (2)**
151:21;250:8
**David (4)**
8:1;92:14,18;
275:15
**day (10)**
9:7,14;143:2;
185:25;189:21;201:2;
205:17;245:7;288:25;
292:19
**days (2)**
155:21;184:14
**day-to-day (2)**
15:3;20:20
**de (1)**
93:17
**deadlines (3)**
165:18,19,19
**deaf (3)**
197:13,18,19
**deal (8)**
274:2;275:2;287:7,
24;289:9;290:5,6,11
**dealer (3)**
219:23;290:6,7
**dealing (1)**
252:7
**debt (19)**
51:17;65:13,25;
66:13;112:10,11;
138:4,7,9,10,13,14;
140:22;176:2,6,9;
180:17,19;226:12
**debt/EBITDA (1)**
51:25
**debt-to-EBITDA (1)**
52:5
**December (1)**
152:23
**decide (2)**
225:22;257:21
**decided (1)**
259:3
**decides (1)**
44:12
**decision (22)**
29:20;37:9,15,19;
44:14;45:14,23;47:3;
58:15,19;68:16;
85:19;86:10;103:6;
125:22,25;136:9;
144:5;252:21;257:18;
258:3;261:7
**decision-making (2)**
22:22;44:22
**decisions (15)**
23:2;25:25;31:17;
44:23;67:17;68:11;
69:9;138:15;213:21;
214:16;227:16,21;
252:15,19;256:4

**declare (1)**
8:11
**decline (1)**
114:4
**declining (1)**
114:10
**decrease (1)**
53:11
**dedicated (1)**
205:25
**default (17)**
145:7,11,13,19;
150:8;165:20;172:12,
14,18;177:21;186:3;
202:5;243:22;252:13;
254:8;255:15;256:9
**defend (1)**
114:17
**DEFENDANT (1)**
3:10
**DEFENDANTS (6)**
3:3;7:19,22;272:14,
16;275:20
**define (1)**
221:11
**defining (1)**
230:20
**degree (2)**
14:7,9
**degrees (1)**
14:13
**demand (5)**
70:18;71:16;149:3;
186:13;267:19
**department (3)**
162:12;184:13;
188:3
**dependent (2)**
193:4;225:21
**Depending (2)**
70:17;220:17
**depends (2)**
134:9;221:10
**deposed (1)**
8:21
**deposition (7)**
7:6;9:25;10:2;
11:20;83:24;93:10;
292:9
**depositions (1)**
26:4
**depressed (1)**
180:6
**derivative (3)**
89:21,22,25
**derivatives (2)**
13:5;89:24
**describe (3)**
15:25;16:3;283:10
**DESCRIPTION (2)**
5:2;6:2
**design (1)**
278:7

**designate (2)**
242:13;249:22
**desire (1)**
153:8
**desk (4)**
205:7;211:9;
216:19;232:16
**desks (2)**
211:13;219:23
**despite (1)**
66:13
**destroy (2)**
6:10;263:5
**determination (2)**
86:5;101:19
**determine (8)**
73:12,13;86:11,14,
17;155:20;154:2;
193:5
**determined (3)**
46:22;153:25;171:5
**determines (2)**
48:3,13
**determining (2)**
36:23;86:16
**developing (1)**
69:18
**developments (2)**
152:18;153:2
**dialogue (1)**
60:3
**died (1)**
75:14
**diesel (6)**
46:18;65:20,25;
67:10;84:3;109:10
**difference (7)**
74:2,7,19,22;86:20;
88:19;132:14
**differences (1)**
218:7
**different (41)**
27:4;42:4,6,9;53:3;
54:3;58:17;73:12;
74:2;90:8,9;100:14;
103:5,6;109:7;121:9,
19,19,21,24;131:20;
133:19;134:6;163:11;
166:22;169:8;191:17;
193:6;196:14;211:25;
212:11,12;213:17;
229:18;237:9;251:22,
23;261:10;262:5,16,
16
**differential (3)**
131:25;132:4,5
**difficulties (2)**
200:10,11
**diligence (2)**
230:18,20
**Dilma (15)**
75:2;76:9,13,17,21;
77:10,24;108:17,19,

19,25;111:14;112:13;
113:19;114:7
**Dilma's (2)**
77:6;109:4
**direct (7)**
71:19,22;140:7,16,
21;278:20;280:7
**direction (6)**
46:23;191:18;
192:22;193:6;258:5,6
**directions (1)**
121:20
**directly (3)**
14:24;70:9;132:18
**director (1)**
93:6
**disagreed (4)**
198:9,13,25;199:9
**discount (5)**
248:16,24;249:2,3,
6
**discretion (1)**
44:14
**discuss (10)**
22:19,25;53:18;
182:13;183:2;201:10;
203:11,17;270:14;
271:15
**discussed (21)**
10:12;21:2;42:8;
53:20;78:13;84:5,10;
94:2;163:19;181:5;
183:18,20,21,22;
191:15;198:5;251:21;
276:24,24;277:2;
286:13
**discussing (9)**
72:23;96:17;139:6;
157:20;168:9;248:19;
251:18,20;274:4
**discussion (31)**
46:17;59:24;69:7,7;
81:21;99:20;110:23;
139:2,4,7;144:21,24;
162:25;163:4;166:16,
18;173:9;178:6;
191:8,9;197:24;
202:13;212:15;
225:25;226:2;228:21,
23;247:19;248:6,16;
252:22
**discussions (18)**
23:2;50:15;52:19;
57:8,14;72:14;
144:25;149:23;
173:12,15;176:9;
184:24;191:4;199:8;
253:9;269:11;274:23;
278:10
**disk (7)**
97:25;98:5;158:22;
159:7;231:20,24;
291:2

**distinction (3)**
29:6;42:21;213:9
**distress (5)**
112:17,20;116:3;
179:7,21
**distressed (1)**
227:13
**distributing (1)**
263:12
**distribution (1)**
95:18
**dividend (7)**
180:22;181:4,8,9;
193:13;194:12,23
**dividends (3)**
181:12;194:4;
262:19
**dividing (1)**
215:9
**document (32)**
55:15;89:11;94:25;
104:10;134:16;142:4;
181:13;185:4;190:7;
203:23;221:18;232:7;
240:7;244:22;245:4;
279:8,9,12,25;280:15,
18;281:8,17,21,23;
282:18,19;283:2,8,23;
284:12,25
**documented (3)**
96:13,14;97:13
**documents (3)**
11:22;12:2;279:6
**dollar (4)**
64:20;239:4;
249:14,15
**dollar-denominated (1)**
217:20
**dollars (1)**
288:3
**domestic (11)**
47:6;65:24;66:12,
15,23,24;68:7,20;
69:2;111:22;112:6
**Domestically (1)**
65:21
**done (21)**
18:16,19;89:17;
140:14;147:12;
162:23;187:23,25;
188:16;194:22;219:4;
225:5,18;278:11;
284:2;285:7,11;
287:7,8,15;288:4
**doubt (8)**
202:2,3;281:22;
282:3,11;285:14,15,
16
**down (34)**
31:7,9,12;40:25;
51:13;64:23;69:20;
71:18,24;76:8;84:18;
87:8;93:16;98:18;

99:22;104:11;106:6;
107:8;109:19,20;
110:17;111:9;117:20;
130:20;138:12,19;
161:18;172:3;177:2;
189:21;209:4;235:25;
259:19;276:9
**downgrade (46)**
57:24,25;122:23,
24,25;123:3,23,24,25,
25;124:2,10,15,18;
125:3,7,10;126:21,22,
25;127:4,8,9,14,19,
24;128:4,8,11,15;
129:21,22,23;202:15,
19;245:8,11,12,15,21,
25,25;246:7,10,14,16
**downgraded (6)**
57:22;123:17,19;
124:13;246:11,19
**downgrades (1)**
124:25
**downward (1)**
106:25;113:22,23
**drafting (1)**
80:15
**drama (1)**
103:23
**draw (1)**
29:6
**drilling (6)**
99:9;102:17;
162:13,18,19;163:8
**Drive (2)**
3:6;86:9
**drought (12)**
108:2,3,6,11,14;
118:4,7,11,17;119:20,
21,22
**droughts (1)**
118:22
**DTC (6)**
243:9,11,17;244:2,
11,19
**due (7)**
54:7,18;57:6;75:21;
180:20,21;201:12
**During (39)**
9:7;12:2;14:21;
21:11,12;24:6;27:10;
30:13;32:19,23;40:3;
43:8;49:9;54:23;
62:10;68:2;70:10;
77:25;85:5;94:2;
95:20;110:7;144:25;
145:23;151:11;
163:13,18,20;176:8;
189:18,22;195:10;
227:20;228:3;266:15;
267:23;270:15;
271:11;274:5
**dynamic (1)**
78:4

**E**

**earlier (12)**
42:8;128:4;158:13;
184:15;220:9;227:24;
245:7;270:8;272:19;
276:13;279:4;280:9
**early (6)**
64:16;114:25;
144:17;195:10;
251:12,16
**earnings (3)**
47:23,25;82:16
**ears (3)**
197:13,18,19
**easier (1)**
132:10
**East (1)**
7:14
**easy (1)**
229:2
**EBITDA (9)**
47:10,15,15,18;
48:14;51:17;112:10,
11;140:22
**economic (1)**
108:25
**Economics (1)**
14:8
**economies (1)**
74:16
**economy (1)**
81:12
**ecosystem (1)**
84:15
**edge (1)**
132:24
**edited (1)**
80:17
**editing (1)**
130:19
**effect (18)**
58:14,22;68:11;
70:5,24;73:17;74:10;
82:24;108:3;119:22;
120:2,3;124:15;
128:16;175:2;178:7;
204:3;277:6
**efficient (1)**
188:25
**efforts (2)**
266:14;278:4
**either (7)**
47:22;74:14;89:8,
18;220:18;244:18;
268:15
**elaborate (1)**
179:23
**election (13)**
72:21,22;73:8,11,
17,19,23,23;109:2,5,
13,17;113:25

**elections (14)**
71:25;72:5,9,15,20;
73:5,7;75:17,20,21,
23;76:3;107:20;
111:16
**election's (1)**
73:9
**electricity (10)**
84:5;106:16;
107:24;108:7,9;
109:8;118:5;119:18,
19,19
**electronic (1)**
129:5
**Ellen (1)**
7:13
**else (24)**
10:25;11:8,20;12:5;
14:24;15:20;16:19;
25:5;28:22;34:8;
37:21;39:4;68:23;
73:9;148:2;171:8;
183:20;198:24;
214:15;263:9,12;
265:18,23,25
**EM (21)**
15:5;24:25;25:4,4,
11,14,16,20;130:21,
25;131:2,4;160:23;
161:3,6;207:9,11,18;
208:2,5;232:16
**E-mail (112)**
5:5,10,12,14,15,18;
6:10;39:18,20,24;
40:7;46:25;47:2;
56:13;57:3;60:12,17,
19;62:25;63:9;72:12;
76:24;92:14,16,23;
93:2,5,21,22;98:12,
14;101:3,25;102:13;
106:3,4,7;109:15,16;
113:2,4,17;116:10;
118:19;129:3,15;
130:10,14;131:2,24;
134:7,11,19;151:20,
24;152:4,9,20;
153:18;154:9,14;
155:15,18;156:13,14;
159:16,19,22;160:6,9;
161:2,8,15;164:10,22;
165:2,5;178:3;
181:20;182:15;185:5;
190:10,14,19;192:3;
193:8;195:2,18;
196:20;197:20;
199:12,22,24;200:4,7,
23;201:6;208:15;
210:6,24;211:23;
212:18;213:24;
214:18;259:13,15;
260:9;263:3,4;278:7;
279:2,3
**e-mails (6)**

159:25;176:21;
197:6;278:19;279:3,3
**Emanuel (1)**
7:24
**EMBI (5)**
42:13,17,20,20,24
**E-M-B-I (1)**
42:20
**Emerging (29)**
5:21,24;6:4,15;
12:8,22,24;13:10,15,
18,24,25;14:3;17:6,7;
24:19;42:18,19,19,22;
79:16;87:4;88:9;
131:5;160:17;206:22;
207:7,14;240:16
**Employees (2)**
8:2;275:17
**employment (2)**
14:22;16:17
**end (26)**
21:13;65:5;81:3;
84:19;92:20;94:19;
97:25;110:22;132:24;
142:4;154:9,20;
155:9;157:9,13,16;
158:22;162:7;171:5;
174:25;179:17;
180:15;200:23;
231:20;270:22;291:2
**ending (11)**
46:9;120:8;160:4;
177:5;190:21;192:2;
247:12;248:7;250:14;
254:13;291:4
**ends (10)**
48:25;49:2;71:25;
80:23;87:3;95:8;
104:11;117:6,11;
185:5
**energy (1)**
119:11
**English (1)**
28:5
**enjoy (1)**
225:24
**ensue (1)**
256:10
**ensure (3)**
108:18;109:2;150:7
**ensuring (1)**
255:14
**enter (4)**
120:17;150:7;
204:13;205:22
**entered (14)**
222:22;233:9,9,13,
24,25;234:4,6;239:6,
14,16;241:2;282:8;
287:10
**entire (1)**
224:9
**entirety (4)**

14:22;27:10;37:5;
43:9
**entities (1)**
17:16
**entitled (5)**
46:10;80:24;87:4;
159:17;160:7
**entity (6)**
99:8;221:4;235:18;
237:13;242:2,11
**entry (2)**
234:20;241:9
**environment (3)**
35:11;107:6,23
**equaled (1)**
191:5
**equals (5)**
178:25;179:4,16;
190:25;192:8
**equity (11)**
21:18;51:12;82:7,8;
128:21;193:14;
194:12,23;220:7,10,
13
**ERS (2)**
275:18;281:9
**especially (2)**
123:9;218:4
**essentially (2)**
42:25;283:23
**estimate (2)**
255:10;257:4
**estimation (6)**
33:4,10;101:12;
124:21;125:20;
200:11
**et (1)**
102:23
**ethics (1)**
268:12
**euro (13)**
217:3,6,6,7,8,9,10,
11,14,16,16,17;218:9
**Euroclear (23)**
237:14,16,20;
238:8,10,11,14,15,18;
242:17,20,22,24;
243:7,9,11,17,21,25;
244:4,8,11,18
**E-u-r-o-c-l-e-a-r (1)**
237:18
**Europe (8)**
206:8,11;211:13;
212:18;213:3;215:25;
217:5,22
**European (5)**
25:5,6,8;244:7,10
**evaluating (2)**
26:24;267:12
**evaluation (1)**
171:25
**even (17)**
54:19;55:4;63:18;

64:4;81:6,6;132:25;
134:12;176:20;187:6;
192:13;218:8;241:23,
25;256:25;258:13;
263:19
**everybody (9)**
26:7;165:16,17,22,
25;166:2;172:5,8;
263:12
**everyone (12)**
69:9;71:25;106:8,
11,19,20;107:4,5;
171:8;172:10;206:23;
215:20
**everyone's (1)**
263:13
**everywhere (1)**
113:15
**ex (1)**
110:24
**exact (2)**
120:14;183:9
**Exactly (27)**
15:18;16:23;63:13;
101:24;115:15;131:6;
160:16;162:5,17;
168:17;174:3;183:9;
191:23;200:9;207:5,
20,22;215:4;218:12;
222:21;223:9;234:10,
12,16;242:9;246:21;
277:8
**exaggeration (1)**
263:8
**EXAMINATION (5)**
8:15;159:5;272:10;
275:10;285:22
**examined (2)**
254:15;256:21
**example (7)**
96:18;113:18;
126:14;132:13;
140:22;207:13;243:8
**exceeded (1)**
210:4
**except (1)**
111:3
**exception (1)**
216:18
**exceptions (4)**
216:12,13,14;220:2
**exchange (13)**
31:16,22;32:2;
63:24;64:9,16,21,24;
65:3,6;177:22,25;
178:7
**exchanges (1)**
279:3
**exchanging (2)**
249:10,10
**exciting (1)**
207:24
**exclusively (2)**

15:19;24:19
**excuse (4)**
7:13;11:17;265:20;
272:18
**ex-director (1)**
93:17
**execute (9)**
211:9;212:13,17;
215:18,23;224:8;
243:16;261:21;
262:17
**executed (13)**
204:19;210:13;
211:19;221:9;224:5,
20;230:6;232:19;
235:17;281:24;282:4;
285:4;287:4
**executing (2)**
225:13;262:15
**execution (5)**
205:7;211:17;
232:15,17;262:12
**executives (2)**
110:16;270:15
**Exhibit (81)**
5:3,5,10,12,14,15,
18,20,23;6:3,6,8,10,
14;39:12,17;60:7,11;
79:9,14;84:11;92:9,
14;94:9,10;98:6,11;
105:21,24,25;106:2;
115:12;116:15,20;
130:5,9;151:14,19;
159:8,15,15;181:14,
18;190:3,10;199:15,
20,21;221:12,16;
231:25;232:5,5;
234:6,11,19;235:4;
239:25;240:5;246:25;
247:6;250:2,6;259:8,
12;278:21,22;279:8,
19,20,23;280:7;
282:18,23;283:6,24;
284:3;285:24;286:12,
13;289:22
**EXHIBITS (2)**
6:19;279:4
**exit (1)**
120:18
**expand (1)**
66:22
**expect (5)**
60:3;72:19;176:12;
210:20;219:5
**expectation (2)**
35:3;176:22
**expected (1)**
147:9
**expense (1)**
176:3
**expensive (4)**
96:17;185:24,25;
186:4

**experience (11)**
45:23;145:7;150:5;
151:2,7;167:19;
242:23;244:7;252:5;
281:20;285:2
**experiencing (1)**
107:23
**Ex-Petrobras (1)**
93:6
**explain (9)**
18:2;64:25;132:11;
186:5,19;188:2;
200:19;242:19;
277:13
**explanation (1)**
129:13
**exposure (1)**
24:22
**extent (3)**
31:5;228:21;271:8
**external (3)**
84:7;142:13;167:5
**externally (2)**
80:7,12
**extort (1)**
188:17
**extreme (2)**
249:3,6
**Ezio (1)**
75:13

**F**

**face (1)**
237:13
**faced (3)**
85:11;167:21;
200:12
**facets (1)**
198:17
**facility (1)**
86:13
**facing (4)**
252:8,9;284:22;
285:10
**fact (20)**
47:8;68:13;73:8;
107:21;111:19;
121:18;157:8;168:15;
169:5,8,11;170:20;
197:6;200:12;218:23;
237:22;265:13,20;
277:14;282:5
**factor (31)**
30:19;32:20;35:19,
21,24;36:3,4;37:19,
25;38:3,4;46:6;64:12;
66:9,9;73:3,5,7;83:3,
4,11;85:20;125:24;
136:8;140:20;144:16;
177:19;178:2;195:24;
252:21;266:5
**factored (1)**

118:13
**factors (41)**
26:17,19,22,24;
29:19;31:19;35:16;
36:25;38:6,8,9,11,12;
52:17;57:25;66:6;
68:15;70:14;81:11;
82:6,13,18;85:18,19;
103:5,7,8;128:18;
138:5,18;144:13;
145:22;175:21,22,24;
176:25;255:16;258:2,
7;265:24;266:3
**facts (2)**
170:11
**fail (3)**
172:7,20,22
**failures (1)**
102:22
**fair (11)**
44:6;71:12;86:5,7,
11,18;146:24;225:14;
272:23;273:3;283:22
**fall (4)**
72:18;125:4;
245:12;270:15
**falling (4)**
186:2;197:13,18,19
**familiar (3)**
220:24;230:2;237:8
**far (10)**
86:3,4,17,18;
101:12;132:4;133:5,
16;141:14;254:2
**favorable (2)**
111:20;258:12
**fear (6)**
157:25;174:14,18,
25;175:8,13
**February (15)**
125:8;129:22;
150:21;181:25;
184:18;185:6;188:12;
189:23;192:22;193:8;
195:10;196:20;
199:22;246:10;
258:24
**federal (1)**
92:6
**fee (1)**
188:17
**feedback (1)**
19:12
**feel (2)**
91:15;163:24
**feeling (1)**
69:21
**feet (1)**
111:15
**felt (3)**
55:11,13;197:17
**few (7)**
56:3;63:16;87:21;

155:12;272:8;275:8;
276:10
**field (4)**
100:2,6
**fields (1)**
99:25
**Figueroa (1)**
7:11
**figure (1)**
130:4
**file (23)**
145:25;146:2,9,21;
147:6,9,15,19,20;
149:2;156:12;157:18,
19,22;173:16;174:6;
177:20;201:11;
252:12;253:17,22,24;
254:6
**filed (16)**
146:15;150:11;
157:8;165:9,11,13;
171:12,21;187:20;
253:11,16;255:14;
258:4,13;264:10,13
**files (1)**
281:8
**filing (24)**
145:5,9;148:15,20,
23,25;157:2,25;
165:19;173:17;174:2;
175:8,14,23;189:8;
191:18,19,20;194:22;
201:24,25,25;202:12;
256:8
**filings (1)**
264:19
**finance (7)**
149:19;162:12;
173:5,11;183:21;
184:12;188:2
**Financial (25)**
27:25;55:7;95:2;
96:15;136:7,23;
146:16;147:2,6,15,20;
150:11;153:10,25;
156:4,8,10;157:2;
165:8,20;169:12;
187:15;201:24;253:7;
268:4
**financials (59)**
137:4,5;145:5,10,
25;146:2,10,22;
153:21;156:12;
157:18,19,23;158:2;
164:6;168:11;171:4,
12,21,24;174:2,7,7,
177:20;185:11;
187:20,23,24;189:4,7,
8;201:21;203:13;
250:25;251:10,10,13,
19,24;252:10,12,23;
253:3,5,5,8,10,15,17,
23,25;254:3,4,6;

255:14;257:11;
258:13;264:11,14
**find (1)**
76:16;170:6;
225:24;278:23
**finding (2)**
18:15;187:15
**fine (1)**
26:11
**finish (7)**
125:15;178:20;
207:25;209:5;220:4;
276:4;288:11
**finished (1)**
9:4
**fire (5)**
18:16;120:10,12;
122:10,11
**firm (6)**
11:2;200:8;223:23;
260:7;272:13;275:16
**firms (1)**
167:9
**Firm-wide (3)**
259:20,23;260:2
**first (36)**
16:4;31:2;33:13;
40:8,22;61:19;63:18;
76:9,17;77:21;78:2;
81:3,12;98:23;
104:14,19;106:6,6;
134:15;147:8;152:6,
9;154:20;156:13;
165:5;169:12,20;
171:10;180:2;185:4,
22;196:19;245:21;
246:6,14;260:9
**five (20)**
16:20,21;19:23;
30:14,23;31:14,23;
32:19,23;33:3,20;
36:11;43:9;47:7;49:9,
16;54:23;57:13,19;
271:21
**five-year (1)**
89:21
**fix (1)**
108:25
**Fixed (9)**
5:20,23;6:3,14;
46:18,20;109:9;
128:22;240:9
**fixed-income (1)**
21:2
**fixed-price (2)**
46:14,16
**fixes (1)**
47:21
**fixing (1)**
109:4
**flexibility (1)**
95:2;194:3
**flip (1)**

279:10
**FLOM (1)**
3:4
**flow (5)**
35:10;50:14,24;
140:2;181:11
**flows (1)**
35:20
**fluid (1)**
154:23
**focal (1)**
271:16
**focus (5)**
12:23;13:7,9;17:5;
131:24
**focused (3)**
13:3;187:10;199:5
**focusing (3)**
30:9;118:8,10
**Folha (1)**
28:4
**folks (2)**
78:16;155:14
**follow (3)**
27:19,21;134:10
**followed (2)**
73:13;164:19
**following (4)**
81:8;84:19;154:14;
178:5
**foreign (3)**
31:16,22;32:2;
63:24;64:9,16,21,24;
65:3,6;177:22,24;
178:7
**form (209)**
9:8;21:22;22:15;
23:16;26:2;27:3;
29:13;30:18;31:18;
32:13,24;33:22;
34:15;35:2,25;36:12;
37:10,17;38:5;41:4,
10;44:9,24;45:13;
46:3;49:11,18,24;
51:4,21;52:15;53:6,
12;55:10;56:19;
57:16;58:4,25;59:10,
17;63:22;64:11;
66:14,25;67:19;69:5;
71:2,9;72:25;73:10,
21;74:11,21;75:18;
76:14,23;77:8;81:20;
82:4,17,25;83:13;
84:12;85:6,16;88:23;
89:3;90:15;92:2,7,25;
94:13;95:9;99:19;
100:22;101:2;103:21;
104:5;107:2;108:5;
113:7;114:2;115:21;
116:7;119:24;120:23;
121:6;122:6;124:17;
125:23;127:10,25;
134:25;135:25;

136:17;137:14,22;
139:12,17;140:13,18;
141:21;143:18,25;
145:14;146:11;147:3,
10;148:6;160:25;
164:24;168:12;
170:18,25;171:14,22;
174:13,20;175:4,16;
176:24;179:11,18;
180:24;182:7;183:12;
184:4,19;188:6,23;
189:5;191:7;192:16;
194:9;195:11;196:10;
197:4,14,15;199:2;
202:20;208:8;210:18;
211:3,15;212:7,21;
213:5,12,25;214:21;
215:12;216:23;
218:15,25;219:2;
221:18;225:3;227:4;
228:4;229:10;231:7;
232:7;235:9;236:10;
238:5;240:7;241:14,
18;242:3,15,25;244:9,
24;245:19,23;249:7;
251:14;252:17;
254:11;255:19;256:6,
16,23;257:23;258:14;
259:5;260:5,24;
261:9;262:10;263:17;
264:16,20;265:4,10,
11;266:7,17;267:2,11,
25;269:2;270:17;
277:11;282:2;285:6;
287:5;289:7
**formally (1)**
167:10
**forms (1)**
27:4
**Forward (8)**
130:12;154:11;
155:20;156:18;
159:18;190:12;
199:23;263:9
**forwarded (3)**
155:17,20;159:23
**forwards (1)**
192:5
**Foster (1)**
156:20
**Four (5)**
16:15,20;28:13;
29:11;194:13
**fourth (4)**
84:7;93:16;253:17,
22
**fourth-quarter (3)**
253:22,25;254:5
**frame (4)**
106:15;136:15;
148:15;206:18
**Francisco (1)**
19:16

