# 16-1914-cv

## United States Court of Appeals
### *for the*
### Second Circuit

UNIVERSITIES SUPERANNUATION SCHEME LIMITED,
EMPLOYEES  RETIREMENT SYSTEM OF THE STATE OF HAWAII,
NORTH CAROLINA  DEPARTMENT OF STATE TREASURER,

*Plaintiffs-Appellees*,

*(For Continuation of Caption See Inside Cover)*

_____

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

**BRIEF OF DEFENDANTS-APPELLANTS PETRÓLEO
BRASILEIRO S.A. – PETROBRAS, PETROBRAS GLOBAL
FINANCE B.V., PETROBRAS AMERICA INC., AND
THEODORE MARSHALL HELMS**

Lewis J. Liman
Jared Gerber
Mitchell A. Lowenthal
CLEARY GOTTLIEB STEEN &
HAMILTON LLP
One Liberty Plaza
New York, New York 10006
(212)-225-2000

*Attorneys for the Petrobras
Defendants-Appellants*

PETER KALTMAN, individually and on behalf of all others similarly situated,
DIMENSIONAL EMERGING MARKETS VALUE FUND, DFA
INVESTMENT DIMENSIONS GROUP INC., on behalf of its series Emerging
Markets Core Equity Portfolio, Emerging Markets Social Core Equity Portfolio
and T.A. World ex U.S. Core Equity Portfolio, DFA INVESTMENT TRUST
COMPANY, on behalf of its series The Emerging Markets Series, DFA
AUSTRIA LIMITED, solely in its capacity as responsible entity for the
Dimensional Emerging Markets Trust, DFA International Core Equity Fund and
DFA International Vector Equity Fund by Dimensional Fund Advisors Canada
ULC solely in its capacity as Trustee, DIMENSIONAL FUNDS PLC, on behalf
of its sub-fund Emerging Markets Value Fund, DIMENSIONAL FUNDS ICVC,
on behalf of its sub-fund Emerging Markets Core Equity Fund, SKAGEN AS,
DANSKE INVEST MANAGEMENT A/S, DANSKE INVEST MANAGEMENT
COMPANY, NEW YORK CITY EMPLOYEES' RETIREMENT SYSTEM,
NEW YORK CITY POLICE PENSION FUND, BOARD OF EDUCATION
RETIREMENT SYSTEM OF THE CITY OF NEW YORK, TEACHERS'
RETIREMENT SYSTEM OF THE CITY OF NEW YORK, NEW YORK CITY
FIRE DEPARTMENT PENSION FUND, NEW YORK CITY DEFERRED
COMPENSATION PLAN, FORSTA AP-FONDEN, TRANSAMERICA
INCOME SHARES, INC., TRANSAMERICA FUNDS, TRANSAMERICA
SERIES TRUST, TRANSAMERICA PARTNERS PORTFOLIOS, JOHN
HANCOCK VARIABLE INSURANCE TRUST, JOHN HANCOCK FUNDS II,
JOHN HANCOCK SOVEREIGN BOND FUND, JOHN HANCOCK BOND
TRUST, JOHN HANCOCK STRATEGIC SERIES, JOHN HANCOCK
INVESTMENT TRUST, JHF INCOME SECURITIES TRUST, JHF
INVESTORS TRUST, JHF HEDGED EQUITY & INCOME FUND,
ABERDEEN EMERGING MARKETS FUND, ABERDEEN GLOBAL EQUITY
FUND, ABERDEEN GLOBAL NATURAL RESOURCES FUND, ABERDEEN
INTERNATIONAL EQUITY FUND, each a series of Aberdeen Funds,
ABERDEEN CANADA EMERGING MARKETS FUND, ABERDEEN
CANADA SOCIALLY RESPONSIBLE GLOBAL FUND, ABERDEEN
CANADA SOCIALLY RESPONSIBLE INTERNATIONAL FUND,
ABERDEEN CANADA FUNDS EAFE PLUS EQUITY FUND AND
ABERDEEN CANADA FUNDS GLOBAL EQUITY FUND, each a series of
Aberdeen Canada Funds, ABERDEEN EAFE PLUS ETHICAL FUND,
ABERDEEN EAFE PLUS FUND, ABERDEEN EAFE PLUS SRI FUND,
ABERDEEN EMERGING MARKETS EQUITY FUND, ABERDEEN FULLY
HEDGED INTERNATIONAL EQUITIES FUND, ABERDEEN
INTERNATIONAL EQUITY FUND, ABERDEEN GLOBAL EMERGING

MARKETS EQUITY FUND, ABERDEEN GLOBAL ETHICAL WORLD
EQUITY FUND, ABERDEEN GLOBAL RESPONSIBLE WORLD EQUITY
FUND, ABERDEEN GLOBAL WORLD EQUITY DIVIDEND FUND,
ABERDEEN GLOBAL WORLD EQUITY FUND, ABERDEEN GLOBAL
WORLD RESOURCES EQUITY FUND, ABERDEEN EMERGING
MARKETS EQUITY FUND, ABERDEEN ETHICAL WORLD EQUITY
FUND, ABERDEEN MULTI-ASSET FUND, ABERDEEN WORLD EQUITY
FUND, ABERDEEN LATIN AMERICA EQUITY FUND, INC., AAAID
EQUITY PORTFOLIO, ALBERTA TEACHERS RETIREMENT FUND, AON
HEWITT INVESTMENT CONSULTING, INC., AURION INTERNATIONAL
DAILY EQUITY FUND, BELL ALIANT REGIONAL COMMUNICATIONS
INC., BMO GLOBAL EQUITY CLASS, CITY OF ALBANY PENSION PLAN,
DESJARDINS DIVIDEND INCOME FUND, DESJARDINS EMERGING
MARKETS FUND, DESJARDINS GLOBAL ALL CAPITAL EQUITY FUND,
DESJARDINS OVERSEAS EQUITY VALUE FUND, DEVON COUNTY
COUNCIL GLOBAL EMERGING MARKET FUND, DEVON COUNTY
COUNCIL GLOBAL EQUITY FUND, DGIA EMERGING MARKETS
EQUITY FUND L.P., ERIE INSURANCE EXCHANGE, FIRST
TRUST/ABERDEEN EMERGING OPPORTUNITY FUND, GE UK PENSION
COMMON INVESTMENT FUND, HAPSHIRE COUNTY COUNCIL
GLOBAL EQUITY PORTFOLIO, LONDON BOROUGH OF HOUNSLOW
SUPPERANNUATION FUND, MACKENZIE UNIVERSAL SUSTAINABLE
OPPORTUNITIES CLASS, MARSHFIELD CLINIC, MOTHER THERESA
CARE AND MISSION TRUST, MOTHER THERESA CARE AND MISSION
TRUST, MTR CORPORATION LIMITED RETIREMENT SCHEME, MYRIA
ASSET MANAGEMENT EMERGENCE, NATIONAL PENSION SERVICE,
NPS TRUST ACTIVE 14, OHIO PUBLIC EMPLOYEES RETIREMENT
SYSTEM, WASHINGTON STATE INVESTMENT BOARD, ABERDEEN
LATIN AMERICAN INCOME FUND LIMITED, ABERDEEN GLOBAL EX
JAPAN PENSION FUND PPIT, FS INTERNATIONAL EQUITY MOTHER
FUND, NN INVESTMENT PARTNERS B.V., acting in the capacity of
management company of the mutual fund NN Global Equity Fund and in the
capacity of management company of the mutual fund NN Institutioneel Dividend
Aandelen Fonds, NN INVESTMENT PARTNERS LUXEMBOURG S.A., acting
in the capacity of management company SICAV and its Sub-Funds and NN (L)
SICAV, for and on behalf of NN (L) Emerging Markets High Dividend, NN (L)
FIRST, AURA CAPITAL LTD., WGI EMERGING MARKETS FUND, LLC,
BILL AND MELINDA GATES FOUNDATION TRUST, BOARD OF
REGENTS OF THE UNIVERSITY OF TEXAS SYSTEM, TRUSTEES OF THE

ESTATE OF BERNICE PAUAHI BISHOP, LOUIS KENNEDY, individually
and on behalf of all others similarly situated, KEN NGO, individually
and on behalf of all others similarly situated, JONATHAN MESSING,
individually and on behalf of all others similarly situated, CITY OF
PROVIDENCE, individually and on behalf of all others similarly situated,
UNION ASSET MANAGEMENT HOLDING AG,

*Plaintiffs,*

– v. –

PETRÓLEO BRASILEIRO S.A. PETROBRAS, BB SECURITIES LTD.,
MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, BANK
OF CHINA (HONG KONG) LIMITED, BANCA IMI, S.P.A., SCOTIA
CAPITAL (USA) INC., THEODORE MARSHALL HELMS, PETROBRAS
GLOBAL FINANCE B.V., PETROBRAS AMERICA INC., CITIGROUP
GLOBAL MARKETS INC., ITAU BBA USA SECURITIES, INC.,
J.P. MORGAN SECURITIES LLC, MORGAN STANLEY & CO. LLC,
MITSUBISHI UFJ SECURITIES (USA), INC., HSBC SECURITIES (USA)
INC., STANDARD CHARTERED BANK, BANCO BRADESCO BBI S.A.,

*Defendants-Appellants,*

JOSE SERGIO GABRIELLI, SILVIO SINEDINO PINHEIRO, PAULO
ROBERTO COSTA, JOSE CARLOS COSENZA, RENATO DE SOUZA
DUQUE, GUILLHERME DE OLIVEIRA ESTRELLA, JOSE MIRANDA
FORMIGL FILHO, MARIA DAS GRACAS SILVA FOSTER, ALMIR
GUILHERME BARBASSA, MARIANGELA MOINTEIRO TIZATTO, JOSUE
CHRISTIANO GOME DA SILVA, DANIEL LIMA DE OLIVEIRA, JOSE
RAIMUNDO BRANDA PEREIRA, SERVIO TULIO DA ROSA TINOCO,
PAULO JOSE ALVES, GUSTAVO TARDIN BARBOSA, ALEXANDRE
QUINTAO FERNANDES, MARCOS ANTONIO ZACARIAS, CORNELIS
FRANCISCUS JOZE LOOMAN, JP MORGAN SECURITIES LLC,
PRICEWATERHOUSECOOPERS AUDITORES INDEPENDENTES,

*Defendants.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Defendants-Appellants Petróleo Brasileiro S.A. – Petrobras ("Petrobras"), Petrobras Global Finance B.V. ("PGF"), and Petrobras America Inc. ("PAI") state that:

1) Petrobras is a publicly traded company organized under the laws of Brazil. Petrobras has no parent company and no publicly-held corporation owns 10% or more of its shares. The Brazilian Federal Government owns 50.26% of the ordinary shares of Petrobras.

2) PGF is an indirectly controlled subsidiary of Petrobras. Petrobras has no parent company and no publicly held corporation owns 10% or more of its shares. The Brazilian Federal Government owns 50.26% of the ordinary shares of Petrobras.

3) PAI is an indirectly controlled subsidiary of Petrobras. Petrobras has no parent company and no publicly held corporation owns 10% or more of its shares. The Brazilian Federal Government owns 50.26% of the ordinary shares of Petrobras.

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ........................................................1

ISSUES PRESENTED FOR REVIEW .................................................1

STATEMENT OF THE CASE...............................................................2

   I.   Factual Background .................................................................2

   II.   Procedural History ..................................................................5

SUMMARY OF THE ARGUMENT .................................................13

STANDARD OF REVIEW ...............................................................15

ARGUMENT ....................................................................................15

   I.   PLAINTIFFS FAILED TO SATISFY THEIR INITIAL BURDEN
       UNDER *BASIC*.............................................................................16

     A.   The District Court Improperly Concluded That Plaintiffs Could
         Satisfy *Basic* Without Direct Evidence Demonstrating
         Market Efficiency .................................................................17

     B.   Plaintiffs' Novel and Flawed Empirical Test Was Insufficient
         To Satisfy *Basic* .................................................................22

        1.   For a Market to Be Efficient Securities Must Be Proven to
            Move in the Appropriate Direction in Response to News .................24

        2.   Plaintiffs' Flawed Test Does Not Prove Efficiency Because
            it Can Be Satisfied Even When the Market Is Inefficient..................29

     C.   The District Court Also Failed to Consider Whether the Evidence
         Severed the Cause and Effect Link............................................34

   II.   PLAINTIFFS FAILED TO ESTABLISH ASCERTAINABILITY,
       PREDOMINANCE, AND SUPERIORITY FOR THE CLASSES OF
       AFTERMARKET INVESTORS WHO PURCHASED PETROBRAS
       GLOBAL NOTES WORLDWIDE............................................35

A.  Plaintiffs Failed to Prove Ascertainability ...................................................36

   1.  The Classes Are Not Ascertainable.....................................................36

   2.  The Decision Below Is Inconsistent With Morrison...........................47

B.  The District Court Improperly Held That Rule 23's Predominance and Superiority Requirements Were Met ...................................................50

CONCLUSION ........................................................................................................57

## TABLE OF DEFINED TERMS

| | |
|---|---|
| 2014 20-F | Petrobras's Annual Report for the fiscal year ended December 31, 2014 (Form 20-F), dated May 15, 2015, http://www.sec.gov/Archives/edgar/data/1119639/000129281415001242/pbraform20f_2014.htm |
| A- | Joint Appendix |
| ADSs | Petrobras American Depositary Shares |
| Barber, et al. | Brad M. Barber, Paul A. Griffin & Baruch Lev, The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency, 19 J. Corp. L. 285 (1994) |
| Certification Order | Order and Opinion granting Motion to Appoint Counsel and Certify the Class, entered on February 2, 2016 (Dkt. No. 428) |
| Class Action | The consolidated class action proceedings before the Hon. Jed S. Rakoff |
| Comparison of Trading Models | Michael Barclay and Frank C. Torchio, A Comparison of Trading Models Used for Calculating Aggregate Damages in Securities Litigation, 64 Law and Contemporary Problems (2001) |
| Company | Petrobras |
| Corrupt Former Executives | Former Petrobras personnel involved in bid-rigging and cartel activities |
| Defendants | The Petrobras Defendants and the Underwriter Defendants |
| Dkt. No. | Docket Number |
| Economists' Amicus | Brief of Financial Economists as Amici Curiae in Support |

| | |
|---|---|
| Brief | of Respondents in *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398 (2014) |
| Ex. | Exhibit |
| Exchange Act | The Securities Exchange Act of 1934, as amended |
| FAC | Fourth Amended Class Action Complaint, dated November 30, 2015 (Dkt. No. 342) |
| FDT | Test described in Paul A. Ferrillo, et al. "The Less than Efficient Capital Markets Hypothesis: Requiring More Proof from Plaintiffs in Fraud-on-the-Market Cases, 78 *St. John's L. Rev.*, 81 (2004) |
| F-I | Prof. Steven P. Feinstein, Corrected Report on Market Efficiency, dated October 23, 2015 (Dkt. No. 264-1) |
| F-II | Prof. Steven P. Feinstein, Rebuttal Report, dated November 23, 2015 (Dkt. No. 338-8) |
| FTr. | Transcripts of the Deposition of Steven P. Feinstein, dated October 26, 2015 and December 4, 2015, (Dkt. Nos. 296-1, 355) |
| G-I | Expert Report of Paul A. Gompers, dated November 6, 2015 (Dkt. No. 294-5) |
| G-II | Reply Report of Paul A. Gompers, dated December 8, 2015 (Dkt. No. 355) |
| GTr. | Transcript of the Deposition of Paul A. Gompers, dated November 11, 2015 (Dkt. No. 338-6) |
| Hawaii | Employees' Retirement System of the State of Hawaii |
| HTr. | Transcript of Evidentiary Hearing on Plaintiffs' |

v

Motion for Class Certification, dated December 21, 2015 (Dkt. No. 384-1)

Individual Actions

*Abbey Life Assurance Co. v. Petroleo Brasileiro S.A. – Petrobras*, No. 15-cv-6661 (JSR); *Aberdeen Emerging Markets Fund, et al. v. Petróleo Brasileiro S.A. – Petrobras*, No. 15-cv- 3860 (JSR); *Aberdeen Latin American Income Fund Limited, et al. v. Petróleo Brasileiro S.A. – Petrobras*, No.15-cv-4043 (JSR); *Al Shams Investment Ltd., et al. v. Petroleo Brasileiro S.A. – Petrobras, et al.*, No. 15-cv-6243 (JSR); *Aura Capital Ltd. v. Petróleo Brasileiro S.A. – Petrobras, et al.*, No. 15-cv-4951 (JSR); *Central States Southeast and Southwest Areas Pension Fund v. Petróleo Brasileiro S.A. – Petrobras, et al.*, No. 15-cv-3911 (JSR); *Delaware Enhanced Global Dividend and Income Fund, et al. v. Petroleo Brasileiro S.A. – Petrobras*, No. 15-cv-6643 (JSR); *Dimensional Emerging Markets Value Fund, et al. v. Petróleo Brasileiro S.A –Petrobras*, No. 15-cv-2165 (JSR); *Discovery Global Citizens Master Fund, Ltd., et al. v. Petróleo Brasileiro S.A. – Petrobras, et al.*, No. 15-cv-9126 (JSR); *Dodge & Cox International Stock Fund, et al. v. Petróleo Brasileiro S.A. – Petrobras, et al.*, No. 15-cv-10111 (JSR); *INKA Internationale Kapitalanlagegesellschaft mbH v. Petróleo Brasileiro S.A. – Petrobras, et al.*, No. 15-cv-6575 (JSR); *Janus Overseas Fund, et al. v. Petróleo Brasileiro S.A. – Petrobras, et al.*, No. 15-cv-10086 (JSR); *Lord Abbett Global Fund, Inc. – Lord Abbett Emerging Markets Currency Fund: Lord Abbett Global Fund Inc., et al. v. Petróleo Brasileiro S.A. – Petrobras, et al.*, No. 15-cv-7615 (JSR); *Manning & Napier Advisors, LLC v. Petróleo Brasileiro S.A. – Petrobras*, No. 15-cv-10159 (JSR); *Massachusetts Mutual Life Insurance Company, et al. v. Petróleo Brasileiro S.A. – Petrobras, et al.*, No. 15-cv-9243 (JSR); *New York City Employees' Retirement System, et al. v. Petróleo Brasileiro S.A. – Petrobras, et al.*, No. 15-cv-2192 (JSR); *NN Investment Partners B.V., et al. v. Petróleo Brasileiro S.A. –Petrobras, et al.*, No.

15-cv-4226 (JSR); *Ohio Public Employees Retirement System v. Petróleo Brasileiro S.A. – Petrobras, et al.*, No. 15-cv-3887 (JSR); *PIMCO Funds: PIMCO Total Return Fund, et al. v. Petróleo Brasileiro S.A. – Petrobras, et al.*, No. 15-cv-8192 (JSR); *Russell Investment Co., et al. v.Petroleo Brasileiro S.A. – Petrobras*, No. 15-cv-7605 (JSR); *Skagen, et al. v. Petróleo Brasileiro S.A. – Petrobras, et al.*, No. 15-cv-2214 (JSR); *State Street Cayman Trust Company, Ltd., solely in its capacity as Trustee of Russell Emerging Markets Equity Fund v. Petróleo Brasileiro S.A. – Petrobras*, No. 15-cv-10158 (JSR); State of Alaska Department of Revenue, Treasury Division, et al. v. Petróleo Brasileiro S.A. – Petrobras*, No. 15-cv-8995 (JSR); *The Hartford Mutual Funds, Inc., et al. v. Petróleo Brasileiro S.A. – Petrobras, et al.*, No. 15-cv-9182 (JSR); *Transamerica Income Shares, Inc., et al. v. Petróleo Brasileiro S.A. – Petrobras, et al.*, No. 15-cv-3733 (JSR); *Washington State Investment Board v. Petróleo Brasileiro S.A. – Petrobras, et al.*, No.15-cv-3923 (JSR); and *WGI Emerging Markets Fund, LLC, et al. v. Petroleo Brasileiro S.A. – Petrobras, et al.*, No. 15-cv-7568 (JSR)

| | |
|---|---|
| INKA Compl. | Complaint, *Internationale Kapitalanlagegesellschaft mbH v. Petróleo Brasileiro S.A. – Petrobras, et al.*, No. 14-cv-9662 (JSR) (S.D.N.Y. Mar. 25, 2016) (Dkt. No. 539) |
| North Carolina | North Carolina Department of State Treasurer |
| Notes | Petrobras notes issued on May 13, 2013 and March 10, 2014 |
| NYSE | New York Stock Exchange |
| Petrobras | Petróleo Brasileiro S.A. – Petrobras |
| Petrobras Defendants | Petrobras, Petrobras Global Finance B.V., Petrobras |

|                          | America Inc., and Theodore M. Helms                                                                                                                                                                                              |
| ------------------------ | ------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------- |
| Petrobras Securities     | The ADSs and the Notes                                                                                                                                                                                                         |
| Plaintiffs               | Hawaii, North Carolina, Union, and USS                                                                                                                                                                                         |
| Rule 23                  | Federal Rule of Civil Procedure 23                                                                                                                                                                                             |
| SEC                      | Securities & Exchange Commission                                                                                                                                                                                               |
| Section 10(b)            | Section 10(b) of the Exchange Act of 1934                                                                                                                                                                                      |
| Section 11               | Section 11 of the Securities Act of 1933                                                                                                                                                                                       |
| Securities Act           | The Securities Act of 1933, as amended                                                                                                                                                                                         |
| SIFMA 23(f) Amicus Brief | Brief of Amicus Curiae Securities Industry and Financial Markets Association in Support of Petition of Defendants-Petitioners for Permission to Appeal Pursuant to Federal Rule of Civil Procedure 23(f), dated February 23, 2016 (Dkt. No. 31-2) |
| SEC Study                | SEC Staff, Study on the Cross-Border Scope of the Private Right of Action Under Section 10(b) of the Securities Exchange Act of 1934 (2012), *available at* https://www.sec.gov/news/studies/2012/929y-study-cross-border-private-rights.pdf |
| SPA-                     | Special Appendix                                                                                                                                                                                                               |
| Stay Reply Decl.         | Motion to File Reply in Further support of Appellants' Emergency Motion For A Stay Pending Appeal Under Seal, dated July 15, 2016 (Dkt. No. 74)                                                                                 |
| Tabak (2010)             | David Tabak, *Use and Misuse of Event Studies to Examine Market Efficiency*, NERA Economic Consulting                                                                                                                          |

