# 16-1914-CV

## United States Court of Appeals

### for the

## Second Circuit

UNIVERSITIES SUPERANNUATION SCHEME LIMITED, EMPLOYEES
RETIREMENT SYSTEM OF THE STATE OF HAWAII, NORTH CAROLINA
DEPARTMENT OF STATE TREASURER,

*Plaintiffs-Appellees,*

*(For Continuation of Caption See Inside Cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR PLAINTIFFS-APPELLEES

MARC I. GROSS
JEREMY A. LIEBERMAN
EMMA GILMORE
JOHN A. KEHOE
BRENDA F. SZYDLO
POMERANTZ LLP
*Attorneys for Plaintiffs-Appellees*
600 Third Avenue, 20th Floor
New York, New York 10016
(212) 661-1100

PETER KALTMAN, individually and on behalf of all others similarly situated, DIMENSIONAL EMERGING MARKETS VALUE FUND, DFA INVESTMENT DIMENSIONS GROUP INC., on behalf of its series Emerging Markets Core Equity Portfolio, Emerging Markets Social Core Equity Portfolio and T.A. World ex U.S. Core Equity Portfolio, DFA INVESTMENT TRUST COMPANY, on behalf of its series The Emerging Markets Series, DFA AUSTRIA LIMITED, solely in its capacity as responsible entity for the Dimensional Emerging Markets Trust, DFA International Core Equity Fund and DFA International Vector Equity Fund by Dimensional Fund Advisors Canada ULC solely in its capacity as Trustee, DIMENSIONAL FUNDS PLC, on behalf of its subfund Emerging Markets Value Fund, DIMENSIONAL FUNDS ICVC, on behalf of its sub-fund Emerging Markets Core Equity Fund, SKAGEN AS, DANSKE INVEST MANAGEMENT A/S, DANSKE INVEST MANAGEMENT COMPANY, NEW YORK CITY EMPLOYEES' RETIREMENT SYSTEM, NEW YORK CITY POLICE PENSION FUND, BOARD OF EDUCATION RETIREMENT SYSTEM OF THE CITY OF NEW YORK, TEACHERS' RETIREMENT SYSTEM OF THE CITY OF NEW YORK, NEW YORK CITY FIRE DEPARTMENT PENSION FUND, NEW YORK CITY DEFERRED COMPENSATION PLAN, FORSTA AP-FONDEN, TRANSAMERICA INCOME SHARES, INC., TRANSAMERICA FUNDS, TRANSAMERICA SERIES TRUST, TRANSAMERICA PARTNERS PORTFOLIOS, JOHN HANCOCK VARIABLE INSURANCE TRUST, JOHN HANCOCK FUNDS II, JOHN HANCOCK SOVEREIGN BOND FUND, JOHN HANCOCK BOND TRUST, JOHN HANCOCK STRATEGIC SERIES, JOHN HANCOCK INVESTMENT TRUST, JHF INCOME SECURITIES TRUST, JHF INVESTORS TRUST, JHF HEDGED EQUITY & INCOME FUND, ABERDEEN EMERGING MARKETS FUND, ABERDEEN GLOBAL EQUITY FUND, ABERDEEN GLOBAL NATURAL RESOURCES FUND, ABERDEEN INTERNATIONAL EQUITY FUND, each a series of Aberdeen Funds, ABERDEEN CANADA EMERGING MARKETS FUND, ABERDEEN CANADA SOCIALLY RESPONSIBLE GLOBAL FUND, ABERDEEN CANADA SOCIALLY RESPONSIBLE INTERNATIONAL FUND, ABERDEEN CANADA FUNDS EAFE PLUS EQUITY FUND AND ABERDEEN CANADA FUNDS GLOBAL EQUITY FUND, each a series of Aberdeen Canada Funds, ABERDEEN EAFE PLUS ETHICAL FUND, ABERDEEN EAFE PLUS FUND, ABERDEEN EAFE PLUS SRI FUND, ABERDEEN EMERGING MARKETS EQUITY FUND, ABERDEEN FULLY HEDGED INTERNATIONAL EQUITIES FUND, ABERDEEN INTERNATIONAL EQUITY FUND, ABERDEEN GLOBAL EMERGING MARKETS EQUITY FUND, ABERDEEN GLOBAL ETHICAL WORLD EQUITY FUND, ABERDEEN GLOBAL RESPONSIBLE WORLD EQUITY FUND, ABERDEEN GLOBAL WORLD EQUITY DIVIDEND FUND, ABERDEEN GLOBAL WORLD EQUITY FUND, ABERDEEN GLOBAL WORLD RESOURCES EQUITY FUND, ABERDEEN EMERGING MARKETS EQUITY FUND, ABERDEEN ETHICAL WORLD EQUITY FUND, ABERDEEN MULTI-ASSET FUND, ABERDEEN WORLD EQUITY FUND, ABERDEEN LATIN AMERICA EQUITY FUND, INC., AAAID EQUITY PORTFOLIO, ALBERTA TEACHERS RETIREMENT FUND, AON HEWITT INVESTMENT CONSULTING, INC., AURION INTERNATIONAL

DAILY EQUITY FUND, BELL ALIANT REGIONAL COMMUNICATIONS INC., BMO GLOBAL EQUITY CLASS, CITY OF ALBANY PENSION PLAN, DESJARDINS DIVIDEND INCOME FUND, DESJARDINS EMERGING MARKETS FUND, DESJARDINS GLOBAL ALL CAPITAL EQUITY FUND, DESJARDINS OVERSEAS EQUITY VALUE FUND, DEVON COUNTY COUNCIL GLOBAL EMERGING MARKET FUND, DEVON COUNTY COUNCIL GLOBAL EQUITY FUND, DGIA EMERGING MARKETS EQUITY FUND L.P., ERIE INSURANCE EXCHANGE, FIRST TRUST/ABERDEEN EMERGING OPPORTUNITY FUND, GE UK PENSION COMMON INVESTMENT FUND, HAPSHIRE COUNTY COUNCIL GLOBAL EQUITY PORTFOLIO, LONDON BOROUGH OF HOUNSLOW SUPPERANNUATION FUND, MACKENZIE UNIVERSAL SUSTAINABLE OPPORTUNITIES CLASS, MARSHFIELD CLINIC, MOTHER THERESA CARE AND MISSION TRUST, MOTHER THERESA CARE AND MISSION TRUST, MTR CORPORATION LIMITED RETIREMENT SCHEME, MYRIA ASSET MANAGEMENT EMERGENCE, NATIONAL PENSION SERVICE, NPS TRUST ACTIVE 14, OHIO PUBLIC EMPLOYEES RETIREMENT SYSTEM, WASHINGTON STATE INVESTMENT BOARD, ABERDEEN LATIN AMERICAN INCOME FUND LIMITED, ABERDEEN GLOBAL EX JAPAN PENSION FUND PPIT, FS INTERNATIONAL EQUITY MOTHER FUND, NN INVESTMENT PARTNERS B.V., acting in the capacity of management company of the mutual fund NN Global Equity Fund and in the capacity of management company of the mutual fund NN Institutioneel Dividend Aandelen Fonds, NN INVESTMENT PARTNERS LUXEMBOURG S.A., acting in the capacity of management company SICAV and its Sub-Funds and NN (L) SICAV, for and on behalf of NN (L) Emerging Markets High Dividend, NN (L) FIRST, AURA CAPITAL LTD., WGI EMERGING MARKETS FUND, LLC, BILL AND MELINDA GATES FOUNDATION TRUST, BOARD OF REGENTS OF THE UNIVERSITY OF TEXAS SYSTEM, TRUSTEES OF THE ESTATE OF BERNICE PAUAHI BISHOP, LOUIS KENNEDY, individually and on behalf of all others similarly situated, KEN NGO, individually and on behalf of all others similarly situated, JONATHAN MESSING, individually and on behalf of all others similarly situated, CITY OF PROVIDENCE, individually and on behalf of all others similarly situated, UNION ASSET MANAGEMENT HOLDING AG,

*Plaintiffs,*

– v. –

PETROLEO BRASILEIRO S.A. PETROBRAS, BB SECURITIES LTD., MERRIL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, BANK OF CHINA (HONG KONG) LIMITED, BANCA IMI, S.P.A., SCOTIA CAPITAL (USA) INC., THEODORE MARSHALL HELMS, PETROBRAS GLOBAL FINANCE B.V., PETROBRAS AMERICA INC., CITIGROUP GLOBAL MARKETS INC., ITAU BBA USA SECURITIES, INC., J.P.MORGAN SECURITIES LLC, MORGAN STANLEY & CO. LLC, MITSUBISHI UFJ SECURITIES (USA), INC., HSBC SECURITIES (USA) INC., STANDARD CHARTERED BANK, BANCO BRADESCO BBI S.A.,

*Defendants-Appellants,*

JOSE SERGIO GABRIELLI, SILVIO SINEDINO PINHEIRO, PAULO ROBERTO COSTA, JOSE CARLOS COSENZA, RENATO DE SOUZA DUQUE, GUILLHERME DE OLIVEIRA ESTRELLA, JOSE MIRANDA

FORMIGL FILHO, MARIA DAS GRACAS SILVA FOSTER, ALMIR
GUILHERME BARBASSA, MARIANGELA MOINTEIRO TIZATTO, JOSUE
CHRISTIANO GOME DA SILVA, DANIEL LIMA DE OLIVEIRA, JOSE
RAIMUNDO BRANDA PEREIRA, SERVIO TULIO DA ROSA TINOCO,
PAULO JOSE ALVES, GUSTAVO TARDIN BARBOSA, ALEXANDRE
QUINTAO FERNANDES, MARCOS ANTONIO ZACARIAS, CORNELIS
FRANCISCUS JOZE LOOMAN, JP MORGAN SECURITIES LLC,
PRICEWATERHOUSECOOPERS AUDITORES INDEPENDENTES,

*Defendants.*

_____

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Plaintiffs/Appellees in this action, Universities Superannuation Scheme, Ltd., North Carolina Department of State Treasurer, and Employees' Retirement System of the State of Hawaii state that they do not have a corporate parent, and there is no publicly held corporation that owns 10 percent or more of either company's stock.

# TABLE OF CONTENTS

STATEMENT OF THE CASE .............................................................................1

I.      Allegations of Plaintiffs' Complaint ......................................................2

II.     The District Court's Grant of Class Certification ...............................5

    A.  After Previously Applying *Morrison*'s "Domestic Transaction"
        Prong With Ease, the Court Properly Held That Rendering Such
        Determinations on a Class-wide Basis Was "Administratively
        Feasible" ...............................................................................................5

    B.  The Court Dutifully Followed *Halliburton II* .....................................7

III.    SUMMARY OF THE ARGUMENT................................................13

IV.     ARGUMENT ........................................................................................16

    A.  The District Court Correctly Certified the Class ...............................16

        1.  The District Court Correctly Found That the Class Was
            Defined by Objective Criteria That Were Administratively
            Feasible ......................................................................................16

        2.  *Absolute Activist*'s First Prong Is Also Satisfied Because
            Beneficial Ownership Is Transferred Through the DTC ..........22

        3.  Defendants' Remaining Arguments Are Equally Meritless .....27

        4.  Defendants' Arguments Contravene *Morrison* and *Absolute
            Activist* ......................................................................................35

    B.  Plaintiffs Amply Satisfied Their Burden Under *Basic*......................37

        1.  The Supreme Court Has Rejected a Heightened Requirement
            of So-Called "Fundamental" Efficiency ...................................37

        2.  The District Court Scrupulously Adhered to *Halliburton II* ....41

    C.  Defendants Failed to Show the Absence of Price Impact...................54

V.      CONCLUSION ...................................................................................59

# TABLE OF AUTHORITIES

Cases

*Abell v. Potomac Ins. Co.*,
   858 F.2d 1104 (5th Cir. 1988) ............................................................57

*Absolute Activist Master Value Fund, Ltd. v. Ficeto*,
   No. 09-cv-8862, 2013 WL 1286170 (S.D.N.Y. Mar. 28, 2013) ........................25

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
   677 F.3d 60 (2d Cir. 2012) ...................................................... passim

*Acticon AG v. China North East Petroleum Holdings Ltd.*,
   692 F.3d 34 (2d Cir. 2012) ............................................................30

*Affiliated Ute Citizens of Utah v. U.S.*,
   406 U.S. 128 (1972)...................................................................57

*Amgen Inc., v Connecticut Retirement Plans and Trust Funds*,
   133 S. Ct. 1184 (2013).......................................................... 42, 55, 57

*Barnes v. Osofsky*,
   373 F.2d 2693 (2d Cir. 1967) ........................................................34

*Basic Inc. v. Levinson*,
   108 S. Ct. 978 (1988)........................................................... passim

*Bennett v. Sprint Nextel Corp.*,
   298 F.R.D. 498 (D. Kan. 2014) ......................................................15

*Brecher v. Republic of Argentina*,
   806 F.3d 22 (2d Cir. 2015) ..................................................... 5, 14, 15

*Byrd v. Aaron's Inc.*,
   784 F.3d 154 (3d Cir. 2015) .................................................. 22, 30, 32

*Cammer v. Bloom*,
   711 F. Supp. 1264 (D.N.J. 1989).................................................. 8, 42

*Camps Newfound/Owatonna v. Town of Harrison*,
   520 U.S. 564 (1997)..................................................................56

*Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*,
   310 F.R.D. 69 (S.D.N.Y. 2015)................................................. passim

*Carrera v. Bayer Corp.*,
   727 F.3d 300 (3d Cir. 2013) .........................................................30

*DeMaria v. Andersen*,
   318 F.3d 1706 (2d Cir. 2003) .......................................................34

*DuPont v. Brady*,
  828 F.2d 75 (2d Cir. 1987) ...............................................................57

*Ebin v. Kangadis Food Inc.*,
  297 F.R.D. 561 (S.D.N.Y. 2014) ......................................................21