**frank (1)**
37:12;89:6;167:16
**fraud (6)**
138:20;139:18;
141:13,15,23,25
**Friday (3)**
7:1,10;159:2
**front (6)**
40:25;199:12;
278:21;279:3;280:9;
283:6
**frontrunner (1)**
75:15
**frustrated (1)**
183:25
**full (1)**
184:20
**full-year (1)**
264:14
**fun (1)**
120:25
**function (8)**
77:12;132:20;
144:12;193:12;216:8;
243:19;257:2;266:10
**fund (8)**
20:7,9;112:16;
137:6,11;174:10;
200:13;260:22
**fundamental (4)**
35:4,5,7
**fundamentals (4)**
34:13,24;35:13;
174:19
**funding (4)**
50:9;138:3,7,14
**funds (3)**
17:17;44:20;261:3
**funny (1)**
187:7
**further (8)**
101:8;109:19;
111:9;272:4;275:7;
285:18,22;290:17
**Future (6)**
35:20;82:9;137:16,
20;138:5,6
**FX (1)**
63:18

## G

**GABAY (3)**
3:13;8:6,6
**game (2)**
187:25;188:15
**gap (2)**
172:21;192:25
**gas (8)**
47:6;49:17,20,22;
65:18;93:18;99:11;
111:23
**gasoline (7)**

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL

46:18;47:3;65:19,
24;67:10;84:3;109:10
**gave (1)**
266:3
**general (27)**
22:14;29:15;35:10;
38:10;42:22;50:18,
21;56:11;66:11;67:2;
76:5;97:9;106:10,21,
24;107:12,14;113:3;
121:17;122:22;
128:18;139:7;198:12;
200:20;242:10;
255:24;266:20
**generalization (3)**
106:23;121:17;
122:3
**generally (12)**
25:10;32:10;131:8;
163:12;204:14;
205:22;227:8;274:23;
278:10;279:5;280:14;
281:18
**gentleman (1)**
75:14
**geographical (1)**
13:9
**geography (1)**
49:23
**German (1)**
19:8
**gets (3)**
112:15;123:12;
217:23
**gist (1)**
66:11
**given (18)**
9:10;36:24;37:5,16;
44:7,13,18,21;45:25;
46:2;50:9;81:15;
88:20;209:2;237:21;
249:11;275:2;292:11
**gives (1)**
250:23
**giving (5)**
9:22;243:8;260:14;
278:11;280:14
**glance (1)**
109:8
**glaring (1)**
197:22
**Glbl (1)**
224:15
**global (17)**
24:23,24;25:4,5,7;
84:8;212:15,23;
213:3,10,14;214:5;
218:22;224:18;
229:17,21;272:17
**globally (2)**
215:21;218:23
**goes (7)**
37:14,22;50:6;51:7;

54:5;93:19;173:2
**Goldsmith (34)**
8:1,1;19:13;26:3,9,
12;45:18,21;74:12;
147:3;197:15;205:11,
14,16;208:8;216:23;
218:15,25;225:3;
229:10;236:10;
265:11;275:8,11,15;
276:5;277:12;282:9,
22,25;285:12,17;
287:5;290:21
**Gomez (18)**
11:13;14:20,21;
16:12;155:16;160:2,
6,9;161:16;164:12,
21;173:2;177:5;
179:3;181:21;185:6,
19;223:24
**Gomez's (5)**
16:10;164:9;165:5;
178:3;179:16
**Good (33)**
5:18;7:6;8:17;
45:25,25;50:4;51:18;
63:7,23;72:10;77:7,
11;97:24;100:25;
101:10;110:24;111:3,
7;113:18;116:6;
149:7,11,15,16;
159:11;167:17;
194:13;199:23;
200:24;203:3;219:14;
275:12,13
**Google (2)**
28:8,10
**Gottlieb (1)**
7:18
**governance (14)**
262:20,21;266:15,
20,21,24;267:4,9,13,
15,21,23;268:20;
269:5
**governance's (1)**
266:12
**government (17)**
46:21,23;47:5;83:7;
88:20;89:16,20;
114:5,10,16,20;115:2,
4,7;166:4,6;172:6
**government's (1)**
33:15
**Graca (4)**
158:5,8,14;192:25
**grade (12)**
42:12;122:25;
123:20;125:11;
126:15;128:5,8;
129:24;245:25;246:8,
11,20
**Granted (1)**
102:3
**Grauer (1)**

7:13
**great (1)**
119:7
**greater (1)**
254:8
**Gross (6)**
223:16,25;280:22;
284:6,8;287:13
**Gross's (1)**
280:24
**group (19)**
12:9;61:9,10;63:2;
131:2;148:18;161:2,
8;162:13,18,19,22;
163:8,10,13,15,20;
240:17;260:15
**groups (2)**
212:12;260:7
**growth (2)**
84:8;197:25
**guess (18)**
28:23;63:24;67:9;
78:7;82:8;113:8;
116:13;138:3;154:15;
172:12;203:20;
230:12,13;235:11;
236:5;241:6;273:12;
274:19
**guidance (1)**
199:10
**guided (1)**
176:19
**guideline (4)**
208:22,23,25;
209:16
**guidelines (11)**
10:2;204:17;
208:18,20,21,23;
209:3,8,9,13;220:22
**Guilherme (1)**
151:21
**guys (1)**
217:16

**H**

**Haaf (3)**
240:13,15,22
**Hamilton (1)**
7:19
**hand (3)**
8:10;17:21;129:18
**handed (19)**
39:16;60:10;79:13;
92:13;98:10;105:24;
116:19;130:8;151:18;
159:14;181:17;190:9;
199:19;221:15;232:4;
240:4;247:5;250:6;
259:11
**happen (13)**
108:18;126:2;
139:9,11,16;191:10;

218:10,13,16;224:10,
11;233:15;281:4
**happened (11)**
72:20;78:21;
124:10;144:25;
149:13;156:24;164:4;
246:22;289:10,11,14
**happening (5)**
77:3;91:13;127:2;
139:14;182:5
**happens (3)**
210:23;218:24;
287:13
**hard (9)**
26:23;83:3;166:10;
168:23;169:3,5;
189:19;256:24;257:3
**harder (1)**
161:14
**Haspa (3)**
19:4,5,7
**Hawaii (5)**
8:3;275:18,18,23;
281:9
**hazard (1)**
241:6
**head (7)**
9:2,2;119:15;135:3;
137:8;146:3;220:14
**heading (1)**
106:25
**headwinds (2)**
69:21,25
**health (1)**
55:7
**hear (4)**
17:22;41:20;45:18;
243:4
**hearing (1)**
278:11
**hedge (2)**
174:10;200:12
**height- (1)**
252:2
**heightened (5)**
139:21;157:25;
174:14,18,25
**held (6)**
12:10;55:3;99:20;
126:23;162:25;163:4
**Helms (1)**
148:3
**help (11)**
18:21;28:10;
104:14;113:24;
150:10;153:13;
154:11;178:6,9;
202:14;203:8
**helped (1)**
11:23
**helpful (4)**
15:13;19:2;20:5;
22:9

218:10,13,16;224:10,
11;233:15;281:4
**hence (1)**
111:14
**hereby (1)**
292:7
**herself (1)**
197:6
**hesitating (1)**
116:9
**high (25)**
13:15,20,23;50:23;
54:19;81:13,15;
82:11;83:6;112:10,
11;138:10;148:21,25;
156:3,9,11;173:22;
181:10;196:17;203:4;
246:2,7,12,20
**high-employee (1)**
82:19
**higher (4)**
149:17;186:2;
188:17;267:20
**highlight (1)**
121:18
**highlighted (1)**
118:23
**highlighting (3)**
103:4;106:21;119:8
**highlights (4)**
102:13;135:7;
139:23;197:22
**highly (11)**
84:23;85:4,8,8;
112:16;176:10;187:5,
9;203:3;225:21;
230:14
**himself (2)**
182:13;241:3
**hindsight (2)**
176:16;180:7
**hire (1)**
17:16
**hired (1)**
18:6
**histogram (1)**
132:24
**historical (9)**
35:22;36:4,10,19;
131:25;132:4,5,11,14
**history (1)**
168:15
**hoc (1)**
23:24
**hold (7)**
14:15;36:23;37:16;
68:12,16;127:20;
134:16
**holders (2)**
134:12,14
**holding (2)**
21:4;114:5
**holds (1)**
67:17
**honest (2)**

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL

132:25;235:3
**Hong (1)**
  216:9
**hope (2)**
  188:24;191:16
**hoping (1)**
  156:19
**hopped (1)**
  70:23
**horizon (1)**
  91:17
**hours (1)**
  10:14
**HRS (2)**
  221:17;283:2
**HSBC (1)**
  272:17
**humor (1)**
  122:13
**humorous (1)**
  120:17
**hundred (1)**
  101:6
**Hunter (1)**
  290:18
**hurting (4)**
  66:16,24;67:4,7
**hypothesize (2)**
  73:25;74:13
**hypothesizing (1)**
  237:21
**hypothetical (2)**
  167:20;168:14
**hypothetically (2)**
  139:8;218:2

**I**

**ID (3)**
  5:2;6:2;229:13
**idea (5)**
  129:7;167:17;
  184:2;212:3;219:14
**ideas (1)**
  227:11
**identification (31)**
  39:13,17;60:8,11;
  79:10;92:10;98:7,11;
  105:22;116:16;130:6,
  9;151:15,19;159:9,
  15;181:15,18;190:4,
  9;199:16,20;221:13,
  16;232:2;240:2;
  247:2;250:3;259:9,
  12;282:24
**identified (3)**
  43:13;112:24;
  280:22
**identify (7)**
  7:16;33:14,16,17,
  18;38:12;288:17
**ie (1)**
  140:21

**IFRS (1)**
  202:2
**IG (3)**
  54:7,15;57:5
**ignored (2)**
  111:13;112:5
**III (1)**
  223:16
**Illinois (1)**
  3:7
**illiquid (3)**
  120:20;122:17;
  123:20
**illiquidity (5)**
  124:3,5,7;128:11;
  245:8
**imagine (11)**
  24:2;62:4;78:18;
  144:24;157:11;180:7;
  181:7;183:14;253:6;
  277:22;288:19
**immediate (2)**
  103:10;195:23
**immediately (6)**
  6:11;17:21;149:4;
  150:18;248:9;263:5
**impact (15)**
  59:8,15;64:15;65:7;
  103:19;109:3;119:20;
  128:20;137:10;140:7,
  11,16,21;153:11;
  175:7
**impacted (2)**
  31:3,6
**impacting (1)**
  82:2
**impacts (3)**
  59:4;140:23;141:2
**impairment (1)**
  139:25
**Impatient (1)**
  125:18
**imperiled (1)**
  137:21
**implement (1)**
  215:5
**implication (7)**
  47:20,25;48:9;52:6,
  9;54:21;83:15
**implications (1)**
  64:8
**implicit (2)**
  64:22,25
**implied (1)**
  105:8
**implying (1)**
  105:16
**importance (3)**
  187:10;188:12;
  274:3
**important (22)**
  35:13,23;37:18;
  52:14;65:13,25;66:9;

72:22;87:14;110:15;
  123:12;136:8,11;
  183:5;203:5;245:24;
  246:5;253:21,22,24;
  265:13;266:5
**importantly (1)**
  252:22
**imposed (1)**
  47:6
**impression (1)**
  258:15
**impressions (1)**
  71:4
**improve (1)**
  194:11
**improves (2)**
  87:5;88:9
**inability (2)**
  137:16;177:20
**inadvertently (1)**
  263:13
**Inaudible (1)**
  72:16
**Inc (4)**
  178:25;179:4,16;
  229:17
**include (2)**
  36:20;254:25
**included (2)**
  36:19;166:3
**including (1)**
  36:10
**inclusion (1)**
  42:22
**Income (9)**
  5:20,23;6:3,14;
  35:9;128:22;140:3;
  240:10;249:17
**incomplete (1)**
  168:16
**inconsistencies (1)**
  197:23
**incorporate (2)**
  25:24;26:15
**incorrect (2)**
  236:9,12
**increase (4)**
  6:11;33:24;260:10,
  14
**increased (7)**
  101:14;108:6;
  139:21;145:9;169:10;
  186:9,16
**increasing (3)**
  108:7,11;186:21
**incumbent (2)**
  75:2;108:20
**indeed (1)**
  98:17
**independent (1)**
  182:12
**INDEPENDENTES (2)**
  3:11;8:7

**index (5)**
  41:16,24;42:19,20;
  143:16
**indicate (1)**
  90:23
**indication (1)**
  250:24
**indications (1)**
  254:17
**indicia (2)**
  280:18;281:19
**indirect (2)**
  71:19,22
**indirectly (1)**
  120:4
**individual (4)**
  272:15;275:23;
  288:18;290:13
**individuals (3)**
  10:21;11:18;186:24
**industry (1)**
  71:17
**infer (5)**
  70:2;76:24;118:19;
  177:14;193:17
**inferring (2)**
  107:14;194:15
**informally (1)**
  34:8
**information (19)**
  135:20;164:20;
  168:17;203:22;
  208:14;227:8;277:7,
  14,17,23;278:5,7,8,
  16;279:2,13,16;280:3,
  5
**informational (1)**
  163:22
**informative (2)**
  225:24;226:2
**infrastructure (2)**
  81:24;82:23;95:12,
  15,17
**INIT (1)**
  280:20
**initial (2)**
  146:4;245:11
**initially (2)**
  147:9;183:7
**initials (5)**
  223:6,13;232:22;
  233:4;280:19
**in-person (1)**
  277:25
**input (10)**
  96:20;130:16,17;
  171:6;204:25;208:18;
  211:8;214:24,25;
  215:7
**inputs (8)**
  47:22;48:3,5,6,9,
  13;49:3;67:11
**inside (7)**

30:7;104:10;117:5;
  190:21;197:9;233:20;
  239:13
**insights (1)**
  84:21
**insinuation (1)**
  75:23
**instances (4)**
  65:8;85:13;197:12;
  198:4
**instead (5)**
  116:11;148:22;
  149:15;244:2;249:12
**instruction (3)**
  9:10;219:9,13
**instruments (1)**
  91:9
**insurance (1)**
  187:21
**intended (1)**
  276:23
**interacted (1)**
  106:22
**interest (6)**
  30:16,22,24;31:2,9;
  176:3;188:20
**interested (1)**
  270:9
**interesting (1)**
  227:11
**interim (1)**
  193:3
**interior (1)**
  104:17
**internally (1)**
  80:6
**International (3)**
  229:19,25;230:3
**internationally (1)**
  239:11
**interpret (6)**
  42:16;48:5;58:18;
  83:22,25;119:10
**interpretation (9)**
  43:10;67:2;86:4,7;
  97:17,19;179:20;
  195:18,19
**interpreted (1)**
  76:18
**interrupt (1)**
  58:5
**interruption (3)**
  72:16;214:8;279:21
**intimated (1)**
  109:21
**into (45)**
  5:8;25:16,21,24;
  26:15;32:18;36:22,
  25;37:14,19,22;
  103:5;113:16,24;
  118:14;130:13;
  131:15,20;133:19;
  141:7;175:2;177:7,

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL

12;186:2;202:4;
203:4;204:13,25;
205:22;208:18;211:8,
10,10,10,14,16,17;
215:3,7;233:13,15,16,
25;258:3;267:15
**invented (1)**
129:6
**invest (13)**
29:5;72:23;85:14;
86:12;101:20;127:21;
137:12,16,20;208:6;
261:8;267:9,16
**invested (9)**
23:14;36:8;101:15,
18;110:16;257:7,8;
263:22;264:7
**investigation (4)**
91:25;93:23;
103:19;271:7
**investigations (2)**
94:3;271:18
**investing (9)**
25:16,17,20;30:11;
99:16;127:13;261:25;
262:5,8
**investment (52)**
25:13,25;27:15;
29:20;31:17;37:9,15,
19;42:12;44:23;
45:15,16,25;46:2;
58:19;73:3;81:25;
85:17,19;86:10;
91:23;94:12,16;
95:11;101:21;103:5;
116:6;122:25;123:20;
125:11,22,25;126:2,
15,15;127:20;128:5,
8;129:23;136:9;
137:6,11;144:10;
160:10,12;203:24;
245:25;246:8,11,20;
258:9,21
**investment-grade (13)**
54:14,18;56:4,14;
57:10;61:9,10,11;
126:14,19,20;203:6;
245:16
**investment-grade-only (1)**
42:10
**investments (20)**
21:3,7,8;22:20;
25:10,11;30:23;31:3,
6;32:12;95:15,17;
112:25;113:5;134:23;
138:15;149:6;252:16,
20;265:9
**investor (4)**
112:19;128:22;
162:15,17
**investors (3)**
91:16;170:15;
188:11

**invited (1)**
158:5
**involved (8)**
149:22,22;173:9,
12;262:7;274:22;
289:9;290:6
**involvement (1)**
83:7
**IR (3)**
162:12,13,15
**Irregular (1)**
23:11
**Ismael (1)**
28:23
**issuance (6)**
193:14;194:13,24;
257:19,22;289:4
**issuances (1)**
230:22
**issue (24)**
34:2;50:8;51:11;
137:6;160:23;161:6;
173:20,25;174:5;
195:4,13;196:5,15;
224:12;230:12;
248:16,24;283:20;
284:22;287:6,16,20,
21;288:3
**issued (5)**
89:16,19;164:6;
219:7;249:2
**issuer (13)**
34:13,24;35:20,22;
36:24;37:5,16;44:13;
103:14;122:14;
209:10,22;274:25
**issuers (6)**
20:23;32:11;
100:14;267:8,16;
273:7
**issuer's (2)**
103:11;209:2
**issues (11)**
102:4,8;126:7;
153:9;173:4;178:7;
191:18,19;262:20,21;
273:16
**issuing (2)**
219:13;249:5
**items (1)**
141:7
**Ivan (11)**
5:19;147:24;151:2,
11;199:23;200:8,14,
24;203:12,17;276:18

---

**J**

**January (21)**
38:17;104:12;
151:21;152:4;155:21;
156:17,22,25;157:9,
13,16;158:9;159:17;

162:7,11;174:25;
175:6;176:8;179:17;
188:12;270:22
**Jato (8)**
91:25;103:18,23;
104:8;262:23;269:8;
270:8,12
**Jeff (1)**
290:18
**JML (1)**
286:24
**job (5)**
12:16;119:7;
128:24;161:13;
200:15
**John (1)**
7:24
**Johnson (3)**
236:2;239:2;285:9;
287:12
**join (1)**
12:12
**joined (5)**
12:17;23:15;24:6;
38:25;200:8
**joke (2)**
120:17;121:17
**JON (2)**
3:19;7:12
**Jonas (2)**
288:15,20
**Journal (1)**
27:25
**JP (27)**
13:13,14,16,17,18,
19,23,25;14:2;43:19,
21;272:18;284:13,16,
18,21,22;285:10;
286:15,16,17,20,23;
287:2,16,21;288:20
**JPM (2)**
226:20;272:18
**JPS (4)**
284:14,17,21;
286:14
**JSR (1)**
7:9
**Judging (1)**
232:22
**judgment (7)**
45:11,16;124:12;
126:4;127:12;188:8;
269:4
**judgments (2)**
84:22;139:20
**June (9)**
12:15,17;206:18,
19,20;228:6;257:6,8;
259:14
**justified (2)**
58:19,21

---

**K**

**keep (10)**
26:7;102:16;
111:15,19;113:15;
121:18;123:8,8,11;
154:23
**kept (2)**
114:9;245:16
**key (7)**
40:11;179:22;
195:4,13;196:5,15;
290:10
**Kiesel (5)**
61:2,4,4;78:12;
79:17
**Kiesel's (1)**
61:6
**kind (12)**
22:14;89:24;
102:22;130:17;
163:24;170:11;
176:11;194:24;
208:21;217:17;227:8;
277:23
**kinds (2)**
21:6;90:3
**KING (1)**
3:12
**Klein (1)**
7:12
**knew (19)**
103:22;104:8;
127:7;139:16;141:17;
168:19,23,25;169:3,4,
8,17,19,24;177:2;
191:11;192:23;
200:14;257:14
**Knoll (6)**
288:15,20,23;
289:4,10,13
**K-n-o-l-l (1)**
288:22
**knowing (6)**
74:14;128:21;
180:8;184:21;186:12;
243:17
**knowledge (2)**
278:14;284:25
**known (1)**
22:6
**knows (1)**
165:16
**Kofi (10)**
7:7,7,23;8:20;
158:5;161:20,24;
222:13;292:7,16
**Kong (1)**
216:9

---

**L**

**Labaton (2)**
8:1;275:16
**labeled (2)**
100:8;155:3
**labor (3)**
81:15,19;82:11
**lack (3)**
148:11,12;174:21
**language (5)**
166:14;185:15;
247:22;251:5;254:23
**large (19)**
47:12,19;50:10;
67:3;74:2,7;86:13;
95:16;114:5;128:12,
14;141:5,12;153:6;
172:21;176:2;202:22;
203:4;289:2
**largely (3)**
25:6;175:24;219:20
**larger (1)**
213:14
**largest (2)**
87:13;183:15
**last (38)**
15:17;20:17;28:13;
29:11;30:13,23;
31:14,23;32:19,23;
33:3,20;36:11;43:9;
47:7;49:9,16;54:23;
57:13,19;58:4;68:18,
21;69:10;87:21;88:2;
94:23,25;95:11;
141:6;142:7;161:18;
223:8,11;232:24;
247:20;263:4;288:21
**late (4)**
144:4;253:13;
258:24;271:11
**lately (1)**
133:6
**later (5)**
115:3;147:9;
155:21;158:11;166:7
**Latin (6)**
12:25;216:11;
219:22;226:12,16;
287:17
**Lava (5)**
91:25;103:18,23;
104:8;262:23;269:8;
270:8,11
**law (1)**
275:16
**lawyer (1)**
119:5
**lead (7)**
58:2;74:3;139:25;
273:7,15,21;290:10
**leadership (2)**
150:21,23
**learn (3)**
227:15,20;270:8

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL

KOFI BENTSI
May 20, 2016

learned (1)
93:23
least (7)
72:20;107:11;
153:10;154:8;171:24;
194:14;203:20
leave (1)
175:11
left (2)
13:18;81:4
legal (3)
201:9,20;202:10
length (1)
251:22
less (7)
47:10,18;48:2,15;
122:20,22;123:16
lessened (1)
71:17
level (5)
33:2,7;53:16;54:6;
196:22
levels (2)
132:11;262:16
leverage (11)
35:18;51:12,16;
52:7,10,13;54:4,20;
112:7,9,10
levered (3)
112:16;176:10;
203:3
levers (1)
194:10
licenses (1)
14:16
likely (12)
77:24;107:21;
109:22;111:13;
138:20;139:2;141:10;
203:12,17;225:14;
231:16;289:25
Lima (30)
5:4,13;6:7,9;11:13;
28:21;34:9;95:24;
96:3,10;97:5,15;
116:22;117:3;119:10;
130:11;159:17,23;
182:2;190:11;247:7,
10;250:8,11;251:18,
20;259:14;263:5,24;
270:11
limit (8)
136:12,22;137:5;
208:23,23;209:25;
210:2,4
Limited (1)
229:22
limits (6)
208:25;209:10,10,
12,14,17
line (18)
39:22;58:23;71:24;
92:21;93:6,16;99:5;

106:9;108:16;109:20,
23;113:11;119:6;
130:21;131:11;
134:16;168:3;181:19;
190:11;192:6;193:22;
195:2;201:6;222:12;
224:13;232:10;233:8;
234:7;235:5;260:9;
263:4
liquid (7)
120:18;122:17,19,
21,23;123:17;228:6
liquidity (5)
216:25;227:14;
228:3,24;229:2
list (12)
61:15;63:16;69:20;
134:13;205:9;212:23;
213:4,10,14,14;260:6,
6
listed (6)
61:19;81:11;100:6;
234:9;239:19;240:13
listing (1)
259:23
literature (2)
96:16,19
Litigation (1)
7:8
little (6)
34:6;109:20;
161:13;201:22;
205:12;235:25
LLC (1)
284:13
LLP (2)
3:4,12
load (3)
65:14,25;66:13
loan (2)
145:7;148:18
loans (3)
13:5;254:4,9
loathe (1)
277:22
local (2)
168:6;220:23
locally (1)
67:4
located (11)
7:11,14;210:25;
215:24;219:19;
234:17;281:25;
282:12;285:5;286:21;
287:3
location (3)
224:21,22;242:13
locations (1)
212:4
London (48)
38:15,16,18,19,20,
25;39:10;206:12;
212:22;213:20;

214:12;215:25;
216:15,19,22,25;
229:8,12,20;230:6;
234:21,24;235:13,18;
236:7,14,15,19,25;
237:5,23,25;238:3;
239:5,9,19;240:24;
241:9,13,17,21,25;
242:2;276:11;286:7,
9,10,23
long (9)
10:13;11:6;13:16;
68:17;69:10;115:9;
279:10,20,24
long-dated (1)
134:17
longer (5)
47:21;112:15;
138:12;185:23;279:8
longer-dated (4)
131:19;261:23;
262:5,8
longer-term (2)
81:25;91:16
Long-term (2)
131:13,15
look (84)
11:22;12:2;28:9;
39:24;51:24;65:12;
74:4;84:18;86:14;
87:3;98:18;99:22;
101:25;104:18,20;
106:6;109:19;110:23;
111:3,9;114:22;
117:2,11,20;119:2;
132:6,22;135:5,13;
138:18,19;140:23;
142:4,24;143:2;
156:17;158:3;161:18;
164:9;172:3,20;
181:24;185:4;187:17;
190:8,22;191:24;
192:2,6;193:7;
194:25;201:5;202:21,
21;221:23;224:13;
225:11;229:13;232:9;
234:5,19,20;235:4,7,
25;240:12;241:8;
247:17;248:20;249:4;
250:20;254:13;
259:19;266:9;267:8;
268:23;279:9,19,23;
281:16;284:11,24;
285:24;286:12
lookback (1)
132:23
looked (7)
111:7;132:23;
144:9;227:12,13;
235:5;283:24
Looking (30)
35:9;66:6;77:19;
85:25;87:25;89:18;