(Apr. 30, 2010)

| | |
|---|---|
| Union | Union Asset Management Holding AG |
| USS | Universities Superannuation Scheme Limited |

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
677 F.3d 60 (2d Cir. 2012)............................................................. 1, 7, 36, 53

*Am. Pipe & Constr. Co. v. Utah*,
414 U.S. 538 (1974)....................................................... 43

*Amati v. City of Woodstock*,
176 F.3d 952 (7th Cir. 1999) ...................................... 43

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997)....................................................... 16, 58

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
133 S. Ct. 1184 (2013) ................................................. 18

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988)....................................................... *passim*

*Bersch v. Drexel Firestone, Inc.*,
519 F.2d 974 (2d Cir. 1975)....................................... 44, 47

*Bertrand v. Maram*,
495 F.3d 452 (7th Cir. 2007) ..................................... 41

*Bieneman v. Chicago*,
838 F.2d 962 (7th Cir. 1988) ..................................... 42

*Brecher v. Republic of Arg.*,
806 F.3d 22 (2d Cir. 2015)......................................... 36, 40

*Broadhurst Invs. LP v. Bank of N.Y. Mellon*,
No. 09 Civ. 1154 (PKC), 2010 WL 3154840 (S.D.N.Y. Aug. 2, 2010) ........ 41

*Brown v. Electrolux Home Prods., Inc.*,
817 F.3d 1225 (11th Cir. 2016) ...................................................... 53

*Cammer v. Bloom*,
711 F. Supp. 1264 (D.N.J. 1989) ................................................... 17

*Carrera v. Bayer Corp.*,
727 F.3d 300 (3d Cir. 2013)........................................................37, 38, 54

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
511 U.S. 164 (1994)....................................................................... 21

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*,
399 F.3d 651 (6th Cir. 2005) ......................................................... 55

*Comcast v. Behrend*,
133 S. Ct. 1426 (2013)...............................................38, 45, 50, 51

*DeSilva v. N. Shore-Long Island Jewish Health Sys.*,
27 F. Supp. 3d 313 (E.D.N.Y. 2014) ............................................. 55

*Dura Pharm., Inc. v. Broudo*,
544 U.S. 336 (2005)....................................................................... 52

*Espenscheid v. DirectSat USA, LLC*,
705 F.3d 770 (7th Cir. 2013) ......................................................... 55

*Forsta AP-Fonden v. St. Jude Med., Inc.*,
312 F.R.D. 511 (D. Minn. 2015).................................................... 26

*Gen. Tel. Co. v. Falcon*,
457 U.S. 147 (1982)....................................................................... 44

*Glatt v. Fox Searchlight Pictures, Inc.*,
811 F.3d 528 (2d Cir. 2016)........................................................... 16

*Gunnells v. Healthplan Servs., Inc.*,
348 F.3d 417 (4th Cir. 2003) ......................................................... 53

xi

*Halliburton Co. v. Erica P. John Fund, Inc.*,
134 S. Ct. 2398 (2014) ................................................................ *passim*

*Hecht v. United Collection Bureau, Inc.*,
691 F.3d 218 (2d Cir. 2012) .......................................................... 37

*Howland v. First Am. Title Ins. Co.*,
672 F.3d 525 (7th Cir. 2012) ........................................................ 52

*IBEW Local 90 Pension Fund v. Deutsche Bank AG*,
No. 11 CIV. 4209 KBF, 2013 WL 5815472 (S.D.N.Y. Oct. 29, 2013) ......... 26, 34

*IBEW Local 98 Pension Fund v. Best Buy Co.*,
818 F.3d 775 (8th Cir. 2016) ......................................................... 28

*In re AIG, Inc. Sec. Litig.*,
265 F.R.D. 157 (S.D.N.Y. 2010) .................................................... 23

*In re Alstom SA Sec. Litig.*,
253 F.R.D. 266 (S.D.N.Y. 2008) .................................................... 26

*In re DVI, Inc. Sec. Litig.*,
639 F.3d 623 (3d Cir. 2011) .......................................................... 18

*In re Fed. Home Loan Mortg. Corp. (Freddie Mac) Sec. Litig.*,
281 F.R.D. 174 (S.D.N.Y. 2012) .................................................. 18, 26

*In re Fosamax Prods. Liab. Litig.*,
248 F.R.D. 389 (S.D.N.Y. 2008) .................................................. 37-38

*In re Groupon, Inc. Sec. Litig.*,
No. 12 C 2450, 2015 WL 1043321 (N.D. Ill. Mar. 5, 2015) ................. 28

*In re Initial Pub. Offerings Sec. Litig.*,
471 F.3d 24 (2d Cir. 2006) ............................................................ 51

*In re Moody's Corp. Sec. Litig.*,
274 F.R.D. 480 (S.D.N.Y. 2011) .................................................... 23

*In re Paulsboro Derailment Cases*,
Civ. No. 13-784, 2014 WL 4162790 (D.N.J. Aug. 20, 2014) ....................... 42

*In re Petrobras Sec. Litig.*,
312 F.R.D. 354 (S.D.N.Y. 2016) ................................................... 2

*In re Philip Morris Inc.*,
214 F.3d 132 (2d Cir. 2000).......................................................... 41

*In re PolyMedica Corp. Sec. Litig.*,
453 F. Supp. 2d 260 (D. Mass. 2006) ............................................ 26

*In re U.S. Foodservice Inc. Pricing Litig.*,
729 F.3d 108 (2d Cir. 2013)......................................................... 15

*In re Xcelera.com Sec. Litig.*,
430 F.3d 503 (1st Cir. 2005)...................................................... 18-19

*ITC Ltd. v. Punchgini, Inc.*,
482 F.3d 135 (2d Cir. 2007)......................................................... 34

*Lehocky v. Tidel Tech., Inc.*,
220 F.R.D. 491 (S.D. Tex. 2004)................................................... 26

*Lindsey v. Normet*,
405 U.S. 56 (1972) .................................................................... 54

*Loginovskaya v. Batratchenko*,
764 F.3d 266 (2d Cir. 2014)..................................................... 35, 51

*Lumen v. Anderson*,
280 F.R.D. 451 (W.D. Mo. 2012).................................................. 26

*Madison v. Chalmette Ref., LLC*,
637 F.3d 551 (5th Cir. 2011) ....................................................... 56

*Marcus v. BMW of N. Am., LLC*,
687 F.3d 583 (3d Cir. 2012)....................................................37, 40, 41, 44

xiii

*Mazzei v. Money Store*,
No. 15-2054, 2016 WL 3876518 (2d Cir. July 15, 2016) .............................. 16, 52

*McCarthy v. Kleindienst*,
741 F.2d 1406 (D.C. Cir. 1984) .................................................... 41

*McIntire v. China MediaExpress Holdings, Inc.*,
38 F. Supp. 3d 415 (S.D.N.Y. 2014) .............................................. 26

*McLaughlin v. Am. Tobacco Co.*,
522 F.3d 215 (2d Cir. 2008)..................................................... 16, 54

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*,
547 U.S. 71 (2006) ............................................................... 22

*Million Air Corp. v. Republic of Arg.*,
No. 04 Civ. 1048 (TPG), 2005 WL 2656126 (S.D.N.Y. Oct. 17, 2005)........ 40

*Morrison v. Nat'l Austl. Bank Ltd.*,
561 U.S. 247 (2010)......................................................... *passim*

*Mullane v. Cent. Hanover Bank & Trust Co.*,
339 U.S. 306 (1950)............................................................. 41

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
259 F.3d 154 (3d Cir. 2001)..................................................... 53

*Ortiz v. Fibreboard Corp.*,
527 U.S. 815 (1999) ............................................................ 56

*Oscar Gruss & Son v. Geon Indus., Inc.*,
89 F.R.D. 32 (S.D.N.Y. 1980) .................................................. 56

*Ottaviani v. State Univ. of N.Y. at New Paltz*,
875 F.2d 365 (2d Cir. 1989)..................................................... 23

*Owens v. Morgan Stanley & Co.*,
No. 96 Civ. 9747 (DLC), 1997 WL 793004 (S.D.N.Y. Dec. 24, 1997)........ 42

xiv

*Parkcentral Glob. Hub Ltd. v. Porsche Auto. Holdings SE*,
763 F.3d 198 (2d Cir. 2014) ............................................................ 36, 49, 50, 53

*Philip Morris USA v. Williams*,
549 U.S. 346 (2007) ................................................................ 54

*Randleman v. Fid. Nat'l Title Ins. Co.*,
646 F.3d 347 (6th Cir. 2011) ...................................................... 42-43

*RJR Nabisco, Inc. v. European Cmty.*,
136 S. Ct. 2090 (2016) ............................................................ 48, 50, 52, 54

*Robinson v. Metro-N. Commuter R.R. Co.*,
267 F.3d 147 (2d Cir. 2001) ........................................................ 55

*Rogers v. Petróleo Brasileiro, S.A.*,
673 F.3d 131 (2d Cir. 2012) ........................................................ 2-3

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
599 U.S. 393 (2010) ................................................................ 54

*Siskind v. Sperry*,
47 F.3d 498 (2d Cir. 1995) ........................................................ 40

*Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court for the S.
Dist. of Iowa*,
482 U.S. 522 (1987) ................................................................ 44

*Sprint Commc'ns Co. v. APCC Servs.*,
554 U.S. 269 (2008) ................................................................ 15, 53

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*,
546 F.3d 196 (2d Cir. 2008) ........................................................ 15, 18, 23, 25

*UFCW Local 1776 v. Eli Lilly & Co.*,
620 F.3d 121 (2d Cir. 2010) ........................................................ 50, 52

*Unger v. Amedisys Inc.*,
401 F.3d 316 (5th Cir. 2005) ...................................................... 18-19

xv

*United States v. Cruz-Flores*,
56 F.3d 461 (2d Cir. 1995)............................................................... 15

*Vega v. T-Mobile USA, Inc.*,
564 F.3d 1256 (11th Cir. 2009) ...................................................... 55

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011)............................................................ 16, 37, 57

## Rules and Statutes

28 U.S.C. § 1292(e) ........................................................................ 1

28 U.S.C. § 1331 ............................................................................ 1

28 U.S.C. § 1603(b) ..................................................................... 2-3

Fed. R. Civ. P. 23(c)(2)(B) .......................................................... 37

Fed. R. Civ. P. 23(c)(3)(B) .......................................................... 36

## JURISDICTIONAL STATEMENT

The district court has jurisdiction over the action pursuant to 28 U.S.C. § 1331.  Following the grant of class certification, Defendants timely filed a petition for permission to appeal under Federal Rule of Civil Procedure 23(f) and Federal Rule of Appellate Procedure 5(a).  The Court granted Defendants' petition on June 15, 2016, and has jurisdiction over this appeal under 28 U.S.C. § 1292(e).

## ISSUES PRESENTED FOR REVIEW

(1)    Whether the district court erred in holding that Plaintiffs satisfied their evidentiary burden to invoke the presumption of reliance under *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), in the absence of empirical evidence showing a cause and effect relationship between news and directionally appropriate stock price movement on particular days, and in the face of evidence that Petrobras Securities did not trade in efficient markets.  *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2408 (2014) ("*Halliburton II*").

(2)    Whether the district court erred in certifying investor classes seeking billions of dollars in damages in connection with purchases of a foreign issuer's non-exchange-traded globally offered notes, where the required existence of domestic transactions raises numerous individual issues of fact that defeat ascertainability, predominance, superiority, and due process.  *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 70 (2d Cir. 2012).

## STATEMENT OF THE CASE

On December 8, 2014, Plaintiffs commenced this putative securities class

action by filing a complaint in the United States District Court for the Southern

District of New York (Rakoff, J.).  On February 2, 2016, the district court certified

two classes under Federal Rule of Civil Procedure 23(b)(3), one alleging violations

of the Securities Act, and the second alleging violations of the Exchange Act.

SPA-1 (*In re Petrobras Sec. Litig.*, 312 F.R.D. 354 (S.D.N.Y. 2016)).  On

February 16, 2016, Defendants petitioned the Court for leave to appeal the

Certification Order under Federal Rule of Civil Procedure 23(f), A-6069–6404,

which the Court granted on June 15, 2016, A-7127.  Defendants moved to stay all

proceedings in the district court pending appeal on June 28, 2016.  On July 12,

2016, a judge of this Court entered a temporary stay pending consideration of the

motion by a panel of this Court.  *See* Order, *In re Petrobras Securities*, No. 16-

1914 (2d Cir. July 12, 2016), Dkt. No. 65.

## I.    Factual Background

### A.    Petrobras

Petrobras is an oil and gas company whose operations are centered in, and

that is majority owned by, Brazil.[1]  A-364–65.  Petrobras's common and preferred

---

[1]     Petrobras is an "agency or instrumentality" of Brazil and thus a "foreign
state" within the meaning of the Foreign Sovereign Immunities Act.  28 U.S.C.

shares are listed and traded on the Brazilian stock exchange, its ADSs are traded on the NYSE, A-366, and its 39 debt securities at issue traded over-the-counter across the globe, including in the U.S., but not on any U.S. exchange. As a Brazilian securities issuer, Petrobras is subject to regulation by the Brazilian securities regulator, the CVM. A-894, 922.

### B. The Cartel Scheme

In 2009, Brazilian federal prosecutors launched an investigation, Operation Lava Jato, aimed at money laundering in Brazil. A-4598. In 2014, the investigators discovered that Petrobras's Brazilian contractors and suppliers had formed a cartel that engaged in bid-rigging in connection with Brazilian construction projects and had paid bribes to Brazilian political parties, public officials, individual contractor personnel, and Corrupt Former Executives at Petrobras. 2014 20-F at F-13. None of this alleged conduct occurred in the U.S.

Petrobras itself did not make or receive any improper payments, and by the time the scheme was discovered by the Brazilian government, the Corrupt Former Executives had left the Company and the information necessary to adjust Petrobras's financial statements was not contained within the Company's records. *Id.* at F-14. In the investigation's wake, Petrobras had to delay issuing its financial

---

§ 1603(b) (2005); *see Rogers v. Petróleo Brasileiro, S.A.*, 673 F.3d 131, 135 (2d Cir. 2012).

3

statements and the prices of certain of its securities fell. However, when Petrobras accounted for the impact of the scheme by making a current-period adjustment of less than 2% to the carrying amount of its historic property, plant, and equipment in its financial statements, its security prices rose. Petrobras did not restate any of its financial statements and its auditors stood behind them.

### C.     Petrobras Is Recognized as a Victim of the Cartel Scheme

Petrobras cooperated with Brazilian authorities in their investigation and has sought to recover from the Corrupt Former Executives and the cartel members. By October 22, 2014, the Brazilian court presiding over the Lava Jato proceedings found that Petrobras was "the victim of unlawful acts" in connection with the corruption scheme. A-371. Petrobras was later formally admitted as an assistant to the prosecutor in the Lava Jato proceedings because the Company is the direct victim of the cartel activity.

### D.     Petrobras's Notes Offerings

Petrobras relies on the international debt markets for a substantial part of its long-term financing. 2014 20-F at 106. Its Global Notes were underwritten by syndicates of U.S. and foreign banks, some of which were authorized to sell them in the U.S. and some of which were authorized to sell them abroad; they were offered for sale across four continents. *See id.* at S-74, S-74–S-78 (discussing conditions placed upon sale of the Notes in, *e.g.*, Brazil, Chile, Peru, the European

4

Union, the Netherlands, the United Kingdom, Switzerland, Dubai, Hong Kong,

Japan, and Singapore).  The Global Notes were held by numerous sophisticated

institutional investors.  A-2009 (F-I ¶ 236); SPA-11.

The Notes do not trade on any U.S. exchange, A-5175–77, but in over-the-

counter transactions throughout the world conducted over a variety of different

platforms, including telephone, electronic platforms, and dark pools.  There are no

required records that document the location where these transactions take place and

the ultimate purchasers generally do not know (and cannot readily learn) that

information.  A-6435–36 (SIFMA 23(f) Amicus Brief).  Nor do Defendants or

Plaintiffs know what proportion of the potentially billions in transactions in the

over $40 billion in Petrobras Notes outstanding during the class period changed

hands in the U.S.

## II.    Procedural History

### A.    The Class Action and Related Individual Actions

Following the delay in the issuance of Petrobras's financial statements and

before Petrobras had even accounted for the impact of the scheme, a putative class

action complaint was filed in December 2014 on behalf of Petrobras investors.

Four similar class actions were later filed and consolidated.  The lead plaintiff

subsequently filed a series of amended complaints, culminating in the November

2015 FAC.  The FAC purports to represent classes of Petrobras debt and equity

investors under, *inter alia*, Sections 11, 12(a)(2), and 15 of the Securities Act and Sections 10(b) and 20(a) of the Exchange Act. Notwithstanding the absence of a restatement, Plaintiffs allege that Petrobras made materially misleading statements regarding its financial performance. Plaintiffs allege that Petrobras's general statements regarding its internal controls and in certain blogs uploaded in Brazil and written in Portuguese were misleading for failure to disclose the scheme.[2] Plaintiffs also alleged that Petrobras's financial statements incorrectly classified the bribe amounts.

Many tag-along Individual Actions have also been filed on behalf of approximately 500 putative class members. Some of those plaintiffs are U.S. funds with offshore affiliates. Many are themselves foreign entities. *See, e.g.*, A-5818–19 (INKA Compl. ¶ 14); A-1–170 (docket entries listing multiple foreign plaintiffs). These Individual Actions were consolidated with the Class Action for pre-trial purposes and for trial. A-929–36.

**B.  Plaintiffs' Efforts to Establish Domestic Transactions**

The district court resolved several motions to dismiss, which argued (among other things) that Plaintiffs had not sufficiently alleged that they purchased Petrobras Notes in "domestic transactions" as required to plead a U.S. securities-

---

[2]  *But see* Stay Reply Decl. ¶¶ 7–8 & Exs. 20–70 (presenting testimony that putative class members and investment advisors did not read or know if others had read certain alleged misstatements).

law claim under *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010).

Under this Court's precedent in *Absolute Activist Value Master Fund Ltd. v.*

*Ficeto*, Plaintiffs could only establish a domestic transaction in securities that, like

the Petrobras Notes, do not trade on a domestic exchange by demonstrating either

that they "incur[red] irrevocable liability to carry out the transaction within the

United States" or that "title [was] passed within the United States." 677 F.3d 60,

70 (2d Cir. 2012). In applying this standard, the district court held that two

investors that purchased directly in Petrobras's initial Notes offerings had

sufficiently alleged that they incurred irrevocable liability to purchase the Notes in

the U.S., relying in part on the presence of "New York area code phone numbers

on the [trade] confirmations" those Plaintiffs attached to the FAC. A-5178 n.5.

The court also held that the two other Plaintiffs in the Class Action had not alleged

sufficient facts regarding domestic transactions, and thus dismissed their Notes

claims. A-5180–84.

Subsequently, the court ruled that the plaintiffs in eleven Individual Actions

also had failed adequately to plead "specific facts" to establish domestic

transactions and dismissed their Notes claims. A-5723–24. Two months later, in

March 2016, the court ruled that another individual plaintiff (INKA) had failed to

allege "material locative details," even after amending its complaint, and dismissed

the challenged Notes claims. A-7123–24 n.1.

7

While these *Morrison*-related challenges were ongoing, Plaintiffs moved for class certification.  In opposition, Defendants argued that highly individualized and fact-specific issues regarding the location of each putative class member's transactions in Petrobras Notes would cause individual issues to predominate over common issues, and that any purported class that included purchasers of Petrobras Notes in the aftermarket would not be ascertainable, as there were no objective, administratively feasible criteria by which to establish whether a particular Note holder was a member of the class.  A-3779–80; A-5788–93.[3]

Plaintiffs did not offer any evidence in response to Defendants' argument that the numerous issues regarding *Morrison* rendered the classes unascertainable and caused individual issues to predominate.  Despite purporting to represent a class of initial-offering *and* aftermarket purchasers of Petrobras Notes, Plaintiffs submitted no trading records sufficient to establish domestic transactions for *any* purchases in the secondary market, nor did they present any evidence suggesting how such transactions are documented or which entities (if any) would have access to documentation containing the transaction-specific locative details required by

---

[3]     This argument was based in part on lead plaintiff USS's own admission to the SEC that "determining whether a transaction occurred domestically can prove difficult," including because "institutions increasingly trade large blocks of securities off-exchange in private markets known as 'dark pools'" and "investors typically do not know which exchange their order is directed through, assuming it even occurs on an exchange."  A-6210–11.

*Morrison* and *Absolute Activist*. Plaintiffs also failed to establish how the court (or Defendants) could resolve the question of which purchasers actually fell into the purported classes and thus would be bound by any class judgment. Rather, Plaintiffs simply asserted that a post-judgment claims process would be sufficient to determine where and when a particular transaction was consummated. A-5766.[4]

### C. Plaintiffs' Efforts to Prove Market Efficiency

In connection with their class certification motion, Plaintiffs were also required to demonstrate that common reliance questions predominated over individual ones under Rule 23(b)(3) for their Section 10(b) claims. Plaintiffs did not offer any direct evidence that the alleged misstatements had price impact. Rather, Plaintiffs invoked the fraud-on-the-market doctrine under *Basic*. Their

---

[4]    After the classes were certified, Plaintiffs continued to resist any plan to even try to ascertain the class members who could satisfy *Morrison*. When Defendants requested that the class notice include interrogatories addressed to domestic-transaction issues (while noting that such interrogatories still would not solve the Rule 23 issues), Plaintiffs argued that obtaining such discovery was "impracticable and unrealistic" and would present "substantial difficult[ies]" for "unsophisticated" absent class members to respond without assistance of counsel. A-6048, 6051. While conceding that the information sought by Defendants was relevant "to determine whether the absent class members' claims satisfy *Morrison*," the court denied the request on the grounds that it was "directed at individual issues, such as the locations of individuals' transactions, and are not relevant to common issues." A-6410, 6412. Plaintiffs never explained how, if it would be impracticable for absent class members to determine whether their purchases were domestic in order to answer interrogatories, it would be practicable for them to determine if their purchases were domestic in order to decide whether to opt out.

evidence consisted solely of opinions offered by Steven Feinstein, the founder of a litigation consulting firm. Feinstein's report addressed a number of structural characteristics about Petrobras, such as its market capitalization, the number of analysts who followed it, and the number of press reports about it. All of the characteristics are generally interdependent, and are essentially proxies for whether the issuer is "large." None of these factors examines, much less measures, whether prices move in response to material news. As Defendants' expert Paul Gompers of the Harvard Business School explained, no economist would rely on these factors to assess whether securities traded in an efficient market. A-3637–38 (G-I ¶¶ 27, 29). And no court in this Circuit (or, to Defendants' knowledge, in any other circuit) has found market efficiency in the absence of an empirical test.