*Ellington Long Term Fund, Ltd. v. Goldman Sachs & Co.*,
  No. 09-cv-9802, 2010 WL 1838730 (S.D.N.Y. May 4, 2010)............23

*Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*,
  651 F.3d 329 (2d Cir. 2011) ..............................................................25

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  309 F.R.D. 251 (N.D. Tex. 2015) ......................................................56

*Estate of Kenneth L. Lay v. Comm'r of Internal Revenue*,
  No. 15732-09, T.C. Memo 2011- 208 (Aug. 29, 2011).......................25

*Forsta AP-Fonden and Danske Invest Mgmt A/S v. St Jude Med., Inc.*,
  312 F.R.D. 511 (D. Minn. 2015) .......................................................45

*Gariety v. Grant Thornton, LLP*,
  368 F.3d 356 (4th Cir. 2004) .............................................................43

*Gordon v. Sonar Cap. Mgmt. LLC*,
  92 F. Supp. 3d 193 (S.D.N.Y. 2015) .................................................30

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  134 S. Ct. 2398 (2014)............................................................... passim

*Hevesi v. Citigroup, Inc.*,
  366 F.3d 70 (2d Cir. 2004) ...............................................................35

*In re Alstom S.A. Sec. Litig.*,
  253 F.R.D. 266 (S.D.N.Y. 2008)......................................................45

*In re Amaranth Nat. Gas Commodities Litig.*,
  269 F.R.D. 366 (S.D.N.Y. 2010)......................................................29

*In re Blech Sec. Litig.*,
  187 F.R.D. 97 (S.D.N.Y. 1999).........................................................28

*In re Citigroup Inc. Bond Litig.*,
  296 F.R.D. 147 (S.D.N.Y. 2013).......................................................15

*In re DVI, Inc. Sec. Litig.*,
  639 F.3d 623 (3d Cir. 2011) ................................................. 42, 43, 57

*In re Dynex Cap., Inc. Sec. Litig.*,
  No. 05-cv-1897, 2011 WL 781215 (S.D.N.Y. Mar. 7, 2011) ............15

*In re Facebook, Inc., IPO Sec. and Derivative Litig.*,
312 F.R.D. 332 (S.D.N.Y. 2015) ............................................................ 18, 22, 29

*In re Goldman Sachs Group, Inc. Sec. Litig.*,
No. 10-cv-3461, 2015 WL 5613150 (S.D.N.Y. Sept. 24, 2015) .................. 12, 44

*In re Groupon, Inc. Sec. Litig.*,
No. 12-cv-2450, 2015 WL 1043321 (N.D. Ill. Mar. 5, 2015) .............................12

*In re Lehman Bros Sec. and ERISA Litig.*,
No. 08-cv-5523, 2013 WL 440622 (S.D.N.Y. Jan. 23, 2013) .............................15

*In re Merck & Co., Inc. Sec. Derivative & ERISA Litig.*,
No. Civ.A. 05-1151, 2013 WL 396117 (D.N.J. Jan. 30, 2013) ...........................43

*In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liability Litig.*,
209 F.R.D. 323, 337 (S.D.N.Y. 2002) ...............................................................27

*In re NII Holdings, Inc. Sec. Litig.*,
311 F.R.D. 401 (E.D. Va. 2015) ............................................................ 12, 15, 45

*In re PolyMedica Corp. Sec. Litig.*,
432 F.3d 1 (1st Cir. 2005).......................................................................... 42, 43

*In re Polymedica Corp. Sec. Litig.*,
453 F. Supp. 2d 260 (D. Mass. 2006) ........................................................ 45, 46

*In re Rodriguez*,
695 F.3d 360 (5th Cir. 2012) ..............................................................................32

*In re Salomon Analyst Metromedia Litig.*,
544 F.3d 474 (2d Cir. 2008) ..............................................................................57

*In re Sanofi-Aventis Sec. Litig.*,
293 F.R.D. 449 (S.D.N.Y. 2013) ........................................................................25

*In re Satyam Computer Servs. Ltd. Sec. Litig.*,
915 F. Supp. 2d 450 (S.D.N.Y. 2013) ................................................................17

*In re Smart Techs., Inc. Shareholder Litig.*,
295 F.R.D. 50 (S.D.N.Y. 2013) ................................................................... 29, 33

*In re VisaCheck/MasterMoney Antitrust Litigation*,
280 F.3d 124 (2d Cir. 2001) ..............................................................................13

*In re Vivendi Universal, S.A. Sec. Litig.*,
284 F.R.D. 144 (S.D.N.Y. 2012) ................................................................. 22, 30

*In re Washington Mut. Inc. Sec., Derivative, & ERISA Litig.*,
No. 08-cv-1919, 2010 WL 4272567 (W.D. Wash. Oct. 12, 2010). .....................15

*In re Xcelera.com Sec. Litig.*,
   430 F.3d 503 (1st Cir. 2005)...............................................................42

*Initial Public Offering Sec. Litig.*,
   471 F.3d 24 (2006).........................................................................34

*Kohen v. Pac. Inv. Mgmt. Co.*,
   571 F.3d 672 (7th Cir. 2009) ............................................................32

*Krogman v. Sterritt*,
   202 F.R.D. 467 (N.D. Tex. 2001) ................................................. 8, 42

*Lehocky v. Tidel Techs., Inc.*,
   220 F.R.D. 491 (S.D. Tex. 2004)................................................ 45, 46

*Local 703, I.B. of T. Grocery & Food Employees Welfare Fund v. Regions
  Fin. Corp.*,
   762 F.3d 1248 (11th Cir 2014) ............................................. 41, 42, 43

*Loginovskaya v. Batratchenko*,
   764 F.3d 266 (2d Cir. 2014) ............................................................17

*Lumen v. Anderson*,
   280 F.R.D. 451 (W.D. Mo. 2012)............................................... 12, 45

*McIntire v. China MediaExpress Holdings, Inc.*,
   38 F. Supp. 3d 415 (S.D.N.Y. 2014) ..................................................45

*McLaughlin v. American Tobacco Co.*,
   522 F.3d 215 (2d Cir. 2008) ............................................................31

*Menkes v. Stolt-Nielsen S.A.*,
   270 F.R.D. 80 (D. Conn. 2010) ........................................................22

*Miller v. Thane Int'l, Inc.*,
   615 F.3d 1095 (9th Cir. 2010) .........................................................43

*Morrison v. National Australia Bank Ltd.*,
   130 S. Ct. 2869 (2010)..................................................................5, 7

*Mullins v. Direct Digital, LLC*,
   795 F.3d 654 (7th Cir. 2015) ..................................................... 30, 32

*Noble v. 93 Univ. Place Corp.*,
   224 F.R.D. 330 (S.D.N.Y. 2004)......................................................27

*Pet Quarters, Inc. v. Depository Trust & Clearing Corp.*,
   559 F.3d 772 (8th Cir. 2009) ..................................................... 23, 24

*Plumbers & Pipefitters Nat. Pension Fund v. Burns*,
   967 F. Supp. 2d 1143 (N.D. Ohio 2013) ............................................15

*Quail Cruises Ship Mgmt. Ltd. v. Agencia de Viagens*,
    645 F.3d 1307 (11th Cir. 2011) .......................................................17

*Rikos v. Procter & Gamble Co.*,
    799 F.3d 497 (6th Cir. 2015) ..........................................................32

*S.E.C. v. Ficeto*, 839 F. Supp. 2d 1101,  1116 (C.D. Cal. 2011) ............................21

*S.E.C. v. Levine*,
    462 F. App'x 717 (9th Cir. 2011) .....................................................17

*Schleicher v. Wendt*,
    618 F.3d 679 (7th Cir. 2010) ..........................................................29

*Seijas v. Republic of Argentina*,
    606 F.3d 53 (2d Cir. 2010) ...................................................... 14, 37

*Siskind v. Sperry Ret. Program, Unisys*,
    47 F.3d 498 (2d Cir. 1995) .............................................................28

*Smilovits v. First Solar, Inc.*,
    295 F.R.D. 423 (D. Ariz. 2013) ................................................. 12, 45

*Stoneridge Investment Partners, LLC v. Scientific Atlanta, Inc.*,
    552 U.S. 148 (2008) .....................................................................58

*Strougo v. Barclays PLC*,
    312 F.R.D. 307 (S.D.N.Y. Feb 2, 2016) ............................................58

*Teamsters Local 445 Fright DivPension Fund v. Bombardier*,
    546 F.3d 196 (2d Cir. 2008) ..........................................................42

*Tyson Foods, Inc. v. Bouaphakeo*,
    136 S. Ct. 1036 (2016) .......................................................... 28, 32

*U.S. Dep't of Justice v. Landano*,
    508 U.S. 165 (1993) .....................................................................55

*U.S. v. Balanovski*,
    236 F.2d 298 (2d Cir. 1956) ..........................................................26

*U.S. v. Georgiou*,
    777 F.3d 125 (3d Cir. 2015) ..........................................................17

*U.S. v. Mandell*,
    752 F.3d 544 (2d Cir. 2014) ..........................................................17

*Unger v. Amedisys Inc.*,
    401 F.3d 316 (5th Cir. 2005) .................................................... 42, 43

*Union Asset Mgmt. Holding A.G. v. Dell, Inc.*,
    669 F.3d 632 (5th Cir. 2012) .................................................... 22, 28

*United States v. N.Y. State Bd. of Elections*,
    312 F. App'x 353 (2d Cir. 2008) ........................................................35
*United States v. Vilar*,
    729 F.3d 62 (2d Cir. 2013) ...............................................................17
*Winstar Comm. Sec. Litig.*,
    290 F.R.D. 437 (S.D.N.Y. 2013) .....................................................15
*Young v. Nationwide Mut. Ins. Co.*,
    693 F.3d 532 (6th Cir. 2012) ............................................................32

Statutes

N.Y.U.C.C. §§ 8–501 to 8–511 .............................................................24
Uniform Commercial Code §§ 8-101, 8-50.................................... 22, 24

Rules

Fed. R. Civ. P. 23 ............................................................................. passim
Federal Rule of Evidence 301 ......................................................... 54, 55

Other Authorities

C. Mueller & L. Kirkpatrick, 1 Federal Evidence §3:8 (4th ed). ...........55
H.R. Rep. No. 1383...............................................................................38
Manual for Complex Litigation (Fourth) § 21.222 (2004) .....................27
McLaughlin on Class Actions § 4:2.......................................................29
*Morrison, the Restricted Scope of Securities Act Section 11 Liability, and*
    *Prospects for Regulatory Reform*,
    41 J. Corp. l. 1, 3 (2015) .................................................................33
The 'Less Than' Efficient Capital Markets Hypothesis: Requiring More
    Proof from Plaintiffs in Fraud-on-the-Market Cases,
    78 St. John's L. Rev. 81 (2004) .......................................................44
*Erica P. John Fund, Inc., v. Halliburton Co.*,
No. 09-1403, 2011 WL 1541295 (U.S.) (2011) Transcript of Oral Argument. .....58

## STATEMENT OF THE CASE

In this securities fraud suit, Appellee shareholders Universities Superannuation Scheme Ltd. ("USS"), North Carolina Department of State Treasurer ("North Carolina"), and Employees' Retirement System of the State of Hawaii ("Hawaii") (Plaintiffs) allege that Appellants (Defendants) made material misrepresentations and omissions about the value of Petrobras' assets, the amounts of the Company's periodic expenses and net income, its internal controls over financial reporting, and the integrity and transparency of its management and operations.

The District Court certified two classes: (1) a class under the Exchange Act of 1934 of all purchasers who, between January 22, 2010 and July 28, 2015, inclusive, purchased the securities of Petroleo Brasileiro S.A. ("Petrobras") or ("the Company"), including debt securities issued by Petrobras International Finance Company S.A. ("PifCo") and/or Petrobras Global Finance B.V. ("PGF") on the New York Stock Exchange or pursuant to other domestic transactions, and were damaged thereby; and (2) a class under the Securities Act of 1933 of all purchasers who purchased or otherwise acquired debt securities issued by Petrobras, PifCo, and/or PGF directly in, pursuant, and/or traceable to a May 15, 2013 public offering and/or a March 11, 2014 public offering, both registered in the United States.

1

In this interlocutory appeal of the class certification order under Fed. R. Civ. P. 23(f) (Rule 23), Defendants allege that the District Court's rulings with respect to whether the class of debt securities (Notes) purchased over-the-counter on the secondary market was ascertainable and whether Petrobras' securities traded in an efficient market were erroneous.

## I. Allegations of Plaintiffs' Complaint

During the Class Period, Petrobras and its construction contractors colluded to inflate bids, with senior Petrobras executives taking bribes and politicians sharing in the proceeds, while Petrobras mislead investors regarding the scheme. A-4598-99, ¶5, A-4601-02, ¶11. Petrobras executives granted contracts to Brazilian construction companies who were members of a cartel that systemically inflated their costs by as much as 20%. A-4598-99, ¶5. After winning the contracts, the construction companies kicked back up to 3% of a contract's total value in the form of bribes to Petrobras executives, Brazilian politicians who appointed the Petrobras executives, and money launderers. A-4598-99, ¶¶3, 5. Petrobras camouflaged these massive overpayments, including the bribes, throughout the Class Period by fraudulently capitalizing them as "assets" on the Company's books, rather than treating them as expenses, thus reporting artificially inflated assets and net income. A-4650-54, ¶¶158-167. The scheme is estimated by authorities to have ***diverted up to or even more than $28 billion from***

*Petrobras' coffers*. A-4598, ¶5. Along with former Petrobras officials (including several members of the Board of Executive Officers), top executives from some of Brazil's largest construction and engineering firms have been jailed. A-4599-600, ¶¶7-9. The Company was not a "victim" of the scheme, but was actively complicit and covered it up. A-4617-20, ¶¶71-81; A-4640-48, ¶¶131-151. While the scheme was ongoing, Petrobras denied every single allegation of corruption—from bribery, to bid rigging, to overpayments—thereby misleading the public as to the corrupt core of Petrobras' operations. A-4680-720, ¶¶222-370; A-4787-93, ¶¶605-622.