104:23;118:24;
124:11,23;126:3;
132:19;134:13,15;
142:25;154:25;
159:20;180:7;183:24;
186:20,21;193:19,21;
220:22;236:21;
239:17;249:9;259:2;
268:20;279:8;281:18
looks (21)
60:18;62:25;89:11;
93:2,5;98:13,16;
116:21;130:15;
152:22;155:15;
159:22;190:19;192:7;
222:17,19;224:11;
228:19,20;235:7;
254:14
loose (1)
37:2
Los (3)
7:1,11;159:2
lose (1)
180:2
losing (2)
67:15;68:3
losses (1)
67:16
lot (29)
30:6;45:17,20;
65:10;68:16;70:12;
73:25;74:3,13;75:19,
22;76:4;104:16;
108:8;117:23;118:3,
5;121:9,19;138:9,10;
168:13;171:24;175:9;
180:2,10,10;252:2,5
low (5)
10:4;67:11;111:23,
24;188:25
lower (6)
112:2;137:13,15;
140:3;141:17;281:12
lowest (1)
188:21
LT (4)
5:8;130:13;131:12,
12
luck (3)
5:18;199:23;200:24
Ludwig (1)
7:12
lunch (1)
158:20
Lupin (9)
11:13;27:9;60:13,
20;63:9;106:3;
161:20;162:4,4

M

Macro (2)
110:18,22

magic (1)
173:3
mailbox (1)
129:5
main (2)
38:10;101:25
maintain (5)
53:15,19;56:14;
57:9;65:5;111:23
maintaining (1)
56:4
major (6)
137:24;138:2,11,
17;145:22;258:7
makes (4)
124:13;158:17;
161:13;176:20
making (23)
22:20;23:2;29:20;
31:20,23;37:8,19;
63:25;68:4,6,10,13;
101:19;120:16,25;
126:4;141:22;188:17;
200:10;224:3;253:6;
274:2;289:9
man (1)
93:19
manage (5)
17:16;24:18;
150:13,15;274:25
managed (4)
15:19;43:21;44:21;
150:13
management (28)
5:16,17;20:19;
149:18,23;150:2,4;
176:17,23;187:18,19;
189:9;190:12,25;
191:5,11,15,16;192:8,
8,21,24;193:2,5;
205:5;258:5;268:2;
276:15
manager (34)
12:8;18:4,6;35:12;
45:4,8;61:8,12;85:11,
14,23;121:13;207:4,
13;208:2;216:5,5;
222:16;223:4,17;
232:10,15;233:8;
235:16,22;240:13,16;
260:7;280:19;281:3,
20;283:17;284:5;
285:3
managers (25)
22:19,25;23:10,14;
72:23;121:10,13,23,
24;131:5;134:11;
198:5,9,16;207:7,9,
11;210:3;220:12;
257:25;260:7,15;
273:7,15,21
manager's (1)
86:7

**Managing (5)**
15:5,20;214:5,6,13
**mandate (2)**
45:9;218:22
**mandates (3)**
45:5;126:6,10
**manner (1)**
188:25
**manual (1)**
268:10
**many (27)**
16:13;21:9;27:4,15;
36:25;38:6;42:4;
57:12,17,17,25;58:17;
71:19;73:3;74:23;
85:18;95:11;109:6,6;
121:9;134:6;194:10;
206:3;262:16,16;
267:3;277:24
**March (13)**
60:13;61:25;66:20,
22;72:12,17;206:16,
19,20;250:9;251:12,
16;256:5
**MARIANNE (3)**
3:5;7:21;272:12
**Marina (1)**
75:13
**Mark (16)**
61:4,6;78:12;79:17;
80:16;84:20;89:4,6;
94:11,14;95:10;
110:8;113:12;142:10;
282:17,21
**marked (40)**
39:12,17;57:5;60:7,
11;79:9,13,14;92:9,
14;98:6,11;105:21,
25;116:15,20;130:5,
9;151:14,19;159:8,
14;181:14,18;190:3,
9;199:15,20;221:12,
16;231:25;232:5;
239:25;240:5;246:25;
247:6;250:2;259:8,
12;282:23
**Market (61)**
5:21,24;6:4,15;
42:19,20,22;47:2;
59:7,15,25;60:4;69:7;
76:6;78:9;82:3;86:20;
87:18;88:25;90:14;
106:24;109:11,17;
112:23;113:4;116:2;
120:18,18,20,21;
121:15,15,128:7,11;
131:5;135:17;136:12,
16,22;138:12;143:15;
145:12;157:21,24;
170:13,22;171:3;
174:8;175:9,15,25;
178:8;179:15;196:2,
7,13,16;226:3,4;

228:24;275:2
**markets (31)**
12:8,22,24;13:10,
15,18,24,25;14:3;
17:6,7;24:19;75:17;
79:16;82:8;87:4;88:9;
89:5;133:18;156:3,9,
11;160:17;186:12;
206:23;207:7,14;
229:17,22;240:17;
258:7
**markets' (2)**
58:22;59:2
**market's (3)**
115:23;127:23;
136:3
**marks (1)**
142:12
**Mark's (3)**
78:25;79:22;83:15
**Martina (1)**
241:4
**Mass (1)**
19:20
**material (11)**
203:21;255:18;
256:4;277:23;278:4,
16;279:12,16,25;
280:2,5
**Mather (3)**
232:23,25;233:2
**M-a-t-h-e-r (1)**
232:25
**Mather's (1)**
239:2
**matter (6)**
7:7;204:10;265:9;
276:20;281:22;
285:15
**maturing (1)**
138:9
**maturities (3)**
138:4,8,15
**maturity (6)**
88:20,21;89:22;
176:2;274:16;275:4
**Mauro (3)**
182:24,24;183:2
**May (62)**
7:1,10;9:7;21:8,8;
23:15;24:7,22;30:19;
31:7,7,8;34:4,4;46:22,
22;53:14,20;71:19;
73:11;80:17;85:24;
93:3;98:13;106:3,7;
107:11,12;109:11;
115:3;124:14;129:25;
130:19;137:15;
140:14,14;141:24;
144:12;147:12,24;
157:17,18;159:2;
160:19,19;167:10;
177:25;179:21;

180:25;184:12;
211:22;220:2;228:5;
242:16,19;249:23;
250:19;264:14;
272:25;274:8;280:25;
288:6
**maybe (9)**
83:15;124:6;
127:11;148:3,3;
168:14;191:11;204:7;
206:18
**MEAGHER (1)**
3:4
**mean (77)**
10:9;16:22;17:16;
21:5;41:9,15;44:7;
49:2;54:14;58:22;
64:25;69:25;83:25;
88:18,25;89:16,17;
90:13;91:4,7;96:15;
99:3;104:20;107:7;
111:3,17;112:9;
119:17;121:22;
123:22;126:10;
127:11,15;129:21;
133:6,17;136:13;
148:13;153:21;154:5;
155:13;156:8;157:4;
162:15;164:18;
165:10;167:3;174:22;
177:11;180:13,17;
184:12;186:5;191:19;
209:20;216:4;217:13;
222:3;232:18;233:12,
21,24;234:24;241:12,
16;242:19;248:5,25;
260:13,21;262:14;
269:21,25;281:18,22;
286:10;290:7
**Meaning (12)**
33:6;36:19;37:15;
47:23;111:22;119:17;
166:24;197:9;201:2;
217:9;238:2;246:7
**meaningful (1)**
17:10
**mean-reverting (1)**
133:18
**means (11)**
25:7;54:17;65:15;
96:7;101:8;131:4;
160:14;197:17,19;
216:6;225:12
**meant (15)**
41:6;63:24;64:4;
83:18;85:9;91:20;
105:7,8;149:14;
179:3;185:19;197:3;
201:16;248:3;261:21
**measure (2)**
26:23;90:13
**meet (12)**
11:20;110:5,14,15;

151:9,11;162:9,18;
163:15,17;182:3,14
**meeting (42)**
10:15,17;11:19;
12:3;62:10;78:15,16,
20;109:21;110:12;
153:4;156:17,18,19,
21,23;158:6,8;161:20,
23;162:6,10,11;
163:11,11,12,20;
164:3,14,16;176:8;
181:5;182:9,11,15,19;
183:2,4,17;201:3;
248:18;276:21
**meetings (13)**
11:3;23:7,9,11,12,
13,17,20,24;163:18;
276:16,17;277:25
**member (4)**
161:6;182:2,12,22
**members (2)**
160:15;161:3
**memo (2)**
79:19;80:22
**Memorandum (6)**
5:21,24;6:4,15;
240:9;280:8
**memory (4)**
59:21;70:5;184:20;
201:22
**mentioned (5)**
19:23;93:10;97:21;
128:4;163:8
**message (6)**
40:20;87:24;
117:19;182:3;213:19;
233:22
**messages (4)**
185:9;187:2,3,5
**met (12)**
10:13;62:13,16;
158:14;162:13,19;
163:14;268:2,2;
270:15,20,21
**method (1)**
268:19
**methodology (18)**
166:12,17,19,21;
167:9,14;168:10;
169:2,4,6,18,20;
170:2,7,17,23;171:7;
202:10
**metric (6)**
35:16;36:18;52:13;
64:2,4;90:22
**metrics (12)**
35:13,15;51:13,16;
52:7,11;54:20;140:8,
12,17,19,21
**Mgr (1)**
222:13
**Michael (15)**
155:16;160:2,6,9;

161:16;164:9,12;
177:5;178:3;179:3,
16;181:21;185:6,18;
223:24
**mid (1)**
109:22
**middle (17)**
5:8;51:24;130:13;
131:16,23;135:5;
155:5;185:5;212:8;
221:24;222:23;233:5;
241:3;247:17;254:13;
282:7;284:13
**mid-range (1)**
133:9
**might (60)**
28:15;53:13,21;
58:17,18,23,23;59:2,
3;65:12;69:14;73:14;
74:3;75:21;78:17;
86:2;96:5,20;102:22;
104:19;112:16,17;
126:6;129:4,6;
134:10;137:5,5;
140:20;141:8;147:23;
158:18;163:9;172:10;
174:9;195:24;199:4;
201:4,19;208:22;
216:17,18;224:11;
225:18;227:11;
228:19;238:8,18;
241:3;242:22;243:8,
9;244:2;249:11;
256:9,9;258:19;
263:7;265:15;269:3
**Mike (6)**
11:13;14:20,21;
172:10;177:13;
185:20
**mildly (1)**
81:6
**milked (2)**
111:11,17
**million (5)**
230:15;260:16,17;
283:11;289:8
**mind (12)**
19:18,22;37:24;
87:21;110:13;120:13;
198:22;204:8;205:11;
227:18;237:16;
246:14
**Mindlin (277)**
7:18,18;8:16;10:8;
19:14;21:24;22:18;
23:19;26:11,14;27:2;
29:16;30:21;31:21;
32:16;33:5,25;34:18;
35:6;36:2,15;37:13,
20;38:7;39:15;41:7,
13;44:11,25;45:22;
46:7;49:14,21;50:2;
51:6,23;52:12,18;

53:9,17;55:14,17,19;
56:2,10,22;57:20;
58:6,10,13;59:6,13,
19;60:9;64:3,14;
66:18;67:6,22;69:12;
71:6,15;73:4,16;74:6,
17,25;75:25;76:20;
77:4,14;79:12;81:23;
82:10,22;83:5,17,23;
84:17;85:10,21;87:2;
88:7,11,13,16,24;
89:10,23;90:18;92:4,
12;93:4;94:17,22,24;
95:13;98:9;99:21;
100:23;101:7;103:25;
104:9,22;105:23;
107:10;108:10;113:9;
114:8;116:4,12,18;
120:6;121:2,11;
122:7;123:10,15;
125:2,19;126:9,17;
127:16;128:3;129:17,
19;130:7;135:4;
136:5,20;137:18,25;
139:15,22;140:15,25;
142:3;143:20;144:3;
145:17;146:12,14;
147:4,13;148:7;
151:17;152:14;155:8;
158:17,21;159:10;
161:5;163:7;165:4;
168:22;170:21;171:9,
19;172:2;174:16,24;
175:12,19;177:3;
178:22;179:14;180:3;
181:3,16;182:10;
183:16;184:7,22;
187:8;188:9;189:2,
10;190:6,18;191:13;
192:19;194:18;
195:15;196:18;197:8;
198:3;199:7,18;
203:7;205:18;208:12;
209:6;210:22;211:12,
21;212:9,25;213:8,
15;214:3,9,22;
215:15;217:4;218:19;
219:6;220:6;221:14;
223:12;225:7;227:6;
228:9;229:15;231:12,
19;232:3;235:14;
236:17;237:15;
238:12;240:3;241:15,
22;242:6,18;243:3;
244:13;245:2,20;
246:3;247:4;249:18,
22;250:5;251:15;
252:24;254:12;
255:22;256:2,12,19;
257:5;258:10,22;
259:10;260:8,25;
261:13;262:13;
263:23;264:17,23;

265:7,19;266:13,22;
267:7,14;268:8;
269:7;270:19;271:20;
272:4;276:13,23;
277:4,11;279:2,22;
280:9;282:2;285:6,
20,23;287:19;289:12;
290:20
**minister (2)**
173:5,11
**minute (3)**
68:2;129:21;278:19
**minutes (2)**
56:3;271:21
**mismanaged (1)**
105:14
**mismanagement (4)**
104:24;105:5,8,16
**mismanaging (1)**
105:11
**miss (1)**
205:15
**missed (1)**
136:14
**misspoke (1)**
100:23
**misspoken (1)**
250:19
**mixed (1)**
217:14
**mn (1)**
6:12
**Mohit (1)**
260:14
**moment (10)**
37:24;97:11;
104:18;117:9;163:8;
169:15;239:14,17;
247:13;278:25
**Monday (1)**
98:13
**money (10)**
63:25;67:15;68:3,4,
6,10,14;133:18;
180:2;227:12
**monitor (3)**
30:10;142:19,20
**monitoring (3)**
143:5,7,8
**Monteiro (4)**
147:25;151:2,11;
276:18
**month (3)**
12:14;124:6;157:3
**monthly (1)**
79:25
**months (7)**
106:13;107:16,19;
123:24,25;176:13,15
**Moody's (8)**
124:23;125:3,21;
126:7;129:21;245:12,
16;246:11

**more (84)**
22:14;23:4;29:3;
30:24;41:18;65:13,
25;77:12;90:14;
96:16;101:4,17;
103:3,4;104:19;
106:21;107:21;115:4;
119:21;121:8,16;
122:12;128:2;131:18,
23,25;138:3;149:8;
150:12,17;161:22;
167:19;168:15,16;
171:17,24;173:6;
174:23;175:10;
176:19;177:6,11,15;
178:14,16;183:4;
184:2;185:13,18,24,
25,25;186:4,12,13;
187:19;188:17;189:8,
25;199:4;200:5,9;
204:20;209:21;
213:13;221:3,24;
224:6;227:10;228:16,
23;230:23;245:13;
252:8,21,22;253:22,
24;262:25;263:8;
270:8;274:13,24;
281:17
**Morgan (27)**
13:13,14,16,17,18,
19,19,23,24,25;14:2;
43:19,21;272:17,18;
284:16,18,22;285:10;
286:15,16,17,20,23;
287:2,17;288:20
**morning (6)**
7:6;8:17,18,23;
216:17,20
**most (22)**
35:16;51:2;66:8;
87:14;104:17;123:3;
161:3;188:25;195:23;
196:13;202:22;
219:22;231:16,16;
244:7,10,11;246:5;
261:11;266:4;269:17;
273:20
**mostly (1)**
25:7
**move (10)**
38:16,18;121:19;
131:20;133:19,21,25;
193:6;203:4;206:13
**moved (3)**
38:25;213:3;214:12
**movements (3)**
47:11,18,24
**moves (2)**
121:13,14
**moving (1)**
90:8
**much (19)**
36:7;68:4,6,10,14;

101:12;103:7;141:15,
25;148:10;186:6;
189:6;208:25;229:2;
249:13;271:13;
281:16;284:24;
285:17
**MUFJ (1)**
20:11
**mumble (2)**
45:17,20
**Munich (7)**
38:19,21,24;
206:13;240:19,20;
241:3
**must (2)**
185:12;237:19
**mute (2)**
19:11;56:6
**Mutual (3)**
19:20;20:7,9
**myriad (5)**
38:9;52:17;54:2;
85:24;114:23
**myself (8)**
129:25;130:19;
131:10;155:12;180:8;
184:21;215:7;287:9

# N

**name (26)**
7:12;8:19;15:11;
39:22;42:25;60:15;
92:20;182:24;216:9;
222:22;232:24;
238:24,25;239:2,2;
241:4,5;242:11;
272:12;275:15;281:4,
21;282:5;283:13;
288:21;290:13
**Natalia (13)**
11:13;28:21;
116:22;130:11;
159:17,23;182:2;
190:11;247:7,10;
250:8;259:14;263:5
**national (1)**
49:5
**natural (2)**
170:12;198:18
**naturally-accrued (1)**
249:17
**Naylips (1)**
75:14
**near (2)**
138:4;284:12
**necessarily (27)**
33:9;65:11;77:10,
19;85:18;103:8;
107:7,8;114:12,14,19;
116:8;119:25;124:18;
136:3;144:12;150:3;
186:11;187:16;

197:16;198:16;208:4;
210:9;212:14;236:11;
267:6;271:16
**need (25)**
33:12,19,21,23;
51:10;104:15,21;
111:15;128:14;140:2;
154:23;172:22,25;
173:6;180:2;187:21;
200:24;208:14;
244:10;255:9;279:10,
20,24;281:16;284:24
**needed (1)**
134:10
**needing (1)**
166:19
**needs (1)**
203:4
**negative (4)**
76:21,25;107:6;
153:10
**negative-free (1)**
50:23
**negatively (1)**
65:4
**neither (1)**
130:3
**net (6)**
51:16,25;52:5;
112:10,11;140:21
**nevertheless (1)**
257:17
**New (75)**
3:15,15;5:15,16,17,
17;7:15,15;150:23;
160:23;161:6;166:19,
20;168:20;169:18;
171:7;190:12,12,25,
25;191:5,5,15,16;
192:8,8,8,9,20,21,24;
193:2,5;217:2;
219:20,21,23;224:12,
23,24;225:6,14;
230:12,22;235:11;
236:13,16,18;237:24;
238:2;258:5,6;
275:16;282:15;
283:20;284:18,19,22;
285:10;286:2,5,22;
287:3,6,8,9,16,18,20,
21,22,25;288:3,4;
289:20
**New- (1)**
39:9
**new-issue (1)**
224:12
**Newport (41)**
38:23;39:3,6,11;
206:22;211:5,5,14;
213:2,7,11;214:4,10;
215:25;216:10,16;
217:22;218:8,24;
225:12;232:16;233:2;

234:18;235:16,18;
236:6;238:23;240:24;
241:7;281:24;282:4;
284:8;285:4,8,9;
286:6;287:10,11,12,
13,15
**news (12)**
27:17,19;28:12,17,
19;59:3,25;60:4;
93:12,14,14;96:18
**newspaper (1)**
27:18
**next (34)**
19:15;46:8;47:9;
60:25;81:24;87:3;
91:12;93:19;99:5;
106:13;107:16,19;
108:16;109:20;
110:17;140:6;153:5;
161:19;165:15;168:3;
170:12;172:3;173:18;
177:4,4;178:23;
191:24;234:19;
236:20,21;246:17;
260:17;272:7;282:18
**night (1)**
142:11
**NOC (1)**
49:5
**NOCs (3)**
47:12,19;49:8
**nodding (1)**
9:2
**N-o-l-l (1)**
288:21
**Nomura (1)**
20:13
**nonbenchmarked (1)**
44:4
**None (1)**
198:22
**nonpublic (11)**
203:22;277:7,14,
17,23;278:4,16;
279:13,16;280:2,5
**Nope (2)**
48:19;239:20
**Norinchukin (2)**
20:15,16
**N-o-r-i-n-c-h-u-k-i-n (1)**
20:18
**normal (1)**
228:7
**North (1)**
3:6
**Notary (1)**
292:22
**notch (1)**
245:16
**note (6)**
60:20;153:16;
181:25;217:20;
224:12;274:12

**notes (8)**
21:16;196:21;
197:2,13;204:10;
244:16,18;273:6
**notice (2)**
234:3;269:3
**noticed (1)**
192:13
**notification (2)**
190:22;192:6
**November (6)**
72:10;130:11;
134:20;135:3;146:5,
20
**number (22)**
15:11,14,22;34:20;
40:8;46:9;61:21;
81:11;99:25;159:16;
171:5;193:19;222:9;
242:17,20,22;243:7;
276:16;280:11;
281:11,12;282:18
**numbered (1)**
155:23
**numbers (8)**
17:10,12;18:24;
19:25;88:14;186:19;
268:4;281:19

---

# O

**OAS (2)**
100:8,11
**oath (1)**
292:8
**Object (81)**
21:22;22:15;23:16;
26:2;29:13;30:18;
31:18;32:13,24;
33:22;34:15;35:2,25;
36:12;37:10,17;38:5;
41:4,10;44:9,24;
45:13;49:11,18;
52:15;53:6,12;55:10;
56:17;57:16;58:7,25;
59:10,17;63:22;
64:11;66:14,25;
67:19;69:5;71:2,9;
72:25;73:10,21;
74:11;75:18;76:14,
23;77:8;81:20;82:4,
17,25;83:13;84:12;
85:6,16;88:23;89:3;
90:15;92:2,7,25;
94:13;95:9;99:19;
100:22;101:2;103:21;
114:2;115:21;116:7;
119:24;120:23;123:9;
125:23;184:4,19;
236:10;238:5
**objection (136)**
9:9;19:12;26:5,6,
21;46:3;49:24;51:4,

21;56:19;58:4,7;
74:12,21;83:20;
86:24;107:2;108:5;
113:7;121:6;122:6;
124:17;127:10,25;
134:25;135:25;
136:17;137:14,22;
139:12,17;140:13,18;
141:21;143:18,25;
145:14;146:11;147:3,
10;148:6;160:25;
164:24;168:12;
170:18,25;171:14,22;
174:13,20;175:4,16;
176:24;179:11,18;
180:24;182:7;183:12;
188:6,23;189:5;
191:7;192:16;194:9;
195:11;196:10;197:4,
14,15;199:2;202:20;
208:8;210:18;211:3,
15;212:7,21;213:5,12,
25;214:21;215:12;
216:23;218:15,25;
219:2;225:3,4;227:4;
228:4;229:10;231:7;
235:9;241:14,18;
242:3,15,25;244:9,24;
245:19,23;249:7;
251:14;252:17;
254:11;255:19,25;
256:6,16,23;257:23;
258:14;259:5;260:5,
24;261:9;262:10;
263:17;264:16,20;
265:4,10,11;266:7,17;
267:2,11,25;269:2;
270:17;277:11;282:2;
285:6;287:5;289:7
**objections (1)**
9:8
**observant (1)**
192:13
**obtain (2)**
14:9;188:24
**obtaining (3)**
186:9;187:11;
188:21
**obvious (2)**
107:22;129:13
**obviously (8)**
17:10;52:24;108:7,
17;129:9;154:3;
262:17;268:3
**occasionally (1)**
123:9
**occur (3)**
10:15;23:3;182:20
**occurred (5)**
31:14;72:18;164:3,
7;172:16
**occurring (1)**
180:25

**o'clock (1)**
216:17
**October (1)**
245:15
**ODEBRE (1)**
98:22
**O-D-E-B-R-E (1)**
99:5
**Odebrecht (20)**
99:5,7,8,9,10;
100:20,21,25;101:4,
13,15,18,20;102:3,11,
11,12,19;105:14;
115:13
**Off (35)**
55:21;58:12;88:6;
98:2;99:20;135:2;
137:7;146:3;158:23;
162:25;163:2,4;
166:12;168:3,6,10;
169:9,11,16,20,23,25;
170:4,7,9;171:11,16;
220:14;231:21;251:3;
255:8;271:23;290:19,
24;291:3
**offer (2)**
63:2;153:13
**offered (3)**
101:4;261:11,14
**offering (3)**
204:11;231:13;
290:9
**offerings (4)**
230:19;272:25;
273:6;274:12
**offhand (1)**
69:17
**office (26)**
23:5;38:14,18,19,
20,22,23,24,25;39:4;
130:18;183:21;212:8;
221:24;222:23;
225:14;229:9,12;
230:6;234:17;236:6;
238:17;241:3;282:7;
287:8;290:16
**official (1)**
42:2
**Officially (1)**
24:13
**often (4)**
23:9;29:3;62:17;
225:19
**OID (4)**
248:16,21,23;
249:12
**Oil (15)**
40:9;47:11,18,24;
48:10;49:6,17,20,22;
65:18;67:11;71:16;
95:12;99:11;105:18
**old (7)**
168:21;200:14;

217:16;226:6,7,9;
240:23
**Once (9)**
9:8;58:12;164:17,
18;210:16;215:16;
219:15;226:10;
247:19
**one (141)**
11:4;15:17;18:12,
25,25;20:3,3,17;26:6,
17,19,22,24;27:18;
29:19;31:19;35:15,
16;38:6,10;48:21;
52:16;53:7;54:2;
58:17,18;62:19;
63:18;66:3,6;68:15;
70:13;71:21;75:15;
79:22;80:2;81:12;
82:13,18;83:16;
85:19;87:13;88:8;
90:8;99:17,4;96:18;
99:10;102:10,14;
103:6,7;107:20;
112:21,22;116:13;
117:9,22;118:8,13;
120:7;128:18;131:9;
132:6,9,20,24,24;
133:13,14,14;134:8;
138:5,11,17;140:19;
141:4,15;144:13,16;
145:22;154:16,17;
160:2,21;166:20,22,
24,24;174:8;175:10,
21,24,24;176:21,25;
177:19;178:13;
179:19;183:7,23;
184:15;185:7;191:9;
192:24;193:9;199:14;
202:16,16;218:7;
228:23;230:15;234:2,
3;239:18,21;241:20;
243:22;244:20;
245:15;246:5,5,7,17;
255:16;256:8;258:2,
19;262:11;263:12;
265:24;274:22;
275:23,24;276:16,17,
20;278:6;282:19,20
**ones (4)**
154:25;211:18;
273:11;274:15
**one-year (2)**
132:22,23
**ongoing (3)**
97:16;102:17;271:7
**only (32)**
8:25;16:7;21:2;
37:3;38:4;66:9;74:13;
76:15;83:21;91:22;
97:8;101:5;105:17,
18;106:14;124:8;
134:12;175:8;176:10;
177:13;192:17;