Although Feinstein had been a testifying expert on market efficiency for decades, he ran an empirical test in this case—the FDT test—that he had never run before, A-5082, 5084 (FTr. 470:3–10, 476:13–23), relying on a single article from the *St. John's Law Review* in 2004.

The FDT test differs from traditional event studies routinely employed by financial economists. Event studies test price movements on specific days that are selected *ex ante*—based upon a body of literature analyzing stock price movements in response to recurring corporate events (*e.g.*, dividend changes and earnings releases) that have been shown to generate value-relevant information—to

10

determine whether the prices react in a directionally-appropriate manner (positively in response to good news, and negatively in response to bad news). The FDT test instead compares price movements on groups of dates that the examiner believes are likely (as a group) to have such value-relevant information, against a group of dates that are not expected to have such news. If the former group has statistically significant more dates with statistically significant residual price movements than the latter, the test is satisfied.

The FDT test is indifferent to whether prices move in the right direction in response to new value-relevant news. That is because the FDT test is *not designed* to establish market efficiency, but rather only to demonstrate market *in*efficiency. As the FDT test authors themselves put it: their "test is a threshold step, not a sufficient condition, to show that a stock traded in an efficient market." FDT at 122. Moreover, in every FDT test that Feinstein ran here, at least half of the event days did *not* have statistically significant residual returns, meaning that most of the time the studied events did *not* react to new material news.

After he was challenged on this flaw, Feinstein purported to characterize the news after-the-fact, and concluded that prices had moved in directionally appropriates ways. A-5089–90 (FTr. 499:19–500:11). But Feinstein conceded that the selection of event dates must be done *ex ante*, that an *ex post* analysis of directionality is "backwards" and "doesn't prove anything," A-5106 (FTr. 564:11–

11

25), and that his characterization of the news to confirm price movements was incorrect.  A-5243 (HTr. 49:18–22).

### D.    The Certified Classes

Notwithstanding these issues, on February 2, 2016, the court granted Plaintiffs' motion for class certification under Rule 23(b)(3), and certified two classes of Petrobras investors.  The Securities Act Class is defined, in relevant part, to include:

> all purchasers who purchased or otherwise acquired debt securities issued by [Petrobras] … in domestic transactions, directly in, pursuant and/or traceable to a May 15, 2013 public offering registered in the United States and/or a March 11, 2014 public offering registered in the United States … and were damaged thereby.

SPA-48.  The Exchange Act Class is defined, in relevant part, to include:

> all purchasers who, between January 22, 2010 and July 28, 2015, … purchased or otherwise acquired the securities of [Petrobras], including debt securities[,] … on the New York Stock Exchange (the "NYSE") or pursuant to other domestic transactions, and were damaged thereby.

*Id.*

Regarding reliance, the court ruled that the "indirect" structural evidence was all Plaintiffs needed to establish "market efficiency" for *all* the Petrobras Securities—ADSs (traded on the NYSE) and 39 series of Notes (transacted world-wide over-the-counter).  SPA-44.  It found that "common sense" alone "suggests that the market[s]" for the securities of a "large" company "would materially react

12

to material disclosures," embraced the FDT test despite its flaws, and did not consider whether the evidence that Defendants marshaled to show that Petrobras Securities traded in *in*efficient markets undermined market efficiency. SPA-32, 37–45. The court thus held that Plaintiffs' evidence was "sufficient … at the class certification stage" to support *Basic*'s presumption of reliance. SPA-44.

Regarding *Morrison*, the court determined that the proposed classes were "ascertainable and administratively manageable." SPA-23. It assumed that whether a particular class member's aftermarket purchases of Petrobras Notes were domestic was "highly likely to be documented in a form susceptible to the bureaucratic processes of determining who belongs to a Class," and that "documentation of the placement of purchase orders is the sort of discrete, objective record routinely produced by the modern financial system." *Id.*

## SUMMARY OF THE ARGUMENT

Plaintiffs did not present any direct evidence of price impact and recognized that, if reliance needed to be proven on an individualized basis, individual questions would defeat class certification. As a result, they sought to invoke the *Basic* presumption of reliance. For decades, to establish that presumption, courts have required a uniform showing—an event study ensuring "that there is a proper connection between a defendant's misrepresentation and a plaintiff's injury." *Halliburton II*, 134 S. Ct. at 2407. The district court jettisoned that standard. It

13

certified classes in the absence of direct evidence that securities prices moved in directionally appropriate ways (and despite evidence that they did not) and announced a rule that, if adopted, would eviscerate the reliance element and present large companies with the threat of class action lawsuits solely because they are large.

The Supreme Court also has held that transactions on a domestic exchange—not over-the-counter transactions worldwide—are the "objects of the [securities laws'] solicitude," *Morrison*, 561 U.S. at 269, and that "plaintiffs … must actually *prove*—not simply plead—that their proposed class satisfies each requirement of Rule 23," *Halliburton II,* 134 S. Ct. at 2412, including in this Circuit the requirements of ascertainability, predominance, and superiority. The court jettisoned those standards as well. It certified a sweeping class action including over-the-counter and aftermarket purchasers in the absence of any evidence that such purchasers can readily be ascertained, and despite the presence of ample contrary evidence that they could not be determined at all without countless mini-trials. As a result, it rewrote *Morrison* from a case that limits the extraterritorial application of the securities laws to one that expands the extraterritorial *in terrorem* effect of securities class actions.

14

## STANDARD OF REVIEW

This Court reviews the discretionary aspects of a class certification decision for "abuse of discretion," but "review[s] *de novo* any issues of law underlying a Rule 23 ruling." *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 201 (2d Cir. 2008). "A district court abuses its discretion when (1) its decision rests on an error of law or a clearly erroneous factual finding, or (2) its decision—though not necessarily the product of a legal error or a clearly erroneous factual finding—cannot be located within the range of permissible decisions." *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 116 (2d Cir. 2013). The Court reviews *de novo* whether a district court's order complies with the requirements of the Due Process Clause. *United States v. Cruz-Flores*, 56 F.3d 461, 463 (2d Cir. 1995).

## ARGUMENT

The Supreme Court has repeatedly held that class actions should be the "exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011). "[C]lass actions constitute but one of several methods … by which multiple similarly situated parties get similar claims resolved at one time in one federal forum." *Sprint Commc'ns Co. v. APCC Servs.*, 554 U.S. 269, 291 (2008). Class certification is therefore only appropriate where class-wide adjudication

15

"would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997); *accord Mazzei v. Money Store*, No. 15-2054, 2016 WL 3876518, at *8 (2d Cir. July 15, 2016). Accordingly, "plaintiffs wishing to proceed through a class action must actually *prove*—not simply plead—that their proposed class satisfies each requirement of Rule 23" prior to class certification. *Halliburton II,* 134 S. Ct. at 2412; *Glatt v. Fox Searchlight Pictures, Inc.*, 811 F.3d 528, 538 (2d Cir. 2016) (plaintiffs "b[ear] the burden of showing that [their] proposed class satisfie[s] Rule 23's requirements"). The Supreme Court insists on a "rigorous analysis" demonstrating that all of Rule 23's requirements are satisfied before a class is certified. *Wal-Mart*, 564 U.S. at 351.

Rule 23, like all other federal rules of procedure, "cannot be used to 'abridge, enlarge, or modify any substantive right.'" *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 231 (2d Cir. 2008) (quoting 28 U.S.C. § 2072(b) (SPA-56)). This includes the due process rights of defendants and absent class members.

# I.  PLAINTIFFS FAILED TO SATISFY THEIR INITIAL BURDEN UNDER *BASIC*

By accepting Plaintiffs' market efficiency argument, the court committed three errors: (1) it held that market efficiency could be proven without direct evidence, including from the only economically supportable way to *demonstrate*

16

it—an empirical study of cause and effect; (2) it concluded that a novel empirical test designed to test for *in*efficiency adequately proved market efficiency, even though (among other flaws) that test provided no evidence that the securities' prices moved in the appropriate direction upon the release of material news; and (3) it entirely ignored, or improperly downplayed, Defendants' empirical evidence that the market for the relevant securities was *not* efficient.

### A. The District Court Improperly Concluded That Plaintiffs Could Satisfy *Basic* Without Direct Evidence Demonstrating Market Efficiency

The court ruled that, as a matter of law, Plaintiffs could prove market efficiency on the basis of "indirect factors" such as trading volume, analyst coverage, the number of market makers, whether the company is eligible to file a simplified security registration form, market capitalization, bid-ask spread, and the amount of shares outstanding, without direct evidence of cause and effect. SPA-28–32. It so ruled—even though none of these loosely quantified factors examines whether prices react to material news—because this Circuit has not yet "held that direct evidence [of cause and effect] is always necessary"; because it was "not bound by [*Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989)]," including *Cammer*'s holding that "direct evidence [of cause and effect] is essential"; and because "[c]ausality is notoriously difficult to prove with certainty." SPA-32. The court erred.

17

*Halliburton II* held that, because reliance is an essential element, "[p]rice impact is … an essential precondition for any Rule 10b-5 class action." 134 S. Ct. at 2416. "The fact that a misrepresentation was reflected in the market price at the time of [the] transaction—that it had price impact—is *Basic*'s fundamental premise." *Id.* The Court drew a distinction between direct and indirect evidence: it held that proof "that the stock traded in a generally efficient market" is only "*indirect*" evidence of "price impact" and therefore of reliance. *Id.* at 2414, 2415 (emphasis added); *see also id.* at 2415 ("Under *Basic*'s fraud-on-the-market theory, market efficiency and the other prerequisites for invoking the presumption constitute an *indirect* way of showing price impact.") (emphasis added). It follows then that Plaintiffs must present direct evidence of an efficient market, and that only direct evidence of market efficiency constitutes the required indirect evidence of price impact. Indeed, even before *Halliburton II*, this Court ruled that direct "[e]vidence that unexpected corporate events or financial releases cause an immediate response in the price of a security" is "the essence of an efficient market and the foundation for the fraud on the market theory," and that empirical evidence of cause and effect therefore "has been considered the most important … factor" in proving market efficiency. *Teamsters*, 546 F.3d at 207.[5]

---

[5]     *See also In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 634 (3d Cir. 2011), *abrogated on other grounds by Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184 (2013) ("[T]he cause-and-effect relationship between a company's

The decision below, however, impermissibly relieved Plaintiffs of their burden by piling presumption on top of presumption. It ruled that because most securities of companies with Petrobras's characteristics trade in an efficient market, that was "indirect" evidence sufficient to show that Petrobras Securities trade in an efficient market, and then also that such indirect evidence further constituted "indirect" evidence that the alleged misrepresentations had price impact. But merely pointing to the size of a company and arguing that securities of large companies usually trade in efficient markets does not "prove" that the securities of the specific company at issue actually do so, particularly in light of the undisputed evidence (reflected in a substantial body of economic literature) that securities of even very large companies trading on major exchanges (*e.g.*, Bristol-Myers Squibb, Royal Dutch Shell, and a "large cross section" of others, A-3639 (G-I ¶ 32)) can and do trade *in*efficiently. A-3636–40 (G-I ¶¶ 26–33); A-5254 (HTr. 60:2–18). The undisputed evidence below, on which both sides' economic experts agreed, reflected that an empirical study is the *only* way to actually *prove* market efficiency, and that the "indirect factors" considered by the district court are at best only "indicators" of efficiency. A-5227, 5228–29 (HTr. 33:11–18,

---

material disclosures and the security price is normally the most important factor in an efficiency analysis."); *accord In re Xcelera.com Sec. Litig.*, 430 F.3d 503, 512 (1st Cir. 2005); *Unger v. Amedisys Inc.*, 401 F.3d 316, 324 (5th Cir. 2005); *In re Fed. Home Loan Mortg. Corp. (Freddie Mac) Sec. Litig.*, 281 F.R.D. 174, 178 (S.D.N.Y. 2012).

34:19–35:8); A-3637, 3638 (G-I ¶¶ 27, 29); *see also* A-1979 (F-I ¶ 113); A-4992

(G-II ¶ 6).[6]

The court's rule thus would impermissibly relax the requirements of Section

10(b) and Rule 10b-5. Reliance is essential because it "provides the requisite

causal connection between a defendant's misrepresentations and a plaintiff's

injury." *Basic*, 485 U.S. at 243; *see also Halliburton II*, 134 S. Ct. at 2406 (noting

necessary element of "causal connection between the defendants' alleged

misrepresentations and the plaintiffs' economic losses"). The Supreme Court has

also enjoined that the *Basic* presumption "does not alter the elements of the Rule

10b-5 cause of action and thus maintains the action's original legal scope."

*Halliburton II*, 134 S. Ct. at 2412. But under the rule below, price impact would

be satisfied—and so would reliance—wherever a company was large enough to

---

[6]     In fact, many of the articles cited by Feinstein even reject the relevance of those "indirect factors" in assessing whether securities trade in an efficient market. For example, the FDT article concluded that "average weekly trading volume … certainly do[es] not show or prove market efficiency" and that "[m]any of the [*Cammer*] factors, like the existence of market makers and coverage by securities analysts, do not even go to the market behavior of a stock." FDT at 128. Another article cited by Feinstein found that "firm size, percentage bid-ask spread, return volatility, price, and institutional holdings … either fail the significance test or yield results counter to our expectations," and "the number of market makers and institutional holdings do not marginally contribute to distinguishing efficient from inefficient firms." Barber et al. at 307, 310. The article concluded that "courts should exercise caution in the use of these … variables as indicators of the efficiency with which a firm's securities are priced." *Id.* at 307; *see also* A-3637, 3638 (G-I ¶¶ 27, 29); A-3968–69 (GTr. 58:16–59:24); A-5247–48 (HTr. 53:25–54:16).

have a large trading volume, a large market capitalization, and analyst coverage. That would fundamentally change the Rule 10b-5 cause of action, in virtually every case where the Rule is invoked. A plaintiff would be able to show reliance in every case involving such a company unless the defendant *disproved* market efficiency for the security, and did so without any empirical evidence to respond to, despite *Halliburton II*'s insistence that "[t]he burden of proving [market efficiency] still rests with plaintiffs and … must be satisfied before class certification." *Id.*

The rule below would also introduce uncertainty and unpredictability into the law of Rule 10b-5, contrary to the Supreme Court's admonition that securities liability is "an area that demands certainty and predictability." *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 188 (1994). The non-empirical "indirect factors" accepted as sufficient by the court fail to provide any meaningful standards, making their application entirely subjective. For some of the factors, including analyst coverage and the existence of market makers, the court did not even purport to have a threshold against which it compared them; it simply reported the numbers and declared the factors satisfied. SPA-26, 29–32. For others, including market capitalization, bid-ask spread, and amount of shares outstanding, the court simply compared Petrobras to other publicly traded companies, without explaining why that is the appropriate

21

comparison or what such comparisons must show to suffice. SPA-27–28. The "indirect factors" cited by the court also do not set a clear standard for how to resolve the market efficiency question when some of those factors are satisfied and others are not.

Finally, the rule below is also inconsistent with the Supreme Court's recognition that Section 10(b) class actions "present[] a danger of vexatiousness different in degree and in kind from that which accompanies litigation in general." *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 80 (2006). *Halliburton II* refused to defer the price impact inquiry to trial because that would permit a case to "proceed as a class action (with all that entails)" without a proper showing of common reliance or invocation of the fraud-on-the-market theory. 134 S. Ct. at 2415. But the relaxed standards applied by the court below would make *Basic* a dead-letter in virtually all cases where it matters.

### B. Plaintiffs' Novel and Flawed Empirical Test Was Insufficient To Satisfy *Basic*

The court below aggravated its error by accepting as valid the empirical test for market efficiency Plaintiffs proffered. Market efficiency is an economic term. Economists agree that an efficient market is one in which prices "'move reasonably promptly in the predicted direction in response to unexpected material public information.'" A-1962 (F-I ¶ 43) (quoting Economists' Amicus Brief). Only because "efficient markets" have this characteristic can reliance be presumed

under *Basic*, and that is why a plaintiff must prove that the securities "traded in an efficient market" to benefit from that presumption. *Halliburton II*, 134 S. Ct. at 2408; *see also id*. at 2409 (*Basic* embraced the "efficient capital markets hypothesis.").

Courts apply economic terms with felicity to their economic definitions. *See, e.g.*, *Ottaviani v. State Univ. of N.Y. at New Paltz*, 875 F.2d 365, 372 (2d Cir. 1989) ("[M]ost courts follow the conventions of social science which set 0.05 as the level of significance below which chance explanations become suspect."); *In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480, 493 n.11 (S.D.N.Y. 2011) (noting a return below "the conventional statistical measure of a 95% confidence level … is not sufficient evidence of a link between the corrective disclosure and the price"); *In re AIG, Inc. Sec. Litig.*, 265 F.R.D. 157, 186–87 (S.D.N.Y. 2010) (adhering to "standard methodology in financial economics" and applying 95%, rather than 90%, confidence interval). Giving an economic term a definition different from that given by economic science means that the conclusions that can reliably be drawn by economic science—here, that in an "efficient market" prices move in response to new material news—may not reliably be drawn.

Rather than using a well-accepted event study test, which this Court previously recognized "has been considered *prima facie* evidence of the existence of … a causal relationship," *Teamsters*, 546 F.3d at 207–08, Feinstein based his

23

opinions on a novel test proposed in a 2004 law review article. This test suffers from at least two fundamental flaws, each of which make it inadequate to satisfy *Basic*'s step-one. *First*, unlike accepted event studies, the FDT test does not analyze whether securities prices move in the appropriate direction in response to news—*i.e.*, whether they move up in response to good news and down in response to bad news—but just measures if they move (irrespective of direction). *Second*, the FDT test can be satisfied even where the market is clearly *in*efficient.

    1.    **For a Market to Be Efficient Securities Must Be Proven to Move in the Appropriate Direction in Response to News**

The Supreme Court accepted that the fraud-on-the-market doctrine rests on the economic theory that an efficient market "reflects all publicly available information, and, hence, any material misrepresentations," and that "the market price will incorporate public information within a reasonable period." *Halliburton II*, 134 S. Ct. at 2408, 2411. In other words, materially positive information raises prices and materially negative information lowers prices. For this reason, *Basic* itself upheld the presumption of reliance because, as a result of the materially negative, false information at issue there, the relevant security's "price had been fraudulently depressed." 485 U.S. at 245. If a security's price does not rise in response to material positive news, then there is no basis to conclude that a defendant's alleged misrepresentation inflated the company's stock, and therefore no proof of a connection between that misrepresentation and any alleged injury.

24

As academic financial economists, including several Nobel laureates, explained to the Supreme Court in *Halliburton II*, the efficient market hypothesis is based upon "the modest assumption that prices move reasonably promptly in a *predictable direction* in response to favorable or unfavorable public information," and that "economists generally agree that stock prices respond to material information in a *predictable direction*." Economists' Amicus Brief at 9, 11 (emphases added). Indeed, even the experts here agreed on this modest premise: in an efficient market "'there is little doubt that the stock price will increase reasonably promptly after favorable news about a company is released and decline after unfavorable news,'" and "'prices generally move reasonably promptly in the predicted direction in response to unexpected material public information.'" A-1962 (F-I ¶ 43) (quoting Economists' Amicus Brief); *see also* A-4990, 4995–96, 5001 (G-II ¶¶ 4, 12, 15, 28); A-3958 (GTr. 18:4–14). This agreement between the experts is not surprising. Feinstein himself conceded that if prices did not consistently move in the right direction, he could *not* conclude that the market in which they traded was efficient. A-5091 (FTr. 504:4–7). Without that cause and effect "demonstration," "it is difficult to presume that the market will integrate the release of material information about a security into its price." *Teamsters*, 546 F.3d at 207. "An event study that correlates the disclosures of unanticipated, material information about a security with corresponding fluctuations in price has

been considered *prima facie* evidence of the existence of such a causal

relationship." *Id.* at 207–08.

The court thus erred in concluding that evidence of directionality was not

necessary to support market efficiency. Indeed, one of the lower courts to consider

the FDT test has directly rejected its use as a way to affirmatively prove efficiency,

*see In re Fed. Home Loan Mortg. Corp. (Freddie Mac) Sec. Litig.*, 281 F.R.D. 174,

180 (S.D.N.Y. 2012) (rejecting reliance on FDT test after noting that "[e]ven if

[expert] demonstrated that news probably had some effect on price, plaintiff's

burden is higher"), and many others have only used it to support a finding of

*in*efficiency.[7]

---

[7]    *See, e.g.*, *Lumen v. Anderson*, 280 F.R.D. 451, 460–61 (W.D. Mo. 2012); *In re PolyMedica Corp. Sec. Litig.*, 453 F. Supp. 2d 260, 269–70 (D. Mass. 2006); *Lehocky v. Tidel Tech., Inc.*, 220 F.R.D. 491, 507–08 (S.D. Tex. 2004).

A few opinions rely on FDT test results. Two were written by the same district judge; the later relied solely on the earlier one, which applied the now-rejected "some showing" standard for Rule 23(b), and neither discussed the flaws in the FDT test. *See McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 426, 430 (S.D.N.Y. 2014); *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 279-80 (S.D.N.Y. 2008). In a third, an FDT author acknowledged that FDT "is a threshold test for market efficiency and does not directly prove it." *See Forsta AP-Fonden v. St. Jude Med., Inc.*, 312 F.R.D. 511, 521 (D. Minn. 2015).

Another court has rejected a similar test because it (like the FDT test) does not require directionally appropriate movements to be satisfied. *IBEW Local 90 Pension Fund v. Deutsche Bank AG*, No. 11 CIV. 4209 KBF, 2013 WL 5815472, at *21 (S.D.N.Y. Oct. 29, 2013).

26

The court nonetheless asserted that directionality is not required to prove market efficiency because it "goes to the accuracy of the price of a security," and *Halliburton II* held that price "accuracy" was not necessary for a market to be efficient.  SPA-41–42.  However, the court misread the directionality requirement. *Halliburton II* responded to claims regarding "the degree to which the market price of a company's stock reflects public information about the company—and thus the degree to which an investor can earn an abnormal, above-market return by trading on such information."  134 S. Ct. at 2410.  It did not rule that the price need not react in the right direction in response to new material news.  To the contrary, it held prices must rise (in some amount) upon the release of good news, and fall (in some amount) upon the release of bad news.  In fact, the financial economists who submitted an amicus brief in *Halliburton II*, which contributed to the comment cited by the court here, drew a sharp distinction between the "debate [among economists about] whether stock prices are fundamentally *accurate*" and "the modest assumption that prices move reasonably promptly *in a predictable direction* in response to favorable or unfavorable public information."  Economists' Amicus Brief at 11 (emphases added).