At its height in 2009, Petrobras was the world's fifth largest company, with a market capitalization of $310 billion. At the time Plaintiffs filed their complaint, after revelations of the rampant money-laundering and kickback scheme, Petrobras was worth just $39 billion. A-4597, ¶2. Petrobras' stock cratered through a series of corrective disclosures. For example, on news that Petrobras would delay publishing its financial statements and subsequent rating agency downgrades due to "concerns about corruption investigations" and "uncertainty about the timely delivery of audited financial statements [that] could lead to significant liquidity pressures," the price of Petrobras securities went into a tailspin, eviscerating billions in market capitalization. A-4597, ¶2, A-4735-4748, ¶¶417-423, 437, 452.

Petrobras' misconduct took place in, and impacted securities transactions that took place in the United States. One of the major fraud-related transactions

involved the Company's vast overpayment for a refinery based in Pasadena, Texas. Moreover, during the Class Period, Petrobras raised more than *$98 billion, including more than $30 billion in Notes,* in securities registered on the New York Stock Exchange or via other transactions executed in the United States.[1] In connection with the bond offerings, Petrobras selected underwriters that were located in the United States; stated that the Underwriters would deliver the notes "against payment in New York;" selected New York law to govern the indenture, the notes, and the bond guarantees; selected the Southern District of New York as a forum for disputes; and disclaimed compliance with the laws of any jurisdiction other than the United States. A-6463.

This class action is the only means by which most of Petrobras' defrauded investors can be recompensed. Petrobras' systemic corruption impacted the U.S., and triggered U.S. securities law concerns, as evidenced by ongoing investigations by the Department of Justice and the Securities and Exchange Commission. A-4603, ¶16. The decision certifying the class should be upheld.

---

[1] A-4604-05, ¶¶22, A-4627-30, ¶¶97-106.

II.     **The District Court's Grant of Class Certification**

A.     **After Previously Applying *Morrison*'s "Domestic Transaction" Prong With Ease, the Court Properly Held That Rendering Such Determinations on a Class-wide Basis Was "Administratively Feasible"**

At the district court level, Defendants argued that the proposed class was not ascertainable, *i.e.*, it was not "sufficiently definite so that it [was] administratively feasible for the court to determine whether a particular individual is a member," the touchstone of ascertainability.  A-5789-90 (citing *Brecher* v. *Republic of Argentina*, 806 F.3d 22, 24 (2d Cir. 2015)).  Defendants asserted that all putative class members must be able to show that they purchased Petrobras securities on an American exchange or in a domestic transaction, the two prongs established by *Morrison v. National Australia Bank Ltd.*, 130 S. Ct. 2869, 2884 (2010).  Interpreting *Morrison*, this Court held that "to sufficiently allege the existence of a 'domestic transaction in other securities,' [*i.e.*, securities not traded on a U.S. exchange] plaintiffs must allege facts indicating that irrevocable liability was incurred or that title was transferred within the United States."  *Absolute Activist Value Master Fund Ltd. v. Ficeto,* 677 F.3d 60, 62 (2d Cir. 2012).  Defendants argued that, because of supposed nuances in the "domestic transaction" standard, determining who is a class member will be an administratively unfeasible task for the District Court.  A-3779-80; A-5790.

5

Remarkably, this newly-minted argument was a complete reversal of Defendants' earlier position, taken in connection with attacks levied on the Fourth Amended Complaint ("Complaint" or "FAC") that *"[e]ach of [Absolute Activist's tests] establishes*, as the site of the transaction that is of congressional concern, *a single location that*—although subject to proof—*can be easily determined based on recognized and readily understood standards*." A-4887 (emphasis added); A-6003-04. Defendants stressed this point when arguing that settlement through the Depository Trust Corporation ("DTC") was insufficient to satisfy a domestic transaction under *Absolute Activist*'s first prong (location of title transfer), but acknowledged that determining where the transaction occurred or the "meetings of the mind" took place under the Court's second prong was readily determinable. Having "baited" the District Court to accept this argument at the motion to dismiss stage, Defendants pulled a "switch" at class certification by arguing that pinpointing the locus of the "meetings of the mind" requires mini-trials. This gamesmanship was not lost on the District Court: "Indeed, defendants themselves have elsewhere represented [that the *Morrison* determination is 'administratively feasible'] to the Court." A-6003; A-4887-89.

The District Court refused to exclude from the class aftermarket Note purchasers because "[a]mending the Class definitions in this way would cut off purchasers who have valid claims under *Morrison*'s second prong, which holds

6

that the securities laws apply to securities purchased in 'domestic transactions.'" A-6003. "This would not be a faithful application of *Morrison*." *Id*.

Significantly, the District Court found that there was nothing infeasible about the application of the "domestic transactions" test, as it had already evaluated whether the four proposed class representatives adequately pleaded that they purchased Petrobras securities in domestic transactions, finding that two plaintiffs met the standard, and two did not. A-6002-04; *see also* A-5177-80. Accordingly, the court was "***confident*** that the *Morrison* determination is 'administratively feasible.'" A-6003 (emphasis added). The court observed that "[t]he criteria identified by *Absolute Activist* . . . as relevant to the determination of whether a transaction was domestic, are highly likely to be documented in a form susceptible to the bureaucratic processes of determining who belongs to a Class." A-6003-04. For example, "documentation of 'the placement of purchase orders' is the sort of discrete, objective record routinely produced by the modern financial system that a court, a putative class member, or a claims administrator can use to determine whether a claim satisfies *Morrison*." A-6004.

## B.   The Court Dutifully Followed *Halliburton II*

Defendants also claimed that Plaintiffs failed to satisfy their evidentiary burden to invoke the presumption of reliance under *Basic Inc. v. Levinson*, 108 S. Ct. 978 (1988), allegedly because they failed to show empirical evidence

demonstrating a cause and effect relationship between news and stock movements.

In determining whether a market is efficient, courts generally apply a set of eight factors, known as the "*Cammer*" and "*Krogman*" factors. *See Cammer v. Bloom*, 711 F. Supp. 1264, 1286 (D.N.J. 1989) (setting out five factors); *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001) (identifying three additional factors). After receiving and reviewing four rounds of briefing and three expert depositions, as well as conducting an extensive evidentiary hearing, the District Court found that Petrobras' securities traded in an efficient market. In a discussion spanning twenty pages, the court meticulously addressed each and every factor courts generally consider as indicia of market efficiency and found that *each* of the *Cammer* and *Krogman* factors supported a finding of market efficiency. A-6005-26. Particularly relevant here, the District Court applied *Cammer* factor five and found direct, empirical evidence of market efficiency. A-6014-26. To examine that factor, Plaintiffs' expert, Dr. Steven Feinstein, ran empirical "event studies" on Petrobras' securities and used a regression analysis to eliminate any price movements that were caused by external forces, such as moves in the wider market.[2] A-6014-15. Dr. Feinstein then applied a well-established and commonly-

---

[2] *Cammer* factor five is often proven with an event study. *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 80 (S.D.N.Y. 2015). An event study is "a statistical regression analysis that examines the effect of an event

used empirical "Z-test" to compare the proportion of event dates with statistically significant price movements to the proportion of non-event dates with statistically significant price movements, concluding that there was a statistically significant difference across Petrobras' securities. *Id*; A-6019.

Dr. Feinstein conducted four sets of proportionality tests to determine if the difference in the proportion of statistically significant reactions on event days versus non-event days was statistically significant. A-1989-90, ¶146. The District Court considered that analysis and found empirical evidence of market efficiency: "the Court ultimately concludes that plaintiffs have satisfied the fifth *Cammer* factor . . . a statistically significant showing that statistically significant price returns are more likely to occur on event dates is sufficient as ***direct evidence*** of market efficiency and thereby to invoke *Basic*'s presumption of reliance at the class certification stage." A-6014-15, 25 (emphasis added). Dr. Feinstein "ran four event studies on the Petrobras equities and two on the debt securities." A-6014. "Feinstein identified three categories of event dates: (1) dates when Petrobras filed 6-K Forms containing the term "corrupt*" excluding dates when the term was used only in boilerplate language; (2) dates when Petrobras filed any 6-K Form; and (3) dates when Petrobras released earnings statements." *Id*. Dr. Feinstein selected

---

... on a dependent variable, such as a company's stock price." *Id.* (citations omitted).

such events *ex ante*, anticipating those dates to contain a higher proportion of new, value-relevant information. A-1976-93, ¶¶102-64. "He then looked at the price movements of Petrobras securities for a given set (or combined multiple sets) of event dates, using a regression analysis to strip out any price movement that was caused by external forces, such as moves in the wider market." A-6014. "Next, he compared the proportion of event dates with statistically significant price movements to the proportion of non-event dates with statistically significant price movements, concluding that there was a statistically significant difference in proportions for common ADS and preferred ADS and across the Petrobras Notes." A-6014-15. "In other words, there were more likely to be big price movements on days when important Petrobras events occurred, demonstrating the markets in Petrobras securities were responsive to new information." A-6015. Dr. Feinstein obtained "Z-scores" well above the threshold level for statistical significance. A-6014-26; A-4069-70, ¶¶8-9; A-4078-80, ¶¶25-31; A-4084-85, ¶¶43-47; A-4087-89, ¶¶52-58, A-2018-26, ¶¶265-94; A-2002-06, ¶¶ 199-221; A-1989-93, ¶¶145-65.

The District Court also thoroughly analyzed Defendants' expert, Dr. Paul Gompers' challenges to Dr. Feinstein's tests, but did not deem them sufficient to invalidate Dr. Feinstein's conclusions. A-6014-26. While not required under *Halliburton Co. v. Erica P. John Fund, Inc.,* 134 S. Ct. 2410 (2014) *("Halliburton II")*, in addition to the Z-test, in response to criticism by Dr. Gompers, Dr.

10

Feinstein performed a supplementary analysis examining the directionality of movements in Petrobras' securities. A-4087-89, ¶¶52-58. Of the 23 earnings announcement dates, the common ADRs rose significantly 2 times, fell significantly 3 times, and exhibited non-significant price movements 18 times. A-4087, ¶53. Each of these price reactions was consistent with the news that emerged on those respective dates. *Id.* Similarly, the security price movements for the preferred ADRs were consistent with the news on each of the event dates. A-4089, ¶58. The court assigned "limited weight" to this analysis, observing that "evidence of directionality or the degree of fit between expected and observed moves in a market need not be substantial to allow a finding of market efficiency." A-6022. The court reasoned that "[s]uch evidence goes to the accuracy of the price of a security, and the Supreme Court has explained that it is not the accuracy of a price as a reflection of underlying value but instead the sensitivity of the price to false statements that underlies the *Basic* presumption. A-6022-23.[3]

Relatedly, the District Court also rejected Dr. Gompers' "absolutist" view of market efficiency, which holds that "'in an efficient market, the price of a security should <u>always</u> move in response to the release of new value-relevant information

---

[3] The court noted that "[w]hether the market, upon receiving new information, moved in the precise way analysts or experts would expect it to move is not the key to unlocking *Basic*'s presumption of reliance[,]" but "[w]hat is essential is evidence that, when the market received new information, it 'generally affect[ed]' the price." A-6023. Here, the Z-test provided precisely such evidence. *Id.*

11

that is materially different from expectations.'" A-6024-25. The court was not alone in its logic. Even before *Halliburton II* (and continuing thereafter), Dr. Gompers has been repeatedly rebuked as "often describ[ing] a different conception of an efficient market than is used by the law." *Lumen v. Anderson*, 280 F.R.D. 451, 460 (W.D. Mo. 2012); *see similarly Smilovits v. First Solar, Inc.,* 295 F.R.D. 423, 437 (D. Ariz. 2013); *Carpenters Pension Trust Fund of St. Louis v. Barclays*, 310 F.R.D. 69, 91-92, 94-95 (S.D.N.Y 2015); *In re Goldman Sachs Group, Inc. Sec. Litig.*, No. 10-cv-3461, 2015 WL 5613150, at *6-*7 (S.D.N.Y. Sept. 24, 2015); *In re Groupon, Inc. Sec. Litig.*, No. 12-cv-2450, 2015 WL 1043321, at *11 (N.D. Ill. Mar. 5, 2015); *In re NII Holdings, Inc. Sec. Litig.*, 311 F.R.D. 401, 412 (E.D. Va. 2015).

The court credited Dr. Feinstein's explanation that not every event will move a market and that the impact of an event depends on a multitude of factors, including the nature of the event, whether the information involved is truly new, whether a confounding event occurs simultaneously, the magnitude of background volatility, and how the event unfolded. A-6024-25. The court explained that, contrary to Defendants' view, the Supreme Court in *Halliburton II* made clear that "market efficiency is a matter of degree" and that "*Basic*'s presumption of reliance . . . does not rest on a 'binary' view of market efficiency." A-6025 (citations and quotations omitted).

### III.   SUMMARY OF THE ARGUMENT

"[F]ailure to certify an action under Rule 23(b)(3) on the sole ground that it would be unmanageable is disfavored and 'should be the exception rather than the rule.'" A-6002 (citing *In re VisaCheck/MasterMoney Antitrust Litig.*, 280 F.3d 124, 140 (2d Cir. 2001) (Sotomayor, J.)). Nowhere is this instruction more applicable than here where, pursuant to objective criteria espoused by this Court, the District Court determined upon a review of trade tickets and similar documents whether the lead and named plaintiffs acquired Petrobras Notes in domestic transactions.  Examining factors such as the date the transaction was consummated, the location of named plaintiffs' traders, the area codes from which purchase confirmations were made, and the identity and location of underwriters/sellers, the District Court readily determined that named plaintiffs North Carolina and Hawaii adequately pleaded that irrevocable liability for their bond purchases incurred in the United States.  A-5177-78.