194:14;206:23;
213:11;217:2,2;
224:5;237:13;242:10;
253:6;269:22,23
**open (2)**
154:24;243:21
**operate (1)**
186:13
**operating (1)**
82:21
**operational (4)**
102:15,19,21,22
**opinion (31)**
33:4;48:22;53:13;
77:6,9;107:6;111:5;
114:12,15;124:19;
151:8;179:8,9,13;
193:4,24;194:2;
200:22;202:10;203:6;
227:13;228:22;
236:16;255:5,6,12;
261:10,14;265:2,5,13
**opinions (10)**
69:14;78:4;201:9,
21;228:23,24;252:3,
4;263:19;267:3
**opportun- (1)**
109:6
**Opportunities (4)**
79:16;144:10;
194:17,19
**opportunity (6)**
91:15,23;94:12,16;
202:4;264:5
**opposed (7)**
84:16;101:15;
124:22;138:6;148:22;
187:22;225:23
**opposite (1)**
103:15
**opposition (6)**
75:5,9,10;113:13,
23;114:4
**oppositions (2)**
75:6,12
**optimize (1)**
133:19
**option (2)**
107:20;215:5
**Option-adjusted (2)**
100:12,13
**options (10)**
53:8;54:3;154:24;
166:22;183:23;
194:13,17,19,22;
258:21
**order (21)**
6:12;150:10;205:5,
7,9;210:6,8,17,21;
211:2,5;215:14,16;
260:10,14,15,17;
261:3;263:13,21;
274:3

**orders (2)**
263:14,16
**ordinarily (1)**
89:14
**ordinary (1)**
244:23
**Orenstein (2)**
28:23;34:10
**organize (1)**
200:13
**original (2)**
248:16,24
**others (14)**
29:3;60:21;131:10;
133:24;155:10,12,18;
164:16,22;170:13;
179:15;184:8;195:25;
196:2
**otherwise (1)**
161:14
**ourselves (2)**
153:7;277:21
**out (23)**
5:7;76:16;78:23;
79:2;93:14;123:5,12;
130:4,12;131:15;
154:13,18;200:13;
217:22;218:8;263:2;
269:8;278:22;282:4;
287:8,17,22;288:4
**out- (1)**
78:18
**outcome (3)**
73:9,11;78:10
**outcomes (3)**
112:22;114:23,24
**outlook (7)**
78:18;127:22;
163:22;195:6,9,14;
199:5
**outperform (1)**
261:22
**output (1)**
137:13
**outputs (7)**
47:22;48:3,5,7,12,
14;49:3
**outside (3)**
29:24;30:3,7
**over (19)**
9:3;10:2;33:2,11,
11,12,19;44:14;57:12,
19;69:2;89:2;95:11;
100:9;137:16;161:11;
209:24;213:3;278:3
**overall (4)**
85:14;108:9;112:7;
120:4
**overcharges' (1)**
138:23
**overcharging (2)**
255:10;257:3
**overruns (9)**

96:2,10,11,25;97:3,
6,10,11,19
**overstate (1)**
59:3
**overstated (2)**
59:8,15
**overstatements (2)**
254:21;255:4
**overweight (19)**
40:9,15,18;41:2,6,9,
12,15,17;44:6,8;45:5,
9,10,24;58:15;143:15,
19,24
**overwhelm (3)**
265:18,23,25
**own (10)**
33:24;47:21;69:9;
124:21;144:11;
150:14;206:23;
232:20;247:20;
275:22

**P**

**P&L (4)**
142:19,20,25;143:5
**page (69)**
40:8,25;46:8;57:5;
60:20;61:15;80:22;
84:18;87:3;88:2,2,10;
94:18,21,23,25;98:18;
99:22;102:2;104:10;
106:6;110:17;117:5,
6,11,12,20;120:7;
130:20;132:8,18;
134:15;140:6;142:7;
152:10,15;155:3,22;
156:13,15;160:4;
161:18,19;177:5;
181:24;185:4,6;
190:21;191:24;192:2;
193:7;194:25;195:3;
196:19;222:9;233:5;
235:25;236:21;
247:12,14,17;248:7,
20,20;250:14;254:13;
259:20;260:2,10
**pages (4)**
40:23;87:21;
104:17;152:11
**paid (1)**
186:13
**paper (2)**
28:2;89:9
**papers (1)**
28:3
**par (7)**
149:4,7,11,13,15,
16,16
**paragraph (33)**
46:13;51:25;54:5;
57:4;81:3;84:19,20;
87:8,10;88:2;93:19;

94:19;98:19,24;
99:23;101:25;104:11,
18,23;113:10;154:20;
155:7,8,9;161:19;
165:5,15;166:7;
172:3;173:18;177:4;
201:5;254:14
**paraphrase (1)**
276:22
**parenthetical (1)**
99:12
**parse (1)**
28:10
**part (14)**
17:7;34:13;38:25;
48:6,7;103:15;
131:20;132:21;
133:19;176:22;
179:22;199:8;205:15;
233:19
**participate (7)**
80:15;230:18,21,
24;231:3,5;257:18
**participated (8)**
23:22,25;231:8,10;
272:19;273:5;289:2,3
**participating (2)**
274:11;290:8
**particular (18)**
17:24;27:22;29:2;
33:17,18;59:3;65:23;
78:11;116:10;131:8,
24;134:22;197:20;
222:17;237:12;269:5;
286:21;290:5
**particularly (6)**
84:8;124:20;
189:22,24;200:9;
227:5
**parties (4)**
26:5;74:4;121:19,
21
**partners (4)**
153:7;202:23,23,24
**parts (3)**
90:8;163:17;237:13
**pass (2)**
216:18;219:12
**passed (1)**
184:14
**passing (1)**
185:25
**past-due (1)**
249:11
**path (1)**
187:15
**Paulo (2)**
92:6;93:16
**Pause (1)**
190:17
**pay (3)**
102:5,9,12,25;
103:2,12,16,20;104:4;

94:19;99:8;19,24;
99:23;101:25;104:11,
18,23;113:10;154:20;
155:7,8,9;161:19;
165:5,15;166:7;
172:3;173:18;177:4;
201:5;254:14
138:12;181:12;186:6;
249:15
**paying (2)**
103:9;262:18
**payment (2)**
180:20,21
**payments (8)**
180:11,13,17,18,22;
181:5,8,9
**payout (1)**
101:21
**PBR (14)**
5:14,15,17;47:10,
15;50:8;54:6;57:5;
117:7,13;181:20;
182:2;190:12,25
**PBRCG-I (1)**
151:20
**PDVSA (7)**
248:6,7,14,19,22;
249:5,8
**penalty (1)**
8:11
**pending (1)**
9:16
**pension (1)**
19:16
**people (25)**
41:12;49:13;65:12;
74:19;86:2;90:7;
106:22;134:3,6,13,16;
184:10;196:21;
198:13;204:24;206:3;
213:18;218:5,17;
226:3,4;249:11;
269:15,17;270:21
**per (4)**
103:17;151:8;
174:15;290:16
**perceive (2)**
261:24;262:3
**perceived (3)**
58:24;107:12;113:4
**percent (8)**
51:11;143:14;
187:24;209:19,21,25;
210:2,4
**percentage (3)**
143:12;249:13,15
**perception (1)**
115:23
**perform (2)**
20:22;103:16
**performance (4)**
90:24;91:2,4;101:5
**performing (3)**
34:25;186:8,11
**perhaps (7)**
58:2;62:21;63:24;
78:15;80:17;120:4;
252:6
**period (37)**
33:11,12,14,16;

66:16,19,23;67:3;
68:2;72:17;95:21;
117:17;124:3,4,4,7;
128:19;137:17;143:4,
23;145:16,23,25;
163:13;166:17;
169:13,24;170:5;
180:23;189:18;228:7;
245:8;258:18;266:16;
267:23;278:3,3

**periodic (2)**
80:2,4

**perjury (1)**
8:11

**permanent (3)**
160:10,14,15

**person (10)**
16:7;77:13;131:8;
149:21,22;223:22;
235:23;282:6;287:2;
288:20

**personal (6)**
33:7;43:10;49:19;
196:6;258:12;264:6

**personally (6)**
55:6;180:4;198:20,
22;205:19;215:5

**personnel (1)**
278:2

**perspect- (1)**
79:24

**perspective (13)**
90:25;91:2,3,5,7;
114:22;126:5;149:9,
19;196:6;209:15;
266:12;267:6

**perspectives (2)**
79:22,23

**pessimism (1)**
107:14

**PETBRA (5)**
5:13;98:21;99:2;
159:18;160:7

**P-E-T-B-R-A (1)**
99:2

**Petro- (1)**
115:7

**Petrobras (358)**
5:8,22,25;6:5,12,
16;7:8,19;21:14,16,
18,21;23:14,21,24;
24:6;31:13,23;32:8,
17,23;33:15;34:7,9;
36:11;37:6;40:10;
43:2,4;44:7,8;46:10,
22;47:4,15,17,21;
49:9,13,16;50:4,16,
24;52:14,17,20;53:5,
11,19,24;54:18,22;
55:12;56:14;57:4,9,
21;58:14,16,23,24;
59:9,16;60:2,5;61:19;
62:7,10,14;63:19,25;

64:9,13,16,22,25;
67:14,16,17;68:3,6,9,
12,13;69:3;70:4,6,25;
71:5,21;76:2,22;77:7,
11;78:22;79:2;82:12,
13,15,24;83:11,15;
86:21,22;87:13;88:4,
19;89:18;90:21,23;
91:9,13;93:24;94:5,
12,15;95:2,16,20,23;
96:12;97:12;99:3,4,
14;100:24;101:5,6,10,
11,15,20;102:12;
103:9;105:10,14;
108:13;109:3,12,25;
110:24;111:4,6,11,17,
25;112:15,20,25;
113:5,14,19;114:4,9,
16,17;115:2,5,8,13;
116:5;117:16;119:23;
120:2,5;121:4;
122:16;123:16;125:5;
126:22,24;127:24;
128:5,8,16,21;130:13;
131:11,15;134:17,23;
135:11;138:16;
142:12;143:5,6,8,9,
13,17,24;144:6,8,9,
12,13,15,18,22;145:2,
6,9,20;146:15,21,22,
25;147:5,15,22;
148:2;149:5,23;
150:21;153:13;154:6,
7,13;156:5,12,25;
157:7,12,22;162:7;
164:6,11,14,16;165:6;
169:6;171:12;172:6,
12,14;173:13;175:2,6,
13;176:5,12;178:4,19,
25;179:4,6,16;180:5,
9;181:5,10;182:12,
13;186:17,24;187:11;
188:4,21;189:17,20,
23;194:6;196:12;
197:13;198:6,10,14,
20,24;199:10;200:20;
202:7,8;203:5,9;
204:9,10;207:19;
208:6;209:12,22,25;
216:21,24;217:20;
218:8,24;219:4,22;
220:7,10,13;224:25;
225:13;226:13,17,24;
227:3,7,16,17,21,22;
228:3,17;230:19;
231:6,11;242:23;
244:14,16,18;245:17;
246:11,19;248:10,14;
251:23;252:16,19,23;
253:2,16,20;257:6,9;
258:3,8,11,23;259:3;
260:11,18;261:17;
262:2,8;263:2;264:5;

265:9;268:7;270:14,
20,21;271:4,11;
272:14,22;273:6;
275:20,23,25;276:15;
278:2,16;279:13;
280:3;283:12;288:3

**Petrobras' (1)**
102:24

**Petrobras/Brazil (2)**
261:12,15

**Petrobras's (39)**
33:21,23;55:7;
57:12,15,18;93:17;
95:6,14;96:15;97:10,
16;102:5,9,25;
103:19;104:4,24;
105:5,16;108:12;
113:20;147:2;149:25;
150:4;174:18;177:20;
195:9;196:16;251:10,
13;258:16;264:10,13;
266:15,19;267:22;
268:9,12

**petrol (1)**
47:3

**phone (5)**
8:5;19:10,11;56:6;
289:16

**pick (2)**
215:23;216:10

**picked (1)**
96:21

**picks (1)**
215:22

**pickup (1)**
100:18

**piece (4)**
55:5;59:3;193:21;
197:21

**pieces (2)**
29:9;149:10

**pile (1)**
278:23

**PIMCO (121)**
7:23,25;8:20;12:7,
12,17,19;13:6;14:18,
22;15:4;16:17;17:2,
16;20:20;21:13;
23:15;24:5,7,12;27:5,
11,13;28:17;29:22,
24;30:3,7;34:3,14,19;
38:14;39:18;40:6,17;
41:8;44:3,12,13;
49:10;50:15;52:19;
53:18;55:3;59:24;
60:12;61:7;66:4;
78:16;79:15;81:18;
92:15,24;98:12;
106:2;116:21;118:16;
120:10,12,17,19;
121:9,10,25;122:4;
124:9,11;130:10;
133:24;144:21,22;

145:6;149:21,22;
155:11,18;159:16;
160:12;164:16,22;
166:24;181:19;183:8,
11,14;190:13;198:25;
199:21;203:24;204:2;
219:10,11,13;220:7;
221:4;230:3;232:6,
14;236:2;238:21;
240:5;241:4;244:22;
247:7;250:7;257:8,
21,24;258:23;259:3,
13;261:8;268:25;
269:16,18;275:22;
278:17;280:25;285:2;
288:25;289:3

**PIMCO-rating (1)**
126:5

**PIMCO's (6)**
45:24;67:16;68:11;
121:3;229:6;238:22

**PIMCO-specific (1)**
43:14

**place (6)**
72:9,15;77:25;
169:12;185:23;
272:25

**placed (1)**
280:9

**placing (1)**
261:3

**plaintiff (3)**
11:10;275:19,22

**plaintiffs (1)**
275:24

**plan (4)**
176:14;261:21;
262:15,18

**planning (4)**
153:16;273:25;
274:2;278:12

**plans (1)**
253:7

**play (3)**
211:14,16,18

**playing (1)**
187:25

**Please (16)**
6:11;7:16;8:9;
45:18;58:7;67:24;
161:10;247:15;
260:10;276:8;277:5;
278:21;279:19,23;
280:8;283:10

**PM (21)**
15:21,22,22;16:4,7,
18;17:5;22:2,2,7,13,
13;42:8;130:21,25;
159:3;161:3;193:8;
223:6;280:20;291:4

**PMs (5)**
131:2,4;161:3;
259:20,23;260:2

**point (93)**
46:2;61:6;64:9;
68:19;75:15;82:3;
89:5,7;91:24;92:5;
99:14;100:20,24;
102:20;103:2,18;
105:4;108:12;109:11;
110:23;111:7;112:25;
113:6,21;115:20;
116:6;122:17,20;
128:17;131:15;
133:22,25;134:17,23;
135:17;137:19;
138:16;141:17;
144:20;151:25;
153:14;157:13,21;
158:11,13;169:14,21;
170:23;172:13;174:7;
177:18,23;178:8;
179:9;180:4;183:25;
186:10,23;188:5,20;
189:12;191:5;194:7,
14,20;195:17,22;
196:3,8;200:21;
203:11;206:13;211:8,
17;223:18,20;252:11,
25;253:10;255:13;
256:5;257:11,17;
261:24;262:9,22;
263:21;270:2,25;
271:16,21;280:25;
284:9

**pointed (2)**
280:17,18

**points (8)**
88:19;90:7,10;
101:6;115:9,16,25,25

**police (1)**
92:6

**policies (11)**
74:2,15;77:13,15,
21,25;78:5;108:25;
109:2,4,7

**policy (32)**
46:14,16;65:2,5,13,
15,24;66:12,16,23,24;
67:4,7;68:9,17,20;
69:2,8,10,11,11,13,
13;73:13;74:23;83:8,
19,25;84:2,5;111:20;
112:6

**political (6)**
30:10;35:11;
111:14;112:13;
113:13;114:6

**pool (1)**
49:19

**poor (3)**
81:24;82:23;266:21

**poorer (1)**
267:20

**poorly (1)**
178:12

**popular (3)**
96:16,19;109:2
**portfolio (91)**
12:8;15:5;16:8,19;
18:4,4,6,24;19:15;
22:19;23:10,13;
35:12;42:6;44:7,18,
21,23;45:4,6,8,9;61:8,
11;72:23;85:11,13,
22;121:10,13,23,24;
126:14,19,24;127:19;
131:5;134:10;142:19,
20,23;143:3,9,12;
144:6,18;198:5,9,16;
207:4,7,9,11,13,14;
208:2;209:18,21;
210:3;211:11;212:15;
214:5;216:4,5;
220:12,17,21;222:13,
15;223:4,17;232:10,
15,20,21;233:8;
235:16,22;240:13,16;
243:20;257:25;260:6,
7,15;280:19;281:2,
20;283:17;284:5;
285:2
**portfolios (57)**
15:6,7,19,21,23,25;
16:5,10,13,17,22,24;
17:2,4;19:24,25;
20:19,25;21:13,25;
22:6,12,13,20,23;
24:18;42:4,7;43:4,20,
24;44:4;126:11,23;
127:3,7;142:17;
143:16,24;144:22;
207:18,18;208:5,6;
209:3,7,9,11,13;
214:6,13;218:21;
219:10;220:10;221:9;
261:3;264:6
**portion (3)**
87:25;249:21;
257:21
**Portuguese (5)**
24:16;28:5,6,9,12
**Posch (3)**
39:19;40:3,18
**position (13)**
12:7,10,21;13:14;
40:11;41:18;44:12;
112:22;120:19;
194:11;227:14;259:3;
280:24
**positions (3)**
142:24;143:2,6
**positive (4)**
76:25;129:25;
150:24,25
**positively (3)**
65:3,6,8
**possession (1)**
278:15

**possibility (3)**
145:12,19;174:17
**possible (4)**
150:19;188:21,22;
271:13
**post (4)**
118:21;122:23;
128:14;176:17
**post-elections (1)**
73:13
**post-financials (1)**
258:4
**postpone (2)**
135:14,23
**postponing (1)**
135:19
**potential (11)**
52:20;70:25;
112:20,22;115:7;
118:5;139:19;177:20;
227:12,14;258:6
**potentially (2)**
86:12;121:25
**power (2)**
77:18;113:24
**practical (3)**
213:16;281:22;
285:15
**practice (3)**
63:7;219:25;290:11
**preclude (1)**
251:2
**preference (3)**
261:17;264:3,6
**preferred (1)**
227:2
**prefix (1)**
281:12
**premium (6)**
177:6,11,16;
178:15,16;267:20
**prepare (4)**
9:24;11:4,20;12:5
**preparing (1)**
11:23
**PRESENT (1)**
3:18
**preserves (1)**
26:6
**president (4)**
74:20;158:5,8,14
**press (2)**
270:7,10
**presumably (2)**
104:3;220:22
**presume (1)**
165:25
**pretty (5)**
96:12;97:12;
163:25;176:16;268:3
**prevent (3)**
9:22;202:14;255:15
**preventing (1)**

202:18
**prevention (1)**
268:9
**previous (7)**
51:21;84:10;100:6;
151:3;195:2;234:3;
248:20
**previously (5)**
13:18;38:21,23;
200:14;213:10
**price (21)**
48:13,14;65:16;
68:7;76:2;86:2;100:2,
4;115:25;124:16;
128:21;142:5,9,10;
145:20;175:2;189:20,
23;224:21;258:17,19
**priced (1)**
90:13
**prices (37)**
31:8,10,11;46:20;
47:6,11,19,21,22,24;
48:10;65:19;67:10;
69:3;73:18,24;74:4,
10,16;107:8;108:7;
111:23;112:2;120:20;
121:4;128:16;146:23;
149:14,17;172:21,21,
21;180:5;189:11,14,
18;196:9
**PRICEWATERHOUSE (2)**
3:10;8:7
**pricing (45)**
46:18;47:3;48:2,4;
65:2,13,15,24;66:12,
15,23,24;67:4,7;68:9,
20;69:2,8;70:20;84:3;
86:21,21;108:25;
109:4,7,9,10;111:19;
112:6;118:14,17;
119:19;142:13;156:3,
9,11;157:22;170:22;
188:4;196:7;228:14;
273:21;274:4,24;
275:5
**primarily (1)**
128:22
**principal (1)**
230:10
**private (1)**
81:25
**probability (3)**
156:4,10,11
**probably (16)**
51:9;93:13;118:21;
121:8,8;130:18;
132:10;137:24;164:8;
195:4;203:19;204:23;
213:6;226:19;230:12;
270:9
**problem (13)**
88:15;166:8,9;
167:19,21;172:19,19;

184:6;189:9,25;
269:24;270:2;271:19
**problems (9)**
106:13,14;107:16;
111:12;112:4,6,12;
188:19;256:8
**procedure (1)**
285:2
**proceed (1)**
194:7
**proceedings (1)**
190:17
**process (12)**
73:3;85:17;114:24,
25;150:6,7,13,13,16;
204:18,22;224:10
**processes (1)**
204:21
**produce (1)**
29:18
**PRODUCED (3)**
6:19;89:12;281:8
**product (1)**
21:20
**production (29)**
53:11,14,15,19,21;
137:15;162:22;
163:10,13,15,20,23,
24;195:5,9,13,17,20,
22;196:3,8,12,14,14,
16;197:24,25;199:5,
10
**productions (1)**
129:9
**products (14)**
13:2,6,8;24:19,21,
22,23,24,25;46:14,15;
48:12;70:18,20
**professional (1)**
14:15
**profile (5)**
17:5;176:2,2,6,9
**program (3)**
137:7,11;268:10
**progress (4)**
187:14;189:4,8;
253:2
**projected (1)**
193:20
**projecting (1)**
194:16
**projects (5)**
95:20;96:17;97:18,
20;99:10
**prolonged (1)**
137:17
**propel (1)**
113:24
**proportion (1)**
215:11
**prospects (3)**
45:15,16;125:25
**protect (2)**

115:2,5
**protecting (1)**
187:19
**provide (7)**
8:25;15:12,14;
28:17,19;102:16;
227:8
**provided (4)**
35:4;102:13;
135:21;164:21
**provides (1)**
63:14
**providing (2)**
34:8;35:4
**public (6)**
20:7,9;111:20,22;
157:2;292:22
**publication (1)**
93:9
**publications (1)**
27:22
**published (1)**
43:16
**publishes (1)**
43:18
**pull (1)**
194:11
**purchase (5)**
227:17,22;258:17;
288:6,12
**purpose (1)**
204:11
**purposes (2)**
37:4;122:2
**pursue (2)**
183:5;185:12
**pursuing (1)**
183:6
**push (1)**
191:17
**put (11)**
19:10,11;104:21;
141:7;158:15;202:4,
4;208:16,18;210:6;
279:2
**puts (1)**
210:14
**PwC (22)**
166:12,23,25;
169:9,11,15,19,25;
170:6,16;171:3,10,16;
201:10;250:24;251:2,
9,19;252:9,10,23;
255:8

---

# Q

**Q3 (13)**
136:10;137:4;
146:6,8;157:5,6,18;
169:22;170:3;171:21;
174:6;201:21,25
**Q4 (8)**

136:10;145:10,25;
146:2;157:4,5,19;
174:7
**qualified (1)**
251:3
**qualifying (2)**
165:24,24
**qualitative (1)**
84:21
**quality (11)**
32:20;33:24;59:5,9,
16;65:4,7,8;67:4;
95:3,6
**quantify (1)**
83:3
**quarter (5)**
164:6;176:20;
253:10,15,17
**quarterly (1)**
79:25
**quasi-sov (3)**
54:8,11;57:6
**quasi-sovereign (5)**
42:24;43:2,5;54:12,
19
**question's (1)**
37:3
**quick (1)**
55:16
**quickly (3)**
188:19,22;278:13
**Quinn (1)**
7:24
**quite (3)**
17:22;63:15;133:5
**quote (3)**
113:12,16;276:23
**quote/unquote (3)**
85:15;138:22;255:3

**R**

**Rahman (15)**
11:14;27:9;60:13,
20;63:9,11;64:7;
69:20;71:7,11;76:12,
15;106:3;162:4;
164:21
**raise (3)**
8:9;184:8,10
**raised (1)**
184:12
**raising (1)**
205:12
**random (1)**
215:14
**range (3)**
132:21,22,23
**rapid (1)**
18:16
**rapidly (1)**
156:3
**rate (10)**

30:16,22,25;31:2,9;
63:25;64:9;177:22,
25;178:4
**rated (1)**
126:5
**rates (2)**
178:17,18
**rather (11)**
8:25;27:21;29:8,25;
170:13;173:17;192:7;
233:22;242:11;278:8,
11
**rating (16)**
54:7,14,18;57:6,12,
15;123:17,19;125:22;
127:22;201:17,20;
202:8,13,15;245:16
**ratings (9)**
57:18,18,22;124:9,
11;126:7;145:2;
208:23;245:14
**ratio (1)**
52:5
**rationing (5)**
118:5,22;119:8,11,
22
**ratios (4)**
31:16,22;32:2;
35:18
**re (12)**
5:6,11,13,14,15,16,
18;6:10,11;7:7;
181:19;190:12
**reached (2)**
154:13;233:22
**reaching (2)**
154:18;200:13
**react (1)**
121:14
**reacted (2)**
128:7;135:18
**reacting (7)**
59:25;60:4;109:12,
17;145:12;189:11;
198:2
**reaction (6)**
59:3;120:11,12;
122:10,11;127:23
**read (32)**
27:21;28:3,5,15,24;
29:3,4;30:4,5,6;36:16,
17;40:20;87:21;
104:13;120:14;
133:12;160:8;190:16;
196:21;235:2;247:13,
23;248:3;264:10,13;
268:9,12,15,23;270:7;
292:7
**reading (4)**
111:18;119:14;
131:17;233:16
**reads (3)**
47:9;111:10;234:20

**real (9)**
59:4,4,8;64:19;
69:11,13;139:19;
170:11;238:15
**realistic (2)**
172:18,19
**reality (1)**
67:10
**really (18)**
12:18;22:16;24:17;
41:5;107:18;119:5,
15;123:7;133:12,13;
188:7;191:11;204:10;
235:12;241:2;250:23;
263:12;264:9
**realtime (1)**
162:24
**reason (13)**
104:3;124:8;129:3;
149:12;167:13;
185:21;236:7,8;
237:9,12;239:3,5;
265:20
**reasonable (1)**
275:2
**reasons (7)**
102:18;265:14,17,
22;266:4,9;278:6
**recall (95)**
20:4;24:3;31:13;
32:25;34:4;38:2;
40:14;54:24;55:4,13;
57:11;59:11,18,21;
60:5;62:4,12,15,18,
21;68:22;69:6,17;
71:3;72:7,11;74:22;
75:14;76:4;77:9;
78:10,14,14;81:18,21;
82:2;85:7;94:6;96:21;
97:4,7;99:15,18;
107:18;120:2,2;
121:7,16;122:11,12;
127:6;128:20,23;
129:2;135:2;136:2,3;
137:8;144:7,19,23;
145:15;146:17;
147:11;156:23;
157:24;164:13;
167:10,12;172:15;
183:9;189:24;227:18;
246:22;251:8;252:18;
263:19;264:12,15,22;
266:18;268:11,13;
269:11;270:18;271:2;
273:18;274:11,18;
275:4;279:5;280:14;
288:5,23;289:21
**recap (1)**
221:21
**recapitalization (1)**
194:24
**recaps (1)**
221:22