Thus, the court's conclusion would completely divorce "market efficiency" both from its economic definition—a market cannot be efficient if prices move in the wrong direction—and its legal meaning:  false information cannot be presumed

to have a price impact and be relied upon to cause injury unless the security at issue is shown at least to move in directionally appropriate ways in response to new value-relevant information.

Finally, by holding that Plaintiffs could prove market efficiency without "substantial" evidence of directionality, SPA-41, the court again adopted a rule that would eliminate the burden-shifting approach adopted by the Supreme Court in *Basic* and *Halliburton II*. *First*, the FDT test does not examine directionality *at all*.[8] *Second*, if evidence of lack of directionality only "goes to the accuracy of the price of a security," *id.*, and not to whether price is impacted, then a showing by Defendants that the price in fact moved in the wrong direction cannot defeat market efficiency. This ruling, too, thus turns the rigorous analysis required to obtain class certification on its head and all but eliminates Defendants' ability to rebut the presumption at the class certification stage, contrary to decisions of other circuits. *See IBEW Local 98 Pension Fund v. Best Buy Co.*, 818 F.3d 775, 782–83 (8th Cir. 2016) (reversing class certification after holding that defendants had rebutted the *Basic* presumption through plaintiffs' own empirical evidence).

---

[8]     For that reason, Feinstein was forced to perform an *ex post* analysis that purported to show that prices moved in the appropriate direction. But even he admitted that an *ex post* analysis of directionality is "backwards" and "doesn't prove anything," A-5106 (FTr. 564:11–25), and "is a violation of the event study rules and a violation of scientific principles," *In re Groupon, Inc. Sec. Litig.*, No. 12 C 2450, 2015 WL 1043321, at *6 (N.D. Ill. Mar. 5, 2015). SPA-40, 43–44 (giving "little weight" to Feinstein's directionality analysis).

That the FDT test employs a common statistical technique—a "z-test," SPA-38—also does not make it a valid measure of market efficiency. The issue is not how often z-tests are generally used; the issue is whether satisfaction of a z-test *demonstrates market efficiency*. The court cited no authority that it does, neither does any economic (much less peer-reviewed) literature, and the FDT authors themselves say it does not. A-4993–95 (G-II ¶¶ 8-13).

### 2. Plaintiffs' Flawed Test Does Not Prove Efficiency Because it Can Be Satisfied Even When the Market Is Inefficient

Even assuming that the district court were correct that it is not important at the class certification stage to introduce evidence that prices moved in the appropriate direction, and all that matters is that new information "generally affected" prices, the FDT test would still fail to meet that standard: it can be satisfied even where the market is unquestionably *in*efficient. For example, the FDT test can be satisfied even if the market only shows statistically significant reactions to material new information 10% of the time—and does not do so *90% of the time*—so long as the percentage of days without new material information that have statistically significant reactions is smaller. A-3647–48 (G-I ¶ 49). Under no definition of market efficiency, however, would a market for a security that only showed reactions to new, material information 10% of the time be considered

efficient.[9] Indeed, one of the authors of the FDT test acknowledged that "'[t]here are also conceptual questions relating to whether a market can exhibit some form of inefficiency but still pass the FDT test. In fact there are clear examples where that could be the case.'" A-3643 (G-I ¶ 40) (quoting Tabak (2010) at 7). Therefore, the FDT test, by design, cannot show that new information "generally affected" the price of securities, since it can be satisfied even when there is substantial evidence of *in*efficiency.

This case provides a demonstration. *First*, the hallmark of an efficient market is that there are "statistically significant residual returns on the vast majority of dates on which new material value-relevant information is released." A-3663 (G-I ¶ 85). Indeed, before this case, in every event study Feinstein performed, the "vast majority" of event dates had to have statistically significant residual returns in order for him to find market efficiency. A-5219 (HTr. 25:5–15); A-5084 (FTr. 476:13–20). In the absence of such evidence, one cannot conclude that the market reacts promptly and meaningfully to new material information. A-1955 (F-I ¶ 19); A-4068 (F-II ¶ 2). But in none of Feinstein's FDT tests did the price of Petrobras equity securities move in a statistically significant manner on

---

[9]     By contrast, in line with the economic definition of an efficient market, both Gompers and Feinstein agreed that under a traditional event study the "vast majority" of event dates must have "statistically significant abnormal returns." A-5219 (HTr. 25:5–15); A-5084 (FTr. 476:13–20); A-3663 (G-I ¶ 85).

more than half of the dates tested. A-3663, 3666 (G-I ¶¶ 86, 90). In fact, after correcting errors Feinstein admits he made, A-4085–86 (F-II ¶ 48), no more than 32% of his event dates had statistically significant residuals; nearly 70% did *not*. A-3664, 3666–67 (G-I ¶¶ 87, 91). And, Feinstein selected the event dates he examined *because* they included "events on which company-specific information was released that [was] new, unexpected, and may reasonably contain information of such import as to be expected to elicit a price reaction over the threshold for statistical significance." A-1980 (F-I ¶ 117). The FDT test results, therefore, are "inconsistent with the contention that the Petrobras Securities traded in efficient markets." A-5004 (G-II ¶ 34).

*Second*, the group of "corrective" disclosure dates that the FAC identified actually demonstrated *in*efficiency under the FDT test. A-5121 (FTr. 624:4–625:6); A-3664–66 (G-I ¶¶ 88–89); A-5014–15 (G-II ¶ 57). Feinstein objected to using these dates in his FDT analysis because doing so would bias the results. A-3323–24, 3384–85, 3414–15 (FTr. 216:13–217:8, 277:22–278:18, 307:23–308:12). However, he routinely uses such dates when conducting event studies for market efficiency, A-5101 (FTr. 547:11–18), and has asserted that the appropriate days for examination using an FDT test are those with "disclosures of information related to allegations in the Complaint," A-1981 (F-II ¶ 119), as corrective disclosure dates alleged in the FAC surely are. Finally, any bias from using such dates would be

31

toward, not against, finding efficiency.  A-3653 n.78 (G-I ¶ 61 n.78); A-5014–15 (G-II ¶ 57).[10]

*Third*, Feinstein also noted that ADS and Notes prices *must* move "appropriate[ly]" in reaction to new Company-specific information, A-1955, 2018 (F-I ¶ 19) (ADS), (F-I ¶ 265) (Notes), as this is "the essence of market efficiency." A-1955 (F-I ¶ 19). Yet Feinstein's own results show they did not consistently move appropriately.  He conducted an *ex-post* content analysis of the "tenor of news" on the dates he examined.  But on dates when the price rose the news was not, as Feinstein required, "overwhelmingly positive," A-5232 (HTr. 38:10–13); it was markedly *negative*.  A-5235–44 (HTr. 41:7–50:5).  The court agreed Feinstein had "mischaracterized" the news.  SPA-40.

---

[10]     The court justified ignoring the FDT test results for these dates because the corrective disclosures "trickled out" over the 85 days, SPA-43 n.11, an assertion made by Feinstein with no analysis, and adopted by the court with no analysis. Further, if Feinstein's use of over 500 days—every day during the class period that Petrobras issued a press release, irrespective of the content of the information it contained, A-1986 (F-I ¶ 129)—was acceptable, as the court found, then there was no sound reason to reject wholesale the evidence generated by a small fraction of those days that Plaintiffs themselves had selected as directly "related to [their] allegations."  A-1981 (F-I ¶ 119).  By writing off these results, however, the court failed to recognize that this evidence was inconsistent with Petrobras Securities trading in an efficient market.  A-3665, 3667, 3669 (G-I ¶¶ 89, 92, 96).  Moreover, the court did not even address how the FDT test could be valid and yet produce dramatically opposite results using dates consistent with Feinstein's protocol, with the test on "corrective" disclosure dates showing evidence of *in*efficiency.

*Fourth*, similar Notes reacted in polar opposite directions in response to new, material, value-relevant news on the same days. A-3669–70 (G-I ¶ 97). Similar securities moving in opposite directions on the same day "is not consistent with market efficiency." *Id.*; A-5091–92 (FTr. 507:16–509:25).

*Fifth*, Feinstein also tested the Notes by using earnings dates as the sole event dates and his tests failed to demonstrate consistent evidence of market efficiency. A-5211 (HTr. 17:11–24); A-4097 (F-II ¶ 88); A-3668 (G-I ¶ 94). While omitted from Feinstein's reports, those results showed *a lack of statistical significance for 86% of the Notes*, 19 of the 22 series considered. A-3668 (G-I ¶ 94).

*Sixth*, just as a market cannot be efficient unless it consistently moves in response to new value-relevant information, a market that reacts to previously disclosed news is *in*efficient. A-5017–18 (G-II ¶ 63); *see also* A-3970 (GTr. 65:4–15); A-5266–67 (HTr. 73:2–3). A review of what Feinstein subjectively categorized as new information, A-4089–90 (F-II ¶ 60), however, demonstrated that a considerable portion of that news had been published in Brazil prior to its release in the U.S. A-3652, 3655–57 (G-I ¶¶ 60, 67–68). Feinstein nevertheless found statistically significant price movements when that stale news was released in the U.S. A-5017–18 (G-II ¶ 63).

33

**C.     The District Court Also Failed to Consider Whether the Evidence Severed the Cause and Effect Link**

"Any showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff … will be sufficient to rebut the presumption of reliance." *Basic*, 485 U.S. at 248; *see also Halliburton II*, 134 S. Ct. at 2408. Defendants do not "have to show an inefficient market," *IBEW Local 90 Pension Fund v. Deutsche Bank AG*, No. 11 CIV. 4209 KBF, 2013 WL 5815472, at *20 (S.D.N.Y. Oct. 29, 2013); they can rebut the *Basic* presumption by "any showing" that severs the cause and effect link. They did so here. The considerable evidence of *in*efficiency in the Petrobras Securities markets that Defendants adduced here (and discussed above) at least severed the link, but the court never addressed whether that evidence constituted a "showing" sufficient to rebut the *Basic* presumption.

The evidence of inefficiency satisfied Defendants' burden under Federal Rule of Evidence 301 "of producing evidence to rebut the presumption," thus shifting the "burden of persuasion … on the party who had it originally," Plaintiffs. Fed. R. Evid. 301; *see ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 149 (2d Cir. 2007) (Under Rule 301, "proffered evidence is sufficient to rebut a presumption as long as the evidence could support a reasonable jury finding of the nonexistence of the presumed fact."). By failing to consider whether this evidence "could support a reasonable jury finding of the nonexistence" of an efficient market (and frequently

34

ignoring it), the court below implicitly (and improperly) shifted the burden of persuasion onto Defendants to affirmatively disprove market efficiency, rather than merely requiring "any showing" that severed the cause and effect link.

## II. PLAINTIFFS FAILED TO ESTABLISH ASCERTAINABILITY, PREDOMINANCE, AND SUPERIORITY FOR THE CLASSES OF AFTERMARKET INVESTORS WHO PURCHASED PETROBRAS GLOBAL NOTES WORLDWIDE

In *Morrison*, the Supreme Court altered decades of jurisprudence by announcing a transactional test that limits the reach of the federal securities laws to "transactions on a domestic exchange" or "domestic transactions in other securities." 561 U.S. at 267. Thereafter, in *Absolute Activist*, this Court held that a plaintiff seeking to establish a domestic transaction in securities (like the Petrobras Notes) that are not sold on a domestic exchange must plead and prove individualized facts that: (1) irrevocable liability was incurred in the U.S.; or (2) title passed in the U.S. 677 F.3d at 67. The location where a domestic transaction takes place is not readily determinable by general evidence. A plaintiff's "residency or citizenship is irrelevant to the location of a given transaction." *Id.* at 67–68. So too is "the location of the broker," the fact that securities are issued by domestic companies, that securities are registered in the U.S., *id.* at 68–69, and that activities "needed to carry out the transactions" occur in the U.S. if the "transactions themselves" did not. *Loginovskaya v. Batratchenko*, 764 F.3d 266, 275 (2d Cir. 2014). Plaintiffs must plead and prove, among other

35

things, "facts concerning the formation of the contracts, the placement of purchase orders, the passing of title, or the exchange of money." *Absolute Activist*, 677 F.3d at 67–68. Even claims based on "domestic transactions" may nonetheless fail under *Morrison* if they are "predominantly foreign." *Parkcentral Glob. Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 215 (2d Cir. 2014).

Notwithstanding these individualized, fact-intensive transactional issues, the court below issued a sweeping order certifying all aftermarket purchasers of Petrobras Notes, subject only to a post-verdict "bureaucratic" determination that they could assert a federal claim. Its order violated principles of ascertainability, predominance, and superiority.

### A. Plaintiffs Failed to Prove Ascertainability

#### 1. The Classes Are Not Ascertainable

This Court has held that Rule 23 contains an implied requirement of ascertainability, which requires plaintiffs to prove (and district courts to find) by a preponderance of the evidence that "the class is sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." *Brecher v. Republic of Argentina*, 806 F.3d 22, 24 (2d Cir. 2015). For a class to be ascertainable, the court must be able to "determine who is in the class and, thus, bound by the ruling," without multiple individualized inquiries. *Id.* at 24; *see also* Fed. R. Civ. P. 23(c)(3)(B) (judgment must specify "whom the court

36

finds to be class members"). The requirement thus "eliminates serious administrative burdens that are incongruous with the efficiencies expected in a class action." *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 593 (3d Cir. 2012). It also ensures that absent class members possess sufficient information to make informed judgments about whether they are members of the class and whether to exercise their due process right to opt out or be bound. *Carrera v. Bayer Corp.*, 727 F.3d 300, 307 (3d Cir. 2013); *In re Fosamax Prods. Liab. Litig.*, 248 F.R.D. 389, 396 (S.D.N.Y. 2008); *see also Hecht v. United Collection Bureau, Inc.*, 691 F.3d 218, 222 (2d Cir. 2012) ("Absent class members have a due process right to notice and an opportunity to opt out of class litigation.").

The court below held that the classes were ascertainable because, since "Petrobras successfully marketed its securities across four continents," it was "not an unfeasible task" "to provide notice to investors across four continents," and "the determination of whether a transaction [is] domestic [is] highly likely to be documented in a form susceptible to the bureaucratic processes of determining who belongs to a Class." SPA-21 n.5, 23. That conclusion cannot be reconciled with *Brecher* or *Absolute Activist*, or the rigorous analysis and proof required to justify a departure from the "usual rule" that litigation is brought by and between named parties. *Wal-Mart*, 564 U.S. at 348.

37

The ascertainability requirement is not satisfied merely by the *dissemination* of notice.[11]  A class member must know or be reasonably able to ascertain from any notice that it is a member of the class, and thus be able to determine whether to opt out.  *Carrera*, 727 F.3d at 307; *In re Fosamax*, 248 F.R.D. at 396; *see also* Fed. R. Civ. P. 23(c)(2)(B) (notice must be "easily understood").  Without this knowledge, Rule 23(c)'s opt-out provision—a necessary "procedural safeguar[d]," *Comcast v. Behrend*, 133 S. Ct. 1426, 1432 (2013)—would be rendered illusory. A court also must be able to readily determine—on a generalized basis and without mini-trials—who is bound by the class judgment.  Here, however, Plaintiffs offered *no* evidence to satisfy their burden that domestic aftermarket purchasers of Petrobras's 39 series of Global Notes are ascertainable, much less that documents exist by which such purchasers or a court could readily determine class membership.  The court below cited none, and the record clearly establishes otherwise.  It took four complaints before even one sophisticated investor was able even to *plead* enough facts to show a domestic transaction, and even then, the two investors that did so had not purchased in the aftermarket or secondary market.[12]

---

[11]    The plaintiff in *Brecher* also could have provided worldwide publication notice.

[12]    Indeed, one Individual Action plaintiff (INKA) observed that "many purchase confirmation forms do not include the same level of detail as those used by North Carolina and Hawaii," A-6935, the two initial-offering purchasers that were able to plead a domestic transaction.

38

Plaintiffs themselves have admitted that "determining whether a transaction is domestic (the 'irrevocable liability' or 'meeting of the minds' prong) is sometimes difficult to apply and prone to yield inconsistent results," and that "while it is feasible to determine temporally when a 'meeting of the minds' occurs, it can be significantly more difficult to pinpoint the location of such a 'meeting' on a map." A-4872. In SEC filings, Plaintiffs asserted that "institutions increasingly trade large blocks of securities off-exchange in private markets known as 'dark pools'" and "investors typically do not know which exchange their order is directed through, assuming it even occurs on an exchange." A-3533–34. That same finding was credited by the SEC which, in its report to Congress, noted that "[d]etermining the location of non-exchange-based transactions has proved quite complicated." SEC Study at 33 n.121. Such locative information resides, if anywhere, in the bowels of various non-party financial institutions and other securities investors and intermediaries worldwide.

Thus, the rule below creates precisely the due process and administrative concerns that the ascertainability requirement is intended to avoid. No class member will know whether it is a class member without at least extensive inquiry from third parties, and in many cases not even then. *See* Stay Reply Decl. Exs. 1– 19 (demonstrating that documents generally do not exist that would show the location of the purchases or sales of Petrobras Notes or the place where irrevocable

39

liability was incurred).[13]  The sophisticated investors here required counsel and

numerous months of pleading to determine whether their purchases were domestic.

Absent class members, who will simply receive a notice and have to make the

momentous decision whether to opt out or stay in, will have no such advantage.

And performing the same analysis for what Plaintiffs claim could be upwards of a

million class members and potentially billions in transactions presents the very

kinds of "serious administrative burdens" that the ascertainability requirement is

designed to prevent.  *Marcus*, 687 F.3d at 593.[14]

Moreover, the decision below entirely ignores that ascertainability also

ensures that a defendant is "told promptly the number of parties to whom it may

ultimately be liable for money damages," *Siskind v. Sperry*, 47 F.3d 498, 503 (2d

Cir. 1995), and is provided with the certainty that comes from a judgment at

---

[13]    Individual Action plaintiff INKA admitted in pleadings before the district
court that documentation regarding the location of their purchases "is held
by third-party investment managers" and that despite affirmatively bringing suit
nearly six months prior, it had "received varying amounts of documentation from
its investment managers to date regarding the circumstances of the individual
trades."  A-5831 (¶ 75).  INKA's claims challenged by Defendants ultimately were
dismissed for failure to even *plead* domestic transactions.

[14]    In *Brecher*, the Court held that it was an abuse of discretion for a class to be
certified even assuming "beneficial interests could be traced" based on
documentary evidence because that class definition was not sufficiently "definite
to allow ready identification of the … persons who will be bound by the judgment"
without individualized mini-hearings.  806 F.3d at 25–26.  The Argentine global
notes are in all relevant respects identical to the Petrobras Notes here.  *See
generally Million Air Corp. v. Republic of Arg.*, No. 04 Civ. 1048 (TPG), 2005 WL
2656126, at *2 (S.D.N.Y. Oct. 17, 2005).

litigation-end that binds all who do not opt out. *Marcus*, 687 F.3d at 593; *see also In re Philip Morris Inc.*, 214 F.3d 132, 134 (2d Cir. 2000) (observing "onerous effect of failing to decide class certification promptly," including resulting "atmosphere of confusion"). Constitutional due process mandates not only adequate notice to defendants but a fair right to be heard, which "has little reality or worth" unless a defendant is provided sufficient information to "choose for himself whether to appear or default, acquiesce or contest." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). Otherwise, class action "defendants haled into court [would] remain indefinitely uncertain as to the bedrock litigation fact" of the number of plaintiffs bringing suit and the amount of damages at stake. *McCarthy v. Kleindienst*, 741 F.2d 1406, 1412 (D.C. Cir. 1984).[15]

---

[15]  *See also Bertrand v. Maram*, 495 F.3d 452, 455 (7th Cir. 2007) ("Until everyone knows who will, and who will not, be bound by the out-come, it is difficult to make informed decisions about how the case should proceed."); *Broadhurst Invs. LP v. Bank of N.Y. Mellon*, No. 09 Civ. 1154 (PKC), 2010 WL 3154840, at *4 (S.D.N.Y. Aug. 2, 2010) ("[S]trategic decisions regarding methods of proof, and decisions about potential settlement, may all be affected by class certification and class membership issues."); Manual for Complex Litig., Fourth § 21.11 ("Whether a class is certified and how its membership is defined affects case management as well as outcome. Certification and class membership determine not only the stakes involved, but also the scope and timing of discovery and motion practice, the structure of trial and methods of proof, and the length and cost of the litigation.").

But, under the lower court's rule, where the existence of class members and the approximate size of class membership would be deferred—if at all—until a post-trial "bureaucratic process," Defendants would know the size of the class which they are facing—if at all— only after a trial and after it is too late.[16]  They would have no ability "to identify the stakes of the case so that the parties may choose their litigation strategies accordingly."  *Bieneman v. Chicago*, 838 F.2d 962, 963 (7th Cir. 1988); *accord Owens v. Morgan Stanley & Co.*, No. 96 Civ. 9747 (DLC), 1997 WL 793004, at *5 (S.D.N.Y. Dec. 24, 1997) ("The Court should resolve issues of class certification 'as soon as practicable after commencement of an action' … so that the parties may take the existence of class claims into account … and in particular as they consider whether to settle the claims in the lawsuit.").  "[A] showing that class members can be ascertained after trial at the claims administration phase will not suffice."  *In re Paulsboro Derailment Cases*, Civ. No. 13-784, 2014 WL 4162790, at *7 (D.N.J. Aug. 20, 2014).

The order below thus also partakes of the qualities of an "improper fail-safe class that shields the putative class members from receiving an adverse judgment."

---

[16]     Unlike the circumstances here, in a prototypical securities fraud case where securities are traded on a domestic exchange, parties can estimate their total exposure. *See, e.g.*, Comparison of Trading Models at 105 (discussing use of trade models "to estimate the number of shares damaged by alleged fraudulent misrepresentations").

*Randleman v. Fid. Nat'l Title Ins. Co.*, 646 F.3d 347, 352 (6th Cir. 2011).