The fundamental flaw with Defendants' argument is their conflation of Rule 23's requirement that class members be "ascertainable" with insistence that all class member be "ascertained" at the time of certification.  Rule 23 only requires that class members be sufficiently *identifiable* so that upon receipt of notice, they can reasonably determine whether or not they will be bound by the judgment.  Rule

23 does not require that each member of the class be *identified* before notice be given.

Defendants' contention that the District Court's order on ascertainability is inconsistent with *Brecher* is meritless. The history of *Brecher* (which includes similar cases filed against the Republic of Argentina) makes clear that a properly defined class containing a temporal limitation, as here, is perfectly ascertainable even when it includes purchases of global note offerings made in the secondary market. *Seijas v. Republic of Argentina*, 606 F.3d 53, 58 (2d Cir. 2010) (*Seijas I*). Indeed, *Seijas I* directly supports class certification here, as this Court allowed for certification of unidentified secondary market purchases on non-U.S. exchanges, as long as there was a temporal limitation on the class period—as is the Class certified by the District Court. Defendants stressed in their brief that "the Argentine global notes are in all relevant respects identical to the Petrobras Notes here." Brief of Petrobras Defendants-Appellants, Dkt. 114, 40 n.14 (July 21, 2016) ("Defs' Br."). Class certification is equally appropriate here. Significantly, in *Seijas I*, this Court held that "manageability is an issue peculiarly within a district court's discretion . . . and the district court determined that all eight classes satisfied this requirement." 606 F.3d at 58.[4]

---

[4] In *Brecher*, the Second Circuit reversed a district court's decision certifying a class because, while the originally defined class "did not suffer from a lack of ascertainability," the district court modified and expanded the class definition *after*

Essentially, Defendants are advocating a bright-line rule that a class of purchasers on a secondary market of securities that are not traded on a U.S. exchange can **never** be certified. But *Morrison* forecloses this draconian outcome, which would apply equally to the majority of the corporate and municipal bond markets. *Morrison* holds that Section 10(b) applies not only to "transactions in securities listed on domestic exchanges" but also to "domestic transactions in other securities." Defendants seek to sever one of *Morrison*'s legs. Defendants' attack also ignores the many post-*Morrison* decisions in this Circuit certifying similar bond classes.[5]

---

*a judgment on liability* by removing a "continuous holder" requirement, thus expanding the class to all holders of beneficial interest *without any limitation whatsoever as to time held*. *Brecher*, 806 F.3d at 24-27. This expansion, not present here, permitted the class to remain fluid even after entry of judgment. *Id*.

[5] *See*, *e.g.*, *In re Winstar Comm. Sec. Litig.*, 290 F.R.D. 437, 452 (S.D.N.Y. 2013) (certifying bond class for Section 10(b) claims); *In re Lehman Bros Sec. and ERISA Litig.*, No. 08-cv-5523, 2013 WL 440622, at *2-*5 (S.D.N.Y. Jan. 23, 2013) (certifying bond class for Section 11 and 12 claims); *In re Dynex Cap., Inc. Sec. Litig.*, No. 05-cv-1897, 2011 WL 781215, at *1 (S.D.N.Y. Mar. 7, 2011) (same). Courts in this district also routinely certify similar classes in the settlement context. *See In re MF Global Holdings Ltd. Inv. Litig.*, No. 11-cv-7866, D.I. 964 at 3-4 (S.D.N.Y. June 26, 2015) (certifying settlement class for Section 11 and 12 claims); *In re Citigroup Inc. Bond Litig.*, 296 F.R.D. 147, 152-53 (S.D.N.Y. 2013) (same). Likewise, courts in other jurisdictions have certified bond classes post-*Morrison*. *See, e.g., NII Holdings*, 311 F.R.D. at 409-14; *Bennett v. Sprint Nextel Corp.*, 298 F.R.D. 498, 506-13 (D. Kan. 2014); *Plumbers & Pipefitters Nat. Pension Fund v. Burns*, 967 F. Supp. 2d 1143, 1147-48 (N.D. Ohio 2013); *In re Washington Mut. Inc. Sec., Derivative, & ERISA Litig.*, No. 08-cv-1919, 2010 WL 4272567, at *1, *13-*14 (W.D. Wash. Oct. 12, 2010). Many of the bonds at issue in these cases traded over the counter and/or on non-U.S. exchanges.

Moreover, Defendants misleadingly contend that the District Court improperly certified the class without direct evidence of market efficiency. But Defendants ignore that the Supreme Court does not require Plaintiffs to proffer direct evidence to invoke the *Basic* presumption of reliance. In any event, the District Court engaged in a thorough analysis of exactly this kind of evidence and found that Plaintiffs did present direct evidence of market efficiency. Defendants' remaining arguments on market efficiency underscore their "absolutist" view of "fundamental" efficiency, which is directly at odds with the Supreme Court's decision in *Halliburton II* at 2398 (2014), requiring only informational efficiency.

The District Court's class certification order should accordingly be affirmed.

## IV. ARGUMENT

### A. The District Court Correctly Certified the Class

#### 1. The District Court Correctly Found That the Class Was Defined by Objective Criteria That Were Administratively Feasible

Stripped to its logical conclusion, Defendants contend that *Absolute Activist* established a complex and unworkable test for what constitutes "domestic transactions in other securities" under *Morrison*, rendering a class premised on such transactions impossible to certify. (Defs' Br., 35-46). To the contrary, *Absolute Activist* expressly espoused objective criteria aimed to determine whether *Morrison*'s "domestic transaction" test is met. The Second Circuit explained that "transactions involving securities that are not traded on a domestic exchange are

16

domestic if irrevocable liability is incurred or title passes within the United States." *Absolute Activist,* 677 F.3d at 67. Irrevocable liability occurs "when the parties to the transaction are committed to one another" and "oblige themselves to perform." *Id*. Other circuit courts have utilized this straightforward test. *See*, *e.g.*, *U.S. v. Georgiou*, 777 F.3d 125, 136 (3d Cir. 2015) ("We agree with [*Absolute Activist* and other several of our sister circuits] that 'commitment' is a ***simple and direct way*** of designating the point at which . . . the parties obligated themselves to perform what they had agreed to perform") (emphasis added); *Quail Cruises Ship Mgmt. Ltd. v. Agencia de Viagens*, 645 F.3d 1307, 1310-11 (11th Cir. 2011) (same); *S.E.C. v. Levine*, 462 F. App'x 717, 719 (9th Cir. 2011) (same).

Objective factors to be considered under *Absolute Activist* include "facts concerning the formation of the contracts, the placement of purchase orders, the passing of title, or the exchange of money." 677 F.3d at 70. Many courts, including circuit courts, have applied these factors to determine whether challenged transactions were domestic in nature. *See*, *e.g.*, *U.S. v. Georgiou*, 777 F.3d at 136; *U.S. v. Mandell*, 752 F.3d 544, 548-49 (2d Cir. 2014); *Loginovskaya v. Batratchenko*, 764 F.3d 266, 274-75 (2d Cir. 2014); *United States v. Vilar*, 729 F.3d 62, 78 (2d Cir. 2013); *In re Satyam Computer Servs. Ltd. Sec. Litig.*, 915 F. Supp. 2d 450, 475 (S.D.N.Y. 2013). Even Defendants have admitted, when it served their litigation strategy, that "[e]ach of them [the 'irrevocable liability' and

17

'transfer of title' criteria] establishes . . . a single location that—although subject to proof—***can be easily determined based on recognized and readily understood standards***." A-4887 (emphasis added); A-6003. In discovery, Defendants have even requested interrogatories and documents from unnamed Class members based on these criteria, readily admitting that discovery is available to "expedite resolution" of *Morrison*-related inquiries. A-6041 (seeking, for example, "any documents relating to the location where you or any intermediary acting on your behalf in making such purchase was located when it agreed with the counterparty to purchase such debt security and where the counterparty was located when it agreed to make such sale").

Courts in this Circuit have little difficulty rejecting *Morrison*-type challenges at the class certification stage, "in light of [*Absolute Activist*'s] ***doctrine that asks exactly where irrevocable liability was incurred***." *See*, *e.g.*, *In re Facebook, Inc., IPO Sec. and Derivative Litig.*, 312 F.R.D. 332, 351 (S.D.N.Y. 2015) (emphasis added) (holding that IPO resulting in a significant percentage of foreign purchases in secondary market did not preclude certification, and plaintiffs have proposed ascertainable classes, "[g]iven that the subclasses may be ascertained with reference to investor records.").

Moreover, in *Absolute Activist*, this Court granted plaintiffs leave to amend a class action complaint to plead the existence of domestic transactions, where the

foreign funds' purchases and sales were not traded on the domestic exchange but were brokered through a U.S. broker-dealer, and the plaintiffs represented that "the underlying transactional documents . . . demonstrate that the transactions occurred in the United States" and where the plaintiffs "claimed to possess trading records, private placement offering memoranda, and other documents indicating that the purchases became irrevocable upon payment and that payment was made . . . in the United States." *Absolute Activist*, 677 F.3d at 62, 68, 71. Thus, *Absolute Activist* strongly suggests that demonstrating domesticity was administratively feasible.

Here, the District Court applied *Absolute Activist* to find that named plaintiffs North Carolina and Hawaii adequately pleaded that irrevocable liability for their bond purchases incurred in the United States and that USS and Union Asset Management Holding AG did not. A-5177-84. Defendants' argument that it took Class Plaintiffs four complaints to plead a domestic transaction (Defs' Br., 38) is a red herring. The first time that Plaintiffs provided *any* transactional details to satisfy *Morrison* was the Fourth Amended Complaint. A-4772-79, ¶¶538-556 (FAC); A-4816-60 (Exs. A-S, attached to FAC). Based on that ***first*** try, the Court was able to determine which documentary evidence of domesticity was sufficient and which was not.

Moreover, the feasibility of establishing domesticity is also demonstrated by the related individual actions. In the overwhelming majority of those cases,

Defendants did not even challenge on *Morrison* grounds the secondary market transactions made by domestic or foreign plaintiffs. As to the minority of transactions that were challenged, when faced with amended pleadings utilizing the objective factors espoused by *Absolute Activist*, such as the name of plaintiffs, the name and location of plaintiffs' investment managers, the counterparty, and the settlement location—which easily demonstrated the transactions' domesticity—Defendants effectively dropped their attacks, conceding that the trading records sufficiently demonstrated domestic transactions at least at the pleading stage.[6]

Defendants further argue, without any factual support, that class members or Defendants do not possess the necessary documentation to establish domestic transactions, but that "[s]uch locative information resides . . . in the bowels of various non-party financial institutions and other securities investors and intermediaries worldwide." (Defs' Br., 39). Logic dictates, however, that to the extent information regarding *domestic* transactions was held by third parties or intermediaries, it would be held by *domestic* third parties and intermediaries, all within reach of subpoena by the District Court. Moreover, there are over fifty market makers/dealers for the Petrobras Notes, both domestic and foreign

---

[6] *See* SA-71-188, ¶¶ 65-96; SA-189-94; SA-1043-90; SA-195-339, ¶¶ 83-115; SA-340-43; SA-344-57; SA-1091-1145; SA-358-524, ¶¶ 361-76, 400-09; SA-525; SA-1146-1216; SA-526-665, ¶¶ 62-97; SA-666; SA-1217-1270; SA-667-832; SA-833-990; SA-1271-1329; *see also* A-5808-5957; A-5958-81; A-6941-59 (listing unchallenged transactions); SA-1330-85.

(including all but one of the Underwriter Defendants), which list their quotations on Bloomberg. The transactions of the domestic market markets/dealers satisfy *Morrison*. *See S.E.C. v. Ficeto*, 839 F. Supp. 2d 1101, 1116 (C.D. Cal. 2011) ("[In] privately negotiated purchases between individually contracting parties… it makes more sense to closely examine the details of the transaction … to determine whether the transaction could reasonably be considered a domestic transaction. *This factual inquiry is unnecessary to determine the territorial application of § 10(b) in the context of the securities sold on the domestic over-the-counter market.*")). Therefore, to the extent that Class members' trading and other records are insufficient to identify domestic transactions, references to the records of the market makers/dealers is another means of identifying Class members with *Morrison*-compliant transactions.

Defendants also argue that the process of determining who is a class member is not administratively feasible (Defs' Br., 8-9, 36-46). That is simply wrong. As is the normal course in securities fraud class actions, a claims process after a judgment is entered will determine if the appropriate criteria of "domestic transactions" has been met. Trading records, for example, will show where and when the transaction was consummated, the price paid for the securities, where the client and broker were located, and the area codes from which purchase confirmations were made. Such process *is* administratively feasible. *See*, *e.g.*,

*Byrd v. Aaron's Inc.*, 784 F.3d 154, 169 (3d Cir. 2015) (finding proposed classes ascertainable because "there are 'objective records' that can 'readily identify' these class members"); *see similarly Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 640 (5th Cir. 2012); *Facebook*, 312 F.R.D. at 353; *Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561, 567 (S.D.N.Y. 2014); *Menkes v. Stolt-Nielsen S.A.*, 270 F.R.D. 80, 93 (D. Conn. 2010); *In re Vivendi Universal, S.A. Sec. Litig.*, 284 F.R.D. 144, 155 (S.D.N.Y. 2012) (establishing claims process).