**receive (4)**
80:8;221:22;278:4,
8
**received (10)**
39:25;60:17;63:8;
80:12;92:24;93:3,3;
161:15;190:19;
210:21
**receiving (1)**
249:13
**Recent (3)**
122:25;123:3;
152:18
**Recess (4)**
55:23;98:3;231:22;
271:25
**recipient (1)**
155:15
**recognize (30)**
39:20;92:16;98:14;
106:4;116:24;151:24,
25;154:22;159:19;
179:22;181:22,23;
190:14;199:24;200:2;
221:18,20;232:7;
237:22;240:7;241:5;
242:4,8,10;247:9;
250:10;259:15,17;
283:8;284:15
**recognized (1)**
171:3
**recollection (31)**
11:12,24;17:3;
20:15;21:23;24:4;
31:4;32:9;33:20;
34:11;38:13;49:25;
50:5;51:5;64:8;78:25;
93:22;122:8;150:17;
164:25;174:10;
186:25;196:12;224:9;
254:2,7;257:13;
261:6;273:4;278:15;
289:15
**recommend (4)**
60:5;98:21;99:13,
13
**Recommendation (3)**
5:7;131:14,19
**recommendations (1)**
130:12
**recommending (2)**
94:12,15
**record (24)**
7:4,17;8:19;55:21,
24;98:2,4;99:20;
123:9;158:23;159:6;
162:25;163:2,4,5;
231:21,23;271:23;
272:2;290:19,24;
291:3;292:10,11
**recording (1)**
8:24
**recovery (2)**

261:21;262:15
**redirect (1)**
285:19
**reduce (10)**
44:12;53:14,20,25;
54:3;82:20;176:12,
15;181:8;262:19
**reduced (3)**
40:9;41:2;175:25
**reduces (1)**
205:9
**reducing (3)**
145:2;176:18,20
**reduction (2)**
40:14;53:14
**reductions (1)**
53:10
**reelected (1)**
77:20
**reelection (6)**
76:9,13,17,21;77:6,
10
**refer (16)**
17:13;46:16;61:4;
89:15;99:7;108:19;
122:24;153:18;
161:24;233:9;251:7;
256:14,17,22;259:23;
260:4
**reference (15)**
49:5;51:25;57:4;
88:17;89:5,7;90:7,9,
11;104:7,24;107:24;
185:17;238:7,7
**referenced (3)**
21:21;103:24;104:2
**references (1)**
115:22
**referred (8)**
41:3;56:13;89:13;
132:12;165:7,23;
256:21;270:8
**referring (36)**
30:25;40:19;52:6,
10;56:8;84:2;89:6;
91:23;95:11;99:9;
105:17;107:19,21;
108:22;109:8;111:19;
112:7;115:12;116:10,
11;119:11;125:12;
139:4;145:4;165:8,
12,25;172:10;177:14;
193:15;197:5;201:17;
233:5;235:19,22;
272:17
**refers (17)**
47:15;50:13;54:11;
76:12;81:12;83:6;
94:25;109:24;131:11;
135:13;165:6;168:3;
173:25;178:3;248:14;
249:12;285:25
**refined (3)**

46:14,15;48:12
**refineries (5)**
95:18,22;96:12;
97:10,12
**refinery (10)**
93:18;95:19,24;
96:3,23,24;97:2,4,16,
16
**refining (4)**
138:21;139:3;
140:4;141:18
**reflect (2)**
142:22;222:15
**reflected (4)**
164:20;264:19;
281:23;284:3
**reflection (1)**
115:17
**reflective (1)**
45:24
**reflects (1)**
115:23
**refresh (2)**
11:23;93:22
**regard (2)**
141:13;142:18
**regarding (3)**
35:13;279:13;280:3
**regardless (1)**
218:5
**regions (1)**
210:25
**regular (5)**
23:11,13,17,20;
89:25
**regularly (4)**
30:4,5;186:24;
221:22
**regulators (1)**
168:6
**relate (1)**
129:12
**related (6)**
94:5;103:11;118:7;
120:7;134:23;272:16
**relates (1)**
251:10
**relating (2)**
93:24;103:3
**relations (2)**
162:16,17
**relative (17)**
44:13;87:5,16,17;
88:9;100:17,18,21,25;
115:17,23;123:20;
144:15;218:6;258:8,
11,20
**relatively (2)**
122:19;289:2
**relayed (1)**
164:22
**release (8)**
135:14,19,23;

136:7,10,14,23;137:4
**releasing (1)**
136:4
**relevance (3)**
32:11;125:22;243:6
**relevant (14)**
30:17,22;31:17;
82:12;83:11;90:2;
114:13,14,20;124:19,
20;134:13;144:11;
278:3
**relocated (2)**
38:19,20
**rely (5)**
28:15;29:7,9,14,25
**relying (2)**
28:13;29:11
**remain (1)**
173:22
**remains (2)**
40:10;154:22
**remember (176)**
12:14;23:21,25;
24:5;28:13;29:11;
36:18;50:3,15,18,21,
25;52:20,25;53:22;
55:11,12;56:23,25;
57:8,14,21;59:7,14,
23;61:24;62:10,13,
22;64:15;65:23;66:8,
10;68:23,24;70:8,10,
24;72:4,9,14;74:7,18,
24;75:9,11,13,16;
78:8,12,19,20,22;
79:19,21;85:4;86:19,
25;95:14;107:15;
108:14;109:16,18;
110:10,11;111:6;
112:5;117:16,18;
118:20;121:3;122:16,
18;124:6;125:6;
127:2,23;128:7;
130:14,15;133:21,24;
134:3;139:2,6;141:9;
143:4,7;144:4,20;
146:3;147:14,18,19;
148:4,8,10;152:3,6,
25;153:3;154:13,15;
155:19;156:21;157:7,
10,20;160:6;162:6,8,
10;163:10,12,19;
164:2,4;165:2;
166:16,18;167:16;
168:9;173:15;174:15;
175:5,13,22;177:24;
178:6,11;181:4,6;
182:5,6,8;188:10;
191:4,8,9;192:25;
193:3;197:12;198:4,
7,8,11,12;199:11;
200:4,5,6,9;201:4,23;
207:17;216:14;
231:13;251:12,16,18,

20;253:4;258:23,25;
259:6;269:13,15,19;
270:24;271:3,6;
272:24;274:5,8;
275:4;290:13
**remembering (1)**
245:22
**remind (2)**
226:9;237:7
**reminds (3)**
189:14;226:6,7
**removes (1)**
205:9
**repeat (7)**
25:19;26:13;34:16;
67:20;136:18;172:25;
204:5
**repeats (1)**
197:6
**repetitive (2)**
187:5,9
**rephrase (5)**
30:2;67:24;90:17;
127:12;136:21
**report (5)**
14:19,25;24:12;
164:15;223:24
**reported (1)**
14:21
**REPORTER (34)**
8:9,24;39:16;60:10;
79:6,13;92:13;98:10;
105:24;116:19;123:8;
126:16,18;130:8;
151:18;159:12;
181:17;190:8;199:19;
207:23;221:15;232:4;
237:17;240:4;243:14;
247:5;250:6;259:11;
273:13;276:8;282:17,
20;290:19,24
**Reporters (1)**
7:13
**reporter's (2)**
18:14;161:10
**Reporting (9)**
7:14;153:20,21,24,
25;173:4,20,25;174:5
**reports (16)**
28:24;29:2,4,8,11;
30:4;35:5,8;36:16,17,
20;37:4;142:22;
196:23;198:6;268:24
**represent (4)**
160:24;272:13;
275:17;281:7
**representative (2)**
160:17;275:19
**representatives (1)**
275:24
**represented (1)**
86:3
**represents (1)**

91:15
**request (2)**
9:15;219:15
**requested (1)**
219:3
**require (1)**
126:22
**required (2)**
136:14;254:6
**requirement (1)**
126:11
**research (54)**
20:22;25:17,21,24;
26:15,20;27:3,14;
29:7,7,9,14,18,25;
30:6,9;32:7;34:6,7,9,
14,19,25;35:4,5,7;
36:21,22;37:2,5,7,14,
18,21,24;38:3,4,10;
45:15;61:3;71:13;
86:13;135:7;193:21;
197:21;198:15,17,18,
20,24;220:24,25;
221:2,6
**researcher (1)**
63:11
**researchers (1)**
29:10
**reserve (2)**
95:7,12
**resigning (1)**
193:2
**resolution (2)**
148:11,12
**resolve (1)**
190:2
**resolved (5)**
153:9;171:20;
188:18;204:9;262:24
**respect (38)**
13:2;16:22;20:25;
27:7;31:13;32:7,17;
42:7;43:20,21;44:8,
23;49:3;99:12;
102:24;112:24;113:5;
125:4;143:16;164:16;
185:17;194:7;196:8;
199:9;200:20;209:16;
218:20;219:9,10;
221:5;253:2;260:21;
263:3;267:16;279:19;
286:21;288:6,12
**respecting (1)**
30:4
**respective (13)**
62:5;74:4;89:21;
134:10;204:18,21;
205:6;211:20;212:12;
215:19,21;216:3,4
**respond (2)**
9:5;210:20
**response (14)**
25:9;63:8;79:3;

134:7;136:4;155:5,
10;158:4,7;172:11;
184:16;223:14;271:8;
276:19
**responsibilities (5)**
12:16;15:3;16:11;
20:20;128:24
**responsibility (4)**
22:14,22;224:3;
261:2
**responsible (2)**
15:8;43:25
**restated (1)**
257:12
**restrict (1)**
277:17
**result (4)**
67:12;68:3,7;
138:20
**resulting (1)**
68:13
**results (10)**
135:15,19,24;
136:4,7,10,14,24;
157:8;163:25
**retained (1)**
244:22
**Retirement (2)**
8:2;275:17
**return (5)**
91:3,5,7;134:6;
142:23
**returned (1)**
134:3
**review (1)**
281:17
**reviewed (1)**
256:14
**Richardson (1)**
7:20
**right (114)**
8:9;16:14;18:9,24;
19:18;24:4;34:20;
36:16;38:13,14;45:7;
56:4,15;57:6;63:3,9,
16;68:8;72:12;74:9;
75:3,5;79:16;81:13;
88:4,10;91:25;93:12,
20;97:13;99:23;
100:2;115:14;116:6,
22;117:8;118:14,25;
125:4;126:21;128:5;
129:14;134:20;
135:15;136:24;137:2,
2;139:11,16;140:5;
141:19;143:9,14;
146:18;149:9;153:11;
154:18,24;157:3,4;
159:20,23;160:11;
161:16,21;169:21;
170:2;173:7;174:2;
176:21,23;183:8;
184:15;191:2,22;

192:4;200:17;212:17;
213:18;214:13;
217:19;218:11;
222:12;223:13;225:2,
17;229:17;232:9,10;
234:5,8;236:23;
238:10;240:12;
255:15,18;256:7,15;
257:9;260:11;263:16,
19,20,21;265:23;
270:22;273:10;
276:18;277:9;281:13;
282:22;283:5,8;286:2
**right-hand (2)**
223:7;283:14
**rigs (4)**
102:16,17,21;
105:18
**Rio (1)**
182:3
**risk (67)**
64:21,24;65:3,6;
84:14;99:16;101:14,
17,21;102:12;103:7,9,
11,13,14,15;106:16;
107:24;108:3,17,22,
24,25;109:12;115:17;
117:23;118:3,6,7,11,
18,22;119:18;120:4;
139:21;145:9;148:20,
23,24;157:22;169:5,
10,13;172:6,6,17,17;
173:17;174:6;177:6,
11,15;178:15,16;
185:21;186:16,20;
187:17,18,22;188:4;
189:9,11;254:8;
262:17,25;267:20
**risks (21)**
86:15;102:10,14,
15,19,21;109:17;
112:24;113:4;118:8;
134:22;176:11;183:6;
188:18;258:18,20;
261:25;262:3,7,11,12
**risky (2)**
119:8;187:25
**Rm (1)**
3:14
**Roberto (2)**
92:6;93:17
**role (9)**
14:18;61:7;202:22;
207:4;229:21;232:14;
234:13,14,15
**room (2)**
153:19,23
**roots (1)**
71:22
**roughly (2)**
62:24;146:19
**round (2)**
76:9,18

**Rousseff (1)**
108:19
**routine (1)**
198:15
**row (1)**
197:7
**rule (2)**
220:2;264:8
**rules (2)**
276:6,8
**run (1)**
148:22
**runners (1)**
230:21
**running (1)**
74:19
**Russ (1)**
287:12
**RYAN (2)**
3:13;8:6

## S

**S&P (3)**
124:24;125:21;
126:7
**Saffari (3)**
16:6;39:8;155:16
**Saffari's (6)**
16:13;22;19:24;
22:2,6;43:20
**Said's (1)**
196:2
**sake (2)**
18:14;161:10
**SAL (4)**
282:14;285:25;
286:6,7
**sales (5)**
193:14;194:4,12,
23;262:19
**salesperson (2)**
287:9,23
**Salomon (4)**
229:18,24;230:2,7
**SAM (1)**
233:6
**same (41)**
19:13;26:21;52:7,
10;53:16;62:24;65:5;
77:21;83:20;84:4,5,9;
88:21;94:19;112:24;
113:4;146:13;170:15;
186:13;193:7;196:22;
197:10;207:6;219:4;
235:23;238:7,8,10,18;
239:3;242:16,20,22;
266:24;276:6,8;
279:18;283:23;284:2,
5,20
**San (1)**
19:16
**satisfy (3)**

279:11,20,24
**save (1)**
115:10
**saved (1)**
172:24
**saw (2)**
90:20;134:11
**saying (18)**
45:4;77:17;137:3;
163:9;178:13;182:2,
3;187:9;195:13;
208:16;209:7;211:2,
6;217:19;235:21;
238:16;242:8;274:20
**SBI (1)**
286:8
**scale (2)**
269:24;270:2
**scattered (1)**
248:15
**scenario (7)**
112:17,20;116:3;
156:2;177:21;179:7,
21
**scenarios (4)**
21:9;218:5;252:9,
10
**schedule (1)**
156:19
**scheduled (1)**
162:11
**score (4)**
133:3,7,10,14
**Scott (2)**
232:23;239:2
**se (3)**
151:8;174:15;
290:16
**searching (1)**
124:24
**SEC (2)**
168:3,9
**second (19)**
57:4;80:22;87:11;
93:15;106:9;109:20;
128:10;129:20,23;
173:18;190:15;201:6;
245:8,10;246:5,7,16,
19;250:15
**secret (2)**
263:10,11
**section (8)**
80:23,25;87:4,6;
94:19;135:6;139:23;
142:5
**sector (3)**
40:11;81:25;144:11
**secure (1)**
115:20
**Securities (29)**
7:8;21:14,21;23:14,
21;67:18;68:12;69:4;
73:18;76:3;122:9;

127:21;204:2;207:21;
208:6;242:24;244:14;
265:9;277:18;278:17;
279:13;280:3;284:16,
18,22;286:15,16,17;
287:3
**security (1)**
115:23
**seeing (2)**
86:3;252:7
**seem (8)**
54:21;91:11;101:3,
16;116:2;162:24;
228:7;237:8
**seemingly (1)**
106:14
**seems (14)**
77:2;111:5;117:19,
19;131:24;134:18;
157:4;194:16;195:19;
196:15;199:4;213:9;
235:12;236:7
**segment (1)**
70:17
**SEIDEL (2)**
3:19;7:12
**sell (16)**
36:23;37:15;67:17;
68:12,16;126:23,25;
127:3,5,8;204:2;
227:17,22;234:2,3;
243:11
**selling (4)**
117:16;121:4;
243:9,25
**sell-side (1)**
196:23
**send (15)**
63:2;164:15;187:2;
208:15;210:23,25;
211:5;212:18,19,23;
213:3,6,10,24;270:11
**sender (3)**
98:16;130:23;131:8
**sending (1)**
165:2
**senior (2)**
223:22;276:15
**sense (27)**
16:4;36:7;71:7;
76:12;83:18;100:17;
103:10;104:19;
106:24;107:12,14;
114:9;115:19;124:13;
141:11;158:17;
166:20;168:17;189:7;
192:14;198:12;204:5;
215:11;228:2;259:2;
266:23;271:18
**sensitive (7)**
47:10,18,22,23;
48:2,2,15
**sent (12)**

98:13;131:7;
134:11,14;155:12;
161:16;164:18;
181:20,23;182:2;
211:8;213:11
**sentence (15)**
50:7;51:8;85:2,3;
87:11;88:3;91:12,21;
95:7;153:5;173:18,
23;178:5,23;193:16
**sentiment (5)**
84:23;85:4,9,15,18
**separate (11)**
17:13,15,19,25;
18:23;37:7;44:17,20,
22;109:16;256:8
**separately (3)**
47:6;129:4;164:15
**September (4)**
39:19;40:15;55:3,8
**series (1)**
159:25
**seriously (2)**
184:3,6
**served (1)**
150:6
**service (3)**
138:10;142:13,14
**services (2)**
102:13,16
**set (13)**
55:15;94:7;105:20;
116:13;121:13;
181:13;190:7;199:14;
203:23;239:21;245:6;
249:19;282:16
**Setting (5)**
21:25;22:12;77:5;
182:15;286:25
**settle (6)**
243:17,23;244:2,3,
8,18
**settled (2)**
244:20,23
**Seven (3)**
10:14;13:25;14:2
**shaking (1)**
9:2
**share (3)**
114:5;118:16;
155:10
**shared (3)**
155:13;179:15;
196:2
**shares (3)**
204:9;220:16,19
**sheer (1)**
230:16
**sheet (5)**
36:20;141:8,18;
255:7;256:11
**sheets (1)**
35:9

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL

**short (4)**
51:9;97:22;181:11;
285:20
**shortage (1)**
108:9
**shortages (1)**
119:19
**shorter (1)**
264:8
**shorter- (1)**
262:8
**shorter-dated (5)**
261:17,18,22,25;
264:4
**shortfall (11)**
193:20,22;194:2,
15;195:5,14,16,20,21;
196:3;197:22
**shortfalls (1)**
196:8
**shorthand (1)**
22:10
**shortly (1)**
161:23
**show (2)**
132:14,19
**showdown (1)**
74:9
**showed (3)**
113:23;114:4;
115:13
**showing (1)**
113:15
**shown (1)**
248:7
**shows (1)**
244:23
**Sí (1)**
95:25
**side (4)**
79:16;161:3;223:7;
252:7
**sides (1)**
277:20
**sidetracked (1)**
197:24
**sign (21)**
166:12;168:10;
169:9,11,16,20,22,25;
170:3,7,9;171:3,11,
16;250:25;251:10,19;
252:10,23;253:7;
255:8
**signed (4)**
251:24;253:5,8;
292:18
**significant (4)**
66:13;74:18;95:2;
277:15
**significantly (4)**
87:15;88:17;
185:13,18
**signifies (1)**

283:17
**signify (2)**
283:16;284:17
**signing (3)**
168:3,6;251:3
**Silva (9)**
28:23;34:10;75:13;
192:3;232:11,12;
233:22;235:23;239:6
**Silva's (2)**
238:24,25
**similar (3)**
153:8;235:7,7
**simple (1)**
237:23
**simply (2)**
142:10;237:23
**Singapore (4)**
206:10;216:2,9;
240:24
**single (1)**
176:19
**single-name (1)**
209:22
**single-name-issuer (2)**
209:14,17
**sitting (3)**
83:24;211:5,14
**situation (7)**
30:10;91:14,21;
107:9;154:22;167:20;
200:20
**situations (1)**
203:2
**six (4)**
106:13;107:16,19;
123:24
**size (17)**
120:17;141:10;
203:12,18;256:10;
263:13,15;265:16;
269:19,20;271:18;
273:22;274:4,25;
275:5;277:3;289:2
**SKADDEN (3)**
3:4;7:21;272:13
**skip (1)**
51:7
**slash (2)**
232:15,17
**SLATE (1)**
3:4
**slippage (2)**
153:20,24
**slow (1)**
209:3
**slowdown (13)**
69:21,25;70:3,6,15,
25;71:5,13,20;84:8,9,
9,14
**slowing (1)**
71:18
**small (1)**

98:24
**social (3)**
83:8,19,25
**sold (3)**
117:7,12;128:14
**soliciting (1)**
174:10
**solution (4)**
106:12;107:15,22;
149:20
**solutions (2)**
180:12;202:25
**somebody (3)**
8:4;32:6;288:6
**someone (15)**
15:20;16:19;18:7;
32:4;41:8;66:8;89:15;
115:10;166:5;183:8;
198:24;199:8;222:22;
238:9;289:24
**Sometimes (4)**
23:8;28:2,11;79:24
**somewhere (3)**
89:8;206:18;214:15
**soon (1)**
150:19
**sorry (59)**
7:25;10:4;13:15;
16:20;17:22;22:4;
25:19;34:16;42:18;
44:18;45:17;52:8,8,9;
56:7,13;67:20;70:21;
79:5;87:10;93:15;
95:7;100:23;106:8;
110:11;111:23;
120:13;121:14;
125:16;126:16;128:2;
129:14;154:25;155:2;
161:12;171:15;
178:21;189:15;
191:24;202:21;
203:16;204:9;205:13;
208:11;214:5;220:5;
228:12,16;238:6;
243:4;244:15;247:14,
23,25;250:19;259:25;
273:13;282:19;
288:17
**sort (4)**
152:11;168:14;
194:24;284:12
**sorts (1)**
129:5
**sound (1)**
146:18
**sounds (2)**
118:20;146:19
**source (1)**
96:20
**sources (2)**
27:15;28:12
**South (1)**
7:11

**sovereign (22)**
32:11,18;33:2,7;
36:21;37:7;42:24;
87:16;88:18;89:7,15,
19;90:22,24;178:4,17,
18;179:7,23,24;180:6,
20
**sovereigns (1)**
20:22
**SPALDING (1)**
3:12
**speak (27)**
24:9;36:13;41:5,11;
45:18;49:12;73:22;
103:22;104:7;145:3;
147:22;167:5,8;
177:13;185:20;202:8;
208:9,11,20;225:22;
249:8;253:16,19;
257:24;288:14;
289:16,24
**Speaking (7)**
32:10;167:13;
186:23;203:8;238:21;
287:24;288:5
**specific (66)**
10:20;12:23;13:4;
15:7;17:5,8;23:4;
29:8,10,17;30:24;
32:4;35:12,15;38:9;
50:3,17;52:21;55:7;
57:11;59:12;60:5;
71:4;72:7;77:17;83:3;
84:16;95:19;99:7;
103:3;121:8;122:8,
14,15;126:7;128:2;
139:4;140:21;142:24;
143:2;144:23;146:17;
147:11;148:10,14;
157:10;176:14;198:7,
11,19;219:16;221:3;
223:3;228:16;230:23;
245:13;251:21;259:7;
269:13,19;272:24;
273:18;274:13,24;
287:2;288:17
**Specifically (80)**
15:11;24:3,8,9;
32:17;34:5,7;37:23;
53:23;55:13;59:18,
22;62:4,12,15,18;
64:17;66:3,5;68:25;
69:18;70:7;71:11;
72:11;76:13;77:15;
78:14,20,23;80:5;
82:5;85:7;86:25;
87:12;88:3;94:15;
96:21;97:4,7;107:18;
108:13,15;110:13;
117:18;118:20;
122:18;124:6;125:4;
127:6;130:15;131:9;
143:5,7;144:4,7,19,

23;145:15;146:3;
155:19;157:20,24;
162:8;167:12;172:15;
175:5;176:18;181:6;
185:20;253:4;258:25;
261:16;266:18;
269:12,13;270:6,18;
274:18;288:5;290:16
**spectrum (3)**
258:9;261:12,15
**spell (4)**
20:17;205:3;
232:24;243:14
**spelled (1)**
288:21
**spelling (1)**
237:16
**spend (1)**
104:16
**spent (2)**
13:25;170:8
**spoke (13)**
147:14;166:5,22,
25;167:7,15;288:15;
289:4,10,13;290:5,10,
14
**spoken (7)**
147:23,24;166:2;
167:10;172:11;
269:17;273:15
**spread (20)**
58:22;85:25;86:6;
87:16;88:18;89:2,7,
15,18,19;90:21,22;
100:12,13,18;115:22;
131:25;132:14,20;
228:17
**spreads (12)**
58:2,15,18;87:15;
88:17;90:12;115:9,
11,13;177:15;178:4,
18
**spring (2)**
86:19;128:25
**ss (1)**
292:4
**stability (1)**
30:10
**stake (1)**
165:16
**stamp (1)**
80:23
**stamped (19)**
39:18;60:12;79:15;
92:15;98:12;106:2;
116:20;130:10;
151:20;181:19;
190:13;199:21;
221:17;232:6;240:5;
247:7;250:7;259:13;
283:2
**stampede (4)**
120:11,12;122:10,

11

**stamps (1)**
94:20
**stand (6)**
19:7;42:17;100:11;
131:12;223:15;
224:18
**standard (2)**
163:21,25
**standards (3)**
266:15,24;268:21
**standpoint (1)**
267:10
**Stanley (3)**
13:19,24;272:17
**start (2)**
31:2
**started (6)**
21:12;39:6;58:12;
93:10;171:10,16
**starting (3)**
17:4;143:21;259:19
**starts (1)**
152:10
**State (8)**
8:3,19;32:22;58:7;
198:18;275:17;292:3,
22
**stated (2)**
9:9;168:14
**statement (14)**
56:21;57:7;65:11;
103:4;105:16;127:12;
140:3;153:4;170:9;
178:9,11,12;272:23;
273:3
**statements (18)**
35:9,10;96:15;
146:16;147:2,6,16,20;
150:11;157:3;165:9,
20;168:14;169:12,23;
170:4;171:17;187:15
**state-run (1)**
81:12
**States (6)**
239:14;266:25;
267:5;281:25;282:12;
285:5
**static (3)**
33:3,4;78:3
**station (1)**
93:18
**status (6)**
54:8,19;56:4,15;
57:6,10
**stay (3)**
111:23,24;203:5
**Steen (1)**
7:19
**step (8)**
114:10,16,20;
115:2,4,7;170:12;
238:13