Defendants do not intend to lose. But because of the impossibility of determining

class membership prior to post-judgment mini-trials and the administrative costs

created by that proof, the order creates one-way intervention. Defendants will be

forced to litigate against (or settle with) an undefined class, which, in the face of a

beneficial result for class members, will result in a windfall for individual plaintiffs

who claim a domestic purchase. However, in the event of a beneficial outcome for

Defendants, putative class members (seeking not to be bound) may well argue that

they were not domestic purchasers and are not class members. *See id.* (describing

results of impermissible fail-safe class as "[e]ither the class members win or, by

virtue of losing, they are not in the class and, therefore, not bound by the

judgment"); *Amati v. City of Woodstock*, 176 F.3d 952, 957 (7th Cir. 1999) (Rule

23 "bars potential class members from waiting on the sidelines to see how the

lawsuit turns out."); *see also Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 546–

49 (1974) (Rule 23 was amended "to assure that members of the class would be

identified before trial on the merits and would be bound by all subsequent orders

and judgments."). In either case, Defendants—and the court system—will be

faced with the inevitable prospect of satellite litigation. In the event of a favorable

judgment for Plaintiffs, that satellite litigation will take place in the U.S., as

investors claim they were class members and Defendants test that assertion. In the

43

event of "a judgment for the defendants or a plaintiffs' judgment or a settlement deemed to be inadequate," *Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974, 996 (2d Cir. 1975), that litigation invariably will take place in courts throughout the world as investors claim they were not class members and were not bound. In that instance, the burden will be on Defendants to show the investors were class members so that they can benefit from the class judgment and the right to *res judicata*. *See Marcus*, 687 F.3d at 593 (ascertainability ensures "that it will be clear later on whose rights are merged into the judgment" and avoids "satellite litigation … over who was in the class in the first place"). And Defendants will not have the benefit of U.S. discovery rules; they will be forced to prove domestic transactions outside of the U.S. under potentially restrictive foreign discovery rules and the vagaries of foreign procedure. *See Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court for the Southern Dist. of Iowa*, 482 U.S. 522, 542 (1987).

Furthermore, apart from compromising Defendants' rights and those of absent class members, the inevitability of mini-trials either in the district court or in other courts entirely undermines the "efficiency and economy of litigation" that justifies use of the class action device in the first place. *See Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 159 (1982).

44

Plaintiffs' argument in opposing the 23(f) Petition that Defendants seek a "bright-line" bar to certification of any class of off-exchange purchasers, A-6448, 6461–63, puts the shoe on the wrong foot: it is not for Defendants to offer a way to ascertain an unascertainable class; under Rule 23, the obligation rests on Plaintiffs. *Comcast*, 133 S. Ct. at 1432; *see also Oscar Gruss & Son v. Geon Indus., Inc.*, 89 F.R.D. 32, 37 (S.D.N.Y. 1980) ("[T]he general principle underlying" Rule 23 "provides that the representative of the class of plaintiffs must bear the burdens of identifying and notifying the class."). As noted above, Plaintiffs submitted no evidence establishing that a class of secondary market purchasers was ascertainable, and thus they failed to meet that obligation here. In any event, this case is not the run-of-the-mill securities suit. Petrobras is a foreign governmental issuer regulated by a foreign regulator; its Global Notes were offered and are traded in at least four continents; there is no centralized repository or identifiable group of repositories that contain the records of where irrevocable liability was incurred in connection with trades in those Notes; the alleged fraud occurred outside the U.S.; and, aside from those persons who have opted out and asserted individual claims, Plaintiffs have not identified a *single* purchaser of the Notes in the aftermarket in the U.S.[17]

---

[17]     Therefore, it is Plaintiffs who seek a bright-line rule that would permit—without limiting principle—global class action lawsuits under U.S. law on the application of a single person who purchased in the U.S. over-the-counter

If the upshot of *Morrison* is that class actions will rarely be certified for over-the-counter aftermarket purchasers of a global security, the answer is not to twist Rule 23 to compromise the due process rights of defendants and absent class members. The answer is that plaintiffs, and similarly situated investors, can and should raise their concerns regarding *Morrison*'s domestic-transaction requirement with the SEC or Congress. In fact, Congress directed the SEC to undertake a study of the effect of *Morrison* and Plaintiffs themselves participated in that study. The SEC recognized that *Morrison* interpreted the securities laws to establish a "transactional test," and provided specific recommendations to Congress to "supplement and clarify" that test, SEC Study at 64, which Congress has chosen not to adopt. Plaintiffs cannot ask this Court to do what Congress (or the SEC through books-and-records rulemaking) has chosen not to do, undermining in the process *Morrison*'s holding and rationale, as well as Rule 23 and constitutional due process.

---

securities of a foreign issuer with the question of ascertainability only to be resolved later, if at all. Plaintiffs have never cited a single case that supports this outcome, because there is none. *In re Facebook, Inc., IPO Securities and Derivative Litigation*, on which Plaintiffs have repeatedly relied, involved claims stemming from an initial public offering of a U.S. company whose shares traded exclusively on a U.S. exchange. MDL No. 12-2389, 2015 WL 9582429, at *14 (S.D.N.Y. Dec. 29, 2015). And its ascertainability finding rested on the fact that the defendant itself had records of who belonged in the class, a fact clearly absent here. *Id.* at *16.

46

## 2.    The Decision Below Is Inconsistent With *Morrison*

The court erroneously ruled that denying or limiting class certification would "not be a faithful application of *Morrison*," as it "would cut off purchasers who have valid claims under *Morrison*'s second prong, which holds that the securities laws apply to securities purchased in 'domestic transactions.'"  SPA-22 (quoting *Morrison*, 561 U.S. at 267).  Any decision denying class certification, however, necessarily denies persons with potentially "valid claims" the opportunity to participate in a class recovery, just as it assures such persons the right to be secure from an adverse decision.  But, the decision below goes far beyond that, interpreting a decision (*Morrison*) that was designed to limit the extraterritorial application of the securities laws in a manner that would expand that application in class actions.

Prior to *Morrison*, where a fraud was alleged to have originated from abroad, U.S. jurisdiction generally was limited to U.S. residents and citizens (and perhaps exchanges).  *Bersch*, 519 F.2d at 989.  *Morrison* changed the law and made clear that transactions on domestic exchanges were the focus of the securities laws and "the objects of [their] solicitude."  561 U.S. at 269.  It also permitted claims regarding "domestic transactions in other securities," but only in the limited circumstances where the plaintiff could prove those transactions occurred in the U.S.  *Id.* at 267.  The Court's approach followed from the well-established

47

presumptions that: (1) "[a]bsent clearly expressed congressional intent to the contrary, federal laws will be construed to have only domestic application" to avoid the "potential for international friction beyond that presented by merely applying U.S. substantive law to … foreign conduct"; and (2) statutes should be construed "to avoid unreasonable interference with other nations' sovereign authority where possible." *RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2100, 2106–07 n.9 (2016). As the court below elsewhere recognized, "the Second Circuit has construed the *Morrison* test narrowly, in line with its underlying rationale." A-5177.

*Morrison*'s focus on domestic exchanges and its concern with international comity in the over-the-counter market would be undermined if, as the district court held, U.S. courts are open to broad class actions of all purchasers of global securities issued by a foreign issuer—based on the transactions of only a couple of domestic purchasers (and here none in the over-the-counter secondary market)— subject only to the restriction that class membership and the defendant's exposure be determined after-the-fact in a claims process. It would extend an invitation to any lawyer who wants to file a broad class action of over-the-counter purchasers worldwide in order to increase the *in terrorem* settlement value of their action: identify a single domestic purchaser and file in the Southern District of New York; you need not worry until later (if at all) whether there are other class members and

48

whether you can ascertain them. *See Morrison*, 561 U.S. at 271 (expressing concern that U.S. would "become the Shangri-La of class-action litigation for lawyers representing those allegedly cheated in foreign securities markets").

Indeed, the court's ruling runs afoul of the concerns expressed by this Court in *Parkcentral* that the securities laws not be given an interpretation that would lead to their application "to wholly foreign activity clearly subject to regulation by foreign authorities solely because a plaintiff in the U.S. made a domestic transaction." 763 F.3d at 216. Petrobras is a majority state-owned Brazilian company. Its "corporate affairs are governed by [its] bylaws and Brazilian Corporate Law, which differ from the legal principles that would apply if [it] were incorporated in a jurisdiction in the United States." 2014 20-F at 31. And "shareholders in Brazilian companies ordinarily do not have standing to bring a class action." *Id.* The alleged fraud originated from Brazil where Petrobras is considered a victim and has "tak[en] the necessary procedural steps with Brazilian authorities to seek compensation for the damages it has suffered." *Id.* at F-12. To expand *Morrison* to permit certification of a class of aftermarket purchasers of indeterminable size and membership—on the claims of only a few putative class members (and here, without any claim by a class representative of a domestic transaction by an aftermarket Note purchaser)—would require all foreign companies to conduct themselves as if the U.S. laws applied, "inevitably plac[ing]"

49

the U.S. securities laws "in conflict with the regulatory laws of other nations." *Parkcentral*, 763 F.3d at 215; *cf. RJR Nabisco*, 136 S. Ct. at 2107 ("[A]lthough a risk of conflict between the American statute and a foreign law is not a prerequisite for applying the presumption against extraterritoriality, where such a risk is evident, the need to enforce the presumption is at its apex.").

### B.    The District Court Improperly Held That Rule 23's Predominance and Superiority Requirements Were Met

The decision below also violates the rule that a party seeking class certification must establish "through evidentiary proof" that common issues predominate over individual ones, and that courts have a "duty to take a 'close look'" to ensure that predominance is satisfied. *Comcast*, 133 S. Ct. at 1432–33; *see also UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 131 (2d Cir. 2010) (Plaintiffs must prove that "the legal or factual questions that … can be achieved through generalized proof … are more substantial than the issues subject only to individualized proof.").  The Supreme Court has held that, notwithstanding common questions of falsity, materiality, and scienter, a securities class cannot be certified in the presence of individual questions of reliance. *See Halliburton II*, 134 S. Ct. 2398; *Basic*, 485 U.S. 224.  And this Court has held that, regardless of common issues of liability, "the need for numerous individualized determinations of class membership" supports the conclusion that individual questions

50

predominate. *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 45 (2d Cir. 2006). Even if there were no threshold failure of ascertainability, the district court's Certification Order would violate predominance and superiority.

The district court did not take a "close look" at the predominance requirement here. *Comcast*, 133 S. Ct. at 1432–33. Indeed, it did not take a look at all, bypassing entirely Defendants' *Morrison*-based challenge to predominance and incorrectly stating that the parties agreed "that, with the exception of reliance and damages, all elements of plaintiffs' claims are susceptible to generalized proof." *Compare* SPA-23 *with, e.g.*, A-5788–93 (making *Morrison*-based objection to predominance).

Moreover, had it looked closely, the necessary conclusion would be that common questions did not predominate over individual ones. Establishing domestic transactions requires individual proof, on a transaction-by-transaction basis, for each and every class member. *Loginovskaya*, 764 F.3d at 275. Plaintiffs have claimed millions of potential class members, A-6048, and potentially billions traded during the class period. SPA-6. Some of the trades were done by purchasers themselves, many of whom are located abroad; many other trades were done on behalf of purchasers by countless third-party investment managers or broker-dealers, any number of which may be foreign entities or otherwise transact through foreign affiliates. Some were done on electronic platforms, others by

51

phone, and still others through dark pools. *See* Stay Reply Decl. Exs. 1–19; A-3533–34. Each of these possible methods of purchase presents unique and individualized issues under *Morrison*'s transactional test. And, not only will each class member have to show it purchased in a domestic transaction, it also will have to show that any loss it suffered was based on that domestic purchase (as opposed to any other overseas purchases it made). *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345–46 (2005). Plaintiffs identified no common or generalized proof or presumption that would satisfy *Morrison* on behalf of all putative class members. The evidentiary disputes regarding liability to each class member based on the location of each transaction undeniably would overwhelm common questions as to Defendants' alleged misconduct. *See, e.g.*, *Mazzei*, 2016 WL 3876518, at *8 (predominance not satisfied where in order to find privity, "the fact-finder would have to look at every class member's loan documents to determine who did and who did not have a valid claim"); *UFCW Local 1776*, 620 F.3d at 133–36 (reversing certification based on lack of generalized proof as to element of causation).[18]

　　The domestic nature of a class member's purchases is not merely a question of class membership. Nor is it akin to a "mechanical" calculation of damages,

---

[18] *See also Howland v. First Am. Title Ins. Co.*, 672 F.3d 525, 533 (7th Cir. 2012) (holding that "individual analysis of each transaction" necessary to establish liability to each class member precluded certification).

*Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 460 (4th Cir. 2003), or to

"pick[ing] off the occasional class member here or there through individualized

rebuttal." *Halliburton II*, 134 S. Ct. at 2412. *Morrison* announced a threshold

territorial limitation that *each* plaintiff seeking to recover must affirmatively prove

to establish that the U.S. securities laws apply *at all* to a securities transaction.

*Absolute Activist*, 677 F.3d at 62. There can be no claim under the Securities Act

or the Exchange Act—and accordingly no verdict for class members—without

affirmative proof and a positive verdict with respect to each underlying transaction.

*See Parkcentral*, 763 F.3d at 214 (identifying "a domestic transaction" as "a

necessary element of a domestic § 10(b) claim"). The fact that this threshold

question will be subject to individualized proof for each class member undermines

entirely the "economies of time, effort, and expense" that justify use of the class

action device under Rule 23, as opposed to the myriad ways that a court can

address complex litigation. *Amchem*, 521 U.S. at 615; *Sprint*, 554 U.S. at 291.

Indeed, "[t]his Herculean task, involving hundreds of millions of transactions,"

strongly "counsels against finding predominance." *Newton v. Merrill Lynch,*

*Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 187 (3d Cir. 2001); *see also Brown v.*

*Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1235 (11th Cir. 2016) ("If common

issues truly predominate over individualized issues in a lawsuit, then the addition

or subtraction of any of the plaintiffs to or from the class should not have a

53

substantial effect on the substance or quantity of the evidence offered.").[19]

Proceeding with a trial on liability issues and delaying the domestic-transaction determination to a bureaucratic post-judgment claims process is no answer. SPA-23. Plaintiffs bear the burden of proof as to the location of their transactions, and Defendants have "a due process right to raise [these] individual challenges and defenses to claims," *Carrera*, 727 F.3d at 307, including the right to rebut individual showings of domestic transactions and to have the ultimate determination on that threshold issue be made prior to judgment. *McLaughlin*, 522 F.3d at 231. The defendant has a due-process right "to raise individual defenses against each class member," *id.* at 232,[20] and class treatment must "leave[] the parties' legal rights and duties intact and the rules of decision unchanged." *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 599 U.S. 393, 408 (2010).

---

[19]    The Supreme Court has recently highlighted the complex and individualized nature of the threshold "domesticity" inquiry necessary to establish the application of U.S. laws. *See RJR Nabisco*, 136 S. Ct. at 2111 (holding that a civil RICO plaintiff is required to prove a "domestic" injury to business or property, and that "[t]he application of this rule in any given case will not always be self-evident, as disputes may arise as to whether a particular alleged injury is 'foreign' or 'domestic'").

[20]    *See also Philip Morris USA v. Williams*, 549 U.S. 346, 353 (2007) ("[T]he Due Process Clause prohibits a State from punishing an individual without first providing that individual with an opportunity to present every available defense."); *Lindsey v. Normet*, 405 U.S. 56, 66 (1972) ("Due process requires that there be an opportunity to present every available defense."); *Carrera*, 727 F.3d at 307 ("A defendant in a class action has a due process right to raise individual challenges and defenses to claims, and a class action cannot be certified in a way that eviscerates this right or masks individual issues.").

Moreover, whether a class member incurred irrevocable liability in the U.S. is a question that, like all elements of a securities fraud claim, is subject to the Seventh Amendment right to resolution by jury. *See, e.g.*, *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 683 n.25 (6th Cir. 2005) ("Traditionally, there has been a right to jury trial for securities fraud claims."); *Robinson v. Metro-N. Commuter R.R. Co.*, 267 F.3d 147, 170 (2d Cir. 2001) ("[O]nce the right to a jury trial attaches to a claim, it extends to all factual issues necessary to resolving that claim.").

Furthermore, a "critical need" in evaluating both whether common issues predominate and whether a class action is superior "is to determine how the case will be tried." 2003 Advisory Committee Notes on Rule 23(c)(1)(A). Accordingly, "[a]n increasing number of courts require a party requesting class certification to present a 'trial plan' that describes the issues likely to be presented at trial and tests whether they are susceptible of class-wide proof." *Id.*[21]

---

[21] *See also, e.g.*, *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1278–79 (11th Cir. 2009) (reversing certification based on plaintiff's "failure to acknowledge [individual] issues or propose a trial plan that would feasibly address them," and the district court's failure to consider "how this case, with its individualized claims and defenses, would be tried"); *Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 776 (7th Cir. 2013) (affirming decertification because "[e]ssentially, [plaintiffs] asked the district judge to embark on a shapeless, freewheeling trial that … would be virtually evidence-free so far as damages were concerned"); *DeSilva v. N. Shore-Long Island Jewish Health Sys.*, 27 F. Supp. 3d 313, 327 (E.D.N.Y. 2014) (noting with respect to collective action that "Plaintiffs have not offered a manageable trial plan" to address individual issues).

Nevertheless, Plaintiffs elected not to even offer a plan for how such an unwieldy class could be managed before a judge or jury. Plaintiffs' "figure-it-out-as-we-go-along approach" demonstrates their failure to satisfy the requirements of predominance and superiority, and the district court's resulting abuse of discretion in certifying Plaintiffs' classes. *Madison v. Chalmette Ref., LLC*, 637 F.3d 551, 557 (5th Cir. 2011) (reversing certification based on district court's failure to seriously consider administration of the trial).

Finally, Rule 23(b)(3)'s superiority requirement demands that "a class action [be] superior to other available methods for fairly and efficiently adjudicating the controversy," including based on "the likely difficulties in managing a class action" and "the extent and nature of any litigation concerning the controversy already begun." Fed. R. Civ. P. 23(b)(3). As with all class certification requirements, Plaintiffs bore the burden of proof on this question below. *Comcast*, 133 S. Ct. at 1432. Rule 23 does not permit certification of an unmanageable class in which individual issues predominate in order to avoid individual actions, particularly where, as here, Individual Actions can and have been consolidated for discovery and trial, even apart from the Class Action. Under such circumstances, the correct approach is not to depart on an "adventurous application" of Rule 23, *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 845 (1999), but rather to rely on "the usual rule" that to obtain relief a person must assert a claim before trial, and not

56

afterwards and only in a claims process. *Wal-Mart*, 564 U.S. at 348.

## CONCLUSION

For the foregoing reasons, the Court should vacate the Certification Order.

Dated:  New York, New York
       July 21, 2016

                               Respectfully submitted,

                               CLEARY GOTTLIEB STEEN &
                               HAMILTON LLP

                               By:   */s/ Lewis J. Liman*
                                   Lewis J. Liman
                                   Jared Gerber

                                   One Liberty Plaza
                                   New York, New York  10006
                                   (212) 225-2000

                                   Mitchell A. Lowenthal, Of Counsel

                                 *Attorneys for the Petrobras*
                                 *Defendants-Appellants*

57

## CERTIFICATE OF COMPLIANCE

I hereby certify that:

1.     This brief complies with Fed. R. App. P. 32(a)(7)(B)(i), because it contains 13,978 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

      /s/ *Lewis J. Liman*
      Lewis J. Liman

Dated:  New York, New York
        July 21, 2016

58

# SPECIAL APPENDIX

# TABLE OF CONTENTS

**Page**

*In re Petrobras Sec. Litig.*, No. 14-9662 (JSR) (S.D.N.Y.)
    Opinion and Order granting Plaintiffs' Motion for
    Class Certification, entered on February 2, 2016
    (Dkt. No. 248) ................................................................................. SPA-1

Fed. R. Civ. P. 23 ...................................................................................... SPA-50

28 U.S.C. § 2072 ....................................................................................... SPA-56

SPA-1

U.S.D.C. SDNY
DOC #:
DATE FILED: 2/2/16

DAILY FILED

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
                            :          14-cv-9662 (JSR)

In re: PETROBRAS SECURITIES    :
LITIGATION                       :         OPINION AND ORDER
                            :
------------------------------------x

JED S. RAKOFF, U.S.D.J.

    Lead Plaintiff Universities Superannuation Scheme Ltd.

("USS") brings this putative class action against Brazilian oil

company Petróleo Brasileiro S.A. – Petrobras ("Petrobras"); two

of Petrobras' wholly-owned subsidiaries, Petrobras Global

Finance, B.V. ("PGF")[1] and Petrobras America, Inc. ("PAI");

various former officers and directors of Petrobras and its

subsidiaries (the "Individual Defendants");[2] Petrobras'

--------------------------------

[1] On February 12, 2014, PGF acquired the outstanding shares of
another wholly-owned subsidiary of Petrobras, Petrobras
International Finance Company S.A. ("PifCo").

[2] Specifically, the Individual Defendants include former
Petrobras Chief Executive Officer ("CEO") Maria das Gracas Silva
Foster, another former Petrobras CEO José Sergio Gabrielli, and
various other current or former executives of Petrobras or
associated companies, namely, Petrobras Chief Financial Officer
("CFO") Almir Guilherme Barbassa, Petrobras director Paulo
Roberto Costa, Petrobras director Jose Carlos Cosenza, Petrobras
director Renato de Souza Duque, Petrobras director Guillherme de
Oliveira Estrella, Petrobras director Jose Miranda Formigli
Filho, Petrobras director Silvio Sinedino Pinheiro, PifCo
Chairman and CEO Daniel Lima de Oliveira, PifCo director José
Raimundo Brandão Pereira, PifCo CFO Sérvio Túlio da Rosa Tinoco,
PifCo Chief Accounting Officer Paulo Jose Alves, PGF CEO and
"Managing Director A" Gustavo Tardin Barbosa, PGF CFO and
"Managing Director B" Alexandre Quintão Fernandes, PGF "Managing
Director A" Marcos Antonio Zacarias, PGF "Managing Director B"

1

independent auditor, PricewaterhouseCoopers Auditores Independentes ("PwC"); and the various underwriters of Petrobras's debt offerings (the "Underwriter Defendants").[3] Plaintiffs allege that Petrobras was at the center of a multi-year, multi-billion dollar bribery and kickback scheme, in connection with which defendants made false and misleading statements in violation of the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act").