### 2. *Absolute Activist*'s First Prong Is Also Satisfied Because Beneficial Ownership Is Transferred Through the DTC

Moreover where, as here, all of the relevant transactions settled through the DTC, which is located in New York, a court or claims administrator should have no difficulty concluding that title or its functional equivalent passed in the U.S.[7] DTC, a member of the U.S. Federal Reserve System, has been in operation since 1975 for the purpose of "immobilizing" securities—either holding security certificates on deposit in its vaults or converting them to book-entry-only for electronic safekeeping.[8] The DTC employs an automated book-entry system that electronically transfers ownership of securities from the selling broker's account at

---

[7] As alleged and demonstrated by the Plaintiffs' transaction confirmations and records, the Note purchases of Lead Plaintiff USS and named plaintiffs North Carolina and Hawaii settled at DTC and beneficial ownership transferred to Plaintiffs at the time of settlement of those trades. A-4772-79, ¶¶538-56 (FAC); A-4816-60 (Exs. A-S, attached to FAC).

[8] A-4976, ¶7.

DTC to the buying broker's DTC account when the transaction is settled.[9] Transfer of beneficial ownership in securities at DTC is achieved through the company's Rules & Procedures for clearing and settling trades, which begins when a trade is executed, and is given legal effect through Article 8 of the Uniform Commercial Code ("UCC"), Sections 8-101 *et seq.*[10] When shares are sold that are held in street name, the shares are debited electronically from the beneficial owner's broker's account at DTC in New York and credited to the DTC account of the brokerage firm whose client bought the bonds.[11] DTC finalizes the trades by transferring ownership of the traded asset and the cash to pay for it.[12] Absent settlement through DTC in New York, a transaction is never consummated, and the transfer of beneficial ownership never occurs.

In determining what constitutes a "domestic sale" under *Morrison*, this Court cited the definition of "sale" under Black's Law Dictionary ("Black's") and the UCC. *Absolute Activist*, 677 F.3d at 68. Black's clarifies that beneficial ownership is the functional equivalent of title and that a "sale" occurs at the location where beneficial ownership is transferred. Black's defines "sale" to include not only the transfer of title, but also the ***transfer of property***: a "sale" is

---

[9] A-4901-06; A-4940, 4945-49, 4969; A-4976-78, ¶¶7, 10-12; A-4979-84.

[10] *See Pet Quarters, Inc. v. Depository Trust & Clearing Corp.*, 559 F.3d 772, 776-77 (8th Cir. 2009); *Ellington Long Term Fund, Ltd. v. Goldman Sachs & Co.*, No. 09-cv-9802, 2010 WL 1838730, at *2-*3 (S.D.N.Y. May 4, 2010).

[11] A-4901-06; A-4940, 4945-49, 4969; A-4976-78, ¶¶7, 10-12; A-4979-84.

[12] A-4940, 47.

ordinarily defined as "[t]he transfer of property *or* title for a price." *Id*.; Blacks' Law Dictionary (10th ed. 2014). In turn, Black's defines "property" as a "bundle of rights" that "include[s] the *right to possess and use*, the right to exclude, and *the right to transfer*." *Id*. "Transfer" is defined as "to sell or give." *Id*. "Beneficial ownership" is defined as "[a] corporate shareholder's *power to buy or sell the shares*, though the shareholder is not registered on the corporation's books as the owner." *Id*. Accordingly, a beneficial owner's right to buy or sell falls squarely under the Exchange Act's definition of "sale."

UCC Article 8, which has been adopted in New York,[13] similarly provides that investors may hold securities indirectly by acquisition of a "security entitlement" from a "securities intermediary" such as a clearing company, bank, or broker dealer. USS §§ 8-101(14) and (17), 8-501. A security entitlement is "*a property interest entitling the holder to exercise all of the rights attached to the security.*" *See Pet Quarters*, 559 F.3d at 776; *see also* UCC §§ 8-101(17), 8-501(b), cmt. 1. DTC provides a similar definition for "beneficial ownership" as does Black's. DTC defines a "beneficial owner" as "an investor who has purchased and owns a security, even though the title is held in nominee name (also

---

[13] Petrobras' pertinent Supplemental Prospectuses provide that New York law governs the indenture, the notes, and the guaranties. *See* A-2834; A-2938. New York adopted the relevant provisions of the UCC in substantially the same form as the uniform version of the UCC, which became effective as of October 10, 1997. *See* N.Y.U.C.C. §§ 8–501 to 8–511 (McKinney 1999–2000).

known as street name) for safety and convenience. The beneficial owner receives the dividends or interest the security pays, ***has the right to sell it***, and, in the case of stock, is entitled to vote on certain corporate matters." A-4969 (emphasis added). DTC explains that title is held in street name only "for safety and convenience." *Id*. Indeed, DTC makes clear that the beneficial owner is "always" the "actual" owner of the securities. A-4906.[14]

In light of the unequivocal Second Circuit and UCC precedent, it is little surprise that on remand from this Court, the district court found that settlement via DTC in New York was sufficient to satisfy *Morrison and Absolute Activist. Absolute Activist Master Value Fund, Ltd. v. Ficeto*, No. 09-cv-8862, 2013 WL 1286170, at *18 (S.D.N.Y. Mar. 28, 2013) ("In the securities context, courts look at the place where a trade settled to determine where title is transferred."); *see generally Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*, 651 F.3d 329, 341 (2d Cir. 2011) (providing a series of business dictionaries' definitions of "settlement," including "the completion of a transaction through final transfer of securities and funds between the buyer and the seller") (quotations omitted); *cf. In re Sanofi-Aventis Sec. Litig.*, 293 F.R.D. 449, 457-59 (S.D.N.Y. 2013) (certifying class that excluded non-domestic transactions and finding that one of the plaintiffs

---

[14] *Cf. Estate of Kenneth L. Lay v. Comm'r of Internal Revenue*, No. 15732-09, T.C. Memo 2011- 208 (Aug. 29, 2011) ("The status of legal title to the annuity contracts does not control in determining whether a sale occurred. Beneficial ownership, and not legal title, determines ownership for Federal income tax purposes").

had no claims under *Morrison*, since title passed outside the U.S. as settlement occurred in Europe).[15]

While this Court in *Absolute Activist* was not presented with the issue of whether transfer of beneficial ownership and transfer of title are equivalent for purposes of qualifying as a "purchase or sale" under the Exchange Act, it did face analogous circumstances decades ago and found the two terms interchangeable in determining the place where a "sale" occurred. *See U.S. v. Balanovski*, 236 F.2d 298, 305 (2d Cir. 1956) (holding that the U.S. was deemed the place of "sale" for the goods rather than Argentina, because legal title to the goods **or at least beneficial title ownership** *of the goods* **passed in the United States: "Here, by deliberate act of the parties, title, or at least beneficial ownership, passed to IAPI in the United States."**).

According to the terms of the Supplemental Prospectuses, DTC's book-entry system in New York was the ***only*** means by which beneficial ownership could pass. A-2871; A-3007. The Prospectuses also made clear that delivery of the Notes via DTC and its participants would be "against payment in New York, New York." A-2813; A-2909. Accordingly, having taken advantage of the benefits of

---

[15] *In Sanofi,* it was Petrobras' counsel that urged the court to find that a sale occurred outside the U.S. under *Morrison*'s "bright line" test because confirmation slips showed that instead of settling at DTC, the trades' settlement location was in France. Defendants' Memorandum In Opposition to Class Certification, *Sanofi-Aventis*, 2013 WL 1194489 at *43-*44 (S.D.N.Y. Jan. 29, 2013).

the U.S. financial and regulatory system by registering title to the Petrobras Notes in the DTC, Defendants can hardly complain when they are subject to a lawsuit relating to material misstatements "in connection with the purchase or sale" of those very same securities.

In sum, in transactions settled at DTC, *where legal title never changes hands,* the fact that legal title never transferred in no way detracts from the completeness of the "sale" transaction. Indeed, a contrary result would render nugatory *Absolute Activist*'s first prong in the overwhelming majority of securities transactions occurring in the U.S. markets.

### 3. Defendants' Remaining Arguments Are Equally Meritless

Defendants advance several additional arguments, none justifying denial of class certification. *First*, they argue that they have the right to know the identity of all class members at this early stage in order to determine who will be bound by a judgment and to estimate potential damages. (Defs' Br., 40-43). This is an impermissible demand that the class be fully ***ascertained***, rather than ascertainable, where the latter is all that is required. *See, e.g., Noble v. 93 Univ. Place Corp.*, 224 F.R.D. 330, 338 (S.D.N.Y. 2004); *In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liability Litig.*, 209 F.R.D. 323, 337 (S.D.N.Y. 2002) (same); *see also* Manual for Complex Litigation (Fourth) § 21.222 (2004) (same). Here, the classes certified by the District Court are clearly ascertainable because, at the claims

administration process, claimants will either be able to show, through their trading records or other documentary evidence that they purchased the relevant Petrobras Notes in domestic transactions, or they won't.

Defendants' argument suffers from other legal infirmities. For one, Plaintiffs' burden of proof regarding the number of class members is delineated by Rule 23(a)'s numerosity requirement, which does not require Plaintiffs to show the precise number of class members. *See In re Blech Sec. Litig.*, 187 F.R.D. 97, 103 (S.D.N.Y. 1999).[16] Moreover, it is not necessary for Plaintiffs to identify upfront exactly which potential class members will be able to satisfy all the elements of the class definition, and it is common for courts to certify classes which depend on a later adjudication. *See, e.g., Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1050 (2016) ("Whether [proposed methodology] will be successful in identifying uninjured class members is a question that . . . is premature"); *Union Asset Mgmt. Holding*, 669 F.3d at 640 (certifying settlement class of investors who purchased common stock "directly or beneficially" and "were damaged thereby," as "a quick

---

[16] Rule 23 does not grant Defendants the right to know early in the litigation exactly who comprises the class and will be bound by the judgment. In *Siskind v. Sperry Ret. Program, Unisys*, 47 F.3d 498, 503 (2d Cir. 1995), cited by Defendants, the Second Circuit overturned a judgment in favor of a class of employees, where the district court failed to certify a class under Rule 23. *Id.* Although the Second Circuit stated that Rule 23(c)(1) requires a defendant "be told promptly the number of parties to whom it may ultimately be liable," it is clear from context that the required notice to defendants was whether they would be subjected to a class action, and not the precise identity of the class. *See id.*

look at [the] trading records" is all that is required to determine whether someone did so" and the objectors' "worry about individualized 'mini-trials' is misplaced") (citations omitted); *Schleicher v. Wendt*, 618 F.3d 679, 685 (7th Cir. 2010) (fact that identifying who can recover and who cannot must await a later determination does not militate against class certification); *Facebook,* 312 F.R.D. at 338, 340-53 (certifying two Securities Act classes of investors who purchased in or traceable to Facebook's IPO, and "were damaged thereby"); *see similarly In re Smart Techs., Inc. Shareholder Litig.*, 295 F.R.D. 50, 53, 58-59 (S.D.N.Y. 2013) (certifying class under the Securities Act of persons who purchased common stock "in the United States"); *In re Amaranth Nat. Gas Commodities Litig.*, 269 F.R.D. 366, 381–82 (S.D.N.Y. 2010) (certifying class requiring "identifying whether potential class members had *net* short or long positions" despite need to employ "*some complex math*"). "[T]he possibility that some members of the class may fail to prevail on their individual claims will not defeat class membership" on ascertainability grounds. McLaughlin on Class Actions § 4:2 (12th ed.).

Indeed, as demonstrated above, courts often certify classes defined by class members that were "damaged thereby" as a result of defendants' misconduct. Yet, the determination of whether a putative class member has been, in fact, "damaged" is often a complex factual and legal determination. In securities class actions, whether an investor is "damaged" can depend on whether LIFO, FIFO or "Net-

Net" calculations are employed; whether the investor lost monies on certain transactions but had gains on other transactions, and the legal question as to whether the gains can offset those losses to eviscerate damages. *See*, *e.g.*, *Acticon AG v. China North East Petroleum Holdings Ltd.*, 692 F.3d 34, 39 (2d Cir. 2012) (courts have "utilized their discretion to endorse several different compensatory damage theories"); *Gordon v. Sonar Cap. Mgmt. LLC*, 92 F. Supp. 3d 193, 202 (S.D.N.Y. 2015) ("Prudence suggests that in many instances this difficult decision may best be reserved until the time of trial"); *In re Vivendi Universal, S.A. Sec. Litig.*, 284 F.R.D. 144, 159 (S.D.N.Y. 2012) (same). Despite these weighty issues, courts have not hesitated to certify classes with the definition "and were damaged thereby."

*Second*, citing *Carrera v. Bayer Corp.*, 727 F.3d 300 (3d Cir. 2013), Defendants contend that they have a due-process right to raise individual challenges to claims (Defs' Br., 55), but nothing about the District Court's granting of class certification eviscerates their right. As the Third Circuit has recently explained, "*Carrera* counsels that this due process right relates to the ability to 'challenge the *proof* used to demonstrate class membership' . . . . Here, [Plaintiffs] are not relying solely on unverified affidavits to establish ascertainability," but rather on objective proof such as order confirmations and trading records. *Byrd*, 784 F.3d at 171. *See similarly Mullins v. Direct Digital, LLC*, 795 F.3d 654, 671

(7th Cir. 2015) ("As long as the defendant is given the opportunity to challenge each class member's claim to recovery during the damages phase, the defendant's due process rights are protected").[17]

*Third*, Defendants quibble that the class definition is somehow inappropriate as a "fail safe class." (Defs' Br., 42-43). The class in this case, however, is adequately defined and clearly ascertainable pursuant to *Morrison* and the objective criteria espoused by *Absolute Activist*. The class is limited to purchasers who acquired Petrobras securities on the New York Stock Exchange or pursuant to domestic transactions. That determination can be made by a claim evaluator using transaction and other records that the class member has in its possession and/or Defendants or third parties are required to supply. For example, the records relied on by the District Court to determine whether Class Plaintiffs adequately plead domestic transactions clearly show that several Defendants who were part of the underwriting syndicate were the counterparties to the disputed transactions. These same Defendants are also market makers in the Notes at issue. A-2011, ¶¶241-42. Thus, examination of Defendants' own records would provide, in many instances, sufficient information to determine whether a given transaction in Petrobras Notes was domestic.