**stepping (1)**
113:3
**steps (4)**
115:10;201:10;
204:3;267:22
**still (21)**
45:2;54:7,18;57:5;
61:13;80:10;102:3;
157:21;163:10;
184:18;187:6;207:18;
208:3;213:21;214:16;
240:20;247:20;
252:11;262:23,24,24
**stipulation (1)**
290:22
**stock (2)**
113:14,20
**stocks (1)**
74:10
**stop (1)**
262:18
**stored (1)**
129:4
**stories (1)**
262:25
**story (4)**
107:7;250:23;
251:7;262:23
**Stracke (2)**
155:16;181:21
**straight (4)**
123:8,11;213:6;
238:10
**strategy (2)**
17:8;149:9
**Street (4)**
7:11,14;27:25;
290:8
**stress (6)**
175:9,14;177:14,
17,23;183:4
**strike (23)**
21:11;40:17;44:19;
85:12;97:10;145:18;
170:14;178:5;179:2;
184:9;188:10;189:16;
195:25;203:24;231:4;
237:7;244:6,15;
251:17;257:7;264:25;
265:21;270:20
**string (6)**
5:5,10,12,14,15;
6:10
**strong (1)**
173:4
**stuff (2)**
152:12;207:24
**subinvestment-grade (1)**
127:20
**subject (11)**
93:6;130:11;
131:11;181:19;
190:11;192:6;201:9,

21;260:9;263:3;
276:20
**subjective (2)**
32:14,15
**subscribe (1)**
65:11
**subscribed (1)**
292:18
**subscription (1)**
190:22
**Subsequent (1)**
125:9
**subsidize (1)**
111:21
**subsidized (1)**
84:3
**substance (1)**
139:20
**Sucharow (2)**
8:2;275:16
**suffer (3)**
111:21,25;112:2
**suffering (1)**
108:14
**sufficiently (1)**
180:5
**suggest (11)**
101:3,16;107:5;
108:24;117:19;133:5;
156:10;179:5;181:7;
201:19;254:17
**suggested (3)**
124:8;183:22;
235:18
**suggesting (9)**
53:3;70:2;76:16,16;
91:23;120:24;153:15;
193:22;202:7
**suggestion (11)**
19:9;91:11;112:14;
114:3;118:12;131:17;
133:16;148:17,19;
173:5,16
**suggestions (2)**
150:12,15
**suggests (1)**
107:14
**Suisse (10)**
12:20,24;13:12;
190:22;192:5;193:20;
197:21;226:21,22,23
**supervisor (1)**
223:20
**support (30)**
32:11,19,23;33:2,4,
7,10,11,12,14,15,19,
21,23;66:12;109:2;
112:18;114:10,20;
115:8;161:4;179:6,
20,23,24;180:6,9;
212:12;234:14;236:5
**supposed (1)**
128:12

**supposition (3)**
46:24,25;47:2
**Sure (41)**
9:6;18:5;37:11;
40:21;44:15;45:3;
46:4;55:17;62:15;
64:12;67:23,23;
68:25;71:21;97:23;
105:7;117:10;126:18;
134:11;144:2,16;
162:20;188:18;
204:14,16;208:17;
211:7;213:18;214:2;
217:12;231:19;
250:16,23;263:18;
269:10;271:22;274:8;
289:9,11,14;290:16
**surety (1)**
187:24
**surprise (2)**
269:23,25
**surprised (1)**
270:2
**surprising (3)**
235:12,15;236:7
**suspect (1)**
286:15
**suspected (1)**
286:17
**swap (1)**
90:2
**swiftly (1)**
187:12
**Switch (3)**
5:7;130:12;131:15
**syndicate (3)**
287:24;288:4,19
**System (21)**
8:2;129:6;142:5,9;
204:13;205:2,6,20,23;
208:17,19;211:7;
215:3,20,21;233:13,
20,25;244:16,23;
275:17
**systematic (2)**
267:12;268:22
**systems (1)**
243:22

**T**

**table (2)**
132:17;260:16
**tables (2)**
133:12,14
**Tadashi (2)**
234:4;287:10
**talk (28)**
9:3;23:5,7;24:10;
29:21;32:3;33:13;
34:2;140:11;146:25;
147:5;176:5;184:24;
186:17;187:3,14;

188:11;189:3;204:24;
225:19;227:9;228:10,
14,17;248:21;263:24;
269:9;278:19
**talked (9)**
10:18;34:6;172:5;
176:18;216:3;225:16;
227:7;271:4;278:25
**talking (24)**
24:5;29:22;37:6;
56:3,24,25;64:15;
66:19;70:10;72:4;
84:10,13;94:11;
104:16;115:11;
129:20;141:4;157:7;
180:22;195:20;
238:20;245:7;270:24;
289:18
**talks (1)**
76:8
**tangible (1)**
204:3
**tape (1)**
97:22
**target (6)**
21:4,4;196:13,14,
14,17
**tax (1)**
249:15
**team (9)**
61:3;81:4;94:2;
206:2,4;207:6;
214:19;219:4;240:22
**teams (4)**
211:24;212:6,19;
240:24
**technical (12)**
145:7,11,13,19;
150:8;165:20;172:18;
186:3;202:4;252:13;
255:15;256:9
**Ted (1)**
148:3
**telephone (2)**
3:13;278:2
**Telephonic (2)**
214:8;279:21
**telling (2)**
10:12,18
**tells (2)**
222:4,5
**ten (1)**
184:14
**tenor (2)**
87:24;134:18
**ten-year (2)**
131:18;274:16
**term (9)**
41:8,25;77:21;78:2;
106:21;107:3;138:4;
217:14,14
**terms (9)**
78:4;102:15;

124:19,20;138:10;
141:12;175:7;211:18;
283:10
**testified (2)**
272:19,21
**testimony (4)**
9:22;280:14;292:8,
10
**thanked (1)**
154:18
**Thanks (9)**
5:11;6:13;55:20;
56:7;152:17;155:24;
156:16;158:16;
260:11
**that'd (1)**
216:17
**theme (2)**
106:10,22
**Theoretically (2)**
31:11;149:2
**theory (1)**
66:11
**therefore (3)**
8:24;111:25;136:15
**thinking (12)**
32:4;77:16;109:23;
119:21;122:14;125:7;
167:17;170:8;176:23;
192:14,18;261:16
**third (9)**
83:6;87:8;98:18;
100:2;104:11;164:6;
201:5;253:10,15
**third-quarter (5)**
135:15,24;254:3,4;
264:11
**thorough (1)**
268:4
**though (8)**
30:6;54:19;56:11;
89:11;115:24;134:12;
241:25;264:8
**thought (42)**
19:13;22:9;33:2;
50:4;54:2,17;59:14;
65:12,24;66:6,8;
69:10,11;76:25;
77:12;86:15,16;
101:4,16;103:9;
109:22;113:18;116:5;
122:9;127:14,18;
135:3;145:24;148:21;
150:5;151:3;166:23;
171:8;196:16;202:16;
219:14;228:6;258:19;
261:20;264:4,5;
273:11
**thoughts (4)**
5:13;159:18;160:7;
164:10
**Three (17)**
11:7;75:10,10,10,

11;123:25;178:14;
206:5;210:25;211:23;
212:4,6,11,12,19;
240:24;266:3
**throughout (2)**
9:14;72:15
**thus (2)**
111:20;139:19
**ticker (1)**
99:4
**ticket (15)**
205:8;221:21,22;
233:14,25;234:2,3;
236:9,12;239:3;
241:8;282:7,8;
283:11;289:23
**tickets (3)**
221:8,10,11
**tight (2)**
228:20,22
**tighter (1)**
90:10
**till (1)**
65:5
**Tim (2)**
240:13;241:2
**times (8)**
13:17;21:6;25:13;
27:25;30:19;59:7,14;
226:9
**time-stamp (1)**
282:5
**timetable (3)**
154:3,4,7
**timing (5)**
126:2;127:13;
147:2;165:10;245:10
**title (2)**
42:2;190:25
**titled (2)**
79:15;199:23
**today (13)**
5:18;9:21;119:5,9;
199:23;200:24,25;
256:21;275:14;
276:11,13;279:4;
280:9
**Today's (2)**
7:10;9:24
**together (1)**
188:16
**told (1)**
218:17
**took (1)**
72:9
**tool (4)**
111:14;112:13;
113:19;114:6
**top (19)**
102:2;117:6,12;
119:6;132:18;135:2;
137:8;146:3;155:3,7,
8;159:22;194:25;

220:14;222:12;
224:13;232:9;240:12;
284:12
**topics (3)**
191:9;274:5;275:5
**topmost (1)**
63:8
**total (1)**
44:14
**tough (1)**
123:7
**toward (2)**
117:11;187:15
**Trade (111)**
5:6,20,23;6:3,14;
130:12;161:4;204:4,
13,14,16,18,20,24,25;
205:8;208:16;210:13;
211:7,9,17,23,25;
212:17,24;215:17,22,
23,23;216:9,10,10,15,
21,21,25;218:5,8;
219:15;220:7,12,15,
18,21;221:8,10,11,21,
22;222:5,16,18,20,22,
25;224:5,8,10,20;
225:12,13,17,18;
226:11,13,24;229:3,9,
12;230:5,7,15,15;
232:19;233:11,25;
234:14,25;235:20;
236:5,8,12;238:9,17;
239:5,7,15,17;240:9,
25;241:2,8,12,16,19;
242:24;243:9,16;
277:18;280:8;281:23;
283:11,18;284:2,3;
285:3,7;286:21;
287:4,16;289:23
**traded (5)**
217:21,22;227:2;
283:20,20
**trader (15)**
12:22;204:18,21;
215:17,22;225:23;
226:10,11,15;233:22;
235:17,19,22;281:21;
285:3
**traders (3)**
212:2;215:24;
219:15
**trades (18)**
205:22;208:14;
211:19;212:6,14;
214:19,24,25;215:6,7,
19;218:20;221:8;
224:4;225:20;238:3;
242:23;244:17
**trading (47)**
101:6;115:24;
179:24,25;204:15;
205:25;206:3,9,11,21,
23,25;207:12,15;

208:7,13;210:7,8,10,
14,16,24;211:6,9;
212:4,16,18,23;213:4,
7,21,24;214:16,18,23;
215:10,16;216:7,7,8;
218:24;219:4,9;
234:15;240:22,24;
243:9
**trajectory (3)**
57:19;113:22,24
**transacted (3)**
281:24;282:11;
285:4
**transcript (5)**
146:12;249:20;
290:23;292:8,9
**transfer (1)**
277:23
**transition (2)**
129:5;206:20
**Translate (3)**
28:8;10;175:2
**transportation (1)**
95:18
**travel (2)**
62:17;214:15
**traveled (1)**
239:10
**traveling (1)**
213:20
**Treasury (1)**
89:2
**tree (2)**
47:3;125:25
**trends (4)**
30:16,22,25;31:3
**tricky (1)**
18:15
**trigger (1)**
119:15
**trip (28)**
61:24;62:3,6,11;
63:6;70:11,12;71:13;
78:6,9,11,13,23;79:2;
80:19,24;84:22;85:5,
8;94:3;106:22;
107:13;110:7,10;
118:21;119:16;
164:12;172:11
**trips (2)**
62:13,23
**true (6)**
27:10;30:13;62:20;
207:9;292:9,11
**Trump (1)**
74:8
**Trump/Clinton (1)**
74:9
**truth (3)**
8:12,12,12
**truthful (1)**
9:22
**try (7)**

208:7,13;210:7,8,10,
14,16,24;211:6,9;
212:4,16,18,23;213:4,
7,21,24;214:16,18,23;
215:10,16;216:7,7,8;
218:24;219:4,9;
234:15;240:22,24;
243:9
**TSOX (10)**
205:2,19,23;211:8;
215:3,6,7,16;233:18,
19
**T-S-O-X (1)**
205:4
**Tsueyoshi (4)**
234:4,9;285:8;
287:11
**Tsueyoshi's (1)**
234:13
**turn (10)**
46:8;61:15;80:22;
94:18;104:10;117:5;
190:21;214:18;
247:12;250:13
**twice (2)**
62:19;197:10
**two (31)**
13:17,23,23;40:22;
74:2;75:6,8;90:8,9;
100:8,14,19;132:15;
133:14,15;149:10;
162:6;174:8;197:6;
206:5;228:24;229:24;
242:16,19;256:7,8;
258:7;265:12;279:2,
6;290:10
**type (4)**
21:20;92:23;
220:17;283:23
**types (2)**
13:2,6
**typical (1)**
49:8
**typically (2)**
37:8;63:5

U

**UBF (4)**
6:12;260:10,16,21
**UBS (23)**
234:21,24;235:11,
13;236:7,13,15,19;
237:13,23,24,25;
238:3,21,22,22;
239:19;241:9,13,17,
20,21,25
**UBS's (1)**
238:16
**UK (2)**
229:25;230:3
**ULO (6)**

236:22;237:6;
238:9,18;241:9;242:7
**ULS (1)**
242:21
**ULST (1)**
242:21
**ultimate (1)**
255:17
**ultimately (1)**
137:13
**ULW (3)**
236:15;237:2,5
**unable (6)**
102:12;103:16,16;
141:24;174:8;180:9
**uncertainty (6)**
170:23;171:10,13,
15,16,20
**Unclear (1)**
149:24
**uncompetitive (1)**
81:15
**unconcerned (1)**
260:22
**under (5)**
8:11;25:5;106:7;
252:9;292:8
**underneath (1)**
99:10
**underperforming (3)**
90:24;91:8,10
**understate (1)**
59:4
**understated (2)**
59:8,15
**Understood (8)**
43:11;58:13;
188:18;199:13;
207:16;217:18;
262:22;290:12
**underweight (8)**
41:17;45:6,9,10,24;
58:16;143:15;144:11
**UNDERWRITER (4)**
3:3;7:22;272:14,16
**underwriters (11)**
230:24;231:3,5,9,9,
10;272:20,21;273:5;
274:12;290:10
**unfortunately (1)**
133:12
**union (4)**
82:14,15,19,20
**unions (3)**
81:15,19;82:11
**unique (2)**
91:14,20
**United (6)**
239:14;266:25;
267:5;281:25;282:12;
285:5
**university (1)**
14:12

**unjustified (2)**
58:19,21
**unless (4)**
9:10;19:11;180:9;
187:23
**unlikely (1)**
230:14
**unofficially (1)**
24:14
**unrealistic (3)**
193:23,25;194:4
**unrelated (1)**
102:4
**unsure (1)**
185:10
**unusual (1)**
269:6
**unwilling (2)**
171:3,11
**up (31)**
31:7,12;45:18;
64:22;96:22;110:22;
129:10;134:10;
145:25;153:16;
164:19;166:11;
168:24;169:4,6,18;
170:16;171:6;182:15;
189:21;196:19,19;
215:22,23;216:10,16;
217:17;247:23,24;
250:15;253:9
**update (1)**
80:15
**updates (3)**
80:2,4,13
**upgraded (1)**
124:13
**upper (1)**
283:13
**upside (1)**
101:5
**upstanding (1)**
102:16
**urge (1)**
253:2
**use (23)**
26:20,23;28:10;
29:19;31:19,22;32:2;
41:12,14;42:3;52:17;
86:2,9,16;90:4;
100:13,16;113:19;
131:3;202:3;226:23;
240:23;255:7
**used (9)**
32:7;83:7;107:4;
111:13;112:12;114:6;
226:10;286:5,6
**uses (3)**
41:8;240:22,23
**using (7)**
89:4;90:22;101:11,
11;142:5;207:12,14
**usual (4)**

123:21,22;219:24;
290:22
**usually (14)**
45:8;206:5;210:23;
212:23;222:4;226:25;
236:19;243:19,24,24;
258:16;273:21;278:7;
290:11

## V

**Vaguely (1)**
62:2
**valid (1)**
48:21
**Valor (1)**
28:4
**valuation (28)**
85:20,22,25;86:17;
100:18;124:20,23;
141:24;166:11,17,19,
20,21;167:9,11,14;
168:10,18,19,20,21;
169:2,16,18,25;
170:10;218:6;258:16
**value (29)**
35:22;36:4,10,19;
58:24;86:5,7,11,18;
87:5;88:9;98:23;
100:21,25;114:4;
131:18,23;132:3;
139:20;140:4;141:18;
144:15;171:7;255:11;
258:8,11;261:11,14,
19
**valued (3)**
124:22;125:21;
167:18
**Vanessa (1)**
7:20
**various (2)**
163:17;281:18
**Veja (2)**
93:6,9
**verbal (2)**
8:25
**verbally (2)**
79:7;199:9
**versus (8)**
41:17,18;42:22;
90:21,24;133:11;
258:8,11
**Via (8)**
3:13;210:6;215:6;
223:24;238:3;243:17;
244:3,8
**viability (1)**
82:9
**video (3)**
7:6,13;182:18
**videoconference (2)**
182:16,19
**VIDEOGRAPHER (17)**

3:19;7:4;8:8;55:21,
24;97:21,25;98:4;
158:22;159:6;163:2,
5;231:20,23;271:23;
272:2;291:2
**view (29)**
53:24;54:22,24;
55:2;77:24;78:22,25;
82:12;83:12;121:12;
135:22;136:3;137:19;
144:12;150:23;151:6;
172:13;179:16;180:4,
8;192:20;194:6;
200:20;258:12;
263:15;265:8;279:12;
280:2;284:25
**views (5)**
45:24;78:3,8,13;
198:18
**Vinicius (4)**
28:23;192:3;
232:11;235:20
**visited (2)**
61:16;84:25
**visiting (1)**
61:2
**voice (1)**
205:12
**volatile (1)**
145:16
**volatility (17)**
69:3;73:25;74:3,14;
75:16,20,23;76:2,5;
124:15;145:20;
146:22;173:21;174:5,
12,15;175:7
**volume (2)**
195:5,10
**voters (1)**
111:21
**VPMSILVA (1)**
233:9
**vulnerability (1)**
84:7

## W

**Wacker (1)**
3:6
**wait (15)**
9:4;18:16,19;
123:12;127:21;
161:11;178:20;
180:15;187:6;207:23,
24;209:5;220:3;
239:24;276:3
**waited (1)**
185:23
**waiting (2)**
71:25;186:21
**waiver (25)**
148:18,22;150:19;
173:7,10,13,17;183:5,

6,18,19;184:2;185:12,
22,24;186:6,9,18;
187:11,22;188:12,16,
17,21,25
**walk (1)**
152:18
**walking (1)**
152:25
**Wall (1)**
27:25
**wants (1)**
165:17
**warnings (1)**
152:12
**warrant (1)**
180:6
**wave (1)**
129:18
**way (26)**
16:3;17:11;60:18;
86:16,20,21;89:11;
113:18;115:10;132:6;
141:14,15;154:3,5,6,
7,10;191:25;220:20;
239:18;243:16;
249:23;267:8,12;
268:22;284:8
**ways (7)**
53:3,15,19;58:17;
71:19;85:24;258:16
**weak (1)**
107:22
**weakening (1)**
64:19
**weakly (1)**
90:14
**weakness (1)**
128:19
**Wednesday (1)**
151:21
**week (1)**
60:25
**weekly (3)**
187:2;271:10,14
**weeks (1)**
11:7
**weigh (1)**
103:6
**weighing (1)**
101:20
**weight (2)**
143:16;144:11
**weighting (4)**
144:5,7,17,21
**weren't (6)**
122:14;169:22;
170:3;187:20;262:17,
18
**WG (2)**
223:13;280:19
**whereas (1)**
254:5
**wherever (3)**

213:23;216:8;
276:11
**whichever (1)**
222:6
**whole (8)**
8:12;84:15;96:12;
97:12;104:13;196:16;
205:17;252:5
**whose (14)**
29:2,11,24;30:3,4;
32:6;44:20;48:16,23,
24;121:13,14;232:21;
233:22
**wide (3)**
90:10;228:19,22
**widened (1)**
87:15
**widening (7)**
58:2,14,18,22;
88:17;90:12,21
**wider (5)**
101:6,8,10,13;
177:15
**William (2)**
223:16;280:22
**willing (9)**
169:9,11,16,20,22,
25;170:3,7,9
**win (1)**
108:18
**winning (1)**
74:5
**winter (4)**
151:12;270:16;
271:11,11
**wish (2)**
196:21;249:22
**within (18)**
12:24;13:9;17:7;
27:5,13;29:22;49:22;
106:15;118:4;121:10,
25;136:14;144:9;
260:7;261:11;269:16,
18;285:5
**without (5)**
10:12,17;170:10;
184:20;261:16
**WITNESS (214)**
7:23,25;8:13;21:23;
22:16;23:17;26:13,
22;29:14;30:19;
31:19;32:14,25;
33:23;34:16;35:3;
36:13;37:11,18;38:6;
39:14;41:5,11;44:10;
45:14,20;46:4;49:12,
19,25;51:5;52:9,16;
53:7,13;55:11,20;
56:8,18,20;57:17;
59:2,11,18;63:23;
64:12;66:15;67:2,20;
69:6;71:3,10;73:2,11,
22;74:13,22;75:19;

76:15,24;77:9;79:11;
81:21;82:5,18;83:2,
14,21;84:13;85:7,17;
86:25;89:4;90:16;
92:3,8,11;93:2;94:14;
95:10;98:8;101:3;
103:22;104:6;107:3;
108:6;113:8;114:3;
115:22;116:8,17;
119:25;120:24;121:7;
123:6,14;124:18;
125:16,18,24;127:11;
128:2;135:2;136:2,
18;137:15,23;139:13,
18;140:14,19;141:22;
143:19;144:2;145:15;
147:11;151:16;161:2;
164:25;168:13;
170:19;171:2,15,23;
174:14,21;175:5,17;
176:25;178:21;
179:12,19;180:25;
182:8;183:13;184:5,
20;188:7,24;189:6;
190:5;191:8;192:17;
194:10;195:12;
196:11;197:5,16;
199:3,17;202:21;
205:13,15,17;208:9;
210:19;211:4,16;
212:8,22;213:6,13;
214:2;215:13;216:24;
218:16;219:3;220:5;
225:5;227:5;228:5;
229:11;231:8;235:10;
236:11;238:6;241:19;
242:4,16;243:2;
244:10,25;245:24;
247:3;249:8,24;
250:4;252:18;255:20;
256:7,17,24;257:24;
258:15;259:6;260:6;
261:10;262:11;
263:18;264:21;265:5,
12;266:9,18;267:3,
12;268:2;269:3;
270:18;273:14;282:3;
285:7;287:6;289:8
**woken (1)**
216:16
**women (1)**
162:6
**wonder (1)**
141:4
**wondering (2)**
55:18;170:6
**word (3)**
41:12,14,24
**words (1)**
71:25
**work (18)**
12:19;13:12,16,20;
14:3;15:20;16:2,5,8,

23;19:24;39:8;40:3;
150:10;207:6;219:16,
17,19
**worked (7)**
13:17,17,22;16:18;
122:2;207:2;268:5
**working (9)**
16:14,19;95:20;
102:17;121:25;
150:18;156:2;168:16;
268:6
**works (1)**
214:7
**world (2)**
213:23;214:16
**worldwide (2)**
207:10,11
**worried (2)**
184:5;195:16
**worry (2)**
114:25;184:10
**worse (2)**
106:15;267:4
**worsen (1)**
107:9
**worsened (1)**
33:24
**worsens (1)**
112:15
**Wow (1)**
152:13
**write (5)**
29:4;155:21,23;
250:22;265:15
**write-down (28)**
141:3,5,6,10,12;
184:25;203:12,18;
256:4,15,18,22;257:2;
264:18,25;265:3,8,14,
15,16,17,22;266:4,10;
276:21,25;277:3;
278:13
**write-downs (7)**
138:21;139:3,8,19;
140:8,12,17
**writer (2)**
54:17;105:15
**writes (8)**
40:18;69:21;79:24,
25;84:20;154:17,21;
165:15
**writing (4)**
63:2;200:4,19;
248:15
**written (4)**
106:5;130:19;
178:12;268:24
**wrong (7)**
163:9;191:12;
247:20;248:3,10,13;
277:5
**wrote (7)**
48:17,18;55:4;

106:19;152:21;200:3,
23

**Y**

**Yang (1)**
236:2
**Yang's (1)**
239:2
**year (6)**
14:9;72:20;73:17;
109:22;132:20;164:7
**years (29)**
13:23,24,25;14:2;
21:11,12;23:15;24:6;
28:13;29:12;30:14,
23;31:14,24;32:19,
23;33:3,20;36:11;
43:9;47:7;49:10,16;
54:23;57:13,19;
95:11;226:15;264:8
**Yep (1)**
168:5
**Yesterday (3)**
10:16;11:4,19
**yield (11)**
13:15,20,23;86:2,6;
100:18;203:4;246:2,
8,12,20
**yields (1)**
31:12
**York (34)**
3:15,15;7:15,15;
217:2;219:20,21,23;
224:23,24;225:6,14;
235:11;236:13,16,18;
237:24;238:2;275:16;
282:15;284:18,19;
285:10;286:2,5,22;
287:3,8,9,18,22,25;
288:4;289:20

**Z**

**Zeljka (22)**
11:16;32:5;62:7,9;
126:3;135:10;155:17;
162:2;190:10;193:8,
11;196:20;198:5,9,13,
19,23;199:9,22;
251:23;269:9,14
**Zeljka's (2)**
194:14;197:12
**zone (3)**
206:6;208:3;217:2
**zones (2)**
206:7;213:17

**0**

**00032657 (1)**
151:20
**000713954 (1)**

159:16
**00221530 (1)**
240:6
**00221670 (1)**
232:17
**00330978 (1)**
221:17
**00330987 (1)**
283:2
**00349896 (1)**
106:2
**00369353 (1)**
60:12
**0039482 (1)**
79:15
**00500792 (1)**
181:19
**00603377 (1)**
116:21
**00621045 (1)**
98:12
**00663163 (1)**
259:13
**00729598 (1)**
130:10
**00766712 (1)**
247:8
**00781100 (1)**
250:7
**00800765 (1)**
190:13
**00869330 (1)**
199:21
**01552783 (1)**
92:15
**01906648 (1)**
39:18
**04 (1)**
250:20
**05 (2)**
250:18;254:13
**0bject (1)**
104:5