The general details of this case are set forth in the Court's Opinion dated July 30, 2015, familiarity with which is here presumed. See Opinion dated July 30, 2015, at 2-14, ECF No. 194. Plaintiffs now move to certify two classes, one for their Securities Act claims and one for their Exchange Act claims. Plaintiffs propose the following Class for their Securities Act claims (the "Securities Act Class"):

> As to claims under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933, all purchasers who purchased or otherwise acquired debt securities issued

---

Cornelis Franciscus Jozef Looman, and authorized Petrobras United States Representative Theodore Marshall Helms.

[3] Specifically, the Underwriter Defendants are: BB Securities Ltd., Citigroup Global Markets Inc., J.P. Morgan Securities LLC, Itau BBA USA Securities, Inc., Morgan Stanley & Co. LLC, HSBC Securities (USA) Inc., Mitsubishi UFJ Securities (USA), Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated, Standard Chartered Bank, Bank of China (Hong Kong) Limited, Banco Bradesco BBI S.A., Banca IMI S.p.A., and Scotia Capital (USA) Inc.

by Petrobras, Petrobras International Finance Company S.A. ("PifCo"), and/or Petrobras Global Finance B.V. ("PGF") directly in, pursuant and/or traceable to a May 15, 2013 public offering registered in the United States and/or a March 11, 2014 public offering registered in the United States. Excluded from the Class are Defendants, current or former officers and directors of Petrobras, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

Plaintiffs' Memorandum of Law in Support of Motion for Class

Certification at 1, ECF No. 256. Plaintiffs propose the

following Class for their Exchange Act claims (the "Exchange Act

Class"):

> As to claims under Sections 10(b) and 20(a) of the Exchange Act of 1934, all purchasers who, between January 22, 2010 and July 28, 2015, inclusive (the "Class Period") purchased or otherwise acquired the securities of Petroleo Brasileiro S.A. ("Petrobras"), including debt securities issued by Petrobras International Finance Company S.A. ("PifCo") and/or Petrobras Global Finance B.V. ("PGF") on the New York Stock Exchange (the "NYSE") or pursuant to other domestic transactions, and were damaged thereby. Excluded from the Class are Defendants, current or former officers and directors of Petrobras, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

Id. Plaintiffs move to appoint four plaintiffs -- namely USS,

North Carolina Department of State Treasurer ("North Carolina"),

Employees' Retirement System of the State of Hawaii

("Hawaii"),and Union Asset Management Holding AG ("Union") -- as

class representatives for the Securities Act Class, and one

plaintiff, USS, as class representative for the Exchange Act Class. Plaintiffs also move to appoint Pomerantz LLP ("Pomerantz") as Class Counsel for both Classes.

Defendants oppose plaintiffs' class certification motion, arguing that plaintiffs have failed to satisfy the requirements of Rules 23(a) and 23(b)(3). The Court received briefing from the parties and held an evidentiary hearing on December 21, 2015. At the hearing, the Court heard the testimony of competing expert witnesses: Dr. Steven Feinstein ("Feinstein") for plaintiffs and Dr. Paul Gompers ("Gompers") for defendants. See Transcript dated Dec. 21, 2015, ECF No. 414. Each of these experts also submitted two written reports apiece, all four of which the Court received in evidence. See Declaration of Emma Gilmore dated Oct. 23, 2015, Ex. A ("Feinstein Report"), ECF No. 264-1; Declaration of Emma Gilmore dated Nov. 23, 2015, Ex. H ("Feinstein Rebuttal Report"), ECF No. 338-8; Declaration of Jared Gerber dated Nov. 6, 2015, Ex. 27 ("Gompers Report"), ECF No. 294-5; Declaration of Jared Gerber dated Dec. 8, 2015, Ex. A ("Gompers Rebuttal Report"), ECF No. 355.

Having now fully reviewed the parties' submissions and evidence, the Court grants plaintiffs' motion for class certification, certifies a Securities Act Class and an Exchange Act Class, appoints North Carolina and Hawaii as class representatives for the Securities Act Class and USS as class

representative for the Exchange Act Class, and appoints Pomerantz as Class Counsel for both Classes.

To prevail on their motion for class certification, plaintiffs must first satisfy the four requirements of Rule 23(a), commonly referred to as numerosity, commonality, typicality, and adequacy. See Fed. R. Civ. P. 23(a). The Court considers each in turn.

Rule 23(a)(1) provides that class may be certified only if "the class is so numerous that joinder of all members is impracticable." In the Second Circuit, numerosity is usually presumed for classes larger than forty members. See Pennsylvania Public School Employee's Retirement System v. Morgan Stanley & Co., Inc., 772 F.3d 111, 120 (2d Cir. 2014). However, "the numerosity inquiry is not strictly mathematical but must take into account the context of the particular case." Id. Relevant factors include "(i) judicial economy, (ii) geographic dispersion, (iii) the financial resources of class members, (iv) their ability to sue separately, and (v) requests for injunctive relief that would involve future class members." Id.

Defendants do not dispute the statements in Feinstein's report that, on average during the Class Period, there were 756.1 million Petrobras common ADS outstanding and 741.8 million Petrobras preferred ADS outstanding and that the total face value of Petrobras bonds was $41.1 billion. Feinstein Report ¶¶

5

33, 93, 193. On the basis of these figures, plaintiffs estimate that there are thousands of class members, dispersed across the globe. Defendants do not object to this assessment per se, but argue instead that the volume of "opt-out" individual actions filed against Petrobras demonstrates that the class includes sophisticated members with the resources to sue separately. See, e.g., New York City Employees Retirement System et al v. Petroleo Brasileirio S.A. -Petrobras et al, No. 15-cv-2192. Defendants also point to the fact that the Court has scheduled a joint trial of the instant action and the individual actions as evidence that a class action is not necessary in this instance. See Order dated Nov. 18, 2015, ECF No. 311 (setting common trial date for all cases related to the present action).

Defendants are correct that a significant volume of sophisticated plaintiffs have opted out of the present action, but they miss the point of these opt-outs. The Second Circuit has made clear that "the numerosity inquiry . . . must take into account the context of the particular case." Pennsylvania Public School Employee's Retirement System v. Morgan Stanley & Co., Inc., 772 F.3d 111, 120 (2d Cir. 2014). The context of this particular case is that Petrobras was among the world's largest companies during the Class Period. Defendants do not dispute that the billions of Petrobras securities traded vigorously around the world throughout the Class Period. In light of this,

the volume of sophisticated opt-outs does not indicate that a
class action is inappropriate or that the Classes are
insufficiently numerous. Instead, the volume of opt-outs
underscores just how vast the Classes are. Hundreds of opt-outs
is a large number, but a conservative estimate would place the
size of the proposed Classes in the thousands. Judicial economy
will be served by a joint trial because of the similarities
between the individual actions and the present action, but,
contrary to defendants' suggestion, this would not extend to a
joint trial for thousands upon thousands of individual actions.
Accordingly, the Court concludes that the Classes satisfy the
numerosity requirement of Rule 23(a)(1).

Rule 23(a)(2) requires that there be "questions of law or
fact common to the class." In the context of a securities class
action, "[c]ommon questions of law and fact include whether
certain statements were false and misleading, whether those
statements violated the federal securities laws, whether those
statements were knowingly and recklessly issued, and ensuing
causation issues." Pennsylvania Ave. Funds v. Inyx Inc., 2011 WL
2732544 at *4 (S.D.N.Y. July 5, 2011). Common questions of law
and fact in this case include the truth of the bribery and
kickback allegations against Petrobras, the accuracy of
Petrobras's statements in connection with the allegations, the
knowledge of individual defendants regarding these matters, and

7

related causation issues. Defendants do not seriously challenge that common questions of law and fact exist here. Accordingly, the Court concludes that the commonality requirement is satisfied.

Rule 23(a)(3) requires that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class." Defendants do not materially attack the typicality of North Carolina's or Hawaii's Securities Act claims, but they argue that, because the Court dismissed Union's and USS's Notes claims, Rule 23(a)(3) bars them from serving as class representatives for the Securities Act Class. Plaintiffs respond that Union's and USS's Exchange Act claims arise from the "same set of concerns" as the Securities Act claims, and so Union's and USS's claims are still typical of the Securities Act Class. NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co., 693 F.3d 145, 149 (2d Cir. 2012). However, the "same set of concerns" standard pertains to class standing, a distinct inquiry from typicality under Rule 23(a)(3). Id. at 158 n.9.

While the underlying thrust of plaintiffs' argument might still have some relevance to a Rule 23(a)(3) analysis in general -- because "a class representative can establish the requisite typicality under Rule 23 if the defendants 'committed the same wrongful acts in the same manner against all members of the class.'" Hevesi v. Citigroup, Inc., 366 F.3d 70, 82 (2d Cir.

8

2004) (citation omitted) -- here, Union and USS fail to clear even this relatively modest hurdle with respect to the Securities Act Class because they no longer have Securities Act claims. Indeed, although plaintiffs' proposed definition of the Securities Act Class does not explicitly require that class members have purchased Notes in domestic transactions, such a requirement must be part of any certified class definition. See Morrison v. National Australia Bank Ltd., 561 U.S. 247 (2010). Because neither Union nor USS adequately pleaded that they purchased Notes in domestic transactions, see Opinion and Order dated Dec. 21, 2015, at 12, ECF No. 374, they cannot be members of the Securities Act Class. And, while typicality does not require identity amongst class members' claims, it does demand that a class representative be a member of the Class. Accordingly, USS and Union cannot serve as class representatives for the Securities Act Class.

Turning to the Exchange Act Class, defendants argue that typicality also bars USS from serving as a class representative for the Exchange Act Class because USS's Notes claims were dismissed. But there is no dispute that USS is a member of the Exchange Act Class, although its claims are based only on its purchases of Petrobras equities. Defendants object that there are significant differences, including differences in price movements, between Petrobras's debt and equity securities. But

such variations are not relevant when the same alleged
misconduct drives the claims based on debt and equity alike. The
defendants allegedly "'committed the same wrongful acts in the
same manner against all members of the class'" by participating
in a bribery and kickback scheme and making false and misleading
statements that impacted all members of the Exchange Act Class.
Hevesi v. Citigroup, Inc., 366 F.3d 70, 82 (2d Cir. 2004)
(citation omitted), see In re Enron Sec. Litig., 206 F.R.D. 427,
445-46 (S.D. Tex. 2002) ("[C]ourts have repeatedly concluded
that stock purchasers can represent purchasers of debt
instruments and vice versa in the same action.") (collecting
cases). Accordingly, the Court concludes that the typicality
requirement does not bar USS from serving as class
representative for the Exchange Act Class solely because of its
lack of Notes claims.

Defendants also argue that USS fails the typicality
requirement because it faces unique defenses in four respects.
First, defendants argue that USS is atypical because USS made
some additional purchases of Petrobras securities in June 2015,
after Petrobras had made corrective disclosures and plaintiffs
had filed the Consolidated Amended Complaint in this case. But
aside from the irrelevance of post-disclosure purchases to
earlier reliance, see In re Monster Worldwide, Inc. Sec. Litig.,
251 F.R.D. 132, 135 (S.D.N.Y. 2008), the Class Period for the

10

Exchange Act Class runs through July 28, 2015, based on plaintiffs' allegations that Petrobras's earlier corrective disclosures were a "whitewash." See Opinion and Order dated Dec. 21, 2015, at 12-14, ECF No. 374.[4] Accordingly, USS's purchases of securities in June 2015 do not mean it will face atypical defenses.

Second, defendants argue that USS is atypical in that it alternated between purchases and sales throughout the class period. But such "in-and-out" trading is not atypical in a class that contains, by defendants' own admission, numerous sophisticated institutional investors. See Defendants' Joint Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification ("Def. Opp.") at 3, ECF No. 295. Moreover, plaintiffs claim that USS lost approximately $80 million, its in-and-out trading notwithstanding. See Class Plaintiffs' Reply Memorandum of Law in Further Support of Motion for Class Certification at 3, ECF No. 337.

Third, defendants claim that USS's trading decisions were based on atypical considerations. In particular, defendants claim that USS had special contact with Petrobras during the

---

[4] In their opposition to plaintiffs' motion for class certification, defendants reiterate their earlier request to shorten the periods for the claims in this case. The Court again denies this request for the reasons stated in its decision on defendants' motion to dismiss the Fourth Amended Complaint. See Opinion and Order dated Dec. 21, 2015, at 12-14, ECF No. 374.

Class Period that affected its decisions, and also that USS followed a special investment strategy that "look[s] at extra financial factors" that "the market does not accurately reflect." Declaration of Jared Gerber dated Nov. 6, 2015, Ex. 4, ECF No. 294. Such general statements do not seriously call the typicality of USS's claims into question: it is common practice for money managers to claim they have some special strategy that will deliver insights -- and returns -- superior to the wider market. Likewise, the interactions with Petrobras that defendants point to -- communications with the company's investment relations team and operating personnel and a brief meeting with the Petrobras CEO. See Declaration of Emma Gilmore dated Nov. 23, 2015, Ex. A (Deposition of Christopher Shale) at 84:3-23, 108:10-14, ECF No. 338-1 -- are typical of the relationships between large institutional investors and companies like Petrobras. In a class so heavily populated by institutional investors, these sorts of interactions do not mean that USS is subject to atypical defenses.

Fourth, defendants claim that USS will face unique reliance defenses based on its May 25, 2015, vote against approving Petrobras's management reports and financial statements for 2014. These documents were part of Petrobras's alleged "whitewash" of the bribery and kickback scandal, which valued the total overcharges from the bribery scheme at $2.5 billion.

See Fourth Amended Complaint ¶¶ 169, 176 ECF No. 342; Def. Opp. at 7. USS objected to the documents because it had "concerns regarding the reliability of the reported numbers." Declaration of Jared Gerber dated Nov. 6, 2015, Ex. 3, ECF No. 294. Such statements by plaintiffs may form part of a reliance defense, but any such defense will be typical of the Exchange Act Class because the Consolidated Amended Complaint in this case was filed on March 27, 2015, and alleged that the bribery scheme cost an estimated $28 billion. Consolidated Amended Complaint ¶ 5, ECF No. 109. Indeed, defendants have already argued that plaintiffs cannot prove reliance on Petrobras's May 25, 2015, statements because of the filings in this case. See Defendants' Memorandum of Law in Support of their Motion to Dismiss the Third Consolidated Amended Complaint at 10-14, ECF No. 226. The Court takes no position on the merits of this issue at this stage, but it does conclude that disputes over class members' reliance on the alleged "whitewash" are typical of the Exchange Act class a whole. Accordingly, USS's claims and defenses against them are typical, and plaintiffs have satisfied the requirements of Rule 23(a)(3).

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." "Adequacy 'entails inquiry as to whether: 1) plaintiff's interests are antagonistic to the interest of other members of

the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation.'" In re Flag Telecom Holdings, Ltd. Sec. Litig., 574 F.3d 29, 35 (2d Cir. 2009). Defendants argue that USS's interests are antagonistic to members of the Exchange Act Class whose claims are based on purchases of Notes or preferred ADS because USS no longer has Notes claims and sold its preferred ADS in October 2013. See Declaration of Jared Gerber dated Nov. 6, 2015, Ex. 16 at 1-2, ECF No. 294-2. However, even assuming that the date USS sold its preferred ADS would significantly alter its interests with respect to those securities, defendants have not sufficiently explained why the interests of holders of common ADS like USS would be antagonistic to the interests of holder of Notes or preferred ADSs. The only theory of antagonism of which the Court is aware was presented during consideration of appointment of Lead Plaintiff and concerned the differing priority of securities in the event of bankruptcy. See Memorandum dated May 18, 2015, at 10 n.3, ECF No. 166. There is no evidence that the bankruptcy scenario is remotely likely or relevant. Because the same alleged misconduct drives plaintiffs' claims, regardless of whether they arise from purchases of Notes, common ADS, or preferred ADS, the interests of all members of the Exchange Act Class are aligned. See In re Enron Sec. Litig., 206 F.R.D. 427, 445-46 (S.D. Tex. 2002) ("[C]ourts have repeatedly concluded

that stock purchasers can represent purchasers of debt
instruments and vice versa in the same action.") (collecting
cases). Moreover, the solution to USS's putative adequacy
problem would not be to deny certification of the Exchange Act
Class but rather to appoint another class representative
alongside USS. For now, this course remains a solution in search
of a problem. However, if, as the litigation proceeds, an
Exchange Act Class member with claims based on Notes or
preferred ADS purchases wishes to appoint a class representative
dedicated to their interests, the Court will entertain her
motion.

        Defendants also argue that North Carolina, Hawaii, and USS
are collectively inadequate class representatives because they
suffer from a lack of cohesion. In particular, they rely on this
Court's decision appointing USS Lead Plaintiff to criticize the
appointment of three class representatives who, defendants
claim, are an "artificial grouping" and will not be able to
cooperate effectively. See Memorandum dated May 18, 2015, at 4
ECF No. 166. Although the Court recognizes that there are costs
associated with the appointment of multiple class
representatives, the dangers are not the same as those presented
by lawyers bundling unrelated clients together to win a lead
plaintiff appointment under 15 U.S.C. § 78u-
4(a)(3)(B)(iii)(I)(bb) (directing court to adopt presumption

that lead plaintiff is person or group of persons with "the
largest financial interest in the relief sought by the class").
There is now a valid reason to appoint multiple class
representatives because Lead Plaintiff USS is no longer a member
of one of the Classes to be certified. Moreover, the proposed
class representatives have already demonstrated that they can
work together effectively: they managed the addition of three
named plaintiffs, Hawaii, North Carolina, and Union, and
produced a Joint Prosecution Agreement. See Order dated March
30, 2015, ECF No. 112. In light of this, the number of class
representatives is not a barrier to their collective adequacy.

Defendants make other attacks on the competence and
qualifications of the proposed class representatives and their
counsel, but none has merit. First, defendants argue that USS
has never led a U.S. securities class action before. However,
experience is not a prerequisite to adequacy under Rule
23(a)(4).

Second, defendants claim that the volume of opt-outs should
be seen as a vote of no confidence in USS's leadership of the
class. Defendants do not provide any support for this
interpretation of class members exercising their opt-out rights.
Indeed, it is not uncommon for large institutions to opt out of
class actions simply so that they can improve their bargaining
position if, as usually occurs, settlement discussions begin. If

anything, as explained above, the Court views the volume of opt-out plaintiffs as indirect evidence that a class action is appropriate in this case and that a sophisticated institutional investor like USS is needed as a class representative for the thousands of remaining class members.

Third, defendants claim that the proposed class representatives have exhibited "stark discovery failures." Def. Opp. at 9. But this Court almost never refers discovery disputes to Magistrate Judges, precisely so that the Court can remain apprised of any discovery defalcations, and to this end, the Court provides a mechanism for swift joint telephone conferences to resolve any such problems. If defendants felt that plaintiffs and their counsel were behaving so badly, they should have notified the Court sooner than their opposition to plaintiffs' motion for class certification. The argument thus smacks more of strategy than substance.

In any event, on the basis not only of USS's counsel's prior experience but also the Court's observation of its advocacy over the many months since it was appointed lead counsel, the Court concludes that Pomerantz, the proposed class counsel, is "qualified, experienced and able to conduct the litigation." In re Flag Telecom Holdings, Ltd. Sec. Litig., 574 F.3d 29, 35 (2d Cir. 2009). There is no real dispute that Pomerantz is an established firm with considerable class action

experience, and the Court has now had multiple opportunities to observe Pomerantz's performance. The Court finds that the Pomerantz firm has both the skill and resources to represent the Classes adequately.

On the basis of the foregoing discussion, the Court concludes that the requirements of Rule 23(a)(4) are satisfied. With that, the Court concludes that plaintiffs have satisfied all four prongs of Rule 23(a).

In addition, of course, for plaintiffs to prevail on their motion for class certification, the action must meet one of the three alternative conditions of Rule 23(b). Plaintiffs argue that the requirements of Rule 23(b)(3) are satisfied. Rule 23(b)(3) requires that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy" and that "the questions of law or fact common to class members predominate over any questions affecting only individual members."

The foregoing analysis under Rule 23(a) supports a finding that a class action is superior to other methods of adjudication. Petrobras was a massive company with investors around the globe. Notwithstanding Petrobras's size and its numerous and far-flung investors, the interests of the class members are aligned and the same alleged misconduct underlies their claims. Moreover, the thousands of individual class

members who have not opted-out have a minimal interest in controlling the course of the litigation; there are significant efficiency gains to be reaped from concentrating the litigation in a single forum; and the likely difficulties in managing the class action are readily surmountable. See Fed. R. Civ. P. 23(b)(3)(A), (C), (D). Defendants again point to the volume of actions brought by individual plaintiffs as evidence against the superiority of the class action form in this case. See Fed. R. Civ. P. 23(b)(3)(B). But the Court again disagrees: instead, the volume of opt-outs demonstrates the need for a class action in these circumstances. Otherwise, the Court risks the present stream of individual actions growing into an unmanageable flood.

Defendants raise two more specific arguments against the superiority of a class action in this case. First, defendants argue that plaintiffs must demonstrate "a probability that a foreign court will recognize the res judicata effect of a U.S. class action judgment" to satisfy superiority. In re Vivendi Universal, S.A., 242 F.R.D. 76, 95 (S.D.N.Y. 2007). The Court is not aware of any binding precedent that sets out such a requirement. In re Vivendi Universal, S.A., the case on which defendants rely for their position, was decided before Morrison v. National Australia Bank Ltd., 561 U.S. 247 (2010), which limited the reach of U.S. securities laws to securities traded on a U.S. exchange or purchased in domestic transactions.

19

Case 1:14-cv-09662-JSR Document 428 Filed 02/02/16 Page 20 of 49
**SPA-20**

Morrison, 561 U.S. at 267. Morrison materially lessens the foreign res judicata concerns animating In re Vivendi Universal, S.A.. Moreover, In re Vivendi Universal, S.A. only concluded that res judicata concerns could be one consideration that could lead to the exclusion of foreign members from a class. In re Vivendi Universal, S.A., 242 F.R.D. 76, 95 (S.D.N.Y. 2007). While defendants also propose including in the Class definitions lists of countries whose residents would be excluded from the Classes, see Defendants' Joint Supplemental Memorandum of Law in Further Opposition to Plaintiffs' Motion for Class Certification, App. A, ECF No. 389, defendants have not explained in any detail why these particular countries would not recognize a U.S. class action judgment in this case. Accordingly, the Court concludes that foreign res judicata concerns are not a bar to the superiority of a class action and declines to list any specific countries in the Class definitions.