---

[17] *McLaughlin v. American Tobacco Co.*, 522 F.3d 215, 231 (2d Cir. 2008) (Defs' Br., 54), is entirely inapposite. There, the plaintiffs sought $800 billion in "fluid recovery," which would have deprived the defendants of the opportunity to challenge individual claims. *Id.* at 233.

Courts routinely certify classes whose membership can be established by reference to objective criteria, as here. *See*, *e.g.*, *Tyson Foods*, 136 S. Ct. at 1043 (certifying class of all current and former employees "who are or were paid under a 'gang time' compensation system in the Kill, Cut or Retrim departments" even in the absence of Tyson's failure to keep records, based on "representative evidence" including employee testimony, video recordings, and a study performed by an industrial relations expert); *see similarly Mullins*, 795 F.3d at 658; *Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 525-26 (6th Cir. 2015); *Byrd*, 784 F.3d at 154, 158-61, 163-72; *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 535-36, 538-41 (6th Cir. 2012); *Kohen v. Pac. Inv. Mgmt. Co.*, 571 F.3d 672, 674-80 (7th Cir. 2009). Other circuits have even certified fail-safe classes. *See*, *e.g.*, *In re Rodriguez*, 695 F.3d 360, 369-70 (5th Cir. 2012).

*Fourth*, the Underwriter Defendants urge this Court to reverse the District Court's holding that the Class is ascertainable based on the supposed "laborious nature of the inquiry," and arguing that Plaintiffs have acknowledged that class members "'are not identifiable at this stage'" and that the discovery necessary to obtain their identities would be "'impracticable and unrealistic.'" (Brief for Underwriter Defendants-Appellants, Dkt. 81, 25 ("UW Br.")). But this argument fails for several reasons. The burden to prove class membership rests on the Plaintiffs. If documents are required, prospective Class Members will have to

produce them. The Underwriters surely cannot complain about Plaintiffs' burden. Additionally, the Underwriter Defendants improperly rely on out of context quotes from Plaintiffs' brief opposing burdensome and untimely discovery of unnamed class members. *Id*. at 25-26. In their brief opposing such discovery, Plaintiffs correctly noted that based on the District Court's earlier ruling on which entities could represent Bond Purchasers, A-5177-84, Class Members who purchased Notes in the United States are not identifiable without production of relevant documents, but that courts do not require putative class members to produce such documents until a later stage in the litigation. A-6048. The District Court agreed. A-6411-12.

The Underwriter Defendants also argue that Class Members who purchased Petrobras Notes in the aftermarket would have to "trace the origins of their securities to domestic offerings" to avoid "'springing section 11 right[s] of action.'" (UW Br., 25). But the only authority they offer is a law review article written by a frequent defendants' expert in securities class-action cases, Joseph A. Grundfest, *Morrison, the Restricted Scope of Securities Act Section 11 Liability, and Prospects for Regulatory Reform*, 41 J. Corp. l. 1, 3 (2015). Importantly, the article does not even discuss class certification. Moreover, Plaintiffs are not aware

of any case or subsequent article that cites the Grundfest article.[18]  Moreover, the Underwriter Defendants' novel view of ascertainability seeks to distort clear Second Circuit precedent on Section 11 liability.  "[A] cause of action exists for any person who purchased a security [such as the Petrobras bonds at issue] that was originally registered under the allegedly defective registration statement—so long as the security was indeed issued under that registration statement and not another." *DeMaria v. Andersen*, 318 F.3d 170, 176 (2d Cir. 2003).  *See also Barnes v. Osofsky*, 373 F.2d 269, 273 (2d Cir. 1967) (Section 11 extends "liability to open-market purchasers of the registered shares").

*Fifth*, after carefully examining Defendants' *Morrison* arguments, the District Court correctly found predominance was satisfied since "plaintiffs' claims rest almost exclusively on class-wide questions of law and fact . . . ."  A-6003-05.  This Court has noted the overlap between the question of ascertainability and predominance, *see In re Initial Public Offering Sec. Litig.*, 471 F.3d 24, 45 (2d Cir. 2006), and Defendants themselves argued that the issue could be framed under either the superiority, ascertainability, or predominance requirements of Rule 23.  A-5791.[19]

---

[18] In a footnote, Grundfest acknowledges that in a case where, unlike here, tracing was required, the court still rejected the argument that the tracing requirement defeats predominance. *Id.* at 56, n. 280.

[19] Defendants argue that Plaintiffs failed to provide an adequate "trial plan" to address how individual issues would be tried (Defs' Br., 55), but there is no such

Finally, Defendants' contention that a class action is not superior to other methods here because several individual actions have been consolidated for discovery and trial was properly considered and rejected by the District Court. A-6000.

### 4. Defendants' Arguments Contravene *Morrison* and *Absolute Activist*

The District Court firmly grasped the practical effect of Defendants' attempt to undercut *Morrison*. It observed that "[a]mending the Class definitions [to exclude off-exchange purchasers, aftermarket purchasers and purchasers from non-U.S. underwriters] *would cut off purchasers who have valid claims under Morrison's second prong*, which holds that the securities laws apply to securities purchased in 'domestic transactions.'" A-6003 (emphasis added). "This would not be a faithful application of *Morrison*." *Id.* By arguing that neither settlement through DTC nor the "meeting of the minds" test can serve as a basis for class certification, Defendants contend that *Morrison* intended that an open market class can *never* be certified under the "domestic transactions" prong. But nothing in *Morrison* or its progeny countenances such a tortured result. Indeed, Defendants' criticism is not properly aimed at the District Court, but rather at the Second Circuit's ruling in *Absolute Activist*, as Defendants contend that the Court's

---

requirement under Rule 23. *See, e.g., Hevesi v. Citigroup, Inc.*, 366 F.3d 70, 83 (2d Cir. 2004); *see also United States v. N.Y. State Bd. of Elections*, 312 F. App'x 353, 355 (2d Cir. 2008).

"meeting of the minds" standard was constructed in such a way as to *never* allow for class certification in the modern securities marketplace.

Taking Defendants' argument to its logical conclusion would ***eliminate*** class action litigation for all after market purchases that are not made on U.S. exchanges—in direct contravention with *Morrison*. In ***any*** offering conducted in the United States by a large corporation, there will be at least some foreign purchasers of the securities. Given that reality, defendants will always argue that there is a need to determine where each member of the proposed class made its purchases. Thus, if Defendants were correct that each such determination requires a mini-hearing, there could ***never*** be a class based on an IPO, or a class of bond purchasers (where the bond did not trade solely on a U.S. exchange). Such a result is wholly unwarranted and would cause egregious harm here, where the majority of the purchases occurred in domestic transactions. For example, according to Bloomberg, 15 of the largest 21 holders of Petrobras Note 71645WAN during the Class Period were located in the United States. Bloomberg Finance L.P. Historical Security Ownership for CUSIP: 71645WAN as of Q4 2010 (Retrieved Aug. 18, 2016 from Bloomberg database); Bloomberg Finance L.P. Historical Security Ownership for CUSIP: 71645WAN as of Q4 2014 (Retrieved Aug. 18, 2016 from Bloomberg database). And deposition testimony from individual plaintiffs with some of the largest losses further demonstrates that their secondary market

36

transactions were domestic.  CSA-9-12, 198:2-200:8, 202:10-21, 229:7-25; CSA-13-15, 219:15-23, 286:12-288:4.

Defendants also complain that Petrobras should not be subjected to liability in the United States because the fraud "originated in Brazil," but the Second Circuit has already rejected this same argument in *Absolute Activist*.  677 F.3d at 69 ("Ewing's lack of contact with the United States may provide a basis for dismissing the case against him for lack of personal jurisdiction . . . but the transactional test announced in *Morrison* does not require that each defendant alleged to be involved in the fraudulent scheme engage in conduct in the United States").[20]  And here, Defendants committed fraud *in* the United States by, among other misdeeds, engaging in a bribery scheme involving a large refinery in Pasadena, Texas, and by raising billions of dollars from sales on exchanges and other domestic transactions based on repeatedly false and misleading SEC filings.[21]

## B.  Plaintiffs Amply Satisfied Their Burden Under *Basic*

### 1.  The Supreme Court Has Rejected a Heightened Requirement of So-Called "Fundamental" Efficiency

In a securities-fraud case, requiring proof of reliance usually precludes class certification because it raises individual questions as to whether each member of the class relied on the alleged misrepresentation.  To resolve the difficulties of

---

[20] *See also Seijas I*, 606 F.3d 53 (affirming grant of class certification against the Republic of Argentina).

[21] A-4604-05, ¶22, A-4627-30, ¶¶97-106.

proving direct reliance in the context of modern securities markets, where impersonal trading rather than a face-to-face transaction is the norm, the Supreme Court held in *Basic* that a prospective class of plaintiffs could invoke a rebuttable presumption of reliance by resorting to the "fraud on the market theory," which provides that "[a]n investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price." 108 S. Ct. at 992. The Supreme Court explained that modern securities markets differ significantly "from the face-to-face transactions contemplated by early fraud cases," and flexibility becomes necessary if the law is to fulfill the fundamental purposes of the securities laws. *Id.* at 990. As Congress observed, "[t]he idea of a free and open public market is built upon the theory that competing judgments of buyers and sellers as to the fair price of a security brings [sic] about a situation where the market price reflects as nearly as possible a just price." *Id*. at 991 (quoting H.R. Rep. No. 1383, at 11). In addition to providing a mechanism to effectuate the federal securities laws, the *Basic* presumption "is also supported by common sense and probability." *Id*. at 991. The presumption is founded on the "efficient capital markets hypothesis," which assumes that "the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentation." *Id*.

38

The continuing viability of this hypothesis—after twenty-five years of economic development—was recently a threshold issue in *Halliburton II*. Reaffirming *Basic*'s "***modest premise***," the Supreme Court squarely declined defendants' invitation to overrule or modify the *Basic* presumption. *Halliburton II*, 134 S. Ct. at 2410. The Court ***rejected*** Halliburton's argument that the *Basic* presumption is no longer tenable in light of "[empirical] studies purporting to show that 'public information ***is often not incorporated immediately (much less rationally) into market prices*****.**'" *Id*. at 2409; *see also* Brief for Petitioners, *Halliburton II,* No. 13-317, 2013 WL 6907610 (U.S.) *16-*17 (Dec. 30, 2013).[22] The Court made clear that *Basic* requires only a showing that information is incorporated into the price of securities:

> *To recognize the presumption of reliance, the Court explained, was not "conclusively to adopt any particular theory of how quickly and completely publicly available information is reflected in market price*." . . . The Court instead ***based the presumption on the fairly modest premise that "market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices***." . . .

> The academic debates discussed by Halliburton have not refuted the ***modest premise*** underlying the presumption of reliance. Even the foremost critics of the efficient-capital-markets hypothesis acknowledge that public information generally affects stock prices . . . Debates about the precise *degree* to which stock prices accurately reflect public information are thus largely beside the

---

[22] For example, among other things, Defendants claimed that the market for Halliburton securities was not efficient because the securities reacted to "stale" information, an argument the Supreme Court rejected. *Id*. at 2409 (citing Brief for Petitioners at 16-20).

point. "***That the ... price of a stock may be inaccurate does not detract from the fact that false statements affect it, and cause loss," which is "all that Basic requires***."

*Halliburton II*, 134 S. Ct. at 2410 (emphasis added). In a concurring opinion, Justice Ginsburg, accompanied by Justices Breyer and Sotomayor, joined the Court acknowledging that establishing this "modest premise" "should impose no heavy toll on securities-fraud plaintiffs with tenable claims." *Id*. at 2417. Justice Thomas, with whom Justices Scalia and Alito joined, in a concurring judgment, observed that "*Basic*'s presumption that investors rely on the integrity of the market price is virtually irrebuttable in practice[]." *Id*. at 2420.

But the Court did not stop at the wholesale rejection of fundamental efficiency. It refused to require a plaintiff to demonstrate "price impact"—that a defendant's misrepresentation actually affected the stock price—at the class certification stage. *Id*. at 2413. Instead, the Court held that the presumption can be met through a plaintiff's demonstration that the market for that security was "generally efficient:" "[I]f a plaintiff shows that the defendant's misrepresentation was public and material and that the stock traded in a *generally efficient* market, he is entitled to a presumption that the misrepresentation affected the stock price." *Id*. at 2414. Halliburton's proposal that "since the *Basic* presumption hinges on price impact, plaintiffs should be required to prove it directly in order to invoke the

40

presumption," the Court said, "would radically alter the required showing for the reliance element of the Rule 10b-5 cause of action." *Id.*[23]

The Court, however, permitted defendants to defeat the presumption at the class certification stage by "show[ing] that the alleged misrepresentation did not, for whatever reason, actually affect the market price, or that a plaintiff would have bought or sold the stock even had he been aware that the stock's price was tainted by fraud." *Id.* at 2408 (citing *Basic*, 108 S.Ct. at 992). Here, Defendants do not come remotely close to meeting their burden.

### 2. The District Court Scrupulously Adhered to *Halliburton II*

Defendants claim that the District Court "improperly concluded that plaintiffs could satisfy *Basic* without direct evidence demonstrating market efficiency" (Defs' Br., 17), but this is precisely what *Halliburton II* permits, cautioning lower courts that share prices in an efficient market can nevertheless be "inaccurate" or "irrational." 134 S. Ct. at 2414-16. "Requiring a plaintiff to submit proof of market reactions—and to do so with an event study—ignores Supreme Court precedent as well as practical considerations." *Barclays,* 310 F.R.D. at 84. "Event studies test for a degree of efficiency that may not be required." *Id*. "*Halliburton II* makes clear that no specific degree of efficiency is

---

[23] *See also Local 703, I.B. of T. Grocery & Food Employees Welfare Fund v. Regions Fin. Corp.*, 762 F.3d 1248, 1255-56 (11th Cir 2014) (refusing to impose an empirical evidentiary requirement to trigger the *Basic* presumption, as "run[ning] contrary to the market principles that motivated the decision in *Basic*").

mandated to invoke the *Basic* presumption." *Id.* Indeed, event studies are often an inappropriate test for determining market efficiency for one particular company. *Id.* at 85.