**1**

**1 (19)**
15:21;16:4,7,18;
17:5;18:4;22:2,13;
39:12,17;40:8,25;
42:8;46:9;63:16,21;
98:2;135:13;259:14
**1/break (1)**
63:18
**1:05 (1)**
159:3
**10 (8)**
5:12;51:10,11;
159:8,15,15;181:25;
184:18
**10:37 (1)**
98:2
**10:47 (1)**

98:5
**100 (5)**
  6:12;187:24;
  260:15,17;264:8
**10036 (1)**
  3:15
**100mn (1)**
  260:11
**100y (1)**
  6:13
**100-year (3)**
  260:11,18;264:9
**105 (2)**
  115:25;250:14
**10-year (1)**
  274:17
**11 (8)**
  5:14;181:14,18;
  184:18;185:6;190:7,
  7;250:9
**11-19-14 (1)**
  5:5
**115 (1)**
  115:25
**116 (1)**
  5:3
**1185 (1)**
  3:14
**12 (3)**
  5:15;190:3,10
**12:14 (1)**
  158:23
**12:57:13 (1)**
  250:22
**122.5 (1)**
  283:11
**126 (1)**
  7:14
**13 (10)**
  5:18;199:15,21;
  248:7;278:22;279:4,
  19,20,23;288:6
**13:50:53 (1)**
  248:11
**13:51:55 (1)**
  247:18
**130 (1)**
  5:5
**1305 (1)**
  159:7
**1310 (1)**
  163:3
**1311 (1)**
  163:6
**14 (13)**
  5:20;151:21;
  221:12,16;234:6,11;
  235:4;248:20;280:7;
  283:24;284:3;285:24;
  289:22
**1437 (1)**
  231:21
**1454 (1)**

231:24
**14-CV-9662 (1)**
  7:8
**15 (9)**
  5:23;228:3;231:25;
  232:5,5;234:19;
  247:12,14;250:18
**151 (1)**
  5:10
**1548 (1)**
  271:24
**155 (1)**
  3:6
**159 (1)**
  5:12
**16 (3)**
  6:3;239:25;240:5
**1604 (1)**
  272:3
**1628 (1)**
  291:3
**17 (4)**
  6:6;39:19;246:25;
  247:6
**175 (1)**
  230:15
**18 (3)**
  6:8;250:2,7
**181 (1)**
  5:14
**19 (4)**
  6:10;130:11;259:8,
  12
**190 (1)**
  5:15
**199 (1)**
  5:18
**1996 (1)**
  14:11

---

**2**

**2 (9)**
  15:22;22:2,7,13;
  60:7,11;98:5;143:14;
  158:23
**2.4 (1)**
  133:3
**2:32 (1)**
  193:8
**20 (12)**
  6:14;7:1,10;51:11;
  159:2;179:25;199:22;
  274:17;282:18,23;
  283:6;286:12
**20:57:04 (1)**
  117:6
**20_ (1)**
  292:19
**200 (3)**
  115:9,16,25
**200- (1)**
  271:11

**2000 (1)**
  133:11
**2009 (1)**
  226:19
**2011 (4)**
  12:11,13,17;226:19
**2012 (8)**
  39:19;40:15;55:3,8,
  12,13;266:16;267:23
**2013 (13)**
  59:7;62:20;225:12;
  273:5,7,11;274:19;
  275:3;280:25;285:8;
  287:7,9;288:6
**2014 (44)**
  59:14;60:13;61:25;
  62:14,17;64:16;
  66:20,22;72:5;74:20;
  75:17;76:3;78:6;
  79:17;86:19;94:3;
  96:7,8,10;97:6;98:13;
  106:3;107:11;117:8;
  124:25;125:4;128:25;
  130:11;134:20;144:4;
  146:5,20;147:6,7;
  152:23;227:15;228:3;
  245:12;258:13;
  266:16;269:9;270:15;
  274:12,15
**2015 (62)**
  21:13;23:15;24:7;
  38:17;59:20;62:22;
  124:25;125:10;
  127:24;128:5,9;
  129:22;144:17;
  146:10,16,18,20;
  147:16,21;150:21;
  151:12,22;152:4;
  159:17;162:7;163:14,
  20;164:2,4;174:25;
  175:6;179:17;181:25;
  188:12;189:23;
  192:22;193:8;195:10;
  196:20;199:23;
  206:16,19,20;227:20;
  246:2,10;250:9;
  251:12,16;253:13;
  256:5;257:6,8;258:4,
  24;259:14;264:11,14;
  267:24;270:16,22;
  271:12
**2016 (8)**
  7:1,10;159:2;
  273:12,14;275:4;
  283:12;289:2
**2019 (3)**
  273:9,12,14
**2019s (1)**
  273:10
**2021 (1)**
  133:10
**2024 (4)**
  273:12,14;274:16,

17
**2024s (1)**
  273:10
**20-F (1)**
  264:13
**21 (2)**
  60:13;245:15
**21:07:25 (1)**
  117:20
**21:11:58 (1)**
  119:13
**21:17:10 (1)**
  120:8
**212.556.2137 (1)**
  3:16
**221 (1)**
  5:20
**23 (7)**
  222:9,10,24,25;
  223:2;224:4;284:4
**231 (1)**
  5:23
**239 (1)**
  6:3
**24 (1)**
  246:10
**24/7 (2)**
  210:10;211:23
**246 (1)**
  6:6
**24-hour (2)**
  214:6,13
**250 (1)**
  6:8
**259 (1)**
  6:10
**282 (1)**
  6:14

---

**3**

**3 (6)**
  69:20;79:9,14;
  94:10;159:7;231:21
**3.5x (3)**
  51:13,16;52:4
**3:00 (2)**
  216:17,20
**3:49 (1)**
  106:7
**30 (7)**
  152:23;156:17,22,
  25;159:17;162:11;
  176:8
**300 (1)**
  289:8
**30th (1)**
  158:6
**3-11-15 (1)**
  6:8
**312.407.0903 (1)**
  3:8
**3-3-15 (1)**

6:6
**3422 (1)**
  3:14
**3Q (1)**
  157:8
**3-year (1)**
  274:19

---

**4**

**4 (9)**
  71:24;92:9,14;94:9;
  193:8;196:20;231:24;
  291:2,3
**4-1-12 (1)**
  6:3
**4719 (2)**
  20:2,8
**49 (2)**
  46:9;57:5
**4-9-14 (1)**
  5:3

---

**5**

**5 (11)**
  89:12;98:6,11,13;
  115:12;155:21;
  209:19,21,25;210:2,4
**50 (1)**
  249:13
**5-13-13 (2)**
  5:20;6:14
**55 (1)**
  160:4
**56 (2)**
  104:11;177:5
**56th (1)**
  7:14
**59 (1)**
  155:23

---

**6**

**6 (4)**
  104:12;105:21,25;
  106:2
**6:28 (1)**
  291:4
**60 (2)**
  152:10;155:3
**600 (2)**
  132:8,9
**601 (3)**
  132:9,9,13
**60606-1720 (1)**
  3:7
**6-1-15 (1)**
  6:10
**6599 (2)**
  15:16;19:17
**66 (1)**
  192:2

IN RE PETROBRAS SECURITIES LITIGATION CONFIDENTIAL

**KOFI BENTSI**
**May 20, 2016**

**67 (1)**
190:21
**6979 (2)**
15:16;19:15
**6-K (1)**
264:10

**7**

**7 (5)**
5:3;63:16;76:8;
116:15,20
**709 (2)**
20:2,6
**7-31-14 (1)**
5:23
**7480 (2)**
15:16;19:19
**7621 (5)**
15:16;18:4,12;19:3;
42:10
**79 (2)**
117:6,11
**792 (1)**
185:5
**7940 (4)**
15:16,17;19:21;
42:13

**8**

**8 (7)**
5:5;106:3,7;130:5,
9;138:19;139:24
**8:39 (2)**
7:2,5
**80 (2)**
119:4;179:25
**81 (1)**
120:8
**83 (1)**
80:23
**84 (2)**
87:3;88:2
**85 (1)**
94:18
**865 (1)**
7:11

**9**

**9 (7)**
5:10;117:8;151:14,
19;278:21;279:4,8
**9:39 (1)**
55:22
**9:47 (1)**
55:25
**9170 (2)**
20:2,10
**9735 (2)**
20:2,14
**9780 (2)**

20:2,12
**991 (1)**
283:3

# EXHIBIT 5

# SULLIVAN & CROMWELL LLP

TELEPHONE: 1-212-558-4000
FACSIMILE: 1-212-558-3588
WWW.SULLCROM.COM

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _2-1-16_

*125 Broad Street*
*New York, NY 10004-2498*

LOS ANGELES • PALO ALTO • WASHINGTON, D.C.

FRANKFURT • LONDON • PARIS

BEIJING • HONG KONG • TOKYO

MELBOURNE • SYDNEY

January 28, 2016

*By ECF and Hand Delivery*

The Honorable Paul A. Crotty,
    U.S. District Court for the Southern District of New York,
        500 Pearl Street,
            New York, New York 10007.

> Re:    *In re Goldman Sachs Group, Inc. Sec. Litig.,*
>        Master File No. 1:10-cv-03461-PAC

Dear Judge Crotty:

The case is STAYED. The Clerk of Court is directed to terminate the pending motion for summary judgment, without prejudice to its renewal (doc # 167). The parties are directed to notify the Court if or when the motion should be reinstated and the stay lifted.
SO ORDERED: 2-1-16

HON. FAUL A. CROTTY
UNITED STATES DISTRICT JUDGE

On behalf of Defendants in the above-referenced action (the "Action"), we write to inform the Court that on January 26, 2016, the Second Circuit granted Defendants' petition under FED. R. CIV. P. 23(f) for permission to appeal from the Court's September 24, 2015 order certifying a class in this Action (the "Certification Order"). A copy of the Second Circuit's order is enclosed.

After conferring with Plaintiffs' counsel, we respectfully request that the Court stay further proceedings in the Action pending the Second Circuit's adjudication of Defendants' appeal (other than that Defendants will complete briefing on their summary judgment motion on February 5, 2016). Plaintiffs consent to this proposed stay, including deferring a ruling on the summary judgment motion while the appeal is pending. Following the Second Circuit's ruling, the parties will meet and confer and promptly inform the Court as to whether there are any matters they believe are impacted by the appellate ruling. Defendants reserve the right to seek additional briefing at that time.

The Honorable Paul A. Crotty                                                    -2-

Defendants note that other district courts have issued stays following grants of interlocutory review of class certification orders.[1] The decision on appeal not only may determine whether a class should be certified, it also may address issues of law and expert evidence relevant to the merits of this case, including the summary judgment motion. For example, Defendants will present various issues on appeal, including whether the fraud-on-the-market presumption of reliance applies here and the viability of Plaintiffs' theories of the "price impact" of the challenged statements. Defendants believe these issues overlap with legal and evidentiary merits issues, including materiality, reliance and loss causation. A stay thus may avoid significant and potentially unnecessary waste of Court and party resources, and would not delay discovery, which is complete. Adjudication of the summary judgment motion prior to final resolution of certification issues potentially may also raise substantial questions as to the scope of the ruling's *res judicata* effect on the members of the class certified by this Court.

The parties would be pleased to provide any further information that may be of assistance to the Court, and to address these matters further at a conference should the Court request.

Respectfully submitted,

Rich J H. Klapp

Richard H. Klapper

(Enclosure)

cc:    Counsel of Record

---

[1] *See, e.g., N.J. Carpenters Health Fund* v. *RALI Series 2006-QO1 Trust*, No. 08-cv-8781 (HB), Dkt. No. 137 (S.D.N.Y. May 31, 2011); *IBEW Local 98 Pension Fund* v. *Best Buy Co.*, No. 11-429, Dkt. No. 235 (D. Minn. Oct. 22, 2014); *Nieberding* v. *Barrette Outdoor Living, Inc.*, 2014 WL 5817323, at \*1, 5 (D. Kan. Nov. 10, 2014).

EXHIBIT 6

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 7/5/16

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------- X
BARBARA STROUGO, et al.,          :
                                   :
                    Plaintiffs,    :         14 Civ. 5797(VM)
                                   :
            - against -            :         **DECISION AND ORDER**
                                   :
BARCLAYS PLC, et al.,             :
                                   :
                    Defendants.    :
-----------------------------------X

**VICTOR MARRERO, United States District Judge.**

On June 15, 2016, the Court of Appeals for the Second
Circuit ("Second Circuit") granted the petition pursuant to
Rule 23(f) of the Federal Rules of Civil Procedure ("Rule
23(f) Petition") filed by Barclays PLC, Barclays Capital
Inc., Robert Diamond, Antony Jenkins, and William White
(collectively, "Defendants") for leave to appeal the order of
the Honorable Shira Scheindlin dated February 2, 2016
("February 2 Order," Dkt. No. 78) granting the motion of
plaintiffs Mohit Sahni and Joseph Waggoner, individually and
on behalf of all others similarly situated (collectively,
"Plaintiffs"), for class certification.[1] (Dkt. No. 86.)

By letter dated June 20, 2016, Defendants requested a
pre-motion conference regarding their contemplated motion to
stay the action due to the Second Circuit's granting of its

--------------------------------------------------

[1] This action was reassigned to this Court on April 7, 2016. (See Dkt.
Entry for Apr. 7, 2016.)

1

23(f) Petition ("June 20 Letter"). (Dkt. No. 88.) Defendants put forth several arguments in favor of a stay: (1) whether the action proceeds as an individual or class action will have a significant effect on the way the parties litigate because the individual plaintiffs are seeking minimal damages; (2) although the 23(f) Petition relates only to class certification, if the Second Circuit decides in Defendants' favor, Defendants will be entitled to summary judgment on Plaintiffs' individual claims because Plaintiffs admit they did not actually rely on the alleged misrepresentations; and (3) any delay in the litigation will be short as the Second Circuit has ordered an expedited appeal. (Id. at 1-2.)

In analyzing the four factors courts consider when determining whether a stay is appropriate, Defendants contend: (1) there is a high likelihood of success because the Second Circuit does not typically grant Rule 23(f) petitions if it considers the underlying order to be correctly decided; (2) Defendants face irreparable injury if a stay is not granted due to unnecessary and costly litigation; (3) there is no harm to Plaintiffs as discovery is almost complete, and any harm is outweighed by the harm to Defendants; and (4) the public's interest in judicial efficiency weighs in favor of granting a stay. (Id. at 2-3.)

2

Plaintiffs responded to the Defendants' June 20 Letter by letter dated June 21, 2016 ("June 21 Letter"). (Dkt. No. 89.) Plaintiffs argue that Defendants cannot make a showing that their appeal will succeed on the merits because: (1) the granting of the Rule 23(f) Petition does not necessarily indicate that the Second Circuit will grant Defendants' appeal as that would obviate the need for an appeal process following the granting of a Rule 23(f) petition and (2) the February 2 Order certifying the class followed extensive briefing as well as an evidentiary hearing in which the parties and Judge Scheindlin questioned the parties' market efficiency experts. (Id. at 1.)

In considering whether there was irreparable injury to the Defendants, Plaintiffs contend: (1) there is no need for a stay as the litigation will continue even if it is on an individual basis; (2) Judge Scheindlin correctly applied the presumption of reliance; and (3) even if the Second Circuit grants Defendants' appeal, Defendants' expert could not conclude that Barclays' American Depository Shares traded in an inefficient market. (Id. at 2-3.)

Finally, with respect to the harm Plaintiffs will face and the public interest, Plaintiffs assert: (1) expedited briefing does not guarantee an expedited ruling, and a stay in the litigation will result in a delay of Plaintiffs

3

recouping the losses they sustained and (2) the public interest is best served by allowing Plaintiffs to have their day in court, especially if the litigation will proceed on an individual basis regardless of the Second Circuit's decision on the appeal. (Id. at 3.)

The Court construes the correspondence described above as a motion by Defendants to stay the action pending the Second Circuit's review of Judge Scheindlin's February 2 Order ("Motion"). For the reasons discussed below, Defendants' Motion is DENIED.

## I.  **LEGAL STANDARD**

The Supreme Court has made clear that because a "stay is an intrusion into the ordinary processes of administration and judicial review," it "not a matter of right[;]" rather, it is an "exercise of judicial discretion." Nken v. Holder, 556 U.S. 418, 427, 433 (2009) (internal quotation marks omitted); see also Maldonado-Padilla v. Holder, 651 F.3d 325, 327 (2d Cir. 2011).

The four factors courts consider when determining whether to grant a stay are: "'(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the

4

proceeding; and (4) where the public interest lies.'" U.S.
S.E.C. v. Citigroup Glob. Markets Inc., 673 F.3d 158, 162 (2d
Cir. 2012); see also In re World Trade Ctr. Disaster Site
Litig., 503 F.3d 167, 170 (2d Cir. 2007) (quoting Hilton v.
Braunskill, 481 U.S. 770, 776 (1987)); In re Elec. Books
Antitrust Litig., No. 11 MD 2293, 2014 WL 1641699, at *4
(S.D.N.Y. Apr. 24, 2014). Courts have treated these factors
"like a sliding scale," such that "more of one excuses less
of the other." Duka v. U.S. S.E.C., No. 15 Civ. 357, 2015 WL
5547463, at *5 (S.D.N.Y. Sept. 17, 2015) (internal quotation
marks omitted); see also Thapa v. Gonzales, 460 F.3d 323, 334
(2d Cir. 2006) ("We have treated these criteria somewhat like
a sliding scale, citing approvingly other circuits'
formulation that '[t]he necessary 'level' or 'degree' of
possibility of success will vary according to the court's
assessment of the other stay factors' and explaining that
'[t]he probability of success that must be demonstrated is
inversely proportional to the amount of irreparable injury
plaintiff will suffer absent the stay. Simply stated, more of
one excuses less of the other.'"). However, "the movant cannot
prevail by showing a mere possibility of success or of harm."
Sutherland v. Ernst & Young LLP, 856 F. Supp. 2d 638, 641
(S.D.N.Y. 2012) (citing Nken, 556 U.S. at 434).

5

## II. __DISCUSSION__

Since the first two factors - likelihood of success on the merits and irreparable injury - are the most critical, the Court will address those first. See <u>Nken</u>, 556 U.S. at 434 ("The first two factors of the traditional standard are the most critical."); <u>Sutherland</u>, 856 F. Supp. 2d at 641 ("The first two questions -- addressing likely success and irreparable harm to the movant -- are the most salient concerns.").

A. __LIKELIHOOD OF SUCCESS ON THE MERITS__

First, demonstrating likelihood of success on the merits "requires 'more than a mere possibility of relief.'" <u>In re Elec. Books Antitrust Litig.</u>, 2014 WL 1641699, at *7 (<u>quoting Nken</u>, 556 U.S. at 434). Defendants fail to demonstrate more than a "mere possibility" that they will succeed on the merits. In the June 20 Letter, Defendants state that "[i]n granting Defendants' Rule 23(f) petition, the Second Circuit has, to a certain extent, 'already weighed in on the substantiality' of the strength of Defendants' arguments" because "the Second Circuit does not usually grant Rule 23(f) petitions if it considers the underlying order to have been correctly decided." (Dkt. No. 88 at 2-3.) However, Defendants fail to address the merits of their appeal regarding class certification. Rather, they read the Second Circuit's

6

granting of their petition as an assessment of the merits and speculate that it signals a likelihood of success. Upon review, the Court is persuaded that the granting of the Rule 23(f) Petition does not necessarily indicate that the Second Circuit will reverse the February 2 Order. Because Defendants have failed to analyze the merits of their appeal, the Court finds that Defendants have failed to establish a likelihood of success.

B.   <u>IRREPARABLE INJURY TO DEFENDANTS</u>

To establish irreparable injury, Defendants have the burden of showing "'injury that is not remote or speculative but actual and imminent.'" <u>In re Elec. Books Antitrust Litig.</u>, 2014 WL 1641699, at *4 (internal citations omitted). Furthermore, they must demonstrate that the injury "'cannot be remedied' absent a stay" and "for which a monetary award cannot be adequate compensation." <u>Id.</u>

Defendants argue they will be "irreparably harmed through unnecessary and costly litigation[.]"[2] (Dkt. No. 88 at 3.) It is well-established by courts in the Second Circuit, however, that the prospect of incurring litigation costs, even if substantial, is not sufficient to constitute

---

[2] Defendants cite district courts in Nevada and California but fail to cite any courts in the Second Circuit that have found litigation expense to be sufficient to demonstrate irreparable injury. (<u>See</u> Dkt. No. 88 at 3.)

irreparable injury. <u>See</u>, <u>e.g.</u>, <u>Glatt v. Fox Searchlight Pictures Inc.</u>, No. 11 Civ. 6784, 2013 WL 5405696, at *4 (S.D.N.Y. Sept. 17, 2013) ("A stay is inappropriate here because the only 'irreparable harm' identified by Defendants is the cost of continuing to litigate this action. However, it is well established that 'litigation costs do not rise to the level of irreparable injury.'"); <u>L-7 Designs, Inc. v. Old Navy, LLC</u>, 964 F. Supp. 2d 299, 320 (S.D.N.Y. 2013). Furthermore, Plaintiffs have represented that they intend to continue this action even on an individual basis. (<u>See</u> Dkt. No. 89 at 2.) In consequence, Defendants will be faced with litigation expenses regardless of the Second Circuit's class certification decision. The Court therefore finds that Defendants have failed to demonstrate irreparable injury warranting a stay.

C.   <u>HARM TO PLAINTIFFS</u>

Because "'the first two factors -- the movant's likelihood of success on appeal and prospect of suffering irreparable harm -- are the most critical [and] movants have failed to make the required showing on these two prongs, little more needs to be said as to the second two, which ask whether a stay is likely irreparably to harm [Plaintiff] and whether a stay is in the public interest.'" <u>Duka v. U.S.</u>

8

S.E.C., 2015 WL 5547463, at *7. Therefore, the Court will address these two factors in brief order.

First, the harm to Plaintiffs is a neutral factor in this action. Some courts have held that a delay in final resolution of the claim is not prejudicial as it can be remedied with pre-judgment interest. See, e.g., Sutherland, 856 F. Supp. 2d at 643 ("[T]he only harm to her from a stay is delay in achieving a final resolution of her claim, and that harm may be fully remedied by an award of pre-judgment interest.").

Alternatively, other courts have held that plaintiffs have a strong interest in being fully compensated for their losses as soon as possible, and therefore, a stay is not appropriate. See, e.g., In re Elec. Books Antitrust Litig., 2014 WL 1641699, at *12 ("Delaying the trial would also delay any recovery due plaintiffs, should they prevail. . . . [C]lass members have a strong interest in being fully compensated for any losses they have suffered."). As a corollary, courts have also cited litigation expense as an additional harm associated with delay, especially for those plaintiffs who may face a financial hardship. See, e.g,, Medien Patent Verwaltung AG v. Warner Bros. Entm't Inc., No. 10 Civ. 4119, 2014 WL 1169575, at *2 (S.D.N.Y. Mar. 21, 2014) (In discussing whether a damages trial should go forward, the

court held: "In addition to the axiom that 'justice delayed is justice denied,' it is a practical reality that the longer litigation lasts, the more expensive it will be. Allowing Deluxe to drag this case out even further by staying the damages trial will impose even more financial hardship on MPV for a longer period of time.").

In this case, while Plaintiffs have a strong interest in resolving this matter and recovering their losses as soon as possible, they may be able to obtain pre-judgment interest to offset the delay. Furthermore, Plaintiffs do not mention the harm of increased litigation expense in their June 21 Letter, and there is no indication that they face a financial hardship. Therefore, the Court finds that the harm to Plaintiffs is a neutral factor in this analysis.

D.    PUBLIC INTEREST

As an initial matter, the Court agrees with Defendants that there is a public interest in resolving matters quickly. See, In re Elec. Books Antitrust Litig., 2014 WL 1641699, at *12 ("Likewise, the public interest favors a speedy trial and resolution of this matter."), However, this argument for judicial efficiency would apply to every motion to stay pending an appeal if the court assumes that the appeal will necessarily result in a reversal. See, e.g., Medien Patent Verwaltung AG v. Warner Bros. Entm't Inc., 2014 WL 1169575,

at *3 ("Apparently unwilling to acknowledge that there might be even one factor that does not weigh in its favor, Deluxe argues that the public interest favors a stay because conducting the damages trial now 'would be a waste of judicial resources, and therefore tax dollars.' . . . Of course, this argument applies to every motion to stay pending appeal if one assumes, as Deluxe does, that the appeal will result in reversal. Not surprisingly, Deluxe fails to cite any cases that adopt this rationale. In truth, the Court's interest lies in concluding this matter and getting it off my docket. This is not the type of case that implicates the public interest, so this factor should be treated as neutral."); see also Glatt, 2013 WL 5405696, at *4 ("Moreover, a stay would not be in the public interest. Defendants argue a stay would free up this Court's resources, but that is true of every case. And it would do so at the expense of delaying Plaintiffs' rights to pursue this action."). Therefore, contrary to Defendants' assertions, it is not necessarily a waste of time and resources if the Court declines to assume that the February 2 Order will be reversed on appeal.

Moreover, judicial economy is not promoted if the issue on appeal will not be dispositive of the entire case. See, e.g., Sutherland, 856 F. Supp. 2d at 644 ("First, considerations of judicial economy counsel, as a general

11

matter, against investment of court resources in proceedings that may prove to have been unnecessary.") (internal citations omitted).

In the instant action, there is an interest in resolving matters quickly, and the Plaintiffs contend they will continue the litigation even on an individual basis. (See Dkt. No. 89 at 3.) Accordingly, the pending appeal of the class certification order will not be dispositive. Furthermore, there is no guarantee that the appeal will result in a reversal, weakening Defendants' argument that judicial efficiency would favor a stay. Therefore, at best this factor is neutral.

In conclusion, this Court finds that Defendants have failed to demonstrate that a stay of further litigation is warranted in this action.

### III.  **ORDER**

For the reasons stated above, it is hereby

**ORDERED** that the motion (Dkt. No. 88) of defendants Barclays PLC, Barclays Capital Inc., Robert Diamond, Antony Jenkins, and William White (collectively, "Defendants") to stay this action pending the Court of Appeals for the Second

Circuit's review of the order dated February 2, 2016 issued
by the Honorable Shira Scheindlin (Dkt. No. 78) is **DENIED**.

**SO ORDERED.**

Dated:     New York, New York
           5 July 2016

Victor Marrero
U.S.D.J.