Defendants also argue against superiority on so-called "ascertainability" grounds. The Second Circuit has framed ascertainability as a stand-alone "implied requirement" of Rule 23, and, to the extent defendants' arguments are addressed to ascertainability as distinct from superiority, the Court also considers them here. See Brecher v. Republic of Argentina, 806 F.3d 22, 24 (2d Cir. 2015). "[T]he touchstone of

ascertainability is whether the class is 'sufficiently definite
so that it is administratively feasible for the court to
determine whether a particular individual is a member.'" Id.
However, "failure to certify an action under Rule 23(b)(3) on
the sole ground that it would be unmanageable is disfavored and
'should be the exception rather than the rule.'" In re Visa
Check/MasterMoney Antitrust Litigation, 280 F.3d 124, 140 (2d
Cir. 2001).

Defendants point out that any putative class member must be
able to show that they purchased Petrobras securities on an
American exchange or in a domestic transaction under Morrison v.
National Australia Bank Ltd., 561 U.S. 247 (2010). Defendants
argue that, because of the nuances of the "domestic transaction"
standard, determining who is a class member and damages will be
an administratively unfeasible task for this Court, for putative
class members who receive notice of the action, and for future
courts facing claims from class members who have not properly
opted out.[5] To cut this supposed Gordian knot, defendants propose
that the Exchange Act Class definition be amended to exclude
off-exchange purchasers and that the Securities Act Class

---

[5] Defendants also argue that the Classes are unmanageable because
plaintiffs will need to provide notice to investors across four
continents. In today's modern world, this is not an unfeasible
task, as demonstrated by the fact that Petrobras successfully
marketed its securities across four continents.

21

definition be rejected outright or amended to exclude aftermarket purchasers and purchasers from non-U.S. underwriters.

Amending the Class definitions in this way would cut off purchasers who have valid claims under Morrison's second prong, which holds that the securities laws apply to securities purchased in "domestic transactions." Morrison, 561 U.S. at 267. This would not be a faithful application of Morrison. Moreover, having recently evaluated whether the four proposed class representatives adequately pleaded that they purchased Petrobras securities in domestic transactions, see Opinion and Order at 5-6, ECF No. 374, the Court is confident that the Morrison determination is "administratively feasible." Brecher v. Republic of Argentina, 806 F.3d 22, 24 (2d Cir. 2015). Indeed, defendants themselves have elsewhere represented as much to the Court. See Defendants' Supplemental Memorandum of Law in Support of their Motion to Dismiss the Fourth Consolidated Amended Complaint and in Further Support of their Motion to Dismiss the Third Consolidated Amended Complaint at 6, ECF No. 351 ("Each of [Absolute Activist's tests] establishes, as the site of the transaction that is of congressional concern, a single location that—although subject to proof—can be easily determined based on recognized and readily understood standards."). The criteria identified by Absolute Activist Value Master Fund Ltd. v.

Ficeto, 677 F.3d 60 (2d Cir. 2012), as relevant to the
determination of whether a transaction was domestic, are highly
likely to be documented in a form susceptible to the
bureaucratic processes of determining who belongs to a Class.
For example, documentation of "the placement of purchase orders"
is the sort of discrete, objective record routinely produced by
the modern financial system that a court, a putative class
member, or a claims administrator can use to determine whether a
claim satisfies Morrison. Accordingly, the Court concludes that
the proposed Classes are ascertainable and administratively
manageable and that a class action is the superior method of
adjudication under Rule 23(b)(3).

Rule 23(b)(3) also requires that "the questions of law or
fact common to class members predominate over any questions
affecting only individual members." "Class-wide issues
predominate if resolution of some of the legal or factual
questions that qualify each class member's case as a genuine
controversy can be achieved through generalized proof, and if
these particular issues are more substantial than the issues
subject only to individualized proof." UFCW Local 1776 v. Eli
Lilly and Co., 620 F.3d 121, 131 (2d Cir. 2010). Here,
plaintiffs submit, and defendants do not meaningfully contest,
that, with the exception of reliance and damages, all elements
of plaintiffs' claims are susceptible to generalized proof. The

Court agrees: with the exception of reliance and damages, plaintiffs' claims rest almost exclusively on class-wide questions of law and fact centered around the alleged bribery and kickback scheme, Petrobras's alleged misstatements in connection with the scheme, the conduct of Petrobras's officers and employees, and the effects of these actions and events on the market.

It is true that, with respect to the Exchange Act Class, reliance is an element of plaintiffs' claims. But while reliance may be an individual phenomenon, here plaintiffs argue that reliance will be established on a common basis under a "fraud-on-the-market" theory. See Basic, Inc. v. Levinson, 485 U.S. 224, 241-42 (1988). "[T]o invoke the Basic presumption, a plaintiff must prove that . . . (3) the [security] traded in an efficient market." Halliburton Co. v. Erica P. John Fund, Inc., 134 S. Ct. 2398, 2413 (2014). The Second Circuit has not adopted a test for the market efficiency of stocks or bonds. See Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc., 546 F.3d 196, 204 n.11 (2d Cir. 2008). However, it has recognized that courts generally apply a set of eight factors, known as the "Cammer factors." Id.; see Cammer v. Bloom, 711 F. Supp. 1264, 1286 (D.N.J. 1989) (setting out five factors); Krogman v. Sterritt, 202 F.R.D. 467, 478 (N.D. Tex. 2001) (considering three additional "Cammer" factors). To address

these factors, plaintiffs submitted two expert reports from
their witness Feinstein. Feinstein also testified at an
evidentiary hearing on December 21, 2015. Defendants and their
expert do not meaningfully dispute Feinstein's conclusions with
respect to all but one of the Cammer factors (discussed below).
The Court accepts Feinstein's testimony with respect to these
other factors and concludes that they weigh in favor of finding
that Petrobras equity and debt securities traded in efficient
markets.

The Court first considers the application of the Cammer
factors to the Petrobras equity markets. The Cammer factors are
designed for equity markets and can be applied directly to the
markets for Petrobras common and preferred ADS. The first Cammer
factor considers the average weekly trading volume during the
Class Period. Specifically, "average weekly trading of two
percent or more of the outstanding shares would justify a strong
presumption that the market for the security is an efficient
one; one percent would justify a substantial presumption."
Cammer, 711 F. Supp. at 1286 (citing Bromberg & Lowenfels, 4
Securities Fraud and Commodities Fraud, § 8.6 (Aug. 1988)).
Feinstein reported that 14.1% of all common ADS and 6.61% of all
preferred ADS outstanding traded on average in a given week
during the Class Period. Feinstein Report ¶¶ 61, 171. This is

well above the 2% threshold for a "strong presumption" of
efficiency discussed in Cammer.

The second Cammer factor considers analyst coverage.
Feinstein reported that over 50 analysts covered Petrobras's
securities, inarguably a significant number. Id. ¶¶ 66, 173.
There was also extensive news coverage of Petrobras during the
Class Period. Id. ¶¶ 71, 176.

The third Cammer factor considers whether market makers
existed for the securities at issue. Feinstein reported that
there were at least 574 market makers for Petrobras common ADS
and 147 market makers for Petrobras preferred ADS; these market
makers included Goldman Sachs, JP Morgan, Citigroup, and Morgan
Stanley. Id. ¶¶ 78, 181.

The fourth Cammer factor considers whether an issuer was
eligible to file a Form S-3, a simplified security registration
form that can be filed by companies that have met prior
reporting requirements. A Form F-3 is the equivalent of a Form
S-3 for foreign companies; companies are eligible to file an F-3
or an S-3 form when, among other things, they have filed
Exchange Act reports for a certain time and have a float over a
certain level. Id. ¶¶ 81.[6] Petrobras satisfied the F-3
requirements for the duration of the Class Period, except for

---

[6] "Float" refers to outstanding shares minus closely-held and
restricted shares.

when it delayed release of its financials because of the
allegations that underlie this case. <u>Id.</u> ¶¶ 90, 187. Petrobras
filed an F-3 form during the Class Period on August 29, 2012.
<u>Id.</u>

Defendants dispute the fifth <u>Cammer</u> factor, which looks to
"empirical facts showing a cause and effect relationship between
unexpected corporate events or financial releases and an
immediate response in the stock price." <u>Cammer</u>, 711 F. Supp. at
1287. Because this factor is disputed, the Court considers it
separately below.

The sixth <u>Cammer</u> factor[7] considers market capitalization.
The average aggregate market value of the Petrobras common ADS
during the Class Period was $16.9 billion, greater than 90% of
publicly traded U.S. companies. Feinstein Report ¶ 93. The
average aggregate market value of Petrobras preferred ADS during
the Period was $15.9 billion, an amount that, on its own, would
mean Petrobras was larger than 90% of publicly traded U.S.
companies. <u>Id.</u> ¶ 190.

The seventh <u>Cammer</u> factor considers the bid-ask spread for
the securities at issue. The average bid-ask spread for
Petrobras common ADS over the Class Period was 0.09%, and the

---

[7] Really the first "<u>Krogman</u>" factor. As noted above, in <u>Krogman
v. Sterritt</u>, 202 F.R.D. 467 (N.D. Tex. 2001), the court
supplemented and elaborated on the <u>Cammer</u> factors.

average bid-ask spread for Petrobras preferred ADRs was 0.08%. Id. ¶¶ 99, 196. By comparison, the average bid-ask spread for all stocks in the Center for Research in Security Prices ("CRSP") database was 0.59%. Id.

The eighth Cammer factor considers the issuer's float. Feinstein reported that none of the Petrobras common ADS were held by insiders or affiliated corporate entities. Id. ¶ 95. Accordingly, the entire $16.9 billion average aggregate value of Petrobras common ADS was floated during the Class Period, again placing Petrobas in the top decile of U.S. companies. The float for the preferred ADS varied during the Class Period, but averaged $15.9 billion, always exceeding the minimum requirement for F-3 eligibility. Id. ¶ 185.

The Court now considers the application of the Cammer factors to the market for Petrobras debt securities. Although the Cammer factors were not designed for debt securities, plaintiffs argue that they are still useful in evaluating the efficiency of a debt securities market, particularly in conjunction with an analysis of the equities market for the same company. See In re Enron Corp. Sec., 529 F. Supp. 2d 644, 747-48 (S.D. Tex. 2006). To analyze the Petrobras debt markets, Feinstein omitted some Cammer factors, modified others, and considered additional debt-specific factors. The Court agrees

that the modified <u>Cammer</u> factors provide a useful rubric to evaluate debt markets.

The first modified <u>Cammer</u> factor considers the par value and float of the debt securities. Feinstein reported that the aggregate par value of Petrobras Notes totaled $41.4 billion and was larger than 90% of all market capitalizations on the NYSE, Amex, and NASDAQ during the Class Period. Feinstein Report ¶ 246. Feinstein reported that no substantial portion of Petrobras Notes was held by insiders, so that the float was equivalent to the aggregate par value. <u>Id.</u> ¶ 248.

The second modified <u>Cammer</u> factor considers analyst and credit rating agency coverage of the debt securities. As noted above, Feinstein reported that over 50 analysts cover Petrobras's securities, inarguably a significant number. <u>Id.</u> ¶¶ 66, 173. There was also extensive news coverage of Petrobras. <u>Id.</u> ¶¶ 71, 176. During the Class Period, Petrobras was covered by the major credit rating agencies, Fitch, Moody's, and Standard & Poor's. <u>Id.</u> ¶¶ 231-35.

The third modified <u>Cammer</u> factor considers the market makers and underwriters for the debt securities. Feinstein reported that there were at least 20 underwriters of the Petrobras Bonds, including large and prominent investment banks. <u>Id.</u> ¶ 241. Feinstein also opined that underwriters generally serve as market makers for securities and that many investment

banks that published analyst reports covering the bonds also served as market makers. Id. ¶ 242-43.

The fourth modified Cammer factor considers institutional ownership of the debt securities. Feinstein reported that 214 different mutual funds held one or more Petrobras bonds during the Class Period. Id. ¶¶ 236-38. Feinstein opined that wide institutional ownership indicates market efficiency because institutional investors often conduct their own research on securities and make investment decisions based on that research. Id.

The fifth modified Cammer factor again considers the ability of the issuer to file a Form S-3. As discussed above, Petrobras satisfied the F-3 requirements for the duration of the Class Period, except for when it delayed release of its financials because of the allegations that underlie this case. Id. ¶ 90, 187. Petrobras filed an F-3 form during the Class Period on August 29, 2012. Id.

The sixth modified Cammer factor considers trading volume and frequency. Feinstein reported a table of weekly average trading volumes for the Petrobras Notes during the Class Period. See id. at 64 tbl.5. The volumes ranged from 1.13% to 10.95%, with most over 2%. Id. Accordingly, all the bonds were over Cammer's 1% threshold for a substantial presumption of efficiency, even though the Cammer thresholds are designed for

common stock, which trades more frequently than bonds. Id. ¶ 253. In addition, the average number of days between successive trades in the Notes ranged from 0.020 and 0.418 over the Class Period. Id. ¶ 257. By comparison, relatively few corporate bonds trade more frequently than 200 days in a year. Id. § 255. Feinstein concluded that the trading volumes and frequencies of the Notes were significantly high.

The final modified Cammer factor is the fifth unmodified Cammer factor: empirical evidence of a cause and effect relationship between events and an immediate response in the price of the debt securities. Because this factor is also disputed with respect to the Notes, the Court considers it separately below.

Defendants and their expert Gompers do not directly dispute Feinstein's application of the foregoing Cammer factors, unmodified or modified. Instead, Gompers testified that the foregoing factors are "structural factors that are necessary for efficient markets," but not, on their own, sufficient. Gompers Report ¶ 27. According to Gompers, the fifth Cammer factor, "empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price," is the only factor sufficient to show market efficiency.

31

**SPA-32**

Although the Second Circuit has recognized that evidence of causality has been considered the most important Cammer factor, it has not held that direct evidence is always necessary. See Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc., 546 F.3d 196, 204 n.11, 207-08 (2d Cir. 2008). While some language in Cammer supports Gompers' view that direct evidence is essential, see Cammer, 711 F. Supp. at 1287, this Court, which is not bound by Cammer, does not agree that only direct evidence is sufficient to demonstrate market efficiency in translating material disclosures into effect on market price. As the Supreme Court recently opined, "market efficiency is not a yes-or-no proposition," and particularly strong indications of market efficiency from the indirect Cammer factors can lessen the burden to be carried by the fifth, "direct evidence" Cammer factor. Halliburton Co. v. Erica P. John Fund, Inc., 134 S. Ct. 2398, 2414 (2014). Causality is notoriously difficult to prove with certainty, even in physics or chemistry, let alone in market analyses, because of the large number of factors involved and the difficulty of measuring them with precision, separating out their interactions, etc. Where, as here, the indirect factors overwhelmingly describe a large and well-functioning market for Petrobras securities, common sense suggests that the market would materially react to material disclosures. Put simply, Petrobras was one of the largest and most-analyzed firms

32

in the world throughout the Class Period, and such size and
sophistication raise the likelihood of an efficient market.

In any event, though it is a somewhat involved analysis,
the Court ultimately concludes that plaintiffs have satisfied
the fifth Cammer factor. To be sure, almost every aspect was
disputed. The experts even sparred over whether any direct
evidence of the fifth factor existed. Feinstein testified that
he found direct evidence of a link between events and prices
movements in Petrobras securities. Specifically, Feinstein ran
four event studies on the Petrobras equities and two on the debt
securities. Feinstein identified three categories of event
dates: (1) dates when Petrobras filed 6-K Forms containing the
term "corrupt*",[8] excluding dates when the terms was used only in
boilerplate language; (2) dates when Petrobras filed any 6-K
Form; and (3) dates when Petrobras released earnings statements.
He then looked at the price movements of Petrobras securities
for a given set (or combined multiple sets) of event dates,
using a regression analysis to strip out any price movement that
was caused by external forces, such as moves in the wider
market. Next, he compared the proportion of event dates with
statistically significant price movements to the proportion of
non-event dates with statistically significant price movements,

---

[8] Meaning the letters "corrupt" followed by any letters or no
letters.

concluding that there was a statistically significant difference in proportions for common ADS and preferred ADS and across the Petrobras Notes. See Feinstein Report ¶¶ 148-61, 205-21, 279-86. In other words, there were more likely to be big price movements on days when important Petrobras events occurred, demonstrating the markets in Petrobras securities were responsive to new information.

Gompers challenged both the execution and the sufficiency of Feinstein's tests. First, Gompers objected to Feinstein's selection of event dates. Gompers objected that by selecting dates uses the term "corrupt*," Feinstein ignored dates on which allegation-related information was released to the market that did not include the specific term "corrupt*." Gompers also identified three additional dates with 6-Ks that included the term corruption that he argued should not have been excluded as boilerplate dates. Finally, Gompers claimed that Feinstein failed to produce evidence that the information released on various dates across all three date sets was new. In particular, he contended that, because Petrobras is a Brazilian company, some information had already been released in Brazil.

Feinstein offers some specific ripostes to these points, but the Court does not deem it necessary to discuss them at length here. The dispute over the inclusion of event dates is essentially about the role of subjectivity in such analysis.

Gompers objects that Feinstein's choice of event dates injects subjectivity into his analysis. However, Gompers' suggested improvements -- including other dates with allegation-related information, more 6-K corruption dates, analysis of whether information was new enough -- could also be criticized as subjective. There is always some subjectivity in analyses of this nature, and courts would be unable to rely on expert testimony if they could not tolerate a modest level of subjectivity. The Court concludes that Feinstein's selection of event dates displays only that -- a modest level of subjectivity -- and that this is not fatal to his conclusions.

Gompers next objected that Feinstein should have used the BOVESPA index, an index of stocks on the Brazilian stock market, instead of the CRSP Market Index in his regression analysis. Gompers contended that the BOVESPA does a better job than the CRSP Market Index of stripping out exogenous returns. Feinstein responded that the BOVESPA returns are not exogenous to the Petrobras returns because, as a result of Petrobras's size and prominence in Brazil, the BOVESPA's movements were driven in part by Petrobras. Moreover, Feinstein re-ran his tests using the BOVEPSA index and concluded that using the BOVESPA in his regression analysis would not change his overall conclusions. See Feinstein Rebuttal Report ¶ 83, Exhibit-7a-7w. The Court

35

credits Feinstein's testimony and concludes that his regression analysis is sound.

Gompers further objected that the sample sizes used in Feinstein's tests were too small and could result in "large standard errors, broad confidence intervals, and tests having low power." Gompers Report ¶ 84 (quoting <u>Reference Manual on Scientific Evidence</u>, 3rd ed. (Washington: The National Academies Press, 2011), 255). But Feinstein pointed out that these properties would bias his tests against finding statistical significance -- the danger would be false negatives not false positives. Feinstein Rebuttal Report ¶ 68. Moreover, Feinstein performed an additional bootstrap analysis and the Fisher's Exact Test to demonstrate that his results were robust. <u>See</u> Feinstein Rebuttal Report ¶¶ 69-70, Exhibit 8a-8b. The Court credits Feinstein's testimony and concludes that his sample sizes do not seriously undermine his results.

Gompers still further objected that Feinstein did not conduct tests on the Petrobras Notes using the earnings statement date set alone, although Feinstein did use the earnings statement date set by itself for his analysis of the common and preferred ADS. Gompers Report ¶ 72. Feinstein responded that unless bonds are close to default they are insensitive to earnings announcements and so the earning statements date set by itself was not an appropriate event date

36

set for the Petrobras Notes. Feinstein Rebuttal Report ¶ 89.
Moreover, the results of Feinstein's regression analysis on the
Petrobras Notes showed that the fixed-rate Petrobras bonds moved
in response to market interest rates, indicating the market for
Petrobras Notes was efficient. Feinstein Report ¶ 288-91, Ex.
7c. Accordingly, the Court concludes that the fact that
Feinstein did not use the earnings statement date set alone in
his analysis of the Petrobras Notes does not damage his
conclusions regarding the market for Petrobras debt securities.

Gompers raised some other technical objections to
Feinstein's report. For example, he pointed out computational
errors that Feinstein made in his initial analysis. See Gompers
Report ¶ 76-80. Feinstein corrected these errors in his rebuttal
report, and they did not change his conclusions. Feinstein
Rebuttal Report ¶¶ 48-49. Upon considering the magnitude of
these errors and Gompers' other critiques of Feinstein's
execution of his methodology, the Court does not deem them
substantial enough to seriously undermine Feinstein's
credibility or his conclusions regarding the efficiency of the
markets for Petrobras securities.

Concerns about execution aside, Gompers also raised
objections to the sufficiency of Feinstein's approach. First,
Gompers objected to Feinstein's conclusions because no peer-
reviewed academic article has used Feinstein's methodology to

Case 1:14-cv-09662-JSR Document 478-16 Filed 02/02/16 Page 381 of 649

evaluate the efficiency of a market. Feinstein's method of comparing the proportions of statistically significant observations in two samples is a "z-test," essentially a version of the more famous Student's "t-test." <u>See</u> <u>Reference Manual on Scientific Evidence</u>, 3rd ed. (2011), 300.[9] There is no dispute that z-tests are commonly used and widely accepted statistical tools. <u>See</u> <u>id.</u>; Feinstein Rebuttal Report ¶ 37; Gompers Rebuttal Report ¶ 9; <u>see</u> <u>also</u>, <u>Reference Manual on Scientific Evidence</u>, 3rd ed. (2011), 591–97 (discussing epidemiological cohort study that compares incidence of emphysema in different populations). Both sides refer to Feinstein's methodology as an "FDT" test because use of z-test to evaluate market efficiency was first proposed in a law review article by three well-known securities econometric experts, whose combined initials were "FDT." <u>See</u> Paul A. Ferrillo, Frederick C. Dunbar, and David Tabak, <u>The "Less Than" Efficient Capital Markets Hypothesis: Requiring More Proof from Plaintiffs in Fraud-on-the-Market Cases</u>, 78 St. John's L. Rev. 81, 119–22 (2004). Gompers contends that, because the article was not peer-reviewed, a z-test cannot be used to show market efficiency. Were Feinstein using a novel or

---

[9] The Reference Manual on Scientific Evidence is jointly prepared by the Federal Judicial Center and by the National Research Council of the National Academy of Sciences. The undersigned was one of the four federal judges who served on the committee that oversaw the preparation of the 3rd Edition.

questionable statistical technique, the Court would place more
weight on the absence of peer review. But it is not necessary
for every application of a commonly used statistical technique
to be peer-reviewed. Indeed, the elegance of statistical methods
is that they can be applied to data sets of varying substantive
significance, from rates of emphysema to transactions on modern
securities markets.[10] Because the Court is convinced that the z-
test is a well-established and sound statistical technique, the
lack of peer review does not seriously undermine Feinstein's
application of the z-test.