Lower courts have enumerated several factors that are frequently used to determine whether a market is efficient.[24] "The vast majority of courts have used [these factors] as 'an analytical tool rather than as a checklist.'" *Barclays*, 310 F.R.D. at 83. These courts have "not required their use or held that any one of them is dispositive." *Id.*[25] This Court endorsed, but did not require the use of the *Cammer* factors in *Teamsters Local 445 Fright DivPension Fund v. Bombardier*, 546 F.3d 196, 204 n.11 (2d Cir. 2008).

Petrobras amply satisfied each of these factors during the Class Period. Petrobras' securities traded with heavy volume; the Company was followed by over 50 analysts and widely reported in the press with over 20,000 articles; there were hundreds of active market makers for its ADRs, and at least twenty prominent underwriters for its bonds; Petrobras was eligible to file a Form F-3; its ADRs market capitalization was larger than at least 90% of all other publicly-

---

[24] *See Cammer*, 711 F. Supp. at 1283–87 (D.N.J. 1989); *Krogman*, 202 F.R.D. at 478 (N.D. Tex. 2001).

[25] *See also In re DVI*, Inc. Sec. Litig., 639 F.3d 623, 634 n.16 (3d Cir. 2011), *abrogated on other grounds by Amgen Inc. v. Connecticut Ret. Plans & Trust Funds,* 133 S. Ct. 1184, 1991 (2013) ("the *Cammer* factors may be instructive depending on the circumstances"); *Unger v. Amedisys Inc.*, 401 F.3d 316, 323 (5th Cir. 2005) (same); *Regions*, 762 F.3d at 1257 (same); *In re PolyMedica Corp. Sec. Litig.*, 432 F.3d 1, 18 (1st Cir. 2005) (same). *See also* A-3826-27.

traded companies in the United States, and it had an aggregate par value of bonds totaling $41.4 billion; Petrobras' bid-ask spreads were razor-thin; and the public float portion of its ADRs far exceeded the F-3 registration level requirement. A-1966-76, ¶¶59-101; A-1994-2001, ¶¶165-198, A-2006-18, ¶¶222-64; *see also* A-6006-13.[26]

Moreover, during the Class Period, Petrobras' ADRs traded on the New York Stock Exchange ("NYSE"), a strong indicator of market efficiency. *See*, *e.g.*, *Regions*, 762 F.3d at 1257; *In re Merck & Co., Inc. Sec. Derivative & ERISA Litig.*, No. Civ.A. 05-1151, 2013 WL 396117, at *11 (D.N.J. Jan. 30, 2013). Indeed, if a company as large and as well-covered by analysts as Petrobras does not trade on an efficient market, it is difficult to conceive of a company that does.

Yet, Dr. Gompers completely ignored these factors. A-4076-78, ¶¶18-24. No court decision supports his myopic approach. *Id*.

While not required by *Halliburton II* to conduct an empirical study, in an abundance of caution, Plaintiffs did so here. *See supra* at 8-11 (describing Dr. Feinstein's employment of the Z-test to find direct evidence of market efficiency). Dr. Gompers' claims that the Z-test is "novel" and "flawed" do not withstand

---

[26] Even before *Halliburton II*, circuit courts consistently embraced this type of evidence as compelling indicia of market efficiency. *See*, *e.g.*, *Bombardier*, 546 F.3d at 205; *Regions*, 762 F.3d at 1254-56; *In re DVI*, 639 F.3d at 634 n.16; *Miller v. Thane Int'l, Inc.*, 615 F.3d 1095, 1102 (9th Cir. 2010); *In re Xcelera.com Sec. Litig.*, 430 F.3d 503 (1st Cir. 2005); *Unger*, 401 F.3d 316; *PolyMedica Corp.*, 432 F.3d at 18; *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 368 (4th Cir. 2004).

scrutiny.[27] The Z-test is a statistical methodology employed across a broad array of disciplines, including scientific studies, medical research, and FDA clinical trials. *See*, *e.g.*, *Comparison of Proportions or Odds*, F. Ramsey, D. Schafer, The Statistical Sleuth: A Course in Methods of Data Analysis, 3E, Ch. 18 (2013); *Reference Manual on Scientific Evidence*, Fed. Judicial Ctr. & Nat'l Research Council of the Nat'l Acads. eds., at 566-67, 3d ed. (2011). The use of the Z-test to determine market efficiency has been endorsed by academic journals and law review articles. *See*, *e.g.*, T. P. McWilliams, V. B. McWilliams, *Another Look at Theoretical and Empirical Issues in Event Study Methodology*, The Journal of Applied Business Research, Vol. 16. No. 3, at 3 (2000); P. A. Ferrillo, F. C. Dunbar, D. Tabak, *The 'Less Than' Efficient Capital Markets Hypothesis: Requiring More Proof from Plaintiffs in Fraud-on-the-Market Cases*, 78 St. John's L. Rev. 81, 119-22 (2004); M. L. Hartzmark, H. N. Seyhun, *The Curious Incident of the Dog That Didn't Bark and Establishing Cause-and-Effect in Class Action Securities Litigation*, Va. L. & Bus. Rev. 6 (2011).

---

[27] Dr. Feinstein explained that his use of the Z-test was particularly appropriate in this case, given the large market coverage of Petrobras (with over 20,000 article published about the Company during the Class Period), hundreds of 6-K filings, and extensive analyst coverage. A-4083-84, ¶42; A-5207-09, 13:10-15:3; A-3256-58, 149:16-151:16; A-3260-61, 153:23-154:15; A-3295-96, 188:23-189:22; ;*see also* A-4082-85, ¶¶36-47 (explaining that the Z-test is a strong and sufficient measure of informational efficiency).

Significantly, in an amicus brief submitted to the Supreme Court in *Halliburton II,* more than 18 months before Dr. *Feinstein was retained as an exper*t in this case, eight economists, including Dr. Feinstein, endorsed the Z-test as one of two possible empirical, event study tests to be employed as direct indicators of market efficiency. *See* Brief of Testifying Economists as Amici Curiae in Support of Respondent, *Halliburton Co. v. Erica P. John Fund, Inc.*, No. 13-317, 2014 WL 5071964 (U.S.), *9-*11 (Feb. 5, 2014).

In light of the near universal acceptance of the Z-test in scientific and academic literature, courts around the country have relied upon it in certifying securities class actions. *See*, *e.g.*, *Goldman Sachs* 2015 WL 5613150, at *4-*7; *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 433 (S.D.N.Y. 2014); *In re Alstom S.A. Sec. Litig.*, 253 F.R.D. 266, 280 (S.D.N.Y. 2008); *Forsta AP-Fonden and Danske Invest Mgmt A/S v. St Jude Med., Inc.*, 312 F.R.D. 511, 519-22 (D. Minn. 2015); *NII Holdings,* 311 F.R.D. at 411-12; *Smilovits*, 295 F.R.D. at 434 (D. Ariz. 2013); *Lumen v. Anderson*, 280 F.R.D. 451, 461 (W.D. Mo. 2012); *Lehocky v. Tidel Techs., Inc.*, 220 F.R.D. 491, 507-08 (S.D. Tex. 2004); *cf. In re Polymedica Corp. Sec. Litig.*, 453 F. Supp. 2d 260, 270 (D. Mass. 2006) (faulting plaintiffs' expert for using a weaker test rather than a statistical one akin to the proportionality test).

Indeed, when suitable to his client's needs, *Dr. Gompers himself* has employed the type of comparative analysis advanced by Plaintiffs as an indirect test of whether a company's stock price responded to news. A-3638-39, ¶30; *Lumen*, 280 F.R.D. at 460-62.[28]   Accordingly, there is no merit in Defendants' argument that a comparative event study is not an appropriate test for *Cammer* factor five.  *See also* A-4084-85, ¶¶43-47.[29]

Defendants' contention that courts only used the proportionality test to support a finding of *in*efficiency (Defs. Br., 26 n.7) is plainly wrong.  *See Lehocky*, 220 F.R.D. at 506-08 (noting that "plaintiffs have adequately demonstrated that Tidel stock price may have been affected by company-specific news during the class period," where plaintiffs' expert "concluded that the price changes on information days versus non-information days was statistically significant"); *Polymedica*, 453 F. Supp. at 270 (criticizing plaintiffs' expert for failing to use a

---

[28] The authors and main advocates for the application of the FDT Test to market efficiency are Fred Dunbar, a former Senior Vice President at NERA Economic Consulting and David Tabak, also from NERA.  They have been regularly retained as experts by *defendants* in securities class action litigation. *See*, *e.g.*, http://www.nera.com/experts/dr-david-tabak.html#tab-3; http://www.prnewswire.com/news-releases/fred-dunbar-senior-nera-economist-provides-trial-expertise-on-behalf-of-beleaguered-manufacturers-facing-plaintiff-class-actions-71209822.html.

[29] With respect to the Petrobras Bonds, Dr. Feinstein performed an additional empirical test, yielding additional compelling evidence of market efficiency. A-2024-26, ¶¶287-91.   All of the relevant fixed rate bonds demonstrated a statistically significant relationship with benchmark interest rates, indicating reaction of these notes to new information. *Id.*

valid statistical test akin to the Z-test because "[t]o approach usefulness, an analysis should statistically compare all news days with all non-news days"). Moreover, Defendants' characterization of the Z-test as a "threshold" test (Defs' Br., 11, 26 n. 7) is plucked out of context. The authors explained that, while the test indicated whether the stock responded to new information, it "does not answer the question of whether the response is of the *correct magnitude*." Accordingly, the authors continued, the Z-test and 'most other tests" don't measure "the *fundamental* value of the underlying company." 78 St John L. Rev. at 122. Given that the Supreme Court has rejected the "fundamental value" approach for market efficiency, this "threshold" is sufficient.

Still, Defendants insist that an appropriate event study provide perfect or nearly perfect *ex ante* prediction of the magnitude, direction, and correctness of stock-price reactions to new information. Indeed, at his deposition, Dr. Gompers freely admitted that he was applying the legally-rejected notion of *fundamental* efficiency when criticizing Dr. Feinstein's Report. A-3958, 19:23-20:3; *see also* A-4070, ¶11 (explaining that conformity of the security price to a particular model, and the correctness of price movements with respect to a particular model, are properties of fundamental efficiency); A-4078-80, ¶¶25-31 (explaining the distinction between informational and fundamental efficiency).

Defendants' fundamentalist view undergirds their insistence that directionality (*i.e.*, whether the reactions to Petrobras' earnings announcements were in the correct direction) be part of a market efficiency analysis. Neither *Basic* nor *Halliburton II*, however, ever references the word "direction" when describing market efficiency. While the Halliburton defendants urged the Supreme Court to adopt a "rationality" approach to market efficiency,[30] *Halliburton II* specifically rejected such a requirement. *Halliburton II*, 134 S. Ct. at 2409-2410. Defendants' insistence that a plaintiff *ex ante* predict precisely *which types* of news will cause a statistically significant price reaction in *which directions* contemplates a nearly impossible task. Yet, *Halliburton* merely requires sufficient evidence to establish a "modest premise," not prophecy. *Id.* at 2410. Indeed, a recent study conducted by NERA shows that, on average, for the "median company" in the S&P 500 Index, only 37.5% of earnings surprises result in statistically significant returns in the "same direction as the earnings news."[31] This is in contrast to a much higher average of statistically significant returns regardless of direction (54.2%).

Nevertheless, despite there being no legal requirement to do so (*Halliburton II*, 134 S. Ct. at 2409-10), in response to Dr. Gompers' criticism, Dr. Feinstein performed a directionality test and found overwhelming evidence of market

---

[30] *See* Brief for Petitioners/Defendants, *Halliburton II*, No. 13-317, 2013 WL 6907610 at *16-*18 (2013).

[31] *See http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2824565*, at 11-12.

efficiency. *See supra* at 10-11. While Defendants questioned whether *two* event dates were ***correctly categorized as positive/negative/or neutral***, they never argued or proved that the prices rose by statistically significant amounts in response to negative news, or that the security prices declined by statistically significant amounts in response to positive news. *See* A-5011-12, ¶¶50, 52; *see also* A-5231, 37:14-25 ("I observed that ***[Gompers] gave <u>zero</u> examples of the security price moving statistically significantly in the wrong direction."*** (emphases added)). Their argument is essentially a subjective disagreement with Plaintiffs' expert and the market place over how certain earnings news should have been interpreted on those two dates. A-5242-44, 48:25-50:5; A-5116, 604:6-607:22.

Moreover, even if Dr. Feinstein were to characterize the news on those few days as mixed instead of positive, the ADR price reaction would still have been consistent with that tenure. A-5243-44, 49:18-50:5. And even if the District Court were to find that the price movement on those two days was inconsistent with the news, removing them from the analysis would not impact the results of Dr. Feinstein's study, which showed that it was far more likely for the price of Petrobras securities to move significantly on news days than on non-news days, indicating a cause-and-effect relationship between information and price movements. A-6012-26.

The District Court thoroughly examined this evidence. A-6012-26; A-5237-44, 43:14-50:5; A-5271-74, 77:2-80:4. The court explained that, consistent with *Halliburton II*, "[w]hat is essential is evidence that, when the market received new information, it 'generally affect[ed]' the price." A-6023 (internal citations omitted). The court observed that "Defendants' own arguments that Feinstein's tenor assessments were subjective demonstrate the wisdom of the Supreme Court's position," as "[a]ny assessment of the tenor of analyst coverage and the expected impact of an event on the market will be subjective." A-6023. "Indeed, *the analyst reports* released on May 15, 2011, and May 16, 2011, *varied in their assessments* of the same earnings event." *Id.* (emphasis added).