# EXHIBIT 7

FILED

2005 Sep-08  AM 10:12
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| **AAL HIGH YIELD BOND FUND and** | ) | |
| **DELAWARE DELCHESTER FUND, a series** | ) | |
| **of Delaware Group Income Funds and** | ) | |
| **formerly a series of Delaware Group Income** | ) | |
| **Funds, Inc., on behalf of themselves** | ) | |
| **individually and all others similarly situated,** | ) | |
| | ) | Civil Action Number |
| Plaintiffs, | ) | **2:00-cv-01404-UWC** |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **HAROLD RUTTENBERG;** | ) | |
| **RANDALL L. HAINES;** | ) | |
| **DELOITTE & TOUCHE LLP; and** | ) | |
| **BANC OF AMERICA SECURITIES LLC** | ) | |
| **f/k/a NATIONSBANC MONTGOMERY** | ) | |
| **SECURITIES LLC, on behalf of itself and a** | ) | |
| **class of underwriters,** | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER DENYING MOTION FOR A STAY

This case is now nearly five years old.  It has finally been scheduled for trial.  The

Court sees no reason to delay the trial.

Defendant's Motion For a Stay Pending Appeal is accordingly DENIED.

Done this 7th day of September, 2005.

_____
U.W. Clemon
Chief United States District Judge

EXHIBIT 8

Case 16-1914, Document 54, 07/08/2016, 1811110, Page393 of 417

# IN THE UNITED STATES COURT OF APPEALS

## FOR THE FIFTH CIRCUIT

---

No. 11-40789

---

M.D., by next friend Sarah R. Stukenberg; D.I., by next friend Nancy G. Pofahl; Z.H., by next friend Carla B. Morrison; S.A., by next friend Javier Solis; A.M., by next friend Jennifer Talley; J.S., by next friend Anna J. Ricker; K.E., by next friend John W. Cliff, Jr.; D.P., by next friend Karen J. Langsley; T.C., by next friend Paul Swacina,

       Plaintiffs - Appellees

v.

RICK PERRY, in his official capacity as Governor of the State of Texas; THOMAS SUEHS, in his official capacity as Executive Commissioner of the Health and Human Services Commission of the State of Texas; ANNE HEILIGENSTEIN, in her official capacity as Commissioner of the Department of Family and Protective Services of the State of Texas,

       Defendants - Appellants

---

Appeal from the United States District Court for the
Southern District of Texas, Corpus Christi

---

Before BENAVIDES and CLEMENT, Circuit Judges*.

PER CURIAM:

      IT IS ORDERED that appellants' opposed motion for stay pending appeal is **DENIED**.

IT IS FURTHER ORDERED that appellants' alternative request to stay all discovery in the District Court that is related solely to the class pending resolution of the appeal is **DENIED.**

This court sua sponte **ORDERS** the expediting of this appeal.

*\* This order is being entered by a quorum of this court pursuant to 28 U.S.C. Section 46(d)*

# *United States Court of Appeals*
### FIFTH CIRCUIT
### OFFICE OF THE CLERK

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE**
**NEW ORLEANS, LA 70130**

August 17, 2011

MEMORANDUM TO COUNSEL OR PARTIES LISTED BELOW:

    No. 11-40789     M.D., et al v. Rick Perry, et al
                 USDC No. 2:11-CV-84

Enclosed is an order entered in this case.

                Sincerely,

                LYLE W. CAYCE, Clerk

                *Claudia N. Farrington*
                By: _____
                Claudia N. Farrington, Deputy Clerk
                504-310-7706

Mr. Richard Thaddeus Behrens
Mr. Hector Antonio Canales
Ms. Amelia Jean Cardenas
Ms. Shelley Nieto Dahlberg
Mr. Edward Caldwell Dawson
Mr. Stephen Andrew Dixon
Mr. David Allen Dodds
Mr. James Byron Eccles
Mrs. April L. Farris
Ms. Dori Kornfeld Goldman
Ms. Marcia Robinson Lowry
Mr. Barry Frank McNeil
Ms. Jessica Polansky
Mr. James Patrick Sullivan
Ms. Velma Gano, Court Reporter
Mr. James Carlton Todd
Mr. Richard Paul Yetter

P.S. to Ms. Gano: Please advise this Court how quickly the
    transcript can be filed in light of the Court Order.

EXHIBIT 9

S.D.N.Y.-N.Y.C.
12-md-2389
Sweet, J.

# United States Court of Appeals

FOR THE
SECOND CIRCUIT

————————

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 12th day of May, two thousand sixteen.

Present:

        José A. Cabranes,
        Raymond J. Lohier, Jr.,
           *Circuit Judges.*[1]

————————————

Facebook, Inc., et al.,

                *Petitioners,*

        v.                                               15-4167

North Carolina Department of State Treasurer, et al.,

                *Respondents.*

————————————

Petitioners move, pursuant to Federal Rule of Civil Procedure 23(f), for leave to appeal the district court's order granting Respondents' motion for class certification, and for leave to file a reply brief in support of their Rule 23(f) motion. Upon due consideration, it is hereby ORDERED that the motion for leave to file a reply brief is GRANTED, but the Rule 23(f) motion is DENIED because an immediate appeal is not warranted. See *Sumitomo Copper Litig. v. Credit Lyonnais Rouse, Ltd.*, 262 F.3d 134, 139-40 (2d Cir. 2001).

                          FOR THE COURT:
                          Catherine O'Hagan Wolfe, Clerk



————————————

1 Judge Chester J. Straub has recused himself from consideration of this petition. Pursuant to Second Circuit Internal Operating Procedure E(b), the matter is being decided by the two remaining members of the panel.

**DECLARATION OF MATTHEW L. MUSTOKOFF**

## <u>DECLARATION OF MATTHEW L. MUSTOKOFF</u>

I, Matthew L. Mustokoff, declare and state under 28 U.S.C. § 1746 as follows:

1.      I am a member of the Bar of this Court and a partner with the law firm Kessler Topaz Meltzer & Check, LLP in Radnor, Pennsylvania.

2.      Pursuant to the district court's August 3, 2015 Order Coordinating Pre-Trial Matters, Kessler Topaz Meltzer & Check, LLP was appointed as head of the Plaintiffs' Steering Committee for the Individual Actions ("PSC"). *See* Ex. 1, ¶ 7.

3.      I submit this declaration in my role as head of the PSC, on behalf of the hundreds of plaintiffs in the twenty-seven individual actions that are part of the *In re Petrobras Securities Litigation*, No. 14-cv-9662 (JSR) consolidated action (the "Opt-Out Plaintiffs"). These individual actions are listed in Exhibit A to the Declaration of Lewis J. Liman in Support of Appellants' Emergency Motion for a Stay Pending Appeal (ECF No. 45) (the "Individual Actions").

4.      The Opt-Out Plaintiffs are not parties to the appeal of the district court's grant of class certification, captioned as *Universities Superannuation Scheme Limited, et al. v. Petróleo Brasileiro S.A. – Petrobras, et al.*, No. 16-1914-cv. However, the Emergency Motion for a Stay Pending Appeal (the "Motion") filed by the Defendants-Appellants on June 28, 2016 seeks a stay of ***all***

1

proceedings in the consolidated action, including the twenty-seven Individual Actions, and therefore implicates the trial schedule for the Individual Actions.

5.     I submit this declaration to provide facts and information that are pertinent to the Motion and to register the Opt-Out Plaintiffs' joinder in the arguments asserted by the Plaintiffs-Appellees in response to the Motion.

6.     Pursuant to the district court's August 3, 2015 order, Counsel for the Opt-Out Plaintiffs have litigated their claims in tandem with Class Counsel, Pomerantz LLP.  The Opt-Out Plaintiffs have expended significant time and resources preparing their cases for the joint trial scheduled to begin on September 19, 2016.  *See* Ex. 2, at 1 (ordering that a single trial before a single jury be held for the class action and the individual actions); Ex. 3 (scheduling trial to begin on September 19, 2016).

7.     At the pleading stage, the Opt-Out Plaintiffs successfully opposed two separate rounds of motions to dismiss, beyond the motions filed against the Class' complaints.

8.     During fact discovery, Defendants propounded document requests, interrogatories, requests for admission, and deposition notices on every Opt-Out Plaintiff.  The Opt-Out Plaintiffs produced tens of millions of pages of documents and responded to other written discovery propounded by Petrobras and the other Defendants.  The Opt-Out Plaintiffs met and conferred with Defendants regarding

2

this written discovery separately from the Class, and raised disputes with the district court separately from the Class.

9.     Since February 24, 2016, Counsel in the Individual Actions have defended the depositions of over sixty Opt-Out Plaintiff representatives and participated in the depositions of more than one hundred third-party investment managers and advisors.  As they did with written discovery, the Opt-Out Plaintiffs met and conferred with Defendants and raised disputes with the district court regarding depositions separately from the Class.

10.     Counsel for the Opt-Out Plaintiffs also attended and participated in most of the fact witness depositions conducted in the consolidated action, i.e., depositions pertaining to "common issues" to be tried in the first phase of the joint trial, as set forth in the district court's October 31, 2015 Order.  *See* Ex. 2.

11.     In addition to the four experts who submitted reports addressing common issues on behalf of the Class and Opt-Out Plaintiffs, the Opt-Out Plaintiffs collectively retained four experts to opine on damages issues, submitted a total of nine expert reports and defended these experts at deposition.

12.     The damages under the Securities Exchange Act of 1934 claimed by the Opt-Out Plaintiffs total more than $1.07 billion.

13.     Many of the Opt-Out Plaintiffs have asserted claims based on their purchases of Petrobras' American Depositary Shares ("ADSs").  These Opt-Out

3

Plaintiffs' claims are not implicated by the first issue that is the subject of the appeal in the Class Action, to wit, the ascertainability of a class of purchasers of non-exchange traded Petrobras notes in light of *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010).[1]

14. Several of the Opt-Out Plaintiffs directly relied on Petrobras' allegedly false and misleading statements and, therefore, do not rely exclusively on the fraud-on-the-market presumption of reliance. Thus, these plaintiffs' claims are not implicated by the second issue that is the subject of the appeal in the Class Action, to wit, the sufficiency of the Class' showing of market efficiency at the class certification stage for purposes of invoking the fraud-on-the-market presumption of reliance on a classwide basis.

15. In light of the substantial time and resources that the Opt-Out Plaintiffs have devoted to prosecuting their cases and preparing for trial on September 19, 2016, it would be prejudicial for the Individual Actions to be stayed indefinitely based on an appeal of an order that does not apply to these actions.

16. Pursuant to the district court's schedule, representatives for the Opt-Out Plaintiffs and dozens of attorneys for these plaintiffs have arranged their

---

[1] Defendants have not challenged the district court's ascertainability finding as it pertains to the class of purchasers of Petrobras ADSs, which Defendants acknowledge "are exchange-traded." *In re Petrobras Securities Litigation*, No. 16-463-cv, Defendants' Petition Pursuant to Fed. R. Civ. P. 23(f) for Leave to Appeal from the District Court's Order Granting Class Certification (ECF No. 1), at 2.

schedules and prepared to proceed to trial on September 19, 2016, even if the Class claims are not tried at this time.

/s/ *Matthew L. Mustokoff*
**KESSLER TOPAZ MELTZER & CHECK, LLP**
280 King of Prussia Road
Radnor, PA 19087
Phone: (610) 667-7706
Fax: (610) 667-7056
mmustokoff@ktmc.com

***Head of Plaintiffs' Steering Committee for the Individual Actions***

**EXHIBIT 1**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

IN RE PETROBRAS SECURITIES
LITIGATION

14-cv-9662 (JSR)

ALL CASES

 **[PROPOSED] ORDER COORDINATING PRE-TRIAL MATTERS**

**I.      APPLICATION OF THIS ORDER TO PENDING AND SUBSEQUENT CASES**

1.      This Order shall apply generally to the five class actions consolidated for all purposes by the Court's Order dated February 17, 2015 under the caption, *In re Petrobras Securities Litigation*, 14-cv-9662 (the "Class Action"), each of the related currently filed individual actions (the "Currently Filed Individual Actions"),[1] and any case which relates to the same subject matter as any of the foregoing actions that is subsequently filed in or transferred to this Court and assigned to the undersigned, unless a party who has the right to object to the consolidation of that case or to any other provision of this Order serves an application for relief from this Order or from any of its provisions within ten (10) days after the date on which defense counsel mails a copy of this Order to counsel for that party (together with the Currently Filed Individual Actions, the "Individual Actions").  The provisions of this Order shall apply to any

---

[1]      The Currently Filed Individual Actions consist of:  *Dimensional Emerging Markets Value Fund, et al. v. Petroleo Brasileiro S.A.*, No. 15-cv-2165 (JSR); *Skagen et al. v. Petroleo Brasileiro S.A. – Petrobras, et al.*, No. 15-cv-2214 (JSR); *New York City Employees' Retirement System, et al. v. Petroleo Brasileiro S.A. – Petrobras, et al.*, No. 15-cv-2192 (JSR); *Transamerica Income Shares, Inc., et al. v. Petroleo Brasileiro S.A. – Petrobras, et al.*, No. 15-cv-3733 (JSR); *Aberdeen Emerging Markets Fund v. Petroleo Brasileiro S.A. – Petrobras, et al.*, No. 15-cv-3860 (JSR); *Ohio Public Employees Retirement System v. Petroleo Brasileiro S.A. – Petrobras, et al.*, No. 15-cv-3887 (JSR); *Central States Southeast and Southwest Areas Pension Fund v. Petroleo Brasileiro S.A. – Petrobras, et al.*, No. 15-cv-3911 (JSR); *Washington State Investment Board v. Petroleo Brasileiro S.A. – Petrobras, et al.*, No. 15-cv-3923 (JSR); *Aberdeen Latin Am. Income Fund Limited, et al. v. Petroleo Brasileiro S.A. – Petrobras, et al.*, No. 15-cv-4043 (JSR); *NN Investment Partners B.V., et al. v. v. Petroleo Brasileiro S.A. – Petrobras, et al.*, No. 15-cv-4226 (JSR); *Aura Capital Ltd. v. Petroleo Brasileiro S.A. -- Petrobras, et al.*, No. 15-cv-4951 (JSR).

such action pending the Court's ruling on the application. For purposes of this Order, the Class Action and the Individual Actions are collectively referred to as the "Consolidated Securities Litigation." Except if otherwise provided in an order, any order entered in the Class Action is deemed entered in all the actions constituting the Consolidated Securities Litigation.

## II.   CAPTIONS AND FILING

2.   On March 24, 2015, the Court issued an order consolidating the Consolidated Securities Litigation for pre-trial purposes. Pursuant to the Court's February 17, 2015 Order, the Clerk maintains a master consolidated docket under 14-cv-9662 (JSR).

3.   All orders, pleadings, motions and other documents filed in any or all of the actions now or hereafter subject to this order shall bear the following caption:

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
IN RE PETROBRAS SECURITIES
LITIGATION                                           14-cv-9662 (JSR)

This Document Applies to:      [insert]
-------------------------------------------------------x

4.   A paper pertinent to the entire Consolidated Securities Litigation shall state that it applies to "ALL CASES." A paper pertinent to fewer than all of the actions shall state the docket number of each individual case to which it pertains. All papers filed in any of these cases shall be docketed on the master docket and on the docket of each individual case to which it pertains.

## III.   DUTIES OF COUNSEL

5.   On March 4, 2015, the Court appointed Pomerantz LLP as Lead Counsel in the Class Action ("Lead Counsel").

6.      Lead Counsel shall have the following responsibilities with respect to the Consolidated Securities Litigation:

(a)    Sign any consolidated class action complaint, motions, briefs, discovery requests, objections, or notices on behalf of the plaintiffs in the Class Action and other plaintiffs joining in such papers.

(b)    Except as noted below, conduct all pretrial proceedings on behalf of all plaintiffs.

(c)    Brief and argue motions, except if the matters at issue pertain solely to one or more Individual Actions.

(d)    Initiate and conduct discovery.  Plaintiffs' discovery will be conducted by Lead Counsel in the Consolidated Securities Litigation with respect to issues common among the Class Action and the Individual Actions, in consultation with  Plaintiffs' Steering Committee for the Individual Actions ("PSC"), as defined in § IV below.  Lead Counsel in the Consolidated Securities Litigation shall agree upon a procedure that will give plaintiffs' counsel in the Individual Actions a reasonable opportunity to request additions and deletions from any discovery request crafted by Lead Counsel in the Consolidated Securities Litigation, and to otherwise permit the discovery in the Consolidated Securities Litigation to be conducted after Lead Counsel in the Consolidated Securities Litigation has given appropriate consideration to the views of counsel in the Individual Actions.  Should counsel for any of the plaintiffs in an Individual Action believe that his/her views are not being appropriately incorporated into the discovery process, the dissenting

attorney may seek the Court's intervention. Counsel for the plaintiffs in the Individual Actions shall avoid duplicative or overlapping discovery.

(e) Speak on behalf of plaintiffs at any pretrial conference, except if the matters at issue pertain solely to one or more Individual Actions, in which case, counsel for the plaintiffs in such Individual Action(s) may address the issue with the Court.

(f) Employ and consult with experts. Nothing in this Order precludes the plaintiffs in the Individual Actions from employing and consulting with their own experts.

(g) Conduct settlement negotiations with defense counsel in connection with the Class Action.

(h) Call meetings of plaintiffs' counsel.

(i) Maintain an up-to-date list of counsel available to all plaintiffs' counsel on request; keep a complete electronic file of all papers and discovery materials filed or generated in the Consolidated Securities Litigation which shall be available to all plaintiffs' counsel via secure web-based access to an online document repository, provided that plaintiffs and their counsel in the Individual Actions have become signatories to all confidentiality agreements in place for such discovery and bear all duplication expenses.

(j) Circulate and discuss with the head of the PSC any stipulated proposals.

(k) Keep all plaintiffs informed about discovery matters and other issues and proceedings of common interest in the Consolidated Securities Litigation.

(l)     Consult with the head of the PSC to obtain the views of plaintiffs' counsel on proposed document requests, interrogatories, requests for admissions, depositions, and litigation strategy, and incorporate those views where it is reasonably appropriate to do so, including with respect to particular discovery items.

(m)     On behalf of plaintiffs, schedule and conduct all depositions in the Consolidated Securities Litigation with respect to all issues relevant to the Class Action. Should any counsel in the Individual Actions request time to examine a witness through non-duplicative questions relevant to an Individual Action, Lead Counsel in the Consolidated Securities Litigation shall devise and implement in good faith a process such that, through consultation with the PSC, counsel for plaintiffs in the Individual Actions may ask such questions to the extent that Lead Counsel does not wish to do so. If counsel for plaintiff in any of the Individual Actions requests time to examine a witness through such questions, then counsel for plaintiffs in all Individual Actions collectively shall allocate among themselves a reasonable amount of time and a fair opportunity within which to do so. Nothing in this Order shall preclude counsel for plaintiffs in the Individual Actions from attending any deposition and (as set forth herein) examining witnesses at any deposition, provided that such examination is non-duplicative and follows consultation with Lead Counsel and the head of the PSC. No witness may be deposed more than once without leave of the Court.

## IV.  APPOINTMENT OF PSC

7.      The law firm of Kessler Topaz Meltzer & Check, LLP is designated as the head of the PSC for the Individual Actions.  The members of the PSC are: Robbins Geller Rudman & Dowd, LLP; Grant & Eisenhofer; Kahn Swick & Foti, LLC; Kaplan Fox; Kessler Topaz Meltzer & Check, LLP.

8.      The head of the PSC shall have the following responsibilities:

(a) Distribute to all plaintiffs' counsel in the Individual Actions those materials that they need to review in order to form and communicate their views regarding discovery, motion practice, and settlement.

(b) Where issues pertain solely to one or more Individual Actions, communicate with the Court regarding any issues common to the Individual Actions. Nothing in this Order precludes a plaintiff in any of the Individual Actions from communicating with the Court regarding issues unique to its action.

(c) For purposes of pre-trial proceedings in the Consolidated Securities Litigation, any party's or the Court's communication with the head of the PSC shall be sufficient communication with all plaintiffs in the Individual Actions.  For purposes of the Court's Rule 2(a), the head of the PSC is designated "lead" counsel to represent all plaintiffs in the Individual Actions in telephone calls to Chambers.

9.      The members of the PSC shall share the following responsibilities:

(a) Confer with plaintiffs' counsel in the Individual Actions to obtain their collective views regarding discovery and any issues that need to be communicated to Lead Counsel or to the Court.

(b) Communicate with Lead Counsel regarding any discovery that plaintiffs in the

Individual Actions wish to take, litigation strategy and motion practice.

(c) Coordinate the taking of any discovery unique to the Individual Actions.

## V.    SERVICE

10.    For purposes of pre-trial proceedings in the Consolidated Securities Litigation,

service by defendants of pleadings and all other papers on Lead Counsel and the head of the PSC

shall be deemed sufficient service on all plaintiffs in the Consolidated Securities Litigation.

Service of papers in the Consolidated Securities Litigation may be made by electronic mail.

## VI.    RELIEF FROM PROVISIONS HEREIN

11.    Counsel may seek relief from any of the provisions of this Order by application to

the Court upon a showing of good cause.

## VII.    DISCOVERY

12.    Subject to the terms of this Order and in accordance with the applicable Protective

Order, all discovery obtained by any plaintiff in any action within the Consolidated Securities

Litigation will be shared with all other plaintiffs in the Consolidated Securities Litigation, and all

discovery obtained by any defendant in any action within the Consolidated Securities Litigation

may be shared with any other defendant.  All discovery obtained by any party in any action

within the Consolidated Securities Litigation shall be deemed discovered in all of the actions.

## VIII.    PRIVILEGE

13.    Cooperation by and among counsel is essential for the orderly and expeditious

resolution of the Consolidated Securities Litigation.  Accordingly, the communication of

information among and between Lead Counsel, the PSC and plaintiffs' counsel in the Individual

Actions shall not be deemed a waiver of the attorney-client privilege or the attorney work

product doctrine.  Likewise, the communication of information among and between defendants'
counsel shall not be deemed a waiver of the attorney-client privilege or the attorney work
product doctrine.

## IX.   RIGHT TO BE HEARD BY THE COURT

14.   All counsel in the Consolidated Securities Litigation shall use their best efforts to
avoid duplication, inefficiency and inconvenience to the Court, other parties, other counsel and
witnesses.  Nothing stated herein, however, shall be construed to diminish the right of any party
to be heard by the Court on matters that are not susceptible to joint or common action, or as to
which there is a genuine disagreement among counsel.

## X.   SCHEDULE FOR INDIVIDUAL ACTIONS

15.   Discovery directed to plaintiffs in the Individual Actions (except if relevant to the
Class Action) and additional non-duplicative discovery and proceedings in the Individual
Actions shall be conducted in accordance with schedule(s) set at a ~~pretrial~~ conference with the
Court, ~~after the earlier of the trial in the Class case or its resolution otherwise.~~ on October 26, 2015 at 4 p.m.

16.   Defendants shall have until August 21, 2015 within which to respond to the
complaints on file in the Currently Filed Individual Actions.  With respect to any motion to
dismiss such complaints, the plaintiffs shall have until September 18, 2015 to file opposition
papers, and defendants shall have until October 5, 2015 to submit any reply papers.  Oral argument will be held on October 13, 2015 at 3:30 pm.

17.   Defendants' time to respond to any subsequently filed Individual Actions will be
set by order of the Court upon application of the affected parties.

SO ORDERED:

Dated: New York, NY
August 3, 2015

Jed S. Rakoff, U.S.D.J.

**EXHIBIT 2**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11/2/15
```

```
                                    :
In re: PETROBRAS SECURITIES         :        14-cv-9662 (JSR)
LITIGATION                          :
                                    :            ORDER
This Document Applies to: ALL CASES :
                                    :
                                    :
----------------------------------x
```

JED S. RAKOFF, U.S.D.J.

In response to the Court's request, see Transcript dated October 26, 2015, the Court has received letter submissions from the parties regarding the structuring and scheduling of trial in all the cases comprising In re Petrobras Securities Litigation, No. 14-cv-9662 (JSR). Having considered the positions of the parties, the Court has determined that a single trial before a single jury will be held, combining the Class Action with the Individual Actions. However, the trial will proceed in two phases: in the first phase, the jury will resolve all common issues, and in the second phase the jury will resolve all individual issues.[1] The Court will set appropriate time limits so that the entire combined trial does not last more than eight weeks (not counting jury deliberation time).

---

[1] If, as the class plaintiffs seem to suggest, a jury trial is not required in some or all respects, the Court will take the jury verdict as advisory.

1

Since the existing Case Management Order in the Class Action (which will now be deemed binding on all the Individual Actions as well) did not contemplate a joint trial of all the cases, some modest adjustments in that Order may be necessary. Accordingly, counsel for all parties should mutually confer and, if possible, agree on a date for trial to commence, no earlier than August 8, 2016, and no later than October 17, 2016. The parties should designate one or more counsel to inform the Court, in writing, by Wednesday, November 4, 2015, at 6:00 pm whether they have reached agreement on such date and if so, what date they have chosen. If the parties cannot agree on a date, the Court will unilaterally set the trial date by the following Monday, November 9, 2015.

Once the trial date has been set, if the parties believe that other adjustments to the existing Case Management Order are appropriate, they should convene a joint telephone call with Chambers by no later than Thursday, November 12, 2015.

SO ORDERED.

Dated:    New York, NY
          October 31, 2015          JED S. RAKOFF, U.S.D.J.

2

**EXHIBIT 3**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------x
                                   :
In re: PETROBRAS SECURITIES        :        14-cv-9662 (JSR)
LITIGATION                         :
                                   :               ORDER
This Document Applies to: ALL CASES:
                                   :
                                   :
-----------------------------------x

JED S. RAKOFF, U.S.D.J.

    The Court has received the parties' letter dated November 4, 2015, regarding scheduling the single overall trial in this matter. The parties jointly suggested that the trial begin on September 26, 2016, but they also requested that trial not be held on numerous dates in October. To accommodate those requests (as well as certain conflicting obligations of the Court) but also assure that the trial is completed before the year-end holidays, the Court hereby orders that the trial will begin on Monday, September 19, 2016. In addition to not sitting on the dates that the parties requested the Court not sit, the trial will also not be held on September 26-28, 2016, when the Court is unavailable.

    SO ORDERED.

Dated:    New York, NY
           November 5, 2015

JED S. RAKOFF, U.S.D.J.

1