Next, Gompers objected to Feinstein's conclusions on the
grounds that Feinstein's z-tests failed to consider the
directionality of movements in the Petrobras market. By simply
comparing the proportions of dates with statistically
significant returns, Feinstein's z-tests did not examine whether

_____

[10] The Court is also mystified by Gompers' claim that one of the
authors of the FDT article subsequently disavowed Feinstein's
methods. Gompers states, "[i]n fact, David Tabak (one of the
authors of the St. John's Law Review article) specifically noted
that the collective evaluation required by the FDT test rendered
the methodology 'not . . . able to fully distinguish an
efficient market from an inefficient one.'" Gompers Rebuttal
Report ¶ 13 (quoting Tabak, David, "Use and Misuse of Event
Studies to Examine Market Efficiency," NERA Working Paper, April
30, 2010, 7). But Tabak's sentence is, in fact, "[t]here are
several ways that versions of the FDT methodology may not be
able to fully distinguish an efficient market from an
inefficient one." Tabak, David, "Use and Misuse of Event Studies
to Examine Market Efficiency," NERA Working Paper, April 30,
2010, 7. This manner of selective quotation does not redound to
Gompers' credit.

a statistically significant return on a given day was positive
or negative and, in particular, whether the price of a security
moved up or down as expected based on the precipitating market
event. Feinstein did not dispute that his z-test methodology
alone could not test directionality. Instead, he reported the
results of a supplementary analysis examining how the prices of
common and preferred Petrobras ADS moved on earning announcement
dates. See Feinstein Rebuttal Report ¶ 53, Appendix-2. To
conduct this analysis, Feinstein examined analyst reports on
earnings event dates and coded their tenor as "Positive,"
"Negative," "Mixed/Neutral," or "In Line." On dates with
statistically significant returns, he found that the price
movements in common and preferred ADS were consistent with his
assessments of the tenor of analyst coverage. Id.

Gompers and defendants objected to this analysis as
subjective and flawed. Overall, they objected to Feinstein's
categorization of the tenor of analyst coverage as dependent on
his subjective interpretation. More specifically, they claimed
that the tenor of coverage on two of the dates Feinstein labeled
"Positive," May 16, 2011, and October 28, 2013, should have been
labeled "Mixed/Neutral." The Court agrees that these dates were
mischaracterized. See Transcript dated Dec. 21, 2015 at 44-50,
ECF No. 413; Gompers Rebuttal Report ¶¶ 52-55. Moreover,
Feinstein did not provide the analyst reports he relied on in

40

making his coverage assessments and, other than the excerpts listed in Appendix-2 to his rebuttal report, did not explain how he arrived at specific tenor determinations. Therefore, it is difficult to assess whether the two dates identified by defendants are anomalous or indicative of wider deficiencies in Feinstein's directionality testing. Accordingly, the Court places only limited weight on Feinstein's directionality testing of the Petrobras ADS.

The Court also places only limited weight on the evidence of the directionality of the movements in the Petrobras Notes market. Feinstein reported that his regression analysis of the Notes showed that they moved with his Benchmark Bond return variable, which serves as basic confirmation of the directionality of Notes price movements. Feinstein Report ¶¶ 288-91; Ex. 7c. However, Gompers identified three dates when some Notes had statistically significant price declines while other Notes had statistically significant price increases. Feinstein did not address these movements. Accordingly, the Court concludes that there is only limited evidence of directionality in the Petrobras Notes market.

However, evidence of directionality or the degree of fit between expected and observed moves in a market need not be substantial to allow a finding of market efficiency. Such evidence goes to the accuracy of the price of a security, and

41

the Supreme Court has explained that it is not the accuracy of a price as a reflection of underlying value but instead the sensitivity of the price to false statements that underlies the Basic presumption. See Halliburton Co. v. Erica P. John Fund, Inc., 134 S. Ct. 2398, 2410 (2014) ("'That the ... price [of a stock] may be inaccurate does not detract from the fact that false statements affect it, and cause loss,'" which is 'all that Basic requires.'") (quoting Schleicher v. Wendt, 618 F.3d 679, 685 (7th Cir. 2010) (alteration in original)). Defendants' own arguments that Feinstein's tenor assessments were subjective demonstrate the wisdom of the Supreme Court's position. Any assessment of the tenor of analyst coverage and the expected impact of an event on the market will be subjective. Indeed, the analyst reports released on May 15, 2011, and May 16, 2011, varied in their assessments of the same earnings event. See Feinstein Rebuttal Report, Appendix-2; Transcript dated Dec. 21, 2015 at 44-50, ECF No. 413. Whether the market, upon receiving new information, moved in the precise way analysts or experts would expect it to move is not the key to unlocking Basic's presumption of reliance. What is essential is evidence that, when the market received new information, it "generally affect[ed]" the price. Halliburton, 134 S. Ct. at 2410. In this case, the z-tests provide such evidence. Accordingly, the Court

concludes that the limited evidence of directionality is not fatal to plaintiffs' showing of market efficiency.

Finally, Gompers objected to the sufficiency of Feinstein's results on the grounds that "in an efficient market, the price of a security should <u>always</u> move in response to the release of new value-relevant information that is materially different from expectations." Gompers Rebuttal Report ¶ 31. Gompers allowed that, because of potential shortcomings in a regression analysis, "there may be instances where [an] event study does not <u>always</u> show directionally consistent price movements to new information." <u>Id.</u> But, he "would expect the vast majority of days with new value-relevant information that is materially different from expectations to have statistically significant price movements that are directionally consistent with the information." <u>Id.</u> Gompers pointed out that Feinstein's event studies failed to show that the Petrobras markets moved in response to events the vast majority of the time.

Feinstein responded that not every event will move a market and that the impact of an event depends on various factors, including, among other things, the nature of the event, whether the information involved is truly new,[11] whether a confounding

---

[11] This factor is why the Court gives little weight to Gompers' application of Feinstein's methodology to the eighty-five alleged corrective disclosure dates in Plaintiffs' Complaint. Gompers Report ¶¶ 88-89, 92, Ex. 3. Gompers found that the

event occurs simultaneously, the magnitude of background volatility, and how the event unfolded. Feinstein Rebuttal Report ¶ 33. In light of these complex forces, one should not expect to see a price movement on every news day.

The Court sides with Feinstein. The Supreme Court has rejected Gompers' absolutist view of market efficiency by making clear that "market efficiency is a matter of degree" and that "Basic's presumption of reliance . . . does not rest on a 'binary' view of market efficiency." Halliburton Co. v. Erica P. John Fund, Inc., 134 S. Ct. 2398, 2410 (2014). In assessing market efficiency, courts should not let the perfect become the enemy of the good. In this case, where the indirect Cammer factors lay a strong foundation for a finding of efficiency, a statistically significant showing that statistically significant price returns are more likely to occur on event dates is sufficient as direct evidence of market efficiency and thereby to invoke Basic's presumption of reliance at the class certification stage. Accordingly, plaintiffs have adequately

---

proportion of alleged corrective disclosure dates with statistically significant price moves was not statistically significantly larger than other dates during the period. Id. In contrast to Feinstein's selection of event dates, which involved a tolerable level of subjectivity, see supra, the alleged corrective disclosure dates were compiled by plaintiffs as dates when news of the alleged bribery and kickback scheme trickled out. By design, they did not all involve new information being presented to the market and are therefore not an appropriate sample for a z-test. Feinstein Rebuttal Report ¶ 64.

44

demonstrated that common issues of law and fact will predominate
over individual issues with respect to the reliance element of
their Exchange Act claims.

Defendants also argue that plaintiffs have failed to
satisfy Rule 23(b)(3) because they have not presented an
adequate model of classwide damages. It is "'well-established'
in [the Second Circuit] that 'the fact that damages may have to
be ascertained on an individual basis is not sufficient to
defeat class certification' under Rule 23(b)(3)." Roach v. T.L.
Cannon Corp., 778 F.3d 401, 405 (2d Cir. 2015). However, the
Supreme Court has held that if a court does rely on a classwide
model of damages when certifying a class, the "model . . . must
actually measure damages that result from the class's asserted
theory of injury." Id. at 407; see Comcast Corp. v. Behrend, 133
S. Ct. 1426 (2013).

Feinstein proposed a three-step damages methodology: (1) an
event study could determine the amount of price inflation in a
given security, as well as how much of this dissipated upon
disclosures; (2) an "inflation ribbon" could be constructed,
measuring the difference between the inflated price of the
security and what it would have traded at without the alleged
misrepresentations; and (3) per shares damages could be
calculated as the difference between the inflation on the date

45

shares were purchased and the inflation on the date those same shares were sold. Feinstein Report ¶ 296.

In response, Gompers divided the alleged corrective disclosures into "numeric" and "non-numeric" disclosures. Gompers Report ¶ 107-08. Numeric disclosures involved quantitative information, such as the amount of a write-down, while non-numeric disclosures involved qualitative information, such as acknowledgment of ethical breaches. Id. Gompers claimed that numeric disclosures would categorically have no impact on the price of Petrobras securities because prices were based on the economic value of Petrobras's assets, specifically their future cash flows. Id. ¶¶ 109-17. Gompers further claimed that the impact of non-numeric disclosures on the prices of Petrobras securities would be too difficult to measure because, among other reasons, different investors would have had different appetites for risk when investing in Petrobras and price declines following non-numeric disclosures could have been caused by collateral factors.

It is not necessary, however, to resolve the detailed disputes over plaintiffs' damages model at the class certification stage. Indeed, plaintiffs do not even have a burden to produce a classwide damages model at this time. "'[T]he fact that damages may have to be ascertained on an individual basis' [is] simply one 'factor that [courts must]

46

consider in deciding whether issues susceptible to generalized proof 'outweigh' individual issues' when certifying the case as a whole." Roach v. T.L. Cannon Corp., 778 F.3d 401, 405 (2d Cir. 2015). Nonetheless, the Court concludes that plaintiffs' proposed damages model weighs modestly, although not dispositively, in favor of granting class certification. Plaintiffs' proposed damages model is not unusual for a securities fraud class action. The Court credits Gompers' point that there may be serious difficulties in determining the impact of non-numeric disclosures. But it is not clear that these difficulties will be fatal, and they do not mean that plaintiffs' proposed model does not match their theory of liability. The Court does not credit Gompers' claim that numeric disclosures have no effect on the prices of Petrobras securities. The Court understands Gompers' point about economic value as a theoretical matter, but, in practical terms, it is difficult for the Court to accept that, in a reasonably efficient market, a company's stock price would not decline upon reports that it faces billions of dollars in losses. Gompers Report ¶ 108, 117. Accordingly, the Court concludes that plaintiffs' model of classwide damages provides a modest indication that common issues of law and fact will predominate over individual issues under Rule 23(b)(3).

Based on the foregoing analysis, the Court concludes that plaintiffs have satisfied the requirements of Rule 23(b)(3). Because plaintiffs have satisfied the requirements of Rule 23, the Court hereby certifies two classes. The Exchange Act Class is defined as follows:

> As to claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, all purchasers who, between January 22, 2010 and July 28, 2015, inclusive (the "Class Period") purchased or otherwise acquired the securities of Petroleo Brasileiro S.A. ("Petrobras"), including debt securities issued by Petrobras International Finance Company S.A. ("PifCo") and/or Petrobras Global Finance B.V. ("PGF") on the New York Stock Exchange (the "NYSE") or pursuant to other domestic transactions, and were damaged thereby. Excluded from the Class are Defendants, current or former officers and directors of Petrobras, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

The Securities Act Class is defined as follows:

> As to claims under Sections 11 and 15 of the Securities Act of 1933, all purchasers who purchased or otherwise acquired debt securities issued by Petroleo Brasileiro S.A. ("Petrobras"), Petrobras International Finance Company S.A. ("PifCo"), and/or Petrobras Global Finance B.V. ("PGF"), in domestic transactions, directly in, pursuant and/or traceable to a May 15, 2013 public offering registered in the United States and/or a March 11, 2014 public offering registered in the United States before Petrobras made generally available to its security holders an earnings statement covering a period of at least twelve months beginning after the effective date of the offerings, and were damaged thereby. As to claims under Sections 12(a)(2) of the Securities Act of 1933, all purchasers who purchased or otherwise acquired debt securities issued by Petroleo Brasileiro S.A.

Case 1:14-cv-09662-JSR Document 574 Filed 02/02/16 Page 49 of 49

("Petrobras"), Petrobras International Finance Company
S.A. ("PifCo"), and/or Petrobras Global Finance B.V.
("PGF"), in domestic transactions, directly in a May 15,
2013 public offering registered in the United States
and/or a March 11, 2014 public offering registered in
the United States before Petrobras made generally
available to its security holders an earnings statement
covering a period of at least twelve months beginning
after the effective date of the offerings, and were
damaged thereby. Excluded from the Class are Defendants,
current or former officers and directors of Petrobras,
members of their immediate families and their legal
representatives, heirs, successors or assigns, and any
entity in which Defendants have or had a controlling
interest.

The Court appoints USS class representative for the Exchange Act

Class and North Carolina and Hawaii class representatives for

the Securities Act Class. The Court appoints Pomerantz LLP as

class counsel for both Classes.

The Clerk of Court is directed to close documents numbered

255 on the docket of this case.


SO ORDERED.

Dated:     New York, NY
           February  1 , 2016                     _____
                                                  JED S. RAKOFF, U.S.D.J.

| United States Code Annotated |
| Federal Rules of Civil Procedure for the United States District Courts (Refs & Annos) |
| Title IV. Parties |

Federal Rules of Civil Procedure Rule 23

Rule 23. Class Actions

Currentness

<Notes of Decisions for 28 USCA Federal Rules of Civil Procedure Rule 23 are displayed in two separate documents. Notes of Decisions for subdivisions I and II are contained in this document. For Notes of Decisions for subdivisions III to end, see second document for 28 USCA Federal Rules of Civil Procedure Rule 23.>

**(a) Prerequisites.** One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

**(1)** the class is so numerous that joinder of all members is impracticable;

**(2)** there are questions of law or fact common to the class;

**(3)** the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

**(4)** the representative parties will fairly and adequately protect the interests of the class.

**(b) Types of Class Actions.** A class action may be maintained if Rule 23(a) is satisfied and if:

**(1)** prosecuting separate actions by or against individual class members would create a risk of:

**(A)** inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or

**(B)** adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;

**(2)** the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or

**(3)** the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

**(A)** the class members' interests in individually controlling the prosecution or defense of separate actions;

**(B)** the extent and nature of any litigation concerning the controversy already begun by or against class members;

**(C)** the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

**(D)** the likely difficulties in managing a class action.

**(c) Certification Order; Notice to Class Members; Judgment; Issues Classes; Subclasses.**

**(1) *Certification Order.***

**(A)** *Time to Issue.* At an early practicable time after a person sues or is sued as a class representative, the court must determine by order whether to certify the action as a class action.

**(B)** *Defining the Class; Appointing Class Counsel.* An order that certifies a class action must define the class and the class claims, issues, or defenses, and must appoint class counsel under Rule 23(g).

**(C)** *Altering or Amending the Order.* An order that grants or denies class certification may be altered or amended before final judgment.

**(2) *Notice.***

**(A)** *For (b)(1) or (b)(2) Classes.* For any class certified under Rule 23(b)(1) or (b)(2), the court may direct appropriate notice to the class.

**(B)** *For (b)(3) Classes.* For any class certified under Rule 23(b)(3), the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. The notice must clearly and concisely state in plain, easily understood language:

**(i)** the nature of the action;

**(ii)** the definition of the class certified;

**(iii)** the class claims, issues, or defenses;

**(iv)** that a class member may enter an appearance through an attorney if the member so desires;

**(v)** that the court will exclude from the class any member who requests exclusion;

**(vi)** the time and manner for requesting exclusion; and

**(vii)** the binding effect of a class judgment on members under Rule 23(c)(3).

**(3)** *Judgment.* Whether or not favorable to the class, the judgment in a class action must:

**(A)** for any class certified under Rule 23(b)(1) or (b)(2), include and describe those whom the court finds to be class members; and

**(B)** for any class certified under Rule 23(b)(3), include and specify or describe those to whom the Rule 23(c)(2) notice was directed, who have not requested exclusion, and whom the court finds to be class members.

**(4)** *Particular Issues.* When appropriate, an action may be brought or maintained as a class action with respect to particular issues.

**(5)** *Subclasses.* When appropriate, a class may be divided into subclasses that are each treated as a class under this rule.

**(d) Conducting the Action.**

**(1)** *In General.* In conducting an action under this rule, the court may issue orders that:

**(A)** determine the course of proceedings or prescribe measures to prevent undue repetition or complication in presenting evidence or argument;

**(B)** require--to protect class members and fairly conduct the action--giving appropriate notice to some or all class members of:

**(i)** any step in the action;

**(ii)** the proposed extent of the judgment; or

Case 16-1914, Document 114, 07/21/2016, 1822461, Page133 of 136

**(iii)** the members' opportunity to signify whether they consider the representation fair and adequate, to intervene and present claims or defenses, or to otherwise come into the action;

**(C)** impose conditions on the representative parties or on intervenors;

**(D)** require that the pleadings be amended to eliminate allegations about representation of absent persons and that the action proceed accordingly; or

**(E)** deal with similar procedural matters.

**(2)** *Combining and Amending Orders.* An order under Rule 23(d)(1) may be altered or amended from time to time and may be combined with an order under Rule 16.

**(e) Settlement, Voluntary Dismissal, or Compromise.** The claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval. The following procedures apply to a proposed settlement, voluntary dismissal, or compromise:

**(1)** The court must direct notice in a reasonable manner to all class members who would be bound by the proposal.

**(2)** If the proposal would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate.

**(3)** The parties seeking approval must file a statement identifying any agreement made in connection with the proposal.

**(4)** If the class action was previously certified under Rule 23(b)(3), the court may refuse to approve a settlement unless it affords a new opportunity to request exclusion to individual class members who had an earlier opportunity to request exclusion but did not do so.

**(5)** Any class member may object to the proposal if it requires court approval under this subdivision (e); the objection may be withdrawn only with the court's approval.

**(f) Appeals.** A court of appeals may permit an appeal from an order granting or denying class-action certification under this rule if a petition for permission to appeal is filed with the circuit clerk within 14 days after the order is entered. An appeal does not stay proceedings in the district court unless the district judge or the court of appeals so orders.

**(g) Class Counsel.**

**(1)** *Appointing Class Counsel.* Unless a statute provides otherwise, a court that certifies a class must appoint class counsel. In appointing class counsel, the court:

**(A)** must consider:

    **(i)** the work counsel has done in identifying or investigating potential claims in the action;

    **(ii)** counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;

    **(iii)** counsel's knowledge of the applicable law; and

    **(iv)** the resources that counsel will commit to representing the class;

**(B)** may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class;

**(C)** may order potential class counsel to provide information on any subject pertinent to the appointment and to propose terms for attorney's fees and nontaxable costs;

**(D)** may include in the appointing order provisions about the award of attorney's fees or nontaxable costs under Rule 23(h); and

**(E)** may make further orders in connection with the appointment.

**(2)** *Standard for Appointing Class Counsel.* When one applicant seeks appointment as class counsel, the court may appoint that applicant only if the applicant is adequate under Rule 23(g)(1) and (4). If more than one adequate applicant seeks appointment, the court must appoint the applicant best able to represent the interests of the class.

**(3)** *Interim Counsel.* The court may designate interim counsel to act on behalf of a putative class before determining whether to certify the action as a class action.

**(4)** *Duty of Class Counsel.* Class counsel must fairly and adequately represent the interests of the class.

**(h) Attorney's Fees and Nontaxable Costs.** In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement. The following procedures apply:

**(1)** A claim for an award must be made by motion under Rule 54(d)(2), subject to the provisions of this subdivision (h), at a time the court sets. Notice of the motion must be served on all parties and, for motions by class counsel, directed to class members in a reasonable manner.

Case 16-1914, Document 114, 07/21/2016, 1822461, Page135 of 136
**SPA-55**

**(2)** A class member, or a party from whom payment is sought, may object to the motion.

**(3)** The court may hold a hearing and must find the facts and state its legal conclusions under Rule 52(a).

**(4)** The court may refer issues related to the amount of the award to a special master or a magistrate judge, as provided in Rule 54(d)(2)(D).

**CREDIT(S)**

(Amended February 28, 1966, effective July 1, 1966; March 2, 1987, effective August 1, 1987; April 24, 1998, effective December 1, 1998; March 27, 2003, effective December 1, 2003; April 30, 2007, effective December 1, 2007; March 26, 2009, effective December 1, 2009.)

Fed. Rules Civ. Proc. Rule 23, 28 U.S.C.A., FRCP Rule 23
Including Amendments Received Through 6-1-16

---

**End of Document**
© 2016 Thomson Reuters. No claim to original U.S. Government Works.

Case 16-1914, Document 114, 07/21/2016, 1822461, Page136 of 136

**SPA-56**

---

> United States Code Annotated
>   Title 28. Judiciary and Judicial Procedure (Refs & Annos)
>     Part V. Procedure
>       Chapter 131. Rules of Courts

28 U.S.C.A. § 2072

§ 2072. Rules of procedure and evidence; power to prescribe

Currentness

**(a)** The Supreme Court shall have the power to prescribe general rules of practice and procedure and rules of evidence for cases in the United States district courts (including proceedings before magistrate judges thereof) and courts of appeals.

**(b)** Such rules shall not abridge, enlarge or modify any substantive right. All laws in conflict with such rules shall be of no further force or effect after such rules have taken effect.

**(c)** Such rules may define when a ruling of a district court is final for the purposes of appeal under section 1291 of this title.

**CREDIT(S)**

  (Added Pub.L. 100-702, Title IV, § 401(a), Nov. 19, 1988, 102 Stat. 4648; amended Pub.L. 101-650, Title III, §§ 315, 321, Dec. 1, 1990, 104 Stat. 5115, 5117.)

28 U.S.C.A. § 2072, 28 USCA § 2072
Current through P.L. 114-181. Also includes P.L. 114-183.

---

**End of Document**           © 2016 Thomson Reuters. No claim to original U.S. Government Works.