Defendants' remaining criticism—each of which should be considered in the context of the utterly implausible notion that Petrobras' securities remained unaffected by the disclosure of the massive fraud—similarly misses the mark. *First*, with respect to stocks in the S&P 500, "it is rarely the case that all or nearly all of the earnings announcements are associated with statistically significant returns . . . [O]nly 2.2% of the S&P 500 companies have more than 80% of their earnings announcements associated with statistically significant returns."[32] Indeed, for the median S&P 500 company, "only 54.2% of its earnings announcements were associated with statistically significant returns . . . Thus, the argument that

---

[32] *See http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2824565*, at 9.

even a majority of news announcement should be associated with statistically significant returns would not hold for approximately half of the members of the S&P 500." *Id*.

*Second*, Defendants claim that in an efficient market, there are "statistically significant residual returns on the vast majority of dates on which new material value-relevant information is released." (Defs' Br., 30). But whether or not an event exhibits a statistically significant price reaction depends on a number of factors, *only one* of which is the efficiency of the market. A-4081-82, ¶¶33-35. There is simply no requirement that an expert wade through these factors in order to accurately predict in which direction a stock would move. Dr. Feinstein is a financial economist, not a day trader.

An example illustrates this point. Assume that pursuant to Dr. Gompers' advice, Dr. Feinstein selected positive "earnings surprise" dates, defined as earnings reports that beat analyst estimates by more than 20%, as his *ex-ante* criteria for testing *Cammer five*. Assume further that there were only four dates that met this definition during the Class Period. On two of those dates, however, negative news was released regarding Petrobras' future oil production. As a result, on those two days, Petrobras' stock declined, while on the other two there was a positive statistically significant price reaction. Defendants' would point to both (1) the fact that only on half of the selected dates there was a positive stock price

reaction and (2) the fact that on two of those days the stock price moved in the *opposite* predicted direction as **evidence of inefficiency**, while common sense dictates that is hardly the case.

*Third*, Dr. Gompers' Z-test on the sample of 85 corrective disclosures identified in the Complaint is misleading and baseless. A-4090-91, ¶¶63-65. Dr. Gompers' choice of events fails his own *ex ante* requirement because the events were selected by Lead Counsel, evidencing unraveling of the corruption scheme. *Id*. Not every news date (whether allegation-related or not) constitutes an appropriate event date for testing market efficiency. *Id*. Given how the information correcting the alleged fraud in this case *trickled out over a series of 85 dates* (or more), this screening choice is improper and unlikely to indicate market efficiency even for an efficient market. *Id*.[33] Nonetheless, Dr. Gompers ignores the fact that at least seven of the ten most negative price movements during the Class Period for the Petrobras common and preferred ADRs are among the 85 dates he focused on. *Id*. An examination of those days provides compelling proof of market efficiency for the Petrobras Securities, as well as the "directionality" Defendants claim is lacking from Dr. Feinstein's report. *Id*.

---

[33] The fraud at Petrobras did not have 85 separate components. Information about certain aspects of the fraud, *e.g.*, bribery at a specific refinery or with respect to a specific contract, trickled out over several disclosure dates. For example, information disclosing bribery at SBM trickled out over several dates. A-3732-48; A-5084, 478:3-479:19.

*Fourth*, Dr. Gompers faults Dr. Feinstein for failing to conduct a Z-test on the Petrobras Bonds separately for the earnings event dates (Defs' Br., 33), but Dr. Feinstein explained that because of the bonds' unique characteristics, such a test would not have been a good candidate for a market efficiency study. A-2018-19, ¶¶265-67.

*Fifth*, Dr. Feinstein explained that the fact that on a couple of days, a few similar bonds moved in different directions is not inconsistent with market efficiency, especially in view of the number of bonds at issue and length of the Class Period. A-5225-26, 31:18-32-6; A-5136-37, 686:20-689:21.

*Sixth*, Dr. Gompers' argument that on a few occasions the Petrobras securities reacted to U.S. news that was previously disclosed in Brazil (Defs' Br., 33) stems from his fundamentalist view of market efficiency, which *Halliburton II* squarely rejected. *See Halliburton II*, 134 S. Ct. at 2409-2411; *see also* A-3344-46, 237:19-239:5. In any event, Dr. Feinstein tested the Brazilian earnings announcement dates in response to Dr. Gompers' criticism. A-4089-90, ¶¶59-62. The results of these tests are even more indicative of market efficiency. A-4090, ¶61. Following the 23 Brazilian earnings announcement events, the common and preferred ADRs exhibited statistically significant price reactions 7 times, proving with a high degree of statistical certainty that there was a cause and effect

relationship between information and movements in the prices of Petrobras' securities. *Id*.

### C. Defendants Failed to Show the Absence of Price Impact

Defendants had the opportunity "to rebut the presumption by ***showing***, among other things, that the particular misrepresentation[s] at issue did not affect [Petrobras'] market price." *Halliburton II*, 134 S. Ct. at 2414, 2416 (emphasis added). Such a showing must be satisfied with "more salient" evidence than that proffered by Plaintiffs in order to rebut *Basic*'s presumption of reliance. *Id*. at 2416. While given this opportunity, Defendants opted not to perform their own event study to demonstrate lack of price impact. Indeed, in light of the overwhelming evidence of market efficiency, Dr. Gompers did not even affirmatively suggest that Petrobras' securities were not efficient, preferring instead to stay on the sidelines and simply criticize the sufficiency of Dr. Feinstein's report. Such a tepid approach hardly makes the "showing" with "more salient" evidence required to "sever[] the link between the alleged misrepresentation and . . . the price received (or paid) by the plaintiff . . ." *Id*. at 2415 (citations omitted).

Acknowledging the paucity of evidence showing lack of price impact, Defendants instead claim that under Federal Rule of Evidence 301, they have a minimal burden of production to rebut the *Basic* presumption with "any showing"

(Defs' Br., 34) of the ilk discussed above (*i.e.*, different categorization of news on a couple of days and a few stock reactions to so-called "stale" news).  But neither Rule 301 nor Supreme Court precedent supports that assertion.  By its own terms ("unless a federal statute or these rules provide otherwise"), Rule 301 is inapplicable, as here, when the court is effectuating congressional intent.  *See* C. Mueller & L. Kirkpatrick, 1 Federal Evidence §3:8 at 441 (4th ed).  The fraud-on-the-market presumption is "a substantive doctrine of federal securities-fraud law," not established under Rule 301.  *See Amgen*, 133 S. Ct. at 1193; *U.S. Dep't of Justice v. Landano*, 508 U.S. 165, 174 (1993).

*Basic*'s reference to the Advisory Committee Note to Rule 301 was intended to validate the use of evidentiary presumptions with a substantial burden of rebuttal—not to embrace a lower burden of production.  Justice Blackmun referred to a version of Rule 301 that was not adopted, a version that shifted the burden of *persuasion* to the party against whom it operated to disprove the presumed fact.  *See* 1 Stephen A. Saltzburg, Michael M. Martin, & Daniel J. Capra, Federal Rule of Evidence Manual § 301.04, at 301-31 (11th ed. 2015) (reproducing the Note).  Defendants' argument is also contrary to *Halliburton II*.  There, the Court did not mention Rule 301, despite the fact that defendants raised the same burden argument advanced here. *See* Brief for Petitioners, *Halliburton II*, 2013 WL 6907610, at *55-*56 (U.S. 2013).  By omitting any reference to Rule 301, the

Court implicitly rejected defendants' argument. *See, e.g., Camps Newfound/Owatonna v. Town of Harrison*, 520 U.S. 564, 606 (1997) (citations omitted).

    *Halliburton II* makes clear that it is incumbent upon Defendants' to **prove** the ***absence of price impact***. *Halliburton II*, 134 S. Ct. at 2405, 2414, 2417. Under Defendants' logic, if they meet their burden of production by "any evidence," the presumption immediately evaporates, placing the onus on Plaintiffs to show ***both*** price impact and reliance. But "[b]y requiring plaintiffs to carry the burden of persuasion to show price impact at the class certification stage, this Court would, in effect, be requiring the Fund to prove price impact directly, a proposition the Supreme Court refused to adopt." *Erica P. John Fund, Inc. v. Halliburton Co.*, 309 F.R.D. 251, 259 (N.D. Tex. 2015); *see also Halliburton II*, 134 S. Ct. at 2414 (requiring proof of price impact "would radically alter the required showing for []reliance"). And, by requiring plaintiffs to carry the burden of persuasion to show that investors relied upon the integrity of the stock price without the benefit of the *Basic* presumption, individual issues would necessarily predominate and a securities fraud case could never be certified. This unfair result is precisely what *Basic* intended to avoid.

    Indeed, in the nearly thirty years since *Basic*, *no* court has held that the presumption can be rebutted by presenting just *any* evidence of lack of price

impact. Significantly, jury instructions in both the Ninth and Fifth Circuits require that Defendants prove lack of price impact by a preponderance of evidence. *See* Pattern Jury Instructions §7.1, at 75 (5th Cir. 2014); Ninth Circuit Manual of Jury Instructions: Civil §18.5, at 422 (2007). Similarly, this Circuit, among others, held that defendants bore the burden of persuasion to show proof of lack of price impact. *See In re Salomon Analyst Metromedia Litig.*, 544 F.3d 474, 483 (2d Cir. 2008), *abrogated on other grounds by Amgen*, 133 S. Ct. at 1203-04 ("burden of showing that there was no price impact is properly placed on defendants . . . *Basic* made clear that *defendants* could "rebut proof of the elements giving rise to the presumption, or show that the misrepresentation in fact did not lead to a distortion of price"); *In re DVI,* 639 F.3d at 638, *abrogated on other grounds by Amgen*, 133 S. Ct. at 1991 (same); *Abell v. Potomac Ins. Co.*, 858 F.2d 1104, 1120 (5th Cir. 1988), *vacated in part on other grounds sub nom.*, *Fryar v. Abell*, 492 U.S. 914 (1989) (same).

In *Affiliated Ute*, the Supreme Court established a presumption of reliance in Rule 10b-5 cases involving primarily material omissions. *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128, 153-54 (1972). Rebutting that presumption requires defendants to prove by a preponderance of the evidence that plaintiff's transaction decision would not have been affected had the omission been disclosed. *See DuPont v. Brady*, 828 F.2d 75, 78 (2d Cir. 1987) (citing cases). Defendants'

burden to rebut the presumption should be no different here.   The two presumptions derive from the Exchange Act, fulfill the same function, and are often analyzed together. *See*, *e.g.*, *Stoneridge Investment Partners, LLC v. Scientific Atlanta, Inc.*, 552 U.S. 148 (2008); *Basic*, 485 U.S. at 234, 243, 245.

Likewise, courts considering the issue since *Halliburton II* have held that defendants bear the burden of production and persuasion to *prove* a lack of price impact at the class certification stage to rebut the presumption of reliance.  *See, e.g., Strougo v. Barclays PLC*, 312 F.R.D. 307, 324 n. 110 (S.D.N.Y. Feb 2, 2016) (collecting cases).

Permitting Defendants to easily rebut the presumption all but ensures that a class will rarely be certified, for any time a plaintiff proves market efficiency a defendant can present some flimsy evidence in response.   Such a draconian outcome would turn the presumption on its head.  Indeed, during oral argument in *Halliburton I*, Defendants' counsel contended that they could satisfy their burden of production merely by having an expert opine that price impact was absent.  *See* Transcript of Oral Argument at *39-*40, *Erica P. John Fund, Inc., v. Halliburton Co.*, No. 09-1403,  2011 WL 1541295, *39-*40 (U.S.) (2011).  That prompted Justice Kagan to respond, "Well, that does suggest that the [*Basic*] presumption isn't worth much in your world." *Id*. at 40.  The *Basic* presumption is grounded in strong public policy, facilitating Congress' intent in enacting the

federal securities laws by enabling a purchaser to rely on the expectation that the securities markets are free from fraud. According the presumption too "slight and evanescent" an effect flies in the face of Supreme Court precedent and public policy.

## V.    CONCLUSION

The District Court's class certification order should be affirmed.

DATED:  August 25, 2016

**POMERANTZ LLP**

*/s/ Jeremy A. Lieberman*
Marc I. Gross
Jeremy A. Lieberman
Emma Gilmore
John Kehoe
Brenda Szydlo
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone: 212-661-1100
Facsimile:  212-661-8665

*Attorneys for Lead Plaintiff and*
*Named Plaintiff North Carolina*
*Department of State Treasurer*

**LABATON SUCHAROW LLP**
Thomas A. Dubbs
Louis Gottlieb
140 Broadway
New York, NY 10005
Telephone: 212-907-0700
Facsimile: 212-818-0477

*Attorneys for Employees' Retirement*
*System of the State of Hawaii*

59

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, the foregoing brief is in <u>14-Point Times New Roman</u> proportional font and contains 13,980 words and thus is in compliance with the type-volume limitation set forth in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure.

DATED:  August 25, 2016                    **POMERANTZ LLP**

*/s/ Jeremy A. Lieberman*
Marc I. Gross
Jeremy A. Lieberman
Emma Gilmore
John Kehoe
Brenda Szydlo
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone: 212-661-1100
Facsimile:  212-661-8665

*Attorneys for Lead Plaintiff and Named Plaintiff North Carolina Department of State Treasurer*

**LABATON SUCHAROW LLP**
Thomas A. Dubbs
Louis Gottlieb
140 Broadway
New York, NY 10005
Telephone: 212-907-0700
Facsimile: 212-818-0477

*Attorneys for Employees' Retirement System of the State of Hawaii*